# Exhibit A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

|  |  |
|---|---|
| JANE DOE, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> MINDGEEK USA INCORPORATED, MINDGEEK S.A.R.L., MG FREESITES, LTD, D/B/A PORNHUB, MG FREESITES II, LTD, MG CONTENT RT LIMITED, and 9219-1568 QUEBEC, INC. D/B/A MINDGEEK, <br><br> Defendants. | Case No.: SACV 21-00338-CJC(ADSx) <br><br><br><br> ORDER DENYING DEFENDANTS' MOTION FOR RECONSIDERATION OR, IN THE ALTERNATIVE, MOTION FOR INTERLOCUTORY APPEAL [Dkt. 73] |

## I. INTRODUCTION

Plaintiff brings this putative class action against Defendants Mindgeek USA Incorporated, Mindgeek S.A.R.L., MG Freesites, LTD, d/b/a Pornhub, MG Freesites II, LTD, MG Content RT Limited, and 9219-1568 Quebec, Inc. d/b/a Mindgeek, alleging that Defendants violated federal sex trafficking and child pornography laws by knowingly posting, enabling the posting of, and profiting from pornographic videos featuring persons under the age of 18. (Dkt. 42 [First Amended Complaint, hereinafter "FAC"].) On September 3, 2021, this Court denied in substantial part Defendants' motion to dismiss Plaintiff's claims, which was largely predicated upon Defendants' argument that they are entitled to immunity under Section 230 of the Communications Decency Act. (Dkt. 66 [Court's Order on Defendants' Motion to Dismiss, hereinafter "MTD Order"].) Now before the Court is Defendants' motion for reconsideration of its MTD Order, or in the alternative, for Section 1292(b) certification. (Dkt. 73 [hereinafter "Mot."].) For the following reasons, the Court reaffirms its prior Order, and Defendants' motion is **DENIED**.[1]

## II. BACKGROUND

As the Court explained in its prior Order, Plaintiff alleges that Defendants operate popular pornographic websites, such as Pornhub, RedTube, and YouPorn.[2] (FAC ¶ 38.) In 2019, Defendants' "flagship" video sharing platform, Pornhub, had roughly 42 billion visits, making Pornhub the eighth most visited website in the United States. (*Id*. ¶¶ 39–40.) Plaintiff alleges that victims, activist organizations, law enforcement, press reports,

---

[1] Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing. *See* Fed. R. Civ. P. 78; Local Rule 7-15.

[2] After the Court issued its MTD Order, Plaintiff filed a Second Amended Complaint, (Dkt. 72), with the Court's leave. Since Defendants seek reconsideration of the Court's prior Order, the operative allegations concerning this motion are those contained in Plaintiff's First Amended Complaint.

and government agencies have all made Defendants aware that child pornography or Child Sexual Exploitation Material ("CSEM"), such as children being raped and assaulted, appear on their platforms. (*Id*. ¶¶ 106–35.) For example, a recent *New York Times* piece explained that many videos on Pornhub feature the rape of unconscious girls, with rapists opening the eyelids of the victims and touching their eyeballs to demonstrate that they were unconscious. (*Id*. ¶¶ 131–34.)

In her FAC, Plaintiff alleges that Defendants encourage this practice. Specifically, Plaintiff alleges that Defendants offer video playlists on their platforms with titles such as "less than 18," "the best collection of young boys," and "under-age." (*Id*. ¶ 81.) Defendants feature videos tagged with the terms "cp," "no18," "young," and "youngster." (*Id*. ¶ 87.) In at least one instance, visitors to Defendants' platforms have publicly commented that a girl depicted in a video on Defendants' website was "only in ninth grade," but Plaintiff alleges that Defendants chose to advertise the video to receive additional views. (*Id*.) Moreover, Plaintiff alleges that when individuals post videos to Pornhub, Defendants direct them on a "How to Succeed" page to use up to 16 tags to describe videos and to select up to eight relevant categories, including ones such as "teen," "school," "babysitter," and "old/young," to make sure the video is visible to the "right" fans. (*Id*. ¶ 96.) Defendants also instruct users that indicating that a student is a participant in the video "will entice users to click." (*Id*. ¶ 97.) Defendants suggest and promote search terms to their users, such as "young girls," "middle school girls," "middle school sex," "middle schools," and "middle student." (*Id*. ¶ 103.) Plaintiff also alleges that searches for terms such as "14yo," "13yo," "girlunder18," and "girl with braces" generate thousands of results on Defendants' platforms. (*Id*. ¶¶ 101–02.) Defendants also encourage users to fill out surveys where they may indicate a preference for video categories such as "babysitter," "college," and "school." (*Id*. ¶ 82.)

Though Defendants employ moderators who review each video for approval, Plaintiff alleges that former moderators have admitted that videos depicting "very underage" individuals are approved. (*Id.* ¶¶ 84, 86.) For example, Defendants gave the "seal of approval" to 58 videos of someone assaulting a 15-year-old. (*Id.* ¶ 56.) Defendants have also approved videos that use language such as "I'm 14," "middle schooler," "young teen," and "boy." (*Id.* ¶ 93.) Plaintiff also alleges that comments appearing under videos on Defendants' platforms openly indicate that some use Defendants' platforms to seek child pornography, such as terms like "cp"—a well-known abbreviation for child pornography—"no18," "young," and "youngster." (*Id.* ¶¶ 87, 95.) Comments on Defendants' platforms also indicate that some use their platforms to trade child pornography with others. (*Id.* ¶ 95.)

Plaintiff also alleges that Defendants have made efforts to avoid revealing the full extent of child pornography on their platforms. Defendants use a virtual private network, accept cryptocurrency, use a Tor site, and allow site visitors to use a private messaging system to discuss or send child pornography so that they may evade law enforcement. (*Id.* ¶¶ 58–60.) Moreover, Defendants do not employ tools to verify the age of those depicted in videos posted to their platforms. (*Id.* ¶ 53.) Additionally, Plaintiff alleges that Defendants have publicly acknowledged that implementing age verification tools would be a "disaster" for Defendants' industry, resulting in a 50% reduction in traffic to their websites. (*Id.* ¶¶ 2–3, 53, 73, 140.)

Plaintiff's FAC also contains allegations that Defendants and child pornographers profit off child pornography. For example, Defendants use their "Modelhub" program to enter into agreements with sex traffickers, featuring videos of trafficked minors in exchange for a part of the proceeds. (*Id.* ¶ 71.) The Modelhub program requires Pornhub to "verify" users seeking to earn a portion of the advertising revenue that the verified users' videos will generate. (*Id.* ¶ 48.) Verified users are paid up to 80% of the

advertising revenue, depending upon the number of views their video receives. (*Id.* ¶ 48.) Moreover, Plaintiff alleges that Defendants also earn revenue from child pornography through their fee-based subscription services and by monetizing user data. (*Id.* ¶¶ 66–70.)

Plaintiff also alleges that Defendants capitalize on the ability of child pornography to drive traffic to their websites. (*Id.* ¶ 77.) Even when Pornhub has taken down videos depicting child pornography, Defendants have left "the link, title, and tags" to the video on the site to continue to drive users to its platform. (*Id.* ¶ 78.) In one such instance, a prepubescent victim was anally raped in a video Defendants featured on their platforms. (*Id.*) The video was only removed after the National Center for Missing and Exploited Children reported it to Defendants. (*Id.*) Plaintiff alleges that, although Defendants removed the video, they left the link, title, and tags to the video on their website, so those seeking child pornography would continue to visit Defendants' platforms. (*Id.* ¶¶ 77–79.)

Additionally, Plaintiff alleges that Defendants have profited off child pornography depicting her. When Plaintiff was 16 years old, her ex-boyfriend filmed the two of them engaged in sexual intercourse without her knowledge or consent. (*Id.* ¶ 141.) In December 2019, Plaintiff's ex-boyfriend posted multiple videos of these acts to Defendants' websites, including Pornhub and RedTube. (*Id.* ¶ 143.) Plaintiff is visible and identifiable in the videos. (*Id.*) Defendants reviewed these videos and approved them for posting, making no efforts to verify Plaintiff's age. (*Id.* ¶¶ 84, 143.) Defendants uploaded at least one of the videos to RedTube and featured the video on the front page of the website, where it was viewed 30,000 times. (*Id.* ¶¶ 146–47.) Defendants financially benefitted from advertisements that appeared next to the video and from increased traffic to their platforms. (*Id.* ¶ 146.) The videos remained on Defendants' websites for nearly a month before Defendants removed them upon Plaintiff's request.

(*Id.* ¶ 149.) Plaintiff also alleges that her ex-boyfriend posted more than 500 images and videos on Defendants' websites and others, victimizing other young women. (*Id.* ¶ 151.)

## III. LEGAL STANDARD

"As long as a district court has jurisdiction over [a] case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001); *Balla v. Idaho State Bd. Of Corrections*, 869 F.2d 461, 465 (9th Cir. 1989) ("Courts have inherent power to modify their interlocutory orders before entering a final judgment."). Local Rule 7-18 lists the grounds upon which a motion for reconsideration may be made. C.D. Cal. L.R. 7-18. Those grounds include: 1) a material difference in fact or law from that presented to the Court that, in the exercise of reasonable diligence, could not have been known to the party moving for reconsideration at the time the Order was entered; 2) the emergence of new material facts or a change of law occurring after the Order was entered; or 3) a manifest showing of a failure to consider material facts presented to the Court before the Order was entered. *Id.* "No motion for reconsideration may, in any manner, repeat any oral or written argument made in support of, or in opposition to, the original motion." *Id.* "Absent good cause shown, any motion for reconsideration must be filed no later than 14 days after entry of the Order that is the subject of the motion or application." *Id.*

In other words, a "motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003) (quotations omitted); *Olander Enters., Inc. v. Spencer Gifts*, 2011 WL 13225062, at *2 (C.D. Cal. Oct. 21, 2011) (denying L.R. 7-18 motion where "[plaintiff] does not cite any intervening

controlling law decided after the Court issued its August 25, 2011 Order"); *see also Rivera v. UHS of Del., Inc*., 2018 WL 6177235, at *3 (C.D. Cal. Mar. 14, 2018) ("[S]everal courts in the Central District of California have reasonably construed 'change in law' in Local Rule 7-18 to require a change in controlling law.") (collecting cases).

## IV. DISCUSSION

Defendants maintain that two district court cases and one report and recommendation from a magistrate court, issued after this Court's MTD Order, warrant reconsideration of the Court's MTD Order: 1) *M.L. v. Craigslist, Inc.*, 2021 WL 5217115 (W.D. Wash Sept. 16, 2021)) ("*M.L. III*"); 2) *J.B. v. G6 Hosp., LLC*, 2021 WL 4079207 (N.D. Cal. Sept. 8, 2021) (slip op.); and 3) *Doe v. Reddit, Inc.*, No. 21-cv-768 (C.D. Cal. Oct. 28, 2021). The Court notes at the outset, as the parties acknowledge, (Mot. at 3, Dkt. 74 [Plaintiff's Opposition, hereinafter "Opp."] at 2–6), that this Court is not bound by the decisions of its sister courts. And neither district court order, nor the report and recommendation of the magistrate court, effected a change in controlling law, as required for a motion for reconsideration. *See Olander Enters., Inc*., 2011 WL 13225062, at *2; *see also Rivera*, 2018 WL 6177235, at *3. At any rate, the core of Defendants' motion for reconsideration appears to be that these cases show that the Ninth Circuit *en banc* opinion *Gonzalez et al. v. Google LLC et al.* forecloses Plaintiff's claims here. (Mot. at 5–10); 2 F.4th 871 (9th Cir. 2021). Defendants also maintain that, under these cases, Plaintiff is required to plead that Defendants had actual knowledge of the sex trafficking at issue pursuant to the Allow States to Fight Online Sex Trafficking Act of 2017, or "FOSTA." (Mot. at 5–10); 2 F.4th 871 (9th Cir. 2021).

Defendants have not stated sufficient grounds for reconsideration. Accordingly, the Court reaffirms its MTD Order but takes this opportunity to clarify why Plaintiff sufficiently alleges under *Gonzalez* that Defendants do not enjoy Section 230 immunity

from any of Plaintiff's claims. The Court also expands upon its holding that FOSTA requires Plaintiff to plead that Defendants had constructive knowledge of the sex trafficking at issue, rather than actual knowledge.

## A. Communications Decency Act, Section 230 Immunity

As the Court has explained, Section 230 of the Communications Decency Act ("CDA") affords Interactive Computer Service Providers ("ICSs") broad immunity from liability for content posted to their websites by third parties.[3] *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003). The statute immunizes ICSs when plaintiffs seek to treat them "as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). That is, Section 230 applies when a plaintiff alleges that the defendant is "'(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat . . . as a publisher or speaker (3) of information provided by another information content provider.'" *Gonzalez v. Google LLC*, 2 F.4th 871, 891 (9th Cir. 2021) (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01) (ellipsis in original). "Courts consistently have held that § 230 provides a 'robust' immunity," *Goddard v. Google, Inc.*, 2008 WL 5245490, at * 2 (N.D. Cal. Dec. 17, 2008) (quoting *Carafano*, 339 F.3d at 1123), and "that all doubts 'must be resolved in favor of immunity.'" *Id.* (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1174 (9th Cir. 2008)). However, there are exceptions to Section 230 immunity, such as when an ICS acts as a content-creator as opposed to a mere publisher of third-party content.

---

[3] There is no dispute that Defendants qualify as Interactive Computer Service Providers because they operate websites. Indeed, "[t]oday, the most common interactive computer services are websites." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008).

### a. *Content Creators Under Section 230*

Content creators, even if they are ICSs, cannot use Section 230 immunity to escape liability for the unlawfulness of content they create. *See Roommates.com*, 521 F.3d at 1162 (defendants "can be both a service provider and a content provider"). That is, if an ICS is responsible "in whole or in part, for the creation or development" of unlawful content on its platforms, then Section 230 will not bar claims arising from that unlawful content. 47 U.S.C. § 230(f)(3). The Ninth Circuit has admittedly struggled to draw a bright-line rule for determining when an ICS is responsible "in whole or in part, for the creation or development" of unlawful content, explaining that "[t]he meanings of the words 'creation' and 'development' are hardly self evident in the online world" and that Ninth Circuit "cases have struggled with determining their scope." *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1269 (9th Cir. 2016) (collecting cases); *see, e.g., Roommates.com*, 521 F.3d at 1171 (recognizing that a website could be a content developer where it encouraged users to provide illegal content); *Batzel v. Smith*, 333 F.3d 1018, 1031 (9th Cir. 2003) (concluding that "development of information" requires "something more substantial than merely editing portions of an e-mail and selecting material for publication"). But the Ninth Circuit has articulated a test: "[a] website helps to develop unlawful content, and thus falls within the exception to Section 230, if it *contributes materially* to the alleged illegality of the conduct." *Roommates.com*, 521 F.3d at 1168 (emphasis added).

### i. The Material Contribution Test

"A 'material contribution' does not refer to 'merely . . . augmenting . . . content [posted on ICS platforms] generally, but to materially contributing to [the content's] alleged unlawfulness.'" *Gonzalez*, 2 F.4th at 892 (quoting *Roommates*, 521 F.3d at 1167–68 (emphasis in original). "This test draw[s] the line at the 'crucial distinction

between, on the one hand, taking actions' to display 'actionable content and, on the other hand, responsibility for what makes the displayed content [itself] illegal or actionable.'" *Id.* (quoting *Kimzey*, 836 F.3d at 1269 n.4) (internal quotation marks omitted). In other words, this test acknowledges "that making a material contribution does not mean 'merely taking action that is necessary to the display of the allegedly illegal content,' but rather, 'being responsible for what makes the displayed content allegedly unlawful.'" *Id.* (quoting *Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 410 (6th Cir. 2014)). Absent this sort of material contribution, Defendants would not qualify as an "information content provider," and may be eligible for Section 230 immunity for Plaintiff's claims. *Id.*

### ii. *Gonzalez*

Defendants maintain that *Gonzalez v. Google, LLC* establishes that they are entitled to Section 230 immunity for all of Plaintiff's claims because Defendants provide only neutral tools that do not materially contribute to the illegality of the videos depicting Plaintiff. (Mot. at 4–11.) Specifically, Defendants argue that "at most, Plaintiff alleges that Defendants created an attractive location" to post child pornography videos, including those depicting Plaintiff, which does not abrogate Section 230 immunity. (*Id.* at 9.) Defendants cling to the Circuit's holding in *Gonzalez* that "[a] 'website does not create or develop content when it merely provides *a neutral means* by which third parties can post information of their own independent choosing online'" to show they are entitled to immunity. *Gonzalez*, 2 F.4th at 893 (quoting *Kimzey*, 836 F.3d at 1270) (emphasis in original). Yet, Defendants misread *Gonzalez* and misconstrue Plaintiff's allegations. The Court takes this opportunity to review *Gonzalez*, specifically its explanation of the Ninth Circuit's precedent on this issue, in-depth and applies it directly to the allegations in Plaintiff's First Amended Complaint.

***(1) Ninth Circuit Precedent, as Explained in Gonzalez, Establishes That An ICS'S Tools Are Neutral When They Do Not Encourage the Creation of the Illegal Content***

As the *Gonzalez* court explained, in *Carafano v. Metrosplash.com*, the defendant website was entitled to Section 230 immunity, "concern[ing] a prankster's unauthorized creation of a libelous profile impersonating actress Christianne Carafano on an online dating site," because the defendant "provided neutral tools specifically designed to match romantic partners depending on their voluntary inputs." *Gonzalez*, 2 F.4th at 893 (citing *Carafano*, 339 F.3d at 1121–22.)  The Circuit reasoned that "[t]he website was not transformed into the creator or developer of libelous content contained in users' dating profiles, even though its matchmaking functionality allowed [the libelous profile of Christianne Carafano] to be more effectively disseminated." *Id.*  Crucially, the Circuit found that the website's tools "were neutral because the website did not 'encourage the posting of defamatory content' by merely providing a means for users to publish the profiles they created." *Id.*  In other words, nothing on the defendant's platform prompted users to post libelous dating profiles.

Similarly, in *Dyroff v. Ultimate Software Group, Inc.*, a website defendant was entitled to Section 230 immunity after one of its users died from a heroin overdose, despite the plaintiff alleging that the user bought the heroin through a connection made on the defendant's website.  *Gonzalez*, 2 F.4th. at 894 (citing *Dyroff v. Ultimate Software Group, Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019)).  In attempting to show the defendant was not entitled to Section 230 immunity, the plaintiff "argued that the website created and developed online content because the website 'used features and functions, including algorithms, to analyze user posts . . . and recommend other user groups'" that helped the user find the heroin he purchased.  *Id.*  However, the Circuit held "'[t]hese functions—recommendations and notifications—[were] tools meant to facilitate the communication

and content of others,' and 'not content in and of themselves.'" *Id.* (quoting *Dyroff*, 934 F. 3d at 1098)). Significantly, the plaintiff did not allege that the recommendation and notification tools encouraged the creation of posts to sell illegal substances.

By contrast, in *Roommates* the defendant website operator was not entitled to Section 230 immunity after plaintiffs alleged that the website at issue "require[ed] users to disclose their sex, sexual orientation, whether they had children, and the traits they preferred in their roommate" because the website "was designed to encourage users to post content that violated fair housing laws." *Id.* at 894 (quoting *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1167-78 (9th Cir. 2009)). Essentially "'[b]y requiring subscribers to provide the information as a condition of accessing its service,' and requiring subscribers to choose between 'a limited set of pre-populated answers,' the website became 'much more than a passive transmitter,' and instead became 'the developer, at least in part, of that information.'" *Id.* That is, "[t]he Roommates website did not employ 'neutral tools'; it required users to input discriminatory content as a prerequisite to accessing its tenant-landlord matching service." *Id.* Therefore, "[t]he website . . . lost its Section 230 immunity with respect to the discriminatory content it prompted, but it retained immunity for generically asking users to prove 'Additional Comments' without telling them 'what kind of information they should or must include.'" *Id.*

Applying these cases, the Ninth Circuit in *Gonzalez* found that defendant Google was entitled to Section 230 immunity. There, the plaintiffs alleged that "Google makes a material contribution to the unlawfulness of" ISIS terrorist content on its platforms "by pairing [terrorist videos] with selected advertising and other videos because 'pairing' enhances user engagement with the underlying content." *Id.* at 893 *"*Though . . . accept[ing] as true the TAC's allegation that Google's algorithms recommend ISIS content to users," the court found that the plaintiffs did not allege that "the algorithms . . .

treat[ed] ISIS-created content differently than any other third-party created content, and thus [Google was] entitled to Section 230 immunity." *Id.* at 894.  The Ninth Circuit concluded that, as alleged in the TAC, "Google's YouTube service is materially [in]distinguishable from the matchmaking website at issue in *Carafano* or the algorithms employed by the message board in *Dyroff*.  [The plaintiffs] allege that Google recommends content—including ISIS videos—to users based upon users' viewing history and what is known about the users." *Id.* at 894–95.  Significantly, "[t]he *Gonzalez* complaint [wa]s devoid of any allegations that Google specifically targeted ISIS content, or designed its website to encourage videos that further the terrorist group's mission." *Id.* at 895.  "Instead, the *Gonzalez* Plaintiff's allegations suggest[ed] that Google provided a neutral platform that did not *specify or prompt* the type of content to be submitted, nor determine particular types of content its algorithms would promote." *Id.* (emphasis added).

### iii.  Application of *Gonzalez* to Plaintiff's Allegations

Contrary to Defendants' assertions, Plaintiff's claims are not foreclosed under *Gonzalez* and are bolstered by their similarity to the claims in *Roommates.*  Unlike *Gonzalez*, Plaintiff here alleges that Defendants do far more than employ neutral tools that treat videos depicting child pornography the same as any other video on their platforms.  *Gonzalez*, 2 F.4th at 892–94.  Instead, Plaintiff alleges that Defendants solicit, review, approve, and feature such videos on their platforms.  That is, like the defendant in *Roommates*, Defendants target unlawful content by "direct[ing] users to complete preference surveys, categoriz[ing its] videos using coded language for child pornography to ensure that content is visible to the 'right fans,' and instruct[ing] users how to title their videos to target individuals interested in child pornography." (FAC ¶¶ 82, 96–97, 101–103.)  Defendants also "encourage" child pornography through its curation of "video playlists on [its] platforms with titles such as 'less than 18,' 'the best collection of young

boys,' and 'underage.'" (*Id.* ¶ 81.)  Plaintiff also alleges that Defendants take it upon themselves to "upload" child porn videos to their sites, (*id.* ¶¶ 146–47), and assist trackers in "anonymiz[ing] web traffic, making it difficult for law enforcement to locate child pornography producers," (*id.* ¶¶ 58–60.)   It was based upon these allegations, and others similar to them, that this Court found that Defendants' alleged "conduct goes far beyond the neutral tools the Ninth Circuit has protected" because Defendants "did not encourage the posting of [unlawful] content by merely providing a means for users to publish [what] they created," but rather contributed to it by "call[ing] directly for child pornography." (MTD at 20 [citing *Gonzalez*, 2 F.4th at 893]).  In other words, based on the allegations in Plaintiff's FAC, Defendants' conduct rises to a level in which they "specify or prompt the type of content," in this case child pornography, "to be submitted." *Gonzalez*, 2 F.4th at 895.

### iv.  Application of *M.L. III* to Plaintiff's Allegations

Though Defendants contend that the report and recommendation of the magistrate court in *M.L. III* applying *Gonzalez* also forecloses Plaintiff's claims here, the Court disagrees.  While the Court's prior Order found remarkable similarities between this case and *M.L. III*'s predecessor case, Plaintiff here alleges that Defendants' conduct is much more active in encouraging child pornography than the defendant in that case.  Unlike in any iterations of the *M.L.* case, Defendants here took one of the videos featuring Plaintiff and uploaded, distributed, and featured that video on a separate, independent platform, where it was tagged as "teen" porn to drive traffic.  (FAC ¶¶ 146–47.)  Plaintiff also alleges that Defendants feature other videos containing child pornography to target users interested in this unlawful content.  (*See, e.g., id.* ¶¶ 78, 87.)  And as described earlier, Defendants compile video playlists with titles and tags indicating the videos are child pornography.  (*Id.* ¶¶ 77–79, 81, 87, 93, 96.)  Moreover, Plaintiff alleges that Defendants instruct sex traffickers to post videos using categories that are coded language for child

porn.  (*Id.* ¶¶ 81–82, 96–97, 101–103).  Plaintiff also alleges that even when Defendants remove child pornography from their platforms, they leave up links to that illegal content to continue to attract visitors.  (*Id.* ¶¶ 77–79, 92, 109–14.)  Finally, Defendants openly acknowledge that tools like age verification technology would severely harm their business operations, resulting in at least a 50% reduction in traffic on their platforms.  (*Id.* ¶¶ 2–3, 53, 73, 140.)  These allegations distinguish this case from *M.L. III* and further bolster this Court's finding that the allegations, together, indicate that Defendants have designed their platforms for an illicit purpose and therefore make a material contribution to the creation of child pornography.

Nevertheless, Defendants point to case law suggesting that the tools Defendants employ are, in fact, neutral.  For example, Defendants argue that "site features that make illegal content easier to locate do not affect the illegality of the content itself as is necessary to abrogate Section 230 immunity."  (Mot. at 8 [citing *M.L. III*, 2021 WL 5217155 at *7–8, 12; *Jurin v. Google, Inc.*, 695 F. Supp. 2d 1117 (E.D. Cal. 2010) (use of search words); *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1197-98 (N.D. Cal. 2009); *Herrick v. Grindr LLC*, 765 F. App'x 586, 591 (2d Cir. 2019) (ICSs "cannot be held liable for providing . . . tools and functionality available equally to bad actors and the [platform's] intended users.")].)  Defendants also cite cases holding that use of a VPN or Tor site to anonymize web traffic and make it more difficult for law enforcement to locate child pornography producers does not vitiate Section 230 immunity.  (Mot. at 9.)  Nor does offering use of a private messaging system, as "courts have repeatedly found that private messaging systems that can be used by any site user are content neutral tools that do not abrogate Section 230 protection."  (*Id.* [citing *Reddit, Inc.*, No. 21-cv-768, at *7 (C.D. Cal. Oct. 28, 2021); *Dyroff*, 934 F.3d at 1099; *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1127–29 (N.D. Cal. 2016); *Herrick*, 765 F. App'x at 590].)  Additionally, Defendants cite cases holding that a defendant's knowledge that its platforms contain illegal content and share proceeds with traffickers also does not eradicate Section 230

immunity.  (*Id.* at 8 [citing *Goddard*, 640 F. Supp. 2d at 1197-98; *M.L. III* at *12–13; *Doe v. Twitter, Inc.*, -- F. Supp. 3d --, 2021 WL 3675207, at *30 (N.D. Cal. Aug. 19, 2021].)

However, *Gonzalez* clearly requires that a court evaluate the purpose and design behind the defendants' platform and whether it was created for an unlawful purpose. *Gonzalez,* 2 F.4th at 894 (evaluating whether ICS defendant was "a neutral platform that did not *specify or prompt* the type of content to be submitted, nor determine particular types of content its algorithms would promote") (emphasis added).  While Plaintiff's allegations evaluated independently of each other may not amount to a situation in which Section 230 immunity is vitiated, the allegations considered together, including that the Defendants' business model would be devastated by simple tools such as age verification, indicate otherwise. (FAC ¶¶ 2–3, 53, 73, 140.)  Read in the light most favorable to Plaintiff, the allegations establish that part of Defendants' operating model depends upon the development and creation of child pornography and that their tools are designed to elicit that exact content.

Defendants also urge this Court to read *Roommates* and *Gonzalez* as though Defendants could only be held liable for Plaintiff's claims if they *require or compel* their users to make and post child pornography, rather than merely encourage its creation and development.  (Mot. at 5–8.)  Neither *Roommates* nor *Gonzalez* requires such action to abrogate Section 230 immunity.  Indeed, such a rule would produce absurd results.  Take, for example, a situation in which a hypothetical defendant operates a website entitled childpornography.com.  The website instructs users how to make pornography videos appealing to its users; reviews and approves each video; features child pornography videos on the front page of their platforms; provides tags and playlists to identify and compile child pornography specifically; employs tools to evade law enforcement; provides ample proceeds to those that post; and publicly acknowledges that removal of those videos would severely harm its bottom line, but does not explicitly *require* users to

post child pornography.  Under Defendants' interpretation, such a platform would escape all civil liability, despite instructing and encouraging users to post such content on their platforms.  But "the CDA does not declare 'a general immunity from liability deriving from third-party content.'"  *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 852–53 (9th Cir. 2016) (quoting *Barnes*, 570 F.3d at 1100).  Indeed, "'the Communications Decency Act was not meant to create a lawless no-man's-land on the Internet.'"  *Id.* (quoting *Roommates.com*, 521 F.3d at 1164).  Despite Defendants' arguments, "Congress has not provided an all purpose get-out-of-jail-free card for businesses that publish user content on the internet[.]"  *Id.* at 853.  Plainly, *Gonzalez* does not articulate such a narrow test; its implicit holding is that the core inquiry behind whether an ICS is a content creator is whether defendants have taken action to encourage unlawful content and employ features to make a material contribution to such content.

### b.  Pleading Requirements Under The FOSTA Exception to Section 230

As the Court explained in its MTD Order, in 2018, Congress enacted another exception to Section 230 immunity known as FOSTA.  47 U.S.C. § 230(e)(5)(A).  FOSTA exempts certain provisions of the federal Trafficking Victims Protection Reauthorization Act ("TVPRA") from Section 230 immunity.  *Id*.  Specifically, FOSTA provides that "[n]othing in [Section 230] . . . shall be construed to impair or limit any claim in a civil action brought under 1595 of [the TVPRA], if the conduct underlying the claim constitutes a violation of section 1591 of [the TVPRA][.]"  *Id.*  That is, an ICS cannot assert Section 230 immunity if the ICS violates federal anti-trafficking laws.

Section 1595 of the TVPRA provides trafficking victims with a private right of action to pursue claims against perpetrators of trafficking ("direct liability"), or those who knowingly benefit financially from trafficking ("beneficiary liability"). 18 U.S.C. § 1595. To state a claim under Section 1595, a plaintiff must allege that the defendant has

"constructive knowledge" of the trafficking at issue. *See id.* (imposing civil liability against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person *knew or should have known* has engaged in an act in violation of this chapter") (emphasis added). Section 1591 of the TVPRA, on the other hand, is a criminal statute, penalizing the same conduct when a defendant has actual knowledge of the sex trafficking at issue. 18. U.S.C. § 1591(a). The FOSTA exemption references both these sections, abrogating Section 230 immunity for civil Section 1595 claims, "if the conduct underlying the claim constitutes a violation of *section 1591*[.]" 47 U.S.C. § 230(e)(5)(A) (emphasis added)

Defendants encourage this Court to reconsider its findings on what Plaintiff is required to plead under FOSTA. In its MTD Order, the Court found that FOSTA does not require that Plaintiff allege Defendants' actual knowledge of the sex trafficking at issue. (MTD Order at 10–11.) Rather, the Court explained that FOSTA requires only that Plaintiff plead that Defendants knew or should have known of the sex trafficking. (*Id.*) In interpreting the provision, the Court relied in part on the court's decision in *J.B. v. G6 Hospitality, LLC*, 2020 WL 4901196, at * 8 (N.D. Cal. Aug. 19, 2021). A few days after this Court issued its MTD Order, the *J.B.* court reversed course, granting a motion for reconsideration and finding that the actual knowledge standard applies when a plaintiff alleges a sex trafficking claim against an ICS. *J.B. v. G6 Hospitality, LLC*, 2021 WL 4079207 (N.D. Cal. Sept. 8, 2021). With great respect to the *J.B.* court, the Court declines to reconsider its holding on FOSTA's requirements for several reasons.

First, the Court disagrees that FOSTA's plain language requires that Plaintiff plead Defendants actual knowledge of the sex trafficking at issue. Again, FOSTA provides that Section 230 immunity is abrogated for "any claim in a civil action brought under section 1595 of [the TVPRA], if the conduct underlying the claim constitutes a violation of section 1591 of that title." 47 U.S.C. § 230(e)(5)(A). The *J.B.* court explained that

"[r]eferencing solely the language [of FOSTA] itself, the Court finds the most straightforward reading to be that the provision provides an exemption from CDA immunity for a section 1595 claim if the civil defendant's conduct amounts to a violation of section 1591." *J.B.*, 2021 WL 4079207 at * 6. Though Section 1591 allows for beneficiary liability, this interpretation is significant because Section 1591 would require civil plaintiffs, seeking relief under a remedial provision of the Communications Decency Act, to meet a criminal *mens rea* standard. Alleged victims of sex trafficking would have to allege that the website: 1) benefitted financially from sex trafficking; 2) had "actual knowledge" of the trafficking at issue, rather than constructive knowledge; and 3) "knowingly assist[ed], support[ed], or facilitate[ed]" the sex trafficking at issue. *See* 18 U.S.C. § 1591(a)(1)-(2), (e)(4) (defining "participation in a venture").

This holding was based, in part, on the logic that "if Congress meant to exempt all claims involving sex trafficking, it 'could have'" drafted FOSTA to read "'if the claim arises out of a violation of section 1591,' or 'if the plaintiff is a victim of a violation of section 1591.'" *J.B.*, 2921 WL 4079207 at *6. However, as the court in *Doe v. Twitter, Inc.* explained, "the more natural reading of the second phrase of [FOSTA] is simply that it creates an exemption to Section 230 immunity for civil sex trafficking claims under Section 1591 and not as to other sections of Title 18 that can give rise to civil liability under Section 1595." *Twitter*, 2021 WL 3675207, at *24. In other words, Section 1595 creates civil liability for the entirety of Chapter 77 of Title 18, which "prohibits a host of conduct including 'hold[ing] or return[ing] any person to a condition of peonage' (§ 1581), '[e]nticement into slavery' (§ 1583), and 'benefit[ing], financially or . . . receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of [forced] labor' (§ 1589)." *Id.* Indeed, "[t]his more straightforward reading does not limit FOSTA's exemption to a narrow subset of civil sex trafficking claims" but "makes available to victims of sex trafficking the same civil remedies against an ICS provider under Section 1591(a)(2)" that victims would have against non-ICS defendants.

*Id.*   If Congress intended to limit a remedial statute to such narrow and limited circumstances, it could have made that plain.  But Congress took no such action.

FOSTA's remedial purpose cannot be ignored.  Indeed, "[t]here is no question that FOSTA is a remedial statute in that it carves out exceptions to CDA § 230 immunity, thereby affording remedies to victims of sex trafficking that otherwise would not have been available[.]"  *Twitter*, 2021 WL 3675207, at*24; *accord J.B.*, 2021 WL 4079207, at *6.  Though sister courts have found that the "'the specific context in which [FOSTA's] language is used'" supports a more restrictive interpretation of the exception, they have primarily relied upon parallel criminal provisions.  *J.B.*, 2021 WL 4079207, at *6; *see also Dow v. Kik Interactive, Inc.*, 482 F. Supp. 3d 1242, 1250–51 (S.D. Fla. 2020) (holding that FOSTA's legislative history and its plain text indicates that Congress "did not abrogate CDA immunity for all claims arising from sex trafficking").  However, there are "obvious differences between civil claims and criminal charges[.]"  *J.B.*, 2021 WL 4079207, at *6.  Remedial statutes must be interpreted broadly to effectuate their purpose.  *See Wadler v. Bio-Rad Laboratories, Inc.*, 916 F.3d 1176, 1187 (9th Cir. 2019) ("It is a familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes, but this canon should not be treated . . .  as a substitute for a conclusion grounded in the statute's text and structure.") (internal quotations and citations omitted).   The Court finds nothing within the statute's text and structure to suggest anything other than the plainest interpretation of the provision, which is that as long as the conduct underlying Plaintiff's Section 1595 claim amounts to a violation of Section 1591, then she may bring the claim alleging the lesser constructive knowledge standard.  To hold otherwise, as the Court explained in its prior Order, would effectively write Section 1595 out of existence for websites, which Congress cannot have intended to do when passing a statute designed to provide victims of sex trafficking with their day in court.   Thus, the Court reaffirms its prior Order that Plaintiff is only required

to plausibly allege a violation of Section 1595, which imposes a lower constructive knowledge standard. [4]

In any event, the Court finds that Plaintiff's FAC does plead that Defendants had actual knowledge of the trafficking at issue. Plaintiff alleges that Defendants were familiar with her ex-boyfriend, who posted hundreds of videos and images depicting other victims. (FAC ¶ 151.) Plaintiff also alleges that Defendants' moderators review and approve each and every video posted to their platforms, including those depicting Plaintiff, specifically evaluating whether the content contains illicit content, such as child pornography, (*id.* ¶¶ 84, 86), and intentionally allow some videos to be posted anyway, (*id.* ¶¶ 56, 84–87, 93, 95). Defendants are aware of the broad appeal such videos have, refuse to implement tools to verify the age of the individuals depicted because of the vast financial harm it would cause, and profit off these exact kinds of videos, featuring videos depicting Plaintiff on the front page of one their platforms. (*Id.* ¶¶ 2–3, 53, 73, 140.) At this stage, read in the light most favorable to Plaintiff, these allegations are enough to allege that Defendants knowingly "benefitted, financially or by receiving anything of value, from participation in a venture[.]" 18 U.S.C. § 1595(a).

Finally, Plaintiff need not meet Section 1591's actual knowledge standard because Plaintiff sufficiently alleges here that Defendants are content creators. "[A] plaintiff can bring a [Section 1595] claim against . . . websites that are ineligible for immunity because they create or materially contribute to the content at issue." *J.B.*, 2021 WL 4079207 at *6. Since there is no question that Section 1595, applied to any other civil defendant, only requires constructive knowledge, Plaintiff's claims stand at any rate.

---

[4] The *J.B.* court also pointed to statements made by members of Congress during debates on FOSTA and its passing to suggest that FOSTA's actual purpose was to exempt only a subsection of 1595 claims from Section 230 immunity. However, as the *J.B.* court acknowledges, "statements made by individual legislators 'rank among the least illuminating forms of legislative history,'" *J.B.*, 2021 WL 4079207, at *7 (quoting *N.L.B.R v. SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017)), and are not binding, *id.*

**B.  Motion for Interlocutory Appeal Certification**

Defendants also encourage this Court to certify two questions to the Ninth Circuit for interlocutory appeal pursuant to 28 U.S.C. Section 1292(b).  The first is whether the "material contribution" exception to Section 230 applies to websites that create an attractive forum for users to post illegal content but do not participate in creating the content itself.  The second is whether the FOSTA exception to Section 230 requires only that Plaintiff allege Defendants violated Section 1595 or whether Plaintiff must also plead Defendants violated Section 1591 as well.  Defendants maintain that these questions are both pure questions of law that will materially advance the termination of this case because they are central to Defendants' Section 230 immunity.  (Mot. at 19–21.)  The Court disagrees.

Generally, an order is appealable only if it represents the final judgment in the action.  *Romoland Sch. Dist. v. Inland Empire Energy Ctr., LLC*, 548 F.3d 738, 747 (9th Cir. 2008).  A "narrow exception" to the final judgment rule is embodied in 28 U.S.C. § 1292(b), which sets forth three requirements for certification: (1) the order "involves a controlling question of law," (2) the question is one "as to which there is substantial ground for difference of opinion," and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation."  *See In re Cement Antitrust Litig. (MDL No. 296)*, 673 F.2d 1020, 1026 (9th Cir. 1982).  Certification of an appeal pursuant to 28 U.S.C. § 1292(b) is only appropriate under "exceptional circumstances."  *Id.*

A question of law is controlling if resolving it on appeal could materially affect the outcome of the litigation in the district court.  *Id*.  A controlling question of law may only be found in "exceptional situations in which allowing an interlocutory appeal would avoid protracted and expensive litigation."  *Id*.  In addition, the question of law must be a

pure question of law, not a mixed question of law and fact or an application of law to a particular set of facts.  *See Ahrenholz v. Board of Trustees of the Univ. of Ill.*, 219 F.3d 674, 675–77 (7th Cir. 2000); *Sateriale v. RJ Reynolds Tobacco Co.*, 2015 WL 3767424, at *2 (C.D. Cal. June 17, 2015) (internal quotation omitted) ("The legal question must be stated at a high enough level of abstraction to lift the question out of the details of . . . a particular case and give it general relevance to other cases in the same area of law.").  A pure question of law is one that the Court of Appeals can "decide quickly and cleanly without having to study the record."  *Ahrenholz*, 219 F.3d at 677.  The antithesis of a pure question of law is one that asks whether the district court properly applied settled law to the facts or evidence of a particular case.  *McFarlin v. Conseco Servs.*, LLC, 381 F.3d 1251, 1259 (11th Cir. 2004).

With respect to Defendants' first question, Defendants fail to satisfy the requirements of Section 1292(b).  Defendants purport to raise a pure question of law, but the question instead impermissibly challenges "whether the district court properly applied settled law to the facts or evidence of a particular case."  *McFarlin*, 281 F.3d at 1259. This is plain because whether Defendants are content creators within the meaning of Section 230 is an inherently factual inquiry, depending upon the very nature of the platforms at issue and the specific features available to its users.  *See generally Gonzalez*, 2. F.4th 871; *Carafano*, 339 F.3d at 1119; *Roommates.com,* 521 F.3d 1157; *Dyroff*, 934 F.3d 1093.  Defendants attempt to characterize the question as one of law by inserting their characterization of what Plaintiff has alleged Defendants do in this case, that is, "create an attractive forum" for the posting of child pornography, rather than this Court's finding, based on Ninth Circuit precedent, that Plaintiff plausibly alleges that Defendants materially contribute to the creation of child pornography on their platforms.

The second question fares no better because "an immediate appeal from the order" resolving what a plaintiff is required to allege under FOSTA will not "materially advance

the ultimate termination of the litigation." *See In re Cement Antitrust Litig.*, 673 F.2d at 1026. As explained above, Defendants do not have Section 230 immunity for any of the claims arising out of the child pornography videos depicting Plaintiff because they materially contributed to their creation. Even if the Circuit finds that FOSTA requires that Plaintiff plead that Defendants also violated Section 1591, Plaintiff's claims still stand.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion for reconsideration or, in the alternative, to certify for 1292(b) certification is **DENIED**.

DATED:     December 2, 2021

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE