# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| JANE DOE #1, and JANE DOE #2, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | 7:21-cv-00220-LSC |
| MG FREESITES, LTD, d/b/a "PORNHUB", a foreign entity; MG FREESITES II LTD, a foreign entity; MINDGEEK, S.A.R.L., a foreign entity; MINDGEEK USA, INCORPORATED, a Delaware corporation; MG CY HOLDINGS LTD, a foreign entity; MINDGEEK CONTENT RT LIMITED, a foreign entity; 9219-1568 QUEBEC INC. d/b/a MINDGEEK, a foreign entity; MG BILLING LTD, a foreign entity, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OF OPINION AND ORDER

## I. Introduction

This cause comes before the Court on Defendants' motion to dismiss Plaintiffs' First Amended Complaint. (Doc. 24.) Plaintiffs, two individuals proceeding pseudonymously who are victims and survivors of childhood sex

trafficking, bring this putative class action against Defendants MG Freesites, LTD, d/b/a "Pornhub"; MG Freesites II, LTD; Mindgeek S.A.R.L.; Mindgeek USA Incorporated; MG CY Holdings LTD; Mindgeek Content RT Limited; 9219-1568 Quebec, Inc., d/b/a Mindgeek; and MG Billing LTD, alleging that Defendants violated federal sex trafficking and child pornography laws by owning, operating, controlling, and profiting from websites that provide public video platforms to share and view illegal child pornography. For the reasons set forth below, Defendants' motion to dismiss the complaint is due to be denied.

## II.    Background

The following facts are taken from the Plaintiffs' complaint and are assumed to be true for purposes of the pending motion to dismiss. Defendants[1] own and operate one of the largest and most-visited pornographic websites in the world, www.Pornhub.com ("Pornhub"), as well as www.YouPorn.com, www.RedTube.com, www.WTube.com, and www.Tube8.com. FAC ¶¶ 15, 46. In 2019, Pornhub averaged 115 million visits a day and acquired 1.36 million hours of new content. *Id.* ¶ 47. Nearly seven million new videos were uploaded to Pornhub in

---

[1]    Defendants comprise a complex network of related companies with offices in the United States and abroad, including in the Republic of Cyprus, Luxembourg, and Montreal, Canada. First Amended Complaint ("FAC") ¶¶ 15-28. The Defendant entities own and/or control the majority of the pornography on the Internet. *Id.* ¶ 17.

2019. *Id.* Thirty-nine billion searches were performed over 42 billion visits. *Id.* Pornhub garnered more traffic than tech giants Amazon and Netflix that year. *Id.* ¶ 167. The United States is the country with the highest daily traffic on Pornhub, and Alabama users rank second in the nation in time spent on Pornhub. *Id.* ¶ 48.

Pornhub's main feature is a library of pornographic videos uploaded by third-party users, which Defendants make available for free to anyone, without a viewer even having to create an account. *Id.* ¶¶ 52, 96. Until December 2020, videos could be uploaded anonymously, and there was no requirement that the uploader verify the age or consent of those depicted in the videos. *Id.* ¶ 97. Until December 2020, visitors to the site could not only view but also download videos. *Id.* ¶¶ 98, 119. Defendants monetize the pornographic content on their websites in various ways: offering subscription services, selling advertising space, entering into profit sharing agreements with uploaders, and data mining. *Id.* ¶¶ 98, 101, 148. Defendants' enterprise is profitable: annual revenues are at least $500 million. *Id.* ¶ 128.

Defendants' business model is predicated on maximizing views and traffic to Pornhub. *Id.* ¶ 56. Defendants accomplish this by exerting control over every video on the site, despite its source, through creating and editing titles, tags, keywords, storylines, themes, and scenes. *Id.* For example, when a user uploads a new video, Defendants require the user to choose a minimum number of tags to describe the

content from provided options, and when users choose certain tags, Defendants suggest related tags to increase traffic to the video. *Id.* ¶ 65. Defendants also create thumbnails for the videos, which are a key component for attracting viewers, advising uploaders to carefully choose a thumbnail from provided options that will appeal to viewers. *Id.* ¶ 74. Additionally, Defendants create timelines placed underneath videos to demonstrate the level of intensity of activity within the video, which enables users to identify and quickly "skip" to various activity within the video. *Id.* ¶ 72. Defendants also control the comments surrounding videos, the process for viewing, posting, and creating accounts, and the process for encouraging and rewarding income and fees for downloaded and viewed content. *Id.* ¶ 57. Pornhub maintains a 40-page instruction guide, called "The Pornhub Playbook," advising how to make money from the site. *Id.* ¶ 58. Pornhub advises uploaders on what types of videos and images to post, specifically suggests keywords and categories, and will edit non-compliant posts. *Id.*

Defendants offer several profit-sharing programs with uploaders, including their "Modelhub" program. *Id.* ¶¶ 61-67, 76, 82. Modelhub offers the "amateur" pornographer various ways to upload content and create view-based revenue on Pornhub and other sites. *Id.* ¶ 82. Modelhub members can agree to sell their videos, as opposed to free streaming, through subscriptions or fee-based "fan club"

programs, and if they do, Modelhub members are granted an elevated status on the site, promotion of their content, and support services to assist their viewership and profit sharing. *Id.* ¶ 77. Defendants closely control the content that Modelhub members upload to ensure that it includes the scenes, keywords, tags, and titles that Defendants know successfully generate traffic to videos, providing a 15-page "How to Succeed" directive for Modelhub members. *Id.* Defendants take a direct cut of the revenue garnered by Modelhub members through advertising or subscriptions. *Id.* ¶¶ 77, 83. Defendants threaten to withdraw revenue if their rules are not followed. *Id.* ¶ 90. Because Defendants control the flow of money to Modelhub members, they can force compliance with content creation according to their specific parameters. *Id.* ¶ 67.

Defendants do not rely exclusively on user-generated videos and images but also include on their platforms videos and images from a number of "Content Partners," which are companies that produce pornography, including Brazzers, Fake Taxi, and Kink.com. *Id.* ¶¶ 52, 78. Defendants split advertising revenue with their Content Partners. *Id.* ¶ 77. Defendants own some of the entities they describe as Content Partners, including Brazzers, Babes.com, Digital Playground, Reality Kings, and Twistys. *Id.* ¶ 53. Defendants also own their own production studios and admit that they create at least some videos and images on Pornhub. *Id.* ¶ 54. Further,

Defendants store a copy of all content on its servers, regardless of whether the content is available for public view. *Id.* ¶ 143.

Defendants' use of keywords and tags is essential for search engine optimization ("SEO"), which drives users Googling pornographic content to Defendants' websites. *Id.* ¶ 66. Defendants capitalize on this, describing themselves as "A leader in IT, Web Development and SEO." *Id.* Defendants boast, "[w]ith over 100 million daily visitors to some of the world's largest trafficked websites, we're uncovering trends and user habits overnight that takes others months to gather." *Id.* Defendants have a Search Engine Marketing team dedicated to developing "successful strategies to ensure top-ranking in search engine traffic." *Id.* Defendants' focus on certain keywords and tags, and their creation of related search terms, has resulted in Defendants' websites regularly appearing among the top results for virtually any pornography-related Google search, and even for searches unrelated to pornography but which contain certain keywords. *Id.* ¶ 71 & Exh. 3 (printout of Google video search of "step daughter step dad" resulting in Pornhub pornographic videos as the top search results).

Plaintiffs allege that victims and their representatives, government agencies, and press reports have all made Defendants aware that child pornography or child sexual abuse material ("CSAM"), such as children being raped or assaulted, appear

on their websites. For example, a missing 15-year-old girl was spotted by her mother in 58 pornographic videos, many of which were on Pornhub. *Id.* ¶ 94 & n.76 (citing Pritha Paul, *15-year-old girl missing for a year spotted in 58 videos on adult websites, Periscope and Snapchat by mother*, MEAWW (Feb. 27, 2021)).

In March 2020, after years of being confronted with allegations that child pornography was being harbored and generating profit on their websites, Defendants turned over 4,171 videos to the National Center for Missing and Exploited Children ("NCMEC"), which is the national clearinghouse for child pornography and/or CSAM reports. *Id.* ¶ 37. Plaintiffs allege that Defendants clearly underreported, considering that Facebook, a non-pornographic website, reported 20 million CSAM instances to NCMEC in 2020. *Id.* ¶ 135. NCMEC also maintains a hash-sharing database that allows online companies to check all videos and images against the database to ensure they are not hosting CSAM. *Id.* ¶ 36. In February 2021, Defendants agreed to use the NCMEC hash-sharing database, but as of the end of February 2021, Defendants had not yet accessed the system to check if any of the videos in their library matched those in the database qualifying as known CSAM, which would require the video to be removed and turned over to NCMEC to prevent future uploading and to abide by U.S. child pornography laws. *Id.* ¶ 38.

In December 2020, Pornhub was the target of a New York Times report describing videos on the site of assaults of unconscious women and girls, which led to large credit card companies blocking customers from using their credit cards to make purchases on the website. *See id.* ¶ 51 & n.22 (citing Jordan Valinsky, *Pornhub removes a majority of its videos after investigation reveals child abuse*, CNN Business (Dec. 15, 2020)). That month Defendants enacted new policies, suspending the majority of their videos—nine to ten million—from Pornhub because they were unverified. *Id.* ¶ 51.

Plaintiffs allege that Defendants know that there is a demand for CSAM on their sites and cater to this demand by creating tags, categories, and search suggestions that facilitate easy access to CSAM, such as their suggested tags "teen," "abused teen," "crying teen," "extra small petite teen," and "middle school girls." *Id.* ¶¶ 113-14. Defendants closely track and publish data surrounding traffic, keywords, and search terms on their sites, and their own data demonstrates that the words "teen" and "amateur" are consistently the top search terms in North America on Pornhub. *Id.* ¶ 69. And as the New York Times reported, as of December 4, 2020, a search for "girlunder18" led to more than 100,000 videos; a search for "14yo" led to more than 100,000 videos; and "13yo" led to approximately 155,000

videos on Pornhub. *Id.* ¶ 118 & n.88 (citing Nicholas Kristof, *The Children of Pornhub*, N.Y. Times (Dec. 4, 2020)).

Although Pornhub had a list of hundreds of banned terms uploaders cannot use, that list no longer appears on the website. *Id.* ¶ 62 & Exh. 1 at 2-7. The list includes terms associated with CSAM, such as "child," "teenybopper," and "16 year old," and terms implying other illegal acts, including non-consensual sex, like "drugged," "force," "tipsy," and "rape." *Id.* at Exh. 1 at 2-7. Videos with these terms in their titles cannot be posted, and users are told that any videos that "contain any content that matches these descriptions" will be removed as well. *Id.* ¶ 62. However, many of these terms still appear in the titles or tags of videos on Pornhub but in loosely concealed forms, such as a letter replaced with an asterisk, the word appearing in a different language, or the term represented by a term common to predators and exploiters looking for such videos and images. *Id.* ¶ 63. And the searches for these terms within Pornhub create related search terms so that users can locate similar content. *Id.*

Plaintiffs' complaint also contains allegations that Defendants profit from CSAM specifically. According to the complaint, Defendants use their Modelhub program to enter into profit sharing agreements with sex traffickers, featuring videos of trafficked minors in exchange for a part of the proceeds. *Id.* ¶ 94. For example,

Verified Modelhub Model "Suga Daddy Zo" films his commercial sex encounters with real prostituted persons and uploads them to Pornhub, where Defendants share in the profits. *Id.* Many of his videos are shot in his car with titles such as, "On the Hunt for Hos (The Lost Tapes of Ep. 11) Run-a-way teen" and "On the Hunt for Hos Ep. 16 (Kelvyn Park High School Teen) Barely Legal." *Id.* ¶ 94 & nn.72-74. His videos have 9.7 million views, and he has 21,000 subscribers. *Id.* Plaintiffs allege that this "Verified Model" is not submitting the name, age, or any other information on the women he is exploiting. *Id.* Similarly, Verified Modelhub Model Randy Johnson advertises his videos on Pornhub as "massage videos of young amateur teens and milfs," where he records illegal massage sessions that result in commercial sex acts with women who do not know that they are being recorded, with titles such as "tiny teen" and tags such as "exploited teens." *Id.* Plaintiffs allege that Defendants are not verifying the ages or other information of the individuals in these videos, yet Defendants share the profits from these videos, which have 9.8 million views. *Id.*

Plaintiffs allege that Defendants use their Content Partner program the same way, for example partnering, until December 2020, with a company called GirlsDoPorn, whose leaders now face sex trafficking charges for coercing women into producing pornography and earning money from doing it. *Id.* ¶¶ 52, 78-80 & n.24 (citing Samantha Cole & Emanuel Maigberg, *Pornhub finally removes girls do*

*porn*, VICE (Oct. 19, 2019)). Similarly, another longtime Content Partner of Defendants was Czech Casting, which has since been shut down as nine people associated with the channel were arrested for human trafficking, sexual coercion, and rape in July 2020. *Id.* ¶ 81. This was a highly successful channel on Pornhub with over 79 million views. *Id.*

Aside from profiting from partnerships with sex traffickers, Plaintiffs also allege that Defendants earn revenue from CSAM specifically through their fee-based subscription services, selling advertisements, and by monetizing user data. For example, Defendants own and operate an internal web advertising and digital marketing company called Traffic Junky through which they sell banner and sidebar advertisements, as well as advertisements that appear before and after videos on their websites. *Id.* ¶ 101. Defendants place these advertisements on videos featuring CSAM. *Id.* Traffic Junky edits advertisements to highlight terms such as "girls," "boys," "broken teens," and "twink," which are words commonly associated with CSAM. *Id.* ¶ 103. Further, Traffic Junky advises advertisers of the most popular keywords to use to reach users, including "teen." *Id.*

Plaintiffs further allege that Defendants' policies, or lack thereof, incentivize their employees not to remove CSAM and sometimes prevent them from doing so altogether. Defendants employ a team of moderators who review each video that is

uploaded to their sites to identify "inappropriate" content, including underage performers or other non-minor inappropriate content such as bestiality or someone being murdered. *Id.* ¶ 121. Moderators essentially "eyeball" the performers in the videos to see if they look young, typically flagging a video only if the performer looks to be under the age of 12. *Id.* ¶ 85. Defendants' moderation team is comprised of only about ten individuals, who are tasked with reviewing 800-900 videos a day, or 100 videos per hour. *Id.* ¶¶ 121, 126-28 & n.89 (citing Daily Mail, *Our job was to find weird excuses not to remove them: Pornhub moderators, who watched 1,200 videos A DAY, reveal lenient guidelines at the site being sued for $80m for profiting from sex trafficking* (Dec. 17, 2020)). To compensate for and accomplish the impossible task, moderators fast-forward and skip through videos, often with the sound turned down. *Id.* ¶ 128. Defendants also offer a yearly bonus system based upon the number of videos approved, not blocked. *Id.* ¶¶ 123, 129. Moderators are instructed that if videos appeared to be "professionally made" to assume that they were not child pornography and should not be flagged as inappropriate. *Id.* ¶ 124. Moderators are also instructed to assume that Defendants' business partners, like their Content Partners and Modelhub members, were abiding by the rules and to upload their content with little scrutiny. *Id.* ¶ 165. Additionally, when child pornography is reported by a moderator, the video can only be removed by the "team leader." *Id.* ¶

134. There is an approximate backlog of five months between when a user reports a video and a "team leader" reviews it to determine whether to remove it. *Id.* Moderators have also viewed video comments, deleted those noting a video constituted child pornography, and left the video up. *Id.* ¶ 132.

Plaintiffs also allege that Defendants have made efforts to evade revealing the full extent of CSAM on their platforms. For example, Defendants permit and encourage the use of VPN connections, which are less secure and less traceable, to create accounts, browse, and process videos, including those containing illegal content, so as to keep the users' location and true identity private and anonymous. *Id.* ¶ 140. In May 2018 Defendants launched its own VPN service. *Id.* VPN not only disguises who is accessing the site but permits banned users to re-enter the site and reuse the banned images or videos as well as the associated comments, tags, and keywords. *Id.* ¶¶ 139-40. Additionally, even when content has been removed at the request of NCMEC, Defendants have continued to profit from this material by disabling the video or image but keeping the link to the video live with all the associated metadata, keywords, comments, and tags so that this link will still appear in the search engine results for someone searching for this illegal material. *Id.* ¶ 144. The user is then led to Pornhub with the message that the video was removed, but there is also a message created by Defendants suggesting "related videos" to further

engage the viewer on their site. *Id.* Additionally, this allows the video to continue to feed SEO, as the tags, keywords, and title are still live on the site and continue to garner traffic. *Id.* For example, a prepubescent victim was anally raped in a video featured on Pornhub. *Id.* ¶ 145. The video was uploaded to the site three times; the video was reported to Pornhub but it did not act until NCMEC issued a take-down request; and even after Pornhub was forced to remove the video, it left the link, title, and tags on the site to continue to drive traffic. *Id.* Plaintiffs' complaint contains a screen-shot image of this "blacked-out" video on Pornhub with the associated categories and tags remaining under it, as well as a comment by a user below the video warning that the video is child pornography. *Id.* Finally, even when Defendants actually ban users of their websites for CSAM, that user's data and videos are banned for only 90 days, unless Defendants made a formal law enforcement report and were obligated to preserve that data. *Id.* ¶ 136. After 90 days, all data associated with the banned material and user is deleted, leaving no ability for Defendants to block the user from creating a new account and posting the same video again after 90 days. *Id.*

Aside from describing Defendants' general business practices, Plaintiffs also allege that Defendants have profited off child pornography depicting them. Both Plaintiffs, Jane Doe #1 and Jane Doe #2, allege that they were minors when third

parties created sexually explicit videos of them without their consent and later posted those videos on Defendants' websites.

Specifically, Jane Doe #1 alleges that she was drugged and raped when she was 16 by a man in Tuscaloosa, Alabama, who filmed the incident. *Id.* ¶¶ 149-50. That same man entered into a profit-sharing agreement with Defendants under their Modelhub program and uploaded at least two videos of the incident to Defendants' websites. *Id.* ¶ 151. Doe #1 alleges that Defendants reviewed and tagged the videos of her, including titling one of the videos with the word "Lil" to signify her youth. *Id.* ¶ 154. One of the videos has had over 2,400 views since it was posted in 2018. *Id.* ¶¶ 149, 151-52. Doe #1 alleges that Defendants did not attempt to verify her identity or age. *Id.* ¶¶ 153-54.

Jane Doe #2 alleges that when she was 14, she was forced to participate in the creation of sexually explicit videos with adults and that those videos were subsequently uploaded to Defendants' websites by a "Pornhub official Content Partner." *Id.* ¶¶ 161–62, 165. At least four videos have been identified, and the videos depicting Doe's #2's rape remained on Defendants' websites for at least four years, until at least Spring 2020. *Id.* ¶¶ 166-68. Doe #2 is currently a resident of California. *Id.* ¶ 12.

Pursuant to Federal Rule of Civil Procedure 23(b)(2), (b)(3), and (c)(4),
Plaintiffs also seek to represent all persons who had pornographic videos posted of
them on Defendants' websites that were made when they were under 18 years of age.
*Id.* ¶ 194.

Plaintiffs' First Amended Complaint ("complaint") contains two counts: one
alleging that Defendants knowingly benefitted from participation in what they knew
or should have known was a sex trafficking venture, in violation of 18 U.S.C. §§ 1591
and 1595 (Count I), and the other that Defendants received and distributed child
pornography in violation of 18 U.S.C. §§ 2252 and 2252A (Count II). Plaintiffs
request that this Court certify their proposed class pursuant to Fed. R. Civ. P. 23,
award damages, and issue injunctive and equitable relief, including requiring
Defendants to identify and remove CSAM and implement corporate-wide policies
to prevent continued dissemination of CSAM on their platforms. *Id.* ¶ 176.

Defendants move to dismiss on several grounds.[2] First, they argue that all of
Plaintiffs' claims are barred by Section 230 of the Communications Decency Act, 47
U.S.C. § 230(a), which affords a provider of interactive computer services immunity

---

[2]     After Defendants moved to dismiss Plaintiffs' original complaint (*see* doc. 16), Plaintiffs
filed their First Amended Complaint (doc. 22). The instant motion to dismiss pertains to the First
Amended Complaint. The Court thus **DENIES AS MOOT** Defendants' motion to dismiss the
original complaint (doc. 16).

from liability for content posted to its websites by third parties. Plaintiffs respond that Defendants' activities fall within an exception pursuant to which certain claims under 18 U.S.C. §§ 1591 and 1595 of the Trafficking Victims Protection Reauthorization Act do not qualify for Section 230 immunity. Plaintiffs also argue that because Defendants materially contribute to the creation of child pornography, including that of Plaintiffs, they cannot avail themselves of Section 230 immunity. Aside from Section 230 immunity, Defendants also argue that Plaintiffs fail to state a claim for relief pursuant to the federal statutes prohibiting sex trafficking and criminalizing the receipt or distribution of child pornography. Finally, Defendants contend that the Court lacks personal jurisdiction over Plaintiff Jane Doe #2's claims against them.

## III.  Motion to Dismiss Standard

In general, a pleading must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, to withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1347–48 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Stated another way, the factual allegations in the complaint must be sufficient to "raise a right to relief above the speculative level." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1301 (11th Cir. 2010) (quoting *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008) (per curiam)). A complaint that "succeeds in identifying facts that are suggestive enough to render [the necessary elements of a claim] plausible" will survive a motion to dismiss. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1296 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 556) (internal quotation marks omitted).

In evaluating the sufficiency of a complaint, this Court first "identif[ies] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. This Court then "assume[s] the[] veracity" of the complaint's "well-pleaded factual allegations" and "determine[s] whether they plausibly give rise to an entitlement to relief." *Id.* Review of the complaint is "a context-specific task that requires [this Court] to draw on its judicial experience and common sense." *Id.* If the pleading "contain[s] enough information regarding the material elements of a cause of action to support recovery under some 'viable legal theory,'" it satisfies the notice pleading standard. *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1186 (11th Cir. 2011) (quoting

*Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683–84 (11th Cir. 2001)). Ultimately, the Court must be able to draw a reasonable inference from the facts that the other party is liable. *Reese v. Ellis, Painter, Ratterree & Adams, LLP*, 678 F.3d 1211, 1215 (11th Cir. 2012). The Court must construe pleadings broadly and resolve inferences in the nonmoving party's favor. *Levine v. World Fin. Network Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006).

## IV.  Discussion

### A.  Count I:  Benefitting from a Sex Trafficking Venture in Violation of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1591 and 1595

In 2000, Congress passed the Trafficking Victims Protection Act ("TVPA"). *See* Pub. L. No. 106-386, § 102(a), 114 Stat. 1464, 1467 (2000). The TVPA was the first comprehensive law in the United States to penalize the full range of human trafficking offenses, including sex trafficking of children under the age of 18 or sex trafficking by force, fraud, or coercion. *See* 18 U.S.C. § 1591, *et seq*. Congress reauthorized the TVPA in 2003. *See* Pub. L. No. 108-193, § 4(a)(4)(A), 117 Stat. 2875, 2878 (2003). In doing so, the Trafficking Victims Protection Reauthorization Act ("TVPRA") created a civil cause of action, codified at 18 U.S.C. § 1595. That provision of the TVPRA permits a party to bring a civil claim against perpetrators of sex trafficking and against persons or entities who, although not the direct

perpetrator, knowingly benefitted from participating in what they knew or should have known was a sex trafficking venture. *See* 18 U.S.C. § 1595(a).

Section 1591(a) of the TVPRA, which criminalizes sex trafficking of children, provides as follows:

> (a) Whoever knowingly –
>
>> (1) in or affecting interstate or foreign commerce . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
>>
>> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
> knowing, or except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, will be punished as provided in subsection (b).

18 U.S.C. § 1591(a). Thus, section 1591(a)(1) punishes primary violators who directly engage in sex trafficking, and section 1591(a)(2) punishes secondary participants who "knowingly . . . benefit[], financially or by receiving anything of value, from participation in a venture" with a primary violator. *Id.* § 1591(a)(1)-(2).

Section 1595(a) of the TVPRA provides as follows:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a). As such, trafficking victims may use section 1595 to pursue civil claims against perpetrators of trafficking (direct liability) or those who knowingly benefit financially from trafficking (beneficiary liability).

The elements that Plaintiffs are required to plead to state their federal trafficking claim at the motion to dismiss stage are affected by the fact that Defendants claim that they are immune from suit under Section 230 of the Communications Decency Act. Thus, the Court will first analyze whether Defendants have Section 230 immunity before turning to whether Plaintiffs have properly stated a TVPRA claim.

### 1. Immunity Under Section 230 of the Communications Decency Act

Defendants argue that they are immune from suit under Section 230 of the Communications Decency Act of 1996 ("CDA"), 47 U.S.C. § 230.[3] When it was

---

[3] Plaintiffs have not argued that it is improper for this Court to consider the application of Section 230 immunity on Defendants' motion to dismiss for failure to state a claim. In any event, "whether a particular ground for opposing a claim may be the basis for dismissal for failure to state a claim depends on whether the allegations in the complaint suffice to establish that ground." *Jones*

enacted "at the dawn of the dot.com era," *see Malwarebytes, Inc. v. Enigma Software Group USA, LLC*, 141 S. Ct. 13 (2020) (Thomas, J., concurring), the primary purpose of the CDA was to protect children from sexually explicit content on the Internet. *See FTC v. LeadClick Media, LLC*, 838 F.3d 158, 173 (2d Cir. 2016) (citing 141 Cong. Rec. S1953 (daily ed. Feb. 1, 1995) (statement of Sen. Exon) ("[T]he information superhighway should not become a red-light district. This legislation will keep that from happening and extend the standards of decency which have protected telephone users to new telecommunications devices.")).

At the same time, however, Congress, through Section 230 of the CDA, endeavored to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material. Leading up to the enactment of Section 230, a combination of cases in New York had deterred online service providers from taking it upon themselves to attempt to filter obscene or offensive content from their networks. *See Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1046 (9th Cir. 2019). The result of those cases was

---

*v. Bock*, 549 U.S. 199, 215 (2007). Here, Defendants' Section 230 immunity defense relies entirely on the allegations in the complaint. Accordingly, the Court finds it proper to consider Defendants' Section 230 immunity defense at the motion to dismiss stage. *See Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013) (applying the test articulated in *Jones* to find that the court could properly consider whether the application of Section 230 immunity barred the plaintiffs' claims on a 12(b)(6) motion to dismiss).

that "if a provider remained passive and uninvolved in filtering third-party material from its network, the provider could not be held liable for any offensive content it carried from third parties." *Id.* (citing *Cubby, Inc. v. CompuServe, Inc.*, 776 F. Supp. 135, 139–43 (S.D.N.Y. 1991)). On the other hand, "once a service provider undertook to filter offensive content from its network, it assumed responsibility for any offensive content it failed to filter, even if it lacked knowledge of the content." *Id.* (citing *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710, at *5 (N.Y. Sup. Ct. May 24, 1995) (holding Prodigy responsible for a libelous message posted on one of its message boards and deeming it a "publisher" under state law because it voluntarily deleted some messages based on offensiveness and bad taste and was therefore legally responsible for the content of defamatory messages it failed to delete). "The *Stratton Oakmont* decision, along with the increasing public concern about pornography on the internet, served as catalysts" for the enactment of the CDA. *Id.*

To that end, Section 230 of the CDA, entitled "Protection for private blocking and screening of offensive material," begins with a list of "Findings" and "Policy" as follows:

**(a) Findings**

The Congress finds the following:

(1) The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

(2) These services offer users a great deal of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

(3) The internet and other interactive computer services offer a forum for a true diversity of public discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

(4) The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of governmental regulation.

(5) Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

**(b) Policy**

It is the policy of the United States –

(1) to promote the continued development of the Internet and other interactive computer services and other interactive media;

(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict

their children's access to objectionable or inappropriate online
material; and

(5) to ensure vigorous enforcement of Federal criminal laws to deter
and punish trafficking in obscenity, stalking, and harassment by means
of computer.

47 U.S.C. § 230(a)-(b). In recognition of those stated findings and policies,

subsection (c)(1) of Section 230 provides that "[n]o provider . . . of an interactive

computer service shall be treated as a publisher or speaker of any information

provided by another information content provider." 47 U.S.C. § 230(c)(1). This is

the immunity provision relied upon by Defendants.

In the first appellate court decision to consider Section 230 after its

enactment, *Zeran v. America Online, Inc.*, the Fourth Circuit described Congress's

concerns underlying Section 230:

Congress made a policy choice . . . not to deter harmful online speech
through the separate route of imposing tort liability on companies that
serve as intermediaries for other parties' potential injurious messages.
. . . The amount of information communicated via interactive computer
services is . . . staggering. The specter of . . . liability in an area of such
prolific speech would have an obvious chilling effect. It would be
impossible for service providers to screen each of their millions of
postings for possible problems. Faced with potential liability for each
message republished by their services, interactive computer service
providers might choose to severely restrict the number and type of
messages posted. Congress . . . chose to immunize service providers to
avoid any such restrictive effect.

129 F.3d 327, 331 (4th Cir. 1997) (finding AOL immune from a defamation suit alleging its failure to remove statements posted online by a third party).

The Eleventh Circuit has recognized that Section 230 provides for "broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'" *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006) (quoting *Zeran*, 129 F.3d at 330). Indeed, numerous courts have now recognized Section 230 immunity in claims made against interactive computer service providers ("ICSs") arising from content produced by their users. For instance, a defamation claim against Google based upon posts made by a third-party user was dismissed due to Section 230 immunity. *See Shuler v. Duke*, 2018 WL 2445685, at *10 (N.D. Ala. May 31, 2018), *aff'd*, 792 F. App'x 697 (11th Cir. 2019). A negligence claim against Amazon arising from failure to warn of dangers of a product sold on its site was similarly barred by Section 230. *See McMillan v. Amazon.com, Inc.,* 433 F. Supp. 3d 1034, 1045 (S.D. Tex. 2020). "In general, [Section 230] protects websites from liability for material posted on the website by someone else." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 850 (9th Cir. 2016).

To avail itself of immunity from suit under Section 230 of the CDA, a defendant must show that: (1) it is a "provider . . . of an interactive computer service,

(2) the claim is based on information provided by another information content provider and (3) the claim would treat the defendant as the publisher or speaker of that information." *Doe v. Kik Interactive, Inc.*, 482 F. Supp. 1242, 1248 (S.D. Fla. 2020) (quoting *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 588 (S.D.N.Y. 2018)). As to the first element, there is no dispute that Defendants are "providers" of "interactive computer services" as defined in 47 U.S.C. § 230(f)(2) because they operate websites. Indeed, "[t]oday, the most common interactive computer services are websites." *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008). According to Defendants, the second and third elements are also satisfied because Plaintiffs seek to hold them liable as "publishers" of illegal content—child pornography—created and posted, not by Defendants, but by third parties, the uploaders. *See* FAC ¶¶ 85, 134-37, 153. True, lawsuits seeking to hold an ICS liable "for its exercise of a publisher's traditional editorial functions— such as deciding whether to publish, withdraw, postpone or alter content—are barred" by Section 230. *Zeran*, 129 F.3d at 330. Thus, "[a]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Klayman v. Zuckerberg*, 753 F.3d 1354, 1359 (D.C. Cir. 2014).

If the allegations in this case were that simple, Defendants might prevail. However, even the broad statutory grant of immunity in Section 230 does not apply without limitation and exceptions, two of which Plaintiffs have advanced in this case.

### i.   The FOSTA Exception to CDA Section 230 Immunity

Plaintiffs contend that Defendants are not immune because of an exception to Section 230 known as the Allow States to Fight Online Sex Trafficking Act ("FOSTA"), enacted by Congress in 2018. *See* Pub. L. 115-164, § 2, Apr. 11, 2018, 132 Stat. 1253; 47 U.S.C. § 230(e)(5)(A).[4] FOSTA, added as an additional subsection to Section 230 of the CDA, exempts certain provisions of the TVPRA, discussed above, from Section 230's immunity. Specifically, FOSTA provides that Section 230 has "no effect on sex trafficking law" and that "[n]othing in this section . . . shall be construed to impair or limit . . . any claim in a civil action under section 1595 of Title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title." 47 U.S.C. § 230(e)(5)(A). The FOSTA amendment to Section 230 is retroactive. *See* 132 Stat. 1253, § 4(b); *see also Woodhull Freedom Found v. United States*, 948 F.3d 363, 368 (D.C. Cir. 2020).

---

[4]     The law is sometimes referred to as FOSTA-SESTA due to a companion bill in the Senate, the Stop Enabling Sex Traffickers Act.

Congress passed FOSTA to "narrow Section 230's scope and provide prosecutors with new tools to combat the sex trafficking of both minors and adults." *Woodhull Freedom Foundation*, 948 F.3d at 368; *see also* 164 Cong. Rec. S1849-08, 164 Cong. Rec. S1849-08, S1849 (reflecting that FOSTA was enacted in response to an increase in sex trafficking resulting from "the presence of [sex trafficking] organizations online that are using the ruthless efficiency of the internet to sell women and children"). The legislative history reflects that one of the websites of particular concern to Congress was Backpage.com, an online forum for classified personal advertisements that knowingly trafficked in young women and children. *See* 164 Cong. Rec. S1849-08, 164 Cong. Rec. S1849-08, S1854 (statement of Sen. McCaskill) ("Why is this law so important? If I am looking at this through a prosecutor's lens, now all of the prosecutors in the country can go after anyone who knowingly facilitates sex trafficking online. I am not saying when it is by accident, and I am not saying when it has slipped through and they don't know it; I am talking about to knowingly facilitate, which is what [B]ackpage was doing."). Prior to FOSTA's enactment, minor victims of sex trafficking had sued Backpage under 18 U.S.C. § 1595, alleging that Backpage had structured its website to camouflage advertisements for sex traffickers, but the First Circuit dismissed the suit, ruling that Section 230 provided Backpage with immunity. *See Doe No. 1 v. Backpage.com, LLC*,

817 F.3d 12, 18 (1st Cir. 2016). In enacting FOSTA, Congress declared that Section 230 was "never intended to provide legal protection to websites that unlawfully promote and facilitate prostitution and websites that facilitate traffickers in advertising the sale of unlawful sex acts with sex trafficking victims," Pub. L. No. 115-164 § 2(1), 132 Stat. at 1253, and stated that "clarification" of Section 230 was needed to ensure that it would "not provide such protection to such websites," *id*. § 2(3).

As quoted above, the FOSTA exception references both sections 1591 and 1595 of the TVPRA, abrogating Section 230 immunity for civil section 1595 claims, as long as "the conduct underlying the claim constitutes a violation of section 1591." 47 U.S.C. § 230(e)(5)(A). The parties disagree on what this means.

Defendants argue that FOSTA's second phrase—"if the conduct underlying the claim constitutes a violation of section 1591"—means that Plaintiffs' TVPRA claim is barred by Section 230 unless Plaintiffs sufficiently plead that Defendants violated section 1591(a)(2), the criminal statute prohibiting sex trafficking by a beneficiary, which Defendants say Plaintiffs cannot do. As noted above, section 1591 criminalizes sex trafficking, either by direct perpetrators or by those who knowingly benefit financially from a venture that has engaged in sex trafficking. *See* 18 U.S.C. § 1591(a). Here, it is undisputed that Plaintiffs seek to hold Defendants liable as

beneficiaries of sex trafficking. *See* FAC ¶ 56 (styling Count I as "benefiting from a sex trafficking venture"). According to Defendants, section 1591's text and *United States v. Afyare*, 632 F. App'x 272, 286 (6th Cir. 2016), require Plaintiffs to plead all four of the following elements or risk Defendants being subject to Section 230 immunity. First, there must be a "venture" that commits an act of commercial sex trafficking, a term defined by the TVPRA. *See* 18 U.S.C. § 1591(a)(2), (e)(3). Second, Defendants must have knowingly participated in the venture, *id.* § (a)(2), (e)(4), which requires Plaintiffs to allege Defendants committed "some 'overt act' that furthers the sex trafficking aspect of the venture." *Afyare*, 632 F. App'x at 286. Third, Plaintiffs must plead that Defendants knowingly benefitted from participation in the sex trafficking venture. 18 U.S.C. § 1591(a)(2). And fourth, Defendants must have had actual knowledge of specific sex trafficking involving Plaintiffs. *Id.*

Plaintiffs, on the other hand, contend that to establish that FOSTA applies, they must merely plead the elements of a section 1595(a) claim, which are that the defendant "(1) knowingly benefit[ted] financially or by receiving anything of value; (2) from participation in a venture; (3) it knew or should have known has engaged in sex trafficking under section 1591." *Doe v. Rickey Patel, LLC*, 2020 WL 6121939, at *3 (S.D. Fla. Sept. 30, 2020) (internal quotation marks omitted). Thus, under Plaintiffs' interpretation, they need only allege a predicate violation of section 1591

*by someone*, meaning that they can bring the civil beneficiary claim against Defendants for the underlying sex trafficking perpetrated by their traffickers without needing to show that Defendants themselves would be criminally liable. This distinction is crucial because, while sections 1591 and 1595 both include provisions for beneficiary liability, the criminal statute requires that the defendant have actual knowledge of sex trafficking at issue while the civil statute allows a plaintiff to plead that the defendant merely had constructive knowledge. *Compare* 18 U.S.C. §§ 1591(a)(2) (making it unlawful to "benefit[ ], financially or by receiving anything of value, from participation in a venture which has engaged in" sex trafficking) *and* 1591(e)(4) (defining "participation in a venture" as "knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)) *with* 18 U.S.C. § 1595(a) (allowing sex trafficking victims to bring civil claims against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter").

Plaintiffs derive the elements of a civil section 1595 claim from cases wherein sex trafficking victims have sought to recover damages from hotel chains by imposing beneficiary civil liability under section 1595. In the context of sex trafficking at hotels, numerous courts have found that plaintiffs need not satisfy the definitions that apply

to criminal prosecutions under section 1591(a) to establish civil liability under section 1595(a). *See, e.g.*, *S.Y. v. Naples Hotel Co.*, 2020 WL 4504976, at *2 (M.D. Fla. Aug. 5, 2020) (conducting thorough review of cases). In those cases, courts have addressed the significance of the fact that the "language of § 1591 differs from the language of § 1595" in that "the former does not have a constructive knowledge element manifested by 'should have known' language." *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 969 (S.D. Ohio 2019).

In *M.A.*, for example, the plaintiff was a victim of sex trafficking that occurred at hotels owned by the defendant, and she sued under sections 1595(a) and 1591(a)(2) of the TVPRA. Her claims were based on the theory that the hotel chain benefited from the rental of the rooms where she was trafficked and knew or should have known that trafficking was occurring there based on various signs of sex trafficking that should have been obvious to hotel staff. *Id.* at 962. The Ohio federal court first found that the plaintiff adequately alleged that the hotel chain "knowingly benefited" from the sex trafficking based on the rental of its rooms. *Id.* at 964-65. It next found that the plaintiff alleged sufficient facts to show that the hotel chain "knew or should have known" that the venture was engaged in sex trafficking, citing both to allegations that there were obvious signs of sex trafficking that hotel staff should have recognized and that the hotel chain was "on notice about the prevalence

of sex trafficking generally at their hotels and failed to take adequate steps to train staff in order to prevent its occurrence." *Id.* at 965-68. Third, the court addressed what the plaintiff was required to plead to meet the "participation in a venture" requirement of section 1595(a). The court ruled that the plaintiff need not allege that the hotel actually participated and committed some "overt act" that furthers the sex trafficking aspect of the venture for civil liability under the TVPRA because "otherwise, the 'should have known' language in section 1595(a) would be meaningless." *Id.* at 968-71. The court went on to find that "[i]n the absence of a direct association, Plaintiff must allege at least a showing of a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement." *Id.* at 970. The court found that the plaintiff met this requirement by alleging that the defendant rented rooms to people it knew or should have known were engaged in sex trafficking. *Id.*

Granted, the cases establishing the pleading requirements for section 1595 claims against hotels are not on all fours with FOSTA because hotels are not "interactive computer service providers," *see* 47 U.S.C. § 230(e), and thus in those cases, neither FOSTA nor CDA immunity was considered. And the Eleventh Circuit has not had the occasion to address whether a sex trafficking victim must plead the

elements of a civil section 1595 claim or a criminal section 1591 violation to establish that FOSTA exempts a website from Section 230 immunity. The few district courts that have considered the issue in the four years since FOSTA's enactment have reached different conclusions. Decisions from federal district courts in Florida and California have dismissed TVPRA claims against ICSs on the ground that FOSTA withdraws immunity for websites only if the sex trafficking victim has sufficiently pled that the website's own conduct amounts to a violation of section 1591, in effect requiring plaintiffs to allege that the defendants in those cases had actual knowledge of their sex trafficking and knowingly participated in it. *See Kik Interactive*, 482 F. Supp. 3d 1242; *J.B. v. G6 Hospitality, LLC*, 2021 WL 4079207 (N.D. Cal. Sept. 8, 2021) (J., Gilliam) (granting motion for reconsideration of earlier denial of motion to dismiss based on Section 230 immunity grounds); *Doe v. Reddit*, 2021 WL 5860904 (C.D. Cal. Oct. 7, 2021). On the other hand, other decisions from federal district courts in California have found that plaintiffs must do no more than plead the elements of a section 1595 claim, including in a case where a Jane Doe plaintiff sued the same defendants that Plaintiffs sue here—those entities that own and operate Pornhub—on very similar grounds. *See Doe v. Mindgeek USA Inc.*, -- F. Supp. 3d --, 2021 WL 4167054 (C.D. Cal. Sept. 3, 2021). *See also Doe v. Twitter, Inc.*, -- F. Supp. 3d --, 2021 WL 3675207 (N.D. Cal. Aug. 19, 2021). A brief review of these decisions

is helpful in addressing this question of statutory interpretation and of first
impression.

Defendants rely heavily on the Southern District of Florida's 2020 decision in
*Kik Interactive*. In that case, the defendant was a web-based messaging app called Kik
that marketed to teens and young adults. 482 F. Supp. 3d at 1244. The plaintiff
alleged that numerous adult male users of Kik induced her to send them sexually
graphic photographs of herself using Kik; that there had been multiple instances
where adult users of Kik had used the service to contact and solicit sexual activity
with minors, with some of those contacts resulting in death of the minors; and that
Kik knew about such instances but failed to provide warnings or enact policies to
protect minors from such abuses. *Id*. The plaintiff sued under section 1595 of the
TVPRA, but the court ruled that Kik was immune under Section 230 and that
FOSTA did not apply. *Id*. at 1251. The court ruled that FOSTA only exempts civil
claims brought pursuant to section 1595 from immunity under Section 230 if the
plaintiff has pled that the defendant's conduct met the criminal *mens rea* standard in
section 1591. *Id*. In so holding, the court first opined that the plain language of
FOSTA removes immunity only for conduct that violates section 1591. *Id*. at 1249
("Had Congress intended to revoke CDA immunity for all claims involving sex
trafficking on websites . . ., it could have done so; but it did not."). The court then

relied on the Congressional history of FOSTA, stating that "Congress only intended to create a narrow exception to the CDA for openly malicious actors such as Backpage where it was plausible for a plaintiff to allege actual knowledge and overt participation." *Id.* at 1250 & n.6 (quoting 164 Cong. Rec., at S1860-62 ("[FOSTA] is a narrowly crafted bill that would ensure that Section 230 of the [CDA] does not provide legal immunity to websites like Backpage that knowingly facilitate sex trafficking.") and H.R. Rep. No 115-572, at 5 ("general knowledge that sex trafficking occurs on a website will not suffice as the knowledge element must be proven as to a specific victim")). Because the plaintiff did not allege that Kik "knowingly participate[d] in the sex trafficking venture involving her," the court found Kik to be immune and dismissed the TVPRA claim. *Id.*

     In August 2021, in *Doe v. Twitter*, the Northern District of California disagreed with the decision in *Kik Interactive*, ruling instead that when a "plaintiff seeks to impose civil liability under Section 1595 based on a violation of Section 1591(a)(2) . . . [,] the 'known or should have known' language of Section 1595 (rather than the actual knowledge standard of Section 1591)" applies. 2021 WL 3675207, at *23. *Doe v. Twitter* concerned two plaintiffs who alleged that when they were minors, pornographic videos depicting them were posted on the social media platforms Snapchat and Twitter; that despite law enforcement requesting that Twitter take

down the videos Twitter initially refused to do so; and that it was not until the mother of one of the minors contacted an agent of the Department of Homeland Security, who contacted Twitter, that Twitter finally removed the videos, nine days after being contacted and after the videos had been viewed over 167,000 times and retweeted 2,223 times. *Id.* at *1. In deciding whether FOSTA applied to bar Twitter from claiming Section 230 immunity from the plaintiffs' section 1595 claim, the court first noted that the line of section 1595 cases involving sex trafficking at hotels "does not answer the question of whether the same standards apply where a civil claim is asserted under section 1591(a)(2) against an ICS." *Id.* at *23. The court then engaged in a statutory interpretation of FOSTA, first emphasizing that in interpreting the plain language of a statute, the Supreme Court has instructed that courts should "consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme." *Id.* at *24 (quoting *Bailey v. United States*, 516 U.S. 137, 145 (1995)). The court further stressed that where a statute, like FOSTA, is "remedial," it "should be liberally construed." *Id.* (quoting *Peyton v. Rowe*, 391 U.S. 54, 65 (1968)). The court noted that FOSTA is a remedial statute "in that it carves out exceptions to CDA 230 immunity, thereby affording remedies to victims of sex trafficking that otherwise would not have been available." *Id.* The court found that the *Kik Interactive* court's interpretation of FOSTA—adopting the most restrictive

reading—resulted in the implication that "a sex trafficking victim who seeks to impose civil liability on an [ICS] on the basis of beneficiary liability faces a higher burden than a victim of sex trafficking who seeks to impose such liability on other types of defendants [such as hotel chains]." *Id.* The court found that Congress meant something entirely different than what the *Kik Interactive* court found in drafting the second phrase of FOSTA: that the reference to section 1591 was added to create an exception to Section 230 immunity for civil trafficking claims specifically as to section 1591 (penalizing sex trafficking) and *not* as to other sections of Title 18 that can give rise to civil liability under Section 1595, such as those states penalizing slavery and forced labor, explaining:

> In particular, Section 1595 is found in Chapter 77 of Title 18, entitled "Peonage, Slavery, and Trafficking in Persons," and creates civil liability for "[a]n individual who is a victim of a violation of this chapter." 18 U.S.C. § 1595(a) (emphasis added). As the title of the chapter suggests, it prohibits a host of conduct including "hold[ing] or return[ing] any person to a condition of peonage" (§ 1581), "[e]nticement into slavery" (§ 1583), and "benefit[ing], financially or ... receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of [forced] labor" (§ 1589).

*Id.* Finally, the court cautioned against relying too heavily on isolated statements by legislators made prior to passage of a bill, as was done in *Kik*, and concluded that the issue was better resolved on the language of FOSTA as it fits within the statutory framework of the TVPRA and the CDA. *Id.* at *25. Having concluded that the

plaintiffs' section 1595 claim was not subject to the more stringent pleading requirements applicable to section 1591, the court ultimately found that the plaintiffs stated a claim for civil liability under the TVPRA on the basis of beneficiary liability and that the claim fell within FOSTA's exception to Section 230 immunity. *Id.* at *28.

The next month, the Central District of California, in a case very similar to the one before this Court, sided with the *Doe v. Twitter* court and distinguished the *Kik Interactive* decision in denying in substantial part a motion to dismiss a complaint brought by an individual plaintiff proceeding pseudonymously against Mindgeek and related companies. *Doe v. Mindgeek USA Inc.*, 2021 WL 4167054, at *4 ("[W]hen a 'plaintiff seeks to impose civil liability under Section 1595 based on a violation of Section 1591(a)(2) . . . [,] the "known or should have known" language of Section 1595 (rather than the actual knowledge standard of Section 1591)' applies.") (quoting *Doe v. Twitter*, 2021 WL 3675207, at * 23).

In October of last year, in another decision out of the Central District of California, that court dismissed a plaintiff's TVPRA claims against Reddit.com, finding that she was required to plead Reddit's violation of section 1591 to prevail under FOSTA and that she had not done so. *Doe v. Reddit*, 2021 WL 5860904 (C.D. Cal. Oct. 7, 2021). Plaintiffs sought to pursue a class action against Reddit, one of the

Internet's most popular websites that is built around users submitting links, pictures, and text that everyone can view and vote on, arising from the posting of sexually explicit videos and images of children. *Id.* at *1. The court found that the plaintiff was not able to establish Reddit's knowing participation in a business venture with the plaintiff's sex traffickers because there was no allegation that Reddit had any monetary relationship with those traffickers. *Id.* at *8 ("To conclude otherwise would mean that all web-based communications platforms have a legal duty to inspect every single user-generated message before it is communicated to a single person or displayed to the public, lest such platforms be deemed to have participated in the venture. [T]here is no indication that Congress intended to create such a duty, or that it would be reasonable in light of the volume of posts generated by third parties daily.") (quoting *J.B. v. G6 Hospitality, LLC*, 2020 WL 4901196, at *9 (N.D. Cal. Aug. 20, 2020)).

The most recent decision to have addressed the issue is that of *J.B. v. G6 Hospitality, LLC*, where in December 2021, the Northern District of California granted the defendant Craigslist.com's motion for reconsideration of its original denial of Craiglist's motion to dismiss based upon Section 230 immunity. 2021 WL 4079207, at *17. Perhaps illustrating the difficulty of this issue, the court reversed course from its previous—August 2020—opinion, this time finding that Craiglist

was saved by Section 230 immunity, despite FOSTA, from the plaintiff's section 1595 claim because the plaintiff did not establish that Craiglist's own conduct violated section 1591. *Id.* at *12. In *J.B.*, the plaintiff alleged that she was repeatedly trafficked for commercial sex as a minor and advertised for sale on Craigslist's "Erotic Services" and "Adult Services" classified categories. In holding that FOSTA limits the scope of civil sex trafficking claims against websites that otherwise meet the requirements for CDA immunity to circumstances in which the website's conduct amounts to a violation of section 1591, the court reasoned that, "if Congress meant to exempt all claims involving sex trafficking, it could have said 'if the claim arises out of a violation of section 1591,' or 'if the plaintiff is a victim of a violation of section 1591.'" *Id.* at *6 (quotation omitted).

Fortunately for this Court, it need not decide at this juncture which way it interprets FOSTA. This is so because, as discussed in the next section, the Court finds that Defendants are not subject to Section 230 immunity based upon another exception—Defendants materially contribute to the creation of illegal content on their platforms. *See J.B.*, 2021 WL 4079207 at *6 ("[A] plaintiff can bring a [section 1595] claim against . . . websites that are ineligible for immunity because they create or materially contribute to the content at issue."). And since the Court finds in the next section that Defendants are not immune, Plaintiffs need only establish the

elements of their civil TVPRA claim pursuant to section 1595, not the elements of the criminal violation, as might have been required were they having to proceed under FOSTA's exception to Section 230. *See id.*

### ii. Content Providers and CDA Section 230 Immunity

FOSTA is not the only exception to Section 230 immunity, and Plaintiffs offer another theory to argue that their TVPRA claim is not barred. Plaintiffs argue that Defendants are acting as content providers, and, as such, cannot claim Section 230 immunity. "This grant of immunity [under Section 230] applies only if the [ICS] is not also an 'information content provider,' which is defined as someone who is 'responsible, in whole or in part, for the creation or development of' the offending content." *Roommates.com*, 521 F.3d at 1162 (citing 47 U.S.C. § 230(f)(3) (defining "information content provider")). "A website operator can be both a service provider and a content provider: If it passively displays content that is created entirely by third parties, then it is only a service provider with respect to that content. But as to content that it creates itself, or is responsible, in whole or in part for creating or developing, the website is also a content provider." *Id.* (cleaned up) Thus, content providers cannot use Section 230 immunity to escape liability for the unlawfulness of the content they create.

The Ninth Circuit in *Roommates* articulated the following test, which other circuits have adopted as well: "[a] website helps to develop unlawful content, and thus falls within the exception to Section 230, if it *contributes materially* to the alleged illegality of the conduct." *Id.* at 1168 (emphasis added). The Ninth Circuit more recently reiterated that "[a] 'material contribution' does not refer to 'merely . . . augmenting the content generally, but to materially contributing *to its alleged unlawfulness*.'" *Gonzalez v. Google*, 2 F.4th 871, 892 (9th Cir. 2021) (quoting *Roommates*, 521 F.3d at 1167–68) (emphasis in original). In other words, this test acknowledges that "making a material contribution does not mean 'merely taking action that is necessary to the display of the allegedly illegal content,' but rather, 'being responsible for what makes the displayed content allegedly unlawful.'" *Id.* (quoting *Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 410 (6th Cir. 2014)).

The Eleventh Circuit has not had the occasion to apply this "material contribution" test to a claim that a website is not subject to Section 230 immunity. However, several decisions from and within the Ninth Circuit are illustrative in applying the test to Plaintiffs' allegations.

In *Roommates*, the plaintiffs, San Diego-area fair housing councils, sued Roomates.com, a website designed to match people renting out spare rooms with

people looking for a place to live, alleging that the website contributed to the creation of rental listings that violated fair housing laws because users of the website were required to disclose information, via questionnaires, such as their sex, their sexual orientation, whether they had children, and the traits they preferred in their roommate, before they could post advertisements for housing. 521 F.3d at 1166. Though Roommates sought Section 230 immunity, the Ninth Circuit instead deemed it a content provider, noting that "[t]he CDA does not grant immunity for inducing third parties to express illegal preferences. Roommates' own acts—posting the questionnaire and requiring answers to it—are entirely its doing and thus section 230 of the CDA does not apply to them." *Id.* at 1165. Essentially, the court found that "[b]y requiring subscribers to provide the information as a condition of accessing its service, and by providing a limited set of pre-populated answers, Roommate becomes much more than a passive transmitter, of information provided by others; it becomes the developer, at least in part, of that information." *Id.* at 1166. The Ninth Circuit distinguished its earlier decision *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003), in which it had found that the defendant, an online dating website, was entitled to Section 230 immunity against claims of defamation and invasion of privacy brought by an actress stemming from an incident where an unknown prankster created an unauthorized profile of her on the site suggesting that

she was looking for an unconventional liaison. *Roommates*, 521 F.3d at 1171-72. Unlike

the website in *Roommates*, the website in *Carafano* merely "provided neutral tools

specifically designed to match romantic partners depending on their voluntary

inputs." *Id.* at 1172. These tools were neutral because the website did not

"encourage the posting of defamatory content" by merely providing a means for

people to publish dating profiles they created. *Id.* at 1171.

     More recently, the Ninth Circuit in *Gonzalez* held that the defendant Google

was entitled to Section 230 immunity and was not a content provider. 2 F.4th at 892.

There, the plaintiffs, family members of victims of fatal shootings which were

committed by persons associated with the ISIS terrorist group, sued operators of

social media platforms Google, Twitter, and Facebook for damages pursuant to the

Anti-Terrorism Act, 18 U.S.C. § 2333, alleging that they knowingly allowed ISIS to

post videos and other content to communicate its message of terror and to radicalize

new recruits and were thus directly and secondarily liable for the murders. *Id.* at 880.

The plaintiffs specifically alleged that Google's YouTube platform used computer

algorithms to match and suggest content to users based on their viewing history,

thereby recommending ISIS videos to users and enabling users to locate other ISIS

content. *Id.* at 881-82. The Ninth Circuit held that because the plaintiffs were

seeking to impose liability on Google for allowing ISIS to place content on YouTube,

they were seeking to treat Google as a publisher of a third-party message, and thus
Section 230 immunity applied. *Id.* at 892. The court rejected the plaintiffs' theory
that "Google makes a material contribution to the unlawfulness of ISIS content by
pairing it with selected advertising and other videos because 'pairing' enhances user
engagement with the underlying content." *Id.* at 893. In so holding, the court
discussed its earlier decisions in *Roommates*, *Carafano*, and *Dyroff v. Ultimate
Software Group, Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019). Recalling these cases, the
Ninth Circuit first noted that "[t]he website [in *Carafano*] was not transformed into
the creator or developer of libelous content contained in users' dating profiles, even
though its matchmaking functionality allowed that content to be more effectively
disseminated." *Id.* at 893. In contrast, the court continued, "[t]he *Roommates*'
website did not employ 'neutral tools'; it required users to input discriminatory
content as a prerequisite to accessing its tenant-landlord matching service." *Id*. And
in *Dyroff*, a website defendant did not materially contribute to the creation of a post
on one of its message boards advertising heroin, on which the plaintiff overdosed and
died, merely because it used algorithms to recommend that particular message board
to the user-plaintiff based on that user's preferences but did not encourage heroin
sales. 934 F.3d at 1095-96, 1098. The *Gonzalez* court found that, as in *Carafano* and
*Dyroff*, Google's use of algorithms to recommend content to users based upon users'

viewing history and preferences, and even to target advertising to users based on those same preferences, are neutral tools because the complaint failed to allege that these tools "prompted ISIS to post unlawful content" or "treated ISIS-created content differently than any other third-party created content." 2 F.4th at 896. Instead, Google simply "provided a neutral platform that did not specify or prompt the type of content to be submitted, nor determine particular types of content its algorithms would promote." *Id.*

In *Doe v. Mindgeek*, discussed above, the California district court, in addition to finding that FOSTA applied to bar the defendants' Section 230 immunity to the plaintiff's TVPRA claim, also found that the defendants "materially contributed to" the development of illegal child pornography on Pornhub. 2021 WL 4167054, at *8-9. The district court relied on *Roommates* and the other Ninth Circuit cases discussed above, concluding that those cases stand for the rule that a website's tools are neutral only when they do not *encourage* the creation of illegal content. *Id. See also Doe v. Mindgeek*, 2021 WL 5990195, at *4-6 (C.D. Cal. Dec. 2, 2021) (order denying motion for reconsideration of denial of motion to dismiss and discussing *Roommates*, *Carafano*, *Dyroff*, and *Gonzalez* in greater detail). The *Doe v. Mindgeek* court concluded that the plaintiff's allegations described conduct by the defendants that went "far beyond the neutral tools the Ninth Circuit has protected within the ambit

of Section 230 immunity." 2021 WL 4167054, at *9. Rather, the plaintiff alleged that "Defendants' guidance and directions to users call directly for child pornography." *Id.*

The *Doe v. Mindgeek* court also found its case similar to *M.L. v. Craigslist*, 2020 WL 5494903 (W.D. Wash. Sept. 11, 2020). *Id.* at *8-9. In *M.L.*, a Washington district court ruled that Craigslist could not claim Section 230 immunity when the plaintiff plausibly alleged that it materially contributed to the creation of advertisements that sex traffickers used to sell their victims on its platform. *Id.* at *11. There, the plaintiff defeated Craigslist's motion to dismiss on Section 230 immunity grounds when she alleged that: (1) traffickers used Craigslist's rules and guidelines to create the content and format of the advertisements; (2) traffickers would pay Craigslist a fee to post the advertisement on Craigslist's erotic services section; (3) Craigslist designed a communication system to allow traffickers and purchasers to communicate anonymously and evade law enforcement; (4) Craigslist developed user interfaces to make it easier for purchasers to find desired trafficking victims; and (5) that Craigslist was aware that this was occurring but had relationships with traffickers to facilitate the illegal conduct in exchange for payment. *Id.* at *11–12.

Defendants argue that they are not content providers with respect to child pornography on their websites because, based on the cases discussed above, a

website does not become a creator of content if it fails to edit or block user-generated content, if it does nothing more than disseminate content, or if it employs content-neutral search technology that enables users to find certain types of content. However, just as in *Doe v. Mindgeek*, *supra*, the Court finds that Plaintiffs have plausibly alleged that Defendants indeed materially contribute to the provision of child pornography on their platforms. Plaintiffs allege that Defendants do more than just provide a place to host third-party CSAM or employ neutral tools that treat videos depicting CSAM the same as any other videos on Pornhub. Rather, Plaintiffs allege that Defendants encourage and materially contribute to the development, optimization, and advertising of CSAM on Pornhub. Specifically, the complaint alleges that Defendants *themselves* generate tags, categories, and keywords that users wishing to post CSAM videos can use, and in fact are encouraged to use, to maximize views, such "teen," "abused teen," and "middle school girls," FAC ¶¶ 56, 59, 65-67, 71, 103, 112-18; Defendants admit to creating at least some of the pornography content on their websites and create thumbnails of CSAM videos, including of the videos of Plaintiffs, which amounts to new creation and possession of child pornography, *id.* ¶¶ 74-75; Defendants create timelines for viewers to jump around to certain labeled scenes in videos depicting CSAM, *id.* ¶¶ 72-73; they employ coded language for CSAM content to ensure that such content is visible to users who search

for it, *id.*; and their moderators are discouraged from flagging CSAM, *id.* ¶¶ 123-24. Plaintiffs have also alleged that Defendants develop and materially contribute to illegal content by editing advertisements to market to pedophiles by including terms associated with CSAM, *id.* ¶ 103; controlling the content in each video through extensive instructions to uploaders including the type of content viewers wish to see and the sex acts to take place, *id.* ¶¶ 58-62, 65, 87, 91; and exercising even greater control over the content of Modelhub members and Content Partners, some of which constitutes CSAM, *id.* ¶¶ 88-90. In this way, Defendants do even more than merely encourage the posting of CSAM by providing a means for users to publish what they created but rather materially contribute to it by designing their platforms for an illicit purpose.

The facts of this case are unlike those cases in which neutral search tools or algorithms were misused by bad actors. *See Force v. Facebook*, 934 F.3d 53, 66-68 (2nd Cir. 2019) (the content provider allegations failed where they were premised on Facebook's friend- and content-suggestion algorithms, which merely blindly connected users based on their information); *Grindr LLC*, 765 F. App'x at 591 (Grindr "cannot be held liable for providing . . . tools and functionality available equally to bad actors and the [platform's] intended users"). Here, the allegations are that Defendants' tools themselves function in a way to direct users to CSAM in

particular, as opposed to treating CSAM the same way that lawful videos on Defendants' websites are treated. Indeed, Defendants exert extensive control over the development of pornographic content on their websites. Defendants have instructed uploaders and users, down to a granular level, on how to create content, and has made these instructions a condition of use for Modelhub members and Content Partners. Plaintiffs have alleged that Defendants intend to and do direct users to the CSAM that they are seeking by using criteria indicating the illegal nature of the content.

Ultimately, Pornhub simply cannot be likened to other kinds of ICSs that were aptly described in a similar case as "the river[s] through which internet sexual trafficking flows." *See M.A. ex rel. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1055 (E.D. Mo. 2011). As the *M.A.* court noted, "whatever [those ICSs] did to increase their profitability and visibility, [they] did not create the content of the offensive posted information." *Id*. The same cannot be said about Pornhub, at least insofar as Plaintiffs' allegations are deemed true. Pornhub is alleged to be an entirely different animal. Thus, taking Plaintiffs' allegations as true and construing the assertions in the light most favorable to Plaintiffs, the complaint alleges sufficient facts to plausibly state a claim that Defendants are providers of illegal CSAM content, not merely publishers of third party-created content. Therefore,

Defendants are not entitled to CDA Section 230 immunity from Plaintiffs' TVPRA claims.[5]

### 2. Whether Plaintiffs have Stated a Plausible TVPRA Claim

Finding Defendants not immune, the Court now turns to the question of whether Plaintiffs have sufficiently alleged a section 1595 claim. Recall that to state such a claim, Plaintiffs must plead that Defendants knowingly participated in a venture, knowingly received a benefit from their participation, and knew or should have known that Plaintiffs were victims of sex trafficking. *See Doe v. Twitter*, 2021 WL 3675207, at *25. The Court analyzes each element in turn.

#### i. *Plaintiffs Sufficiently Alleged that Defendants Knowingly Participated in a Venture*

The first element of a section 1595 claim is whether Defendants knowingly participated in a venture. A "venture" is defined in the TVPRA as "any group of two or more individuals associated in fact." 18 U.S.C. § 1591(e)(6). Plaintiffs must "allege at least a showing of a continuous business relationship between the trafficker and [Defendants] such that it would appear that the trafficker and [Defendants] have

---

[5]      Finding as such, the Court therefore does not find it necessary to address the two other theories that Plaintiffs advance in support of their argument that Defendants are not entitled to Section 230 immunity, one based on their sharing of revenue with Plaintiffs' traffickers, as discussed in *Gonzalez*, 2 F.4th at 897-98, and the other based on their claim that Defendants operate their websites in bad faith.

established a pattern of conduct or could be said to have a tacit agreement." *Doe v. Mindgeek*, 2021 WL 4167054, at *5 (quoting *M.A.*, 425 F. Supp. 3d at 970).

In *Doe v. Twitter*, the California district court found that the plaintiffs had sufficiently alleged Twitter's participation in a venture with their sex traffickers by alleging that Twitter makes it difficult for users to report CSAM, permits large amounts of human trafficking on its platform, despite having the ability to monitor it and at least constructive knowledge of its posting on the platform, provides hashtags to help users find CSAM, rarely removes hashtags that are associated with such material, and has a search suggestion feature that makes it easier for users to find the illicit content. 2021 WL 3675207, at *25. The court further found that the plaintiffs' specific allegations about how Twitter failed to remove, after being asked numerous times, child pornography videos depicting *them* made it plausible that Twitter and the sex traffickers had a "tacit agreement." *Id.*

Similarly in *Doe v. Mindgeek*, the court found that the plaintiff plausibly alleged that the defendants generally enable child sex trafficking on their platforms and failed to remove the child pornography depicting the plaintiff, sufficiently pleading that the defendants participated in a venture with traffickers. 2021 WL 4167054, at *5. With respect to the plaintiff's general allegations about Pornhub, the court opined that they closely mirrored those in *Doe v. Twitter*, to wit: the defendants enable child

pornography by permitting large amounts of human trafficking and commercial sexual exploitation material on their platforms, despite having the ability to monitor it; review, approve, post, and feature videos of children being assaulted or raped; know about the pervasiveness of child pornography on their platforms but fail to implement age verification technology or take meaningful action to stop it; make it easy for users to find child pornography; offer, approve, and capitalize upon video playlists, tags, titles, categories, and descriptors indicating that videos consist of child pornography, using terms such as "less than 18," "the best collection of young boys," and "underage;" and promote and suggest to users search terms such as "middle school girls." *Id.* The court further noted, "[M]ore egregious than Twitter, Plaintiff alleges that Defendants enable child sex trafficking when they enter into agreements with traffickers to share proceeds of advertisement revenue earned from child pornography videos posted to their websites [] and actively employ tactics to make it difficult for law enforcement to locate traffickers." *Id.* With regard to the specific allegations concerning the videos of the plaintiff, the plaintiff alleged that the defendants' moderators reviewed, approved, and uploaded at least one of the child pornography videos of the plaintiff to RedTube; that the video title contained the word "teen," was tagged with the word "teen," and was categorized as "teen" pornography, indicating how youthful the plaintiff appeared; that the defendants had

approved the plaintiff's ex-boyfriend's posting of over 500 images and videos victimizing young women to its websites; and that videos of the plaintiff were on the defendants' platforms for nearly a month before they were removed, providing ample time for the defendants to identify the videos as child pornography and remove them. *Id.* at *6. The court found these allegations sufficient to make it plausible that the defendants were aware the videos of the plaintiff contained child pornography and failed to remove them, thereby creating a venture.

Similarly, here, Plaintiffs have alleged facts showing that Defendants participated in a venture by possessing, reviewing, disseminating, and refusing to remove child pornographic content, profiting from that content, and sharing those profits with Plaintiffs' sex traffickers. *See* FAC ¶¶ 56, 63, 106, 114, 125, 147, 149-74. Plaintiffs have alleged facts from which it can be reasonably inferred that their sex traffickers had not only tacit agreements with Defendants—which is all that is required under section 1595—but in fact had explicit agreements with Defendants, namely their Modelhub and Content Partner business relationship agreements—where they shared in the benefit from Plaintiffs' exploitation. *Id.* ¶¶ 106, 151-52, 165. Plaintiffs have sufficiently alleged the first element of their section 1595 claim.

> ii.    ***Plaintiffs Sufficiently Alleged that Defendants Knowingly Received a Benefit from their Participation in the Venture***

Plaintiffs also adequately allege the second element of their section 1595 claim: Defendants "knowingly benefit[ted] financially or by receiving anything of value" from their participation in the venture. *Doe v. Mindgeek*, 2021 WL 4167054, at *6 (quoting *B.M. v. Wyndham Hotels & Resorts, Inc.*, 2020 WL 4368214, at *4 (N.D. Cal. Jul. 30, 2020) (finding that hotel's revenues from room rentals to sex traffickers met the financial benefit element)). *See also Doe v. Twitter*, 2021 WL 3675207, at *26 ("the 'knowingly benefit' element of section 1595 merely requires that Defendant knowingly receive a financial benefit from its relationship with the sex trafficker") (quotations and internal alterations omitted).

In *Doe v. Twitter*, it was sufficient to show Twitter's knowing receipt of a financial benefit from participation in a venture with sex traffickers that the complaint contained detailed allegations about how Twitter monetizes content, including CSAM, through advertising and data collection, and that Twitter received a financial benefit from the distribution of the videos depicting plaintiffs because the videos were "viewed at least 167,000 times and retweeted 2,220 times for additional views." *Id*. at *27. In *Doe v. Mindgeek*, it was sufficient to show a financial benefit that the plaintiff alleged that the defendants monetize the posting of child pornography through advertising revenue, fee-based subscription services, and selling user data, and that the defendants monetized the videos of the plaintiff

specifically by placing advertisements next to the videos depicting her and that one video received 30,000 views, resulting in increased traffic to the defendants' web platforms. 2021 WL 4167054, at *6.

The same is true here. Plaintiffs have alleged that Defendants knowingly received a benefit and something of value from the CSAM by monetizing it and entering into business partnerships with traffickers, and that Defendants specifically monetized the sex trafficking content featuring Plaintiffs specifically, through the profit-sharing partnership with Plaintiffs' sex traffickers under their Modelhub and Content Partner programs. *See* FAC ¶¶ 106, 151-52, 165.

### iii. *Plaintiffs Sufficiently Alleged that Defendants Knew or Should have Known the Venture was Engaged in Sex Trafficking*

Finally, Plaintiffs have alleged that Defendants knew or should have known that they were the victims of sex trafficking "at the hands of the users who posted the content." *Doe v. Mindgeek*, 2021 WL 4167054, at *7 (quoting *Doe v. Twitter*, 2021 WL 3675207, at *25)). Before explaining why this is so, the Court must address Defendants' argument that Plaintiffs have not alleged that they were trafficked in the first place, much less that the sex acts they were involved in were commercial, and that without these threshold showings, the TVPRA does not apply.

Contrary to Defendants' contention, Plaintiffs' complaint alleges that they are victims of sex trafficking under section 1591 of the TVPRA. *See* FAC ¶¶ 9, 12, 44. Section 1591(a)(1) defines sex trafficking, among other things, as "knowingly recruit[ing], entic[ing], harbor[ing], transport[ing], provid[ing], [obtain]ing, advertis[ing], maintain[ing], patronize[ing], or solicit[ing] by any means a person . . . knowing, or . . . in reckless disregard of the fact . . . that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act[.]" 18 U.S.C. § 1591(a)(1). A "commercial sex act" is defined as "any sex act, on account of which anything of value is given to or received by any person." *Id.* § 1591(e)(3). Thus, sex trafficking is, among other things, engaging someone under 18 in a sex act for which something of value is given to or received by any person. Plaintiffs have alleged that 1) as minors they engaged in sex acts, 2) that were filmed by the sex traffickers, and then 3) exchanged for something of value by both the original sex traffickers and Defendants. *See* FAC ¶¶ 149-74. Specifically, the complaint alleges that a man "drugged and raped" Jane Doe #1 when she was a minor. *Id.* ¶ 149. Similarly, Jane Doe #2 alleges that she was trafficked beginning at age 14 and that a "sex trafficker . . . forced her to participate in the creation of sexually explicit videos." *Id.* ¶¶ 161-62.

Defendants further argue that for sex trafficking to be commercial, there must be a *quid pro quo* between the sex act and an exchange of something of value. The *Doe*

*v. Mindgeek* court rejected this argument, noting that the TVPRA does not define "commercial sex act" so narrowly, instead stating that it is "*any sex act*, on account of which anything of value is given to or received by *any person*." 2021 WL 4167054, at *7 (citing 18 U.S.C. § 1591(e)(3)). And the *Doe v. Twitter* court found the posting of child pornography to Twitter to be a commercial sex act. *See* 2021 WL 3675207, at *27. Similarly, Plaintiffs sufficiently allege a commercial sex act here. They allege that CSAM depicting them was posted to Defendants' websites, and Defendants— as well as the uploaders—received a financial benefit in return for posting child pornography in the form of revenue and increased website traffic.

Nor is Defendants' contention well taken that Plaintiffs are required to, but did not, allege that their abusers had the intent to monetize the CSAM videos at the time they were made. Defendants rely upon *United States v. Todd*, 627 F.3d 329, 334-37 (7th Cir. 2010), for the proposition that Plaintiffs' allegations that their assailants subsequently attempted to monetize the videos does not retroactively make their actions commercial. *Todd* is distinguishable because it dealt with direct criminal liability under section 1591(a)(1) of the TVPRA, not civil liability under section 1595, and nowhere opines on what constitutes a commercial sex act. Further, courts have explained that "[t]he statutory language [of section 1595] requires that [the defendant] knowingly benefit financially, not that the perpetrator compensate [the

defendant] on account of the sex trafficking." *H.H. v. G6 Hospitality, LLC*, 2019 WL 6682152, at *2 (S.D. Ohio Dec. 6, 2019).

Accordingly, Plaintiffs have sufficiently alleged that they are the victims of sex trafficking. Further, they have shown that Defendants should have known this. In *Doe v. Twitter*, the third element was met through the plaintiffs' allegations that they alerted Twitter that the videos were created under threat when the plaintiffs were children; they provided evidence of one of the plaintiff's age at the time of filming in response to Twitter's request for further information; and that other Twitter users used the word "twinks" to describe the children in the videos, which, according to the complaint, is a term used to describe young boys or men. 2021 WL 3675207, at *28. These allegations refuted Twitter's claim that it had no way of knowing that the videos might have been evidence of commercial sex trafficking.

In *Doe v. Mindgeek*, this final element was met through the plaintiff's allegations that the Defendants reviewed, approved, and featured the videos of the plaintiff on its platforms; the video depicting the plaintiff that Defendants uploaded to RedTube had the word "teen" in its title and was categorized as teen pornography, indicating how young the plaintiff appeared in the video; and the plaintiff's ex-boyfriend had posted hundreds of videos to the defendants' platforms, victimizing other women. 2021 WL 4167054, at *7. Further, "[t]his was all done

when Defendants had actual knowledge of the pervasiveness of child pornography on their platforms, and yet they still refused to implement basic protections against posting child pornography, such as age verification technology." *Id.*

Similarly here, Plaintiffs allege the following facts that make it plausible that Defendants should have known that the videos of Plaintiffs on Pornhub constituted child pornography. Defendants own and control multiple pornography websites without verifying age and consent of persons appearing in the content, FAC ¶ 142; review all content on their websites, *id.* ¶¶ 56, 64, 126-27; harvest and analyze user data, including searches and video views, *id.* ¶¶ 107-111; tag, categorize, and otherwise optimize content for user preferences, including Jane Doe #1's content by tagging it "Lil", *id.* ¶¶ 102, 112-14, 152; give bonuses to moderators based on the number of videos approved (instead of blocked), *id.* ¶¶ 129; discourage moderators from removing profitable users' illegal videos, *id.* ¶ 133; direct less scrutiny to videos that look professionally made or are from Defendants' business partners, including Modelhub members, *id.* ¶¶ 123-24; maintain a list of banned terms that would indicate illegal activity, including child pornography and sex trafficking, but loosely conceal those terms with other terms, *id.* ¶¶ 62-64; and profit from encouraging VPN use to disguise who is accessing the site and from permitting banned users to re-enter the site and reuse the banned images or videos as well as the associated

comments, tags, and keywords, *id*. ¶¶ 139-141. Defendants are alleged to have general knowledge of widespread CSAM and other sex trafficking content on their sites, *id*. ¶¶ 79-82, 113, and specific knowledge of sex trafficking content from their Content Partners GirlsDoPorn and Czech Casting, who faced criminal charges, *id*. ¶¶ 79-80. Defendants are alleged to have retagged and retitled known CSAM videos, *id*. ¶ 125, leaving links to known CSAM live, with associated metadata, keywords, comments, and tags so that it will continue to feed SEO and direct users to this material, *id*. ¶¶ 144-45; and reporting CSAM content to NCMEC but waiting until 2020 to do so and making relatively few reports, *id*. ¶ 135. Plaintiffs have more than sufficiently alleged that Defendants had constructive knowledge of Plaintiffs' sex trafficking.

Because Plaintiffs have established every element of their civil sex trafficking violation claim under section 1595 of the TVPRA, Defendants' motion to dismiss insofar as it relates to Count I is denied.

> **B.     Count II:     Knowing Receipt, Possession, and Distribution of Child Pornography in Violation of 18 U.S.C. §§ 2252 & 2252A**

Count II alleges that Defendants knowingly received, possessed, and distributed child pornography depicting class members including Plaintiffs, in

violation of 18 U.S.C. §§ 2252 and 2252A.[6] Plaintiffs further allege that Defendants
duplicated and distributed *new* child pornography by creating and hosting new
"thumbnail" images from existing videos of Plaintiffs and others. Section 2252A(f)
provides a civil remedy to persons aggrieved by the conduct prohibited in section
2252A(a) or (b). 18 U.S.C. § 2252A(f). Section 2252A recognizes that the elements
of the offense can be met through actions "by any means, including by computer"
and liability for knowing distribution applies to "any child pornography"—
regardless of the material's publication status or whether it was originally created by
a third party. *Id.* § 2252(A)(a)(2).

Defendants raise two arguments in support of why Count II should be
dismissed: (1) Plaintiffs have not pleaded facts establishing that Defendants received,
possessed, or distributed any videos of them *knowing that they contained CSAM*; and
(2) even if Plaintiffs have stated a claim that Defendants knowingly received,
possessed, and distributed child pornography in violation of 18 U.S.C. §§ 2252 and
2252A, Defendants are entitled to immunity for such a claim under Section 230 of
the CDA. Each argument is addressed in turn.

### 1. Section 2252 and 2252A's Knowledge Requirement

---

[6] The conduct prohibited by sections 2252 and 2252A is identical, and courts applying one
routinely cite precedent interpreting the other.

Defendants argue that Plaintiffs have not pled that Defendants were aware that they were receiving CSAM at the time the videos were uploaded to Pornhub or when the site generated "thumbnail" preview images from those videos. A person "knowingly receives" child pornography when he "intentionally views, acquires, or accepts child pornography on a computer from an outside source." *United States v. Pruitt*, 638 F.3d 763, 766 (11th Cir. 2011). A person "knowingly possesse[s]" child pornography when he "knew the [videos] in question contained a visual depiction of minors engaging in sexually explicit conduct." *United States v. Dixon*, 589 F. App'x 427, 428 (11th Cir. 2014) (citing *United States v. Alfaro–Moncada*, 607 F.3d 720, 733 (11th Cir. 2010)). In *Dixon*, the defendant had searched for pornography using terms such as "young girls" and "teens," downloaded results from this search and previewed the videos. *Id*. There was no evidence the defendant had actual knowledge of the ages of those depicted in the videos, yet his conviction was upheld. *Id*. Similarly, in *Alfaro-Moncada*, the defendant had seen the covers and watched "a little bit" of the DVDs containing child pornography in his possession. 607 F.3d at 733. This was enough to meet the knowledge requirement. *Id*. It was not necessary for the government to prove that the defendant had actual knowledge.

Plaintiffs have easily pled the knowledge requirement for violations of §§ 2252 and 2252A. This is not a case, such as the cases cited by Defendants, where a

defendant has no way of knowing whether he had received the CSAM images he

sought because he had never accessed nor viewed them. *See, e.g.*, *United States v.*

*Dobbs*, 629 F.3d 1199, 1200-01 (10th Cir. 2011). To the contrary, Plaintiffs have

alleged that Defendants actively control which videos are posted to Pornhub. FAC

¶¶ 57–62, 65, 87–91. They have alleged that Defendants claim to review every video,

flagging videos only if the performer appears to be under the age of 12. *Id.* ¶¶ 85, 120,

126. Defendants sometimes retitle videos indicating CSAM but leave the videos

available for distribution. *Id.* ¶ 125. Defendants allow slightly modified versions of

their banned terms to remain on the site, such as replacing a letter of a banned term

with an asterisk, replacing a banned term with the same term in a different language,

or replacing a banned term with another term common to predators and exploiters

looking for such videos and images. *Id.* ¶¶ 62–63. Allowing banned terms to remain

searchable in loosely concealed forms especially demonstrates Defendants'

knowledge of their receipt of CSAM on their sites and acts as instruction to users to

avoid blatant terms that would tip off law enforcement. Further, Defendants create

and suggest tags indicating CSAM for uploaders to use, such as the "Lil" tag that

was used to categorize Plaintiff Jane Doe #1's videos. *Id.* ¶¶ 56, 59, 65-67, 71, 103,

112-18, 154. These practices require accessing and viewing videos and thus provide

knowledge of the video content and knowing receipt of the videos. And this is all

done despite numerous notifications to Defendants by law enforcement, victims advocacy groups, press reports, and government agencies as to the prevalence of child pornography on their websites. Further, not only are Defendants aware of the CSAM content, but they boast to potential advertisers of their intimate knowledge of users' interactions with that illegal content.

Taking these allegations as true, Plaintiffs have stated a claim for relief pursuant to 18 U.S.C. §§ 2252 and 2252A. Defendants' actions exceed the conduct that was sufficient to meet the knowledge requirement in *Dixon* and *Alfaro-Moncada*, *supra*. This is enough to plausibly allege that Defendants knowingly received, possessed, and distributed child pornography. *See Doe v. Mindgeek*, 2021 WL 4167054, at *10 (reaching same conclusion in California case against the same defendants). Indeed, if Plaintiffs' allegations are confirmed, Defendants, through their ownership and operation of Pornhub and other sites, are no different than the thousands of individuals who are convicted of non-production child pornography offenses in the United States each year. *See generally* United States Sentencing Commission Report: *Federal Sentencing of Child Pornography: Non-Production Offenses* (June 29, 2021). Frankly, if true, the Court would not be surprised to see at least some of the defendants prosecuted for such offenses.

### 2. Section 230 Immunity's Effect on Section 2252 and 2252A Claims

Finding that Plaintiffs have stated a claim for relief on Count II, the Court now turns to Defendants' argument that they are nonetheless immune from suit and liability on the sections 2252 and 2252A claim pursuant to Section 230 of the CDA. Defendants assert that there is simply no carve-out from Section 230 immunity for claims under sections 2252 and 2252A, when those claims would hold an ICS as publisher of child pornography posted by a third party.

Nonetheless, the Court agrees with Plaintiffs that Section 230 does not apply to their claim that Defendants knowingly received, possessed, and distributed child pornography, for several reasons. First, child pornography is not lawful "information provided by another information content provider" as contemplated by Section 230. *See* 47 U.S.C. § 230(f)(3). Rather, it is illegal contraband, stemming from the sexual abuse of a child, beyond the covering of First Amendment protection, and wholly outside any other protection or immunity under the law, including Section 230. In other words, Section 230's prohibition on ICSs being treated as "speaker[s]" of "information" is not implicated here because child pornography is not protected speech and conveys no legally cognizable information. *Contra Zeran*, 129 F.3d 327 (in first appellate decision applying Section 230 immunity to internet provider accused of failing to remove defamatory statements posted by third party user, noting that Congress "considered the weight of the *speech* interests implicated and

chose to immunize service providers to avoid any such restrictive effect") (emphasis added). Additionally, Section 230 immunity applies when an ICS is treated as a "publisher or speaker" of the information provided by a third party, but Plaintiffs' section 2252 and 2252A claims allege that Defendants are not only distributors of but also *receivers and possessors of* child pornography. Receipt and possession of child pornography, alone, are criminal acts, and are not shielded by Section 230 immunity.

Second, Congress enacted Section 230 of the CDA to incentivize ICSs to protect children, not immunize them for intentionally or recklessly harming them. *See* 47 U.S.C. § 230(b)(4) (stating as policy of Section 230 to "remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material). Indeed, Section 230 mandates that ICSs notify their customers of parental controls and filter technology that is available to protect children. *Id.* § 230(d). Furthermore, Section 230(e)(1) specifically states that Section 230 has "no effect on criminal law," including chapter 110 of Title 18, which contains sections 2252 and 2252A. It is untenable then, to assert that Section 230 immunizes platforms from knowingly possessing and distributing CSAM.

Third, insofar as Defendants are not immune to Plaintiffs' TVPRA claims because they materially contribute to the illegal sex trafficking content posted on

Pornhub, it follows that the same exception to immunity applies to Plaintiffs' claims for damages premised on violations of the child pornography statutes.

Defendants rely on two opinions for the proposition that ICSs are immune under Section 230 for civil claims for child pornography violations—*Doe v. Bates*, 2006 WL 3813758 (E.D. Tex. Dec. 27, 2006), and *Diez v. Google, Inc*., 831 F. App'x 723 (5th Cir. 2020)—but the Court finds neither opinion persuasive.

In *Doe v. Bates*, the Texas federal court dismissed claims that Yahoo! Inc. had violated section 2252A by failing to remove CSAM that had been shared in a user-created child pornography forum called "Candyman" on Yahoo!'s internet groups platform. 2006 WL 3813758, at *5. Finding that Section 230 immunity applied to Yahoo!, the court noted, "If internet service providers such as Yahoo! could be liable for reviewing materials but ultimately deciding to allow them, they would likely chose [sic] not to regulate at all." *Id.* at *4. The court continued, "While the facts of a child pornography case such as this one may be highly offensive, Congress has decided that the parties to be punished and deterred are not the [ICSs] but rather are those who created and posted the illegal material, such as defendant Mark Bates, the moderator of the 'Candyman' e-group." *Id.*

In so holding, the district court in *Doe v. Bates* relied upon the reasoning of the Fourth Circuit in *Zeran*, 129 F.3d 327, and upon another district court decision, *Noah*

*v. AOL Time Warner, Inc.*, 261 F. Supp. 2d 532, 537 (E.D. Va. 2003). However, neither case dealt with child pornography. For example, in *Zeran*, the plaintiff argued that AOL unreasonably delayed in removing defamatory messages posted by an unidentified third party, refused to post retractions of those messages, and failed to screen for similar postings thereafter. 129 F.3d at 328. The Fourth Circuit rejected the plaintiff's claims, holding that because he was seeking to hold the ICS liable based on injuries allegedly resulting from the dissemination of third-party content, his claims necessarily sought to treat the service provider as "publisher" of that content. *Id.* at 332-33. The court found AOL was immune from suit under Section 230. *Id.* Similarly, the Muslim plaintiff in *Noah* sued AOL under Title II of the Civil Rights Act, which prohibits discrimination in places of public accommodation, based on AOL's alleged failure "to prevent participants in an online chat room from posting or submitting harassing comments that blasphemed and defamed the plaintiff's Islamic religion and his co-religionists." 261 F. Supp. 2d at 534. According to the plaintiff, his claim fell outside the scope of Section 230 because it did not treat AOL as a publisher or speaker but rather "as the owner of a place of public accommodation" who was subject to Title II and who had engaged in discrimination. *Id.* at 538. The court granted AOL's motion to dismiss based on Section 230 immunity, finding that because the plaintiff had alleged that AOL was liable "for its

refusal to intervene and stop the allegedly" harmful content and had also "request[ed] an injunction requiring AOL to adopt 'affirmative measures' to stop such harassment," the "allegations [made] clear that plaintiff [sought] to hold AOL liable for its failure to exercise 'a publisher's traditional editorial functions.'" *Id.* at 538-39.

This Court disagrees with the *Doe v. Bates* court insofar as it treats child pornography in the same way courts have treated speech, such as defamatory statements, instead of treating it as illegal contraband.[7] Bluntly, if Plaintiffs' allegations are true, Defendants, through Pornhub and other sites, host and harbor child pornography—i.e., knowingly receive and possess it—which are illegal acts under the United States Code and which are prosecuted in proceedings against individuals every day. How, then could a corporate defendant escape punishment for the same illegal conduct? Further, Plaintiffs' allegations here are more egregious in that Defendants not only received, possessed, distributed and failed to remove CSAM, as in *Bates*, but they also played a vital role in the creation and development

---

[7]      Most recently, in *Doe v. Twitter*, the California district court followed the reasoning in *Doe v. Bates* to conclude that Section 230 immunity is not defeated by the fact that the third-party content at issue is illegal child pornography. 2021 WL 3675207, at *31. Although the *Doe v. Twitter* court noted that the plaintiff's argument that defamatory speech is nothing like child pornography "has some force," it found that such an argument was trumped by the Ninth Circuit decisions recognizing the breadth of Section 230 immunity for ICSs. *See id.* at *30 (citing *Gonzalez*, 2 F.4th at 886, *Carafano*, 339 F.3d at 1123).

of CSAM, such as by using keywords and tags to encourage users to find CSAM, such as the "Lil" tag used on videos of Plaintiff Doe #1.

The *Diez* decision, also relied upon by Defendants, is also distinguishable, because the claims in that case were brought against Google by a man awaiting trial for possession of child pornography and attempting to foist the blame for his actions on Google. *See* 831 F. App'x at 724-25. His claim turned on Google's "failure to filter out certain images," *id.* at 724, and the Fifth Circuit held that Google was immune from suit under Section 230, partly in part because the plaintiff did not allege that Google was an "information content provider." *Id.* at 725. The plaintiff in *Diez* did not assert that Google was knowingly receiving, possessing, and distributing CSAM, as Plaintiffs have alleged here. And, this Court has also deemed Defendants to be "information content providers" of CSAM under Section 230.

Accordingly, because Plaintiffs have plausibly stated a civil claim for Defendants' violations of the federal child pornography statutes, and Defendants are not immune, Defendants' motion to dismiss insofar as it concerns Plaintiffs' 18 U.S.C. §§ 2252 and 2252A claim is due to be denied.

### C. Personal Jurisdiction over Defendants as to Jane Doe #2's Claims

In a Rule 12(b)(2) motion to dismiss, the plaintiff generally "bears the burden of establishing a prima facie case of jurisdiction over the movant, non-resident

defendant." *PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 810 (11th Cir. 2010) (quoting *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988)). "A *prima facie* case is established if the plaintiff presents enough evidence to withstand a motion for directed verdict." *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990). The court must treat facts alleged in the complaint as true if they are not controverted by affidavits submitted by the defendant. *Id.*

Defendants move to dismiss Jane Doe #2's claims under Rule 12(b)(2), arguing that the standards for the exercise of general jurisdiction are not met and, relying on the Supreme Court's decision in *Bristol-Myers Squibb Company v. Superior Court of California*, 137 S. Ct. 1773 (2017), that the Court cannot exercise specific jurisdiction over them as to Jane Doe #2's claims because she resides in California and there is no connection between the conduct alleged and Alabama. However, as set forth below, *Bristol-Myers* has no application in this case because Jane Doe #2 is asserting federal statutory claims under 18 U.S.C. §§ 1591, 2252, and 2252A, which, through the operation of 18 U.S.C. § 2255, provide for nationwide service of process and, therefore, the personal jurisdiction analysis is governed by the Fifth Amendment's Due Process Clause and whether the Defendants have sufficient contacts with the United States and not specifically with Alabama.

The Eleventh Circuit has held that "[w]hen a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction." *Kammona v. Onteco Corp.*, 587 F. App'x 575, 579 (11th Cir. 2014) (quoting *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997)). When the plaintiff's claims are brought under such federal statutes, the statutory "nationwide service-of-process provision grants district courts nationwide personal jurisdiction over any defendant that has minimum contacts with the United States. . . . In such an instance, the constitutional limits of the court's jurisdiction are fixed by the Due Process Clause of the Fifth Amendment, rather than the Fourteenth Amendment, and the applicable forum for a minimum contacts analysis is the United States." *Id.* at 579-80 (citing *U.S. Sec. & Exch. Comm'n v. Carrillo*, 115 F.3d 1540, 1544 & n.4 (11th Cir. 1997)). In *Kammona*, the plaintiff brought federal securities claims in a Florida federal district court against various defendants, including a Utah corporation that acted as the transfer agent for a Nevada corporation that had done business in Florida. In reversing the district court's dismissal of the claims against the Utah corporation for lack of personal jurisdiction, the Eleventh Circuit concluded that because the applicable federal statute "authorizes nationwide service of process in securities-fraud cases, the district court incorrectly analyzed [the Utah corporation's] minimum contacts in the

context of the forum state of Florida, as opposed to its contacts with the United States as a whole [and the Utah corporation's] basic operations show that it has at least 'minimum contacts' with the United States" to support personal jurisdiction. *Id.* at 580.

Here, the complaint alleges that Jane Doe #2 was a minor at the time she was trafficked and had sexually explicit videos of her uploaded and disseminated through Defendants' websites. *See* FAC ¶¶ 3, 161-74. Jane Doe #2 has brought federal statutory claims against Defendants under the TVPRA, 18 U.S.C. §§ 1591 and 1595 (Count I), and the federal child pornography statute, 18 U.S.C. §§ 2252 and 2252A (Count II). *See* FAC ¶¶ 178-93.

18 U.S.C. § 2255 is titled "Civil remedy for personal injuries" and provides in pertinent part:

> (a) In general.--Any person who, while a minor, was a victim of a violation of section 1589, 1590, 1591, 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, or 2423 of this title and who suffers personal injury as a result of such violation, regardless of whether the injury occurred while such person was a minor, may sue in any appropriate United States District Court and shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred. The court may also award punitive damages and such other preliminary and equitable relief as the court determines to be appropriate.
>
> . . .

(c) Venue; service of process.—

    (1)    Venue.--Any action brought under subsection (a) may be brought in the district court of the United States that meets applicable requirements relating to venue under section 1391 of title 28.

    (2)    Service of process.--In an action brought under subsection (a), process may be served in any district in which the defendant—

        (A)    is an inhabitant; or

        (B)    may be found.

18 U.S.C. § 2255(a), (c). Thus, section 2255(a) specifically authorizes victims who were minors at the time certain sex trafficking and child pornography offenses were committed to bring civil actions for such criminal violations, including for violations of the statutes on which Jane Doe #2 asserts her two claims in this action—18 U.S.C. § 1591 and 18 U.S.C. § 2252/2252A. In addition, section 2255(c) provides for service of process on the defendant in an action brought under section 2255 "in any district in which the defendant . . . may be found." *Id.* § 2255(c)(2)(B). It is well accepted that this type of statutory language authorizes nationwide service of process. *C.T. v. Red Roof Inns, Inc.*, 2021 WL 2942483, *7 (S.D. Ohio July 1, 2021) (stating, in dicta, that "18 U.S.C. § 2255 . . . confers nationwide service of process for minors bringing

TVPRA suits" under 18 U.S.C. § 1591);[8] *Kammona*, 587 F. App'x at 579 (similar language in 15 U.S.C. § 78aa(a) authorizes nationwide service in securities fraud cases); *Roche Diagnostics Corp. v. Priority Healthcare Corp.*, 2020 WL 2309874, *7 (N.D. Ala. May 8, 2020) (similar language in RICO, 18 U.S.C. § 1965(d), authorizes nationwide service); *Turner v. Sedgwick Claims Mgmt. Servs., Inc.*, 2015 WL 225495, at *4 (N.D. Ala. Jan. 16, 2015) (similar language in ERISA § 502(e)(2) authorizes nationwide service and "effectively preclude[s] virtually all objections based on personal jurisdiction" in case against Missouri corporate defendant).

Applying these provisions, Defendants have certainly maintained minimum contacts with the United States to support personal jurisdiction over Jane Doe #2's claims. For example, the complaint sets forth that Defendants conduct business throughout the United States, including the Northern District of Alabama, FAC ¶¶ 15-22; "[Defendants have] a complex corporate structure through which [they have] developed, designed, produced, advertised, and distributed pornographic content

---

[8] *C.T.* is the only case this Court has located that is directly on point. In *C.T.*, however, the court ultimately ruled that section 2255 did not apply to confer nationwide personal jurisdiction over the defendants because the plaintiff was an adult trafficking victim, not a child. 2021 WL 2942483, at *9. Additionally, in *Ramsbottom v. Ashton*, 2022 WL 106733, at *14 (M.D. Tenn. Jan. 11, 2022), the court ruled that section 2255 did not apply to child victims of sex trafficking bringing suit solely under 18 U.S.C. § 1595 against defendants who are not themselves alleged to have violated 18 U.S.C. § 1591. *Ramsbottom* is distinguishable because here, Plaintiffs allege that Defendants have violated not only 18 U.S.C. § 1595 but also 18 U.S.C. § 1591(a)(2) (as well as the child pornography statues), which are all specifically listed in section 2255(a).

throughout the world and the United States, including specific business contacts with Alabama," *id*. ¶ 45; "[t]he United States remained by far the country with the highest daily traffic on Pornhub, with Alabama users ranking second in the nation in time spent per visit to Pornhub," *id*. ¶ 48; "the majority of Pornhub's content is hosted on U.S.-based servers," *id*. ¶ 49; sexually explicit videos of Jane Doe #2's trafficking when she was 14 years old remained on Defendants' websites "for at least four (4) years and were available for view and download all around the world and within the United States and the state of Alabama," *id*. ¶ 166; "[o]n information and belief, residents of Alabama downloaded videos of Jane Doe #2's rape from [Defendants'] websites," *id*.; "Alabama ranks second among all states for longest time spent on Pornhub per visit, time spent at least in part, viewing videos of Jane Doe #2's rape," *id*. ¶ 167; and "Defendants have profited specifically from people in Alabama viewing videos of Jane Doe #2's rape," *id*.

Additionally, Defendants do not challenge the Court's ability to exercise personal jurisdiction over them to adjudicate Jane Doe #1's claims. Since the allegations of Defendants' wrongdoing and the territorial reach of their actions and presence are substantially identical with regard to each plaintiff, and the only meaningful difference between the two named plaintiffs' claims is that Jane Doe #1 is an Alabama resident and Jane Doe #2 is a California resident, by conceding that

Jane Doe #1 has alleged sufficient facts connecting her claims to Alabama to support personal jurisdiction, it directly follows that Jane Doe #2 (a Californian) also has alleged sufficient facts to establish Defendants' minimum contacts with the United States to support personal jurisdiction over Defendants as well.

Defendants claim to disagree that section 2255 confers nationwide personal jurisdiction over a defendant, but they do not offer any authority in support. They also contend that because Plaintiffs' complaint does not specifically state that this Court has personal jurisdiction over Defendants pursuant to the nationwide service of process provision found in 18 U.S.C. § 2255(c)(1), that the Court should disregard her reliance on that statute. The Court finds no authority requiring a plaintiff to state as much in a complaint. Rather, plaintiffs must plead sufficient *facts* to support jurisdiction over all defendants. Plaintiffs have done that here.

Defendants also argue that even if section 2255 conveys personal jurisdiction over them in this Court as to Doe #2's claims, that venue is nonetheless improper because her claims do not satisfy the 28 U.S.C. § 1391 venue requirements included in 18 U.S.C. § 2255(c)(1). This is incorrect. Under 28 U.S.C. § 1391(b), venue lies in "a judicial district in which any defendant resides," "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred," or any jurisdiction where personal jurisdiction exists if "there is no district in which an

action may otherwise be brought as provided in this section." Given the foregoing discussion, personal jurisdiction over Defendants "exists" in any district in the United States. Thus, venue is proper in this district.

As pleaded, the complaint supports personal jurisdiction over Defendants, based on the nationwide service of process provision applicable to Jane Doe #2's claims. Accordingly, Defendants' motion to dismiss insofar as it is based upon lack of personal jurisdiction is denied.

## V.     Conclusion

For the foregoing reasons, Defendants' motion to dismiss (doc. 24) is hereby **DENIED**.

**DONE** and **ORDERED** on February 9, 2022.

_____
L. Scott Coogler
United States District Judge

160704