1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| SERENA FLEITES and JANE DOES NO. 1 through NO. 33,<br><br>        Plaintiffs,<br><br>    v.<br><br>MINDGEEK S.A.R.L; MG FREESITES, LTD; MINDGEEK USA INCORPORATED; MG PREMIUM LTD.; RK HOLDINGS USA INC.; MG GLOBAL ENTERTAINMENT INC.; TRAFFICJUNKY INC.; BERND BERGMAIR; FERAS ANTOON; DAVID TASSILLO; COREY URMAN; VISA INC.; COLBECK CAPITAL DOES 1–10; and BERGMAIR DOES 1-10,<br><br>        Defendants. | Case No.: CV 21-04920-CJC(ADSx)<br><br><br>ORDER GRANTING DEFENDANTS' MOTION TO SEVER [Dkt. 75], DENYING AS MOOT DEFENDANTS' MOTIONS TO DISMISS [Dkts. 55, 62, 67, 68, 69, 70], DENYING AS MOOT INTERNATIONAL CENTER FOR LAW & ECONOMIC'S REQUEST TO FILE AMICUS BRIEF [Dkt. 95], and DENYING AS MOOT DEFENDANTS' MOTION TO STAY CASE [Dkt. 108] |

# I. INTRODUCTION

On June 17, 2021, named Plaintiff Serena Fleites and Plaintiffs Jane Does No. 1 through No. 33 (collectively "Plaintiffs") filed this action against Defendants MindGeek S.A.R.L., MG Freesites, Ltd., MindGeek USA, Inc., MG Premium, Ltd., RK Holdings USA, Inc., MG Global Entertainment, Inc., TrafficJunky, Inc., Bernd Bergmair, Feras Antoon, David Tassillo, Corey Urman, Visa, Inc., Colbeck Capital unnamed does 1 through 10, and Bergmair unnamed does 1 through 10 (collectively "Defendants").  (Dkt. 1 [Complaint, hereinafter "Compl."].)  Plaintiffs allege numerous federal statutory violations against Defendants, including federal sex trafficking laws, 18 U.S.C. § 1591(a)(1), (a)(2), 1594(c), 1595 (Counts I, II, III, IV), federal child pornography laws, 18 U.S.C. §§ 2252, 2252A, 2255 (Counts V & VI), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a), (c), (d) (Counts VII, VIII, IX).  Plaintiffs also bring suit under state law for public disclosure of private facts (Count X), intrusion into private affairs (Count XI), false light (Count XII), misappropriation of name and likeness (Count XIII), misappropriation of name and likeness in violation of California Civil Code § 3344 (Count XIV), distribution of private sexually explicit materials in violation of California Civil Code § 1708.85 (Count XV), negligence (Count XVI), unjust enrichment (Count XVIII), violation of California Bus & Prof. Code §§ 17200 and 17500 (Count XVIII), and civil conspiracy (Count XIX).

Before the Court is Defendants MindGeek S.A.R.L., MG Freesites Ltd., MindGeek USA Inc., MG Premium Ltd., RK Holdings USA Inc., MG Global Entertainment Inc., TrafficJunky Inc., Corey Urman, Feras Antoon, Bernd Bergmair, and David Tassillo's motion to sever Plaintiffs, which Plaintiffs oppose.  (Dkt. 75 [hereinafter "Mot."]; Dkt. 76 [Defendant Corey Urman's Notice of Joinder to Motion to Sever], Dkt. 81 [Defendant David Tassillo's Notice of Joinder to Motion to Sever]; Dkt. 82 [Defendant Feras Antoon's Notice of Joinder to Motion to Sever]; Dkt. 86 [Defendant Bernd Bergmair's

Notice of Joinder to Motion to Sever]; Dkt. 94 [Plaintiffs' Omnibus Opposition to Defendants' Motion, hereinafter "Opp."].)  For the following reasons, Defendants' motion is **GRANTED**.[1]

## II.    BACKGROUND

Defendant MindGeek S.A.R.L. owns and operates over 100 pornographic websites, production companies, and brands, including Pornhub, RedTube, Tube8, YouPorn, PornIQ, gaytube, Thumbzilla, Peeperz, PornMD, Xtube, Brazzers, Babes.com, Reality Kings, Digital Playground, Twistys, Men.com, Mofos, MyDirtyHobby, SexTube, and Webcams (collectively "MindGeek's platforms").  (Compl. ¶ 45.)  Defendant MG Freesites, Ltd. is a wholly owned subsidiary of MindGeek S.A.R.L. and owns, operates, and/or manages one or several of MindGeek's platforms, including its "flagship" website Pornhub.  (*Id.* ¶¶ 46, 73.)  Defendant MindGeek USA Inc. is also a subsidiary of MindGeek S.A.R.L., as are Defendants MG Premium Ltd., RK Holdings USA Inc., MG Global Entertainment Inc., and TrafficJunky Inc.  (*Id.* ¶¶ 47–51.)  Defendant Bernd Bergmair is the majority owner of MindGeek S.A.R.L, (*id.* ¶ 52); Defendant Feras Antoon is the co-owner and CEO of MindGeek S.A.R.L., (*id.* ¶ 53); Defendant David Tassillo is the Chief Operating Officer of MindGeek S.A.R.L., (*id.* ¶ 54); and Defendant Corey Urman is the Vice President of Product Management and Video Sharing Platform of MindGeek S.A.R.L, (*id.* ¶ 54).[2]  These Defendants are collectively referred to as the "MindGeek Defendants."  Defendant Visa, Inc. is not an affiliate or subsidiary of any

---

[1] Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing.  *See* Fed. R. Civ. P. 78; Local Rule 7-15.  Accordingly, the hearing set for February 14, 2022, at 1:30 p.m. is hereby vacated and off calendar.

[2] Other Defendants identified in the Complaint are the unnamed Bernd Bergmair Doe(s) 1 through 10 and the unnamed Colbeck Capital Management LLC Doe(s) 1 through 10, whom Plaintiffs allege "financed, directed, participated in, and otherwise facilitated the MindGeek enterprises' illegal activities[.]"  (Compl. ¶¶ 56, 57.)

MindGeek entity, but Plaintiffs allege that Visa, Inc. recognized MindGeek entities as an authorized merchant and processed payment to MindGeek's platforms, including but not limited to Pornhub.  (*Id.* ¶ 58.)

Plaintiffs are 34 individuals that allege videos of them engaged in sexual activity were posted to MindGeek's platforms without their consent in violation of federal and state law.  (*Id.* ¶¶ 262–404.)  The Plaintiffs' individual factual allegations differ greatly in several respects.  Some of the key factual differences include: (1) how the underlying conduct featured in the videos occurred (some of the underlying sexual acts appear to have been consensual while others appear forced or coerced); (2) where the underlying conduct occurred; (3) who recorded and posted the videos on MindGeek's platforms (some perpetrators were former romantic partners of the individual Plaintiffs while others were strangers); (4) how the MindGeek Defendants tagged, circulated, or featured the videos; (5) whether the Plaintiffs sought to have the videos removed, (6) how the MindGeek Defendants responded to any such requests to remove the videos; (7) the age of the Plaintiffs when the recordings were made (some were minors while others were adults); (8) when the videos were posted; and (9) how long the videos remained on MindGeek's platforms.

For example, named Plaintiff Serena Fleites was in the eighth grade when she learned that a nude, sexually explicit video of her, which her high school boyfriend coerced her to make, was uploaded to Pornhub without her knowledge or consent.  (*Id.* ¶ 262.)  The video was on the platform for months before Ms. Fleites learned of its existence.  (*Id.*)  She was just 13 years old in the video.  (*Id.*)  When Ms. Fleites attempted to have the video removed from Pornhub, the platform did not respond for two weeks and took at least one to two weeks more to remove the video.  (*Id.* ¶ 263.)  In the months before the video was removed, it was downloaded many times and reuploaded by different users and with different titles.  (*Id.* ¶ 264.)  Each time Ms. Fleites learned the

video had been reuploaded, she asked that it be removed.  (*Id.*)  But Pornhub took weeks to take each video down, requiring Ms. Fleites each time to provide photographic proof that she was the child depicted in the video before removing it from its site.  (*Id.*)  One of the video uploads had almost three million views.  (*Id.*)

Plaintiff Jane Doe No. 1 alleges that the underlying sexual conduct in her videos was a product of force, stating that she "was raped, trafficked, and exploited by a ring of Hollywood men and New York financiers, including Jeffrey Epstein" from the ages of 7 to 28.  (*Id.* ¶ 270.)  The first recording of Jane Doe No. 1 was made in a garage in Maryland when she was 10 years old.  (*Id.* ¶ 271.)  She is aware of at least seven explicit videos of her on Pornhub, as well as at least one recording from a livestream.  (*Id.* ¶ 273.) The videos were filmed in warehouses in multiple locations in California and, in some instances, her traffickers forced her to upload and reupload old videos of herself as a form of punishment.  (*Id.*)  Her therapist helped her submit takedown requests, but she was not successful in having all of the videos removed.  (*Id.* ¶ 274.)

Plaintiff Jane Doe No. 8 alleges that she was trafficked as a minor in a foreign country, specifically by a "female pimp" in Colombia.  (*Id.* ¶ 301.)  She further alleges that she was paid to have sex with a now indicted sex offender, while another individual recorded the activity.  (*Id.*)  The video was uploaded to Pornhub in April 2020.  (*Id.* ¶ 303.)  By October 2020, a third-party organization "Operation Underground Railroad" helped her remove the video from Pornhub.  (*Id.*)  Nevertheless, as of December 2020, the video remained live on multiple internet sites.  (*Id.*)  According to the Complaint, both of Jane Doe No. 8's perpetrators were arrested and face criminal charges, including sexual exploitation of children and possession and transportation of child pornography. (*Id.* ¶ 304.)

Plaintiff Jane Doe No. 10 alleges that she was 15 years old in 2017 when she received an unsolicited message through Facebook "from now-convicted sex trafficking felon, Kamonsak Chanthasing, who posed as a woman, and offered to pay Jane Doe No. 10 for video clips and photographs of herself masturbating wearing her middle school uniform." (*Id.* ¶ 309.)  Though she initially refused, Jane Doe No. 10 provided a video and 100 photographs of herself that her alleged trafficker made available on Pornhub, under the title "Thai Student." (*Id.* ¶ 310.)  Pornhub removed the video, but screenshots of Jane Do No. 10's body and genitalia remain on Pornhub as of the filing of Plaintiffs' Complaint. (*Id.*)

Plaintiff Jane Doe No. 14 alleges that she had a marital relationship with her trafficker.  Her estranged ex-husband drugged her and sexually assaulted her while she was unconscious, recorded the assault and uploaded it to Pornhub, among other sites. (*Id.* ¶ 323.)  The video title disclosed that she was unconscious and had the following descriptors or "tags": "while sleeping," "hold her hands," and "sleeping pills." (*Id.*)  Jane Doe No. 14 did not consent to the sexual acts or the recording. (*Id.*)  Her ex-husband was criminally charged with sexual assault and distribution of intimate images without consent. (*Id.* ¶ 324.)  Though the video was removed from MindGeek's platforms, search results for the title of the original Pornhub video depicting Jane Doe No. 14 returned 1,900 search results, indicating that users may have downloaded and reuploaded the video. (*Id.* ¶ 326.)  Even after Pornhub deactivated the original video, it maintained a thumbnail image file of the video, depicting Jane Doe No. 14 naked. (*Id.* ¶ 327.)  After eight emails and forty-five days, Pornhub removed some, but not all, of the data and thumbnails. (*Id.*)

Plaintiff Jane Doe No. 17 alleges that she was forcibly raped by two men in 2006. (*Id.* ¶ 339.) In the months that followed, she learned that the video had been uploaded to one of MindGeek's platforms, "Exploited College Girls," without her knowledge or consent. (*Id.* ¶ 340.) Pornhub refused to remove the video, claiming that Jane Doe No. 17 could not lawfully demand that the video be removed because she did not own the copyright to the recordings. (*Id.*) Only after Jane Doe No. 17 was able to acquire the copyrights to the video did Pornhub agree to remove them. (*Id.* ¶ 342.)

Plaintiff Jane Doe No. 26 alleges that from 2012 to 2015 she was forced and coerced to engage in videorecorded sex acts with others in exchange for payment in various locations across the United States. (*Id.* ¶ 367.) These videos were uploaded to MindGeek's platforms without her knowledge or consent. (*Id.*) If Jane Doe No. 26 refused to engage in sex acts with others, her trafficker physically assaulted her and, on at least one occasion, injured her to the point where she needed medical attention. (*Id.*) She was also forced to engage in sex acts with her alleged trafficker. (*Id.*) Jane Doe No. 26 does not detail whether she or anyone else attempted to have the videorecordings removed from MindGeek's platforms. Nor does she provide any allegations as to whether the videos were removed. (*See* ¶¶ 367–369.)

Plaintiff Jane Doe No. 28 alleges that she was videotaped and photographed engaged in sex acts in 2014. (*Id.* ¶ 375.) The videos and photographs were uploaded to Pornhub without her knowledge or consent. (*Id.*) At least one of the videos of Jane Doe No. 28 trended on Pornhub as one of its top three videos. (*Id.*) As a professional athlete in the United Kingdom, the videos were accompanied with comments disclosing Jane Doe No. 28's name and other identifying information. (*Id.*) Jane Doe No. 28 requested that Pornhub remove the videos over the course of six months. (*Id.* ¶ 376.) Only after she misrepresented her age to Pornhub, claiming to be a minor, did Pornhub remove the video. (*Id.*)

Beyond the individual allegations of the Plaintiffs, the Complaint alleges that all Defendants named in this action are engaged in racketeering activity, including sex trafficking, possession and distribution of child pornography, use of the mails and wires in furtherance of a scheme, money laundering, criminal copyright piracy, internet hacking, bank and creditor fraud, tax evasion, blackmail, extortion, harassment, defamation, and hacking. (*Id.* ¶¶ 539, 540.) The Complaint frequently asserts that the MindGeek Defendants are engaged in activity "just like the Sopranos" and that a "bro-club" gave rise to extensive criminal conduct, impacting Plaintiffs. (*See, e.g.*, *id.* ¶¶ 3, 4, 72, 93–122, 126, 139, 144, 146, 152, 153, 155, 157, 158, 178, 185, 186, 188, 204, 539.)

## III.  LEGAL STANDARD

Federal Rule of Civil Procedure 21 allows a party to move the Court at any time to sever a misjoined party. Since Rule 21 "provides no standards to determine if parties or claims are misjoined, courts look to Rule 20 for guidance." *Wanke v. Invasix, Inc.*, 2019 WL 7997250, at * 2 (C.D. Cal. Aug. 7, 2019).

Federal Rule of Civil Procedure 20(a) "permits the joinder of plaintiffs in one action if: (1) the plaintiffs assert any right to relief arising out of the same transaction, occurrence, or series of transactions or occurrences; *and* (2) there are common questions of law or fact." *Coughlin v. Rogers*, 130 F.3d 1348, 1350 (9th Cir. 1997) (emphasis added); *see also Visendi v. Bank of Am., N.A.*, 733 F.3d 863, 870 (9th Cir. 2013). Regardless of whether the requirements of Rule 20(a) are satisfied, "a court, in its discretion, may sever the misjoined parties, so long as no substantial right will be prejudiced by the severance." *Id.*; *see* Fed. R. Civ. Proc. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party."). In other words, even if the requirements of Rule 20(a) are met, "a district court must examine whether

permissive joinder would 'comport with the principles of fundamental fairness' or would result in prejudice to either side." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1296 (9th Cir. 2000) (quoting *Desert Empire Bank v. Insurance Co. of N. Am.*, 623 F.2d 1371, 1375 (9th Cir. 1980)).

"Courts have denied joinder to avoid prejudice or delay, to ensure judicial economy, or to safeguard principles of fundamental fairness." *Acfalle v. DirectTV, Inc.*, 2014 WL 12738214, at *2 (C.D. Cal. July 22, 2014). Other factors "relevant to this inquiry may include . . . whether separate claims require different witnesses and documentary proof." *Blackman v. Teespring, Inc.*, 2019 WL 7832600, at *2 (N.D. Cal. July 12, 2019). "In such a case, the court can generally dismiss all but the first named plaintiff without prejudice to the institution of new, separate lawsuits by the dropped plaintiffs 'against some or all of the present defendants based on the claim or claims attempted to be set forth in the present complaint.'" *Coughlin*, 130 F.3d at 1350 (quoting *Aaberg v. ACandS Inc.*, 152 F.R.D. 498, 501 (D. Md. 1994)).

## IV.    DISCUSSION

### A.    Same Transaction or Occurrence

Plaintiffs' claims do not arise out of the same transaction or occurrence or series of transaction or occurrences. "By its terms, [the same transaction or occurrence requirement] requires factual similarity in the allegations supporting Plaintiffs' claims." *Visendi*, 733 F.3d at 870. Here, Plaintiffs' individual factual allegations vary widely. For example, the alleged occurrences of sex trafficking, child pornography, and appropriation and misuse of likeness differ substantially in where the improper conduct allegedly occurred, how it occurred, and who perpetrated the conduct. Videos of Plaintiffs were allegedly created in Florida, Arizona, California, Maryland, New York, Pennsylvania, Colombia, the United Kingdom, and other unidentified states. (*See, e.g.*, Compl. ¶¶ 12,

271–73, 289, 301, 306–07, 333–35, 367, 370–71, 375.)  Plaintiffs were victimized by different individuals, such as "a ring of Hollywood men and New York financiers, including Jeffrey Epstein" (*id.* ¶ 270); convicted sex traffickers (*id.* ¶¶ 276, 309, 364); "a female pimp in Colombia" (*id.* ¶ 301; *see id.* ¶ 306); former intimate partners of the Plaintiffs (*id.* ¶¶ 323, 388), among others (*id.* ¶ 317).  The videos that were posted to MindGeek's platforms also were posted at different time periods, with some videos made as early as 2001 and some as late as 2018.  (*Id.* ¶¶ 271, 345, 358–60, 368.)

Significantly, the Plaintiffs' interactions with MindGeek also vary widely.  Some Plaintiffs do not allege any interaction at all with any of the MindGeek Defendants (Jane Does 4, 13, 20, 26, 27, 30).  For those who claim to have interacted with MindGeek, those interactions are each unique and factually distinct.  Some allege they did so on their own (Fleites, Jane Does 3, 6, 10, 15, 16, 18, 19, 21, 32, 33), while others allege they obtained assistance from third parties with take-down requests (Jane Does 1, 5, 7, 8, 9, 12, 22, 23, 24, 25).  Others allege they did both (Jane Does 2, 11, 14, 17, 28, 29, 31).  (*Id.* ¶¶ 263-64, 274, 280-282, 286, 293, 295, 298, 303, 308, 310, 314, 318, 325, 327, 33, 336, 341-43, 346, 349, 354, 356, 359, 362, 365, 376-377, 382-83, 389-390, 398, 402.)  How the MindGeek Defendants responded to these take-down requests also varies substantially according to the Complaint.  Some Plaintiffs (Fleites, Jane Does Nos. 3, 5, 7, 8, 11, 12, 14, 17, 21, 23, 25, 28, 29, 33) allege that the Defendants did remove content in response to their own or others' requests.  (*Id.* ¶¶ 263-64, 286, 293, 298, 303, 314, 318, 325, 342-43, 354, 359, 365, 376, 383, 402.)  Others allege that MindGeek asked for additional information to enable it to act on the request, requiring them to verify their identity.  (*Id.* ¶¶ 264, 281, 331, 356.)  Still other Plaintiffs do not provide any facts in the Complaint on whether the MindGeek Defendants responded to any take-down requests. (*Id.* ¶¶ 282, 349, 390, 398.)

Under these circumstances, Plaintiffs' Complaint alleges "[f]actual disparities of the magnitude . . . too great to support permissive joinder." *Visendi*, 733 F.3d at 870. *Coughlin v. Rogers* confirms this. There, the Ninth Circuit affirmed a district court's decision to sever the claims of 49 plaintiffs alleging that the Immigration and Naturalization Service had failed to adjudicate the plaintiffs' pending applications and petitions in violation of the Administrative Procedure Act. 130 F.3d at 1349–50. The Circuit explained that the plaintiffs had not satisfied Rule 20's first prong—the "same transaction" requirement—because "the basic connection among all the claims is the alleged procedural problem of delay[,]" but "[e]ach Plaintiff has waited a different length of time, suffering a different duration of alleged delay." *Id.* at 1350. That is, "the delay is disputed in some instances and varies from case to case" and "most importantly, there may be numerous reasons for the alleged delay." *Id.* The Ninth Circuit also noted that the plaintiffs had not alleged that the delays in adjudicating their applications was a result of a "systematic pattern of events" or "a pattern or policy of delay in dealing with all applications and/or petitions[.]" *Id.*

Plaintiffs argue that joinder is appropriate because their claims all stem from a systemic pattern of misconduct. (Opp. at 82.) Specifically, Plaintiffs assert that the MindGeek Defendants' liability arises from "their *modus operandi* of operating the Enterprise, including: encouraging and setting a road map for traffickers to upload child pornography and non-consensual content; the systemic reformatting and uploading of unlawful videos to its sites; the pattern and practice of transferring illegal content to other MindGeek-owned tubesites, even after such content was purportedly removed; and the coordinated effort to conceal these criminal activities." (*Id.*) But Defendants' alleged pattern and practice does not vitiate the Court's significant concerns about the vast factual distinctions between the individualized circumstances of Plaintiffs' claims. For example, in *Visendi*, the Ninth Circuit affirmed a district court's decision to sever the claims of over 100 plaintiffs against various financial institutions, despite plaintiffs'

allegations that the Defendants' misconduct was "regular and systematic[.]" 733 F.3d at 870.  The Circuit explained that plaintiffs' "interactions with Defendants were not uniform" and therefore could not support permissive joinder.  *Id.*  The same is true here.

Plaintiffs' reliance on *Fraihat v. U.S. Immigr. & Customs Enf't*, 2020 WL 2759848 (C.D. Cal. Apr. 15, 2020) and *MadKudu Inc. v. U.S. Citizenship & Immigr. Servs.*, 2020 WL 5628698 (N.D. Cal. Sept. 14, 2020), is misplaced.  In both cases, the courts permitted joinder of plaintiffs, in part, because the plaintiffs were not seeking plaintiff-specific relief.  In *Fraihat,* the plaintiffs were seeking systemwide injunctive and declaratory relief that would improve baseline conditions at detention facilities.  2020 WL 2759848, at *12.  Similarly, in *MadKudu* the court allowed joinder when all of the plaintiffs' claims for injunctive and declaratory relief could be resolved in one stroke by evaluating whether the defendant was incorrectly interpreting governing procedure.  2020 WL 568698 at *4–5.

Plaintiffs' reliance on *Ardolf v. Weber* also is unpersuasive because there the court permitted joinder because the factual allegations of the individual plaintiffs were nearly identical.  332 F.R.D. 467 (S.D.N.Y. 2019).  *Ardolf* concerned claims from five male models brought against the same defendant who allegedly molested them during photoshoots.  *Id.* at 471-72.  The plaintiffs' factual allegations were practically the same, describing how the defendant would recruit and entice them by booking them as models for photoshoots, arrange to be alone with the models, and manipulate the power dynamics between them to coerce them into sexual acts.  The district court found that the "nearly-identical" claims amounted to establishing the defendant's *modus operandi* and thus joinder was proper.  *Id.* at 480.

Here, Plaintiffs' Complaint is not against a single defendant that harmed each of the 34 plaintiffs in a nearly identical way.  Plaintiffs' perpetrators are also not the same

individuals.  Plaintiffs' interactions with the MindGeek Defendants also vary widely.
The Complaint also does not sufficiently connect the sprawling criminal enterprise
encompassing money laundering, tax evasion, and the like, to the specific allegations
each Plaintiff raises.  The Court would need to analyze each of Plaintiffs' injuries to
determine if the MindGeek Defendants' pattern and practices caused their harm.  This
raises significant issues as Plaintiffs' claims sprawl across a vast timeline and any
unlawful patterns and practices may have changed or evolved across that period.  The
difficulty of inquiring into Defendants' practices at varying time periods would
compound the already arduous task of wading through the individualized circumstances
giving rise to Plaintiffs' claims.  *See Alvarado v. City of Los Angeles*, 720 F. App'x 889,
904 (9th Cir. 2018) (affirming severance because plaintiffs "do not allege any greater
connection between their claims than that the [defendant's] employees violated the
[statute] in comparable ways, at various different times, and in various different divisions
and bureaus"); *Bess v. Cate*, 2008 WL 4754860, at *1 (E.D. Cal. Oct. 27, 2008) (granting
motion to sever despite allegations that defendants were engaged in a "pattern and
practice" of wrongful conduct where "alleged [misconduct] occurred at separate facilities
and in separate locations"); *Gonzalez*, 2008 WL 11336944, at *4 ("Plaintiffs argument
that the same transaction or occurrence is met by alleging injuries resulting from 'the
systematic corruption'" of the defendant "incorrectly broadens the permissive joinder
standard."); *Blackman*, 2019 WL 7832600, at *1 (rejecting conclusory allegations of
systematic conduct because plaintiffs' interactions with defendant were not uniform);
*Martinez v. Encore Credit Corp.*, 2009 WL 3233531, at *1-2 (C.D. Cal. Sept. 30, 2009)
(finding joinder improper because "[t]he 19 Plaintiffs in this action all have claims
arising out of distinct factual scenarios involving mortgages on 15 separate
properties[.]").

### B.      Common Questions of Law and Fact

Plaintiffs also fail to satisfy the second prong of Rule 20—whether their claims present "any question of law or fact common to all plaintiffs[.]"  Fed. R. Civ. P. 20(a)(1)(B).  As the Court has already detailed, each Plaintiff's claims are predicated on vastly different factual scenarios.  More than that, "each Plaintiff's claim is discrete, and involves different legal issues, standards, and procedures," requiring the Court to "give each claim individualized attention" and precluding joinder.  *Coughlin*, 130 F.3d at 1351.

The 34 separate Plaintiffs in this action bring 18 different claims under both state and federal law.  The state law claims alone would raise numerous state law differences and highly individualized questions of fact.  Plaintiffs reside all over the world and the alleged unlawful conduct took place all over the world.  Seven Plaintiffs are residents of Thailand (Compl. ¶¶ 21–24, 34, 35–36); four are from the United Kingdom (*id.* ¶¶ 13, 17, 38–39); two are from Colombia (*id.* ¶ 19–20); one is from Canada (*id.* ¶ 25); five are from California (*id.* ¶¶ 11–12, 15, 26, 30); three are from Nevada (*id.* ¶¶ 29–32); and the remainder are from Arizona (*id.* ¶ 28), Colorado (*id.* ¶ 14), Illinois (*id.* ¶ 37), Missouri (*id.* ¶ 18), North Carolina (*id.* ¶ 40), Ohio (*id.* ¶ 27), Rhode Island (*id.* ¶ 16), Texas (*id.* ¶ 41), and Utah (*id.* ¶ 33).  Videos of Plaintiffs were allegedly created in Arizona, Florida, California, Maryland, New York, Pennsylvania, Colombia, the United Kingdom, and other unidentified states.  (*See, e.g.*, *id.* ¶¶ 12, 271–73, 289, 301, 306–07, 333–35, 367, 370–71, 375.)

All Plaintiffs bring a cause of action under California Business and Professions Code §§ 17200 and 17500.  But "[s]tate consumer-protection laws vary considerably," *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002), and courts should not assume the appropriate state law  applicable to each claim without undergoing the appropriate choice-of-law analysis, *Paracor Finance, Inc. v. General Elec. Capital*

-14-

*Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996) ("In a federal question action where the federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-laws of the forum state—in this case, California.").  Plaintiffs also allege five intrusion of privacy torts, but state laws governing these claims vary significantly. For example, Colorado, Florida, North Carolina, Rhode Island, Texas, and New York appear to either not recognize or restrict privacy torts.  *See Denver Publ'g Co. v. Bueno*, 54 P.3d 893, 904 (Colo. 2002) ("[W]e find no benefit to our jurisprudence by adopting the tort of false light invasion of privacy."); *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1115 (Fla. 2008) ("[W]e decline to recognize false light as a viable cause of action in this state."); *Burgess v. Busby*, 544 S.E.2d 4, 11 (N.C. Ct. App. 2001) ("North Carolina does not recognize a cause of action for the invasion of privacy by disclosure of private facts."); *Clift v. Narragansett Tele. L.P.*, 688 A.2d 805, 814 (R.I. 1996) ("An action for invasion of privacy was not maintainable at common law[.]"); *Cain v. Hearst Corp.*, 878 S.W.2d 577, 584 (Tex. 1994) ("[W]e expressly decline to recognize the tort of false light."); *Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 704 (N.Y.) ("[A] claim grounded in the right to privacy must fall within Civil Rights Law §§ 50 and 51."), *aff'd in part,* 619 N.E.2d 650 (N.Y. 1993); *Renwick v. News & Observer Publ'g Co.*, 312 S.E.2d 405, 410 (N.C. 1984) ("We will not expand the tort of invasion of privacy recognized in this jurisdiction to include 'false light' invasions of privacy.").  The Court may also have to determine the laws of foreign jurisdictions where the unlawful conduct occurred, bringing into a single action the laws of different nations concerning the Plaintiffs' privacy claims.

The same is true for Plaintiffs' unjust enrichment claim.  Indeed, "[t]he elements necessary to establish a claim for unjust enrichment . . . vary materially from state to state." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 591 (9th Cir. 2012).  "[T]he states' different approaches to, or elements of, unjust enrichment are significant.  Some of the most troublesome differences are . . . the disparity in proof required to prove an enrichment was 'unjust or wrongful' and the requirement by some states that there be no

adequate remedy at law." *Thompson v. Bayer Corp.*, 2009 WL 362982, at *4 (E.D. Ark. Feb. 12, 2009); *accord Thompson v. Jiffy Lube Int'l, Inc.*, 250 F.R.D. 607, 626 (D. Kan. 2008).

Even if California law governed all of Plaintiffs' state law claims, that would not resolve the issue.  For instance, if California law applies to all of Plaintiffs' privacy torts, each claim for each Plaintiff would present an individualized factual inquiry as to whether each Plaintiff was identifiable in the videos, whether each video had previously been shared publicly prior to appearing on MindGeek's platforms, and what damages each Plaintiff sustained because of the privacy torts alleged.  Such claims simply do not involve common questions of law or fact for the purposes of joinder.

Plaintiffs' federal claims also do not present common questions of law or fact.  To start, the Court questions, and no party provides any answer, whether the federal laws governing these claims apply to the Plaintiffs that suffered their injuries abroad.  (*See* Mot. at 11–12 [citing *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007) ("United States law governs domestically but does not rule the world.")]; *see also* Opp. at 80–83.].)  Nor does alleging RICO claims against the Defendants show that there are common questions of law and fact here.  To assert a RICO claim, each Plaintiff must have standing.  That is, each Plaintiff is required to show that "(1) [her] alleged harm qualifies as injury to [her] business or property; and (2) that [her] harm was 'by reason of' the RICO violation." *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co.*, 943 F.3d 1243, 1248 (9th Cir. 2019), *cert denied*, 141 S. Ct. 86 (2020).  Again, this requires Plaintiffs to show that the pattern and practice complained of caused their specific injuries—an individualized inquiry.  Plaintiffs' claims for violation of federal sex trafficking laws (18 U.S.C. §§ 1591(a)(1), 1591(a)(2), 1595) fare no better. At a minimum, each Plaintiff will have to show that they were trafficked within the meaning of the sex trafficking statute, again a fact-specific and plaintiff-specific inquiry.

Simply put, it is not enough that Plaintiffs "merely allege that Defendants violated the same laws in comparable ways.  Rule 20(a) requires more." *Visendi*, 733 F.3d at 870.

### C.    Judicial Economy, Inconvenience, Delay, and Added Expense

Contrary to Plaintiffs' assertions, proceeding with all 34 Plaintiffs joined in one action will result in inconvenience, delay, and added expense, the exact opposite of the result Rule 20 was designed to achieve.  *See Coughlin*, 130 F.3d at 1351 ("Rule 20 is designed to promote judicial economy, and reduce inconvenience, delay, and added expense.").  Given the choice-of-law issues the Complaint presents, the Court will spend considerable resources analyzing the laws of multiple different states and foreign countries.  "When each claim raises potentially different issues and must be viewed in a separate and individual light by a court, 'trial efficiency will not be promoted by allowing all [p]laintiffs to bring a single case.'" *Blackman*, 2019 WL 7832600, at *2 (quoting *Coughlin*, 130 F.3d at 1351); *see Nelson-Devlin*, 2015 WL 5436700, at *4 ("Maintaining the various non-California plaintiffs in the same action, which would require the application of sixteen different state laws, would not promote judicial economy[.]").

There are also practical concerns to consider.  The allegations in the Complaint indicate that witnesses with relevant information pertinent to Plaintiffs' claims likely reside across jurisdictions, both nationally and internationally.  Courts have granted motions to sever when keeping claims joined "would mean that the Court would have no compulsory process power over certain out-of-state fact witnesses, potentially prejudicing one side or the other." *Rubio v. Monsanto Co.*, 181 F. Supp. 3d 746, 759 (C.D. Cal. 2016).  Plaintiffs' argument that the RICO claims would avoid these concerns is not persuasive because it fails to account for the existence of foreign witnesses.  (Opp. at 84.)

Given the sheer number of claims and issues presented, the Court also shares Defendants' concerns that trial would be unmanageable and would be difficult to present in a manner that does not conflate the issues for jury members. The Ninth Circuit has explained that a defendant "would be prejudiced by having [multiple plaintiffs] testify in [a single] trial" because "even the strongest jury instructions [can] not . . . dull[] the impact of a parade of witnesses, each recounting his contention that defendant" committed the same wrongful acts. *Coleman*, 232 F.3d at 1296-97 (citation omitted); *see Todd v. Tempur-Sealy Int'l, Inc.*, 2017 WL 2840272, at *3–4 (N.D. Cal. June 30, 2017) (finding joinder would be prejudicial under Rule 20 because by "trying the two claims together . . . one plaintiff, despite a weaker case of causation, could benefit merely through association with the stronger plaintiff's case") (internal quotations and citation omitted).

**D.    Prejudice**

Finally, severing Plaintiffs' claims will not prejudice any substantial right of either party. As the Ninth Circuit has explained, "severance will not prejudice Plaintiffs, as they remain free to pursue their claims individually" should they wish to do so. *Visendi*, 733 F.3d at 871; *Coughlin*, 130 F.3d at 1350 ("[T]he court can generally dismiss all but the first named Plaintiff without prejudice to the institution of new, separate lawsuits by the dropped plaintiffs.").

//
//
//
//
//

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion to sever is **GRANTED**.  Plaintiff Serena Fleites will continue as the only named Plaintiff in this action and the Court **ORDERS** her to file a First Amended Complaint consistent with this order by **Monday, March 14, 2022**.  Plaintiffs Jane Doe No. 1 through No. 33 are **DISMISSED WITHOUT PREJUDICE** and may re-file their actions in any court of competent jurisdiction.[3]

DATED: February 10, 2022

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

---

[3] In light of the Court's order granting severance, Defendant Visa, Inc.'s Motion to Dismiss (Dkt. 55), Defendant Bernd Begmair's Motion to Dismiss (Dkt. 62), Defendant David Tassillo's Motion to Dismiss (Dkt. 67), Defendant Feras Antoon's Motion to Dismiss (Dkt. 68), Defendant Corey Urman's Motion to Dismiss (Dkt. 69), Defendants TrafficJunky Inc., RK Holdings USA Inc, MindGeek S.A.R.L, MG Premium Ltd., MindGeek USA, and MG Global Entertainment's Motion to Dismiss (Dkt. 70), Putative Amici International Center for Law & Economics' Notice to File Amicus Brief (Dkt. 95), and Defendants' Motion to Stay Case (Dkt. 108) are **DENIED AS MOOT**.  The hearings on these matters scheduled for February 14, 2022 at 1:30 p.m. are also vacated and off calendar.  *See* Fed. R. Civ. P. 78; Local Rule 7-15.