Michael J. Bowe
(*admitted pro hac vice*)
mbowe@brownrudnick.com
Lauren Tabaksblat
(*admitted pro hac vice*)
ltabaksblat@brownrudnick.com
BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
Telephone:   (212) 209-4800
Facsimile:    (212) 209-4801

David M. Stein (#198256)
dstein@brownrudnick.com
BROWN RUDNICK LLP
2211 Michelson Drive, 7th Floor
Irvine, California 92612
Telephone:  (949) 752-7100
Facsimile:   (949) 252-1514

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| SERENA FLEITES,<br><br>Plaintiff,<br><br>v.<br><br>MINDGEEK S.A.R.L., a foreign entity; MG FREESITES, LTD.; MINDGEEK USA INCORPORATED, a Delaware corporation; MG PREMIUM LTD, a foreign entity; MG GLOBAL ENTERTAINMENT INC., a Delaware corporation; 9219-1568 QUEBEC, INC., a foreign entity; BERND BERGMAIR, a foreign individual; FERAS ANTOON, a foreign individual; DAVID TASSILLO, a foreign individual; COREY URMAN, a foreign individual; VISA INC., a Delaware corporation; COLBECK CAPITAL DOES 1-5; and BERGMAIR DOES 1-5,<br><br>Defendants. | CASE NO. 2:21-cv-4920-CJC-ADS<br><br>HON. CORMAC J. CARNEY<br><br>**PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date:      August 8, 2022<br>Time:      1:30 p.m.<br>Courtroom:      9B |

1

## <u>TABLE OF CONTENTS</u>

2
<u>Page</u>

3 PRELIMINARY STATEMENT ................................................................ 1

4 FACTUAL BACKGROUND ................................................................ 5

5    A.   Plaintiff's Exploitation. ........................................................ 5

6
     B.   MindGeek's Human Trafficking Venture and Criminal
7         Enterprise. ........................................................................ 7

8          1.   MindGeek Solicited, Modified, Optimized, And
9               Distributed, Illegal Content on Its Platform. ............... 9

10         2.   MindGeek's Unpoliced Platform ............................. 13

11
           3.   MindGeek Re-uploaded Illegal and Nonconsensual
12              Content ..................................................................... 14

13         4.   MindGeek Advertised and Otherwise Commercialized
14              CSAM and Other Illegal Content ............................. 16

15   C.   The Enterprise Directing MindGeek's Rackets and Schemes ........... 16

16         1.   The Enterprise and its Members ............................... 16

17         2.   Antoon, Tassillo, Urman, and The Bro Club ........................ 17

18
           3.   Bergmair and The Financiers ..................................... 18
19
           4.   The Fraudulent Network of MindGeek Sham Shell
20              Companies ................................................................. 20

21
           5.   Visa ........................................................................... 22
22
     D.   The Criminal Scheme to Conceal the Enterprise's Activities and
23        Discredit and Silence Victims. .......................................... 24

24
   LEGAL STANDARD ........................................................................ 26
25
   ARGUMENT .................................................................................... 26
26
27 I.    THE COMPLAINT PLEADS VIOLATIONS OF THE TVPRA................. 26
28

A.    The MindGeek Defendants Are  Beneficiaries of a Trafficking Venture. ........................................................................... 28

    1.    The FAC Alleges Commercial Sex Trafficking. ..................... 28

    2.    The FAC Alleges The MindGeek  Defendant's Participation In A Trafficking Venture. ................................... 30

    3.    The MindGeek Defendants Knowingly Received  A Benefit From Their Participation in a Venture. ....................... 34

    4.    The FAC Alleges Defendants' Actual And Constructive Knowledge that the Venture was Engaged in Trafficking. ...... 34

B.    The MindGeek Defendants Are Directly Liable for Sex Trafficking. ..................................................................................... 39

C.    The FAC Pleads Beneficiary Liability Against Visa. ........................ 41

    1.    Participation in a Venture ......................................................... 41

    2.    Benefitting from its Participation in that Venture .................... 42

    3.    Visa Knew or Should Have Known  that the Venture was a Sex Trafficking Venture ............................................................ 43

D.    The FAC Adequately Pleads a Violation of Section 1594. ................ 44

II.    PLAINTIFF STATES CLAIMS FOR VIOLATIONS OF CHILD SEXUAL EXPLOITATION LAWS ............................................................ 45

III.    THE FEDERAL RICO CLAIMS ARE PROPERLY PLED. ...................... 47

A.    Plaintiff's RICO Claims Are Timely Asserted. ................................. 48

B.    The FAC Alleges a RICO Enterprise. ................................................ 50

C.    The FAC Alleges a Cognizable RICO Injury. ................................... 53

D.    The FAC Adequately Pleads Racketeering Activity. ......................... 56

E.    The FAC Alleges a RICO Conspiracy. .............................................. 58

IV.    PLAINTIFF'S STATUTORY AND  COMMON LAW CLAIMS ARE PROPERLY PLED. ..................................................................................... 59

A.    The FAC Pleads a Claim for Civil Conspiracy. ................................ 59

B.    The FAC Pleads a Violation of California Civil Code 1708.85. ....... 59

C.    The FAC Pleads a Violation of Unfair Competition Law................. 60

D.    The FAC Pleads Invasion of Privacy and Intrusion. ......................... 61

E.    The FAC Pleads Misappropriation. ................................................... 64

V.    CDA § 230 DOES NOT BAR PLAINTIFF'S CLAIMS ............................ 65

A.    The MindGeek Defendants Are Content Creators. ........................... 66

B.    CDA 230 Does Not Immunize Intentional Publication of CSAM..... 69

VI.   THE COURT HAS JURISDICTION AND PLAINTIFF HAS
      STANDING. ................................................................................... 71

A.    The Court has Personal Jurisdiction Over Each Defendant. ............. 71

      1.    The Agency and Alter Ego Relationship Between  and
            Among the MindGeek Defendants Confer General
            Jurisdiction .............................................................................. 72

      2.    The Court has Personal Jurisdiction Pursuant  to Rule
            4(k)(2), 18 U.S.C. § 2255, and the RICO Statute. ................. 77

      3.    The Individual Defendants' Remaining Arguments are
            Unavailing. .............................................................................. 80

      4.    Jurisdictional Discovery is Appropriate.................................. 80

B.    Plaintiff has Article III Standing. ...................................................... 81

CONCLUSION ........................................................................................ 85

PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Action Embroidery Corp. v. Atl. Embroidery, Inc.*,
  368 F.3d 1174 (9th Cir. 2004) ........................................................................ 79

*ADO Fin., AG v. McDonnell Douglas Corp.*,
  931 F. Supp. 711 (C.D. Cal. 1996) ................................................................ 73

*Amy v. Curits*,
  2020 WL 5365979 (N.D. Cal. Sep. 8, 2020) (MG Mot. 24) .......................... 55

*Anderson v. Peregrine Pharms., Inc.*,
  2013 WL 12122423 (C.D. Cal. Aug. 23, 2013), *aff'd*, 654 F. App'x
  281 (9th Cir. 2016) ......................................................................................... 39

*Aragon v. Che Ku*,
  277 F. Supp. 3d 1055 (D. Minn. 2017) ........................................................... 57

*B.M. v. Wyndham Hotels & Resorts, Inc.*
  2020 WL 4368214 (N.D. Cal. July 30, 2020) ................................................. 43

*Ballard v. Savage*,
  65 F.3d 1495 (9th Cir. 1995) .......................................................................... 76

*Barnett v. Cnty. of Los Angeles*,
  2021 WL 826413 (C.D. Cal. Mar. 4, 2021) .................................................... 35

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................ 26

*Bennett v. Spear*,
  520 U.S. 154 (1997) .................................................................................. 83, 84

*Bondit, LLC v. Hallows Movie, Inc.*,
  2020 WL 7777992 (C.D. Cal. Apr. 1, 2020) .................................................. 52

*In re Boon Glob. Ltd.*,
  923 F.3d 643 (9th Cir. 2019) .......................................................................... 72

*Booth v. United States*,
  914 F.3d 1199 (9th Cir. 2019) ........................................................................ 48

*Boyle v. United States*,
   556 U.S. 938 (2009) ............................................................................ 50, 52, 53

*Bristol-Myers Squibb Company v. Superior Court of California*,
   137 S. Ct. 1773 (2017) ................................................................................. 79

*Brophy v. Almanzar*,
   359 F. Supp. 3d 917 (C.D. Cal. 2018) (Carney, J.) ..................................... 80, 81

*Bui v. Nguyen*,
   712 F. App'x 606 (9th Cir. 2017) ...................................................................... 50

*Bunnett & Co. v. Gearhart*,
   2018 WL 1070298 (N.D. Cal. Feb. 27, 2018) ........................................ 50, 51, 53

*C&M Café v. Kinetic Farm, Inc.*,
   2016 WL 6822071 (N.D. Cal. Nov. 16, 2016) ................................................ 54

*Californians for Alternatives to Toxics v. Schneider Dock & Intermodal
   Facility, Inc.*,
   374 F. Supp. 3d 897 (N.D. Cal. 2019) ........................................................... 82

*Calvert v. Huckins*,
   875 F. Supp. 674 (E.D. Cal. 1995) ................................................................ 76

*Canosa v. Ziff*,
   2019 WL 498865 (S.D.N.Y. Jan. 28, 2019) ................................................... 29

*Chan v. Society Expeditions, Inc.*,
   39 F.3d 1398 (9th Cir. 1994) ........................................................................ 77

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod.
   Liab. Litig.*,
   295 F. Supp. 3d 927 (N.D. Cal. 2018) ...................................................... 31, 53

*Chubchai v. AbbVie, Inc.*,
   2022 WL 1236877 (N.D. Cal. April 21, 2022) ................................................ 74

*Cooper v. San Bernardino Sheriff Dep't*,
   2017 WL 10511568 (C.D. Cal. Mar. 10, 2017) .............................................. 38

*Corcoran v. CVS Health Corp.*,
   169 F. Supp. 3d 970 (N.D. Cal. 2016) ........................................................... 75

*Cork v. CC-Palo Alto, Inc.*,
    534 F.Supp.3d 1156 (N.D. Cal. 2021) ................................................................ 59

*Diaz v. Gates*,
    420 F.3d 897 (9th Cir. 2005) (en banc) ........................................................ 54, 55

*DISH Network L.L.C. v. Vicxon Corp.*,
    923 F. Supp. 2d 1259 (S.D. Cal. 2013)................................................................. 72

*Doe #1 v. MG Freesites, LTD*,
    2022 WL 407147 (N.D. Ala. Feb. 9, 2022) ............................................... *passim*

*Doe v. Facebook, Inc.*,
    142 S. Ct. 1087 (2022) ....................................................................................... 67

*Doe v. MindGeek*,
    558 F. Supp. 3d 828 (C.D. Cal. 2021) ........................................................ *passim*

*Doe v. Mindgeek USA Inc.*,
    2021 WL 5990195, (C.D. Cal. Dec. 2, 2021) ................................. 35, 65, 60, 66

*Doe v. Red Roof Inns, Inc.*,
    21 F.4th 714 (11th Cir. 2021) ............................................................................ 33

*Doe v. Reddit, Inc.*,
    2021 WL 5860904 (C.D. Cal. Oct. 7, 2021) ...................................................... 33

*Doe v. Unocal Corp.*,
    248 F.3d 915 (9th Cir. 2001)............................................................................... 73

*Doe v. Webgroup Czech Republic, AS.*,
    2022 WL 982248 (C.D. Cal. Jan. 13, 2022) ........................................... 78, 79, 80

*Downing v. Abercrombie & Fitch*,
    265 F.3d 994 (9th Cir. 2001)............................................................................... 65

*In re Facebook, Inc., Consumer Privacy User Profile Litig.*,
    402 F. Supp. 3d 767 (N.D. Cal. 2019) ............................................................... 81

*Fair Housing Council v. Roommates.com*,
    521 F.3d 1157 (9th Cir. 2008) ........................................................................... 66

*Fed. Reserve Bank of San Fran. v. HK Sys.*,
    1997 U.S. Dist. LEXIS 5573 (N.D. Cal. 1997) ................................................. 73

*Fla. Audubon Soc. v. Bentsen*,
   94 F.3d 658 (D.C. Cir. 1996) ........................................................................... 84

*Fleetwood Servs., LLC v. Complete Bus. Solutions Grp., Inc.*,
   374 F. Supp. 3d 361 (E.D. Pa. 2019) ............................................................ 53

*Flynt Distrib. Co. v. Harvey*,
   734 F.2d 1389 (9th Cir. 1984) ........................................................................ 73

*Fraley v. Facebook, Inc.*,
   830 F. Supp. 2d 785 (N.D. Cal. 2011) ................................................. 55, 56, 64

*Friedman v. 24 Hour Fitness USA, Inc.*,
   580 F. Supp. 2d 985 (C.D. Cal. 2008) ........................................................... 53

*Georgian v. Zodiac Grp., Inc.*,
   2011 WL 13214306 (S.D. Fla. Jan. 6, 2011) ................................................. 54

*Gomez v. Guthy-Renker, LLC*,
   2015 WL 4270042 (C.D. Cal. July 13, 2015)................................................. 53

*Gonzalez v. Google LLC*,
   2 F.4th 871 (9th Cir. 2021) ............................................................................ 66

*Grimmett v. Brown*,
   75 F.3d 506 (9th Cir. 1996)......................................................................... 48, 49

*Guerrero v. Gates*,
   110 F. Supp. 2d 1287 (C.D. Cal. 2000) ......................................................... 54

*H.H. v. G6 Hosp., LLC*,
   2019 WL 6682152 (S.D. Ohio Dec. 6, 2019) ............................................ 30, 34

*Hernandez v. Hillsides, Inc.*,
   47 Cal. 4th 272 (2009) ................................................................................... 61

*Holland Am. Line Inc. v. Wartsila N. Am., Inc.*,
   485 F.3d 450 (9th Cir. 2007)........................................................................... 77

*Horton by Horton v. City of Santa Maria*,
   915 F.3d 592 (9th Cir. 2019)........................................................................... 35

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945) ....................................................................................... 78

*J. B. v. G6 Hosp., LLC*,
    2020 WL 4901196 (N.D. Cal. Aug. 20, 2020) .................................................. 33

*Jubelirer v. MasterCard Int'l, Inc.*,
    68 F. Supp. 2d 1049 (W.D. Wis. 1999) ........................................................... 53

*Just Film, Inc. v. Buono*,
    847 F.3d 1108 (9th Cir. 2017) ....................................................... 47, 53, 54, 57

*JW Gaming Dev., LLC v. James*,
    2018 WL 4853222 (N.D. Cal. Oct. 5, 2018) .................................................... 58

*JW Gaming Dev., LLC v. James*,
    2020 WL 3640004 (N.D. Cal. July 6, 2020) ..................................................... 51

*Kaing v. Pulte Homes, Inc.*,
    No. 09-5057 SC, 2010 WL 625365 (N.D. Cal. Feb. 18, 2010),
    *aff'd sub nom. Kaing v. Pultegroup, Inc.*, 464 F. App'x 630
    (9th Cir. 2011) ................................................................................................. 85

*Kammona v. Onteco Corp.*,
    587 F. App'x 575 (11th Cir. 2014) .................................................................. 80

*Kao v. Holiday*,
    58 Cal. App. 5th 199 (Cal. Ct. App. 2020) ..................................................... 65

*Ketayi v. Health Enrollment Grp.*,
    516 F. Supp. 3d 1092 (S.D. Cal. 2021)...................................................... 52, 59

*Kevin Barry Fine Art Assocs. v. Ken Gangbar Studio, Inc.*,
    391 F. Supp. 3d 959 (N.D. Cal. 2019) ............................................................ 58

*Khosroabadi v. Mazgani Social Servs., Inc.*,
    2017 WL 4712074 (C.D. Cal. July 28, 2017)................................................... 47

*KNB Ent. v. Matthews*,
    78 Cal. App. 4th 362 (Cal. Ct. App. 2000) ..................................................... 64

*Kokkinis v. Boyd*,
    2017 WL 5634602 (C.D. Cal. Aug. 3, 2017).................................................... 49

*Laub v. U.S. Dep't of the Interior*,
    342 F.3d 1080 (9th Cir. 2003) ........................................................................ 77

*LD v. United Behavioral Health*,
    508 F. Supp. 3d 601 (N.D. Cal. 2020) ........................................................ 53, 59

*Lee v. Penthouse Int'l, Ltd.*,
    1997 WL 33384309 (C.D. Cal. Mar. 19, 1997).................................. 62, 63, 64

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ........................................................................................ 83

*M.A. v. Wyndham Hotels Resorts Inc.*,
    425 F. Supp. 3d 959 (S.D. Ohio 2019) .................................................... 30, 34

*Massachusetts v. E.P.A.*,
    549 U.S. 497 (2007)........................................................................................ 82

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
    647 F.3d 1218 (9th Cir. 2011) ................................................................. 72, 76

*McGee v. Poverello House*,
    2021 WL 3602157 (E.D. Cal. Aug. 13, 2021)................................................ 61

*MD Helicopters, Inc. v. Aerometals, Inc.*,
    2021 WL 978953 (E.D. Cal. Mar. 16, 2021) .................................................. 49

*MedImpact Healthcare Sys., Inc. v. IQVIA, Inc.*,
    2020 WL 5064253 (S.D. Cal. Aug. 27, 2020) ................................................ 54

*Mendia v. Garcia*,
    768 F.3d 1009 (9th Cir. 2014) ................................................................. 83, 84

*Mendoza v. Zirkle Fruit Co.*,
    301 F.3d 1163 (9th Cir. 2002) ....................................................................... 56

*MH Pillars Ltd. v. Realini*,
    2018 WL 1184847 (N.D. Cal. Mar. 7, 2018)............................................ 52, 57

*Michaels v. Internet Entertainment Group, Inc.*,
    5 F. Supp. 2d 823 (C.D. Cal. 1998) ......................................................... 62, 63

*Mieuli v. DeBartolo*,
    No. C-00-3225 JCS, 2001 WL 777447 (N.D. Cal. Jan. 16, 2001) ................... 73

*Milliner v. Bock Evans Fin. Counsel, Ltd.*,
    114 F. Supp. 3d 871 (N.D. Cal. 2015) ........................................................... 49

PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1   *Nat. Res. Def. Council v. Sw. Marine, Inc.*,
2      236 F.3d 985 (9th Cir. 2000)............................................................... 83

3   *Nat. Res. Def. Council v. U.S. E.P.A.*,
       542 F.3d 1235 (9th Cir. 2008) ........................................................... 82

4
5   *National Audubon Society v. Davis*,
       307 F.3d 835 (9th Cir. 2002)............................................................... 83

6   *Native Vill. of Kivalina v. ExxonMobil Corp.*,
7      663 F. Supp. 2d 863 (N.D. Cal. 2009), *aff'd,* 696 F.3d 849 (9th Cir.
       2012).................................................................................................... 85
8
9   *Natural-Immunogenics Corp. v. Newport Trial Grp.*,
       2020 WL 7263544 (C.D. Cal. Nov. 23, 2020).................................... 51
10
11  *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
       724 F.3d 1268 (9th Cir. 2013) ........................................................... 55
12
13  *Newcal Indus., Inc. v. Ikon Office Solution*,
       513 F.3d 1038 (9th Cir. 2008) ........................................................... 56
14
15  *Newcal Indus., Inc. v. IKON Office Solutions, Inc.*,
       2011 WL 18999404 (N.D. Cal. May 19, 2011) ................................. 49
16
17  *Ning Xianhua v. Oath Holdings, Inc.*,
       No. 20-CV-06185-LHK, 2021 WL 1700227
18     (N.D. Cal. Apr. 29, 2021) .................................................................. 83

19  *Noble v. Weinstein*,
20     335 F. Supp. 3d 504 (S.D.N.Y. 2018)............................. 26, 29, 37, 38

21  *Novoa v. The GEO Group, Inc.*,
       2018 WL 3343494 (C.D. Cal. Jun. 21, 2018) .................................... 61
22
23  *NuCal Foods, Inc. v. Quality Egg LLC*,
       887 F. Supp. 2d 977 (E.D. Cal. 2012).................................................. 73
24
25  *Nuñag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*,
       790 F. Supp. 2d 1134 (C.D. Cal. 2011) ............................................. 57
26
27  *Odom v. Microsoft Corp.*,
       486 F.3d 541 (9th Cir. 2007)............................................................... 50
28

*Orchid Biosciences, Inc. v. St. Louis University*,
    198 F.R.D. 670 (S.D. Cal. 2001) ....................................................................... 77

*Payrovi v. LG Chem America, Inc., et al.*,
    491 F. Supp. 3d 597 (N.D. Cal. 2020) ............................................................. 81

*Pebble Beach Co. v. Caddy*,
    453 F.3d 1151 (9th Cir. 2006) .......................................................................... 71

*Perez v. DirecTV Grp. Holdings, LLC*,
    2019 WL 6362471 (C.D. Cal. July 23, 2019)....................................... 57, 58, 59

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
    494 F.3d 788 (9th Cir. 2007)...................................................................... 22, 43

*Ratha v. Phatthana Seafood Co.*,
    2017 WL 8293174 (C.D. Cal. Dec. 21, 2017) ................................................ 43

*Robins v. Spokeo, Inc.*,
    867 F. 3d 1108 (9th Cir. 2017)......................................................................... 82

*Sarafian v. Wright Medical Technology, Inc.*,
    2016 WL 1305087 (C.D. Cal. Apr. 1, 2016) ................................................... 79

*Sec. & Exch. Comm'n v. City of Victorville*,
    2013 WL 12133651, at *11 (C.D. Cal. Nov. 14, 2013), *on
    reconsideration*, 2014 WL 12607683 (C.D. Cal. Jan. 7, 2014)......................... 38

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985) ......................................................................................... 47

*Sierra Club v. EPA*,
    699 F.3d 530 (D.C. Cir. 2012) ......................................................................... 81

*Sihler v. Fulfillment Lab, Inc*,
    No. 3:20-CV-01528-H-MSB, 2020 WL 7226436
    (S.D. Cal. Dec. 8, 2020) .................................................................................. 73

*Socheat Chy v. Lam Sin Yam*,
    2017 WL 10676596 (C.D. Cal. Nov. 7, 2017).......................................... 57, 59

*Solano v. Playgirl, Inc.*,
    292 F.3d 1078 (9th Cir. 2002) ................................................................... 55, 63

CASE NO. 21-CV-04920-CJC-ADS
PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

*Spencer v. Mowat*,
    46 Cal. App. 5th 1024 (Cal. Ct. App. 2020) ........................................ 59

*State Comp. Ins. Fund v. Khan*,
    2013 WL 12132027 (C.D. Cal. July 30, 2013) ............................... 26, 51

*State Compensation Ins. Fund v. Khan*,
    2012 WL 12887395 (C.D. Cal. Dec. 28, 2012) .............................. 51, 52

*Symmetrrica Ent. Ltd. V. UMG Recordings, Inc.*,
    2019 WL 8806093 (C.D. Cal. Sept. 20, 2019) ................................... 75

*Synopsys, Inc. v. Ubiquiti Networks, Inc.*,
    2017 WL 3485881 (N.D. Cal. Aug. 15, 2017) .................................... 58

*Tanaka v. First Hawaiian Bank*,
    104 F. Supp. 2d 1243 (D. Haw. 2000) ............................................... 49

*Tatung Co. v. Shu Tze Hsu*,
    217 F. Supp. 3d 1138 (C.D. Cal. 2016) .............................................. 49

*Taus v. Loftus*,
    151 P.3d 1185 (Cal. 2007) ................................................................. 64

*Times-Mirror Co. v. Superior Court*,
    198 Cal.App.3d 1420 (1988) .............................................................. 62

*Doe v. Twitter*,
    555 F. Supp. 3d 889 (N.D. Cal. 2021) ....................................... *passim*

*Ulti-Mate Connectors, Inc. v. Am. Gen. Life Ins. Co.*,
    2015 WL 12734007 (C.D. Cal. Mar. 27, 2015) ................................. 58

*United States v. Alcius*,
    952 F. 3d 83 (2d Cir. 2020) ............................................................... 37

*United States v. Christensen*,
    828 F.3d 763 (9th Cir. 2015) ............................................................. 50

*United States v. Cook*,
    782 F.3d 983 (8th Cir. 2015) ............................................................. 34

*United States v. Estrada-Tepal*,
    57 F. Supp. 3d 164 (E.D.N.Y. 2014) ........................................... 39, 40

*United States v. Flanders*,
752 F.3d 1317 (11th Cir. 2014) ............................................................ 37

*United States v. Jungers*,
702 F.3d 1066 (8th Cir. 2013) .............................................................. 40

*United States v. Juskowich*,
2021 WL 5166564 (W.D. Pa. Nov. 5, 2021) ........................................ 37

*United States v. Marcus*
487 F. Supp. 2d 289, 307 (E.D.N.Y. 2007) ......................................... 29

*United States v. Mongol Nation*,
693 F. App'x 637 (9th Cir. 2017) ................................................... 51, 52

*United States v. Robinson*,
702 F.3d 22 (2d Cir. 2012)................................................................... 37

*United States v. Rogers*,
321 F.3d 1226 (9th Cir. 2003) ............................................................. 58

*United States v. Toyota Motor Corp.*,
561 F. Supp. 354 (C.D. Cal. 1983) ...................................................... 76

*United States v. Zitlalpopoca-Hernandez*,
495 F. App'x 833 (9th Cir. 2012) .................................................. 29, 37

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
MDL No. 2672 CRB (JSC), 2017 WL 4890594
(N.D. Cal. Oct. 30, 2017)....................................................... 31, 54, 77

*Waldrup v. Countrywide Fin. Corp.*,
2015 WL 93363 (C.D. Cal. Jan. 5, 2015) ............................................ 31

*White v. Symetra Assigned Benefits Serv. Co.*,
2021 WL 3472408 (W.D. Wash. Aug. 5, 2021)................................... 49

*Wood v. Hustler Magazine, Inc.*,
736 F.2d 1084 (5th Cir. 1984) ............................................................. 63

*Xcentric Ventures, LLC v. Borodkin*,
798 F.3d 1201 (9th Cir. 2015) ............................................................. 54

*Yeager v. Cingular Wireless LLC,*
  673 F. Supp. 2d 1089 (E.D. Cal. 2009) ................................................................. 65

*Zosma Ventures, Inc. v. Givi,*
  2014 WL 12579805 (C.D. Cal. Oct. 28, 2014) ................................................. 72

**Statutes**

18 U.S.C. § 1591 ........................................................................................... *passim*

18 U.S.C. § 1594 ..................................................................................................... 44

18 U.S.C. § 1595 ........................................................................................... *passim*

18 U.S.C. § 1957 ..................................................................................................... 58

18 U.S.C. § 1961 ............................................................................................. 50, 56

18 U.S.C. § 1962 ..................................................................................................... 47

18 U.S.C. §§ 2252 and 2252A ................................................. 45, 47, 51, 56, 57, 70

18 U.S.C. § 2255 ........................................................... 55, 72, 77, 78, 80

18 U.S.C. § 2257 ..................................................................................................... 23

47 U.S.C. § 230 ............................................................................................. *passim*

Cal. Civ. Code § 1708.85 .............................................................................. 59, 60

Cal. Civ. Code § 3344 ........................................................................................... 55

**Other Authorities**

Fed. R. Civ. P. 4 .............................................................................................. 72, 77

Fed. R. Civ. P. 12 ...................................................................................... 26, 48, 56

Fed. R. Civ. P. 9 ............................................................................................... 50-51

PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Serena Fleites ("Fleites" or "plaintiff") submits this memorandum of points and authorities in opposition to the motions of MindGeek S.á.r.l., MindGeek Freesites Ltd., MindGeek USA Incorporated, MG Premium Ltd., MG Global Entertainment, Inc., 9219-1568 Quebec, Inc. (Dkt. 139-1 ("MG Mot.")), Bernd Bergmair (Dkt. 135 ("Bergmair Mot.")), Feras Antoon (Dkt. 137 ("Antoon Mot.")), David Tassillo (Dkt. 136 ("Tassillo Mot.")), Corey Urman (Dkt. 140-1 ("Urman Mot.")), and Visa (Dkt. 138-1 ("Visa Mot.")) to dismiss the First Amended Complaint ("FAC").[1]

## PRELIMINARY STATEMENT

MindGeek is one of the largest trafficking ventures in the world.  For more than a decade, MindGeek, its owners, executives, and partners—including the Individual Defendants and Visa—have elected to capitalize on the exploitation and abuse of tens of thousands of human beings so that they can make more than the enormous sums of money they would have otherwise made.  Plaintiff, Serena Fleites, became one of defendants' victims when, at age thirteen, her child sexual abuse materials ("CSAM") were uploaded to MindGeek's tubesites and disseminated all over the internet.

In the arms race to be the number one result in the Google search engine for pornography, defendants knew it would be a huge advantage to have more content than anyone else.  In the science of search engine optimization ("SEO"), content is king, and the unrestricted accumulation of content is a driving factor in determining which website leads in Google search results.  Thus, the MindGeek Defendants embraced a business model in which they not only allowed users to populate their platform with virtually any type of pornographic content, but also devoted themselves

---

[1] References to the "MindGeek Entities" are to MindGeek S.á.r.l., MG Freesites Ltd. ("Freesites"), MindGeek USA Incorporated, MG Premium Ltd., MG Global Entertainment, Inc., and 9219-1568 Quebec, Inc. ("9219").  References to the "Individual Defendants" are to Bergmair, Antoon, Tassillo, and Urman (together with the MindGeek Entities, "MindGeek Defendants").  References to "MindGeek" is to the MindGeek Defendants and the sham entities they operate and control."

PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1  to analyzing all the content and how such content, including illegal CSAM, could be

2  used to maximize website traffic and advertising revenue.

3       This detailed, moment-to-moment analysis of site content provided defendants

4  with a comprehensive understanding of the content on their platforms, the users who

5  consumed it, and how to induce such users to use their platforms with the content of

6  their choice.  This included the not-insignificant number of consumers of child

7  pornography.  Defendants used this comprehensive understanding of the content,

8  including illegal content, to maximize site traffic and advertising revenue by

9  (a) soliciting, producing, purchasing, and promoting such illegal content, including

10  CSAM, on their platforms; (b) editing video length, titles, and search tags based on

11  analytics to maximize views and customer advertising conversions; (c) directing users

12  to similar illegal content defendants' analytics identified as likely to induce further

13  engagement from that user; (d) failing to impose even pretextual restrictions on the

14  type of content that was uploaded; (f) transferring illegal content defendants had

15  optimized to its affiliate sites; (g) actively resisting and frustrating efforts from victims

16  to get such material removed; (f) reuploading illegal content that they were forced to

17  remove; and (g) actively misrepresenting the presence and defendants' intentional

18  exploitation of such content to platform users, the public, the media, law enforcement

19  and legislative bodies.  In addition, they used this detailed understanding of their

20  content and users to generate advertising revenues by displaying ads purchased

21  through their TrafficJunky platform on all displayed content, including ads directing

22  users to premium pay products, services, and memberships that users could purchase

23  through its in-house payment platform Probiller.  Such transactions on both platforms

24  were overwhelmingly processed through credit card companies, like defendant Visa,

25  which was aware of the inextricably intertwined use of CSAM and trafficked content

26  in MindGeek's business model, but nevertheless imposed no limitations on

27  transactions they would process.  In doing so, the MindGeek Defendants and Visa

28  created a bustling marketplace for child pornography.

CASE NO. 21-CV-04920-CJC-ADS

PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1      These criminal activities were directed by MindGeek's financier, Bergmair, and
2  its executives, Antoon, Urman, and Tassillo, and executed through a byzantine
3  international structure of shell companies that were in constant metamorphosis, served
4  no legitimate purpose, and were created and dissolved sometimes daily to mask
5  criminal activity, evade liability, and enrich defendants.  Defendant Visa, which was
6  uniquely situated to stop this exploitation, chose instead to participate in the
7  profiteering, even after its competitors publicly cut ties with MindGeek.

8      The extensive criminal activities and the detailed allegations of each
9  defendant's role in these activities set forth in the FAC gives rise to a host of
10  cognizable federal and state claims.  Defendants' motions to dismiss offer no
11  arguments that individually or collectively insulate them from liability for the harm
12  their wrongdoing has caused plaintiff.

13      First, defendants argue that they cannot be held liable for sex trafficking
14  because the FAC fails to allege that any defendant compensated plaintiff for the
15  CSAM or was responsible for the initial uploads to MindGeek's tubesites.  According
16  to defendants, plaintiff's ex-boyfriends and traffickers are solely responsible for the
17  harm she suffered, and MindGeek is simply a neutral internet platform that had no
18  knowledge of these violations and cannot be held liable.  But this Court and others
19  have previously rejected these very same arguments, and this Court should do so again
20  here.  As this Court previously held on substantially similar (albeit less egregious)
21  allegations, MindGeek's patterns and practices create an inference of its participation
22  in a trafficking venture and actual knowledge of the harm plaintiff sustained.  At a
23  minimum, these allegations raise inherent questions of fact which turn on information
24  uniquely in defendants' possession and cannot be resolved on these Motions.

25      The MindGeek Defendants' challenges to plaintiff's claim for violation of
26  federal child exploitation laws fare no better.  As an initial matter, the MindGeek
27  Defendants do not contest that they violated these federal laws when they uploaded
28  plaintiff's initial video titled "13-Year Old Brunette Shows Off For the Camera."

Thus, at a minimum, the case proceeds as to this claim.  The Individual Defendants' claim that the FAC fails to plead their knowledge or reckless disregard that plaintiff was underage is belied by, among other things, MindGeek's repeated public claim that MindGeek moderators reviewed every video prior to upload, as well as the videos, titles, and comments which clearly conveyed plaintiff's age.  In any event, even assuming defendants lacked the requisite knowledge at the time the images were uploaded (which they did not), MindGeek has maintained that it never deleted a single video posted to its tubesites even after being informed they were illegal.  MindGeek, therefore, has illegally possessed plaintiff's CSAM on its servers for years after it was forced to remove it and continues to do so to this day.

Plaintiff's RICO claims are likewise sufficiently alleged, and none of defendants' challenges warrant dismissal.  As set forth herein, the FAC pleads a RICO enterprise, each defendant's role in that enterprise, cognizable injury, and hundreds of predicate acts.  To the extent, certain allegations involve "group" pleading, that is plainly permissible at this stage in the proceedings as this Court and the Ninth Circuit have repeatedly held.

Finally, the FAC also pleads numerous state statutory and common law claims which defendants do not meaningfully challenge.

Faced with the FAC's detailed allegations and this Court's prior holdings, defendants resort to a series of procedural arguments.  None of these challenges insulate them from liability.  As this Court has previously and repeatedly held, defendants' practice of soliciting, curating, modifying, transferring, and reuploading illegal content materially contributed to the CSAM on its tubesites, and renders it a content creator not entitled to CDA 230 protection.

Defendants' efforts to escape liability on personal jurisdiction grounds should similarly be rejected.  As an initial matter, the MindGeek Entities concede for the purposes of these motions that all but two of the entities are subject to personal jurisdiction in this state.  The FAC alleges that each of the Individual Defendants and

MindGeek Entities—including the defendants which do not contest jurisdiction on this Motion—are alter egos of each other and hundreds of international sham shell companies that serve no other purpose than to avoid investigation and liability for their ongoing criminal activities.  Under these circumstances, the sufficient jurisdictional contacts of these alter egos must be imputed to the remaining MindGeek Defendants who challenge jurisdiction.  Alternatively, defendants are subject to nationwide service of process pursuant to the numerous federal claims for their minimum contacts with the United States.  At a minimum, plaintiff is entitled to discovery concerning the relationship between these entities and individuals and their jurisdictional contacts.

For these reasons and those set forth below, defendants' Motions should be denied.

## **FACTUAL BACKGROUND**

### A.    **Plaintiff's Exploitation.**

Serena Fleites is one of tens of thousands of victims of defendants' sex trafficking venture.  She became a victim of child pornography at age 13 when MindGeek, its owners, agents, and partners—including defendant Visa—illegally solicited, reviewed, accepted, uploaded, optimized, tagged, categorized, and disseminated CSAM of plaintiff and advertised alongside her CSAM on its tubesites. (¶¶ 259-60, 262, 268, 272.)  Her age was explicit from the image itself, the title of the video "13-Year Old Brunette Shows Off For the Camera" (¶ 258), and the hundreds of comments noting that Serena could not be more than a "teenager."  (¶ 262.)

The video initially went viral on MindGeek's flagship tubesite, Pornhub.  By the time Serena discovered the video, it had more than 400,000 views, had been widely disseminated, and continued to generate views exponentially.  (¶ 260.)  The video appeared alongside advertisements that MindGeek revenues with every page visit, impression, engagement, and conversion.  (*Id*.)  MindGeek also uploaded

1  Serena's optimized, tagged, categorized video to its other tubesites and incorporated it

2  into its algorithmic playlists and suggested videos.  (¶ 259.)

3          When Serena finally became aware of the illegal CSAM, she demanded it be

4  taken down.  (¶ 261.)  Pornhub ignored her requests.  (¶¶ 262-63.)  It waited more than

5  two weeks before responding to Serena's takedown e-mails informing them that the

6  videos contain "child pornography," during which time MindGeek continued to

7  generate advertisement revenue and impressions.  (¶ 261.)  When Pornhub did

8  ultimately respond, it acknowledged the video contained CSAM and agreed to take it

9  down.  (*Id*.)  Yet another two weeks went by before the video was removed from its

10  site, and then only after continued demands from the minor victim.  (*Id*.)

11          This abuse continued for years while Serena was a minor during which time

12  MindGeek repeatedly accepted and exploited videos of her for monetary purposes.

13  Even after MindGeek finally agreed to remove the original video, the videos were

14  reuploaded on countless occasions, and, for each upload, MindGeek reviewed and

15  accepted the video once; optimized, categorized, tagged it, and paired it with

16  advertisements again; and uploaded the video to its other tubesites.  (¶¶ 262, 272, 212-

17  15.)  One of the uploads had 2.7 million views.  (¶ 262.)  Others had hundreds of

18  comments noting Serena's minor status.  (*Id*.)  Each time Serena learned the video had

19  been reuploaded, she recommenced the process to have the video removed.  (¶ 263.)

20  Yet, Pornhub still took weeks to take each video down, each time requiring Serena to

21  provide photographic proof that she was the child depicted in the video before

22  removing it from its site.  (*Id*.)  The CSAM videos continue to stream on MindGeek's

23  sites as recently as last year (¶ 270), and is available on MindGeek's servers to this

24  day, along with other illegal disabled and removed content that MindGeek has

25  repeatedly conceded have never been deleted and continue to be in its possession.

26  (¶¶ 135, 219, 250-53, 522, 532, 549.)

27          The impact on Serena's life has been devastating, derailing a good, innocent

28  young student's education, family, friend, and community relationships, and mental

health.  (¶¶ 266-67, 270.)  The dissemination and proliferation of Serena's CSAM has interfered with her employment.  (¶ 271.)  Moreover, to mitigate these challenges, Serena was forced to retain an investigatory firm to locate all the videos and facilitate takedown requests.  She became estranged from her family.  (*Id*.)  Throughout various stages of the past five years she was homeless and lived in her car.  (¶¶ 265-67, 270.) She continues to suffer from depression and anxiety and has attempted suicide on multiple occasions over the years.  (*Id*.)

Her experience was not unique, but instead a regular part of the business model defendants created to get rich in the porn industry by operating without restrictions.

**B.**   **MindGeek's Human Trafficking Venture and Criminal Enterprise.**

Defendants go to great lengths to portray MindGeek like other internet companies, such as YouTube or Craigslist.  (MG Mot. 3; Tassillo Mot. 4; Antoon Mot. 3.)  But as far as it goes, MindGeek has similarities to other internet companies, much like Satrieles and BadaBing had similarities to legitimate businesses in the Sopranos.  MindGeek owns a group of "tubesites" that contain free, purportedly user-populated, digital pornography.  Users are drawn to MindGeek tubesites by the ability to access, upload, and exchange free content.  (¶ 60.)  MindGeek uses the traffic generated by that free content to (a) advertise additional pornographic sites that offer paid content that are owned by MindGeek or third parties; (b) sell advertising for other products and services it or third parties offer; and (c) harvest user data for its own purposes and to sell to third parties.  (*See* ¶¶ 60-66.)

Central to the economics of these relationships is traffic to MindGeek's tubesites.  (¶ 69.)  The more traffic, the more attractive the tubesites are to advertisers and paid content partners, the more ad impressions and customer conversions generating revenue, the more data to optimize and increase traffic, impressions, and conversions, and the more content to attract more user traffic.  (*Id*.) This is a reinforcing dynamic.  (*Id*.)  As traffic increases, content, product, and

service optimization increases, which, in turn, increases traffic even more.  (*Id.*)
Advertising prices increase with increased traffic to the site.  (¶¶ 62, 119.)  Ad
revenue earned through TrafficJunky, MindGeek's advertising platform, accounts
for over 50% of MindGeek's revenues annually.  (*Id.*)

     None of that is remarkable or illegal. To the contrary, it is standard internet
business.  What is remarkable and illegal is MindGeek's incorporation of illegal,
nonconsensual content as a major component of this business.  Although MindGeek
tries to portray its flagship tubesite, Pornhub, as well as its other tubesites as third
party generated, "wholesome," legitimate, responsible, and mainstream, this was all
window dressing.  MindGeek's business plan is to provide supply for any
pornography for which there is a demand, without regard to consent or legality
because this was the only way to maximize SEO.  Content was king and
MindGeek's exclusive priority.  (¶¶ 102-06.)

     To maximize SEO, MindGeek intentionally elected to put no restrictions on
the content it would accept, offer, and commercialize.  (¶¶ 9, 168.)  Like a soft-drink
company selling different beverage types and flavors to capture all existing
consumer tastes, MindGeek sought to service demand for all pornographic tastes,
including tastes for child pornography, rape, extreme violence, racism and hate, and
other illegal acts like bestiality.  (¶¶ 164-72.)  Indeed, numerous versions of
"underage," "teen," and "incest" were consistently among the most searched terms
and popular results in MindGeek's algorithmic video and search term tubesite
suggestions.  (¶¶ 107-09, 120-24.)  Likewise, numerous versions of "drunk,"
"drugged," "passed out," and other tags indicating incapacitation were also among
search terms sought most often by users and suggested by MindGeek.  (¶ 107.)
None of this was random.  It was all a product of MindGeek's constant SEO
operation which monitored traffic, use, searches, and interactions to constantly refine
the platform's interface with users, particularly the descriptive tags and search terms
used and proposed for additional searches and content the site provided to users.

Indeed, the entire image of Pornhub and its affiliates as platforms comprised primarily of user-uploaded content was a fraud.  (¶ 111.)  It was designed to obscure the MindGeek Defendants' direct control and culpability and insulate them from exposure under United States laws.  (*Id.*)  In fact, however, vast amounts of the content on these sites, although appearing to be uploaded by individuals independent of MindGeek was produced, acquired, and uploaded by MindGeek, sometimes directly and sometimes through affiliates and partners.  (¶¶ 112, 125-29, 196-200.)

> 1.   MindGeek Solicited, Modified, Optimized,
>      And Distributed, Illegal Content on Its Platform.

From inception, MindGeek embraced underage, nonconsensual content in its business; solicited, produced, paid for, and placed such content on its pornography platforms; and lied about and concealed these facts.  (¶¶ 164, 172.)

As part of its critical SEO process of supplying product for every taste and demand, MindGeek's primary business function was real-time analytics of all its content and traffic, including its illegal content, so that it could decipher what content, presentations, and other elements generated the most traffic, interaction, and revenue conversion and modify the content and sites accordingly.  (¶¶ 69, 127.) Based on this relentless real-time analysis, even content that was user generated would be modified by MindGeek formatters before upload.  (¶ 128, 196.) MindGeek would modify the titles, tags, and descriptions of user generated content to improve its performance and SEO generally.  MindGeek has repeatedly maintained publicly that every video on its sites went through this process.  (¶¶ 127-28.)  In addition, MindGeek issued guidelines, policies, and interfaces that encouraged users to not only post nonconsensual content, but maximize its reach via designating descriptive titles, tags, categories, and playlists.  (¶¶ 12, 109).  The categories suggested by MindGeek readily demonstrate the MindGeek Defendants' targeting of viewers interested in child pornography, with categories like 'teen,' 'school,' 'babysitter' and 'old/young.'"  (*Id.*)  MindGeek's "How to Succeed" guide

1  on the Pornhub website acknowledges that "teen" is one of Pornhub's most popular

2  categories.  (*Id.*)

3        MindGeek's intentional use of illegal content was nowhere more apparent

4  than the unrestricted ability to upload such content onto its tubesites.  (¶ 183.)

5  MindGeek's own Social Media Manager publicly explained that it would be a

6  "disaster" to try to restrict users to adults because "then no one would upload

7  anything," it would "cost[] us money to verify," "devastate[] traffic," and

8  "MindGeek loses money." (*Id.*)  This MindGeek spokesperson further warned that

9  even pretextual restrictions would be unacceptable to MindGeek because some

10  percentage of minors would not be able to figure out how to circumvent them: "you

11  would get around them, a lot of people here would too but the large majority won't

12  know how." (*Id.*)  In the SEO arms race, any restriction on content is unacceptable.

13        Consistent with this ethos, despite publicly representing that every image was

14  reviewed before being uploaded and despite knowing illegal content would be

15  uploaded without legitimate monitoring, MindGeek intentionally used an upload

16  process that would not filter out illegal content.  (¶ 184.)  Thus, while non-

17  pornographic tubesites with far less content uploaded on a daily basis (and far less

18  users seeking illegal conduct) employed tens of thousands of "moderators" and

19  sophisticated technology to ensure content was legal and complied with the terms of

20  service, MindGeek's uploading process—with a vastly increased risk of illegal

21  content—ensured virtually no illegal content would be blocked from upload.  (¶

22  185.)  MindGeek's sham moderation function consisted of as few as 6 but never

23  more than about 30 untrained, minimum wage contractors for all of MindGeek's

24  tubesites and millions of videos uploaded daily.  (¶ 186.)  It was, of course,

25  impossible for such a minute number of individuals to actually watch and moderate

26  the vast volume of daily videos uploaded.  (¶¶ 187, 189.)  Indeed, their real function

27  was formatting, and internally they were called "content formatters," not "content

28  moderators." (¶ 188.)  As formatters, their task was not to moderate legality, but

format the videos for optimal SEO.  (¶¶ 188, 191.)  To do so, they would add or edit the title, tags, and descriptions and sometimes edit the video.  (¶ 188.)  They also "scrubbed" words in the titles and tags that unequivocally indicated criminality.  (*Id.*)  While the red flags of criminality were removed, the video would nevertheless be uploaded with optimized titles, tags, and descriptions that would still permit MindGeek's search engine to suggest the video to users searching for that illegal content.  (*Id.*)

Demonstrating the task was formatting not moderation, MindGeek set unrealistic daily quotas of a minimum 700-800 videos that bore no relationship to the time it would take to actually screen that content.  (¶ 190.)  The quotas were based on how long it should take to format, not screen, the content.  (*Id.*)  MindGeek "reviewers" also received yearly bonuses based on the numbers of videos approved for upload, further incentivizing maximation of uploaded content.  (¶ 187.)

Once uploaded, MindGeek's intensive SEO function scrutinized all content, particularly content that its real-time analytics indicated was trending, gaining ad impressions, and generating conversions.  (¶ 127.)  This process was applied to all content, regardless of category or subject being portrayed, and content that was effective would be modified and often duplicated to optimize its SEO further.  (*Id.*)  It used a sophisticated and ever-improved algorithm to direct users to more content that suited their identified interests.  (¶ 199.)  This was done for all categories of content, including those depicting minors, rape victims, and other nonconsensual conduct.  (¶ 196.)  MindGeek formatters would also create a graph or timeline and place it underneath videos to demonstrate the level of intensity of activity within a particular section of the video, as well as "buttons" describing certain sexual activity occurring within the video.  (¶¶ 116-17.)  Knowing that users would be able to use this enhancement to quickly advance to certain sections of a video, MindGeek optimized its ad placement accordingly.  (*Id.*)  MindGeek formatters also created thumbnails for the videos on its tubesites, which MindGeek stores on a separate

server.  (¶ 118.)  Content that was trending was further refined and tested to amplify it even more, and the conclusions drawn from that were applied to similar content. (*Id.*)  What was not a focus at all was whether the content was in fact consensual or adult.  (*Id.*)  Nowhere in this process or elsewhere, did MindGeek comply with § 2257's requirements that they secure proof of age where they were uploading material or confirm that content being transferred by MindGeek contained the required age certification from the producer.  (*Id.*)

MindGeek also used sophisticated search algorithms by which it would solicit users to view similar content.  (¶ 199.)  Thus, for example, when a user, searched for "teen sex," MindGeek would present the most popular video results associated with that term, and solicit searches with a host of other more detailed terms used by others for similar content, like "barely legal teen sex," "young teen sex," "middle school teen sex." (*Id.*)  Investigators, advocates, and journalists following MindGeek's suggestions easily found within a few clicks videos of obvious child pornography or other forms of nonconsensual sex with terms associated with that type of abuse, like "drunk," drugged," "passed out." (*Id.*)

This was no accident.  (¶ 200.)  It was a product of MindGeek's deliberate and detailed understanding of the content on its site and effort to solicit people to watch that content and continue using the site.  (*Id.*)  As an insider explained, MindGeek had the capabilities to easily search for illegal content, but never did: "[Y]ou can search any word, any video, you can look for the user, anything like any other database . . . so, why are they not searching for this and cleaning? . . . Because they want the content on their sites." (¶ 201.)  MindGeek did not search because it did not need to.  It was intimately aware of the content of its websites, and knew full well that it had thousands of videos with clear indicia of illegal or nonconsensual content, and that this was a "genre" from which it could generate significant revenue.  (*See, e.g.*, ¶¶ 213 (15-year-old beaten and raped); 214 (describing videos of toddler in

diapers and a prepubescent girl being raped); 298 (results from searches for illegal content).)

When MindGeek identified a title or tags that too explicitly flagged illegal content, it would notify the user to change the title or change it themselves (¶ 198), but it would not disable the illegal video. (*Id.*) One video of an underage, incapacitated woman carried the viewers comments, "I thought she was dead until five minutes in" and "I don't think that girl is old enough to buy lottery tickets" (*Id.*) The uploader originally titled the video, "delete your history after watching this," clearly flagging the video as child pornography. (*Id.*) But then he changed the title and, when asked why, he explained, "Pornhub support told to change all titles." (*Id.*)

The only time MindGeek would voluntarily remove content was when this detailed analysis revealed the content was harming its SEO. (¶ 202.) For example, MindGeek determined that male homosexual content was interfering with its impressions and conversions. (*Id.*) Accordingly, MindGeek affirmatively worked to reduce such content on its site. (*Id.*) No similar steps were taken when it became aware of illegal CSAM in its SEO work. (*Id.*)

## 2.   MindGeek's Unpoliced Platform

The intentional exploitation of illegal content is further evidenced by MindGeek's treatment of videos flagged by authorities, victims, and users as illegal. (¶ 203.) Such requests were ignored, stonewalled, and stalled to preserve the use of the content for as long as possible. (*Id.*) This was especially a priority when the content was performing well, and MindGeek's SEO analysts were trying to use that data to refine their algorithms and solicit views of similar content from the same category of "consumers." (*Id.*)

Thus, when victims, including plaintiff, notified MindGeek that videos of their abuse had been uploaded, they were typically ignored unless the victims persisted. (¶¶ 204, 263-64.) Then they would be stonewalled with denials or

1  demands for information.  (¶ 204.)  For example, victims were told that only the

2  uploader could request a video be taken down; or they needed to provide the URLs;

3  or that the videos did not exist or could not be found when they did exist and could

4  be found; or that they had been taken down when they had not been.  (¶¶ 208, 264.)

5  In the case of plaintiff, each time her CSAM was reuploaded, MindGeek waited

6  weeks to respond to her takedown requests, and then required her to provide proof

7  that she was the victim in the video before taking down the CSAM.  (¶ 263.)

8      Moreover, when victims or authorities succeeded in getting MindGeek to

9  remove an illegal video, it would only disable the video but keep the webpage with

10  its title, description, tags, and comments so that the video, though disabled, would

11  still continue to increase SEO.  (¶ 205.)  When a user searching for such content

12  landed on the disabled video's webpage, MindGeek's search and video suggestion

13  algorithms would solicit the user with similar videos to the one disabled.  (*Id.*)

14  Indeed, to this day, one can run internet searches for known CSAM or other

15  nonconsensual content that was ordered taken down and the search will bring you to

16  Pornhub even though that video is not enabled.  (¶ 207.)  MindGeek's algorithm will

17  then direct you to similar non-disabled content.  (*Id.*)

18      3.    MindGeek Re-uploaded Illegal and Nonconsensual Content

19      Much worse, according to multiple insiders, MindGeek would systematically

20  reupload all content that it had been forced to disable back to the system and do so in

21  a manner in which it appeared to have been reuploaded by independent users and

22  which circumvented MindGeek's purported systems for identifying previously

23  disabled videos.  (¶ 208.)  This is the reason why so many victims, including

24  plaintiff, reported that even when they successfully got videos disabled, the same

25  videos would be reuploaded again and again.  (*Id.*)  One eyewitness to this process,

26  explained that caches of disabled content "would be provided to employees on disks

27  and they would be instructed to reupload those videos from non-MindGeek

28

PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1    computers using specific email addresses that would allow the uploads to bypass

2    MindGeek's purported 'fingerprinting' of removed videos. . ." (¶ 209.)

3         MindGeek has repeatedly stated publicly that it retains on its servers all videos

4    ever uploaded onto its tubesites. (*Id.*) This no doubt is necessary for its reuploading

5    practice and SEO generally. (*Id.*) MindGeek, therefore, has throughout its existence

6    illegally possessed CSAM, and reuploaded that CSAM innumerable times. (*Id.*)

7    Indeed, MindGeek, with duplicative servers in the United States and Canada (among

8    other places), is likely the largest non-regulatory repository of CSAM/child

9    pornography in North America. (*Id.*)

10        Moreover, MindGeek pushed all content posted on any of its tubesites,

11   regardless of initial sourcing, to its other tubesites, which it again falsely portrayed

12   as posted by third-party users. (¶¶ 126, 128, 194-95, 243, 245-49, 255, 272.) In

13   addition, insiders explained that MindGeek provided a download button for users to

14   facilitate the propagation of content, including illegal content. (¶ 210.) MindGeek

15   knew and counted on users to download content, make new content and

16   compilations, and then reupload it as new content or as a replacement for disabled

17   content. (*Id.*) And it incentivized them to do so by providing various programs

18   whereby they could monetize such content, sharing the revenue with MindGeek.

19   MindGeek also took other steps to permit users engaged in illegal conduct to feel

20   safe operating on MindGeek tubesites, including providing VPN, Tor site access,

21   and direct-messaging services. (¶¶ 12, 210, 212.)

22        Despite admitted possession of massive amounts of child pornography and

23   hundreds if not thousands of complaints about such content, MindGeek never

24   voluntarily made a single legally required disclosure to authorities in the United

25   States or Canada about that material under either countries' laws until 2020. (¶ 213.)

26   Not only did MindGeek not report CSAM it became aware of on its tubesites, it

27   actively discouraged victims and others from reporting it, and lied to do so. (¶ 215.)

28   For example, MindGeek tried to convince a victim of CSAM not to report its

presence on MindGeek's tubesites and lied about MindGeek's practice of not removing such content unless forced to do so: "You don't need to report the urls to an agency, just flag them it[']s very likely if it[']s not removed it not illegal content. . . . We do have access to our entire upload library, including deleted videos and can confirm this." (*Id.*)  Only an entity committed to the exploitation of such illegal material would systemically fail to report it as legally required and try so hard to ensure others did not report it as well.

4.      MindGeek Advertised and Otherwise Commercialized CSAM and Other Illegal Content

MindGeek, through its subsidiary, TrafficJunky, sells banner and sidebar advertisements, as well as advertisements that appear before and after videos, which are placed on all pages viewed by users, including those featuring CSAM. (¶ 119.)  The ads placed by MindGeek frequently highlight terms such as "girls," "boys," "broken teens," and "twink," that are known and encouraged for use by MindGeek.  (¶ 120.)  Indeed, MindGeek's TrafficJunky advertising platform allows advertisers to build campaigns around these keywords that clearly reflect illegal activity, including "13yearoldteen"; "not18"; "14yrold"; and "15yrold." (¶ 121.)  Thus, for example, if an advertiser selects the keyword "teens," the TrafficJunky platform shows that term alongside several related terms, including "teenager"; "pigtail"; "clubseventeen"; "coed"; "pigtails"; "braces"; "teenyplayground"; and "teenylovers." (*Id.*)  Further evidencing MindGeek's intent to monetize this illegal content, the TrafficJunky platform monitors the amount of traffic being driven by such keywords, showing advertisers the volume of traffic to be expected with each search term and related terms.  (¶ 122.)

**C.      The Enterprise Directing MindGeek's Rackets and Schemes**

1.      The Enterprise and its Members

MindGeek's criminal activities were executed through an associated-in-fact enterprise (the "Enterprise") comprised of hundreds of international sham shell

entities, including the MindGeek Entities (¶¶ 78, 131-33, 135, 137, 423).  This international network of sham entities, were managed, directed, and controlled by among others, defendants Antoon, Tassillo, Urman, Bergmair and the investors that Bergmair represents (¶¶ 7, 97-100, 135, 137, 140-42, 144, 423) and a network of corrupt credit-card companies (¶¶ 140, 150, 293), including defendant Visa (¶¶ 14, 286-295, 302-03, 383-386, 423), which the Enterprise relied on to process fraudulent financial transactions, siphon off illicit profits, and avoid credit card red flags.  (¶¶ 14, 47-50, 423, 432.)  The FAC details each member's role in furthering the Enterprise's common purpose.  (¶¶ 424, 426-34.)

### 2.    Antoon, Tassillo, Urman, and The Bro Club

Managing and directing every aspect of these illegal activities was a select group of "made" men, led by MindGeek's now former CEO, defendant Antoon. (¶¶ 71, 78, 87, 91, 96-97, 135-36, 144-46, 174.)[2] These "made men," including defendants Urman and Tassillo, refer to themselves as the "Bro-Club."  (¶¶ 71-72.) Bro-Club membership comes with the opportunity to make substantial monies participating in the Enterprise's criminal activities.  (¶ 71.)

These "made" members earned their "bones" not through *bona fide* skills, but because they had demonstrated a loyalty to Antoon, an appetite for money, and a willingness to participate without objection, inquiry, or disclosure of the Enterprise's illicit activities to advance in the organization.  (¶ 72.)  Thus, for example, the critical position of Chief Technology Officer of this purportedly leading technology company was initially given to an Antoon relative, Karin Mouaffi, without the resume to rate the job.  (¶ 75.)  Other high-ranking positions were also reserved for Antoon's relatives despite that they lacked the credentials for these roles.  (¶¶ 73-74, 101.)

---

[2] On June 21, 2022, CEO Feras Antoon and COO David Tassillo resigned their positions, but continue to maintain putative ownership interests.  *See, e.g.,* Lateshia Beachum, *Top executives quit Pornhub's parent company amid more controversy*, WASH. POST: BUSINESS (Jun. 21, 2022), https://www.washingtonpost.com/business/2022/06/21/pornhub-mindgeek-leaders-resign/.

This core group of "bosses" controlled all the elements of MindGeek's business through which the Enterprise executed and masked its schemes. (¶ 78.) In particular, they controlled its finances, technology, content acquisition, formatting, moderation, website operation and optimization, and the byzantine network of international affiliates and partners through which the Bro-Club executed many of its schemes. (*Id.*) They did so through "capos" looking to enter the Bro-Club. (*Id.*) These directors and vice-presidents were directly supporting the Enterprise's illegal activities that ran off the MindGeek platform. (*Id.*) One former insider explained, "they referred to directors and managers as 'parachutes' if this goes wrong. . . . They keep them in the dark, tell them to approve shady things like ads and partnerships and credit card transactions but never in writing. Then they would be able to say it was someone else's decision if it went wrong." (¶ 81.) This structure provided the Bro-Club with, in defendant Antoon's words, "plausible deniability"; revealed which employees should be promoted; and chilled insiders with questions or objections. (*Id.*)

Defendants Antoon, Tassillo, and Urman actively concealed the Enterprise's criminal activities through false testimony to the Canadian House of Commons and in public interviews with media sources wherein they materially misrepresented the types of content on Pornhub's and its affiliates' tubesites and their putative moderation and review systems (¶¶ 57-59, 192-93, 200, 251, 311-312, 323-330, 332-333, 336-338, 343-344, 346-351), and through an astroturf campaign, orchestrated by Urman, to silence victims and advocates threatening to expose MindGeek's criminal activities. (¶¶ 307-356; *see also* Facts § C.)

### 3.   Bergmair and The Financiers

While the Bro-Club had daily operational control over MindGeek's business, they were not the exclusive bosses. (¶ 87.) Also in control were the actual owners of MindGeek, a group of uber wealthy individuals represented by Bergmair, the former CEO of Pornhub competitor RedTube. (¶¶ 87, 92.) In 2012-13, Bergmair's investors purchased MindGeek's predecessor, Manwin, restructured Manwin's existing debt,

and merged it with RedTube.  (¶¶ 94-95.)  Despite full awareness of the fraudulent international corporate structure through which Manwin conducted its business (¶¶ 93, 97), the acquisition was falsely portrayed as a "clean wash" of the company which had been plagued by criminal misconduct and government investigations, and the "new" company, MindGeek, was portrayed publicly as a company specializing in SEO and committed to best practices and technology to ensure the business was free of illegal content and activities.  (¶ 97.)  In truth, nothing had changed.  (*Id.*)  Bergmair and his owner group conducted extensive due diligence before proceeding with the transaction and were fully aware of the fraudulent international structure through which MindGeek conducted its illicit business and on which it depended.  (*Id.*)

Despite their centrality to the transaction, and control of the company going forward, the identities of Bergmair's investors, as well as Bergmair's real identity remained unknown.  (¶ 96.)  To the public, Antoon and other members of the Bro-Club were falsely reported to be the owners of the business.  (*Id.*)  For example, according to December 2020 investigation by the Financial Times, Antoon and Tassillo were listed as the sole shareholders of MindGeek's ultimate corporate parent, aside from anonymous family trusts and shell companies.  (*Id.*)  However, during his testimony before the Canadian House of Commons in early February 2021, Antoon admitted that he and Tassillo are "minority shareholders of the Company" and that Bergmair is "[t]he majority shareholder" of the business, "owning over 50% of the company." (*Id.*)[3] Consistent with this deception, Bergmair took extreme steps to conceal not just his identity, but his very existence.  (¶ 93.)  He expended substantial sums scrubbing almost any references of himself from the internet and went by various aliases.  (*Id.*)  He took such extraordinary measures because he and his investors were fully aware of the legally dubious nature of the business they owned

_____

[3] Even this testimony from Antoon was false; Bergmair does not himself own the majority of MindGeek, but instead represents a group of investors who collectively hold the majority of the beneficial interests in the MindGeek entities.  (¶ 96.)

PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

and ran, and some of these investors were themselves the subject of legal scrutiny or associated with those who were.  (*Id.*)  The investors were so uneasy being associated with this business, they were rabid about their financier becoming known.  (*Id.*)

Bergmair exercised daily direct oversight over the strategic operations of MindGeek, closely managing financial operations, business plans, and even the technology that was critical to the internet porn company's business.  (¶¶ 99-100.) Indeed, his technology involvement was so extensive, programmers and developers complained incessantly about what they considered his uninformed meddling.  (¶ 99.)

In exercising control for the owner group, Bergmair was in regular, direct communication with and was directing the Bro-Club on major MindGeek decisions. (¶¶ 29, 97, 99-100.)  He received regular briefings on the financial performance of the Enterprise, was briefed on all activities designed to meet its financial commitments to the owners, and approved those initiatives material to that requirement.  (¶ 100.) Bergmair was thus fully aware of, endorsed, and directed MindGeek's unrestricted use of all content, including CSAM and trafficked content.  (*Id.*)

### 4.   The Fraudulent Network of MindGeek Sham Shell Companies

From its inception, MindGeek operated its business through hundreds of sham shell companies scattered throughout the world that were created and maintained solely to facilitate and mask criminal conduct and insulate the company, its executives, owners, and enterprise members from liability.  (¶¶ 31-32, 48, 131-137, 151-56.)  Consistent with its illicit purpose, this network was in constant metamorphosis.  (¶¶ 32, 133.)  MindGeek created, dissolved, and then replaced sham shell companies on a monthly and sometimes daily basis, often with virtually the same names.  (¶ 133.)  These sham shell companies had no *bona fide* business or substantive economic purpose, directors, officers, employees, or offices.  (*Id.*)  There was, likewise, no *bona fide* business purpose for the network's sheer complexity and opaqueness or its constantly quantum like dissolution and creation of entities.  (*Id.*)

Bergmair and the Bro-Club implemented and controlled this elaborate shell game. (¶¶ 78, 135.)

These sham entities would have a single nominal director from among low-level Enterprise members or MindGeek employees (such as executive assistants). (¶ 135.)  These purported "directors" knew nothing about the shell's purpose, existence, or operations; exercised no control over its bank accounts or "operations"; were paid handsomely for the no-show job and the substantial legal risk associated with it; were pure proxies and agents from the Bro-Club members who appointed and directed them; were frequently questioned by authorities without having any information to provide because they were figureheads controlled by the Bro-Club leaders; and were replaced regularly according to an appointed schedule so as to further impede the ability of authorities to investigate.  (*Id.*)

MindGeek operated these various sham entities as agents and alter egos of each other.  (¶¶ 31, 41.)  Indeed, it funneled monies from its foreign subsidiaries in Luxembourg and Cyprus through its MindGeek USA subsidiary into California to lobby against laws governing the porn industry in violation of California law.  (¶ 310.)  This illegal lobbying and laundering of money to oppose these proposed laws resulted in fines imposed by California Fair Political Practices Committee.  (*Id.*)

In addition to being used to mask criminal involvement, MindGeek's sham shell companies were used to launder cash out of the organization to criminal partners and Enterprise members.  (¶¶ 31, 137.)  These transactions, typically in the form of loans, investments, or vendor payments, would result in net operating losses to MindGeek. (¶ 137.)  Indeed, over the last 3-5 years, MindGeek has accumulated substantial net operating losses despite hundreds of millions of dollars in annual revenue.  (*Id.*)  Those "lost" monies were transferred to third parties in which Enterprise members had an interest or financial arrangement.  (*Id.*; *see also* ¶¶ 138-41.)

Enterprise members or their associates and partners would use their control over MindGeek to cause it to transact with shell companies they owned, or (more often)

CASE NO. 21-CV-04920-CJC-ADS

PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1    companies owned by others from whom the Enterprise members would be paid.  (¶¶

2    31, 143.)  In another scheme, the Bro-Club would use its control over MindGeek to

3    give favorable advertising placement to so-called affiliate channels or partners using

4    the site as a feeder for their own paysites.  (¶ 144.)  In exchange, Enterprise members

5    would receive a cut of that third party's profits as a kickback.  (*Id.*)  This defrauded

6    others who had bid and paid more for priority placement on the site by diverting

7    traffic from their sites to the ones paying the Enterprise members.  (*Id.*)  In other

8    instances, the Bro-Club would simply place ads for these affiliates ahead of those of

9    unrelated affiliates who had bid more for that placement.  (*Id.*)

10              5.   Visa

11              Central to MindGeek's criminal activities were credit card companies, like

12   defendant Visa.  (¶ 273.)  For over a decade, Visa partnered with MindGeek and

13   profited hundreds of millions of dollars from MindGeek's trafficking venture and

14   other criminal activities.  (¶¶ 273-76, 283-84, 287-88, 291-97, 302-04, 382.)  A former

15   MindGeek employee admitted that there is a "constant worry" at MindGeek "that

16   payments companies like Visa could cut off service."  (¶ 273.)

17              Although Visa has long been aware of MindGeek's business model to monetize

18   CSAM and other illegal content, from its own due diligence, numerous high-profile,

19   publicly reported instances of obvious and indisputable trafficking, the termination of

20   relationships with MindGeek by competitors and other business partners, facts in plain

21   sight and known to it, and detailed reports presented to it from numerous anti-

22   trafficking advocacy groups, Visa and its member banks explicitly agreed to process

23   payments for these illegal transactions so long as MindGeek maintained pretextual

24   public claims that it had processes in place to prevent CSAM and trafficked content.

25   (¶¶ 14-16, 276-87, 291-95.)  Visa did so because it elected to not assume any

26   responsibility for illegal conduct in this industry lest it set a precedent that it needed to

27   police illegal or objectionable content in other industries and thereby restrict its ability

28   to do business and increase its costs of compliance and monitoring.

Indeed, even the most superficial inquiry would have revealed: (i) titles, descriptions, and tags and MindGeek's algorithmic suggested video and search functions did not merely tolerate nonconsensual content but encouraged its upload and viewing; (ii) MindGeek failed to take any steps to police illegal content; and (iii) MindGeek systemically ignored age-verification requirements or otherwise failed to comply with 18 U.S.C. § 2257.  (¶¶ 278-83.)  As part of its due diligence and compliance functions, Visa and its agent banks did conduct such reviews in response to reports of illegal content and were well aware of the presence of such materials throughout their relationships with MindGeek, but continued to work with and benefit from the trafficking venture nonetheless.  (¶¶ 278-83.)

Visa's knowing and intentional participation in MindGeek's human trafficking enterprise and other criminal activities is further evidenced by the fact that Visa continued to do business with MindGeek even after: (i) PayPal publicly terminated its business relationship with MindGeek because it could no longer ignore the overwhelming evidence of MindGeek's trafficking venture (¶¶ 15, 286); (ii) MindGeek's partner channels, GirlsDoPorn, was convicted for being a human trafficking venture (¶ 287); (iii) Visa was presented with irrefutable evidence from advocates and public interest groups about MindGeek's illegal activities and Visa's participation therein (¶¶ 288-96); and (iv) the December 4, 2020 New York Times bombshell report by Nicholas Kristoff, "The Children of Porn Hub," reported how his relatively modest investigative efforts easily revealed that MindGeek was flooded with nonconsensual content and seemed designed to be so.  (¶¶ 297-98)  Indeed, in that wake of that report, Visa publicly announced an investigations of its own, which within days purportedly confirmed the Kristoff reporting.  (¶¶ 299-300, 302.)

Nevertheless, within weeks of purportedly investigating MindGeek's practices, Visa reembraced MindGeek and began processing payments again for MindGeek's paysites despite knowing that these revenue streams are likewise permeated with trafficking like GirlsDoPorn, and that MindGeek used its trafficking venture overall to

attract, advertise, and funnel visitor revenues to these paid sites.  (¶ 303.)  Visa

continues to process payments for such content, including TrafficJunky and Probiller,

which respectively are MindGeek's in-house advertising and premium payment

platforms that allow users to buy advertising or premium products, services, and

memberships and which account for the vast amount of the revenue that MindGeek

earns from its business model based that inextricably incorporates and exploits

trafficked and CSAM content.  (*Id.*)  In the case of plaintiff, it is virtually certain that

Visa was involved in the processing of advertising revenues, including the

conversions, and revenues from premium services and products that MindGeek earned

from the viral exploitation of plaintiff's underage videos.  (¶ 304.)

Moreover, like Urman, Antoon, and Tassillo, Visa further supported the

Enterprise through numerous public misrepresentations designed to conceal

MindGeek's criminal activities and its own participation therein including, among

others, false claims and implications that: (1) Visa categorically barred transactions

involving child pornography and human trafficking; (2) that Visa only permits

transactions on the Visa network for lawful products and services; and

(3) MindGeek's content was lawful and legitimate.  (¶¶ 289-90, 297.)

### D.     The Criminal Scheme to Conceal the Enterprise's Activities and Discredit and Silence Victims.

MindGeek worked as hard to conceal the truth about its business model as it did

on SEO.  (¶ 305.)  When illegal content was publicly questioned, it initially hid behind

the false façade it had built of itself as a mainstream legitimate company.  (*Id.*)  As

part of this gaslighting campaign, defendants touted nonexistent technology,

processes, and policies meant to exclude illegal content and repeatedly misrepresented

that such content was not part of MindGeek's business model or frequently on its

sites. (¶ 10.)  This was done to mislead the market that because users were not

operating on the dark web, but on Pornhub, the content was legal and to thereby

induce many users to MindGeek's tubesites who would not otherwise have accessed

1  the sites had they known the truth.  (¶¶ 10, 305, 454.)  This disinformation campaign

2  was also undertaken to satisfy credit card companies like Visa who agreed to continue

3  processing transactions only if MindGeek made such claims, even though Visa knew

4  from its own due diligence and other external sources that no such effective

5  technology, processes, or policies were in effect.  (¶¶ 10, 275, 278, 284, 286.)

6      Indeed, Social Media Optimization ("SMO") was an integral part of its

7  Enterprise.  (¶ 306.)  As part of this SMO, MindGeek used its extensive control over

8  all aspects of the new online porn industry that it dominated to mount powerful public

9  messaging campaigns.  (*Id.*)  When it felt necessary, MindGeek would activate this

10  extensive network to generate an "astroturf" campaign to promote messaging

11  MindGeek needed, manufacture a false public image that concealed its illicit practices,

12  and to silence those who posed a risk to that façade.  (¶¶ 307-10, 323-31.)  Moreover,

13  MindGeek used its powerful messaging network to attack, discredit, and intimidate

14  former employees, whistleblowers, activists, and victims of its schemes.  (¶ 311.)

15      These efforts were led by MindGeek vice-president, defendant, Corey Urman,

16  who closely controls and personally participates in the public messaging in in close

17  coordination with powerful New York public relations firms, including 5wPR.

18  (¶ 311-12, 251, 323-37, 344-51.)  Among other tactics, Urman and 5wPR directly and

19  through investigative firms do deep opposition research and investigation of their

20  "enemies" and their immediate and extended families.  (¶ 313.)  This information is

21  then used to intimidate and blackmail them.  (*Id.*)  MindGeek "enemies" also

22  repeatedly experience hacking of personal information and doxing.  (*Id.*)  Insiders

23  uniformly report that it is understood that anyone who crosses MindGeek or is seen as

24  a threat to expose their illegal practices will be subjected to this treatment.  (*Id.*)  Over

25  the course of 2020 and 2021, MindGeek, 5wPR, and their operatives have mounted an

26  aggressive "astroturf" campaign against advocates and victims calling attention to its

27  true business practices.  (¶¶ 313, 319-56.)  They have also attacked them on social

28

media, through various aliases, including Ian Andrews, Mike Williams, Chris Jackson, Brett Hall, Dusty Gitalto, and Corey Price.  (¶¶ 312-13.)

### LEGAL STANDARD

A motion to dismiss pursuant to Fed. R. Civ. P. 12 should be denied "where a plaintiff has alleged 'enough facts to state a claim to relief that is plausible on its face.'"  *State Comp. Ins. Fund v. Khan*, 2013 WL 12132027, at *2 (C.D. Cal. July 30, 2013) (Carney, J.) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  At this stage of the case, the Court "must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party."  *Id.*  The issue "is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support the claims . . . ."  *Doe v. MindGeek*, 558 F. Supp. 3d 828, 834 (C.D. Cal. 2021).  A plaintiff's factual allegations are sufficient to survive a motion to dismiss "even if it strikes a savvy judge the actual proof of those facts is improbable and that recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556 (internal quotation omitted).

### ARGUMENT

### I.  THE COMPLAINT PLEADS VIOLATIONS OF THE TVPRA.

Section 1595 of the Trafficking Victims Protection Act ("TVPRA") "provides trafficking victims with a private right of action to pursue claims against perpetrators of trafficking ('direct liability'), or those who knowingly benefit financially from trafficking ('beneficiary liability')."  *Doe v. MindGeek*, 558 F. Supp. 3d at 835. Congress mandated that the TVPRA be "broad," "expansive," and punish a wide range of conduct.  *Noble v. Weinstein*, 335 F. Supp. 3d 504, 515–16 (S.D.N.Y. 2018).

This Court has already held, based on nearly identical (albeit less egregious) allegations, that the MindGeek Defendants' criminal scheme to monetize videos depicting minors engaged in sex acts gives rise to claims for beneficiary liability.  *Doe v. MindGeek*, 558 F. Supp. 3d at 840.  The same conclusion is mandated here where the FAC alleges that the MindGeek Defendants benefited from a trafficking venture

that they knew, or at a minimum, reasonably should have known was engaged in sex trafficking 13-year old plaintiff when they reviewed, approved, modified, tagged, optimized, disseminated, and re-uploaded sexual images of her as a minor for profit and stonewalled her repeated requests to have those images taken down.  Moreover, the FAC's detailed allegations of the monetization of plaintiff's (and tens of thousands of other victims') CSAM through placed advertisements state a claim for direct liability.

Despite this Court's prior ruling and the FAC's well-plead allegations, the MindGeek Defendants argue that they should not be held responsible for the devastating and ongoing harm caused by the dissemination and commercialization of plaintiff's CSAM on their tubesites because the FAC fails to allege a causal *quid pro quo* between the sex act and an exchange of value.  (MG Mot. 12-13.)  According to MindGeek, Ms. Fleites' ex-boyfriend and anyone else who uploaded or re-uploaded her images are solely and exclusively responsible for the harm that she suffered, and MindGeek is simply a neutral, innocent internet platform that cannot be held liable, irrespective of MindGeek's business practice of soliciting, optimizing, and monetizing this illegal content.  As set forth below, this Court has previously rejected these very same arguments, and should do so here again.

Alternatively, MindGeek argues that even if the Court were to accept the FAC's detailed allegations of MindGeek's criminal activities as required on this Motion, dismissal is still warranted because these general allegations are insufficient to establish liability as to Ms. Fleites.  This argument fares no better.  Leaving aside the FAC's detailed allegations as to Ms. Fleites, this Court has previously held that in this pre-discovery phase, where plaintiff pleads a widespread practice of sex trafficking by the MindGeek Defendants, it is reasonable to infer that those practices were applied to plaintiffs.  *See Doe v. MindGeek*, 558 F. Supp. 3d at 842 n.6 ("[p]laintiff alleges general, widespread practices detailing how [d]efendants materially contribute to the creation of child pornography and that the videos depicting her constitute child

CASE NO. 21-CV-04920-CJC-ADS
PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

pornography. Viewing these allegations in the light most favorable to the non-moving party, as the Court must at the motion to dismiss stage, [p]laintiff plausibly alleges that those widespread practices applied to videos depicting her.").

### A.   The MindGeek Defendants Are Beneficiaries of a Trafficking Venture.

To state a claim for beneficiary liability, a plaintiff must allege that defendant "'1) . . . knowingly participated in a venture; 2) . . . received a benefit from its participation; and 3) . . . knew or should have known that [p]laintiffs were victims of sex trafficking.'" *Doe v. MindGeek*, 558 F. Supp. 3d at 836 (internal citations omitted).  The FAC pleads each of these elements.

### 1.   The FAC Alleges Commercial Sex Trafficking.

MindGeek contends that plaintiff's TVPRA claim fails as a matter of law because the FAC does not plead a commercial sex act.  (MG Mot. 12-13.)  According to MindGeek, the private images created by plaintiff are not commercial sex acts under the statute because no money or financial benefit was exchanged at the time of the act, and the subsequent monetization cannot render the acts commercial retroactively.  (*Id*. at 13.)  This is not the law, and courts, including this one, have rejected this position.  *See Doe v. MindGeek*, 558 F. Supp. 3d at 840.[4]

The TVPRA defines a "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person."  18 U.S.C. § 1591(e)(3).  The statute is remedial and has been liberally construed.  *See Doe v. MindGeek*, 558 F. Supp. 3d at 840 ("the TVPRA . . . defines a commercial sex act broadly . . ."); *Doe #1 v. MG Freesites, LTD*, 2022 WL 407147, at *19 (N.D. Ala.

---

[4] Consistent with these holdings, the MindGeek Defendants did not contest whether plaintiff alleged a commercial sex act in their prior motions to dismiss.  *See* ECF No. 7-1 at 26 (alleging that "[s]everal Plaintiffs," not including Ms. Fleites, did not allege commercial sex acts); *see also* ECF No. 106 at 26, 37 ("Does 2-7, 14, 15, 17-22, 25, and 28-33 also do not plead facts that support a finding that the offending conduct involved a commercial sex act.").

Feb. 9, 2022); *Noble*, 335 F. Supp. 3d at 515-16 (collecting cases). Consistent with this liberal construction, this Court previously held that the monetization of CSAM on the internet constitutes a commercial sex act under the TVPRA, irrespective of whether money was exchanged at the time the CSAM was created.[5]  *See Doe v. MindGeek*, 558 F. Supp. 3d at 840 (rejecting the argument advanced by defendants here and holding that allegations that MindGeek received a financial benefit from the uploading of CSAM on MindGeek's tubesites satisfied the element of a commercial sex act); *see also Doe v. Twitter*, 555 F. Supp. 3d 889, 924-25 (N.D. Cal. 2021); *MG Freesites*, 2022 WL 407147, at *19 (holding that the posting of child pornography to Pornhub constituted a commercial sex act, even though there was no "*quid pro quo* between the sex act and an exchange of something of value"); *Canosa v. Ziff*, 2019 WL 498865, at *24 (S.D.N.Y. Jan. 28, 2019) (finding that a beneficiary's participation in the venture can be shown from after-the-fact conduct, like covering up a sexual assault); *Marcus*, 487 F. Supp. 2d at 307.[6]

There is likewise no requirement that defendant participated in the underlying sex act; rather a plaintiff need only allege that defendants received "anything of value" from "any person" on account of the underlying sex act. The FAC plainly meets this standard. Like in *Doe v. MindGeek*, plaintiff alleges that the MindGeek Defendants solicited, uploaded, monetized, refused to take down, and then proceeded to reupload

_____

[5] Indeed, the monetization of all pornography online—including legal, consensual pornography—qualifies as a commercial sex act, as the court in *United States v. Marcus* reasoned. 487 F. Supp. 2d 289, 307 (E.D.N.Y. 2007) (vacated, 538 F.3d 97 (2d Cir. 2008), *rev'd*, 560 U.S. 258, 130 S. Ct. 2159 (2010), *and aff'd in part, vacated in part, remanded*, 628 F.3d 36 (2d Cir. 2010)).

[6] The MindGeek Defendants' reliance on *United States v. Zitlalpopoca-Hernandez*, 495 F. App'x 833 (9th Cir. 2012), is misplaced. (MG Mot. 13.) In that case, the Ninth Circuit overturned defendant's conviction because there was no territorial nexus between the alleged commercial sex act and the United States. 495 F. App'x at 835-36. The ruling simply does not address whether after-the-fact monetization of a sex act makes a sex act "commercial."

1   plaintiff's CSAM to Pornhub and its affiliate sites in exchange for financial benefits

2   including, among others, premium subscriptions, advertisement revenue, and/or credit

3   card transaction fees.  (Facts, §§ B.1., B.2.iv, B.4.)  Each upload, repost, transfer,

4   advertisement, or other monetization of the minor plaintiff's images constitutes a new

5   commercial sex act.  *Twitter*, 555 F. Supp. 3d at 925.[7]

6               2.    The FAC Alleges The MindGeek
                     Defendant's Participation In A Trafficking Venture.
7

8           Defendants' challenges to the FAC's detailed allegations of their participation

9   in a sex trafficking venture (MG Mot. 14-17) are likewise irreconcilable with

10  controlling case law.

11          As this Court previously recognized, participation in a venture is inferred where

12  the complaint pleads "a pattern of conduct" or a "tacit agreement."  *See Doe v.*

13  *MindGeek*, 558 F. Supp. 3d at 837 (finding nearly identical allegations sufficient to

14  meet the participation in a venture element of a § 1595 claim); *see also H.H. v. G6*

15  *Hosp., LLC*, 2019 WL 6682152, at *4 (S.D. Ohio Dec. 6, 2019).  Courts have found a

16  tacit agreement to participate in a sex trafficking venture where, as here, the complaint

17  generally pleads defendants' awareness of the prevalence of sex trafficking and their

18  failure to take adequate steps to prevent its occurrence.  *See, e.g., Twitter*, 555 F.

19  Supp. 3d at 922 ("general allegations" that Twitter makes it hard for users to report

20  sexual abuse material, permits large amounts of human trafficking, rarely removes

21  hashtags associated with such materials, and has a search suggestion feature that

22  makes it easier for users to find the illicit content were sufficient to defeat motion to

23  dismiss); *M.A. v. Wyndham Hotels Resorts Inc.,* 425 F. Supp. 3d 959, 968 (S.D. Ohio

24  [7] Contrary to the MindGeek Defendants' claims, these holdings are not irreconcilable

25  with the Ninth Circuit's decision in *United States v. Bazar* which defined a "sex act"
    as "an act performed with another for sexual gratification." (MG Mot. 13.)  Rather,

26  this Court and others have properly recognized that the uploading and viewing of
    pornography itself constitutes a commercial sex act between the uploader and the

27  viewers.  *See Doe v. MindGeek*, 558 F. Supp. 3d at 840; *Twitter*, 555 F. Supp. 3d at

28  924-25; *MG Freesites*, 2022 WL 407147, at *19.

2019) (allegations that defendants rented rooms to individuals they knew or should

have known were sex traffickers were adequate at the pleading stage).[8]

       In *Doe v. MindGeek*, this Court held that the MindGeek Defendants'

participation in a sex trafficking venture was sufficiently pled where the complaint

alleged, among other things, that the MindGeek Defendants "enable child sex

trafficking on their platforms and failed to remove the child pornography depicting

plaintiff;" "permit[] large amounts of human trafficking and commercial sexual

exploitation on its platform despite having the ability to monitor it"; "enter into

agreements with traffickers to share proceeds of advertisement revenue earned from

child pornography videos posted to their websites"; and "actively employ tactics to

make it difficult for law enforcement to locate traffickers." *See* 558 F. Supp. 3d at

837-38.  Similarly, in *MG Freesites*, the Northern District of Alabama agreed with this

---

[8] The Individual Defendants argue that the TVPRA claims against them fail because
they are merely lumped in with the entity defendants.  (MG Mot. 5-6).  As an initial
matter, the FAC alleges that each of the Individual Defendants exercised control over
the operation of the MindGeek Entities.  (Facts §§ C.1-4.)  More importantly, the FAC
details the ways in which defendants created a complex corporate structure and
enterprise designed to conceal which entities and which individuals exercised control
over which aspects of the enterprise/venture's rackets and schemes.  (*See, e.g.*, ¶¶ 31-
35, 78, 81-82, 85, 93, 96, 135-37, 141-49.)  The Individual Defendants cannot benefit
from the structure they created to avoid the consequence of their illegal conduct.  In
any event, where, as here, the allegations are based on illegal conduct and the
defendants are uniquely in possession of information concerning that conduct, group
pleading is permitted at this stage of the proceedings.  *See Waldrup v. Countrywide
Fin. Corp.*, 2015 WL 93363, at *8 (C.D. Cal. Jan. 5, 2015) ("[a]bsent discovery . . .
plaintiff [could not] point to the specific fraudulent misrepresentations or omissions
allegedly made by the four parent company defendants as part of the alleged
scheme"); *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab.
Litig.*, 295 F. Supp. 3d 927, 977-76 (N.D. Cal. 2018) (sustaining RICO claims based
on group pleading where plaintiffs were unable to parse out individual defendants
because of how "[d]efendants have chosen to operate"); *In re Volkswagen "Clean
Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, MDL No. 2672 CRB (JSC), 2017
WL 4890594, at *9, 11 (N.D. Cal. Oct. 30, 2017) (same).  At a minimum, plaintiff is
entitled to discovery concerning each individual defendants' role in the venture and
enterprise.  *See Waldrup*, 2015 WL 93363, at *8.

CASE NO. 21-CV-04920-CJC-ADS
PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1   Court and held that MindGeek "participated in a venture by possessing, reviewing,

2   disseminating, and refusing to remove child pornographic content, profiting from that

3   content, and sharing those profits with [p]laintiffs' sex traffickers."  2022 WL 407147,

4   at *18.

5          The FAC alleges all these facts and more.  Among other things, the FAC alleges

6   that defendants reviewed each of plaintiff's videos prior to upload (Facts, §§ A, B.1),

7   and approved them despite that it was evident from their putative review of the

8   images, the video title "13-Year Old Brunette Shows Off For the Camera" and from

9   tags and comments, that the content was illegal (*id.* § A); defendants actively

10  optimized plaintiff's CSAM to increase traffic and profits (*id.*); they placed

11  advertisements alongside plaintiff's images (*id.*); stonewalled plaintiff's efforts to

12  have the CSAM removed so that they could continue to generate advertising revenue

13  and other financial benefits; (*id.*) actively transferred plaintiff's images to their

14  affiliated sites (*id.* §§ A, B.1), re-uploaded videos of plaintiff's CSAM after they

15  initially removed it at plaintiff's request (*id.* §§ A, B.3), and continue to maintain

16  copies of plaintiff's CSAM on their servers to this day (*id.*).  In addition, the FAC

17  alleges that all of this conduct was part of a coordinated business practice whereby the

18  MindGeek Defendants not only failed to place any restriction on the uploading of

19  content because they knew this would reduce traffic and profits (*id.* § B.1), they

20  actively facilitated the dissemination of CSAM on their tubesites by, among others

21  methods, the use of download buttons (*id.* § B.3), maintaining the webpage, title, tags,

22  and comments for content it was forced to remove so that it could continue to generate

23  SEO and conversions from the disabled content (*id.* § B.2) actively transferring

24  content to affiliate sites and re-uploading content that it was forced to remove under

25  different titles (*id.* §§ B.1, B.3), and maintaining copies of all content that ever

26  appeared on its tubesites, even those images that were identified as CSAM or

27  otherwise illegal (*id.* §§ B.3-B.4).

28

Faced with these facts, the MindGeek Defendants resort to arguing that the holdings in *Doe* and *Twitter* are distinguishable because both those cases dealt with perpetrators that had a history of posting illegal content.  (MG Mot. 16-17.)  However, defendants readily concede that the "most important" determination was whether defendants in those cases "had left the content up knowing it was CSAM" and defendants' relationship with the perpetrator was just one factor the courts considered in reaching that determination.  (*Id*. at 16 ("Most important, the court found that there were sufficient allegations that Twitter had left the content up despite knowing it was CSAM").)  In any event, like plaintiff in *MG Freesites*, Ms. Fleites alleges an explicit contractual relationship between the MindGeek Defendants and her traffickers in the form of profit sharing from advertising revenues.  *See* 2022 WL 407147, at *18; *see also* Facts, §§ A, B.4.  These allegations are more than sufficient at this stage—prior to discovery—particularly where additional information about the relationship between defendants and plaintiff's trafficker are uniquely within those parties' possession.

The non-binding holdings in *Doe v. Red Roof Inns*, *Doe v. Reddit*, and *J.B. v. G6 Hosp.*—relied on by the MindGeek Defendants—do not mandate a different result.  (MG Mot. 14-15 (citing *Doe v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir. 2021); *Doe v. Reddit, Inc.*, 2021 WL 5860904 (C.D. Cal. Oct. 7, 2021), and *J. B. v. G6 Hosp., LLC* ("J.B. I"), 2020 WL 4901196 (N.D. Cal. Aug. 20, 2020))).  While the Eleventh Circuit held in *Red Roof Inns* that "observing something is not the same as participating in it," the allegations here extend far beyond mere observation.  *See also J.B. I*, 2020 WL 4901196, at *9 (urging caution in interpreting the TVPRA's participation in a venture requirement to avoid creating liability for scrupulous websites).  In contrast to the factual circumstances in those cases, here the FAC alleges that defendants' business model was predicated on the solicitation, optimization, and monetization of CSAM and other illegal content (Facts, §§ B.1-B.2)

1  and that these general business practices were implemented with respect to plaintiff

2  (*id.* § A).

3        Taken together, plaintiff's general and specific allegations plainly plead the

4  existence of a tacit agreement to participate in a sex trafficking venture.

5                **3.**      **The MindGeek Defendants Knowingly Received**
                           **A Benefit From Their Participation in a Venture.**

6

7        The MindGeek Defendants do not dispute that the FAC adequately alleges that

8  they received benefits from their participation in a sex trafficking venture, including

9  through advertising revenue, fee-based subscription services, selling user data, and

10  driving additional traffic and customer conversions to MindGeek's tubesites.  *See Doe*

11  *v. MindGeek*, 558 F. Supp. 3d at 839; *cf.* Facts §§ A.1, A.3, B.4.[9]  Plaintiff also alleges

12  that the MindGeek Defendants received additional benefits in the form of actual

13  pornographic videos and images, which the MindGeek Defendants maintained and

14  continue to maintain on a server in the United States (*see, e.g.*, Facts, §§ A, B.1, B.3).

15  These images alone constitute something "of value."  *See, e.g.*, *United States v. Cook*,

16  782 F.3d 983, 989-90 (8th Cir. 2015) ("[S]exual acts, photographs, and videos—

17  which are items that many people spend significant time, money, and effort pursuing

18  and acquiring—could constitute 'things of value.'").

19                **4.**      **The FAC Alleges Defendants' Actual And Constructive**
                           **Knowledge that the Venture was Engaged in Trafficking.**

20        The MindGeek Defendants concede that plaintiff need only allege constructive

21  knowledge, not actual knowledge, to establish beneficiary liability under the TVPRA.

22

23  _____

24  [9] There is no requirement of a direct payment from the trafficker to the beneficiary.
*See H.H.*, 2019 WL 6682152, at *2 (rejecting defendants' argument that there must be

25  a "causal relationship between the rental of a hotel room and the perpetrator's sex
trafficking scheme" because "[t]he statutory language requires that [the defendant]

26  knowingly benefit financially, not that the perpetrator compensate [the defendant] on
account of the sex trafficking."); *M.A.*, 425 F. Supp. 3d at 965 (hotel room rental to

27  trafficker "constitutes a financial benefit from a relationship with the trafficker
sufficient to meet this element of the § 1595(a) standard.").

28

      CASE NO. 21-CV-04920-CJC-ADS

(MG Mot. 17 (quoting 18 U.S.C. § 1595(a))).  The FAC alleges both actual and constructive knowledge in spades.

This Court has twice held based on substantially identical allegations that the MindGeek Defendants "'knew or should have known that [p]laintiff[] w[as] the victim[] of sex trafficking at the hands of user[] who posted the content.'" *MindGeek*, 558 F. Supp. 3d at 839 (quoting *Twitter*, 555 F. Supp. 3d at 925); *Doe v. Mindgeek USA Inc.*, 2021 WL 5990195, at *7-8 (C.D. Cal. Dec. 2, 2021) ("*MG* Recon. Order"). In so holding, the Court reasoned that the MindGeek Defendants' public claims that they "review and approve each and every video posted to their platforms . . . specifically evaluating whether the content contains illicit content, such as child pornography, [ ] intentionally allow some evidence to be posted anyway" (*id.*; *see also e.g.*, Facts, § B.1.), and refuse to implement verification tools because of the financial harm it would cause, (*id.*) constitutes actual knowledge of a sex trafficking venture.  *See MG* Recon. Order, 2021 WL 5990195, at *9.  The Court's ruling is consistent with the long line of authority which uniformly holds that questions of "actual or constructive knowledge . . . as well as the reasonableness of actions taken . . . are factual questions," which are "precisely the type of question[s] that should be left to a jury and not decided on summary judgement," let alone on a motion to dismiss.  *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 608 (9th Cir. 2019); *see also Barnett v. Cnty. of Los Angeles*, 2021 WL 826413, at *8 (C.D. Cal. Mar. 4, 2021) ("question of . . . actual or constructive knowledge . . . are questions of fact to be determined at trial, and [p]laintiff has sufficiently alleged their existence to survive a 12(b)(6) motion").[10]

---

[10] Without citation to any authority, the MindGeek Defendants incorrectly argue that the TVPRA cannot create liability for commercialized CSAM because the distribution of CSAM "is covered by numerous other statutes."  (MG Mot. 19.)  In fact, the same conduct can be violative of multiple federal statutes—here 18 U.S.C. §§ 1591, 1595, 2252, and 2252A.  In any case, the language of Sections 1595 and 1591—which

1    Again, defendants are forced to try to distinguish this Court's prior holdings.

2  They argue that the holding in *Doe v. MindGeek* is inapposite here because there "are

3  simply no facts in the FAC to support the inference that MindGeek could have known,

4  let alone actually knew, about [p]laintiff's alleged trafficking." (MG Mot. 18.)  In so

5  arguing, the MindGeek Defendants attempt to create a distinction between the

6  monetization of CSAM and "trafficking." (*Id.* at 18-19.)  They argue because plaintiff

7  does not allege that the creation of her CSAM was induced by fraud, force, or

8  coercion, that the commercialization of those illegal images is not "trafficking" and

9  thus not actionable under the TVPA.  In fact, Section 1591(a)(2) criminalizes the act

10  of "recruiting, enticing, harboring, transporting, providing, obtaining, advertising,

11  maintaining, patronizing, or soliciting by any means a person . . . knowing . . . that the

12  person has not attained the age of 18 years and will be caused to engage in a

13  commercial sex act." 18 U.S.C. ¶ 1591(a).  Consistent with the plain terms of Section

14  1591, in *MG Freesites*, the court rejected the very same argument defendants advance

15  here based on nearly identical allegations, reasoning that "sex trafficking is, among

16  other things, engaging someone under 18 in a sex act for which something of value is

17  given to or received by any person."  2022 WL 407147, at *19.  Like the plaintiff in

18  *MG Freesites*, plaintiff here alleges that she engaged in sex acts when underage, that

19  were filmed by her traffickers, and exchanged for something of value by both the

20  original sex traffickers and the MindGeek Defendants.  Nothing more is required

21  under the statute.[11]

22  _____

23  create liability for those who benefit from what they should know is commercialized
    CSAM—is dispositive.  18 U.S.C. §§ 1591(a), 1595.

24  [11] Even assuming that fraud, force or coercion is required to state a violation of
    section 1591—which it is not in the case of minor victims—the FAC alleges that

25  plaintiff was fraudulently induced and/or forced and coerced to create the CSAM

26  under the false pretenses that they would be for private use, and would not have
    done so if she had known the videos would be publicly uploaded, monetized,

27  reuploaded, transferred to multiple sites and made available for download.  Thus, the

28

1         The MindGeek Defendants' related claim that the FAC fails to plead

2    MindGeek's requisite knowledge that plaintiff was a minor in certain videos which

3    did not have titles, comments, tags, or titles identifying her as underage (MG Mot. 19)

4    is similarly unavailing.  Pursuant to 18 U.S.C. 1591(c), defendants' knowledge is

5    presumed where, as here, defendants had a reasonable opportunity to observe the

6    minor.  *See* 18 U.S.C. § 1591(c).  As set forth above, at a minimum, MindGeek

7    observed plaintiff during its putative "moderation" process.  (*See supra*.)  Moreover,

8    the FAC also alleges that plaintiff reported the CSAM to Pornhub and other

9    MindGeek tubesites, informed them that the video contained CSAM, and that the

10   MindGeek Defendants nevertheless failed to timely remove their videos.  (Facts, § A.)

11   Finally, the FAC alleges that some of plaintiff's videos were streaming for months or

12   years at a time (and continuing up to as recently as last year), providing the MindGeek

13   Defendants and their moderators prolonged opportunities to view the content.  (*Id.*)

14   This passage of time has been held to constitute as "a reasonable opportunity to

15   observe."  *United States v. Alcius*, 952 F. 3d 83, 87 (2d Cir. 2020) (rejecting

16   defendant's argument that reasonable opportunity requires evidence of a more

17   extensive personal relationship between the defendant and victim); *see United States*

18

19

20

21

22   commercialization of the sex act was obtained by fraud, force, and/or coercion in
     violation of the statute.  It is irrelevant the MindGeek Defendants did not,

23   themselves, use force, fraud, or coercion against the victims, as MindGeek
     incorrectly claims.  *See United States v. Juskowich*, 2021 WL 5166564, at *3 (W.D.

24   Pa. Nov. 5, 2021).  Rather, the monetization of the sex act constitutes a violation of

25   Section 1595.  *See*, *e.g.*, *United States v. Flanders*, 752 F.3d 1317, 1330 n.2 (11th
     Cir. 2014) (finding a violation of 1591(a)(1) where the victims were recruited "under

26   the false pretense of auditioning for a lucrative modeling contract" by purported

27   "modeling agent[s]" and the victims agreed to perform "love scenes" under the

28   assumption that they were there for modeling work not pornography).

1  *v. Robinson*, 702 F.3d 22, 31 (2d Cir. 2012) (section 1591(c) imposes strict liability

2  with regard to defendant's awareness of age).[12]

3        Defendants' presumed awareness is corroborated by their abject failure to

4  implement the most basic protections against the upload and monetization of CSAM

5  on their systems and their failure to use age verification technology.  (Facts, §§ B.1-

6  B.2.)  Indeed, MindGeek's own Social Media Manager publicly explained that

7  actually creating a system to prevent the uploading of illegal content would be a

8  "disaster" because "then no one would upload anything," it would "cost[] us money to

9  verify," "devastate[] traffic," and "MindGeek loses money."  (*Id.* § B.1.)  Instead,

10  MindGeek created a sham video moderation "team" of as few as six but never more

11  than thirty untrained contractors, whose true purpose was to reformat videos to

12  maximize revenue instead of removing unlawful videos.  (¶¶ 183-91, 280, 298.)

13        These detailed allegations of the MindGeek Defendants' reckless disregard for

14  the prevalence of sex trafficking on its tubesites are sufficient to raise an inference of

15  actual knowledge at this early stage of the litigation.  *See, e.g., Cooper v. San*

16  *Bernardino Sheriff Dep't*, 2017 WL 10511568, at *3 (C.D. Cal. Mar. 10, 2017)

17  (finding that the court could draw reasonable inferences from the circumstances

18  alleged to find actual knowledge); *Sec. & Exch. Comm'n v. City of Victorville,* 2013

19  WL 12133651, at *11 (C.D. Cal. Nov. 14, 2013), *on reconsideration*, 2014 WL

20  

21  [12] Defendants' reliance on *Zitlalpopoca-Hernandez* and *Noble* to argue that
defendants must have the requisite knowledge at the time the sex act took place is

22  misplaced because, both cases address ***direct*** sex trafficking liability—not beneficiary
civil liability under Section 1595(a).  *Noble*, 335 F. Supp. 3d at 518.  Just as the

23  knowledge standards for beneficiary liability under Sections 1591 and 1595 differ,

24  the requirements for the timing the knowledge for direct and beneficiary liability
differs.  Section 1595(a) notably uses the past tense when setting forth the civil

25  beneficiary liability standard, attributing civil liability to those who "***knew or should***

26  ***have known***" that a venture was "engag***ed***" in sex trafficking.  18 U.S.C. § 1595(a)
(emphasis added).  Had Congress intended only to extend civil liability prospectively,

27  Section 1595 would attribute liability to those who "know or should know" that they

28  will benefit from sex trafficking.

12607683 (C.D. Cal. Jan. 7, 2014) ("[T]his pleading requirement also permits a court to make reasonable inferences of actual knowledge from the facts as pleaded."). Notably, the MindGeek Defendants do not claim, nor can they, that there is no verification system that would have identified illegal and non-consensual content. Instead, they simply argue that under their intentionally flawed review process they cannot be charged with knowledge of its existence. This is not the law. *Anderson v. Peregrine Pharms., Inc.*, 2013 WL 12122423, at *7 (C.D. Cal. Aug. 23, 2013), *aff'd*, 654 F. App'x 281 (9th Cir. 2016) ("[D]istrict courts in the Ninth Circuit have found scienter adequately alleged when the complaint supported an inference that the defendants had actual knowledge of facts contradicting statements they made . . . .).

Finally, there can be no doubt that the MindGeek Defendants acted knowingly when they themselves reuploaded Ms. Fleites's videos after they had been removed as CSAM. (Facts, §§ A, B.4.)

Applying these standards, the FAC adequately alleges actual knowledge, or at a minimum, constructive knowledge of the venture's sex trafficking violations.

**B.    The MindGeek Defendants Are Directly Liable for Sex Trafficking.**

To state a claim for direct liability under Section 1595 of the TVPRA, a plaintiff must allege that the defendants (1) "advertis[ed] . . . by any means a person"; (2) knowing or in reckless disregard of the fact that; (3) the person was a minor and would be caused to engage in a commercial sex act, or that the person was caused to engage in the sex act by means of force, threats of force, or fraud. 18 U.S.C. §§ 1591(a), 1595(a). As set forth, *supra*, this Court has already held that the MindGeek Defendants had actual knowledge of the venture's sex trafficking violations. The FAC, likewise, alleges that defendants advertised plaintiff—and tens of thousands of other victims—with actual knowledge that plaintiff was a minor.[13]

---

[13] The statute imposes a requirement of actual knowledge to state a claim for direct liability on the basis of advertising. 18 U.S.C. § 1591(a).

Courts and the legislature mandate that the definition of trafficking under the first prong of the statute is expansive and broad. *See, e.g., United States v. Estrada-Tepal*, 57 F. Supp. 3d 164, 168-69 (E.D.N.Y. 2014) (citing numerous cases and legislative history). Indeed, the TVPRA was specifically enacted to "criminalize[] a broad spectrum of conduct." *United States v. Jungers*, 702 F.3d 1066, 1069-70 (8th Cir. 2013) (internal citations and quotations omitted). "[E]xpansiveness was a legislative goal in enacting the statute." *Estrada-Tepal*, 57 F. Supp. 3d at 169. Accordingly, courts have ascribed the delineated violations their plain meaning as informed by the context of the statute. *Id.*

A website "advertises" a person in violation of 18 U.S.C. § 1591(a)(1) by posting a video of either a minor engaged in a commercial sex act or an individual engaged in a commercial sex act through means of force, threats of force, or fraud. *Twitter*, 555 F. Supp. 3d at 915. Here, the FAC alleges that MindGeek advertised plaintiff by posting, reuploading, monetizing, and transferring content of her as a minor to its other platforms. (Facts, §§ A, B.4.) Moreover, MindGeek further advertised plaintiff when it promoted her images in curated video recommendations which directed users to additional videos of the same persons or similar styles of videos depicting similarly illegal behavior. (*Id.*) It also advertised her, when it sold space alongside her videos to third parties. (¶¶ 260, 262, 268.) Finally, even when MindGeek was forced to remove videos that contained illegal content, MindGeek continued to advertise plaintiff by, among other things, maintaining the webpage, title, tags and comments and thumbnails. (Facts, § B.2.)[14]

---

[14] Because the MindGeek Defendants are solely in possession of information as to whether MindGeek used plaintiff in advertisements for MindGeek's services, plaintiff is entitled to discovery. Plaintiff's allegations of a widespread practice of advertising from nonconsensual content counsels in favor of drawing a reasonable inference at this stage, that plaintiff was advertised. *See MindGeek*, 558 F. Supp. 3d at 842 n.6.

40

C.      **The FAC Pleads Beneficiary Liability Against Visa.**

1.      Participation in a Venture

The FAC likewise alleges a claim for beneficiary liability against Visa arising
from the ongoing benefits Visa received from its overt and active participation in the
MindGeek Defendants' sex trafficking venture.  As set forth in the FAC, Visa was in a
continuous business relationship with the MindGeek Defendants (Facts, § C.5); had a
complete understanding of MindGeek's sex trafficking operation based on its
extensive due diligence of those operations, public disclosures, actions of its
competitors, and direct correspondence from advocates (*id.*); processed credit card
payments that "carried with them obvious red flags" including those involving CSAM
and other illegal content, including those related to plaintiff (¶ 294); and willfully
turned a blind-eye to known or obvious instances of sex trafficking for its own
financial gain (Facts, § C.5).  Indeed, Visa explicitly agreed to continue participating
in MindGeek's venture by continuing to process payments even after Mastercard and
PayPal refused to do so and after it purported to conduct its own investigation.  (*See
id.*)  These allegations are more than sufficient to establish a "tacit agreement" to
participate in a trafficking venture (*see Doe v. MindGeek*, 558 F. Supp. 3d at 837)
which Visa acknowledges is the requisite standard.  (Visa Mot. 13).[15]

Despite these allegations, Visa argues that the claims against it should be
dismissed because extension of beneficiary liability to payment processors who
knowingly benefit from sex trafficking "would be untenable."  (Visa Mot. 16.)
However, holding Visa responsible for its actual knowledge, or at a minimum

---

[15] Though Visa implies that plaintiff must allege Visa's "active engagement" in her
trafficking to plead beneficiary liability under the TVPRA (Visa Mot. 12-13), the
*Twitter* court rejected this stringent standard, holding a plaintiff need not allege
defendant's "knowing and active participation in a sex trafficking venture" for
beneficiary liability.  *See Twitter*, 555 F. Supp. 3d at 920.  In any event, as set forth
herein, the FAC pleads Visa's active engagement through the processing of
advertising and subscription transactions related to plaintiff's CSAM.  (Facts, § C.5.)

PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1   constructive knowledge, that it was funding, facilitating, and profiting from a

2   trafficking venture, would not interfere with legitimate commerce; rather it would

3   further FOSTA's main legislative goal: to prevent proliferation of sex trafficking by

4   stopping companies like Visa from knowingly continuing to benefit from such illegal

5   activities.  *See* 154 Cong. Rec. S4795 at 4799 (daily ed. May 22, 2008) (statement of

6   Sen. Joe Biden) ("Today's reauthorization bill also expands our ability to combat

7   trafficking in the United States. . . . [W]e establish some powerful new legal tools,

8   including . . . punishing those who profit from trafficked labor and ensuring restitution

9   of forfeited assets to victims.").

10       Visa's argument that it "has no control over" MindGeek's sex trafficking

11  content and that it could not have prevented or lessened plaintiff's injuries (Visa Mot.

12  16) is undermined by the fact that when MasterCard changed its payment policies

13  (followed, temporarily, by a reluctant Visa), MindGeek was left with no choice but to

14  remove ten million unverified videos.  (¶ 274.)  Thus, continued violations of the sex

15  trafficking laws could have been prevented had Visa terminated its relationship with

16  MindGeek earlier or, at a minimum, not knowingly continued to process payments.

17  Nevertheless, even with the knowledge it has today, Visa, in contrast to PayPal and

18  MasterCard, has returned to processing payments for MindGeek without insisting on

19  sufficient controls to prevent illegal content.  (Facts, § C.5.)

20                    2.    Benefitting from its Participation in that Venture

21       The FAC similarly pleads Visa's financial benefit from its participation in the

22  MindGeek Defendants' sex trafficking ventures, as plaintiff alleges that it is virtually

23  certain that Visa was involved in the processing advertising and premium subscription

24  revenue that MindGeek earned from its exploitation of plaintiff's videos.  (*Id.*)

25  Further, the FAC alleges that Visa received other commercial benefits, including,

26  among others: (i) millions of dollars in profits from GirlsDoPorn and similar

27  MindGeek partner channels; (ii) profits—through its merchant banks—from tens of

28  thousands of transactions annually from MindGeek's trafficking venture; (iii)

1   payments for TrafficJunky and Probiller—MindGeek's in-house advertising and

2   premium payment platforms—which account for most of MindGeek's revenue from

3   its business model that inextricably incorporates and exploits CSAM content; and (iv)

4   millions of dollars in profits from transaction fees for premium subscriptions.  (*Id.*)

5         Nevertheless, Visa claims that dismissal is warranted because the FAC fails to

6   "tie the transaction fees that Visa received to illegal sex trafficking content involving

7   [p]laintiff, as opposed to the *legal* content hosted on MindGeek websites." (Visa Mot.

8   19.)  This argument fails for several reasons.  First, the FAC alleges the ubiquitous

9   presence of illegal and non-consensual content on MindGeek's platforms, such that

10  Visa's routine processing of payments necessarily implicated such content.  (Facts, §

11  C.5.)  Second, the court in *B.M. v. Wyndham Hotels & Resorts, Inc*. rejected the

12  stringent standard Visa advocates for here, holding that plaintiff need only allege that

13  the benefit received by the defendants "derive directly from, and be knowingly

14  received in exchange for, participating in a sex-trafficking venture."  2020 WL

15  4368214, at *4 (N.D. Cal. July 30, 2020).  It need not derive benefits directly from the

16  illegal activities itself.  *See id.*  ("The 'knowingly benefit' element of section 1595

17  'merely requires that [d]efendant knowingly receive a financial benefit' and the rental

18  of a room . . . constitutes a financial benefit from a relationship with the trafficker.").[16]

19  Here, Visa received the benefit of all of MindGeek's commerce by willingly

20  processing payments for those portions of its commerce that were trafficked and non-

21  consensual.  And, unlike MasterCard, it continues to do so to this day.  The FAC

22  alleges specific facts showing this was a knowing and intentional decision, one which

23  it cannot now use technical legal arguments to hide behind.

24          3.     Visa Knew or Should Have Known

---

[16] The cases Visa relies on to support this standard do not deal with beneficiary
liability under section 1591.  *See Ratha v. Phatthana Seafood Co.*, 2017 WL 8293174,
at *4 (C.D. Cal. Dec. 21, 2017) (interpreting Section 1589 of the TVPRA with
different language); *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 798 (9th
Cir. 2007) (interpreting copyright infringement statute).

<u>that the Venture was a Sex Trafficking Venture.</u>

Finally, the FAC sufficiently alleges that Visa knew or should have known about the sex trafficking venture.  The FAC alleges that long before this suit, Visa's competitor PayPal publicly terminated its relationship with MindGeek "because it could no longer ignore the overwhelming evidence of MindGeek's trafficking venture." (Facts, § C.5.)  It also alleges that "[t]he presence of trafficking in the webcam industry was notorious and well known to Visa," and its member banks (¶¶ 278, 293) as well as the monetization of other trafficked content on the platform from their own due diligence and compliance functions, anti-trafficking advocacy groups' presentations and warning (Facts, § C.5), and numerous other public disclosures, such as the December 2020 New York Times article (*id.*).  Indeed, in the wake of that reporting Visa and MasterCard both purported to launch investigations into the allegations and announced days later they had confirmed the allegations and would take action.  The speed at which such "investigations" were concluded is definitive proof that the evidence of this illegal conduct was obvious to anyone, like Visa, remotely familiar with this business.

**D.     The FAC Adequately Pleads a Violation of Section 1594.**

Section 1594(b) of the TVPRA imposes liability on those who conspire with another to violate various sections of the TVPRA.  18 U.S.C. § 1594(b).  Despite Visa's argument to the contrary (Visa Mot. 23-26), the FAC sufficiently alleges that Visa and the MindGeek Defendants had a "unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." (Visa Mot. 24 (citing *Transgo, Inc v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1020 (9th Cir. 1985))).  For example, the FAC alleges that Visa knew that its funding supported and facilitated MindGeek, would lead to the commercialization and monetization of CSAM and other non-consensual content depicting plaintiff (*see* Facts § C.5), and continued to partner with MindGeek despite numerous disclosures that MindGeek was engaged in trafficking and dissemination of CSAM.  *See id.*

Antoon's and Tassillo's arguments that plaintiff fails to plead each Individual Defendants' agreement to violate the sex trafficking laws (Antoon Mot. 27; Tassillo Mot. 21) and Bergmair's and Urman's argument that plaintiff fails to allege that they engaged in any prohibited conduct (Bergmair Mot. 37; Urman Mot. 32-33) are belied by the detailed allegations of each individual's role in the Enterprise (Facts §§ C.2-C.3; *see also* ¶¶ 428-30) and the FAC's alter ego allegations. (*See infra* Argument, § VI.A.1.) These allegations, in which these defendants are alleged to direct detailed illegal activities and be intimately involved in the execution of these activities, are more than sufficient at the pleading stage.

## II.   PLAINTIFF STATES CLAIMS FOR VIOLATIONS OF CHILD SEXUAL EXPLOITATION LAWS

The Child Sexual Exploitation laws provide a private right of action to recover damages for the possession, distribution, and receipt of child pornography.[17] Plaintiff, who was a minor in all videos featured on MindGeek's tubesites, including one with a title clearly identifying her as thirteen-years old, alleges violations of these statutes.

Indeed, the MindGeek Entity Defendants concede that plaintiff has stated a claim against them under Sections 2252 and 2252A with respect to the video entitled "13-Year Old Brunette Shows Off For the Camera." (*See* MG Mot. 39-40 (only challenging videos plaintiff made for sale).)

Nonetheless, the MindGeek Entity Defendants argue that the FAC fails to sufficiently plead their knowledge that plaintiff was underage in the subsequent CSAM videos that were uploaded onto MindGeek's tubesites, and the Individual Defendants make a similar lack-of-knowledge argument about all of plaintiff's CSAM videos. (MG Mot. 39-40; Bergmair Mot. 38; Antoon Mot. 28; Tassillo Mot. 21-22;

---

[17] Section 2252 criminalizes possession, distribution, and receipt of child pornography, whereas Section 2252A also covers altered computer-generated sexually explicit images involving a minor. Plaintiff's allegations satisfy both sections.

Urman Mot. 34.)[18] This argument is belied by MindGeek's repeated public claim that moderators reviewed and approved every video prior to it being uploaded to its tubesites (Facts, § B.1), as well as the FAC's allegations that MindGeek reviewed and modified plaintiff's CSAM videos (*id.*).  Moreover, plaintiff repeatedly informed the MindGeek Defendants that videos and photographs on their tubesites depicted her underage, yet the MindGeek Defendants repeatedly waited extended periods of time before taking the videos down.  (*Id.* § A.)  Even in those instances where MindGeek did ultimately remove the videos, MindGeek has conceded publicly that they maintain the content in their libraries on their servers.  (Facts, §§ B.2, B.3.)  In fact, MindGeek has maintained that it never deleted a single photograph or video posted to its tubesites even after being informed they were illegal and nonconsensual and received requests they be taken down.  (*Id.* §§ A, B.3)  MindGeek, therefore, has illegally possessed plaintiff's CSAM on its servers for years and continues to do so to this day.  (*Id.*)  Moreover, MindGeek duplicated and distributed new child pornography depicting plaintiff by creating and hosting new "thumbnail" images from existing videos of plaintiff.  (*Id.* § B.1.)  They also reuploaded plaintiff's videos after she forced them to take them down, and actively transferred them to their affiliate sites.  (*Id.* § A, B.3.)  Nothing more is required at the pleading stage.  *See Doe v. MindGeek*, 558 F. Supp.

---

[18] As an initial matter, this Court has previously held that this level of specificity is not required at the pleading stage where evidence of defendants' state of mind is uniquely within defendants' possession.  *See Doe v. MindGeek*, 558 F. Supp. 3d at 843.  Rather, this Court held that the same allegations of MindGeek's pattern and practice of soliciting, curating, and disseminating CSAM alleged here were sufficient to infer knowledge of possession and distribution of child pornography at the pleading stage.  *See id.* (allegations that MindGeek was "told repeatedly . . . about the prevalence of child pornography on their websites," "Defendants curate[d] content and develop[ed] platforms to help users share and distribute child pornography"; "that users of Defendants' platforms openly discuss trading child pornography and identify certain videos as child pornography in public comments"; and their "moderators knowingly reviewed, approved, and featured child pornography videos on their platforms" were sufficient to infer knowledge at the pleading stage).

1  3d at 843; *MG Freesites*, 2022 WL 407147, at *21-*22 (holding similar allegations

2  "easily pled the knowledge requirement for violations of §§ 2252 and 2252A" and

3  further explaining: "[f]rankly, if true, the Court would not be surprised to see at least

4  some of the defendants prosecuted for such offenses.").

5  **III.   THE FEDERAL RICO CLAIMS ARE PROPERLY PLED.**

6          The federal RICO statute makes it unlawful for "any person employed by or

7  associated with any enterprise engaged in, or the activities of which affect, interstate

8  or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of

9  such enterprise's affairs through a pattern of racketeering activity," 18 U.S.C.

10  § 1962(c), and for anyone to conspire to violate Section 1962(c). *See id.* § 1962(d).

11  To plead a RICO violation, a plaintiff must allege defendant: (1) conducted, (2) an

12  enterprise, (3) through a pattern, (4) of racketeering activity, (5) resulting in damages

13  to business or property. *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017)

14  (quoting *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 361

15  (9th Cir. 2005)).  Congress mandated that RICO is to "be liberally construed to

16  effectuate its remedial purposes." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498

17  (1985) (internal quotations omitted); *see also Khosroabadi v. Mazgani Social Servs.,*

18  *Inc.*, 2017 WL 4712074, at *7 (C.D. Cal. July 28, 2017) (Carney, J.).

19          The FAC details defendants' coordinated scheme to capitalize and profit from

20  child pornography, rape, assault, trafficking, nonconsensual content, and other wide-

21  ranging criminal activities so that defendants and the Enterprise members could make

22  more than the enormous sums of money they would have otherwise made from a

23  legitimate online pornography platform.  This is the quintessential conduct the RICO

24  statute was designed to protect against.

25          Despite these detailed allegations, defendants argue that plaintiff fails to

26  adequately allege a RICO enterprise, a cognizable RICO injury, and a pattern of

27  racketeering.  The MindGeek Entity Defendants also argue that plaintiff's RICO

28  claims are time barred.  As set forth below, these arguments rely on cherry-picked

facts and ignore others.  When the FAC is viewed as a whole in the light most favorable to plaintiff—as required on these Motions—plaintiff's claims are timely and the allegations are plainly sufficient to satisfy each element of the claim.

### A.  Plaintiff's RICO Claims Are Timely Asserted.

The MindGeek Entity Defendants argue that plaintiff's RICO claims are untimely because the four-year statute of limitations began to run when 13-year old Serena first discovered her CSAM video on Pornhub in 2014.  (MG Mot. 20-23.)  This argument must be rejected for several reasons.

First, it is well established that RICO's statute of limitations is subject to equitable tolling, *see Grimmett v. Brown*, 75 F.3d 506, 514 (9th Cir. 1996), and there are numerous factors relevant to the equitable-tolling analysis implicated here.  Not only was plaintiff a minor when she first discovered the video, but she also experienced severe and disabling depression, attempted suicide on multiple occasions, was admitted to a mental-health facility, struggled with heroin addiction for several years, was disenfranchised from her family, and experienced multiple periods of homelessness.  (Facts, § A.)  *See Booth v. United States*, 914 F.3d 1199, 1207 (9th Cir. 2019) (recognizing that "[p]articular circumstances connected to one's age could support equitable tolling. For example, there may be cause for equitable tolling if a minor is abandoned by his parents and/or guardians and so left unprotected . . . .").  Moreover, compounding these myriad and significant debilitating personal circumstances which mitigate in favor of equitable tolling, the MindGeek Defendants' own practices were designed to perpetuate their elaborate shell game, mask its illicit activities, and evade victims, like plaintiff, by among other things, delaying in responding to plaintiff's takedown requests, actively transferring CSAM to other MindGeek affiliated sites, and re-uploading plaintiff's CSAM videos after they were initially removed.  (Facts, §§ A, B.2-B.3.)  Because the equitable-tolling determination is inherently fact-intensive and "depends on matters outside the pleadings, . . . it is rarely appropriate to grant a Rule 12(b)(6) motion to dismiss

1    (where review is limited to the complaint) if equitable tolling is at issue," and this

2    determination clearly cannot be made at this juncture in this case. *White v. Symetra*

3    *Assigned Benefits Serv. Co.*, 2021 WL 3472408, at *9 (W.D. Wash. Aug. 5, 2021)

4    (quoting *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 1003-04 (9th Cir. 2006))).[19]

5          Second, even apart from plaintiff's first discovery of the first of her multiple

6    CSAM videos on Pornhub, the FAC details how (1) that video was repeatedly

7    reuploaded and transferred by MindGeek to its other tubesites; and (2) other CSAM

8    videos of plaintiff were repeatedly uploaded to MindGeek's tubesites, where they

9    remained until at least 2020.  (Facts, §§ A, B.3.)  This subsequent and continuing

10   conduct by MindGeek plainly constitutes new and independent injury-causing conduct

11   under the "separate accrual rule."  *Grimmett*, 75 F.3d at 512; *see MD Helicopters, Inc.*

12   *v. Aerometals, Inc.*, 2021 WL 978953, at *6 (E.D. Cal. Mar. 16, 2021); *Newcal Indus.,*

13   *Inc. v. IKON Office Solutions, Inc.*, 2011 WL 18999404, at *4 (N.D. Cal. May 19,

14   2011).  Although MindGeek argues that all of plaintiff's injuries flow from the initial

15   upload of the first video (MG Mot. 22-23), at a minimum, the application of the

16   separate accrual rule is a fact-dependent exercise that cannot be resolved at the

17   pleading stage.  *See Tanaka v. First Hawaiian Bank*, 104 F. Supp. 2d 1243, 1251-52

18   (D. Haw. 2000) (holding genuine issues of material fact existed as to whether new and

19   independent acts caused new injury under separate accrual rule).

20

21   _____

22   [19] *See Milliner v. Bock Evans Fin. Counsel, Ltd.*, 114 F. Supp. 3d 871, 886 (N.D.
     Cal. 2015) ("[A] cause of action should only be dismissed if 'it is clear from the face
23   of the complaint that the statute has run and that no tolling is possible.'" (quoting
     *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 2011 WL 1044899, at *3 (N.D.
24   Cal. Mar 23, 2011))); *cf. Kokkinis v. Boyd*, 2017 WL 5634602, at *3 (C.D. Cal. Aug.
     3, 2017) (holding that RICO statute of limitations defense could not be resolved on
25   the pleadings in light of fact-specific issues such as "equitable estoppel or waiver"
     and "tolling"); *Tatung Co. v. Shu Tze Hsu*, 217 F. Supp. 3d 1138, 1160 (C.D. Cal.
26   2016) (denying summary judgment premised on RICO statute of limitations
     argument because genuine issue of fact existed as to "whether [p]laintiff's claims
27   were tolled because of excusable delay of such discovery" of plaintiff's injuries).

28

### B.    The FAC Alleges a RICO Enterprise.

The RICO statute defines an "enterprise" broadly to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  The Supreme Court has held the "very concept of an association in fact is expansive" and encompasses any "continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 945, 948 (2009).  The Ninth Circuit has similarly recognized that "[t]his expansive definition is 'not very demanding,'" *United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015) (quoting *Odom v. Microsoft Corp.*, 486 F.3d 541, 548 (9th Cir. 2007)), and it "is to be 'liberally construed to effectuate its remedial purposes,'" *id*. (quoting *Boyle*, 556 U.S. at 944-45).  Applying these principles, each of defendants' challenges to the enterprise element should be rejected.

First, certain defendants argue that the FAC fails to plead a "common purpose" between enterprise members.  (MG Mot. 28-29; Urman Mot. 35.)  As explained above, however, the FAC plainly identifies the Enterprise's common purpose to maximize their own profits through the monetization of CSAM and other illegal content, *see* ¶ 424, Facts § C.1, and identifies each member's role in furthering that common purpose, *see* ¶¶ 427-34, Facts § C.2 (Antoon, Urman, Tassillo, and Bro-Club), § C.3 (Bergmair and Bergmair Doe Defendants), § C.4 (the hundreds of MindGeek shell entities), § C.5 (Visa).  These allegations are more than sufficient. *See Odom*, 486 F.3d at 552; *Bui v. Nguyen*, 712 F. App'x 606, 608-09 (9th Cir. 2017); *Bunnett & Co. v. Gearhart*, 2018 WL 1070298, at *3 (N.D. Cal. Feb. 27, 2018) (plaintiff's satisfied the enterprise element where the complaint identified the common purpose, the enterprise's members and the roles, and alleged that they engaged in various criminal activities over a period of 18 months).

Second, the MindGeek Defendants argue that the FAC impermissibly lumps the Enterprise together and does not adequately allege each defendant's individual role as required under Rule 9(b)'s heightened pleading requirements.  This argument is

1  likewise belied by the specific allegations detailed above.  In any event, in this pre-

2  discovery period, where the FAC alleges that defendants have intentionally chosen to

3  operate as a unit and obscure their individual roles, and information concerning each

4  individual's role is uniquely within defendants' control, courts in the Ninth Circuit

5  have held group pleading is permissible.  *See, e.g.*, *Khan*, 2013 WL 12132027, at *4

6  (sustaining RICO claims and explaining that the requirements of Rule 9(b) "may be

7  relaxed with respect to matters within the opposing party's knowledge.  In such

8  situations, plaintiffs cannot be expected to have personal knowledge of the relevant

9  facts.'" (quoting *Nuebronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993))); *see also*

10  *supra* note 8).[20] Moreover, although Rule 9(b)'s particularity requirement applies to

11  predicate acts of mail or wire fraud, it does not apply to the remainder of a RICO

12  claim or to predicate acts that are not premised on fraud, such as the TVPRA and

13  Section 2252 predicate acts here.  *See Natural-Immunogenics Corp. v. Newport Trial*

14  *Grp.*, 2020 WL 7263544, at *9 (C.D. Cal. Nov. 23, 2020).

15       Third, the MindGeek Entities and Urman argue that the FAC fails to allege an

16  enterprise distinct from the RICO person or persons it seeks to hold liable (MG Mot.

17  33-35; Urman Mot. 35.)  However, here too, the case law has uniformly held that the

18  requirement that the RICO person be distinct from the enterprise is not a demanding

19  pleading hurdle: "'the only important thing is that [the enterprise] be either formally

20  . . . or practically . . . separable from the individual' RICO person." *United States v.*

21  *Mongol Nation*, 693 F. App'x 637, 638 (9th Cir. 2017) (mem.) (quoting *Sever v.*

22  *Alaska Pulp Corp.*, 978 F.2d 1259, 1534 (9th Cir. 1992)).  Where, as here, the RICO

23

24  [20] These same allegations also satisfy the conduct element, which requires only a

25  showing that defendant played "some part in directing th[e] affairs" of the Enterprise.
   *JW Gaming Dev., LLC v. James*, 2020 WL 3640004, at *3 (N.D. Cal. July 6, 2020);

26  *see Khan*, 2012 WL 12887395, at *7-8; *see also Bunnett & Co.*, 2018 WL 1070298, at

27  *7 (denying motion to dismiss based on conduct element where allegations of
   complaint "suggest[ed] coordinated activity . . .").  In any event, here the FAC alleges

28  illegal conduct separate and apart from the legitimate pornography business.

1    "person" is part of a larger "enterprise," distinctiveness is satisfied.  *See id*.  As set

2    forth above, the FAC alleges that the MindGeek Enterprise consists of not just the

3    MindGeek Entities but also hundreds of shell companies set up by defendant Antoon,

4    the other Individual Defendants, the Bro-Club's capos, corrupt payment processors,

5    including Visa, and secret shadow investors that direct, control, and finance the

6    Enterprise's activities.  (¶¶ 423, 427-34, Facts § C.1.)  However, even assuming

7    *arguendo*, the Enterprise was limited to the MindGeek Entities and its officers and

8    directors, defendants' arguments would still fail because Ninth Circuit has expressly

9    "rejected the argument that 'there is no distinction between the officers, agents and

10   employees who operate [a] corporation and the corporation itself,'" *Mongol Nation*,

11   693 F. App'x at 638 (quoting *Sever*, 978 F.2d at 1534), "because 'a corporate officer

12   can be a person distinct from the corporate enterprise,'" *id.* (quoting *Living Designs*,

13   431 F.3d at 362).  *See also MH Pillars Ltd. v. Realini*, 2018 WL 1184847, at *4 (N.D.

14   Cal. Mar. 7, 2018) (explaining that the "argument that a RICO enterprise cannot be

15   formed by parent and subsidiary corporations is not in accordance with the law of this

16   Circuit.").  Indeed, even where individual defendants are alleged to be alter egos of

17   corporate defendants, distinctiveness is satisfied.  *See Bondit, LLC v. Hallows Movie,

18   Inc.*, 2020 WL 7777992, at *4 (C.D. Cal. Apr. 1, 2020).[21]

19           Finally, Visa's and MindGeek's claim that the FAC simply pleads a contractual

20   relationship with the parties (MG Mot. 30; Visa Mot. 21-22), simply ignores the

21   FAC's detailed allegations of Visa's role in the Enterprise which must be accepted as

22   true on this motion.  *See Ketayi v. Health Enrollment Grp.*, 516 F. Supp. 3d 1092,

23   ___

24   [21] Urman's argument that the FAC fails to allege an enterprise that is distinct from the
     racketeering activity (Urman Mot. 35-36), should also be rejected.  As the Supreme

25   Court has explained, "evidence used to prove [a] pattern of racketeering activity and
     evidence establishing an enterprise 'may in particular cases coalesce,'" *Boyle*, 556

26   U.S. at 947 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)); *see also

27   State Compensation Ins. Fund v. Khan*, 2012 WL 12887395, at *7 (C.D. Cal. Dec. 28,
     2012) (Carney, J.) (rejecting the argument that plaintiff was required to plead that the

28   enterprise had a purpose separate from the racketeering activity).

1135 (S.D. Cal. 2021)) (finding that plaintiffs "have alleged more than that [d]efendants simply contracted with one another for legitimate purposes"); *LD v. United Behavioral Health*, 508 F. Supp. 3d 601, 602 (N.D. Cal. 2020) ("That a legitimate contractual relationship between the defendants exists does not undermine plaintiffs' plausible allegations that defendants also engaged in an enterprise to defraud them and used the contractual relationship as a cover.").  Visa's coordinated and continuing participation in carrying out and directing the Enterprise's affairs creates liability, *see Bunnett & Co*, 2018 WL 1070298, at *3, and makes the facts of this case readily distinguishable from the inapposite cases relied on by Visa.  *See, e.g.*, *Jubelirer v. MasterCard Int'l, Inc.*, 68 F. Supp. 2d 1049, 1053 (W.D. Wis. 1999) (involving claim by online gambler against MasterCard for facilitating online gambling where "[p]laintiff has alleged facts which make it apparent that the *only* relationship between the on-line casino and the defendants is a routine relationship for the provision of consumer financing" (emphasis added)); *Gomez v. Guthy-Renker, LLC*, 2015 WL 4270042, at *2, *5-6, *8 (C.D. Cal. July 13, 2015) (provider of services was *unaware* of other defendant's fraud that formed the basis of the RICO liability); *see also Fleetwood Servs., LLC v. Complete Bus. Solutions Grp., Inc.*, 374 F. Supp. 3d 361, 374 (E.D. Pa. 2019) (declining to follow *Jubelirer* because its "persuasive value" "is unclear in light of *Boyle*, which rejected a rigid definition of association-in-fact enterprises"); *Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985, 993 (C.D. Cal. 2008) (declining to follow *Jubelirer* as applying "the 'ascertainable structure' requirement that the Ninth Circuit has since rejected").

### C.    The FAC Alleges a Cognizable RICO Injury.

Defendants' claim that the FAC fails to allege a cognizable RICO injury (MG. Mot. 23-27) likewise misstates the law.  RICO injuries include any "concrete" financial harm to business or property.  *See In re Chrysler-Dodge-Jeep*, 295 F. Supp. 3d at 962.  Concrete financial losses include out-of-pocket expenditures arising from the racketeering conduct.  *See Just Film*, 847 F.3d at 1119. "An out-of-pocket loss is

1 not required, however, for a financial loss to be tangible or concrete." *In re*

2 *Volkswagen*, 2017 WL 4890594, at *5; *see Just Film*, 847 F.3d at 1119 (time away

3 from work is a RICO injury); *Diaz v. Gates*, 420 F.3d 897, 898, 900 (9th Cir. 2005)

4 (en banc) (loss of employment opportunities is a RICO injury).

5     As an initial matter, the FAC pleads out-of-pocket expenses incurred by

6 plaintiff to remove her CSAM from MindGeek's websites, including investigative and

7 legal fees to ascertain whether her images were still available online, and if so, on

8 which sites, and assist with takedown requests to have those images removed.  (Facts,

9 § A, ¶¶ 271, 464, 474.)  These out-of-pocket costs are recoverable RICO damages.

10 *See, e.g., Xcentric Ventures, LLC v. Borodkin*, 798 F.3d 1201, 1203 (9th Cir. 2015)

11 (costs incurred to pay an expert to mitigate damaging social media posts sufficiently

12 alleged requisite injury to business or property); *C&M Café v. Kinetic Farm, Inc.*,

13 2016 WL 6822071, at *8 (N.D. Cal. Nov. 16, 2016) ("[L]egal fees may constitute

14 RICO damages when they are proximately caused by a RICO violation." (quoting

15 *Chevron Corp. v. Donzinger*, 833 F.3d 74, 136 (2d Cir. 2016))).  Moreover, the

16 dissemination and proliferation of plaintiff's CSAM has adversely impacted her

17 employment (Facts, § A), for which damages are recoverable under the RICO statute.

18 *See Guerrero v. Gates*, 110 F. Supp. 2d 1287, 1293 (C.D. Cal. 2000).

19     In addition to these damages, the FAC pleads that plaintiff also suffered a

20 concrete loss through the commercial misappropriation of her image and likeness.

21 (¶¶ 464, 474.)  Misuse of intellectual property that results in concrete economic harm

22 constitutes a sufficient RICO injury.  *See C&M Cafe*, 2016 WL 6822071, at *8;

23 *MedImpact Healthcare Sys., Inc. v. IQVIA, Inc.*, 2020 WL 5064253, at *25 (S.D. Cal.

24 Aug. 27, 2020); *Georgian v. Zodiac Grp., Inc.*, 2011 WL 13214306, at *9-10 (S.D.

25 Fla. Jan. 6, 2011).  California law has long recognized an individual's cognizable

26 property interest in the right of publicity, which prohibits the unauthorized use of

27

28

image or likeness.[22] *See In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268, 1280 (9th Cir. 2013) (The right of publicity "protects a form of intellectual property [in one's person] that society deems to have some social utility."); *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 806 (N.D. Cal. 2011) (internal quotation marks and citations omitted) (recognizing that right of publicity is a tool to "protect the economic value of one's name, voice, signature, photograph, or likeness.").  This right is protected by both the common law and California Civil Code Section 3344, the latter of which provides that individuals, like plaintiff, who have had their likeness commercially misappropriated, can recover "any profits from the unauthorized use."  Cal. Civ. Code § 3344(a); *see also Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1090 (9th Cir. 2002).[23]  Where an individual's identity, image or likeness has commercial value, such as in the case of a video depicting an individual, "the injury may be largely, or even wholly, of an economic or material nature."  *Fraley*, 830 F. Supp. 2d at 806 (internal quotation marks and citations omitted).

Here, the FAC alleges both an injury to a property interest—commercial misappropriation of image and likeness when MindGeek monetized plaintiff's images and sold advertisements and placed them alongside plaintiff's CSAM—and concrete financial loss—the profits the Enterprise collected from the monetization of plaintiff's CSAM, which are expressly recoverable under Cal. Civ. Code § 3344(a) and thus under the federal RICO statute.  *See Diaz*, 420 F.3d at 898, 900; *cf. Fraley*, 830 F. Supp. 2d at 810-12 (holding plaintiffs adequately alleged injury in fact and loss of

---

[22] Under RICO, whether an interest constitutes "property" is determined by state law.  *See Diaz*, 420 F.3d at 900.

[23] The MindGeek Entity Defendants' reliance on *Amy v. Curits*, 2020 WL 5365979, at *4-5 (N.D. Cal. Sep. 8, 2020) (MG Mot. 24), is misplaced.  That case addressed the question of whether certain harms qualified as "personal injury" for purposes of 18 U.S.C. § 2255(a), which permits recovery for one "who suffers personal injury."  *Amy* did not address the question of whether the plaintiffs suffered harm to their property under RICO or any other statute.

1  money or property under California's Unfair Competition Law where defendants

2  misappropriated plaintiff's names and likenesses and derived profits).[24]

3       The MindGeek Entity Defendants' claim that plaintiff must allege specific prior

4  attempts to monetize her property interest or a present intention of doing so (MG Mot.

5  24) is inconsistent with California commercial misappropriation law.  *See Fraley*, 830

6  F. Supp. 2d at 806-07 (rejecting argument that plaintiff must plead some "preexisting

7  commercial value and efforts to capitalize on such value in order to survive a motion

8  to dismiss.").  Similarly meritless is the MindGeek Entity Defendants' argument that,

9  because CSAM is illegal to possess and sell, plaintiff can have no property right in

10 that CSAM under state law.  (MG Mot. 24-25.)  Plaintiff's claimed injury is not

11 premised on a property right in the CSAM, but in the economic value of her image

12 and likeness, which the Enterprise commercially misappropriated and profited from.

13       **D.    The FAC Adequately Pleads Racketeering Activity.**

14       Finally, the FAC chronicles the MindGeek Enterprise's pattern of racketeering

15 activity,[25] including numerous acts of: (a) sex trafficking; (b) sexual exploitation of

16

17 [24] The MindGeek Defendants' claim that this injury is not supported by factual
allegations (MG Mot. 24) must be rejected at this juncture.  The FAC details the
18 ways in which MindGeek profits from all content, including free content on its
19 tubesites (¶¶ 60-69) and alleges that the Enterprise profited from advertising revenue
sold based on views of pornographic videos containing plaintiff's image (¶¶ 260,
20 262, 268, 464, 474).  The harm from the commercial misappropriation of plaintiff's
21 image and likeness is causally related to defendants' violations of the TVPRA and
Sections 2252 and 2252A. "It is inappropriate at [the pleading] stage to substitute
22 speculation for the complaint's allegations of causation."  *Mendoza v. Zirkle Fruit*
23 *Co.*, 301 F.3d 1163, 1171 (9th Cir. 2002); *see also id.* (holding that the plaintiffs
"must be allowed to make their case through presentation of evidence . . . at a later
24 stage in the proceedings"); *see also Newcal Indus., Inc. v. Ikon Office Solution*, 513
25 F.3d 1038, 1055 (9th Cir. 2008) (concluding that proximate cause raises "factual
questions which we cannot resolve on a Rule 12(b)(6) motion in this case").
26
27 [25] The RICO statute defines a pattern of racketeering activity as requiring "at least two
acts of racketeering activity" within a ten-year period of time.  *See* 18 U.S.C.
28

1  children; (c) money laundering; (d) wire fraud; and (e) criminal copyright

2  infringement.  (*See* Facts, § C.)[26]

3      As an initial matter, the tens of thousands of TVPRA violations committed by

4  defendants, *see supra* Argument, § I, alone constitute a pattern of racketeering activity

5  under RICO.  *See Socheat Chy v. Lam Sin Yam*, 2017 WL 10676596, at *9 (C.D. Cal.

6  Nov. 7, 2017); *Nuñag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134,

7  1148 (C.D. Cal. 2011); *see also Aragon v. Che Ku*, 277 F. Supp. 3d 1055, 1072 (D.

8  Minn. 2017).  Where, as here, the pattern of racketeering is adequately alleged, the

9  Court need not address defendants' challenges to other predicate acts.  *See, e.g.*, *MH*

10  *Pillars Ltd.*, 2018 WL 1184847, at *6 (declining to address additional predicated acts

11  once the racketeering activity prong had been met).

12      Nevertheless, the FAC also alleges that the MindGeek Defendants committed

13  numerous violations of 18 U.S.C. § 2252, as this Court already found in *Doe v.*

14  *MindGeek*.  (*See supra* Argument, § II.)  Moreover, the FAC alleges numerous

15  predicate acts of wire fraud in furtherance of the scheme to effectuate the Enterprise's

16  criminal activities, including soliciting, uploading, transferring, and reuploading

17  CSAM and other illegal content; processing payments to partners, agents, and other

18  enterprise members; communicating with victims, advocates, and law enforcements

19  about nonconsensual content, stonewalling efforts to have it removed, and silencing

20  victims and advocates who tried to expose MindGeek's scheme.  (¶¶ 126, 128, 172,

21  194-200, 203-04, 208-10, 232, 243, 245-49, 255, 305-06, 446-54.)[27] In the face of

22

23  § 1961(5).  A civil RICO plaintiff need not allege that she has been harmed by all of the predicate acts or even multiple predicate acts; all that is required is that one of the

24  predicate acts caused the plaintiff's injury.  *See Just Film*, 847 F.3d at 1117-18.

25  [26] The FAC clearly establishes that these predicate acts meet the relatedness and

26  continuity requirements, and none of the defendants argues otherwise.

27  [27] Importantly, the use of mails and wires need not itself be fraudulent.  *Perez v.*

28  *DirecTV Grp. Holdings, LLC*, 2019 WL 6362471, at *3 n.3 (C.D. Cal. July 23, 2019).

these detailed allegations, defendants' complaints about a lack of specificity are
meritless.  *Perez*, 2019 WL 6362471, at *3-4 (sustaining RICO claim where the
complaint was "replete with examples of the Defendants employing the mails and
wires to effectuate the scheme"); *Ulti-Mate Connectors, Inc. v. Am. Gen. Life Ins. Co.*,
2015 WL 12734007, at *7-8 (C.D. Cal. Mar. 27, 2015) (same).[28] Finally, the
Complaint also alleges numerous predicate acts of money laundering in violation of
18 U.S.C. § 1957[29] and criminal copyright infringement.[30]

### E.    The FAC Alleges a RICO Conspiracy.

Finally, the FAC also alleges a RICO conspiracy.  (Facts, § C.)  The existence
of the agreement between defendants and the intent and knowledge of the conspirators
"can be readily and plausibly inferred" from the FAC's detailed allegations of
interdependence and mutual efforts to further the common purpose of the Enterprise.
*See* Facts, § C; *see also Synopsys, Inc. v. Ubiquiti Networks, Inc.*, 2017 WL 3485881,

_____

Rather, a plaintiff need only allege that the use of mails or wires was in furtherance of
a scheme to deceive, which is easily inferred here.  *Id.*

[28] The MindGeek Entity Defendants' argument that the FAC does not allege a
scheme to defraud someone of money or property (MG Mot. 35) overlooks the
allegations in the FAC that the Enterprise's relentless pursuit of traffic was to
maximize profits from advertising revenue (Facts, § B.2-4) and that members of the
public relied upon defendants' fraud to purchase products and services that were
advertised alongside the nonconsensual or illegal content (¶ 454).

[29] The FAC's allegations that the defendants created shell companies that were used
to bleed out hundreds of millions of dollars so that MindGeek effectively pays no
taxes and reports net operating losses, despite paying executives substantial
compensation (Facts, §§ C.1, C.4), is one example of funds derived from unlawful
activity (¶¶ 138-39, 141, 146-47, 156, 177, 458), which are sufficient to establish
predicate acts of money laundering.  *See United States v. Rogers*, 321 F.3d 1226,
1229 (9th Cir. 2003); *JW Gaming Dev., LLC v. James*, 2018 WL 4853222, at *6-7
(N.D. Cal. Oct. 5, 2018).

[30] *See Kevin Barry Fine Art Assocs. v. Ken Gangbar Studio, Inc.*, 391 F. Supp. 3d 959,
973 (N.D. Cal. 2019) (holding that infringer's knowledge was "adequately alleged in
the interstices of the complaint" and could be inferred from allegations in complaint).

1  at *17 (N.D. Cal. Aug. 15, 2017) (intent and agreement inferable from allegations);

2  *see also Ketayi*, 516 F. Supp. 3d at 1138-39 (defendants' knowledge inferable from

3  allegations of participation in scheme); *LD*, 508 F. Supp. 3d at 605; *Perez*, 2019 WL

4  6362471, at *6; *Socheat Chy*, 2017 WL 10676596, at *10.[31]

5  **IV.   PLAINTIFF'S STATUTORY AND**

6  **COMMON LAW CLAIMS ARE PROPERLY PLED.**

7  Plaintiff also asserts several state and common-law causes of action (*see* Counts

8  IX-XVII, (¶¶ 476-534), which defendants fail to challenge in any meaningful way.  To

9  the extent defendants addressed these claims at all, they simply regurgitate their

10 specificity and other flawed arguments disposed of above.

11 **A.   The FAC Pleads a Claim for Civil Conspiracy.**

12 Defendants' challenges to plaintiff's civil conspiracy claims are predicated

13 entirely on its challenges to the underlying claims.  (*See* MG Mot. 40; Urman Mot. 41;

14 Tassillo Mot. 24.)  But, as set forth herein, each of these claims are adequately

15 alleged.  Moreover, there are ample facts to create an inference of an agreement

16 between defendants, and each defendants' role in the conspiracy.  *See* Facts, § B; *Cork*

17 *v. CC-Palo Alto, Inc.*, 534 F.Supp.3d 1156, 1189 (N.D. Cal. 2021); *Spencer v. Mowat*,

18 46 Cal. App. 5th 1024, 1037 (Cal. Ct. App. 2020) ("Due to the secret nature of

19 conspiracies, their existence is often inferentially and circumstantially derived . . . .").

20 **B.   The FAC Pleads a Violation of California Civil Code 1708.85.**

21 Like the plaintiff in *Doe v. MindGeek*, plaintiff has stated a claim for

22 distribution of private sexually explicit material in violation of California Civil Code

23 § 1708.85 (*see* Count XIV).  Citing to Cal. Civ. Code § 1708.85(c)(6), the MindGeek

24 Defendants argue that this Court must dismiss plaintiff's § 1708.85 claim because the

25 videos were sold or otherwise shared with others prior to being posted on Pornhub

26

27 [31] Despite Visa's argument (Visa Mot. 24-26), a civil RICO plaintiff "'is not required
   to prove every detail of the agreement' when alleging conspiracy, particularly at the
28 motion to dismiss stage." *Ketayi*, 516 F. Supp. 3d at 1138.

thereby insulating them from liability.  (MG Mot. 43.)  But this Court has previously
rejected this same argument and held that the prior distribution of CSAM does not
create blanket immunity.  *See Doe v. MindGeek*, 558 F. Supp. 3d at 844.  This is
especially so here, where defendants not only benefited financially from the
dissemination and monetization of 13-year-old plaintiff's CSAM, but repeatedly
uploaded, optimized, and capitalized on the CSAM for monetary purposes, despite
repeated takedown requests which explicitly informed the MindGeek Defendants that
the videos contained child pornography.  (Facts, §§ A, B.1.)  Indeed, these practices of
stonewalling plaintiff's efforts to have CSAM removed, re-uploading removed
content, and transferring it to affiliate sites continued for years, and plaintiff's CSAM
remained available on Pornhub as recently as June 2020.  (*Id.* §§ A, B.3.)

Defendant Tassillo's attempts to avoid liability under § 1708.85 on the grounds
that the FAC fails to plead that he "'intentionally distributed' videos . . . or even knew
these materials existed," (Tassillo Mot. 23), are similarly unavailing.  In fact, his
claims that he did not have knowledge of plaintiff's videos or that he "reasonably
should have known" that plaintiff possessed a reasonable expectation of privacy in the
videos, are irreconcilable with his sworn testimony to the Canadian House of
Commons, in his capacity as COO of defendant 9219-1568 Quebec, Inc. in which he
stated that he could "guarantee you that every piece of content, before it's actually
made available" gets reviewed.  (¶ 59.)  In any event, information concerning the
extent of Mr. Tassillo's personal knowledge is uniquely within defendants' possession
and turns on inherent factual determinations which are not properly resolved at this
stage of the proceedings.  *See Doe v. MindGeek*, 558 F. Supp. 3d at 843.

## C.    The FAC Pleads a Violation of Unfair Competition Law.

Similarly, Visa's contention that plaintiffs' Unfair Competition Law ("UCL")
claim should be dismissed because the FAC does not allege that Visa participated in
or exercised control over the sex trafficking venture (Visa Mot. 27), is belied by the
detailed allegations that Visa affirmatively agreed to partner with MindGeek despite

actual and constructive knowledge of its illegal activities and profited millions of dollars from its participation, including advertising and subscription fees earned from plaintiff's images.  (*See* Facts, § C.5.)  These allegations of violations of the TVPRA, RICO statutes, and numerous common law claims are more than sufficient at the pleading stage.  *See Novoa v. The GEO Group, Inc.*, 2018 WL 3343494, at *14 (C.D. Cal. Jun. 21, 2018) (denying motion to dismiss UCL claim and holding that for such claims "unlawful practices" are any practices forbidden by law).[32]

### D.  The FAC Pleads Invasion of Privacy and Intrusion.

The MindGeek Defendants, who were, and remain, fully aware that plaintiff was a minor at all relevant times, move to dismiss plaintiff's privacy causes of action (Counts IX, X, and XI) on the basis that the minor-plaintiff "voluntarily" made the videos which were sold and distributed and thus there was "no intrusion" or public disclosure by MindGeek.  (MG Mot. 41-43).  According to MindGeek, because plaintiff "voluntarily created pornographic videos of herself and made some of them for purposes of sale" MindGeek's optimization of the illegal content and further distribution and commercialization without plaintiff's knowledge or consent is not actionable.  (MG Mot. 42.)  This is not the law.

To state a claim of intrusion into private affairs, a plaintiff need only allege that (1) "the defendant must intentionally intrude into a place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy"; and (2) "the intrusion must occur in a manner highly offensive to a reasonable person."  *Hernandez v. Hillsides, Inc.,* 47 Cal. 4th 272, 286 (2009). "Relevant factors include the degree and setting of the intrusion, and the intruder's motives and objectives."  *McGee v.*

---

[32] The MindGeek Entities' claim that plaintiff's UCL and false advertising claim should be dismissed for failure to allege an economic injury with requisite specificity (MG Mot. 44), is likewise wrong.  They concede that the FAC alleges economic harm in the form of investigative and legal fees and adverse impacts on employment, which is more than sufficient at the pleading stage where a complaint need only put defendants on notice.

1   *Poverello House*, 2021 WL 3602157, at *24 (E.D. Cal. Aug. 13, 2021) (citing

2   *Shyulman v. Grp. W. Prods., Inc.*, 18 Cal. 4th 200, 232 (1998).  Applying these

3   factors, courts have held that the distribution of sex tapes without consent is an

4   actionable intrusion of private affairs.  *See, e.g., Michaels v. Internet Entertainment*

5   *Group, Inc.*, 5 F. Supp. 2d 823, 842 (C.D. Cal. 1998) (privately made adult sex tapes

6   "constitute[] a set of private facts whose disclosure would be objectionable to a

7   reasonable person" and finding that plaintiffs are "likely to convince the finder of fact

8   that sexual relations are among the most private of private affairs, and that [the] video

9   . . . represents the deepest possible intrusion into such affairs.")

10        Citing *Lee v. Penthouse Int'l, Ltd.*, 1997 WL 33384309 (C.D. Cal. Mar. 19,

11   1997), a case concerning world famous adult entertainers who routinely and publicly

12   discussed their sex lives and posed for nude photographs for magazines, defendants

13   argue that simply "republishing sexually explicit images" of plaintiff does not give

14   rise to a claim for intrusion.  (MG Mot. 41.)  The *Lee* case is inapposite for several

15   reasons.  First and foremost, as discussed above, this action concerns the sexual

16   activity of a child and her relationships with two coercive, abusive men, not adult

17   celebrities who regularly placed their sex lives into the public domain.  Second, in

18   *Lee*, the court evaluated the publishing of plaintiffs' intimate photographs against the

19   backdrop of its previous determination that the sex life of plaintiffs were legitimate

20   subjects for a Penthouse magazine article and the fact that the intimate photos had

21   been published previously in numerous magazines.  *Lee*, 1997 WL 33384309, at *5-

22   *7.)[33]  Finally, defendants ignore the *Lee* court's analysis of *Times-Mirror Co. v.*

23   *Superior Court*, 198 Cal. App. 3d 1420 (1988) and its determination that plaintiff was

24   not a crime victim when evaluating the privacy rights of the *Lee* plaintiffs.  (*Lee*, 1997

25

26   [33] Courts have also found that private revelations or interactions between friends and
    relatives are insufficient to render private information public.  *See, e.g., Times-Mirror*

27   *Co. v. Superior Court*, 198 Cal.App.3d 1420, 1428 (1988) ("[W]e cannot say Doe
    rendered otherwise private information public by cooperating in the criminal

28   investigation and seeking solace from friends and relatives.").

WL 33384309, at *7.  In this case, however, plaintiff is a crime victim, and the distribution of her videos were also individual crimes, warranting continued privacy protections regardless of whether the videos had been previously disseminated.  The minor teen did not consent to have any of her videos mass disseminated, and subsequently requested on multiple occasions that the videos be removed, yet MindGeek and all the defendants persisted in leaving the videos up so that they could continue to profit off them and maximize SEO.

Moreover, by maintaining, streaming, tagging, promoting, and monetizing plaintiff's videos, defendants did portray plaintiff in the false light that she, a minor, wanted to sell her videos as a voluntary actress or adult performer, despite knowing she wanted the videos removed, resulting in damages that plaintiff is entitled to present to the jury.  *See Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1080 (9th Cir. 2002) (finding a triable issue of fact where photos published in Playgirl made it appear plaintiff was willing to endorse the magazine); *see also, Wood v. Hustler Magazine, Inc.*, 736 F.2d 1084, 1092 (5th Cir. 1984) (affirming judgment on false light claim where nude photograph was published as a result of Hustler's "slipshod procedure" and nature of material "would obviously warn a reasonably prudent [publisher] of the potential for . . . privacy invasion if a consent form was forged).

For these same reasons, defendants' motions to dismiss plaintiff's disclosure of private facts claim must also be denied. "The elements of the tort of public disclosure of private facts are (1) public disclosure (2) of a private fact (3) which would be offensive to the reasonable person and (4) which is not of legitimate public concern." *Michaels*, 5 F. Supp. 2d, at 839 (citing *Diaz v. Oakland Tribune, Inc.*, 139 Cal.App. 3d 118 (1983).  The non-consensual publication of a child coerced into sexual conduct or lude exhibition is clearly offensive and objectionable to any reasonable person and constitutes "the unwarranted publication of intimate details of [plaintiff's] private life which are outside the realm of legitimate public interest." (*Lee*, 1997 WL 33384309, at *6 (citing *Sipple v. Chronicle Publishing Co.*, 201 Cal. Rptr. 665, 669 (Cal. App. 1

1   Dist. 1984)).  The fact that plaintiff later made additional videos to sell in order to fuel

2   a drug habit induced by her abuser and trafficker, does not change the analysis.  Child

3   pornography laws were created to protect children, and defendants' continuous

4   dissemination of this material continued to place the intimate, sexual activity of a

5   minor, who could not consent under any circumstances to the distribution of this

6   material, into the public realm.  There is no legitimate public interest in watching a

7   child be sexually assaulted or otherwise engaged in sexual conduct.  Accordingly,

8   plaintiff's privacy rights never detached, and the unlawful dissemination of that

9   material did not forfeit her right of privacy.  *Taus v. Loftus*, relied on by the

10  MindGeek Defendants (MG Mot. 41), is in accord: "Although in such an instance the

11  person assumes the risk, for purposes of the intrusion tort, that the relative or friend

12  may betray his or her confidence by voluntarily disclosing the information, there is no

13  reason to conclude that the person does not retain a reasonable expectation of privacy

14  that may be violated when a third-party defendant, by intentionally engaging in

15  improper and unforeseen conduct, gains unauthorized and unwanted access to such

16  information from such a relative or friend."  151 P.3d 1185, 1217-18 (Cal. 2007).

17          **E.     The FAC Pleads Misappropriation.**

18          Defendants' challenges to the FAC's misappropriation claims are likewise

19  without merit. (MG Mot. 42.)  Defendants' sole challenge to these claims is that the

20  FAC fails to plead that plaintiff has a "unique" identity.  (*Id.*)  But, no such

21  requirement exists.  *See Fraley*, 830 F. Supp. 2d at 807 ("the appropriation of the

22  identity of a relatively unknown person may result in economic injury or may itself

23  create economic value in what was previously valueless.") (citation omitted); *KNB

24  Ent. v. Matthews*, 78 Cal. App. 4th 362, 373 n. 12 (Cal. Ct. App. 2000) ("California's

25  appropriation statute is not limited to celebrity plaintiffs.").  Moreover, defendants'

26  assertion that they are not liable because they never "used" plaintiff's image directly

27  in advertising is likewise wrong as a matter of law."  *Lee*, 1997 WL 33384309, at *2.

28  In any event, the FAC alleges that plaintiff's images and likeness were used as

1   "window-dressing to advance" MindGeek's goal of attracting customers to its other

2   services and advertised products, which is actionable.  *Downing v. Abercrombie &*

3   *Fitch*, 265 F.3d 994, 1000 (9th Cir. 2001).  "[L]iability 'is determined by the role that

4   the use of the plaintiff's name or likeness plays in the main purpose and subject of the

5   work at issue."  *Yeager v. Cingular Wireless LLC*, 673 F. Supp. 2d 1089, 1100 (E.D.

6   Cal. 2009) (citation omitted).

7                              *       *       *

8        Finally, the remaining arguments concerning the common law and statutory

9   claims, made primarily by Tassillo (Mot. 20-23), Urman (Mot. 41-44), and Antoon

10  (Mot. 25), simply repeat defendants' refrain that the FAC does not contain any

11  allegations of wrongful conduct by them.  These arguments are all addressed above.

12  *See* Facts, §§ B.2-3; *see also See Kao v. Holiday*, 58 Cal. App. 5th 199, 202, 207 (Cal.

13  Ct. App. 2020) (individual defendants were alter egos of corporation and were

14  therefore personally liable for plaintiff's damages).[34]

15  **V.    CDA § 230 DOES NOT BAR PLAINTIFF'S CLAIMS**

16       This Court has (twice) correctly held that Section 230 of the Communications

17  Decency Act ("CDA 230") does not immunize MindGeek[35] from liability.  *See Doe v.*

18  *MindGeek*, 558 F. Supp. 3d 828 (C.D. Cal. 2021); *Doe v. MindGeek USA Inc.*, 2021

19  WL 5990195 (C.D. Cal. Dec. 2, 2021).  In those decisions, this Court held that claims

20  asserted by a putative class of plaintiffs, defined to include Ms. Fleites (Second

21  Amended Complaint, *Doe v. MindGeek*, Dkt. 72 at ¶ 154 (C.D. Cal. Sept. 30, 2021)

22  (the "*Doe v. MindGeek* SAC")) and represented by a lead plaintiff who, like Ms.

23  ────────────────

24  [34] The FAC details the affirmative acts of each defendant, including the Individual
    Defendants, in furtherance of the Enterprise.  While defendants argue that they have
25  no duty and were simply a neutral third party, this mischaracterizes the allegations in
    the FAC and has twice been rejected by this Court.  (*See infra* Argument, § V.)
26  Where, as here, defendants were on notice of the conduct and either willfully or with
27  reckless disregard failed to take action, defendants are at a minimum, negligent.

28  [35] This same reasoning applies to the Individual Defendants or Visa.

1   Fleites, was induced by her then-boyfriend to record a video containing CSAM that
2   was subsequently posted to Pornhub without her knowledge or consent (*id.* ¶¶ 141,
3   143), were not barred by the Communications Decency Act.  In so ruling, this Court
4   reasoned: "Congress has not provided an all purpose get-out-of-jail free card for
5   businesses that publish user content on the internet[.]" 2021 WL 5990195 at *7
6   (internal citation omitted).  Rather, where, as here, defendants "have taken action to
7   encourage unlawful content and employ features to make a material contribution to
8   such content," CDA 230 has no application.  *Id.*

9        **A.**     **The MindGeek Defendants Are Content Creators.**

10        While CDA 230 provides a defense to claims brought against a provider or
11   user of an interactive computer service (or ICS) that is simply publishing
12   information provided by a third party, "the Communications Decency Act was not
13   meant to create a lawless no-man's land on the Internet."  *Id.* Thus, a defendant
14   that is "responsible, 'in whole or in part, for the creation or development' of
15   unlawful content on its platforms" is not entitled to CDA 230 protection.  *Doe v.*
16   *MindGeek*, 558 F. Supp. 3d at 841; *see also* 2021 WL 5990195 at *4; *Fair*
17   *Housing Council v. Roommates.com*, 521 F.3d 1157, 1168 (9th Cir. 2008) (*en*
18   *banc*) (website did not have Section 230 immunity when it required users to
19   disclose information that violated federal laws).  The party seeking CDA 230
20   immunity bears the burden of establishing entitlement.  *See Gonzalez v. Google*
21   *LLC*, 2 F.4th 871, 889 (9th Cir. 2021).  In assessing whether an ICS, such as
22   MindGeek, is a content creator, the Court considers whether the allegations
23   "considered together," amount to an encouragement of unlawful content,
24   regardless of whether individual tools or policies would mandate vitiation of CDA
25   230 immunity if considered alone.  *MG* Recon. Order, at *7.[36]

26

27   [36] Consistent with this holding, Justice Thomas in a recent statement denying
28   certiorari, argue that federal courts have improperly "interpreted § 230 to confer

Applying these principles, in *Doe v. MindGeek*, this Court held that MindGeek is a content creator and is not entitled to CDA 230 immunity.  *See Doe v. MindGeek*, 558 F. Supp. 3d at 840-42; *MG* Recon. Order, at *6-*7.  In reaching its conclusion, the Court reasoned that the MindGeek Defendants (1) "solicit, review, approve, and feature [illegal content] on their platforms" (*MG Recon.* Order at *6); (2) "target unlawful content by . . . categoriz[ing its] videos using coded language for child pornography to ensure that content is visible to the 'right fans,' and instruct[ing] users how to title their videos to target individuals interest in child pornography" (*id.*); (3) "'encourage' child pornography through [the use of] titles such as 'less than 18,' 'the best collection of young boys,' and 'underage.'" (*id.*); (4) "'upload' child porn videos to their sites'" (*id.*); (5) fail to remove videos identified as nonconsensual, merely disabling the link but keeping the webpage with its title, description, tags, and comments, so that the video would continue to increase SEO (*id.*); and (6) actively choose not to employ verification technology because it recognized it would "severely harm their business operations" (*id.*).  Moreover, relying in part on this Court's decisions, a district court in Alabama reached the same conclusion, holding "that [p]laintiffs have plausibly alleged that [MindGeek] indeed materially contribute to the provision of child pornography on their platforms."  *MG Freesites*, 2022 WL 407147, at *16.  Ultimately, the Alabama court determined that MindGeek offered more than "neutral tools," citing, among other things, MindGeek's creation of thumbnails of CSAM videos and the use of coded language for CSAM content to ensure such content is visible to users who search for it.  *Id.* at *17.  Based on these factors, the court denied the applicability of CDA 230 immunity.

---

sweeping immunity on some of the largest companies in the world, particularly by employing a capacious conception of what it means to treat a website operator as [a] publisher or speaker."  Statement of Thomas, J. in Denial of Certiorari, *Doe v. Facebook, Inc.*, 142 S. Ct. 1087, 1088 (2022) (internal citations omitted).

As set forth herein, the FAC alleges the same allegations this Court and the Northern District of Alabama held precluded CDA protection and additional relevant factors, including by way of example only that MindGeek (a) targets and promotes child pornography and other illegal content (Facts, § B.1); (b) directs users to illegal content through tags, curated playlists; edited titles and tags, and coded language (*id.*); (c) advises users to include the tags to target the "right" fans, including those looking for child pornography (*id.*; ¶ 109) (d) actively transfers child pornography and other illegal content to its affiliated sites (*id.* § B.3); (e) maintains the webpages, titles, and comments for known CSAM content so that it could continue to drive traffic and conversion (*id.* § B.2); (f) modified and reformatted the content, titles and tags of nonconsensual content to improve SEO (*id.* § B.1); (g) created thumbnails for the videos from CSAM, which it stored on a separate server (*id.*); (h) used MindGeek's TrafficJunky platform to build advertising campaigns around keywords that clearly reflect illegal activity (*id.* § B.4) (i) stonewalled efforts to have CSAM and other illegal content removed from its websites (Facts, § B.2); (j) reuploaded content after it was forced to remove from its tubesites (*id.* § B.3); (k) facilitated the reuploading of content by including the free download button and re-uploading some of that content themselves (*id.*); (l) avoided even "pretextual restrictions" on the uploading of content because they knew it would reduce traffic and profits (¶ 183); and (m) provided users with VPN services to allow them to hide their unlawful conduct (Facts, § B.3).

This Court previously rejected MindGeek's argument that a sex trafficking plaintiff must plead how MindGeek "created the content at issue" (MG Mot. 8), instead holding that allegations of MindGeek's "general, widespread practices detailing how Defendants materially contribute to the creation of child pornography" are sufficient to overcome CDA 230 immunity on a motion to dismiss. *Doe v. MindGeek*, 558 F. Supp. 3d at 842 n.6. ("Plaintiff plausibly alleges that [MindGeek's] widespread practices applied to videos depicting her.")

In any event, even if Ms. Fleites was required to plead that MindGeek materially contributed to videos depicting her CSAM, the allegations in the FAC plainly meet this standard.  The FAC alleges that MindGeek solicited and encouraged Ms. Fleites's CSAM by failing to implement appropriate moderation and verification policies (Facts, § B.2), directed users to Ms. Fleites's illegal CSAM through the use of title clearly depicting she was only 13-years old (*id.* § A), actively continued to disseminate the CSAM by stonewalling multiple requests by Ms. Fleites's to have her videos removed (*id.*), maximized the number of video views by categorizing, tagging, and optimizing the videos for user preferences, creating thumbnail images of Ms. Fleites containing CSAM, incorporating Ms. Fleites's videos into playlists, and suggesting additional videos based on views of Ms. Fleites's video (*id.*).  Moreover, MindGeek's policy permitting free downloads ensured that Ms. Fleites's videos would be virtually impossible to remove; indeed one video, which contained comments suggesting that Ms. Fleites was underage, had 2.7 million views.  (*Id.* § B.3.)  Finally, the FAC pleads that MindGeek itself reuploaded the video to its affiliated sites.  (*Id.* §§ A, B.3)[37]

Taken together, these allegations go far beyond the neutral tools the Ninth Circuit has held are protected under CDA 230.  Accordingly, the Court's holdings in *Doe v. MindGeek* apply with equal force here.

**B.    CDA 230 Does Not Immunize Intentional Publication of CSAM.**

CDA 230 likewise does not give the MindGeek Defendants a free pass to knowingly distribute CSAM in violation of 18 U.S.C. §§ 2252 and 2252A, as such

---

[37] Defendants attempt to distinguish this Court's prior holdings on the grounds that the FAC pleads that all but one of the videos were created by plaintiff for sale.  (MG Mot. 6.)  As an initial matter, this argument fails to address plaintiff's initial video that MindGeek monetized and re-uploaded without plaintiff's consent and which precipitated the damages and downward spiral set forth in the FAC.  In any event, MindGeek cannot escape liability for videos that the FAC alleges were coerced by an individual in a trafficking venture which MindGeek then optimized, disseminated, reuploaded, and monetized.

1   liability is not contingent on treatment of MindGeek "as the publisher or speaker of

2   any information provided by another information content provider."  47 U.S.C. §

3   230(c)(1).  Plaintiff alleges that MindGeek itself created thumbnail images of her

4   which it stored on other servers, reuploaded videos of her that contained CSAM after

5   they were removed, and pushed videos of her to its other tubesites so that it could

6   continue to profit from advertising revenue gained from the illegal content.  (Facts,

7   §§ A, B.3.)  MindGeek's misconduct in reuploading Ms. Fleites's videos and in

8   creating thumbnail images is independent of third-party conduct and MindGeek's

9   liability for its knowing publication of videos containing child pornography in

10  violation of 18 U.S.C. §§ 2252 and 2252A is not contingent on any role as a publisher.

11      In any event, "[r]eceipt and possession of child pornography, alone, are

12  criminal acts, and are not shielded by [CDA] 230 immunity." *MG Freesites*, 2022

13  WL 407147, at *22.  The court in *MG Freesites, Ltd.* held that "[CDA] 230 does not

14  apply to [plaintiffs'] claim that [MindGeek] knowingly received, possessed, and

15  distributed child pornography" and this Court should do the same for two reasons. *Id*.

16  First, "child pornography is not lawful 'information provided by another information

17  content provider' as contemplated by [CDA] 230," but is instead "illegal contraband,

18  stemming from the sexual abuse of a child, beyond the covering of First Amendment

19  protection, and wholly outside any other protection or immunity under the law,

20  including [CDA] 230." *Id. (*quoting 47 U.S.C. § 230(f)(3)).  Because child

21  pornography is "not protected speech and conveys no legally cognizable information,"

22  CDA 230's "prohibition on ICSs being treated as 'speaker[s]' of 'information' is not

23  implicated." *Id.*  Second, in enacting CDA 230, Congress intended "to incentivize

24  ICSs to protect children, not immunize them for intentionally or recklessly harming

25  them." *Id.* (citing 47 U.S.C. § 230(b)(4), which states that CDA 230 is intended to

26  "remove disincentives for the development and utilization of blocking and filtering

27  technologies that empower parents to restrict their children's access to objectionable

28

or inappropriate online material").  It is untenable that Congress intended to immunize MindGeek's knowing distribution of CSAM through CDA 230.  *See id.*

## VI.    THE COURT HAS JURISDICTION AND PLAINTIFF HAS STANDING.

Faced with this Court's prior findings in *Doe v. MindGeek* and the detailed allegations of defendants' rackets, schemes, and wrongdoing, defendants resort to a series of procedural arguments in an effort to secure dismissal.  First, the Individual Defendants and defendants MindGeek S.a.r.l. and MG Premium Ltd. ("MG Premium")[38] allege that they are not subject to jurisdiction in this state because they did not engage in any intentional acts aimed at California.  (MG Mot. 46-47; Antoon Mot. 10-11; Bergmair Mot. 20; Tassillo Mot. 9-11; Urman Mot. 6-8.)  Visa argues that plaintiff lacks Article III standing to assert claims against it.  (Visa Mot. 6.)  As set forth herein, defendants are wrong and their motions amount to nothing more than last-ditch efforts to use their shadowy, sham-shell corporate structure to sow confusion and prevent this Court from exposing their criminal corporate enterprise. Where, as here, plaintiff has established a prima facie showing of jurisdiction and traceable injury, and defendants fail to rebut this showing, defendants' procedural challenges should be rejected.  At a minimum, plaintiffs should be granted jurisdictional discovery.

### A.    The Court has Personal Jurisdiction Over Each Defendant.

On a motion to dismiss for lack of personal jurisdiction, absent formal discovery and an evidentiary hearing, a plaintiff need make only a prima facie showing that the court has jurisdiction.  *See Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006).  In making this determination, the Court must accept all allegations in the FAC as true unless they are "directly contradicted" by affidavit, s*ee Zosma Ventures*, 2014 WL 12579805, at *4; *DISH Network L.L.C. v. Vicxon Corp.*,

---

[38] Notably, defendants MG Freesites, Ltd., MindGeek USA Incorporated, MG Global Entertainment Inc., and 9219-1568 Quebec, Inc., all of which are part of the criminal MindGeek enterprise, have not challenged this Court's jurisdiction.

923 F. Supp. 2d 1259, 1264 (S.D. Cal. 2013), and resolve all factual disputes in plaintiff's favor. *DISH Network L.L.C.*, 923 F. Supp. 2d at 1262.

Federal courts have jurisdiction over a defendant where permissible under a federal statute, or to the extent permissible under the state law of the forum. Fed. R. Civ. P. 4(k)(1)(A). California's long-arm statute, "is coextensive with federal due process requirements . . . ." *Maverix Photo*, 647 F.3d at 1223. Thus, the only question the Court must address is whether defendants "have certain minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *In re Boon Glob. Ltd.*, 923 F.3d 643, 650 (9th Cir. 2019). As set forth herein, this Court has general jurisdiction over each defendant. Moreover, each defendant is subject to jurisdiction in this state under the RICO statute, 18 U.S.C. § 2255, and/or FRCP Rule 4(k)(2).

Significantly, the MindGeek Entities, including Luxembourg-based MindGeek S.a.r.l., which challenges jurisdiction on this motion, have been sued at least seven times in California and an additional eight times in other jurisdictions in the United States, and have virtually never raised any personal jurisdiction challenges, including before this Court in *Doe v. MindGeek*, or secured dismissal on those grounds. Clearly, MindGeek S.a.r.l. and MG Premium do not actually find litigating in this forum or the United States to be onerous or otherwise unreasonable. Thus, the only logical inference is that these entities find the gravity of the allegations against them difficult to defend against, and so instead have chosen to fight them on procedural rather than substantive grounds.

1.  The Agency and Alter Ego Relationship Between
    and Among the MindGeek Defendants Confer General Jurisdiction

This Court has personal jurisdiction over each of the MindGeek Entities and Individual Defendants based on the jurisdictional contacts of their agents/alter-egos MG USA and MG Global which are not contested on this motion and properly imputed to the remaining MindGeek Defendants.

To establish alter ego jurisdiction, the plaintiff must make out a prima facie case "(1) that there is such unity of interest and ownership that the separate personalities [of the entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice." *Doe v. Unocal Corp.,* 248 F.3d 915, 926 (9th Cir. 2001) (quoting *Am. Telephone & Telegraph Co. v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 591 (9th Cir.1996)); *ADO Fin., AG v. McDonnell Douglas Corp.*, 931 F. Supp. 711, 715 (C.D. Cal. 1996) (the alter ego theory of jurisdiction has been similarly applied to exert jurisdiction over officers, directors, and managers of entities); *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1393 (9th Cir. 1984) (same). "The essence of the alter ego doctrine is that justice be done." *NuCal Foods, Inc. v. Quality Egg LLC*, 887 F. Supp. 2d 977, 992 (E.D. Cal. 2012) (quoting *Mesler v. Bragg Mgmt. Co.*, 39 Cal. 3d 290, 301 (1985)). "Under California law the kind of inequitable result that makes alter ego liability appropriate is an abuse of the corporate form . . ." In conducting the alter ego analysis, "the Court presumes [non-movant's] allegations of jurisdictional facts are true and decides all factual disputes in [non-movant's] favor." *ADO Fin., AG*, 931 F. Supp. at 718.

Courts routinely deny motions to dismiss for lack of personal jurisdiction where a plaintiff has sufficiently pled various factors of alter ego. *See, e.g.*, *Sihler v. Fulfillment Lab, Inc*, No. 3:20-CV-01528-H-MSB, 2020 WL 7226436, at *7 (S.D. Cal. Dec. 8, 2020) (imputed alter ego contacts despite defendant's conclusory denials in an affidavit, defendant did not deny the fundamental contention of involvement in the alleged wrongdoing); *Mieuli v. DeBartolo*, No. C-00-3225 JCS, 2001 WL 777447, at *10 (N.D. Cal. Jan. 16, 2001); *Fed. Reserve Bank of San Fran. v. HK Sys.,* 1997 U.S. Dist. LEXIS 5573, *19 (N.D. Cal. 1997); *ADO Fin., AG*, 931 F. Supp. at 713. In assessing whether unity of interest and ownership is such that the separate personalities of the entities no longer exist, courts consider several factors including the commingling of funds and other assets of the entities, identical equitable ownership of the entities, use of the same offices and employees, use of one entity as a

1  mere shell or conduit for the affairs of the other, and identical directors and officers.

2  *Chubchai v. AbbVie, Inc.*, 2022 WL 1236877, at *5 (N.D. Cal. April 21, 2022) (citing

3  *Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 983 (N.D. Cal. 2016).

4        Applying these standards, the FAC plainly alleges sufficient alter-ego

5  allegations to impute jurisdictional contacts at this stage of the proceedings.  Among

6  other things, the FAC alleges that the MindGeek entities, including MindGeek S.a.r.l.

7  and MG Premium, operate as a single business entity (¶ 32), created "an international

8  network of ever-changing sham shell companies" through which they: (a) mask

9  criminality under the guise of legitimate entertainment (¶¶ 48, 131-34); (b) pay for,

10  populate the website with, and separately profit from content produced through human

11  trafficking and slavery and pirated copyright materials; (c) advertise and otherwise

12  monetize the criminal content through paid subscription services and other partner

13  relationships; (d) permit known criminal organizations to steal customer information,

14  commit credit card fraud, and blackmail customers; (e) defraud MindGeek advertisers,

15  marketers, and other third-parties; (f) launder monies by "bleeding" value out of the

16  organization to defendants and other Enterprise members via sham investments and

17  expenses; and (g) pay for and execute blackmail, extortion, harassment, defamation,

18  and hacking against those the Enterprise viewed as threats.  (¶¶ 131-57.)  Tellingly,

19  the network was in constant metamorphosis.  The MindGeek Enterprise created,

20  dissolved, and then replaced sham shell companies on a monthly and sometimes daily

21  basis, often with virtually the same names.  (Facts, § C.4.)  Plaintiff alleges that these

22  sham shell companies had no *bona fide* business purpose for the network's sheer

23  complexity and opaqueness or its constantly quantum like dissolution and creation of

24  entities.  (¶ 133.)  Moreover, as to the Individual Defendants, the Complaint details

25  each of their roles in directing, managing and carrying out the operations of the

26

27

28

Company, including controlling and dictating the illegal conduct at issue in this case. (*See* Facts, §§ C.2-C.4.)[39]

None of the Individual Defendants submit a declaration refuting any of the underlying factual allegations that support this Court's jurisdiction.  MindGeek S.a.r.l. and MG Premium collectively submit one barebones, nine-page affidavit that does nothing more than offer a self-serving statement that simply denies plaintiff's allegation of a sham corporate structure as "baseless."  *See* Andreou Declaration. While the Andreou Declaration purports to claim that each of the MindGeek Entities have independent responsibilities, operate as "distinct legal entities", and have been adequately capitalized with individual responsibilities, the declaration offers nothing with respect to the specific service or financial agreements (written or otherwise) that exist between them.  Furthermore, despite being the parties with exclusive knowledge of the facts, the Andreou Declaration only identifies the current management of several entities and fails to account for any changes in the management at all times relevant to this litigation.

Indeed, far from supporting their jurisdiction defense, the Andreou Declaration supports plaintiff's allegation that the various sham-entities operate in concert with one another to further their criminal enterprise.  The Andreou Declaration concedes, amongst other things, that California-based MG Global, which does not contest jurisdiction on this Motion and which purportedly functions to provide pornography to cruise ships, have unspecified responsibilities for the content on MindGeek websites and tubesites operated by other MindGeek corporate entities (*see* Andreou Declaration, ¶ 29; October 19, 2021 Andreou Declaration (Dkt. 72-3), ¶ 29), that

---

[39] Thus, this case is distinguishable from the cases defendants cite where the court declined to exercise alter ego jurisdiction based on mere affiliation.  *See, e.g., Symmetrrica Ent. Ltd. V. UMG Recordings, Inc.*, 2019 WL 8806093, at *3-4 (C.D. Cal. Sept. 20, 2019) (finding no jurisdiction based on detailed affidavits); *Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 983 (N.D. Cal. 2016) (declining to exercise jurisdiction over subsidiary which had no involvement in claim).

PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

9219-1568 Quebec Inc., which also does not contest jurisdiction on this Motion, is a service provider to Freesites and other affiliates (Andreou Declaration (Dkt. 139-3), ¶ 32), that MG Premium is responsible for operating paysites and holds unidentified intellectual property rights to unidentified content for Freesites (*id.* ¶ 24), that Freesites, which also does not contest jurisdiction on the Motion, is "responsible for operating tubesites, including Pornhub" and operates other subscription sites and "Content Partner Program" that necessarily require paysites (*id.* ¶ 17), and that MindGeek S.a.r.l. is the parent corporation of these sites (*id.* ¶ 13).  These admissions are fatal to defendants' claims, directly support plaintiff's allegations that the MindGeek entities operate as one entity and that additional entities were created solely to evade liability, and supports the exercise of jurisdiction based on those relationships.[40]  Because defendants have failed to rebut plaintiff's allegations, "the uncontroverted allegations in the complaint must be taken as true." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011); *see also Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995).  Here, plaintiff has alleged that each entity is a mere "instrumentality of the former" because of the control of the parent entity and the Individual Defendants who exercise directive authority over the operations of *all* the entities.  *Calvert v. Huckins*, 875 F. Supp. 674, 678 (E.D. Cal. 1995); *see also United States v. Toyota Motor Corp.*, 561 F. Supp. 354, 359 (C.D. Cal. 1983) (piercing the corporate veil is appropriate and the alter-ego test is satisfied where parent corporation uses subsidiary to shield itself from liability).

While MindGeek S.a.r.l. and MG Premium contend that plaintiff "does not plead jurisdictional facts as to each MindGeek entity" (MG Mot. 49), it is well-recognized that, in this pre-discovery period, only the MindGeek Defendants, and not

---

[40] Similarly, defendants' identification of the current management show indicia of intertwined board members and directors carrying out functions in multiple organizations, which, although not definitive for jurisdiction, provides further support for plaintiff's claims and, at a minimum, warrants jurisdictional discovery.

plaintiff has information from which each entity's role can be determined.  (*See* discussion *supra* Argument, VI.A.1. and note 40).  This information imbalance is compounded in this case by the creation of hundreds of sham MindGeek entities with no legitimate purpose. Thus, under these circumstances, discovery, not dismissal, is warranted.  *See Laub v. U.S. Dep't of the Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003) (quoting *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 540 (9th Cir. 1986) ("discovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary."); *Chan v. Society Expeditions, Inc.*, 39 F.3d 1398, 1406 (9th Cir. 1994) (remanding for jurisdictional discovery due to insufficient factual record on personal jurisdiction); *see also Orchid Biosciences, Inc. v. St. Louis University*, 198 F.R.D. 670, 674-75 (S.D. Cal. 2001) (additional citation omitted) ("Defendant must meet the relatively high burden of establishing that 'it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction.'").

> 2.    The Court has Personal Jurisdiction Pursuant to Rule 4(k)(2), 18 U.S.C. § 2255, and the RICO Statute.

Moreover, the exercise of personal jurisdiction over the MindGeek Defendants is also appropriate under either FRCP 4(k)(2), 18 U.S.C. § 2255, or RICO's nationwide jurisdiction.  Rule 4(k)(2) confers jurisdiction over a foreign defendant who lacks substantial contacts with any single state, but has sufficient contacts with the United States as a whole to satisfy due process standards.  *See In re Volkswagen*, 2017 WL 4890594, at *17.  Courts have "adopted a burden-shifting mechanism so that 'if the [d]efendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2).'" *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 461 (9th Cir. 2007) (quoting *ISI Int'l, Inc., v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001)).  Under Rule 4(k)(2), plaintiffs need only make a prima facie showing that defendants have minimum contacts with the United States.

The FAC alleges MindGeek S.a.r.l., MG Premium, and the Individual Defendants' minimum contacts with the United States to confer jurisdiction under these statutes.  Among other things, defendants own and operate hundreds of pornographic websites that are accessible throughout the United States and California (¶ 19), they conduct business throughout the United States, including the Central District of California (¶¶ 19-36), they designed and operate a complex corporate structure through which defendants targeted United States and California consumers with its sexually exploitative products by optimizing its websites to promote CSAM and trafficked material in order garner top search rankings and to funnel consumers to paid content websites (¶¶ 60-70), defendants directly conduct operations and advertisements in California, which in turn generates substantial profits from United States and California-based users, including Los Angeles which in 2019 was the city with the fourth highest volume of Pornhub.com usage in the world (¶¶ 43-44), and MindGeek partnered and shared advertising revenue with sex traffickers and distributed sexually explicit videos of the California-based plaintiff without her knowledge or consent, generating additional revenue and other financial benefits from those uploads (¶ 45).  Defendants' prolific and widespread contacts with the United States and California are more than sufficient to establish jurisdiction and are "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyere*, 311 U.S. 457, 463 (1940)).

These U.S.-based contacts also confer jurisdiction on defendants under the nationwide service of process clauses of various federal statutes, including 18 U.S.C. §§ 1591, 2252, and 2252A.  *See* 18 U.S.C. § 2255 (permitting any person who, while a minor, was a victim of crimes in violation of 18 U.S.C. §§ 1591, 2252, 2252A to "sue in any appropriate [District Court]"); *Doe v. Webgroup Czech Republic, AS.*, 2022 WL 982248, at * 8 (C.D. Cal. Jan. 13, 2022) (finding "that the service of process provision in § 2255 establishes nationwide service of process, and therefore

nationwide personal jurisdiction" for §§ 1591, 2252, 2252A claims).  Indeed, the Northern District of Alabama recently found that it had jurisdiction over several MindGeek Entity Defendants—including MindGeek S.a.r.l. who challenges jurisdiction here—under a nationwide contacts analysis under these same provisions. *see also*, *MG Freesites*, 2022 WL 407147, at *24-26.  Relying on substantially similar allegations to those in the FAC, the Court held that "Defendants have certainly maintained minimum contacts with the United States to support personal jurisdiction over [plaintiff's] claims."  *Id.* at *26; (*cf.* ¶¶ 19-36, 43-45 60-70).[41]

It is for these same reasons that defendants' reliance on *Bristol-Myers Squibb Company v. Superior Court of California*, 137 S. Ct. 1773 (2017) and *Sarafian v. Wright Medical Technology, Inc.*, 2016 WL 1305087, at *4 (C.D. Cal. Apr. 1, 2016), is misplaced.  Unlike plaintiffs in those cases who only brought claims under California state law, here, at a minimum, the Court should exercise jurisdiction over MindGeek S.a.r.l., MG Premium, and the Individual Defendants based on their U.S.-based contacts, and over the state law claims, which arise out of a common nucleus of operative fact as the federal claims for which nationwide personal jurisdiction is available, under theories of pendent jurisdiction.  *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180-81 (9th Cir. 2004).[42]

---

[41] The Individual Defendants argue that Section 1965(b) does not confer jurisdiction here because they completed waivers of service and thus were not served in the United States.  (Bergmair Mot. 6 n.4; Tassillo Mot. 19; Antoon Mot. 19-20; Urman Mot. 27.) Notably, defendants are all represented by United States counsel each of whom requested a waiver of service in exchange for additional time to respond to the initial Complaint.  Defendants even agreed to waive all challenges to service of process. Nevertheless, defendants now claim that their request to waive service is a bar to jurisdiction.  The Court should reject defendants' attempts at gamesmanship; particularly here where the facts strongly suggest wrongdoing, the Court should not allow defendants to continue to evade liability through sham international entities.

[42] The court's jurisdictional analysis over foreign defendants in *Doe v. Webgroup Czech Republic* was narrowly focused on specific jurisdiction and did not consider

1    3.    The Individual Defendants' Remaining Arguments are Unavailing.

2    Each of the Individual Defendants argue that it would not be reasonable or fair

3    to subject them to jurisdiction in this state.  The allegations in the FAC completely

4    belie these arguments.  Plaintiff alleges that the MindGeek Enterprise, under the

5    control of the Individual Defendants, created shell entities in California to further their

6    fraudulent schemes and trafficking venture; purposely directed and tailored

7    advertising to California-based users; derived substantial revenue from California-

8    based users; and partnered with known-sex traffickers in California.  No Individual

9    Defendant submits an affidavit at all, let alone contradicting these allegations.  Thus,

10   these allegations constitute a prima facie showing that the exercise of jurisdiction

11   would comport with "fair play and substantial justice."  That the Individual

12   Defendants purportedly did this from a foreign jurisdiction, as they claim, is of no

13   moment, where they purposely injected themselves into the forum state's affairs.

14    4.    Jurisdictional Discovery is Appropriate.

15   At a minimum, plaintiff is entitled to jurisdictional discovery.  As this Court has

16   recognized "[r]equests for [jurisdictional] discovery should ordinarily be granted

17   'where pertinent facts bearing on the question of jurisdiction are controverted . . . or

18   where a more satisfactory showing of the facts is necessary.'" *Brophy v. Almanzar*,

19   359 F. Supp. 3d 917, 925 (C.D. Cal. 2018) (Carney, J.) (quoting *Wine Bottle*

20   *Recycling v. Niagara Sys. LLC*, No. 12-1924 SC, 2013 WL 1120962 at *9 (N.D. Cal.

21   Mar. 18, 2013)).  Moreover, "denial of jurisdictional discovery constitutes an abuse of

22   discretion when further discovery 'might well demonstrate facts sufficient to

23

24   § 2255. 2022 WL 982248 at *6-7.  Here, plaintiff alleges that jurisdiction is

25   appropriate under § 2255 because the federal statutes cited by plaintiff provide for

26   nationwide service of process and "[i]n such an instance, the constitutional limits of

     the court's jurisdiction are fixed by the Due Process Clause of the Fifth Amendment

27   . . . and the applicable forum for a minimum contacts analysis is the United States."

28   *Kammona v. Onteco Corp.*, 587 F. App'x 575, 579-80 (11th Cir. 2014) (additional

     citation omitted).

1   constitute a basis for jurisdiction.'" *Id.* (quoting *Harris Rutsky & Co. Ins. Servs., Inc.*

2   *v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003)).  Jurisdictional

3   discovery is particularly appropriate here, where the FAC alleges that defendants

4   operated through hundreds of sham entities, and information concerning the activities

5   and jurisdictional contacts of each entity is uniquely within defendants' possession.[43]

6   Unlike cases where it is clear that further discovery would not demonstrate facts

7   sufficient to constitute a basis for jurisdiction, the circumstances here demonstrate that

8   discovery is likely to produce additional "facts bearing on the question of jurisdiction"

9   and "a more satisfactory showing of the facts" already pled by plaintiff.  *See, e.g.*,

10  *Payrovi v. LG Chem America, Inc., et al.*, 491 F. Supp. 3d 597, 608 (N.D. Cal. 2020)

11  (quoting *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008) (granting

12  jurisdictional discovery).

13          **B.     Plaintiff has Article III Standing.**

14          Finally, Visa's challenges to plaintiff's standing fare no better.  As an initial

15  matter, Visa's entire argument is premised on Visa's position that the allegations in

16  the FAC regarding Visa's participation in and benefits from the MindGeek

17  Enterprise's sex trafficking venture and RICO enterprise are false.  These factual

18  determinations are not properly resolved at this stage of the proceeding; the law is

19  clear that courts must "presume success on the merits when evaluating standing."  *In*

20  *re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 788

21  (N.D. Cal. 2019)); *see also Sierra Club v. EPA,* 699 F.3d 530, 533 (D.C. Cir. 2012).

22          Second, in enacting FOSTA, Congress conferred Article III standing for all

23  claims against those who participate in or benefit from a trafficking venture.  Congress

24  enacted FOSTA to expand civil liability, purposely reshaping the traceability analysis,

---

25  [43] Moreover, plaintiff alleges that the MindGeek Enterprise, including the Individual
26  Defendants, operated on behalf of and at the behest of, the Colbeck Capital and
    Bergmair Does.  The identity of these Doe Defendants is exclusively within the
27  knowledge of some or all of the defendants.  Thus, at a minimum, plaintiff is entitled
28  to jurisdictional discovery concerning the jurisdictional contacts of these defendants.

CASE NO. 21-CV-04920-CJC-ADS
PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

both in terms of who caused the injury and the definition of that injury.  "Congress has

the power to . . . articulate chains of causation that will give rise to a case or

controversy where none existed before."  *Massachusetts v. E.P.A.*, 549 U.S. 497, 516

(2007); *Robins v. Spokeo, Inc.*, 867 F. 3d 1108, 1113 (9th Cir. 2017).  Congress must

only "identify the injury it seeks to vindicate and relate the injury to the class of

persons entitled to bring suit."  *Massachusetts*, 549 U.S. at 516; *see Nat. Res. Def.*

*Council v. U.S. E.P.A.*, 542 F.3d 1235, 1248 (9th Cir. 2008) (holding that in enacting

the Clean Water Act, "Congress has expressed its view that developing [certain EPA

regulations] reduces the risk of the pollution causing the members' injury," thus

"support[ing] an inference that there is a causal connection between the lack of those

regulations and adverse environmental effects" sufficient to satisfy Article III's

traceability requirements.); *see also Californians for Alternatives to Toxics v.*

*Schneider Dock & Intermodal Facility, Inc.*, 374 F. Supp. 3d 897, 909–10 (N.D. Cal.

2019).  By enacting FOSTA, Congress recognized that companies and individuals that

knowingly benefit from a sex trafficking venture cause harm to sex trafficking

victims.  Congress extended sex trafficking liability beyond just the perpetrators

themselves, as it (i) recognized that sex trafficking plaintiffs will likely have difficulty

in recovering from offenders themselves and (ii) realized that the individuals and

businesses that benefit from sex trafficking, but who are not direct violators, may be in

the best position to prevent human trafficking.  154 Cong. Rec. S4795 at 4799 (daily

ed. May 22, 2008) (statement of Sen. Joe Biden) ("Today's reauthorization bill also

expands our ability to combat trafficking in the United States. . . . [W]e establish some

powerful new legal tools, including . . . punishing those who profit from trafficked

labor and ensuring restitution of forfeited assets to victims."); *See also* 18 U.S.C. §§

1591(a)(2), 1595.[44] Visa is one such corporation and must be held accountable.

---

[44] Visa's slippery-slope argument that future plaintiffs could sue Visa for purchase of
"guns, prescription drugs, tobacco, soda, furs, and myriad other products or services"

1    Finally, even without FOSTA, plaintiff has standing because her injuries are

2  "fairly traceable" to Visa.  The requirement of traceability "is relatively modest at [the

3  pleading] stage of the litigation."  *Bennett v. Spear*, 520 U.S. 154, 171 (1997);

4  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014)

5  ("Proximate causation is not a requirement of Article III standing, which requires only

6  that the plaintiff's injury be fairly traceable to the defendant's conduct.").[45] Article

7  III's traceability requirement does not necessitate that plaintiff "show to a scientific

8  certainty that defendant's [conduct] caused the precise harm suffered." *Nat. Res. Def.*

9  *Council v. Sw. Marine, Inc.*, 236 F.3d 985, 995 (9th Cir. 2000).

10   Indeed, "the United States Supreme Court has stated that Article III standing

11  does not require that the [d]efendant's actions be the last step in the chain of

12  causation."  *Ning Xianhua v. Oath Holdings, Inc.*, No. 20-CV-06185-LHK, 2021 WL

13  1700227, at *7 (N.D. Cal. Apr. 29, 2021) (citing *Bennett*, 520 U.S. at 168–69).  The

14  chain of causation may have "more than one link," provided the causal chain "is not

15  hypothetical or tenuous." *National Audubon Society v. Davis,* 307 F.3d 835, 849 (9th

16  Cir. 2002).  Thus, contrary to Visa's allegations, Visa's conduct need not be the sole

17  cause of plaintiff's injuries, nor the sole motivation for sex traffickers' to traffic

18  plaintiff on MindGeek's websites; instead it must only be "a substantial factor

19  motivating the third parties' actions."  *Mendia v. Garcia*, 768 F.3d 1009, 1013 (9th

20  Cir. 2014) (quoting *Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 308

21  (D.C. Cir. 2001) (internal quotation marks omitted).

22   Visa argues that there is no Article III standing because plaintiff's injuries

23  "depend *entirely* on the independent actions of parties other than Visa." (Visa Mot. 7.

24  

25  (Visa Mot. 8-9) ignores that such claims would require congress to confer standing
26  through statute which it has not done so at this time.

27  [45] Nevertheless, plaintiff has alleged proximate cause in connection with the claims
28  where it is required, *see* Facts, § B.5; Argument, § I.C, *supra*, thus conferring
statutory standing as well as Constitutional standing.

CASE NO. 21-CV-04920-CJC-ADS
PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1   (emphasis in original)).  But standing exists when the injury is produced by

2   determinative or coercive effect upon the action of someone else.  *Bennett*, 520 U.S. at

3   169; *see also Mendia*, 768 F.3d at 1011, 1013 (finding Article III standing where there

4   was a "causal chain with multiple links" but the actions of the third-party were not

5   entirely independent).

6          As set forth herein, Visa was not forced to participate in the trafficking venture

7   and was uniquely situated to stop the MindGeek Enterprise's criminal activities and

8   prevent plaintiff's injuries.  Instead, Visa affirmatively chose to aid in the venture by

9   processing subscriptions that allowed viewers to access or download videos of

10  plaintiff and other victims and encouraged continued patronage of the criminal

11  establishment by public statements falsely affirming that MindGeek's content was

12  lawful and legitimate, despite its knowledge otherwise.  (Facts, § C.5.)  Even after it

13  was directly informed of rampant sex trafficking on MindGeek's websites, Visa

14  continued to profit from its business relationship with MindGeek.  (*Id.*)  It did so,

15  despite the fact that its competitors publicly terminated their relationships with

16  defendants.  More egregiously, Visa publicly misrepresented that the content on

17  MindGeek tubesites was consensual and did not depict CSAM.  (*Id.*)  Visa's

18  participation in defendants' sex trafficking venture and enterprise was a substantial

19  factor in the harm caused to plaintiff because had Visa withdrawn from the venture,

20  MindGeek would likely have to have addressed its illegal practices, like it did when

21  Visa and Mastercard announced investigations in December 2020.  Instead, Visa's

22  processing of payments on MindGeek's platform had a determinative or coercive

23  effect because it allowed defendants to continue to perpetuate their wrongdoing and

24  provided means by which defendants could fund their activities.[46]  Visa attempts to

---

[46] The cases relied upon by Visa are inapposite, as in those cases, "[m]ost, if not all, of the individual links in the chain[s] . . . depend[ed] on some allegation that [could not] be easily described as true or false."  *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996); *see* Visa Mot. 8.  Here, by contrast, all events in the

evade responsibility for its role by claiming that "[p]laintiff's injuries would have occurred even if Visa did not exist" and that proof of this is that after Visa instructed banks to stop processing payments related to MindGeek, "illegal content depicting [p]laintiff nevertheless remained available." (Visa Mot. 8.)  What Visa knows and refuses to acknowledge is that its conduct directly contributed, enabled, and substantially motivated the defendants to accept, optimize, upload, and disseminate the sexually exploitative videos and images of plaintiff in the first place.  Had Visa not been motivated by greed, it would not have incentivized the conduct at issue and plaintiff's images, and thousands like them, would not have been uploaded and distributed to begin with.  This is especially so, where former employees have admitted that MindGeek operations were influenced directly by assessments of how major credit card companies might react to certain content and concern that "payments companies like Visa could cut off service." (Facts, § C.5)  Accordingly, because plaintiff has demonstrated that Visa provided merchant services to MindGeek, was aware of the trafficking and CSAM risk, and her injuries are fairly traceable to Visa's conduct, this Court must deny defendant's motion to dismiss.

## CONCLUSION

For the foregoing reasons, defendants' Motions should all be denied.

---

causal chain between Visa's conduct and plaintiff's injuries have occurred, and the connections between Visa's conduct and MindGeek's pornographic pay sites can be proven once the requisite information is made available to plaintiff in discovery.

In other cases relied upon by Visa, plaintiffs' injuries were caused by society as a whole, making it impossible for the court to reliably assess the connection between defendant's conduct and plaintiffs' injuries.  *See Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863 (N.D. Cal. 2009), *aff'd*, 696 F.3d 849 (9th Cir. 2012); *Kaing v. Pulte Homes, Inc.*, No. 09-5057 SC, 2010 WL 625365 (N.D. Cal. Feb. 18, 2010), *aff'd sub nom. Kaing v. Pultegroup, Inc.*, 464 F. App'x 630 (9th Cir. 2011); Visa Mot. 8.  Here, plaintiff's injuries were caused by a discrete group of actors—the MindGeek Defendants, plaintiff's sex traffickers, and Visa—not by society as a whole, and the Court can therefore assess Visa's responsibility for plaintiff's injuries.

1

2

3   DATED:  June 27, 2022          Respectfully submitted,

4                                  BROWN RUDNICK LLP

5

6                                  By:   */s/ Michael J. Bowe*

7                                        Michael J. Bowe (*pro hac vice*)
                                         Lauren Tabaksblat (*pro hac vice*)
8                                        Attorneys for Plaintiff
                                         SERENA FLEITES
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS