**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SERENA FLEITES, | ) Case No.: CV 21-04920-CJC(ADSx) |
| Plaintiff, | ) |
| v. | ) **ORDER GRANTING IN PART AND DENYING IN PART VISA'S MOTION TO DISMISS [Dkt. 138], DEMANDING A MORE DEFINITE STATEMENT WITH RESPECT TO PLAINTIFF'S CIVIL CONSPIRACY CLAIM, AND GRANTING THE INTERNATIONAL CENTER FOR LAW & ECONOMICS' MOTION TO FILE AN AMICUS BRIEF [Dkt. 145]** |
| MINDGEEK S.A.R.L., *ET AL*. | ) |
| Defendants. | ) |

## I.  INTRODUCTION

In this case, Plaintiff Serena Fleites brings numerous causes of action against Defendants MindGeek S.A.R.L., MG Freesites Ltd., MindGeek USA Inc., MG Premium Ltd., MG Global Entertainment Inc., 9219-1568 Quebec, Inc., Bernd Bergmair, Feras Antoon, Davis Tassillo, Corey Urman (collectively, the "MindGeek Defendants"), and

Visa, Inc., as well as certain doe defendants, referred to as the "Colbeck Capital Does" and the "Bergmair Does." (Dkt. 124-3 [First Amended Complaint, hereinafter "FAC"].) Against Visa, Plaintiff raises causes of action under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), California's Unfair Competition Law ("UCL") and False Advertisement Law ("FAL"), and common law civil conspiracy. (*Id.*) Now before the Court is Visa's motion to dismiss. (Dkt. 138 [Motion], Dkt. 138-1 [Memorandum, hereafter "Mem."].) For the following reasons, the motion is **GRANTED IN PART AND DENIED IN PART**.[1] The Court also **GRANTS** the International Center for Law & Economics' ("ICLE") motion to file an amicus brief, which the Court finds unpersuasive for the reasons discussed below.

## II.   BACKGROUND

### A.   Plaintiff's Allegations

In 2014, Plaintiff was thirteen years old. (FAC ¶ 258.) At that time, a sexually explicit video featuring Plaintiff titled "13-Year Old Brunette Shows Off For the Camera" was available on Pornhub.com, a pornography website owned and operated by MindGeek.[2] (*Id.*) Plaintiff's then-boyfriend pressured her into making the video and posted it without her knowledge or consent. (*Id.*) MindGeek also took the video and posted it to its other pornography websites. (*Id.* ¶ 259.) The video garnered 400,000 views by the time Plaintiff discovered it. (*Id.* ¶ 260.) MindGeek earned revenue from advertisements that appeared alongside the video. (*Id.*)

---

[1] Having read and considered the papers presented by the parties, the Court finds these matters appropriate for disposition without a hearing. *See* Fed. R. Civ. P. 78; Local Rule 7-15. Accordingly, the hearing set for August 8, 2022 at 1:30 p.m. is hereby vacated and off calendar.

[2] As the Court makes clear in a companion order, (Dkt. 167), there is a dispute as to whether the various MindGeek business entities operated as a single unit or shared an alter ego relationship. But for the purposes of this order, the Court refers to those business entities simply as "MindGeek."

Impersonating her mother, Plaintiff contacted MindGeek to inform it that the video qualified as child pornography.  (*Id*. ¶ 261.)  MindGeek seems to have acknowledged as much, but took a few weeks to remove the video.  (*Id*.)  In this internet age, a week might as well be an eternity because content constantly and instantaneously proliferates and disseminates.  The video was downloaded by users and reuploaded several times, and Plaintiff regularly received messages from strangers containing hyperlinks to the video in the years following the original posting.  (*Id*. ¶ 262.)  One of the reuploads had 2.7 million views.  (*Id*.)  MindGeek earned advertisement revenue from the reuploads and posted the reuploads to its other pornographic websites as well.  (*Id*.)  When videos were reposted, Plaintiff would tell MindGeek to remove the videos, but MindGeek would ask Plaintiff "to provide photographic proof that she was the child depicted in the video before removing [the videos]."  (*Id*. ¶ 263.)  Assuming Plaintiff's allegations are true, the Court is at a loss to understand why such photographic proof was necessary.

Plaintiff's life spiraled out of control.  She was harassed and bullied in school to such a degree that she started skipping school and finally unenrolled to attend courses online.  (*Id*. ¶ 265.)  Plaintiff did not tell her mother about the video, and so her relationship with her mother became strained, as her mother did not know why her daughter had suddenly begun to skip classes.  (*Id*.)  This led to Plaintiff leaving her mother's home to move in with her sister.  (*Id*.)  A year later, she moved back in with her mother, whereafter she attempted to hang herself, only to be stopped by her younger sister and her mother's boyfriend "who removed the power cord from her neck."  (*Id*. ¶ 266.)  She would attempt suicide several times in the ensuing years.  (*Id*. ¶ 270.)  Plaintiff did not want to face her family after the first suicide attempt, and so she moved in with a friend.  (*Id*. ¶ 267.)  At her friend's house, an older man introduced Plaintiff to heroin.  (*Id*.)  Plaintiff became addicted.  (*Id*.)  To fund her heroin addiction, Plaintiff—still a minor at this point—created sexually explicit videos at the older man's behest, who in turn sold the videos on Craigslist.  (*Id*.)  Some of the videos were uploaded to Pornhub

and were still available on the website as recently as June 2020.  (*Id*. ¶ 268.)  MindGeek uploaded these videos to its other pornographic websites and earned ad revenue from the videos.  (*Id*.)  While MindGeek profited from the child porn featuring Plaintiff, Plaintiff was intermittently homeless or living in her car, addicted to heroin, depressed and suicidal, and without the support of her family.  (*Id*. ¶ 270.)

## B.  MindGeek's Business Practices and Business Model

MindGeek operates several free pornographic websites, including Pornhub, as well as other paid porn sites.  (*Id*. ¶ 60.)  MindGeek makes money from its free sites in multiple ways: by advertising its paid sites or its products on the free sites, by selling ad space on the free sites for the services or products of third parties, and by harvesting and selling the data of persons who use the free sites.  (*Id*.)  MindGeek sells ad space through "TrafficJunky," its advertising platform.  (*Id*. ¶ 62.)  Ad revenue earned through TrafficJunky accounts for over 50% of MindGeek's revenue.  (*Id*.)  To reach their intended audience, advertisers can build campaigns around keywords like "13yearoldteen" and "not18"; indeed, they can even target ads to people searching the term "child rape" in Japanese.  (*Id*. ¶¶ 121-123.)  Like a billboard on Interstate 5 is more expensive in Los Angeles than the Grapevine, the price to advertise on MindGeek's sites corresponds with the traffic on those sites: the higher the traffic, the pricier the ad space.  (*Id*. ¶ 62.)  Thus, MindGeek is incentivized to drive traffic.  (*Id*.)

Disturbingly, child porn drives web traffic.  In 2020, the National Center for Missing and Exploited Children ("NCMEC") produced a report describing the "insatiable demand" for child porn, with 8.4 million such videos posted online in 2018.  (*Id*. ¶ 170.)  Despite the fact that MindGeek operates porn sites that allow third parties to upload content, which any competent and scrupulous businessperson would understand incurs the substantial risk that child porn will be uploaded to the sites, MindGeek maintained

what Plaintiff describes as an "unpoliced platform." (*Id*. ¶ 183.) MindGeek employed a barebones team of "as few as 6 but never more than about 30 untrained, minimum wage contractors" to monitor the millions of daily uploads. (*Id*. ¶ 186.) This team was clearly understaffed, but also perversely incentivized: they were offered pay bonuses that depended on the number of videos they *approved* for upload. (*Id*. ¶ 187.) Such an incentive structure suggests that content moderation was not the goal.

To exacerbate its failure to police its flagship site Pornhub, MindGeek also spread content around, taking Pornhub videos and uploading them to its various other porn websites. (*Id*. ¶ 194.) Ensuring a hopeless whack-a-mole situation for victims, like Plaintiff, MindGeek also allowed users to download and then reupload videos. (*Id*. ¶ 210.) Most disturbing of all, Plaintiff alleges that MindGeek itself would reupload illegal videos that it had been forced to disable using made-up accounts that masked the true identity of the uploader. (*Id*. ¶ 208.) Plaintiff alleges "MindGeek has repeatedly stated publicly that it kept every video ever uploaded on its servers even when they were disabled from its sites." (*Id*. ¶ 125.) That would mean that MindGeek keeps a cache of child porn for future re-uploading. (*Id*. ¶ 209.)

Part of the fight to drive traffic happens on Google or other search engines. (*Id*. ¶ 167.) Simply put, MindGeek wants its sites to be the top result when people search for porn. (*Id*. ¶ 165.) To that end, the above-described team of monitors—who had insufficient time for their first job, monitoring—took on a second job, formatting. (*Id*. ¶ 188.) In that role, these contractors edited "the title, tags, and descriptions" of a video or sometimes the video itself. (*Id*.) They also created thumbnails—or still shots of the videos—that are meant to attract users to the videos. (*Id*. ¶ 120.) Plaintiff alleges that MindGeek has maintained that every video on its sites goes through this "formatting" process. (*Id*. ¶ 117.) It seems that MindGeek often used this formatting process to dog-whistle to persons on the hunt for child porn. For example, they could tag a video with

"barely legal teen sex" so that the video appears on a Google search (or on a search on the porn site itself) for "teen sex." (*Id*. ¶ 199.) Through this tagging system, child porn was easy to find on MindGeek's sites for anyone who cared to look. (*Id*. ¶¶ 199-201.)

Plaintiff alleges that MindGeek's sites contain a trove of obvious and easily accessible child porn. Plaintiff alleges that "in just a few clicks, in just a few minutes, users (and investigators and journalists) could find seemingly unlimited pages and videos depicting . . . child sexual assault or exploitation." (*Id*. ¶ 217.) Titles, descriptions, and tags bluntly described the illicit nature of the videos. (*Id*. ¶¶ 218-19.) And many videos contained clearly underage girls. (*Id*. ¶ 219.) Oftentimes users would leave comments in the videos' "comment section" on how flagrantly illegal the videos were. (*Id*. ¶¶ 223-24, 230.) Plaintiff serves as a prime example: the title of her video quite literally (and accurately) stated that she was 13 years old.

Sometimes, victims like Plaintiff would do MindGeek's policing for it. But these victims were often met with delay or stonewalling. (*Id*. ¶¶ 203-204.) The delay would permit MindGeek to continue analyzing a well performing, albeit illegal, video so that MindGeek could refine its algorithms to push similar content. (*Id*. ¶ 203.) When MindGeek removed a video, it would keep the video's webpage with its title, description, tags, and comments. (*Id*. ¶ 205.) That way, when a user attempted to find a since-removed video on Google, Pornhub would still come up, and when a user clicked the link, they would be taken to a landing page which contained suggestions for similar videos. (*Id*.) As Plaintiff explains "one can run internet searches for known [Child Sexual Abuse Material]/child pornography or other nonconsensual content that was ordered taken down by NCMEC or otherwise and the search will bring you to Pornhub even though that video is not enable [*sic*]. MindGeek's algorithm will then direct you to similar nondisabled content." (*Id*. ¶ 207.) Plaintiff alleges a harrowing example in which a video of a toddler and a video of a prepubescent girl being sexually abused were

removed, but their "title, tags, views, and url" were kept "live to continue driving traffic to the site." (*Id*. ¶ 214.)

MindGeek often went well beyond evasion and delay when interacting with victims. Plaintiff alleges that MindGeek worked to silence and intimidate victims and advocates, efforts which "were directly led by MindGeek vice president Corey Urman, who closely controls and often personally participates in [MindGeek's] public messaging." (*Id*. ¶ 311.) Part of this effort involves Urman using false identities to speak on MindGeek's behalf. (*Id*. ¶ 312.) For example, after an activist by the name of Laila Mickelwait published an op-ed in the Washington Times describing child porn on Pornhub, Urman allegedly wrote an email to the media under the name "Blake White," wherein he insinuated that Mickelwait was a member of an anti-LGBTQ, anti-women group. (*Id*. ¶ 323.) Plaintiff alleges that over the next year, MindGeek would continuously accuse Mickelwait of lying and using her claims to enrich herself. (*Id*. ¶ 328.) Under the same pseudonym, Urman allegedly represented to Insider.com in January 2020 that Pornhub immediately removes illegal content when notified, which Plaintiff knows to be false from personal experience. (*Id*. ¶ 325.) Plaintiff also alleges that Urman commissioned an "operative" who wrote online under the pseudonym "EyeDeco" who would harass and intimidate activists and victims and release their personal information. (*Id*. ¶ 330.) "EyeDeco" allegedly received this personal information from Urman. (*Id*. ¶ 332-33.) Urman allegedly directed this operative to attack Plaintiff online, stating in a social media post "Serena seems like she knows and has known for quite some time exactly what she is doing aka #grifting." (*Id*. ¶ 344.)

## C.    Visa's Involvement

Plaintiff alleges that "Visa recognized MindGeek as an authorized merchant and processed payments to its websites including but not limited to Pornhub[.]" (*Id*. ¶ 36.)

1  Plaintiff alleges that Visa knew MindGeek's sites contained a substantial amount of child
2  porn and that MindGeek failed to police its sites for such content.  (*Id*. ¶¶ 278-283.)
3  Plaintiff alleges that nonetheless, "Visa and its agent banks explicitly agreed with
4  MindGeek to continue to process transactions without restrictions on all MindGeek sites
5  provided MindGeek maintained pretextual window dressing claims that it had
6  technology, processes, and policies in place to prevent such content[.]"  (*Id*. ¶ 284.)
7  Elsewhere, Plaintiff alleges that Visa was "aware of MindGeek's trafficking venture and
8  explicitly agreed with MindGeek to process the financial transactions from which the
9  defendants profited from the venture."  (*Id*. ¶ 276.)

10

11      Plaintiff alleges that Visa obtained knowledge of MindGeek's child porn problem
12  from various sources.  First, Plaintiff alleges that Visa performed reviews of MindGeek's
13  sites pursuant to its own "due diligence and compliance functions."  (*See, e.g.*, *id*. ¶ 278.)
14  Plaintiff alleges that Visa was further put on notice from its "discussions and negotiations
15  about these issues with MindGeek itself."  (*Id*. ¶ 283.)  Further, in November 2019,
16  Visa's competitor PayPal terminated its relationship with MindGeek, issuing a public
17  statement that "[PayPal] explicitly prohibits the use of [its] services for the sale of
18  materials that depict criminal behavior[.]"  (*Id*. ¶ 286.)  Visa also landed on a list
19  maintained by anti-trafficking advocates for processing payments for "pornography
20  websites, including those hosting content fetishizing minors[.]"  (*Id*. ¶ 288.)  Visa
21  responded with a statement that it only permits transactions for the purchase or sale of
22  lawful products or services.  (*Id*. ¶ 289.)  Anti-sex trafficking advocates also sent various
23  letters and emails to Visa detailing MindGeek's child trafficking venture.  (*Id*. ¶¶ 291-
24  95.)  Visa responded: "Maintaining a neutral stance under the law is vital for the free
25  flow of commerce."  (*Id*. ¶ 297.)

26

27      It was not until December 2020 when the New York Times published a report
28  titled "The Children of Pornhub"—wherein the author explained MindGeek's child porn

problem—that Visa took temporary action, at which point Visa suspended business with MindGeek pending 'investigations' into the allegations in the New York Times article. (*Id*. ¶ 274.)  In response to the suspension, "MindGeek took down over 10 million unverified videos from its [sites], constituting over 80% of its content[.]"  (*Id*. ¶ 274.) Ultimately, however, Visa "restored services for MindGeek's paid premium sites and for advertising on all its sites."  (*Id*.)

## III.   DISCUSSION

### A.   Standing

Visa argues that Plaintiff lacks Article III standing.  (Mem.)  Plaintiff has the burden of establishing that she has Article III standing with respect to Visa.  *See WildEarth Guardians v. U.S. Dep't of Agriculture*, 795 F.3d 1148, 1154 (9th Cir. 2015). To establish standing, Plaintiff must show that she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

Visa's argument centers on traceability.  Visa argues that Plaintiff's injuries "depend *entirely* on the independent actions of parties other than Visa."  (Mem. at 7 [emphasis in original].)  Visa explains "Plaintiff alleges that her injury stems from third parties who took videos and uploaded them to MindGeek sites, from MindGeek's maintenance of sites on which the videos could be uploaded, and from MindGeek's lack of monitoring of its sites and failure to remove the videos."  (*Id*. at 6-7.)  Visa insists that the involvement of "*numerous* third parties whose independent decisions collectively ha[d] a significant effect on [P]laintiffs' injuries" in this case forecloses a finding that

Plaintiff has standing to sue Visa.  (*Id*. at 7 [*quoting Maya v. Centex Corp.*, 658 F.3d
1060 (9th Cir. 2011)] [emphasis in original].)

Visa attempts to separate itself from Plaintiff's injuries by interposing Plaintiff's
traffickers—like Plaintiff's ex-boyfriend and the unnamed older man—between itself and
the harms Plaintiff suffered.[3]  In the words of 18 U.S.C. section 1591, Plaintiff's
traffickers "entice[d]" or "solicit[ed]" Plaintiff—then a minor—to engage in commercial
sex acts, thereby violating section 1591(a)(1).  If Plaintiff were suing just those men and
Visa, and not MindGeek, and attempting to proceed on a theory that those men
"entice[d]" or "solicit[ed]" her to engage in a sex act on camera because they knew Visa
would permit MindGeek to monetize the resulting videos, the Court might understand
Visa's position.  After all, Plaintiff does not allege that her ex-boyfriend and the unnamed
older man were motivated by a desire to earn profit on Pornhub or any of MindGeek's
other websites.[4]  Instead, Plaintiff's case focuses on the monetization of child porn after it
was made and posted to MindGeek's sites, which, if what Plaintiff alleges is true, Visa
knowingly took part in.  Plaintiff is suing MindGeek for—again in the words of section
1591—"benefit[ting] financially" from the child porn featuring Plaintiff, knowing or in
reckless disregard of the fact that Plaintiff was a minor when such videos were produced,
in violation of section 1591(a)(2).  That is where Visa enters the picture in full view,
unobscured by the third parties that it attempts to place between itself and Plaintiff.  The

---

[3] In its memorandum, Visa also explains that it sits atop Acquirers and Issuers, who in turn directly deal
with merchants (like MindGeek) and consumers.  (Mem. at 2-3.)  Visa, however, submits no declaration
to support this assertion.  Instead, Visa relies on an explanation of the structure of their network from a
Second Circuit case and California Court of Appeal case.  Visa is permitted to introduce facts beyond
the record on a Rule 12(b)(1) motion.  *See Golo, LLC v. Goli Nutrition Inc.*, 2021 WL 3360134, at *3
(C.D. Cal. July 30, 2021).  But Visa cannot simply borrow the record of another case—or another
court's explanation of the record of a separate case—in lieu of introducing facts into the record of this
case.  At any rate, Plaintiff's allegations with respect to Visa's ultimate control over whether or not
MindGeek is recognized as a merchant bely Visa's apparent argument that other entities make such a
determination.

[4] The unnamed older man did seem to have a profit motive, but he sought to earn such profit through
channels other than MindGeek's websites, such as Craigslist.  (*See* FAC ¶ 267.)

emotional trauma that Plaintiff suffered flows directly from MindGeek's monetization of her videos and the steps that MindGeek took to maximize that monetization.  If not for its drive to maximize profit, why would MindGeek allow Plaintiff's first video to be posted despite its title clearly indicating Plaintiff was well below 18 years old?  Why would MindGeek stall before removing the video, which Plaintiff alleges had advertisements running alongside it?  Why would MindGeek take the video and upload it to its other porn websites?  Why, after being alerted by Plaintiff that the video was child porn, would it allow the video to be reuploaded, whereafter advertisements were again featured alongside the reuploaded videos?   And why did Plaintiff have to fight for years to have her videos removed from MindGeek's sites?  Plaintiff claims that MindGeek did these things for money, and Visa knowingly offered up its payment network so that MindGeek could satisfy that goal.

Visa urges that it has no involvement in the maintenance of MindGeek's websites. Visa would argue that the decisions made in the list of rhetorical questions above were made by MindGeek without input from Visa and within MindGeek's sole and direct control.  But that again ignores Plaintiff's allegations of the nature of Visa's wrongdoing. Plaintiff alleges that Visa pushed the first domino when it continued to recognize MindGeek as a merchant with knowledge of its illicit nature.  With that decision—which Visa and Visa alone controlled—in place, the means to profit from child porn was ensured, and MindGeek filled in the gaps to seize the opportunity, promulgating the profit-maximizing policies and practices described above that so damaged Plaintiff's life. Visa lent to MindGeek a much-needed tool—its payment network—with the alleged knowledge that there was a wealth of monetized child porn on MindGeek's websites. (*See* Section II.C., *supra*.)  If Visa was aware that there was a substantial amount of child porn on MindGeek's sites, which the Court must accept as true at this stage of the proceedings, then it was aware that it was processing the monetization of child porn, moving money from advertisers to MindGeek for advertisements playing alongside child

porn like Plaintiff's videos.  And so, after opening the door, Visa was there at the end of the line, too, performing the final act necessary to establish Plaintiff's section 1591(a)(2) claim against MindGeek: the movement of money.[5]

Visa is also alleged to have far more control over MindGeek than Visa's motion would suggest.  Plaintiff alleges that after the New York Times ran its article exposing MindGeek's child porn problem, Visa suspended MindGeek's merchant privileges, which led MindGeek to remove 10 million of its videos, or a staggering 80% of its content.  (FAC ¶ 274.)  Visa never mentions this allegation in its motion, going so far as arguing "Plaintiff's claims against Visa are all based on an unsupported assumption that Visa could force MindGeek to operate differently."[6]  (Mem. at 8.)  But Visa quite literally did force MindGeek to operate differently, and markedly so, at least for a time.  And the astonishingly strong response from MindGeek—who is otherwise alleged to stonewall and even harass victims—is consistent with Plaintiff's allegations that unnamed former MindGeek employees have explained that MindGeek constantly worries that Visa could cut it off and makes decisions based on what content the "major credit card companies are willing to work with."  (*Id*. ¶ 273.)  So yes, Visa might not be directly involved in MindGeek's day-to-day operations, as Visa does not control precisely how MindGeek goes about satisfying its drive for profit.  And MindGeek might be happy to profit from just about any type of content if there exists a market of users demanding

---

[5] Visa tries to make something of the fact that Pornhub is a free website, and that Plaintiff never alleges that her videos were behind any paywalls.  That account is mostly consistent with the FAC, though there is some confusion as to whether Plaintiff's videos were behind any paywall.  But Visa ignores that Plaintiff alleges that advertisements were placed alongside her videos and that Visa, even to this day, processes advertising payments on all MindGeek websites.  (FAC ¶ 274.)

[6] In its reply, Visa argues that Plaintiff speculates that "if Visa had discontinued payment processing for the MindGeek sites, MindGeek in reaction might have done more to police its website more closely, which might then have led to the identification and removal of videos depicting Plaintiff[.]"  (Dkt. 159 at 3.)  As the Court echoes throughout this order, Plaintiff is not engaging in far-fetched speculation.  MindGeek allegedly *did* remove 80% of its videos in response to Visa's temporary suspension of processing payments for the company.  Discovery will tell whether some of Plaintiff's videos were removed, but there is a non-fanciful chance that hers were amongst the 80%.

such content.  But the FAC supports an inference that Visa draws the informal boundaries of what types of content are fair game for profit, or fair game for its payment network, the mechanism through which MindGeek earns profit.  When MindGeek crosses the line, or at least when MindGeek is very publicly admonished for crossing the line, Visa cracks the whip and MindGeek responds vigorously.[7]  Yet, here is Visa, standing at and controlling the valve, insisting that it cannot be blamed for the water spill because someone else is wielding the hose.[8]

This is not a case in which the "independent decisions" of "numerous third parties" separate Visa from Plaintiff, to borrow Visa's words.  (*See* Mem. at 7.)  It is simple: Visa made the decision to continue to recognize MindGeek as a merchant, despite its alleged knowledge that MindGeek monetized child porn, MindGeek made the decision to continue monetizing child porn, and there are enough facts pled to suggest that the latter decision depended on the former, at least judging from the fallout from the New York Times piece.  The cases to which Visa cites are inapposite.  In those cases, various plaintiffs sought to pin intractable and complicated social, economic, or political problems on one or a few actors despite the existence of multiple, independent actors who could also be blamed for the plaintiffs' harms.  For example, Visa cites *Boschma v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 2018 WL 2251629 (C.D. Cal. May

---

[7] The Court questions whether *Novak v. U.S.*, cited in Visa's reply, is an apposite case, given that it announces a rule of standing in cases wherein a plaintiff alleges an injury caused by the government's regulation (or lack thereof) of a third party.  795 F.3d 1012 (9th Cir. 2015).  Even if the case is on point, for the reasons mentioned above, Plaintiff has plausibly alleged that Visa's conduct of recognizing MindGeek as a merchant was "at least a substantial factor motivating [MindGeek's] actions."  *Id.* at 1019 (internal citations and quotations removed).

[8] Visa tries to argue that even after it suspended MindGeek, and even after MindGeek removed 80% of its content, Plaintiff alleges that her content remained on Pornhub.  Visa gets the timeline wrong.  Plaintiff alleges that some of her videos were still on Pornhub as late as June 2020.  (*Id.* ¶ 268.)  The New York Times article and Visa's response did not come until December 2020.  (*Id.* ¶ 298.)  But even if Plaintiff's videos were still on Pornhub after Visa suspended MindGeek, that would not upset Plaintiff's theory of standing, because a temporary suspension is just that: temporary.  Visa is alleged to have resumed processing advertisement transactions for all MindGeek's sites after the suspension.  (*Id.* ¶ 274.)

16, 2018), wherein the court held that the Department of Justice and the Bureau of
Alcohol, Tobacco, Firearms, and Explosives could not be sued on the theory that their
inaction causes gun violence, citing a "casual chain" that "includes numerous third
parties, most significantly, the individuals who commit acts of gun violence." *Id*. at *3.
In *Snake River Farmers' Ass'n, Inc. v. Dep't of Lab.*, 9 F.3d 792 (9th Cir. 1993), certain
farmers sued the Department of Labor on a theory that farm wages they had set in a
certain area for a certain kind of farm work might depress the wages paid in another area
for the same type of work, but the court found that theory too speculative to support
Article III standing.  And in *Kaing v. Pulte Homes, Inc.*, 2010 WL 625365 (N.D. Cal.
Feb. 18, 2010), *aff'd sub nom. Kaing v. Pultegroup, Inc.*, 464 F. App'x 630 (9th Cir.
2011), the plaintiff attempted to hold a certain lender responsible for the decrease in her
home's value on the theory that the lender's practices caused foreclosures in her
neighborhood, but the court explained that the plaintiff's standing "theory…depends
upon a chain of causation that is dependent upon many factors, such as unemployment,
health problems, a general weakening economy, or other financial conditions, the
decisions of various homeowners to foreclose rather than refinance, as well as other
economic factors that can have unpredictable effects on the housing market."

    The sexual exploitation of minors is an intractable, complicated social problem
involving countless independent bad actors.  But Plaintiff does not seek to pin society's
problem with the sexual exploitation of minors on Visa, she seeks to hold Visa
accountable for a much narrower problem: MindGeek's monetization of the sexual
exploitation of children.  Properly framed, the problem at issue becomes less nebulous
and involves far fewer actors.  That is especially true when one keeps in mind what
MindGeek is being sued for in this case: knowingly monetizing (or financially benefitting
from) child porn.  Again, Visa is not being sued on a theory that Visa encourages the
production of child porn by allowing MindGeek to monetize it.  Such a theory would not
fit the facts of this case, because, as mentioned above, Plaintiff's traffickers are not

alleged to have had in mind profiting from Plaintiff's videos through MindGeek's monetization and profit-sharing system.  Visa is being sued instead for knowingly providing the means through which MindGeek monetizes child porn once such content is already produced and posted.  And unlike the cases to which Visa cites wherein the courts would have had to speculate with respect to how the actions of the defendants would affect numerous other independent actors lending to a societal problem, the Court need not speculate as to how Visa's actions affect the way that MindGeek approaches child porn.  It bears repeating that after the New York Times published an article specifically addressing child porn on Pornhub, Visa suspended MindGeek's merchant privileges, and MindGeek responded by removing 80% of its content.  Plaintiff never explicitly describes the nature of the content that MindGeek removed.  But given the subject matter of the New York Times article and given that Visa was clear that its decision to suspend MindGeek was in response to the article, it is reasonable to infer that much of the removed content was child porn or suspected child porn.  When the Court couples MindGeek's expansive content removal with allegations that former MindGeek employees have reported a general anxiety at the company that Visa might pull the plug, it does not strike the Court as fatally speculative to say that Visa—with knowledge of what was being monetized and authority to withhold the means of monetization—bears direct responsibility (along with MindGeek) for MindGeek's monetization of child porn, and in turn the monetization of Plaintiff's videos.

In an argument reminiscent of the "too big to fail" refrain from the financial industry in the 2008 financial crisis, Visa argues that "[i]f accepted, Plaintiff's theory would upend the financial and payment industries."  (Mem. at 9.)  The Court does not see this decision as the drastic tectonic shift that Visa fears.  But the Court will make the gist of its holding clear, to assuage any such fear: Visa is being kept in this case because it is alleged to have continued to recognize as a merchant an immense, well known, and highly visible business that it knew used its websites to host and monetize child porn.

Moreover, Visa alegedly had considerable sway over that business's decision-making, a conclusion amply supported by the allegation that MindGeek removed 80% of its content when Visa suspended its business with MindGeek.  Visa is not being asked to police "the billions of individual transactions it processes each year."  (Mem. at 9.)  It is simply being asked to refrain from offering the tool with which a known alleged criminal entity performs its crimes.  That is not a tall order and does not spell out an existential threat to the financial industry.

### B.   Failure to State a Claim

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a plaintiff's claims.  The issue on a motion to dismiss for failure to state a claim is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support the claims asserted.  *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997).  Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2); *see Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1176 (9th Cir. 2021).  When evaluating a Rule 12(b)(6) motion, the district court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party.  *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1014 (9th Cir. 2012).  To survive a motion to dismiss, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A complaint must contain well-pleaded factual allegations, not legal conclusions, that "plausibly give rise to an entitlement to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  In keeping with this liberal pleading standard, the district court should grant the plaintiff leave to amend if the complaint can possibly be cured by additional factual allegations.  *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

### 1.   TVPRA

While Plaintiff's FAC was not abundantly clear on what theories of TVPRA liability she is raising against MindGeek and Visa, her opposition to Defendants' various motions to dismiss clarifies her theories.  (Dkt. 151 [Opposition, hereafter "Opp."].)  Plaintiff claims that MindGeek is a beneficiary of a trafficking venture under 18 U.S.C. section 1591(a)(2), (Opp. at 28-39), and a direct sex trafficker under section 1591(a)(1), (Opp. at 39-40), and that Visa is a beneficiary of a trafficking venture under section 1591(a)(2), (Opp. at 41-44), and that Visa conspired to violate section 1591 pursuant to section 1594(c), (Opp. at 44-45).  Plaintiff has failed to state a beneficiary liability claim against Visa pursuant to section 1591(a)(2), but she has stated a conspiracy claim against Visa pursuant to section 1594(c) on a theory that Visa conspired with MindGeek to violate section 1591(a)(2).  The Court begins with an analysis of Plaintiff's section 1591 claims against MindGeek, as such claims can be imputed to Visa as an alleged co-conspirator.[9]

### a) MindGeek's TVPRA Violation

18 U.S.C. section 1595 provides a private right of action to victims of violations of 18 U.S.C. ch. 77, which contains section 1591.  18 U.S.C. § 1595(a).  Section 1591 criminalizes two categories of actors involved in a sex trafficking venture: direct traffickers and those who benefit financially from the venture.  Section 1591(a)(1), the direct trafficker portion of the statute, punishes whoever knowingly "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person" knowing that "the person has not attained the age of 18 years and will be

---

[9] The Court recognizes that the MindGeek Defendants' motions are not before it, (*see* Dkt. 167), and the Court does not intend for its analysis in this order to serve as a ruling on the MindGeek Defendants' motions to dismiss.  Still, this order should be a highly relevant signal to the MindGeek Defendants as to how the Court views many of their attacks and challenges to Plaintiff's complaint.

caused to engage in a commercial sex act." *Id*. § 1591(a)(1).  Plaintiff argues that MindGeek bears direct trafficker liability because the company "advertised" her in the sense that term is used in section 1591(a)(1).  Plaintiff's argument is based on a few sentences of dicta from *Doe v. Twitter, Inc.*, 555 F.Supp.3d 889 (N.D. Cal. 2021).  In that case, two individuals sued Twitter when sexually explicit videos of those individuals as minors were posted on Twitter.com after they had sent the videos to a third-party.  *Id*. at 893-894.  The boys did not allege that Twitter advertised them, but the court, in *dicta*, explained that their case might have supported an advertisement claim, stating that videos posted to Twitter could conceivably advertise a person.  *Id*. at 915.  The Court does not disagree: a video can certainly advertise a person.  However, the term "advertise" must be read with the remainder of section 1591(a).  It is a crime to advertise a person knowing that the person is not 18 years old and will be caused to engage in a commercial sex act. 18 U.S.C. § 1591(a).  The Court understands the statute to criminalize the advertisement of minors when that advertisement aims to lead to a sex act.  Twitter's and MindGeek's websites could certainly be used to effectuate advertisement of a minor that leads to further sex acts.  For example, if a trafficker posts a video of a minor engaged in a sex act to an online platform like Pornhub and makes known—through the title, tags, or comments on the video, for example—that the minor is available for future sex acts to those interested, depending on how the owner of the online platform interacts with the advertisement and video, the platform owner might bear direct trafficker liability for such advertisement under section 1591(a)(1).  But Plaintiff does not allege that her videos were posted in the form of an advertisement to users that she might be available for future sex acts.  In this case, the direct traffickers include Plaintiff's ex-boyfriend and the unnamed older man.  In the words of section 1591(a)(1), these men both solicited or enticed Plaintiff to commit a sex act knowing she was underage.

Plaintiff has, however, comfortably stated a claim under section 1591(a)(2) against MindGeek.  As the Court thoroughly explained in *Doe v. MindGeek USA Incorporated*,

-18-

558 F.Supp.3d 828 (C.D. Cal. 2021), for a civil plaintiff proceeding under section 1595 to state a beneficiary liability claim pursuant to section 1591(a)(2), the plaintiff must allege that (1) the defendant knowingly participated in a sex trafficking venture, (2) knowingly received a benefit from its participation, and (3) knew or should have known that the plaintiff was a victim of sex trafficking.[10]  *Id*. at 837.

As in *Doe*, Plaintiff has adequately pled that MindGeek knowingly participated in a sex trafficking venture with Plaintiff's primary traffickers.  *See id*. at 838.  The title of the first video featuring Plaintiff was "13-Year Old Brunette Shows Off For The Camera."  (FAC ¶ 258.)  If that was not enough of a red flag, Plaintiff alleges that her age was obvious from the video itself.  (*Id*.)  And yet, after review, MindGeek allowed the video to be posted to Pornhub.  (*Id*.)  MindGeek went further than passively allowing the video to be posted, it also "categorized, tagged, [and] optimized the video for user preferences," placed the video in playlists, posted the video to its other porn websites, and placed advertisements alongside the video.  (*Id*. ¶¶ 259-60.)  Plaintiff contacted MindGeek and explicitly informed them that the video was child porn, whereafter the video remained on Pornhub for two weeks and continued to gain views.  (*Id*. ¶ 261.)  But the problem did not end there, because many users downloaded and then reuploaded the video to Pornhub (it is even possible that MindGeek itself reuploaded the video after it was removed),[11] and the process would start over: MindGeek allowed the video to be posted, monetized the video, spread it to its other sites, and delayed in removing the

---

[10] The Court notes that the sex acts in this case were commercial in nature.  In *Doe v. MindGeek USA Incorporated*, 558 F.Supp.3d 828 (C.D. Cal. 2021), this Court recognized the theory that the commercial nature of the sex act could be latent.  *Id*. at 840.  Plaintiff does not allege that her ex-boyfriend monetized Plaintiff's first video or made the video with any hope of earning profit from it.  But MindGeek did monetize the first video by placing advertisements alongside it, thereby commercializing Plaintiff's sex act with her ex-boyfriend.  Latent commercialization is not at issue with the second set of videos: those videos were expressly made for sale.

[11] As this Court explained in *Doe*, at the pleading stage, the Court can reasonably infer that MindGeek interacted with Plaintiff's videos in a manner consistent with Plaintiff's allegations as to how MindGeek interacted with child porn generally.  558 F.Supp.3d at 842, n.6.  Plaintiff alleges that MindGeek has a practice of reuploading videos that it has been forced to remove.  (FAC ¶ 208.)

video after Plaintiff's complaints.  (*Id*. ¶ 262-63.)  As for the latter series of sexually explicit videos that Plaintiff made as a minor to fund her depression-induced heroin addiction, MindGeek interacted with those videos in much the same way.  (*Id*. ¶ 268.) Some of these videos were still on Pornhub as late as June 2020.  (*Id*.)  By allowing the videos to be posted, formatting the videos, propagating the videos, and monetizing the videos over the course of several years, MindGeek developed a continuous business relationship with Plaintiff's primary traffickers.  *See Doe*, 558 F.Supp.3d at 837.

The second prong—knowing receipt of a financial benefit from participation in a sex trafficking venture—is easily met.  MindGeek monetized Plaintiff's videos by placing advertisements alongside those videos.  (FAC ¶¶ 260, 262, 268.)  And the third prong—MindGeek's actual or constructive knowledge that Plaintiff was the victim of sex trafficking—is also easily met.  Plaintiff quite literally told MindGeek herself that she was a minor in her videos, thereby expressly alerting them that she was the victim of sex trafficking, and yet the videos remained on MindGeek's sites—in their reuploaded form—for several years, each earning MindGeek ad revenue.[12]  (*Id*. ¶¶ 261-263.)

\\
\\
\\
\\
\\
\\
\\
\\

---

[12] Plaintiff's section 1595 claim against MindGeek is excepted from the immunity conferred by section 230 of the Communications Decency Act pursuant to the Allow States and Victims to Fight Online Sex Trafficking Act.  *See Doe v. MindGeek*, 558 F. Supp. 3d at 836.

**b) Visa's TVPRA Violation**

The Court finds that Plaintiff has stated a conspiracy claim against Visa pursuant to section 1594(c) but fails to state a claim against Visa for beneficiary liability pursuant to section 1591(a)(2), though as a co-conspirator, Visa might be held liable for MindGeek's alleged violation of section 1591(a)(2).  The Court begins with an analysis of Plaintiff's section 1591(a)(2) claim against Visa.

In this Court's holding in *Doe v. MindGeek*, and in the Northern District court's holding in *Doe v. Twitter*, one of the main focuses in finding that the respective plaintiffs had adequately alleged that the respective defendants had knowingly participated in a sex trafficking venture was the plaintiffs' allegations regarding how the defendants' interacted with their videos specifically.  *Doe v. MindGeek*, 558 F.Supp.3d at 838; *Doe v. Twitter*, 555 F.Supp.3d at 922-23.  Those allegations supported the conclusion that MindGeek and Twitter formed a relationship with the direct traffickers who harmed the plaintiffs in those cases.  And that same category of allegations is serving the same role here, with respect to MindGeek.  Visa, however, is not alleged to have had any direct interaction with Plaintiff, her direct traffickers, or her videos, and therefore cannot bear beneficiary liability for knowingly *participating* in the sex trafficking venture that harmed Plaintiff.  Visa—having not touched Plaintiff's videos, unlike MindGeek—did not form any sort of continuous relationship with or tacit agreement with Plaintiff's primary traffickers, her ex-boyfriend and the unnamed older man.  And section 1591(a)(2) is an awkward fit with respect to Visa in another respect: having not had any interaction with Plaintiff and her videos, how can it be said that Visa knew or should have known that Plaintiff was a victim of sex trafficking?  Unlike the allegations concerning MindGeek, the allegations concerning Visa in the FAC do not reflect that

Visa had any knowledge—constructive or otherwise—of Plaintiff, her videos, or her age in the videos.[13]

However, under section 1594(c), Plaintiff has adequately pled that Visa conspired with MindGeek to violate section 1591(a)(2).  The Court opens with some axioms relating to the law of criminal conspiracy.  One conspirator is liable for the acts of its co-conspirator when such acts are in furtherance of the conspiracy, *see Pinkerton v. United States*, 328 U.S. 640, 647 (1946), even if the conspirator "is unaware of the existence of the acts or the actors[,]" *United States v. Testa*, 548 F.2d 847, 855 (9th Cir. 1977), so long as the acts are the "necessary or natural consequence" of the conspiracy, *United States v. Fonseca-Caro*, 114 F.3d 906, 908 (9th Cir. 1997).  *See also United States v. Mothersill*, 87 F.3d 1214, 1218 (11th Cir. 1996) ("Each party to a continuing conspiracy may be vicariously liable for substantive criminal offenses committed by a co-conspirator during the course and in the furtherance of the conspiracy, notwithstanding the party's non-participation in the offenses or lack of knowledge thereof.  Liability will not lie, however, if the substantive crime did not fall within the scope of the unlawful project, or was

---

[13] While the Court agrees with Visa that its alleged conduct does not amount to a section 1591(a)(2) violation, the Court feels it necessary to explain the difference between this case and *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788 (9th Cir. 2007), which Visa relies upon to argue that it did not violate section 1591(a)(2), (Mem. at 15-16), because the Court feels that Visa's analysis of *Perfect 10* reflects its misunderstanding of the proper framing of this case.  In *Perfect 10*, Visa was sued for contributory and vicarious copyright infringement for processing credit card charges incurred by customers purchasing infringing images from numerous offending websites.  *Perfect 10*, 494 F.3d at 794.  There, the court explained "While Perfect 10 has alleged that Defendants make it easier for websites to profit from this infringing activity, the issue here is reproduction, alteration, display and distribution, which can occur without payment."  *Id*. at 797.  Here, in contrast, what is at issue *is payment* (or monetization).  The court in *Perfect 10* explained that Visa made "it easier for infringement to be profitable, which tends to increase financial incentives to infringe, which in turn tends to increase infringement," and that the "additional step in the causal chain" prevented liability.  *Id*. at 798.  But there is no additional step here because profiting is MindGeek's crime and Visa allegedly directly participated in that crime.  Visa's motion reads as though it believes it is being sued for incentivizing the production and posting of child porn by money-driven direct traffickers by processing payments on MindGeek's sites.  If that were the case, this case would come far closer to *Perfect 10*.  But Visa is being sued for knowingly providing the tool through which MindGeek monetized child porn, which is itself a crime (or a "direct infringement," to analogize to *Perfect 10*).

merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.") (internal quotations and citations removed) (cleaned up).  If a conspiracy is adequately pled, Visa can bear liability for MindGeek's section 1591(a)(2) violation if such crime was committed in furtherance of and a natural consequence of the conspiracy, regardless of whether Visa knew of or interacted with Plaintiff or her primary traffickers.

To borrow Visa's own statement of the law, to allege a conspiracy to violate section 1591(a)(2), Plaintiff must allege facts supporting a conclusion that MindGeek and Visa had a "'unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.'"  (Mem. at 24 [*quoting Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1020 (9th Cir. 1985)].)  Such meeting of the minds or agreement need not be explicit but can be inferred if Visa "entered into a joint enterprise with consciousness of its general nature and extent." *Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 440 (E.D.N.Y. 2017).  Visa allegedly did just that.  Plaintiff adequately alleges that Visa knew that MindGeek's websites were teeming with monetized child porn from its own due diligence and discussions and negotiations with MindGeek, PayPal's decision to cease doing business with MindGeek, communications from advocates with which Visa interacted, and from the New York Times article.  (*See* Section II.C., *supra*.)  Despite this alleged knowledge, Plaintiff asserts that Visa "explicitly agreed with MindGeek to process the financial transactions from which the defendants profited from the [sex trafficking] venture."  Through Plaintiff's entire ordeal and to this day, Visa processes advertisement payments on MindGeek's sites.  (FAC ¶ 275.)  If Visa knew MindGeek's sites contained a wealth of child porn and that MindGeek regularly placed ads alongside its videos, facts that are either expressly alleged or clearly implied in the FAC, then it knew that MindGeek was regularly committing violations of section 1591(a)(2) by participating in hundreds or thousands of sex trafficking ventures and financially benefiting from such participation.

With such knowledge, Visa continued to grant MindGeek the means to financially benefit from its participation in sex trafficking ventures: the Visa payment network.  It does not matter that Visa did not know who the eventual victims or primary traffickers would be or whether Visa interacted with or knew of Plaintiff, her videos, or her traffickers.  MindGeek's violation of section 1591(a)(2), and Plaintiff's resulting harm, were natural consequences of Visa's alleged knowing decision to provide the means through which MindGeek could monetize child porn videos, like those featuring Plaintiff.

Visa argues "[t]he allegation that Visa recognized MindGeek as an authorized merchant and processed payment to its websites does not suggest that Visa agreed to participate in sex trafficking of any kind."  (Mem. at 24 [internal quotations removed] [cleaned up].)  The predicate criminal agreement or meeting of the minds here, however, is not to participate in sex trafficking, it is an agreement to knowingly benefit financially from sex trafficking.  At this stage, Visa's agreement to financially benefit from child porn can be inferred from its decision to continue to recognize MindGeek as a merchant despite allegedly knowing that MindGeek monetized a substantial amount of child porn on its websites.

Visa cites *Craigslist Inc. v. 3Taps Inc.*, 942 F. Supp. 2d 962, 982 (N.D. Cal. 2013) for the proposition that a commercial relationship alone does not establish a conspiracy.[14] In *Craigslist*, Craigslist accused 3Taps of stealing its data and selling it to Padmapper, another company.  In dismissing Craigslist's civil conspiracy claim against Padmapper, the court held: "[t]hat Padmapper had an incentive to use the inappropriately obtained

---

[14] Visa also cites *Benson v. JPMorgan Chase Bank, N.A.*, 2010 WL 1526394, at *6 (N.D. Cal. Apr. 15, 2010).  That case is not persuasive.  It involves one or two sentences of analysis with respect to the conspiracy claim therein.  And the court had good reason to avoid any in-depth analysis: the plaintiff conceded that the claim was inadequately pled and asked for leave to amend.  Also, for what it is worth, both *Benson* and *Craigslist* come from the common law civil conspiracy context.  They do not involve claims under section 1594.  The Court queries whether they are even applicable to the present analysis.  At any rate, they are distinguishable or unpersuasive.

information, or that 3Taps would not itself have committed the acts without a market for the resulting information, *does not plausibly suggest* that Padmapper ever intended to assist 3Taps in the alleged wrongful conduct required to obtain the information in the first place." 942 F. Supp. 2d at 982 (emphasis added).  In other words, it seems that the court in *Craigslist* was uncomfortable with what it saw as a logical leap from one alleged co-conspirator's conduct and the inferred intent of that co-conspirator to aid the other co-conspirator in a wrongful act.  The court thought the bridge between Padmapper's conduct—buying stolen data—and an inference that Padmapper intended to assist 3Taps in stealing that data in the first place was too far.

But the bridge is short and clear in this case when one keeps in mind what MindGeek's alleged criminal act is and how Visa's conduct is intertwined with MindGeek's criminal act.  MindGeek is being sued for knowingly monetizing child porn.  Visa's act of continuing to recognize MindGeek as a merchant is directly linked to MindGeek's criminal act, as Visa's act served to keep open the means through which MindGeek completed its criminal act knowing that that criminal act was being committed.  At this early stage of the proceedings, before Plaintiff has had any discovery from which to derive Visa's state of mind, the Court can comfortably infer that Visa intended to help MindGeek monetize child porn from the very fact that Visa continued to provide MindGeek the means to do so and knew MindGeek was indeed doing so.  Put yet another way, Visa is not alleged to have simply created an incentive to commit a crime, it is alleged to have knowingly provided the tool used to complete a crime.

## 2.    Statutory Standing Under TVPRA

Visa argues that Plaintiff lacks statutory standing under the TVPRA.  As Visa explains, courts are instructed to "presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute." *Lexmark*

*Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014).  The "proximate-cause requirement generally bars suits for alleged harm that is too remote from the defendant's unlawful conduct."  *Id.* at 133 (internal quotations and citations removed). Visa argues that its conduct was not the proximate cause of Plaintiff's injuries.  The above analysis—of both Article III standing and Visa's alleged TVPRA violation— should make clear that Visa's argument is unpersuasive to the Court at this stage of the case.  Plaintiff adequately pleads that Visa conspired with MindGeek to violate section 1591(a)(2), that MindGeek did complete such violation of section 1591(a)(2), that such violation can be imputed to Visa on a conspiracy basis, and that her alleged injuries flow from the monetization of her videos and the acts taken to effectuate and maximize that monetization.  When MindGeek decides to monetize child porn, and Visa decides to continue to allow its payment network to be used for that goal despite knowledge of MindGeek's monetization of child porn, it is entirely foreseeable that victims of child porn like Plaintiff will suffer the harms that Plaintiff alleges.

*Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018) is distinguishable.  There, Twitter was sued for providing material support to ISIS after ISIS members killed plaintiffs' husbands in Jordan on the theory that Twitter allowed its platform to be used by ISIS to communicate, fundraise, recruit, and train members.  The court held: "Appellants have not pleaded that Twitter's provision of communication equipment to ISIS, in the form of Twitter accounts and direct messaging services, had any direct relationship with the injuries that Plaintiffs–Appellants suffered."  881 F.3d at 749-50. The court also cited the district court with approval, who stated "There are no facts indicating that Abu Zaid's attack was in any way impacted, helped by, or the result of ISIS's presence on the social network."  *Id.* at 750.

First, the Court will not decide whether the "direct relationship" test adopted in *Fields*—a decision tied directly to the language of a different statute than the TVPRA

with different wording—applies to the TVPRA, as neither party briefed that issue with

any sort of depth or even recognized that the court in *Fields* made a deliberate choice

based on a statutory analysis.  *See Fields*, 881 F.3d at 748.  For the reasons explained

above, if foreseeability is the standard, it is met here.  Even if a direct relationship were

required, and even if such standard would excuse Visa if its payment network was not

used to monetize Plaintiff's videos specifically, the Court would not dismiss Plaintiff's

claims against Visa.  At this stage of the proceedings, she has adequately alleged the

possibility that Visa's payment network was used in relation to her videos: she alleges

that advertisements were placed alongside her videos and that Visa continues to process

advertisement payments for MindGeek's porn sites.  The Court can infer a strong

possibility that Visa's network was involved in at least some advertisement transactions

relating directly to Plaintiff's videos.  To require Plaintiff to have concrete proof that

Visa's payment network was actually used in connection with her videos would be an

impossible standard to meet prior to discovery.

To sum, the Court **GRANTS** Visa's motion with respect to Plaintiff's section

1591(a)(2) claim against Visa and **DENIES** Visa's motion with respect to Plaintiff's

section 1594(c) claim against Visa, which in turn may serve as a predicate for imputing

MindGeek's section 1591(a)(2) liability to Visa.

### 3.   RICO

Visa argues that Plaintiff has failed to state a RICO claim against it.  But the Court

will not perform a RICO analysis on this motion.  As the Court held in a companion

order, jurisdictional discovery is appropriate with respect to the MindGeek Defendants.

(*See* Dkt. 167.)  The MindGeek Entity Defendants, in their motion to dismiss—which the

Court denied without prejudice in light of the parties proceeding to jurisdictional

discovery—raised two related threshold arguments that the Court believes may dispose of

Plaintiff's RICO claims.  They argue that Plaintiff's injuries are not cognizable under RICO, and that the statute of limitations has run even if the injuries are cognizable.  Of Course, this is an order on Visa's motion, and Visa failed to raise these arguments.  But the Court cannot ignore them when to do so would necessitate what very well may end up being a needless analysis of whether Plaintiff adequately pleads the other specifics of a RICO claim.  After jurisdictional discovery, the Court suspects Plaintiff will file a Second Amended Complaint, which the Court grants her leave to do.  In that Second Amended Complaint, if she has a good faith, reasonable basis for doing so, she must include additional facts relating to MindGeek's arguments regarding her injuries and the statute of limitations.  The Court believes that Plaintiff's injuries—her loss of employment opportunities and damage to her image—may be cognizable under current Ninth Circuit case law, which seems to recognize a broad category of what might be deemed a property interest.[15]  *See, e.g.*, *Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005). Still, the FAC is critically vague in tying Plaintiff's injuries to MindGeek's and Visa's conduct.  It was no mystery in *Diaz* as to why the plaintiff could not seek employment: he was imprisoned.  *Id*.  The Court can guess reasons why Plaintiff's employment prospects were affected by MindGeek's conduct, but she has not made that connection clear in the FAC and it is not the Court's job to guess.  Plaintiff will also have to plead specific facts as to why her depression, addiction, suicidal ideations, and other complicating conditions stopped her from filing a complaint sooner.  Or she will have to allege facts that support a conclusion that she suffered a new, independent RICO injury during the limitations period, rather than just a continuation or compounding of the injuries she suffered outside the limitations period.  *See Sasser v. Amen*, 2001 WL 764953, at *7 (N.D. Cal. July 2, 2001), *aff'd*, 57 F. App'x 307 (9th Cir. 2003).

---

[15] While these injuries seem to be cognizable under Ninth Circuit case law, and therefore worthy of passing the pleading stage, the Court strongly questions whether Plaintiff could prove damages relating to these injuries with the requisite level of certainty on summary judgment or at trial.

### 4.      UCL and FAL

Plaintiff alleges that Visa violated the UCL and FAL.  Visa argues that Plaintiff has failed to state a claim under either law.  (Mem. at 26-27.)  Visa focuses on the fact that in the section of the FAC wherein UCL and FAL violations are pled, Plaintiff's allegations focus primarily on conduct attributable to MindGeek, not Visa.  However, while the Court would have liked Plaintiff to clearly spell out the factual theories underlying her UCL and FAL claims against Visa in the section of the FAC that deals specifically with those laws, the Court must view the complaint as a whole to assess whether Plaintiff has pled facts sufficient to support her claims against Visa under the UCL and FAL.  The UCL prohibits unlawful, unfair, or fraudulent business acts or practices.  Cal. Bus. & Prof. Code § 17200.  "Under the UCL's unlawful prong, violations of other laws are borrowed and made independently actionable under the UCL."  *Herron v. Best Buy Co. Inc.*, 924 F. Supp. 2d 1161, 1177 (E.D. Cal. 2013) (internal quotations omitted).  For the reasons explained above, Plaintiff has adequately pled that Visa violated 18 U.S.C. section 1594(c) by continuing to process financial transactions for MindGeek whilst knowing MindGeek's sites contained a substantial amount of monetized child porn.  This could qualify as an "unlawful" business practice.  And, contrary to Visa's assertion, Plaintiff has adequately alleged that Visa has control over deciding whether to recognize MindGeek as a merchant, making *Emery v. Visa Internat. Serv. Ass'n*, 95 Cal.App.4th 952 (2002) distinguishable.  Plaintiff has, however, failed to plead an FAL claim against Visa.  Plaintiff does not attempt to spell out her theory of FAL liability with respect to Visa in her opposition, and, unlike the UCL claim, the Court cannot neatly glean a theory of liability for Plaintiff's FAL claim from the FAC.  The Court **GRANTS** Visa's motion with respect to Plaintiff's FAL claim and **DENIES** the motion with respect to the UCL claim.

### 5.      Common Law Conspiracy

The Court **ORDERS** Plaintiff to plead a more definite statement of her civil conspiracy claim.  Federal Rule of Civil Procedure 12(e) permits a party to move for a more definite statement when a complaint is "so vague or ambiguous that the party cannot reasonably prepare a response."  Fed. R. Civ. Pro. 12(e).  And the Court is empowered to demand a more definite statement *sua sponte.  See Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1127 (11th Cir. 2014) ("[N]othing should stop District Courts from demanding, on their own initiative, that the parties replead the case.").  Although Visa does not lodge a Rule 12(e) motion, the Court finds it necessary to demand of Plaintiff a more definite statement with respect to her common law civil conspiracy cause of action against Visa.

Under California law, civil "[c]onspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510–11, (1994).  Thus, a claim for civil conspiracy rests on the "commission of an actual tort." *Id.* at 511.  And so, to assess whether civil conspiracy is adequately pled, the Court would have to assess whether Plaintiff has adequately pled the commission of the underlying tort or torts.  *See Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 511 (1994).

Plaintiff does raise several tort causes of action.  (*See* FAC.)  But Plaintiff brings these causes of action against the MindGeek Defendants, not Visa.  (*See id.*)  When Plaintiff pleads her civil conspiracy claim, she includes Visa, but she does not make clear what torts Visa allegedly conspired to commit.  Instead, she lists a series of alleged "overt acts," the same list of alleged acts that she used to support her section 1591 claims

against the MindGeek Defendants.  The Court cannot simply guess what tort or torts that list is supposed to represent.  And so, the Court cannot perform an analysis of whether civil conspiracy is adequately pled, because it does not know which tort or torts it should evaluate to assess whether Plaintiff has adequately pled the commission thereof.  If Plaintiff mistakenly pled civil conspiracy as a standalone tort, it should be removed from her complaint.  If she is attempting to use the civil conspiracy claim as a means to impute tort liability to Visa for some or all of the various torts that she pleads, she must amend her complaint to make clear which tort causes of action Visa allegedly conspired to commit.

## IV.  ICLE'S AMICUS BRIEF

Also before the Court is the ICLE's motion for leave to participate as amicus curiae.  (Dkt. 145.)  The Court **GRANTS** that motion.  However, the Court does not find ICLE's brief persuasive.  The brief focuses on whether Visa should be treated as a participant as that term is used in the RICO and TVPRA statutes.  (See id. at 4 ["The fundamental question with respect to Visa's Motion to Dismiss, then, is whether Visa should properly be considered a 'participant' in the activities alleged under these statutes."].)  But as discussed, the Court does reach the RICO claim in this order, and the Court agrees that Visa did not participate in a sex trafficking venture as that term is used in the TVPRA.  In other words, ICLE focuses on a moot point.  ICLE also operates under the assumption that the Court's only concern is to make sure to assign liability to parties in a superior position to avoid future harms—deterrence, in other words.  But courts also punish parties for past harms, even if there is no prospect that such punishment will deter an ongoing problem.  The Court is also not so sure that deterrence will not be had if Visa—as a result of this order or further developments in this case—ceases to recognize MindGeek as a merchant.  The last time Visa did that, MindGeek allegedly cleaned up its

websites to the tune of 80% of its content.  That looks a lot like effective deterrence.  This alleged fact is something both Visa and ICLE ignore in their briefing.

The Court also takes issue with ICLE's suggestion that keeping Visa in this case would send a signal that any company who allows MindGeek to "do business"—like FedEx, who delivers packages to the company—is fair game for a lawsuit.  (Dkt. 145 at 16.)  Visa is alleged to have knowingly allowed MindGeek to use its payment network to do crime, not simply to "do business."  FedEx can keep delivering packages to MindGeek if it has no reason to believe those packages are instrumental to a crime.  Nor would this order support a suit against Google for allowing Pornhub to appear in its search results. (*See id*.)  Visa allegedly knowingly provided the very tool through which MindGeek committed its alleged crime of financially benefitting from child porn.  Even if Google knows that its search engine is being used to drive traffic to a website allegedly teeming with child porn, and thereby indirectly helps that website financially benefit from its illicit content, it would not have provided a tool through which the crime is completed, unlike Visa.

The Court further takes issue with ICLE's suggestion that it would be unfair to expect Visa to cut MindGeek off when the majority of MindGeek's content is legal porn. (*Id*. at 17.)  MindGeek is alleged to have done far more than unwittingly host some illicit content amidst its numerous legal videos.  It is alleged to have solicited child porn and those searching for it, stored, distributed, and re-uploaded child porn knowing that it was child porn, and analyzed the performance of child porn to refine its algorithms, all with an intent to monetize illegal content.  If that is true, MindGeek is a criminal enterprise also engaged in legitimate business.  Suffice to say, law abiding businesses should avoid doing business with criminal enterprises, even when those criminal enterprises have been smart enough to diversify their activities.

1

## V.     CONCLUSION

2

3        For the foregoing reasons, Visa's motion is **GRANTED IN PART AND**

4  **DENIED IN PART WITH LEAVE TO AMEND**.  However, leave to amend is limited.

5  The Court will not permit Plaintiff to amend her section 1591(a)(2) claim against Visa.

6  Such amendment would be futile because Plaintiff simply has no basis for claiming Visa

7  directly participated in the sex trafficking ventures that harmed her.[16]  Plaintiff shall

8  withhold any amendment until the parties have completed jurisdictional discovery, which

9  the Court has ordered in a companion order.  (*See* Dkt. 167.)

10

11        DATED:     July 29, 2022

12                                            _____

13                                            CORMAC J. CARNEY

14                                            UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28  [16] That does not mean that Visa cannot be held liable for MindGeek's section 1591(a)(2) violation on a
conspiracy basis.