# EXHIBIT 1

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SERENA FLEITES, | ) Case No.: CV 21-04920-CJC(ADSx) |
| | ) |
| Plaintiff, | ) |
| | ) **ORDER GRANTING IN PART AND** |
| v. | ) **DENYING IN PART VISA'S MOTION** |
| | ) **TO DISMISS [Dkt. 138], DEMANDING** |
| MINDGEEK S.A.R.L., *ET AL*. | ) **A MORE DEFINITE STATEMENT** |
| | ) **WITH RESPECT TO PLAINTIFF'S** |
| | ) **CIVIL CONSPIRACY CLAIM, AND** |
| Defendants. | ) **GRANTING THE INTERNATIONAL** |
| | ) **CENTER FOR LAW & ECONOMICS'** |
| | ) **MOTION TO FILE AN AMICUS** |
| | ) **BRIEF [Dkt. 145]** |
| | ) |
| | ) |

## I.   INTRODUCTION

In this case, Plaintiff Serena Fleites brings numerous causes of action against Defendants MindGeek S.A.R.L., MG Freesites Ltd., MindGeek USA Inc., MG Premium Ltd., MG Global Entertainment Inc., 9219-1568 Quebec, Inc., Bernd Bergmair, Feras Antoon, Davis Tassillo, Corey Urman (collectively, the "MindGeek Defendants"), and

Visa, Inc., as well as certain doe defendants, referred to as the "Colbeck Capital Does" and the "Bergmair Does." (Dkt. 124-3 [First Amended Complaint, hereinafter "FAC"].) Against Visa, Plaintiff raises causes of action under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), California's Unfair Competition Law ("UCL") and False Advertisement Law ("FAL"), and common law civil conspiracy. (*Id*.) Now before the Court is Visa's motion to dismiss. (Dkt. 138 [Motion], Dkt. 138-1 [Memorandum, hereafter "Mem."].) For the following reasons, the motion is **GRANTED IN PART AND DENIED IN PART**.[1] The Court also **GRANTS** the International Center for Law & Economics' ("ICLE") motion to file an amicus brief, which the Court finds unpersuasive for the reasons discussed below.

## II. BACKGROUND

### A. Plaintiff's Allegations

In 2014, Plaintiff was thirteen years old. (FAC ¶ 258.) At that time, a sexually explicit video featuring Plaintiff titled "13-Year Old Brunette Shows Off For the Camera" was available on Pornhub.com, a pornography website owned and operated by MindGeek.[2] (*Id*.) Plaintiff's then-boyfriend pressured her into making the video and posted it without her knowledge or consent. (*Id*.) MindGeek also took the video and posted it to its other pornography websites. (*Id*. ¶ 259.) The video garnered 400,000 views by the time Plaintiff discovered it. (*Id*. ¶ 260.) MindGeek earned revenue from advertisements that appeared alongside the video. (*Id*.)

---

[1] Having read and considered the papers presented by the parties, the Court finds these matters appropriate for disposition without a hearing. *See* Fed. R. Civ. P. 78; Local Rule 7-15. Accordingly, the hearing set for August 8, 2022 at 1:30 p.m. is hereby vacated and off calendar.

[2] As the Court makes clear in a companion order, (Dkt. 167), there is a dispute as to whether the various MindGeek business entities operated as a single unit or shared an alter ego relationship. But for the purposes of this order, the Court refers to those business entities simply as "MindGeek."

Impersonating her mother, Plaintiff contacted MindGeek to inform it that the video qualified as child pornography. (*Id*. ¶ 261.) MindGeek seems to have acknowledged as much, but took a few weeks to remove the video. (*Id*.) In this internet age, a week might as well be an eternity because content constantly and instantaneously proliferates and disseminates. The video was downloaded by users and reuploaded several times, and Plaintiff regularly received messages from strangers containing hyperlinks to the video in the years following the original posting. (*Id*. ¶ 262.) One of the reuploads had 2.7 million views. (*Id*.) MindGeek earned advertisement revenue from the reuploads and posted the reuploads to its other pornographic websites as well. (*Id*.) When videos were reposted, Plaintiff would tell MindGeek to remove the videos, but MindGeek would ask Plaintiff "to provide photographic proof that she was the child depicted in the video before removing [the videos]." (*Id*. ¶ 263.) Assuming Plaintiff's allegations are true, the Court is at a loss to understand why such photographic proof was necessary.

Plaintiff's life spiraled out of control. She was harassed and bullied in school to such a degree that she started skipping school and finally unenrolled to attend courses online. (*Id*. ¶ 265.) Plaintiff did not tell her mother about the video, and so her relationship with her mother became strained, as her mother did not know why her daughter had suddenly begun to skip classes. (*Id*.) This led to Plaintiff leaving her mother's home to move in with her sister. (*Id*.) A year later, she moved back in with her mother, whereafter she attempted to hang herself, only to be stopped by her younger sister and her mother's boyfriend "who removed the power cord from her neck." (*Id*. ¶ 266.) She would attempt suicide several times in the ensuing years. (*Id*. ¶ 270.) Plaintiff did not want to face her family after the first suicide attempt, and so she moved in with a friend. (*Id*. ¶ 267.) At her friend's house, an older man introduced Plaintiff to heroin. (*Id*.) Plaintiff became addicted. (*Id*.) To fund her heroin addiction, Plaintiff—still a minor at this point—created sexually explicit videos at the older man's behest, who in turn sold the videos on Craigslist. (*Id*.) Some of the videos were uploaded to Pornhub

and were still available on the website as recently as June 2020. (*Id*. ¶ 268.) MindGeek uploaded these videos to its other pornographic websites and earned ad revenue from the videos. (*Id*.) While MindGeek profited from the child porn featuring Plaintiff, Plaintiff was intermittently homeless or living in her car, addicted to heroin, depressed and suicidal, and without the support of her family. (*Id*. ¶ 270.)

### B.   MindGeek's Business Practices and Business Model

MindGeek operates several free pornographic websites, including Pornhub, as well as other paid porn sites. (*Id*. ¶ 60.) MindGeek makes money from its free sites in multiple ways: by advertising its paid sites or its products on the free sites, by selling ad space on the free sites for the services or products of third parties, and by harvesting and selling the data of persons who use the free sites. (*Id*.) MindGeek sells ad space through "TrafficJunky," its advertising platform. (*Id*. ¶ 62.) Ad revenue earned through TrafficJunky accounts for over 50% of MindGeek's revenue. (*Id*.) To reach their intended audience, advertisers can build campaigns around keywords like "13yearoldteen" and "not18"; indeed, they can even target ads to people searching the term "child rape" in Japanese. (*Id*. ¶¶ 121-123.) Like a billboard on Interstate 5 is more expensive in Los Angeles than the Grapevine, the price to advertise on MindGeek's sites corresponds with the traffic on those sites: the higher the traffic, the pricier the ad space. (*Id*. ¶ 62.) Thus, MindGeek is incentivized to drive traffic. (*Id*.)

Disturbingly, child porn drives web traffic. In 2020, the National Center for Missing and Exploited Children ("NCMEC") produced a report describing the "insatiable demand" for child porn, with 8.4 million such videos posted online in 2018. (*Id*. ¶ 170.) Despite the fact that MindGeek operates porn sites that allow third parties to upload content, which any competent and scrupulous businessperson would understand incurs the substantial risk that child porn will be uploaded to the sites, MindGeek maintained

what Plaintiff describes as an "unpoliced platform." (*Id.* ¶ 183.) MindGeek employed a barebones team of "as few as 6 but never more than about 30 untrained, minimum wage contractors" to monitor the millions of daily uploads. (*Id.* ¶ 186.) This team was clearly understaffed, but also perversely incentivized: they were offered pay bonuses that depended on the number of videos they *approved* for upload. (*Id.* ¶ 187.) Such an incentive structure suggests that content moderation was not the goal.

To exacerbate its failure to police its flagship site Pornhub, MindGeek also spread content around, taking Pornhub videos and uploading them to its various other porn websites. (*Id.* ¶ 194.) Ensuring a hopeless whack-a-mole situation for victims, like Plaintiff, MindGeek also allowed users to download and then reupload videos. (*Id.* ¶ 210.) Most disturbing of all, Plaintiff alleges that MindGeek itself would reupload illegal videos that it had been forced to disable using made-up accounts that masked the true identity of the uploader. (*Id.* ¶ 208.) Plaintiff alleges "MindGeek has repeatedly stated publicly that it kept every video ever uploaded on its servers even when they were disabled from its sites." (*Id.* ¶ 125.) That would mean that MindGeek keeps a cache of child porn for future re-uploading. (*Id.* ¶ 209.)

Part of the fight to drive traffic happens on Google or other search engines. (*Id.* ¶ 167.) Simply put, MindGeek wants its sites to be the top result when people search for porn. (*Id.* ¶ 165.) To that end, the above-described team of monitors—who had insufficient time for their first job, monitoring—took on a second job, formatting. (*Id.* ¶ 188.) In that role, these contractors edited "the title, tags, and descriptions" of a video or sometimes the video itself. (*Id.*) They also created thumbnails—or still shots of the videos—that are meant to attract users to the videos. (*Id.* ¶ 120.) Plaintiff alleges that MindGeek has maintained that every video on its sites goes through this "formatting" process. (*Id.* ¶ 117.) It seems that MindGeek often used this formatting process to dog-whistle to persons on the hunt for child porn. For example, they could tag a video with

"barely legal teen sex" so that the video appears on a Google search (or on a search on the porn site itself) for "teen sex." (*Id.* ¶ 199.) Through this tagging system, child porn was easy to find on MindGeek's sites for anyone who cared to look. (*Id.* ¶¶ 199-201.)

Plaintiff alleges that MindGeek's sites contain a trove of obvious and easily accessible child porn. Plaintiff alleges that "in just a few clicks, in just a few minutes, users (and investigators and journalists) could find seemingly unlimited pages and videos depicting . . . child sexual assault or exploitation." (*Id.* ¶ 217.) Titles, descriptions, and tags bluntly described the illicit nature of the videos. (*Id.* ¶¶ 218-19.) And many videos contained clearly underage girls. (*Id.* ¶ 219.) Oftentimes users would leave comments in the videos' "comment section" on how flagrantly illegal the videos were. (*Id.* ¶¶ 223-24, 230.) Plaintiff serves as a prime example: the title of her video quite literally (and accurately) stated that she was 13 years old.

Sometimes, victims like Plaintiff would do MindGeek's policing for it. But these victims were often met with delay or stonewalling. (*Id.* ¶¶ 203-204.) The delay would permit MindGeek to continue analyzing a well performing, albeit illegal, video so that MindGeek could refine its algorithms to push similar content. (*Id.* ¶ 203.) When MindGeek removed a video, it would keep the video's webpage with its title, description, tags, and comments. (*Id.* ¶ 205.) That way, when a user attempted to find a since-removed video on Google, Pornhub would still come up, and when a user clicked the link, they would be taken to a landing page which contained suggestions for similar videos. (*Id.*) As Plaintiff explains "one can run internet searches for known [Child Sexual Abuse Material]/child pornography or other nonconsensual content that was ordered taken down by NCMEC or otherwise and the search will bring you to Pornhub even though that video is not enable [*sic*]. MindGeek's algorithm will then direct you to similar nondisabled content." (*Id.* ¶ 207.) Plaintiff alleges a harrowing example in which a video of a toddler and a video of a prepubescent girl being sexually abused were

removed, but their "title, tags, views, and url" were kept "live to continue driving traffic to the site." (*Id.* ¶ 214.)

MindGeek often went well beyond evasion and delay when interacting with victims. Plaintiff alleges that MindGeek worked to silence and intimidate victims and advocates, efforts which "were directly led by MindGeek vice president Corey Urman, who closely controls and often personally participates in [MindGeek's] public messaging." (*Id.* ¶ 311.) Part of this effort involves Urman using false identities to speak on MindGeek's behalf. (*Id.* ¶ 312.) For example, after an activist by the name of Laila Mickelwait published an op-ed in the Washington Times describing child porn on Pornhub, Urman allegedly wrote an email to the media under the name "Blake White," wherein he insinuated that Mickelwait was a member of an anti-LGBTQ, anti-women group. (*Id.* ¶ 323.) Plaintiff alleges that over the next year, MindGeek would continuously accuse Mickelwait of lying and using her claims to enrich herself. (*Id.* ¶ 328.) Under the same pseudonym, Urman allegedly represented to Insider.com in January 2020 that Pornhub immediately removes illegal content when notified, which Plaintiff knows to be false from personal experience. (*Id.* ¶ 325.) Plaintiff also alleges that Urman commissioned an "operative" who wrote online under the pseudonym "EyeDeco" who would harass and intimidate activists and victims and release their personal information. (*Id.* ¶ 330.) "EyeDeco" allegedly received this personal information from Urman. (*Id.* ¶ 332-33.) Urman allegedly directed this operative to attack Plaintiff online, stating in a social media post "Serena seems like she knows and has known for quite some time exactly what she is doing aka #grifting." (*Id.* ¶ 344.)

## C.    Visa's Involvement

Plaintiff alleges that "Visa recognized MindGeek as an authorized merchant and processed payments to its websites including but not limited to Pornhub[.]" (*Id.* ¶ 36.)

Plaintiff alleges that Visa knew MindGeek's sites contained a substantial amount of child porn and that MindGeek failed to police its sites for such content. (*Id.* ¶¶ 278-283.) Plaintiff alleges that nonetheless, "Visa and its agent banks explicitly agreed with MindGeek to continue to process transactions without restrictions on all MindGeek sites provided MindGeek maintained pretextual window dressing claims that it had technology, processes, and policies in place to prevent such content[.]" (*Id.* ¶ 284.) Elsewhere, Plaintiff alleges that Visa was "aware of MindGeek's trafficking venture and explicitly agreed with MindGeek to process the financial transactions from which the defendants profited from the venture." (*Id.* ¶ 276.)

Plaintiff alleges that Visa obtained knowledge of MindGeek's child porn problem from various sources. First, Plaintiff alleges that Visa performed reviews of MindGeek's sites pursuant to its own "due diligence and compliance functions." (*See, e.g.*, *id.* ¶ 278.) Plaintiff alleges that Visa was further put on notice from its "discussions and negotiations about these issues with MindGeek itself." (*Id.* ¶ 283.) Further, in November 2019, Visa's competitor PayPal terminated its relationship with MindGeek, issuing a public statement that "[PayPal] explicitly prohibits the use of [its] services for the sale of materials that depict criminal behavior[.]" (*Id.* ¶ 286.) Visa also landed on a list maintained by anti-trafficking advocates for processing payments for "pornography websites, including those hosting content fetishizing minors[.]" (*Id.* ¶ 288.) Visa responded with a statement that it only permits transactions for the purchase or sale of lawful products or services. (*Id.* ¶ 289.) Anti-sex trafficking advocates also sent various letters and emails to Visa detailing MindGeek's child trafficking venture. (*Id.* ¶¶ 291-95.) Visa responded: "Maintaining a neutral stance under the law is vital for the free flow of commerce." (*Id.* ¶ 297.)

It was not until December 2020 when the New York Times published a report titled "The Children of Pornhub"—wherein the author explained MindGeek's child porn

problem—that Visa took temporary action, at which point Visa suspended business with MindGeek pending 'investigations' into the allegations in the New York Times article. (*Id*. ¶ 274.)  In response to the suspension, "MindGeek took down over 10 million unverified videos from its [sites], constituting over 80% of its content[.]"  (*Id*. ¶ 274.)  Ultimately, however, Visa "restored services for MindGeek's paid premium sites and for advertising on all its sites."  (*Id*.)

## III.  DISCUSSION

### A.  Standing

Visa argues that Plaintiff lacks Article III standing.  (Mem.)  Plaintiff has the burden of establishing that she has Article III standing with respect to Visa.  *See WildEarth Guardians v. U.S. Dep't of Agriculture*, 795 F.3d 1148, 1154 (9th Cir. 2015).  To establish standing, Plaintiff must show that she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

Visa's argument centers on traceability.  Visa argues that Plaintiff's injuries "depend *entirely* on the independent actions of parties other than Visa."  (Mem. at 7 [emphasis in original].)  Visa explains "Plaintiff alleges that her injury stems from third parties who took videos and uploaded them to MindGeek sites, from MindGeek's maintenance of sites on which the videos could be uploaded, and from MindGeek's lack of monitoring of its sites and failure to remove the videos."  (*Id*. at 6-7.)  Visa insists that the involvement of "*numerous* third parties whose independent decisions collectively ha[d] a significant effect on [P]laintiffs' injuries" in this case forecloses a finding that

1    Plaintiff has standing to sue Visa.  (*Id*. at 7 [*quoting Maya v. Centex Corp.*, 658 F.3d

2    1060 (9th Cir. 2011)] [emphasis in original].)

3

4          Visa attempts to separate itself from Plaintiff's injuries by interposing Plaintiff's

5    traffickers—like Plaintiff's ex-boyfriend and the unnamed older man—between itself and

6    the harms Plaintiff suffered.[3]  In the words of 18 U.S.C. section 1591, Plaintiff's

7    traffickers "entice[d]" or "solicit[ed]" Plaintiff—then a minor—to engage in commercial

8    sex acts, thereby violating section 1591(a)(1).  If Plaintiff were suing just those men and

9    Visa, and not MindGeek, and attempting to proceed on a theory that those men

10   "entice[d]" or "solicit[ed]" her to engage in a sex act on camera because they knew Visa

11   would permit MindGeek to monetize the resulting videos, the Court might understand

12   Visa's position.  After all, Plaintiff does not allege that her ex-boyfriend and the unnamed

13   older man were motivated by a desire to earn profit on Pornhub or any of MindGeek's

14   other websites.[4]  Instead, Plaintiff's case focuses on the monetization of child porn after it

15   was made and posted to MindGeek's sites, which, if what Plaintiff alleges is true, Visa

16   knowingly took part in.  Plaintiff is suing MindGeek for—again in the words of section

17   1591—"benefit[ting] financially" from the child porn featuring Plaintiff, knowing or in

18   reckless disregard of the fact that Plaintiff was a minor when such videos were produced,

19   in violation of section 1591(a)(2).  That is where Visa enters the picture in full view,

20   unobscured by the third parties that it attempts to place between itself and Plaintiff.  The

21

22   [3] In its memorandum, Visa also explains that it sits atop Acquirers and Issuers, who in turn directly deal
23   with merchants (like MindGeek) and consumers.  (Mem. at 2-3.)  Visa, however, submits no declaration
     to support this assertion.  Instead, Visa relies on an explanation of the structure of their network from a
24   Second Circuit case and California Court of Appeal case.  Visa is permitted to introduce facts beyond
     the record on a Rule 12(b)(1) motion.  *See Golo, LLC v. Goli Nutrition Inc.*, 2021 WL 3360134, at *3
25   (C.D. Cal. July 30, 2021).  But Visa cannot simply borrow the record of another case—or another
     court's explanation of the record of a separate case—in lieu of introducing facts into the record of this
26   case.  At any rate, Plaintiff's allegations with respect to Visa's ultimate control over whether or not
27   MindGeek is recognized as a merchant bely Visa's apparent argument that other entities make such a
     determination.
28   [4] The unnamed older man did seem to have a profit motive, but he sought to earn such profit through
     channels other than MindGeek's websites, such as Craigslist.  (*See* FAC ¶ 267.)

emotional trauma that Plaintiff suffered flows directly from MindGeek's monetization of her videos and the steps that MindGeek took to maximize that monetization.  If not for its drive to maximize profit, why would MindGeek allow Plaintiff's first video to be posted despite its title clearly indicating Plaintiff was well below 18 years old?  Why would MindGeek stall before removing the video, which Plaintiff alleges had advertisements running alongside it?  Why would MindGeek take the video and upload it to its other porn websites?  Why, after being alerted by Plaintiff that the video was child porn, would it allow the video to be reuploaded, whereafter advertisements were again featured alongside the reuploaded videos?   And why did Plaintiff have to fight for years to have her videos removed from MindGeek's sites?  Plaintiff claims that MindGeek did these things for money, and Visa knowingly offered up its payment network so that MindGeek could satisfy that goal.

Visa urges that it has no involvement in the maintenance of MindGeek's websites. Visa would argue that the decisions made in the list of rhetorical questions above were made by MindGeek without input from Visa and within MindGeek's sole and direct control.  But that again ignores Plaintiff's allegations of the nature of Visa's wrongdoing. Plaintiff alleges that Visa pushed the first domino when it continued to recognize MindGeek as a merchant with knowledge of its illicit nature.  With that decision—which Visa and Visa alone controlled—in place, the means to profit from child porn was ensured, and MindGeek filled in the gaps to seize the opportunity, promulgating the profit-maximizing policies and practices described above that so damaged Plaintiff's life. Visa lent to MindGeek a much-needed tool—its payment network—with the alleged knowledge that there was a wealth of monetized child porn on MindGeek's websites. (*See* Section II.C., *supra*.)  If Visa was aware that there was a substantial amount of child porn on MindGeek's sites, which the Court must accept as true at this stage of the proceedings, then it was aware that it was processing the monetization of child porn, moving money from advertisers to MindGeek for advertisements playing alongside child

porn like Plaintiff's videos. And so, after opening the door, Visa was there at the end of the line, too, performing the final act necessary to establish Plaintiff's section 1591(a)(2) claim against MindGeek: the movement of money.[5]

Visa is also alleged to have far more control over MindGeek than Visa's motion would suggest. Plaintiff alleges that after the New York Times ran its article exposing MindGeek's child porn problem, Visa suspended MindGeek's merchant privileges, which led MindGeek to remove 10 million of its videos, or a staggering 80% of its content. (FAC ¶ 274.) Visa never mentions this allegation in its motion, going so far as arguing "Plaintiff's claims against Visa are all based on an unsupported assumption that Visa could force MindGeek to operate differently."[6] (Mem. at 8.) But Visa quite literally did force MindGeek to operate differently, and markedly so, at least for a time. And the astonishingly strong response from MindGeek—who is otherwise alleged to stonewall and even harass victims—is consistent with Plaintiff's allegations that unnamed former MindGeek employees have explained that MindGeek constantly worries that Visa could cut it off and makes decisions based on what content the "major credit card companies are willing to work with." (*Id.* ¶ 273.) So yes, Visa might not be directly involved in MindGeek's day-to-day operations, as Visa does not control precisely how MindGeek goes about satisfying its drive for profit. And MindGeek might be happy to profit from just about any type of content if there exists a market of users demanding

---

[5] Visa tries to make something of the fact that Pornhub is a free website, and that Plaintiff never alleges that her videos were behind any paywalls. That account is mostly consistent with the FAC, though there is some confusion as to whether Plaintiff's videos were behind any paywall. But Visa ignores that Plaintiff alleges that advertisements were placed alongside her videos and that Visa, even to this day, processes advertising payments on all MindGeek websites. (FAC ¶ 274.)

[6] In its reply, Visa argues that Plaintiff speculates that "if Visa had discontinued payment processing for the MindGeek sites, MindGeek in reaction might have done more to police its website more closely, which might then have led to the identification and removal of videos depicting Plaintiff[.]" (Dkt. 159 at 3.) As the Court echoes throughout this order, Plaintiff is not engaging in far-fetched speculation. MindGeek allegedly *did* remove 80% of its videos in response to Visa's temporary suspension of processing payments for the company. Discovery will tell whether some of Plaintiff's videos were removed, but there is a non-fanciful chance that hers were amongst the 80%.

such content. But the FAC supports an inference that Visa draws the informal boundaries of what types of content are fair game for profit, or fair game for its payment network, the mechanism through which MindGeek earns profit. When MindGeek crosses the line, or at least when MindGeek is very publicly admonished for crossing the line, Visa cracks the whip and MindGeek responds vigorously.[7] Yet, here is Visa, standing at and controlling the valve, insisting that it cannot be blamed for the water spill because someone else is wielding the hose.[8]

This is not a case in which the "independent decisions" of "numerous third parties" separate Visa from Plaintiff, to borrow Visa's words. (*See* Mem. at 7.) It is simple: Visa made the decision to continue to recognize MindGeek as a merchant, despite its alleged knowledge that MindGeek monetized child porn, MindGeek made the decision to continue monetizing child porn, and there are enough facts pled to suggest that the latter decision depended on the former, at least judging from the fallout from the New York Times piece. The cases to which Visa cites are inapposite. In those cases, various plaintiffs sought to pin intractable and complicated social, economic, or political problems on one or a few actors despite the existence of multiple, independent actors who could also be blamed for the plaintiffs' harms. For example, Visa cites *Boschma v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 2018 WL 2251629 (C.D. Cal. May

---

[7] The Court questions whether *Novak v. U.S.*, cited in Visa's reply, is an apposite case, given that it announces a rule of standing in cases wherein a plaintiff alleges an injury caused by the government's regulation (or lack thereof) of a third party. 795 F.3d 1012 (9th Cir. 2015). Even if the case is on point, for the reasons mentioned above, Plaintiff has plausibly alleged that Visa's conduct of recognizing MindGeek as a merchant was "at least a substantial factor motivating [MindGeek's] actions." *Id.* at 1019 (internal citations and quotations removed).

[8] Visa tries to argue that even after it suspended MindGeek, and even after MindGeek removed 80% of its content, Plaintiff alleges that her content remained on Pornhub. Visa gets the timeline wrong. Plaintiff alleges that some of her videos were still on Pornhub as late as June 2020. (*Id.* ¶ 268.) The New York Times article and Visa's response did not come until December 2020. (*Id.* ¶ 298.) But even if Plaintiff's videos were still on Pornhub after Visa suspended MindGeek, that would not upset Plaintiff's theory of standing, because a temporary suspension is just that: temporary. Visa is alleged to have resumed processing advertisement transactions for all MindGeek's sites after the suspension. (*Id.* ¶ 274.)

16, 2018), wherein the court held that the Department of Justice and the Bureau of Alcohol, Tobacco, Firearms, and Explosives could not be sued on the theory that their inaction causes gun violence, citing a "casual chain" that "includes numerous third parties, most significantly, the individuals who commit acts of gun violence." *Id*. at *3. In *Snake River Farmers' Ass'n, Inc. v. Dep't of Lab.*, 9 F.3d 792 (9th Cir. 1993), certain farmers sued the Department of Labor on a theory that farm wages they had set in a certain area for a certain kind of farm work might depress the wages paid in another area for the same type of work, but the court found that theory too speculative to support Article III standing. And in *Kaing v. Pulte Homes, Inc.*, 2010 WL 625365 (N.D. Cal. Feb. 18, 2010), *aff'd sub nom. Kaing v. Pultegroup, Inc.*, 464 F. App'x 630 (9th Cir. 2011), the plaintiff attempted to hold a certain lender responsible for the decrease in her home's value on the theory that the lender's practices caused foreclosures in her neighborhood, but the court explained that the plaintiff's standing "theory…depends upon a chain of causation that is dependent upon many factors, such as unemployment, health problems, a general weakening economy, or other financial conditions, the decisions of various homeowners to foreclose rather than refinance, as well as other economic factors that can have unpredictable effects on the housing market."

The sexual exploitation of minors is an intractable, complicated social problem involving countless independent bad actors. But Plaintiff does not seek to pin society's problem with the sexual exploitation of minors on Visa, she seeks to hold Visa accountable for a much narrower problem: MindGeek's monetization of the sexual exploitation of children. Properly framed, the problem at issue becomes less nebulous and involves far fewer actors. That is especially true when one keeps in mind what MindGeek is being sued for in this case: knowingly monetizing (or financially benefitting from) child porn. Again, Visa is not being sued on a theory that Visa encourages the production of child porn by allowing MindGeek to monetize it. Such a theory would not fit the facts of this case, because, as mentioned above, Plaintiff's traffickers are not

alleged to have had in mind profiting from Plaintiff's videos through MindGeek's monetization and profit-sharing system. Visa is being sued instead for knowingly providing the means through which MindGeek monetizes child porn once such content is already produced and posted. And unlike the cases to which Visa cites wherein the courts would have had to speculate with respect to how the actions of the defendants would affect numerous other independent actors lending to a societal problem, the Court need not speculate as to how Visa's actions affect the way that MindGeek approaches child porn. It bears repeating that after the New York Times published an article specifically addressing child porn on Pornhub, Visa suspended MindGeek's merchant privileges, and MindGeek responded by removing 80% of its content. Plaintiff never explicitly describes the nature of the content that MindGeek removed. But given the subject matter of the New York Times article and given that Visa was clear that its decision to suspend MindGeek was in response to the article, it is reasonable to infer that much of the removed content was child porn or suspected child porn. When the Court couples MindGeek's expansive content removal with allegations that former MindGeek employees have reported a general anxiety at the company that Visa might pull the plug, it does not strike the Court as fatally speculative to say that Visa—with knowledge of what was being monetized and authority to withhold the means of monetization—bears direct responsibility (along with MindGeek) for MindGeek's monetization of child porn, and in turn the monetization of Plaintiff's videos.

In an argument reminiscent of the "too big to fail" refrain from the financial industry in the 2008 financial crisis, Visa argues that "[i]f accepted, Plaintiff's theory would upend the financial and payment industries." (Mem. at 9.) The Court does not see this decision as the drastic tectonic shift that Visa fears. But the Court will make the gist of its holding clear, to assuage any such fear: Visa is being kept in this case because it is alleged to have continued to recognize as a merchant an immense, well known, and highly visible business that it knew used its websites to host and monetize child porn.

Moreover, Visa allegedly had considerable sway over that business's decision-making, a conclusion amply supported by the allegation that MindGeek removed 80% of its content when Visa suspended its business with MindGeek. Visa is not being asked to police "the billions of individual transactions it processes each year." (Mem. at 9.) It is simply being asked to refrain from offering the tool with which a known alleged criminal entity performs its crimes. That is not a tall order and does not spell out an existential threat to the financial industry.

### B.      Failure to State a Claim

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a plaintiff's claims. The issue on a motion to dismiss for failure to state a claim is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support the claims asserted. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1176 (9th Cir. 2021). When evaluating a Rule 12(b)(6) motion, the district court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1014 (9th Cir. 2012). To survive a motion to dismiss, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint must contain well-pleaded factual allegations, not legal conclusions, that "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In keeping with this liberal pleading standard, the district court should grant the plaintiff leave to amend if the complaint can possibly be cured by additional factual allegations. *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

### 1.   TVPRA

While Plaintiff's FAC was not abundantly clear on what theories of TVPRA liability she is raising against MindGeek and Visa, her opposition to Defendants' various motions to dismiss clarifies her theories.  (Dkt. 151 [Opposition, hereafter "Opp."].)  Plaintiff claims that MindGeek is a beneficiary of a trafficking venture under 18 U.S.C. section 1591(a)(2), (Opp. at 28-39), and a direct sex trafficker under section 1591(a)(1), (Opp. at 39-40), and that Visa is a beneficiary of a trafficking venture under section 1591(a)(2), (Opp. at 41-44), and that Visa conspired to violate section 1591 pursuant to section 1594(c), (Opp. at 44-45).  Plaintiff has failed to state a beneficiary liability claim against Visa pursuant to section 1591(a)(2), but she has stated a conspiracy claim against Visa pursuant to section 1594(c) on a theory that Visa conspired with MindGeek to violate section 1591(a)(2).  The Court begins with an analysis of Plaintiff's section 1591 claims against MindGeek, as such claims can be imputed to Visa as an alleged co-conspirator.[9]

### a)  MindGeek's TVPRA Violation

18 U.S.C. section 1595 provides a private right of action to victims of violations of 18 U.S.C. ch. 77, which contains section 1591.  18 U.S.C. § 1595(a).  Section 1591 criminalizes two categories of actors involved in a sex trafficking venture: direct traffickers and those who benefit financially from the venture.  Section 1591(a)(1), the direct trafficker portion of the statute, punishes whoever knowingly "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person" knowing that "the person has not attained the age of 18 years and will be

---

[9] The Court recognizes that the MindGeek Defendants' motions are not before it, (*see* Dkt. 167), and the Court does not intend for its analysis in this order to serve as a ruling on the MindGeek Defendants' motions to dismiss.  Still, this order should be a highly relevant signal to the MindGeek Defendants as to how the Court views many of their attacks and challenges to Plaintiff's complaint.

caused to engage in a commercial sex act." *Id*. § 1591(a)(1).  Plaintiff argues that MindGeek bears direct trafficker liability because the company "advertised" her in the sense that term is used in section 1591(a)(1).  Plaintiff's argument is based on a few sentences of dicta from *Doe v. Twitter, Inc.*, 555 F.Supp.3d 889 (N.D. Cal. 2021).  In that case, two individuals sued Twitter when sexually explicit videos of those individuals as minors were posted on Twitter.com after they had sent the videos to a third-party.  *Id*. at 893-894.  The boys did not allege that Twitter advertised them, but the court, in *dicta*, explained that their case might have supported an advertisement claim, stating that videos posted to Twitter could conceivably advertise a person.  *Id*. at 915.  The Court does not disagree: a video can certainly advertise a person.  However, the term "advertise" must be read with the remainder of section 1591(a).  It is a crime to advertise a person knowing that the person is not 18 years old and will be caused to engage in a commercial sex act. 18 U.S.C. § 1591(a).  The Court understands the statute to criminalize the advertisement of minors when that advertisement aims to lead to a sex act.  Twitter's and MindGeek's websites could certainly be used to effectuate advertisement of a minor that leads to further sex acts.  For example, if a trafficker posts a video of a minor engaged in a sex act to an online platform like Pornhub and makes known—through the title, tags, or comments on the video, for example—that the minor is available for future sex acts to those interested, depending on how the owner of the online platform interacts with the advertisement and video, the platform owner might bear direct trafficker liability for such advertisement under section 1591(a)(1).  But Plaintiff does not allege that her videos were posted in the form of an advertisement to users that she might be available for future sex acts.  In this case, the direct traffickers include Plaintiff's ex-boyfriend and the unnamed older man.  In the words of section 1591(a)(1), these men both solicited or enticed Plaintiff to commit a sex act knowing she was underage.

Plaintiff has, however, comfortably stated a claim under section 1591(a)(2) against MindGeek.  As the Court thoroughly explained in *Doe v. MindGeek USA Incorporated*,

558 F.Supp.3d 828 (C.D. Cal. 2021), for a civil plaintiff proceeding under section 1595 to state a beneficiary liability claim pursuant to section 1591(a)(2), the plaintiff must allege that (1) the defendant knowingly participated in a sex trafficking venture, (2) knowingly received a benefit from its participation, and (3) knew or should have known that the plaintiff was a victim of sex trafficking.[10]  *Id*. at 837.

As in *Doe*, Plaintiff has adequately pled that MindGeek knowingly participated in a sex trafficking venture with Plaintiff's primary traffickers.  *See id*. at 838.  The title of the first video featuring Plaintiff was "13-Year Old Brunette Shows Off For The Camera."  (FAC ¶ 258.)  If that was not enough of a red flag, Plaintiff alleges that her age was obvious from the video itself.  (*Id*.)  And yet, after review, MindGeek allowed the video to be posted to Pornhub.  (*Id*.)  MindGeek went further than passively allowing the video to be posted, it also "categorized, tagged, [and] optimized the video for user preferences," placed the video in playlists, posted the video to its other porn websites, and placed advertisements alongside the video.  (*Id*. ¶¶ 259-60.)  Plaintiff contacted MindGeek and explicitly informed them that the video was child porn, whereafter the video remained on Pornhub for two weeks and continued to gain views.  (*Id*. ¶ 261.)  But the problem did not end there, because many users downloaded and then reuploaded the video to Pornhub (it is even possible that MindGeek itself reuploaded the video after it was removed),[11] and the process would start over: MindGeek allowed the video to be posted, monetized the video, spread it to its other sites, and delayed in removing the

---

[10] The Court notes that the sex acts in this case were commercial in nature.  In *Doe v. MindGeek USA Incorporated*, 558 F.Supp.3d 828 (C.D. Cal. 2021), this Court recognized the theory that the commercial nature of the sex act could be latent.  *Id*. at 840.  Plaintiff does not allege that her ex-boyfriend monetized Plaintiff's first video or made the video with any hope of earning profit from it.  But MindGeek did monetize the first video by placing advertisements alongside it, thereby commercializing Plaintiff's sex act with her ex-boyfriend.  Latent commercialization is not at issue with the second set of videos: those videos were expressly made for sale.

[11] As this Court explained in *Doe*, at the pleading stage, the Court can reasonably infer that MindGeek interacted with Plaintiff's videos in a manner consistent with Plaintiff's allegations as to how MindGeek interacted with child porn generally.  558 F.Supp.3d at 842, n.6.  Plaintiff alleges that MindGeek has a practice of reuploading videos that it has been forced to remove.  (FAC ¶ 208.)

video after Plaintiff's complaints.  (*Id*. ¶ 262-63.)  As for the latter series of sexually explicit videos that Plaintiff made as a minor to fund her depression-induced heroin addiction, MindGeek interacted with those videos in much the same way.  (*Id*. ¶ 268.) Some of these videos were still on Pornhub as late as June 2020.  (*Id*.)  By allowing the videos to be posted, formatting the videos, propagating the videos, and monetizing the videos over the course of several years, MindGeek developed a continuous business relationship with Plaintiff's primary traffickers.  *See Doe*, 558 F.Supp.3d at 837.

The second prong—knowing receipt of a financial benefit from participation in a sex trafficking venture—is easily met.  MindGeek monetized Plaintiff's videos by placing advertisements alongside those videos.  (FAC ¶¶ 260, 262, 268.)  And the third prong—MindGeek's actual or constructive knowledge that Plaintiff was the victim of sex trafficking—is also easily met.  Plaintiff quite literally told MindGeek herself that she was a minor in her videos, thereby expressly alerting them that she was the victim of sex trafficking, and yet the videos remained on MindGeek's sites—in their reuploaded form—for several years, each earning MindGeek ad revenue.[12]  (*Id*. ¶¶ 261-263.)

\\
\\
\\
\\
\\
\\
\\
\\

---

[12] Plaintiff's section 1595 claim against MindGeek is excepted from the immunity conferred by section 230 of the Communications Decency Act pursuant to the Allow States and Victims to Fight Online Sex Trafficking Act.  *See Doe v. MindGeek*, 558 F. Supp. 3d at 836.

**b) Visa's TVPRA Violation**

The Court finds that Plaintiff has stated a conspiracy claim against Visa pursuant to section 1594(c) but fails to state a claim against Visa for beneficiary liability pursuant to section 1591(a)(2), though as a co-conspirator, Visa might be held liable for MindGeek's alleged violation of section 1591(a)(2). The Court begins with an analysis of Plaintiff's section 1591(a)(2) claim against Visa.

In this Court's holding in *Doe v. MindGeek*, and in the Northern District court's holding in *Doe v. Twitter*, one of the main focuses in finding that the respective plaintiffs had adequately alleged that the respective defendants had knowingly participated in a sex trafficking venture was the plaintiffs' allegations regarding how the defendants' interacted with their videos specifically. *Doe v. MindGeek*, 558 F.Supp.3d at 838; *Doe v. Twitter*, 555 F.Supp.3d at 922-23. Those allegations supported the conclusion that MindGeek and Twitter formed a relationship with the direct traffickers who harmed the plaintiffs in those cases. And that same category of allegations is serving the same role here, with respect to MindGeek. Visa, however, is not alleged to have had any direct interaction with Plaintiff, her direct traffickers, or her videos, and therefore cannot bear beneficiary liability for knowingly *participating* in the sex trafficking venture that harmed Plaintiff. Visa—having not touched Plaintiff's videos, unlike MindGeek—did not form any sort of continuous relationship with or tacit agreement with Plaintiff's primary traffickers, her ex-boyfriend and the unnamed older man. And section 1591(a)(2) is an awkward fit with respect to Visa in another respect: having not had any interaction with Plaintiff and her videos, how can it be said that Visa knew or should have known that Plaintiff was a victim of sex trafficking? Unlike the allegations concerning MindGeek, the allegations concerning Visa in the FAC do not reflect that

Visa had any knowledge—constructive or otherwise—of Plaintiff, her videos, or her age in the videos.[13]

However, under section 1594(c), Plaintiff has adequately pled that Visa conspired with MindGeek to violate section 1591(a)(2). The Court opens with some axioms relating to the law of criminal conspiracy. One conspirator is liable for the acts of its co-conspirator when such acts are in furtherance of the conspiracy, *see Pinkerton v. United States*, 328 U.S. 640, 647 (1946), even if the conspirator "is unaware of the existence of the acts or the actors[,]" *United States v. Testa*, 548 F.2d 847, 855 (9th Cir. 1977), so long as the acts are the "necessary or natural consequence" of the conspiracy, *United States v. Fonseca-Caro*, 114 F.3d 906, 908 (9th Cir. 1997). *See also United States v. Mothersill*, 87 F.3d 1214, 1218 (11th Cir. 1996) ("Each party to a continuing conspiracy may be vicariously liable for substantive criminal offenses committed by a co-conspirator during the course and in the furtherance of the conspiracy, notwithstanding the party's non-participation in the offenses or lack of knowledge thereof. Liability will not lie, however, if the substantive crime did not fall within the scope of the unlawful project, or was

---

[13] While the Court agrees with Visa that its alleged conduct does not amount to a section 1591(a)(2) violation, the Court feels it necessary to explain the difference between this case and *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788 (9th Cir. 2007), which Visa relies upon to argue that it did not violate section 1591(a)(2), (Mem. at 15-16), because the Court feels that Visa's analysis of *Perfect 10* reflects its misunderstanding of the proper framing of this case. In *Perfect 10*, Visa was sued for contributory and vicarious copyright infringement for processing credit card charges incurred by customers purchasing infringing images from numerous offending websites. *Perfect 10*, 494 F.3d at 794. There, the court explained "While Perfect 10 has alleged that Defendants make it easier for websites to profit from this infringing activity, the issue here is reproduction, alteration, display and distribution, which can occur without payment." *Id*. at 797. Here, in contrast, what is at issue *is payment* (or monetization). The court in *Perfect 10* explained that Visa made "it easier for infringement to be profitable, which tends to increase financial incentives to infringe, which in turn tends to increase infringement," and that the "additional step in the causal chain" prevented liability. *Id*. at 798. But there is no additional step here because profiting is MindGeek's crime and Visa allegedly directly participated in that crime. Visa's motion reads as though it believes it is being sued for incentivizing the production and posting of child porn by money-driven direct traffickers by processing payments on MindGeek's sites. If that were the case, this case would come far closer to *Perfect 10*. But Visa is being sued for knowingly providing the tool through which MindGeek monetized child porn, which is itself a crime (or a "direct infringement," to analogize to *Perfect 10*).

merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.") (internal quotations and citations removed) (cleaned up).  If a conspiracy is adequately pled, Visa can bear liability for MindGeek's section 1591(a)(2) violation if such crime was committed in furtherance of and a natural consequence of the conspiracy, regardless of whether Visa knew of or interacted with Plaintiff or her primary traffickers.

To borrow Visa's own statement of the law, to allege a conspiracy to violate section 1591(a)(2), Plaintiff must allege facts supporting a conclusion that MindGeek and Visa had a "'unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.'"  (Mem. at 24 [*quoting Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1020 (9th Cir. 1985)].)  Such meeting of the minds or agreement need not be explicit but can be inferred if Visa "entered into a joint enterprise with consciousness of its general nature and extent."  *Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 440 (E.D.N.Y. 2017).  Visa allegedly did just that.  Plaintiff adequately alleges that Visa knew that MindGeek's websites were teeming with monetized child porn from its own due diligence and discussions and negotiations with MindGeek, PayPal's decision to cease doing business with MindGeek, communications from advocates with which Visa interacted, and from the New York Times article.  (*See* Section II.C., *supra*.)  Despite this alleged knowledge, Plaintiff asserts that Visa "explicitly agreed with MindGeek to process the financial transactions from which the defendants profited from the [sex trafficking] venture."  Through Plaintiff's entire ordeal and to this day, Visa processes advertisement payments on MindGeek's sites.  (FAC ¶ 275.)  If Visa knew MindGeek's sites contained a wealth of child porn and that MindGeek regularly placed ads alongside its videos, facts that are either expressly alleged or clearly implied in the FAC, then it knew that MindGeek was regularly committing violations of section 1591(a)(2) by participating in hundreds or thousands of sex trafficking ventures and financially benefiting from such participation.

With such knowledge, Visa continued to grant MindGeek the means to financially benefit from its participation in sex trafficking ventures: the Visa payment network. It does not matter that Visa did not know who the eventual victims or primary traffickers would be or whether Visa interacted with or knew of Plaintiff, her videos, or her traffickers. MindGeek's violation of section 1591(a)(2), and Plaintiff's resulting harm, were natural consequences of Visa's alleged knowing decision to provide the means through which MindGeek could monetize child porn videos, like those featuring Plaintiff.

Visa argues "[t]he allegation that Visa recognized MindGeek as an authorized merchant and processed payment to its websites does not suggest that Visa agreed to participate in sex trafficking of any kind." (Mem. at 24 [internal quotations removed] [cleaned up].) The predicate criminal agreement or meeting of the minds here, however, is not to participate in sex trafficking, it is an agreement to knowingly benefit financially from sex trafficking. At this stage, Visa's agreement to financially benefit from child porn can be inferred from its decision to continue to recognize MindGeek as a merchant despite allegedly knowing that MindGeek monetized a substantial amount of child porn on its websites.

Visa cites *Craigslist Inc. v. 3Taps Inc.*, 942 F. Supp. 2d 962, 982 (N.D. Cal. 2013) for the proposition that a commercial relationship alone does not establish a conspiracy.[14] In *Craigslist*, Craigslist accused 3Taps of stealing its data and selling it to Padmapper, another company. In dismissing Craigslist's civil conspiracy claim against Padmapper, the court held: "[t]hat Padmapper had an incentive to use the inappropriately obtained

---

[14] Visa also cites *Benson v. JPMorgan Chase Bank, N.A.*, 2010 WL 1526394, at *6 (N.D. Cal. Apr. 15, 2010). That case is not persuasive. It involves one or two sentences of analysis with respect to the conspiracy claim therein. And the court had good reason to avoid any in-depth analysis: the plaintiff conceded that the claim was inadequately pled and asked for leave to amend. Also, for what it is worth, both *Benson* and *Craigslist* come from the common law civil conspiracy context. They do not involve claims under section 1594. The Court queries whether they are even applicable to the present analysis. At any rate, they are distinguishable or unpersuasive.

information, or that 3Taps would not itself have committed the acts without a market for the resulting information, *does not plausibly suggest* that Padmapper ever intended to assist 3Taps in the alleged wrongful conduct required to obtain the information in the first place." 942 F. Supp. 2d at 982 (emphasis added). In other words, it seems that the court in *Craigslist* was uncomfortable with what it saw as a logical leap from one alleged co-conspirator's conduct and the inferred intent of that co-conspirator to aid the other co-conspirator in a wrongful act. The court thought the bridge between Padmapper's conduct—buying stolen data—and an inference that Padmapper intended to assist 3Taps in stealing that data in the first place was too far.

But the bridge is short and clear in this case when one keeps in mind what MindGeek's alleged criminal act is and how Visa's conduct is intertwined with MindGeek's criminal act. MindGeek is being sued for knowingly monetizing child porn. Visa's act of continuing to recognize MindGeek as a merchant is directly linked to MindGeek's criminal act, as Visa's act served to keep open the means through which MindGeek completed its criminal act knowing that that criminal act was being committed. At this early stage of the proceedings, before Plaintiff has had any discovery from which to derive Visa's state of mind, the Court can comfortably infer that Visa intended to help MindGeek monetize child porn from the very fact that Visa continued to provide MindGeek the means to do so and knew MindGeek was indeed doing so. Put yet another way, Visa is not alleged to have simply created an incentive to commit a crime, it is alleged to have knowingly provided the tool used to complete a crime.

## 2. Statutory Standing Under TVPRA

Visa argues that Plaintiff lacks statutory standing under the TVPRA. As Visa explains, courts are instructed to "presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute." *Lexmark*

*Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014).  The "proximate-cause requirement generally bars suits for alleged harm that is too remote from the defendant's unlawful conduct."  *Id.* at 133 (internal quotations and citations removed). Visa argues that its conduct was not the proximate cause of Plaintiff's injuries.  The above analysis—of both Article III standing and Visa's alleged TVPRA violation—should make clear that Visa's argument is unpersuasive to the Court at this stage of the case.  Plaintiff adequately pleads that Visa conspired with MindGeek to violate section 1591(a)(2), that MindGeek did complete such violation of section 1591(a)(2), that such violation can be imputed to Visa on a conspiracy basis, and that her alleged injuries flow from the monetization of her videos and the acts taken to effectuate and maximize that monetization.  When MindGeek decides to monetize child porn, and Visa decides to continue to allow its payment network to be used for that goal despite knowledge of MindGeek's monetization of child porn, it is entirely foreseeable that victims of child porn like Plaintiff will suffer the harms that Plaintiff alleges.

*Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018) is distinguishable.  There, Twitter was sued for providing material support to ISIS after ISIS members killed plaintiffs' husbands in Jordan on the theory that Twitter allowed its platform to be used by ISIS to communicate, fundraise, recruit, and train members.  The court held: "Appellants have not pleaded that Twitter's provision of communication equipment to ISIS, in the form of Twitter accounts and direct messaging services, had any direct relationship with the injuries that Plaintiffs–Appellants suffered."  881 F.3d at 749-50. The court also cited the district court with approval, who stated "There are no facts indicating that Abu Zaid's attack was in any way impacted, helped by, or the result of ISIS's presence on the social network."  *Id.* at 750.

First, the Court will not decide whether the "direct relationship" test adopted in *Fields*—a decision tied directly to the language of a different statute than the TVPRA

with different wording—applies to the TVPRA, as neither party briefed that issue with any sort of depth or even recognized that the court in *Fields* made a deliberate choice based on a statutory analysis.  *See Fields*, 881 F.3d at 748.  For the reasons explained above, if foreseeability is the standard, it is met here.  Even if a direct relationship were required, and even if such standard would excuse Visa if its payment network was not used to monetize Plaintiff's videos specifically, the Court would not dismiss Plaintiff's claims against Visa.  At this stage of the proceedings, she has adequately alleged the possibility that Visa's payment network was used in relation to her videos: she alleges that advertisements were placed alongside her videos and that Visa continues to process advertisement payments for MindGeek's porn sites.  The Court can infer a strong possibility that Visa's network was involved in at least some advertisement transactions relating directly to Plaintiff's videos.  To require Plaintiff to have concrete proof that Visa's payment network was actually used in connection with her videos would be an impossible standard to meet prior to discovery.

To sum, the Court **GRANTS** Visa's motion with respect to Plaintiff's section 1591(a)(2) claim against Visa and **DENIES** Visa's motion with respect to Plaintiff's section 1594(c) claim against Visa, which in turn may serve as a predicate for imputing MindGeek's section 1591(a)(2) liability to Visa.

### 3.    RICO

Visa argues that Plaintiff has failed to state a RICO claim against it.  But the Court will not perform a RICO analysis on this motion.  As the Court held in a companion order, jurisdictional discovery is appropriate with respect to the MindGeek Defendants. (*See* Dkt. 167.)  The MindGeek Entity Defendants, in their motion to dismiss—which the Court denied without prejudice in light of the parties proceeding to jurisdictional discovery—raised two related threshold arguments that the Court believes may dispose of

Plaintiff's RICO claims. They argue that Plaintiff's injuries are not cognizable under RICO, and that the statute of limitations has run even if the injuries are cognizable. Of Course, this is an order on Visa's motion, and Visa failed to raise these arguments. But the Court cannot ignore them when to do so would necessitate what very well may end up being a needless analysis of whether Plaintiff adequately pleads the other specifics of a RICO claim. After jurisdictional discovery, the Court suspects Plaintiff will file a Second Amended Complaint, which the Court grants her leave to do. In that Second Amended Complaint, if she has a good faith, reasonable basis for doing so, she must include additional facts relating to MindGeek's arguments regarding her injuries and the statute of limitations. The Court believes that Plaintiff's injuries—her loss of employment opportunities and damage to her image—may be cognizable under current Ninth Circuit case law, which seems to recognize a broad category of what might be deemed a property interest.[15] *See, e.g.*, *Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005). Still, the FAC is critically vague in tying Plaintiff's injuries to MindGeek's and Visa's conduct. It was no mystery in *Diaz* as to why the plaintiff could not seek employment: he was imprisoned. *Id*. The Court can guess reasons why Plaintiff's employment prospects were affected by MindGeek's conduct, but she has not made that connection clear in the FAC and it is not the Court's job to guess. Plaintiff will also have to plead specific facts as to why her depression, addiction, suicidal ideations, and other complicating conditions stopped her from filing a complaint sooner. Or she will have to allege facts that support a conclusion that she suffered a new, independent RICO injury during the limitations period, rather than just a continuation or compounding of the injuries she suffered outside the limitations period. *See Sasser v. Amen*, 2001 WL 764953, at *7 (N.D. Cal. July 2, 2001), *aff'd*, 57 F. App'x 307 (9th Cir. 2003).

---

[15] While these injuries seem to be cognizable under Ninth Circuit case law, and therefore worthy of passing the pleading stage, the Court strongly questions whether Plaintiff could prove damages relating to these injuries with the requisite level of certainty on summary judgment or at trial.

### 4.     UCL and FAL

Plaintiff alleges that Visa violated the UCL and FAL.  Visa argues that Plaintiff has failed to state a claim under either law.  (Mem. at 26-27.)  Visa focuses on the fact that in the section of the FAC wherein UCL and FAL violations are pled, Plaintiff's allegations focus primarily on conduct attributable to MindGeek, not Visa.  However, while the Court would have liked Plaintiff to clearly spell out the factual theories underlying her UCL and FAL claims against Visa in the section of the FAC that deals specifically with those laws, the Court must view the complaint as a whole to assess whether Plaintiff has pled facts sufficient to support her claims against Visa under the UCL and FAL.  The UCL prohibits unlawful, unfair, or fraudulent business acts or practices.  Cal. Bus. & Prof. Code § 17200.  "Under the UCL's unlawful prong, violations of other laws are borrowed and made independently actionable under the UCL."  *Herron v. Best Buy Co. Inc.*, 924 F. Supp. 2d 1161, 1177 (E.D. Cal. 2013) (internal quotations omitted).  For the reasons explained above, Plaintiff has adequately pled that Visa violated 18 U.S.C. section 1594(c) by continuing to process financial transactions for MindGeek whilst knowing MindGeek's sites contained a substantial amount of monetized child porn.  This could qualify as an "unlawful" business practice.  And, contrary to Visa's assertion, Plaintiff has adequately alleged that Visa has control over deciding whether to recognize MindGeek as a merchant, making *Emery v. Visa Internat. Serv. Ass'n*, 95 Cal.App.4th 952 (2002) distinguishable.  Plaintiff has, however, failed to plead an FAL claim against Visa.  Plaintiff does not attempt to spell out her theory of FAL liability with respect to Visa in her opposition, and, unlike the UCL claim, the Court cannot neatly glean a theory of liability for Plaintiff's FAL claim from the FAC.  The Court **GRANTS** Visa's motion with respect to Plaintiff's FAL claim and **DENIES** the motion with respect to the UCL claim.

### 5. Common Law Conspiracy

The Court **ORDERS** Plaintiff to plead a more definite statement of her civil conspiracy claim. Federal Rule of Civil Procedure 12(e) permits a party to move for a more definite statement when a complaint is "so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. Pro. 12(e). And the Court is empowered to demand a more definite statement *sua sponte*. *See Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1127 (11th Cir. 2014) ("[N]othing should stop District Courts from demanding, on their own initiative, that the parties replead the case."). Although Visa does not lodge a Rule 12(e) motion, the Court finds it necessary to demand of Plaintiff a more definite statement with respect to her common law civil conspiracy cause of action against Visa.

Under California law, civil "[c]onspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510–11, (1994). Thus, a claim for civil conspiracy rests on the "commission of an actual tort." *Id*. at 511. And so, to assess whether civil conspiracy is adequately pled, the Court would have to assess whether Plaintiff has adequately pled the commission of the underlying tort or torts. *See Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 511 (1994).

Plaintiff does raise several tort causes of action. (*See* FAC.) But Plaintiff brings these causes of action against the MindGeek Defendants, not Visa. (*See id*.) When Plaintiff pleads her civil conspiracy claim, she includes Visa, but she does not make clear what torts Visa allegedly conspired to commit. Instead, she lists a series of alleged "overt acts," the same list of alleged acts that she used to support her section 1591 claims

against the MindGeek Defendants.  The Court cannot simply guess what tort or torts that list is supposed to represent.  And so, the Court cannot perform an analysis of whether civil conspiracy is adequately pled, because it does not know which tort or torts it should evaluate to assess whether Plaintiff has adequately pled the commission thereof.  If Plaintiff mistakenly pled civil conspiracy as a standalone tort, it should be removed from her complaint.  If she is attempting to use the civil conspiracy claim as a means to impute tort liability to Visa for some or all of the various torts that she pleads, she must amend her complaint to make clear which tort causes of action Visa allegedly conspired to commit.

## IV.    ICLE'S AMICUS BRIEF

Also before the Court is the ICLE's motion for leave to participate as amicus curiae.  (Dkt. 145.)  The Court **GRANTS** that motion.  However, the Court does not find ICLE's brief persuasive.  The brief focuses on whether Visa should be treated as a participant as that term is used in the RICO and TVPRA statutes.  (See id. at 4 ["The fundamental question with respect to Visa's Motion to Dismiss, then, is whether Visa should properly be considered a 'participant' in the activities alleged under these statutes."].)  But as discussed, the Court does reach the RICO claim in this order, and the Court agrees that Visa did not participate in a sex trafficking venture as that term is used in the TVPRA.  In other words, ICLE focuses on a moot point.  ICLE also operates under the assumption that the Court's only concern is to make sure to assign liability to parties in a superior position to avoid future harms—deterrence, in other words.  But courts also punish parties for past harms, even if there is no prospect that such punishment will deter an ongoing problem.  The Court is also not so sure that deterrence will not be had if Visa—as a result of this order or further developments in this case—ceases to recognize MindGeek as a merchant.  The last time Visa did that, MindGeek allegedly cleaned up its

websites to the tune of 80% of its content.  That looks a lot like effective deterrence.  This alleged fact is something both Visa and ICLE ignore in their briefing.

The Court also takes issue with ICLE's suggestion that keeping Visa in this case would send a signal that any company who allows MindGeek to "do business"—like FedEx, who delivers packages to the company—is fair game for a lawsuit.  (Dkt. 145 at 16.)  Visa is alleged to have knowingly allowed MindGeek to use its payment network to do crime, not simply to "do business."  FedEx can keep delivering packages to MindGeek if it has no reason to believe those packages are instrumental to a crime.  Nor would this order support a suit against Google for allowing Pornhub to appear in its search results.  (*See id.*)  Visa allegedly knowingly provided the very tool through which MindGeek committed its alleged crime of financially benefitting from child porn.  Even if Google knows that its search engine is being used to drive traffic to a website allegedly teeming with child porn, and thereby indirectly helps that website financially benefit from its illicit content, it would not have provided a tool through which the crime is completed, unlike Visa.

The Court further takes issue with ICLE's suggestion that it would be unfair to expect Visa to cut MindGeek off when the majority of MindGeek's content is legal porn.  (*Id*. at 17.)  MindGeek is alleged to have done far more than unwittingly host some illicit content amidst its numerous legal videos.  It is alleged to have solicited child porn and those searching for it, stored, distributed, and re-uploaded child porn knowing that it was child porn, and analyzed the performance of child porn to refine its algorithms, all with an intent to monetize illegal content.  If that is true, MindGeek is a criminal enterprise also engaged in legitimate business.  Suffice to say, law abiding businesses should avoid doing business with criminal enterprises, even when those criminal enterprises have been smart enough to diversify their activities.

## V.   CONCLUSION

For the foregoing reasons, Visa's motion is **GRANTED IN PART AND DENIED IN PART WITH LEAVE TO AMEND**.  However, leave to amend is limited. The Court will not permit Plaintiff to amend her section 1591(a)(2) claim against Visa. Such amendment would be futile because Plaintiff simply has no basis for claiming Visa directly participated in the sex trafficking ventures that harmed her.[16]  Plaintiff shall withhold any amendment until the parties have completed jurisdictional discovery, which the Court has ordered in a companion order.  (*See* Dkt. 167.)

DATED:     July 29, 2022

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

---

[16] That does not mean that Visa cannot be held liable for MindGeek's section 1591(a)(2) violation on a conspiracy basis.

# EXHIBIT 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. LACV-21-04920-CJC-(ADSx)                    Date:  July 29, 2022

Title: SERENA FLEITES V. MINDGEEK S.A.R.L., *ET AL*.

PRESENT:

### HONORABLE CORMAC J. CARNEY, UNITED STATES DISTRICT JUDGE

Rolls Royce Paschal                                  N/A
Deputy Clerk                                         Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFF:      ATTORNEYS PRESENT FOR DEFENDANT:

None Present                                         None Present

**PROCEEDINGS: (IN CHAMBERS) ORDER DIRECTING THE MINDGEEK DEFENDANTS TO SUBMIT TO JURISDICTIONAL DISCOVERY UNTIL DECEMBER 30, 2022, GRANTING PLAINTIFF LEAVE TO AMEND HER COMPLAINT AFTER JURISDICTIONAL DISCOVERY IS COMPLETE, AND DENYING THE MINDGEEK DEFENDANTS' MOTIONS TO DISMISS WITHOUT PREJUDICE [Dkts. 135-137, 139-140] FOR THEM TO RENEW AFTER PLAINTIFF HAS FILED A SECOND AMENDED COMPLAINT**

In this case, Plaintiff Serena Fleites brings numerous causes of action against Defendants MindGeek S.A.R.L., MG Freesites Ltd., MindGeek USA Inc., MG Premium Ltd., MG Global Entertainment Inc., 9219-1568 Quebec, Inc. (collectively, the "MindGeek Entity Defendants"), Bernd Bergmair, Feras Antoon, Davis Tassillo, Corey Urman (collectively, the "MindGeek Individual Defendants") (the MindGeek Entity Defendants and MindGeek Individual Defendants are referred to collectively as the "MindGeek Defendants"), and Visa, Inc., as well as certain doe defendants, referred to as the "Colbeck Capital Does" and the "Bergmair Does," for the emotional and financial harms she suffered when various sexually explicit videos of her as a minor were posted to MindGeek's pornographic websites, where they remained—either in their original or reuploaded form—for years, allegedly earning MindGeek advertisement revenue while Plaintiff battled the resulting depression, drug addiction, suicidal ideations, suicide attempts, and homelessness.  (Dkt. 124-3 [First Amended Complaint, hereinafter "FAC"].)  The disturbing allegations against the MindGeek Defendants are further

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LACV-21-04920-CJC-(ADSx)                    Date:  July 29, 2022
                                                     Page 2

---

detailed in the Court's companion order granting in part and denying in part Visa's motion to dismiss.  (*See* Dkt. 166.)

    In response to the FAC, the MindGeek Defendants move to dismiss on various grounds.  The MindGeek Entity Defendants filed a joint motion to dismiss, (Dkt. 139), and the MindGeek Individual Defendants filed separate motions to dismiss, (Dkts. 135-137, 140).  In the MindGeek Entity Defendants' joint motion, MindGeek S.A.R.L., which is the alleged parent company of the remaining MindGeek Entity Defendants, (FAC ¶¶ 20-24), and MG Premium Ltd., who allegedly owns and operates MindGeek's premium and pay sites, (*id*. ¶ 22), raise challenges to the Court's personal jurisdiction over them, (Dkt. 139 at 45-50.)  Each of the MindGeek Individual Defendants also challenge the Court's personal jurisdiction.  (Dkts. 135-137, 140.)

    Plaintiff argues that the Court should impute to MindGeek S.A.R.L., MG Premium Ltd., and the MindGeek Individual Defendants the jurisdictional contacts of the non-objecting MindGeek Entity Defendants on an alter ego basis.  (Dkt. 151 at 72-77.)  She also argues that MindGeek S.A.R.L., MG Premium Ltd., and the MindGeek Individual Defendants have sufficient contacts with the United States on their own to support a finding of personal jurisdiction under Federal Rule of Civil Procedure 4(k), which confers jurisdiction over a foreign defendant who lacks sufficient contacts with any one state but maintains sufficient contacts with the United States as a whole.  (*Id*. at 77-79.)  Plaintiff also makes a request for jurisdictional discovery.[1]  Given the jurisdictional issues addressed below, the Court agrees that jurisdictional discovery is appropriate.

## A.    Personal Jurisdiction: MindGeek S.A.R.L. and MG Premium Ltd.

    It is important to note at the outset that MG Freesites, Ltd. and 9219-1568 Quebec, Inc. do not object to the Court's personal jurisdiction.  Per the declaration of MindGeek S.A.R.L. director Andreas Alkiviades Andreou, MG Freesites Ltd. operates Pornhub and MindGeek's other porn sites, and 9219-1568 Quebec, Inc. provides services to MG Freesites, Ltd.  (Dkt 139-3 [Andreou Decl.] ¶¶ 17, 32.)  Plaintiff alleges that 9219-1568 Quebec, Inc. performs operational functions for Pornhub and MindGeek's other porn

---

[1] Plaintiff also argues that the RICO statute might provide a sufficient basis for personal jurisdiction, but for the reasons mentioned in the Court's companion order, (*see* Dkt. 166), the Court has serious doubtS as to whether Plaintiff has adequately pled RICO injuries or the timeliness of her RICO claims.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. LACV-21-04920-CJC-(ADSx)                     Date: July 29, 2022
                                                      Page 3

sites. (FAC ¶ 33.) These entities' decisions not to object to the Court's personal jurisdiction are unsurprising: Plaintiff alleges that Pornhub is used extraordinarily frequently in this district, as Los Angeles boasts the fourth highest usage of Pornhub (per city) in the world and Pornhub drives 3.17 trillion monthly ad impressions. The Court is left to wonder, however, who *owns* Pornhub and the other MindGeek websites that hosted Plaintiff's videos? Mr. Andreou is clear that MG Freesites *operates* Pornhub and the other porn sites, and he asserts "MindGeek S.A.R.L. has been and is nothing more than a holding company, without any employees or operations of its own." (Andreou Decl. ¶¶ 14, 17.) That neither confirms nor denies MindGeek S.A.R.L.'s possible ownership of Pornhub. Plaintiff, however, cannot firmly commit to an allegation that MindGeek S.A.R.L. owns Pornhub and the other porn sites on which her videos appeared. She alleges that MindGeek S.A.R.L. "directly and indirectly owns and operates over 100 pornographic websites…including Pornhub." (FAC ¶ 19.) The distinction between direct and indirect ownership of the offending websites is crucially important to the Court's jurisdictional analysis, but *neither* party makes a firm statement on that issue.[2] Also, operation of a website is not necessarily the same as control over a website. MG Freesites and 9219-1568 Quebec, Inc.'s operation of Pornhub and other MindGeek websites might not embrace control over the overall policies governing the website. Mr. Andreou does not speak to this distinction, and Plaintiff is again vague on the point of control, stating that MindGeek S.A.R.L. "owns and/or controls the majority of the pornography on the internet."[3] (*Id.* ¶ 19.)

---

[2] Where the money flows in the MindGeek web, which may relate to ownership of the porn sites that generate revenue, matters to the Court's jurisdictional analysis. As the Court sees it, financially benefitting from the sexual exploitation of minors is the core of this case. *See* 18 U.S.C. § 1591(a)(2). Jurisdictionally relevant conduct could include operating Pornhub and other MindGeek sites in a manner that maximizes the profitability of child porn. But it also includes collecting money—possibly from U.S.-based advertisers—flowing from the success of the aforementioned criminal operation.

[3] Plaintiff does not make other allegations specific to MindGeek S.A.R.L. The Court has reviewed the other allegations to which Plaintiff cites in support of her argument that MindGeek S.A.R.L. has maintained sufficient nationwide contacts and notes that these allegations either pertain to other Defendants or simply group-plead the MindGeek Defendants without identifying their specific conduct. But personal jurisdiction is just that: *personal* (unless there are grounds for imputing one defendant's contacts to another). Further, the Court cannot derive from the complaint a clear understanding of MG Premium's specific contacts with this state or with the United States as a whole as those contacts relate to this action. Plaintiff does allege that MG Premium owns and operates certain MindGeek paid sites, (FAC ¶ 22), but it is not clear from the FAC that Plaintiff's videos were placed on any of MindGeek's premium sites (*see* FAC ¶¶ 258-272 [explaining Plaintiff's story without mention of whether her videos were placed on premium sites]).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. LACV-21-04920-CJC-(ADSx)                    Date:  July 29, 2022
                                                     Page 4

---

Plaintiff may also be able to impute the contacts of the non-objecting MindGeek Entity Defendants to MindGeek S.A.R.L. and MG Premium through the alter ego doctrine.  "[T]o avail [herself] of the [alter ego] doctrine, [P]laintiff must allege two elements: First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone." *Wehlage v. EmpRes Healthcare, Inc.*, 791 F.Supp.2d 774, 782 (N.D. Cal. 2011).

For their part, the MindGeek Entity Defendants, through Mr. Andreou's declaration, aver in rather conclusory and repetitive fashion that they are each adequately capitalized and maintain separate financials, functions, and management, and that to the extent one MindGeek Entity Defendant provides services to another, those services are remunerated.  (*See* Andreou Decl.)  The Court notes, however, that even Mr. Andreou confirms a substantial overlap in the directors of the MindGeek Entity Defendants.[4] (Andreou Decl. ¶¶ 15, 19, 22, 26, 30, 35.)  In that same vein, Plaintiff alleges that the true managerial ties between the MindGeek Entity Defendants runs deeper, asserting that the MindGeek Individual Defendants exercise ultimate control over all of the MindGeek Entity Defendants, (FAC ¶¶ 25-28), an assertion that the MindGeek Defendants do not explicitly rebut.  The Court also has some concern with respect to the capitalization or solvency of the MindGeek Entity Defendants.  Plaintiff alleges that "MindGeek" has accrued millions of dollars of revenue in the past three to five years while operating at "massive" net losses, owing to various schemes in which some MindGeek Defendants bleed money out of others through fraudulent transactions.  (*See, e.g.*, *id.* ¶¶ 131-37.)

And therein lies the possible unfairness in dismissing any of the MindGeek Defendants at this point in the proceedings: the possibility that judgment will be entered against remaining insolvent or undercapitalized entities.  If the jury finds that the MindGeek Defendants engaged in schemes which diverted money from revenue generating MindGeek entities in contravention of corporate formalities, the Court is

---

[4] According to Mr. Andreou, MindGeek S.A.R.L.'s directors are himself, Anis Baba, and Claude Favre, MG Freesites's directors are himself, Anis Baba, Constantine Georgoude, and Charme Management Ltd., MG Premium has the same directors has MG Freesites, MG Global Entertainment and MindGeek USA have the same director: Andrew link, and the directors of 9219-1568 Quebec Inc. are himself, Feras Antoon, Constantine Georgoude, Polina Hadjivasilliou, and David Tassillo.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LACV-21-04920-CJC-(ADSx)                    Date: July 29, 2022
                                                      Page 5

---

concerned with the ability of the non-objecting MindGeek Entity Defendants to satisfy the damages awarded by a jury.

### B.    Personal Jurisdiction: MindGeek Individual Defendants

With respect to the specific conduct of the MindGeek Individual Defendants that might support an exercise of personal jurisdiction, there are various allegations throughout the FAC that identify specific MindGeek policies or practices—which were applied to Plaintiff and her videos—that the MindGeek Individual Defendants allegedly directed or implemented.  (*See* FAC ¶¶ 171-72, 194, 199, 203-209, 213.)  But those allegations suffer from a group-pleading problem that unfortunately plagues Plaintiff's FAC, as Plaintiff lists *each* MindGeek Individual Defendant as responsible for a policy or practice each time she identifies the pernicious policy or practice.  On the one hand, it might be true that the MindGeek Individual Defendants are all guilty of promulgating, knowingly approving, or implementing the criminal policies identified in the FAC, putting them at the center of the conduct that harmed Plaintiff.  Conspicuously, the MindGeek Individual Defendants do not submit their own declarations to rebut these allegations.  On the other hand, given the scattershot nature of the FAC and these allegations in particular, the Court has some concern that Plaintiff is merely guessing at who bears responsibility for the policies and practices that were applied to her videos.[5]

---

[5] In addition to more clearly identifying the *individual* conduct of the MindGeek Individual Defendants, Plaintiff must plead specific allegations—not generalizations—which distinguish her case from *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1210 (9th Cir. 2020), *cert. denied*, 142 S. Ct. 76 (2021).  The Court can discern from the FAC a few distinguishing factors that Plaintiff should clarify.  First, *AMA* involved a passive website (or at least the court used a framework applicable to passive websites).  *See id.* at 1219.  Pornhub is not a passive site, as users—ostensibly in the United States—can download and upload videos, a practice that the MindGeek Individual Defendants may have promulgated that directly harmed Plaintiff by allowing her videos to propagate faster than she could request their removal.  Also, the percentage of Pornhub users living in the United States may be far higher than the 20% in *AMA*, (*see* FAC ¶ 42), which may serve as a ground for finding that Pornhub has a "forum-specific focus" relating to the United States, *AMA*, F.3d at 1210.  It is also possible that one or many of the MindGeek Entity Defendants maintains servers in the U.S., that child porn featuring Plaintiff ended up on these servers, and that one or all of the MindGeek Individual Defendants promulgated a policy of reuploading child porn, like Plaintiff's videos, to MindGeek's websites after taking them down.  (*See* FAC ¶ 209.)  The Court is not convinced by the MindGeek Entity Defendants' conclusory, vague denial of ownership of any servers in the United States, as they fail to identify where the servers are otherwise located.  (*See* Dkt. 139-4.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. LACV-21-04920-CJC-(ADSx)                    Date: July 29, 2022
                                                     Page 6

Plaintiff might also have a workable alter ego theory pursuant to which she can impute the jurisdictional contacts of the non-objecting MindGeek Entity Defendants to the MindGeek Individual Defendants. She alleges that the MindGeek Entity Defendants are each controlled by the MindGeek Individual Defendants, (FAC ¶¶ 25-28), that the MindGeek Individual Defendants appoint sham directors to the entities which they control in order to impede investigations, (*id*. ¶ 135), and that the MindGeek Entity Defendants divert money, possibly to the MindGeek Individual Defendants,[6] (*id*. ¶ 137). On the one hand, these allegations are rather conclusory, vague, and indeed, quite difficult to follow at times, in terms of identifying the specific Defendants responsible for the conduct described. Importantly, however, and as mentioned above, the MindGeek Individual Defendants do not rebut these allegations through any declarations.

C.     **Jurisdictional Discovery**

Plaintiff requests leave to conduct jurisdictional discovery. (Dkt. 151.) "A court may permit discovery to aid in determining whether it has personal jurisdiction." *EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp.*, 711 F. Supp. 2d 1074, 1093 (C.D. Cal. 2010) (*citing Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977)). Jurisdictional discovery may be appropriate when "pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008). Jurisdictional discovery is appropriate in this case. In the sections above, the Court attempted to outline the push and pull of the jurisdictional facts before it. Neither side is clear on who owns and controls Pornhub and MindGeek's other porn sites on which Plaintiff's videos appeared. Both sides allege or rebut certain alter ego factors in a conclusory, generalized manner. Plaintiff offers group-pleading and conclusory assertions relating to the degree of the MindGeek Individual Defendants' responsibility for certain policies which affected her and relating to their pervasive control over the MindGeek Entity Defendants overall, which, in turn, draw silence from the MindGeek Individual Defendants.[7]

---

[6] This alleged flow of money is also jurisdictionally relevant for the reason discussed in footnote 2, *supra*.
[7] The MindGeek Defendants cite several Ninth Circuit cases wherein the court upheld the *denial* of jurisdictional discovery, intimating that the Ninth Circuit has announced a standard for *granting* jurisdictional discovery. When a higher court identifies reasons that support a lower court's exercise of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. LACV-21-04920-CJC-(ADSx)

Date: July 29, 2022
Page 7

---

The MindGeek Individual Defendants resort to a refrain that jurisdictional discovery would be a mere fishing expedition. (Dkt. 158 at 15; Dkt. 163 at 15; Dkt. 164 at 13.) But as the Court mentioned above, Plaintiff has alleged facts bearing on the MindGeek Individual Defendants direction of specific policies pursuant to which Plaintiff was harmed, and the MindGeek Individual Defendants do not submit any affidavit to rebut their involvement in those decisions. And this case is a far cry from this Court's decision in *Symettrica Entertainment, Ltd. v. UMG Recordings, Inc.*, 2019 WL 8806093 (C.D. Cal. Sept. 20, 2019), a case cited by the MindGeek Individual Defendants. In that case, UMG countersued Symettrica and two of its directors for copyright infringement. *Id*. at *1. The directors moved to dismiss for lack of personal jurisdiction, invoking the fiduciary shield doctrine. *Id*. at *3. The Court granted the motion after comparing the generalized allegations that the directors "authorized, directed, or participated in the wrongful conduct alleged" with the directors' detailed affidavits disclaiming their direct involvement. *Id*. Again, there are no affidavits to rebut the MindGeek Individual Defendants' alleged direct involvement in promulgating the practices and policies that harmed Plaintiff. But on a more fundamental level, Symettrica faced much different allegations than MindGeek. Symettrica, a documentary filmmaker, was alleged to have committed copyright infringement relating to *one* of its documentaries. It is reasonable to assume that executives and directors at a company are not aware of every act that that company takes. And, like in *Symettrica*, when a company is alleged to have committed a one-off illegal act, it would be improper to grant jurisdictional discovery based only on the vague allegation that the relevant executives or directors guided or directed that act. But Plaintiff alleges that one of MindGeek's main lines of business was criminal in nature. Plaintiff is not seeking to pin one-off illegal activity on a company's executives or directors with nothing more than an assumption that those executives or directors control everything at the company. That would be speculative. Plaintiff is instead seeking to tie to the MindGeek Individual Defendants the policies and practices that governed one of MindGeek's main lines of business. That is not speculative, especially in light of the MindGeek Individual Defendants failure to offer contrary evidence. It is entirely plausible that at least one of the MindGeek Individual Defendants—high up as they were in the MindGeek hierarchy—had substantial involvement in the practices and policies of one of MindGeek's major lines of business that harmed Plaintiff.

---

discretion to deny jurisdictional discovery, those reasons do not become prerequisites for the granting of a request for jurisdictional discovery.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LACV-21-04920-CJC-(ADSx)                    Date:  July 29, 2022
                                                     Page 8

---

The Court **ORDERS** Plaintiff and the MindGeek Defendants to engage in jurisdictional discovery.  The Court sets **FRIDAY, DECEMBER 30, 2022** as the close for jurisdictional discovery.  The Court **REFERS** this matter to the Magistrate Judge for the jurisdictional discovery period.

The Court **DENIES WITHOUT PREJUDICE** the MindGeek Defendants' motions to dismiss in light of the near certainty that Plaintiff will file a Second Amended Complaint at the close of jurisdictional discovery, which the Court **GRANTS** her leave to do.  The Court's prior orders extending the page limits for the motions to dismiss are not standing orders.  Extensions of page limits are allowable when additional elaboration would be helpful to the Court and only to that extent.  The MindGeek Entity Defendants did not need ten pages to reprise the arguments that this Court twice rejected in *Doe v. MindGeek*, and the MindGeek Individual Defendants did not need multiple pages to repetitively walk through several district court cases that illustrate the application of the fiduciary shield doctrine, for example.  When it comes time to file renewed motions to dismiss, the usual 25-page limit will apply, unless the Court grants permission to surpass that limit.

MINUTES FORM 11
CIVIL-GEN                                            Initials of Deputy Clerk RRP

# EXHIBIT 3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. LACV-21-04920-CJC-(ADSx)                    Date: July 29, 2022

Title: SERENA FLEITES V. MINDGEEK S.A.R.L., ET AL.

PRESENT:

### HONORABLE CORMAC J. CARNEY, UNITED STATES DISTRICT JUDGE

Rolls Royce Paschal                              N/A
Deputy Clerk                          Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFF:    ATTORNEYS PRESENT FOR DEFENDANT:

None Present                        None Present

**PROCEEDINGS: (IN CHAMBERS) ORDER DENYING PLAINTIFF'S REQUEST FOR ISSUANCE OF SCHEDULING ORDER AND REQUEST TO OPEN DISCOVERY [Dkt. 129]**

On May 6, 2022, Plaintiff requested that the Court enter a scheduling order and that the Court order the parties to proceed to discovery. (Dkt. 129.)  The Court **DENIES** that request.  In a separate order, the Court ordered the MindGeek Defendants (individual and entity) to submit to jurisdictional discovery. (Dkt. 167.)  Consequently, the Court denied the MindGeek Defendants' motions to dismiss without prejudice. (*Id.*)  As such, the scope of this case—both in terms of parties and claims—has yet to be determined. That is reason enough to deny Plaintiff's request.  *See, e.g., Estate of Jackson v. City of Modesto*, 2021 WL 5989754 at \*3 (E.D. Cal. Dec. 17, 2021) (deferring discovery where pending motions "will define defendants and issues in dispute, and thus the bounds of discovery, to the extent any claims survive"); *Yagman v. Garcetti*, 2020 WL 8125658 at \*1 (C.D. Cal. Sept. 3, 2020) (allowing discovery while motions to dismiss are pending is "premature" since motions could potentially "alter the landscape of the case significantly as to claims, defenses and jurisdiction").

Plaintiff might argue that she should be able to proceed with discovery with respect to Visa, as the Court partially denied Visa's motion to dismiss. (Dkt. 166.) However, as the Court's order at Dkt. 166 made clear, the remaining claims against Visa are uncertain. (*Id.*)  Additionally, the Court finds that it would be inefficient case

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No. LACV-21-04920-CJC-(ADSx)                    Date:  July 29, 2022
                                                     Page 2

management to issue a scheduling order with respect to just one defendant in a multi-
defendant case, and then put whatever defendants remain on a separate schedule.  Such
dual tracking would lead to duplication of effort, unnecessary discovery, and undue
burden on the Court and the parties.

 The Court understands Plaintiff's frustration that a case she filed in June 2021 has
yet to make it past the pleading stage.  The MindGeek Defendants are not giving her an
inch, reprising many of the same arguments this Court twice rejected in *Doe v.
MindGeek*, and thereby contributing to the delay in this case.  But Plaintiff and her
counsel must recognize their own part in creating an abnormally long pleading stage.
Plaintiff initially filed an unwieldy action with over 30 co-plaintiffs that necessitated
severance.  (Dkt. 119.)  Severance went far to simplify Plaintiff's complaint, but she has
still persisted in pleading some causes of action of questionable value to her overall case,
and has continued to engage in scattershot, group pleading, largely failing to identify the
MindGeek Defendants' *individual* roles in causing her harm.  The Court recognizes that
Plaintiff's failure in that regard may be due to the fact that she is not a MindGeek insider.
For that reason, and because Plaintiff has alleged enough facts unrebutted by affidavits to
raise a colorable argument that there is personal jurisdiction over the MindGeek
Defendants objecting to jurisdiction, the Court granted jurisdictional discovery.  (Dkt.
166.)  But the Court urges Plaintiff and her counsel to not use this opportunity to further
complicate this case.  Jurisdictional discovery is meant to provide Plaintiff the
information she needs to make a clear statement regarding the role and conduct of each
MindGeek Defendant *separately*.  The Court does not mean to deter Plaintiff from
pursuing the individuals and entities that allegedly harmed her, but if jurisdictional
discovery does not yield the information she needs to clearly define a defendant's
conduct as it relates to her harm, then that defendant should simply be dismissed so this
case can proceed without further unnecessary delay.

# EXHIBIT 4

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

SERENA FLEITES, et al.

           Plaintiff(s),

    v.

MINDGEEK S.A.R.L., et al.



           Defendant(s).

Case No.:
2:21–cv–04920–CJC–ADS


**SCHEDULING ORDER**

    The Court, having reviewed the pleadings and the parties' submissions pursuant to Federal Rule of Civil Procedure 26(f), now ORDERS as follows:

    [1]  All discovery, including discovery motions, shall be completed by April 6, 2023.  Discovery motions must be filed and heard prior to this date.

    [2]  The parties shall have until June 5, 2023 to file and have heard all other motions, including motions to join or amend the pleadings.

    [3]  A pretrial conference will be held on **Monday, August 7, 2023 at 03:00 PM**. Full compliance with Local Rule 16 is required.

    [4]  The case is set for a **jury trial, Tuesday, August 15, 2023 at 08:30 AM.**

///

[5] The parties are referred to ADR Procedure No. 3 – Private Mediation. The parties shall have until April 20, 2023 to conduct settlement proceedings. The parties shall file with the Court a Joint Status Report no later than five (5) days after the ADR proceeding is completed advising the Court of their settlement efforts and status.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Order on counsel for the parties in this matter.

**IT IS SO ORDERED.**

DATED: August 11, 2022

_____

Cormac J. Carney
United States District Judge

cc: ADR OFFICE

# EXHIBIT 5

**Weil, Gotshal & Manges LLP**

1395 Brickell Avenue, Suite 1200
Miami, FL 33131-3368
+1 305 577 3100 tel
+1 305 374 7159 fax

**Nicole Comparato**
+1 (305) 577-3236
Nicole.Comparato@weil.com

September 16, 2022

<u>VIA ELECTRONIC MAIL</u>

Michael J. Bowe
Lauren Tabaksblat
Brown Rudnick LLP
7 Times Square
New York, NY 10036

David M. Stein
Brown Rudnick LLP
2211 Michelson Drive, 7th Floor
Irvine, CA 92612

Re: *Serena Fleites v. MindGeek S.A.R.L., et al.*, Case No. CV 21-04920-CJC (ADSx) (C.D. Cal.)

Dear Counsel:

      I write to address Plaintiff's First Request for Production of Documents to Visa, sent by email September 7, 2022 ("RFPs"). As you know, the Court expressly denied Plantiff's request to proceed with discovery against Visa in advance of the filing of an amended complaint. *See* Dkt. 168. The Court stated that "the remaining claims against Visa are uncertain" and that proceeding with discovery from Visa "would be inefficient case management" and "lead to a duplication of efforts, unnecessary discovery, and undue burden on the Court and the parties." *Id.* Because no amended complaint has been filed, the RFPs are premature and do not require a response from Visa. While we understand that the district court authorized jurisdictional discovery, that discovery is authorized as to the MindGeek Defendants only, and the RFPs to Visa are not addressed to jurisdictional issues in any event. Please let us know if you have a different understanding of the Court's ruling.

      In addition, please provide Visa with copies of the jurisdictional discovery served on any of the MindGeek Defendants, as required by Rule 5(a)(1)(c). We received a copy of the third-party subpoena to Grant Thornton but have not received copies of any other jurisdictional discovery served on other parties.

Brown Rudnick LLP
September 16, 2022
Page 2

**Weil, Gotshal & Manges LLP**

Sincerely,

Nicole Comparato

# EXHIBIT 6

Michael J. Bowe
(*admitted pro hac vice*)
mbowe@brownrudnick.com
Lauren Tabaksblat
(*admitted pro hac vice*)
ltabaksblat@brownrudnick.com
BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
Telephone:      (212) 209-4800
Facsimile:      (212) 209-4801

David M. Stein (#198256)
dstein@brownrudnick.com
BROWN RUDNICK LLP
2211 Michelson Drive, 7th Floor
Irvine, California 92612
Telephone:      (949) 752-7100
Facsimile:      (949) 252-1514

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| SERENA FLEITES, | CASE NO. 2:21-cv-4920-CJC-ADS |
| Plaintiff, | HON. CORMAC J. CARNEY |
| v. | **PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO VISA INC.** |
| MINDGEEK S.A.R.L., a foreign entity; MG FREESITES, LTD.; MINDGEEK USA INCORPORATED, a Delaware corporation; MG PREMIUM LTD, a foreign entity; MG GLOBAL ENTERTAINMENT INC., a Delaware corporation; 9219-1568 QUEBEC, INC., a foreign entity; BERND BERGMAIR, a foreign individual; FERAS ANTOON, a foreign individual; DAVID TASSILLO, a foreign individual; COREY URMAN, a foreign individual; VISA INC., a Delaware corporation; COLBECK CAPITAL DOES 1-5; and BERGMAIR DOES 1-5, | |
| Defendants. | |

PROPOUNDING PARTY:      PLAINTIFF SERENA FLEITES

RESPONDING PARTY:      DEFENDANT VISA INC.

SET NO.:      ONE

1

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff Serena Fleites ("Plaintiff") requests that Defendant Visa Inc. ("Defendant") produce, in accordance with the following definitions and instructions, documents and other tangible things requested in the following Requests for Production of Documents, Set No. 1 (the "Requests"), for inspection and copying, within thirty (30) days after service, at the law office of Brown Rudnick LLP, 2211 Michelson Drive, Seventh Floor, Irvine, California 92612, or such other place as agreed upon by counsel. The failure to fully and accurately answer these requests may result in sanctions pursuant to Rule 37 of the Federal Rules of Civil Procedure.

## **DEFINITIONS**

1.     "Action" means the lawsuit captioned *Fleites v. MindGeek S.A.R.L. et al*, 2:21-cv-4920-CJC-ADS.

2.     "Andreou Declaration" refers to the May 23, 2022 Declaration of Andreas Alkiviades Andreou, Dkt. 139-3.

3.     "You" or "Your" or "Defendant" refers to Visa Inc.;  and each of its current or former subsidiaries, affiliates, parents, predecessors and successors, divisions, departments, and operating units, and includes, without limitation, each of its current or former partners, directors, shareholders, employees, employers, officers, agents, principals, officials, representatives, associates, consultants, attorneys, advisors, accountants, aliases, and all persons and entities acting or purporting to act on their behalf.

4.     "Defendants" means the following parties/entities and each of their current or former subsidiaries, affiliates, parents, predecessors and successors, divisions, departments, and operating units, and includes, without limitation, each of their current or former partners, directors, shareholders, employees, employers, officers, agents, principals, officials, representatives, associates, consultants, attorneys, advisors, accountants, aliases, and all persons and entities acting or purporting to act on their behalf:

       a.     Mindgeek Freesites LTD
       b.     Mindgeek USA Incorporated
       c.     MG Premium LTD
       d.     MG Global Entertainment

e.    9219-1568 Quebec Inc.
f.    Bernd Bergmair
g.    Feras Antoon
h.    David Tassillo
i.    Corey Urman
j.    Visa Inc.

5.    "MindGeek" "MindGeek Entity" or "MindGeek Entities" refers to any corporation, limited partnership, limited liability company, partnership, or other legal entity in which MindGeek S.à.r.l. has any direct, indirect, or beneficial ownership interest or relationship, including all parents, subsidiaries, and related entities, and includes each of those entities current or former partners, directors, shareholders, employees, employers, officers, agents, principals, officials, representatives, associates, consultants, attorneys, advisors, accountants, aliases, and all persons and entities acting or purporting to act on the entities' behalf.

6.    "MindGeek Tubesites" refers to the over 100 pornographic websites and brands owned by MindGeek, including but not limited to Pornhub, RedTube, Tube8, YouPorn, PornIQ, gaytube, Thumbzilla, Peeperz, PornMD, Xtube, Brazzers, Babes.com, Reality Kings, Digital Playground, Twistys, Men.com, Mofos, MyDirtyHobby, SexTube, and Webcams.

7.    "Document" is synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Rule 34(a) of the Federal Rules of Civil Procedure, and includes any written, recorded or graphic matter of any nature whatsoever, regardless of how recorded, and whether in original or copy, and any related communication.

8.    "Communication" shall mean and refer to any mode of conveying, distributing, disclosing, publishing, transferring and exchanging meaning or information, whether orally or by document, or whether by in-person conversations, telephone, mail, facsimile, personal delivery, overnight delivery, video recording, text or other electronic message, including ICQ, electronic mail or computer-generated posting or any other display on the internet, or otherwise. The term shall include notes, memoranda, or any other document memorializing, conveying, or referring to the information Posts and comments to any social media accounts such as Facebook, Twitter, YouTube, LinkedIn, Tumblr, Instagram, Pinterest, and Snapchat, and include comments to online materials posted to the MindGeek Tubesites.  These terms are further intended to include, without

1  limitation, any summaries, reviews, reports, notes, logs, records, journals, minutes, or outlines

2  concerning or memorializing the transmittal of information, opinion, words, or data.

3      9.    "Employee" includes, without limitation, current or former partners, directors,

4  shareholders, employees, officers, agents, officials, representatives, associates, consultants,

5  attorneys, advisors, accountants, aliases, and all persons and entities acting or purporting to act on

6  the employer's behalf.

7      10.    "Person" means any natural person, corporation, partnership, firm, association or

8  any business, legal or governmental agency.

9      11.    "Parent" means any person or entity which owns shares of stock or other ownership

10 interests in a subordinate entity, having ordinary voting power to elect a majority of the board of

11 directors or other managers of such subordinate entity are at the time owned, or the person which

12 manages or otherwise controls, directly or indirectly, such subordinate entity.

13      12.    "Affiliate" means a subsidiary corporation, sister corporation, subsidiary limited

14 liability company, sister limited liability company, or any other form of business entity with an

15 overlap of ownership, board of directors, managers, or executives, or a direct or indirect ownership

16 interest.

17      13.    "Related Party Entities" means any entity in which any MindGeek owner, investor,

18 lender, secured party licensee, licensor, or executive, or family member or affiliate of such person

19 or entity hold a direct, indirect, or beneficial interest.

20      14.    "CSAM" refers to Child Sexual Abuse Material and includes child pornography

21 and any visual depiction of sexually explicit conduct involving a minor (a person less than 18

22 years old) or the sexual abuse and exploitation of a child or children.

23      15.    "December 2020 New York Times Article" refers to the article *The Children of*

24 *Pornhub*, written by Opinion Columnist Nicholas Kristof and published by the New York Times

25 on December 4, 2020.

26      16.    "February 2020 Dirty Dozen List" refers to the National Center on Sexual

27 Exploitation's February 2020 publication of its annual campaign list which identified twelve

28 mainstream entities for facilitating or profiting from sexual abuse and exploitation, available at

1   https://endsexualexploitation.org/dirtydozen-2020/.

2       17.     "May 2020 Email Campaign" refers to the email communications sent between

3   approximately May 8, 2020 and approximately May 22, 2020 by anti-human and sex trafficking

4   public advocates to Visa directors, executives, and employees calling for Visa to terminate its

5   relationship with Pornhub due to the existence of CSAM and other illegal content on Pornhub.

6       18.     The relevant time period pertaining to these requests is January 1, 2013 through the

7   present.

8                                    **INSTRUCTIONS**

9       1.      These requests should be construed in the broadest possible manner consistent with

10   the Federal Rules of Civil Procedure and the Local Civil Rules.

11       2.      The use of a verb in any tense shall be construed as the use of the verb in all other

12   tenses, as necessary, to bring within the scope of this document request all documents and

13   responses which might otherwise be considered beyond the scope.

14       3.      The use of capital letters, lower case letters or quotation marks in this document

15   request shall not be construed to limit the scope of any specific request contained herein.

16       4.      The term "including" means including without limitation.

17       5.      The connectives "and" and "or" shall be construed either disjunctively or

18   conjunctively as necessary to bring within the scope of the discovery request all responses that

19   might otherwise be construed to be outside its scope.

20       6.      The use of the singular form of any word includes the plural and vice versa.

21       7.      In responding to the Requests, furnish all responsive documents that are available

22   to you, including documents in the possession of your agents, advisors, attorneys, contractors,

23   representatives, partners, representatives, and anyone else acting on your behalf or otherwise

24   subject to your control.

25       8.      In responding to the Requests, make a diligent search of your records, electronic

26   files and of any other papers and materials in your possession or available to your representatives.

27       9.      Documents are to be produced in full and unexpurgated form without abbreviation

28   or redaction.  In the event that you are able to provide only part(s) of the document(s) called for in

PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO VISA, INC.

1  any particular Request for Production, provide all document(s) that You are able to provide and

2  state the reason, if any, for the inability to provide the remainder.

3          10.      If you do not have within your possession, custody or control any document(s)

4  responsive to a particular Request for Production, your response to that Request should so state.

5          11.      If any document requested herein has been lost, deleted, discarded or destroyed, it

6  shall be identified and described as completely as possible, including the following information:

7  content, author, recipient, sender copied recipient (indicated or blind), date prepared or received,

8  date of disposal, reasons for disposal, personnel authorizing the disposal, person disposing of the

9  document and contents of the document.

10          12.      All documents shall be produced in the order in which they are kept in the usual

11  course of business, and shall be produced in their original file folders, binders, cover or containers,

12  or facsimiles thereof. In addition, all documents shall be produced, organized, and labeled to

13  correspond to the individual Requests for Production.

14          13.      Documents constituting Electronically Stored Information (ESI) are to be provided

15  in Concordance Default format with associated default delimiters, and are to include bates-labeled

16  TIFF images, all associated metadata, and native files named after the bates number of the

17  corresponding TIFF image.

18          14.      Hard copy documents (non-ESI) are to be produced in Concordance Default format

19  with associated default delimiters, and are to include bates-labeled TIFF images and all associated

20  metadata.

21          15.      To the extent that you refuse to produce any document requested on the ground that

22  the document is protected from discovery by the work product doctrine, the attorney-client

23  privilege, or any other privilege or doctrine, provide a log identifying the document by stating: (1)

24  the date on which the document was prepared, the date appearing on the document, if different, and

25  the date on which it was transmitted; (2) the name(s) of the sender(s) and author(s) of the

26  document, including all recipients, "cc" recipients and "bcc" recipients; (3) the number of pages

27  withheld; (4) a description sufficient to identify the document without revealing the information for

28  which the privilege is claimed, including the general subject matter and character of the document

1  (e.g., letter, memorandum, notes); and (5) the statute, rule or decision which is claimed to give rise

2  to the privilege or any other reason for withholding the document, in accordance with Rule

3  26(b)(5)(A) and any stipulations between the parties.

4      16.    If only a portion of a responsive document is privileged against disclosure, you

5  must produce the responsive non-privileged portion of the document in redacted form, provided

6  that the redacted material is identified and the basis for the claim of privilege stated as provided in

7  the instruction above.

8      17.    Each and every non-identical duplicate of a document within the scope of any

9  request, whether different from the original because of stamps, indications of recipient, handwritten

10 notes, marks, comments or attachments to different documents, or for any other reason, is a

11 separate document to be produced in response hereto.

12     18.    The Requests are continuing in nature and require that you promptly produce

13 additional responsive documents or information whenever they are acquired, discovered or come

14 into existence after the date of the initial production.

15              **REQUESTS FOR PRODUCTION OF DOCUMENTS**

16 **REQUEST NO. 1**

17     All policies, rules, manuals, and guidelines regarding Your processing of payments for or

18 otherwise governing Your business relationships and operations with companies engaged in the

19 online pornography and adult entertainment businesses.

20 **REQUEST NO. 2**

21     All documents and communications regarding compliance programs, compliance reports,

22 or investigatory reports related to online pornography and the adult entertainment businesses.

23 **REQUEST NO. 3**

24     All contracts, agreements, or terms of service between You and MindGeek, any Defendant,

25 or any MindGeek Entity or Related Entity.

26 **REQUEST NO. 4**

27     All documents and communications concerning MindGeek's compliance with Your

28 policies, rules, guidelines, and terms of service.

PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO VISA, INC.

7

**REQUEST NO. 5**

All documents and communications concerning any audits or investigations You conducted of the MindGeek Entities, the MindGeek Related Entities, or other businesses involved in the online pornography or adult entertainment business regarding CSAM, non-consensual, prohibited, or illegal content, and any responses or actions taken by You in response to, reports, lawsuits, demands, testimony, or complaints of such activities.

**REQUEST NO. 6**

All documents and communications concerning, or relating to, any media reports regarding the existence of CSAM, non-consensual, prohibited, or illegal content, on MindGeek Tubesites.

**REQUEST NO. 7**

All documents and communications concerning or relating to MindGeek's decision to remove approximately ten million videos from its Tubesites in or around December 2020, including any communications between You and any MindGeek Entity, MindGeek Related Entity, or Defendant prior to or resulting from the removal of said content.

**REQUEST NO. 8**

All documents and communications reflecting or relating to Your decision to temporarily cease payments to any of the MindGeek Entities or any MindGeek Related Entity in or around December 2020.

**REQUEST NO. 9**

All documents and communications related to the investigation into CSAM, non-consensual, prohibited, or illegal content on MindGeek's Tubesites that You announced in December 2020 including all steps You took in response to the December 2020 investigation.

**REQUEST NO. 10**

All communications with any MindGeek Entity, MindGeek Related Entity, or Defendant about the allegations in the December 2020 New York Times Article.

**REQUEST NO. 11**

All documents and communications concerning the indictment and subsequent conviction of the individuals, owners, recruiters, and producers of MindGeek's partner channel Girls Do Porn

and all documents and communications concerning the allegations that were the subject of those indictments and convictions.

**REQUEST NO. 12**

All documents and communications concerning the February 2020 Dirty Dozen List and all documents and communications concerning any investigations You conducted about Your inclusion on the list or responses issued thereto.

**REQUEST NO. 13**

All documents and communications concerning the April 30, 2020 letter addressed to Your Director of Global Brand Protection, Elizabeth Scofield, described in paragraph 291 of the Amended Complaint and all documents and communications concerning any investigations You conducted concerning the allegations in the letter or any responses You issued thereto.

**REQUEST NO. 14**

All documents and communications concerning the May 1, 2020 letter addressed to Alfred F. Kelly described in paragraph 292 of the Amended Complaint, and all documents and communications concerning any investigations You conducted into the allegations in the letter or responses issued thereto.

**REQUEST NO. 15**

All documents and communications concerning the May 5, 2020 letter described in paragraph 293 of the Amended Complaint, and all documents and communications concerning any investigations You conducted into the allegations in the letter or responses issued thereto.

**REQUEST NO. 16**

All documents and communications concerning the May 2020 Email Campaign by anti-trafficking advocates described in paragraph 295 of the Amended Complaint, including, without

limitation, any documents or communications concerning internal meetings, communications with shareholders or outside parties, concerning the Email Campaign or the allegations made therein.

**REQUESNT NO. 17**

All documents and communications concerning Visa's July 15, 2020 letter described in paragraphs296-297 of the Amended Complaint.

**REQUEST NO. 18**

All internal and external communications concerning the presence of CSAM, non-consensual, prohibited, or illegal content on the platforms or websites of companies engaged in online pornographic or adult entertainment, including without limitation, any communications with lawyers, advocates, activists, victims, legislators, law enforcement, regulators, media or news organizations, and financial institutions.

**REQUEST NO. 19**

Documents and communications identifying financial institutions using Your network to process payments for, by, or on behalf of the MindGeek Entities or any MindGeek Related Entity.

**REQUEST NO. 20**

All documents and communications reflecting Your annual revenues and profits from any services provided to any MindGeek Entities, any MindGeek Related Entities, or Defendants.

**REQUEST NO. 21**

All documents and communications reflecting annual revenues and profits earned by financial institutions using Your network for the provision of services to the MindGeek Entities or any MindGeek Related Entity.

**REQUEST NO. 22**

All documents, communications, or presentations to Your board of directors regarding CSAM, non-consensual, prohibited, or illegal content and any investigations, responses, or actions taken in response to reports, lawsuits, demands, testimony, or complaints of such activities related to such content.

**REQUEST NO. 23**

All documents and communications, internal or external, relating to or referencing

1    PayPal's decision around November 2019 to cease all payments to MindGeek Entities.

2    **REQUEST NO. 24**

3        All documents and communications reflecting or related to any reports or information from

4    any of the MindGeek Entities, any MindGeek Related Entity, or any Defendant regarding any

5    CSAM, non-consensual, prohibited, or illegal content.

6    **REQUEST NO. 25**

7        All documents concerning Visa's policies, practices, and compliance related to 18 U.S.C.

8    § 2257.

9    **REQUEST NO. 26**

10        All documents and communications related to the purported resignation of Feras Antoon

11    and David Tassillo as CEO and COO of MindGeek respectively.

12    **REQUEST NO. 27**

13        All documents and communications concerning MindGeek's use of Your logo or other

14    "Visa" brand-related slogans or images on its websites, tubesites, advertisements, or advertising

15    platforms, including any profit-sharing or contractual agreements entered into by and between

16    You and any MindGeek Entity, MindGeek Related Entity, or any Defendant.  This includes any

17    documents and communications with third-party vendors providing payment or transaction related

18    services for MindGeek.

19    **REQUEST NO. 28**

20        All documents and communications about this action and the allegations set forth in the

21    Amended Complaint.

22    **REQUEST NO. 29**

23        All documents and communications concerning your August 4, 2020 decision to terminate

24    payment services for advertising on MindGeek's advertising arm, TrafficJunky.

25    **REQUEST NO. 30**

26        All documents and communications concerning Alfred Kelly's August 4, 2020 statement

27    announcing Visa's decision to terminate payment services to TrafficJunky.

28    **REQUEST NO. 31**

1       All documents and communications concerning Your "rules" referenced in Alfred Kelly's

2  August 4, 2020 statement which "explicitly and unequivocally prohibit the use of our products to

3  pay for content that depicts nonconsensual sexual behavior or child sexual abuse."

4  **REQUEST NO. 32**

5       All documents and communications concerning Your "efforts" as referenced in Alfred

6  Kelly's August 4, 2020 statement to deter the use of Visa products to pay for content that depicts

7  nonconsensual sexual behavior or child sexual abuse and other illegal activity on the Visa

8  network.

9  **REQUEST NO. 33**

10      All documents outlining Visa's Global Brand Protection Program, its implementation and

11  operation, and any documents and communications concerning its application to the MindGeek

12  Entities and transactions by, for, or through any MindGeek Entity, or services provided by any

13  MindGeek Entity or MindGeek related entity.

14  **REQUEST NO. 34**

15      All documents and communications concerning the underwriting, monitoring and control

16  processes employed pursuant to Your Global Acquirer Risk Standards for ensuring merchant

17  transactions by, between, and involving any MindGeek Entity or MindGeek Related Entity

18  complied with applicable laws and policies.

19  **REQUEST NO. 35**

20      All documents and communications concerning Serena Fleites or other victims of

21  MindGeek.

22  DATED:  September 7, 2022          BROWN RUDNICK LLP

23

24

25                  By: _____

26                        Michael J. Bowe

                            Lauren Tabaksblat

27                        Attorneys for Plaintiff

                            SERENA FLEITES

28