UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

SERENA FLEITES, ET AL.,          ) CASE NO: 2:21-cv-04920-CJC-ADSx
                                 )
              Plaintiffs,        )          CIVIL
                                 )
    vs.                          )     Santa Ana, California
                                 )
MINDGEEK S.A.R.L., ET AL.,       )   Wednesday, January 11, 2023
                                 )    (10:24 a.m. to 11:53 a.m.)
_____Defendants._____)    ( 1:12 p.m. to  2:57 p.m.)


HEARING RE:


DEFENDANT MINDGEEK ENTITIES' MOTION TO COMPEL RESPONSES
TO INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS
[DKT.NO.223];


PLAINTIFFS' MOTION TO COMPEL DEFENDANT MINDGEEK ENTITIES'
RESPONSES TO PLAINTIFFS' FIRST REQUEST FOR PRODUCTION
OF DOCUMENTS AND INTERROGATORIES [DKT.NO.224]


BEFORE THE HONORABLE AUTUMN D. SPAETH,
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:                SEE PAGE 2

Court Reporter:             Recorded; CourtSmart

Courtroom Deputy:           Kristee Hopkins

Transcribed by:             Exceptional Reporting Services, Inc.
                            P.O. Box 8365
                            Corpus Christi, TX 78468
                            361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES**</u>:


For Plaintiffs:          LAUREN TABAKSBLAT, ESQ.
                         Brown Rudnick
                         7 Times Square
                         New York, NY 10036

                         DAVID M. STEIN, ESQ.
                         Brown Rudnick
                         2211 Michelson Drive
                         7th Floor
                         Irvine, CA 92612

For Defendants:          KATHLEEN N. MASSEY, ESQ.
                         Dechert
                         Three Bryant Park
                         1095 Avenue of the Americas
                         New York, NY 10036

                         CHRISTOPHER R. BOISVERT, ESQ.
                         Dechert
                         Cira Centre
                         2929 Arch Street
                         Philadelphia, PA 19104

1    **Santa Ana, California; Wednesday, January 11, 2023; 10:24 a.m.**

2                         **(Call to Order)**

3              **THE COURT:**  All right.  Good morning, everybody.

4    Please be seated.

5              **ALL COUNSEL:**  Good morning, Your Honor.

6              **THE CLERK:**  Calling Case CV-21-4920, *Serena Fleites,*

7    *et al versus MindGeek S.A.R.L., et al*.  And, Counsel, please

8    make your appearances starting with Plaintiff.

9              **MR. STEIN:**  Good morning, Your Honor, David Stein for

10   the Plaintiff.

11             **THE COURT:**  Morning.

12             **MR. TABAKSBLAT:**  Good morning, Your Honor, Lauren

13   Tabaksblat from Brown Rudnick on behalf of the Plaintiff.

14             **THE COURT:**  Okay.  I'm sorry.  Would you say your

15   last name again?

16             **MR. TABAKSBLAT:**  Sure.  It's Lauren Tabaksblat.

17             **THE COURT:**  All right, thank you.

18             And Counsel.

19             **MR. MASSEY:**  Good morning, Your Honor, Kathleen

20   Massey for the MindGeek Entity Defendants from Dechert.

21             **THE COURT:**  Okay.

22             **MR. BOISVERT:**  Good morning, Your Honor, Christopher

23   Boisvert also from Dechert here on behalf of the MindGeek

24   Entity Defendants.

25             **THE COURT:**  All right.  Good morning, everybody.

4

 1   Today will be much less dramatic than last time you were here,

 2   I'm guessing.

 3          Okay.  What I'd like to start with is the Defendants'

 4   motion to compel with regard to the jurisdictional discovery.

 5   But before I turn to the Defendants --

 6      **(Loud buzzing sound in courtroom)**

 7          Does somebody have their cell phone near -- well,

 8   there we go.

 9      **MR. SPEAKER:**  No.

10      **THE COURT:**  Thank you.

11          All right.  I'd like to hear from Plaintiff -- well,

12   a couple things.  We're here on jurisdictional discovery that's

13   pursuant to Judge Carney's July 29th, 2022 order, correct?

14      **MR. TABAKSBLAT:**  Yes, Your Honor.

15      **THE COURT:**  All right.  I'd like to hear from

16   Plaintiff so that I better understand what is the potential

17   basis for jurisdiction that Plaintiff believes exists or is

18   pursuing?  And if you would, would you mind coming to the

19   lectern?

20      **MR. TABAKSBLAT:**  Absolutely, Your Honor.  So, Your

21   Honor, there's several bases for jurisdiction with respect to

22   the two MindGeek Defendants that are contesting jurisdiction.

23   As Your Honor is aware, the remainder of the MindGeek entities

24   have consented to jurisdiction in this case.

25          One basis for jurisdiction is the direct contacts of

1   either MindGeek S.A.R.L. or MindGeek Premium with the U.S.  And

2   so the Court's order and the case law and statutes make clear

3   that jurisdiction is not only limited to California, the forum

4   state, but minimum contacts for the U.S. under certain statutes

5   would be sufficient.

6          And so in connection with that analysis of

7   jurisdiction, the minimum contacts with respect to those two

8   entities, there's relevant discovery concerning forum contacts

9   through travel, servers, relationships with the U.S.-based

10  entities.  A separate and equally important basis for

11  jurisdiction is the Court's July 29th order recognizes alter

12  ego jurisdiction.

13         And so the Court has recognized that there are

14  allegations in the complaint and the discovery that's been

15  produced to date demonstrate that these MindGeek entities,

16  although there were hundreds of entities formed, operated

17  without reference to corporate formality.  They are sham

18  entities and that under the alter ego analysis, the

19  jurisdictional contacts of one entity may be imputed to

20  another.

21         And so we're looking both at the direct contacts

22  between those entities -- those contesting entities in the U.S.

23  as well as alter ego entities that look at the funding, the

24  transfer of assets between entities, whether or not there were

25  corporate formalities.

1          So, for example, Your Honor, MG Premium, which is one

2  of the contesting entities in this case, has conceded through a

3  declaration, a motion to dismiss, that they provided -- that

4  certain of their employees provided moderation for MG Freesites

5  which is the entity that owns and operates Pornhub which is the

6  entity that Plaintiff's video was on.

7          And so the relationship between the two, the terms of

8  service, how they were paid, whether or not there were

9  corporate formalities between those entities would obviously be

10 relevant to the Court's alter ego analysis and whether the

11 contacts could properly be imputed.

12         **THE COURT:**  Okay.  Are there any aspects of the

13 jurisdictional analysis that Judge Carney will be asked to make

14 or to perform that -- where the information is in the

15 possession of Plaintiff as opposed to Defendants?

16         **MR. TABAKSBLAT:**  I don't believe so, Your Honor.

17 It's undisputed in this case that at all relevant times the

18 Plaintiff lived in the state of California.  So it would have

19 been California and in the U.S.  It's undisputed that the video

20 was recorded -- or the videos that are the subject of the case

21 were recorded in California and as a result, all of Plaintiffs'

22 damages were suffered in California.

23         Nothing else is relevant to the jurisdictional

24 analysis and so there's nothing that we will be asking Judge

25 Carney -- there's no other factors that would be relevant to

1    Judge Carney's determination.

2          **THE COURT:**  All right.  Thank you.  All right, thank

3    you so much.

4          **MR. TABAKSBLAT:**  Thank you.

5          **THE COURT:**  All right.  Let me hear from the

6    Defendants.  What I would really like for you, in your oral

7    argument, to concentrate on is tying the discovery request to

8    some portion of the relevant jurisdictional analysis that's

9    going to have to occur.  So I'd really like to know how these

10   requests -- because they don't simply say, provide me all facts

11   that you have regarding -- insert a limit, right.  They are far

12   more complicated than that and so I'd like to better understand

13   how they are tied to jurisdiction.  Okay?

14         **MR. BOISVERT:**  Absolutely, Your Honor.  Good morning.

15   This is Christopher Boisvert here on behalf of the MindGeek

16   Entity Defendants on Defendants' motion to compel discovery

17   this morning.

18         As Your Honor is aware, MindGeek Entity Defendants

19   did serve their discovery request over four months ago.

20   Despite that, to date, we have received no documents from the

21   Plaintiffs and only a partial response to one of the MindGeek

22   Entity Defendants' 13 interrogatories.

23         As I think Your Honor was getting at before, rather

24   than contesting specific objections relevant to particular

25   requests, Plaintiffs are arguing two things -- two reasons why

1    they should not have to respond to these requests.

2            The first is that they do not believe that Judge

3    Carney was contemplating that discovery would be two ways.

4    They're arguing that it's only one way.  But there's nothing in

5    Judge Carney's order that suggests that MindGeek could not also

6    serve discovery on the Plaintiffs provided, as you indicated,

7    that it is relevant to jurisdictional questions that the Court

8    will ultimately need to answer to determine whether it can

9    exercise personal jurisdiction over MindGeek S.A.R.L. and MG

10   Premium.

11           Secondly, they're arguing that the requests are

12   irrelevant to those jurisdictional questions and that's simply

13   not the case.  The MindGeek entity requests are primarily

14   directed toward evaluating whether MindGeek S.A.R.L. and MG

15   Premium themselves in their individual capacity have sufficient

16   relevant jurisdictional contacts to support personal

17   jurisdiction in this case.

18           This is the core question at issue.  It is not

19   irrelevant to what Judge Carney must ultimately determine and

20   it's not merely limited to any sort of contact that those

21   entities have with the United States.

22           To show that the Court may exercise personal

23   jurisdiction, Plaintiff must demonstrate not only that MindGeek

24   S.A.R.L. and MG Premium Limited have certain minimum contacts

25   such as the maintenance of the suit, does not offend

1   traditional notions of fair play and substantial justice --

2   that's the Supreme Court's decision in *Walden versus Fiore* --

3   but also that Plaintiffs' claim arises out of or relates to

4   Defendants' foreign-related activities.  And we cite to the

5   *Schwarzenegger* case for that proposition, Your Honor.

6           So it's not merely that those entities had activities

7   in California, as we contend, or even just the United States

8   more broadly, as Plaintiff contends, but it's that those

9   activities are related to the harm that Plaintiff alleges she

10  suffered in this case.

11          Absent that connection, there can be no personal

12  jurisdiction over those entities and so as part of that

13  inquiry, we need to understand exactly what occurred here.  As

14  I think Your Honor may have been getting at earlier, it's not

15  -- it was not clear, I think, from the papers precisely what

16  the theory of jurisdiction was the Plaintiff was pursuing.

17          Clearly, they believe very strongly in their alter

18  ego argument which we contest vigorously but it was not clear

19  whether they were, in fact, pursuing jurisdiction on an

20  individual basis based upon the individual contacts of the two

21  entities at issue here.  Plaintiffs' counsel has just indicated

22  this morning that she is but if that's the case, we need to

23  fully understand all of the underlying events here such that

24  those contacts can be evaluated.

25          This is not a case where Defendants have a full

1   understanding of the salient facts and Plaintiffs' complaint is

2   selective in terms of the facts that are included which is, of

3   course, Plaintiffs' prerogative.  It is her complaint.  She is

4   the master of it but there are important gaps in the

5   information provided by that document.

6           **THE COURT:**  Could I ask a question?

7           **MR. BOISVERT:**  Absolutely.

8           **THE COURT:**  If what you're proposing is an

9   interpretation of jurisdictional discovery that gets to the

10  merits, you're saying you have to understand all of the facts

11  behind what Plaintiff alleges occurred here in order to

12  determine whether jurisdiction applies.

13          And so we know that Judge Carney denied merits

14  discovery, right.  We know that jurisdictional discovery is

15  intended to be limited but it feels to me like that

16  interpretation that you're proposing opens the door to every

17  aspect of merits discovery and there isn't a limit at all.

18          **MR. BOISVERT:**  So, Your Honor, we're not asking for

19  every element of merits discovery.  We are limiting our request

20  very specifically to who did what, where and to whom, which are

21  the core issues in determining whether or not the activities

22  taken by particular entities were those -- activities were, in

23  fact, related to the harm that Plaintiff is alleging she

24  suffered in this case.

25          **THE COURT:**  And that information isn't in the

11

1   complaint?

2         **MR. BOISVERT:**  Well, some of it is, Your Honor, but a

3   lot of it is not.  So, for example, apart from the fact that

4   Plaintiff pleads that she created these videos herself in the

5   first instance, she doesn't plead who the videos were

6   ultimately disseminated to -- or excuse me -- initially

7   disseminated to, who allegedly uploaded the videos to Pornhub,

8   who Plaintiff and the uploaders allegedly interacted with at

9   Pornhub and who allegedly caused her harm and the sort of the

10  connection between those activities and the harm that she

11  ultimately alleges that she suffered.  And those things are

12  relevant to the jurisdictional inquiry here.

13        We're not asking for, like, full-blown comprehensive

14  merits discovery but we are trying to target -- trying to gain

15  a full understanding of who the relevant actors were, what they

16  did and when they did it because that goes to the heart of

17  jurisdictional discovery.

18        **THE COURT:**  Okay.  Go on.

19        **MR. BOISVERT:**  As I think Your Honor has gathered

20  from the papers, the MindGeek Entity Defendants have for

21  several months now been making these inquiries both formally

22  through these discovery requests but also informally to

23  Plaintiff because they are connected to MindGeek's ability to

24  actually produce discovery themselves.

25        We have found some limited information relevant to

12

1    Plaintiff in our own records but we have not been able to

2    locate or at least identify information that dates back to when

3    these events initially took place and that's partially because

4    Plaintiff has categorically refused to provide information that

5    could facilitate those searches and, in turn, receive discovery

6    from the MindGeek Entity Defendants that they have requested

7    and are, in fact, at issue on their own motion to compel today.

8            It's not that the MindGeek Entity Defendants are

9    refusing to provide -- have that information and are refusing

10   to provide it.  We've done an extensive search.  We've tried to

11   find these things -- they have tried to find things in a

12   variety of ways and they've not been successful in doing so.

13   We're not saying it's not the proper subject of discovery at

14   this phase or any other phase but we cannot produce what we do

15   not have and Plaintiffs are not cooperating with the process

16   and helping us locate it.

17           Even something like the email address that was sent

18   to the company to request a video takedown or something like

19   that would greatly assist our efforts in fulfilling our own

20   discovery obligations as well as understanding all of the

21   underlying facts that are germane to personal jurisdictional.

22           In addition to -- did Your Honor have any other

23   questions about the sort of contacts piece of it before I move

24   on to alter ego?

25           **THE COURT:**  No, other than that when we go through

13

1    each of the requests, I'll want to make sure that you clarify

2    for me how they are tied.  Okay?

3              **MR. BOISVERT:**  Sure, absolutely, Your Honor.

4              Interrogatories Numbers 11 through 13 and Request for

5    Production Number 11 seek information regarding the basis for

6    Plaintiff's claim in her complaint that the MindGeek Entity

7    Defendants failed to observe all necessary corporate

8    formalities.  Plaintiff's alter ego theory in her briefing both

9    here on these motions as well as on the motion to dismiss seem

10   to be really at the core of her argument that personal

11   jurisdiction is appropriate over these two entities.  So --

12             **THE COURT:**  Aren't your clients the ones solely in

13   control of that information?

14             **MR. BOISVERT:**  We have our own information and we are

15   certainly producing it.  We vigorously contest those

16   allegations.  We do not believe they are true and we believe

17   that the record will ultimately show that.  But presumably

18   Plaintiff had some source of information for bringing those

19   allegations in the first instance, presenting them to the Court

20   and representing that that was the case.

21             We believe that that information is incorrect and

22   that it is mistaken but we are compromised in our ability to

23   refute it or clarify it or put information into context if we

24   don't know what the source of that information is.  And so the

25   Court has a full understanding of what is being alleged and

14

1   what the basis of it is, we believe that those requests will

2   move that ball forward and facilitate resolution of that issue.

3          And I don't think there's any question that they are

4   relevant.  And Your Honor is correct that most of that

5   information is in our possession and that has been largely the

6   subject of discovery to this point.  We've produced extensive

7   discovery on that point but we need to understand what the

8   basis of Plaintiffs' arguments are as well in order to have,

9   like, a comprehensive view of the picture here.

10          Just one final point before we address specific

11   requests if Your Honor wants to walk through them is that with

12   respect to any remaining objections that Plaintiff has raised,

13   those should be considered waived at this point.

14          The only real issues that Plaintiff argued in the

15   joint stipulation are the two that we've just discussed, that

16   the questions were -- that Judge Carney did not contemplate any

17   discovery of Plaintiff and that otherwise the requests are

18   irrelevant to personal jurisdiction.

19          Beyond that, they made a choice not to argue their

20   remaining objections and given that, should Your Honor grant

21   our motion today, they should not be permitted to come back and

22   then subsequently again refuse to produce this information on

23   the basis that they didn't have an opportunity to argue their

24   other objections that were previously put in place.

25          The whole purpose of this process is to get all of

15

1   the objections, all of the arguments in place at once so it can

2   be resolved so we don't have to come back to Your Honor and

3   argue again on the very same requests again.  I think we cited

4   a couple of cases in our brief to that point.  So to the extent

5   that arguments have not been raised in the joint stipulation,

6   they should not be able to be raised in any sort of future

7   pleading.

8            Those are my general arguments.

9            **THE COURT:**  Okay.

10           **MR. BOISVERT:**  I don't know how Your Honor --

11           **THE COURT:**  I think I'd like to move to the

12   Plaintiffs to --

13           **MR. BOISVERT:**  Sure.

14           **THE COURT:**  -- address generally and then we can go

15   through more specifics.  One question I have for you is, back

16   whenever the parties were arguing whatever they were arguing

17   that resulted in that July 29th order, did Defendants move or

18   make a request of the Court to pursue jurisdictional discovery

19   or was it just Plaintiff?

20           **MR. BOISVERT:**  It was exclusively Plaintiff, Your

21   Honor.

22           **THE COURT:**  All right.

23           **MR. BOISVERT:**  Defendants did put in an affidavit

24   refuting the allegations as they existed in the complaint.

25   Judge Carney felt that jurisdictional discovery was necessary.

1          **THE COURT:**  Okay, thank you.

2          **MR. TABAKSBLAT:**  Thank you, Your Honor.  I'll just

3    make two quick points in response to Counsel's argument.

4    First, as the Court correctly just recognized, Judge Carney's

5    July 29th order specifically says on Page 6, "Plaintiff

6    requests leave to conduct jurisdictional discovery."  It was

7    our request and with respect to all the categories of discovery

8    that the Court outlined as relevant, it's all information

9    that's uniquely within the hands of the Defendants.

10          The Court didn't point to any categories of

11   information that would be within Plaintiffs' possession that

12   would be relevant to the Court's analysis and as I previously

13   set forth, there really isn't anything that Plaintiffs will be

14   arguing with respect to their contacts other than the location

15   of Plaintiffs' residence and where all the actions took place

16   in California that would be relevant for the Court's

17   consideration.

18          What you essentially heard Defense counsel argue here

19   is that they're required to understand the full factual context

20   essentially so that they can refute our jurisdictional

21   allegations.  However, what the Court ordered here was limited

22   jurisdictional discovery and then an amended complaint.

23          This isn't an opportunity for the Defendants to come

24   back and refute the facts.  It's an opportunity for us to --

25   for Plaintiffs to be able to explore whether or not there are

17

1    sufficient contacts either through a specific jurisdictional

2    analysis or an alter ego analysis to amend the complaint based

3    on the evidence that's learned through the discovery process

4    and then for the Court to assess whether those contacts are

5    sufficient.

6          It's not necessary for Defendants to understand every

7    individual who the video was sent to.  The Court's analysis

8    isn't whether or not there's another appropriate forum but

9    whether or not there's sufficient contacts with this forum.

10   That's where the analysis ends.

11         **THE COURT:**  Tell me, are the allegations in the

12   complaint that exists now sufficient for the Court to determine

13   whether contacts that you end up -- however you end up trying

14   to allege jurisdiction exists here that if the contacts that

15   relate to the damage and injury from -- of the Plaintiff?

16         **MR. TABAKSBLAT:**  I would say, Your Honor, I think

17   that the -- I think that discovery will show that the damages

18   are undisputed and extensive and I think the relevant inquiry

19   is what is MindGeek S.A.R.L. and MindGeek Premium's direct

20   involvement in causing those damages.

21         And the relevant -- that inquiry rests on two, I

22   think, separate analyses, one, whether or not Freesites and

23   Pornhub, which is Freesites, contacts can be imputed to either

24   one of those two entities and that relates to the corporate

25   structure, alter ego, corporate formalities.  That's

1    information uniquely within the hands of the Defendants.

2            And secondly, that relates to what those two entities

3    operational controls are over, for existence -- for example,

4    servers or data sites in the U.S., how those two entities

5    directly interacted with the video, with the policies of

6    optimizing and commercializing and monetizing.

7            And, again, that all relates to the relationship

8    between entities and who owned and who paid for the servers and

9    the data sites and the location of those.  It doesn't relate to

10   -- it's not necessary to gain access to any further information

11   from Plaintiff to make those determinations.

12           **THE COURT:**  All right, thank you.

13           **MR. TABAKSBLAT:**  Just one last point on the

14   objections.  The procedural posture in which the objections and

15   then this motion were filed I think is important for the Court

16   to understand.  The Defendants initially served these requests

17   in late September.  At the time, Plaintiffs at least were

18   operating under the assumption that an August order from the

19   Court had directed that all discovery, both merits discovery as

20   well as jurisdictional discovery, be completed.

21           And so when we responded to those requests, both the

22   RFPs and the rogs in late October and early November, our

23   responses were reflective of our understanding of that stage of

24   the case.  Subsequent to those responses but before the parties

25   filed the current motion, the Court issued another order which

1    clarified that the scope of discovery at this point is limited

2    strictly to jurisdiction.

3            And so for purposes of our motion, our objections

4    were obviously focused on whether or not the requests address

5    or relate to that jurisdictional inquiry and with respect to

6    any other objections and we said in our motion we don't leave

7    them, those relate to merit-based discovery and we disagree

8    that they are in any way waived.

9            **THE COURT:** All right, thank you.

10           All right. Counsel, so, again, I -- it's up to you

11   how you want to proceed specifically but just make sure my

12   primary inquiry is understanding how a specific request relates

13   to jurisdiction. All right?

14           **MR. BOISVERT:** Absolutely. And just before I get

15   started on that, Your Honor, I do think that Plaintiffs'

16   counsel is correct when she says that the direct involvement of

17   these entities at issue here is at the heart of what the Court

18   needs to consider here. And just by way of example and to why

19   the requests in general that we have propounded are necessary,

20   one of the Defendants is MG Premium.

21           MG Premium Limited primarily owns and operates --

22   excuse me -- operates pay sites rather -- as opposed to tube

23   sites, not sites where -- that are populated by user-generated

24   content. These are websites that people actually have to pay a

25   fee in order to access. Plaintiff has been --

20

1          THE COURT:  And you actually just raised an issue

2    that I'm not clear on.  What is a tube site?

3          MR. BOISVERT:  Sure.  A tube site is like -- has Your

4    Honor ever used YouTube, for example?

5          THE COURT:  Unfortunately.

6          MR. BOISVERT:  So they're websites where users can

7    upload videos themselves to the website.  Pornhub is considered

8    a tube site.  It is largely populated by videos that third

9    parties themselves, as opposed to the people who own and

10   operate the site, can upload videos to them much in the same

11   way as YouTube or similar websites like that.  So I don't want

12   to get too caught up in the jargon --

13         THE COURT:  Thank you.

14         MR. BOISVERT:  -- but that is the key distinction

15   there.

16         THE COURT:  Okay.

17         MR. BOISVERT:  And Plaintiff has been unclear as to

18   whether any of her videos ever appeared on any MindGeek pay

19   site.  If they did, that would very much have a potential

20   effect on whether or not personal jurisdiction is appropriate

21   over MG Premium but we've been unable to evaluate that or even

22   get Plaintiff the information that is relevant to that because

23   we cannot locate this information.

24         THE COURT:  Why?  So just help me understand that.

25   If a video of the Defendant is on your Premium site, wouldn't

1   your client have the ability to determine that rather than her?

2         **MR. BOISVERT:**  Well, we can do our best but it's not

3   like there's any -- there's not necessarily any personal

4   identifying information attached to the video.

5         So here the allegations are that Plaintiff made these

6   videos.  She sent them to someone else.  Those videos ended up

7   on the website.  It doesn't necessarily have her name attached

8   to it or anything that would be personally identifying.

9   Plaintiff does, I think, include a title in the complaint but

10  we have not been able to find -- of the video but we've not

11  been able to locate --

12        **THE COURT:**  Title to the video?  I'm sorry.

13        **MR. BOISVERT:**  Yes, yes.

14        **THE COURT:**  Okay.

15        **MR. BOISVERT:**  But we've not been able to locate

16  anything that matches up with that.  So given the limited

17  universe of information that we have, we haven't been able to

18  find it.  It doesn't mean that we don't have that information

19  but we have not been able to find it.

20        Does that make sense, Your Honor?  I know it's --

21        **THE COURT:**  Yes, it does.  Thank you.

22        **MR. BOISVERT:**  With respect to sort of specific --

23  would you like me to just walk through them all, Your Honor?  I

24  can if that's what you prefer I do.

25        **THE COURT:**  I'm sorry.  Say that again.

1          **MR. BOISVERT:**  As far as the specific requests

2   themselves, you'd like to just go through each one?

3          **THE COURT:**  Yes.

4          **MR. BOISVERT:**  Okay.

5          **THE COURT:**  And if you want to clump them because

6   they have the same argument, that's fine.  I'll leave it up to

7   you.

8          **MR. BOISVERT:**  Sure, Your Honor.  I mean, just

9   starting with Interrogatory Number 2 which is the first one in

10  our papers, that request is seeking email addresses and online

11  handles that were used by Plaintiff.  And by "online handles,"

12  I mean, like a user name that you might use on a website which

13  is often not your actual name.  It could be anything that you

14  could make up.

15         And the reason why we're seeking that information is

16  because, as I was sort of just indicating, it is essential for

17  us to be able to locate and identify all of the content that

18  Plaintiff claims appeared on MindGeek websites.  And I think

19  that one is relatively straightforward.  If we had that

20  information, we would be able to do a much more thorough search

21  on our end to make sure that we can find all of this

22  information.

23         Interrogatory Number 3 --

24         **THE COURT:**  No, why don't we stop there --

25         **MR. BOISVERT:**  Oh, yes, absolutely.

1          **THE COURT:** -- and let's go to --

2          **MR. BOISVERT:** Okay.

3          **THE COURT:** -- Plaintiff and let's address -- I see

4    your arguments.  I would like to hear from you with regard to

5    this and we're just going to handle them one at a time.

6          **MR. BOISVERT:** Okay.

7          **THE COURT:** Okay?

8          **MR. BOISVERT:** Thank you, Your Honor.

9          **THE COURT:** Come on up.  I see that the response is

10   that the Plaintiff will provide names, aliases, email addresses

11   or online handles used to communicate with Pornhub but then has

12   limit that it's waiting -- it won't do so until Plaintiff

13   responds to -- I mean, Defendants respond to Plaintiffs'

14   discovery.

15         So explain to me -- it sounds like your client has

16   agreed to produce the stuff, right?  Why do they need to wait

17   to produce it?

18         **MR. TABAKSBLAT:** So, Your Honor, again, this goes to

19   the procedural posture for when we responded to these.  We

20   believe that all this discovery is merits-based discovery, not

21   jurisdictional discovery and so while we definitely agree that

22   it's relevant to merits, we responded at that point based on

23   the understanding that the Court's order required both parties

24   to participate in merits discovery.

25         The Court's order has now said it's limited

24

1    specifically to jurisdiction.  Our view of Judge Carney's July

2    29th order is that that's limited to discovery from Defendants

3    and not Plaintiff.  And so I apologize because the responses

4    are a little bit confusing because they were addressing a

5    different procedural posture and it goes to whether or not we

6    think this is relevant to the merits as opposed to

7    jurisdiction.

8            **THE COURT:**  Okay.  So you don't think that they need

9    to know this information in order to determine -- or in order

10   to produce to you information regarding their contacts with the

11   United States?

12           **MR. TABAKSBLAT:**  So, Your Honor, I agree entirely

13   with the point you made a few minutes ago which is it's not our

14   burden to provide them information for them to respond to

15   discovery.  They can run the client's name.  They can run the

16   title of the video.  They have facial recognition software that

17   allows them to run her face.  They did produce one image.  We

18   know that they do -- they are able to find images of her.

19           And so while I understand that their position is that

20   they can't provide discovery unless we give them information,

21   respectfully, that's just not how discovery works.  If they

22   can't find anything after they've run a diligent search, then

23   the response is, we don't have it.  And that would be a

24   perfectly acceptable response.  We just -- it's not our

25   obligation to provide them information for them to run their

1    searches.

2         Now, we can talk about this, how it relates to our

3    requests to them for information but with respect to their

4    position that they need information from us in order to comply

5    with their discovery obligations, that's just not how it works.

6         **THE COURT:**  Okay.  Doesn't it behoove your client to

7    provide -- if they're telling you they can't find anything

8    because they don't have enough information and they think that

9    this information is what they need to find that, given that

10   jurisdiction and establishing jurisdiction is Plaintiffs'

11   obligation -- right, Plaintiffs' burden -- doesn't it benefit

12   Plaintiff to provide them the information that they need in

13   order to determine -- provide -- in order for them to produce

14   stuff to you?

15        **MR. TABAKSBLAT:**  I think, as we explained, that our

16   jurisdictional bases really hinge on the relationship between

17   the entities and whether or not Premium as having employees

18   that moderate Freesites, how those contacts are imputed as to

19   our clients' video but at the end of the day, if providing them

20   limited information such as her email handles will facilitate

21   them running additional searches, we're obviously happy to

22   participate in that way -- in that limited way.

23        **THE COURT:**  All right, thank you.

24        **MR. BOISVERT:**  Going to wear out your carpet, Your

25   Honor.

1          **THE COURT:**  So help me understand.  Do -- is it your

2    client's position that they cannot produce some of this

3    jurisdictional discovery without those items that are sought in

4    interrogatory number one?

5          **MR. BOISVERT:**  I think it's Interrogatory Number --

6          **THE COURT:**  Two.

7          **MR. BOISVERT:**  -- 2, Your Honor.

8          **THE COURT:**  Yes, thank you.

9          **MR. BOISVERT:**  We cannot produce things that we

10   cannot locate and do -- or do not have.  So in that sense that

11   if we have that information, it would greatly facilitate our

12   ability to locate it.  That -- I don't remember how your

13   question was phrased, Your --

14          **THE COURT:**  But so --

15          **MR. BOISVERT:**  -- Honor, but I --

16          **THE COURT:**  Am I right that the crux of this is

17   not -- the crux of the Plaintiffs' claims is not what she

18   posted to Pornhub or any of these websites but rather what

19   other people did with it; is that right?

20          **MR. BOISVERT:**  Yes, that's right, --

21          **THE COURT:**  Okay.

22          **MR. BOISVERT:**  -- Your Honor.

23          **THE COURT:**  So how do her -- how does her email

24   address and her handles relate to what other people did with

25   it?

1          **MR. BOISVERT:**  Because she ultimately reached out --

2     she claims in her Complaint that she ultimately reached out to

3     the company and, for example, sought -- requested that the

4     videos be taken down.  If we had the email address for the

5     takedown request, we can reverse engineer back through and find

6     the content that's attached to that request, for example.

7          **THE COURT:**  How does that relate to jurisdiction?

8          **MR. BOISVERT:**  How does that relate to -- well,

9     because, one, it would enable us to understand like where the

10    touchpoints were between the company and what entities had

11    contacts with the individuals who are involved in the

12    underlying events here.  And I think as we move through these

13    interrogatories like, you know, we also ask for that

14    information as well.

15         So if we, you know, can backfill this information,

16    understand who -- not only on Plaintiffs' end of things or on

17    the end of things where the video was uploaded to the website,

18    but also on MindGeek's side of things like who actually had

19    contact, who was involved in these events, we can understand

20    what entity -- for which entity's personal jurisdiction is

21    potentially appropriate.

22         **THE COURT:**  Do Plaintiffs intend to use Plaintiffs'

23    communications with these entities as part of those contacts

24    that are going to be the basis for jurisdiction?

25         **MS. TABAKSBLAT:**  Not with respect to S.A.R.L., which

1  we understand doesn't actually have any employees but is a

2  holding company, or with respect to Premium.

3        The other point I'll make, Your Honor, is that our

4  understanding is that the main form of a takedown request was

5  through a takedown page on MindGeek's website.  It wasn't

6  through direct communications between Plaintiff using an email

7  address and MindGeek.  So it would have been a direct link that

8  would have been uploaded, you know, through entering

9  information onto a webpage.

10        **THE COURT:**  Okay.  Continue.

11        **MR. BOISVERT:**  And that's their MG Free sites, Your

12  Honor, which is one of the entities that we're not contesting

13  jurisdiction over at this time and don't plan to.  I apologize,

14  lost my train of thought there.

15        **THE COURT:**  It's okay.

16        **MR. BOISVERT:**  I just want to mention two other quick

17  things.  One is Plaintiff asserted when she was speaking a

18  moment ago that MindGeek has facial recognition software.  It's

19  not facial recognition software that like the CIA has where you

20  can take a picture of somebody and they can run it against

21  everything.  It can be used to find --

22        **MS. MASSEY:**  Match.

23        **MR. BOISVERT:**  -- matches, like the same instance of

24  the same video.  So if a video was uploaded previously that was

25  taken down, they can use it to try to prevent that same video

29

```
1    from being re-uploaded or, if they detect it, to take it down.

2    It's not like you could take a picture of somebody and find

3    every video that involved that person on the website.  That's

4    just not how it works.

5              I also want to clarify too that we -- as part of

6    this, the company will not be producing any images themselves.

7    So any sort of CCM or illegal content, you know, that's not

8    part of the discovery here, and I just wanted to clarify that

9    point because that would be against the law, Your Honor.

10             THE COURT:  Okay.

11             MR. BOISVERT:  Okay.  So I think that's all I have on

12   interrogatory two, Your Honor, unless you have additional

13   questions.

14             THE COURT:  No.  Go ahead.

15             MR. BOISVERT:  Okay.  So interrogatory three seeks

16   sort of the identity of who Plaintiff alleges her traffickers

17   were, the people that were actually involved in the uploading

18   of the videos of her to the website.  And I think I've already

19   gotten at this a little bit, Your Honor.

20             That's relevant because we need to understand who

21   these people were to evaluate like where the points of contact

22   between the company were and the individuals that actually

23   uploaded it.  You know, again the sort of who, what, when,

24   where of what occurred here.

25             You know, Plaintiffs' core allegation in this case is
```

1   that the MindGeek entities are in effect responsible for the

2   creation and publication of videos depicting her.  We need to

3   understand the circumstances under which the videos were

4   created and uploaded in order to evaluate what entities are

5   allegedly responsible involved in that.

6           Obviously we don't agree that that is the case.  But

7   in terms of understanding the allegations, the harm that she's

8   alleging, and who was involved, the identity of those

9   individuals is relevant.

10          **THE COURT:**  Okay.  Let me hear from Plaintiff.  How

11  are the identities of these traffickers relevant to your client

12  proving personal jurisdiction?

13          **MS. TABAKSBLAT:**  Your Honor, respectfully, I don't

14  think they are at all.  Again, apologies for repeating myself,

15  but our basis for jurisdiction is based on the relationship

16  between these various MindGeek entities, what their functions

17  were, how they're related to each other, who controls what,

18  where the money flows.

19          And so the -- as counsel just articulated, they need

20  -- first of all, I'll come back to the point I made earlier,

21  which is that what counsels are essentially articulating is

22  that they are required to or allowed to sort of understand all

23  the facts and all the contacts so that they can assert, you

24  know, where the jurisdictional nexus and contacts are.  That's

25  not how it works.

1          What we need to establish is that there is

2   sufficient contact with either United States or with the State

3   of California.  That doesn't require understanding every single

4   contact between every individual that received the video, that

5   uploaded the video, that created the video, that spoke about

6   the video.

7          And so that may be an inquiry for a merits discovery

8   but it's certainly not an inquiry for jurisdictional discovery.

9          The other thing I'll just say is that counsel just

10  said that at the core of our case is that MindGeek created

11  these videos.  Our allegation is that they commercialize and

12  monetize them and they financially benefitted from them.

13         And so the -- again, I think all of this goes to

14  merits discovery again.  But whether where the video is

15  created, how it was disseminated, none of that is relevant to

16  (a) what the Court articulated as relevant to the

17  jurisdictional analysis or how we intend to prove jurisdiction

18  in this case.

19         **THE COURT:**  All right.  Thank you.

20         **MR. BOISVERT:**  Your Honor, I'm happy to just stay

21  here if that works for counsel.  It's --

22         **MS. TABAKSBLAT:**  And, I'm sorry, I will move over in

23  the future.

24         **MR. BOISVERT:**  It's entirely up to you, Your Honor.

25         **THE COURT:**  It may be more efficient if you are

32

1    comfortable.  However, when you stand, you have to bend over to

2    speak into that, and that could be tiring.  So if your back

3    starts to hurt, let us know.

4              **MS. TABAKSBLAT:**  Will do.

5              **THE COURT:**  Okay.

6              **MS. TABAKSBLAT:**  Thank you.

7              **MR. BOISVERT:**  And, yeah, certainly please do.

8              Your Honor, at the risk of sounding a little like a

9    broken record, it's not merely whether there are contacts.

10   It's whether those contacts are related to the harm claimed in

11   this case.  And if we don't understand the harm related to the

12   case and the people that are involved in it, we cannot evaluate

13   whether those contacts are relevant to it.

14             So, again, I just -- I think we have a little bit of

15   a disagreement on the law here.  But I think if you review the

16   cases, you know, that is an additional requirement.  It's not

17   just contacts.  It's contacts that -- and actions that harm

18   arises out of.

19             Interrogatory four is it -- this goes to identifying,

20   you know, the universe of videos that Plaintiff alleges were on

21   the website.  Understanding what websites they were on

22   obviously is relevant to personal jurisdiction.  If a web -- if

23   a video did appear on a pay site, MG Premium may potentially be

24   -- you know, jurisdiction may potentially be appropriate over

25   MG Premium.

1          But without understanding, you know, all of the

2    videos that were allegedly posted, where they were posted, and

3    who they were posted by, it's not possible to make that

4    evaluation.

5          I think it's unlikely that there were contacts beyond

6    MG Free sites.  But if that is the case, then we need to

7    understand it because it is relevant for the Court's analysis.

8          **THE COURT:**  All right.  Thank you.

9          **MS. TABAKSBLAT:**  So, Your Honor, I just come back to

10   the point I made a moment ago, which is that it's not necessary

11   to understand the entire landscape for jurisdiction.  Our

12   burden, and as Your Honor correctly pointed out a few moments

13   ago, it's the Plaintiffs' burden is to establish sufficient

14   minimum contacts.

15         And so we intend to do that, again, through the

16   interrelationship of the entities, alter ego, imputation, as

17   well as direct contacts through location of servers, data

18   centers.  And none of that requires any of the information that

19   Defendants seek in these interrogatories.

20         **THE COURT:**  All right.

21         **MS. TABAKSBLAT:**  The other thing I'll just say, Your

22   Honor, generally is that if we're looking at the actual

23   requests in these interrogatories, they're far broader than the

24   way that they're being characterized.

25         So just by way of example, and I'm sorry to go back

1    but, for example, in interrogatory number two where I agree

2    that we would be willing to give email addresses or handles to

3    facilitate a search, actually seeks far broader discovery than

4    that.

5              And so I just wanted to just make the point that

6    generally when counsel's explaining the limited information

7    that's relevant to the jurisdictional analysis, and in many of

8    these cases requests seek far broader information that goes to

9    all the circumstances, all the communications, things beyond

10   just the mere identity of traffickers, the mere identity of

11   handles and, with respect to the most recent request, you know,

12   the names of the sites that the videos were on.

13             **THE COURT:**  Okay.  To some degree I kind of agree

14   with that, which is that the requests do seem broader.  Were

15   these drafted at a time when you believed you were only doing

16   jurisdictional discovery or at a time where you believed that

17   you were also doing merits discovery and therefore -- or sort

18   of trying --

19             **MR. BOISVERT:**  They were drafted at a time we

20   believed we were doing jurisdictional discovery, Your Honor.

21             **THE COURT:**  Okay.  All right.  Go ahead.

22             **MR. BOISVERT:**  Interrogatory five, identify the

23   support for your allegation that any MindGeek entity uploaded

24   content depicting Plaintiff to a website operated by a MindGeek

25   entity.  This request is in Plaintiffs' Complaint.

 1          They allege that it was not merely third parties

 2   unaffiliated with the company that uploaded these videos but

 3   that people working for the company themselves also uploaded

 4   videos to different websites.  If an entity did that, you know,

 5   it would be potentially like relevant and connected to this

 6   case.

 7          We don't have any reason to believe that that is the

 8   case.  We want to understand what the basis of that allegation

 9   is so that it can be evaluated so we can determine, you know,

10   exactly who did what again.

11          **THE COURT:**  Okay.  All right.  Counsel.

12          **MS. TABAKSBLAT:**  Your Honor, I'll just make the same

13   point I made with respect to the prior interrogatories and

14   requests.  Again, this is all to me it's merit-based discovery.

15   It's looking to get a head-start on preparing their defense.

16          This again is seeking to understand the full factual

17   contacts as opposed to the specific limited information that

18   Judge Carney ordered the parties should engage in now.

19          **THE COURT:**  So is it correct to say that at this

20   point -- because what I -- the gist I'm getting from you is

21   that really at this point Plaintiffs' case with the discovery

22   isn't so much based on contacts through e-mails or uploading,

23   it's more about the alter ego.  Is that right?

24          **MS. TABAKSBLAT:**  I think it's both with respect to

25   alter ego and also as to which entities did what.  So -- and so

36

1    just to give you an example.  I think alter ego is a main

2    component of our jurisdictional analysis or our jurisdictional

3    nexus.

4           But the other point I would make is with respect to

5    MG Premium, again, as they've conceded in their own declaration

6    that they've submitted in opposition to their motion, MG

7    Premium, while these say it's -- was only limited to operating

8    pay sites, they actually served as moderators for Pornhub.

9           And so we do believe we're entitled to information as

10   to what the function of Premium was and what role they played

11   in both the policies, the commercialization, the optimization

12   of videos on Pornhub, the monetization, allowing child

13   pornography to be posted.  But it doesn't relate to, as Your

14   Honor asked specifically, Plaintiffs' communications with MG

15   Premium directly.

16          **THE COURT:**  What's the other entity that is still at

17   issue, this jurisdiction?

18          **MS. TABAKSBLAT:**  S.A.R.L.

19          **MR. BOISVERT:**  MindGeek S.A.R.L.

20          **THE COURT:**  Okay.

21          **MS. TABAKSBLAT:**  And MindGeek S.A.R.L., Your Honor,

22   is what Defendants allege to be a holding company that doesn't

23   have any employees.  And so the analysis with respect to

24   MindGeek S.A.R.L. again would center I would say on two buckets

25   of facts.  One would be the flow of money and the relationship

37

1    between the entities.

2         And the second being what MindGeek S.A.R.L.'s

3    ownership, control was either with respect to those tube sites

4    on which Plaintiffs' videos were uploaded, optimized, and

5    commercialized, or whether or not they paid for the servers,

6    the third parties that stored this information and held it and

7    redistributed it.

8         Again, so with respect to both entities, neither

9    jurisdictional argument is going to hedge on direct

10   communications between Plaintiff and those entities.

11        **THE COURT:**  Okay.  And just so I'm clear, those are

12   the two remaining entities.  So the other entities, they have

13   consented to jurisdiction; is that right?

14        **MR. BOISVERT:**  There are two entities that have

15   consented to jurisdiction.  And I think there are two other

16   entities that argue that they really just had nothing to do

17   with this and are not appropriate defendants, but not on a

18   jurisdictional basis.

19        **THE COURT:**  Do you agree with that?

20        **MS. TABAKSBLAT:**  Correct.  And I would argue that the

21   Court -- with respect to the Court's order, it held at this

22   point that those four entities did not contest jurisdiction and

23   that the only two entities that contest jurisdiction --

24        **THE COURT:**  All right.

25        **MS. TABAKSBLAT:**  -- are MindGeek --

38

1          **MR. BOISVERT:**  They're California entities so --

2          **THE COURT:**  Understood.  Okay.  All right.  Go ahead.

3          **MR. BOISVERT:**  I --

4          **THE COURT:**  I guess one question I have for you is --

5          **MR. BOISVERT:**  Sure.

6          **THE COURT:**  -- given their argument that the basis

7    for their jurisdictional arguments are what they are, I mean,

8    you've heard her repeatedly, does that alter at all your

9    position about your need for this information being

10   jurisdictional?  I mean, if they're not asserting these facts

11   as part of the jurisdictional analysis, why do you need

12   discovery for them?

13         **MR. BOISVERT:**  Well, I mean, I think that, you know,

14   nonetheless, Your Honor, I think Plaintiff is dancing around

15   it, but she is still -- they've still indicated that they are

16   going to pursue a contacts-based theory of jurisdiction over

17   these two entities.

18         And to the extent that that is true, we need to have

19   an understanding of what all of those contacts are.  And we

20   lack information to fully evaluate that, absent receiving this

21   discovery.

22         I know.  It -- I share your confusion, Your Honor,

23   because, you know, if we're really just talking about alter

24   ego, it narrow -- it does narrow the scope here.  But, you

25   know, I'm not hearing that that -- counsel is limiting it to

39

1  that argument.

2         **THE COURT:**  Okay.  Go ahead.

3         **MR. BOISVERT:**  Interrogatory six is communications

4  between Plaintiff and each MindGeek entity after Plaintiff

5  learned or discovered that contact -- excuse me, content had

6  been posted or uploaded to any website operated by a MindGeek

7  entity.

8         I mean, again, Your Honor, this is like direct

9  contact between MindGeek and Plaintiff herself, understanding

10 where those contacts happened.  Who was involved, and who they

11 worked for is relevant if a contact analysis is being pursued.

12        **THE COURT:**  Counsel.

13        **MS. TABAKSBLAT:**  Your Honor, I just -- you know, in

14 the interest of brevity, I'll just repeat all the points that

15 I've previously made and just refer the Court to those.

16        **THE COURT:**  Okay.  You believe it's irrelevant

17 because you're not asserting this type of contact as part of

18 your jurisdictional analysis.

19        **MS. TABAKSBLAT:**  Yeah.  And just to be clear, I think

20 more importantly, what I'm hearing from counsel is that it's

21 irrelevant to the Defendants to be able to evaluate all the

22 jurisdictional factors.

23        But the burden is on us to establish jurisdiction.

24 And what I'm hearing from them is that this analysis is

25 relevant to somehow refute what we would argue is proper

40

 1   jurisdiction.  And I just don't think there's any basis in the

 2   law for that.

 3           **MR. BOISVERT:**  I -- you know, the -- Your Honor,

 4   Plaintiff is also seeking this same type of information from

 5   MindGeek and, you know, everything related to her and the

 6   context there as well.  And so they've put that into issue,

 7   they're pushing it, they're seeking it in their motion to

 8   compel.  So it's hard to square with what we're hearing today

 9   about what's actually being pursued, I think.

10           And, you know, with -- when you are doing an analysis

11   for personal jurisdiction, the focus is on the Defendant that

12   is challenging jurisdiction -- not on the Plaintiff -- and what

13   actions the Defendant took and whether they purposely availed

14   themselves and took actions in the forum that harmed the

15   Plaintiff.

16           And so these contacts are relevant to that inquiry.

17   It's inescapable.

18           **THE COURT:**  All right.  Go ahead.

19           **MR. BOISVERT:**  Interrogatory eight is again seeking

20   information about where the content was created, who it was

21   created by, and when it was uploaded and by whom.  I think Your

22   Honor understands at this point why we believe that that's

23   relevant.  I don't want to belabor the point.

24           **THE COURT:**  Okay.  Go ahead.

25           **MR. BOISVERT:**  Interrogatory ten seeks information

41

1    about the harms that Plaintiff is alleging.  That is relevant

2    to personal jurisdiction because the contacts, the

3    jurisdictional activity, has to be related to the harm that is

4    claimed.  Without understanding the harm that is claimed, you

5    cannot evaluate whether certain actions were related to it.

6            THE COURT:  Okay.

7            MR. BOISVERT:  And we're out of those contact-based

8    ones now, Your Honor.

9            THE COURT:  Okay.

10            MR. BOISVERT:  I think interrogatory 11, 12, and 13

11    can maybe be addressed together.  They're all seeking different

12    element --

13            THE COURT:  Which ones?  Eleven, 12, --

14            MR. BOISVERT:  Eleven, 12, and 13, Your Honor.

15            THE COURT:  Okay.

16            MR. BOISVERT:  They're really again, and we talked

17    about this earlier, seeking the sources of the information for

18    Plaintiffs' allegations that the MindGeek Entity Defendants do

19    not observe all corporate formalities.  There's support for

20    various allegations that are taken directly from the Complaint

21    about that and that -- their allegation that they operate as a

22    singular business entity.

23            As I indicated earlier, we believe that that is

24    relevant because it is -- it appears to be Plaintiffs' core

25    argument as to why personal jurisdiction is appropriate over

42

1    these two entities.

2              We vigorously contest that it is on this basis, and

3    we certainly will argue that each of these entities are

4    independent, they were fully capitalized, they were own

5    entities.  There's no blurring whatsoever.

6              But we need to understand what the basis of these

7    allegations so that, yes, so that we can refute them or put

8    them into the proper context.

9              **THE COURT:**  Do you have any arguments?

10             **MS. TABAKSBLAT:**  Your Honor, this is classic merits-

11   based discovery.  It's going to the nature of the allegations

12   in our Complaint.  We don't think it's proper discovery for

13   this stage.  As Your Honor recognized and posed to the

14   Defendants approximately 20 minutes ago, all of this

15   information is within the Defendants' possession.

16             And, again, the limited inquiry before the Court

17   right now is whether there is sufficient contacts; not the

18   entire merits of our case or really the entire factual context

19   (phonetic) either.

20             **THE COURT:**  All right.  Thank you.

21             **MR. BOISVERT:**  These are the core allegations, Your

22   Honor, that Plaintiff is basing her claim that alter ego

23   jurisdiction is appropriate on.

24             **THE COURT:**  Okay.

25             **MR. BOISVERT:**  I think we're done the

43

1   interrogatories.

2           **THE COURT:**  Yeah.

3           **MR. BOISVERT:**  The request for production of

4   documents --

5           **THE COURT:**  I just wanted you to get, you know, some

6   of that experience of oral argument again.  You know, we spent

7   two years a home.  Anyway, go ahead.  Just kidding.

8           **MR. BOISVERT:**  You know, we're --

9           **THE COURT:**  Just kidding.

10          **MR. BOISVERT:**  I'm just hoping that my voice holds

11  up, Your Honor.  I've been battling laryngitis and I -- we're

12  back to a place where I can at least talk to you, which is

13  great.

14          But the good news here I think, Your Honor, is that

15  the request for production of documents largely mirror the

16  interrogatories.  The interrogatories are seeking information,

17  and then the request for production of documents are seeking

18  documents related to those inquiries.

19          So I don't think that there are any -- I want to

20  double-check but I don't think there are any novel sort of

21  legal issues or arguments that we need to talk through here.

22  But I'm happy to walk through them all if you prefer that.

23          **THE COURT:**  Let me take a second look.  All right.  I

24  agree that they appear to largely mirror.  Do you have any

25  further argument on them?

44

1          **MR. BOISVERT:**  I don't, Your Honor.  I think we've

2    set it out pretty clearly for you.  And unless you have more

3    questions, I will stand-down.

4          **THE COURT:**  Okay.  Let me hear from the Plaintiff.

5    Do you have anything further?

6          **MS. TABAKSBLAT:**  Your Honor, I don't have anything

7    further with respect to the substance.

8          But, again, with respect to the requests for

9    production, I would make the same point that I made with

10   respect to the interrogatories, which is that even with respect

11   to the jurisdictional nexus that counsel's articulating, these

12   requests go far beyond that.

13         **THE COURT:**  Okay.  All right.  Thank you.  Do you --

14         **MR. BOISVERT:**  Thank you, Your Honor.

15         **THE COURT:**  -- have anything further?  All right,

16   we're going to take a short break while I consider and confer

17   with my able law clerk and my able extern.  And we'll be right

18   back.

19         **MS. TABAKSBLAT:**  Thank --

20         **THE COURT:**  Okay.

21         **MS. TABAKSBLAT:**  -- you, Your Honor.

22         **MR. BOISVERT:**  Thank you, Your Honor.

23         **MS. MASSEY:**  Thank Your Honor.

24      **(Recess taken from 11:18 a.m. to 11:38 a.m.)**

25         **THE CLERK:**  All rise.  This Court is again in

1    session, the Honorable Autumn D. Spaeth, United States

2    Magistrate Judge presiding.

3           **THE COURT:**  All right, thank you.  Have a seat.

4           Okay.  This is the Court's ruling.  In this

5    situation, the parties agree that only jurisdictional discovery

6    is occurring in this case, and that it's occurring pursuant to

7    Judge Carney's July, 2022 order.

8           Parties agree that Plaintiffs were the moving party

9    seeking jurisdictional discovery.  And Judge Carney's order

10   outlines several areas of factual development that is needed

11   for his analysis of jurisdiction.

12          And all of those categories of information are in the

13   possession, custody, and control of Defendants.

14          Moreover, the Defendants' discovery I feel is

15   predominantly merits-based, which is not permitted in this case

16   at this time.  As a result, I am denying Defendants' motion to

17   compel the interrogatories and RFPs by Plaintiff in its

18   entirety.

19          Now, for the record, I want to point out the reason

20   for my interpretation of Judge Carney's order.  Again, it was

21   the -- it was Plaintiffs who moved to obtain jurisdictional

22   discovery.  And that is stated in Judge Carney's order, as was

23   pointed out by the Plaintiffs, but also the title of the order.

24   The order says:  "Order Directing the MindGeek Defendants to

25   Submit to Jurisdictional Discovery."  All right.  Okay.  Thank

46

1    you.

2            Now, let's turn to the Plaintiffs' motion.  And I'd

3    like to start with I know that there were amended responses or

4    additional responses that were served.  And I need to get a

5    handle on precisely what is still outstanding.  What is it that

6    Plaintiff still needs or is requesting as a result or after the

7    fact that Defendants produced these additional responses?

8            **MR. STEIN:**  Thank you, Your Honor, David Stein for

9    the Plaintiff.

10           We've split the argument sort of.  They brought me

11   along largely for the alter ego issue, which I think

12   technically is arising within the objections but probably

13   covers the vast amount of information that's in play.

14           So to the question of what I guess is still in play

15   or what are we still seeking, our position is that we have very

16   little of what's relevant to the alter ego analysis.

17           As I understand kind of the alter ego posture, what

18   Judge Carney has said is, go do the jurisdictional discovery,

19   presumably you will prepare a second amended complaint, and in

20   that you will need to detail the specifics for each entity and

21   what they did and how it contributes to the allegations, and

22   then he will look at the sufficiency of that.

23           And for the two named entities, MindGeek S.A.R.L. and

24   Premium, there's a number of broad categories I can walk

25   through of stuff that we don't have that we would contend are

1    still at issue.

2         But there's I think somewhere in here it says there's

3    a web of entities.  I think there's like a hundred MindGeek

4    entities total; a number of them are named, some of them are

5    not.  But the interrelationship between all of them, what's

6    capitalized, where the money is going, who's funding what,

7    who's controlling what, who's setting the policies that

8    controlled the uploading of content, the optimization, the

9    monetization, the advertising.

10         I think the entire production in this case so far is

11   like a box of documents or less.  And when you talk about a

12   hundred entities and I think it's ten years of time now and

13   very complicated corporate structure and shareholder agreements

14   and finance agreements and presentations to boards, we have

15   almost none of that yet.  So I can walk through a broad list if

16   it would be helpful.

17         **THE COURT:**  So just big picture then, what I'm

18   hearing is that although there were supplemental or responses

19   that occurred after the initial briefing, that those don't

20   remove off the table any specific categories.  Is that --

21         **MR. STEIN:**  I think that's correct.

22         **THE COURT:**  Okay.

23         **MR. STEIN:**  I do think there are maybe a -- putting

24   aside alter ego for a second, I don't mean to step into

25   Ms. Tabaksblat's territory here, but like one of the items

 1  raised was the was the identification of the location of

 2  servers.  I think at the time we filed this, maybe we didn't

 3  have anything.  But maybe there's been a subsequent agreement

 4  in part to -- and I don't -- maybe I should allow them to

 5  address this, too.

 6          But my understanding is that is -- the production is

 7  not complete but maybe it's much less of a dispute where

 8  there's kind of some willingness to get that worked out versus

 9  alter ego, which is a giant elephant in the room in terms of a

10  debate about the scope of what's in play.

11          THE COURT:  Okay.

12          MR. STEIN:  So I think the short answer is the

13  supplement did not remove anything; although we may have made

14  some small progress on one issue.

15          THE COURT:  Okay.  Let me just hear from counsel.  Do

16  you agree with that?

17          MS. MASSEY:  No, I do not, Your Honor.  Your Honor,

18  whether the documents fit within a box or not is not relevant.

19  What is relevant is that the MindGeek Entity Defendants have

20  been working diligently to respond to Plaintiffs' requests

21  insofar as they concern jurisdictional discovery.

22          Mr. Stein mentioned the fact that, you know, they

23  allege there are hundreds of entities and they think they need

24  documents about each of those hundred entities, that is not

25  what Judge Carney permitted.  He acknowledged that the

1   Plaintiffs had alleged, you know, there were a number of

2   entities.  But the issue is, are there sufficient contacts of

3   the two entities challenging jurisdiction.

4           And then are there facts that would support

5   Plaintiffs' alter ego theory?  And regarding the alter ego

6   theory, the MindGeek Entity Defendants have produced almost all

7   of the sort of information that would bear on this issue.

8           We've produced organizational charts showing how all

9   of the entities relate to each other.  We have produced the

10  only shareholder agreements.  We have produced information

11  about who the officers, directors, and shareholders are of not

12  only each Defendant but also each owner of each Defendant, all

13  the way up the chain to MindGeek S.A.R.L.

14          And then insofar as the Court expressed an interest

15  in knowing who owns Pornhub and how do the funds flow resulting

16  from the Pornhub business, we have produced IP agreements and

17  financial information showing how those funds flow, regardless

18  of entity.

19          And we have produced group financial documents that

20  show the finances for every entity in the group.

21          And we have produced not only documents showing that

22  the relevant entities -- and I'm not undertaking, sorry, to

23  address, you know, the hundreds, but the relevant entities

24  certainly are formed properly.

25          We produced documents relating to their observation

1    of corporate formalities.  We have produced board minutes and

2    shareholder resolutions and the like.

3              So the suggestion that the MindGeek Entity Defendants

4    have not adequately produced documents bearing on the issues of

5    alter ego theory is belied by the documents.

6              And, Your Honor, we did submit a declaration from our

7    colleague Michelle Yeary.  And in that declaration she details

8    -- I think it's paragraphs eight through 13 or 14 -- all of the

9    specific things that we have produced.

10             Now, there were perhaps two tax returns that the

11   MindGeek Entity Defendants couldn't put their hands on right

12   away and so we followed up and supplemented with those.

13             So I'm not saying there hasn't been a document here

14   or there that we couldn't put our hands on right away, but we

15   have produced what we have been able to locate.  And we're

16   certainly willing to discuss, you know, any reasonable

17   supplements that would bear on the issues.

18             As Mr. Stein said, we're talking about a lengthy

19   period here, from June, 2014 until June, 2020.  We have seven

20   MindGeek Entity Defendants.  We have another half dozen or so

21   entities that go up the ownership chain.

22             And then as I mentioned, we produced for other

23   entities regarding Pornhub and for the whole group regarding

24   finances.  I omitted to mention we have all the financial

25   statements to the extent the entities are required to have them

51

1    and do have them.  And we've produced tax returns.

2            And we're talking about entities in Luxembourg, in

3    Cypress, in Quebec; a lot of documents in foreign languages.

4    And the MindGeek Entity Defendants really have acted

5    diligently, Your Honor, to find --

6            **THE COURT:**  So from your perspective or from your

7    clients' perspective, do you believe you have produced

8    everything that you have agreed to produce?  And what I'm

9    trying to figure out is, you know, are you done, do you think

10   you're done, or are there -- you know, sometimes we have a bank

11   of documents that still have to be reviewed to determine if

12   we're producing them or whatever.  I mean, I just want to know.

13   Do you think you're done or are you in the process, like

14   there's a rolling production?

15           **MS. MASSEY:**  We're largely done I would say with what

16   we initially agreed to produce.  And then we agreed with the

17   Plaintiffs to produce some more.  And I believe we have

18   produced that.

19           For example, the Plaintiffs were inquiring, we

20   produced relating to moderation efforts and the like for

21   Pornhub.  Plaintiffs wanted more about the tube sites so we

22   produced for three additional tube sites.  And I'm pretty sure

23   that is done.

24           It has come to our attention that there was not

25   adequate documentation of distributions to one of the

52

1   individual Defendants.  And, you know, literally I saw those

2   documents on Monday and yesterday.  And we just need to make

3   sure that we've got, you know, a complete set.  And we'll be

4   prepared to produce those in short order.

5           So, Your Honor, if there are specifics, we're

6   certainly open to discussing them.  But I really don't know how

7   to deal with these vague statements that --

8           **THE COURT:**  Okay.

9           **MS. MASSEY:**  -- the MindGeek Entity Defendants have

10  not produced information.

11          Now, there were references to whether there's a

12  dispute over servers and the like.  I think there's a little

13  bit of confusion that in the motion to dismiss papers, the

14  MindGeek Entity Defendants submitted a declaration from one of

15  the directors of MindGeek S.A.R.L.  And he stated that there

16  were no servers in the U.S. that hosted content uploaded to

17  Pornhub.

18          And the judge observed that it's necessary to

19  identify where the servers are then.  And MindGeek did that in

20  its interrogatory responses.  Initially they were redacted

21  until there was a protective order in place.  But with the un-

22  redacting of the interrogatory responses, Plaintiffs know now

23  where the servers are that host content uploaded to Pornhub.

24          And just getting back to the discussion for she's

25  alleged her content was uploaded to Pornhub, there are vague

53

1    allegations that her content might have been uploaded to other

2    sites.  But without information about what sites, we -- you

3    know, we're at somewhat of a loss.

4            So to the extent that she's alleging and we have

5    identified content posted after she was of age on Pornhub,

6    we've produced information about where the relevant servers are

7    there, Your Honor.

8            **THE COURT:**  All right.  Thank you.

9            **MS. MASSEY:**  Thank you.

10           **THE COURT:**  Unless -- do you have a response to that?

11   But I just want to throw out here, based on the time, I'm

12   thinking we might take a lunchbreak and then come back and deal

13   with the second motion.

14           **MR. STEIN:**  Whatever works for the Court and --

15           **THE COURT:**  Okay.  But do you want to respond to that

16   before we take a break or --

17           **MR. STEIN:**  I don't want to keep people from lunch,

18   Your Honor.  But I could respond to say when we come back from

19   lunch, I can identify with a lot of specificity exactly the

20   types of things that we think we should have that we don't

21   have.

22           **THE COURT:**  Okay.  Thank you.  All right.  So let's

23   take a lunchbreak.  And I'm sorry to keep you around.  But I

24   just think that given what I can tell about these issues, it's

25   not a five-minute oral argument.

54

1          And, you know, I understand many of the issues better

2     now so I would like the opportunity to spend some more time

3     with the paperwork while you guys all go enjoy yourself and

4     have lunch.  So unless somebody has a time constraint or

5     something that would preclude us from doing that --

6               **MS. MASSEY:**  No, Your Honor.

7               **MR. BOISVERT:**  No, Your Honor.  I'm sorry.

8               **MS. MASSEY:**  As you wish.

9               **MS. TABAKSBLAT:**  No, Your Honor.

10              **MR. STEIN:**  No, Your Honor.

11              **THE COURT:**  All right.  I assume you guys are

12    familiar with the area.  But there are plenty of place across

13    the street and even on the backside of the Court to go and eat.

14              And let's return -- it's 11:53.  Is everyone okay

15    returning at 1:00 o'clock?

16              **MS. TABAKSBLAT:**  Yes, Your Honor.

17              **MR. STEIN:**  Yes, Your Honor.

18              **THE COURT:**  All right.  Let's do that.

19              **MS. TABAKSBLAT:**  Okay.  Thank you.

20              **THE COURT:**  Thank you.

21              **MR. STEIN:**  Thank you, Your Honor.

22              **THE CLERK:**  We're now in recess.

23          **(Recess taken from 11:53 a.m. to 1:12 p.m.; Call to Order)**

24              **THE COURT:**  All right.  Welcome back everyone.  Have

25    a seat.

55

1          **MS. MASSEY:**  Thank you.

2          **THE COURT:**  I hope that was sufficient for you to get

3    some food.

4          **MS. MASSEY:**  Yes, ma'am.

5          **THE COURT:**  Okay, good.  All right.

6          Mr. Stein, are you starting?

7          **MR. STEIN:**  Sure.  Thank you, Your Honor.  For my

8    kids, thank you.  I was able to get cookies from Crave.  So the

9    break was appreciated.

10          I think where we left off is on the specific

11    documents that are still in play or still missing or things

12    that are the subject of primarily the Alter Ego dispute.  And

13    so let me -- I made a list of categories.  And maybe I'll raise

14    one at a time, and then we'll see where we go.

15          But I think -- as I understand it, there was an

16    original mind greet -- MindGeek structure, and then somebody in

17    charge got in trouble.  They had to restructure.  And so, in

18    2012, they repackaged or reinvented kind of the MindGeek

19    corporation structure.  And then, in 2018, there was a

20    restructuring of MindGeek.  I think, is my understanding, is

21    the 2018 restructure was not significant; maybe some minor

22    changes.

23          And I'm not a corporation lawyer, obviously.  But my

24    understanding is, when you do a deal like this, where you set

25    up a corporation structure like this, there's usually a closing

1    binder, essentially, that has all of the relevant agreements

2    about the creation of the entities and how it operates and who

3    owns it and who controls it; a deal doc or a deal binder.

4          So I would think -- and I think it's -- all the

5    lawyers have it; all the investors have it; all the

6    shareholders can get it.  I mean, I think it's a readily

7    available, kind of one volume, big binder of stuff -- of stuff

8    in general.

9          And we do not have either the 2012 or the 2018 deal

10   documents, which I think would be relevant to the structure of

11   the various entities and the function and operation and, in

12   particular, the interoperation of the various entities.

13         I would acknowledge they can create additional

14   entities, and probably have.  But I would think those would be

15   kind of two core things that would be easy to put your -- their

16   hands on that we don't have yet, that would shed quite a bit of

17   light on the jurisdictional analysis.

18         **THE COURT:**  Okay.  Before you move to the next

19   category, could you identify for me which discovery request

20   those documents would be --

21         **MR. STEIN:**  Sure.

22         **THE COURT:**  -- responsive to?

23         **MR. STEIN:**  Well, and to be candid, there's not a

24   request that says, "Give us the deal box."

25         **THE COURT:**  Understood.  But is there a request for

1  those documents they're responsive for too?

2          MR. STEIN:  I think so.  And I'm -- maybe I should

3  have gone out of order, because it'll make more sense.  But

4  where we're ultimately focused in large part is on the

5  financial interoperation of the entities.

6          THE COURT:  Okay.

7          MR. STEIN:  Which would be -- I think it's Request

8  for Production Number 13.  This is on page 12 of Docket 224,

9  which is our motion.

10         THE COURT:  Yeah, I'm there.

11         MR. STEIN:  For each entity -- affiliate subsidiary-

12 related entity, monthly, quarterly, and annual bank and

13 investment statements.  In order to know what all the related

14 entities are or for whom we need the bank and investment

15 statements, we need to know who the entities are.

16         And also Interrogatory Number 4, which is on page 14

17 of our motion, Docket 224, "Describe in detail all direct or

18 indirect jurisdictional con -- contacts."

19         And then it continues on down to the bottom,

20 "Revenues, profits, expenses, taxes earned or paid in or from

21 California or any jurisdiction in the U.S."

22         Where I'm going kind of backwards is, in Judge

23 Carney's July 2022 order -- I think it's a Footnote 2 or

24 Footnote 6, or maybe both -- he says, "The flow of money in the

25 corporate web of MindGeek is relevant to the jurisdictional

58

1   analysis."  So the category we're about to get to is the

2   financials and the flow of money and all that.

3          I think, in order to know that we have the full

4   correct picture of revenues, profits, expenses -- which are in

5   ROG 4 and RFP 13 -- we need to know that we have all the

6   correct entities and make sure that we are matching up the

7   finances with the relevant entities.

8          So when Judge Carney says, "The flow of money is

9   relevant to my jurisdictional analysis," then we then have the

10  burden of showing him why we have the right entities, with the

11  right contacts or the right Alter Ego folks.

12         We're going to have to plead with specificity, I

13  think -- or brief it with specificity, maybe is a better way to

14  say it.

15         **THE COURT:**  Okay.  Those don't look to me like they

16  specifically call for, or even roundabout the way call for

17  these binders.  So perhaps you can be looking for -- at these

18  discovery requests that are at issue in the motion to see if

19  there's anything else, okay?

20         I understand that these -- those ones are looking for

21  underlying documents, but not necessarily a deal binder or

22  something that would have, you know, the sort of the

23  corporation restructuring documents.

24         **MR. STEIN:**  That's correct.  It definitely doesn't

25  directly call for it.

59

1          **THE COURT:**  Right.

2          **MR. STEIN:**  I might say it does roundabout call for

3     it.  But I understand the Court's point.

4          Some of this is aimed around objections that I think

5     affect this motion.  But also apparently there's -- there's

6     other motions coming where some of the rulings today on the

7     scope of what entities are in play may narrow or eliminate

8     future issues.

9          **THE COURT:**  Okay.

10         **MR. STEIN:**  But maybe I'll go backwards.  Because I

11    think several of the categories that we've identified are in

12    the same vein as that.

13         **MS. MASSEY:**  Your Honor, I don't want to interrupt --

14         **MR. STEIN:**  Please.

15         **MS. MASSEY:**  -- if you're going onto a very connected

16    point.

17         But Mr. Stein did raise a half-dozen points here,

18    crossing over different interrogatories.  Respectfully, if I --

19         **THE COURT:**  Well, what I'd like to do is --

20         **MS. MASSEY:**  -- could have a minute.

21         **THE COURT:**  -- I'd like to get from him the list of

22    cate -- of documents that he believes have not yet been

23    produced.

24         **MS. MASSEY:**  Fine.  Thank you.

25         **THE COURT:**  And then we can sort of --

60

1          **MS. MASSEY:**  Okay.

2          **THE COURT:**  -- go through them.  All right?

3          **MS. MASSEY:**  Sure.

4          **MR. STEIN:**  Okay.  So next category, similar thinking

5     and structuring.  Before the lunch break, I mentioned that

6     there's 100 entities.  I think that's true.  I don't think

7     we're seeking everything on 100 entities.

8          MindGeek has -- the entity Defendants have produced

9     an org chart, which I believe has 12 or 15 -- or some number

10    like that -- entities on it.  So we have that org chart.

11         But what we don't have are -- for each of those

12    entities, who owns it, who's got the economic interest, who

13    controls it, what the shareholder rights are, the voting rights

14    are, the interoperability between the various entities.  We

15    just have like a piece of paper that says, "Here's a bunch of

16    our entities."

17         But in terms of tracing through the Alter Ego

18    analysis and figuring out whether they -- I'll have to turn to

19    the factors.  But, in the Ninth Circuit, I think commingling of

20    funds and assets, equitable ownership, same offices and

21    employees, same directors and officers -- we don't have any of

22    that information on the entities that are on the org chart to

23    know whether -- whether we have all the relevant facts for the

24    jurisdictional analysis that's on the org chart that they've

25    given us.

61

1          **THE COURT:**  Okay.

2          **MR. STEIN:**  So to the extent I said there were 100,

3     I'm not -- I want to clarify, I'm not seeking 100 or seeking,

4     for the ones on the chart, the information that shows the

5     economic interest, ownership, control, you know, who's setting

6     the policies, how they work together, et cetera.

7          Third category -- and we talked about this briefly

8     before lunch -- is the shareholder agreements, which has been

9     produced.  My understanding is there's only one.  I'm not sure

10    of that.  But I believe that's what MindGeek has said; there's

11    only one.  And we have that.

12         But within the shareholder agreement, it makes

13    reference to other agreements, including a finance agreement,

14    that we don't have.

15         So I guess the request would be to complete the

16    production of the shareholder agreement by supplementing with

17    whatever's referenced in the agreement.  We have the agreement

18    itself, but the not the appendices or the attachments or the

19    referenced documents.

20         **THE COURT:**  And so I know, have you had the

21    conversation with Defendants about what those are, and asked

22    for them?  Or are we doing this now?  Which is fine.  I just

23    want to know the status.

24         **MR. STEIN:**  I personally have not.  Has that been --

25    I don't know, actually.

62

1          **MS. MASSEY:**  No.  There's been no --

2          **THE COURT:**  Okay.

3          **MS. MASSEY:**  -- discussion and no request.

4          **THE COURT:**  All right.  Okay.

5          **MR. STEIN:**  It may all be the same.  But they've

6    produced some board meeting minutes.  So we have those.

7          **THE COURT:**  Uh-huh.

8          **MR. STEIN:**  But in a lot of the board meeting

9    minutes, they reference underlying documents or presentations

10   or attachments or things like that that we don't have.  So I

11   guess just a completion of the production on the board meeting

12   minutes.

13          And I guess maybe related to the shareholder

14   agreement -- when MindGeek says there's only one shareholder

15   agreement, I don't know if that means for the company or for

16   the named individual Defendants, if they have their own

17   shareholder agreements or not.  I don't know.  But to the

18   extent they do, I think that would be relevant to the Alter Ego

19   jurisdictional analysis.

20          The fourth category, I think, is kind of where I

21   thought one, two, three roundabout got to, which is the

22   financial picture.

23          You know, again, looking at Judge Carney's order,

24   where he says, "The flow of money is relevant to the

25   jurisdictional analysis, in particular, Alter Ego," they've

63

1  given us some high-level tax returns.

2          I think Ms. Massey referred to that before the lunch

3  break.  And they've given us some very basic high-level

4  financial documents, but not on anything that would allow you

5  to trace money in or out.

6          Revenue -- we see that there's a lot of revenue in --

7  and then they operate at a net loss.  But we don't know why.

8  We don't where that money is going, who the payments are being

9  made to.

10         And part of Judge Carney's order -- I can get the

11 page and site.  But he talks about how he has concern that, if

12 there are, you know, funded entities and unfunded entities, and

13 they're kind of ignoring the corporation formalities and moving

14 the money back and forth such that any judgment would be non-

15 collectible, that would -- that concerns him about dismissing

16 Defendants -- this was in the context, I think, of the Motion

17 to Dismiss.

18         And so we're trying to get more detailed financials

19 on what they've given us.  Because we do have some, but I think

20 not enough.

21         And then I don't think we have the documents that

22 would show the financial operations as between the named

23 Defendants and the various entities on the org chart as to

24 where the money is going.

25         A lot of money comes in, and then it's gone.  But who

64

1    it goes to and what it's used for, and is it a service

2    contract.  And is it a service that's really kind of the same

3    entity, but it's being moved back and forth to -- to hide it,

4    or is it really a third-party vendor they're hiring?

5            All of that, I think is highly relevant to the -- the

6    jurisdictional analysis.  And we just don't have that

7    information yet.

8            So the fourth category, I guess I would say, would be

9    financial documents.  And I think it spans -- Ms. Massey

10   referred to this as a "long period of time."  And I agree.  I

11   think we're going back to like 2013, or maybe 2014 was when the

12   first video of Plaintiff was -- was put up on the -- on the

13   website.

14           So it may be ten years of relevant financials.  And I

15   understand that can bring some challenges.  But I think all of

16   that is relevant.

17           As far as I know, the videos were still up at least

18   as of 2020.  I believe they've said they're down now, but I'm

19   not sure if that's been verified, and I'm not sure if that's

20   true.  But at least from 2013 to 2020, there were videos of the

21   Plaintiff that were on at least some of these websites.

22           And then the last two categories.  They produced a

23   lot of documents that are redacted.  And that may be a by-

24   product of them being produced before the protective order was

25   in.  I would assume that's the case.

1          But I guess part of what we would be seeking is the

2     reproduction of documents, unredacted.  Because what seems to

3     be redacted is information about the interplay between the

4     various MindGeek entities.

5          And I think now they could produce that and mark it

6     confidential.  Obviously, we can file it under seal if we need

7     to or whatever.  But we don't have a privilege log.  I don't

8     think there's a claim of privilege.  I think they redacted it

9     because we had no protective order.

10          So I think the unredacted version of that would

11     relate to the jurisdictional analysis as between the operations

12     between the various entities.

13          And then the last one -- and I think this might go

14     maybe to RFP Number 1, which is super broad -- "All documents

15     and communications concerning Plaintiff."  It can't get much

16     more broad than that -- is communications.  We have essentially

17     zero commune -- communications, about her, from any of the

18     MindGeek entities.

19          I think they gave us one four-page email chain, from

20     2020, when a news story broke about this.  And they sent some

21     emails like, "Does anyone know the details of what's going on?"

22     kind of a thing.

23          But no communications, anywhere along the way about

24     the content, the videos, uploading them, taking them down, who

25     was handling them, where the advertising was going, how the

66

1    advertising revenue was connected, what servers they were on,

2    what entity was controlling, whether it was moving between

3    websites.

4           I believe their objection has been that they're

5    limiting it to communications with Plaintiff; not

6    communications about Plaintiff.  And so I our dispute on RFP

7    Number 1 is that it's -- it's more broad than just

8    communications directly to her.

9           We talked about this some in connection with our

10   motion; is we're not alleging that the jurisdiction is

11   communications directly with her.

12          But to the extent that MindGeek entities were

13   communicating about her and her videos and having discussions

14   between, maybe, the individuals, and relating to the

15   corporation structure, and what websites they're on, and what

16   was being done to take them down or not, I think all of that

17   would be relevant to who is reaching into the United States

18   jurisdiction for the purposes of the statute and the

19   jurisdictional analysis.

20          And I think -- hold on.  Let me check one sec.  I

21   think that's all.  And a lot of this is coming up because I

22   think -- at least my understand is, in the meet-and-confer

23   process and in the responses, a lot of the objections are that

24   it's -- our requests are too broad because they go beyond the

25   two Defendants that are named; the MindGeek S.A.R.L. and the

1    MindGeek Premium.

2            But I think kind of the whole point of the Alter Ego

3    allegation and analysis is that those two entities are not just

4    standing alone, but that they're actually interacting in ways

5    that disregards corporation formalities with other entities

6    where a jurisdiction is proper, such that it's proper to

7    impute, and that they are properly part of the jurisdictional

8    analysis, and properly named Defendants in this case.

9            **THE COURT:**  Okay.  Thank you.

10           **MS. MASSEY:**  Your Honor, Mr. Stein was addressing the

11   Alter Ego list.  There is just two other categories.  And so I

12   don't know if you prefer for Counsel to response to the Alter

13   Ego, and address the two other categories afterwards, or if you

14   want our entire list now.

15           **THE COURT:**  Let's go with the entire list now.

16           **MS. MASSEY:**  Great.

17           **THE COURT:**  And before, actually really quick, let me

18   just make sure I have this down right.

19           **MR. STEIN:**  Sure.

20           **THE COURT:**  One category is closing binders for --

21   deal docs for the two corporation reorganizations or --

22           **MR. STEIN:**  Correct.

23           **THE COURT:**  -- organ -- right?  2012 and 2018?

24           **MR. STEIN:**  Yes.

25           **THE COURT:**  Two.  Who owns, controls shareholder

68

1    agreements, et cetera, for the entities that are on the org

2    chart?

3           **MR. STEIN:**  Correct.

4           **THE COURT:**  Three.  Shareholder agreement documents

5    that are referenced in the shareholder agreement, right?

6           **MR. STEIN:**  Yes.

7           **THE COURT:**  Four.  For the board minutes,

8    attachments, and documents, and documents for (indiscern.) in

9    the board attachment --

10          **MR. STEIN:**  Correct, Your Honor.

11          **THE COURT:**  -- board minutes?

12          Five; related to the financial picture.  There's

13   pretty much detailed financials to evidence; the flow of money.

14          **MR. STEIN:**  That's correct.  And I believe there's

15   actually -- it's called an "electronic accounting system,"

16   EARL, or something like that, that MindGeek has, where I

17   believe all of that information -- the ledgers, the costs, the

18   profits, the revenues -- is housed in that system.

19          So I guess it's -- yes, Your Honor is correct about

20   the category.  And I think it would all come from that -- that

21   financial system, is my understanding.

22          **THE COURT:**  Six.  Redacted documents that should be

23   produced and redacted.

24          Seven.  Communications about the Plaintiff.

25          **MR. STEIN:**  Correct.

69

1          **THE COURT:**  All right, thank you.

2          **MR. STEIN:**  Thank you, Your Honor.

3          **MS. MASSEY:**  Thank you, Your Honor.  There is just

4   two other brief categories which are the subject of our motion.

5          One is discovery concerning MindGeek's data centers.

6     **(Loud alarm sounds)**

7          **THE COURT:**  I think this has happened to us before.

8   And we think it might be our system, if I recall correctly.

9   And it kept happening.  So I'm just going to warn you.

10          **MR. STEIN:**  So why did it --

11          **MS. SPEAKER**  So long as --

12          **MR. STEIN:**  -- stop me this time?

13          **THE COURT:**  It is the ghost of the courtroom.

14          **MS. SPEAKER:**  So long as it's not a fire alarm.

15          **MS. MASSEY:**  And this --

16          **THE COURT:**  So I'm sorry.  Restate that category

17   again.

18          **MS. MASSEY:**  Sure.  It's discovery concerning

19   MindGeek's data centers, IT infrastructure, and the vendors

20   that provide any type of IT-related data storage.

21          And this was a category that was alluded to shortly

22   before we broke for lunch.  And Counsel for MindGeek said that

23   they had provided information concerning the location of the

24   servers -- of Pornhub servers, and that they've since -- since

25   the filing of this motion -- have agreed to provide the

1    location of other tube site servers as well.

2           However, while we do think we've at least narrowed

3    the dispute, we do still believe that it's not just the

4    location of the servers.

5           We need information about where Plaintiffs' content

6    and other -- where Plaintiffs' content is stored, how it's

7    stored, who pays for that storage or those facilities or those

8    sites, and who pays for the vendors that -- or if there are

9    vendors or aren't vendors, who pays for those vendor and those

10   fees related to the storage.

11          One of the statements that MindGeek has made

12   publicly, is that they continue to maintain content on their --

13   on their servers to this day, even content that's been removed.

14   The complaint obviously alleges that one of the reasons for

15   this was that they could continue to reupload it to their

16   various sites.

17          ROG 14 talks about whether or not this content still

18   exists; whether or not Plaintiffs' content that has still been

19   removed is still on the server is up; and where that server is

20   located; and who owns that server; or who pays for the

21   services; are jurisdictional context that are specific to

22   Plaintiff and relevant to the Court's jurisdictional analysis.

23          Finally, with respect to the last category -- it's

24   Request 6.  It's the documents concerning pervasive control.

25   And I believe it's Request six, and I will confirm that -- that

1  seeks information concerning -- information concerning the

2  moderators; the individuals that are moderating and screening

3  the content that's being uploaded to MindGeek's various tube

4  sites; and how, in the manner -- who pays them and how they're

5  paid.

6          In response to this request, Defendants -- and I

7  believe this is an interrogatory -- Defendants' responded, and

8  said, "The moderators worked for one of two entities."  It's

9  either 9219-1568 Quebec or MindGeek Premium, which Your Honor

10  will recall as one of the entities that is a Defendant and is

11  contesting jurisdiction.

12          Obviously, it is important for us to understand how

13  many employees at MindGeek Premium moderated content on free

14  sites; how they're getting paid; where those employees are

15  located; which entity is paying them; and where the money

16  flows.

17          This is all clearly relevant to who the real party in

18  interest is; where the money flows; and whether or not there's

19  any corporation formalities between an entity that is

20  purportedly created to operate pay sites, but in fact is also

21  being used to screen and moderate content for non-pay sites.

22          So those are two additional categories of information

23  that we think is -- there's no documents responsive to us

24  that's been produced.  And the limited interrogatory responses

25  are -- are plainly insufficient.

1          **THE COURT:** So just to make sure I understand. One

2    category, which would be your eighth category, I think might

3    actually be two categories, to be generous.

4          Yeah.  Initially, you identified data centers, IT

5    structure, vendors of data storage, but then you also said you

6    need to know where things are stored, how they're stored, who

7    pays for storage and vendors, which is broader.

8          Is that accurate?  So would I be fair to consider

9    those two different categories?

10          **MS. MASSEY:**  I think that's fair.  I think it's all

11    encompassed within RFP 26 and ROG 10.  But I would agree that

12    we think all that information is relevant to the jurisdictional

13    analysis.

14          **THE COURT:**  Okay.  Now, for your second category,

15    which you decide -- said was part of RFP 6.  And it related to

16    pervasive control.

17          You said you need to know who moderates and who pays

18    for the moderation.  And then specifically for Premium, how

19    many employees are paying for -- and more details that way.  Is

20    that right?

21          **MS. MASSEY:**  Correct.  And the basis for that, Your

22    Honor, is that they've already conceded.  And in their -- both

23    of their interrogatory responses, and also in the affidavit,

24    that there are employees for Premium that do moderate for a

25    free site.

1          **THE COURT:**  Okay.  Thank you.

2          Mr. Stein, it would be helpful for me if you go

3     through, while they're speaking, and try to identify for me the

4     discovery requests at issue that will -- besides what you've

5     already told me -- to see if there's anything else that the

6     categories you've identified would be responsive to.

7          Does that make sense?  So that I can point to which

8     discovery request seeks -- or that the documents you're asking

9     for, which discovery request they are responsive to.

10         **MR. STEIN:**  Yes, Your Honor.

11         **THE COURT:**  Right?

12         **MR. STEIN:**  Yes.

13         **THE COURT:**  You're on a Motion to Compel, compelling

14     responses or productions to specific requests need to tie the

15     documents that Plaintiff wants to the request that it has

16     served that is subject to this motion, okay?

17         **MR. STEIN:**  Thank you.

18         **THE COURT:**  Thank you.

19         All right.  Counsel, now, again, what we're talking

20     about here is these -- they have identified certain number of

21     categories of documents.  We're sort of moving off of the

22     traditional structure of going request-by-request, and going

23     more subject matter.

24         And to some degree, from what I can tell, that they

25     are -- there are -- perhaps the parties haven't met and

74

1    conferred completely with regard to some of these things.

2            So there might be categories or documents that you

3    agree -- "Okay, those are responsive, I'll produce them.  I

4    just didn't know they were asking for them."  If there's

5    something like that, you know, let me know that.

6            But let's sort of take them -- one, you're free to

7    say anything you want, right?  Or an argument.  But let's try

8    to take these in order as well.

9            **MS. MASSEY:**  Sure.

10           **THE COURT:**  If possible.  All right?

11           **MS. MASSEY:**  Your Honor, I'd be happy to address the

12   various categories that the Counsels have identified.

13           Starting with the first category, Mr. Stein noted

14   that the MindGeek entities have not produced deal binders with

15   documents relating to reorganizations in 2012 and 2018.

16           First of all, 2012 is way outside of the discovery

17   period.  And insofar as there was a certain degree of

18   reorganizing in 2018, Defendants have produced that material.

19           We're not talking about a big public company here.

20   We're talking about a set of private companies.  So maybe

21   Mr. Stein's other clients always have deal binders.  I'm not

22   aware of deal binders.

23           But what I am aware of is that we have produced every

24   document relating to the MindGeek Entity Defendants and their

25   parents, going up the chain, that would reflect a change of

75

1    ownership or a restructuring.

2           So if there was a sale of assets and an assumption of

3    liabilities, we produced the agreement for that.  If one entity

4    was formed, we produced the documents showing that the entity

5    was formed.

6           So I'm not aware of any requests for a binder per se.

7    To the extent that the Plaintiff has asked for documents

8    regarding transactions showing the ownership structure, the

9    MindGeek Entity Defendants have produced those.

10          In the course of discussing reorganizations, the --

11   the Plaintiff talked about org charts.  I guess that goes to

12   the second -- the second category.  So let me hold off on that.

13          With respect to the first category and the deal

14   binders, the Plaintiffs mentioned that the MindGeek Entity

15   Defendants did not produce bank statements.

16          But the MindGeek Defendants did produce audited

17   financials and tax returns and a group -- financials for the

18   whole group, by year.

19          And as Your Honor started out today, asking about the

20   jurisdictional theories, we have to come back to that, and say

21   -- what is the goal here?

22          The goal is to determine whether two entities

23   challenging jurisdiction have sufficient contacts that relate

24   to the harm claimed.

25          And then we have to determine whether Plaintiffs'

76

1    theory about Alter Ego holds water.  So we don't need monthly

2    bank statements in order to determine that.  In terms of

3    ownership issued, as I had mentioned, we have produced that.

4          But bank statements really are not relevant here to

5    the Alter Ego analysis.  Or if they are, the need for them is

6    not proportional to the needs of the case, especially in light

7    of everything else that has been produced.

8          In terms of Category 2, who owns the Defendants?

9          The MindGeek Entity Defendants have produced

10   organization charts, a whole series of them, showing how the

11   MindGeek Entity Defendants fit in to the overall structure, as

12   of June 2014, which is the earliest time Plaintiffs' could have

13   been uploaded, through June of 2020, when Plaintiff alleges the

14   content was removed.

15         And certainly, as far as we're aware of any content,

16   we're aware of content that was uploaded in 2019, after

17   Plaintiff was over 18.  And that was removed no later than June

18   2020.  So we've produced org charts for that entire period,

19   showing not only for the MindGeek Entity Defendants, but also

20   for the entities up the ownership chain.

21         So based on that org chart one can see who owns the

22   MindGeek Entity Defendants and all the way up the chain but

23   we've identified officers, directors, shareholders and other

24   documents showing ownership and control

25              THE COURT:  And is that of all of the entities on

1    that org chart?

2         **MS. MASSEY:**  No, Your Honor.  Plaintiffs have alleged

3    there are hundreds of entities involved here --

4         **THE COURT:**  Right but he said that this org chart had

5    about 15.

6         **MS. MASSEY:**  Frankly, Your Honor, I think there are

7    more and there are quite a few entities.  This -- MindGeek is a

8    group of companies that has different lines of business.  One

9    line of business is the Geek tube site business which is where

10   Plaintiff alleges her content was uploaded.  Separate line of

11   business is the pay site business.  We don't have any evidence

12   that her content was uploaded to the pay sites.  Another line

13   of business includes gaming and there's no allegations here

14   about gaming and yet another line of business involves cable

15   and television and there's no allegations that would implicate

16   that line of business.  So Plaintiff's request, insofar as

17   she's asking for detailed information about every entity on the

18   org chart is overbroad, unduly burdensome, not proportional to

19   the needs of jurisdictional discovery here.

20        Indeed, one of the cases that Plaintiff cited in

21   support of its position, Vizio versus AliefCo (phonetic), it's

22   a Central District of California case decided in 2018,

23   specifically denied a motion to compel production of materials

24   for 80 affiliates.  And that, you know, that case applies

25   equally here.  There's no reason Plaintiff needs discovery

78

 1  about the details of all of the entities in the MindGeek

 2  structure.  We have not only provided for the MindGeek Entity

 3  Defendants but we've gone beyond that, Your Honor, and we've

 4  provided for the shareholders and up the ownership chain and

 5  where relevant to Judge Carney's decision about who owns

 6  Pornhub and where the funds flow.  We have provided documents

 7  about that as well even if that goes beyond these particular

 8  entities.

 9          Defendants have -- sorry -- Plaintiff has referred to

10  the comingling of funds.  That was maybe an offhand comment

11  when speaking about wanting information about the hundreds of

12  entities but we have produced financial statements for the

13  various entities and group financials.  And if the Plaintiff

14  looks at those documents, they will see what you would

15  typically see about assets and liabilities.  You look at the

16  tax returns, it shows payments due to, due from various

17  affiliates and there are also service agreements that were

18  provided showing where one entity provides services to another,

19  the terms pursuant to which compensation will be paid.  And to

20  the extent there's not a particular service agreement -- and

21  let me correct what I said before the break, we are still

22  producing some service agreements but to the extent that we

23  don't have service agreements for every entity, certainly there

24  are references in the financial statements to payments to

25  related parties and there's some degree of detail there.

1          Category 3 regarding shareholder agreements, I'm

2    aware of one shareholder agreement concerning the MindGeek

3    entity shareholders relevant here.  That was amended and we

4    provided both the agreement and the amendment.  Plaintiff

5    hasn't asked us for more but --

6          **THE COURT:**  And can I ask --

7          **MS. MASSEY:**  Sorry.

8          **THE COURT:**  -- your inquiry because you preface that

9    with, "I'm aware of one," so your inquiry to your client or

10   clients, were you seeking shareholder agreements as to what

11   entities?

12         **MS. MASSEY:**  I'm confident I have the relevant

13   shareholder agreement.  I've had conversations about this.

14         So the MindGeek Entity Defendants, as you know,

15   there's MindGeek S.A.R.L., the parent, and then there's a line

16   that comes down.  There's an intermediate affiliate and then

17   you go down further to different affiliates and sometimes I

18   think down yet another level.

19         At the MindGeek S.A.R.L. level, there -- the

20   shareholder applies at -- the shareholder agreement applies at

21   that level; otherwise we're talking about wholly-owned

22   subsidiaries for the most part below -- below MindGeek S.A.R.L.

23   There may be some instances where there's some entity that has

24   some shares but for the most part we're talking about

25   wholly-owned subsidiaries that go down the chain from MindGeek

1   S.A.R.L. down to the lowest defendant.  And we've provided the

2   documents showing who owns and who is being paid any dividends

3   from those businesses; again, with one exception that we

4   learned about just recently on dividend payments to a

5   particular shareholder.  There's a set of documents that I just

6   got this week that we will be producing.

7          THE COURT:  Okay.

8          MS. MASSEY:  There was a reference as part of the

9   discussion about shareholder agreements to the Plaintiff having

10  received board minutes and they're complaining that they don't

11  have references to documents in those minutes or to

12  presentations or to attachments and the like.  Again, we're

13  here for jurisdictional discovery.  We're not doing a forensic

14  analysis.  If this was even ever related to merits, we're not

15  there.  What we're looking at is, are these entities separate

16  and distinct entities?  Do they follow corporate formalities?

17  Is there comingling of funds or are there separate financial

18  statements?  And Judge Carney commented upon he would be

19  interested in knowing whether the Defendants not challenging

20  jurisdiction are adequately capitalized.  And there's plenty of

21  financial information that has been produced that would allow

22  the Plaintiff to make that determination without getting into

23  every document referred to in the board minutes and that sort

24  of thing.  It's not relevant to jurisdictional discovery.  And

25  if the Plaintiff thinks there's something in there that is

1   relevant to jurisdictional discovery, by all means we're happy

2   to discuss that but they have not asked for any particular

3   attachments or complained about needing more in the way of the

4   board materials than they've been provided.

5          **THE COURT:**  And can I ask you, going back to the

6   shareholder agreement, there was sort of the same argument

7   which is that there were other things referenced in it that

8   they believed that they needed.

9          **MS. MASSEY:**  Right.  So again, I would take the same

10  position.  We're here for jurisdictional discovery.  The Court

11  ultimately wants to hear about who owns the different entities

12  and the information who owns and controls the different

13  entities.  And the shareholder agreement will tell you that,

14  will tell you exactly who has how many shares of what entity

15  and how the voting goes and that's what they need.  They don't

16  need every document whereas, whereas, whereas, setting up this

17  situation.  If they do, if they think they do, they can ask us

18  and we're happy to discuss it but there's no need to produce in

19  the course of jurisdictional discovery every document

20  referenced in the shareholders' agreement.

21         One of the documents that they referenced was a

22  finance agreement and that's a perfect example.  There's no

23  need for the Plaintiff to inquire about MindGeek's

24  relationships with any financing entities.  The economics of

25  those relationships are set forth in the financial statements;

1   and frankly, the board materials and other material that we

2   have produced talks about the financing agreement.  So

3   Plaintiff actually has gotten more about financing agreements

4   than they could ever need for jurisdictional purposes.  I

5   really don't see that that's relevant at all, but there's

6   absolutely no need to go further and produce finance agreements

7   to determine who owns and controls and where the money flows.

8   That is set forth in the documents.

9            THE COURT:  Are the -- I mean who were the financing

10  entities?  Are they MindGeek entities or are they third

11  parties?

12           MS. MASSEY:  There are I think what is being referred

13  to here are financing agreements with third parties.

14           THE COURT:  Okay, thank you.

15           MS. MASSEY:  To the extent that there are loans or

16  due-to/due-from among the MindGeek entities or shareholders,

17  that is information that has been produced.

18           THE COURT:  Okay.

19           MS. MASSEY:  So Financial Picture.

20           I've touched on this and maybe I've addressed it

21  sufficiently but Plaintiff refers to Defendants having produced

22  high-level tax returns and high-level financial documents.

23  Again, we're talking about jurisdictional discovery: who owns,

24  who controls, where does the money flow?  The MindGeek Entity

25  Defendants have produced via the financials to the extent they

 1    exist.  We're talking here about entities outside the U.S. in

 2    Canada or Cyprus and Luxembourg so not every jurisdiction

 3    requires audited financials.  So to the extent they were

 4    required, we have them for these Defendants and they've been

 5    produced but we have also provided the group financial

 6    statements which are not audited but provide financial

 7    information for all of the entities, and we've provided all the

 8    tax returns for all of these entities for all of these years.

 9         A reference was made to the high level so there's the

10    tax return sufficient to show basic income, assets, liability,

11    taxes paid and the like.  Again, if Plaintiff has a problem

12    with what we've produced in this regard and think they need

13    specifically something more, they can let us know and we'd be

14    happy to discuss that.  But I'm not aware of their having

15    inquired about specifically needing more than what we have

16    provided, though I did hear a discussion about monthly bank

17    statements but I addressed that.

18         **THE COURT:**  Okay.  And let's -- how about the

19    redacted documents?

20         **MS. MASSEY:**  The redacted documents, honestly, Your

21    Honor, I'm not sure what Plaintiff is referring to here.  If

22    there is specific information about this, I'm happy to consider

23    it.

24         I know there were some redactions made for

25    confidentiality purposes.  Again, we are dealing with entities

84

1    outside the U.S. where there are serious privacy regimes so we

2    are required to redact where we don't have consent to disclose

3    names, for example.  And to the extent that the names of the

4    financing entities may have appeared in the documents, those

5    names have been redacted because they're covered by a

6    confidentiality agreement.  If Plaintiff has particular

7    concerns, we're happy to address them but I would be shocked,

8    Your Honor, if any redaction interferes with the ability of the

9    Plaintiff to determine the interplay between the entities given

10   all the other information we have provided on that subject.

11          **THE COURT:**  Okay.

12          **MS. MASSEY:**  Now we get to the communications about

13   Serena Fleites.

14          It's ironic that the Plaintiff is pushing still for

15   more documents about Serena Fleites when she's not willing to

16   produce any herself.  Originally the Plaintiff asked for

17   documents concerning Serena Fleites.  Initially the MindGeek

18   Entity Defendants said, We don't think that's relevant to

19   jurisdictional discovery, we'll provide communications with

20   Ms. Fleites because that could have a bearing on jurisdiction

21   who was communicating with Ms. Fleites.

22          It turns out that there are -- you know there's very

23   few communications between Ms. Fleites and the MindGeek Entity

24   Defendants that we've been able to locate.  Mr. Stein

25   referenced some of that.

1           But what we did produce was documentation showing

2    that Ms. Fleites opened an account with Pornhub in part of the

3    Model Hub program.  In connection with that account, she

4    provided certain documentation.  Through that we were able to

5    identify certain comments she made on videos, comments like,

6    "That's me.  If you like what you see, I sell my content on

7    this other site."  And we produced the information about her

8    opening the account, we produced her comments.  And based on

9    going to the other site, we were able to reverse engineer and

10   find certain videos depicting Ms. Fleites.  As I mentioned,

11   those were uploaded in 2019 after she was 18, and we've

12   identified those videos for Plaintiff.  We provided a

13   spreadsheet with that information.

14          Then Plaintiff pushed for more.  "Don't you have more

15   communications about Ms. Fleites?"  And so even though the

16   content was down as of June 2020, the MindGeek Entity

17   Defendants agreed to produce communications regarding the

18   content.

19          As Mr. Stein said, there was an inquiry, a news

20   inquiry that referred to Ms. Fleites and there were

21   communications within MG Freesites which operates the tube

22   sites about does anyone know about this?  Can we find any

23   content depicting her based on the information provided and the

24   answer was no which is why we were asking the Plaintiff for

25   information about different titles perhaps, who the uploaders

1   were, what email address she used for takedown requests and the

2   like so that we could identify content that she was pushing

3   for, so we could identify communications about such content

4   which she was pushing for.

5        Now that Plaintiff does not seem to be relying on any

6   communications or context between her and the MindGeek Entity

7   Defendants, I don't know how she can be pressing the MindGeek

8   defendants for more documentation about her but we have

9   produced anyways the one set of communications about what which

10  we are aware and we've produced information about her accounts

11  and communications about her content.

12       The next category -- I guess let me pause for a

13  minute.  I think those are the categories that Mr. Stein

14  identified that relate to the alter ego analysis.

15       I do want to make sure it's clear that the MindGeek

16  Entity Defendants do object to providing additional information

17  about every entity on the organizational chart.  Your Honor, I

18  think we've been very reasonable in producing as much as we

19  have about the Defendants and about the entities that own them

20  all the way up to the parent company.  Why the Plaintiff needs

21  information about entities involved with TV, broadcasts, cable,

22  gaming, or the pay sites has not been explained and certainly,

23  how does that relate to the jurisdictional analysis?  There's

24  nothing really that would justify that kind of discovery.

25       So I think that's it on the alter ego based on what I

1    heard from Mr. Stein.  If you don't have any questions at this

2    point, I'll go on to --

3             **THE COURT:**  Nothing further.

4             **MS. MASSEY:**  -- the other categories.  Okay.

5             The other categories that Ms. Tabaksblat identified

6    concerned, as you noted, 8-A and B, so 8-A concerned data

7    centers, infrastructure, vendors that provided data storage and

8    the like.  Again, we don't see how that goes to jurisdiction.

9             Plaintiff alleges her content was uploaded to Pornhub

10   and there's no dispute that the MindGeek Entity Defendants

11   provided Plaintiff with information about where content stored

12   -- where content uploaded to Pornhub is stored.  They have

13   that.  Why do they need to know about the whole MindGeek group

14   IT infrastructure?  There's no reason that that is relevant.

15   There's no way that is relevant to jurisdiction here.

16            And the same would be about data storage relating pay

17   sites when she doesn't have any content that she's identified

18   on the pay sites or data storage for TV or broadcasts or

19   gaming.  None of that has anything to do with Ms. Fleites'

20   claim against the MindGeek Entity Defendants.

21            Similarly, Plaintiff is seeking documents regarding

22   who pays for the storage and what vendors are used and that

23   sort of thing.  Again, that -- that does not relate to

24   jurisdiction here.

25            We have agreed, the MindGeek entities have agreed and

88

1    have produced documents and information about who owns Pornhub

2    and all the financial -- the money that flows from Pornhub,

3    where it goes and how it gets distributed up the chain.  Beyond

4    that, I don't see how it's relevant about who pays for storage

5    of content.

6         We have to remember, we have not been provided

7    information to even identify the content of Ms. Fleites when

8    she was underage but if there is such content, they allege it

9    was on Pornhub and we can tell you that we've identified the

10   location of the Pornhub servers.

11        Finally, Plaintiff asserts that she is entitled to

12   more documentation in terms of who controls the Pornhub

13   business.  As I said, we have provided extensive information

14   and really I can't imagine that the Plaintiff would need more

15   to determine who owns and controls the relevant entities.

16        Plaintiff has asked for information about who employs

17   the individuals who do moderation and formatting and the like.

18   We've provided that information.  We gave them the names of the

19   entities that employ those individuals.

20        Plaintiff has asked for information about who pays

21   the individuals.  We have provided information about the

22   entities that pay the individuals.  MG Freesites, for whom many

23   individuals do work, pays for those individuals' employment.

24        Why the Plaintiff needs the names of the individuals

25   or specifics on compensation is beyond me.  That has nothing to

1    do with jurisdiction, Your Honor.  So we have objected to

2    producing, you know, details about who exactly was moderating,

3    but we have provided information about the companies who

4    employed those individuals and about the companies who paid

5    those individuals.

6              **THE COURT:**  Do you have anything further?

7              **MS. MASSEY:**  I don't, Your Honor.

8              **THE COURT:**  Okay.  All right, thank you very much.

9              **MR. STEIN:**  Thank you, Your Honor.  David Stein again

10   for the Plaintiff.  A few things that Ms. Massey mentioned.

11             Audited financial statements.  We have some audited

12   financial statements.  There's two problems with it.  Number

13   one, many of the entities that are involved that are on the org

14   chart are not required to have audited financials, so that

15   doesn't mean they don't have to provide financial information.

16   The second problem is, as I understand it, the audited

17   financials that we have expressly say from the auditors that

18   they are qualified because they did not have access to the

19   related party transactions and financial information, so I

20   think on their face they're sort of incomplete.

21             In any event, when I look back again at

22   Judge Carney's July 2022 Order, Docket 167, on Page 3,

23   Footnote 2, he says pretty clearly where the money flows in the

24   MindGeek web matters to the Court's jurisdictional analysis.

25   This is probably the largest point of what we're talking about

1    and how we're trying to put a lot of these categories together.

2    You can't determine where the money flows in an organization

3    from one entity's tax return or some entity's partial

4    financials.  It's more broad than that.  I mean it's a forensic

5    accounting exercise of sorts.  And I assume Judge Carney is

6    going to expect us to say when we argue alter ego and why these

7    jurisdictional contacts can be imputed or why other entities

8    are properly subject to this we're going to have to show him

9    the money went from here to there in these specific financial

10   transactions.

11        So I heard Ms. Massey say several times I can't

12   imagine why the Plaintiff would want or need more.  This is

13   exactly why we want and need more because Judge Carney has said

14   he wants to see more.  And so what we want to do is present a

15   complete financial picture of the relationship of the MindGeek

16   web of entities and where the money flows and why we think that

17   supports an alter ego jurisdictional finding or basis.

18        As to the deal docs, Ms. Massey said 2012 is outside

19   the scope of discovery.  I might generally agree with that but

20   the reason why we asked for it is because my understanding is

21   the corporate structure even today is still substantially the

22   same as when it was created in 2012.  So it's just -- it's just

23   an attempt for us to make sure what's in the org chart is

24   actually what the corporate structure is.  You look at the

25   original deal docs, how all these entities were created, where

1    they fit in the chart, so, yes, it's 2012 and we're not

2    generally broadly asking for 2012 discovery, but there's not a

3    2014 deal doc that would provide that.

4              With respect to the org charts, here's part of the

5    problem.  Some of the Individual Defendants that are named have

6    testified in other proceedings and they've testified as to what

7    they owned in this web and then you look at the org charts and

8    some of the documents that have been produced and they don't

9    match up.  And so I don't know exactly why that is, but that's

10   why we want to see all of the information about the various

11   entities on the org chart, again to trace the money flow and

12   the financials that are in Judge Carney's Order and I mean I

13   guess it's a credibility issue for later but it seems like a

14   jurisdictional issue.  If you've got entities that are

15   consenting to jurisdiction and they're the ones that are

16   directing the money, taking the money, cycling the money,

17   switching the money, putting it into an entity they own and

18   control as opposed to a different entity, that all seems like

19   pretty relevant stuff that we would at least want to present

20   for the jurisdictional analysis.

21             We talked about service agreements.  Ms. Massey said

22   they've produced them.  I believe we have one from 2013 and

23   that's all.  I would imagine with the amount of services being

24   provided, the number of entities all across the globe and the

25   hundreds of millions of dollars in revenue, there's probably a

1    lot of them.  There may not be but then they could just provide

2    a response certifying that there is only one service agreement.

3    We don't have that yet.  It seems to me there would be a lot.

4           With respect to the shareholder agreement, you know,

5    again they say there's only one.  If that's their

6    representation, we have to -- we have to accept that.  But the

7    shareholder agreement, they argued, you know, why would we need

8    anything else that's in it.  Well, there's a finance agreement

9    and we talked about that a few minutes ago and the Court asked

10   whether that relates to the named entities or third parties and

11   they said third parties, but this goes right to the heart of

12   the issue.  We believe the third parties, quote/unquote, are

13   related MindGeek entity issues -- entities that are not truly

14   third parties.  And that's part of the alter ego, that they've

15   set up a structure where you have operational entities and

16   money coming in on this side with the four levels that

17   Ms. Massey described, and I wish I had a picture, but then

18   there's other entities over on this side that control licensing

19   or other aspects of the business that are controlled by the

20   individuals and others who agree that they have jurisdiction

21   and it's all flowing from here, from the right side over to the

22   left side, from the operational entities to the other entities,

23   and they're calling them third parties or they're somehow

24   saying it's not relevant to jurisdiction.  But that all goes to

25   the alter ego, are they really one and the same, is it the same

93

 1    people controlling them, the same officers, the same directors,

 2    is it a shell, is it just a sham, is it a way to move money.

 3              What we know is there's, I think I saw in one --

 4    Judge Carney's Order maybe, $500 million in in a net loss.

 5    That's a lot of money to just not be accounted for.  It went

 6    somewhere.  And if it went from ad revenue coming in from the

 7    videos that are uploaded onto the various servers, including

 8    Plaintiff's, and went into operational entities and then were

 9    removed by the Individual Defendants or other entities that

10    have jurisdiction, that seems to go towards the alter ego

11    theory that the entity that they're saying over here on the

12    right is actually really just one and the same for the entity

13    over here and they're trying to argue these folks are not

14    involved.  But they're all collapsing together and it's all the

15    same money.

16              And it all goes back to the flow of the money.

17    Right?  I mean we're going to have to for jurisdictional

18    purposes say here's where the money went and who it got paid to

19    and why those jurisdictional ties are sufficient or not.  I

20    mean it may be at the end of this process we say you're right,

21    we don't have jurisdiction over this entity.  We just don't

22    know yet.  That's why we're doing jurisdictional discovery.

23              A similar argument came up with the board meeting

24    minutes and I would agree, we don't need everything and every

25    document.  Of course not.  I mean we're here for jurisdiction.

94

1    But part of the jurisdictional alter ego analysis is corporate

2    formalities, same officers and directors, who's controlling

3    things.  If you have a board meeting at entity "X" and there's

4    a policy being discussed and adopted and it's actually being

5    discussed and adopted by people from entity "Y" or Individual

6    Defendants over here, there's maybe a lack of corporate

7    formalities.  They're not really independent.  It's the same

8    folks.  They're all operating together.  That's the alter ego

9    allegations that we're making, is that --

10           **THE COURT:**  Were there attachments or references in

11   the board meetings?  If you have an example.

12          **MR. STEIN:**  I think there are some where they talk

13   about key performance indicators or metrics that would go to

14   the financial picture of how the entities are doing, how

15   they're monetizing.  There may -- and I don't know this for

16   sure, but I think there's at least one other one where they're

17   adopting a policy about how to moderate the content.  And, you

18   know, what that policy is and who's voting for it and what

19   entities it impacts it would seem would be relevant

20   jurisdictionally.  I don't have any other board meeting minutes

21   in front of me.

22           But that's why we made the request, not because we

23   think every single thing that happens at every meeting is

24   relevant.  But it's also not completely irrelevant because if

25   it's showing that there is a lack of corporate formalities and

95

1  a collapse of how these entities operate, that's exactly what

2  the Ninth Circuit has told us we're supposed to be -- that

3  we're supposed to be looking at.

4          Some of this may go to Ms. Tabaksblat's jurisdiction,

5  for lack of a way to put it.  I don't want to get ahead of some

6  of the categories.  But I guess the last one maybe I would

7  address is I think Ms. Massey addressed the communications and

8  why do we need communications about her, especially since we're

9  saying -- they're trying to limit it to communications with

10  her.  I think we've been over that ground.  But communications

11  about her, I mean what if the news story breaks that this is

12  happening and people within MindGeek are sending each other

13  emails like, hey, what sites is this video on, who put it

14  there, let's move it to this site, let's put it on that server,

15  how much ad revenue did we make from this stuff, that's a lot,

16  leave it up.  You could imagine a lot of communications that

17  would relate very directly to who's doing what and how they're

18  reacting to her video and how they're handling her content.

19  And I don't know if they do or not, but from a discovery

20  relevance perspective for us just to look and say this shows

21  that there's contact -- contacts from these international

22  entities into the U.S., and this may dovetail directly into

23  what Ms. Tabaksblat would address on the server point, I mean

24  if their servers are in the U.S. and then the entity is

25  overseas but putting the content onto the servers in the U.S.,

1    I mean I think that's a relevant jurisdictional contact, both

2    from the servers' point of view, the IT, the infrastructure,

3    all those categories, and also the discussions that the company

4    is having, you know, 2020-ish or maybe before, but certainly in

5    2020 when this hit public news and they were made aware of

6    this, I would imagine there were a lot of discussions about

7    these allegations.

8         And maybe some of them are privileged.  I would

9    acknowledge that.  But we don't have a privilege log.  And if

10   they're going to claim privilege, they can claim privilege.

11   Maybe lawyers did some investigating.  But I would also bet

12   that the company, the individuals and the folks who control it,

13   especially in a private company, were communicating about these

14   allegations and her video or videos and where they are and what

15   they did with them and how they got up there and how they're

16   going to take them down and what the revenue is tied to them

17   and what policies they have to control these things.  I would

18   think all of those communications would be jurisdictionally

19   relevant.

20        They may not end up being persuasive or carry the day

21   or establish our burden, but I think they're at least in the

22   scope of a jurisdictional analysis.

23        I think that covers the points that were within the

24   alter ego umbrella.  I guess if the Court has questions, I can

25   address them.  Or maybe Ms. Tabaksblat could address the last

1    couple of categories.

2            **THE COURT:**  Okay.

3            **MR. STEIN:**  We kind of split the argument in a weird

4    way, I guess.  But I hope that's okay.

5            **THE COURT:**  All right, thank you.

6            **MS. TABAKSBLAT:**  Thank you.  I would make two really

7    quick points because but I think Mr. Stein addressed the main

8    points.  And I'll start backwards, if that's okay.

9            But with respect to who pays for moderation and

10   screening, I believe what Ms. Massey just told the Court in

11   response to our request for this information is that MindGeek

12   Freesites pays for it.  And she said we told them that, we told

13   them MindGeek Freesites pays for it.  But I would direct the

14   Court to their response to Interrogatory 8, which actually says

15   that Premium and 9219-1568 pays.  MindGeek Premium, Your Honor,

16   is one of the entities that's contesting jurisdiction in the

17   case.  And so it's not Freesites that's paying for it.  It goes

18   directly to the heart of the jurisdictional and alter ego

19   questions at issue.

20           And then the same I think attempt to sort of look at

21   everything in isolation permeates what Ms. Massey is arguing

22   with respect to the servers.  So first of all I won't profess

23   to sort of understand how these documents are stored or how

24   this infrastructure is stored.  I am sure a company that's as

25   sophisticated as MindGeek has a storage system that is far more

98

1   sophisticated than just simple servers in one location, which

2   is why it's very important for us to understand how this data

3   is stored and maintained and transferred and why it's important

4   that it's not just limited to the servers.  Because it could be

5   that the relevant storage system is "X" and it's here, as

6   opposed to where the server is, and we're asking the wrong

7   question.

8           But more importantly, the same way that MindGeek

9   Premium pays for moderators, potentially and certainly relevant

10  to the analysis is who pays for those servers and who pays for

11  those vendors and is that S.A.R.L., is that Premium, is that

12  some other entity and where are they located and where is --

13  how are the payments being made between these related entities.

14  And all of that is directly relevant.

15          So it's not just a simple question of where are the

16  servers located.  We really need to understand how the data is

17  maintained, the repositories that contain our client's c-sam

18  (phonetic) and who's paying for that, who's responsible for it,

19  and whether there are any third parties with jurisdictional

20  contacts in the U.S. or in the state, that's relevant for that

21  analysis.

22          **THE COURT:**  All right, thank you.

23          **MS. MASSEY:**  Your Honor, you had asked Plaintiff to

24  identify the specific requests at issue and I haven't really

25  heard that and I'm concerned that this hearing today has kind

1    of gone into a very vague and difficult place.  Because

2    Plaintiff made certain requests, we met and conferred over

3    certain requests, and they moved as to certain requests.  A lot

4    of what we're hearing today is beyond, you know, the scope of

5    those issues.  So we're doing our best to respond to that on

6    the fly and I really think that there's a lot here that was not

7    properly set up in terms of motions.

8             But, you know, just going back to, you know,

9    Mr. Stein's comment about the audited financials that are not

10   showing certain related party transactions.  The MindGeek

11   Entity Defendants produced a lot more than just audited

12   financials.  They've produced individual company financials and

13   they've produced financials for different business loans.

14   So -- and tax returns.  So with all that together the Plaintiff

15   should be able to figure out where the money was going.

16            And if they have some questions they could proceed

17   with the 30(b)(6) deposition that they noticed early on.

18   Within, you know, a very short time after the notice we

19   communicated with Plaintiff.  We gave dates on which the

20   30(b)(6) witness would be available.  They can ask questions of

21   that 30(b)(6) witness if there are particulars or they can come

22   to us and raise particular questions and we'll do what we can.

23            We are trying to comply obviously with Judge Carney's

24   Orders and complete this jurisdictional discovery, which has

25   become really quite massive and complicated and expensive.  We

1    would like to give the Plaintiff what they need and do it in as

2    efficient a manner as possible.

3        There were references to, you know, needing more

4    information about, you know, where the money flows in the web

5    and the like.  Again, with all the financial information we've

6    provided Plaintiff should be able to identify where the

7    relevant money is flowing, which is Pornhub.  We gave the

8    licensing agreements.  We identified who owns the trademarks

9    and the URLs and we gave information about the flow of money

10   for the Pornhub business.

11       You know, in terms of the deal documents and

12   Individual Defendants testified about what they own and it

13   doesn't match up, I'm not sure what testimony is being referred

14   to here and I'm not sure what concern there is about members

15   not matching up.  Again, the Plaintiff can come to us or they

16   can take the deposition of somebody who might be able to answer

17   specific questions.

18       Mr. Stein said that the MindGeek Entity Defendants

19   produced one service agreement.  That's not correct.  In the

20   declaration of Michelle Yeary submitted, Document 224-1O, on

21   Page 8, you know, there's a list of additional service

22   agreements.  As I said, we've identified, you know, a couple

23   few others which we'll be producing.  And to the extent that

24   there aren't formal service agreements, there are references in

25   the materials produced to payments from one entity to another,

1    amounts due from one to another for services rendered.

2         Then we got into a lot of speculation about financing

3    and shell companies and this might be happening and that might

4    be happening and there's a loss here and how could that happen.

5    That's a lot of speculation, Your Honor.  We have produced a

6    lot of facts and this -- we have corporate formation documents,

7    we have resolutions, board minutes, meetings, financials, tax

8    returns, et cetera.  Speculating about kind of things that have

9    no basis in the facts when we've produced as much as we have

10   is, frankly, not productive.  If there are specifics about

11   which Plaintiff is concerned, we're happy to address them.

12        In terms of the attachments to board meetings, again

13   Plaintiff hasn't alerted us to any particular concern, but

14   certainly if there is an attachment about a policy, a policy

15   about the moderation of content, we would be more than willing

16   to produce information about who was, you know, approving that

17   policy.

18        And then communications about Ms. Fleites, again a

19   lot of speculation about the communications that might have

20   been had about how much money was made on the video and when

21   did we take it down or whatever.  Since we don't know anything

22   about the video, there couldn't have been any communications

23   about the video.  And we have produced communications after,

24   you know, the videos we're aware of had come down about the

25   allegation for underage content showing in fact the MindGeek

102

1    Entity Defendants were not able to identify any.  So there

2    could be no conversations about how much money was made on a

3    video that has not been identified.

4              In terms of who pays for moderation, absolutely, Your

5    Honor, as Ms. Tabaksblat stated, the MindGeek Entity Defendants

6    responded in Interrogatory Number 9 and identified who pays for

7    the moderators.  So if I focused on MindGeek Freesites or

8    missed an entity, I apologize, but the full list is in the

9    interrogatories.

10             And then in terms the servers and the massive amount

11   of technological data that MindGeek must have, again, yes,

12   MindGeek is a technology company.  There's a lot of technology.

13   There's infrastructure.  There's data centers and the like.

14   But the question here is personal jurisdiction.  Plaintiff

15   alleges her content went up on Pornhub.  We've told them where

16   the Pornhub content is stored.  Beyond that, the information is

17   simply not relevant to jurisdiction, Your Honor.

18             **THE COURT:**  Thank you.

19             **MS. MASSEY:**  Thank you.

20             **THE COURT:**  Anything further?

21             **MR. STEIN:**  Just a couple points briefly, Your Honor,

22   because I know we're running really long and I know all the

23   parties thank you for your patience and taking the time.

24             They make it sound like they've produced a warehouse

25   of information and we're whining.  I think we have 275 total

103

1    documents all in to date.  I've gotten more than that in one

2    party straightforward breach of contract cases.  We're talking

3    about many years, many entities, and a really complicated

4    structure.  There's got to be thousands and thousands and

5    thousands of documents that relate to the jurisdictional

6    analysis and where the money's flowing in these corporate

7    structures.  I just want to put that into some context.

8              Second, I would say, you know, the Court's asked a

9    couple times where does this fit.  I mean Interrogatory

10   Number 4 says identify all the direct or indirect

11   jurisdictional contacts.  I think everything we talked about

12   today is a direct or indirect jurisdictional analysis contact

13   or point.  That's what all of it is.  There are other requests

14   that, sadly, may be coming your way.  A lot of why we're doing

15   this today and why the hearing may have gone more broadly than

16   the specifically listed requests is that what it seems like for

17   these and others, and maybe for all of them, the MindGeek

18   Defendants are relying on the objection that they don't have to

19   provide discovery beyond the two entities, S.A.R.L. and

20   Premium.  And in their responses I think for every one they

21   say, well, we object because you're going beyond those two

22   entities.  And that's kind of the whole point with alter ego.

23             I guess part of what we're trying to do is not have

24   to be here again in three or four weeks on the same issues with

25   the same objections.  To the extent the Court overrules that

1    objection, it may facilitate the ability to -- I mean it sounds

2    like they're willing to give us more.  This morning they said

3    they were done and now they're saying they might be willing to

4    give us more.  But if we have a fundamental dispute over the

5    scope of discovery -- and I think we do.  The alter ego

6    analysis to us is very broad and to them it sounds like it's

7    very narrow and they're saying you can get this little bit of

8    narrow stuff and then if you want something specific you can

9    come tell us and maybe we'll give it to you.  But I think the

10   Ninth Circuit analysis of jurisdiction with alter ego is very

11   broad and Judge Carney's Order is very broad and I guess part

12   of what we're trying to do is not to have serial motions.

13            I mean the Court will probably not be pleased to see,

14   I think there's four more motions to compel being filed today

15   related to the Individual Defendants.  And this has been a case

16   with a lot of --

17            **THE COURT:**  Mr. Stein --

18            **MR. STEIN:**  Yes.

19            **THE COURT:**  -- do you have a -- is there a case cited

20   in this briefing that you would like to point me to that you

21   believe is the sort of best articulation of the alter ego scope

22   with regard to jurisdictional discovery in the Ninth Circuit?

23            **MR. STEIN:**  I think, yes.  If we look at our brief,

24   Docket 224, Page 26, at the top we cite *In re Boon*, that's B-

25   like boy-o-o-n, 923 F.3d 643-653, which -- and then, I'll say

1    it wrong, but *Chubchai, C-h-u-b-like boy-c-h-a-i, v. Abbvie*.

2    That's actually a Northern District of California case but

3    referring to the Ninth Circuit.  There they list the alter ego

4    factors and what the Ninth Circuit considers.  And I believe,

5    continuing also in Docket 224, you asked for only one case but

6    I believe there's two, sorry, on Page 28 --

7              **THE COURT:**  Or rather three.

8              **MR. STEIN:**  Okay, sorry.  I'd rather have three than

9    zero.  So *Siano, I guess, S-i-a-n-o, Mobile*, which is on

10   Page 28 of our brief.  That's a Northern District of California

11   case citing again to the Ninth Circuit, *Harris Rutsky*, 328 F.3d

12   1122 at 1134-35, where they say the Ninth Circuit adopted a

13   broad view of the appropriate scope of jurisdictional discovery

14   and directing broad discovery concerning alter ego and agency

15   relationships between corporate entities.

16             **THE COURT:**  Thank you.

17             **MR. STEIN:**  I think that's where we would point the

18   Court.

19             I guess the last point I'd make is we've already had

20   to extend the date for jurisdictional discovery once.  We'd

21   really like to not have to do that --

22             **THE COURT:**  What is the current deadline?

23             **MR. STEIN:**  I believe it's in May.

24             **UNIDENTIFIED SPEAKER:**  May 1.

25             **THE COURT:**  May 1.

106

```
 1          UNIDENTIFIED SPEAKER:  May 1.

 2          THE COURT:  Okay.

 3          MR. STEIN:  And so that's again part of -- you know,

 4  there's only eight requests or something that are specifically

 5  briefed, but this same objection as to scope of alter ego and

 6  which entities are responsible probably comes up over and over

 7  and over and over and over again and maybe we can avoid further

 8  motion practice if there was clarity as to the scope of what's

 9  relevant for alter ego.

10          THE COURT:  Can I ask a question?  What is the status

11  of the international discovery to the authors (phonetic)?

12          MR. STEIN:  Ah.  I believe it's underway is the short

13  answer.  It takes a long time.  We've got local counsel helping

14  with a number of those and some of the rules are different and

15  the ways they operate are different.  I think it's underway.

16  It will take a while.

17          THE COURT:  Okay, so you don't yet have the

18  responses.

19          MR. STEIN:  We don't.

20          THE COURT:  Okay.  I would be surprised if you did,

21  but….

22          MR. STEIN:  We don't yet have them.  We're pushing as

23  hard as we can.  It's complicated.

24          It does raise one issue, which is a complete

25  non sequitur, but one of the letter rogatory, or rogatory, I
```

1   don't know to say it either, that the Court granted was to

2   Grant Thornton LLP in Toronto.  Grant Thornton has let us know

3   that they are the incorrect entity, that there is an entity

4   called Raymond Chabot Grant Thornton in Montreal which is

5   actually the correct entity.  And what they've said is under

6   Canadian law they need the letter to the actual correct entity,

7   not to the incorrect one.  There's no control such that they

8   can just go get the information.  So we need to get a new

9   letter issued, identical in substance but just to a new

10  recipient.  And I don't know if you can answer this, but I

11  didn't know if we need like a motion for that or if it's

12  clerical we can just submit a request.

13          **THE COURT:**  If the parties are in agreement that -- I

14  mean a stipulation would be the easiest method.  I wouldn't

15  need a motion in that context.  If there is a dispute, then I

16  probably need a motion.  And that may be something we could do

17  through the informal discovery process as well.

18          **MS. MASSEY:**  Your Honor, I don't anticipate that

19  there would be a dispute.  You have ruled on what is

20  permissible and we're happy to coordinate with Plaintiff on

21  that.

22          **THE COURT:**  Okay.

23          **MR. STEIN:**  Thank you.

24          **THE COURT:**  Just so that I have something, you know,

25  there needs to be something on the docket that reflects that

108

```
 1    there is this issue and, you know, in order to issue another

 2    one.

 3            MR. STEIN:  Thank you, Your Honor.  But other than

 4    that, I think the update is we're pushing it but it takes a

 5    long time.

 6            THE COURT:  Okay.  All right, thank you.

 7            MR. STEIN:  Thank you, Your Honor.

 8            THE COURT:  You look like you have some final

 9    comments, right?

10            MS. MASSEY:  I do, Your Honor, and I know we've

11    overstayed our welcome I'm sure, and I'll be really, really

12    quick.

13            THE COURT:  And maybe you can answer for me something

14    I failed to ask now, which was, since you brought up that there

15    are future discovery motions coming down the pike.  How many

16    sorts of discovery -- where are you guys on this jurisdictional

17    discovery?  Are depositions going to be taken?  I mean help me

18    understand the scope of what is going on.

19            MS. MASSEY:  Well, Your Honor, Plaintiff so far to my

20    knowledge has served two deposition notices on the MindGeek

21    Entity Defendants and Plaintiff had indicated to us that they

22    wanted to wait until they had received, you know, certain

23    documents before they go forward.  We're willing to work with

24    Plaintiff on the dates.  We haven't heard and we certainly will

25    endeavor to make our witness available as quickly as possible.
```

1          I'm not aware -- there was a third party subpoena

2   served on one of MindGeek's lawyers and I believe the

3   deposition was requested there, but the law firm objected to

4   that subpoena, as did the MindGeek Entity Defendants.  So I'm

5   not aware that that is proceeding, though that will be -- there

6   is an issue brewing, Your Honor, about the Plaintiff's attempt

7   to seek discovery from MindGeek's counsel.

8          **THE COURT:**  And other additional sets of

9   interrogatories and RFPs and other RFAs, what else is out

10  there?

11         **MS. MASSEY:**  No, it's just -- I mean so far it's just

12  been the one set of interrogatories and, you know, on each

13  side, one set of interrogatories, one set of RFPs, and there's

14  no -- I'm not aware of any Rule 37 letters or requests for meet

15  and confer on additional issues on the MindGeek Entity side.

16  There are, as Mr. Stein said, some issues with the Individual

17  Defendants and I think you'll be seeing motions on that.

18         **MS. TABAKSBLAT:**  That's correct, Your Honor.  So

19  there was one side of interrogatories and document requests

20  served on each of the Defendants in this case and there are --

21  the Individuals have taken the position that they actually

22  don't have to produce any documents or respond to any

23  interrogatory responses and some of those objections are the

24  same, some of them are different.  That is going to be filed I

25  believe today or tomorrow.  Those motions have been fully

110

1    briefed through the joint motion process.

2           With respect to additional discovery, the discovery

3    we have served we feel like covers the jurisdictional analysis

4    and consideration and so to the extent that there's motions --

5    additional motion practice, it will turn on, as Mr. Stein

6    alluded to, we just got in the last few weeks additional

7    documents from the MindGeek Defendants which are now claiming

8    is the sum total of their production.  And so while we did

9    raise I think a lot of the threshold issues that go to that

10   document production, we will be meeting and conferring with

11   them with respect to the deficiencies, many of which have been

12   highlighted by Mr. Stein today.

13           **THE COURT:**  Okay.  Thank you.

14           **MS. MASSEY:**  Your Honor, just a couple quick things.

15   Mr. Stein suggested that the MindGeek Entity Defendants had

16   objected to providing discovery for entities other than the two

17   challenging jurisdiction.  Obviously, that's not correct.  I've

18   been over several times all the discovery that's been produced

19   for other entities.  The MindGeek Entity Defendants did object

20   to Plaintiff's requests insofar as they defined MindGeek to

21   include every affiliate and the MindGeek Entity Defendants did

22   object to producing beyond those entities who are either

23   Defendants or owners or otherwise relevant to what the Judge

24   has ordered.

25           And, Your Honor, you asked for a case that supports

1    the Plaintiff's position on what they're asking for for

2    jurisdictional discovery.  I am not aware of any case that

3    would permit jurisdictional discovery about IT generally or

4    servers generally, nothing that would support the broad

5    discovery that is being sought here.  In fact, as I mentioned

6    earlier, the *Vizio* case in fact supports the MindGeek position

7    that discovery of affiliates is overly burdensome and overbroad

8    and not proportional.  I think we really do need to keep

9    proportionality in mind here, as I'm sure Your Honor knows

10   well.

11            **THE COURT:**  Okay.

12            **MS. MASSEY:**  Thank you.

13            **THE COURT:**  Thank you.  All right, we'll take a short

14   break and I'll be back.

15            **MR. STEIN:**  Thank you, Your Honor.

16        **(A recess was taken from 2:35 p.m. to 2:50 p.m.; parties**

17   **present)**

18            **THE CLERK:**  All rise.  This Court is again in

19   session, the Honorable Autumn D. Spaeth presiding.

20            **THE COURT:**  Please have a seat.

21            All right, so for -- the short answer is I'm taking

22   this under submission.  All right?  However, I am going to

23   order the parties to meet and confer to try to resolve as many

24   of the issues raised in this motion as possible.  And I'm going

25   to order -- well, I guess I will ask you how long you need to

1    be able to report back to me the success of that event.

2            You guys have spent a lot of time discussing these

3    issues.  I think we have identified multiple call it

4    subcategories where perhaps the issue could be easily resolved

5    with just some follow up.  Hey, this is an attachment that we

6    think is relevant or important, you know, that kind of thing

7    that I think would be helpful.

8            However -- so I'm going to ask you to do that.  Now,

9    I know that obviously you're filing motions and you probably

10   feel like you've met and conferred with each other to the

11   death, but I'm going to leave you sort of with this wisdom

12   while I do the analysis I think I need to do here.

13           I see significant risk for both parties or both sides

14   with regard to this motion.  Now, there may be some really

15   procedurally basic problems with Plaintiff's case and whether

16   or not the discovery, the documents that are being sought now

17   were sought in the discovery that is subject to this motion.

18   But the other side of this, which I know seems to -- I agree

19   with Mr. Stein, the bigger issue is the scope of discovery,

20   jurisdictional discovery and specifically alter ego.  It's the

21   bankruptcy litigator in me that spent a lot of time on

22   fraudulent transfers and alter ego issues and those issues can

23   be forensic.

24           I know that quite often the flow of money, which is

25   the thing that Judge Carney specifically identified as

113

1  something that he wants to see, generally that happens and

2  quite often when it's purposeful is not being identified in tax

3  returns or audited financial statements or shareholder

4  agreements.  You have to get down to the bank statements, you

5  have to get down to the financials to see where the transfers

6  are happening, how the loans are occurring, who is paying for

7  what.  And I understand that that is incredibly intensive.

8  Right?

9         These are substantial risks that I'm seeing on both

10  sides that I will be looking through while I prepare a decision

11  and that I think should give both sides a good faith basis for

12  maybe covering your eyes, plugging your nose, and coming up

13  with something in the middle.  Because again I think there are

14  substantial risks to both sides.  Okay?

15         Let's talk about timeframe.  What I'm hoping you guys

16  can do is communicate some more about what you need, what you

17  might be willing to do, how long -- you know, if you are able

18  to resolve some of these categories and take them off the --

19  again, I'm always somebody who's about wise judicial resources.

20  Right?  If you guys can resolve it, you shouldn't have me

21  resolve it.  You know?  Because everyone's happier that way.

22         So how long do you think that will take?

23         **MR. STEIN:**  I think everyone else is flying East

24  Coast, so maybe we lose a day.

25         **THE COURT:**  Okay.

1          **MR. STEIN:**  I would love to be able to report back to

2     the Court Friday or no later than Monday.  I mean on our side

3     we'd like to go fast.  I want to take it seriously.  I'd like

4     to get it all resolved, quite frankly, and it's a lot to do.

5     But we have conferred a lot and there's a lot of us, so if

6     they're willing to carve out time Thursday or Friday, given

7     their travel schedules, so that we could report back to Your

8     Honor by Monday and maybe you don't spend too much time working

9     up an order if we can make progress.

10         **MS. MASSEY:**  Your Honor, we certainly are committed

11    to working constructively with the Plaintiff.  I think it might

12    be an iterative process though, so if we could have a week.

13    Because I'm happy to speak with you Thursday or Friday but then

14    I'm going to have to go back to the client presumably and I

15    might ask you for more specificity.  And so I think it will be

16    somewhat iterative and maybe if we have a week we'll be able to

17    report to Your Honor about the issues that hopefully we will

18    have resolved.

19         **MR. STEIN:**  I am never one to fight over a couple

20    days.  If that helps get it resolved or helps the Court, a week

21    is fine.

22         **THE COURT:**  So today is the 11th, as I understand it.

23    That's interesting, it's 1-1-1 '23.  And I'm sure there's some

24    math term for that.  But so a week would be the 18th.  I know

25    that you all are very busy human beings and you have travel and

115

1    we're still dealing with somewhat of a holiday season, so what

2    do we say about me setting a deadline of January 20th, and I'm

3    going to say close of business so that you're not stuck doing

4    something until 11:59 on Friday night, where you file for me

5    one joint statement about what remains at issue for me.  Okay?

6            Now again, I think the framing in the oral argument

7    went through the sort of groups of documents, which is a little

8    different than the framing of the first one and we really went

9    request by request.  I will leave it up to you on how you guys

10   report back to me, but, you know, keep that in mind that it

11   might be helpful to go category by category, but I will leave

12   it to the brilliant minds that are in front of me to help me

13   understand that.  Okay?

14           Any concerns with that?

15        **MS. MASSEY:**  No, Your Honor.

16        **MR. STEIN:**  No concerns, Your Honor.

17        **THE COURT:**  All right.  Then this matter is taken

18   under submission.

19     **(Counsel thank the Court)**

20        **THE COURT:**  Thank you.

21     **(Counsel thank the Court)**

22        **THE CLERK:**  Court is now adjourned.

23     **(This proceeding was adjourned at 2:57 p.m.)**

24

25

## CERTIFICATION

     I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>January 13, 2023</u>

       Signed                                           Dated


               *TONI HUDSON, TRANSCRIBER*