Michael J. Bowe
(admitted *pro hac vice*)
mbowe@brownrudnick.com
Lauren Tabaksblat
(admitted *pro hac vice*)
ltabaksblat@brownrudnick.com
**BROWN RUDNICK LLP**
7 Times Square
New York, NY 10036
Telephone:   (212) 209-4800
Facsimile:   (212) 209-4801

Attorneys for Plaintiff

Kathleen N. Massey
(admitted *pro hac vice*)
Kathleen.Massey@dechert.com
**Dechert LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Tel: (212) 698-3500
Fax: (212) 698-3599

Attorneys for Defendants MindGeek
Entities

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| SERENA FLEITES, <br><br> Plaintiff, <br><br> v. <br><br> MINDGEEK S.A.R.L.; MG FREESITES, LTD; MINDGEEK USA INCORPORATED; MG PREMIUM LTD.; MG GLOBAL ENTERTAINMENT INC.; 9219-1568 QUEBEC, INC.; BERND BERGMAIR; FERAS ANTOON; DAVID TASSILLO; COREY URMAN; VISA INC.; COLBECK CAPITAL DOES 1-5; BERGMAIR DOES 1-5 <br><br> Defendants. | CASE NO. 2:21-CV-04920-CJC-ADS <br><br> **DISCOVERY DOCUMENT: REFERRED TO MAGISTRATE JUDGE AUTUMN D. SPAETH** <br><br> **NOTICE OF MOTION AND PLAINTIFF'S SECOND MOTION TO COMPEL DEFENDANT MINDGEEK ENTITIES' RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES** <br><br> Date: March 1, 2023 <br> Time: 10:00 a.m. <br> Courtroom: 6B <br><br> Jurisdictional Discovery Cutoff: May 1, 2023 |

NOTICE OF MOTION AND PLAINTIFF'S SECOND MOTION TO COMPEL DEFENDANT MINDGEEK
ENTITIES' RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS
AND INTERROGATORIES

# **TABLE OF CONTENTS**

**Page**

JOINT STIPULATION .................................................................................3

I.    THE PARTIES' PRELIMINARY STATEMENTS .......................................3

    Plaintiff's Preliminary Statement ...........................................................3

    Defendant's Preliminary Statement ........................................................6

II.   JOINT SPECIFICATION OF ISSUES IN DISPUTE ...................................9

    A.   Requests for Production in Dispute. .......................................9

III.  PLAINTIFF'S POSITION .......................................................................28

    A.   The Permissible Scope of Jurisdictional Discovery Ordered by
       Judge Carney is Far Broader than the MindGeek Entity
       Defendants' Selective Production .......................................28

    B.   Defendants' Failure to Produce Foundational Alter Ego
       Discovery Specifically Identified By The District Court. ...............34

       1.   Corporate, Operational, and Ownership Structure ...................36

       2.   Finance Information.......................................................41

IV.   THE MINDGEEK ENTITY DEFENDANTS' POSITION .........................45

    A.   Plaintiffs' Jurisdictional Discovery Requests are Far Broader
       than What is Permitted by the Federal Rules of Civil Procedure
       and the Court's Orders ....................................................45

    B.   The MindGeek Entity Defendants Have Produced or Agree to
       Produce the Alter Ego Discovery Identified by the Court.................48

       1.   Corporate, Operational, and Ownership Structure ...................49

       2.   Finance Information.......................................................54

V.    CONCLUSION .....................................................................................57

    A.   Plaintiff's Conclusion .....................................................57

    B.   Defendant's Conclusion..................................................57

NOTICE OF MOTION AND PLAINTIFF'S SECOND MOTION TO COMPEL DEFENDANT MINDGEEK
ENTITIES' RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS
AND INTERROGATORIES

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on March 1, 2023, at 10:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Autumn D. Spaeth, located at the Ronald Reagan Federal Building and United States Courthouse, Courtroom 6B, 411 West Fourth Street, Santa Ana, CA 92701, Plaintiff Serena Fleites ("Plaintiff") will move the Court for an Order compelling defendants MindGeek S.A.R.L., MG Freesites LTD, MindGeek USA Inc., MG Global Entertainment Inc., MG Premium Ltd., and 9219-1568 Quebec, Inc. (hereinafter "MindGeek Entity Defendants" or "Defendants") to respond to discovery and produce documents pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure.

Plaintiff brings this motion pursuant to Rules 26, 33, 34, and 37 of the Federal Rules of Civil Procedure; Local Rule 37-2, and this Court's July 2018 Standing Orders on Discovery Disputes.

In accordance with L.R. 7-3 and 37-1, counsel for Plaintiff and Defendants conferred by telephone on January 18, 2023.

Plaintiff bases this motion on this Notice, the Parties' Joint Stipulation regarding this discovery dispute, the pleadings and papers on file in this action, and on such other evidence as may be submitted to the Court. Plaintiff submits a proposed order with this application.

**PLAINTIFF'S SECOND MOTION TO COMPEL DEFENDANT MINDGEEK ENTITIES' RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES**

1   Dated: February 8, 2023

2

3   By:__s/ Michael J. Bowe__          By:__s/ Kathleen N. Massey__

4   MICHAEL J. BOWE (*pro hac vice*)          Kathleen N. Massey (*pro hac vice*)
    mbowe@brownrudnick.com                    Kathleen.Massey@dechert.com
5   Lauren Tabaksblat                         **Dechert LLP**
    ltabaksblat@brownrudnick.com              Three Bryant Park
6   **Brown Rudnick LLP**                     1095 Avenue of the Americas
7   7 Times Square                            New York, NY 10036
    New York, NY 10036                        Tel: (212) 698-3500
8   Phone: (212) 209-4800                     Fax: (212) 698-3599
9   Fax: (212) 209-4801                       Attorneys for Defendants
    Attorneys for Plaintiff                   MindGeek Entities
10

11  David M. Stein (#198256)
    dstein@brownrudnick.com
12  **BROWN RUDNICK LLP**
    2211 Michelson Drive, 7th Floor
13  Irvine, California 92612
    Phone:   949.752.7100
14  Fax:   949.252.1514

15

16  Attorneys for Plaintiff

17

18

19

20

21

22

23

24

25

26

27

28

2                                            CASE NO. 21-CV-04920-CJC-ADS

# JOINT STIPULATION

## I.    THE PARTIES' PRELIMINARY STATEMENTS

### Plaintiff's Preliminary Statement

In sworn testimony before the Canadian Parliment, Defendant Antoon was asked "[w]ho owns MindGeek" and responded by identifying himself and Defendant Tassillo as "minority shareholders of the company," and Defendant Bergmair as "[t]he majority shareholder, owning over 50% of the company." First Amended Complaint ("FAC"), ¶ 96.

However, according to the very few documents produced by the MindGeek Defendants to-date, the entity Antoon identified as "MindGeek" in his sworn testimony was actually a different entity -- RedTube Holdings -- that has no formal corporate relationship with MindGeek. Those documents also suggest that Defendant Bergmair owns no interest in MindGeek, and the "over 50%" interest he does own is in RedTube Holdings. Likewise, the "minority" ownership percentage Antoon was referring to for himself was likewise in the same entity. In short, Antoon appears to plainly have identified RedTube Holdings as the alter ego of the Mindgeek Defendants.

As alleged in the complaint, documents produced to date suggest that the MindGeek Defendants have transferred all of its assets to this "Shadow" MindGeek alter ego owned by Bermair, Antoon, and Feras and agreed to pay pay it the majority of their revenues in the form of purported royalties, licensing fees, and dividends (even though this "Shadow" entity has no formal, direct interest in the MindGeek entities through which it could receive a true dividend).

However, the MindGeek Defendants refuse to produce the foundational organizational and financial information necessary to determine exactly what the relationship is in and between these individual "MindGeek" owners, this "Shadow" MindGeek alter ego, and the MindGeek Defendants.

1   They refuse to produce a complete set of the contracts, agreements, and other

2   corporate documents setting forth the relationship and rights of these parties.

3   They refuse to produce any documents summarizing, explaining or describing

4   the relationship of these parties and its operation.

5   They refuse to produce all the organizational charts depicting this relationship.

6   They refuse to produce any documents identifying all the direct and indirect

7   owners of this "Shadow" alter ego.

8   They refuse to produce internal organizational charts and documents

9   identifying the MindGeek Defendants' complete corporate structure, management,

10  structure, and operational structure, including documents showing where its website

11  operations and infrastructure, including the data centers and servers it uses, are

12  located.

13  They refuse to produce the financial information necessary to actually

14  determine where the $500 million in annual revenues the MindGeek business earns

15  goes on its way up to the MindGeek parent, which consistently reports little to no

16  profit.

17  They refuse to produce any of these materials even though Judge Carney

18  directed this phase of discovery to determine, "who *owns* Pornhub and the other

19  MindGeek websites that hosted Plaintiff's videos?," and held that "[t]he distinction

20  between direct and indirect ownership of the offending websites is crucially important

21  to the Court's jurisdictional analysis" and "[w]here the money flows in the MindGeek

22  web, which may relate to ownership of the porn sites that generate revenue, matters

23  to the Court's jurisdictional analysis."

24  They refuse to do so even though Judge Carney held unequivocally that the

25  Court wanted discovery into who "exercise[d] ultimate control over all of the

26  MindGeek Entity Defendants," due to the Court's "concern with respect to the

27  capitalization or solvency of the MindGeek Entity Defendants" and whether "owing

28

4

to various schemes in which some MindGeek Defendants bleed money out of others through fraudulent transactions."

They refuse to do so even though Judge Carney held that the Court was "not convinced by the MindGeek Entity Defendants' conclusory, vague denial of ownership of any servers located in the United States," and wanted to know whether "one or many of the MindGeek Entity Defendants maintains servers in the U.S."

They have refused not because they maintain such information does not exist or is not easily obtained or produced. Rather, their position is that the threadbare production of summary tax returns, internal top-line financial statements, and incomplete organizational documents "are sufficient to understand the structure and know the entities are separate." This position is a *non sequitur vis-a-vis* Judge Carney's Order. And it obviously does not remotely comply with their obligations under the Federal Rules.

For months, Plaintiff has waited in good faith for promised supplemental productions to determine whether the discovery demands could be narrowed to a mutually acceptable universe in conjunction with representations and interrogatory response and to avoid seeking the Court's intervention. It is now clear, however, that this is not possible.

Accordingly, Plaintiff respectfully requests that the Court issue an Order compelling the MindGeek Defendants to produce the below categories of foundational jurisdictional and alter ego documents concerning the ownership, organization, operation, and finances of the MindGeek entities.

As set forth below, in any billion-dollar organization following the most basic corporate formalities, each of these categories of documents would be maintained in the normal course and be readily and easily accessible and producible. Indeed, most would have been part of the materials made available as part of the basic lender due diligence for the MindGeek's various financings, for its international auditors, and for its reported potential investors and buyers. They are also almost certainly easily

1   accessed by its finance, legal and senior executive personnel. And they most likely

2   have already been collected and reviewed by their defense counsel, particularly in

3   preparing the declaration they submitted in seeking to have this case dismissed on

4   jurisdictional grounds.

5   **Defendant's Preliminary Statement**

6       Plaintiff brings this second motion to compel against the MindGeek Entity

7   Defendants claiming that she requires additional discovery related to her alter ego

8   allegations, both as to the corporate structure and relationships among certain

9   entities and as to the finances of the companies. The problem, however, is not the

10  volume or types of documents that the MindGeek Entity Defendants have produced

11  or agreed to produce; it is that all of those documents demonstrate that the

12  MindGeek Entity Defendants maintain formal separation, and the parent holding

13  company does not exercise pervasive control over its subsidiaries. In other words,

14  Plaintiff is dissatisfied with the discovery because it disproves her alter ego

15  allegations. So instead of addressing the discovery produced or to be produced

16  shortly, Plaintiff continues to "further complicate this case," despite the Court's

17  "urging" not to do so, by making baseless assertions that Plaintiff wishes were so

18  and refusing to accept that the documents and information produced are more than

19  adequate to address the Ninth Circuit's alter ego factors.

20      For example, Plaintiff argues that the MindGeek Defendants have

21  misrepresented important facts bearing on jurisdiction without taking into account

22  discovery provided that directly contradicts Plaintiff's assertions. For example,

23  •   Plaintiff argues that during testimony before the Canadian Parliament,

24      Defendant Antoon misrepresented that he and Defendant Tassillo are minority

25      owners and that Defendant Bergmair is a majority owner of "MindGeek."

26      However, Defendants Antoon and Tassillo each provided sworn interrogatory

27      responses stating that they ███████████████████████████

28      ████████  Defendant Bergmair provided a sworn interrogatory response stating

6    CASE NO. 21-CV-04920-CJC-ADS

1    that he ███████████████████████████████████  And the

2    Shareholder Agreement, as amended, that was produced confirms as much.

3    •    Plaintiff argues that "RedTube Holdings" is a "'Shadow' MindGeek alter

4         ego" that has "no formal corporate relationship with MindGeek."  Plaintiff

5         asserts that the MindGeek Entity Defendants refuse to produce "the

6         foundational organizational and financial information necessary" to determine

7         how "RedTube Holdings" relates to the MindGeek Defendants.  In fact, the

8         MindGeek Entity Defendants have produced organizational charts that show

9         how the entity, actually called "RT Holdings S.a.r.l.", relates to its affiliates,

10        and has produced or will shortly produce documents that show how funds

11        flow to the entity and how it, in turn, distributes funds to its shareholders,

12        including entities through which Defendant Bergmair holds his ownership

13        interest in MindGeek.

14   Plaintiff then goes on to say more than ten times that the MindGeek Defendants

15   refuse to produce relevant material bearing on jurisdiction.

16        As discussed below, that is categorically false.  At a meet and confer on

17   January 18, 2023, the MindGeek Entity Defendants agreed to consider many of the

18   categories of documents Plaintiff now seeks in her motion to compel.  Before and

19   afterwards, Defendants were working diligently to identify potentially responsive

20   documents.  See Yeary Decl. at ¶ 3.  Had Plaintiffs continued the meet and confer

21   process, most of the current motion could have been avoided.  In fact, on February

22   6, 2023, the MindGeek Entity Defendants communicated their offer to produce a

23   large volume of documents that responded to almost every request Plaintiff seeks to

24   compel.  *See* Exhibit 9.

25        Further, Plaintiff's motion addresses two requests that were already the

26   subject of her first motion and have been ruled on by the Court.  Specifically,

27   Plaintiff moves again here on her Request for Production Nos. 6 and 26; but the

28   issues raised by those requests have been resolved.  Minute Order entered February

7                          CASE NO. 21-CV-04920-CJC-ADS

3, 2023 ("Order"), at 4-7. [Dkt. # 260.]  The MindGeek Entity Defendants also informed Plaintiff that they would comply with the Court's rulings and suggested that this motion could be narrowed as a result.  But Plaintiff responded by saying that the MindGeek Entity Defendants are required to produce more than the Court determined was appropriate and refused to narrow the scope of this motion to reflect the Court's rulings.  Nor was Plaintiff willing to defer this motion for one week to allow the MindGeek Entity Defendants to make their production and for the parties to continue to meet and confer in the hope of not needing to burden the Court with a motion that was substantially resolved.

While Plaintiff takes issues with the MindGeek Entity Defendants' responses to 25 requests for production, in the end, Plaintiff distills her 25 requests down to eight categories of documents, of which the MindGeek Entity Defendants believe only two remain contested.   As set forth in detail below, the MindGeek Entity Defendants have produced or will produce shortly documents that resolve Plaintiff's requests for:

- A set of all agreements in and between the owners, investors, lenders, executives, and MindGeek, deal files related to those transactions and agreements, and the governing articles and by-laws for the relevant MindGeek entities.

- Due diligence files, presentations, or the equivalent prepared in connection with any actual or contemplated financing, investment, purchase, reorganization, or other corporate transaction or audit.

- Ownership and corporate organizational charts, and contract abstracts, summaries, and memoranda, explaining or depicting the identities and legal and economic relationships of and between the direct and indirect owners, investors, lenders, and any MindGeek entity, affiliates, and related parties.

- Documents reflecting which MindGeek entities employed and paid the management and personnel operating the business and paid the costs associated with the business.

**PLAINTIFF'S SECOND MOTION TO COMPEL DEFENDANT MINDGEEK ENTITIES' RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES**

- Financial reports prepared for, and associated information given to, senior management, directors or their equivalent, lenders, or outside consultants, accountants, or other third parties.[1]

- Documents related to the reorganizations, inter-company and related-party transactions, contracts, accounting, and third-party transfer pricing analysis as described in the Andreou Declaration.

As to Plaintiff's remaining two categories, one was partially resolved by the Court's February 3, 2023 Order and one is an unjustified and unduly burdensome request. As to the former, Plaintiff seeks detailed documents regarding internal management and operations, rosters, and infrastructure for each MindGeek entity. The Court already denied this discovery in relation to Plaintiff's request for IT infrastructure documents and the same rationale applies to this even broader request. Order at 5-7. As to the latter, Plaintiff seeks access to the MindGeek entities' complete accounting and financial reporting systems without offering the Defendants or the Court any explanation for why the extensive financial documents already produced are not sufficient. Discovery of the underlying accounting systems goes well beyond what is needed, and allowed, for jurisdictional discovery.

As explained in further detail below, Plaintiff's motion to compel should be denied.

## II.    JOINT SPECIFICATION OF ISSUES IN DISPUTE

### A.    Requests for Production in Dispute.

Request for Production No. 2: "All documents describing, depicting, explaining, or relating to the past or present corporate and ownership organization and structure of MindGeek, the identity of all affiliated or related

---

[1] The reporting packages are detailed spreadsheets with numerous tabs and large amounts of data, making them impossible to print and attach as an exhibit in any meaningful way. The MindGeek Entity Defendants do not object, if the Court requests, to producing them and other financial documents for *in camera* review.

PLAINTIFF'S SECOND MOTION TO COMPEL DEFENDANT MINDGEEK ENTITIES' RESPONSES TO
PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES

party entities, corporations, limited partnerships, limited liability companies, partnerships, or other entities; the nature of the direct, indirect or beneficial ownership or other interests held by any such person, entity, or organization; and the owners, members, directors, managers, lenders, secured parties, general or limited partners, executives, and outside law firms and accountants of such entities."

Response to Request for Production No. 2: "Defendants object to this Request on the grounds it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, particularly to the needs of addressing the Court's exercise of personal jurisdiction over MG Premium Ltd and MindGeek S.à.r.l. or to the viability of Plaintiff's alter ego arguments.  Nor is it limited to the entities who are parties to this lawsuit.  Defendants object to producing documents identifying all managers, lenders, secured parties, executives, outside law firms or accountants as unrelated to the issue of personal jurisdiction.  Defendants also object on the grounds that the phrase "beneficial ownership or other interests" is vague and ambiguous.

Subject to and without waiving any and all objections, after entry of an appropriate confidentiality order and ESI protocol, Defendants will produce corporate organizational charts and documents sufficient to describe the transactions pursuant to which equity ownership interests in each Defendant were acquired and disposed of during the relevant time period.  By way of further response, Defendants refer Plaintiff to and incorporate herein their response to Interrogatory Nos. 1, 2, and 5."

Request for Production No. 3: "All documents related to any past or present,

**PLAINTIFF'S SECOND MOTION TO COMPEL DEFENDANT MINDGEEK ENTITIES' RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES**

direct, indirect, or beneficial ownership, lending, or secured or other economic interest in, or business relationship with, MindGeek or any MindGeek Related Entity by Bernd Bergmair, Feras Antoon, David Tassillo, Colbeck Capital, JP Morgan Chase, Fortress Investment Group, Cornell, Bjorn Daniel Sudan, or Shaileshkumar P. Jain (a/k/a "Sam" Jain) or individuals or entities introduced or represented by such persons or entities."

Response to Request for Production No. 3: "Defendants object to this Request on the grounds it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, particularly to the needs of addressing the Court's exercise of personal jurisdiction over MG Premium Ltd and MindGeek S.à.r.l. or to the viability of Plaintiff's alter ego arguments. Nor is it limited to the individuals and entities who are parties to this lawsuit. Defendants also object on the grounds that phrases "beneficial ownership or other interests" is vague and ambiguous.

Subject to and without waiving any and all objections, after entry of an appropriate confidentiality order and ESI protocol, Defendants will produce documents sufficient to describe the transactions pursuant to which equity ownership interests in each Defendant were acquired and disposed of during the relevant time period."

Request for Production No. 4: "All documents related to any past or present, direct, indirect or beneficial ownership, licensing, or secured or other economic interest of, or in, any intellectual property owned or licensed, directly or indirectly by MindGeek."

<u>Response to Request for Production No. 4</u>: "Defendants object to this Request on the grounds it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, particularly to the needs of addressing the Court's exercise of personal jurisdiction over MG Premium Ltd and MindGeek S.à.r.l. or to the Court's assessment of the viability of Plaintiff's alter ego arguments. Nor is it limited to the entities who are parties to this lawsuit or intellectual property related to either Pornhub or the claims at issue in this litigation.

Subject to and without waiving any and all objections, after entry of an appropriate confidentiality order and ESI protocol, Defendants will produce documents sufficient to identify who owns the domain name and trademark for Pornhub, and any licensing agreements related to that intellectual property."

<u>Request for Production No. 5</u>: "All documents describing, depicting, explaining, or relating to MindGeek's past or present internal organizational structure, offices, departments, executives, and personnel."

<u>Response to Request for Production No. 5</u>: "Defendants object to this Request on the grounds it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, particularly to the needs of addressing the Court's exercise of personal jurisdiction over MG Premium Ltd and MindGeek S.à.r.l. or the Court's assessment of the viability of Plaintiff's alter ego arguments. Nor is it limited to the entities who are parties to this lawsuit. Defendants also object on the grounds that phrase "internal organizational structure" is vague and ambiguous. Defendants further object that this Request is overly broad and unduly burdensome to that extent it seeks "all documents . . . relating to . . .

1   personal." Defendants further object to this Request as overly broad and

2   unduly burdensome to the extent it asks Defendants to produce documents

3   identifying the employees of all MindGeek entities for a seven-year period.

4

5   Subject to and without waiving any and all objections, Defendants will produce

6   written service agreements between the entities identified in Response to

7   Interrogatory No. 1."

8

9   <u>Request for Production No. 6</u>: "All documents identifying all MindGeek or

10   outside person or vendors with any current or past responsibility for

11   moderating, monitoring, formatting, optimizing, filtering, reviewing,

12   screening, or removing content on any MindGeek platform or website, the

13   entities they were retained and employed by, and the entities that they were

14   compensated by, whether salary, bonus or otherwise."

15

16   <u>Response to Request for Production No. 6</u>: "Defendants object to this Request

17   on the grounds it is overly broad, unduly burdensome, not reasonably

18   calculated to lead to the discovery of admissible evidence, and not proportional

19   to the needs of the case, particularly to the needs of addressing the Court's

20   exercise of personal jurisdiction over MG Premium Ltd and MindGeek S.à.r.l.

21   or the Court's assessment of the viability of Plaintiff's alter ego arguments. Nor

22   is it limited to the entities who are parties to this lawsuit. The names of the

23   individual employees who performed the functions and the vendors retained to

24   support the functions described in this Request are unrelated to the issue of

25   personal jurisdiction. Defendants also object on the grounds that term "outside

26   personnel" is vague and ambiguous. Defendants further object to the extent this

27   Request is not limited to Pornhub, the only tubesite on which Plaintiff alleges

28   content depicting her was uploaded. Nor is it appropriately limited to functions

**PLAINTIFF'S SECOND MOTION TO COMPEL DEFENDANT MINDGEEK ENTITIES' RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES**

at issue in this litigation. Defendants further object to this Request as overly broad and unduly burdensome to the extent it asks Defendants to produce documents identifying the employees of all MindGeek entities for a seven-year period."

Request for Production No. 7: "All documents relating to MindGeek's past or present jurisdictional contacts with the United States or California, including but not limited to, offices, residences, and real estate located in California or any jurisdiction in the United States; personnel or vendors employed, retained, paid, or located in, or otherwise providing services in California or any jurisdiction in the United States; political activities in California or any jurisdiction in the United States, including through direct or indirect participation in, or financial support for, lobbying, trade or industry, or activist organizations; trips to California or any jurisdiction in the United States; servers; revenues, profits, expenses, taxes earned or paid in or from California or any jurisdiction in the United States; and communications or business relationships with, to, from, or in California or any jurisdiction in the United States."

Response to Request for Production No. 7: "Defendants object to this Request on the grounds it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, particularly to the needs of addressing the Court's exercise of personal jurisdiction over MG Premium Ltd and MindGeek S.à.r.l. or the Court's assessment of the viability of Plaintiff's alter ego arguments. Nor is it limited to the individuals or entities who are parties to this lawsuit. Defendants also object on the grounds that phrase "jurisdictional contacts" is vague and ambiguous and calls for legal conclusions. The term

14

"communications or business relationships with, to, or in California or any jurisdiction in the United States" is also vague and ambiguous. Defendants object to this Request to the extent it assumes that any of the contacts identified in the Request are "jurisdictional contacts" or that the actions or "contacts" of any of MG Premium Ltd's owners, executives, or employees or MindGeek S.à.r.l.'s owners or executives are relevant to the question of whether the Court has personal jurisdiction over MG Premium Ltd and MindGeek S.à.r.l. Defendants specifically object to the request for information regarding vendors, unspecified communications, and unspecified business relationships that have no connection to the allegations in this case. Defendants further object that "contacts" generally in or with the United States are not relevant to whether personal jurisdiction exists in California.

Subject to and without waiving any objections, Defendants refer to and incorporate herein their response to Interrogatory No. 4. By way of further response, after entry of an appropriate confidentiality order and ESI protocol, Defendants will produce the lease for the office space in Woodland Hills, CA that is the principal executive offices for Defendants MindGeek USA Incorporated and MG Global Entertainment Inc., f/k/a/ Playboy Plus Entertainment Inc. and U.S. and California tax returns, if any, for those Defendants that were required to file them."

Request for Production No. 8: "All documents reflecting annual revenues, profits and losses, and expenses for each MindGeek Related Entity or Tubesite or the entity that owns or controls that platform or website."

Response to Request for Production No. 8: "Defendants object to this Request on the grounds it is overly broad, unduly burdensome, not reasonably

1  calculated to lead to the discovery of admissible evidence, and not proportional
2  to the needs of the case, particularly to the needs of addressing the Court's
3  exercise of personal jurisdiction over MG Premium Ltd and MindGeek S.à.r.l.
4  or the Court's assessment of the viability of Plaintiff's alter ego arguments.
5  Nor is it limited to the entities who are parties to this lawsuit.  Defendants
6  further object to the extent this Request is not limited to Pornhub, the only
7  tubesite on which Plaintiff alleges content depicting her was uploaded, or to
8  MG Freesites Ltd, the entity that operates Pornhub.
9
10  Subject to and without waiving any and all objections, Defendants state that the
11  domain name and trademark for Pornhub are owned by Licensing IP
12  International S.à.r.l., and the domain name Pornhub.com is owned by
13  Cartwright II S.à.r.l. for the benefit of Licensing IP International S.à.r.l.  Those
14  two entities license the relevant intellectual property to MG Freesites Ltd. in
15  exchange for royalty payments generated from MG Freesites Ltd's operation
16  of Pornhub.  After entry of an appropriate confidentiality order and ESI
17  protocol, Defendants will produce documents from which information can be
18  determined regarding the financial performance of Pornhub and MG Freesites
19  Ltd and how MG Freesites Ltd's profits are distributed."
20
21  Request for Production No. 9: "All documents concerning, reflecting,
22  describing, relating to, or comprising presentations to or from, proposed
23  transactions from, or data and information provided or made available to, actual
24  or potential investors, lenders, secured parties, licensees, purchasers or others
25  concerning MindGeek or any MindGeek Related Entity."
26
27  Response to Request for Production No. 9: "Defendants object to this Request
28  on the grounds it is overly broad, unduly burdensome, not reasonably

calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, particularly to the needs of addressing the Court's exercise of personal jurisdiction over MG Premium Ltd and MindGeek S.à.r.l. or the Court's assessment of the viability of Plaintiff's alter ego arguments. Nor is it limited to the entities who are parties to this lawsuit. Defendants also object on the grounds that the term "or others" is vague and ambiguous. As written this Request also is overly broad and unduly burdensome to the extent it seeks all documents reflecting "information provided or made available to . . . others."

Subject to and without waiving any and all objections, after entry of an appropriate confidentiality order and ESI protocol, Defendants will produce annual presentations made about the financial performance of each Defendant in connection with the meetings of directors or their legal equivalent for each Defendant."

Request for Production No. 10: "All transaction documents, term sheets, and communications concerning any actual or proposed transactions involving the ownership of, loans to, secured interest in, or intellectual property or other rights related to, MindGeek."

Response to Request for Production No. 10: "Defendants object to this Request on the grounds it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, particularly to the needs of addressing the Court's exercise of personal jurisdiction over MG Premium Ltd and MindGeek S.à.r.l. or the Court's assessment of the viability of Plaintiff's alter ego arguments. Nor is it limited to the entities who are parties to this lawsuit. Defendants also

object on the grounds that the term "other rights" is vague and ambiguous.

Subject to and without waiving any and all objections, after entry of an appropriate protective order and ESI protocol, Defendants will produce documents sufficient to describe the transactions pursuant to which equity ownership interests in each Defendant were acquired and disposed of during the relevant time period."

Request for Production No. 11: "For each MindGeek entity, affiliate, subsidiary, or related entity, all financial, ledgers; shareholder, investor, director, member, manager, or partner lists; board presentation materials, board minutes, and calendars of board meetings or conferences; records reflecting capitalization, revenues, profits, tax payments, distributions or dividends, and distribution or dividend recipients for such entities; articles of incorporation or formation, by-laws, shareholder and lender agreements; profit and loss, balance sheet, tax, payroll, and expense records; and records reflecting the sources of all payments made to or on behalf of the entity, affiliate, subsidiary, or related entity."

Response to Request for Production No. 11: "Defendants object to this Request on the grounds it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, particularly to the needs of addressing the Court's exercise of personal jurisdiction over MG Premium Ltd and MindGeek S.à.r.l. or to the Court's assessment of the viability of Plaintiff's alter ego arguments. Nor is it limited to the individuals or entities who are parties to this lawsuit. Defendants object to the phrase "records reflecting the sources of all payments made to or on behalf of the entity, affiliate, subsidiary, or related entity" as

**PLAINTIFF'S SECOND MOTION TO COMPEL DEFENDANT MINDGEEK ENTITIES' RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES**

vague and ambiguous. Defendants object to the production of financial ledgers, lists of investors or managers, lender agreements, payroll and expense records, and sources of payments as unrelated to any claim in this case or to personal jurisdiction.

Subject to and without waiving any and all objections, after entry of an appropriate confidentiality order and ESI protocol, Defendants will produce for themselves and the entities identified in response to Plaintiff's Interrogatory No. 1 the records required to be maintained by the laws of their individual states or countries of organization, annual financial statements, income tax returns, and documents sufficient to identify dividends paid and other distributions made to equity holders."

Request for Production No. 12: "For each MindGeek Entity, affiliate, subsidiary, or Related Entity, all quarterly and annual tax filings, audits, financials, and statutory reporting, including work papers and reports of its outside accountants."

Response to Request for Production No. 12: "Defendants object to this Request on the grounds it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, particularly to the needs of addressing the Court's exercise of personal jurisdiction over MG Premium Ltd and MindGeek S.à.r.l. or to the Court's assessment of the viability of Plaintiff's alter ego arguments. Nor is it limited to the entities who are parties to this lawsuit. Defendants object to the term "work papers" as vague and ambiguous. Defendants object to the production of quarterly tax filings, audits, statutory reporting and any work product or reports prepared by outside accountants.

Subject to and without waiving any and all objections, after entry of an appropriate confidentiality order and ESI protocol, Defendants will produce for themselves and each of the entities identified in response to Plaintiff's Interrogatory No. 1 annual financial records and income tax returns."

Request for Production No. 13: "For each MindGeek Entity, affiliate, subsidiary, or Related Entity, all monthly, quarterly, and annual bank and investment statements."

Response to Request for Production No. 13: "Defendants object to this Request on the grounds it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, particularly to the needs of addressing the Court's exercise of personal jurisdiction over MG Premium Ltd and MindGeek S.à.r.l. or to the Court's assessment of the viability of Plaintiff's alter ego arguments. Nor is it limited to the entities who are parties to this lawsuit."

Request for Production No. 14: "All documents related to any corporate reorganization by MindGeek and the business purpose of that reorganization."

Response to Request for production No. 14: "Defendants object to this Request on the grounds it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, particularly to the needs of addressing the Court's exercise of personal jurisdiction over MG Premium Ltd and MindGeek S.à.r.l. or to the Court's assessment of the viability of Plaintiff's alter ego arguments. Nor is it limited to the entities who are parties to this lawsuit.

Subject to and without waiving any and all objections, after entry of an appropriate protective order and ESI protocol, Defendants will produce documents sufficient to describe the transactions pursuant to which equity ownership interests in each Defendant were acquired and disposed of during the relevant time period."

Request for Production No. 15: "All documents identifying the "various subsidiaries comprising the business of MindGeek" as described in the Andreou Declaration."

Response to Request for production No. 15: "Subject to and without waiving any and all objections, Defendants will produce corporate organizational charts which identify the MindGeek subsidiary companies addressed in the Andreou Declaration and identified in response to Plaintiff's Interrogatory No. 1."

Request for Production No. 16: "All documents identifying the directors, managers, members, executives, and personnel of the "various subsidiaries comprising the business of MindGeek" as described in the Andreou Declaration."

Response to Request for production No. 16: "Defendants object to this Request on the grounds it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, particularly to the needs of addressing the Court's exercise of personal jurisdiction over MG Premium Ltd and MindGeek S.à.r.l. or to the Court's assessment of the viability of Plaintiff's alter ego arguments. Nor is it limited to the individuals or entities who are parties to this lawsuit. Defendants also object to this Request as duplicative of Request No. 2.

21

Defendants further object to this Request as overly broad and unduly burdensome to the extent it asks Defendants to identify the employees of all MindGeek entities for a seven-year period.

Subject to and without waiving any and all objections, Defendants refer Plaintiff and incorporate herein their Response to Interrogatory No. 5 identifying the officers and directors of Defendants and the other entities identified in response to Plaintiff's Interrogatory No. 1 during the relevant time period."

Request for Production No. 17: "All documents identifying the companies "organized and existing under the laws of multiple jurisdictions where [MindGeek] has assets, operates businesses, or provides services" and the nature of the assets, businesses, or services being referred to in Paragraph 7 of the Andreou Declaration."

Response to Request for production No. 17: "Defendants object to this Request on the grounds it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, particularly to the needs of addressing the Court's exercise of personal jurisdiction over MG Premium Ltd and MindGeek S.à.r.l. or to the Court's assessment of the viability of Plaintiff's alter ego arguments. Nor is it limited to the entities who are parties to this lawsuit. Defendants further object to this Request on the grounds that it is overly broad and unduly burdensome to the extent it seeks the production of all documents identifying the "assets, businesses, or services" of all MindGeek entities, including those unrelated to MG Premium Ltd, MindGeek S.à.r.l., or Pornhub.

**PLAINTIFF'S SECOND MOTION TO COMPEL DEFENDANT MINDGEEK ENTITIES' RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES**

Subject to and without waiving any and all objections, after entry of an appropriate confidentiality order and ESI protocol, Defendants will produce corporate organizational charts which identify the MindGeek subsidiary companies addressed in the Andreou Declaration and identified in response to Plaintiff's Interrogatory No. 1."

Request for Production No. 18: "All documents identifying the entities providing services to MG Freesites LTD described in Paragraph 8 of the May 23, 2022 Andreou Declaration."

Response to Request for production No. 18: "Subject to and without waiving any and all objections, after entry of an appropriate confidentiality order and ESI protocol, Defendants will produce the relevant service agreements between Defendants and MG Freesites Ltd for the relevant period."

Request for Production No. 19: "All documents identifying the bank accounts, services, payments, written agreements, third parties providing transfer pricing studies, pricing studies and price ranges, accounting, and tax determinations described in paragraph 9 of the Andreou Declaration."

Response to Request for Production No. 19: "Defendants object to this Request on the grounds it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, particularly to the needs of addressing the Court's exercise of personal jurisdiction over MG Premium Ltd and MindGeek S.à.r.l. or to the Court's assessment of the viability of Plaintiff's alter ego arguments. Nor is it limited to the entities who are parties to this lawsuit.

**PLAINTIFF'S SECOND MOTION TO COMPEL DEFENDANT MINDGEEK ENTITIES' RESPONSES TO
PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES**

Subject to and without waiving any and all objections, Defendants will produce written service agreements between Defendants and the other entities identified in Response to Interrogatory No. 1.  By way of further response, Defendants are willing to meet and confer with Plaintiff about producing other responsive information."

Request for Production No. 20: "All audited financial statements referred to in Paragraph 10 of the Andreou Declaration and all related communications with auditors regarding the same."

Response to Request for Production No. 20: "Defendants object to this Request on the grounds it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, particularly to the needs of addressing the Court's exercise of personal jurisdiction over MG Premium Ltd and MindGeek S.à.r.l. or to the Court's assessment of the viability of Plaintiff's alter ego arguments. Nor is it limited to the entities who are parties to this lawsuit.  Defendants object to producing communications with auditors as overly broad and unduly burdensome.

Subject to and without waiving any and all objections, MindGeek S.à.r.l., MG Freesites Ltd, and MG Premium Ltd state they have audited financial statements and Defendants will produce those after entry of an appropriate confidentiality order and ESI protocol."

Request for Production No. 21: "All documents identifying the "distinct legal entities" referred to in paragraph 11 of the Andreou Declaration."

Response to Request for production No. 21: "Subject to and without waiving any and all objections, after entry of an appropriate confidentiality agreement and ESI protocol, Defendants will produce corporate organizational charts that identify the entities referred to in response to Plaintiff's Interrogatory No. 1."

Request for Production No. 22: "All documents related to the "support services" MG Global Entertainment has provided as described in paragraph 29 Andreou Declaration."

Response to Request for production No. 22: "Defendants object to this Request on the grounds it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, particularly to the needs of addressing the Court's exercise of personal jurisdiction over MG Premium Ltd and MindGeek S.à.r.l. or to the Court's assessment of the viability of Plaintiff's alter ego arguments. Nor is it limited to the entities who are parties to this lawsuit.

Subject to and without waiving any and all objections, after entry of an appropriate confidentiality order and ESI protocol, Defendants will produce service agreements between MG Global Entertainment and the entities identified in response to Interrogatory No. 1."

Request for Production No. 23: "All documents related to the services provided by 9219-1568 Quebec Inc. as described in paragraph 32 of the Andreou Declaration."

Response to Request for production No. 23: "Defendants object to this Request on the grounds it is overly broad, unduly burdensome, not reasonably

1   calculated to lead to the discovery of admissible evidence, and not proportional
2   to the needs of the case, particularly to the needs of addressing the Court's
3   exercise of personal jurisdiction over MG Premium Ltd and MindGeek S.à.r.l.
4   or to the Court's assessment of the viability of Plaintiff's alter ego arguments.
5   Nor is it limited to the entities who are parties to this lawsuit.

6

7   Subject to and without waiving any and all objections, after entry of an
8   appropriate confidentiality order and ESI protocol, Defendants will produce
9   service agreements between 9219-1568 Quebec Inc. and the entities identified
10  in response to Interrogatory No. 1."

11

12  Request for Production No. 24: "All documents relating to MindGeek related
13  payments, investments, or loans to, in, or for any personal affairs, expenses,
14  entities, businesses, real estate, or investments related to Feras Antoon, David
15  Tassillo, Bernd Bergmair, Corey Urman, or any of their family members or
16  entities in which either or a family member holds a direct or indirect interest."

17

18  Response to Request for Production No. 24: "Defendants object to this Request
19  on the grounds it is overly broad, unduly burdensome, not reasonably
20  calculated to lead to the discovery of admissible evidence, and not proportional
21  to the needs of the case, particularly to the needs of addressing the Court's
22  exercise of personal jurisdiction over MG Premium Ltd and MindGeek S.à.r.l.
23  or to the Court's assessment of the viability of Plaintiff's alter ego arguments.
24  Nor is it limited to the entities who are parties to this lawsuit.

25

26  Subject to and without waiving any and all objections, Defendants will produce
27  documents sufficient to identify any related party transactions and employment
28  compensation to Messrs. Antoon, Tassillo and Urman."

1  Request for Production No. 26: "All documents depicting, describing, or

2  explaining MindGeek's IT infrastructure and networks, data storage, server and

3  data centers and providers of the same, internal and external communications

4  systems including ICQ, and ISP and Cloud storage services and providers,

5  including the locations and identities of any outside vendors associated with

6  the same."

7

8  Response to Request for Production No. 26: "Defendants object to this Request

9  on the grounds it is overly broad, unduly burdensome, not reasonably

10  calculated to lead to the discovery of admissible evidence, and not proportional

11  to the needs of the case, particularly to the needs of addressing the Court's

12  exercise of personal jurisdiction over MG Premium Ltd and MindGeek S.à.r.l.

13  or to the Court's assessment of the viability of Plaintiff's alter ego arguments.

14  Nor is it limited to the entities who are parties to this lawsuit. Defendants object

15  to the request for documents describing every aspect of Defendants information

16  technology systems as overly broad and unduly burdensome because

17  Defendants' "IT infrastructure" is either not related to Plaintiff's claims or so

18  attenuated from Plaintiff's claims as to render discovery about them

19  disproportionate to the needs of the case."

20

21  Request for Production No. 44: "All documents related to the purchase, upload,

22  or distribution of content to any MindGeek platform or MindGeek Tubesite,

23  any MindGeek Related Entity, or any person or entity working for MindGeek

24  or a MindGeek related entity."

25

26  Response to Request for Production No. 44: "Defendants object to this Request

27  on the grounds it is overly broad, unduly burdensome, not reasonably

28  calculated to lead to the discovery of admissible evidence, and not proportional

27

1    to the needs of the case, particularly to the needs of addressing the Court's

2    exercise of personal jurisdiction over MG Premium Ltd and MindGeek S.à.r.l.

3    or to the Court's assessment of the viability of Plaintiff's alter ego arguments.

4    Nor is it limited to the entities who are parties to this lawsuit. Defendants also

5    object that this Request is not limited to Pornhub, the only tubesite on which

6    Plaintiff alleges content depicting her was uploaded. Further, Defendants object

7    to the extent this Request is not limited to documents related to suspected

8    CSAM. Defendants further object on the grounds that as written this Request

9    seeks every document related to every piece of content on every platform

10   owned or operated by any MindGeek affiliated entity. Defendants object to this

11   Request as overly broad and unduly burdensome to the extent it seeks

12   documents concerning any content other than content depicting Plaintiff."

13

14   **III.    PLAINTIFF'S POSITION**

15          A.      **The Permissible Scope of Jurisdictional Discovery Ordered by**

16                  **Judge Carney is Far Broader than the MindGeek Entity**

17                  **Defendants' Selective Production**

18          The FAC contains detailed allegations concerning the needlessly elaborate

19   corporate structure of MindGeek and the manner in which that byzantine structure

20   was used to bleed money out of the company and to Enterprise members, including

21   the Individual Defendants. (*See* FAC ¶¶ 31-32, 41, 48, 131-137, 151-56.) Although

22   the MindGeek entities operate as a single business entity (*id.*, ¶ 32), MindGeek set up

23   a complex network of sham shell companies that was in constant metamorphosis. (¶¶

24   32, 133.) There was no legitimate business purpose for this elaborate shell game,

25   and it was instead used solely to facilitate and mask criminal conduct and insulate the

26   company, its executives, owners, and enterprise members from liability. (¶¶ 31-32,

27   41, 48, 131-137, 151-56.) These transactions, typically in the form of loans,

28   investments, or vendor payments, would result in net operating losses to MindGeek.

**PLAINTIFF'S SECOND MOTION TO COMPEL DEFENDANT MINDGEEK ENTITIES' RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES**

(¶ 137.)  Indeed, over the last 3-5 years, MindGeek has accumulated substantial net operating losses despite hundreds of millions of dollars in annual revenue.  (*Id.*)  Those "lost" monies were transferred to third parties in which Enterprise members had an interest or financial arrangement.  (*Id.*; *see also* ¶¶ 138-41.)  And Enterprise members or their associates and partners would use their control over MindGeek to cause it to transact with shell companies they owned, or (more often) companies owned by others from whom the Enterprise members would be paid.  (¶¶ 31, 143.)

In support of their motion to dismiss the FAC for lack of personal jurisdiction, MindGeek S.a.r.l. and MG Premium submitted the declaration of Andreas Alkiviades Andreou, a director of MindGeek S.a.r.l. and several other MindGeek entities, including defendants MG Freesites, MG Premium, and 9219-1568 Quebec Inc.  (Dkt. 139-3.)  The Andreou Declaration contained what the court characterized as "rather conclusory and repetitive" averments concerning the corporate structure and organization of each of the MindGeek Entity Defendants and their observance of corporate formalities.  (Dkt. 167, at 4.)  The Andreou Declaration also averred that "each change to the corporate structure was for a legitimate business purpose" (Dkt. 139-3, ¶ 4); and whenever a MindGeek entity provides services to another entity, "the entity receiving services has paid the entity providing the services pursuant to the terms of a written agreement" and that MindGeek "has engaged third parties to conduct transfer pricing studies" relevant to those service agreements (*id.*, ¶ 9).

In his order directing the MindGeek Defendants to submit to jurisdictional discovery (Dkt. 167), Judge Carney was clear that Plaintiff was entitled to pursue discovery relative to two distinct bases for establishing personal jurisdiction over the Defendants.  First, the Court directed that jurisdictional discovery was appropriate into the defendants' jurisdictional contacts with the United States.  To that end, given the allegations in the FAC that "Pornhub is used extraordinarily frequently in this district," the Court was clear that a critical question needing to be answered was "who *owns* Pornhub and the other MindGeek websites that hosted Plaintiff's videos?" and

that "[t]he distinction between direct and indirect ownership of the offending websites is crucially important to the Court's jurisdictional analysis." (Dkt. 167, at 3.) Along similar lines, the Court was clear that the question of who controls those websites and "the overall policies governing the website" was jurisdictionally relevant. (*Id* ("[O]peration of a website is not necessarily the same as control over a website. MG Freesites and 9219-1568 Quebec, Inc.'s operation of Pornhub and other MindGeek websites might not embrace control over the overall policies governing the website. Mr. Andreou does not speak to this distinction . . . ."); *id.* at 3 n.2 ("Jurisdictionally relevant conduct could include operating Pornhub and other MindGeek sites in a manner that maximizes the profitability of child porn.").) With respect to these critical questions of ownership and control of the websites, the Court was clear that "[w]here the money flows in the MindGeek web, which may relate to ownership of the porn sites that generate revenue, matters to the Court's jurisdictional analysis." (*Id.* at 3 n.2; *see id.* ("Jurisdictionally relevant conduct . . . also includes collecting money—possibly from U.S.-based advertisers—flowing from the success of the aforementioned criminal operation.").) The Court also noted that it was "not convinced by the MindGeek Entity Defendants' conclusory, vague denial of ownership of any servers located in the United States," and noted that jurisdictionally relevant facts included whether "one or many of the MindGeek Entity Defendants maintains servers in the U.S."; "child porn featuring Plaintiff ended up on these servers"; and "the percentage of Pornhub users living in the United States may be far higher than the 20% in *AMA" Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1210 (9th Cir. 2020), "which may serve as a ground for finding that Pornhub has a 'forum-specific focus' relating to the United States." (Dkt. 167, at 5 n.5.)

Second, Judge Carney was clear that jurisdictional discovery was also appropriate with respect to the alter ego doctrine. (*Id.* at 4.) The Court noted that the Andreou declaration was "rather conclusory and repetitive" in terms of its averments and that "even Mr. Andreou confirms a substantial overlap in the directors of the

MindGeek Entity Defendants." (*Id.*) The Court also emphasized that the MindGeek Entity Defendants did not explicitly rebut Plaintiff's allegations that the MindGeek Individual Defendants "exercise ultimate control over all of the MindGeek Entity Defendants." (*Id.*) Additionally, the Court voiced "concern with respect to the capitalization or solvency of the MindGeek Entity Defendants." (*Id.*) Based on Plaintiff's allegations that millions of dollars of revenue ultimately translate into massive net losses at the operating company level "owing to various schemes in which some MindGeek Defendants bleed money out of others through fraudulent transactions," the Court explained that "therein lies the possible unfairness in dismissing any of the MindGeek Defendants at this point in the proceedings: the possibility that judgment will be entered against remaining insolvent or undercapitalized entities." (*Id.*) The Court further explained: "If the jury finds that the MindGeek Defendants engaged in schemes which diverted money from revenue generating MindGeek entities in contravention of corporate formalities, the Court is concerned with the ability of the non-objecting MindGeek Entity Defendants to satisfy the damages awarded by a jury." (*Id.* at 4-5.)

With respect to the alter ego theory of jurisdiction for which this Court ordered jurisdictional discovery to proceed, that theory has two elements: (1) "there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist"; and (2) "failure to disregard [their separate identities] would result in fraud or injustice." *City & Cty. of San Fran. v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 635 (N.D. Cal. 2020) (internal quotations and citations omitted) There are numerous factors courts examine when assessing whether a unity of interest and ownership exists, including: commingling of funds and other assets; use of one entity as a mere shell or conduit for the affairs of another or where defendant companies act as a "single enterprise"; manipulation of assets and liabilities between entities so as to concentrate assets in one entity and liabilities in another; identical equitable ownership of the entities; use of the same offices and employees; identical officers

and directors; inadequate capitalization; disregard of corporate formalities and failure to maintain an arm's length relationship; and the holding out by one entity that it is liable for the debts of the other. *See id.*; *Kayne v. Ho*, 2012 WL 12878753, at *8 (C.D. Cal. Sept. 6, 2012). And, given the number of factors at play and the unique facts and circumstances in which those factors can be implicated, there are a host of categories of relevant alter ego evidence, including, among many other things:

- evidence of one entity controlling the profits, revenues, or expenditures of the others, *see United States ex rel. Ginger v. Ensign Grp., Inc.*, 2022 WL 4110166, at *5 (C.D. Cal. Mar. 10, 2022);
- evidence that the parent corporation ran itself and its subsidiaries as "one commercial organization" or that the parent used its subsidiaries as a "single venture," *Purdue Pharma L.P.*, 491 F. Supp. 3d at 636, 641; *see also Ginger*, 2022 WL 4110166, at *5;
- evidence that the subsidiary's profits were passed up to a parent entity by way of a management agreement and debt restructuring, *see Tam Vu v. Liberty Mut. Ins. Co.*, 2018 WL 5982867, at *3 (N.D. Cal. Nov. 14, 2018);
- evidence that one entity offers to guarantee another entity's debts for no consideration, *see Vizio, Inc. v. LeEco V. Ltd.*, 2018 WL 5303078, at *18 (C.D. Cal. July 27, 2018); *Tatung Co. v. Shu Tze Hsu*, 217 F. Supp. 3d 1138, 1178 (C.D. Cal. 2016);
- evidence of virtually identical unaudited balance sheets of multiple entities, which suggests that the entities are not truly separate, but that there is only a single company with the same assets, *see Vizio*, 2018 WL 5303078, at *18;
- evidence of a free transfer of company assets or money among entities, *see Lux EAP, LLC v. Bruner*, 2021 WL 3508136, at *4 (C.D. Cal. May 10, 2021); *Purdue Pharma L.P.*, 491 F. Supp. at 640;
- evidence that a company shares assets used to manage the company's "total business," including IT Finance, Human Resources, Corporate Compliance, Communications, and Government Affairs, *see Purdue Pharma L.P.*, 491 F. Supp. at 640;
- evidence of interest-free loans between entities without observing corporate formalities or evidence that assets of one entity are used to obtain loans for another entity, *see Doe v. Unocal*, 248 F.3d 915, 927-28 (9th Cir. 2001); *Tatung*, 217 F. Supp. 3d at 1178;
- evidence of one entity paying the employees of another entity, *see Lux EAP, LLC v. Bruner*, 2021 WL 3508136, at *4;
- evidence of a diversion of corporate assets or funds to other than corporate uses, *see Burns v. WeCall Media, Inc.*, 2022 WL 3012520 (C.D. Cal. May 27,

2022);
- ▪ sharing of key employees and senior executives in the areas of management, compliance, IT, legal, accounting, billing, and HR, *see Ginger*, 2022 WL 4110166, at *5.

With respect to the fraud or injustice prong, the plaintiff must show that "an inequitable result will follow if the acts are treated as those of the [subsidiaries'] alone." *Purdue Pharma L.P.*, 491 F. Supp. at 635 (quotations omitted). "The Court may consider the same variety of factors in making determinations on both prongs of the alter-ego test." *Tam Vu*, 2018 WL 5982867, at *2. "An inequitable result includes enabling a 'shell game,' in which an entity deflects liability on to shell corporations to avoid liability, to continue," *Purdue Pharma L.P.*, 491 F. Supp. at 835, or where there is evidence that assets are bled out of an entity for the purpose of evading potential judgments or liabilities, *see Kayne*, 2012 WL 12878753, at *8, or where affirmative misrepresentations are made in the deployment of the corporate form, *Lux EAP*, 2022 WL 2168877, at *4, or where one entity exercises control over all aspects of the business and purposefully creates a false division of labor through the creation of subsidiaries to shield the controlling entity from liability, *see Tam Vu*, 2018 WL 5982867, at *2.

In the end, "California courts emphasize that the alter ego determination is very fact specific." *Daewoo Elecs. Am. Inc. v. Opta Corp.*, 875 F.3d 1241, 1250 (9th Cir. 2017) (internal quotations and citations omitted)); *see also Maganallez v. Hilltop Lending Corp.*, 505 F. Supp. 2d 594, 607 (N.D. Cal. 2007) ("Alter ego determinations . . . are highly fact-based, and require considering the totality of the circumstances." (internal quotations and citations omitted)). Indeed, this Court recognized precisely that point during the January 11, 2022 hearing on an earlier motion to compel, when the Court explained that "fraudulent transfers and alter ego issues . . . can be forensic." (Dkt. 253, at 112:20-23.) This Court further explained that "quite often" examining "the flow of money, which is the thing that Judge Carney specifically identified as something that he wants to see," "is incredibly intensive." (*Id.* at 112:24-113:7; *see*

33

**PLAINTIFF'S SECOND MOTION TO COMPEL DEFENDANT MINDGEEK ENTITIES' RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES**

*also id.* at 113:2-7 ("[Q]uite often when it's purposeful is [sic] not being identified in tax returns or audited financial statements or shareholder agreements. You have to get down to the bank statements, you have to get down to the financials to see where the transfers are happening, how the loans are occurring, who is paying for what. And I understand that that is incredibly intensive.").

## B. <u>Defendants' Failure to Produce Foundational Alter Ego Discovery Specifically Identified By The District Court.</u>

Judge Carney's Decision explicitly directed discovery into the foundational elements of the alter ego analysis: Who owns and controls the company; how is it structured and operated; and where does its money go, for what, and how does it get there and on what basis.

Consistent with the case law and Judge Carney's Order, Plaintiff served discovery requests that tracked the precise categories of information this Court held to be relevant to its jurisdictional analysis. *See* Doyle Decl., Exhibits 1 & 2. The most central of these were directed at (a) the ownership structure, economic interests, and control rights of the owners; (b) the corporate and operational organizational, including the location of the servers and infrastructure that Judge Carney specifically identified as critical; and (c) basic financial information such as revenues, profits and loss, capitalization, debt, and related party transactions. (Ex. 2, RFPs 2-5, 7-24, 26, 44-45.)

In their initial discovery responses and objections, the MindGeek Defendants promised to produce responsive documents on these topics subject to boilerplate objections as to reasonableness and the like. *See* Doyle Decl., Exhibit 3, Responses of MindGeek Entity Defendants to Plaintiff's First Set of Interrogatories;[2] Exhibit 4,

---

[2] Defendants' initial September 22, 2022, response to Plaintiff's first set of interrogatories was redacted because a protective order had not yet been entered in the case. *See* Exhibit 3. The MindGeek Entity Defendants provided an unredacted interrogatory response designated in its entirety as "Confidential-Subject to Protective

34

Responses of MindGeek Entity Defendants to Plaintiff's First Request for Production of Documents.    Despite repeatedly assuring Plaintiffs they were not done with their production and intended to reasonably comply with those requests, it is beyond the point of obvious that they have no intention of materially complying in good faith with the very discovery Judge Carney ordered.  By the end of the year the Defendants had produced a total of 440 documents and, after further promises subsequent to the last court conference and further meet and confer, they produced a mere 24 more.

This production is wholly lacking in the information Judge Carney ordered discovery into.  Defendants have had months to make a complete production of these responsive foundational documents and to make good-faith proposals to limit the production of all such responsive documents to some mutually acceptable universe.

They have instead elected to unilaterally curate a custom record to their liking. Even worse, the Individual Defendants have refused outright to produce any documents (including their own personal emails and texts) even though they admit they have responsive documents, because the MindGeek Defendants will be producing such documents.

What limited information has been produced, however, demonstrates that the requested information is necessary because it corroborates the core alter ego allegations of the complaint.  According to these documents, the publicly declared owner group of MindGeek actually does not own MindGeek; they actually own a parallel "Shadow" MindGeek entity.  The MindGeek executives who are also part of the "Shadow" MindGeek entity, Defendants Antoon and Tassillo, have transferred all of MindGeek's assets, including its intellectual property, to the "Shadow" entity, and agreed that MindGeek will pay substantial royalties and licensing fees for their use. It appears these payments to the "Shadow" MindGeek entity consume over 50% of

---

Order" on October 17, 2022.  Plaintiff has filed the unredacted response under seal, pursuant to the Stipulated Protective Order, Dkt. 187.  *See* Doyle Decl., Exhibit 5.

**PLAINTIFF'S SECOND MOTION TO COMPEL DEFENDANT MINDGEEK ENTITIES' RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES**

1   its revenues; another substantial portion is paid to the majority owners of the

2   "Shadow" MindGeek entity on a massive loan accruing exorbitant interest rates; and

3   the remaining revenues are apparently paid as a dividend or distribution to that same

4   "Shadow" MindGeek entity or its owners even though it does not appear to own any

5   interest in MindGeek that would merit a distribution or a dividend.

6       The MindGeek Defendants will no doubt challenge these claims based on the

7   documents produced as incomplete, inaccurate, or misleading.  But they refuse to

8   produce the documents necessary to determine what the truth actually is on these

9   issues as Judge Carney specifically directed this process was intended to do.

10      Accordingly, this motion is directed at the most central alter ego discovery.

11   Moreover, as set forth below, it seeks production of the necessary information from

12   obvious and readily accessible sources that were certainly maintained in the normal

13   course of this billion-dollar company's business and which are easily collected and

14   produced.

15      **1.**     **Corporate, Operational, and Ownership Structure**

16      The threshold understanding necessary to begin an alter ego analysis is about

17   an organization's ownership, corporate, and operational structure – stated and de

18   facto.  Shortly after Judge Carney's decision, Plaintiff served comprehensive requests

19   for such information.  *See* Exhibits 1 and 2.   Among other things, these requests

20   covered basic foundational documents that presumably would be produced without

21   dispute:

22          (i)    all the contracts and agreements identifying the real owners in interests

23               and governing the relationship and economics in and among them and

24               the MindGeek entities (*see, e.g.*, RFP Nos. 2, 4-5, 9-12, 16, 18, 22);

25          (ii)   contract abstracts, memoranda, and summaries explaining those

26               agreements and their intent and operation (*see, e.g.*, RFP Nos. 9-10, 12,

27               15, 24); and

28          (iii)  organizational charts, schematics, rosters, and memoranda depicting

**PLAINTIFF'S SECOND MOTION TO COMPEL DEFENDANT MINDGEEK ENTITIES' RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES**

1    the ownership structure, corporate affiliate and related-party structure,

2    and the internal management and operational structure for core

3    functions such as finance, accounting, IT, website operation and

4    infrastructure (including the servers), moderation, compliance, legal,

5    and media and public relations (*see, e.g.*, RFP Nos. 2, 4-5, 11, 14-19,

6    21).

7    The production of these materials should not have been subject to any good-

8    faith objection or delay. Certainly, Plaintiff is entitled to a complete set of the

9    contracts and associated documents governing the owners' interests in the company

10    and relationship to each other. Yet, the MindGeek Defendants have only produced

11    some and not others, without which it is impossible to understand these relationships.

12    Likewise, Plaintiff is entitled to the memoranda and other documents that are

13    created in the normal course in any similar corporate context to memorialize, explain,

14    and implement these contracts and the complex legal and economic relationships they

15    created. The MindGeek Defendants have produced none of these documents.

16    And obviously the organizational charts and other documents mapping out how

17    those contracts were, in fact, implemented and how the ownership, corporate, and

18    operational organization is structured and operated under those contracts and

19    otherwise is essential to any alter ego analysis. Indeed, without such basic roadmaps

20    it is almost impossible to conduct a thorough alter ego analysis.

21    In particular, what entity employed and paid the management and personnel

22    operating the businesses of these supposedly separate entities, including the websites

23    and their content moderation, is critical evidence of whether they are actually different

24    entities. Indeed, only within the last week did the MindGeek Defendants produce a

25    few documents showing that the various website businesses do pay another

26    MindGeek entity for data server use, but that purported contract reflects no rate or

27

28

37

**PLAINTIFF'S SECOND MOTION TO COMPEL DEFENDANT MINDGEEK ENTITIES' RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES**

other prices, which appear to be left to be determined by unknown standards.[3]  This only highlights further the need for the financial data showing which entities paid what costs and on what basis.

Furthermore, the documents and organizational charts and schematics describing MindGeek's basic website platform, including the locations of its data centers, servers and other infrastructure goes to a specific question Judge Carney directed be investigated.

After promising to produce documents responsive to these topics, months later the MindGeek Defendants have produced only a carefully curated and materially incomplete selection of some of these documents.  Most they have refused to produce at all.

For example, the MindGeek Defendants' produced a single copy of a "Shareholder Agreement" between entities owned by the still partially anonymous owners that references various other agreements (many executed the same day as part of the same leveraged buyout of MindGeek) in and between that group, the company, and various unknown third parties.  Virtually none of those documents have been produced.[4]  Without them, it is impossible to know the identities of all the parties in this relationship, what their economic, control, and other interests and rights are, and what the actual ownership structure is or how it operates.  It is also impossible to accurately analyze key alter ego factors such as control, capitalization, and solvency without documents that other produced documents suggest grant seemingly *de facto* ownership of the company's assets to third parties.

Compounding these deficiencies, the MindGeek Defendants have also failed to produce or commit to produce any summaries, memoranda, or digests describing these terms or their intent and operation.

---

[3] *See* Doyle Decl., Exhibit 7.

[4] *See* Doyle Decl., Exhibit 8, with referenced documents highlighted.

CASE NO. 21-CV-04920-CJC-ADS

**PLAINTIFF'S SECOND MOTION TO COMPEL DEFENDANT MINDGEEK ENTITIES' RESPONSES TO
PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES**

Likewise, the MindGeek Defendants produced only a single version of an annual ownership and corporate schematic that vaguely indicates without specifics some form of relationships between approximately 32 MindGeek entities, the members of the Shareholder Agreement, and other entities related to those same members. What this vaguely depicted structure means is not discernible from its face and not a single document that discusses the depicted structure has been produced. No organizational chart, list or other document identifying all the MindGeek affiliates and related entities has been produced. No organizational chart depicting the organizations management and operational structure has been produced. No technology, website, and server infrastructure schematics have been produced.

The answer to Judge Carney's question about the location of the servers hosting MindGeek's content remains unanswered, and in the parties' last meet and confer the MindGeek Defendants unequivocally stated they will not produce such information because it is not relevant.

Critically, the MindGeek Defendants do not deny that responsive documents exist or claim that it would be unreasonably burdensome to produce them because they cannot. There is no doubt that a billion-dollar organization so painstaking and complexly structured by consultants and lawyers has complete sets of the operative contracts and agreements governing all its constituents; memoranda and summaries of those contracts and agreements; and documents, including detailed organizational charts, identifying the complete ownership, corporate, and operational structure of the business, including all owners, lenders, affiliates, related-parties, and executive personnel.

Indeed, these documents (almost certainly in multiple copies and versions) would have been in a due diligence files reviewed by investment bankers, lenders, financial and tax advisors, lawyers, and accountants when the current "Shadow" MindGeek entity bought the company in a leveraged buyout in 2013 and again when it refinanced that debt in 2018; they would have been provided and explained

regularly to the organization's many international accounting firms (and likely to tax and other authorities); they would have been provided to the potential buyers and investors that have been identified in public reporting; and they were certainly maintained in some central and organized manner by the company's finance personnel, the individual owners and executives, and the financial advisors and lawyers of each.

And, of course, it would be surprising if the Defendants' lawyers in this case did not long ago review all these documents themselves, especially when preparing their motion to dismiss on personal jurisdiction and the Andreou Declaration in support thereto.  In short, these are foundational documents, already collected and organized, and easy to locate and produce.

Defendants' only explanation for not producing these materials has been that the limited materials produced are "sufficient to understand the structure and that the entities are separate" and that plaintiffs do not need information concerning additional MindGeek entities because "they have nothing to do with the tubesites."  Obviously, defense counsel do not get to determine what portions of unquestionably relevant materials are "sufficient" to understand the issues.  And they certainly do not get to simply declare that the very issues Judge Carney said the Court wanted to know the answers to do not need to be provided.

Defendants must produce the complete universe of materials related to these foundational alter ego issues Judge Carney ordered examined.  Fortunately, to the extent MindGeek Defendants follow the most basic corporate formalities as they claim, all or most of these categories of information are centrally maintained and easily produced.

Accordingly, Plaintiff seeks an order requiring Defendants to produce all documents in the following categories:

       a. A complete set of all agreements in and between the owners, investors, lenders, executives, and MindGeek, deal files related to those

transactions and agreements, and the governing articles and by-laws for the relevant MindGeek entities (*see, e.g.*, RFP Nos. 2-5, 10-11, 14-19, 21).

b. All due diligence files, presentations, or the equivalent prepared in connection with any actual or contemplated financing, investment, purchase, reorganization, or other corporate transaction or audit (*see, e.g.*, RFP Nos. 9-11, 14).

c. All ownership and corporate organizational charts, and contract abstracts, summaries, and memoranda, explaining or depicting the identities and legal and economic relationships of and between the direct and indirect owners, investors, lenders, and any MindGeek entity, affiliates, and related parties (*see, e.g.*, RFP Nos. 2-5, 11, 15-18, 21, 24).

d. All management and operational organizational charts, rosters, and memoranda depicting and explaining the management and operational infrastructure of the core business functions for each MindGeek entity such as finance, accounting, IT, website operation and infrastructure (including the servers), moderation, compliance, legal, and media and public relations (*see, e.g.*, RFP Nos. 2-6, 11, 15-18, 21, 24).

e. Documents reflecting which MindGeek entities employed and paid the management and personnel operating the business and paid the costs associated with the business (*see, e.g.*, RFP Nos. 5-6, 8, 11).

**2.     Finance Information**

In addition to a complete understanding of MindGeek's ownership and corporate structure, Plaintiff requires the financial information necessary to show how it operated in fact. This is critical to several key alter ego factors.

For example, MindGeek asserted in its motion to dismiss and the Andreou Declaration that every entity in its organization was operated in a financially separate manner, held separate bank accounts, paid its own expenses, and was adequately

capitalized.  Plaintiffs are entitled to the information necessary to test this assertion and, conversely, prepare its theory of the case that, in fact, these entities were operated without proper corporate, financial, or operational formalities or separateness.  As this Court has recognized, doing so requires a detailed review of how the entire organization's finances were managed.

This necessary discovery requires, among other things, the information related to: (a) the manner and means by which each entities' allegedly separate financials were separately managed and recorded; (b) how and in what amount each entity was capitalized; (c) what bank accounts existed for which entities; (c) how revenue and expense monies flowed and were paid and whether each entity received its revenues into its separate bank accounts and paid its expenses from those accounts with its own funds, or were revenues deposited into other accounts and comingled with other entity funds and expenses for all paid from that comingled fund; and (d) were intercompany financial and business transactions done in the normal course, for bona fide purposes, properly recorded, and based on adequate consideration as calculated by third-party experts as alleged in the Andreou Declaration.

In addition, Plaintiff alleges and initial discovery indicates that virtually all of the revenues earned in the MindGeek enterprise are bled out of the organization to a parallel entity owned by the Individual Defendants.  The discovery to date indicates this is true, with the monies being bled out to the "Shadow" MindGeek entity.  However, the actual evidence of those related-party payments has not been produced.  Instead, to date, Defendants have produced only a handful of high-level internal financial statements prepared for some of the MindGeek entities but not others and summary corporate tax filings in tax havens, but not any of the financial data underlying those reports.  None of those documents show where the hundreds of millions of dollars paid out of MindGeek went.

What has been produced confirms Plaintiff's allegations by revealing that MindGeek's websites generate approximately $500 million a year in revenue but it is

virtually all gone before it gets to the parent organization.  Half of those amounts go to licensing and royalties, and the limited documents produced thus far indicate that substantial portions (perhaps all) of these amounts are being paid to the parallel "Shadow" MindGeek entity to which the individual defendants transferred all of MindGeek's assets, including its intellectual property.  But none of the records from which this can be determined have been produced.

Of the remaining half of revenue, it appears a substantial portion goes to pay the debt owed to the majority owners of the "Shadow" MindGeek entity at exorbitant interest rates, which is another means of funneling money to the same group as alleged.  But again, the detail of the payments and the identity of the recipients has not been produced.

Likewise, it is not clear where the remainder of the profits after debt payments go, but it appears they are paid as dividends to the same members of the shareholder agreement and "Shadow" ownership entity, none of whom are actually owners in the MindGeek entities.  Any such "dividend" or distribution to an individual or entity that purportedly has no interest in the MindGeek entities would be clear evidence of an alter ego relationship.  But no records have been produced from which it can be determined where the remaining revenues have gone after paying debt, royalties, licensing, and other expenses.

Furthermore, the MindGeek Defendants have not produced the financial information and documents related to assertions submitted in the Andreou Declaration.  No records concerning the reorganizations, inter-company transactions, contracts, or transfer pricing analysis have been produced.  And none of the underlying information concerning the capitalization of MindGeek's entities has been produced.

Despite the obvious relevance of this information to the very issues Judge Carney directed this discovery to examine, and the obvious relevance to the alter ego determination, Defendants have refused to produce any of their finance and

43                            CASE NO. 21-CV-04920-CJC-ADS

accounting information beyond the handful of internal financial statements and summary tax returns prepared for some but not all of the defendants.   Their reason for not doing so is that what was produced is "sufficient to understand the [corporate] structure and that the entities are separate."   But this is neither factually true on its face nor what is required under the Federal Rules.   Plaintiff is entitled to the underlying evidence.

As with the ownership and organizational documents, the MindGeek Defendants have not said, and cannot credibly say, that producing such evidence would be unduly burdensome.  As a threshold matter, any billion-dollar corporation following basic corporate formalities tracks this financial information via a sophisticated electronic accounting system and experienced finance personnel and systems, and the MindGeek Defendants have acknowledged this is the case. Therefore, securing and producing this information is a data pull from a centralized location that could probably be done in a day.  To the extent it is not, that in and of itself would be a relevant fact in considering whether the organization was run with the requisite corporate formalities as it has asserted.

Likewise, such information typically would be subject to various reporting requirements for MindGeek's various boards, lenders, auditors, and actual or potential investors.  And the documents produced thus far indicate that such reports are required and done.  These materials also are easily secured and produced.

Finally, with respect to the reorganizations, inter-company transactions, contracts, and transfer pricing analyses discussed in the Andreou Declaration, given his sworn statements as to the manner in which he says he manages these matters, such materials likewise should be easy to locate and produce.

Like the ownership, corporate, and operations materials above, this financial information is the foundational *sine qua non* of alter ego analysis; precisely what Judge Carney ordered discovery into; and is certainly recorded in detail in the finance and accounting departments centralized electronic and other records and readily

producible.

Accordingly, Plaintiffs ask for an order compelling production of the following:

  a. The information from MindGeek's accounting and financial reporting systems related to all profit and loss and balance sheet categories, including revenues, expenses, assets, liabilities, inter-company transactions, as well as all dividends and distributions (*see, e.g.*, RFP Nos. 2-6, 8, 10, 11, 12, 13).

  b. Financial reports prepared for, and associated information given to, senior management, directors or their equivalent, lenders, or outside consultants, accountants, or other third parties (*see, e.g.*, RFP Nos. 2-4, 6, 11, 12, 19, 20, 24).

  c. All documents related to the reorganizations, inter-company and related-party transactions, contracts, accounting, and third-party transfer pricing analysis as described in the Andreou Declaration (*see, e.g.*, RFP Nos. 2-6, 11, 12, 15-18, 19, 21, 24).

## IV. THE MINDGEEK ENTITY DEFENDANTS' POSITION

### A. Plaintiffs' Jurisdictional Discovery Requests are Far Broader than What is Permitted by the Federal Rules of Civil Procedure and the Court's Orders

"In a motion for an order compelling production, the party seeking discovery carries the burden of showing that the requested information is relevant and why any objections lack merit." *Fitness Int'l, LLC v. DDRM Hill Top Plaza L.P.*, 2021 WL 4497889, at *1 (C.D. Cal. July 30, 2021) (Spaeth, M.J.). Information is discoverable only if it is a "nonprivileged matter that is relevant to [a] party's claim or defense and proportional to the needs of the case." FED. R. CIV. P. 26(b). Additionally, information is not discoverable if it is "unreasonably cumulative or duplicative, or can

be obtained from some other source that is more convenient, less burdensome, or less expensive." FED. R. CIV. P. 26(b)(2)(C)(i). Discovery is not proportional where "the expected benefits [are outweighed by the expected] burdens posed by particular discovery requests." *U.S. ex rel. Carter v. Bridgepoint Educ., Inc.*, 305 F.R.D. 225, 237 (S.D. Cal. 2015).

Plaintiff's Motion to Compel should be denied in its entirety because it seeks production of documents that are irrelevant to jurisdictional discovery, unduly burdensome, unreasonably cumulative, or duplicative. But, with the exception of two categories of documents, one of which the Court has already ruled on, the Court need not reach the merits of Plaintiff's requests or of the MindGeek Entity Defendants' objections. In the interest of compromise and to move discovery forward, the MindGeek Entity Defendants have agreed to produce the majority of what Plaintiff's motion seeks to compel. The MindGeek Entity Defendants communicated their offer to Plaintiff on February 6, 2023, and requested that Plaintiff defer this motion for one week to allow them to make their production and for the parties to continue to meet and confer. Plaintiff refused. Moving forward with this motion despite the fact that the MindGeek Entity Defendants offer to produce significantly more documents reveals Plaintiff's real motive is to harass and burden the MindGeek Defendants and to pursue a fishing expedition rather than obtain information relevant to personal jurisdiction.[5]

This is also evidenced by Plaintiff's rehashing of the allegations in her complaint and the rulings by Judge Carney that do not bear on her actual requests that are the subject of the current motion. For instance, Plaintiff once again raises the issue of the location of MindGeek servers, *supra* at 30, an issue already addressed in her prior motion and subsequently resolved by this Court. (Dkt. #260, at 7). This

---

[5] Plaintiff's intent to continue to "complicate" this discovery and unduly burden the MindGeek Entity Defendants is also evidenced by her serving another Rule 37-1 Letter just days after serving her motion to compel. *See* Decl. of M. Yeary at ¶ 5.

exemplifies Plaintiff's approach to jurisdictional discovery to date—scattershot and scorched earth with no focus on the actual issues in dispute and unproportional to the needs of the case.

Where Plaintiff does focus on the issues raised by Judge Carney that are related to her current requests, it is undisputed that the MindGeek Entity Defendants have produced ample information. The Court wanted more information on who served as directors of the MindGeek Entity Defendants. Defendants provided that information in response to Interrogatory No. 5. The Court wanted more information on who exercised "ultimate control over the MindGeek Entity Defendants." The MindGeek Entity Defendants have agreed to produce the documents showing the corporate reorganizations and refinancings that took place in 2013 and 2018, and the communications involving the Individual Defendants and their alleged direction of policy regarding underage content and moderation of content. As for capitalization and solvency, the MindGeek Entity Defendants have produced audited financial statements, balance sheets, income statements, and cash flow statements for all MindGeek entities, as well as tax returns for the MindGeek Entity Defendants and additional entities within the chain of ownership. Any questions the Court had about the ability to satisfy a judgement in this single-plaintiff case should be fully addressed by the documents produced to date.

Tellingly, none of the cases relied on by Plaintiff addresses the issue of the scope of jurisdictional discovery. Rather they just reiterate the factors used by courts in determining whether alter ego status has been sufficiently pleaded or established. That is because the case law does not support the fishing expedition Plaintiff has undertaken. *See Smith v. Nerium Int'l, LLC*, 2018 WL 6444898, at *6 (C.D. Cal. Nov. 7, 2018) (jurisdictional discovery need not be allowed if it is merely a "fishing expedition"). The Federal Rules of Civil Procedure are not different for jurisdictional or alter ego discovery. The requests must still be proportional to the needs of the case. *Wang v. Wu*, 2016 WL 10957847, at *2 (C.D. Cal. Dec. 7, 2016). For example, courts

**PLAINTIFF'S SECOND MOTION TO COMPEL DEFENDANT MINDGEEK ENTITIES' RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES**

have denied requests for monthly bank statements as overbroad and burdensome in the alter ego analysis. *See SelfHelpWorks.com, Inc. v. 1021018 Alberta Ltd.,* 2010 WL 11684790, at *3 (S.D. Cal. Dec. 20, 2010); *see also TC Skyrocket, LLC v. Superskyrocket, LC*, 2007 WL 1110723, at *1 (S.D. Cal. March 29, 2007) (finding tax returns, asset disclosures, and financial statements relevant to alter ego but sustaining objections to subpoenas for defendant's bank records).

Here, Plaintiff refused to even consider the large amounts of additional materials the MindGeek Entity Defendants agreed to produce before bringing this motion, demonstrating that they are not engaging in reasonable discovery tailored to address the specific questions at issue, but rather that they will never be satisfied with anything the MindGeek Entity Defendants produce. Marginally relevant discovery, if what Plaintiff seeks even can be described as such, should be denied where the "discovery would not be proportional in view of its burden and invasiveness." *United States v. Metic Transplantation Lab Inc.,* 2017 WL 11636152, at *2 (C.D. Cal. Feb. 16, 2017).  The goal of discovery is not to force parties to produce "all" documents, especially where the production burden of one party significantly outweighs the other, but to produce documents and information in the least burdensome and expensive manner. *Wang,* 2016 WL 10957847, at *2.  At a minimum, before invasive discovery into all of the MindGeek Entity Defendants' accounting and financial systems, Plaintiff should have to review the detailed financial information that has been and will be produced and be required to make a showing to the Court as to why it is not sufficient to answer the key alter ego questions regarding control and corporate formalities.

### B.    <u>The MindGeek Entity Defendants Have Produced or Agree to Produce the Alter Ego Discovery Identified by the Court.</u>

Plaintiff identifies three categories of documents or information that she considers to be "foundational" to the question of alter ego jurisdiction.  *See supra at*

34.  But she ignores what the MindGeek Entity Defendants have agreed to produce in each category.  First, Plaintiff asks for the documents that show the ownership structure, economic interests, and control rights of the owners.  The MindGeek Entity Defendants previously produced organizational charts and the shareholder agreement, as amended, among other documents and information, in response to this request.  In addition, the MindGeek Entity Defendants have agreed to produce the deal documents, including all ancillary agreements and collateral documents, related to the 2013 reorganization of the MindGeek group (before the start of the relevant period) and a subsequent reorganization in 2018, as well as the financing agreements entered at the same time.  Next Plaintiffs ask for the corporate and operational infrastructure of the company as well as the location of servers.  This issue was already ruled on by the Court and the MindGeek Defendants are working on producing the information regarding servers that was ordered to be produced.  Finally, Plaintiff also asks for "basic financial information, such as revenues, profits and loss, capitalization, debt, and related party transactions."  The MindGeek Entity Defendants have produced all of this information.  For a seven-year period, the MindGeek Entity Defendants have produced income statements, earnings statements, cash flow statements, and balance sheets not just for the entities challenging jurisdiction, not just for the entities in those defendants' chain of ownership, but for every active MindGeek entity including RT Holdings S.a.r.l. which Plaintiff baselessly refers to as a "shadow" alter ego entity.  The produced audited financials already include information on related-party transactions, but beyond that the MindGeek Entity Defendants have agreed to produce additional contracts and agreements for related-party transactions.  Having agreed to produce everything that Plaintiff identified as "foundational" to the alter ego analysis, the MindGeek Entity Defendants are left to wonder what more Plaintiff seeks and how anything more could be reasonably proportional to the needs of the case.

### 1.  <u>Corporate, Operational, and Ownership Structure</u>

Plaintiff raises no new arguments with respect to the documents they seek in

1  this category and so the MindGeek Entity Defendants focus on addressing the five

2  specific requests she asks the Court to compel, all of which should be denied as moot.

3          a.   Request:   complete set of all agreements in and between the owners,

4  investors, lenders, executives, and MindGeek, deal files related to those transactions

5  and agreements, and the governing articles and by-laws for the relevant MindGeek

6  entities.

7          This request seeks two different types of documents.  The MindGeek Entity

8  Defendants have already produced the articles of incorporation and by-laws, or their

9  foreign equivalents, for 9219-1568 Quebec Inc., MindGeek USA Inc., MindGeek

10  Global Entertainment Inc., MG Freesites Ltd, MG Premium Ltd, and MindGeek

11  S.a.r.l., and have agreed to produce them for RT Holdings S.a.r.l.  Defendants also

12  produced documents reflecting transactions pursuant to which entities assigned assets

13  and liabilities to another, merged with another, and were dissolved.

14          The MindGeek Entity Defendants have agreed to produce the complete set of

15  transactional documents for two corporate reorganizations, one of which occurred

16  before the relevant period began in 2014, and the other of which occurred in 2018.

17  There were no other significant reorganizations during the relevant period.  (And as

18  mentioned above, documents describing any potentially relevant organizational

19  changes were already produced or will be shortly.)  The MindGeek Entity

20  Defendants have also agreed to produce the complete set of financing documents –

21  essentially the deal binders – for two refinancings, one of which occurred in 2013,

22  before the relevant period began, and the other of which occurred in 2018, subject to

23  complying with the relevant confidentiality provisions.  There were no other

24  financings during the relevant period.  Therefore, this request should be denied as

25  moot.

26          b.   Request:  All due diligence files, presentations, or the equivalent prepared

27  in connection with any actual or contemplated financing, investment, purchase,

28  reorganization, or other corporate transaction or audit.

1      Plaintiff's request on its face is not tethered to any of the alter ego factors.
2  Rather it is based on Plaintiff's assumption that somewhere in "due diligence" files
3  and the like there may be descriptions of the organizational structure.  But that is the
4  very definition of an impermissible fishing expedition.   Especially where the
5  MindGeek Entity Defendants have now agreed to produce a full set of transaction
6  documents for the only reorganizations arguably relevant.  Having asked for and now
7  receiving these foundational documents, Plaintiff has no justification for requiring the
8  MindGeek Entity Defendants to undertake this burdensome search for documents of
9  marginal relevance.

10      Notwithstanding the foregoing, the MindGeek Entity Defendants have
11  undertaken a reasonably diligent search of documents maintained in the normal course
12  of business that may be responsive to this request and have agreed to produce the
13  Confidential Information Memoranda that were prepared in connection with any
14  actual or contemplated financing, investment or purchase transaction described
15  above.  The MindGeek Entity Defendants have also agreed to produce a document
16  used for third-party presentations regarding the corporate structure and flow of
17  money.  Therefore, Plaintiff's motion to compel this category should be denied as
18  moot.

19      c.    Request:   All ownership and corporate organizational charts, and
20  contract abstracts, summaries, and memoranda, explaining or depicting the identities
21  and legal and economic relationships of and between the direct and indirect owners,
22  investors, lenders, and any MindGeek entity, affiliates, and related parties.

23      The MindGeek Entity Defendants have produced 11 organizational charts
24  spanning the years 2014 to 2021.  *See, e.g.,* Exh 10 (2020 org chart).  The MindGeek
25  Entity Defendants have no additional organizational charts that show different or
26  additional information to produce for the relevant years.  The all of the produced
27  charts include the MindGeek Entity Defendants, their corporate parents, and the
28  company Plaintiff claims is a "shadow MindGeek alter ego"—RT Holdings S.a.r.l.—

1  confirming its formal corporate relationship to the MindGeek entities and identifying

2  its subsidiaries and shareholders.

3       Despite this complete production and the upcoming production of the

4  reorganization and financing documents, and in the spirit of compromise, the

5  MindGeek Entity Defendants have agreed to undertake a reasonably diligent search

6  to determine if any non-privileged "summary" type documents beyond the

7  organizational charts already produced exist and are responsive.  Therefore, Plaintiff's

8  motion to compel this category should be denied as moot.

9       d.    Request:  All management and operational organizational charts, rosters,

10  and memoranda depicting and explaining the management and operational

11  infrastructure of the core business functions for each MindGeek entity such as finance,

12  accounting, IT, website operation and infrastructure (including the servers),

13  moderation, compliance, legal, and media and public relations.

14       This request was addressed by the Court's February 3, 2023 Order in which the

15  Court denied Plaintiff's request for documents depicting and explaining MindGeek's

16  IT infrastructure. Order at 6.  The Court concluded that "documents related to how

17  Defendants' IT infrastructure operates and functions" were not "appropriately

18  proportional for the Court's jurisdictional analysis."  This conclusion should extend

19  equally to the infrastructure of the other business functions identified by Plaintiff.

20  The MindGeek Entity Defendants are preparing to produce the information the Court

21  determined was relevant and proportional—who employs and who compensates the

22  individuals who perform the review and moderation of content on the tubesites,

23  including those in supervisory roles, and where those individuals are located.  This

24  request should be denied for the same reasons set forth in the Court's February 3,

25  2023 ruling.

26       e.    Request:  Documents reflecting which MindGeek entities employed and

27  paid the management and personnel operating the business and paid the costs

28  associated with the business.

This request contains two sub-categories of documents. First, the MindGeek Entity Defendants have been ordered to produce documents showing which entities employed and compensated the individuals responsible for moderating and reviewing content on the tubesites, and those in supervisory or management positions, and where those individuals are located. The MindGeek Entity Defendants have already identified which entities employed and compensated the individuals engaged in moderation, monitoring, formatting, optimizing, filtering, reviewing, screening and removing content on Pornhub, and they will provide additional information about where those individuals were located during the relevant period as required by the Court. Further, the MindGeek Entity Defendants have already produced the employment agreements for Feras Antoon (CEO), David Tassillo (COO), and Corey Urman (Director of Product Management).

Second, information regarding operating costs is available for each MindGeek Entity in the already produced financial reporting packages. The internal financial reporting packages that MindGeek has agreed to produce also have detailed operating expenses reported at both the business unit level and for the individual websites. Therefore, this request should be denied as moot.

Aside from Plaintiff's unwillingness to acknowledge that the MindGeek Entity Defendants have agreed to produce everything they have requested in the above categories—other than what the Court has already denied—one of Plaintiff's overarching themes seems to be an unsupported belief that more or other documents must exist. This, however, overlooks the content of the documents the MindGeek Entity Defendants have produced – such as detailed financial statements – and focuses on form over substance. Given the breadth of the documents the MindGeek Entity Defendants have agreed to produce, if Plaintiff does not understand or has legitimate questions about MindGeek's corporate structure or finances, at this juncture it would be more efficient for Plaintiff to take a deposition and seek information directly from those most knowledgeable. The MindGeek Entity Defendants were prepared to make

a witness available in October 2022 in response to Plaintiff's Rule 30(b)(6) deposition notice and remain willing to arrange a mutually agreeable time for that deposition to take place.

## 2. Finance Information

Again, after several pages of rehashed accusations that the MindGeek Entity Defendants have not produced enough, Plaintiff boils her motion down to three categories of documents that she asks the Court to compel. Two of these categories the MindGeek Entity Defendants have agreed to produce and one is an unduly burdensome and overbroad request unsupported by any legal precedent for such invasive discovery.

a. Request: The information from MindGeek's accounting and financial reporting systems related to all profit and loss and balance sheet categories, including revenues, expenses, assets, liabilities, inter-company transactions, as well as all dividends and distributions.

As the MindGeek Entity Defendants read this request, Plaintiff seems to be asking them to turn over their entire accounting systems for the seven-year period at issue. Plaintiff cites no case law to support such an intrusive request. In fact, courts routinely disallow discovery of monthly bank statements as overly burdensome and disproportionate to the alter ego analysis. *See SelfHelpWorks.com, Inc.,* 2010 WL 11684790, at *3. Unfettered access to all accounting and financial systems maintained by the MindGeek entities goes several steps beyond that which courts have found to be over-reaching.

Not only has Plaintiff provided no legal basis for this request, she fails to explain to the Court why the extensive information already provided does not address the alter ego questions. Discovery is not permitted from "every" or "all" sources of information as such would be needlessly duplicative. Rather discovery should be conducted by those means which are less burdensome and less expensive. FED. R. CIV. P. 26(b)(2)(C)(i). Plaintiff wants the underlying accounting data for every entry

on the MindGeek Entity Defendants profit and loss statements and balance sheets without establishing why the profit and loss statements and balance sheets are not adequate in and of themselves. *TC Skyrocket, LLC,* 2007 WL 1110723, *1 (finding tax returns, asset disclosures, and financial statements of individual defendants relevant to alter ego but not bank statements). *See also Integrated Practice Solutions, Inc. v. Wilson,* 2013 WL 3946061, at *3 (S.D. Cal. Jul. 13, 2013) (denying request for "forensic computer discovery" as well beyond the bounds of limited jurisdictional discovery). While the MindGeek Entity Defendants can "easily access" their accounting systems, producing the data from those systems would be extremely burdensome both in time and cost.

The financial statements, both audited and unaudited, that the MindGeek Defendants have produced or have agreed to produce provide itemized information for revenues, expenses, assets, liabilities, inter-company transactions, as well as dividends and distributions. In fact, they are the routine business documents kept by the MindGeek entities providing the information from their internal accounting systems. They are the exact documents that are provided to third parties and to the senior executives. Most importantly, they establish that each individual MindGeek entity has its own set of accounting records as seen through their separate balance sheets, income statements, and earnings statements. Realizing that dividends and distributions are of particular interest to Plaintiff, the MindGeek Entity Defendants also agreed to produce a summary of those distributions for the relevant years out of their accounting system.

Because Plaintiffs have failed to demonstrate a need for this information and due to its lack of proportionality to the alter ego analysis, this request should be denied.

b.    Request: Financial reports prepared for, and associated information given to, senior management, directors or their equivalent, lenders, or outside consultants, accountants, or other third parties.

The annual reporting packages prepared for use with third parties were among the first documents produced to Plaintiff. These have been in Plaintiff's position for months and yet Plaintiff continues to include them in her outstanding requests. Although not needed for the alter ego analysis, Defendants have agreed to produce the packages prepared quarterly for use with third parties as well as the annual and quarterly packages prepared for senior executives which not only contain detailed financial information for every MindGeek entity, but also for business units and for individual tubesites. This request should be denied as moot.

c.       Request: All documents related to the reorganizations, inter-company and related-party transactions, contracts, accounting, and third-party transfer pricing analysis as described in the Andreou Declaration.

As noted above, the MindGeek Entity Defendants are willing to produce the transactional documents for the 2013 and 2018 reorganizations. The MindGeek Entity Defendants have also agreed to produce transfer pricing studies for the relevant period. The MindGeek Entity Defendants have already produced the inter-company service agreements and licensing agreements for the MindGeek Entity Defendants and affiliates relevant to the ownership of and distributions of profits from the tubesites. And, while the financial documents already produced or agreed to be produced contain information about related-party transactions, the MindGeek Entity Defendants have also agreed to produce the contracts for related-party transactions that occurred during the relevant time period, as well as information regarding payments made pursuant to those contracts. Therefore, this request should also be denied as moot.

As previously stated, the MindGeek Entity Defendants have not objected to Plaintiff's conducting a Rule 30(b)(6) deposition and at this point believe it would be the more efficient way to clarify any legitimate questions Plaintiff may still have.

**PLAINTIFF'S SECOND MOTION TO COMPEL DEFENDANT MINDGEEK ENTITIES' RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES**

## V.   <u>CONCLUSION</u>

### A.   <u>Plaintiff's Conclusion</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court grant this Motion in full, and order the MindGeek Entity Defendants to produce the requested documents and to respond fully to Plaintiff's Requests for Production Nos. 1-6, 8, 10, 11-19, 21, 22, and 24.   Plaintiff submits herewith a Proposed Order specifying the materials that the MindGeek Entity Defendants should be ordered to produce.

### B.   <u>Defendant's Conclusion</u>

The MindGeek Entity Defendants have produced, and are continuing to produce, hundreds of documents responsive to the requests at issue.   To the extent Plaintiff is dissatisfied with the MindGeek Entity Defendants' production, that is a function of her unwillingness to even review the documents Defendants have agreed to produce, her duplicative requests aimed at unduly burdening Defendants, and her requests seeking information that goes well beyond the needs of jurisdictional or alter ego discovery.   Accordingly, Plaintiff's motion to compel should be denied.

**PLAINTIFF'S SECOND MOTION TO COMPEL DEFENDANT MINDGEEK ENTITIES' RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES**

1    Dated: February 8, 2023        Respectfully Submitted

2                            **BROWN RUDNICK LLP**

3

4                            By: s/ Michael J. Bowe

5                            MICHAEL J. BOWE (*pro hac vice*)
mbowe@brownrudnick.com

6                            LAUREN TABAKSBLAT
(*pro hac vice*)

7                            ltabaksblat@brownrudnick.com

8                            7 Times Square
New York, NY 10036

9                            Phone: (212) 209-4800

10                          Fax: (212) 209-4801

11                          David M. Stein (#198256)

12                          dstein@brownrudnick.com
2211 Michelson Drive, 7th Floor

13                          Irvine, California 92612

14                          Phone: 949.752.7100
Fax: 949.252.1514

15

16                          Attorneys for Plaintiffs

17

18    Dated: February 8, 2023        DECHERT LLP

19                          By: s/ Kathleen N. Massey

20                          KATHLEEN N. MASSEY (*pro hac vice*)

21                          Kathleen.Massey@dechert.com

22                          Dechert LLP
Three Bryant Park

23                          1095 Avenue of the Americas

24                          New York, NY 10036
Tel: (212) 698-3500

25                          Fax: (212) 698-3599

26

27                          Attorney for Defendants MindGeek
Entities.

28

CASE NO. 21-CV-04920-CJC-ADS

**PLAINTIFF'S SECOND MOTION TO COMPEL DEFENDANT MINDGEEK ENTITIES' RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES**