1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4  SERENA FLEITES, et al.,        ) Case No. LA CV 21-04920-CJC-
                                  )                        (ADSx)
5              Plaintiffs,        )
                                  ) Los Angeles, California
6  vs.                            )
                                  ) Wednesday, March 8, 2023
7  MINDGEEK S.A.R.L. et al.,      )
                                  ) (10:11 a.m. to 1:26 p.m.)
8              Defendants.        )
   _____)

9

10

11        TRANSCRIPT OF PLAINTIFF'S MOTIONS TO COMPEL
              [261], [264], [267], [274]
              SCHEDULING CONFERENCE
12        BEFORE THE HONORABLE AUTUMN D. SPAETH
              UNITED STATES MAGISTRATE JUDGE

13

14

   Appearances:                   See next page.
15
   Court Reporter:                Recorded; CourtSmart
16
   Courtroom Deputy:              Kristee Hopkins
17
   Transcribed by:               Jordan Keilty
18                                Echo Reporting, Inc.
                                  9711 Cactus Street, Suite B
19                                Lakeside, California 92040
                                  (858) 453-7590
20

21

22

23

24

   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

2

```
 1  APPEARANCES:

 2  For the Plaintiffs:          DAVID M. STEIN, ESQ.
                                 Brown, Rudnick, LLP
 3                               2211 Michelson Drive
                                 7th Floor
 4                               Irvine, California 92612
                                 (949) 440-0231
 5
                                 JOHN G. DOYLE, ESQ.
 6                               Brown Rudnick, LLP
                                 601 Thirteenth Street NW
 7                               Suite 600
                                 Washington, D.C. 20005
 8                               (202) 536-1706

 9                               LAUREN TABAKSBLAT, ESQ.
                                 Brown Rudnick, LLP
10                               Seven Times Square
                                 New York, New York 10036
11                               (212) 209-4904

12  For MindGeek S.A.R.L.:       KATHLEEN N. MASSEY, ESQ.
                                 Dechert, LLP
13                               Three Bryant Park
                                 1095 Avenue of the Americas
14                               New York, New York 10036
                                 (212) 698-3686
15
                                 MICHELLE H. YEARY, ESQ.
16                               Dechert, LLP
                                 Cira Centre
17                               2929 Arch Street
                                 Philadelphia, Pennsylvania
18                                 19104
                                 (609) 955-3277
19
    Bernd Bergmair:              DAN E. MARMALEFSKY, ESQ.
20                               Morrison & Foerster, LLP
                                 707 Wilshire Boulevard
21                               Suite 6000
                                 Los Angeles, California 90017
22                               (213) 892-5200

23

24

25
```

3

```
 1  APPEARANCES:  (Cont'd.)

 2  For Bernd Bergmair:          RONALD G. WHITE, ESQ.
                                 Walden Macht & Haran, LLP
 3                               250 Vesey Street
                                 Suite 27th Floor
 4                               New York, New York 10281
                                 (212) 335-2387
 5
     For Feras Antoon:           DAVID W. WIECHERT, ESQ.
 6                               Wiechert, Munk & Goldstein, PC
                                 East Tower
 7                               4000 MacArthur Boulevard
                                 Suite 600
 8                               Newport Beach, California
                                   92660
 9                               (949) 361-2822

10                               S. JASON BROWN, ESQ.
                                 Cohen & Gresser, LLP
11                               800 Third Avenue
                                 New York, New York 10022
12                               (212) 957-7609

13  For David Tassillo:          JONATHAN S. SACK, ESQ.
                                 Morvillo Abramowitz Grand
14                                 Lason & Anello, PC
                                 565 Fifth Avenue
15                               New York, New York 10017
                                 (212) 880-9410
16
     For Corey Urman:            KERIME S. AKOGLU, ESQ.
17                               Mintz Levin Cohn Ferris
                                   Glovsky & Popeo, P.C.
18                               919 Third Avenue, 39th Floor
                                 New York, New York 10022
19                               (212) 983-3115

20                               PETER A. BIAGETTI, ESQ.
                                 Mintz Levin Cohn Ferris
21                                 Glovsky & Popeo, PC
                                 One Financial Center
22                               Boston, Massachusetts 02111
                                 (617) 542-6000
23

24

25
```

4

1  Los Angeles, California; Wednesday, March 8, 2023 10:11 a.m.

2                          --o0o--

3                      (Call to Order)

4        THE CLERK:  Calling case CV 21-4920-CJC(ADSx),

5  Serena Fleites, et al. versus MindGeek S.A.R.L., et al.

6        And, Counsel, please state your appearances,

7  starting with Plaintiff.

8        MS. TABAKSBLAT:  Good morning.  Lauren Tabaksblat

9  from Brown Rudnick on behalf of the Plaintiff, and with me

10  today is David -- my partner David Stein and our colleague

11  Jonathan Doyle.

12        THE COURT:  All right.  Good morning.

13        UNIDENTIFIED SPEAKER:  Good morning.

14        MS. MASSEY:  Good morning, your Honor.  Kathleen

15  Massey of Dechert for the MindGeek entity Defendants.  I'm

16  here with my colleague Michelle Yeary, also from Dechert.

17        THE COURT:  All right.

18        MS. MASSEY:  And we have counsel for the

19  individual Defendants as well here.

20        THE COURT:  Right.  And we have a lot more other

21  people here.  So, who is everyone else?

22        MR. BROWN:  Jason Brown of Cohen and Gresser for

23  Feras Antoon.  Good morning, your Honor.

24        THE COURT:  Good morning.

25        MR. SACK:  Jonathan Sack with Morvillo Abramowitz

5

1   for Defendant David Tassillo.  Good morning, your Honor.

2           THE COURT:  Good morning.

3           MR. WHITE:  Good morning, your Honor.  Ronald

4   White from Walden Macht and Haran on behalf of Defendant Mr.

5   Bergmair.

6           THE COURT:  Good morning.

7           MS. AKOGLU:  Good morning, your Honor.  Kerime

8   Akoglu from Mintz Levin on behalf of Corey Urman.

9           THE COURT:  Good morning.

10          MR. BIAGETTI:  Good morning.  Peter Biagetti also

11  of Mintz for Defendant Urman.

12          THE COURT:  Good morning.

13          MR. MARMALEFSKY:  Dan Marmalefsky of Morrison and

14  Foerster, also for Mr. Bergmair.

15          THE COURT:  Good morning.

16          MR. WIECHERT:  And good morning, your Honor.

17  David Wiechert on behalf of Mr. Tassillo and Mr. Antoon as

18  local counsel.

19          THE COURT:  All right.  Good morning.

20          So, the number of lawyers is an example of the

21  amount of paperwork I think we have here.  Let's start with

22  the individuals, those motions.  All right.  We have four

23  motions.  We have largely the same discovery, but we have

24  four different individuals that we're dealing with.  I'd

25  like to star with Plaintiff, and then we're going to go pick

6

1  your order, Gentlemen, but let's just be consistent about --

2  I'm assuming gentlemen.  I'm sorry.  But I -- whoever's

3  going to be arguing, let's just stay consistent, and let's

4  go.

5          MR. STEIN:  Good morning, your Honor.  David

6  Stein.  We've split the argument where I'll do the

7  individual portion, and Ms. Tabaksblat will be the entities.

8          THE COURT:  Okay.

9          MR. STEIN:  And a lot of the general entity

10  structure and background and all that is more focused on --

11  on that side.

12          On the individual side --

13          THE COURT:  And, before you move forward --

14          MR. STEIN:  Yes.

15          THE COURT:  -- may I ask who is it within

16  Plaintiffs' counsel who drafted the discovery?

17          MR. STEIN:  I don't know.  Is that Mr. Doyle?

18          MS. TABAKSBLAT:  The actual request, your Honor,

19  was a combination of Mr. Bowe, myself, Mr. Doyle.

20          THE COURT:  Okay.  Thank you.  All right.

21          MR. STEIN:  So, we have four individuals, your

22  Honor.  I'll try and maybe group them in a way that makes

23  sense for -- for everyone, the Court and for the -- the

24  individual counsel, but I'm not sure there's magic to it.

25  If I have it right, Mr. Antoon was the CEO of MindGeek, and

7

1  Mr. Tassillo was the COO.  I think both -- both of them were
2  in position until June of 2022.  So, they were in those
3  positions at the -- at the relevant time frame.  And then I
4  believe Mr. Bergmair, if I'm saying that correctly, was a --
5  a significant shareholder, and Mr. Urman was I think vice
6  president at 9219, a related entity, which I believe is the
7  entity that was responsible for monitoring, and that's kind
8  of how they plug in.
9         So, in my head at least, preparing for today, it
10  made sense maybe to talk about Mr. Antoon and Mr. Tassillo
11  first and together, former CEO, COO of MindGeek.  I believe
12  as of today, we do not have a single piece of paper from
13  either of them.  It would seem to me at a -- at a 30,000
14  foot level, the CEO and the COO of a company like this, I
15  believe a billion dollar company, would have at least some
16  records of their financial interest, moneys they put in or
17  received out, which would be relevant to the alter ego
18  communications about the operation of the company and the
19  CSAM policies that are at issue and how those policies
20  operated, when they were changed, if they were changed.  I
21  imagine this was a high-profile incident.  So, there would
22  have been discussion when it broke.
23         As I understand it, there's been more meet and
24  confers than I can count, as you can probably see from the
25  paper in front of you, but I -- as I understand it, they've

8

1  taken the position that -- that MindGeek entity Defendants

2  will be producing a lot of stuff and, therefore, they're --

3  I don't want to say excused, but -- but they don't really

4  have to do much because it's all going to come from the

5  entity.  If I misstate their position, they'll certainly

6  correct me, but at a general level, that's kind of what I

7  understand.

8          I think certainly there's probably some stuff that

9  when they left the company stayed with MindGeek.  I believe

10  there's some email accounts that they don't have access to

11  anymore, and we understand that.  If it's outside of their

12  possession, custody or control, then obviously we're not

13  seeking that.

14          But it would seem to me there's at least

15  communications about this incident, about the company

16  policies, about their financial interest in the company, and

17  -- and from a strictly just jurisdictional position, I

18  believe there was at least one meeting that we know of in

19  January of 2018 in Los Angeles where I think at least Mr.

20  Antoon, Mr. Tassillo, maybe Mr. Bergmair also -- and I'm not

21  sure about Mr. Urman -- but they all met in person.  And,

22  so, it would seem to me if -- if they're all getting

23  together in person in January of 2018 in Los Angeles, that

24  would be relevant to jurisdiction over them in this case.

25          They've identified that the trip existed.  Just

9

1  recently I think -- actually, last night I think Mr.

2  Bergmair supplemented his interrogatories to say, I'm aware

3  there's documents that show the trip.  I don't remember the

4  trip.  But, so, now we know the trip existed, but we don't

5  have any of the documentation about it, communications about

6  it, what they were talking about, what they were meeting

7  about.  And, so, I think at a high level, just looking at

8  Mr. Antoon and Tassillo -- and I think the requests are

9  essentially the same, and I think the responses are

10  essentially the same.  But what we would be asking for is,

11  irrespective of the fact that the entity Defendants will be

12  producing documentation and answering interrogatories, I

13  think the individuals are still responsible for searching

14  their own stuff and producing relevant responsive stuff

15  about their financial interest, their communications about

16  the policies at issue that relate to Ms. Fleites, and not

17  just her by name but -- but the incident or people like her.

18  The policies that impact her, I think all of that would be

19  relevant to the jurisdictional analysis.  And, certainly, we

20  could go through the particular request, but at this point

21  we -- we just don't have anything, and the deadline is May.

22  We would like to take their depositions ideally in April and

23  ideally with some time to review whatever documents they

24  have before that.  So, that's sort of how we've come to --

25  to the Court on the motions with respect to Mr. Antoon and

10

1 Mr. Tassillo.

2          I don't know if you just want me --

3          THE COURT:  Is it meaningful that these

4 individuals are in possession of the material as opposed to

5 just the fact that MindGeek has it?

6          MR. STEIN:  Is it meaningful?

7          THE COURT:  Um-hmm.

8          MR. STEIN:  I would think yes.  If they're an

9 actual --

10          THE COURT:  In other words, does it relate to

11 jurisdictional discovery, the fact that the individual

12 possesses any of this data that you're asking for?

13          MR. STEIN:  Yes.  I would think yes, for the alter

14 ego allegations, their financial interest, and where the

15 money was going back and forth and if they have financial

16 records that show that perhaps they were the alter ego of

17 some of the entities in the -- in the org chart, and Ms.

18 Tabaksblat will go through the -- the org chart with you.

19 It's -- it's quite complicated, but part of those

20 allegations are that lots of -- and you might remember this

21 from the last hearing.  Lots of money comes in, and then at

22 the end of the day, it's not there, and we don't know where

23 it went.  And if it's going to the individuals and they're

24 in possession of those financial records, which I would

25 assume an individual investor would be, I think that's

11

1  relevant to the alter ego and to jurisdiction.

2        There may well be communications between Mr.

3  Antoon and Mr. Tassillo one on one that maybe the MindGeek

4  entities wouldn't have.  I don't know.  But that would seem

5  relevant to jurisdiction.  Trips they took to the United

6  States and business they conducted in the United States, if

7  they have travel itineraries, if they have agendas, if they

8  have presentations, if they have summaries, I would think

9  all of that would be relevant to the jurisdictional

10 analysis.

11        I also think there's some belt and suspenders or

12 testing of, you know, the reason why an entity and an

13 individual would produce this to even see if they match up.

14 And what we've seen so far here is originally some of the

15 individuals said, I don't know anything about meetings in

16 the United States.  And then the entity produced some

17 documents that said there was a meeting, and then now the

18 individual said, Oh, okay, there was a meeting.  So, I think

19 it is important that all of them, separately or producing

20 what they have in their possession, custody or control, so

21 we ensure that we have the complete picture and that when we

22 present it to -- to the Court, we're presenting the full

23 picture, you know, the complete argument for why there's

24 jurisdiction or why there isn't over any of the -- of the

25 Defendants.

12

1          I think a lot of the same arguments apply to Mr.

2  Bergmair and Mr. Urman.  Mr. Bergmair has produced I think

3  about 65 documents total.

4          THE COURT:  That's Mr. Bergmair?

5          MR. STEIN:  That's Mr. Bergmair.  And, again, if

6  my numbers are wrong, I'm -- I'm sure they'll correct me.

7          THE COURT:  I'm sure.

8          MR. STEIN:  And I believe Mr. Urman has produced I

9  think four or five documents.  So, we're not at zero.  But,

10 again, that still seems to us like -- like there must be

11 more.  These are sophisticated individuals.  And the fact

12 that, you know, Mr. Bergmair has some stuff would just tend

13 to support that other people would have some stuff too.

14 And, so, that's -- you know, we're just trying to put the

15 pieces together, and I think that's -- that's where we're

16 landing.  There's got to be employment agreements,

17 distribution agreements, financial summaries of -- of

18 payments in or out, financial advisors, tax consultants,

19 people they were -- they were doing their financial

20 reconciling with.  We don't have any of that.

21          If they -- if they literally do a real search and

22 come up with zero, they can certify to the Court that

23 they've done a real search and come up with zero.  But they

24 haven't done that yet.  And, so, we don't know, and it

25 strikes me as though that can't be the answer.

13

1      And, so, I guess what we're -- what we're trying

2  to do is kind of bring this to a head so we don't have to

3  keep coming back to -- to your Honor and -- and get all of

4  the documents that relate to their financial interests and

5  all of the documents that relate to communications about the

6  policies.

7      The last thing I'll say in general, and then

8  certainly we could go to the request if we need to, but I'm

9  trying to do it kind of as a -- as an overall picture is

10 there's been a lot of meet and confers.  I haven't been on

11 all of these, but there's been a lot of meet and confers

12 where they've been talking about search terms and search

13 parameters and things like that.  And I understand maybe all

14 of the Defendants, certainly a lot of them, have cut off the

15 time frame for where they're searching at 2020, and I

16 believe their basis for doing that is Judge Carney's order

17 that says contacts after the incident can't form the basis

18 of jurisdiction.  And I think that's probably right, but

19 that doesn't mean that documents after that date are

20 automatically not relevant.

21     So, let's say the incident is June of 2020.  I'm

22 just picking the date, but there could be an October of 2020

23 communication that says, Wow, this is really bad.  What

24 policy was in place back then, and why did we let that

25 happen and what are we going to do to fix it.  All of that

14

stuff, even if it occurs after the date, would still be

relevant to the jurisdictional analysis.  You know, in the

extreme example, if somebody sends an email that says -- I'm

sure this never exists, but -- but in the hope world as the

Plaintiff, you know, if there's the email that says I can't

believe you put that policy in place, shame on you, we need

to change it, that could be a year after the incident but

still be relevant to who was controlling the policies, who

was implementing the policies, what the policies were.

So, I -- I do think there's some merit to the

position that there's a cutoff date for a contact.  You

know, if they flew here today for the hearing, the fact that

they're here wouldn't mean the Court has jurisdiction over

them for the purpose of what happens, the underlying

incidents.  But that doesn't mean they can just not search

for those documents, and I think what they -- their position

has been, if I'm saying it fairly, is that they're going to

cut off the search, and our position is that they should

search through the present.  They should find everything

that's captured by the search terms and the -- and the

requests, and it may be that they want to claim privilege

and they can, and then they can send us a privilege log.  We

don't have one yet.  So, I don't know if they're claiming

privilege over anything.  They could certainly claim stuff

is not relevant or -- or not subject to discovery for

15

1  whatever reason, but I would think they would then need to
2  supplement their responses to say we've done the search.  We
3  have some stuff, but we're withholding it under objection A,
4  B, and C, and then we could come to your Honor to fight over
5  those objections.  I believe a couple of years ago, Congress
6  changed the rules to say for each request you have to say if
7  you're withholding stuff, because in the old days we would
8  end up in meet and confer hearings and, you know, at the end
9  of the day, you'd come to a motion to compel, and then there
10 were no documents.  And they're like, okay, everybody wasted
11 their time.  If there's no documents, there's no documents.
12 But we don't know.  There's no certification or explanation
13 of whether they're withholding stuff, whether it's
14 privileged, why they're withholding it.  So, I would think
15 what we'd be seeking is an order that they need to go do a
16 comprehensive search through the complete time frame and
17 then provide updated responses with -- if they have
18 anything, if they're withholding it, why they're withholding
19 it and a privilege log if they're asserting privilege.  And,
20 ideally, a production, because I just -- I know it's not a
21 legal test, but it just seems hard to believe that they
22 don't have a single piece of paper that relates to their
23 financial interest in a company of this size or their time
24 as CEO or COO, and Mr. Antoon or Mr. Tassillo's time.  You
25 would think the COO would have some documentation, some

16

1  email, some text messages about their role and their

2  position in an incident that was high profile like this.  I

3  would assume stuff exists.  Obviously, if they certify to

4  the Court that they've done the comprehensive search and

5  nothing exists, we have to take them at their word as

6  officers of the court, but we're not there, and that's why

7  we're here I guess.

8          Let me pause there and see if your Honor has any

9  questions or if you want me to actually go through requests

10  or if we should hear from them.

11          THE COURT:  Why don't we consider this your

12  opening, and let's hear from the other folks on the sort of

13  big picture arguments.

14          MR. STEIN:  Thank you, your Honor.

15          THE COURT:  And I would like to hear from counsel

16  for Mr. Antoon and Mr. Tassillo first.  Let's kind of keep

17  with that organization.  Sorry.  That will just help me in

18  my -- my cognitive ability to keep track.

19          MR. SACK:  Yes.  May it please the Court.  I'm

20  Jonathan Sack for Mr. Tassillo.  And in the interest of

21  efficiency, since we have a lot of issues and a lot of

22  lawyers, with the Court's permission, I'm going to speak on

23  behalf of both Mr. Tassillo and Mr. Antoon.  Mr. Antoon's

24  counsel is here, Jason Brown, but our clients, as you heard,

25  were senior executives.  They left the company at the same

17

1  time in 2022 and have very -- they're similarly situated for

2  a lot of the issues that are before us today.

3          THE COURT:  Okay.  I appreciate that.

4          MR. SACK:  So, what I -- I think it's important to

5  begin with several preliminary points to, I think, address

6  what Mr. Stein was saying.

7          I think the -- the first and most important is for

8  us to really understand what is in their possession that may

9  be subject to discovery here.  They have personal emails

10  such as a gmail account essentially.  They do not have

11  company emails, company documents or access to those as

12  former employees.  So, we're talking about personal emails.

13          THE COURT:  Understood.  And that's --

14          MR. SACK:  So, in our view, this --

15          THE COURT:  -- what I understand they are seeking

16  based on Mr. Stein's arguments.

17          MR. SACK:  Yes.  And that's why I think there

18  should be no surprise and no outrage, which I respectfully

19  think is somewhat feigned in this case, that they actually

20  don't have emails about the day-to-day operations of the

21  company or they don't have gmails about complicated

22  financial matters.  There's nothing to be surprised about.

23  I think it would be, on the contrary, a problem if they had

24  a lot of company CSAM-related policy material in their

25  personal email accounts.  They don't.  And those have been

18

1  reviewed.  So, this notion that we're just ignoring our

2  obligations and not reviewing material is just flat out

3  wrong.

4        There is one other category of information that I

5  do want to bring to your Honor's attention, and that's

6  something we've been calling mobile data.  That would be

7  text messages in chat systems and messaging apps, that sort

8  of thing.  That is in our clients' possession.  It is also

9  in the possession of the company which downloaded and imaged

10  all of that material when they left the company, and all of

11  that material is fully incorporated in what the company has

12  reviewed for responsiveness and included if there's anything

13  responsive in what has been produced to Plaintiffs.

14        So, to give one concrete example, we've done a

15  search for CSAM-related policy, whether our clients directed

16  or implemented CSAM-related policies.  We did that search in

17  the gmails and did not come up with anything, and we've

18  advised that to Plaintiff.  The company has done a search.

19  We used 13 search terms.  We did not get any from the

20  Plaintiff.  We formulated 13 search terms, conducted a

21  search.  The company used those terms, searched company

22  emails, company mobile data, and other information in the

23  company's possession and produced hundreds of documents

24  relating to our client and other individual Defendants

25  relating to their involvement in CSAM policies.

*Echo Reporting, Inc.*

1          I recognize that the Plaintiffs may feel that's

2    inadequate, but that's where the documents lie, in the

3    company's possession and email systems.  They did get

4    hundreds of documents, many of which involve Mr. Tassillo,

5    Mr. Antoon, and others in the company.  So, this notion that

6    there's this wholesale disregard is just not accurate.

7          The other point that I wanted to make was a

8    preliminary point is this argument that somehow we view

9    ourselves as absolved of our discovery obligation because --

10   or obligations because documents are in the possession of

11   the company, that's not the case at all, and we've said that

12   to Plaintiff many many times.

13         We do feel, though, that there are -- that

14   discovery should be reasonable and proportional and it

15   shouldn't be wasteful and duplicative.  So, what we have

16   said is, given the nature of the issues here for personal

17   jurisdiction as laid out by Judge Carney, that is, the

18   financial and governance relationship of the MindGeek

19   entities, and that is the conduct of company policy vis-a-

20   vis CSAM policies, that really is core material in the

21   company's possession.  So, obviously, that should be pursued

22   with the entity Defendants.  Please let us know what are the

23   specific things that you're looking for from individuals

24   that would not be in the company's possession, and we've not

25   said in any flat out way we won't produce something just

20

1  because it may be duplicative.

2          What we have said is we're faced with 54 broad

3  merits-based discovery demands that really touch on

4  virtually every aspect of this company, every aspect of our

5  clients' financial lives.  They've asked for eight years of

6  every bank account, investment account, or any other

7  financial account for out clients.  It's virtually boundless

8  and clearly not limited in any way tailored to personal

9  jurisdiction.

10         Let's work with you and try to find some common

11  ground, somewhere between the 54 merits-based discovery

12  demands that you have and let us know what's reasonably not

13  coming to you from the company and what is it you need, and

14  we'll look for it.  That's what we've not been able to get

15  after many phone calls and many requests and many meetings

16  with defense counsel.

17         So, our position is not we have no discovery -- we

18  have no obligations.  We've conducted searches, as I'll

19  elaborate on in a moment.  What we've said is it's got to be

20  reasonable and proportional and not cumulative, particularly

21  in light of the nature of the limited personal

22  jurisdictional discovery issues here, which are very company

23  centric.  It's about financial interrelationships among the

24  companies, governing structures.  It's not, for example, how

25  did our clients invest or spend the money that they received

21

1  from the MindGeek entities.  The company Defendants have

2  produced the shareholder distributions to our clients who

3  are part owners of the company.  They've produced all

4  compensation information to our clients.  And yet the

5  Plaintiffs want to conduct an unlimited examination of every

6  dollar spent by our clients.  That's just not related to

7  personal jurisdiction here.  We've asked for limitations of

8  such requests, and we've not gotten anywhere.

9          So, now let me just turn to what specifically

10  we've done to try to meet our discovery obligations and be

11  very reasonable under the circumstances.  We've conducted a

12  search in our clients' personal emails for documents

13  concerning the Plaintiff.  We didn't find anything, and

14  we've informed the Plaintiff.

15          We conducted a search in our clients' personal

16  emails.  The company counsel did it separately for company

17  emails.  We did a search for documents relating to CSAM --

18  the implementation and direction of CSAM-related policies.

19  We used 13 search terms.  We advised the Plaintiff of what

20  those terms were, and we did not find anything responsive

21  there.

22          And, as again, we don't believe that should be

23  surprising or in any way indicative of a lack of diligence

24  or a lack of good faith in this process given the limited

25  universe.

22

1          The Plaintiff -- Plaintiffs' counsel recently

2   provided us with a list of approximately 280 search terms

3   that they'd like us to run that, broadly speaking, relate to

4   CSAM policies and many other subjects broadly relating to I

5   think company efforts to try to keep illegal material off of

6   the site.  We are going to run those search terms.  And,

7   unless there's some burdensome number of hits from the

8   search terms, because some of them are very broad, absent

9   something burdensome like that, we would intend to review

10  all of the hits from those terms.

11          THE COURT:  And you're running those search terms

12  in what?

13          MR. SACK:  In the pers -- in the personal emails.

14          THE COURT:  Okay.

15          MR. SACK:  Now, the issue may be different for

16  company counsel that has a much vaster -- a vast universe of

17  data, certain terms might generate an enormous number of

18  false hits in that context that may not generate that kind

19  of number of false hits if we're looking at personal emails.

20  But we're going to run those and, again, subject to anything

21  anomalous with some very very large number, we'll review for

22  responsiveness, and we'll let the Plaintiffs know.

23          And I would just note on that subject, we've gone

24  by many months and just I think it was 10 days ago was the

25  first time we ever got search terms from Plaintiff.  We have

23

asked for various ways to try to narrow these very broad

requests.

        THE COURT:  And do those search terms, those 280

search terms, are -- do they relate to all of the requests

or is it just a category?

        MR. SACK:  In our reading of it, the -- the

Plaintiff did not specify what they related to, but as we

read those search terms, they appear to relate to policies

and practices to try to keep illegal material off the -- off

the sites.  They don't have any apparent relationship to

alter ego and financial information.  We'd welcome getting

search terms from the other side on alter ego and financial

related information.  We'd welcome, as we've told them for

months, any effort to try to narrow those very broad

categories.  And we'd engage with them.

        In fact, Mr. Stein and I had a phone call on

January 13th, two days after the -- some of the parties were

here before you, where I said exactly those words.  I said,

Please help us specify and narrow these very broad requests.

We want to try to work with you to find a common ground.  We

may agree or disagree, but if we could find some basis,

we'll do -- we'll do targeted searches that are more focused

on the issues in the case, and basically the next

communication was the joint stipulation which we got in

February on which we're now before the Court.  So --

24

 1          THE COURT:  And you mentioned running these

 2  searches and running them in emails.  Are there -- is there

 3  other -- I mean, you know, back in the day we used to have

 4  files --

 5          MR. SACK:  Yes.

 6          THE COURT:  -- right?  We all remember those.

 7          MR. SACK:  Yes.

 8          THE COURT:  Most of the people in the room look

 9  like they actually had them.

10          MR. SACK:  Yes.

11          THE COURT:  You know, so, we've got other sources

12  besides emails, although we -- you know, so, how are those

13  being searched for this data?

14          MR. SACK:  Yeah, no, we -- our -- our client is

15  actually fairly sophisticated in his data practices.  So, he

16  does not have, you know, rooms full of hard copies, but

17  we're working with him, and we'll absolutely go through

18  electronic documents that might be stored electronically.

19  We have already done so, documents that are stored

20  electronically outside of a particular email.  And to the

21  extent there's a box or a file cabinet -- and there are --

22  we've -- we've worked with him to try to identify anything

23  responsive there, and we'll do that.

24          Our real concern up till now is these requests are

25  so overbroad and so not tailored to personal jurisdiction

25

1    that there was just no way we'd be able to conduct an

2    adequate search and not be vulnerable to what in our view

3    would be an unfair attack for incompleteness.  That's why

4    we've wanted greater specificity.

5            I mean, we've been given this choice of either

6    comply with grossly overbroad merits-related discovery for

7    individuals who are not yet in this case because personal

8    jurisdiction hasn't been established or come up with our own

9    narrowing definition and then be vulnerable to an attack for

10   not acting in good faith.  We want to work with the other

11   side to try to find specificity, and then I would hope we'd

12   be able to proceed very effectively with discovery and

13   minimize any remaining issues that would be brought to your

14   Honor.

15           I'll just spend a few more moments talking about

16   what I think are some of the more problematic requests, just

17   to give you a flavor.  So, one request, RFP Number 2, seeks

18   all documents and communications concerning our client's

19   affiliation with, employment by, or ownership of MindGeek.

20   On its face, that would appear to cover virtually every

21   document this individual has that might in some way relate

22   to MindGeek.

23           Number four, all documents and communications

24   between and among you and any of the Defendants related to

25   this action.  Obviously problematic in terms of privilege

26

1 and being post this action but, again, very hard to specify

2 what is being sought.

3          Number nine, all documents relating to MindGeek's

4 past or present offices, departments, executives, and

5 personnel.  Again, we just don't see how that's limited to

6 personal jurisdiction.

7          Number 18, eight years of every bank account and

8 investment account statement for your clients without any

9 limitation whatsoever.

10          Number 28, all documents related to the services

11 provided by one of the MindGeek entities, 9219.  Again, that

12 may relate to every single aspect of the company's business.

13          So, I just think we have said, Can we try to come

14 up with some meaningful working limitations on those to

15 particular things.

16          THE COURT:  Can you talk to me?  So, if -- let's

17 -- again, just looking at number 28, your example, all

18 documents related to the services provided by 9219-1568

19 Quebec, Inc.  I understand how that could be really

20 overbroad if that question went to potentially -- went to

21 MindGeek.  But if it's going to an individual who's no

22 longer there, who doesn't have access to his corporate email

23 account and computer, why is that overbroad?  Because I

24 would imagine that there may not be very much of that.

25          MR. SACK:  Well, I -- I think there could -- I

27

think both of those things could be true, your Honor.  It's overbroad because it potentially touches every single aspect of what 9219 does, and I'm not saying that it's impossible to do that search.  But if we were to find some document in our client's personal emails or a document in a filing cabinet that related to 9219 that had nothing to do with CSAM policy or nothing to do with financial payments to our client, our view would be that shouldn't be produced because it's not related to personal jurisdiction.  So, it does raise that dilemma of --

THE COURT:  Before you move on -- and I don't normally do this, but, Mr. Stein, I'd like to hear your response to that.  How -- how is it related to personal jurisdiction if, for example, his client were to have some document related to this entity?  You can speak from your chair.

MR. STEIN:  Oh.

THE COURT:  Yeah.

MR. STEIN:  Thank you, your Honor.  I mean, I guess it would depend on what the some document is, right?  I mean, if it's a document that just has the name of the entity, probably not so relevant.  But if it's a document -- a communication between it directing it to do something -- 9219 I believe was the entity that did the monitoring.  So, if the individual Defendant is communicating with 9219

28

about how to monitor or how not to monitor or what to look

for or what to screen for or setting the policy for how

things are screened out or getting in, I would think all of

that is relevant to jurisdiction insofar as it's the

control.

THE COURT:  Okay.  But what you just described is

the subset of the documents called for on there?  I just

want to make -- because you're being very specific about the

types of material.

MR. STEIN:  Yes.  I guess I -- I would agree it's

broad.  I -- you know, and I didn't draft these, but at the

time, I think you don't -- you don't know what's out there,

so you ask broadly.

My understanding of kind of the -- the right

approach to do this is when -- when requests are too broad,

of course, you meet and confer.  We've done that

exhaustively.  But you also don't not look.  You go look for

what you as -- we've had -- I'm glad he reminded me.

January 13th, a very pleasant conversation.  He's a very

savvy, sophisticated lawyer.  He knows what would be

relevant and responsive.  And you can look for that and say

I don't have anything or I do.  You can argue over the

scope, but I don't think we go down to zero.  I think your

Honor's right there may not be a lot here, which may cure

some of the burden or the -- or the breadth.  But I don't

29

1  know what's there, and without looking for --

2          THE COURT:  Okay.

3          MR. STEIN:  -- it and then finding out what's --

4          THE COURT:  Understood.

5          MR. STEIN:  -- there, you don't know --

6          MR. SACK:  May I be heard briefly, your Honor?

7          THE COURT:  Thank you.

8          Of course.  I'm coming back to you, Mr. Stein.

9  Please have a seat.  Thank you.

10          MR. SACK:  Excuse me, that's not -- excuse me.

11  That's not the way discovery should work.  We get to ask for

12  the sun, the moon, and the stars and leave it for us to

13  guess what might be potentially responsive.  That's not

14  appropriate, respectfully, in any discovery process.  It's

15  certainly not in one that is supposed to be tailored to

16  personal jurisdiction, and I think that's part of the

17  problem here is this discovery was drafted at a time when

18  the Plaintiff said they believed they're entitled to merits-

19  based -- merits discovery and not just personal

20  jurisdiction.  And there's literally been not one inch, not

21  one inch of movement off of that position, despite numerous

22  efforts to try to say, Can we limit a request of that

23  nature, everything relating to 9219 services?

24          It seems to me your Honor brought out an exactly

25  right point, which is it's overbroad -- excuse me -- my

30

1    words, not yours -- overbroad, and now we're left to guess

2    with what might we find that might be relevant.  We're not

3    making your Honor like an absolute burdensomeness argument

4    here because we are talking about a limited set of material.

5    What we want to try to avoid is a situation where it's so

6    nebulous and so vague, what's being sought, we can't really

7    say for sure whether we're complying and, therefore, we're

8    vulnerable to what in our view would be very unfair attacks

9    of deficiency.  We think we're -- those are being leveled at

10   us now unfairly, and we think it may be worse if we're left

11   with very vague and overbroad requests.

12          I'll give one example.  So, one of the issues that

13   is -- we have a dispute about are -- are trips to the United

14   States.  And we, in our interrogatory responses, provided

15   very high level information about the business related trips

16   that our clients took to the United States and to California

17   during the relevant period.

18          Plaintiff asks for more specificity about that.

19   They recently got more specificity from company counsel

20   because the company is in possession of all the T and E

21   information for the individuals for the reimbursed trips.

22          THE COURT:  T and E?

23          MR. SACK:  I'm sorry, travel and entertainment.

24          THE COURT:  Thank you.

25          MR. SACK:  Travel -- excuse me -- travel and

31

entertainment related --

THE COURT:  We don't have that budget, the Court.

MR. SACK:  Entertainment, not travel perhaps.

And, so, the company provided a list that said the dates, the locations of the travel and the purpose, and the Plaintiffs in the joint stipulation -- Plaintiff in the joint stipulation said that's what we're looking for, date, location and purpose, and now they're coming back and saying they want more information.

What we have said is personal trips are not relevant to personal jurisdiction, and we have said that the business trips don't relate to the Plaintiff in any way. They relate to the -- this business, which was a large business based in Canada, but it had a lot of U.S. ties. There's nothing unusual or special about a trip to the United States.  Mr. Stein mentioned one particular trip in January of 2018.  We've not been hiding any balls.  We've said this is what we think is relevant.  This is what we've produced.  We've not changed our position in any way.

We don't see what the relevance is of personal trips for one thing, and we just don't see the relevance of additional information about business trips.  They can -- our clients can be asked about that in deposition, but this -- I don't see the basis for getting, you know, everything relating to a business trip to the United States.  This is a

32

1  -- this is not a general jurisdiction case where did our

2  Defendants have extensive presence in the United States.

3  It's did our clients -- it's a specific jurisdiction case,

4  did they take particular action directed to -- to this

5  Plaintiff in causing these injuries.  That just seems to me,

6  you know, not appropriate for discovery.

7           I know the time period will, I'm sure, come up

8  with company counsel, but I'll just say a few words about

9  that.  We have a very broad time period here from June of 20

10  -- 2014 to June of 2020.  We were sensitive to court

11  rulings, including your Honor, which said that the relevant

12  period for personal jurisdiction is the period of the

13  alleged illegal activity.  Outside that period the activity

14  -- the actions would normally not be relevant to personal

15  jurisdiction because of the concept of, you know, directing

16  activity to a jurisdiction in a particular time period.

17  And, so, we've applied that rule.  We think it's a very

18  reasonable rule to try to impose some reasonable limitations

19  on a -- on a very broad scope of -- of discovery.

20           I'll just spend -- say a few more words about --

21  we have a dispute about RFP Number 18, the personal

22  financial information.  We -- again, the Defendant -- the

23  Plaintiff has sought eight years of every bit of banking and

24  investment and financial information for our clients.

25  Respectfully, we just don't see how that bears on the alter

33

ego analysis which goes to the financial flows among the
MindGeek entities.  The company has produced specific
information about the shareholder distributions, the
dividends, the compensation paid to our clients in audited
financial statements and otherwise.  Again, we just don't
see how that level of information is appropriate here.

          And I think I'll just end by noting the request
about contact lists.  The Plaintiff has sought contact lists
for our clients.  I know our client has thousands of names.
It's RFP Number 32, excuse me.  Our client has thousands of
names reflecting a lifetime of activities in his contact
list.  We don't see how that relates to personal
jurisdiction, and we don't see -- we just see that as unduly
burdensome and intrusive under the circumstances, their
family members, you know, friends, family, business
associates of various kinds.  We think that's just not --
not reasonable under the circumstances given the judge's
order.

          THE COURT:  Thank you.

          MR. SACK:  Thank you.

          THE COURT:  I'm going to ask Mr. Stein to respond
just -- it's just general -- it's just going to help me keep
this straight, and we'll -- I know it's a little unorthodox,
but I'd rather hear his response, and then we can move on.
Okay.

34

1          MR. STEIN:  Thank you, your Honor.  A couple of

2    things.  I heard Mr. Sack say there's been no movement on us

3    seeking merits-based discovery.  I don't think that's true,

4    but let me make it clear, and let me move.  We are not

5    seeking merits-based discovery.  At the time they were

6    drafted, I think it was an open question whether that

7    discovery was open.  Judge Carney closed that question, and

8    we're now limited to jurisdiction, and that's all we're

9    seeking.  So, let me make that very clear.

10          I think -- I think we approach discovery

11   differently, Mr. Sack and I, and that's okay.  I think when

12   you get a broad request, if you know there's some stuff you

13   have that's relevant and responsive, you gather it, you turn

14   it over, you tell the other side what you've gathered and

15   turned over and what you're not going to do with you talk

16   about the dispute in scope, and the dispute is what gets

17   briefed and argued.

18          I understand maybe he -- he does it differently.

19   I'm not saying it's right or wrong.  I'm just saying I think

20   they are capable of identifying what is relevant to

21   jurisdiction without us.  I mean, certainly, there's back

22   and forth, but --

23          THE COURT:  Can you speak to the request about the

24   contacts list?

25          MR. STEIN:  Sure.

35

 1          THE COURT:  And the -- and RFP 18 with the

 2    monthly, quarterly, and annual bank statements and

 3    investment statements?

 4          MR. STEIN:  Yes, I can.  Number 32, RFP 32 is the

 5    contact list.  We are not seeking every contact they have.

 6    We are seeking the contacts they have with managers or

 7    employees of the MindGeek entities who may have been

 8    responsible for the implementation or administration of the

 9    policies at issue.

10          So, maybe the request as written is broader than

11    that.  I don't have it in front of me, although I could get

12    it, but, no, we're not asking him to go into his phone and

13    give us every contact he's ever had over his life, for any

14    of them.

15          We're -- we're looking at, again, from a

16    jurisdictional perspective as I understand the -- the

17    factors in the previous orders from the Court.  It's -- part

18    of it is who did what and who dictated who did what, and

19    that kind of goes to the alter ego analysis of who's

20    controlling things.  And, so, if there are high level

21    managers or employees at let's say 9219, for example, that

22    are implementing policies about monitoring, if Mr. Antoon or

23    Mr. Tassillo is communicating with them and directing that

24    and telling them what to do, that's control, and that goes

25    to alter ego, and it goes to jurisdiction.  So, that's what

36

1    we're seeking, if that helps clarify the scope.

2          THE COURT:  Okay.  All right.

3          Unless you have anything direct, rather than sort

4    of doing your sum up, I just kind of wanted some answers to

5    the specific allegations that --

6          MR. STEIN:  Sure.

7          THE COURT:  -- he raised --

8          MR. STEIN:  Sure.

9          THE COURT:  -- I wouldn't lose it.

10         MR. STEIN:  On number 18, the financials, I think

11   the same thing.  We're not seeking every bank transaction

12   they've ever made in their lives.  We're seeking to figure

13   out where the money went as it relates to MindGeek, and what

14   Mr. Sack referred to that's been produced by the entities is

15   we got a spreadsheet recently this -- I think you called it

16   a dividend report or something.  It appears to be a document

17   that was created for us for the lawsuit that just says

18   here's who got money, and here's how much they got, and

19   that's it.  There's no backup.  There's no support.  There's

20   nothing to explain how things were calculated, and I -- I

21   just think the financial picture, especially with a

22   complicated organization like this and with an entity

23   structure like this and with individuals like this, we're

24   not trying to figure out -- I mean, I -- I'm guessing he has

25   income from other sources and other businesses and other

37

ventures.  We're not looking for any of that.  We're looking

for when there's money that's at the MindGeek entities and

it goes to the individuals or back and when it shuffles

between them, we have no records of how that's happening,

and all we have is a spreadsheet that just says somebody got

X dollars, but that's it.

So, I think we'd like to get more into the weeds

on the MindGeek connected financials, and then the last one

I would clarify, and I don't remember the request, maybe it

is -- let me find it -- on the travel, the trips.  I think

it's number 11, RFP 11.  Again, we're not interested in

every trip that they take.  I mean, certainly they take

trips that have nothing to do with this, and we don't care

about that.  But if they take trips to the United States, it

would be nice to know about the trip and to ask is it

connected to MindGeek, is it connected to MindGeek's

business, is it connected to the setting and implementation

of CSAM policies.  Certainly, when we depose them, we're

going to want to ask them about meetings that relate to

these issues, but unless they identify the trips that they

took, we don't know what to ask them about.

So, if they came on a family vacation to --

THE COURT:  I understand you want to talk next.

Got it.

MR. STEIN:  Yeah, if they came on a -- if they

38

1    came on a family vacation to Disneyland, no interest in

2    that.  But if they came on a family vacation to Disneyland

3    and while they were here, Mr. Antoon or Mr. Tassillo sat

4    down and talked about CSAM policies and implementation and

5    things like that --

6                THE COURT:  Understood.

7                MR. STEIN:  -- that seems relevant to

8    jurisdiction.  So, for all of these, we're not seeking

9    everything in the world.  We're seeking things that connect

10   to their jurisdictional ties and the operation and

11   administration, financially or otherwise, of these

12   particular policies in the MindGeek entities, if that --

13               THE COURT:  Got it.  Thank you.

14               MR. STEIN:  -- answers the question.

15               THE COURT:  It does.

16               And, Mr. Sack.

17               MR. SACK:  I'll try to be very very brief.  Thank

18   you, your Honor.

19               The problem is this is the -- literally the first

20   time we've heard from Plaintiff about any sort of attempt or

21   -- attempt at a sensible limitation of the request.  So, in

22   terms of RFP Number 18, all bank information, this is

23   literally the first time we've ever heard that the Plaintiff

24   is not seeking what they're seeking.  They've sought it, and

25   they've told us in every meet and confer that they're

39

1  seeking it, and there's no movement.  So, this is now the

2  very first time.  This is what we would -- we have been

3  trying to do for months.  That was, I would say, a lot of

4  progress just in this session -- in this a few moments ago,

5  but in -- I believe this should be happening among counsel,

6  and we should not be hearing about it for the first time.

7  The same thing with the contact list.  That is literally the

8  first time we ever heard of a single limitation on the

9  contact list to the one Mr. Stein just said.  We've sought

10 limitations.  We've sought discussion, and we've hit a

11 stonewall.

12          Same thing with -- with travel I'm, frankly, a

13 little bit puzzled about exactly what's being sought on

14 travel because we've said to the -- we've said to the

15 Plaintiff this is business reimbursed travel.  All of this

16 travel relates to their work on behalf of MindGeek.  They're

17 the -- they were the CEO and the COO of the company.  When

18 they went to the United States, including to California, to

19 meet with people in the industry, that related to the

20 MindGeek business.  It did not relate to CSAM.  It did not

21 relate to Plaintiff, but they can address that in their

22 depositions, but they -- they've been given basic

23 information, in our view, adequate information about

24 business trips to the United States and California.  If

25 there are very targeted requests that the Plaintiff has

40

1  about those trips, we'd be more than comfortable considering

2  them and really do our best to try to find a common ground.

3        Last point is, your Honor, the -- the Plaintiffs

4  them -- Plaintiff herself through counsel said this was

5  merits discovery.  They said that was merits discovery when

6  it was propounded, and there hasn't been any movement.  I

7  know now it's been transmogrified into limited personal

8  jurisdiction discovery, but there's been no effort to try to

9  tailor it at all, and nothing's changed since they've

10  propounded merits discovery.  That's been our problem, and

11  it -- we'd love to try to get to a different place where we

12  can agree on somewhere in the middle.  It's like we're both

13  at opposite ends of a football field, and we've been trying

14  to get in the middle, and we've been unsuccessful because of

15  no movement from the -- from the Plaintiff's side.

16        Thank you, your Honor.

17        THE COURT:  Thank you.

18        MR. STEIN:  Very briefly?

19        THE COURT:  Do you need to?  We've got a lot more

20  to go.

21        MR. STEIN:  I don't need to, but -- well, no, I

22  don't need to.

23        THE COURT:  Thank you.

24        MR. STEIN:  We don't necessarily agree, but fair

25  enough.

41

1          THE COURT:  Understood and anticipated.

2          MR. STEIN:  By the way, just for the record, I've

3    never heard the word transmogrified.  So, I'm going to look

4    that up and thank you.

5          THE COURT:  I was -- I wrote that down to look it

6    up.  That's funny.

7          MR. STEIN:  Thank you, your Honor.

8          THE COURT:  Is it a real world?

9          MR. SACK:  It is.  It's a high falutin word.

10   I --

11         THE COURT:  That's what I love about this job.

12   You learn --

13         MR. SACK:  -- apologize.

14         THE COURT:  No.  What I love about what we all do

15   is that we learn something new every day.  Yeah.

16         MR. BROWN:  Jason Brown for Mr. Antoon.  I'm going

17   to be really brief.

18         THE COURT:  Okay.

19         MR. BROWN:  Because Mr. --

20         THE COURT:  I appreciate that.

21         MR. BROWN:  -- Sack did a wonderful job

22   summarizing the difficulties that we've encountered

23   throughout this --

24         THE COURT:  And I'm sorry, sir.  Your name again?

25         MR. BROWN:  Sure.  Jason --

42

1          THE COURT:  Jason Brown.

2          MR. BROWN:  -- Brown.

3          THE COURT:  Got it.

4          MR. BROWN:  Cohen and Gresser for Mr. Antoon.

5          THE COURT:  Okay.  Okay.

6          MR. BROWN:  I confirm that he spoke on behalf of

7  both Mr. Antoon and his client, Mr. Tassillo in -- in

8  everything he said, and I think for the record, transmogrify

9  means to evolve or to change in some way.

10          THE COURT:  I gathered that from the word use.

11          MR. BROWN:  We should look it up.  We should look

12  it up.

13          THE COURT:  Yeah.

14          MR. BROWN:  The only clarification, the only --

15  the only area in which there's a slight difference between

16  the two -- the two Defendants, MR. Tassillo and Mr. Antoon

17  -- and we've disclosed this to Brown Rudnick, and I think

18  it's somewhere in those voluminous papers that the Court has

19  before her, Mr. -- Mr. -- there you go, and I won't point

20  you to the right binder or the right page, but it's

21  somewhere in there.  So, I don't think there's any secret or

22  mystery about it.

23          Mr. Antoon, when he left the company, did have the

24  IT person export not -- just copied, not take -- not delete

25  from -- from MindGeek's records, a limited number of

43

1   personal emails on his MindGeek account.  I want to assure
2   the Court that even though Dechert is in possession of those
3   emails and is presumably -- has presumably searched them and
4   will continue to do whatever is required, we have also
5   searched them.  So, when Mr. Sack said personal email, that
6   was in effect shorthand for both the personal emails that
7   his client has and the personal and limited number of
8   MindGeek emails that our client has.
9            THE COURT:  Okay.
10           MR. BROWN:  Thank you, your Honor.
11           THE COURT:  All right.  Thank you for clarifying.
12           Okay.
13           MR. WHITE:  Good morning, your Honor.  Ronald
14  White on behalf of Mr. Bergmair.  Let me -- I could just
15  start at the end and say, congratulations, your Honor.  You
16  have gotten them to move on narrowing these requests in a
17  way that we've been trying to for six months, that you got
18  them to say that there's a subset of -- of certain requests
19  that they want, that they only want personal travel and not
20  business travel or MindGeek related contacts and not all
21  contacts.  That's progress.  But let me circle back to the
22  beginning, your Honor.  I think there's sort of three
23  issues, some of which have been touched on.  I'll try not to
24  repeat, that are -- that sort of put this in context.
25           First, your Honor, a little bit about Mr.

44

Bergmair.  Mr. Bergmair is an individual shareholder of

MindGeek.  He has never had any management position at the

company.  He's never been a director, an officer, an

employee.  Your Honor, his -- he's a private investor.  His

business is investing in companies and leaving the

management of the companies to the senior executives that

have experience in that relevant industry.  And MindGeek is

one of those companies.

He resides in China, and the company is run in

Montreal, Canada by a team of senior -- a dozen or so senior

executives there.  So, he doesn't live or work in the United

States.  He has virtually no connection to the United

States.

Second key fact which Mr. Sack touched upon is

these discovery requests were served at a time when the

Plaintiff admittedly believed that it -- they were entitled

to merits discovery.  And I won't repeat the examples.  Your

Honor has cited some of them already.  But we've asked

repeatedly -- I know I personally asked in at least two meet

and confers if there was even a single one of their 60

requests that they were willing to narrow in light of that

fact, and the answer was no.  Mr. Doyle told me no.  In the

second meeting, Mr. Bowe told me no and accused me of

looking for sound bites.  But the answer is they just

haven't moved.  You got them to move way more than they have

45

1  since then.

2          Their position was that somehow it was an amazing

3  coincidence that their merits-focused discovery requests all

4  just happen to also be relevant to limited jurisdictional

5  discovery, but your Honor has gotten them to move off of

6  that.

7          I think third, your Honor, we have to evaluate

8  where we are today in light of the discovery that's already

9  been provided.  So, let me talk a little bit about what Mr.

10  Bergmair's done and the company as well.  So, on the first

11  area of CSAM policies, Mr. Bergmair played no role in the

12  direction or implementation of company's -- of the company's

13  CSAM policies.  He's already produced all of the emails he

14  has over the relevant six-year period, and they amount to

15  just a handful of emails where he's forwarded an email on an

16  FYI basis, and he doesn't even respond to a single one of

17  them.

18          Now, the Plaintiff's motion complains, Oh, where

19  are the documents, the email sent by Mr. Bergmair?  You

20  didn't produce any of them.  But, your Honor, that's not a

21  deficiency in his production.  It's reflective of the fact

22  that he was just a shareholder and didn't have a role in the

23  setting of company policies.

24          What it really is is a confirmation of the

25  observation that Judge Carney made in his order regarding

46

 1  jurisdictional discovery where he said it appeared that the

 2  Plaintiffs were merely guessing at what the Defendants'

 3  roles were in setting policies.  And since the filing of the

 4  motion, your Honor, we've received the same 278 search terms

 5  regarding CSAM that the Plaintiffs have asked us to -- to

 6  run.  There -- I'm a little less optimistic than my

 7  colleague, Mr. Sack, because they're ridiculously broad.

 8  So, we're -- we're supposed to be searching for company

 9  policies and the formulation of them, and we're -- included

10  on their list are the terms babysitter and sleeping.  So,

11  I'm -- I'm sure I'm going to be sifting through Mr.

12  Bergmair's emails looking for a babysitter on a Saturday

13  night.

14          THE COURT:  Does he have young children?

15          MR. WHITE:  He does, your Honor

16          THE COURT:  I mean, if he was an 80-year old man

17  with a similarly aged wife, there probably wouldn't be very

18  many babysitter emails.

19          MR. WHITE:  That's true, but all -- it's hard to

20  imagine that that's something that -- that comes up in

21  discussing company policy I guess is my point, your Honor.

22          But, in the interest of transparency, we'll run

23  the search terms, and we'll see what -- what they yield.  On

24  the second topic, which was alter ego, the Plaintiffs

25  already got -- already received substantial information both

47

1   from Mr. Bergmair and from the company.  So, there's no
2   mystery at all.  Plaintiffs professed mystery about a lot of
3   things in the case.  There's no mystery at all about Mr.
4   Bergmair's interests.  Way back in September, in response to
5   interrogatory number one, he verified that he was -- had an
6   ownership interest in MindGeek and identified the specific
7   entities through which he owned that -- that interest.  He
8   subsequently produced corporate resolutions reflecting the
9   -- all the dividend distributions -- I should say all --
10  he's produced all the resolutions he has reflecting dividend
11  distributions to him from the MindGeek entities.
12          So, there's no mystery.  The Plaintiff -- sorry.
13  MindGeek has also produced now 66,000 pages of documents and
14  counting full of corporate and financial records that go to
15  all the key topics that are relevant to the alter ego
16  analysis.  So, they identify all of the MindGeek entities.
17  It shows their corporate structure, their ownership
18  structure, the quarterly and annual financial reports, tax
19  returns, corporate resolutions.  And, your Honor,
20  significantly, the company has produced or agreed to produce
21  and already has or will shortly documents showing the flow
22  of all funds of whatever type from MindGeek to the ultimate
23  shareholders, my client and -- and the other two as well.
24          So, Plaintiff professes that they want to be able
25  to trace the money, to figure out whether these ultimate

48

1  shareholders are diverting corporate money to themselves.

2  So, they're going to get that.  There's -- it takes various

3  forms.  There's dividend distributions, which is what you

4  would expect owners would -- how they would get the profits

5  of the company, as well as so-called related party

6  transactions.  Again, nothing -- everything was above board.

7  Everything is apparent in the documents, whatever, but

8  they're going to get those records.  So --

9          THE COURT:  And who are they getting them from?

10          MR. WHITE:  Well, the corporate resolutions have

11  come from Mr. Bergmair, and my understanding is they have

12  already gotten additional information, at least with respect

13  to Mr. Bergmair, regarding expense reimbursements and -- and

14  documents regarding the so-called related party transactions

15  will be forthcoming.

16          So, your Honor, these are documents that are like

17  prototypical corporate documents, resolutions, financials,

18  legal agreements.  It shouldn't come as a surprise that the

19  company, which has a legal department and a finance

20  department and an IT department, is the -- is the most

21  readily -- is the most convenient source and the most

22  official source of those documents, as opposed to presumably

23  they also have a -- a comprehensive system of maintaining

24  their relevant corporate records as opposed to Mr. Bergmair

25  in China sifting through whatever records he has.

1          So, the bottom line, your Honor, is when you look

2   at where we are now, the Plaintiffs have an enormous amount

3   of documents, particularly the alter ego question.  They --

4   who they got them from really doesn't make a difference.

5   They have them now.  They have the answers to their

6   questions.  And it only serves to burden the individual

7   Defendants to make them go and -- and produce duplicative

8   documents.

9          Your Honor, the Plaintiff specifically told us

10  back when MindGeek had only produced 7,000 documents that if

11  you have those 7,000 duplicates, we want you to give them to

12  us.  Now -- now, unless they've changed their position, if

13  it's consistent, they wouldn't -- they'd be expecting us to

14  produce -- each of us to produce an extra 66,000 pages that

15  are complete duplicates.

16          Your Honor, what -- what the Plaintiff ignores

17  here, you can search their -- all their briefs and all the

18  motions on the court calendar today and see no mention of it

19  is they ignore that Rule 26 has a proportionality

20  requirement.  It was amended in 2015 as, of course, your

21  Honor knows, to require that courts take a closer look at

22  the proportionality of requested discovery.  The Advisory

23  Committee notes, your Honor, those amendments specifically

24  say that they were "intended to encourage judges to be more

25  aggressive in identifying and discouraging discovery

50

overuse."  And those cases which we cite in our brief, your Honor, about proportionality make the point that at a certain point, discovery produces only diminishing returns, and the evidence -- if the Plaintiff already has substantial discovery, is only of marginal utility.  And the question I think that's presented by this motion is if the Plaintiff is unable to prove her case now with 66,000 pages of documents, in the specific categories that she's identified, it wouldn't -- it just simply wouldn't be proportional to make the individual shareholders produce mostly duplicative documents.

So, let me just now address a couple of -- of the points that Mr. -- that Mr. Stein made.  First on contacts, the -- the -- up until now, the position was that they wanted production of all -- all contacts, including personal contacts.  Similarly, with respect to travel, Mr. Bergmair, as Mr. Stein alluded, amended his interrogatory responses to disclose that he -- based on documents, it appeared that there was a meeting in California in 2018 that he doesn't recall but that his name is listed as -- as being there.  That's it, one trip in the whole six-year period.

But, again, we asked about personal trips.  We use the example of if Mr. Bergmair took his family to Disneyland, are you saying we have to disclose that?  The answer at least today is different than it was then back

51

several months ago.  It was, yes, I need to know about that
because I need to test whether what you say is personal is
really personal or not, which is completely -- is completely
wasteful.

        And -- oh, finally, let me just address this issue
of the -- that Mr. Stein raised back in the beginning
regarding the end date for the relevant period.  So, the
last date that Plaintiffs' content is on a MindGeek website
was June of 2020.  And we've searched for the period from
2014 when her contact -- content first allegedly appeared to
June of 2020.  But their argument that -- their argument, as
I understand it, is, well, even after that period, the
parties might have been talking about events that preceded
it by months or years.  In this case, it's between one and a
half or two to eight years earlier.  But what they ignore,
your Honor, is they already have the -- two things that they
ignore.  One is they have all the emails for that -- for
example, with respect to the CSAM policies, they have all
the policies that -- sorry -- the emails that were exchanged
for that six-year period from the individuals.

        What are the odds that that's not sufficient to
make their case but that somehow, someone makes some odd
remark years later that relates back.  And then the second
factor is you -- by implicating that later period, you're
talking about -- you're talking about the time when

52

1  litigation was threatened and then -- and now has proceeded.

2  So, all or virtually all of those contacts are going to be

3  privileged.  And, so, what you're looking for is to -- is to

4  thread the needle.  You have to find -- for them to find

5  something significant, it would have to be something both

6  that is (a) non-privileged and (b) somehow relates back to

7  events that took place years before.

8          And, so, my argument would be, your Honor, it

9  doesn't justify the burden of us searching for and logging

10 pretty much every email about this litigation for a several

11 year period simply on the off chance that such a unicorn of

12 an email exists.

13         I think those are the points I had to make, your

14 Honor, unless you had questions.

15         THE COURT:  I do not.

16         MR. WHITE:  Thank you.

17         THE COURT:  Thank you very much.

18         MR. STEIN:  Do you want me to talk, your Honor, or

19 do you want to go to the next individual?

20         THE COURT:  You know, I don't have any questions

21 with regard to his at this -- his oral argument at this

22 point.  So, thank you.

23         MR. STEIN:  Fair enough.

24         MS. AKOGLU:  Good morning, your Honor.  KErime

25 Akoglu on behalf of Corey Urman.

53

1        THE COURT:  Okay.  One second.  Would you say your

2  last name again for me?

3        MS. AKOGLU:  Akoglu.

4        THE COURT:  Akoglu, okay.  Thank you.

5        MS. AKOGLU:  Your Honor, I'd like to start with

6  one of the things that Mr. Stein said.  He said if they've

7  done a search and it's zero, that's fine.  He said if -- I

8  think when you get a broad request, you can discuss the

9  scope, and you can argue about the scope.

10        Mr. Urman has done exactly that, your Honor.  We

11  have met and conferred at length with Plaintiff.  We sent a

12  10-page letter identifying exactly what we did, exactly what

13  we found, what we didn't find, and exactly what we

14  understand their requests to be.  This letter, your Honor,

15  is Exhibit A to the supplemental brief submitted by Mr.

16  Urman.

17        Interestingly, this letter is not reflected in any

18  of the meet and confer summaries that Plaintiff provided in

19  her briefs.

20        Now, with respect to what Mr. Urman has done in

21  response to the discovery requests, your Honor, we have

22  notified Plaintiff that we ran 26 search terms, broad search

23  terms, to find any responsive documents to her requests.  We

24  identified that we found no documents responsive to 14

25  requests, your Honor.  And, therefore, respectfully, your

54

1  Honor, we believe that the dispute between -- for those

2  requests are moot.

3          And for 11 additional requests, your Honor, we

4  identified that those requests -- we understood them to be

5  too broad, and we explained what we believe the permissible

6  scope to be.

7          You've heard some of those requests this morning,

8  your Honor.  For example, Mr. Sack referred to RFP 2, which

9  asks for all documents about affiliation with the

10 Defendants.  I had this conversation with Mr. Doyle.  We

11 explained we don't understand what you mean by affiliation.

12 That could mean the world.  We think what you're asking for

13 and we think what's permissible is employment agreements or

14 evidence of his -- of Mr. Urman's compensation from the one

15 entity Defendant that he worked for, 9219.

16         The response was, yes, that's along the lines of

17 what we're looking for.  Now, interestingly, your Honor, the

18 company had already provided that information.  They already

19 had the employment agreements, and they already had the

20 summary of the compensation.  But, still, your Honor, we

21 went, we looked for that information, and we produced all of

22 the employment agreements in Mr. Urman's possession.

23         With that, your Honor, we believe that those 14

24 requests for which we have no documents are already moot.

25 Then an additional 11 requests for which we've identified

55

1    what we think are the permissible scope, we've told

2    Plaintiff that we found no documents within that permissible

3    scope.

4           And I will also let your Honor know that in

5    response to our framing of what is the permissible scope, we

6    received no response from Plaintiff.  So, they have never

7    gotten back to us to say, Wait a minute.  What you think is

8    permissible is too narrow.  We want you to do X, Y, Z, even

9    though we told them we are 100 percent open to that

10   conversation and listening to them.

11          Then, your Honor, there's a broad -- there are

12   multiple requests that relate to broadly CSAM policies and

13   the direction and implementation of those policies.  We

14   already told Plaintiff that we would search for those

15   documents, and, in fact, the 26 search terms that we applied

16   also go to those requests.  We searched for those documents

17   within all the documents that Mr. Urman has in his

18   possession.  And that, your Honor, is his personal email

19   address and the text and messaging applications that are

20   still in his possession.  Just like Mr. Antoon and Mr.

21   Tassillo, Mr. Urman does not have access to any of his

22   company emails.

23          After searching for documents related to the

24   direction and implementation of CSAM policy, your Honor, we

25   found only one document, and we produced that to the

56

1  Plaintiff.

2          Now, again, Plaintiff, you know, seems to be

3  outraged that we have nothing else on this when my client

4  was a vice president 9219.  But, your Honor, this should not

5  come as a surprise.  The company has produced hundreds of

6  documents that reflect communications from my client.  It is

7  simply that he doesn't have those communications in his

8  personal possession, and that shouldn't be a surprise.  When

9  you look at those documents, the communications are

10 happening with Mr. Urman's MindGeek email address, not his

11 gmail address.  So, that should not come as a surprise, your

12 Honor.

13         So, I just want to clarify that it is not that

14 Plaintiff has no communications reflecting the direction or

15 implementation of CSAM policy.  They simply have it from

16 MindGeek, not from Mr. Urman, except for that one document

17 that we produced, your Honor.

18         THE COURT:  Now, you said you sent through email

19 accounts and texted messaging.  But people save -- you know,

20 let's say there's an agreement or a contract or a policy,

21 people sometimes save those onto their home computer.  Have

22 you looked for non-email, non-text messaging documents?

23         MS. AKOGLU:  We have, your Honor.  We've searched

24 for -- first of all, Mr. Urman used a company computer for

25 all company business.  And, so, he did not have any

57

1  electronic or physical files in his home or anywhere else.

2  So, we've asked all those questions, and the only places

3  that there could be responsive documents are a gmail address

4  and the text and messaging applications.

5         THE COURT:  What are the -- we're talking about

6  text messaging applications.  Are there certain ones?  Can I

7  know what they are?

8         MS. AKOGLU:  Of course.  So, regular text messages

9  and then messaging applications such as telegram, signal.  I

10  think we've identified a couple of others, but those are the

11  ones, your Honor.

12        THE COURT:  All right.  Thank you.

13        MS. AKOGLU:  Now, that, your Honor, brings us to

14  what is actually remains in dispute, and it's much of -- you

15  know, I don't want to repeat too much of what's been already

16  said, but we believe that with respect to Mr. Urman there's

17  only five issues in dispute.

18        So, the first one, your Honor, is RFP Number 4.

19  Mr. Sack already discussed that.  That is all documents and

20  communications between and among the Defendants related to

21  this action.  Your Honor, we believe -- in fact, in the

22  letters rogatory to Grant Thornton, your Honor deleted this

23  very same request which was request 13 to Grant Thornton.

24  So, he believed that the same ruling should apply here.

25        The second dispute, your Honor, is RFP Number 11,

58

1  and this one asks for all documents and communications

2  relating to Mr. Urman's or MindGeek's past and present

3  jurisdictional contacts.

4         With respect to this request, your Honor, the Mind

5  -- the company has already produced all of Mr. Urman's

6  business trips, and they've produced it in a way that

7  identifies the date of the trip, the location, and the

8  purpose of the trip.  I will note, your Honor, that this is

9  exactly what Plaintiff has requested in her motion to compel

10 in response to one of the -- you know, this relates to RFP

11 11, but there's also a similar request in interrogatory

12 number four I believe, and this exact information is already

13 in the hands of Plaintiff.

14        Because she already has this information, we

15 believe that requesting all documents relating to those

16 contacts is simply overbroad, your Honor.  In fact, I think

17 Mr. Stein said, you know, we don't know what the trips are.

18 If we had the trips, then we could ask them at a deposition.

19 But he has exactly that, your Honor.  He has the list of

20 trips.  If he wants to ask Mr. Urman questions about those

21 trips, he is welcome to do so in a deposition.

22        The third dispute, your Honor, is RFP Number 12.

23 This is a long one.  It's almost eight lines, but I will --

24 I will try to be brief.  It is all documents and

25 communications relating to Mr. Urman's or MindGeek's

59

1  personnel or vendors employed or paid or located in the U.S.

2          Now, we believe that a request for -- first of

3  all, Mr. Urman does not have personnel or vendors in the

4  United States but a request to Mr. Urman about the personnel

5  and vendors that MindGeek employed to us seems to be the

6  wrong target.  In fact, I don't believe that they made this

7  same request to the company.  So, it -- it puzzles us about

8  why Mr. Urman would get this request.

9          The fourth dispute, your Honor, is RFP Number 18.

10 You've heard about this one.  This is your monthly,

11 quarterly, and annual bank and investment statements.  Now,

12 as my colleagues have -- as, you know, the counsel for other

13 individual Defendants have mentioned today is the first time

14 that we have heard that they don't want all bank statements

15 and all investment statements.

16         And, your Honor, you don't have to take our word

17 for that.  That is -- how we understood that request is in

18 the joint stipulation, and nowhere in the joint stipulation

19 do they say, "But, actually, we narrowed our request and we

20 only want X, Y, Z."  So, with respect to Mr. Urman, because

21 the company has already produced a complete summary of all

22 of the compensation and dividends that he has received,

23 Plaintiffs' request for all bank statements and investment

24 statements is simply overbroad, intrusive, irrelevant, and

25 unnecessary, your Honor.

60

1          And the last one, your Honor, again, this is one
2  that you've heard about, is RFP Number 32, and this is the
3  contact list request.  Again, I have to echo what other
4  counsel have said.  Today is the first time that we've heard
5  that they were actually willing to narrow the contact list.
6  But, as it stands, their request is for all contact lists,
7  and we believe that is too broad.
8          One last thing that I will mention, your Honor, is
9  that we -- this letter that I mentioned to you that we sent
10 to Plaintiff about how we interpret their requests and what
11 we did and what we have to produce, we sent that on February
12 17.  Received no response, and only last Friday Plaintiff
13 sent us a request to run nearly 300 search terms.  We will
14 run those search terms.  And, assuming that there's no
15 burden associated with them, we will produce anything that
16 is not privileged and responsive.
17         Unless your Honor has any questions, I have
18 nothing further, your Honor.
19         THE COURT:  Nope.  I don't have any questions.
20 Thank you.
21         MS. AKOGLU:  Thank you.
22         THE COURT:  Mr. Stein?
23         MR. STEIN:  Your Honor, I'm not sure you want to
24 hear from me.  Certainly, I'll -- I'll talk to you if you
25 want to.  I think the Court understands what our responses

61

would be and that we don't agree with the history of the
discussions as it's been framed.  But let me just point out
a date that -- that goes to this date issue and -- and the
search issue.

I believe all of the Defendants cut off their
searching as of June 30 of 2020.  It was December of 2020
that the major news story broke about the underlying
allegations, and Ms. Fleites was the face of that story.
And there was testimony -- and I'm sure I'll get it wrong,
but it was I think in the House of Commons in Canada I
believe in February and March of 2021, and I think -- I
don't know about Mr. Bergmair, but I think at least the
other three individuals all testified about these incidents.

So, it just seems it's an artificial cutoff to say
we're not going to search for anything after June 30, 2020.
Like I said before, we -- we would agree with Judge Carney
obviously that later in time contacts can't form
jurisdiction.  But -- but there was probably a whole lot of
activity and communications around these policies, these
issues and communications between them I would guess in
December 2020 when it broke and in the months that follow
leading up to their testimony.  If it's privileged, it's
privileged, but I don't think we know that.  But it seems
just to say we're not going to search for it isn't right.
It seems they should at least be running these searches

62

1  through the spring of 2021.

2        The other thing that I heard today from several
3  people was that they're willing to run these search terms,
4  and they're willing to produce, and if they don't have
5  anything, they don't have anything.  And that's great, but
6  we're -- we're coming up against the deadline.  It would
7  seem to me what we ought to do is, so we don't have to keep
8  coming back, you know, maybe we -- we would request an order
9  that says within some tight time frame, you know, next
10 couple of weeks, they expand the time frame through at least
11 the spring of 2021, they run these searches on -- on emails
12 and on paper files and wherever else, they produce whatever
13 they find that's relevant and responsive, and to the extent
14 they have nothing or they're withholding something either on
15 privilege or other grounds, they supplement their responses
16 to let us know that.

17        And maybe there's nothing left to fight about, and
18 maybe there is, but it's hard for us to know, and there
19 seems to be a willingness to do it, and -- and that's great.
20 So --

21        THE COURT:  And did these search terms go to all
22 of the categories of requests?  I mean, I -- what I'm asking
23 is if all of the Defendants -- the individual Defendants
24 were to run the search for the time frame you're asking for
25 and -- and produce the responsive documents, does that --

63

1  from your perspective, is that a potential resolution of the

2  entire motion?

3          MR. STEIN:  I don't think so.  I might have to

4  defer to my colleagues.  I think the search terms go to the

5  -- the policies aspect of the motion, and maybe in its

6  entirety.  I don't think they go to the financial aspects.

7  I think our side has kind of taken the position that you

8  don't really need to identify search terms to somebody for

9  them to know what their financial interest is in an entity,

10 what moneys have been distributed to them, what moneys

11 they've invested.  I mean, I think there's year-end

12 statements or quarterly statements just in the routine

13 course or materials provided to tax advisors or financial

14 advisors that would show their financial interest in the

15 various entities.  So, I don't think we crafted search terms

16 for that.  I think the search terms were crafted, if I

17 understand it, towards the CSAM policies and the

18 administration and monitoring around those.

19         THE COURT:  All right.  Thank you.

20         MR. STEIN:  Unless the Court has questions, I know

21 we're long on time.  So, I don't have anything further.

22         THE COURT:  Yeah, I don't have any questions for

23 you right now.  Thank you.

24         MR. STEIN:  Thank you, your Honor.

25         THE COURT:  Okay.  Why don't we take a brief break

64

1  since we have been going already for an hour and a half and

2  then come back, and I'd like to hear oral argument with

3  regard to the -- we call it the eight buckets motion, right.

4  All right.  So, can we just do maybe 10 minutes, just a

5  quick stand up, you know, other -- yeah.  All right.  See

6  you in 10 minutes.

7        (Proceedings recessed briefly.)

8          THE COURT:  All right.  Thank you.  Everybody have

9  a seat.

10          So, let's move to the eight buckets motion to

11  compel.

12          MS. TABAKSBLAT:  Thank you, your Honor.

13        (Pause for background noise.)

14          MS. TABAKSBLAT:  So, your Honor, I'm going to try

15  to distill the eight buckets down into one or possibly two

16  buckets.  And, to do so, I'm going to start with a little

17  bit of context but get to what we need very quickly.

18          THE COURT:  Okay.

19          MS. TABAKSBLAT:  So, the complaint that was filed

20  in this case alleged the Defendants were bleeding money out

21  of the -- out of MindGeek through various related party

22  transactions, and we allege that these illegal transactions

23  left the company undercapitalized and insulated the assets

24  from the creditors.  And Judge -- and, in response, on the

25  motion to dismiss, the Defendants put in an affidavit, and

65

1    they said, "We respect the corporate form.  All of these

2    entities are properly capitalized, and any third party

3    related transactions have transfer pricing and contracts."

4            Judge Carney reviewed the submission, and he

5    issued an order in July that was very specific information

6    that he was looking for, who owns these companies, where

7    does the money flow, and ultimately what he made clear was

8    he wanted to understand where the money went so if we got to

9    the end of this case and there was a judgment, which was the

10   entities that had the money and that were holding the

11   assets.

12           We were here in January, and there's been some

13   discussion about that.  And at the conclusion of that

14   hearing, your Honor properly instructed the parties that

15   your understanding is that these alter ego types of

16   analyses, the specific analysis that Judge Carney directed

17   the parties to go take discovery on is a forensic analysis.

18   And your Honor said quite often this is a -- "The flow of

19   money," which the thing that Judge Carney specifically

20   identified as something he wanted to see -- "is incredibly

21   intensive."  And that's a quote from the Court.

22           So, I want to begin today because there's been a

23   lot of discussion about all of the documents that MindGeek's

24   produced.  I think somebody said it was 66,000 pages, and I

25   want to explain to the Court what has been produced and why

66

1   what has been produced leaves us many questions and
2   ultimately leaves unanswered the question that Judge Carney
3   is most interested in.  And, ultimately, your Honor, as Mr.
4   Stein correctly said, it's March.  We're looking at a May
5   1st discovery deadline.  Nobody wants to move forward with
6   merits discovery more than the Plaintiff.  And, so, we would
7   like to resolve this and get the discovery we need to answer
8   the Court's question and to move on.
9           So, your Honor, I'm sure you've heard and you've
10  read in the briefs that there's all these corporate
11  organizational charts that have been produced, and there
12  have been charts for each year.  And what those charts show
13  is that the entity that we understand to be MindGeek, and
14  particularly flowing into MG S.A.R.L., which is the one
15  entity, the Defendant in this case that is contesting
16  jurisdiction that's publically depicted as the owner of this
17  business doesn't appear to actually be the owner.  So, the
18  Defendants attached the MindGeek entity is -- it's Exhibit 9
19  -- is an organizational chart.  But with your permission, if
20  I can approach, your Honor, I'm going to hand you another
21  chart that they produced that actually shows what the
22  various percentage interests are, and I'm going to use this
23  to just briefly walk through our understanding of the
24  relationship.
25          THE COURT:  Okay.  And have you provided a copy of

67

1  this?

2          MS. TABAKSBLAT:  I will provide them a copy.  And,

3  my apologies, because the way it was printed, the Bates

4  numbers --

5          THE COURT:  Kristee, would you please.

6          MS. TABAKSBLAT:  -- the Bates number was cut off,

7  but this is a document that was produced by the MindGeek

8  entity Defendants in this case.  And, just for the record,

9  your Honor, there were similar charts that were produced for

10 each year, and for purposes of this discussion, we're not

11 taking the position that they're materially different.

12 We're just using this as an exemplar.

13         THE COURT:  Okay.

14         MS. TABAKSBLAT:  So, if you look on the left side

15 of the -- on the right side of the chart, that's what we

16 have traditionally understood to be MindGeek.  And in our

17 motion, we refer to what we call the shadow MindGeek.  And

18 that's on the left side of the chart, where it says

19 CogInvest or Acausu U and RK Holdings and everything that

20 flows from there.  I'm going to start with the right side.

21         The two entities at the top, 9288-1259 and 9288-

22 1275 are entities that are owned -- wholly owned by

23 Defendants Antoon and Tassillo, and those entities

24 essentially own virtually 100 percent of MindGeek S.A.R.L.

25 if you look down to MindGeek Holdings, and the MindGeek

68

1   S.A.R.L., there's a very small interest that's held by RK
2   Holdings, which flows down to MindGeek RK S.A.R.L. and then
3   to the various operating subsidiaries.
4           Included in those operating subsidiaries at the
5   bottom are MindGeek Freesites, which is Pornhub.  The
6   Court's well versed in --
7           THE COURT:  Hold on.  Where are you?  I've lost
8   you.
9           MS. TABAKSBLAT:  Sure.  So, if you go down to
10  licensing, underneath licensing are another set of holding
11  companies, and underneath those holding companies are
12  various LTD's, and included in those LTD's are, as relevant
13  to this -- to this --
14          THE COURT:  Are we on the lefthand side?
15          MS. TABAKSBLAT:  We're on the right hand.  We're
16  sort of -- we're in the middle -- is MindGeek Freesites,
17  LTD.  Do you see that, your Honor?  It's -- it's the second
18  row from the bottom, smack in the middle of the chart.
19          THE COURT:  Yep.  Got it.
20          MS. TABAKSBLAT:  Okay.  And if you look up a
21  little bit to the right is MindGeek Premium, LTD, which is
22  another Defendant in this case that had been previously
23  contesting jurisdiction but is no longer contesting
24  jurisdiction.
25          THE COURT:  Okay.

69

1              MS. TABAKSBLAT:  And then all the way to the right
2    is 9279 and 9219, which are the management companies which
3    we talked about which were discussed a little bit earlier
4    today.

5              MindGeek has produced consolidated financial
6    statements for the parent company, Defendant MindGeek
7    S.A.R.L. Luxembourg, which is at the top.  And they've also
8    produced unaudited financial statements for FreeSites and
9    Premium.  And what those financial statements show, your
10   Honor -- and this has been discussed at -- in briefing and
11   in prior hearings is that those -- these operating companies
12   generate approximately $500 million a year.  But what they
13   also show is that by the time you get up to the consolidated
14   MindGeek S.A.R.L., there's virtually no money left.  In
15   fact, many years there's negative money.

16             And, essentially, the question is where does the
17   money go.  That's what Judge Carney is -- that's what Judge
18   Carney asked, and that's what we're trying to -- to figure
19   out.  So, we've gone through the documents that they've
20   produced, and let me walk you through what we've pieced
21   together based on what we believe to be an incomplete set of
22   data.

23             It appears that -- it appears that the economics
24   are being played completely inconsistently with sort of this
25   ownership structure on the right, and they're actually being

70

1  paid through RT Holdings, S.A.R.L., which is on the left.

2  Just give me one second.  So -- and this happens

3  through a shareholder agreement among the various

4  shareholders at the top, CogInvest, Acausu (phonetic), RK

5  Holdings, 9288-1259, and 9288-1275, which the Defendants

6  have produced in this case.  It's entirely unclear to us why

7  these entities at the top, CogInvest, Acausu, and RK

8  Holdings, are being distributed the revenue from these

9  entities on the right for which they actually hold no

10  ownership interest.  The only possible -- so -- and, so, the

11  only description or discussion of how these dividends are

12  being paid and how this revenue is ultimately being

13  distributed is this dividend spreadsheet or this

14  distribution spreadsheet that you've heard a lot of

15  discussion about this morning.  The Defendants -- individual

16  Defendants all got up here, and they said to the Court,

17  MindGeek has all these records, and MindGeek has provided

18  all this information.

19  What MindGeek has actually produced to us is a

20  spreadsheet which I'm going to hold up in the format I've

21  printed it, but it's -- each page reflects one year of

22  distributions.  And, so, it's a summary of the distributions

23  that are made to various entities each year.  It's not any

24  underlying data.  It's something that -- that the Defendants

25  prepared either for purposes of this litigation -- the

71

metadata shows it was just produced in the last year or so, and for each year, there's a series of distributions.

What's more, I think, compelling than what this -- you know, than -- I think the most important takeaways from what this actually shows is that it doesn't reflect any dividends from any of these entities on the right side of the chart to RT Holdings. So, we have no idea how the money gets from the operating entities through all these entities on the right side of the chart to RT Holdings. But what it does show is that there are significant distributions from RT Holdings to CogInvest, Acausu and RK Holdings. So, the first obviously central question is how does the money get from the right side to the left side, and what's the formula, what's the distribution, how is it calculated each year. And, by the way, how do we know these numbers are real numbers? They're just numbers that counsel put together or somebody put together. We need the underlying data to corroborate what these numbers are, if these are the actual distributions, and what the relationships are through which these are -- it's distributed from the right side to the left side.

Now, they also have produced an licensing agreement between licensing IP, which is all the way on the right side, slightly up above the operating entities, and RT Holdings. And, pursuant to that licensing agreement, RT

72

Holdings purchased or was given certain IP and licensing

rights for non-U.S. royalties and licensings.  However, when

you look at the consolidated financials for MindGeek

S.A.R.L., which includes all the various subsidiaries, it

shows that the vast majority of the IPN licensing is

actually being generated in the U.S.  It's broken down by

region.  And, so, we have zero understanding of what these

payments are to RT Holdings, and it seems completely

inconsistent with the terms of the licensing agreement and

the corporate structure that we have.

        That's one example, your Honor, of sort of just

the complete dearth of information as to where the -- how

the revenue flows through these various entities, how it

moves from the right side -- from the -- from the right side

of the chart to the left side of the chart.  You would think

the money would flow all the way up to MindGeek S.A.R.L.,

and, so, it would then be distributed consistent with this

-- with this chart, but what the financials that they've

actually produced show is that the money flows -- by the

time it gets up to --

    (Pause for background noise.)

        THE COURT:  Let it run its course before you

speak.  Okay.  We have no idea.  If you weren't here last

time, we have no idea why that happens.  It just

periodically happens.

73

1          MS. TABAKSBLAT:  It must be us.

2          THE COURT:  It's happened in other hearings

3   without you guys here.  So, it's not you.

4          MS. TABAKSBLAT:  Not us.

5          THE COURT:  It's me.

6          MS. TABAKSBLAT:  I'm sure that's not the case.

7          So, we need to understand how the money gets from

8   the right side to the left side.  Again, the Andrew

9   declaration --

10       (Pause for background noise.)

11         THE COURT:  Maybe if you put it in your briefcase

12  just on the off chance.  I've got mine in my pocket.  Could

13  be mine as well, but -- okay.

14         MS. TABAKSBLAT:  Again, the Andrew declaration

15  talks about how all related party transactions, there's

16  transfer pricing.  We do not have a transfer pricing

17  analysis between any of the entities on the right side and

18  RT Holdings.  And, as I said, we have zero documents

19  reflecting the formula or description or discussion of what

20  moneys are paid, how they're paid, and all we do -- and no

21  understanding of how it gets paid other than to see that

22  there are distributions that are flowing from RT Holdings

23  and that ultimately the distributions are consistent with

24  Defendant Bergmair having a 50 percent interest as he said

25  in sworn testimony and in his interrogatory responses.  But

74

1   Mr. Bergmair I don't think contests that he holds no

2   interest in 9288-1275, 9288-1259 or MindGeek S.A.R.L., which

3   are the ultimate owners of the operating companies.  And,

4   so, how he gets his distribution is something that's

5   entirely unknown to us from the documents that have been

6   produced.  I think I just explained the gaps.

7           I'll just give you two or three other examples of

8   major holes in terms of understanding how the money flows

9   and who owns the company.  In addition to the royalty and IP

10  expenses, which is a big bucket of the expenses that are

11  paid out from the revenue that's generated, there's a

12  management fee, and that management fee is approximately

13  $100 million a year that's paid.  They're paid to the

14  Canadian subsidiary run by Mr. Antoon and Mr. Tassillo,

15  which is 9279-2738 and 9219-1558.  From the documents we

16  have, we understand that the hold a preferred share in that

17  entity, and ultimately what we don't understand and which

18  there's no files or explanation or documents from Grant

19  Thornton or other financial advisors explaining how all this

20  -- how these entities are set up and run is -- is why that

21  money is being accounted for as an expense when ultimately

22  these are all wholly owned subsidiaries that are all rolling

23  up into this entity, and how this money is getting paid out

24  to 9279, which is owned by the same beneficial owners but

25  then not making its way up the chart.  It's getting siphoned

75

 1  off at that point.

 2          It's also the payment and the dividend summary

 3  that's given to us is completely inconsistent.  When you

 4  look at the percentages that are paid to Mr. Antoon and Mr.

 5  Tassillo, they're not getting paid 100 percent of those

 6  revenues or even a fraction of that.  They're getting paid a

 7  smaller percent, consistent with Mr. Bergmair's 50 percent

 8  stated interest in the company.  So, again, we need to

 9  understand where that 100 million dollars is going to and

10  how that's being accounted for.

11          There's also -- I'll give you one more example or

12  two more, if you'll indulge me.  There's about $100 million

13  that's being paid in hosting fees to a company called

14  Reflected Networks.  There is an agreement that's -- has

15  been provided -- or between MindGeek and Reflected Networks.

16  Reflected Networks is an entity that's based in

17  Massachusetts.  It's not listed as a MindGeek subsidiary.

18  It appears from the executives and the board members that

19  are -- of Reflected Networks that it is a related entity,

20  and we know that in a shareholder agreement that I referred

21  to earlier between CogInvest, Acausu, RK Holdings, and the

22  two 9288 entities owned by Defendants Antoon and Tassillo,

23  that there's an obligation to pay Mr. Bernd Bergmair to

24  provide services, so hosting and other types of hosting

25  services.  And, so, we suspect that this is a company that's

76

either owned by him or one of the groups that he owns.
Again, we don't have transfer pricing or any types of
understanding of how all of that's priced and -- and what
the basis for that -- for those payments are.

        Finally, you know, we have the loan -- we have
some documents that have been produced in connection with
the 2013 restructure and the purchase of the prior owners
where Mr. Bergmair and his investor groups come in.  There
was a large loan in connection with that transfer.  We have
no understanding of which entities are paying the loan,
which payments are -- are going towards paying this loan,
how all this is calculated.  In certain other instances,
there are additional loans that it appears to be that are
being taken out to purchase other related entities.  Again,
this is all consistent with the allegations in the
complaint, that they created these shell companies to pay
themselves, and the documents that they've produced reflect
this.  But we're missing (a) the key underlying information.
So, we have this summary information that they've provided
or we have some high-level contracts that establish the
connections of these relationships.  And, so, the way I
would describe it is that we sort of have the structure, but
we don't have the pieces to understand how it actually
works.

        And, so, your Honor, to sort of boil it down into

1    the eight buckets into one or two buckets, I really think

2    we're coming back to what we talked about last time, which

3    is we need their financial system.  They've said and --

4         (Pause for background noise.)

5         MS. TABAKSBLAT:  They've taken the position that

6    they are legitimate corporate entities.  They maintain all

7    the regular corporate forums.  This is not something that

8    would be difficult.  We've -- we got the order from the

9    judge, Judge Carney, last July.  It's now March.  We want to

10   move forward.  It would have been much easier for them to

11   just turn over the documents rather than go ahead and create

12   summary documents for us that show us piecemeal information.

13   They haven't done so.  There's no burden associated with it,

14   and we've demonstrated why the information that they've

15   curated and that they've slowly dribbled to us, and while I

16   don't want to go back and forth about delays and timing, I

17   do think it's important to note that it's only been in

18   response to filing motions that we have been able to get

19   information traditionally, and I'm sure this has been laid

20   out in the briefing, not by us but by Defendants.  The

21   pattern has been we file a motion.  They then, on the day

22   that they're supposed to submit their stipulation, after

23   various meet and confers, agree to produce some documents.

24   they ask us to hold off on the motion.  They then generally

25   produce a few more documents in advance of the hearing.

78

Importantly, this dividend spreadsheet was produced last
week in addition with a number -- a handful of other
documents.

And, so, we don't want to come back, and we don't
want to keep burdening the Court.  And, more importantly, we
don't want to extend discovery.  We want to be able to
answer Judge Carney's question, give him the information
he's looking for, and move on, figure out who the correct
parties are in this case, and litigate the case against
those parties.

And, so, we need the financial information.  We
think the system is the -- is the fastest way to get it, but
specifically what we're looking for is the revenues received
by the operating company, the disbursements or the payments,
distributions and intercompany credits, the licensing and
royalty payments that I just talked about, the loan proceeds
or the use of those loan proceeds, which entities are paying
them.

(Pause for background noise.)

THE COURT:  Before loan proceeds, you said?

(Pause.)

MS. TABAKSBLAT:  Which entities are paying them,
where the money's going from and how they're being used.

THE COURT:  No.  I'm sorry.  What was your
category before loan proceeds?

79

1            MS. TABAKSBLAT:  Licensing and royalty payments.

2            THE COURT:  Thank you.

3            MS. TABAKSBLAT:  The intercompany transfers and

4    services, so how much money is being transferred to related

5    entities and also, as the Andrew declaration sets forth,

6    this is all subject to transfer pricing.  I can represent to

7    the Court there's no transfer pricing that's been provided

8    between any licensing IP and RT Holdings.  And, so, we -- if

9    it's there, then we think we're entitled to it, particularly

10   since they put forth in a declaration before the Court.

11           We're looking for the source materials for the

12   distribution spreadsheet they provided and to understand

13   were these distributions actually made and, more

14   importantly, how were they calculated.

15           Financial -- financial presentations or summaries,

16   these are obviously very sophisticated entities.  The

17   Defendants I believe also last week for the first time

18   produced a step memo that was prepared by Grant Thornton in

19   connection with the 2013 restructuring.  It literally goes

20   through the different steps of all these different entities.

21   The conclusion of that presentation is two separate charts,

22   one that says corporate structure and one that says economic

23   structure.  Purportedly, that's the structure for these

24   entities.  Whether or not these entities operated pursuant

25   to that structure, we have zero idea.  So, presentations

80

1  that show, again, the formulas for how these distributions

2  were made, what the relationship is between these entities,

3  what the purpose of it is.

4          And then I think that -- and then the minority

5  owners.  So, you know, how -- again, I think this all

6  relates to things that we've already talked about, but how

7  these -- who holds these interests in CogInvest and Acausu,

8  how all of that is distributed through RT Holdings, and why.

9          And, so, you know, ultimately it's some different

10  buckets, but I think it all roles up into the financial

11  system that we asked for in January and which we're in front

12  of the Court asking for again today.

13          THE COURT:  All right.

14          MS. TABAKSBLAT:  I'll just say one last thing,

15  your Honor, which is it's very possible that either Ms.

16  Massey or Ms. Yeary might get up here and explain to me that

17  everything I just explained to you with respect to the

18  corporate chart is wrong.  And that may very well be the

19  case, but what we've done is we've literally spent hundreds

20  of hours between us and experts pouring through the

21  documents that have been provided to us, and this is what we

22  ascertain based on what -- what we have.

23          Now, to the extent that there's a different

24  picture, we don't have those documents to show that, and,

25  so, that's what we need.  We need to understand what that

81

1  picture looks like so that we can present it and the

2  Defendants can present their picture to Judge Carney and

3  then we can answer that central question from the Court.

4          So, if the Court doesn't have any further

5  questions, I will sit down.

6          THE COURT:  No questions.  Thank you.

7          MS. TABAKSBLAT:  Thank you.

8          MS. MASSEY:  Good afternoon, your Honor.  Kathleen

9  Massey.  I'm going to make a few introductory comments, and

10 then I'm going to turn the mic over to my colleague,

11 Michelle Yeary, to address the eight buckets, which is what

12 we understood was at issue before the Court today.

13         I do want to just recenter the discussion on what

14 we're supposed to be paying attention to here, which is what

15 are the jurisdictional contacts of the entity challenging

16 jurisdiction.  We informed Plaintiff that MG Premium is no

17 longer challenging jurisdiction.  It's only MindGeek

18 S.A.R.L., the -- the holding company.

19         So, the question is does Plaintiff's injury arise

20 out of or relate to the form related contacts of MindGeek

21 S.A.R.L.  That's one thing.  And then the other area is can

22 Plaintiff establish jurisdiction through her alter ego

23 theory.  And, so, can she attribute the contacts of entities

24 who aren't challenging jurisdiction to the entity or the

25 individuals who are challenging jurisdiction.

82

1          And, to conduct that analysis, there's no dispute

2    the Plaintiff has to show that there was pervasive control

3    over the various entities such that the individual entities'

4    separate identities ceased to exist, that there was

5    commingling of assets and funds, that there was a lack of

6    corporate formality, and that it would be inequitable to

7    respect the corporate forms.

8          Judge Carney also wanted information about who

9    owns Pornhub and where do the funds flow.  We heard from Mr.

10   Stein.  We just heard from MS. Tabaksblat that MindGeek

11   produced a spreadsheet of dividends, and the Plaintiff has

12   no backup for that.  That is not true.

13         When I was here last time, your Honor, I

14   represented to you, and it's -- it's as true or more true

15   today than it was then, that the MindGeek entity Defendants

16   have produced all sorts of documents about the dividends

17   that were issued by each of the Defendants and by their

18   owners up the chain.  So, the Plaintiff has not only the

19   organizational documents to show that each of the Defendants

20   and the entities of the chain are appropriately formed, that

21   there are distinct corporate entities, but also that they --

22   they observe corporate formalities.  There were board

23   meetings.  There were resolutions.  There were declarations

24   about the dividends that went up the chain.

25         Plaintiff also has extensive financial

1  information, group financials for not only each of the

2  Defendants but also each of the entities up the chain and

3  even entities that have nothing whatsoever to do with the

4  tubes business.  From those documents, the documents can

5  also see where the money is flowing.  If there's any doubt,

6  there's audited financials.  MindGeek had Grand Thornton, as

7  you know, your Honor, auditing the company.  And, so, it's

8  not like this is a fly-by-night company with no corporate

9  formation, with no board meetings, resolutions, audited

10  financials.  We're talking about a well run, well documented

11  business, and if Plaintiff can't find information in those

12  documents about dividends and where the money flow, they can

13  raise that with the judge.  But, your Honor, we have

14  provided all conceivable documents relating to that issue.

15          Now, the Plaintiff argues that this sheet of

16  dividends appears to be, you know, created for the purposes

17  of this litigation.  In fact, it's a printout from

18  MindGeek's electronic system.  And, so, when the Plaintiff

19  says, "We want everything from MindGeek's electronic

20  system," they've got that on the relative points -- the

21  relevant points, in this case, dividends.  But they also

22  have information from the electronic system on related party

23  payments and -- and the like.  So, we've given the

24  documents, your Honor, on the relevant factors.  Ms. Yeary's

25  going to go through the eight buckets, which don't

84

1  necessarily correlate to what the Plaintiff has just

2  described, but we'll do the best we can to address those

3  issues.

4          In terms of the organization, MindGeek S.A.R.L.,

5  you know, is at the top, the holding company, as we've said.

6  There is a right -- there is a right side of the business

7  which includes the tubes entities, and the funds flow up

8  that side.  But -- but Ms. Tabaksblat is not correct in

9  saying that the MindGeek entity Defendants have failed to

10 provide information about how the money flows over to RT

11 Holding.  In fact, we have provided the licensing agreements

12 that show who owns the IP, who pays the IP, and the like,

13 and through those licensing agreements, the royalties flow

14 and licensing fees for the non-U.S. sales flow through MGX

15 U.S. Holding, which is under RT Holding and into RT Holding.

16 And from there, the money flows upward.

17         There are transfer pricing studies, your Honor,

18 performed by Grand Thornton on the licensing fees.  So, it's

19 not correct that there are no transfer pricing studies that

20 just -- that support the payment of these fees.  And,

21 ultimately, your Honor, as the Plaintiff recognized, there

22 is a shareholder agreement, and the shareholders of the

23 company agreed about who has what percentage economic

24 interest, and the funds flow to them in accordance with the

25 terms of the shareholder agreement, and -- and, ultimately,

85

1   insofar as that agreement provides, in accordance with the

2   parties' respective economic interests.

3           There's no evidence whatsoever of money being

4   dissipated or disbursed out of the company in -- in anyway

5   that's undocumented.  And, your Honor, at the end of our

6   arguments last time we were here, you said to the parties

7   that we both faced risk, as a means, I assume, of

8   encouraging us to negotiate and resolve certain issues.  You

9   said in some cases an analysis of where money flows can

10  involve forensic accounting.

11          We don't need that here, your Honor, because

12  MindGeek has provided extensive information.  And the

13  request for information from -- more information from the

14  accounting system is -- is not going to satisfy what -- what

15  Plaintiffs are asking for.  We've provided all kinds of

16  backup and information, and if -- if more just raw

17  information comes out, you know we're going to be back here

18  with more arguments about where did the money go, why was

19  this, who's this.  And, just as one example, counsel raises

20  Reflected, the entity with which MG Premium has a contract

21  for hosting services.  And I heard for the first time that

22  it appears that Reflected is a related party.

23          We have no information to support that.  If

24  Plaintiff does, we're happy to consider it, but our

25  understanding is that it's a third party that MindGeek does

86

1  not own or control, and we've provided the contract for

2  that.

3         In terms of money paid to Mr. Bergmair for

4  services and they suspect that there's an entity, maybe

5  Reflected, maybe another entity co-owned by him, in the

6  shareholder agreement, there is a reference to an entity

7  owned by Mr. Bergmair that provides certain services, and

8  money was paid to that entity.  We provided Plaintiff with

9  information about that, and there is some additional amount

10 of information that we just don't have yet, but we will have

11 additional funds paid.

12        So, we provided ample disclosure about related

13 party transactions and the funds that were paid to related

14 parties.

15        So, in terms of proportionality, your Honor, we

16 need to look at the elements, and we need to look at what

17 was produced already and whether the production of

18 additional material really adds anything significant

19 relative to the burden.

20        So, with that, I'll turn it over to Ms. Yeary.

21        THE COURT:  Okay.

22        MS. YEARY:  Good afternoon, your Honor.  Michelle

23 Yeary, also for the MindGeek entity Defendants.  And it's a

24 little confusing at this point because I think we just got a

25 completely new list of things that the Plaintiffs are

87

1   seeking.  We focused on the specific eight requests, and

2   their motion says they're asking for a motion to compel

3   these eight buckets.  So, that's how we approached our

4   response and what we've done to date.

5          Now, this is the same thing that happened the last

6   time we were here and there was a new whole list of things

7   that they wanted at that point in time that weren't part of

8   the motion.  Now we're here again, and we have another whole

9   list that's disconnected from the actual motion request

10  itself.  But I will endeavor to go through the -- the eight

11  buckets.

12         So, the first one are all the documents about the

13  corporate ownership transactions.  We have produced complete

14  sets of every transactional document for the entire 2013

15  reorganization and for the entire 2018 reorganization, for

16  the NBO that happened at the same time, for the 2013

17  refinancing that happened, and for the 2018 refinancing that

18  happened.

19         When we were here last time, Mr. Stein said,

20  "Where are the deal binders?"  They now have every document

21  in the deal binders.  There are no -- no additional

22  documents.

23         Bucket number one also says they want the bylaws

24  of -- I think they used "the relevant entities."  We've

25  produced the bylaws of every named Defendant as well as RT

88

Holding, to the extent they exist as bylaws.  Not every country requires the same thing.  So, when I say bylaws, we gave articles of incorporation, corporate filing documents. If they don't have bylaws but they're required to have articles of association or whatever it is, we provided all the corporate form documents.

If there's any other entity that they want to make a specific request about, we're happy to entertain it, but we don't understand what this could be when we've produced everything for the Defendants plus the other entity they specifically asked for, being RT.  So, we consider that bucket to be moot because we've produced everything.

The next category is due diligence presentation -- due diligence or presentations for any types of transactions.  This is one that's not related to any alter ego category.  This is the definition of a fishing expedition.  Let's see if there's anything out there, any presentation you ever made, any due diligence you ever put together for any purported transaction for over seven years' period of time and see if there's anything in there that remotely touches on the corporate structure.  That's not an appropriate discovery request at this time, which I have to just reiterate, when we're talking about burden and proportionality here, we're talking about at a time in the case when the Defendants have not been determined to even be

89

 1  properly before the Court.  So, that needs to be factored

 2  into the proportionality analysis.

 3          That being said, we did go and look for what we

 4  did produce.  They wanted presentations to third parties.

 5  The financial reporting packages that we produced, the

 6  actual physical ones that we produced, are the packages of

 7  financial information that are shared with third parties and

 8  outside investors, lenders, et cetera.  They exist.  We

 9  produced them.

10          They asked for, again, presentations.  When

11  information is presented to third parties about the flow of

12  money in the companies and to the different types of

13  companies and levels, there's a summary document that the

14  company specifically uses to share that information with

15  third parties.  We produced it.

16          We also went back and searched for other documents

17  that would have been made to share information in that

18  situation for transactional purposes or for lending

19  purposes, and we found the company created things called

20  confidential information memoranda.  We produced those.

21  They have levels of information about how the businesses

22  were, who runs which businesses.  It has policy information

23  in it.  It answers a whole host of questions that the

24  Plaintiffs have raised.

25          So, again, we've produced what we were able to

90

find that could be potentially responsive to that bucket.
The next bucket is they want summaries and abstracts of the
deal documents, the org charts and explanations of the
ownership.

Well, as you've seen, we've already provided the
org charts, and we provided them for every year.  The
summaries and abstracts, again, the confidential information
memorandum had summaries.  The flowchart had summaries.
We've provided what we have.

What they asked for was every single transactional
document so that they could test and -- and look at what are
all the pieces that make up the organizational structure.
So, we gave them everything.  Now they want to know beyond
that do you also have summaries.  We looked for what we
could find, and we produced what we had.

The next bucket is the corporate and management
infrastructure.  As to this one, we believe your Honor has
already ruled.  When we were here last time, Plaintiffs
wanted the infrastructure of the IT systems for MindGeek.
Your Honor determined that that was not proportional to the
jurisdictional analysis.  They've now asked for the
infrastructure, the corporate management infrastructure, for
every other business entity or activity in the MindGeek
business, accounting, finance, everything.  So, we believe
that -- like I said, that you've already ruled on that.

91

1          I would also say nowhere in Judge Carney's order
2   is the word "infrastructure".  There's nothing about
3   infrastructure.  In fact, the operation of the tube sites is
4   not in disputes.  If you look at Judge Carney's ruling, he
5   says, MindGeek has told us who operates the Tube sites.  We
6   know who that is.  We know who those entities are.  What I
7   want to know is about control.  Are there other entities
8   that exercise control?

9          So, the operation is not in dispute, and it's not
10  on the table, and discovery to that point would be not
11  proportional.

12         I believe that category also included server
13  information yet again.  Your Honor ruled that we had to
14  produce that by February 24th, and we did.

15         Those were the -- the five buckets I think that
16  were under the structure section.  Then there are three
17  buckets under the finance section.  The first one, who pays
18  the employees and what expenses are paid?

19         Well, who pays the employees, again, was already
20  ruled on by your Honor the last time we were here.  We were
21  ordered to produce and have produced the employees by job
22  title, which entity they worked for, when they were
23  employed, their dates of employment, and their location.
24  You asked for location.  We provided for all those who live
25  outside the U.S.  We provided their country of where they

92

live, and for the two that we produced for inside the U.S.,
we produced their state.  So, again, that's already been
handled.

With respect to expenses, we have produced -- the
-- the amount of financial information we have produced is
staggering.  But, in addition to the external financial
reporting packages that I said were used to make
presentations, we produced the internal financial reporting
packages that are used to make information available to
senior executives, and those have the profit and loss
statements.  They have the balance sheets.  The profit and
loss statements contain things like server costs, rent,
payroll, any number of expenses.  And it has it divided down
at the business unit level, and it has it divided even down
to the website level.  So, how much rent or payroll or
anything that was attributed to Pornhub versus another Tube
site is on the documents that we've provided.

And I believe there was a comment that we've
produced audited financials for the consolidated entity but
not for anybody else.  The financial reporting packages, the
external ones, are a set from audited.  They have Grant
Thornton's notes in them, the financial notes, and we
produce audited financials for both MG Freesites and MG
Premium, as well as a few of the other entities.  So, it's
not the case that there's only one set of audited

93

financials.  Any company that was required to have audited

financials by that country's (sic) state of incorporation or

country of incorporation, we've produced those.

And, again, for who's paying what, the licensing

agreements, the server agreements, the server cost

agreements, all of them show who had the -- the requirement

to provide the service, to whom it was being provided.  The

transfer pricing studies detail this in minute detail.  The

transfer pricing studies are 375-some pages long and go into

great detail about every service that is provided between

the different entities, and it goes through and explains how

they determine how much to charge for those services so that

they can be equivalent to non -- to non-related parties, so

they can be equivalent to arm's-level transactions.  Those

were prepared by Grant Thornton and detail all of that.

The next one is the -- the accounting systems,

which I think is the only one that we've outright objected

to.  Ms. Massey said that they showed you as printout from

the dividends.  It's not a created document.  None of the

printouts that we've produced of payments and expenses and

royalties or anything else are created documents.  They are

documents that we asked the company, Can you give us from

your financial accounting --

    (Pause for background noise.)

        THE COURT:  Thank you.

94

MS. YEARY: -- the answer to this question, who paid the dividends and who were they paid to, who paid the expenses and who were they paid to, who paid the royalties, who were they paid to, and they printed those out from the financial accounting system.

So, this notion that we're not giving them information from the accounting system is just wrong. But the request as it's stated in their papers is basically unfettered access to every entry in the accounting system that underlines every entry in every profit and loss statement and every balance sheet for seven years.

Now, the dividends generated, I don't know how many pages that document was that she held up, but we'd probably have to back a truck in to come up with every entry like they're asking for and entries that are completely irrelevant to anything that's in dispute at this point in the case.

More reasonable requests are can you show us the -- the royalty payments and how they were paid and where they came from. We can go to the company and generate that. We have. Related party transactions, can you show us the actual contracts for the related party transactions? We did. Can you show us the payments for the related party transactions? Sure. We've got it printed out from the financial accounting system.

95

1          So, tailored requests that are focused on the

2   issues about where the money went on specific things that

3   they want to know, we can address those in a reasonable

4   fashion.

5          Financial reports, we've already said they want

6   the financial reports for senior executives, produced them,

7   third parties, produced them.  We have nothing else to

8   produce as far as that's concerned.

9          And the last one had to do with -- it was a very

10  generic request about anything sort of in the declaration

11  that we put in by Mr. Andrayu (phonetic) with the motion to

12  dismiss, but specifically it said reorganization,

13  intercompany transactions, related party transactions, and

14  transfer pricing studies.  All of it's been produced.  Like

15  I said in the beginning, the full set of transactional

16  documents have been produced.  The service agreements

17  between all of the entities that are at issue with the Tube

18  sites have been produced.  The related party transactions,

19  the actual transactions and the payments have been produced.

20  The third party transfer pricing studies for all of the

21  entities at issue have been produced.

22          So, we're left with at the end of the day a

23  completely open ended request for us to just do a complete

24  data dump I guess of every ledger for every company in the

25  entire MindGeek group, and that's just not reasonable at

96

1  this point in time.  And I think, frankly, it would beg many

2  more questions than if we got actual requests like we've

3  produced to date for information specific requests out of

4  the system, because then we could say this is a report from

5  this subledger that gives you this information, which is how

6  I've worded all of that in the production letters that I

7  write to send them the information.  I say this came from

8  our financial accounting system.  That's how it's worded.

9        So, I think that addresses all of the buckets.

10  The only thing that I wanted to take a minute to add was

11  that when Mr. Stein was up here, he asked the Court to enter

12  an order compelling the Defendants to run and produce from

13  the search terms that they've sent us.  Not unsurprisingly,

14  we got the same list of 280 search terms.  We got that last

15  week.  In addition to getting it for 280 search terms,

16  they've asked the MindGeek entity Defendants to run them

17  against 300 custodians, not the three individual Defendants

18  who were at issue, whose direction of policies and

19  procedures are at issue, but 300 Defendants.

20        So, I just want to be 100 percent clear that we

21  are in a completely different category of burden when it

22  comes to what they're asking for from the MindGeek

23  Defendants, and we are currently trying to undertake running

24  those search terms and the information we have, seeing how

25  burdensome they are, and seeing if we can even come up with

97

1 a plan that would negotiate down from there.

2        Unfortunately, they've already made this the

3 subject of their third motion to compel which will be filed

4 today without us getting a lot of time to discuss that with

5 them.  But I can tell you that the terms, just running them

6 against the three individuals, led to over 300,000 documents

7 just in three individuals, and they include way more than

8 CSAM policies.  I will give you just one example.  They

9 asked us to run, untethered to any other thing, every stand-

10 alone reference to 5WPR.  5WPR is a public relations firm

11 that was hired by MindGeek.  That term alone generated

12 70,000 hits.  So, the -- the burden that we're talking about

13 would be astronomical.  So, if there's any confusion about

14 where we are in relationship to these search terms, it's not

15 in the same bucket as running them against personal email.

16        THE COURT:  Thank you.

17        MS. TABAKSBLAT:  Just briefly, your Honor.  So,

18 really quick, to the extent that there's a suggestion that

19 our requests keep morphing, that's actually not true.  And,

20 if anything, I think our -- what we've limited is the eight

21 buckets to three buckets at this point, and the reason for

22 that is, as I described before when I was up after we filed

23 our motion, there was a series of documents that were

24 produced right before their joint stipulation, and then

25 there was a series of documents that were produced on

98

1  Friday.  So, I tailored what we're asking for to not burden

2  the Court with things that had been produced since then.

3  Everything that I've walked through I would argue is

4  encompassed within the documents reflecting which MindGeek

5  entities employed and paid the management and personnel

6  operating the business and the costs associated with that

7  business, the financial reports prepared for and associated

8  information given to senior management, directors, or their

9  equivalent lenders, and the accounting system, which we

10  talked about.

11          THE COURT:  If I was to ask you to back that up

12  and you said -- or which buckets do you believe are still

13  remaining, if we could go back to that original -- if that's

14  even possible with those --

15          MS. TABAKSBLAT:  Sure.

16          THE COURT:  -- that you gave me.

17          MS. TABAKSBLAT:  Your Honor, I would say there's

18  essentially two or three buckets really that are left.  One

19  is the accounting system, and it actually -- from what Ms.

20  Yeary said, if I'm not misinterpreting what she's saying,

21  she's not disagreeing with me.  She's saying -- well, so,

22  first of all, I counted.  I think this is a seven-page

23  spreadsheet.  It's one page for each year that was the

24  relevant period.

25          What she's telling you is that it would be

99

1    truckloads of documents to back this up.  But what she did

2    say is, Well, I can -- I can ask for a report of the royalty

3    payments.  I can ask for a report of the dividends.  I can

4    ask for a report of the revenue.  I mean, that's exactly

5    what I just walked through the Court before I sat down of

6    what specific information I'm looking for for the accounting

7    system.  So, we're not asking -- you know, I think the

8    easiest way to do at this point is given how difficult it

9    has been to get any information -- and, again, there has

10   been information that's been produced.  It's always in

11   response to a motion and always in response to a set court

12   hearing, but it's all in that accounting system that falls

13   into that bucket.  It's the revenues.  It's the

14   disbursements.  It's the licensing and royalty payments.

15   It's the intercompany transfers.  That's the central core of

16   what we're asking for, and that's all in the accounting

17   system.

18            We're looking -- both Ms. Massey and Ms. Yeary

19   talked about third party transfer analyses.  I don't have a

20   third party transfer analysis for MGX -- sorry.  I don't

21   have my org chart -- or RT Holdings.  If there is one, I'd

22   like it.  I do have a agreement.  It doesn't show the

23   formulas of how it's paid.  It also doesn't back up in any

24   way what amounts are paid each year pursuant to those

25   formulas.  I lack that information.  It's likely in the

100

1 accounting system.  That's something we think is highly

2 critical to understand where the money -- how the money

3 flowed, where it went.

4         So, that intercompany related party transactions,

5 the transfer pricing and the backup for those payments that

6 are made, that would be the third bucket.  And to the extent

7 that there are, you know, summary documents explaining how

8 all of this worked, how these structures and these related

9 entities relate to each other, that would be the final

10 bucket.  So, the eight buckets and everything that I just

11 walked through are subsumed within three buckets that we've

12 now narrowed based on documents that we've gotten to date.

13         Unless the Court has anything further --

14         THE COURT:  I don't.  Thank you.

15         MS. TABAKSBLAT:  Thank you.

16         THE COURT:  All right.  Let's take a break, and I

17 will come back with you.

18     (Proceedings recessed briefly.)

19         THE COURT:  All right.  Thanks, everyone.  Have a

20 seat.

21         Okay.  This is what we're going to do.  With

22 regard to -- let's start backwards.  With regard to the

23 eight buckets of discovery served on the entity, okay, I

24 believe that Plaintiff has a serious proportionality

25 problem.  I am not going to give you access to their entire

101

accounting system.  However, I do believe that there is a

significant -- or a decent amount -- let me say that better

-- of financial data that you are still seeking that I

believe you are entitled to and that you -- that I would

award if the requests were drafted differently, because I

feel like not only I have a problem trying to track what it

is precisely Plaintiff wants, I can completely understand

why Defendants have a hard time with it.

However, I think that this corporate structure

makes it really easy for information to be, at a minimum,

difficult to understand and potentially obfuscated, if I'm

saying that correctly, and forgive me.  And I'm not saying

that counsel or the parties are purposely doing that.  But,

nevertheless, the corporate structure just kind of makes

that possible.

And, so, I do believe that the Defendants need to

produce additional information and that that additional

information would be responsive to their requests, but I

think their requests are overbroad.

I also believe that the Defendants did not provide

detailed evidence of what the burden would be that would

support a burden objection.  So, I also heard from Plaintiff

that it sounds like a decent amount of what was originally a

part of the motion has been resolved and that their request

is now more limited.

1          So, as a result of that, I'm ordering the parties
2  to meet and confer.  I expect that Plaintiff will clearly
3  identify -- you know, if you want a printout of the royalty
4  payments and the underlying evidence of those royalty
5  payments and those are reports that can be produced from
6  this accounting system, that that's the kind of thing that
7  you would be very clear that you want and that would be the
8  kind of thing that you would respond to, "Yes, I can do
9  that.  No, I cannot," because I understand that simply
10 saying, Give me access to your accounting system, would be
11 something that as a lawyer I would say heck no to.  Okay.
12         So, that's the kind of meet and confer I'm
13 expecting here, that you can clearly identify for them what
14 these holes are, because I suspect that if you said, I need
15 to understand how this is moving from this entity to this
16 entity and I think that that would be this kind of document,
17 they can respond to that.
18         I think this is the meet and confer that probably
19 should have happened, and maybe to some degree the parties
20 have evolved in their positions.  I don't know.  But this is
21 what needs to happen.  It's -- it's not truly possible for
22 me to rule on this motion in either a grant or a deny in any
23 way that would do justice to either party.
24         And, so, I'm ordering that the parties meet and
25 confer.  Try to identify clearly what you want and need.

103

1  Try to respond clearly about what you can and will be

2  producing.  I will leave it up to you to determine time

3  frame for production.  I just want to know if there remain

4  any requests for production or categories of documents that

5  you are not able to agree to I'm going to request a

6  supplemental briefing explaining if anything remains at

7  issue, what that is, and what is still being sought.  And I

8  hope that by the time that happens, we will truly be at the

9  point where everybody understands what's being asked for and

10  there is just truly a disagreement about whether or not it

11  should be produced.  Okay.

12          I'm going to order that that supplemental brief be

13  filed on March 24th.  That gives you about two weeks to deal

14  with this.  Based on your current discovery cutoff, I think

15  that that makes sense.

16          Now, if some -- if the people who are responsible

17  tell me that you're having a baby or you're going on a

18  vacation and this is not possible, I will revisit that date.

19  Okay.

20          Any questions with regard to the motion to compel

21  the entity Defendant regarding the eight buckets?

22          MS. TABAKSBLAT:  No, your Honor.

23          MS. YEARY:  No, your Honor.

24          THE COURT:  Okay.  Now, with regard to the four

25  motions to compel to the individual Defendants, I'm also

104

1  ordering you guys to meet and confer because what I heard

2  here was that it was the first time that the Defendants have

3  heard the limitations that -- or reasonable limitations that

4  I believe that Mr. Stein stated.  Big picture, I believe

5  that these discovery requests are very overbroad.  I heard

6  the Defendants say that their clients aren't likely to

7  actually have much of the information.  So, the burden

8  objections are not persuasive because if you don't have

9  much, it's not much of a burden to look at, and it's not

10 much of a burden to produce.  And, again, there was no

11 evidence actually supporting the burden objections.

12 Traditionally, I get declarations that say it would take me

13 24 hours to go through the 3,550 documents, and I don't have

14 anything like that here.  All right.

15         But I believe that the Defendants have a right to

16 understand because I think the limitations that Mr. Stein

17 stated in this courtroom generally seemed very reasonable to

18 me.  I understand that this was the first time you heard

19 them.  And, so, you need to have an opportunity to consider

20 them.

21         Now, same thing, I'm going to order that the

22 parties meet and confer, that the Plaintiffs provide what

23 they're actually looking for in -- along the lines of the

24 limitations that Mr. Stein described.  I'm not saying that

25 you have to stick exactly to those, but to the extent that,

1  for example, contact lists to say contacts regarding

2  something very specific, that seems potentially more

3  reasonable to me than all contact lists, like I'm not

4  handing over my cell phone contact lists to you for a

5  specific jurisdiction case.  Okay.

6        Same thing, I'm going to ask that if there remain

7  any categories that remain unresolved, that then I get a

8  supplemental brief, and I want these supplemental briefs to

9  be joint.  That means I want -- you know, just like our

10 joint stipulation, I will leave it up to you guys to

11 determine time frame and how much time you give each other,

12 but I want it filed by the 24th of March, again, hoping that

13 that time frame will allow me to get you a response.  But,

14 again, I -- one thing that I think is missing from the

15 briefing from Plaintiff is explaining to me and to the

16 Defendants how these very broad discovery requests will

17 provide evidence related to jurisdiction.  It can't just be

18 it's jurisdiction.  It can't just be it's context.  I need

19 to know -- we've got, as far as I understand it, five --

20 four individuals and then in the entity situation, one

21 entity that we're trying to establish -- that you're trying

22 to establish jurisdiction over and then how alter ego might

23 work to hold somebody else so it's their contacts, right,

24 and all of the things that the jurisdictional law stands for

25 and how -- so, directly theirs, as well as how somebody

106

1  else's contacts might through an alter ego analysis point to

2  them, but as the motion is currently briefed, neither me or

3  my law clerks can track that.  And I understand why the

4  Defendants argue about it, but I think it's there.  I think

5  there is likely information that the Defendants should be

6  sharing with you, that it's somewhere in there, but I can't

7  figure it out.  Okay.

8         Now, let's talk about -- any questions on that?

9         UNIDENTIFIED SPEAKER:  No, your Honor.

10        THE COURT:  Okay.  Let's talk about that date of

11 March 24th.  I know I'm asking you to do a lot of work in a

12 very short period of time, especially since I'm asking for a

13 joint brief.  Is it possible?

14        UNIDENTIFIED SPEAKER:  Yes, your Honor, from our

15 side, yes.

16        THE COURT:  Counsel?  I've got five counsel here.

17        MS. MASSEY:  It's certainly -- I mean, it's

18 certainly possible from -- from our perspective, but it

19 depends obviously on when we hear from Plaintiffs about the

20 specific categories.

21        THE COURT:  I understand.

22        MS. MASSEY:  The last time we had a bit of a

23 challenge over that, but so long as we --

24        THE COURT:  I understand.

25        MS. MASSEY:  -- can get the categories from

1    Plaintiff, you know -- today we're the 8th.  If we get the

2    categories, you know, by Monday or so, we could certainly

3    look and see what we have and hopefully meet and confer next

4    week and then brief nothing or a very limited set of issues.

5            UNIDENTIFIED SPEAKER:  I'm not sure I'd agree it's

6    the first time it's coming up, but your points are noted,

7    and we will make it very specific very quickly.  Is today

8    Wednesday?  We can do it by Monday.

9            THE COURT:  Okay.  Yes, Gentlemen?

10           UNIDENTIFIED SPEAKER:  Yeah, I -- I think it's

11   going to be challenging but may not be impossible, right.  I

12   know Mr. White has a particular scheduling issue.

13           MR. WHITE:  Your Honor, I guess -- well, the first

14   question was when you said a joint stipulation, do you mean

15   for all four individual Defendants and the Plaintiff?

16           THE COURT:  Since you have four different motions,

17   I think it's fine to keep it separate so that your schedules

18   aren't complicated with the -- you know, let's try to reduce

19   the number of schedules we're implicating.

20           MR. WHITE:  Okay.  I mean, your Honor, I can do my

21   best.  I'm -- I am supposed to be out of town the week of

22   the 20th, which would be the week leading up to the -- I

23   think if we could move it back one more week, that would be

24   helpful, at least for me.

25           THE COURT:  Okay.  And your client is?

108

1           MR. WHITE:  Mr. Bergmair.

2           THE COURT:  Okay.  Thank you.  With regard to Mr.

3  Bergmair, is there any reason why one week later for that

4  brief is a problem?

5           UNIDENTIFIED SPEAKER:  No, I don't think so.

6  Happy to accommodate.  I think we'd like to do the rest on

7  the 24th and his on the 21st.  That's fine.

8           MR. WHITE:  Thank you.

9           UNIDENTIFIED SPEAKER:  Hopefully there are no

10  motions.  So --

11           THE COURT:  Yeah.

12           UNIDENTIFIED SPEAKER:  Look, I think it will be

13  challenging, but we're going to do our utmost.  So, we say

14  leave it on the 24th, and if worse comes to worse, we'll be

15  in touch with the Court, but let's aim for the 24th.

16           THE COURT:  Um-hmm.

17           MS. YEARY:  I think the only thing we'd ask, your

18  Honor, is that we also get that specific list by Monday as

19  well so that that's not just for the MindGeek entity

20  Defendants but for the individuals as well.

21           THE COURT:  Is that possible?  I'm assuming that

22  when you're talking about Monday, you're talking about

23  everybody, is that right?

24           UNIDENTIFIED SPEAKER:  Yes.  And, as long as we're

25  doing this, maybe we could get a response by -- or a

1  scheduled meet and confer by the end of -- by Friday.

2          THE COURT:  So --

3          UNIDENTIFIED SPEAKER:  What I don't want to have

4  happen is we give them a list and then they can't --

5          THE COURT:  That's a good point.

6          UNIDENTIFIED SPEAKER:  -- confer with us until the

7  23rd.

8          THE COURT:  Okay.  So, the list, which, you know,

9  hopefully you're breaking it out by each Defendant, okay --

10          UNIDENTIFIED SPEAKER:  Yes.

11          THE COURT:  -- if that's going to happen on

12  Monday, why couldn't the meet and confer happen by Thursday?

13  Is that possible?

14          MS. MASSEY:  Sure.  We can meet and confer by

15  Thursday.  We will do our utmost --

16          THE COURT:  I mean, I would --

17          MS. MASSEY:  -- to be ready for that, and if

18  there's some issue that we haven't heard back from the

19  client on, then hopefully it will be minor, but we'll do our

20  best to get back for a meet and confer Thursday.

21          UNIDENTIFIED SPEAKER:  Likewise, your Honor.

22          UNIDENTIFIED SPEAKER:  Agreed, your Honor.

23          MS. YEARY:  Same, your Honor.

24          THE COURT:  Okay.  List Monday.  Meet and confer,

25  I'll let you guys pick your time.  I'll let you figure out

110

1  if you're doing it together or separate, but Thursday.

2  Hopefully then it would provide -- you can all get it done

3  on the 24th.  I know I'm asking a lot, but you asked a lot

4  of us.

5          UNIDENTIFIED SPEAKER:  We agree totally, your

6  Honor.

7          THE COURT:  And these are important issues.  I

8  think we all understand that.

9          Anything further?

10          MS. MASSEY:  Your Honor, while we're here, could I

11  just have a word about the Grant Thornton issue that you had

12  issued letters rogatory on a while back?

13          THE COURT:  Before we get to that, I also want to

14  encourage you all to consider my statements here with regard

15  to this amorphous new motion to compel that's being filed

16  that I don't know anything about yet.  But to the extent

17  anything I have said today applies to it, I would ask that

18  you take that into consideration.  Okay.

19          Grant Thornton question, what do you have?

20          MS. MASSEY:  Yes, your Honor.  So, the Plaintiff

21  moved for issuance of letters rogatory.  Letters were issued

22  to four Grant Thornton entities.  Plaintiff asked to

23  substitute one.  That was done.  In at least one of the

24  orders, there's language lacking that was in another.  So,

25  in the order for -- for RCGT, the Quebec Grant Thornton

111

1  entity, there's language to the effect of this letter

2  rogatory shall not require Grant Thornton to do anything

3  inconsistent with the laws of the particular jurisdiction.

4  That language is missing from the Dublin -- the Irish letter

5  rogatory.

6          So, I just wanted to request, your Honor, for --

7  for confirmation that the letters rogatory do not require

8  Grant Thornton to respond to the subpoena in a way that's

9  inconsistent with the law of the particular jurisdiction.

10          THE COURT:  Are you representing Grant Thornton?

11          MS. MASSEY:  No.  I'm representing the MindGeek

12  entity Defendants obviously.

13          THE COURT:  Um-hmm.

14          MS. MASSEY:  But the MindGeek entity Defendants

15  have a concern that Grant Thornton, for example, in Ireland,

16  an ex parte order was obtained requiring Grant Thornton to

17  respond to the letter rogatory everything that Plaintiff is

18  seeking.  Grant Thornton wasn't there for this first order.

19  MindGeek got no notice.

20          The letter rogatory requires of Grant Thornton

21  that it produce documents not only for the Defendants or up

22  the chain, not only for the Tube sites but also for pay

23  sites, also for gaming.  But in Ireland, there -- I

24  understand from MindGeek's counsel there, the principle is

25  that discovery is not allowed unless somebody is testifying

112

1  and -- and the documents are relevant to the testimony in

2  the action.  So, in accordance with that, if there are

3  documents relating to the Defendants or the Tube sites, then

4  that would be consistent with the local law.  But to the

5  extent that there are documents about pay sites, gaming,

6  non-defendants, non-related entities, that would not be

7  relevant to the jurisdictional analysis.  And, so, what --

8  what I am asking the Court is for a clarification that the

9  discovery sought from Grant Thornton relates to the

10  Defendants, their owners, and Tube sites.

11          THE COURT:  Okay.  I don't have a motion in front

12  of me.  Right now everything is hypothetical and unclear.

13  So, I'm not going to say either way.  I'm not going to

14  express an opinion.  The Court's order is what it is.  I

15  suspect that this is an issue for, you know, that

16  jurisdiction there who actually knows what their laws are.

17  If, however, you feel you need to file a motion, I'll allow

18  you -- you know, of course you are allowed to do that.

19          MS. MASSEY:  Okay.

20          THE COURT:  I'm not going to speak exporan -- I

21  think you've ruined me for the day.  That's what it is.

22          UNIDENTIFIED SPEAKER:  Extemporaneously.

23          THE COURT:  Extemporaneously.

24          MS. MASSEY:  I understand, your Honor.

25          THE COURT:  I usually have a decent vocabulary.

113

1   So, it's -- I'm just all --

2            UNIDENTIFIED SPEAKER:  I'm so sorry.

3            MS. MASSEY:  No worries.  One thing at least, the

4   documents that get produced, MindGeek, you know, is -- is a

5   collection of private entities.  Any documents that Grant

6   Thornton produces to the Plaintiff in these various

7   jurisdictions, can we have an agreement or an order that

8   those documents would be subject to the Court's protective

9   order?

10           THE COURT:  I will allow you to speak with

11  counsel.  I don't think this is the kind of thing that I

12  should be ordering or dealing with --

13           MS. MASSEY:  Okay.

14           THE COURT:  -- extemporaneously.  So, I'll leave

15  it at that.

16           MS. MASSEY:  Okay.

17           THE COURT:  All right.

18           MS. MASSEY:  Thank you.

19           THE COURT:  Thank you, everybody.

20           ALL:  Thank you, your Honor.

21       (Proceedings recessed.)

22

23

24

25

114

1      I certify the foregoing is a correct transcript

2  from the electronic sound recording of the proceedings in

3  the above-entitled matter.

4

5  /s/Jordan Keilty                    3/9/2023
   Transcriber                         Date
6
   FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8
   /s/L.L. Francisco
9  L.L. Francisco, President
   Echo Reporting, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25