Michael J. Bowe
(admitted *pro hac vice*)
mbowe@brownrudnick.com
Lauren Tabaksblat
(admitted *pro hac vice*)
ltabaksblat@brownrudnick.com
**BROWN RUDNICK LLP**
7 Times Square
New York, NY 10036
Telephone:   (212) 209-4800
Facsimile:    (212) 209-4801

Attorneys for Plaintiff

Kathleen N. Massey
(admitted *pro hac vice*)
Kathleen.Massey@dechert.com
**Dechert LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Tel: (212) 698-3500
Fax: (212) 698-3599

Attorneys for Defendants MindGeek
Entities

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| SERENA FLEITES, <br><br> Plaintiff, <br><br> v. <br><br> MINDGEEK S.A.R.L.; MG FREESITES, LTD; MINDGEEK USA INCORPORATED; MG PREMIUM LTD.; MG GLOBAL ENTERTAINMENT INC.; 9219-1568 QUEBEC, INC.; BERND BERGMAIR; FERAS ANTOON; DAVID TASSILLO; COREY URMAN; VISA INC.; COLBECK CAPITAL DOES 1-5; BERGMAIR DOES 1-5 <br><br> Defendants. | CASE NO. 2:21-CV-04920-CJC-ADS <br><br> **DISCOVERY DOCUMENT: REFERRED TO MAGISTRATE JUDGE AUTUMN D. SPAETH** <br><br> **JOINT SUPPLEMENT – MOTION TO COMPEL DEFENDANT MINDGEEK ENTITIES' RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES** <br><br> Jurisdictional Discovery Cutoff: May 1, 2023 |

# TABLE OF CONTENTS

I.    PLAINTIFF'S SUPPLEMENTAL BRIEF......................................................4

    A.    MG Freesites and MG Premium Expense Payments to Non-Consolidated Entities ....................................................................4

    B.    Other Ownership Interests in the Consolidated MindGeek Entities..............................................................................................9

    C.    Evidence of Integration, Unity, and Comingling ...........................10

    D.    The 2013 Financial Statements and Compensation.......................12

    E.    Timing of Production......................................................................13

II.   THE MINDGEEK ENTITY DEFENDANTS' SUPPLEMENTAL BRIEFING ...........................................................................................14

III.  CONCLUSION.......................................................................................32

    A.    PLAINTIFF'S CONCLUSION ........................................................32

    B.    MINDGEEK ENTITEY DEFENDANT'S CONCLUSION ...........32

**JOINT SUPPLEMENT PURSUANT TO THE COURT'S MARCH 8, 2023 ORDER**

<u>**JOINT SUPPLEMENT**</u>

## I.   PLAINTIFF'S SUPPLEMENTAL BRIEF

The Court's direction at the last conference was productive.  Plaintiff and the MindGeek Entity Defendants ("MGED") have engaged in an extensive meet and confer process involving multiple conferences, one of which was transcribed (Doyle Decl., Exhibit 16) to permit the parties to fully consider and understand each other's positions for subsequent discussions, multiple emails and correspondence, and an iterative memorandum summarizing the parties' evolving disputes, representations, and agreements up to hours before filing. (Doyle Decl., Exhibit 15).  As a result, the vast majority of issues have been resolved by the MGED agreeing to make substantial additional productions, including emails, or otherwise making written representations sufficient for the Plaintiffs.

What remains open are narrow categories of limited information that are nevertheless critical to the alter ego issue and the specific questions posed for which Judge Carney directed discovery.  These narrow categories of information are as follows:

### A.   MG Freesites and MG Premium Expense Payments to Non-Consolidated Entities

Throughout this case, the MGED have focused myopically on just one of the important variables in the alter ego equation: whether the various consolidated MindGeek entities are operated in an integrated fashion and constitute a unified business as plaintiff alleges, or separately as the MGED argue.  The basic evidence of corporate formalities relevant to this issue was the almost exclusive subject of the MGED's productions until motions to compel began, and after the last rounds of meet and confers that the Court recently directed, the MGED have agreed to produce the remaining elements of necessary discovery on this issue with one exception noted

below.

However, the MGED have absolutely maintained to the moment of this filing that all those corporate documents and financial statements revealing top line profit and loss and cash flow information for MG Freesites ("Freesites"), MG Premium ("Premium"), and MindGeek S.a.r.l. were not just necessary but sufficient for the entire alter ego analysis.  This is not correct.

For example, none of the annual financial statements or any of the other similar financial periodic reporting documents produced by the MGED identify the non-consolidated persons or entities who were paid $100's of millions in expenses that left the consolidated entity each year.  Thus, it is impossible from all these documents individually or collectively to investigate in deposition or otherwise whether any of these $100's of millions in expense payments were to non-consolidated related parties and thus, as alleged in the Amended Complaint, "being bled" out of the company, even though this specific allegation was one of the allegations into which Judge Carney explicitly Ordered discovery. (*See, e.g.,* Doyle Decl., Exhibit 17  (excerpts from 2017 MindGeek S.a.r.l. and Freesites financial statements showing $228 million in expense payments to non-consolidated recipients.))

Nevertheless, despite agreeing since the last Court conference to make substantial additional productions concerning *intra-company* expense payments and allocations in and among MG Freesites and MG Premium and other consolidated affiliates, the MGED still steadfastly refuse to produce even the identities of the payees who received these $100's of millions in expenses.

What plaintiff has requested amounts to a simple historic accounts-payable print-out for specific categories of expenses identified in the MG Freesites and MG Premium financial statements and MindGeek S.a.r.l.'s financial statements that

could be readily produced by even a "mom and pop" grocery store using an off-the-shelf financial accounting system.   For several of the expense categories, Plaintiff also proposed identifying only non-consolidated entities who received $500,000 in a given fiscal year.  The MGED did not ever propose an alternative they would consider.

The importance of this simple bit of information goes without saying in any alter ego case alleging, as Judge Carney noted in Ordering this discovery, that revenues were "being bled out" of the company to related parties.  But since the last conference, it has become even more apparent.  Since that time, in the extensive meet and confers conducted, the MGED have revealed for the first time that these expenses include expenses paid for bandwidth to a non-consolidated related-party owned by defendant Bergmair and that there is no contract associated with such expenses or any documents describing the basis and method of calculating those expenses.  The amounts of these expenses have yet to be produced.  And none of these seemingly undocumented expenses were discoverable from any of the many categories of documents that the MGED's counsel trumpeted to the Court during the last conference had been produced and were "all that they needed" to know "how the money flowed."

This undocumented related party business relationship was only discovered because the name appeared in an expense reimbursement form produced in this action.  Although the MGED have promised to produce whatever records exist about these payments, they have yet to do so.

Similarly, although the MGED previously produced certain lease agreements, lease abstracts, and lease payment summaries for certain Montreal properties, it was not until almost March that counsel for defendants Tassillo and Antoon revealed in a meet and confer that some of these leases were with entities owned in part by

**JOINT SUPPLEMENT PURSUANT TO THE COURT'S MARCH 8, 2023 ORDER**

Antoon and Tassillo.  Over the course of 2014-2020 these entities were paid almost $30 million.  Again, none of these seemingly undocumented expenses were discoverable from any of the many categories of periodic financial reports the MGED keep representing are alone sufficient for a complete alter ego analysis that the Court had Ordered.

This is best exemplified by transfer pricing studies prepared by Grant Thornton that MGED counsel made a centerpiece of her argument at the last conference.  Despite their extensive reliance on those studies to argue no further productions were necessary, during the subsequent meet and confers MGED counsel conceded that the MGED only possess these studies for 2019 and, in any event, that these studies only examine *certain intra-company transactions* limited to those involving expenses that flowed through a wholly-owned management company to the operating companies like MG Freesites and MG Premium.  Therefore, these studies would not even include all the intra-company transactions, including most significantly the largest expenses listed for MG Freesites and MG Premium, licensing and royalty payments that appear to be paid to related party RT Holdings S.a.r.l. owned by defendant Bergmair.  Nor would they include any licensing and royalty or other expenses that were ultimately paid by some consolidated entity in the "money flow" to a non-consolidated entity similar to the individual defendants' now disclosed bandwidth and real estate companies.

In short, as alleged in the Amended Complaint, comparing the financial statements of MG Freesites and MG Premium to the parent company reveals that hundreds of millions of dollars in expenses have been paid to non-consolidated entities over the period in question.   None of the documents MGED counsel referenced at the last conference and continue to do so in the parties' meet and confer discussions identify who was the recipient of all those expenses.

**JOINT SUPPLEMENT PURSUANT TO THE COURT'S MARCH 8, 2023 ORDER**

In refusing to provide this information, the MGED have not argued that doing so would be burdensome, and they cannot because they have acknowledged that the financial accounting system has such information readily available.  Nor have they even countered with any alternative criteria to limit any purported burden.  This outright refusal prevents the plaintiff from conducting the most elementary examination of this fundamental alter ego issue of whether monies were "bled" out of the company to related parties that Judge Carney specifically directed that discovery address.  For example, plaintiff cannot even put a list of such entities in front of the individual defendants in deposition and ask them to identify any in which they have any interest.

Accordingly, the plaintiff respectfully requests that the Court Order production of the following:

1. Documents showing the payees for licensing and royalty expenses for MG Freesites and MG Premium listed on the financial statements and reporting packages produced in the action by the defendants for MG Freesites and MG Premium and their ultimate parent, MindGeek S.a.r.l.

2. Documents showing the payees for "website services" and "other expenses" for MG Freesites and MG Premium listed on the financial statements and reporting packages produced by the defendants for MG Freesites, MG Premium, and MindGeek S.a.r.l. to the extent such payees received $500,000 in a fiscal year.

3. Documents showing the payees for "management expenses" for MG Freesites and MG Premium identified on the financial statements and reporting packages produced by the defendants for MG Freesites, MG Premium, and MindGeek S.a.r.l.  However, according to the very few documents produced by the MindGeek Defendants to-date, the entity

1   Antoon identified as "MindGeek" in his sworn testimony was actually a

2   different entity -- RedTube Holdings -- that has no formal corporate

3   relationship with MindGeek.  Those documents also suggest that

4   Defendant Bergmair owns no interest in MindGeek, and the "over 50%"

5   interest he does own is in RedTube Holdings.  Likewise, the "minority"

6   ownership percentage Antoon was referring to for himself was likewise in

7   the same entity.  In short, Antoon appears to plainly have identified

8   RedTube Holdings as the alter ego of the Mindgeek Defendants.

9

10   The document requests to which this request relates include RFPs 2, 3, 4, 8, 10,

11   15, 18, 22, 23, 24.  (Exhibit 2, Dkt. 261-3)

12   **B.**      **Other Ownership Interests in the Consolidated MindGeek Entities**

13   Documents produced reference "preferred" shares held by Antoon and

14   Tassillo in the Canadian management company, defendant 9219-1568 Quebec Inc.,

15   that manages the entire MindGeek business and is "wholly" owned by the parent

16   defendant MindGeek S.a.r.l.  However, the ownership interests reflected in these

17   preferred shares are not reflected in the organizational and ownership charts

18   produced in this action or ownership calculations in the financial statements

19   produced by the MGED that list all consolidated entities.  The MGED have now

20   represented that these preferred shares represent Class B shares held in 9219-1568

21   Quebec Inc. and that they have included dividends paid out to the individual

22   defendants under those shares in their compensation disclosures.

23

24   However, they have refused to represent whether there are not similar

25   ownership interests in any of the other consolidated entities identified in the

26   organizational charts or in the financial statement schedules of consolidated entities.

27   Plaintiff agreed not to seek the corporate formation documents or financial

28   statements for these entities, or detailed records of the money flowing through these

entities, on the representation that the organizational charts and financial statements identified all ownership interests in all consolidated entities.  But these documents did not identify the ownership interest in in 9219-1568 Quebec, Inc.  Thus, plaintiff does not know whether there are other entities or individuals receiving economics via similar undisclosed ownership interest in other consolidated entities through which MG Freesites and MG Premium revenues flow on their way to the parent.  The MGED have refused to represent that there are no such other ownership interests or distributions paid out of those other entities.

Accordingly, the Plaintiff asks the Court to Order production of documents identifying any additional ownership interests held in any of the consolidated MindGeek entities to the extent there are any.

The document requests to which this request relates include RFPs 2, 3, 4, 10, 11, 15, 21, 24.  (Exhibit 2, Dkt. 261-3).

## C. Evidence of Integration, Unity, and Comingling

As noted by the Court's decisions on the motions to dismiss and discovery motions, a fundamental factor in any alter ego analysis is whether the entities involved were operated in an integrated fashion and observed corporate separateness.  Whether they maintained separate bank accounts and received and paid their own expenses from separate accounts or shared expenses and comingled funds is a critical fact in this analysis.  Indeed, the MGED made these very factors the centerpiece of their motion to dismiss, including submitting a declaration from Andreas Andreou testifying that all such entities maintained their own bank accounts and transacted their business from those accounts.   Judge Carney found

the declaration lacking because, among other reasons, it was "vague and conclusory" and its allegations were the topics on which he Ordered discovery.

Defendants have represented in the recent meet and confers that MG Freesites and MG Premium have their own bank accounts but that some unspecified amount of their expenses that they will not disclose are paid from another account held by one or more other consolidated entities. They have represented that the identity of the bank account paying the expenses of these entities is maintained in the centralized corporate ledger and financial accounting system. However, they have refused to produce any information from which the Plaintiff could examine whether, as the MGED argued in their motion to dismiss and asserted in the Andreou Declaration, the expenses allocated to these entities were actually paid from these separate accounts or from accounts controlled by other entities comingled with revenues and monies from MG Freesites, MG Premium, and other MindGeek entities and then just allocated to Freesites and Premium in the financial accounting system. The MGED have not asserted that producing such information would be unduly burdensome, or made any proposal to provide sufficient information in a manner that would minimize any such burden.

As evidenced by the MGED's own motion to dismiss, settled law, and Judge Carney's decision, whether the expenses allocated to MG Freesites and MG Premium were actually paid by them from their own bank accounts or from comingled accounts of other MindGeek entities and simply allocated to them in the

**JOINT SUPPLEMENT PURSUANT TO THE COURT'S MARCH 8, 2023 ORDER**

financial accounting system is a simple detail of material importance to the alter ego issue that would be easy to provide.

Accordingly, the plaintiff requests that the Court Order the MGED to produce documents sufficient to show from what bank accounts the expenses that are the subject of this submission were paid.

The document requests to which this request relates include RFPs 2, 3, 4, 8, 10, 15, 17, 18, 19, 22, 23, 24.  (Exhibit 2, Dkt. 261-3).

### D.   The 2013 Financial Statements and Compensation

After plaintiff's prior motion to compel, the MGED ultimately produced an almost complete set of transactions documents for the 2013 Management Buy-Out ("MBO") of MindGeek by the individual defendants.  The MBO appears to be a completely leveraged buy-out with all the assets of the entire MindGeek S.a.r.l. and RT Holdings S.a.r.l. corporate families pledged as collateral.

The MGED also produced financial statements, reporting packages, and other financial information for MindGeek S.a.r.l. and certain of its subsidiaries beginning in 2014.  However, they have not produced these materials for 2013.  Likewise, the MGED ultimately produced documents purporting to show all the economics the individual defendants received from the MGED or RT Holdings S.a.r.l. since 2014, but will not produce this information for 2013.

Plaintiff seeks the 2013 financial statements for MindGeek S.a.r.l. and an updated chart with payments made to the individual defendants in 2013 to determine whether material portions of the loan proceeds were distributed to the individual defendants.   This issue is directly relevant to the alter ego factors of adequate capitalization (which the Andreou Declaration made a centerpiece); whether these entities are truly distinct from the individual defendants; and whether it would be

**JOINT SUPPLEMENT PURSUANT TO THE COURT'S MARCH 8, 2023 ORDER**

unjust to not ignore the purported corporate separateness of the entities and the individual owner defendants.  These basic documents are also necessary to have a complete picture of that transaction and whether the actual transaction as implemented was consistent with the produced transaction documents and corporate resolutions.

Defendants have not objected to producing these limited documents based on undue burden because they cannot as it is obviously not burdensome to produce a single year's financial statements or add a year to the financial distribution spreadsheet already produced from the financial accounting system.  Instead, they have asserted specifically that they have produced the information in the 2014 financial statements at notes 4 and 14.  However, while these notes describe generally the use of some of the loan proceeds to pay down the existing loan and other expenses, they do not account for the entire loan balance or whether any of the proceeds from that were distributed to the individual defendants.

Accordingly, the Plaintiff asks the Court to Order production of the following:

1. The 2013 financial statements and reporting packages for MindGeek S.a.r.l.

2. Updated charts of distributions and compensation paid to the individual defendants for 2013.

The document requests to which this request relates include RFPs 3, 4, 8, 9, 10, 11-13, 15, 19, 20, 24.  (Exhibit 2, Dkt. 261-3)

**E.** **Timing of Production**

Although the MGED have from almost the start of the meet and confer process and continuing until today, made commitments to produce additional documents relevant to the alter ego issue, and these commitments have greatly

**JOINT SUPPLEMENT PURSUANT TO THE COURT'S MARCH 8, 2023 ORDER**

narrowed the remaining issues for the Court's consideration, they have yet to produce any of such documents and have represented that it will take them 7-10 days to do so.  In addition, after significant work, the parties agreed on a parameters for searching electronic communication in the last few days, the MGED have represented that it will take them 4-5 weeks to produce such materials.

Absent an immediate production of these materials, it will be impossible to complete these productions and depositions by the current deadline.  Plaintiffs request that the Court direct that the MGED complete their document production in 14 days and their email production in 4 week, and further direct that the parties meet and confer on a short extension to complete discovery in light of those deadline and provide a status report on their positions by April 7, 2023.

## II.    THE MINDGEEK ENTITY DEFENDANTS' SUPPLEMENTAL BRIEFING[1]

At the March 8, 2023 hearing on Plaintiff's Second Motion to Compel documents related to jurisdictional discovery, the Court advised Plaintiff that she "has a serious proportionality problem" and that her "requests are overbroad." Tr. at 100-01 (attached as Exhibit O).  Further, the Court recognized that during the hearing,

---

[1] The MindGeek Entity Defendants are submitting their supplemental briefing without having been provided a copy of Plaintiff's supplemental briefing in advance. During a meet and confer on March 24, 2023, counsel for the MindGeek Entity Defendants asked Plaintiff whether she would be providing her portion of the briefing on March 25, 2023—at that time, 2 days prior to the briefing due date.  Plaintiff's counsel refused and stated his belief that the Court was not requiring the Parties to adhere to the rules for briefing but rather was only seeking a status report from the Parties. Declaration of M. Yeary at ¶ 5. Based on the Court's order requiring briefing and the Court's comments at the March 8, 2023 hearing, the MindGeek Entity Defendants disagree.  *See* Tr. At 105 (Exh. O) ("I want . . . just like our joint stipulation, I will leave it up to you guys to determine time frame and how much time to give each other.").

Plaintiff represented that a "decent amount of what was originally a part of the motion has been resolved and that [plaintiff's] request is now more limited." *Id*. at 101. Plaintiff was directed to "clearly identify" to Defendants the specific types of documents or information she was requesting that were still outstanding by March 13, 2023 so that the parties could meet and confer by March 16, 2023.  The Court also gave instructions to the Defendants that, after appropriate tailoring of the requests, the Court believed additional information remained to be produced by Defendants and where Defendants were arguing undue burden, they needed to support that claim.  The MindGeek Entity Defendants took the Court's instructions seriously; Plaintiff did not.

The list of outstanding document requests that the MindGeek Entity Defendants received on March 13 remained vague and overbroad.  For example, Plaintiff's requests still included large buckets of non-specific financial data such as "the source and receipt of revenues;" and "financial information used to prepare the financial and tax records produced by the MindGeek Defendants."  March 13 Letter from M. Bowe (attached as Exhibit N).  Equally concerning was that Plaintiff's March 13 list continued to press for categories of information that have long been produced, such as inter-company agreements, information concerning the use of loan proceeds, and financial reporting to lenders.  *Id.*  Further, the list included requests that had never been raised with the MindGeek Entity Defendants at all (Defendant Bergmair's visits to MindGeek's offices in Montreal) and/or were not the subject of Plaintiff's Second Motion to Compel (documents concerning the reasons for Messrs. Antoon and Tassillo's resignation; search terms and custodians to respond to requests for documents regarding the Individual Defendant's direction and implementation of CSAM-related policies).  *Id.*  Plaintiff sent a revised list of issues on Saturday March 25, 2023, containing 20 requests with multiple sub-parts, again raising certain issues for the first time.  *See* Exhibit Q.  Attempting to understand and work through these issues, the MindGeek Entity Defendants and Plaintiff met and conferred for over six hours and had additional written exchanges.

CASE NO. 8:21-CV-00338
**JOINT SUPPLEMENT PURSUANT TO THE COURT'S MARCH 8, 2023 ORDER**

1    Throughout the evolution of Plaintiff's requests, she has made minimal efforts

2    to correct any of the problems identified by the Court – proportionality, overbreadth,

3    or lack of specificity.  In fact, Plaintiff has continued to expand on and add requests

4    during discussions that were supposed to have been for narrowing and resolving the

5    issues.  Moreover, nowhere in Plaintiff's revised requests did she "explain[] to . . . the

6    Defendants how these very broad discovery requests will provide evidence related to

7    jurisdiction," which is an explanation that the Court ordered Plaintiff to provide to

8    both Defendants and the Court because it "was missing in Plaintiff's original brief."

9    Tr. at 105.  The explanation "can't just be it's jurisdiction.  It can't just be it's context."

10   *Id.*  The nexus to the jurisdictional analysis is critical because jurisdictional discovery

11   takes place prior to a determination that the Court actually has jurisdiction over

12   MindGeek, S.a.r.l., and it is particularly important to avoid imposing undue burdens

13   on a party who may not even be subject to the Court's power.

14   While certain issues raised in Plaintiff's second motion to compel against the

15   MindGeek Entity Defendants have been resolved, Plaintiff is continuing to press for

16   large amounts of information which is not relevant to the jurisdictional analysis.  As

17   late as 3:00 p.m. Eastern on the date this Supplemental Briefing is due, the MindGeek

18   Entity Defendants were unclear as to the issues to be briefed.  As of 10:00 p.m. Eastern

19   Plaintiff was still changing her positions on what she wished to present to the Court.

20   Notwithstanding the foregoing, based on the last written communication received

21   from Plaintiff, the MindGeek Entity Defendants understand that the issues left to be

22   resolved by the Court are as follows:

23   • Documents sufficient to determine whether the licensing and royalty
     expenses allocated on the financial statements and reporting packages
24   prepared for Freesites and Premium and MindGeek S.a.r.l. to Freesites
     and Premium were expenses paid to non-consolidated parties or from
25   which bank account(s) they were paid.

26   

27   ○ Response:  The MindGeek Entity Defendants have identified all
     royalty payments paid for the Tubesites, which entities made the
28   payments, and which entities received the payments.

- Documents sufficient to determine what non-consolidated parties received over $500,000 in website operating expenses, management expenses, and other expenses allocated to Premium and Freesites and from which bank account(s) they were paid.

  - Response:  The MindGeek Entity Defendants agreed to provide this information for intercompany payments as that request was reasonably tailored to the alter ego analysis.  The MindGeek Entity Defendants object to producing this information for third party vendor payments.

- MindGeek S.a.r.l's financial statements from 2013 and all distributions and compensation to the individual defendants for 2013.

  - Response: The MindGeek Entity Defendants object to producing additional information for 2013 as it is outside the relevant time period, and the information requested regarding the use of loan proceeds is available in the 2013 refinancing documents and 2014 financial statements already produced.

- With respect to payments made by the MindGeek Entity Defendants to the Individual Defendants and entities in which they hold an interest

  - A representation whether such payments were made from a comingled bank account controlled by another entity or from a separate bank account held exclusively by the entity to which the payment was allocated in the accounting system.

  - information showing whether the payments came from a comingled bank account controlled by an entity other than the entity to which the payments were allocated in the financial accounting system.

    - Response:  The MindGeek Entity Defendants have informed Plaintiff that there is no "commingled bank account" and agreed to identify the accounts held by the MindGeek Entity Defendants.  The MindGeek Entity Defendants further informed Plaintiff that in the normal course of business, payments made by a particular entity come from the money in that entity's bank account.

- Documents sufficient to identify any other ownership interests in the entities identified in the organizational charts produced and the amounts, if any, distributed to those ownership interests.

  - Response:  The MindGeek Entity Defendants objected to producing additional material about the capital structures of

17

**JOINT SUPPLEMENT PURSUANT TO THE COURT'S MARCH 8, 2023 ORDER**

entities other than the MindGeek Entity Defendants, the other entities in their corporate ownership chains and the entities involved in the flow of funds for the Tubesites; the MindGeek Entity Defendants also objected to identifying distributions, if any, to individuals other than the Individual Defendants.

- All contracts for webservices for parties paid more than $500,000 in a year and records reflecting where such vendors are providing services, including the locations of the servers and infrastructure for which services are being provided, and the amounts paid to each vendor.

  o Response:  The MindGeek Entity Defendants object to providing contracts for additional vendors and object to providing the amounts paid to outside vendors.  Requests for materials regarding the locations of servers and IT infrastructure have already been ruled on by the Court.

A.      **DESPITE THE MINDGEEK ENTITY DEFENDANTS' PRODUCTION OF MATERIALS MORE THAN SUFFICIENT TO ADDRESS THE REASONABLE REQUIREMENTS OF THE COURT'S JURISDICTIONAL ANALYSIS, PLAINTIFF'S REQUESTS REMAIN DISPROPORTIONATE TO SUCH ANALYSIS**

Plaintiff's continued abuse of the jurisdictional discovery process must end.  In his July 29, 2023 order denying Plaintiff's request to open discovery, Judge Carney set forth how the jurisdictional discovery process should work:

[Plaintiff] has still persisted in pleading some causes of action of questionable value to her overall case, and has continued to engage in scattershot, group pleading, largely failing to identify the MindGeek Defendants' individual roles in causing her harm. The Court recognizes that Plaintiff's failure in that regard may be due to the fact that she is not a MindGeek insider. For that reason, and because Plaintiff has alleged enough facts unrebutted by affidavits to raise a colorable argument that there is personal jurisdiction over the MindGeek Defendants objecting to jurisdiction, the Court granted jurisdictional discovery. (Dkt. 166.) But the Court urges Plaintiff and her counsel to not use this opportunity to further complicate this case. Jurisdictional discovery is meant to provide Plaintiff the information she needs to

make a clear statement regarding the role and conduct of each
MindGeek Defendant separately. The Court does not mean to deter
Plaintiff from pursuing the individuals and entities that allegedly
harmed her, ***but if jurisdictional discovery does not yield the
information she needs to clearly define a defendant's conduct as it
relates to her harm, then that defendant should simply be dismissed***
so this case can proceed without further unnecessary delay.

[Dkt. 168 at 2 (emphasis added).]   Plaintiff's problem at this juncture in the
jurisdictional discovery process is that the evidence does not support the sensational
allegations contained in her First Amended Complaint.   Rather than accept Judge
Carney's admonition to dismiss those Defendants challenging jurisdiction if the
information does not show that their conduct clearly related to her harm (and only one
MindGeek Entity Defendant, MindGeek S.a.r.l. is now doing so), Plaintiff has
decided to press for ever more endless document discovery in the belief that
eventually she will find the evidence she needs to demonstrate either that certain
Defendants had sufficient jurisdictionally relevant contacts with the forum or show
that, despite voluminous evidence to the contrary, there was such unity of interest and
ownership between the MindGeek entities and other evidence to support the alter ego
theory that the each entity's distinct corporate identity ceased to exist.   *See, e.g.,*
*Iconlab, Inc. v. Bausch Health Cos.,* 828 F. App'x 363, 364 (9th Cir. 2020).

Plaintiff's latest buzzword in service of her scorched earth crusade is that the
MindGeek Entity Defendants are improperly "curating" discovery.   *See* Pls. 2nd
Motion to Compel (Dkt. #261) at 35, 38.   But as set forth in detail below, that is not
the case.   To be sure, the MindGeek Entity Defendants attempted to limit their
production to those documents that are relevant and proportional to the needs of
jurisdictional discovery.   Despite Plaintiff's repeated protestations to the contrary,
such limitation is not only appropriate but required by the rules.   The MindGeek Entity
Defendants are simply not required to produce every single document that has ever
passed through any MindGeek entity to satisfy Plaintiff's unending complaints about
their document production.   That is not, and never has been, the appropriate standard.

Notwithstanding the foregoing, the MindGeek Entity Defendants have produced more than what is relevant and proportional to the needs of the case. For example, rather than focusing the discovery on Pornhub, the MindGeek Entity Defendants have produced and agreed to produce material relating to other Tubesites. Although the paysite, gaming, and cable businesses are not at issue in this case, the MindGeek Entity Defendants have produced organizational charts and extensive financial information relating to them. And although the 2013 financing and reorganization occurred before the relevant period started, the MindGeek Entity Defendants produced the "deal binders" for them (as well as the 2018 financing).

Not only have the MindGeek Entity Defendants produced 2392 documents, the types of documents they have produced are the core financial, accounting, and corporate organization documents that are routinely used to conduct an alter ego analysis. *See SelfHelpWorks.com, Inc. v. 1021018 Alberta Ltd.*, 2010 WL 11684790, at *3 (S.D. Cal. Dec. 20, 2010) (request for "all" of defendant's bank account monthly statements is overbroad and seeks irrelevant information in relation to its alter ego allegations); *see also TC Skyrocket, LLC v. Superskyrocket, LC,* 2007 WL 1110723, at *1 (S.D. Cal. March 29, 2007) (finding tax returns, asset disclosures, and financial statements of individual defendants relevant to alter ego determination but sustaining objections to subpoenas for defendant's bank records). Among other things, the MindGeek Entity Defendants have produced:

- Audited financial statements. *See* Exhibit A (2014 audited consolidated financial statement for MindGeek S.a.r.l.); Exhibit B (2014 audited financial statement for MG Freesites Ltd).
- Corporate organizational charts and a Step Memo explaining the 2013 reorganization. *See* Exhibit C.
- Financial reporting packages that contain balance sheets and cash flow statements for each MindGeek entity, as well as auditors' notes. *See* Exhibit D (exemplar reporting package from 2014).
- Financial reporting packages that contain profit and loss statements for each MindGeek line of business and product. *See* Exhibit E (exemplar from 2014

**JOINT SUPPLEMENT PURSUANT TO THE COURT'S MARCH 8, 2023 ORDER**

reporting package showing P&L for Tubesites).

- A report from the financial accounting system identifying the payors and recipients of dividends for each year from 2014 to 2020. *See* Exhibit F.

- A report from the financial accounting system identifying all compensation paid to the three former employee Individual Defendants from their employer 9219-1568 Quebec Inc. *See* Exhibit G.

- A report from the financial accounting system identifying all dividend payments made by 9219-1568 Quebec Inc. to the three former employee Individual Defendants for the Class B shares each held in that entity. *See* Exhibit H.

- A report from the financial accounting system of all expense payments made to Individual Defendant Bergmair. *See* Exhibit I.

- Reports from the financial accounting system of all payments made to entities in which Defendants Antoon and Tassillo have ownership interests, for leased office space. *See* Exhibit J.

- Tax returns for RT Holding S.a.r.l., MG Holdings USA Corp., 9219-1568 Quebec Inc., 9279-2738 Quebec Inc., Licensing IP International S.a.r.l., MG CY Holdings Ltd, MG Freesites Ltd, MG Freesites, S.a.r.l., MG Premium Ltd, MG Premium S.a.r.l., MG Technologies Ltd, MindGeek RK S.a.r.l., and MindGeek S.a.r.l. (These are not attached as exhibits due to volume.)

- The complete transactional documents for the 2013 and 2018 reorganizations and debt refinancings (These are not attached as exhibits due to volume, *but see* the Flow of Fund Agreement for the 2013 refinancing, attached as Exhibit K.)

- Articles of Incorporation, as amended, for 9219-1568 Quebec Inc., describing Class B and other shares in that entity. *See* Exhibit L.

- Intercompany agreements and related documents:

  o the inter-company service agreements for MG Premium and MG Freesites (as recipients of services) and 9219-1568 Quebec, MG Global Entertainment Inc., MG CY Holdings Ltd, and MG Cyprus Ltd (as providers of services to the Tubesites);

  o the server cost sharing agreements between MG Cyprus Ltd, MG Premium and MG Freesites;

  o the licensing agreements governing the licensing of IP for the Tube Sites; and

  o the Transfer Pricing Studies that cover the service agreements and IP

agreements between entities that are in different jurisdictions (the agreements are not attached due to volume, *but see* Exhibit M (excerpt from Transfer Pricing Study for MG Freesites Ltd)).

In addition to the foregoing, the MindGeek Entity Defendants will be producing by next week, all of the following:

- A report from the financial accounting system identifying the royalty payments made by MG Freesites Ltd, MG Freesites Ltd II, and MG Content RT Ltd, the entities that operate the Tubesites, to Licensing IP International S.a.r.l. and MG Ex-US S.a.r.l. pursuant to the terms of the licensing agreements already produced;

- A report from the financial accounting system identifying payments to Bulknet, a company that conducts business with MindGeek and in which Defendant Bergmair has an ownership interest;

- A debt pay-down schedule;

- Documents identifying the amounts MG Freesites Ltd, MG Freesites II Ltd, and MG Content RT Ltd paid other MindGeek Entities for the website operating expenses and other expenses identified in their financial statements;

- Vendor agreements with third parties who provide domain servers for the MindGeek entities;

- Financial bridge documents provided to lenders to explain differences between the financial reporting packages and the audited financial statements;

- Final year-end balance sheets for 2014-2020 that reflect reconciliations made after the periodic reporting statements were issued to management and lenders;

- A step memo explaining the 2018 reorganization;

- Tax returns and audited financial statements for MG Freesites II Ltd and MG Content RT Ltd; and

- Financial statements for RT Holding S.a.r.l.

These produced or soon-to-be-produced documents provide Plaintiff with detailed information in response to each of her requests that are reasonably tailored, limited to the relevant time period, and tied to the jurisdictional or alter ego analysis.

CASE NO. 8:21-CV-00338

**JOINT SUPPLEMENT PURSUANT TO THE COURT'S MARCH 8, 2023 ORDER**

## B.   **PLAINTIFF'S REMAINING REQUESTS ARE DISPROPORATIONATE TO THE COURT'S JURISDICTIONAL ANALYSIS**

### 1.   **The MindGeek Entity Defendants Will Produce Detailed Royalty Payments for the Tubesites**

Plaintiff's Request: Documents sufficient to determine whether the licensing and royalty expenses allocated on the financial statements and reporting packages prepared for Freesites and Premium and MindGeek S.a.r.l. to Freesites and Premium were expenses paid to non-consolidated parties or from which bank account(s) they were paid.

Plaintiff's request for more information on royalty payments directly disregards the discovery provided to date.  With respect to licensing and royalty payments made in relation to the Tubesites (Pornhub, YouPorn, Tube8, and RedTube), the MindGeek Entity Defendants have agreed to produce exactly what Plaintiff has requested— information about the entities who made and received those payments. The only portion of this request that remains in dispute is whether the MindGeek Entity Defendants should be required to provide the licensing and royalty payments made by MG Premium Ltd for MindGeek websites that are not relevant to Plaintiff's claims.

The two MindGeek Entities that own the intellectual property associated with the Tubesites are Licensing IP International S.a.r.l. ("LIPI") and MG Ex-US S.a.r.l. (MG Ex-US).  The MindGeek Entity Defendants have produced the intellectual property licensing agreements that show that these entities licensed the intellectual property for the Tubesites to MG Freesites II Ltd, MG Content RT Ltd, and MG Freesites Ltd.  That intellectual property includes both the free sites (i.e. Pornhub.com) and the premium sites associated with the same names (i.e. Pornhubpremium.com) as reflected in the licensing agreements.  MG Premium Ltd does not license or operate Pornhub.com, Pornhubpremium.com, or any of the other

Tubesites or their premium versions.

The MindGeek Entity Defendants have agreed to produce information showing the amount LIPI invoiced to and was paid by each of MG Freesites II Ltd, MG Content RT Ltd, and MG Freesites Ltd for the relevant years (2014-2020). The information shows the specific entity who was invoiced and the amount of the invoice. These represent the amounts paid to LIPI from each entity for the fees due under the licensing agreements. The MindGeek Entity Defendants also informed Plaintiff that each of these entities maintains its own bank accounts and that payments made for these expenses are made from those accounts to the accounts of LIPI. The MindGeek Entity Defendants have agreed to produce the exact same information for the amounts MG Ex-US invoiced to these entities for the fees due to it under the licensing agreements. This is a complete response to Plaintiff's request insofar as it relates to the website on which she alleges her content was available, Pornhub, and the other Tubesites.

Plaintiff has not alleged that her content was made available on websites operated by MG Premium Ltd, referred to as paysites. As stated by Judge Carney in his ruling on the scope of jurisdictional discovery:

> Plaintiff does allege that MG Premium owns and operates certain MindGeek paid sites (FAC ¶ 22), but it is not clear from the FAC that Plaintiff's videos were placed on any of MindGeek's premium sites.

*Fleites v. MindGeek, S.A.R.L.*, 2022 WL 4455558, *2 n.3 (C.D. Cal. July 29, 2022). That remains true, in part because Plaintiff has been unwilling to provide the information requested by the MindGeek Entity Defendants that would allow them to conduct an appropriate search of their records. There remains no supported allegation that Plaintiff's videos appeared on a MindGeek paysite operated by MG Premium Ltd. Therefore, information related to those paysites is not relevant to the specific jurisdictional analysis.

Plaintiff, however, is not without information regarding the amounts MG

**JOINT SUPPLEMENT PURSUANT TO THE COURT'S MARCH 8, 2023 ORDER**

Premium Ltd has paid in royalty fees for the intellectual property it licenses; however, the information she has is not down to the invoice level because that degree of detail is not proportional to claims or defenses in this case.  The amounts MG Premium Ltd paid for royalties are provided in its audited financial statements. The amounts paid in intercompany royalties for each MindGeek product are also shown on the profit and loss statements produced.  Therefore, the MindGeek Entity Defendants have produced or will produce by next week, the detailed royalty and licensing payment information Plaintiff has requested for the Tubesites and has produced information for other intellectual property in the financial statements and packages.

### 2. Plaintiff's Request for Payments to Third Parties is Not Relevant to the Alter Ego Analysis.

Plaintiff's Request:  Documents sufficient to determine what non-consolidated parties received over $500,000 in website operating expenses, management expenses, and other expenses allocated to Premium and Freesites and from which bank account(s) they were paid.

The MindGeek Entity Defendants have agreed to produce extensive information about *intercompany* payments because Plaintiff stated that she wanted more detail to understand the flow of funds between the MindGeek entities and whether funds were improperly commingled.  Plaintiff's requests for similar information about payments made by MG Freesites Ltd, or any other MindGeek entity, to outside vendors, however, are not connected to the alter ego analysis and are therefore disproportionate to the current issue before the Court.

Pursuant to the intercompany service agreements already produced, Plaintiff is aware that certain MindGeek entities, such as 9219-1568 Quebec Inc., MG CY Holding Ltd, MG Cyprus Ltd, and MG Premium Ltd, provide(d) services to MG Freesites Ltd.  The audited financial statements for MG Freesites Ltd contain information regarding the amount it incurs in website service expenses and other expenses.  *See* Exhibit B, at 30.  Those expenses are in large part for the services provided by these other MindGeek entities.  The audited financial statements also

report how much of those website operating expenses and other expenses are paid to related parties—other MindGeek entities. *Id.* at 32 (showing that over 80% of the expenses were paid to related parties). Plaintiff asked the MindGeek Entity Defendants to provide a breakdown of the specific entities to whom MG Freesites Ltd pays those expenses. So, the MindGeek Entity Defendants have agreed to produce documents that show how much MG Freesites Ltd paid to 9219-1568 Quebec Inc., MG CY Holding Ltd, MG Cyprus Ltd, and MG Premium Ltd for website operating expenses. Those same documents also show how much other MindGeek entities, like MG Premium Ltd., paid for website operating expenses. Those documents will be produced by next week.

The MindGeek Entity Defendants understood Plaintiff's request for this additional internal expense payment information as possibly related to alter ego and therefore agreed to produce additional information. However, Plaintiff's request for payments to outside vendors is not related to personal jurisdiction. The exact identities of the external companies who receive those payments and the exact amounts paid to each outside vendor have nothing to with an appropriate alter ego analysis. Nonetheless, the total amount that MG Freesites Ltd pays to external vendors as a result of doing business can be derived from the financial information already provided: if 80% is paid to MindGeek entities, then 20% is not.

Plaintiff has argued that she needs information about who the outside vendors are and how much has been paid to them to determine whether undisclosed payments to the Individual Defendants were made. But that reasoning fails. Plaintiff asked the MindGeek Entity Defendants to identify any entities with which they conduct business and in which one of the Individual Defendants has an ownership interest. The MindGeek Entity Defendants disclosed the names of those entities and the amounts paid to those entities. Plaintiff has refused to accept the MindGeek Entity Defendants' representation that there are no other such related-party entities with which they do business. But obtaining more information from the MindGeek Entity

**JOINT SUPPLEMENT PURSUANT TO THE COURT'S MARCH 8, 2023 ORDER**

1   Defendants about the business they and their affiliates conduct with third parties will
2   not address any concern she has about whether there has been adequate disclosure of
3   related party transactions.  If she has doubts about such disclosure, the appropriate
4   approach would be to ask questions of the Individual Defendants.  Accordingly,
5   Plaintiff's request for additional information about third party vendors should be
6   denied.

7   ###    3.    Additional Financial Information from 2013 is Outside the Relevant
8   Time Period and Disproportionate to the Needs of the Case

9   Plaintiff's Request:  MindGeek S.a.r.l's financial statements from 2013 and all
10  distributions and compensation to the individual defendants for 2013.

11  The MindGeek Entity Defendants objected to Plaintiff's requests for material
12  relating to their financing agreements because it is neither relevant nor proportional
13  to the needs of the case.  To the extent Plaintiff sought the 2013 financial agreements,
14  the MindGeek Entity Defendants also objected on the grounds that the request sought
15  material outside the relevant time period.   Notwithstanding the foregoing, the
16  MindGeek Entity Defendants agreed to produce the complete set of transactional
17  documents for the 2013 refinancing, hoping that would resolve Plaintiff's request.  It
18  did not.

19  What the MindGeek Entity Defendants or their affiliates did with loan proceeds
20  they received has nothing to do with the jurisdictional analysis.  Even if it did, Plaintiff
21  already has extensive information regarding the 2013 loan proceeds and her request
22  for more is disproportionate to the needs of the case.  The earliest Plaintiff alleges
23  content depicting her appeared on a MindGeek website is June 2014.  Therefore, for
24  purposes of the jurisdictional analysis, that is the start of the relevant time period.
25  Plaintiff has not challenged that date cutoff except as to the 2013 loan proceeds.

26  In 2013, MindGeek S.a.r.l. acquired a majority ownership interest in Manwin
27  RK S.a.r.l. which changed its name to MindGeek RK S.a.r.l.  *See* Exhibit A at 30.
28  This transaction gave rise to the corporate structure of the MindGeek group from 2013

to 2018.  Accordingly, the MindGeek Entity Defendants produced the complete set of transactional documents for the 2013 acquisition and related corporate reorganization, even though those transactions occurred before the relevant time period.  Plaintiff also requested, and the MindGeek Entity Defendants produced, the complete set of transactional documents for the 2013 refinancing.  The 2013 refinancing documents contain a Flow of Funds Agreement that documents the exact flow of the proceeds from the loans.  *See* Exhibit K.  That document shows at each step what proceeds were used to "pay off existing first lien lenders," "pay off interest & standby fee due to lenders," "pay off exiting existing seller notes," the payment of loan related "fees and expenses," and how much was wired to the purchaser's account, how much was wired to the borrower's account, and how much was wired to the seller of Manwin RK S.a.r.l.  *Id.*

Furthermore, the 2014 consolidated audited financial statement for MindGeek S.a.r.l. contains notes that detail both the reorganization and the refinancing.  Note 4 explains the acquisition of Manwin RK S.a.r.l. and Note 14 describes the loans incurred in 2013.  Exhibit A at 30-32, 46-48.  Therefore, Plaintiff has significant detailed information regarding how the proceeds of the 2013 refinancing were utilized.  Her request for additional 2013 financial statements and distribution information is not reasonably tailored to provide information relevant to the jurisdictional analysis or the alter ego analysis, especially in light of the significant information already produced.

4.   **The MindGeek Entity Defendants Have Produced Extensive Information Related to Payments to the Individual Defendants and Related Parties**

Plaintiff's Request:  With respect to payments made by the MindGeek Entity Defendants to the Individual Defendants and entities in which they hold an interest:

- A representation whether such payments were made from a comingled bank account controlled by another entity or from a separate bank account held exclusively by the entity to which the payment was allocated in the accounting system, and

- information showing whether the payments came from a comingled bank account controlled by an entity other than the entity to which the payments were allocated in the financial accounting system.

Plaintiff makes two requests in this category. First, she asked the MindGeek Entity Defendants to represent that the payments made to the Individual Defendants and their related entities did not come from a commingled account. The MindGeek Entity Defendants have so represented because there is no single, "commingled" account for the MindGeek entities. Each entity has its own bank account. Second, she asks for information on "commingling." The MindGeek Entity Defendants have agreed to identify the banks at which each MindGeek Entity Defendant had accounts. Beyond that, this appears to be a request by Plaintiff for bank statements, a request that the MindGeek Entity Defendants have objected to from the beginning based both on undue burden and lack of proportionality. To the extent Plaintiff's request is for bank statements, which is unclear, Plaintiff previously represented that she would take, as a substitute, relevant information from the MindGeek Entity Defendants accounting system as that would obviate the need to review hundreds of monthly bank statements. Yeary Decl. at ¶ 7. The MindGeek Entity Defendants have since produced, and agreed to produce even more, extensive information from their financial accounting system only to now have Plaintiff argue that is not good enough. *See* Exhibit F (a report showing dividend payments), Exhibit G (a report showing compensation to the Individual Defendants), Exhibit H (a report showing dividend payments to the Individual Defendants), Exhibit I (a report showing expense payments to Defendant Bergmair), Exhibit J (a report showing payments to entities in which Defendants Antoon and Tassillo have ownership interests). These reports identify the entities making and receiving payments; Plaintiff refuses to accept that.

During the meet and confers that took place over the past week or so, Plaintiff represented that if the MindGeek Entity Defendants represented that they maintain their own bank accounts, that would resolve the issue. The MindGeek Entity

CASE NO. 8:21-CV-00338

**JOINT SUPPLEMENT PURSUANT TO THE COURT'S MARCH 8, 2023 ORDER**

Defendants so represented.  Notwithstanding the foregoing, Plaintiff wants more, but has again failed to clearly articulate what that more is.  Moreover, Plaintiff has failed to explain what this additional information would provide that has not already been provided by the production of detailed financial statements, *see* Exhibits A, B, D, & F, which include cash flow statements and financial statements containing information verified by the auditors about the cash reported on those statements.  Anything more is not needed for the alter ego analysis and would be disproportionate.

5.      **The MindGeek Entity Defendants Have Disclosed All Ownership Interests Held by Defendants and All Distributions to Defendants**

Plaintiff's Request:  Documents sufficient to identify any other ownership interests in the entities identified in the organizational charts produced and the amounts, if any, distributed to those ownership interests.

The MindGeek Entity Defendants are confused by Plaintiff's request.  The MindGeek Entity Defendants have disclosed to Plaintiff that Defendants Antoon, Tassillo, and Urman held Class B Shares in 9219-1568 Quebec Inc. and provided Plaintiff with the amounts of the distributions to those Defendants in respect of those shares.  Exhibit H.  During the meet and confers over the last two weeks, Plaintiff asked several questions about the classes of shares held in all MindGeek entities and the MindGeek Entity Defendants pointed Plaintiff to the incorporation documents produced that identify the various entities' share structures.  The MindGeek Entity Defendants have also objected to producing information about the share class structures for all entities in the MindGeek group since Plaintiff's claims do not relate to all of those entities.

After many hours of meet and confers, the Plaintiff asked for information about whether any MindGeek entity made distributions to any non-defendant, individuals.  The MindGeek Entity Defendants objected to this request on the grounds that the information sought is not relevant to the Court's jurisdictional analysis.

**JOINT SUPPLEMENT PURSUANT TO THE COURT'S MARCH 8, 2023 ORDER**

1    As of 3:00 P.M. Eastern the afternoon this brief was due, the MindGeek Entity

2  Defendants did not believe Plaintiff intended to seek a ruling from the Court on

3  distributions to non-defendant individuals. At that time, Plaintiff represented that she

4  sought to have the MindGeek Entity Defendants disclose for all MindGeek entities

5  whether distributions were made to non-defendants in respect of shares in a

6  MindGeek entity, and, if so, the gross amount of those distributions.   Plaintiff

7  represented that, unless the amount was very large, she did not need to know the

8  identities of the recipients of the distributions or how much each received

9  individually.  Counsel for the MindGeek Entity Defendants indicated it was willing

10  to make that request to its clients, but given the time of day would not be able to get

11  a response before this brief was due.  Counsel will so discuss the issue and report to

12  Plaintiff next week.   Yeary Decl. at ¶ 8.

13        **6.      Requests for Vendor Contracts and Payments is Disproportional
          and Not Connected to the Jurisdictional or Alter Ego Analyses.**
14

15    Plaintiff's Request:  All contracts for webservices for parties paid more than

16  $500,000 in a year and records reflecting where such vendors are providing services,

17  including the locations of the servers and infrastructure for which services are being

18  provided, and the amounts paid to each vendor.

19    The MindGeek Entity Defendants refer back to their arguments in Section B.2

20  regarding expense payments to third party vendors.  The same is true for this specific

21  request for contracts and payments to IT vendors.  Once again, the MindGeek Entity

22  Defendants acquiesced to Plaintiff's request for the production of contracts with

23  certain vendors who provide servers for the MindGeek entities.  Once again, that was

24  not enough for Plaintiff.  She has offered no justification for this additional request

25  other than what she offered in relation to other third-party expenses—namely, that

26  she seeks information about additional vendor contracts and payments to determine

27  whether the MindGeek Entity Defendants have made adequate disclosures about

28  transactions with related parties.  Because Plaintiff's request for such information will

**JOINT SUPPLEMENT PURSUANT TO THE COURT'S MARCH 8, 2023 ORDER**

1  not shed light on related party transactions, it should be denied for the same reasons

2  discussed above.

3      Further, to the extent Plaintiff's request continues to seek information regarding

4  server locations and IT infrastructure, that request was raised in Plaintiff's First

5  Motion to Compel and was ruled on.  The Court ordered the MindGeek Entity

6  Defendants to provide server location information, and they did.  The Court denied

7  Plaintiff's request for IT infrastructure information.  Accordingly,  Plaintiff's request

8  should be denied on the grounds it seeks material that is neither relevant nor

9  proportionate to the jurisdictional issues before the Court. (Dkt. # 260).

10

11  ## III.   CONCLUSION

12      ### A.     PLAINTIFF'S CONCLUSION

13      For the foregoing reasons, Plaintiff respectfully requests that the Court grant

14  Plaintiff's motion, and order the MindGeek Entity Defendants to produce the

15  requested documents so that the Court may have the full benefit of the very discovery

16  that it ordered when determining the jurisdictional issues before it.

17

18      ### B.     MINDGEEK ENTITEY DEFENDANT'S CONCLUSION

19

20      The MindGeek Entity Defendants have produced, and have agreed to produce

21  in short order, extensive financial and corporate structure information responsive to

22

23  Plaintiff's requests.   Plaintiff, however, continues to press vague, unsupported

24  requests for documents without making the requisite showing regarding their nexus

25

26  to the jurisdictional issues before the Court.   Accordingly, Plaintiff's motion to

27  compel should be denied.

28

**JOINT SUPPLEMENT PURSUANT TO THE COURT'S MARCH 8, 2023 ORDER**

1    Dated: March 31, 2023                    Respectfully Submitted

2                                             **BROWN RUDNICK LLP**

3

4                                             By:   /s/ Michael J. Bowe
                                              MICHAEL J. BOWE (*pro hac vice*)
5                                             mbowe@brownrudnick.com
                                              LAUREN TABAKSBLAT
6                                             (*pro hac vice*)
                                              ltabaksblat@brownrudnick.com
7                                             7 Times Square
                                              New York, NY 10036
8                                             Phone: (212) 209-4800
9                                             Fax: (212) 209-4801

10

11                                            David M. Stein (#198256)
                                              dstein@brownrudnick.com
12                                            2211 Michelson Drive, 7th Floor
                                              Irvine, California  92612
13                                            Phone:      949.752.7100
                                              Fax:  949.252.1514
14

15

16                                            Attorneys for Plaintiffs

17

18   Dated: March 31, 2023                    DECHERT LLP

19
                                              By:  /s/ Kathleen N. Massey
20                                            KATHLEEN  N.  MASSEY (*pro  hac
                                              vice*)
21                                            Kathleen.Massey@dechert.com
                                              Dechert LLP
22                                            Three Bryant Park
                                              1095 Avenue of the Americas
23                                            New York, NY 10036
                                              Tel: (212) 698-3500
24                                            Fax: (212) 698-3599
25

26                                            Attorney for Defendants MindGeek
27                                            Entities.

28

**JOINT SUPPLEMENT PURSUANT TO THE COURT'S MARCH 8, 2023 ORDER**