# EXHIBIT K



HOUSE OF COMMONS
CHAMBRE DES COMMUNES
CANADA

43rd PARLIAMENT, 2nd SESSION

# Standing Committee on Access to Information, Privacy and Ethics

EVIDENCE

**NUMBER 019**

Friday, February 5, 2021

Chair: Mr. Chris Warkentin



[*Translation*]

**Ms. Marie-Hélène Gaudreau:** Mr. Antoon, the only thing I wanted to know is that you are fine. You have a clear conscience that you are doing everything according to the current rules, in 2021. As lawmakers, our job is to make sure that any loophole or loss of control on the Internet is unacceptable.

So you are telling me that your conscience is clear.

Now I'd like to hear from Mr. Urman.

[*English*]

**Mr. Corey Urman (Vice-President, Product Management, Video Sharing Platform, Entreprise MindGeek Canada):** I obviously feel awful, and we feel terrible, about any kind of illegal content that makes it to the site, especially when it involves children. That's something we would never want to happen and we've really worked very hard to prevent it as much as possible. As my colleagues have mentioned, we've taken a lot of steps that no adult company has taken. A lot of those steps, even the most recent ones, very few social media or video-sharing platforms in the world have done to try to avoid any of these kinds of situations from happening in the future, because it is awful and—

**The Chair:** Madame Gaudreau, thank you.

We'll turn to Mr. Angus now.

**Mr. Charlie Angus:** Thank you, Mr. Chair.

I'm very interested in the corporate structure of MindGeek because my understanding is that it's a Canadian company. You have 1,800 employees, 1,000 of whom I think are in the Montreal area. Who owns MindGeek?

**Mr. Feras Antoon:** At the beginning of 2010, MindGeek was called Manwin. It was owned by a German gentleman. His name was Fabian Thylmann, who resided in Europe.

In 2013, he sold the company to a group of people, and I'll walk you through them. When he sold it in 2013, we became MindGeek. David and I are Canadians, residents of Montreal. We are minority shareholders of the company. The majority shareholder, owning over 50% of the company, is a European national residing outside Canada.

The structure of the company has been European for 10—

**Mr. Charlie Angus:** Who is the European national?

**Mr. Feras Antoon:** His name is Bernd Bergmair and he owns over 50%. He is a passive investor and is not involved in daily activities.

The European structure of the company dates from over 10 years ago.

**Mr. Charlie Angus:** Thank you. That's very helpful.

What I found concerning when I was reading your terms of reference is that if people have complaints, for example, Serena Fleites, Rose Kalemba or anyone else, they have to go to the courts in Cyprus. You are here in Canada. I'm concerned that you would think you could avoid Canadian law here, especially if we're talking about child abuse or non-consensual acts.

Don't you think by telling someone in your terms of reference that if they don't like it, such a 13-year-old girl from California, to take their case case up in Cyprus, you're putting up more barriers, putting the onus on the victims, the survivors? That to me doesn't look like a corporation that's trying to do some good fun stuff with adult entertainment and make sure they're going to protect the survivors. Do you think the Cyprus thing would stand up in a court of law?

**Mr. Feras Antoon:** We abide by Canadian laws. There's no need of Cyprus. The structure and the company being European does not—

**Mr. Charlie Angus:** Why is it in your terms of reference? That's what I find confusing. Why is it in your terms of reference?

● (1355)

**Mr. Feras Antoon:** To be honest, I'll have to get back to you on that and ask our legal counsel. Clearly, we are living in Canada. We abide by Canadian law.

**Mr. Charlie Angus:** Yes.

**Mr. Feras Antoon:** For sure.

**Mr. Charlie Angus:** I just have a second or two left.

On your specially trained experts, I think that's a really important question for us. Could you get us the training manual? Mr. Bowe said they were formatters, not moderators. I think it's really important for us to get a sense of how many you have and what training they have so that they can actually identify the horrific videos we've referenced, and whether or not these videos are consensual. Could you get us those training manuals?

**Mr. David Tassillo:** There are a couple of things in there. I'll try to address them quickly to be sensitive to your time.

The content formatters are in a completely separate team. Those are not the individuals who actually do the screening of the content. That's a separate team that's actually located in Montreal. They work with different content providers to work on enhancing the videos and stuff like that. They have nothing to do with the compliance team.

No one at the company is actually allowed to work on the content until it passes through compliance. That was just a misunderstanding.

As for the manual, that is an internal document that I believe is best kept internal. It is a constantly evolving document. We'd like to stand behind what people see on the site, as those are our real words and those are our real actions. It's constantly evolving at every level.

**Mr. Charlie Angus:** Okay.

**The Chair:** Thank you, Mr. Angus.

**Mr. Charlie Angus:** I have a point of clarification, Mr. Chair.

They said they wanted to keep the documents internal, but can we have a discussion about our rights as parliamentarians, being that this is a Canadian company and a parliamentary investigation, and whether we can obtain those documents?