# EXHIBIT 7

**Chambers**
AND PARTNERS



CHAMBERS GLOBAL PRACTICE GUIDES

# Acquisition Finance 2023

Definitive global law guides offering comparative analysis from top-ranked lawyers

**USA: Law & Practice and Trends & Developments**
Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings
Cravath, Swaine & Moore LLP



Exhibit 7

# USA



## Law and Practice

**Contributed by:**
Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina
and Margaret R M Rallings
**Cravath, Swaine & Moore LLP**

## Contents

### 1. Market p.4
1.1   Major Lender-Side Players p.4
1.2   Corporates and LBOs p.4
1.3   Geopolitical and Global Health Considerations p.4

### 2. Documentation p.4
2.1   Governing Law p.4
2.2   Use of Loan Market Agreements (LMAs) or Other Standard Loans p.12
2.3   Language p.12
2.4   Opinions p.12

### 3. Structures p.13
3.1   Senior Loans p.13
3.2   Mezzanine/Payment-in-Kind (PIK) Loans p.13
3.3   Bridge Loans p.14
3.4   Bonds/High-Yield Bonds p.14
3.5   Private Placements/Loan Notes p.14
3.6   Asset-Based Financing p.15

### 4. Intercreditor Agreements p.15
4.1   Typical Elements p.15
4.2   Bank/Bond Deals p.16
4.3   Role of Hedge Counterparties p.16

### 5. Security p.16
5.1   Types of Security Commonly Used p.16
5.2   Form Requirements p.17
5.3   Registration Process p.17
5.4   Restrictions on Upstream Security p.19
5.5   Financial Assistance p.19
5.6   Other Restrictions p.19
5.7   General Principles of Enforcement p.19

### 6. Guarantees p.19
6.1   Types of Guarantees p.19
6.2   Restrictions p.20
6.3   Requirement for Guarantee Fees p.20

### 7. Lender Liability p.20
7.1   Equitable Subordination Rules p.20
7.2   Claw-Back Risk p.20

### 8. Tax Issues p.21
8.1   Stamp Taxes p.21
8.2   Withholding Tax/Qualifying Lender Concepts p.21
8.3   Thin-Capitalisation Rules p.22

### 9. Takeover Finance p.22
9.1   Regulated Targets p.22
9.2   Listed Targets p.23

### 10. Jurisdiction-Specific Features p.24
10.1 Other Acquisition Finance Issues p.24

**Exhibit 7**

**USA** LAW AND PRACTICE

**Contributed by:** Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings, Cravath, Swaine & Moore LLP

**Cravath, Swaine & Moore LLP** has been known as one of the premier US law firms for over two centuries. Each of its practice areas is highly regarded, and its lawyers are recognised for their commitment to the representation of clients' interests. Cravath's financing partners draw from a depth of capital markets and banking expertise to devise bespoke financing solutions. The firm's comprehensive knowledge of the investor bases enables it to structure and execute acquisition financings successfully, clearing the market and providing the borrowing company with the flexibility it requires in connection with its business case for the acquisition. Cravath has extensive experience in cross-border equity and debt financings, including equity-linked products and both high-yield and investment grade debt financings, and for US and non-US borrowers spanning multiple currencies. Cravath's cross-border experience includes negotiating the legal, regulatory and tax issues that present structuring and syndication challenges in non-domestic transactions.

## Authors



**Nicholas A Dorsey** is a partner in Cravath, Swaine & Moore's corporate department who focuses his practice on representing corporate issuers and borrowers, and financial institutions, lenders and other parties, in public and private offerings of securities, loan transactions and other financing transactions. He also represents companies in mergers and acquisitions and regularly advises clients in connection with public disclosure and corporate matters. He has extensive cross-border experience and counts multiple international companies and financial institutions among his diverse client base. Mr Dorsey joined Cravath in 2009 and was elected a partner in 2017.



**Ryan J Patrone** is a partner in Cravath, Swaine & Moore's corporate department who focuses his practice on representing issuers and investment banking firms in capital markets transactions, including initial public offerings and other primary and secondary equity offerings, as well as investment grade and high-yield debt offerings. He also has significant experience representing clients in mergers and acquisitions, corporate governance, shareholder activism defence and general corporate matters. Mr Patrone joined Cravath in 2015 and was elected a partner in 2022.

**Exhibit 7**

**USA** LAW AND PRACTICE

**Contributed by:** Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings, Cravath, Swaine & Moore LLP



**Kelly M Smercina** is a partner in Cravath, Swaine & Moore's corporate department who focuses her practice on representing corporate clients and investment banking firms in a wide range of capital markets and other financing transactions, including in connection with acquisitions and spin offs. She also has significant experience representing clients in mergers and acquisitions and corporate governance matters. Ms Smercina joined Cravath in 2015 and was elected a partner in 2022.



**Margaret R M Rallings** serves as European counsel in Cravath, Swaine & Moore's corporate department and focuses her practice on capital markets transactions, including cross-border high-yield debt and equity offerings, and mergers and acquisitions. Her practice primarily focuses on representing issuers, underwriters and initial purchasers in global capital markets transactions. Ms Rallings joined Cravath in 2010 and was elected European counsel in 2018.

---

## Cravath, Swaine & Moore LLP

Worldwide Plaza
825 Eighth Avenue
New York
NY 10019-7475
USA

Tel: +1 212 474 1000
Fax: +1 212 474 3700
Email: newyork@cravath.com
Web: www.cravath.com



**Exhibit 7**

**USA** LAW AND PRACTICE

**Contributed by:** Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings,
**Cravath, Swaine & Moore LLP**

# 1. Market

## 1.1 Major Lender-Side Players

US acquisition finance for both strategic (ie, corporate) and financial sponsor (including for LBOs) acquirers is typically arranged by US banks, international banks and/or non-bank lenders (in particular, direct lenders). In recent years, non-bank lenders have played an increasingly important role in a variety of US acquisition financings. One key difference between US banks and non-bank lenders is that US banks are subject to more regulatory oversight. Such oversight increased following the 2008 financial crisis and created additional market opportunities for non-bank lenders.

## 1.2 Corporates and LBOs

Please see **1.1 Major Lender-Side Players**.

## 1.3 Geopolitical and Global Health Considerations

The widespread business disruptions triggered by COVID-19 initially caused many companies to consider measures to evaluate and enhance liquidity. The pandemic also initially triggered a significant slowdown in acquisitions, and therefore acquisition finance. Companies that had announced acquisition transactions prior to the pandemic carefully analysed the terms of their financing documentation to determine if they would be able to satisfy draw-down conditions. As acquisition activity resumed and acquisition finance began to rebound, some borrowers sought "add-backs" to EBITDA and other financial metrics for lost cash flow or profits as a way to normalise financial performance during 2020 and other affected periods. Acquisition activity, and acquisition finance, rebounded in 2021, but slowed again in 2022 in light of Russia's invasion of Ukraine and associated geopolitical instability,

rising inflation and interest rates, and fears of a potential recession.

# 2. Documentation

## 2.1 Governing Law
### Committed Financing

In the USA, a potential acquirer is not legally required to have "certain funds", or fully committed financing, either at the time it makes a public offer to acquire a company or at the time it enters into a definitive acquisition agreement. This is in contrast to the practice in the UK and other European jurisdictions where fully committed financing is typically required prior to submitting a public offer. Nonetheless, it is common for acquirers to obtain committed acquisition financing.

The seller of a business (or board of directors and management team of a public target company) usually requires a potential acquirer to obtain committed financing before it will permit the potential acquirer to proceed to advanced stages in the acquisition negotiation or before it will execute a definitive acquisition agreement. Even if not formally required as part of a sales process, potential acquirers may obtain committed financing to demonstrate that they are serious bidders with the financial wherewithal to complete the acquisition in a timely manner.

Further, in US transactions, the definitive documentation for an acquisition rarely, if ever, includes a condition to closing that the acquirer has obtained funding sufficient to pay the purchase price; therefore, obtaining committed financing provides comfort to the acquirer that it will have the necessary funds on the closing date. For these and other reasons, committed financing is common for acquisitions. When an acquirer does not have available cash or borrow-

**Exhibit 7**

# USA LAW AND PRACTICE

**Contributed by:** Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings, **Cravath, Swaine & Moore LLP**

ing capacity under existing financing arrangements, the alternative to committed financing is a "best efforts" financing.

In transactions involving committed financing, the acquirer will obtain a "commitment letter" from one or more lenders that will be executed (or in certain cases countersigned by the acquirer, the lenders having submitted signed documents prior to the buyer submitting a bid) on, or shortly before, the date on which the definitive acquisition agreement is executed. In the commitment letter, the lenders will agree to provide the financing set forth therein, subject to the satisfaction or waiver of certain limited conditions. The commitment letter is accompanied by one or more term sheets and fee letters, and may also be accompanied by a securities engagement letter; these documents are referred to collectively as the "commitment papers".

In lieu of, or prior to, receiving a commitment letter, an acquirer may ask one or more potential lenders to execute and deliver to it a "highly confident letter". A highly confident letter states that, subject to customary conditions, the financial institution is "highly confident" that it can successfully arrange the acquisition financing for the potential acquirer. Importantly, a highly confident letter is not a legally binding commitment to provide financing.

## Loan Facilities and Debt Securities

US acquisition financings may involve one or more loan facilities. Loans almost always bear interest at floating rates. At a high level, term loan "B" financings can be described as loans provided by institutional lenders or direct lenders to non-investment grade borrowers that require minimal amortisation. At a high level, term loan "A" financings can be described as loans provided by traditional banks to both investment

grade and non-investment grade borrowers that require more substantial amortisation.

Loan documents typically include the credit agreement, legal opinions provided by the borrower's counsel, certificates signed by officers of the borrower and, where applicable, guarantee and security documents. In transactions where the acquirer has obtained a commitment letter, drafting of the loan documentation will typically commence shortly after the execution of the commitment papers and will be based on the terms set forth therein, and in many cases the loan documentation will be based on a "precedent" loan agreement that was agreed in the commitment papers.

US acquisition financings may also involve the issuance of debt securities. Debt securities may bear interest at fixed or floating rates, though fixed rate securities are more common. Debt securities may be convertible into other securities, such as equity. The primary documentation for an offering of debt securities includes an offering document provided to potential investors (ie, an offering memorandum or prospectus), a purchase agreement or underwriting agreement, an indenture and notes, as well as, where applicable, guarantee and security documents.

## Commitment Papers
### *Commitment letters*
Commitment letters include the following principal components:

- the lenders' several (rather than joint) commitment to provide all or a portion of the facilities;
- if the facilities will be syndicated, the lenders' rights and the borrower's obligations in respect of syndication of the facilities;

**Exhibit 7**

**USA** LAW AND PRACTICE

**Contributed by:** Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings,
**Cravath, Swaine & Moore LLP**

- a summary of the contemplated acquisition transaction, including any restructuring, any additional contemplated financing and any necessary refinancing of indebtedness of the target company or the acquirer;
- one or more term sheets describing the key terms of the facilities; and
- the conditions that must be satisfied before the lenders are obligated to fund.

Prior to executing a commitment letter, the arrangers and their counsel will review the definitive acquisition agreement to confirm it is satisfactory to them, and then will impose a related condition to funding that, substantially concurrently with funding, the acquisition will be consummated in the manner contemplated by the definitive acquisition agreement (without amendments or waivers thereto that are materially adverse to the lenders to which they have not consented). In addition to confirming that the definitive acquisition agreement reflects the transaction structure (including any required refinancing) and other key terms as understood by the arrangers, the arrangers and their counsel will review the acquisition agreement to confirm that it includes customary lender-protection provisions, often referred to as the "Xerox" provisions. These provisions will, among other things:

- waive any potential claims by the seller and target company against the financing sources;
- establish New York courts as the exclusive forum for, and waive any right to a jury trial in respect of, any disputes involving the financing sources;
- extend to the financing sources the benefit of certain provisions, such as any cap on damages; and
- provide that the financing sources are third-party beneficiaries of these protective provi-

sions such that they cannot be modified in a manner adverse to them without consent.

The commitment letter will include a condition precedent that any other contemplated financing, such as a financial sponsor's equity contribution, or the refinancing of indebtedness of the acquirer or target company, will be consummated substantially concurrently with (or prior to) the funding of the facilities. The commitment letter will also include a condition that, since the date of the acquisition agreement, no material adverse change (MAC) has occurred at the target business, and for this purpose the definition of "material adverse change" normally matches the definition of such term in the definitive acquisition agreement. In the case of a strategic acquirer, the commitment letter may also include a no MAC condition with respect to the acquirer's business.

Other customary conditions include the execution of the loan documentation, the payment of all fees and the delivery of specified historical and pro forma financial information, customary legal opinions of counsel to the borrower, borrowing notices and other borrower certificates, and "know your customer" documentation. Although drafts of the commitment papers will typically include a condition that the lenders are satisfied with the results of their due diligence investigation, this diligence-related condition is almost always satisfied and removed before the commitment papers are executed.

The banks also often negotiate to include a co-operation covenant, whereby the acquirer agrees to co-operate (and will make commercially reasonable efforts to procure co-operation from the target) with the financing process (including drafting of offering documentation (if applicable)

**Exhibit 7**

# USA LAW AND PRACTICE

**Contributed by:** Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings,
**Cravath, Swaine & Moore LLP**

and participating in diligence sessions and the marketing or syndication process).

## Syndication

Depending on the nature and timing of any contemplated syndication, the arrangers may include a condition that a minimum number of consecutive business days (often 15) have elapsed between the delivery of the required financial information and the required funding date. This minimum period is referred to as the "marketing period" and is designed to ensure that the arrangers have sufficient information for a sufficient period of time in order to syndicate the facilities.

Alternatively, the arrangers might include a condition stating that the lenders are not required to fund prior to a specified date, which is referred to as the "inside date". Although the specific date chosen as the "inside date" is very important to such a comparison (the greater the amount of time, the more flexibility afforded to the lenders), lenders generally prefer to have a marketing period rather than an inside date because a marketing period ensures they have the required financial information in hand to syndicate the facilities.

## Bridge loans

In the case of bridge loan commitments (as compared to term loan commitments), it is typical to have a marketing period (often 15 consecutive business days) that commences upon the delivery of the required financial information and certain other customary information necessary to prepare an offering memorandum or prospectus for the contemplated debt securities. Both borrowers and lenders usually intend for debt securities to be issued in advance of, and in lieu of, the funding of the bridge facility, so the marketing period is designed to ensure that the investment banks engaged to lead the offering of debt securities

have sufficient information for a sufficient period of time in order to place the securities.

## The SunGard approach

In the USA, an acquirer will often obtain committed acquisition financing with very few conditions precedent to funding, in particular as it relates to the representations and warranties that must be accurate on the funding date. The approach to limited conditionality is commonly referred to as the "SunGard approach". Under the SunGard approach, the only representations and warranties in the definitive financing documentation the accuracy of which serve as a condition to funding are certain fundamental "specified representations" (such as due authorisation and enforceability of the loan documentation) and certain representations and warranties about the target company contained in the acquisition agreement that are material to the interests of the financing sources, the accuracy of which is a condition to the acquirer's obligation to consummate the acquisition. Notably, the SunGard approach requires the lenders to fund even if certain collateral (for example, real estate mortgages) cannot be put in place prior to the closing date.

## Fee letters

The interest rate on the facilities, and certain other fees that will be payable to all lenders, will usually be documented in the term sheet attached to the commitment letter. In contrast, fees that will be payable in part or in full only to the arrangers and their respective affiliates will usually be documented in one or more separate fee letters to protect the confidentiality of such information. Examples of fees payable in part or in full only to the arrangers and their affiliates include underwriting fees, transaction structuring fees and administrative agent and collateral agent fees.

**Exhibit 7**

**Contributed by:** Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings,
**Cravath, Swaine & Moore LLP**

In a syndicated loan transaction, the fee letter will also include "market flex" provisions. Market flex provides the arrangers with the right to modify the terms of the facilities that have been previously agreed and are set forth in the term sheet attached to the commitment letter in a manner that is more "lender-friendly" in order to enable the arrangers to successfully syndicate the facility. "Success" is determined based on whether the arrangers are able to sell down their position from the initial commitment levels set forth in the commitment letter to at or below pre-agreed levels.

Importantly, market flex does not afford the arrangers open-ended flexibility. Instead, the market flex section of the fee letter almost always provides a specific list of permitted changes, such as a specified increase in the interest rate, specified changes to the capital structure (for example, the ability to reallocate a specific amount of debt among different tranches) or the tightening of specified covenants and related "baskets" in the manner prescribed therein.

### Securities engagement letters
Often an acquirer requires committed financing but desires that securities (typically, debt securities), rather than loans, comprise at least a portion of the acquisition financing. In the USA, the market practice is for financing sources to commit to a bridge loan facility (ie, a temporary loan facility), rather than commit to underwrite the securities themselves, with the intention that the securities will be issued in advance of, and in lieu of, the funding of the bridge facility.

As a result, acquirers will normally obtain a commitment for a bridge facility in an amount equal to the amount of securities they desire to issue and simultaneously enter into a securities engagement letter whereby they will engage an

investment bank to lead the offering of those securities, with the intention of issuing the securities prior to closing of the acquisition. Proceeds of debt securities issued prior to completion of an acquisition are typically held in an escrow account pending completion or redemption (at par plus accrued and unpaid interest) if the acquisition is not completed.

The "securities engagement letter" is executed by the acquirer and one or more investment banks and sets forth the terms of the engagement of the investment banks, including fees. The investment banks selected to lead the securities offering are typically the broker-dealer affiliates of the arrangers that have provided the commitment for the bridge loan. The engagement letter will often include terms for the debt securities that the investment banks will attempt to achieve on a "best efforts" basis, that they were not willing to underwrite in the bridge loans.

### Credit Agreement
The primary definitive document for a loan is a credit agreement. If the acquirer has obtained a commitment letter, the credit agreement will be based on the terms set forth in the term sheet attached to the commitment letter (as may be otherwise agreed between the borrower and the lenders) and will supersede the commitment letter, other than certain fee and indemnity provisions that may by their terms survive. The main provisions of a credit agreement include:

• the definitions of relevant terms, including financial terms;
• representations and warranties;
• affirmative covenants;
• negative covenants;
• prepayment provisions;

**Exhibit 7**

**Contributed by:** Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings,
Cravath, Swaine & Moore LLP

• conditions precedent to funding, including, in the case of a revolving facility, conditions to future borrowings;
• amendment provisions;
• events of default; and
• other miscellaneous provisions.

The definitions section of a credit agreement receives significant attention because certain defined terms, especially financial terms such as "EBITDA", "total net leverage" or "excess cash flow" are fundamental to many of the key restrictions and obligations of the borrower.

The representations and warranties in a credit agreement will focus on the combined business of the acquirer and the target company, as well as the enforceability of the loan documentation and any guarantee and collateral documents. The representations and warranties will be made at the time the credit agreement is executed and again at closing of the facility (ie, the initial funding, which typically corresponds with the closing date of the acquisition). In the case of a revolving credit facility, the representations and warranties will be made again on future borrowing dates.

Affirmative covenants obligate the borrower to undertake certain actions, such as making necessary filings and registrations in order to maintain in effect material licences and other authorisations that are necessary to operate the business, and delivering financial statements and other financial information to the lenders at periodic intervals. Loans may also include one or more financial covenants. Financial covenants require the borrower to satisfy a financial test at specified dates, often at the end of each fiscal quarter. Common financial covenants include maximum leverage ratios and minimum interest coverage ratios. Of course, the credit agreement

also requires the borrower to make interest, amortisation and principal payments on time.

Negative covenants will also be included in a credit agreement. Negative covenants are "incurrence-based", meaning they limit the ability of the business to take certain actions and are evaluated at the time a company desires to take such action. Examples of negative covenants include limitations on the incurrence of additional indebtedness, permitting liens to encumber assets or merging or consolidating with other entities.

In addition to any required amortisation payments, the credit agreement will also set forth the optional and mandatory prepayment terms, including any associated premiums or penalties. In the USA, term loan "B" financings typically include prepayment premiums if repaid within a specified (relatively short) period of time following closing, while term loan "A" financings are typically prepayable at par. Mandatory prepayment may be required with the proceeds of certain securities offerings, insured casualty events and asset sales. The borrower may also be required to make periodic prepayments of the term loan depending on the level of the business' "excess cash flow".

A US acquisition finance loan facility will usually follow the SunGard approach – in other words, there will only be limited conditions to funding. If the facility permits future borrowings, such as in the case of a revolving credit facility, the conditions precedent to future borrowings may be more onerous – for example, it may require that all (rather than only some) representations and warranties are accurate as of each date the revolving facility is drawn, subject to customary materiality qualifiers. Some facilities provide that the limited conditionality afforded by the Sun-

**Exhibit 7**

## USA LAW AND PRACTICE

**Contributed by:** Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings, Cravath, Swaine & Moore LLP

Gard approach applies to future borrowings if used to finance an acquisition.

The amendments section of a credit agreement describes what vote of the lenders is required to make specified changes (often a majority in interest, occasionally 66.6%). Certain changes will require the approval of the administrative agent, and certain fundamental changes will require the approval of all affected lenders. The credit agreement may include a so-called "yank-a-bank" provision, which allows the borrower to replace non-consenting lenders in certain circumstances, such as when the consent of all affected lenders is required for a proposed amendment and the proposed amendment receives a minimum vote (such as a majority in interest).

The events of default section will specify which events give the lenders the ability to accelerate the loans, including any required grace periods. Because lenders operate on a "cost plus" model, the credit agreement will also include tax and cost provisions designed to ensure that each lender receives payments free of withholding taxes and other costs (or receives a "gross-up" payment for such amounts). The credit agreement will also include a governing law section, which is almost always the laws of the state of New York.

### Indenture

The primary definitive documents for the issuance of debt securities are the offering document provided to potential investors, the indenture and the notes. In a public offering of securities registered with the US Securities and Exchange Commission (the SEC), the offering document is known as a prospectus. In a private offering of securities made pursuant to an exemption from SEC registration requirements, the offering document is known as an offering memorandum or offering circular. In either case, the offering document will include significant information about the issuer, including information about its business, risk factors, industry, financial statements and other financial information (including non-GAAP/IFRS key performance indicators) and management's discussion and analysis of the financial results, liquidity and cash flows of the business. The offering document will also include the proposed terms of the debt securities in a section called "Description of Notes".

If the acquirer has obtained a commitment for a bridge facility, the proposed terms of the debt securities will be based on the terms set forth in the bridge term sheet attached to the commitment letter (as may be otherwise agreed between the issuer and the investment banks, including certain terms that the investment banks agree to attempt to achieve on a "best efforts" basis), and usually refer to an agreed precedent indenture.

After the offering document is distributed to potential investors, any changes to the terms therein are documented in a supplement. At a minimum, a pricing supplement will be distributed to investors reflecting the final economic terms including interest rate, interest payment dates and stated maturity date. The terms reflected in the "Description of Notes", as supplemented by the pricing supplement and any other supplements, are then documented in the indenture and the notes.

The indenture is the legally binding agreement executed by the issuer (and the guarantors, if applicable) and a trustee, on behalf of the bondholders, that sets forth the terms of the debt securities, including the payment obligations set forth in the notes. The main provisions of an indenture include:

**Exhibit 7**

**Contributed by:** Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings,
**Cravath, Swaine & Moore LLP**

• the definitions of relevant terms, including financial terms;
• affirmative covenants;
• negative covenants;
• redemption provisions;
• amendment provisions;
• events of default; and
• other miscellaneous provisions.

The indenture will also include a governing law section, which is almost always the laws of the state of New York.

Many of these sections are consistent with the corresponding sections found in credit agreements. One difference is that the affirmative covenants in an indenture are generally less onerous than in a credit agreement. In an indenture, the affirmative covenants are typically limited to basic requirements such as the maintenance of corporate existence, the delivery of periodic financial statements (and usually reports relating to those financial statements), repayment covenants in the case of certain events (including asset sales and a change of control) and, of course, the obligation to satisfy the payment obligations in the indenture and notes.

In the absence of extenuating circumstances, such as a distressed issuer, indentures do not include financial covenants. Historically, covenants in indentures have been less restrictive than in credit agreements due in large part to a recognition of the greater difficulty in seeking amendments to indentures and the higher prepayment penalties associated with debt securities. However, in light of the relatively recent convergence between high-yield debt securities and the leveraged loan market, particularly the term loan "B" market, these differences have become much less pronounced. For example, like indentures, many term loan "B" facilities do not have financial covenants. Debt securities used in acquisition finance rarely require amortisation (although term loan "B" facility amortisation is minimal) and do not require repayment with excess cash flow.

One of the most notable differences between credit agreements and indentures is that debt securities are more expensive to prepay. Investment grade debt securities are generally redeemable only by paying a make-whole premium (often with a "par call" feature, which allows the securities to be redeemed at par a few months to a year before maturity). Non-investment grade debt securities include a call schedule that becomes less expensive over time, eventually allowing redemption at par (floating rate notes, which are considered more similar to loan instruments, generally have a lower prepayment premium than fixed rate notes). In contrast, loans are generally prepayable with little or no premium.

An indenture does not include representations and warranties; instead, representations and warranties are made by the issuer to the underwriters in the underwriting or purchase agreement. In addition, an issuer (and underwriter) can face US securities law liability for material misstatements or omissions in the offering document, which creates a strong incentive for accurate statements in the offering document. An indenture does not include conditions to funding because the indenture is executed substantially simultaneously with funding. Indentures generally permit, subject to compliance with the covenants in the indenture, the issuance of additional notes of the same or a different series than the notes originally issued. In the case of an issuance of additional notes, a new underwriting or purchase agreement will most likely be entered

**Exhibit 7**

**USA** LAW AND PRACTICE

Contributed by: Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings, Cravath, Swaine & Moore LLP

into, which will require the issuer to make representations and warranties again.

The note is the legally binding agreement executed by the issuer and acknowledged by the trustee that sets forth the payment obligations of the issuer. In many cases, the note is a relatively short document that refers back to the other terms contained in the indenture, including the covenants. Sometimes the note also recites the principal covenants in summary form. Typically the indenture provides that one or more series of notes may be issued pursuant to the same indenture. The note (and potentially a supplemental indenture) will set forth specific terms that apply to that particular series of notes but may not apply to other series of notes issued under the same indenture, such as any optional redemption terms.

## 2.2 Use of Loan Market Agreements (LMAs) or Other Standard Loans

In the USA, there is no standard form of documentation for loans or the issuance of debt securities. However, certain industry groups – for example, in the case of loan documentation, the Loan Syndications & Trading Association (LSTA) – have developed certain model clauses. In US acquisition financings, the documentation is typically based on the financial sponsor's form documents, if applicable, the lead arranger's or underwriter's form documents, a precedent transaction previously undertaken by the acquirer or a precedent transaction with similar transaction characteristics that is agreed by the parties. Please see **2.1 Governing Law** for a discussion of standard agreements.

## 2.3 Language

US acquisition finance documentation is prepared in the English language.

## 2.4 Opinions

### Credit Agreement Legal Opinions

US credit agreements typically include a condition to closing that the borrower's counsel has delivered customary legal opinions addressed to the lenders and applicable agents, including the administrative agent and collateral agent. Common opinions include due authorisation and enforceability of the loan documentation; valid existence and good standing of the borrower and the guarantors; "no conflicts" with organisational documents, applicable law or material contracts; and no required consents. For secured facilities, legal opinions will also often cover the proper grant and perfection of security interests.

Legal opinions are typically provided only by counsel to the borrower, not by counsel to the lenders. In multi-jurisdictional transactions, borrower's counsel from each jurisdiction where a guarantor is incorporated or security is granted will be expected to deliver an opinion to the lenders.

### Debt Securities Legal Opinions

Underwriting or purchase agreements typically include a condition to closing that each of the issuer's and the underwriters' counsel has delivered customary legal opinions addressed to the underwriters. The scope of these opinions is substantially similar to opinions provided for a loan (although, as noted above, for a loan it is typically only the borrower's counsel that delivers an opinion). In the case of a securities offering registered with the SEC, the issuer's counsel will also deliver an opinion addressed to the issuer confirming the legality of the securities, which opinion will be publicly filed with the SEC. Both issuer's counsel and the underwriters' counsel will also deliver negative assurance letters following a customary due diligence investigation.

**Exhibit 7**

# USA LAW AND PRACTICE

**Contributed by:** Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings,
**Cravath, Swaine & Moore LLP**

## 3. Structures

### 3.1 Senior Loans

Debt structures commonly used for US acquisition finance include senior secured debt and senior unsecured debt. Senior subordinated debt is also used, though with less frequency.

#### Senior Secured Debt

In the US, term loans and/or debt securities are commonly used to finance a portion of an acquisition. Acquirers who do not otherwise have a revolving credit facility (for example, a special purpose entity formed by a financial sponsor) will also establish such a facility at the time of securing the other financing, typically for working capital purposes. The commitment size and availability under revolving credit facilities may be based on the cash flows of the business or with reference to particular asset classes, such as inventory and accounts receivable. Term loans, debt securities and revolving credit facilities may be secured. They may also be combined in different levels of lien priority; for example, it is relatively common for a financial sponsor acquirer to obtain a first-lien revolving credit facility, a first-lien term loan and a second-lien term loan. Revolving credit facilities are secured on a first-lien basis (although, in the case of an asset-based revolving facility, the first-lien collateral may be limited to the applicable assets while other assets may be pledged on a junior lien basis or remain unencumbered).

In Europe, secured revolving credit facilities are often secured on a "super-senior" basis, with priority over other senior secured debt (usually NY law-governed debt securities) in receiving the proceeds of common security enforcement.

#### Senior Unsecured Debt

Unsecured term loans and/or debt securities may also be used to finance an acquisition. Investment grade facilities are normally unsecured, while non-investment grade facilities will often include one or more secured debt instruments. In European acquisition financing, there will often be a tranche of secured debt instruments, with a tranche of unsecured debt instruments (usually issued by a parent company of the secured debt issuer) also proposed to be issued. In European acquisition financing, "unsecured" debt instruments are often still secured on a subordinated basis on minimal security (eg, share pledges) and are party to the intercreditor agreement.

#### Senior Subordinated Debt

Debt that is contractually subordinated to other debt of the same obligor may be used to finance an acquisition. In European high-yield debt securities issuances, "senior subordinated" can mean that the issuer's primary obligations are senior and the debt securities are guaranteed on a subordinated basis by entities that also guarantee other group debt on a senior basis.

Please see **2.1 Governing Law** for further information on loans.

### 3.2 Mezzanine/Payment-in-Kind (PIK) Loans

Other less common US acquisition financing structures include mezzanine financings and pay-in-kind (PIK) instruments.

#### Mezzanine Financing

Financings that include both debt-like and equity-like components are commonly known as mezzanine financings. The reference to mezzanine relates to the fact that the obligations are subordinate to some or all of the debt in the cap-

**Exhibit 7**

Contributed by: Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings,
Cravath, Swaine & Moore LLP

ital structure yet prior to some or all of the equity in the capital structure. The issuance of preferred shares is an example of a relatively common US mezzanine financing. Preferred shareholders rank behind debt-holders and ahead of common equity holders. Preferred shareholders may also be entitled to the regular payment of dividends, which may accumulate in the event of non-payment.

### PIK Debt
PIK debt allows the obligor to pay upcoming interest payments in cash or, subject to certain conditions, in kind – ie, through an increase in the aggregate outstanding principal amount of the relevant instrument. The obligor may have discretion whether to pay interest in cash or in kind, or the debt instrument may prescribe cash or in kind depending on a specified metric, such as the amount of time that has elapsed since closing or the issuer's financial performance or financial position.

When included in the capital structure, PIK debt will often be issued by the parent company of the obligor of other debt, and the PIK issuer will generally not be part of the covenant group for other debt that is issued. This structure excludes the PIK debt from the covenant calculations for the other parts of the capital structure, and generally is not secured or guaranteed. PIK debt typically has similar covenants to other debt (in particular debt securities) in the capital structure with customary modifications, including tighter restrictions on dividends and other restricted payments.

In particular in European acquisition financing transactions, financial sponsors often add PIK debt to the financing structure after completion of the acquisition as part of a recapitalisation to pay dividends.

### 3.3 Bridge Loans
In the USA, the market practice is for financing sources to commit to a bridge loan facility (ie, a temporary loan facility), rather than commit to underwrite the securities themselves, with the intention that the securities will be issued in advance of, and in lieu of, the funding of the bridge facility. As a result, acquirers will normally obtain a commitment for a bridge facility in an amount equal to the amount of securities they desire to issue and simultaneously enter into a securities engagement letter whereby they will engage an investment bank to lead the offering of those securities, with the intention of issuing the securities prior to closing of the acquisition.

If bridge loans are funded, they are structured in such a way (ie, through interest rate step-ups) to encourage the borrower to refinance as soon as possible. Bridge loans typically have an initial maturity of one year, and, if they are not refinanced within a year, they typically convert into term loans with a longer maturity that can be exchanged for debt securities.

Please see **2.1 Governing Law** for further information on bridge loans and debt securities.

### 3.4 Bonds/High-Yield Bonds
Debt securities are commonly used to finance a portion of an acquisition. As with term loans and revolving credit facilities, debt securities may be secured and may be combined in different levels of lien priority. Please see **2.1 Governing Law** for further information on debt securities.

### 3.5 Private Placements/Loan Notes
Securities offerings may be conducted on a public basis (ie, SEC-registered) or a private basis (ie, pursuant to an exemption from the SEC registration requirements). Please see **2.1 Governing Law** for further information on debt securities.

**Exhibit 7**

**Contributed by:** Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings,
**Cravath, Swaine & Moore LLP**

Loan notes are sometimes requested by lenders to evidence the obligation owed by the borrower to the lenders but do not represent a separate financing structure in the USA. Occasionally the seller of a business will agree to receive a portion of the purchase price at a future date as evidenced by a note owed by the acquirer to the seller, but such arrangements are rare.

## 3.6 Asset-Based Financing

As described in **3.1 Senior Loans**, it is relatively common for a financial sponsor acquirer to obtain a first-lien revolving credit facility, a first-lien term loan and a second-lien term loan, and from time to time that revolving credit facility is an asset-based revolving facility. Asset-based revolving credit facilities have a maximum commitment size and borrowings are further limited by a "borrowing base", which is typically measured with reference to the value of inventory and accounts receivable. Asset-based revolving credit facilities can involve substantial upfront due diligence, including field exams and appraisals, so advance planning is required when considered as a component of acquisition finance.

Structured finance products, such as asset-based securitisations, are generally not used in US acquisition finance, though they may be implemented following closing.

# 4. Intercreditor Agreements

## 4.1 Typical Elements

For non-investment grade debt financings, it is fairly common to combine two or more secured debt instruments with different levels of lien priority on the same collateral. All of the assets may be pledged to the creditors under one or more debt instruments on a first-lien basis and to the creditors under other debt instruments on

a second-lien basis. For example, some financial sponsor acquirers structure their acquisition debt to include a first-lien revolving credit facility, a first-lien term loan and a second-lien term loan. Alternatively, creditors under different debt instruments may have "crossing liens", such as when the lenders on a receivables and inventory-based facility have a first-lien security interest on receivables and inventory and a second-lien security interest on all of the borrower's other assets, while the lenders of a term loan have a second-lien security interest on receivables and inventory and a first-lien security interest on all of the borrower's other assets.

In structures where different sets of creditors have different lien priorities, a representative of each creditor class will execute a document known as the intercreditor agreement. In an intercreditor agreement, the different classes of secured creditors will document their agreement with respect to, among other things:

- the relative priorities of their claims and the repayment and security enforcement proceeds "waterfall";
- the limitations imposed on junior lien creditors, including the "standstill" provision;
- certain bankruptcy matters, including the waiver by junior lien creditors of the right to object to a debtor-in-possession (DIP) facility that is approved by the first-lien creditors, subject to certain limitations including a cap on the size of the DIP facility; and
- any turnover obligations imposed on junior lien creditors when they receive a payment in contravention of the agreed lien priority.

The intercreditor agreement also often includes a purchase option provision that allows the junior lien creditors to purchase all of the interests of the senior lien creditors following an event of

**Exhibit 7**

**Contributed by:** Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings,
**Cravath, Swaine & Moore LLP**

default under the instruments governing the senior lien debt.

One of the most important provisions in an intercreditor agreement is referred to as the "standstill" provision. This provision provides that only the first-lien creditors may exercise enforcement rights for a given period of time, often 180 days, following a trigger event such as an acceleration event under a second-lien debt instrument. If the standstill period has elapsed and the first-lien creditor class is not pursuing enforcement, the second-lien creditors may take enforcement action. To the extent the second-lien creditors receive proceeds from enforcement, they remain subject to the repayment waterfall.

In European acquisition financing, debt securities governed by NY law are often secured on a pari passu basis with term loans or a revolving credit facility, with the intercreditor agreement governing the agreement amongst these pari passu creditors. In transactions with debt securities and revolving credit facilities, although both secured on a first lien basis, the revolving credit facilities (as well as potentially hedging) are usually secured on a "super-senior" basis, which means the lenders under the revolving credit facility have priority over other senior secured debt (usually NY law-governed debt securities) in receiving the proceeds of common security enforcement, and usually control enforcement of the security in the first instance.

### 4.2 Bank/Bond Deals
In transactions that involve bank loans secured on a first-lien basis and debt securities secured on a second-lien basis, the debt securities will normally have a "silent" second lien, meaning that the first-lien lenders would control enforcement pursuant to the intercreditor agreement and the bondholders would be subject to the

standstill and other limitations discussed in **4.1 Typical Elements**. In bank/bond transactions where both creditor groups share a first lien on the collateral (see **3.1 Senior Loans** and **4.1 Typical Elements** for discussions of "super-senior" priority), it is also often the case that the bank lenders are able to control enforcement, but their ability to do so may be more limited, in particular when the aggregate principal amount of bank loans is less than the aggregate principal amount of debt securities with the same lien priority.

### 4.3 Role of Hedge Counterparties
In the USA, hedge counterparties are not typically direct parties to intercreditor agreements. Hedging arrangements provided by secured lenders or their affiliates may be guaranteed and secured on the same basis as secured loans. Typically, hedge counterparties have no voting rights or other direct control mechanisms.

## 5. Security

### 5.1 Types of Security Commonly Used
In the USA, the most important legal principles related to security interests in personal property are found in Article 9 of the Uniform Commercial Code (UCC), as adopted by the states. In contrast, security interests in real property are generally covered by other state law rather than the UCC.

Article 9 of the UCC addresses the "creation" and "perfection" of a security interest in personal property. Creation is the process by which a creditor obtains a valid security interest in the assets of a debtor. Perfection is the process by which a creditor ensures that its security interest will be effective in a bankruptcy of the debtor.

**Exhibit 7**

Contributed by: Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings,
**Cravath, Swaine & Moore LLP**

In order for a security interest in personal property to be properly created (in other words, attach to the personal property of a debtor):

• value must be given to the debtor;
• the debtor must have rights in the collateral; and
• in general, the debtor must execute a security agreement.

The requirements for perfection depend on the type of personal property that is pledged.

When negotiating which assets will comprise the collateral package for the secured creditors, foreign assets may be excluded for a number of reasons, including burden and expense, lack of materiality or as a result of tax considerations. Other assets, including those in the USA, may be excluded if regulatory or other third-party approval is required to grant a valid security interest therein. As a matter of negotiation, borrowers or issuers of secured debt also often seek to exclude:

• certain deposit and securities accounts;
• assets securing purchase money debt;
• cash collateral securing letters of credit;
• intent-to-use trademarks;
• immaterial assets;
• assets for which granting a security interest involves high taxes or other burdens; and
• assets of subsidiaries that are not wholly owned.

Even if some of the assets described above are excluded from the collateral package, any proceeds therefrom may be included.

## 5.2 Form Requirements
In some cases, credit agreements and indentures include detailed collateral provisions. More commonly, a separate collateral agreement (or a combined, guarantee and collateral agreement) is executed. In any event, in US secured transactions the applicable collateral document will include a "granting clause" whereby the borrower or issuer and any other applicable credit parties will grant a security interest in the collateral to secure the payment of principal, interest and other monetary obligations, as well as the performance of the obligations, under the loan or bond documentation. The granting clause is important to create the security interest.

In the case of secured loans, the security interest will be granted in favour of the lenders and agents (and issuing banks, if the credit agreement provides for the issuance of letters of credit) and may also extend to providers of cash management services and hedge obligations, in particular when such cash management and hedge providers are affiliates of the lenders. In the case of debt securities, the security interest will be granted in favour of the collateral agent for itself and on behalf of the bondholders. The applicable document will also set forth any collateral delivery requirements (for example, the delivery of certificated shares and promissory notes) and any covenants, such as an obligation to notify the collateral agent of any changes to corporate name or corporate structure.

## 5.3 Registration Process
Common perfection techniques include the filing of a UCC financing statement, taking possession of the collateral, or obtaining control of the collateral. The appropriate perfection technique depends on the nature of the property and applicable state law.

Assets that are frequently pledged in the USA, and the corresponding actions typically taken to

**Exhibit 7**

# USA LAW AND PRACTICE

**Contributed by:** Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings,
**Cravath, Swaine & Moore LLP**

create and perfect a security interest therein, are set forth below.

## Shares

Creation: security agreement or pledge agreement.

Perfection: if certificated, possession; if uncertificated, control agreement.

## Inventory

Creation: security agreement.

Perfection: filing of UCC financing statement.

## Bank Accounts

Creation: security agreement.

Perfection: control agreement.

## Receivables

Creation: security agreement.

Perfection: filing of UCC financing statement.

## Intellectual Property

Creation: security agreement.

Perfection: filing of UCC financing statement and, as applicable, recording with the US Patent and Trademark Office and/or the US Copyright Office.

## Real Property

Creation: mortgage or, in certain states, a deed of trust.

Perfection: recording mortgage or deed of trust in local recording office where the property is located.

## Movable Assets

Creation: security agreement.

Perfection: filing of UCC financing statement. Special US federal or state law may also apply – for example, for assets such as motor vehicles and railroad rolling stock.

## Further Actions

Certain actions generally need be taken to maintain the effectiveness of UCC financing statements, including the filing of (i) continuation statements, which are required to be filed within the period of six months prior to the expiration of five years from the date of the original filing of the UCC financing statements (which date of the original filing appears on each UCC financing statement) and (ii) such other statements as may be required by any change in name, identity or corporate structure of any grantor or the collateral agent.

Subsequent recordings with the US Patent and Trademark Office or, in the case of copyrights, the US Copyright Office may be necessary to perfect a lien on intellectual property acquired by any of the grantors after the original closing date.

Other actions by the collateral agent may be necessary or advisable in order to preserve or obtain for the secured parties the full benefit of the guarantees and the security interests in the collateral. For example, the debt agreement might contemplate that, upon the occurrence of certain events, the grantors may be required to pledge additional assets and/or that subsidiaries formed or acquired after the original closing date may be required to grant a security interest in their assets and properties to secure the debt. In such cases, the collateral agent will need to file UCC financing statements in the appropriate jurisdiction and may be required to make other

**Exhibit 7**

# USA LAW AND PRACTICE

**Contributed by:** Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings,
**Cravath, Swaine & Moore LLP**

filings and recordings, such as recordings of mortgages and intellectual property recordings described above, and take other actions in connection therewith.

## 5.4 Restrictions on Upstream Security

The USA does not have general restrictions on the provision of upstream security; see **5.6 Other Restrictions** for information on fraudulent conveyance.

## 5.5 Financial Assistance

The USA does not have general "financial assistance" tests that must be satisfied before a security can be granted; see **5.6 Other Restrictions** for information on fraudulent conveyance.

## 5.6 Other Restrictions

The USA does not have general "corporate benefit" tests that must be satisfied before a security can be granted. In the USA, the focus is on the potential for fraudulent conveyance. There are two types of fraudulent conveyance that are potentially relevant to acquisition finance: actual fraud and constructive fraud.

Actual fraud can occur when there is actual intent to defraud a creditor. Constructive fraud can occur when:

• "reasonably equivalent value" is not received by the borrower, issuer or guarantor, as applicable; and
• such entity –
  (a) was insolvent at the time of the grant of security interest or guarantee (or is rendered insolvent as a result thereof);
  (b) was left with unreasonably small capital; or
  (c) intended or expected to incur debts beyond its ability to repay.

Contribution and indemnification language can help address fraudulent conveyance considerations related to guarantees. When a guarantor makes a payment on behalf of the borrower, the guarantor is subrogated to the rights of the lender against the borrower, and the borrower can separately agree to indemnify the guarantor. If the guarantor makes a payment on behalf of the borrower and is not in turn indemnified by the borrower, the other guarantors will agree to contribute their pro rata share based on their respective net worth.

## 5.7 General Principles of Enforcement

Credit agreements and indentures will provide the lenders or bondholders, as applicable, with the ability to accelerate the indebtedness and commence enforcement following and during the continuance of an event of default. The ability to actually enforce may be constrained by an intercreditor agreement, as discussed in **4.1 Typical Elements**. In addition, when a borrower files for bankruptcy under the US federal bankruptcy code, an automatic stay will be imposed that prohibits pre-petition creditors from enforcing any security interests or collecting on pre-petition claims.

# 6. Guarantees

## 6.1 Types of Guarantees

A guarantee provides a direct legal claim against the guarantor, which can address structural subordination that would otherwise exist in a given corporate structure. A guarantee may enhance the credit of the debt instrument, and may help protect lenders or bondholders in the event that the borrower or issuer itself has a valid legal defence to performing its obligations. For US finance structures that include guarantees, the guarantee is typically provided in the form of a

**Exhibit 7**

**USA** LAW AND PRACTICE

**Contributed by:** Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings, **Cravath, Swaine & Moore LLP**

downstream guarantee by a holding company parent of the borrower/issuer and/or upstream guarantees by the material subsidiaries of the borrower/issuer.

Guarantees are typically joint and several obligations of the borrower/issuer and the guarantor, and are guarantees of payment and not simply collection – in other words, the financing source is not required to exhaust its remedies against the borrower/issuer before it may proceed against the guarantor. Guarantors agree in the finance documentation to waive common law and statutory defences and also agree that their liability will be reinstated if payment to the financing sources is recovered by a bankruptcy estate.

### 6.2 Restrictions

The USA does not have general restrictions on upstream guarantees, "financial assistance" or "corporate benefit" tests; see **5.6 Other Restrictions**, for restrictions on fraudulent conveyance. In multi-jurisdictional acquisition financing transactions, restrictions in other jurisdictions can become important for guarantees and security provided for the benefit of NY law-governed debt securities, in particular in disclosing the restrictions to potential investors in the offering documentation.

### 6.3 Requirement for Guarantee Fees

The USA does not have a requirement for guarantee fees.

## 7. Lender Liability

### 7.1 Equitable Subordination Rules

The US federal bankruptcy code permits a court to order a claim be subordinated to other claims under the principles of equitable subordination.

Cases of equitable subordination against lenders or other creditors are rare because they require findings that (i) the creditor committed fraud or other inequitable conduct that resulted in harm to other claimants or an unfair advantage, and (ii) ordering equitable subordination would not be contrary to the principles of US bankruptcy law. Inequitable conduct is more commonly found in cases involving insiders or fiduciaries because of the duties they owe to the debtor. A creditor could be treated like an insider if it exercised control over the debtor.

### 7.2 Claw-Back Risk

The USA does not have general claw-back rules, but lenders should be aware of fraudulent conveyance (see **5.6 Other Restrictions**) and equitable subordination rules (see **7.1 Equitable Subordination Rules**), as well as anti-tying, FinCEN and margin rules discussed immediately below.

#### Anti-tying

The US Bank Holding Company Act Amendments of 1970 prohibit a bank from tying the extension of credit or any other product or service to other products or services offered by the bank or its affiliates. The anti-tying rules do not apply if the bank's client is not a US person.

In US acquisition finance that includes a securities offering, the underwriter of the securities is typically the broker-dealer affiliate of the bank that has provided committed financing. If the bank were to require its client to engage such affiliate as an underwriter as a condition to providing the committed financing, the anti-tying rules could be implicated. However, if the bank's client voluntarily agrees to engage such an affiliate as underwriter, and such engagement is not a condition precedent to providing the commitment or otherwise extending credit, then the anti-tying rules are not implicated. In the USA,

**Exhibit 7**

# **USA** LAW AND PRACTICE

**Contributed by:** Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings, **Cravath, Swaine & Moore LLP**

market practice is for the bank and the client to reach such a voluntary agreement.

## Financial Crimes Enforcement Network (FinCEN)

FinCEN is a part of the Department of the Treasury's Office of Terrorism and Financial Intelligence. FinCEN administers the Bank Secrecy Act, which aims at addressing the problems of money laundering and other forms of illicit finance, including terrorist financing. Effective May 2018, FinCEN updated its "know your customer" rules for all federally regulated financial institutions, requiring financial institutions to perform customer due diligence. These regulated institutions include banks and securities brokers. The customer due diligence rules require regulated financial institutions to identify and verify the beneficial owners of their "legal entity customers". A "legal entity customer" includes a corporation, limited liability company or other entity that is created by filing of a public document with a Secretary of State or similar office, a general partnership, and any similar business entity formed in the USA or a foreign country. Importantly, companies traded publicly in the USA are excluded from the definition of legal entity customer.

A financial institution is required to identify at least one individual who has significant control over the legal entity's affairs (ie, "control prong") and to collect information on all individuals who hold, directly or indirectly, 25% or more of the equity interests of a legal entity customer (ie, "ownership prong"). Financial institutions can ask legal entity customers to provide information for the control prong and ownership prong by filling out the Certification Regarding Beneficial Owners of Legal Entity Customers Form provided by FinCEN, or provide that information in other formats. A financial institution can rely on information presented by the legal entity

customer regarding the status of its beneficial owners, provided that the institution has no knowledge of facts that would reasonably call into question the reliability of the information.

## Margin Rules

The US margin rules limit the ability of banks to make loans for the purpose of purchasing publicly traded equity securities if the loans are secured by such securities. At a high level, the loan amount cannot exceed 50% of the market value of the margin stock used as collateral. The margin rules are generally not implicated by a one-step merger involving a public company because at closing the target company's stock is no longer publicly traded. A two-step merger might present margin rule concerns if the law of the jurisdiction requires a high minimum tender condition before the back-end merger can be consummated. Under Delaware law, it is possible to address this concern by structuring a two-step transaction such that the back-end merger can occur following the tender of a simple majority of outstanding shares.

# 8. Tax Issues

## 8.1 Stamp Taxes

There is no US stamp tax applicable to financing transactions.

## 8.2 Withholding Tax/Qualifying Lender Concepts

The USA generally imposes a 30% withholding tax on interest payments made by US borrowers to foreign lenders. Withholding can be reduced, and often eliminated, if the lender is a treaty-eligible resident in a jurisdiction with a comprehensive US tax treaty. Foreign banks typically avail themselves of these treaty benefits. For foreign lenders organised in non-treaty jurisdictions, the

**Exhibit 7**

**Contributed by:** Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings,
Cravath, Swaine & Moore LLP

so-called "portfolio interest exemption" often eliminates withholding for interest paid to an unrelated foreign lender that is not a bank.

It is market standard in US deals for lenders to certify exemption from withholding tax when the loan is established. Loan documents typically allocate change in law withholding risk to the borrower, but this is not currently viewed as a substantial risk.

The USA also has comprehensive information reporting rules, known as the Foreign Account Tax Compliance Act (FATCA). Under FATCA, foreign lenders are required to provide information and certification to US borrowers. The penalty for not doing so is a 30% withholding tax.

### 8.3 Thin-Capitalisation Rules
#### Limitation on Business Interest Deductions
For decades, thin-capitalisation (or "thin-cap") rules have limited a US taxpayer's interest deductions under certain circumstances. The Tax Cuts and Jobs Act of 2017 (TCJA) significantly broadened the scope of the thin-cap rules to cover all debt (not just related party debt), and also tightened the limit on interest deductions subject to the rules.

The TCJA generally limits a US taxpayer's net business interest deductions to 30% of its "adjusted taxable income", which corresponds roughly to the taxpayer's EBIT (in years prior to 2022 it corresponded to EBITDA). The calculation is performed on a consolidated basis for groups, and "business interest" is defined broadly to generally include all interest that is allocable to the group's trade or business.

If any of a US taxpayer's interest deductions are disallowed, the taxpayer carries forward the deductions to subsequent tax years, where they

are combined with current-year business interest expense and tested for deductibility based on that year's EBIT. If, by contrast, the US taxpayer does not have enough interest expense in a given year to use all of its capacity, the excess capacity does not carry forward and is simply lost.

These rules generally apply to all taxpayers except small businesses and certain real property, farming and regulated utility entities. Special computational rules apply to borrowers that are partnerships and S corporations, with sometimes surprising results.

#### Section 956 Issues
US borrowers whose foreign subsidiaries provide guarantees or asset pledges as credit support have historically faced negative US tax consequences. However, under the TCJA, these negative tax consequences have generally been eliminated where the US borrower is a corporation and the foreign subsidiaries operate only non-US businesses. The TCJA has also allowed for these negative consequences to be more easily managed in certain other contexts.

Even under the TCJA, careful planning may be required (and income inclusions may be unavoidable) where the US borrower is a partnership with non-corporate partners, hybrid entities or instruments are involved or in the unlikely event the foreign subsidiaries have US operations.

## 9. Takeover Finance

### 9.1 Regulated Targets
Several industries in the USA are subject to state and/or federal regulation. Examples include aerospace, insurance, banking, communications, defence and energy. When the target company operates in a regulated industry, it is often

**Exhibit 7**

**USA** LAW AND PRACTICE

**Contributed by:** Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings,
**Cravath, Swaine & Moore LLP**

the case that a change of control transaction requires the approval of the applicable regulator. When significant or lengthy regulatory approvals are required, the borrower and its financing sources should consider factors such as: (i) how might the uncertainty or lengthy timing related to regulatory approvals impact the timeline to syndicate or market the financing; and (ii) how long will the borrower need the commitments set forth in the commitment letter to remain outstanding (and, from the financing sources' perspective, will such length impact pricing, market flex or other terms)? Any restrictions on granting security over the target company's assets should also be considered.

**CFIUS**

The Committee on Foreign Investment in the United States (CFIUS) was established in 1975 to review certain foreign investments in the USA. CFIUS has the authority to review:

• any transaction that could result in a foreign person controlling a US business;
• certain non-controlling investments by foreign persons in US businesses that deal with critical technologies, critical infrastructure or sensitive personal data ("TID US businesses"); and
• certain transactions involving real estate in the USA located within a specified distance of ports or sensitive US government facilities.

Historically, submitting a transaction for CFIUS review was almost always at the discretion of the parties. Following the passage of legislation in 2018, however, certain transactions involving a TID US business must now be submitted to CFIUS at least 30 days prior to closing. If a mandatory CFIUS filing is required, or if the parties choose to submit for CFIUS review voluntarily, the borrower and its financing sources should

consider the expected timeline for obtaining CFIUS approval. This timeline will depend on the type of filing submitted and other factors, but may be lengthy, particularly if CFIUS identifies a national security concern arising from the proposed transaction.

**9.2 Listed Targets**

When a public company is involved in a merger or other business combination, one must consider the relevant laws of its state of incorporation, including board of director and shareholder approval requirements. State law also prescribes the fiduciary duties owed by directors to the corporation, including in connection with the board's review of a change of control transaction.

In the USA, many public companies are incorporated in the state of Delaware. In general, in order for a Delaware corporation to consummate a merger, the merger must be approved by the corporation's board of directors and then submitted to, and approved by, the shareholders representing a simple majority of the outstanding shares.

Shareholder approval for a listed target will be solicited through a proxy statement, which must satisfy the US proxy rules as to both form and substance. The proxy statement is publicly filed and may be reviewed by the SEC.

Borrowers and financing sources should be aware that the acquisition of a US public company is often the subject of litigation. Shareholders of the target public company may challenge the process that the board of directors undertook when considering the transaction and/or the adequacy of the disclosure in the proxy statement. Borrowers and financing sources should also consider the US margin rules, which are

**Exhibit 7**

# USA LAW AND PRACTICE
**Contributed by:** Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings,
**Cravath, Swaine & Moore LLP**

discussed briefly above in **7.2 Claw-Back Risk** (Margin Rules).

US-listed acquirers should be aware that offering shares as a component of the acquisition consideration may trigger a stock exchange requirement that such acquirer obtain shareholder approval for the issuance of shares. For example, the New York Stock Exchange rules for listed companies provide that shareholder approval is required prior to the issuance of stock in a transaction if (i) the common stock represents at least 20% of the voting power outstanding before the issuance of such stock, or (ii) the number of shares of common stock to be issued represents at least 20% of the number of shares of common stock outstanding before the issuance. NASDAQ has a similar rule. There are limited exceptions to this 20% test, including for a public offering for cash and certain bona fide private financings.

## 10. Jurisdiction-Specific Features

### 10.1 Other Acquisition Finance Issues
Acquisition finance is sometimes coupled with a purchase (or repurchase) of existing securities. Purchasers of securities will need to consider whether the manner and size of purchases constitute a tender offer and are therefore subject to the US tender offer rules.

One key US tender offer rule is that the offeror generally must keep the tender offer open for at least 20 business days. In addition, the tender offer must remain open for at least five to ten business days after the offeror announces certain material changes to the terms of the offer, such as a change in the percentage of the class of securities sought in the offer, a change in the consideration offered or the waiver of a material

condition. Tender offers are also subject to US anti-fraud rules.

In 2015, the SEC staff issued a "no-action letter" that described the key criteria of a tender offer for non-convertible debt securities that, if satisfied, permit the offeror to keep the tender offer open for just five, rather than 20, business days. The main requirements include:

- the tender offer is made by the issuer or one of its wholly owned subsidiaries or a parent company;
- the tender offer is for any and all of the subject securities; and
- the consideration consists solely of cash and/or qualified debt securities.

In addition, the tender offer cannot be made in connection with a solicitation of consents to amend the indenture or be financed with new debt that is senior (broadly defined) to the debt that is the subject of the tender offer. If any of the criteria cannot be satisfied, the offeror must keep the tender offer open for 20 business days.

If US holders beneficially own no more than 10% of the securities subject to a tender offer, an exemption from most of the US tender offer rules is available (the "Tier I exemption"), and if US holders beneficially own no more than 40% of the securities subject to a tender offer, an exemption from certain of the US tender offer rules is available (the "Tier II exemption").

**Exhibit 7**

# Trends and Developments

**Contributed by:**
Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings
**Cravath, Swaine & Moore LLP**

**Cravath, Swaine & Moore LLP** has been known as one of the premier US law firms for over two centuries. Each of its practice areas is highly regarded, and its lawyers are recognised for their commitment to the representation of clients' interests. Cravath's financing partners draw from a depth of capital markets and banking expertise to devise bespoke financing solutions. The firm's comprehensive knowledge of the investor bases enables it to structure and execute acquisition financings successfully, clearing the market and providing the borrowing company with the flexibility it requires in connection with its business case for the acquisition. Cravath has extensive experience in cross-border equity and debt financings, including equity-linked products and both high-yield and investment grade debt financings, and for US and non-US borrowers spanning multiple currencies. Cravath's cross-border experience includes negotiating the legal, regulatory and tax issues that present structuring and syndication challenges in non-domestic transactions.

## Authors



**Nicholas A Dorsey** is a partner in Cravath, Swaine & Moore's corporate department who focuses his practice on representing corporate issuers and borrowers, and financial institutions, lenders and other parties, in public and private offerings of securities, loan transactions and other financing transactions. He also represents companies in mergers and acquisitions and regularly advises clients in connection with public disclosure and corporate matters. He has extensive cross-border experience and counts multiple international companies and financial institutions among his diverse client base. Mr Dorsey joined Cravath in 2009 and was elected a partner in 2017.



**Ryan J Patrone** is a partner in Cravath, Swaine & Moore's corporate department who focuses his practice on representing issuers and investment banking firms in capital markets transactions, including initial public offerings and other primary and secondary equity offerings, as well as investment grade and high-yield debt offerings. He also has significant experience representing clients in mergers and acquisitions, corporate governance, shareholder activism defence and general corporate matters. Mr Patrone joined Cravath in 2015 and was elected a partner in 2022.

**Exhibit 7**

**USA** TRENDS AND DEVELOPMENTS

 **Kelly M Smercina** is a partner in Cravath, Swaine & Moore's corporate department who focuses her practice on representing corporate clients and investment banking firms in a wide range of capital markets and other financing transactions, including in connection with acquisitions and spin offs. She also has significant experience representing clients in mergers and acquisitions and corporate governance matters. Ms Smercina joined Cravath in 2015 and was elected a partner in 2022.

 **Margaret R M Rallings** serves as European counsel in Cravath, Swaine & Moore's corporate department and focuses her practice on capital markets transactions, including cross-border high-yield debt and equity offerings, and mergers and acquisitions. Her practice primarily focuses on representing issuers, underwriters and initial purchasers in global capital markets transactions. Ms Rallings joined Cravath in 2010 and was elected European counsel in 2018.

---

### Cravath, Swaine & Moore LLP

Worldwide Plaza
825 Eighth Avenue
New York
NY 10019-7475
USA

Tel: +1 212 474 1000
Fax: +1 212 474 3700
Email: newyork@cravath.com
Web: www.cravath.com



**Exhibit 7**

**USA** TRENDS AND DEVELOPMENTS

**Contributed by:** Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings,
**Cravath, Swaine & Moore LLP**

### Overview of 2022

After record-breaking deal volumes seen in the United States in 2021, acquisition finance volumes (and M&A activity more generally) declined in 2022. Against the backdrop of harsh macroeconomic conditions marked by geopolitical instability, rising interest rates, persisting inflationary pressures and volatile market movements, US capital markets experienced depressed secondary trading prices and mounting debt financing costs, contributing to a slowdown in acquisition finance overall. M&A deal value in the United States totalled USD1.5 trillion in 2022, decreasing 38% from a record total of USD2.6 trillion in 2021. There were 14,075 public and private M&A transactions involving US targets in 2022, decreasing 14% from a record 16,418 transactions in 2021. A total of USD91 billion of US leveraged buyout loans were issued in 2022, a decrease of 47% as compared to USD173 billion in 2021.

Notwithstanding the decreased activity relative to record-setting 2020 and 2021 figures, 2022 was a strong year in the United States relative to historical levels. Total deal volume surpassed 2018 and 2019 levels by 8% and 17%, respectively. Notably, tech companies continued to play a prominent role, with tech sector M&A accounting for a record 32% of overall M&A deal value.

From an acquisition finance perspective, a few noteworthy transactions that were entered into in 2022 include:

- Elon Musk's USD44 billion takeover of Twitter, financed by a USD12.5 billion margin loan collateralised by Musk's Twitter stock, a USD21 billion equity commitment (USD7.1 billion of which was provided by third-party investors) and USD13 billion of committed debt financing;

- Broadcom's offer to acquire VMware for a mix of cash and stock consideration at a valuation of USD61 billion, along with Broadcom's assumption of USD8 billion of VMware debt, for which Broadcom obtained a commitment for a USD32 billion bridge facility from a consortium of banks; and
- Amgen's proposed USD28 billion acquisition of Irish-based Horizon Therapeutics, for which Amgen obtained a USD28.5 billion bridge facility from a consortium of banks.

Notably, the Broadcom and Amgen deals were among the ten largest US investment grade bridge loans of all time.

Recent trends and developments are now highlighted.

### Increase in Alternative Modes of Acquisition Financing

Amid highly volatile market conditions and hawkish US federal monetary policy, alternative methods of financing (such as direct lending and seller financing) and equity financing were increasingly utilised.

#### Direct lending

While public credit market activities slowed in 2022, direct lending – where a loan is extended and held directly by a private lender, rather than arranged by a bank and then syndicated to other investors – increased in popularity. The proliferation of direct lending can be traced back to the decade following the 2008 global financial crisis, when, as a response to the crisis, the US government passed a wave of laws and regulations (most notably, the Dodd-Frank Act of 2010) subjecting US banks to greater regulatory scrutiny and stricter capital and liquidity requirements. US regulators also cautioned banks against engaging in practices they considered to be

**Exhibit 7**

**USA** TRENDS AND DEVELOPMENTS

**Contributed by:** Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings,
**Cravath, Swaine & Moore LLP**

particularly risky. For example, in March 2013, US regulators released guidance highlighting the risks associated with highly leveraged buyouts, especially those where leverage ratios exceed six times the borrower's earnings before interest, taxes, depreciation and amortisation (commonly referred to as EBITDA). These limitations and scrutiny reduced both the willingness and ability of US banks to finance highly leveraged buyouts and other aggressive transactions, and created an opening for direct lenders to finance these transactions.

Borrowers have been increasingly eager to accept direct loans from private lenders. In addition to the potential for increased speed of execution relative to syndicated transactions, direct lending transactions now offer pricing terms and covenants that are substantially similar to those traditionally found in syndicated transactions (as opposed to the early days of direct lending, when terms were more lender-friendly). When combined with the more cautious approach to underwriting taken by US banks in 2022, it is not surprising to see the continued rise in popularity of direct lending as a source of acquisition financing.

As a result, direct lending secured a significant share of the acquisition finance market in 2022, especially in leveraged buyouts where banks are under greater restrictions. With the growing popularity of direct lending in recent years came increased competition, as private equity firms strengthened their direct lending arms and investment banks began to establish (or, in some cases, increase their focus on) direct lending practices in order to hedge against declining syndicated lending.

In light of the foregoing, despite the contraction in the overall M&A market in 2022, the year still finished with USD144.8 billion of direct lending deal value, 31% higher than USD110.3 billion in 2021. Consistent with overall lending trends, direct lending volume was down in the second half of 2022 as compared to the first half, and direct lending terms were becoming more lender-friendly (including higher yields and lower leverage ratios in financial covenants) during 2022; however, direct lending still maintained its position as a popular source of acquisition financing throughout the course of the year. Direct lending volumes even outperformed combined syndicated loan and high-yield bond volumes in the third quarter of 2022, though combined syndicated loan and high-yield bond volumes again overtook direct lending volumes in the fourth quarter of 2022.

*Equity financing*
Facing challenging debt financing conditions in 2022, many acquirers have chosen to finance acquisitions by tapping into their capital reserves and writing larger equity cheques as an alternative to obtaining third-party debt financing.

Over the past decade, the level of "dry powder" (amounts for which private equity funds have investor commitments, but have not yet invested) in the private equity market has steadily increased throughout the world, and in 2022, the dry powder level in the US reached a record high of USD1.354 trillion. With such excess capital at their disposal, and in light of the recently challenging debt financing conditions, private equity firms have been increasingly likely to finance acquisitions using a greater portion of their own funds as compared to incurring debt relative to prior years. For instance, in the second half of 2022, several significant buyouts were announced with high ratios of equity commitments as compared to debt commitments, including:

**Exhibit 7**

**USA** TRENDS AND DEVELOPMENTS

Contributed by: Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings,
Cravath, Swaine & Moore LLP

• EQT Holdings' acquisition of Billtrust, which was valued at USD1.7 billion at the time of signing with USD1.615 billion of committed financing, 77% of which came in the form of an equity commitment from EQT funds and 23% of which came in the form of debt financing commitments provided by a group of direct lenders;

• Vista Equity Partners' acquisition of KnowBe4, which was valued at USD4.6 billion at the time of signing with USD3.605 billion of committed financing, 69% of which came in the form of equity commitments from Vista Equity Partners funds and funds affiliated with KKR (an existing shareholder) and 31% of which came in the form of debt financing commitments; and

• GIC and Oak Street Real Estate Capital's acquisition of STORE Capital, which was valued at USD14 billion at the time of signing with USD10.8 billion of committed financing, 76% of which came in the form of equity commitments from GIC and Oak Street funds and 24% of which came in the form of debt financing commitments.

Furthermore, in the fourth quarter of 2022, several private equity firms (including Thoma Bravo, Sunstone Partners and Veritas Capital) announced all-cash acquisitions that were contemplated to be funded entirely by cash on hand and private equity commitments, with no debt financing commitment.

### Seller financing

Lastly, buyers have also increasingly turned to "seller financing", in which a seller agrees to defer receipt of a portion of the purchase price until one or more dates in the future. In light of the tightening of the syndicated lending market, seller financing has been one tool to help potential buyers bridge the gap between sellers' ask-ing prices and the amount of other financing the potential buyers are able to obtain.

In some recent M&A deals, sellers have been more willing to defer a portion of the cash deal consideration as part of negotiations in order to secure a higher overall deal value than may otherwise have been available, given the potential buyers' diminished access to attractive debt financing. Seller financing can be structured as an interest-bearing note issued by the buyer in favour of the seller, but can also just be embedded in provisions of the acquisition agreement (eg, provisions requiring payments of specified amounts at fixed dates in the future, with such amounts often including an imputed interest component).

### "Windstream Provisions" – Protection Against "Net Short" Debt Investors

Another recent trend in US financing is the increasing prevalence of so-called Windstream provisions, which are designed to protect borrowers against "net short" debt investors. The provisions take their name from default proceedings involving Windstream Services, LLC, after one of its bondholders, an affiliate of hedge fund Aurelius Capital Management, called a default on Windstream's bonds due to a technical covenant violation under Windstream's bond indenture. The default ultimately resulted in Windstream filing for bankruptcy. To many outsiders, Aurelius's actions made sense only if it held a net short position in Windstream, such as through ownership of credit default swaps (which pay out in the event of a default on the underlying debt).

To protect debtors and "net long" creditors from net short creditors seeking to utilise their position as a debt investor to make a profit from their net short position, issuers have begun to include certain provisions in debt financing documents

**Exhibit 7**

**USA** TRENDS AND DEVELOPMENTS

Contributed by: Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings,
**Cravath, Swaine & Moore LLP**

(especially for high-yield products) designed to disenfranchise or even exclude net short investors. Some examples of Windstream provisions include:

- limitations on a net short investor's ability to –
  (a) vote on amendments requiring majority approval;
  (b) participate in instructions to an agent (including an acceleration notice upon an event of default); and
  (c) access confidential information of the borrower;
- restrictions on assignment to net short investors;
- a sunset (often two years) on the investors' ability to issue a default notice with respect to a specific default;
- ability of a court to extend a cure period in respect of a default; and
- in some more aggressive formulations, forced divestment of a net short investor's loans via "yank a bank" provisions (giving the borrower the right to replace a single lender in a syndicate).

In order to give effect to these provisions, financing agreements with Windstream provisions also include the requirement that investors disclose their net short positions, if any, to the borrower and the agent.

One practical issue that arises with respect to Windstream provisions is how to calculate whether an investor holds a net short provision. Specifically, a debt investor's position is often determined by reference to the holdings not just of the investor, but to the holdings of its affiliates as well, in order to restrict the investor from intentionally skirting the Windstream provisions by booking its short positions through an affiliated entity. However, for investors that are affiliated with large financial institutions with multiple other investment units conducting their own business, this can pose a challenge, as it can be nearly impossible for such investors to monitor, let alone control, the investments of such affiliates. As a result, the market continues to evolve around how best to balance the need to include certain affiliates in the net short investor calculation along with the practical reality of certain investors' complex and far-reaching organisational structures.

### Amendments to Financial Disclosure Requirements in US Acquisition Finance

Generally, SEC-registered entities (known as "registrants") that acquire "significant" businesses must disclose audited annual and unaudited interim pre-acquisition financial statements of an acquired business, as well as pro forma financial statements that show the impact of the proposed acquisition on the registrant's historical financial statements. The determination of whether an acquisition is "significant" hinges on whether the transaction meets one of three significance tests, which focus on certain financial metrics of the acquirer and target to determine the relative importance of the transaction to the registrant. Although these rules only apply to acquisition financing taking the form of an SEC-registered security offering (and not, for example, a private offering of securities exempt from registration), in the US it is common for private offerings to take the same approach required for an SEC-registered offering. As a result, as a practical matter, entities planning to utilise debt securities for acquisition financing in the US must navigate these financial disclosure requirements, including considering financial statement requirements in evaluating their expected deal timeline and in negotiating their purchase agreements (eg, by requiring delivery

**Exhibit 7**

**USA** TRENDS AND DEVELOPMENTS

**Contributed by:** Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings, **Cravath, Swaine & Moore LLP**

of target financials by specified dates between signing and closing).

In May 2020, the SEC voted to amend its requirements for financial disclosures related to business acquisitions and dispositions for the first time since their adoption over 30 years ago. On the whole, the amendments serve to relax the financial disclosure requirements for registrants engaging in acquisitions and dispositions, aiming to balance the burdens and benefits of preparing such disclosures. The amendments became effective for all registrants on 1 January 2021. Some notable amendments include:

- revising certain components of the "significance" tests, including expanding the use of pro forma information in calculating significance, to more accurately measure the real-world economic impact of an acquisition on the registrant's businesses;
- reducing the period for required acquired business financial statements from a maximum of three years to a maximum of two years;
- reducing the time period post-acquisition for which acquired company financial statements were required to be included in registration and proxy statements;
- permitting the use of abbreviated financial statements for certain acquisitions of component business units;
- for a significant series of "individually insignificant acquisitions", reducing the disclosure requirements with respect to the individual transactions in favour of increased pro forma disclosure; and
- a shift away from vague and restrictive rules regarding pro forma adjustments in favour of the establishment of two mandatory categories and one optional category of pro forma adjustments.

Intended by the SEC to "improve for investors the financial information about acquired or disposed businesses, facilitate more timely access to capital, and reduce the complexity and costs to prepare the disclosure", the revised rules reflect the comments of market participants – including Cravath – with practical experience in US M&A activity.

## Outlook

The headwinds that the M&A and acquisition finance markets faced in 2022 seem unlikely to abate early in 2023. On a macroeconomic level, pressures such as inflation, interest rate hikes by the Federal Reserve and foreign central banks, geopolitical instability and volatility in the debt, equity and credit markets seem likely to persist for some time. These existing issues are exacerbated by instability in the global banking sector early in 2023, including the failures of Silicon Valley Bank, Signature Bank and Silvergate Bank, as well as the state-backed takeover of Credit Suisse by rival bank UBS. The US Federal Reserve Board has also continued its planned series of interest rate increases to counteract inflation, although, as of March 2023, it has signalled that overall cooling of the US economy may slow the pace of further rate increases or render them unnecessary. All of these factors are likely to make 2023 a relatively slow year for M&A and acquisition finance, especially as compared to historic highs in 2020 and 2021.

The deteriorated macroeconomic environment and continued market volatility are likely to contribute to the continued prominence of alternative financing and accelerate the diversification of direct lenders, especially as traditional bank lenders' appetite for risk declines in the wake of the aforementioned bank collapses. Overall, terms in debt financings are likely to be more lender-friendly than in 2021 and the first half of

**Exhibit 7**

**USA** TRENDS AND DEVELOPMENTS

Contributed by: Nicholas A Dorsey, Ryan J Patrone, Kelly M Smercina and Margaret R M Rallings,
**Cravath, Swaine & Moore LLP**

2022, given the downward shift in market conditions and tighter availability of capital. However, market players that do decide to proceed with acquisition financings in 2023 may see benefits from the SEC's simplified disclosure rules, lessening the burden of compliance in a time of broad uncertainty.

### *Sources*

The following sources were used in the preparation of this chapter of the guide:

• Refinitiv, an LSEG Business;
• Leveraged Commentary & Data (LCD);
• Preqin (US PE Dry Powder);
• Direct Lending Deals; and
• Deal Point Data.

**Exhibit 7**

**CHAMBERS GLOBAL PRACTICE GUIDES**

Chambers Global Practice Guides bring you up-to-date, expert legal commentary on the main practice areas from around the globe. Focusing on the practical legal issues affecting businesses, the guides enable readers to compare legislation and procedure and read trend forecasts from legal experts from across key jurisdictions.

To find out more information about how we select contributors, email Katie.Burrington@chambers.com

**Exhibit 7**