# Exhibit 1

FILED

2024 Dec-19  PM 02:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| JANE DOE, on behalf of herself and all others similarly situated, Plaintiff, vs. MG FREESITES, LTD, d/b/a "PORNHUB", a foreign entity; MG FREESITES II LTD, a foreign entity; MINDGEEK, S.A.R.L., a foreign entity; MINDGEEK USA, INCORPORATED, a Delaware corporation; MG CY HOLDINGS LTD, a foreign entity; MINDGEEK CONTENT RT LIMITED, a foreign entity; 9219-1568 QUEBEC INC. d/b/a MINDGEEK, a foreign entity; MG BILLING LTD, a foreign entity, Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | 7:21-cv-00220-LSC |

## MEMORANDUM OF OPINION AND ORDER
## DENYING CROSS MOTIONS FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

This is a class action lawsuit brought by Plaintiff Jane Doe ("Plaintiff"), a

victim and survivor of childhood sex trafficking, against Defendants MG Freesites,

LTD, d/b/a "Pornhub"; MG Freesites II, LTD; Mindgeek S.A.R.L.; Mindgeek USA

Incorporated; MG CY Holdings LTD; Mindgeek Content RT Limited; 9219-1568

Quebec, Inc., d/b/a Mindgeek; and MG Billing LTD ("Defendants"),[1] on behalf of herself and similarly situated class members. Plaintiff alleges that Defendants violated federal sex trafficking and child pornography laws by owning, operating, and profiting from websites that provide public video platforms to share and view illegal child sexual abuse material ("CSAM").

Presently before the Court are cross motions for summary judgment filed by the parties. Specifically, Defendants have filed a Motion for Summary Judgment seeking the dismissal of all of Plaintiff's claims. (Doc. 221.) Plaintiff has filed a Motion for Partial Summary Judgment on her child pornography claims brought under 18 U.S.C. §§ 2252 and 2252A. (Doc. 223.) For the reasons that follow, both motions are due to be denied.[2]

---

[1]    A number of Defendants' entities have been rebranded since the filing of this action. For ease of reference, the Court will continue to refer to those entities by the names under which they were sued. Additionally, Defendants dispute Plaintiff's reference to them collectively, arguing that she improperly conflates the defendants, and that they are distinct entities with different roles and responsibilities. The Court will address that argument further herein, but for ease of reference, it will to refer to all Defendants collectively throughout this opinion.

[2]    The parties were permitted to file both redacted versions and unredacted versions under seal of their motions and briefs. This Court believes that this opinion should be in the public domain to the extent possible. Thus, some portions of this opinion are redacted, and an unredacted version will be filed under seal contemporaneously. Additionally, the following opinion contains sensitive information, and readers are advised to review the information contained herein with caution.

## II.   FACTS[3]

### A.   Defendants' Business

#### 1.   General introduction

Defendants own and control the pornographic websites Pornhub, YouPorn, RedTube, and Tube8. Defendants' websites are some of the largest commercial pornography websites in the world, and the websites are available worldwide. Users can upload pornographic videos or photos to Pornhub. Defendants structure their websites to monetize pornography, profiting from the content on their sites from advertising, harvesting user data, and contracting with uploaders and pornography creators to share profits. While Defendants' sites have Terms of Service that users must agree to and that prohibit uploading CSAM, Defendants have admitted that users have uploaded CSAM to Pornhub in violation of Pornhub's Terms of Service, and that Defendants became aware of such CSAM after it was made available for public viewing on Pornhub. In February 2020, Visa threatened to stop payment processing on Defendants' websites if Defendants were allowing users to pay for CSAM. Around that time, Defendants' efforts to prevent CSAM from being

---

[3]      These facts are taken from both parties' statements of undisputed material facts as well as, when necessary, their disputes with the other party's facts. The Court views the facts in the light most favorable to the non-moving party on each summary judgment motion. *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012).

uploaded on their websites began or increased in scale significantly. Defendants first began reporting suspected (sometimes referred to as apparent) CSAM to the National Center for Missing and Exploited Children ("NCMEC") in April 2020. Defendants have made more than 20,000 reports of apparent CSAM to NCMEC since then. In December 2020, the New York Times published an article entitled *The Children of Pornhub*. Later in December 2020, Pornhub removed all content from user accounts where the account holder had not verified their age, bringing the total number of videos available on Pornhub down from approximately 13.7 million to approximately 4 million. Defendants also began requiring users to provide a government-issued ID to upload content. Plaintiff filed this suit in early 2021.

### 2. Uploads, tags, categories, thumbnails, and titles

Prior to 2020, any user who created a free account could upload content onto Pornhub; users could also *download* any content from Defendants' websites; and Defendants did not verify the ages of anyone depicted in content uploaded to their websites to determine if individuals were over 18.

When a user uploads content to Pornhub, they can give the content a title and select tags and categories for it. Tags are metadata that are associated with a video and referenced when users search Pornhub's video collection. The tags describe the activities or performers in videos. The tags are created by Defendants, and users choose them from a menu. Categories are named groupings for different types of

videos posted to Defendants' websites and are also created by Defendants. Defendants created a category on Pornhub for "teen" videos. Defendants state that tags such as "teen" or "young" are terms that are frequently used in adult pornographic material and generally do not denote that a video or photo is CSAM. Defendants' employees add, remove, and modify tags and categories, and in some instances, titles. Defendants also create separate thumbnails of every video on their sites. Before upload, the uploader must choose a thumbnail from a set Defendants created from the video, or else Defendants would auto populate a thumbnail. Thumbnails are the primary means by which videos are advertised to users.

As part of their monetization structure, Defendants track how much money each category and tag on Pornhub earns them. The "teen" category was one of the most profitable categories. The tags "young" and "teenager" were among the most profitable tags. Defendants also collect data on the most popular terms that users search for on their websites. For example, in late 2015, among the worldwide searches on Pornhub, "teen" was the ranked the 3rd most popular search term, "extra small petite teen" was ranked 48th, and "very very young girl" was ranked 82nd. Other search terms that Defendants kept data on include: "very very young girl," "virgenes de 15 años" (Spanish for "15-year-old virgins"), "teens virgin first time sex," "tiny teen," and "loli."

Further, Defendants required uploaders who were also their Modelhub Program members and Content Partners to follow detailed instructions, including how to tag videos and use keywords in titles, and Defendants gave them personalized advice, such as when an employee advised an uploader whose video had been deactivated that it was likely due to including both "young" and "teenager" tags. The employee offered to confirm if this was the reason for deactivation and if so, the employee offered to remove one of the tags indicating CSAM so that it could be restored.

### 3.    Moderators review all content

Defendants employ moderators to review all content uploaded to their websites. Since at least 2015, Defendants have had content moderation teams in Cyprus and Montreal. Prior to 2020, moderators would simply review content to determine whether they think the individuals depicted are over 18. Prior to 2021, if someone had the direct URL weblink to a video, that video could be viewed on Defendants' sites before the moderators reviewed it. Presently, however, all uploaded content is reviewed by a moderator before it is made publicly available for viewing on Defendants' websites. Defendants' former Content Manager admitted that she personally saw CSAM when reviewing content. Defendants' moderators conferred with each other on whether they thought content depicted underage individuals and, in certain instances, would ultimately deem content as compliant

6

even if one or more moderators thought the content potentially depicted underage individuals. Defendants' former Content Manager admitted that she saw the terms "jailbait" and "Lolita" in the titles and tags of content "from time to time" and that she understands these terms to be indicative of CSAM.

Historically, when an uploaded video appeared to be or was obvious CSAM, the moderator would mark the content as "TOS-1" and put it in a file called "Folder A." One employee testified that he defined "obvious CSAM" as "pretty straightforward," "[t]hree-year old," and "[i]f there is no matter to believe that . . . this person may be of age . . . ." Defendants did not report the "obvious CSAM" in Folder A to NCMEC from the years 2015 to 2019. Defendants' corporate representative does not know if all of those videos were ever reported to NCMEC. Another corporate representative stated that she does not know where the "obvious CSAM" in Folder A from 2015 to 2018 is being stored.

In June 2020, as part of their efforts to report CSAM to NCMEC, Defendants audited content previously uploaded to their websites to classify it as CSAM to be reported to NCMEC. Defendants created the "TOS-8" classification, which they refer to as potential or apparent CSAM. One moderator estimated that he encounters "approximately 15-20 cases of apparent CSAM on a daily basis[.]" To assist NCMEC, Defendants sometimes classify the apparent CSAM they report to NCMEC using NCMEC's A1/A2/B1/B2 classification—"A" means

7

"prepubescent"; "B" means "pubescent"; "1" means a "sex act"; and "2" means "lewd and lascivious display." Defendants have self-classified at least 10,568 videos of apparent CSAM using NCMEC's A1/A2/B1/B2 classification; 1,679 of which have been classified as either "A1" or "A2," meaning that the CSAM depicted a prepubescent child. According to just one of the Defendants' internal reports, content eventually reported to NCMEC by Defendants was viewed on Defendants' websites over 684,000,000 times before it was removed.

### 4. Defendants employ banned words

Defendants maintain and update a list of banned words—sometimes referred to as "Red Words"—that Defendants ban from being used in searches, titles, tags, and the like. The list has grown over time and now includes over 30,000 words. Back in 2017, while employees discussed the need to add such terms as "very very young teen," "very very young f[**]k," "little girl," "little young girl," "16 virgin," and "16 teen girl," one of Defendants' executives stated in an email to his colleagues that he would not add "young girl" to the banned word list because "I don't think it implies underage in the same way as young boy."

In August 2018, Defendants' employees discussed a series of email complaints Defendants received from a user, who asked why "Pornhub's search engine is recommending" the search term "16 age sxey[sic] video" to him. The employees discussed the need to add "terms to be removed from related

8

search/autocomplete" such as "elementary school," "middle school student," and "10 year old girl." In 2018, employees discussed the fact that they still allowed a combination of the phrase "very young teen" on their sites. In March 2019, a senior employee emailed another employee an excel sheet of Red Words, in which the words "infancy," "infant," "kiddy," "preteen," and "underage" were listed as "Unbanned" with the recommendation that they be banned, but the words "childhood" and "minor" were listed as "Unbanned" with the recommendation that "no action" be taken to change their unbanned status. An excel sheet created in December 2020 by an employee of Defendants shows hundreds of thousands of instances of keywords like "12 yo," "13 yo," and "girls under18," being used in the tag, title, or appearing in search results.

### 5. Users and third parties notify Defendants about CSAM on their sites

Users, Internet Watch groups, and law enforcement altered Defendants to CSAM identified on their sites over the years. Defendants have an internal procedure for reviewing content that has been flagged by users as depicting someone underage. In May 2020, a video had to have been flagged 15 times before moderators would review it. Moderators' turnaround time for review was 72 hours. In June 2020, Defendants changed the ability to flag videos so that only users who were logged into an account could flag videos. That same month, Defendants' employee emailed another employee a screenshot showing 183,302 videos flagged as "underage." A

video uploaded in August 2015—which had the tags "teenager" and "young"—was flagged as "underage" 13 times, amassed 1,744,144 views, and was not taken down until March 2019. A video uploaded in June 2016—which moderators later classified as A1 (prepubescent sex act)—was flagged as "underage" 14 times, amassed 466,598 views, and was not taken down until June 2018. A video uploaded in October 2016—which moderators later classified as A1 (prepubescent sex act)—had the tags "teenager", "young", "virgin-defloration", and "teen"; was flagged as "underage" 12 times; amassed 19,609 views; and was not taken down until April 2021.

In November 2020, Defendants received a Content Removal Request with a Pornhub weblink, stating, "Please review this user's favorites. Some titles are questionable such as 'less than 18' and there are images of what appear to be minors." Defendants' employee subsequently sent a private note to a coworker stating, "[T]here is A LOT of very, very obvious and disturbing CSAM here, connected to numerous CSAM profiles." That same day, that coworker wrote to another: "we came across a video that could be classified as A1," "probably the worst video I've ever seen." It was discovered that the link was uploaded in February of that year and had received 237 views.

### 6.   Defendants' employees encounter CSAM regularly

The record contains numerous instances of Defendants' employees discussing amongst themselves the CSAM that they encountered live on Defendants' platforms. For example, just in March 2020, the following exchanges among employees are in the record. One employee informed another that an account that had uploaded apparent CSAM had not been removed. The employee asked: "what was the video? Was it APPARENT?" to which the other responded: "yes very, I may need to see a psychologist." One employee asked another to review apparent CSAM and informed her that, to do so, she "will need to download one of them" and "recommend[ed she] delete it asap after." The employee stated: "I hope I never get in trouble for having those vids on my computer LOOOOL," to which the other responded: "loool yeah," "I found one yesterday night," "that I had forgotton[sic] to delete," "I freak out," "and it was a really bad one," "like I will go away for a long time." The same employee moderators discussed a video that they had missed, one stating: "they should had know[n] is [a] child" because "the body is super petite," and the other replying "yes," "and the tags," "this is making us look so bad," "f[**]king CP everyday."  In another instance the same employees discussed apparent CSAM that had been removed the day prior but was re-uploaded from a different account; when one asked, "did you fingerprint the content that they're re-uploading," the other responded: "nope we said only really bad cp and you and I t[h]ough[t] that video was not that bad."  As supervisor expressed concern around that time that "they are

11

still approving cp." An employee asked another employee not to copy a supervisor on CSAM reports, to which the employee responded: "[the supervisor] doenst[sic] want to know how much cp we have ignored for the past 5 years?" One employee sent another a screenshot of a publicly available photo album entitled "CHILDPORN" on Defendants' sites. The employee asked, "how did that even make it there," to which the other responded: "Good question lol."

### 7.  Defendants use tools to prevent upload of CSAM

In 2019, Defendants began using new tools to identify and prevent the uploading of CSAM: CSAI Match, Vobile, MediaWise, and Microsoft PhotoDNA. Defendants' employees discussed internally the favorable media attention the companies would garner for implementing CSAI Match. In April 2020, in discussing CSAI Match, one employee stated to others: "you guys want to laugh;" "it caugh[t] a cp video from 2009;" "a full on cp video on the site for 11 years." In June, a moderator summarized in an email that before CSAI Match was introduced, "we were receiving limited feedback and whenever a mistake was found it was negotiated i.e. we were not always enforcing strict rules as the decision was that the team had to focus on speed and numbers instead." Moderators further wrote in emails: "Our team, considering its 20 different tasks, was focused on speed, numbers and multi-tasking which has proven now that it is not effective. We have been understaffed always negotiating how many people to get and are receiving less personnel tha[n]

what we actually needed to follow the right procedures and avoid mistakes. We adapted with what manpower we were given and applied multi-tasking." The moderators also noted: "Now older mistakes are found and many will continue to be found from the 700k backlog and if I go ahead and enforce the strict rules/guidelines we will lose a significant amount of our agents and cause chaos within the team." On July 7, 2021, Defendants completed the CSAI Match audit, which turned up 2,322 videos, with at least 1,262 of the videos listed as being "set to TOS 8" based on a confirmed Google CSAI match.

In 2020, Defendants began using additional tools: Safer, Content Safety API, Yoti, Spectrum Labs, and G2 Web Services/Webshield. In 2021, Defendants implemented three more tools: Instant Image Identifier/Hash Check Service, ActiveFence and NCMEC Hash Sharing. Further, Defendants implemented IWF Hash Lists in 2022 and StopNCII.org and TakeItDown in 2023.

### B. Plaintiff Jane Doe

In early 2018, when Plaintiff, an Alabama native, was 16 years old, ███████ ███████████████████████████ filmed her engaging in a sexual act in his car. On February 27, 2018, Williams uploaded this video of Plaintiff (hereafter the "Car Video") to his Pornhub account with the username ███████ and titled it ███ ████████████████████████████ Plaintiff's face was visible in the Car Video. ███████ was a Modelhub Program member. This meant that he had an

agreement to share profits with Defendants from advertising revenue generated from his videos, tips from Pornhub users, and selling videos directly on Pornhub, among other benefits. Defendants dispute that ███████ is the one who uploaded the Car Video.

On August 26, 2019, ███████ commented on a different Pornhub video, stating, "yea, you would have been my lil juve." Defendants dispute that ███████ was the person who wrote this comment.

On November 1, 2019, the title of the Car Video was changed to ███████ ████████████████████████████ That same day, ███████ uploaded a different video to Pornhub titled, ████████████████████████████████ ████████████

On November 21, 2019, the title of the Car Video was changed to ███████ ████████████████████████████ Two days later, the title of the Car Video was changed to ████████████████████████████ ███████ On December 31, 2019, the title of the Car Video was changed to ███████ ████████████████████████████ The parties dispute whether ███████ chose all of the titles for the videos he posted to Pornhub or whether he was aided in some way by Defendants. ███████ also appended tags to the Car Video. Defendants say that none of the tags that ███████ selected for the Car Video referred to CSAM. Plaintiff disputes that statement, as one tag was "teen."

Sometime in late 2018 or early 2019, ██████ drugged Plaintiff with an unknown pill and filmed himself raping her in a hotel (hereafter the "Rape Video").

On January 20, 2020, the title of the Car Video was changed to ██████████ ████████████████████████ On February 24, 2020, an individual named ███████████████ submitted three content removal requests relating to ████████ Pornhub account. She wrote, ████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████ ████████ wrote again stating, ████████████ ████████████████████████████████████ ████████████████████ She also wrote, ██████████████ ████████████████████████████ Defendants dispute that ██████████ is the one who submitted the removal requests.

On February 25, 2020, a Pornhub employee responded to each of these requests, stating the same thing: "Thank you for contacting Pornhub Support. Please provide us with the link to the videos and/or pictures in order for us to remove them." That same day three of ████████ videos were removed, each mentioning ██████████████, each of which had amassed over 1,000 views, one of which had amassed 6,460 views.

On May 1, 2020,  uploaded the Rape Video to Pornhub. ▮▮▮▮ supplied the initial title of the Rape Video: ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ later changed the title to ▮▮▮▮▮▮▮▮▮▮▮ ▮▮.

Plaintiff became aware of the videos of her that were on Pornhub around June 2020, when someone she knew referred to Plaintiff as ▮▮▮▮▮▮▮▮▮ Plaintiff contacted law enforcement to report the videos. On July 14, 2020, an investigator with the Tuscaloosa Police Department emailed Defendants informing them of "an investigation where videos of an underage female were uploaded to Pornhub.com" and attaching "a preservation letter to preserve any and all records associated with the user account ▮▮▮▮▮▮ Defendants banned ▮▮▮▮▮▮ account on July 15, 2020, with the listed reason being "Legal – CSAM." That same day Defendants took down ten videos uploaded by ▮▮▮▮▮ including the videos depicting Plaintiff. Defendants dispute that the Car Video was taken down on July 15 and state instead that it was taken down on July 10. Plaintiff believes that ▮▮▮▮▮▮ removed the Car Video himself. In total, ▮▮▮▮▮▮ had uploaded a total of 34 videos and 6 photo albums. Defendant's employees do not remember viewing Plaintiff's CSAM. The Car Video and the Rape Video were in the "teen" category.

On April 7, 2022, ███████ pled guilty to "Dissemination/Display of Obscene Matter under 17," a Class B Felony, in the Circuit Court of Tuscaloosa County, Alabama, and was sentenced to 10 years in prison. That same day ███████ also pled guilty to "Sexual Abuse in the First Degree" in violation of Alabama Code 13A-6-066 and was sentenced to 10 years in prison.

On February 11, 2021, Plaintiff filed this class action. NCMEC produced the CyberTipline Reports for Plaintiff's CSAM indicating that the Car Video was reported on April 20, 2022, and the Rape Video was reported on May 13, 2022.

Defendants say that ███████ received no compensation from Defendants in connection with either the Car Video or the Rape Video. Plaintiff disputes this, clarifying that ███████, due to his business agreement with Defendants, earned money from views of his videos, including Plaintiff's CSAM, which Defendants have retained as an unrealized cost.

## III.   PROCEDURAL HISTORY

Plaintiff filed this action with another plaintiff also proceeding pseudonymously. The First Amended Complaint ("complaint") contains two counts: one alleging that Defendants knowingly benefitted from participation in what they knew or should have known was a sex trafficking venture, in violation of 18 U.S.C. §§ 1591 and 1595 of the Trafficking Victims Protection Reauthorization Act ("TVPRA") (Count I), and the other that Defendants received, possessed, and

17

distributed child pornography in violation of 18 U.S.C. §§ 2252 and 2252A (Count II). Plaintiffs requested that this Court certify their proposed class pursuant to Fed. R. Civ. P. 23, award damages, and issue injunctive and equitable relief, including requiring Defendants to identify and remove CSAM and implement corporate-wide policies to prevent continued dissemination of CSAM on their platforms.

On August 6, 2021, Defendants moved to dismiss the complaint. They argued that all of Plaintiffs' claims are barred by Section 230(c) of the Communications Decency Act ("CDA"), 47 U.S.C. § 230(a), which affords a provider of interactive computer services immunity from liability for content posted to its websites by third parties. Plaintiffs responded that Defendants' activities fall within an exception pursuant to which certain claims under the TVPRA do not qualify for Section 230(c) immunity. Plaintiffs also argued that because Defendants materially contribute to the creation of CSAM, including that of Plaintiffs, they cannot avail themselves of Section 230(c) immunity. Aside from Section 230(c) immunity, Defendants also argued that Plaintiffs failed to state a claim for relief pursuant to the federal statutes prohibiting sex trafficking and criminalizing the receipt or distribution of child pornography. Finally, Defendants contended that the Court lacked personal jurisdiction over Plaintiff Jane Doe #2's claims against them.

The Court denied Defendants' motion to dismiss on February 9, 2022. (Doc. 42.) For the next two years, the parties engaged in discovery, a process that

necessitated intervention by the Court several times. The Court implemented a discovery protocol enlisting the Alabama Attorney General's Office as the repository for CSAM or suspected CSAM in Defendants' possession so that neither party's attorneys would illegally possess CSAM while complying with the discovery process. The parties sought and received various stays of these proceedings and other extensions of deadlines while they attempted, unsuccessfully, to mediate and settle the case. The parties also stipulated to the voluntary dismissal of Plaintiff Jane Doe #2 without prejudice. At one point, Plaintiff attempted, unsuccessfully, to intervene in a similar case in the United States District Court for the Central District of California in hopes of having that action transferred here and consolidated with this one. Sometime later, Defendants sought to transfer *this* action to *that* district. The Court denied that request.

On September 8, 2023, Plaintiff sought class certification. (Doc. 95.) On December 19, 2023, the Court granted Plaintiff's motion, certifying the following class under Fed. R. Civ. P. 23(b)(2) and 23(b)(3): "All persons who were under the age of 18 when they appeared in a video or image that has been made available for viewing on any website owned or operated by Defendants anytime from February 12, 2011, through the present." (Doc. 147.) The Court later approved a plan for the form and manner of notice to the class. (Doc. 199.)

Defendants moved for summary judgment on September 6, 2024. (Doc. 221).

Plaintiff moved for partial summary judgment on Count II on the same day. (Doc.

223.) Both motions are fully briefed and ripe for review.[4]

## IV.   STANDARD OF REVIEW

The standard of review for cross-motions for summary judgment does not

differ from the standard applied when only one party files a motion but simply

requires a determination of whether either of the parties deserves judgment as a

matter of law on the facts that are not disputed. *Am. Bankers Ins. Group v. United*

*States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion

on its own merits, resolving all reasonable inferences against the party whose motion

is under consideration. *Id.* A motion for summary judgment is due to be granted upon

a showing that "no genuine dispute as to any material fact" remains to be decided in

the action and "the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). A fact is material "if, under the applicable substantive law, it might affect

the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259

(11th Cir. 2004). A genuine dispute as to a material fact exists where "the nonmoving

---

[4] There are two motions to compel certain discovery responses still pending.
(Docs. 175; 181 (sealed version of doc. 175); 187; and 210 (renewed version of doc.
175).) The Court has conducted both in-person and telephonic hearings on these
motions. In light of the Court's denial of the motions for summary judgment, the
Court hereby **DENIES AS MOOT** these motions. The parties are free to re-file if
the motions pertain to issues relevant to the evidence they wish to present at trial.

party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## V.   DISCUSSION

### A.   Defendants' Motion for Summary Judgment

Defendants raise three arguments. First, they argue that they are immune from suit under Section 230(c) of the CDA as to both of Plaintiff's claims. Second, they argue that even if they did not have statutory immunity, they are entitled to judgment as a matter of law on Count II because there is a lack of evidence that they knew Plaintiff was a minor when ▉▉▉▉▉ uploaded the Car Video and the Rape Video. Third, they argue that certain defendants are separately entitled to summary judgment, either because (i) they have been dissolved and lack the capacity to be sued under the laws of the jurisdictions in which they were organized, (ii) they are distinct corporate entities that had no involvement with the possession and distribution of the videos of Plaintiff, or (iii) they are beyond the territorial reach of the statute upon which Count I is based. Defendants' arguments related to each of Plaintiff's two claims are addressed in turn, followed by Defendants' argument about specific defendant entities.

> **1.   Defendants are not entitled to judgment on Plaintiff's claim that Defendants benefitted from a sex trafficking venture in violation of the TVPRA, 18 U.S.C. §§ 1591 and 1595 (Count I)**

As noted, Count I alleges a claim under the TVPRA, 18 U.S.C. §§ 1591 and 1595. Section 1591 makes illegal two forms of conduct. Section 1591(a)(1) makes it a crime, among other things, to cause a person under the age of 18 to engage in commercial sex acts. Section 1591(a)(2) authorizes criminal punishment for anyone who "benefits, financially or by receiving anything of value, from participation in a venture" that has violated Section 1591(a)(1). Section 1595(a) creates an adjunct civil cause of action. It allows the victim of a Section 1591 violation to sue either the perpetrator of the crime or a participant in that violation who "knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in" a Section 1591 violation.

Defendants argue that they are entitled to judgment as a matter of law on Count I due to immunity under Section 230(c) of the CDA because they operate an "interactive computer service" (a website), and Plaintiff seeks to hold them liable for "publishing" (allowing the upload of) content provided to them by another "information content provider" (Plaintiff's abuser, ███████). Consequently, Defendants argue that they are immune from suit, and any disputed facts concerning the TVPRA claims are immaterial as a matter of law.

Subsection (c)(1) of Section 230 provides that "[n]o provider . . . of an interactive computer service shall be treated as a publisher or speaker of any

information provided by another information content provider." 47 U.S.C. §
230(c)(1). To avail itself of immunity from suit under Section 230(c) of the CDA, a
defendant must show that: (1) it is a "provider . . . of an interactive computer service,
(2) the claim is based on information provided by another information content
provider and (3) the claim would treat the defendant as the publisher or speaker of
that information." *Doe v. Kik Interactive, Inc*., 482 F. Supp. 1242, 1248 (S.D. Fla.
2020) (quoting *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 588 (S.D.N.Y. 2018)).
However, "This grant of immunity [under Section 230(c)] applies only if the
interactive computer service is not also an 'information content provider,' which is
defined as someone who is 'responsible, in whole or in part, for the creation or
development of' the offending content." *Fair Housing Council of San Fernando
Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (citing 47
U.S.C. § 230(f)(3) (defining "information content provider")). "A website operator
can be both a service provider and a content provider: If it passively displays content
that is created entirely by third parties, then it is only a service provider with respect
to that content. But as to content that it creates itself, or is responsible, in whole or
in part for creating or developing, the website is also a content provider." *Id*. Thus,
content providers cannot use Section 230(c) immunity to escape liability for the
unlawfulness of the content they create.

In denying Defendants' motion to dismiss Plaintiff's complaint, this Court ruled that Plaintiff had plausibly alleged that Defendants materially contribute to the provision of CSAM on their platforms—by generating tags, categories, and keywords that users wishing to post CSAM can use (such as "teen", "abused teen," and "middle school girls") as well as generating thumbnail images of CSAM, and are thus "content providers" and disqualified from Section 230(c)(a) immunity. (Doc. 42 at 50–51; *Doe #1 v. MG Freesites, LTD, et al.*, 676 F. Supp. 3d 1136, 1159–60 (N.D. Ala. Feb. 9, 2022)). The undisputed facts that have now been submitted by the parties in conjunction with the pending motions for summary judgment only bolster Plaintiff's allegations and certainly do not do anything to undercut this Court's ruling that Defendants are not due immunity as a matter of law.

Indeed, the record reveals several ways that Defendants provide content on their websites. First, Defendants create new CSAM by creating thumbnails that advertise CSAM videos to users, which is done for every video on the sites. Therefore, Defendants are responsible at the very least for the CSAM it created, stored, and distributed of Plaintiff via its thumbnail creation. For content the website itself creates, the website is "undoubtedly the 'information content provider' as to [that content] and can claim no immunity for posting [it] on its website." *Roommates*, 521 F.3d at 1164.

Additionally, Defendants contribute to the content's illegality by creating tags and categories associated with CSAM, and by adding, removing, and modifying tags, categories, and sometimes titles, of videos. Defendants require all videos to contain tags. No video could be uploaded without choosing from a set of Defendants' created tags. Every video on Defendants' sites can be found by searching tags. There is an entire team devoted to checking submitted videos to ensure they have the correct tags and to add any tags or categories that are relevant to help promote the videos. This included reviewing and approving tags and keywords like "young-AF," which stands for "young as f[**]k." Defendants conceded that the tags, including "young-AF,", "teenager," and "girls under 18," were chosen "from a menu" provided by Defendants. In one instance, an employee of Defendants created Content Partner titles with the keywords "barely legal," "petite teen," and "young school girl."

Further, Defendants required uploaders who were also their Modelhub Program members and Content Partners to follow detailed instructions, including how to tag videos and use keywords in titles. In one instance, an employee advised an uploader whose video had been deactivated that it was likely due to it including both "young" and "teenager" tags. The employee offered to confirm if this was the reason for deactivation and if so, the employee offered to remove one of the tags indicating CSAM so that the video could be restored. Such instruction, advice, and

ongoing tailoring of content by Defendants means that they "developed" this content on their sites. *Roommates*, 521 F.3d at 1167.

Finally, the entire algorithm that Defendants created and employ for their sites uses the tags and categories it created and the keywords in titles to help uploaders advertise CSAM and help users seeking CSAM locate it. Indeed, Defendants tracked how much traffic and profit each category and tag earned them – down to the dollar amount per month and per day for the most popular tags. For example, in October 2019, the category "teen" was the 6th most popular category, earning over $150,000 that month, amounting to just over 30% of total revenue that month. The tag "young" ranked number 2, "teenager" ranked number 3, and "teen" ranked 13 that same month with each earning over $132,000, $117,000, and $54,000 respectively. Video metadata, including titles and tags, factored into Defendants' proprietary algorithm that determined what videos would be curated to users when they search the sites. Tags that Defendants created included: "young-AF," "14 YO," "jailbait" "Lolita," "teen," "young," "homemade," "child," "children," "kids," and "young." Defendants created titles with the keywords "barely legal," "petite teen," and "young schoolgirl" that its algorithm used to display these videos when users searched for those terms. This was all part of Defendants' "content is king" self-described strategy which meant they needed more content than their competitors and used their

own tools to improve the internal search engine and internally designed recommendation engine, which includes "For you" recommended videos.

Recently, the Third Circuit ruled that internet platforms that create algorithms that recommend third-party content to users are not immune under Section 230(c) of the CDA. *See Anderson v. TikTok Inc.*, 116 F. 4th 180, 184 (3d Cir. 2024). *Anderson* concerned a ten-year-old girl who died accidentally after a video on TikTok's website encouraged her to engage in something called a "Blackout Challenge," which encouraged viewers to record themselves engaging in acts of self-asphyxiation. *Id.* at 181–82. The video appeared on her "For You" page on TikTok. *Id.* at 182. TikTok had created the For You page using an algorithm that "curates and recommends a tailored compilation of videos … based on a variety of factors, including the user's age and other demographics, online interactions, and other metadata." *Id.* The Third Circuit, following *Moody v. NetChoice, LLC*, 603 U.S. 707, 144 S. Ct. 2383, 2393 (2024), found that, "[g]iven the Supreme Court's observations that platforms engage in protected first-party speech under the First Amendment when they curate compilations of others' content via their expressive algorithms, it follows that doing so amounts to first-party speech under § 230, too." *Anderson*, 116 F.3d at 184 (internal citation omitted).[5] The court concluded that where the

---

[5]    In *NetChoice*, the Supreme Court had considered social media platforms' algorithms that construct feeds to relay content to users. 144 S. Ct. at 2393. The Court described the platforms at issue in *NetChoice* as ones that "cull and organize

algorithm "decides on the third-party speech that will be included in or excluded from a compilation—and then organizes and presents the included items" it amounts to the platform's own speech or content, unprotected by Section 230(c). *Id.* (cleaned up).

As in *Anderson*, Defendants' tags, categories, and search function (including recommended and keyword searches), are designed to curate content, including illegal CSAM, to users looking for it. Although third parties may originally film the CSAM, Defendants sell advertisements around it in a tailor-made way for users by requiring the content to contain Defendants' created categories and tags, so it can be advertised as CSAM, and those searching for CSAM can find it. These curation processes, including Defendants' proprietary algorithm, are Defendants' own expressive—and in this case illegal—activity. *See Anderson*, 116 F.3d at 184.

The Third Circuit in *Anderson* did limit its holding to the facts presented, explaining that TikTok became a content provider in that particular instance because

---

uploaded posts in a variety of ways. A user does not see everything . . . The platforms will have removed some content entirely; ranked or otherwise prioritized what remains; and sometimes added warnings or labels." *Id.* at 2395. The Court explained that, by engaging in such activity, the platforms "shape other parties' expression into their own curated speech products." *Id.* at 2393. Although "[t]he selection and ranking is most often based on a user's expressed interests and past activities," the Court noted that "it may also be based on more general features of the communication or its creator[,]" particularly given that some platforms have guidelines that "detail the messages and videos that the platform[ ] disfavor[s.]" *Id.* at 2403.

28

the girl did not search for a Blackout Challenge video herself. Rather, TikTok

provided and promoted that content on her "For You" page. *Id.* at 184 n.12. The

court noted in dicta that if she had searched for such content, then TikTok "may be

viewed more like a repository of third-party content than an affirmative promoter of

such content" and potentially immune from suit. *Id.* Defendants argue that *Anderson*

is thus inapposite because they did not independently *recommend* CSAM videos to

users who were not otherwise already searching for CSAM on their sites. But

Plaintiff states that Defendants *did* employ recommended search terms and "For

You" playlists, so facts are in dispute on this issue.

Additionally, one federal district court has already extended *Anderson*'s

holding to a case where it was not alleged that the internet platform independently

recommended the offending content to users without the users searching for it. Mike

Huckabee, former Governor of Arkansas, brought suit against Meta, the parent

company of Facebook, alleging various claims premised on Facebook's allowance

of a third party to advertise their Cannabidiol ("CBD") products using Huckabee's

name, photograph, and likeness without his permission. *Huckabee v. Meta

Platforms, Inc.*, 2024 WL 4817657, at *1 (D. Del. Nov. 18, 2024). Huckabee did not

allege that Facebook independently recommended the CBD products to users who

were not searching for them via some kind of recommended searches list, but instead

merely alleged that Facebook employed an algorithm to collect user data to decide

which advertisements will appear at the top of the user's newsfeeds. *Id.* The district court rejected Facebook's argument that it was immune under Section 230(c) because Facebook's decisions as to which advertisements to feature were its own, not the user's. *Id.* at *4. The same is true here. Defendants use their algorithm not only to help users looking for CSAM find it but also to help users advertising CSAM to advertise it.

The cases that Defendants rely on, in which courts granted Section 230(c) immunity to websites that employ algorithms and keywords, pre-date the Supreme Court's decision in *NetChoice*, which held that a platform engages in protected speech when it curates content. *But see, e.g., Dyroff v. Ultimate Software Grp.*, 934 F.3d 1093, 1098 (9th Cir. 2019) ("[R]ecommendations and notifications . . . are not content in and of themselves."); *Force v. Facebook, Inc.*, 934 F.3d 53, 70 (2d Cir. 2019) ("Merely arranging and displaying others' content to users . . . through [ ] algorithms—even if the content is not actively sought by those users—is not enough to hold [a defendant platform] responsible as the developer or creator of that content." (internal quotation marks and citation omitted)). Indeed, the legal landscape surrounding algorithms used by internet platforms is still developing, which further undercuts the conclusion that Defendants are entitled to immunity as a matter of law.

In sum, because Defendants materially contributed to and developed the illegal content, Section 230(c) does not insulate Defendants from liability. Having concluded as such, the Court need not address Plaintiff's alternative argument that Section 230(c) does not apply because her claims do not treat Defendants as mere publishers or speakers but also as liable for their own acts. Additionally, the Court also need not consider whether the "FOSTA" exception to Section 230(c) immunity—which is an amendment to Section 230(c) that clarifies that sex trafficking victims are not barred from suing websites by Section 230(c), 47 U.S.C. § 230(5)(A)—applies because Plaintiff need not rely on the FOSTA exception to prevail on her TVPRA claim.

Having rejecting Defendants' only argument as to why summary judgment should be granted on Count I,[6] the Court finds that Count I should proceed to trial and now turns to Defendants' arguments on Plaintiff's Count II.

### 2. Defendants are not entitled to judgment on Plaintiff's claim that Defendants knowingly received, possessed, and

---

[6] Defendants argue for the first time in their reply brief that this Court should also grant summary judgment on Count I because Plaintiff cannot prove that they knew she was being sex trafficked by ████. It is possible that Defendants are raising this argument as part of their argument that the FOSTA exception does not apply to 230(c) immunity in this case, but if they are raising an argument independent from their FOSTA argument, the Court will not consider it. Courts generally do not consider arguments raised for the first time by the summary judgment movant in its reply. *See Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1352 n.11 (11th Cir. 2009) (treating argument as waived where it was raised for first time in reply brief).

**distributed CSAM in violation of 18 U.S.C. §§ 2252 & 2252A (Count II)**

Count II alleges that Defendants knowingly received, possessed, and distributed child pornography depicting class members including Plaintiff, in violation of two criminal statutes, 18 U.S.C. §§ 2252 and 2252A. Section 2252 proscribes "knowingly" receiving and distributing any visual depiction involving the use of a minor engaging in sexually explicit conduct. 18 U.S.C. § 2252(a)(2); *see also* 18 U.S.C. § 2256(1) (defining "minor" to mean "any person under the age of eighteen years"). Section 2252A makes it a crime to "knowingly receive[] or distribute[]" any "child pornography." 18 U.S.C. § 2252A(a)(2). Section 2252A(f) provides a civil remedy to persons aggrieved by the conduct prohibited in Section 2252A(a) or (b). 18 U.S.C. § 2252A(f). Additionally, 18 U.S.C. § 2255 creates a separate right of action for violations of a number of statutes. Section 2255 is titled "Civil remedy for personal injuries" and provides in pertinent part:

> (a) In general. –Any person who, while a minor, was a victim of a violation of section 1589, 1590, 1591, 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, or 2423 of this title and who suffers personal injury as a result of such violation, regardless of whether the injury occurred while such person was a minor, may sue in any appropriate United States District Court and shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred. The court may also award punitive damages and such other preliminary and equitable relief as the court determines to be appropriate.

18 U.S.C. § 2255(a). Thus, Section 2255(a) specifically authorizes victims who were minors at the time certain sex trafficking and child pornography offenses were committed to bring civil actions for such criminal violations, including for violations of the statutes on which Plaintiff asserts her two claims in this action—18 U.S.C. § 1591 and 18 U.S.C. §§ 2252 and 2252A.

Defendants raise two arguments in support of why Count II should be dismissed: Defendants are entitled to immunity under Section 230(c) of the CDA, and Plaintiff has not established that Defendants received, possessed, or distributed any videos of her knowing that they contained CSAM. Each argument is addressed in turn.

i.     **Section 230(c) immunity does not apply to Plaintiff's child pornography claims**

Defendants argue that Section 230(c) of the CDA applies to Sections 2252 and 2252A to immunize them from liability. Defendants again argue that they operate an interactive computer service, and the information at issue—the CSAM—was provided to them by another information content provider. In denying Defendants' motion to dismiss Plaintiff's complaint, this Court rejected this argument for several reasons. (*See* Doc. 42 at 68–73; *MG Freesites, LTD*, 676 F. Supp. 3d at 1169–71.) First, this Court ruled that CSAM is not "information" as contemplated by Section 230(c). *See* 47 U.S.C. § 230(f)(3). Rather, CSAM is illegal

contraband stemming from the sexual abuse of a child. Second, the Court noted that because Plaintiff seeks to hold Defendants liable for their own acts, and not just publishing of other parties' content, Section 230(c) immunity does not apply. The immunity applies when a website is treated as a publisher or speaker of the information provided by a third party, but Plaintiff's Section 2252 and 2252A claims allege that Defendants are not only distributors of CSAM but also *receivers and possessors* of it, which are in themselves criminal acts. No evidence has been offered in conjunction with the pending motions for summary judgment to disturb the Court's conclusions when it ruled on the motion to dismiss.

Yet, Defendants urge this Court to reconsider its prior ruling. First, Defendants point out that Section 230(c) does not limit its scope to publication of only "lawful" information by third parties but by its terms applies to "any information." *See* 47 U.S.C. § 230(c)(1). Additionally, Defendants offer the Ninth Circuit's decision in *Doe #1 v. Twitter, Inc.*, No. 22-15103, 2023 WL 3220912 (9th Cir. May 3, 2023), as persuasive authority. In that case, the Ninth Circuit held, with limited discussion, that Section 230(c) precluded the plaintiff from stating a viable claim for possession and distribution of child pornography under Sections 2252A and 2255. *Id.* at *2. The *Twitter* decision is unpublished, not binding, and no court in the Eleventh Circuit has relied upon it. Claims grounded in defamatory, discriminatory, or deceptive speech, or even speech inciting terrorist activity, still

involve a speaker imparting information, albeit unlawful, untrue, discriminatory, or dangerous information. *See, e.g., Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003); *Goddard v. Google, Inc.*, 2008 WL 5245490, at *6 (N.D. Cal. Dec. 17, 2008). CSAM, by contrast, is itself a violent crime, a record of that crime, and contraband—not information. Accordingly, this Court again finds that Section 230(c) of the CDA does not immunize Defendants from Plaintiff's claim that they violated the child pornography statutes.

Second, with regard to this Court's previous ruling that Defendants are not immune because Plaintiff claims injury not only from their distribution of CSAM (akin to publishing) but also from their receipt and possession of it, Defendants contend that Plaintiff's claimed injuries relate only to distribution and that she seeks injunctive relief to stop only distribution. Not so. Defendants cannot distribute CSAM without creating or receiving it and possessing it first. Plaintiff is entitled to attempt to prove injury from all three, and because Plaintiff seeks to hold Defendants liable for conduct other than publishing, that is another reason why Defendants are not immune under Section 230(c) of the CDA.

> ### ii. Genuine issues of material fact exist on the issue of whether Defendants were deliberately ignorant to Plaintiff's underage status

Defendants also argue that they are entitled to summary judgment on Count II because Plaintiff has not offered evidence establishing their knowledge that Plaintiff was underage when ███████ uploaded her CSAM to Pornhub.

The pertinent elements of a child pornography claim for receipt and distribution under Sections 2252 and 2252A are: (1) the defendant "receive[d] or distribute[d]" CSAM; (2) in interstate or foreign commerce "by any means, including by computer"; and (3) the defendant did so "knowingly." 18 U.S.C. §§ 2252(a)(2); 2252A(a)(2). Likewise, the pertinent elements of a child pornography claim for possession are similar: (1) the defendant "possesse[d]" or "accesse[d] with intent to view" CSAM; (2) "that ha[d] been . . . transported using any means or facility of interstate or foreign commerce"' and (3) the defendant did so "knowingly." 18 U.S.C. §§ 2252(a)(5); 2252A(a)(4).

"[T]he term 'knowingly' in § 2252 extends both to the sexually explicit nature of the material and to the age of the performers." *United States v. X-Citement Video*, 513 U.S. 64, 78 (1994). However, "a federal claim's 'knowledge element' 'can be proved by demonstrating either actual knowledge or deliberate ignorance.'" *Does 1-4 v. Red Roof Inns, Inc.*, 688 F. Supp. 3d 1247, 1254 (N.D. Ga. 2023) (quoting *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000)). And, "to prove either actual knowledge or deliberate ignorance, Plaintiff may rely on both direct evidence and circumstantial evidence based on the 'totality' of circumstances." *Id.* (citing *United*

*States v. Perez*, 698 F.2d 1168, 1171 (11th Cir. 1983)). "'[I]f a party has his suspicions aroused but then deliberately omits to make further enquiries, because he wishes to remain in ignorance, he is deemed to have knowledge.'" *Id.* (quoting *Prather*, 205 F.3d at 1270).

Defendants would have this Court ignore any evidence that is not directly related to Plaintiff's two CSAM videos because they argue that Plaintiff cannot prove her claim by showing Defendants' generalized knowledge that CSAM was on their sites but must instead prove that Defendants had particularized knowledge that Plaintiff was underage. But Sections 2252 and 2252A do not delineate between "generalized" and "particularized" knowledge. Defendants' knowledge regarding users submitting CSAM, approving it to go live, users watching and downloading it, and Defendants' storage of it all go towards showing the "totality of circumstances" that Defendants knew or deliberately avoided knowing that Plaintiff was a minor in the Rape and Car videos. *See Red Roof Inns*, 688 F. Supp. 3d at 1254. In any event, Plaintiff has set forth sufficient evidence for a trier of fact to find both Defendants' generalized knowledge of CSAM on their sites and Defendants' particular knowledge that Plaintiff was underage in her videos, such that summary judgment is not warranted.

As to generalized knowledge, first, Defendants received complaints from website users, law enforcement, and Internet watch groups that CSAM was on their

websites during the class period. For example, in June 2015, a user submitted a Pornhub Support message requesting the removal of a video depicting a 12-year-old, which Defendants' employees later determined had 100,000 views. In December 2015, law enforcement emailed Defendants requesting the immediate removal of CSAM on Pornhub depicting a 12-year-old performing oral sex on a 15-year-old. In January 2022, the Internet Watch Foundation sent a Content Removal Request to Defendants, attaching two weblinks to CSAM on Pornhub depicting a 14-year old victim, whose age had been confirmed by law enforcement. These are just three representative examples out of many in the record.

Additionally, Defendants' policies show their deliberate ignorance to CSAM. Defendants did not verify the ages of anyone depicted in uploaded content prior to 2020. Defendants also let *anyone* download *any* content from its websites prior to 2020. Defendants' moderators were historically "focus[ed] on speed and numbers" rather than ensuring that non-compliant content—including CSAM—did not go live on the websites. Defendants' internal procedure for reviewing content that had been flagged by users was to only review content that had been flagged *over 15 times*, so content that had been flagged 14 times was not subject to review. Content moderators review all the content that is uploaded to their sites, which means that they personally reviewed Plaintiff's CSAM as well as the thousands of CSAM videos that Defendants later reported to NCMEC, many of which were left publicly

available for months or years before they were reported. Defendants' former Content Manager explicitly admitted that she came across CSAM when reviewing content, and the record contains numerous instances of Defendants' employees discussing the CSAM that they came across, including one employee noting that she found suspected CSAM on a daily basis.

Further, Defendants' employees reviewed thousands of instances of CSAM when conducting their audit of all content uploaded to their websites to start reporting apparent CSAM to NCMEC. Of the over 20,000 reports of apparent CSAM Defendants have made to NCMEC, Defendants have self-classified at least 10,568 videos of apparent CSAM using NCMEC's A1/A2/B1/B2 classification; 1,679 of which have been classified as either "A1" or "A2," meaning that the CSAM that moderators reviewed depicted a prepubescent child. According to just one of Defendants' internal reports, content reported to NCMEC was viewed over 684,000,000 times before it was removed.

As to Defendants' knowledge regarding Plaintiff's underage status particularly, the following constitutes circumstantial evidence of Defendants' knowledge or deliberate ignorance. When ████████ uploaded the first video of Plaintiff, the Car Video, Defendants did not verify the ages of anyone depicted in content uploaded to its websites to determine if individuals were over 18; they simply relied on their human moderators to personally judge whether they thought

individuals depicted in content were over 18. ███████ repeatedly posted videos with titles and tags indicating that his videos were CSAM. ████████ used "submissive white teen," "barely legal," "juve," "lil," and "high school," when titling the videos he posted of Plaintiff. These phrases clearly indicate that the content depicts an underage individual. Defendants' corporate representative testified that a user-submitted title with the word "juve" in it should be escalated to review it for CSAM.

Another victim of ████████████, submitted three content removal requests within a 15-minute time period. The requests informed Pornhub that █████████ had posted videos of her, that she had been 16 when the videos were recorded, that she did not even know he was recording her, and that he had drugged her prior to recording the videos. ██████ told Pornhub that ████████ username was ██████████ and that he called her ██████ in the video titles. She also provided the information that the content to remove would include ████████ The next day, a Pornhub employee responded to ████████ requests, asking for the URL links in order to remove them. That day, three of ████████ videos were removed, but it is unclear whether ████████ removed them himself or whether Defendants removed them. Defendants did not mark the videos as apparent CSAM or report them to NCMEC at this time or during the time period when they first began reporting content to NCMEC.

Less than three months later, on May 1, 2020, ▮▮▮▮ posted the Rape Video of Plaintiff to Pornhub. He titled the video ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮ Even though ▮▮▮▮ had contacted Defendants in February 2020 notifying them that ▮▮▮▮ had posted videos of her CSAM and described exactly the same actions that occurred in ▮▮▮ video of Plaintiff's rape, Defendants allowed ▮▮▮▮ to post Plaintiff's rape video. Defendants did not ban ▮▮▮▮ and did not remove any of his other CSAM videos for several months. In fact, if Defendants had reviewed ▮▮▮▮ other uploaded content when it received the three Content Removal requests from ▮▮▮, they would have seen that one of Plaintiff's CSAM videos was, at that time, titled ▮▮▮▮▮▮ ▮▮▮▮ It was not until five months *after* the Content Removal requests and only when law enforcement contacted Defendants about Plaintiff's videos, that Defendants took down Plaintiff's CSAM and banned ▮▮▮▮ entirely from their websites for uploading CSAM. In addition, Defendants did not report Plaintiff's CSAM to NCMEC until two years later *after* law enforcement contacted Defendants and Plaintiff's CSAM was removed from its websites and one year after the filing of this lawsuit.

In sum, this is certainly sufficient evidence to enable Plaintiff to prove that Defendants were deliberately ignorant of the fact that Plaintiff was underage at the time that ▮▮▮▮ posted her CSAM to Pornhub. For all of the foregoing reasons,

Defendants are not entitled to summary judgment on Plaintiff's child pornography claims.

> **3. Specific Defendants MG Freesites II Ltd., MG Content RT Limited, MindGeek S.à r.l., MindGeek USA Incorporated, and MG Billing, Limited are not entitled to judgment**

In addition to MG Freesites, Ltd, Plaintiff also sued additional affiliated entities, including: (1) MG Freesites II Ltd, (2) MG Content RT, Limited, (3) MindGeek S.à r.l., (4) MindGeek USA Incorporated, (5) and MG Billing Limited. Defendants argue that each of these five defendants is entitled to summary judgment and dismissal for other reasons, as discussed herein.

> **i. MG Freesites II Ltd and MG Content RT Limited are not due summary judgment on the ground that they have been dissolved**

First, Defendants argue that MG Freesites II Ltd and MG Content RT Limited were dissolved in 2020 and thus lack the capacity to be sued. "Capacity to sue or be sued is determined . . . for a corporation, by the law under which it was organized." Fed. R. Civ. P. 17(b)(2). Defendants cite their corporate representative's declaration for the statement that MG Freesites II Ltd was organized under the laws of the Republic of Cyprus, that MG Content RT Limited was organized under Irish law, and that both entities were dissolved in late 2020. Defendants argue that they both consequently lack the capacity to be sued under laws by which they were organized, *see* The Companies Law of Cyprus Republic § 326(1) (courts may void dissolution

42

of dissolved company to allow proceedings against it only within two years of the date of dissolution); State Property Act §§ 27, 28 (Act. No. 25/1954) (Ir.) (under Irish law, action against dissolved company may be brought only by the government)

Plaintiff responds that she filed her complaint on February 11, 2021, approximately two months after MG Freesites II Ltd was allegedly dissolved, and that therefore, this lawsuit is permitted against MG Freesites II Ltd, according to the Cyprus law relied upon by Defendants. Plaintiff also states that although Defendants' corporate representative declared that MG Content RT Limited's dissolution date was December 21, 2020, the official records in Ireland's Company Registration Office show that it dissolved on May 22, 2022. Plaintiff further states that Defendants have produced no official documents confirming that these entities transferred assets and liabilities to another entity.

Defendants do not offer any rebuttal in their reply brief. The facts are obviously in dispute as to whether MG Freesites II Ltd and MG Content RT Limited both dissolved in December 2020, so neither entity is entitled to summary judgment.

> ### ii. MindGeek S.à.r.l., MindGeek USA Incorporated, and MG Freesites Ltd are not due summary judgment on the ground that they had no involvement in the operation of Pornhub

Defendants argue that these three entities are distinct corporate entities, that they were not involved in operating Pornhub, that neither Plaintiff nor ███████ interacted with them, and that these entities did not benefit from Plaintiff's CSAM.

In response, Plaintiff points out that MindGeek S.à.r.l. has elsewhere admitted that it is the "ultimate parent company" of all defendants and is responsible for the acts of its directors and employees; that Defendants' group of entities (including MindGeek S.à.r.l., MindGeek USA Incorporated, and MG Freesites Ltd) operated Pornhub, and that MG Billing Limited is also part of MindGeek's group of entities, as it hired merchants to scan sites for CSAM.

Plaintiff argues that Defendants are thus alter egos operating a single business enterprise. Whether a subsidiary is the alter ego of a parent corporation is usually a question of fact. *Simmons v. Clark Equipment Credit Corp.*, 554 So. 2d 398, 400 (Ala. 1989). A 12-factor "laundry list" is used to determine whether a subsidiary is the alter ego of its parent, including: "(1) the parent and subsidiary have common stock ownership; (2) the parent and subsidiary have common directors or officers; (3) the parent and subsidiary have common business departments; (4) the parent and subsidiary have consolidated financial statements and tax returns; . . . (11) the daily operations of the two corporations are not kept separate; and (12) the subsidiary does not observe basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings." *United Steelworkers of Am. v. Connors Steel*, 855 F.2d 1499, 1505 (11th Cir. 1988)."[I]t is not necessary that plaintiffs prove the existence of all twelve factors." *Id.* at 1506.

Defendants offer the declaration of one of their corporate representatives for the following statements: each entity has its own bank accounts and performs its own contracts, each has its own board of directors, each observes all necessary corporate formalities, including holding regular meetings, and each also maintains separate daily operations and prepares financial statements and its own tax documents. In stark contrast, Plaintiff offers evidence that MindGeek S.à.r.l. owns the shares of its subsidiaries and has a right to oversee their operations; the same people serve on all the Cyprus companies' boards; the same people serve on all the Luxembourg companies' boards; Defendants have a centralized management; their executives consider all of the entities as one business operation and cannot differentiate between what each does; since at least 2009, Defendants have filed consolidated financial statements; MindGeek S.à.r.l. financed the entire enterprise; and at executive meetings, MindGeek S.à.r.l. executives discuss all aspects of the business and issues in the subsidiaries.

Defendants offer no rebuttal in their reply brief. Because there are obviously material facts in dispute as to whether these entities are distinct or alter egos, summary judgment is not warranted.

   iii. **MindGeek S.à.r.l. is not due summary judgment on Plaintiff's TVRPA claims on the ground that the extraterritorial statutes do not reach it**

Finally, Defendants argue that MindGeek S.à.r.l. is entitled to judgment as a matter of law on Plaintiff's TVPRA claims (Sections 1591 and 1595) because MindGeek S.à.r.l. was incorporated under the laws of Luxembourg; Section 1595 does not apply extraterritorially; and while Section 1591 does apply extraterritorially, Plaintiff cannot establish the extraterritorial jurisdiction requirement for her Section 1591 claim.

"It is a longstanding principle of American law that legislation of Congress, unless a contrary intent [to apply extraterritorially] appears," applies "only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Aus. Bank Ltd.*, 561 U.S. 247, 255 (2010) (citation and quotation marks omitted). Thus, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none," *id.*, and "when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms." *Id.* at 265.

In 2008, Congress amended the TVPRA to add a limited grant of extraterritorial jurisdiction for certain criminal statutes, including Section 1591. *Plaintiff A v. Schair*, No. 2:11-CV-00145-WCO, 2014 WL 12495639, at *1 (N.D. Ga. Sept. 9, 2014). The amendment provides:

> In addition to any domestic or extra-territorial jurisdiction otherwise provided by law, the courts of the United States have extra-territorial jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under section 1581, 1583, 1584, 1589, 1590, or 1591 if—

> (1) an alleged offender is a national of the United States or an alien lawfully admitted for permanent residence ...; or
>
> (2) an alleged offender is present in the United States, irrespective of the nationality of the alleged offender.

18 U.S.C. § 1596(a). Congress did not include Section 1595 in this amendment, only Section 1591. *See Doe I v. Apple Inc.*, 2021 WL 5774224, at *15 (D.D.C. Nov. 2, 2021).

Thus, Defendants argue that even if Section 1595 applied extraterritorially, which it does not, neither Section 1595 nor Section 1591 would reach MindGeek S.à.r.l. because MindGeek S.à.r.l. is not a United States national, an alien lawfully admitted for permanent residence, or "present in" the United States under 18 U.S.C. § 1596(a). Rather, MindGeek S.à.r.l. is a private limited liability company incorporated under the laws of Luxembourg and merely a holding company for Defendants.

Plaintiff responds that there is no extraterritorial issue at all because Plaintiff's TVPRA claims seek nothing more than a *domestic* application of the statute. Whether case involves extraterritorial application of U.S. law is not "self-evident" simply from the parties' location, their conduct, or the resulting harm. *Morrison*, 561 U.S. at 265–66. Rather, there is "a two-step framework for analyzing extraterritoriality issues. At the first step, we ask ... whether the statute gives a clear, affirmative indication that it applies extraterritorially. . . . If the statute is not

extraterritorial, then at the second step we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute's 'focus.'" *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 337 (2016). Courts have discretion to begin at step two "in appropriate cases," especially where ruling on the scope of a statute in step one "would require resolving 'difficult questions' that do not change 'the outcome of the case.'" *WesternGeco v. ION Geophysical Corp.*, 585 U.S. 407, 413 (2018). In the second step, determining whether U.S. law is being applied domestically requires "identifying the statute's 'focus' and asking whether the conduct relevant to that focus occurred in United States territory." *Id*. "The focus of a statute is 'the objec[t] of [its] solicitude,' which can include the conduct it 'seeks to regulate,' as well as the parties and interests it 'seeks to 'protec[t]' or vindicate." *Id*. at 413–14.

Nothing in Section 1595 states that it applies abroad, and Section 1591 applies abroad only if certain conditions are met. *See* 18 U.S.C. § 1596(a). However, the "focus" of the TVPRA as a whole is to protect and assist victims of sex trafficking and hold traffickers and their beneficiaries liable. *See* 22 U.S.C. § 7101(a) (TVPRA works "to combat trafficking in persons, . . . to ensure just and effective punishment of traffickers, and to protect their victims."). Plaintiff argues that in this case, the TVPRA's focus is within the United States for several reasons. Plaintiff, a U.S. citizen and resident, was trafficked and abused in the U.S.; the acts related to her

48

underlying trafficking occurred in the U.S.; and her TVPRA claims are based on the evidence that Defendants promoted, participated in, and profited from that sex trafficking in the U.S. Accordingly, Plaintiff contends that this case "involves a permissible domestic application" of the TVPRA, regardless of MindGeek S.à.r.l.'s location or conduct abroad. *See WesternGeco*, 585 U.S. at 413; *RJR*, 579 U.S. at 337; *see also U.S. v. Skinner*, 536 F. Supp. 3d 23, 37–41 (E.D. Va. 2021) (CSAM prosecution against New Zealand resident who recorded images of a Virginia minor but whose conducted occurred entirely in New Zealand constituted permissible "domestic application" of federal CSAM statute). For these reasons, this case is different from P*laintiff A. v. Schair*, 2014 WL 12495639, *1 (N.D. Ga. Sept. 9, 2014), cited by Defendants, which was decided before the Supreme Court decided *RJR* in 2016 and *WesternGeco* in 2018, and involved a true extraterritorial application of Section 1595 because all of the defendant's actions occurred in Brazil, the victims were Brazilian, and they were sex trafficked by the defendant in Brazil.

The Court agrees with Plaintiff that she seeks a domestic application of the TVPRA against Defendants, so MindGeek S.à.r.l. is not due judgment simply because it was incorporated in Luxembourg. In any event, as noted above, there is a genuine issue of material fact as to whether MindGeek S.à.r.l. is merely part of an integrated enterprise and is an alter ego of the other Defendants. MindGeek S.à.r.l. admits to participating in the operation of the pornography sites and even has offices

in Los Angeles. Accordingly, MindGeek S.à.r.l. is not due summary judgment on this ground.

## B.   Plaintiff's Motion for Partial Summary Judgment on Count II

Finding that Defendants are not due summary judgment, the Court turns to Plaintiff's partial motion, in which she argues that Defendants received, possessed, and distributed CSAM in violation of 18 U.S.C. §§ 2252 and 2252A as a matter of law, and she need not prove this claim at trial. The Court discussed the relevant law and facts in the above section. To succeed, Plaintiff must prove, among other things, that Defendants either knew or deliberately ignored that she was underage in the Car and Rape Videos. A court can find knowledge as a matter of law, and thus grant summary judgment, where the evidence is such that "a reasonable jury could [] not reach a contrary conclusion." *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1476 n.6 (11th Cir. 1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations and citation omitted) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."). The Court finds that, especially with regard to Defendants' knowledge of her underage status, disputes of fact remain that should be determined by the trier of fact. Accordingly, summary judgment to Plaintiff on this claim is not warranted.

## VI.   CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (doc. 221) and Plaintiff's motion for partial summary judgment (doc. 223) are both hereby **DENIED**.

**DONE** and **ORDERED** on December 19, 2024.

L. Scott Coogler
United States District Judge

160704