# EXHIBIT 21

# [PORTIONS OF EXHIBIT FILED UNDER SEAL PURSUANT TO APPLICATION TO SEAL]

CONFIDENTIAL

Page 1

1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                 SOUTHERN DIVISION

4

5    SERENA FLEITES and JANE DOE   )
     NOS. 1 through 33,            )

6                                  ) Case No.
              Plaintiffs,          ) 2:21-CV-04920-CJC-ADS

7                                  )
         VS.                       )

8                                  )
     MINDGEEK S.A.R.L.; MG         )

9    FREESITES, LTD.; MINDGEEK     )
     USA INCORPORATED; MG PREMIUM  )

10   LTD.; RK HOLDINGS USA INC.;   )
     MG GLOBAL ENTERTAINMENT,      ) Pages 1-358

11   INC.; TRAFFICJUNKY INC.;      )
     BERND BERGMAIR; FERAS ANTOON;)

12   DAVID TASSILLO; COREY URMAN;  )
     VISA INC.; COLBECK CAPITAL    )

13   DOES 1-10; BERGMAIR DOES      )
     1-10,                         )

14                                 )
              Defendants.          )

15   _____ )

16

                    C O N F I D E N T I A L

17

18   VIDEOTAPED DEPOSITION OF:

19        BERND BERGMAIR

20        THURSDAY, JUNE 15, 2023

21        9:24 A.M.

22

23

24   Reported by:  LINDA NICKERSON

25                 CSR No. 8746

Page 67

1          A    No, not really.

2          Q    Okay.  Who did you deal with when you were

3     evaluating whether to pursue the opportunity?

4          A    With Feras Antoon and David Tassillo.

5          Q    Did you deal with Fabian Thylmann at all?

6          A    No.

7          Q    But he was the owner at the time, right?

8          A    Yes.

9          Q    So why weren't you dealing with the owner?

10         A    Because the sale wasn't -- how to tell --

11    it wasn't -- it wasn't Fabian -- I think it wasn't

12    Fabian selling his shares.  It was -- it was the

13    company selling the assets underneath.

14         Q    Okay.  And what was Feras Antoon's position

15    at that time at MindGeek?

16              MS. MASSEY:  Object to form.

17              THE WITNESS:  I think he was CEO of that

18    Quebec entity.

19    BY MR. BOWE:

20         Q    Who ran the company, MindGeek?

21              MS. MASSEY:  Object to form.

22              MR. WHITE:  Objection; and timeframe.

23    BY MR. BOWE:

24         Q    At the time you were looking at acquiring

25    it.

```
                                                    Page 68
 1          A     The management there.
 2          Q     Who was that?
 3                MS. MASSEY:  Object to form.
 4                THE WITNESS:  That's a group of 20 or 25
 5       people, I'd say.
 6       BY MR. BOWE:
 7          Q     Okay.  Do you remember any of their names?
 8          A     Sorry?
 9          Q     Do you remember any of their names?
10          A     Sure, yeah.  So --
11                THE REPORTER:  Go ahead.
12                THE WITNESS:  Among management, there was
13       Feras Antoon, David Tassillo.  I don't recall the
14       in-house counsel's name.  It was Italian -- Italian
15       descent.  There was someone called Eddy Kaba.  There
16       was Eddy Di Santo.  This is ten years ago.  I don't
17       know who was there and who came onboard later.
18       BY MR. BOWE:
19          Q     Okay.  Who was the boss of that group?
20                MS. MASSEY:  Object to form.
21                MR. WHITE:  Objection.
22                THE WITNESS:  Which group?
23       BY MR. BOWE:
24          Q     The 25 or so people you said that ran
25       MindGeek.
```

Page 69

```
 1              MS. MASSEY:  Object to form.
 2              THE WITNESS:  So it's my recollection that
 3     Feras was CEO of the Quebec entity.
 4     BY MR. BOWE:
 5         Q     COO or CEO?
 6         A     CEO, and Tassillo was COO of the Quebec
 7     entity.
 8         Q     And you understood that they were bosses?
 9              MR. WHITE:  Objection.
10              THE WITNESS:  I understood they were CEO of
11     the Quebec entity and the COO of the Quebec entity.
12     BY MR. BOWE:
13         Q     Okay.  I'm asking you who was in charge of
14     that group you said was running the company.
15              Was it those two?
16              MS. MASSEY:  Object to form.
17              THE WITNESS:  So Antoon was CEO of the
18     Quebec entity and Tassillo was COO.
19     BY MR. BOWE:
20         Q     And you equate those as being the boss of
21     that group?
22              MS. MASSEY:  Object to form.
23              THE WITNESS:  One, I understood his title
24     was CEO and the other had the title COO.
25     BY MR. BOWE:
```

CONFIDENTIAL

Page 72

```
 1              THE WITNESS:  I don't remember.
 2      BY MR. BOWE:
 3          Q    You don't remember the closing that you
 4      were at on this deal?
 5          A    I did --
 6              MR. WHITE:  Objection.
 7              THE WITNESS:  -- not attend the closing.
 8      BY MR. BOWE:
 9          Q    Okay.  What was your proposal that you made
10      to acquire MindGeek?
11              MR. WHITE:  Objection.
12              THE WITNESS:  I don't remember.
13      BY MR. BOWE:
14          Q    You don't remember anything about it?
15          A    Well, I -- I remember the bargain that was
16      struck in the end, and as one would expect, there's
17      a lot of negotiating, haggling back and forth of
18      what everybody wants.
19          Q    Okay.  Let's start with the bargain.
20              Do you remember the bargain?  What was the
21      bargain that was struck?
22          A    That I get ███████, Feras and David got
23      ███████, and RK ███████.
24          Q    Of what?
25          A    Of the MindGeek assets.
```

CONFIDENTIAL

Page 73

1          THE VIDEOGRAPHER:  Please pardon the
2     interruption, Counsel.  We have a Hayden Coleman.
3          MS. MASSEY:  He can join.  He's from
4     Dechert.
5     BY MR. BOWE:
6          Q    And what were you going to contribute for
7     ██████████?
8          A    Whatever is set out in this contribution
9     subscription agreement.
10          Q    You don't remember?
11          A    No.  I said earlier the -- the -- what I do
12     remember is there was a cash component and Redtube
13     assets.
14          Q    Okay.  And so you said it was ████████████
15     cash component, right?
16          A    Yes.
17          Q    Okay.  Was that -- was that hard cash up
18     front?
19          A    Yes.
20          Q    Okay.  Where did that cash come from?
21          A    The acquiring entity.
22          Q    Well, you were the -- it was your entity
23     that was acquiring it, correct?
24          A    Yes.
25          Q    Your cash?

Page 76

1          A     Yes.

2          Q     And did it have a maturity date?

3          A     Yes.

4          Q     And then the other part that you

5     contributed was the Redtube assets, right?

6          A     Yes.

7          Q     Which you at the time valued at

8     ████████████?

9          A     Yes.

10         Q     Okay.  What did Mr. Antoon and Tassillo

11    contribute?

12               MS. MASSEY:  Object to form.

13               THE WITNESS:  Nothing.  I should say no

14    financial assets.

15    BY MR. BOWE:

16         Q     Sure.  So why did they get ████████ --

17    withdrawn.

18               Did they own any of the company at that

19    point?

20         A     Sorry?

21         Q     Did they own any of MindGeek at that point?

22               MS. MASSEY:  Object to form.

23               THE WITNESS:  I was told they had

24    ████████████.

25    BY MR. BOWE:

CONFIDENTIAL

Page 77

1        Q     And so in the bargain you struck, why did

2    you agree to give them ██████████ of the company?

3        A     Because I wanted them to be motivated and I

4    wanted to have the incentives aligned.

5        Q     Okay.  Now, at the time of this

6    transaction, what was the relative sort of business

7    size between Redtube and MindGeek?

8              MS. MASSEY:  Object to form.

9              THE WITNESS:  So what I do remember is

10   Redtube asset was much smaller than MindGeek, but I

11   don't remember the -- I'd have to look at documents.

12   BY MR. BOWE:

13       Q     Okay.  Was it more profitable, Redtube?

14   Was it more profitable than MindGeek?

15             MS. MASSEY:  Object to form.

16             THE WITNESS:  I don't remember.

17   BY MR. BOWE:

18       Q     Okay.  Before I forget, did ██████████ ever

19   loan any other money with respect to Redtube?

20       A     No.

21       Q     What about with respect to MindGeek?

22       A     No, he didn't lend money to MindGeek.

23       Q     No, I'm asking.  So that was the one time

24   in relation to Redtube or MindGeek that he loaned

25   money?

CONFIDENTIAL

                                                            Page 91

1       way I look at this is there's assets, there's debt,

2       and then, you know, the equity is a residual.

3       BY MR. BOWE:

4           Q    Okay.  But what I'm trying to understand is

5       who is it that has retained Colbeck?

6               MR. WHITE:  Objection.  It's been asked and

7       answered.

8               THE WITNESS:  I don't know.

9       BY MR. BOWE:

10          Q    Okay.  Who paid their fee?

11              MS. MASSEY:  Object to form.

12              THE WITNESS:  I don't know.

13      BY MR. BOWE:

14          Q    Okay.  So after you struck the bargain,

15      when you came to an agreement on a deal, what were

16      the terms?

17          A    Well, incumbent management would run the

18      assets, and, you know, it's all laid out in the

19      documents.

20          Q    Okay.  And how did you come to restructure

21      the organization the way you did as part of the

22      acquisition?

23          A    I didn't restructure anything.

24              MR. WHITE:  Objection.

25      BY MR. BOWE:

CONFIDENTIAL

Page 96

1     asked for a piece of paper, that didn't change your

2     mind and tell you you're not supposed to write

3     something down?

4                MR. WHITE:  Objection.

5     BY MR. BOWE:

6          Q    That's not what happened?

7                MR. WHITE:  Objection.

8                THE WITNESS:  No, I didn't want to write

9     anything down.  I was going to draw a box.

10    BY MR. BOWE:

11         Q    You'd have to -- you'd have to draw -- so

12    draw the box.

13         A    I'll draw the box.  So here -- so here you

14    have, let's say, holdco and you have sub 1, sub 2,

15    right, that's there.  And then I come and I say I

16    contribute assets to here, of course, I get a piece

17    of this.

18         Q    But you could have contributed the assets

19    to H, right?

20               MS. MASSEY:  Object to form.

21               MR. WHITE:  Objection.

22               THE WITNESS:  That's speculation.

23    BY MR. BOWE:

24         Q    Well, no, it's not.  You could have, right?

25               MS. MASSEY:  Object to form.

CONFIDENTIAL

Page 97

```
 1      BY MR. BOWE:
 2          Q    That was the scenario you told me first.
 3      You said if I owned Bowe, Inc., you could give me a
 4      million dollars and you would own a piece of Bowe,
 5      Inc., right?
 6          A    That's what I did here.
 7          Q    Okay.  This could be Bowe, Inc., at the
 8      top, right?
 9          A    No.
10          Q    It can't be.  Why not?
11          A    There was some restriction.  Obviously I
12      would have loved to get my ████████ up here.  I
13      didn't like having to sit down here, but there
14      was -- it had -- what was that -- RCGT would know
15      that.  There was some limitation on -- now I
16      remember.  There was some -- so there was some
17      limitation on how much a non-NAFTA UBO could hold
18      here.
19          Q    Okay.  Let's break that down.  Non -- first
20      of all, UBO means what for the record?
21          A    Ultimate beneficial owner.
22          Q    Okay.  And NAFTA meant what?
23          A    I think that's an acronym for North
24      American Free Trade Association.
25          Q    Okay.  And was Mr. Thylmann in NAFTA?
```

CONFIDENTIAL

Page 98

1              THE REPORTER:  Mr. Who?

2              MR. BOWE:  Thylmann.

3        Q     Was he a NAFTA --

4        A     I don't know.

5        Q     Okay.  But you were not?

6        A     So what I do know is that because of the

7    Hong Kong residency, I could not own a -- I want to

8    say the nonqualifying residents were limited to

9    below 5 percent here.

10       Q     Okay.  That was a Luxembourg company,

11   right?

12       A     Yes, yes.

13       Q     Okay.  The entity that you --

14             MR. WHITE:  Let me just clarify.  When he

15   keeps saying "here" and you're saying "here,"

16   just --

17             MR. BOWE:  Sure.

18       Q     You're talking about what you identified

19   and what I'm going to mark as Exhibit 1, H holdco?

20       A     Okay.

21       Q     Okay.  That was where your restriction was

22   to 5 percent?

23             MS. MASSEY:  Object to form.

24             THE WITNESS:  Yes.

25   BY MR. BOWE:

Page 99

1          Q    Okay.

2          A    But the problem was this:  RK also was in

3     that bucket of less than 5 percent and they already

4     had almost 5 percent.  So that's why I ended up

5     with, I don't know, next to nothing there.

6               THE REPORTER:  I need a break when you get

7     to a good point.

8               MR. BOWE:  Okay.  Okay.  Now is good.

9     We'll take a break.  The court reporter needs a

10    break.  We'll take about ten minutes.

11              Is that all right, Madam Court Reporter,

12    ten minutes?

13              THE REPORTER:  Yes.

14              THE VIDEOGRAPHER:  Okay then.  This is the

15    end of Media Unit Two.  We're going off the record

16    at 11:07 a.m.

17                   (Recess taken.)

18              THE VIDEOGRAPHER:  We're going back on the

19    record at 11:24 a.m., and this is the beginning of

20    Media Unit Three.

21              MR. BOWE:  During the break, I marked the

22    piece of paper that you drew your rough schematic on

23    as Exhibit 1.  So it will be in the record.  Okay?

24              THE WITNESS:  Good.

25                   (The document referred to was marked by the

CONFIDENTIAL

Page 100

1    Reporter as Plaintiffs' Exhibit 1 for identification

2    and is attached hereto.)

3              THE VIDEOGRAPHER:  Pardon me, Counsel, if

4    you could put your microphone on, please.

5    BY MR. BOWE:

6         Q    Now, when we broke, you were explaining

7    part of the reason you understood that structure was

8    adopted, and you said you understood in part because

9    the UBO in terms of your entities was you and you

10   were a Hong Kong resident, not a NAFTA resident?

11        A    I think that was -- so, yes, I think that

12   was the -- you know, the main -- the main reason for

13   RCGT to design the -- this.

14        Q    Okay.  Were there other reasons?

15        A    May well be.  I don't remember.

16        Q    Okay.  Now, they were designed on behalf of

17   the acquiring group, right?

18        A    So this -- the -- as far as I remember, the

19   problem was the following:  If -- if this less than

20   5 percent ownership by the -- I don't know,

21   qualified/nonqualifying resident wasn't observed,

22   then the consequence would be that whatever

23   revenue -- not profit, revenue -- top-line revenue

24   is generated in the U.S. would be subject to the

25   30 percent withholding tax which would have

Page 101

1     prohibited doing the MBO.

2          Q     Okay.  33 percent holding -- 30 percent

3     withholding tax in what jurisdiction?

4          A     The United States.

5          Q     Okay.

6          A     And then if that were to happen, you know,

7     the deal would not have been feasible because

8     that -- because if you operate on a roughly

9     30 percent operating margin, this would have wiped

10    all the profits -- would have wiped a hundred

11    percent of the operating income of the assets, and

12    then there was no -- no way the assets could support

13    the debt service.

14         Q     Right, okay.  Did you understand that the

15    structure that existed at the time was compliant

16    with U.S. law?

17         A     I don't know what they -- they didn't

18    comply with previously.

19         Q     Okay.  Do you know if Mr. Thylmann at the

20    time was a qualifying person?

21         A     I don't know.

22         Q     Okay.  And do you have a more complete

23    understanding than you've shared with us about why

24    you were not a qualifying person -- UBO?

25         A     Say it again, please.

CONFIDENTIAL

Page 102

1          Q    Do you have a more complete understanding

2     than what you've given us about why you -- what it

3     was about you that made you unqualified -- an

4     unqualified UBO?

5               MR. WHITE:  Objection to form.

6               THE WITNESS:  A Hong Kong resident, I was

7     told, is not -- is not -- doesn't satisfy this

8     requirement.

9     BY MR. BOWE:

10         Q    Okay.  All right.

11         A    It's -- I -- there must be something about

12    EU as well.  So EU residents, I remember now, did

13    qualify.  For EU resident, it was not a problem

14    because, for that reason, there was a provision if I

15    ever became an EU resident, then I could convert my

16    shares that I had down here into shares up here.

17         Q    Okay.  Now, you said before you didn't like

18    being -- you referred to the box?

19         A    Down here, yeah, of course not.

20         Q    Down here, what letter do you have on it?

21         A    It says S2 for subsidiary 2.

22         Q    You said I don't like to be down here.  Why

23    not?

24         A    Well, you know, if you invest, naturally

25    you want to stick to the top entity, not in some

CONFIDENTIAL

Page 103

1    subsidiary.

2         Q    Right.  But what difference does it make?

3         A    Pardon me?

4         Q    What difference would it make?

5         A    Well, you know, what difference does it

6    make?  If you have shares in top entity, it just --

7    everything is so much easier, right.  You don't have

8    to work around this limitation or this -- how do you

9    say -- not limitation, this -- let me call it

10   disadvantage of -- of sitting down here in S2.

11        Q    Okay.  But why couldn't you just sit down

12   in S2 and get your ████████?

13             MS. MASSEY:  Object to form.

14             THE WITNESS:  Because I obviously wanted a

15   ████████ interest in not just S2, but in the whole

16   group -- in all of the group assets.

17   BY MR. BOWE:

18        Q    And why wouldn't that happen if you were

19   just at S2 in the structure that existed?

20             MS. MASSEY:  Object to form.

21             THE WITNESS:  Well, that's self-evident.

22   BY MR. BOWE:

23        Q    Okay.  Well, it's not to me.  I'm sure it's

24   not to the jury.

25             Just explain it to us.

CONFIDENTIAL

Page 105

1    what I wanted was to be like better put in a

2    position financially that was equal or at least very

3    similar to having shares up here.

4        Q    I get it.  So you have -- you were buying

5    ███████████ of the company?

6        A    Well, that's what I wanted, but it wasn't

7    possible.

8        Q    Right.  Under the corporate structure that

9    you could legally do, you wouldn't own ███████████ of

10   S1A?

11       A    Sorry.  Again.

12       Q    If you had to do it this way --

13       A    It can be done this way, yes.

14       Q    Okay.  But then the problem is, without

15   doing something further, you wouldn't have

16   ███████████ of S1A?

17       A    That is right.

18       Q    Okay.

19       A    Yes.

20       Q    All right.  All right.  I'm going to come

21   back to that.  Thank you.

22   ████████████████████████████

     ████████████████████████████████

     ██ ████████████████████████████████

     ██ ██ ██████████████████████

     ██ ██ ████████████████████████████

CONFIDENTIAL

Page 106



15      Q      Okay.  Now, with respect to the advice on

16   what you could and couldn't do that you've just

17   walked through in Exhibit 1, who gave you all that

18   advice?

19      A      RCGT did.

20             THE REPORTER:  Sorry?

21             THE WITNESS:  RCGT.

22             MR. WHITE:  Just as we go forward, I'm

23   going to direct you don't answer or exclude from

24   your answer any conversations that you had with

25   lawyers.

CONFIDENTIAL

Page 107

```
 1              THE WITNESS:  Uh-huh, okay.
 2      BY MR. BOWE:
 3          Q    Okay.  Now, at that point in time, did you
 4      have your own accounting advisors?
 5          A    No.
 6          Q    Okay.  And can you tell me whether Grant
 7      Thornton at that point in time was representing you
 8      as the acquirer or MindGeek?
 9          A    They were representing not me, and they
10      were representing the sell side.  What -- how
11      exactly it worked on the sell side, I don't know,
12      you know.
13          Q    But you on your side, when they gave you
14      this advice that you weren't happy with, you didn't
15      have your own advisors to give you advice on whether
16      they were right or wrong or there was a better way
17      to do it?
18          A    I had no reason to doubt this.
19          Q    Did you have Sheppard Mullin's work on
20      that?
21          A    No.
22          Q    Okay.  So you just accepted whatever Grant
23      Thornton was saying?
24          A    Yes.
25          Q    Okay.  What was the -- how did you get
```

CONFIDENTIAL

Page 108

1      around it?

2              MR. WHITE:  Objection to the form.

3              THE WITNESS:  ███████████████████

█      █████████████████████████████████████████

█      █████████████████████████████████████████

█      ████████████████████████████████

7      BY MR. BOWE:

8          Q    █████████████████████

9          A    ████████████

10         Q    Okay.

11         A    So that's how this was dealt with.

12         Q    Okay.  What did that mean?  What did you

13     understand that meant?

14         A    ███████████████████████████████████

█      █████████████████████████████████████

█      █████████████████████████████████████

█      ███████████████

█          █    ███████████

█          █    ██████

█          █    ██████

█          █    █████████

22         Q    Okay.  But how did it work from the

23     corporate perspective?

24             MS. MASSEY:  Object to form.

25             THE WITNESS:  I'm not following.

CONFIDENTIAL

Page 109

1    BY MR. BOWE:

2        Q    Like how did it --

3            THE REPORTER:  I'm sorry.  What was your

4    answer?

5            THE WITNESS:  I said I'm not following it.

6    I didn't understand.

7    BY MR. BOWE:

8        Q



25       Q    Okay.

CONFIDENTIAL

Page 110

1        A    Right.  So, for example, if, say, somewhere

2   down here, one company pays a dividend to its

3   immediate parent or up, this -- no money leaves the

4   system.

5

8                THE REPORTER:  I'm sorry.  Under the?

9                THE WITNESS:

16               And the dividends that were ██████, they

17  didn't care about whether money was paid up inside

18  the group, but if dividends were paid out, then

19  that's all what they cared about.

20  BY MR. BOWE:

21       Q    Okay.  So they -- they had a security

22  interest on every asset within that dotted circle?

23       A    That's my understanding.  I don't want to

24  be --

25       Q    That was your understanding as a 59 percent

Page 117

1          THE WITNESS:  I had full trust in Sheppard
2     Mullin that the agreement they drafted, it would
3     work the way I wanted it.
4     BY MR. BOWE:
5          Q    Okay.  So -- but this is what you used to
6     do is do deals like this, right?
7               MS. MASSEY:  Object to form.
8               THE WITNESS:  This --
9     BY MR. BOWE:
10          Q    This is a merger and an acquisition, an
11     acquisition and a merger, right?
12          A    This is accounting, legal work.  I'm not an
13     accountant.  I'm not a lawyer.  My expertise was in
14     valuing assets.
15          Q    All right.  So let's look at just before --
16     let's look at just before where it says "Current
17     Corporate" -- on page 2, "Current Corporate
18     Structure," page 2 of that PowerPoint.
19               Do you see it?
20          A    This here?
21          Q    Okay.
22          A    Is the current -- yeah.
23          Q    That means the one just before the
24     transaction, right?
25          A    Sorry?

CONFIDENTIAL

Page 120

```
 1          Q    Okay.  So this company generates $2.

 2          A    Where?

 3          Q    $1 at S2A, $1 at S1A.

 4          A    Okay.

 5          Q    The ███████████ at S2A is easy, you own

 6     ███████████ of S2, right?

 7          A    Yes.

 8          Q    You don't own any of S1A.  So how do you

 9     get to ███████████?

10               MS. MASSEY:  Object to form.

11               MR. WHITE:  Objection.

12     BY MR. BOWE:

13          Q    How do you get it?

14               MR. WHITE:  Objection.

15               THE WITNESS:  So if we assume there's ███

16  ███ ██████████████████████████████████████

17  ███ ████████████████████████████████████████████

18  ███ ████████████████████████████████, that's the dividend

19     here.

20     BY MR. BOWE:

21          Q    Out of S2A?

22          A    Yes.

23          Q    Okay.  So does the debt get paid by S1A?

24               MR. WHITE:  Objection.

25               MS. MASSEY:  Object to form.
```

CONFIDENTIAL

Page 122

1    BY MR. BOWE:

2         Q    And can you put -- before you do it, let me

3    know if you can do it first -- could you map out in

4    a pen what would correspond to S2 here?

5         A    No.

6         Q    No?

7              Which entity do you own ████████████ in?

8              MR. WHITE:  Objection.

9              MS. MASSEY:  Object to form.

10             THE WITNESS:  So that was RT Holding

11   S.a.r.L.

12   BY MR. BOWE:

13        Q    Right.  That would be over on the left,

14   right?

15        A    Yes.

16        Q    Okay.  And you own, according to this, ████

17   ████████████ of that, right, through ████████████

18   ██████?

19        A    Yeah, if those numbers are right, yeah,

20   according to this chart, yes.

21        Q    Grant Thornton, those were people you were

22   relying on, right?

23             MS. MASSEY:  Object to form.

24             THE WITNESS:  Yes, but this is -- this is

25   proposed and, hence, that's why I'm saying I don't

CONFIDENTIAL

Page 126

1      they are invested in?

2              MS. MASSEY:  Object to form.

3              MR. WHITE:  Objection.

4              THE WITNESS:  You want me to put Share

5      Invest --

6      BY MR. BOWE:

7          Q



                        I --

19              THE WITNESS:  This is so small I can't read

20      this.  I'm sorry.  I'm jet lagged, and my eyes are

21      less than perfect.

22      BY MR. BOWE:

23          Q

CONFIDENTIAL

Page 127

1      entities in MindGeek S.a.r.L.?

2           A     In MindGeek S.a.r.L., it was next to

3      nothing.

4           Q     So my readers are up to date.  So according

5      to this chart, you had ███████████████████████.

6                 Does that sound about right, the percent?

7                 MS. MASSEY:  Object to form.

8      BY MR. BOWE:

9           Q     ██████████████████████████

10                MS. MASSEY:  Object to form.

11                THE WITNESS:  In MindGeek S.a.r.L.?

12     BY MR. BOWE:

13          Q     Yes.

14          A     That's possible.

15          Q     Does that sound about right?  That's about

16     nothing, right?

17          A     Yeah, very little.  There was --

18          Q     ████████████████████████████████████████

19     ███████████████, right?

20          A     There was -- whatever the percentage was,

21     there was very little room left because RK had

22     consumed most of the ████████.

23          Q     Okay.  So the bulk of your ████████ was

24     through RT Holding, right?

25                MS. MASSEY:  Object to form.

CONFIDENTIAL

                                                    Page 128

1              MR. WHITE:  Objection.

2              THE WITNESS:  In terms of shares, yes.

3       BY MR. BOWE:

4         Q    So your actual ownership -- corporate

5       ownership was over 99.7 percent through RT Holding,

6       right?

7         A    The vast majority.  There was a little bit

8       under MindGeek S.a.r.L., and the majority via RT

9       Holding.

10        Q    Let's just make sure, when you say "a

11      little bit," it's less than half of a percent,

12      right?

13        A    I can't read this.

14        Q    But did you -- did you know that?  You've

15      owned it -- you owned it for over ten years?

16        A    Yep.

17        Q    Did you know whether it was 10 percent or

18      less than a half -- less than half a percent?

19        A    No, I knew it was very little.

20        Q    Would you call it nominal?

21             MS. MASSEY:  Object to form.

22             THE WITNESS:  I call it very little.

23      BY MR. BOWE:

24        Q    Okay.  So if you look at the RT Holding

25      side that you owned, according to this, over about

CONFIDENTIAL

                                                              Page 130

1                     THE WITNESS:  I don't know.

2          BY MR. BOWE:

3              Q    Okay.  You told me before there were

4          operating companies that were generating revenue up

5          to RT Holding, right?

6                     MR. WHITE:  Objection.  I think that

7          misstates the testimony.

8                     THE WITNESS:  No.

9          BY MR. BOWE:

10             Q    No?

11                  Okay.  So did you have -- what revenue did

12         the company that you owned the majority share of RT

13         Holding generate?

14             A    I don't know.

15             Q    Do you know if it was ██████████?

16             A    Of what?

17             Q    Of the whole group's revenues.

18             A    I don't know.

19             Q    Okay.  You never knew?

20             A    No.

21             Q    Okay.  Wasn't that important, though, to

22         make sure that you got your ██████████?

23             A    Not at all.

24             Q    Why?

25             A    Because in the shareholders agreement, it

CONFIDENTIAL

Page 131

1        says if ever any dividends get paid, I get

2        ██████████.

3            Q    Okay.  But that -- but how does that work

4        from a corporate perspective, sir?  You're getting

5        dividends from the corporation you don't have an

6        ownership interest in?

7                 MS. MASSEY:  Object to the form.

8                 MR. WHITE:  Objection.

9                 THE WITNESS:  No.

10       BY MR. BOWE:

11           Q    Is that -- what's that?

12           A    What?

13           Q    Okay.  Well, you don't have -- you have

14       ████████████████████████████████████████████████

15       percent of an ownership interest in MindGeek

16       S.a.r.L., according to this?

17           A    Again.

18           Q    According to this chart, right --

19           A    Yes.

20           Q    -- you have ████████████████████████████ a

21       ████████████████████████████ -- ownership interest in

22       MindGeek S.a.r.L.?

23           A    Okay.

24           Q    Okay.  All the entities that are below

25       MindGeek S.a.r.L. --

CONFIDENTIAL

Page 135

```
 1              MS. MASSEY:  Object to form.

 2              MR. WHITE:  Objection.  It misstates the

 3      testimony.

 4              THE WITNESS:  No, I did not believe that

 5      I'd be entitled to ████████ of distributions paid

 6      out of MindGeek.

 7      BY MR. BOWE:

 8         Q   Okay.  So -- but you would get -- what

 9      would you be entitled to with respect to profits

10      under MindGeek S.a.r.L. as a ██████████████████

11      owner?

12         A   A little ██████████████████ then.

13         Q   Okay.  So how then would you end up with

14      ██████████ of the distributions if the bulk of the

15      revenue came from entities operating under MindGeek

16      S.a.r.L.?

17              MR. WHITE:  Objection.

18              THE WITNESS:  So if MindGeek S.a.r.L. or RT

19      Holding didn't have the money to pay dividends, then

20      there would just be no dividends.

21      BY MR. BOWE:

22         Q   No, I understand, sir, but my question is:

23      If you understood you were only entitled to ██████

24      ████████████████ of distributions from monies

25      generated underneath MindGeek S.a.r.L., the
```

CONFIDENTIAL

Page 136

1        wholly-owned entities, and assuming that was the

2        bulk of the revenue in that group --

3            A    I don't know that.

4            Q    Assume that.  How would you end up with

5        ███████████ of the distributions of the group?

6                 MS. MASSEY:  Object to form.

7                 MR. WHITE:  Objection.

8                 THE WITNESS:  So if, let's say, it was

9        proposed to pay $1 in dividends between -- if you

10       add up the distributions from RT Holding and

11       MindGeek S.a.r.L., right, and the sum of those

12       dividends was to be $1, then I would get ███████

13       ██████████████████████████████████████████████

14       ██████████████████████████████████████████████

15       ████████████████████████████ that went out via

16       MindGeek S.a.r.L. -- that's not right.

17               If -- I don't know now because RK, who held

18       ████████████████████████████████████, but

19       anyway, the -- if -- if the group -- if the sum of

20       distributions to the shareholders between RT Holding

21       and MindGeek was to be $1, then I'd be entitled to

22       ██████████ of that, the vast majority of which would

23       come out of RT Holding.

24       BY MR. BOWE:

25           Q    Right, almost -- the ███████ almost

CONFIDENTIAL

Page 137

1    entirely would come out of RT Holding, right?

2        A    Yes, yes, because the other one I have █████

3    ██████████████████, you said.

4        Q    Right.  So it would be something like

5    ███████?

6            MS. MASSEY:  Object to form.

7            MR. WHITE:  Objection.

8            THE WITNESS:  Whatever the number is.

9    BY MR. BOWE:

10       Q    Right, okay.  But my question is:  What if

11   RT Holding didn't generate ██████ in revenue?

12       A    Then --

13           MR. WHITE:  Objection.  It's asked and

14   answered.

15           THE WITNESS:  There would be -- then the

16   group can't pay it all in dividends.  Maybe can pay

17   50 cents only.

18   BY MR. BOWE:

19       Q    But what if the MindGeek S.a.r.L. group

20   did?

21       A    Well, still they -- the owners of MindGeek

22   S.a.r.L. could not take out dividends unless RT

23   Holding was also able to pay dividends.

24       Q    Okay.  So let me see if I understand.  I

25   think I'm tracking.  Let me just take your

Page 138

1    hypothetical and build one more assumption into it.

2            $1 in dividends is decided upon, okay.  RT

3    Holding has no money that it's generated to

4    contribute to the dollar.

5        A    Then it cannot pay a dividend of a dollar.

6        Q    But MindGeek -- MindGeek --

7        A    It cannot decide to have a dollar in

8    dividends if there's no money.

9        Q    But MindGeek S.a.r.L. does have a dollar

10   for dividends.  It has generated $1 available for

11   dividends.

12           MS. MASSEY:  These are assumptions you're

13   asking him to make?

14           MR. BOWE:  Yes.

15       Q    How -- how -- do you then get -- do you

16   understand then you get ███████ of that dollar?

17       A    So if RT Holding cannot pay dividends,

18   but --

19       Q    Well, it doesn't have a dollar.  It didn't

20   generate a dollar of free cash flow to generate a

21   profit to dividend, but MindGeek S.a.r.L. has.

22           MR. WHITE:  Objection to the form of the

23   question.

24   BY MR. BOWE:

25       Q    How would that work under the agreement

CONFIDENTIAL

Page 139

1     that you entered into and operated under for ten

2     years?

3          A     There's no dividend.

4          Q     There would be no dividend then?

5          A     If either entity doesn't have the means to

6     pay a dividend, as per the shareholders agreement,

7     then it -- once I cannot just pay a dividend.

8          Q     No, I get it, but MindGeek S.a.r.L. does

9     have a dollar for the dividend.

10         A     Fine, but if RT Holding doesn't, then there

11    is not going to be dividend.

12         Q     Okay.  So in order for RT Holding to pay

13    you ████████ on a dollar dividend, it needs to

14    receive ████████?

15              MR. WHITE:  Objection.

16              MS. MASSEY:  Object to form.

17    BY MR. BOWE:

18         Q     Is that your testimony?

19         A     My testimony is that if RT Holding doesn't

20    have the money to pay a dividend, then there is not

21    going to be a dividend.

22         Q     Okay.  But I'm going back to your original

23    hypothetical.  You said assume -- you said the

24    company -- the group decides to pay $1 dividend.

25    You said when the group decides to pay $1 dividend,

CONFIDENTIAL

Page 140

1    ███████████████ of it gets paid to me

2    through RT Holding, and the rest goes up MindGeek.

3    I'm like okay.

4         My question was:  What if there isn't ██

5    cents at RT Holding --

6         MS. MASSEY:  Object to form.

7    BY MR. BOWE:

8         Q    -- how does the ████████ get there then?

9         A    Then the group cannot decide to pay a

10   dollar in dividends.

11        Q    Okay.  So in order for you to get paid a

12   dividend over those ten years, your testimony is

13   that for each of the years you received a dividend,

14   RT Holding had to have ██████████████████ of

15   whatever the dividend amount was, it had to earn

16   that?

17        A    That's not my testimony.

18        Q    Okay.  How would it -- it needed to have ██

19   cents on the dollar of free cash to dividend?

20        MS. MASSEY:  Object to form.

21        MR. WHITE:  Objection.

22        THE WITNESS:  Again, please.

23        MR. BOWE:  Sure.

24        Q    RT Holding needed to have generated ██

25   cents of cash available to dividend in order to

Page 141

1    allow a dividend if there's going to be $1 total

2    dividend?

3        A    I did not say that.

4        Q    Okay.  So if there's a $1 total dividend --

5    withdrawn.

6            How did dividends get set?  Let's -- let's

7    do it that way.  You said if the group decides a $1

8    dividend, that's not how dividends work, right?

9            MS. MASSEY:  Object to form.

10           THE WITNESS:  So --

11           MR. WHITE:  Objection.

12           THE WITNESS:  -- the vast majority of the

13   operating profits or cash flow generated by the

14   group of companies here went to debt servicing, and

15   then if, in a year, there was money left, then

16   obviously it's not only a question of money being

17   left, but there is, depending on the jurisdiction,

18   certain other criteria that the entities have to

19   satisfy.

20           So if all those criteria were satisfied and

21   there was money left after reinvesting in debt

22   servicing, then a dividend could be paid.  And I

23   think, you know, in some years, there was rather

24   little or maybe almost no dividend paid.

25   BY MR. BOWE:

CONFIDENTIAL

Page 147



1          MR. WHITE:  Objection.

2          MS. MASSEY:  Object to form.

3          THE WITNESS:  Not at all.

4     BY MR. BOWE:

5

CONFIDENTIAL

Page 148

1    ██████████████████████████████████████████████

2    ████████████

3           And I'm not an accountant or an auditor or

4    a lawyer, but this -- I have confidence that

5    management and the auditors made sure that all

6    the -- how do you say -- the requirement in order to

7    be able to pay the dividends that were paid were

8    satisfied.

9    BY MR. BOWE:

10      Q    Okay.  So you didn't understand how this

11   was going to work when you invested ████████████?

12           MS. MASSEY:  Object to form.

13           MR. WHITE:  Objection.

14           MR. BOWE:  Actually ████████████ was your

15   testimony.

16           MS. MASSEY:  Object to form.

17           THE WITNESS:  I was satisfied with the

18   concept that whenever a dividend was to be paid, I

19   would get what I'm entitled to.

20   BY MR. BOWE:

21      Q    And that didn't require you to do anything

22   to track whether the right -- right amounts of money

23   were coming over on an intracompany basis to RT

24   Holding and its subsidiary?

25           MR. WHITE:  Objection.

CONFIDENTIAL

Page 150

1                MS. MASSEY:  Object to form.

2                THE WITNESS:  If RT Holding didn't have the

3       means to satisfy the various requirements to pay

4       ███████     to me, then there would not be a dividend,

5       not at RT Holding and not at MindGeek S.a.r.L.

6       BY MR. BOWE:

7           Q    Okay.  But was it ever the case in those

8       ten years that MindGeek S.a.r.L. or one of its

9       subsidiaries simply transferred ███████ over to RT

10      Holding, and then it had the means, right?

11               MS. MASSEY:  Object to form.

12               MR. WHITE:  Objection.

13               THE WITNESS:  I don't know.

14      BY MR. BOWE:

15          Q    You don't know how that worked?

16               MS. MASSEY:  Object to form.

17               THE WITNESS:  No.

18      BY MR. BOWE:

19          Q    So it's your assumption throughout that

20      when you got -- when there was a dividend of which

21      you got ███████, that it just happened to be the

22      case that the business generated ███████ of cash

23      available at RT Holding to pay you that dividend and

24      just happened to generate the converse percentage to

25      dividend at MindGeek S.a.r.L.?

CONFIDENTIAL

Page 151

1            MS. MASSEY:  Object to form.

2            MR. WHITE:  Objection.

3            THE WITNESS:  Repeat, please.

4     BY MR. BOWE:

5        Q    Every time there was a dividend from

6     MindGeek, this entire group that's on this chart --

7        A    So not MindGeek S.a.r.L.?

8        Q    The entire group.

9        A    The group of companies, okay.

10       Q    You only got your dividends from RT

11    Holding, right?

12            MS. MASSEY:  Object to form.

13            MR. WHITE:  Objection.  I think he's

14    answered that already.

15            THE WITNESS:  I presume so.

16    BY MR. BOWE:

17       Q    Well, that's how you understood this to

18    work, right?

19       A    That's my understanding, yes.

20       Q    Okay.  And your assumption is that every

21    time therefore there was a dividend, there was █

22    cents of every dollar of dividend that actually was

23    at RT Holding that it had earned, right?

24            MR. WHITE:  Objection.

25            THE WITNESS:  I don't make assumptions

Page 152

1    about that.  What I'm -- my testimony is that, if I
2    got a dividend from RT Holding, RT Holding must have
3    had the money to pay that dividend, and it must have
4    satisfied the various criteria that the company is
5    required to satisfy in order to pay a dividend.
6    That's my testimony.
7    BY MR. BOWE:
8        Q    Okay.  Are those the only two conditions in
9    issuing a dividend to you?
10            MS. MASSEY:  Object to form.
11            THE WITNESS:  I think so.  Again, I'm not a
12    lawyer nor an accountant nor an auditor --
13    BY MR. BOWE:
14        Q    Let me ask you this.
15        A    -- but it's my understanding that if -- if
16    the company -- it needs to satisfy the various
17    requirements to be able to pay a dividend, and it
18    must have the money to pay a dividend.  If one of
19    the two is not satisfied, in my understanding,
20    there's no dividend.
21        Q    Did it have to earn the money available for
22    the dividend according to some contract?
23            MS. MASSEY:  Object to form.
24            MR. WHITE:  Objection.
25            THE WITNESS:  I don't know that.

```
                                            Page 158

 1          A    I don't know that.

 2          Q    I'm asking you to assume that.

 3          A    So you want me to assume only two companies

 4     generated revenue.

 5          Q    Right.  Let's assume those are the only

 6     two.

 7          A    Okay.

 8          Q    Would it be possible for you to issue a

 9     dividend from RT Holding?

10              MS. MASSEY:  Object to form.

11              MR. WHITE:  Objection.

12              THE WITNESS:  That depends on whether RT

13     Holding satisfies -- in my understanding, as I said

14     earlier, there is at least -- let me -- there's at

15     least two requirements that need to be satisfied for

16     the company to pay a dividend.

17              It must have money to pay the dividend, and

18     it must satisfy a slew of other criteria.  So as

19     long as that is satisfied, it's my understanding the

20     respective entity can pay a dividend.

21     BY MR. BOWE:

22          Q    Okay.  So under the scenario I gave you

23     there, those two entities are the only two entities

24     that have generated revenue?

25          A    Okay.
```

Page 159

1         Q     How would RT Holding have ended up with

2     money to satisfy a dividend?

3               MS. MASSEY:  Object to form.

4               MR. WHITE:  Objection.

5               THE WITNESS:  I don't know that.

6     BY MR. BOWE:

7         Q     How would it?

8         A     I don't know that.

9         Q     Can you tell me a mechanism whereby

10    RT Holding would issue a dividend?

11              MR. WHITE:  Objection.  It's a hypothetical

12    question.

13              THE WITNESS:  The directors have to declare

14    a dividend and they would have to --

15              THE REPORTER:  I'm sorry.  What was the

16    very first thing?  Just repeat your answer.

17              MR. WHITE:  He said the directors would

18    declare --

19              THE WITNESS:  Oh, yes.  So if a company

20    paid a dividend, the directors would have to declare

21    a dividend, and in my understanding, they can only

22    do that if the company has the cash and satisfies a

23    number of other criteria.

24    BY MR. BOWE:

25        Q     Under the scenario I've given you with

CONFIDENTIAL

Page 161

1    do you mean?

2        A    Feras, David, MindGeek, the -- the -- you

3    know, so I contribute to RT Holding, and for me, the

4    value of the assets I put at a ███████████, and

5    then I contributed ███████████.

6            So it makes it ███████████, but it

7    doesn't -- they didn't think it was worth

8    ███████████.  I think they thought it was worth

9    between ███████████.  That's my

10   recollection.

11       Q    Okay.  So you think, at a minimum, you

12   agreed on the value of your Redtube assets at no

13   less than ███████████?

14       A    It didn't matter because, you know, what

15   number I or -- or the absorbing entity put on it, in

16   my mind, didn't matter.  What mattered was the

17   bargain struck, who was entitled to how much of the

18   economic benefits.

19       Q    Okay.  But what was -- if you had all of it

20   in one entity, the Redtube and its subsidiaries,

21   that's where all your value was contributed, okay,

22   but the revenue is being generated by the -- the

23   external revenue, not the intragroup revenue, the

24   external revenue is being generated by the other

25   subgroup that's under MindGeek S.a.r.L., wouldn't

CONFIDENTIAL

Page 163

1          A     I don't know.

2          Q     You didn't know, okay. 

5                MS. MASSEY:  Object to form.

6                THE WITNESS: ██████████.

7     BY MR. BOWE:

8          Q

11         A

CONFIDENTIAL

Page 164

1    investing.  And then it comes to cash flow

2    financing.

3    ██████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

████████████████████████████████

████████████████████████████

9    ██████████████████████████████

███████████████████████████████████████

██████████████████████████████

██████████████████████████████████.

13        Q    Okay.  So in the years you were paid a

14    dividend, you don't know whether the external cash

15    generation came in through an RT Holding subsidiary

16    or a MindGeek S.a.r.L. wholly-owned subsidiary,

17    right?

18            MS. MASSEY:  Object to form.

19            THE WITNESS:  To me, I'm an investor.

20    BY MR. BOWE:

21        Q    Right.

22        A    I'm not an operator.  I wouldn't know how

23    to operate this, and I have zero appetite to roll up

24    my sleeves and get involved or micromanage or tell

25    anyone what to do for me.

Page 165

1           For me, it's very easy.  I invest.  I put a
2     carrot in front of the people who are part of
3     management and have to manage the assets, and then I
4     sit back.
5           Q     And they'll figure it out?
6                 MR. WHITE:  Objection.
7                 THE WITNESS:  Why should they get paid a
8     lot of money which, you know, whatever percentage is
9     mine comes indirectly out of my pocket, if -- if
10    they don't, as you call it, figure things out and do
11    things right.
12    BY MR. BOWE:
13          Q     Right, okay.  A few more questions.  During
14    those ten years from 2013 -- say nine years, 2013 to
15    2022, what did you do to audit royalties and
16    licensing?
17                MS. MASSEY:  Object to form; outside the
18    scope of jurisdictional discovery.  Don't make faces
19    at me, Mr. Bowe.  It's unprofessional.
20                MR. BOWE:  Can you give me your basis for
21    that objection?
22                MS. MASSEY:  Yeah, the period --
23                MR. BOWE:  Royalties -- royalties --
24                MS. MASSEY:  Discovery is relevant between
25    2014 and 2020.  You asked for 2013 to, you know,

CONFIDENTIAL

Page 178

1      Q    Okay.  And you've produced all of them that
2    you have in this case?
3      A    Yes.
4      Q    And how did you go about doing that?
5      A    Doing what?
6      Q    Collecting all the financial statements
7    from your entities involved in the MindGeek
8    investment.
9      A    The counsel organized some forensic expert
10   firm, and the gentleman took all the files.
11     Q    Okay.  But you have -- did they collect
12   files from your service agent there who's doing all
13   the work?
14     A    They -- those files are included, yes.
15     Q    Okay.  So let me back up a bit.  How do you
16   personally keep your records?
17     A    I'm not sure what --
18     Q    Okay.  So you have this investment in
19   MindGeek, right?
20     A    Right.
21     Q    Okay.  Did you have other investments or
22   when you went from Redtube, put into MindGeek, did
23   you just focus on MindGeek or did you continue to
24   invest in other entities?
25     A    My business is investing.  It's not running

CONFIDENTIAL

Page 179

```
 1      assets.
 2          Q    Okay.  All right.  So how do you keep your
 3      business records?
 4          A    On a computer.
 5          Q    Okay.  And is the computer backed up
 6      somewhere?
 7          A    Yes.
 8          Q    Where?
 9          A    A drive.
10          Q    The drive where?
11          A    Wherever I take it.
12          Q    Okay.  Do you have it backed up somewhere
13      other than your computer?
14          A    I just said on a drive.
15          Q    The drive on your computer?
16          A    No.  We have a computer, right, and then
17      you have a -- it looks like this.  You can plug it
18      in, and it backs it up.
19          Q    Okay.  You have a hard drive at home?
20          A    Yes.
21          Q    Where?
22          A    Near the computer.
23          Q    Where is the hard drive that you back stuff
24      up?  In your home in Hong Kong?
25          A    Yes.
```

CONFIDENTIAL

Page 193

1        Q    Okay.  So at the end of every day, do you
2    go through all those different e-mail addresses?
3        A    No.
4        Q    When do you go through them?
5        A    As I please.
6        Q    Okay.  And you do all the management of
7    these investments yourself, right?
8        A    I don't manage investments.
9             MR. WHITE:  Objection.
10    BY MR. BOWE:
11        Q    No?
12             Do you manage your money?
13        A    Well, I invest, and then it's up to the
14    executives at the respective investments to manage.
15        Q    Okay.  They're operating, right?  You
16    invest in operating companies?
17             MS. MASSEY:  Object to form.
18    BY MR. BOWE:
19        Q    You invest in businesses, you said, right?
20        A    I invest in, you know, a wide variety of
21    assets.  I don't have restrictions as to, you know,
22    particular types of assets or categories or -- or a
23    stage.  I -- you know, I can invest in public
24    equities.  I -- if I want, I can buy a -- I don't
25    know, a shipload of oil.  I buy land, real estate.

CONFIDENTIAL

Page 194

1      Q     Where have you bought land and real estate?

2      A     It's opportunistic.

3            MR. WHITE:  Objection.

4            THE WITNESS:     ███████.

5    BY MR. BOWE:

6      Q     Anywhere else?

7            MR. WHITE:  Objection.

8            THE WITNESS:  No.

9    BY MR. BOWE:

10     Q     What investments do you have in the United

11   States?

12     A     None.

13     Q     Okay.  So you say you don't manage your

14   money.

15           How do you manage your investments?

16     A     Well, I -- I read.  I speak to people, and

17   then if I think something is interesting, I research

18   it and, you know, as -- I think as is customary in

19   investing, that the vast majority of potential

20   targets you look at for one reason or another, the

21   investment doesn't materialize.

22     Q     Okay.  How did you manage your investment

23   in MindGeek?

24     A     There was nothing to manage.

25     Q     So you didn't do anything?

CONFIDENTIAL

Page 195

1         A     I received, you know, reports that they
2     e-mailed me, and they e-mailed me other stuff, but
3     that's why there is a highly paid team of
4     executives, and they own shares.  The -- from my
5     perspective, incentives should be well aligned, and
6     that's good enough for me.
7         Q     Are you aware of Mr. Antoon's testimony
8     about your involvement in MindGeek?
9         A     No.
10        Q     Do you know what he testified to yesterday?
11        A     No.
12        Q     Okay.  That topic wasn't something your
13    lawyers talked to you about this morning about his
14    testimony?
15        A     Don't recall.
16             MR. WHITE:  Objection to what he discussed
17    with his lawyers.  You shouldn't have asked that
18    question.
19             MR. BOWE:  The topic?  Sure, that's okay.
20             MR. WHITE:  That's not what you asked.  Go
21    ahead.
22             THE WITNESS:  I just need to step out to
23    the restroom quickly.
24             MR. BOWE:  Okay.
25             THE VIDEOGRAPHER:  Off the record?

CONFIDENTIAL

Page 197

```
 1              THE WITNESS:  No.
 2    BY MR. BOWE:
 3         Q    Did you attend the strategic planning
 4    meetings of management?
 5         A    Some.
 6         Q    Did you travel to Montreal for meetings?
 7         A    Yes.
 8         Q    How often?
 9         A    I would aim to go to Montreal once a
10    quarter, but it didn't -- as always, you know,
11    there's difference between what you plan and what
12    you manage to achieve.
13         Q    Right.  But you regularly went to the
14    quarterly strategic meetings?
15              MS. MASSEY:  Object to form.
16              MR. WHITE:  Objection.
17              THE WITNESS:  I went to a good number of
18    them.  Not all.
19    BY MR. BOWE:
20         Q    I understand, but that was your regular
21    practice, not attending was the exception, right?
22              MS. MASSEY:  Object to form.
23              THE WITNESS:  Initially -- initially, yes.
24    Later on, it became less and less.
25    BY MR. BOWE:
```

CONFIDENTIAL

Page 198

```
 1          Q    So you wouldn't disagree with Mr. Antoon if
 2     he said that you regularly attended quarterly
 3     strategic meetings, right?
 4               MR. WHITE:  Objection.
 5               THE WITNESS:  I just gave my testimony
 6     regarding this.
 7     BY MR. BOWE:
 8          Q    Okay.  And those lasted how long?
 9          A    Sir, which meeting?
10          Q    The quarterly strategic meetings you would
11     go for.
12          A    They would have sessions over several days,
13     morning sessions and afternoon sessions.
14          Q    Okay.  And what other types of periodic
15     meetings with management did you attend?
16          A    So as far as I remember, they did three of
17     what they call those initiative meetings, and then
18     once a year, they went and conducted such meeting in
19     a -- you know, some varied format off-site.
20          Q    Okay.  You attended those, right?
21          A    Some of them, not all.
22          Q    Okay.  Most of them, right?
23          A    Over the years, I'd -- I haven't counted,
24     but my guess would be that I ended up sitting in in
25     two-thirds of them.
```

CONFIDENTIAL

Page 200

1          Q     Okay.  What about calls, did you

2     participate in calls regularly with MindGeek

3     management?

4               MS. MASSEY:  Object to form.

5               THE WITNESS:  They had -- what do they call

6     this -- I'm aware that they had periodic board

7     calls, and I -- I think I normally was invited to

8     listen in, but I rarely ever did.

9     BY MR. BOWE:

10         Q     Okay.  You never -- you rarely ever

11    attended meetings between the board members and

12    management.

13              That's your testimony?

14         A     I -- my testimony is I never attended such

15    meeting in person.  I -- you know, in ten years, if

16    I listened in on five calls, maybe.

17         Q     Okay.  Would it be inaccurate to say that

18    you would rarely go more than a week or two without

19    having phone calls with Mr. Antoon?

20         A     Sometimes I didn't speak to him for several

21    weeks, and at other times, there would be -- there

22    were frequent conversations.

23         Q     Okay.  So you had regular conversations

24    with management each month?

25              MS. MASSEY:  Object to form.

CONFIDENTIAL

Page 201

```
 1              MR. WHITE:  Objection.
 2              THE WITNESS:  I spoke to Feras Antoon at --
 3      you know, the intervals varied greatly.  Sometimes
 4      it was several weeks.  Sometimes it was frequent,
 5      but it was not in any way regular or scheduled or
 6      anything like that.
 7      BY MR. BOWE:
 8         Q    But it wasn't simply hands-off.  You
 9      invested the money and you don't check back in for
10      another year.  You were regularly in contact with
11      them, right?
12              MS. MASSEY:  Object to form.
13              MR. WHITE:  Objection.
14              THE WITNESS:  I was provided information
15      and if I had a question, I wasn't -- I wouldn't
16      hesitate to pick up the phone, like I do with all
17      other investments.
18      BY MR. BOWE:
19         Q    Okay.  But those never involved
20      conversations about child pornography on the site?
21         A    I don't recall such discussions.
22         Q    You think you would have recalled something
23      like that?
24         A    If it was presented to me as, you know,
25      a -- an area of concern or anything, then I would
```

CONFIDENTIAL

Page 207

```
 1      told you?

 2          A    Well, they told me that this is not true

 3      and that was it for me.

 4          Q    Okay.  Didn't you think that was a serious

 5      allegation that you needed to look into?

 6              MS. MASSEY:  Object to form.

 7              THE WITNESS:  No.

 8      BY MR. BOWE:

 9          Q    Why not, because you just trusted

10      management?

11          A    I trusted management, and it's not my job

12      to manage.

13          Q    Okay.  No matter what the allegations are?

14          A    I'm an indirect UBO and passive investor.

15          Q    Your testimony is you're a passive

16      investor?

17          A    Yes.

18          Q    Do you have any understanding what

19      Mr. Antoon testified about yesterday with respect to

20      your involvement in decisions?

21          A    No.

22              MS. MASSEY:  Object to form.

23      BY MR. BOWE:

24
```

CONFIDENTIAL

Page 208



20    Q    No.  Were you actually consulted on those

21    issues?

22    A    I was informed of, you know, decisions they

23    were taking, but my approach was to not micromanage

24    or interfere or -- or involve myself in this because

25    they're managing.  They have to build their team.

CONFIDENTIAL



Page 218

CONFIDENTIAL

Page 234

1        Q    Mr. Bergmair, Mr. Antoon testified that you

2    used to attend trade shows with him and the MindGeek

3    team; is that true?

4        A    I remember attending one trade show, but

5    this was before the MBO.  This was in 2012 and --

6    yep.

7        Q    Okay.  So if Mr. Antoon testified you

8    attended trade shows after the MBO, do you think

9    he's mistaken or do you just might not recall?

10            MS. MASSEY:  Object to form.

11            THE WITNESS:  I don't recall attending

12    trade shows.  I generally wouldn't go to those.  I

13    just remember the one pre-MBO in 2012 for a

14    particular reason.

15    BY MR. BOWE:

16        Q    Okay.  Now, do you recall going to a

17    meeting at ████?

18        A    Yes.

19        Q    Were you excited about that meeting?

20        A    I was hoping to -- to achieve my goal.

21        Q    What was your goal?

22        A    To get them to sell me a plot of land in

23    ████████████████████████████████████████.

24        Q    Where was that?

25        A    ████████████████████████████████

CONFIDENTIAL

Page 235

```
 1          Q    Okay.  And why did they buy it?
 2               MS. MASSEY:  Object to form.
 3               THE WITNESS:  My understanding is that they
 4      bought it with a view to establish a data center
 5      there.
 6      BY MR. BOWE:
 7          Q    Okay.  What's the name of the site?
 8          █    ███████████
 9          █    █████████████
10          █    ██████████████
11          █    █████████████████████
12          █    ███████████████████████  in that
13      range.
14          Q    Okay.  So a pretty big site?
15          A    It's relative.
16          Q    And they were going to build a data center
17      there.
18               What does that mean?
19          A    That they were going to construct buildings
20      and have -- what is it called -- servers inside.
21          Q    Servers, when you say -- you understand
22      what servers are?
23          A    Some computer.
24          Q    Okay.
25          A    It's a form of computer.
```

CONFIDENTIAL

Page 236

1      Q    Okay.  And how did you find out about that?

2      A    This was in the media.

3      Q    Okay.  How much did they pay for the

4    property?

5      A    I don't know.

6      Q    Well, you wanted to buy the property.  How

7    much did you think it was going to cost?

8      A    So normally land in that area would go for

9    anywhere from 7 to 15 Euros per square meter.

10     Q    So you had a meeting with ████ at the

11   executive center, right?

12     A    Yes.

13     Q    Did you bring anyone from MindGeek with

14   you?

15     A    No.

16     Q    Okay.  Did you have more than one?

17     A    Sorry?

18     Q    Did you have more than one meeting with

19   ████?

20     A    No.  It was just that meeting with the head

21   of their infrastructure.  It was probably half hour,

22   45 minutes, I would guess.

23     Q    Okay.  And no one from MindGeek Montreal

24   came with you?

25     A    Sorry?

CONFIDENTIAL

Page 237

1          Q    No one from MindGeek Montreal came with

2     you?

3          A    That's right.

4               THE VIDEOGRAPHER:  Please pardon the

5     interruption, Counsel.  We have a Ryan McMenamin

6     joining.

7               MR. BOWE:  Yeah, that's fine.

8          Q    ████████████████████████████████████

      ████████████████

      █  ██████████████████████████████████████

      █ █████████████████████████████████████████████

      █ █████████████████████████████████████████████

      █ ████████████████████████████████████████

      █ ████████████████████████████████████

      █ ██████████████████████████████████

      █ █████████████

17         Q    I'm not sure I understand what you're

18    saying, so let me follow up.

19              You were just --███████████████████████

      █ ██████████████████████████████████████

21         A    ███████

22         Q    Okay.  But at this stage, there was nothing

23    to, like, buy or anything because this was in the

24    early process and never came to fruition; is that

25    right?

CONFIDENTIAL

Page 238

1          A    Right.

2          Q    Okay.  So was that a topic of conversation

3     at this meeting with █████ or no?

4          A    Yeah, yeah, they -- █████ was interested

5     in -- in, you know, servicing MindGeek.

6          Q    Did they make -- didn't they make a

7     proposal?

8          A    Yeah, but nothing ever came to fruition.

9          Q    Okay.  But when they met with you at

10    this -- at this center in California, did they think

11    they were meeting you because you wanted to buy some

12    real estate in █████ --

13         A    No.

14         Q    -- or did they think they were meeting you

15    to --

16         A    No, they didn't expect that.

17         Q    Okay.  This was a meeting about doing

18    business with █████, right?

19              MS. MASSEY:  Object to form.

20              THE WITNESS:  They had invited me as the

21    majority UBO.

22    BY MR. BOWE:

23         Q    Aren't you the chairman?

24              MS. MASSEY:  Object to form.

25              MR. WHITE:  Objection.

Page 239

1           THE WITNESS:  I was never chairman.  When
2       you say -- sorry.
3       BY MR. BOWE:
4           Q    That would be -- that would be a
5       misrepresentation that you were the chairman, right?
6               MS. MASSEY:  Object to form.
7               THE WITNESS:  Sir?
8       BY MR. BOWE:
9           Q    That would be a misrepresentation to
10      describe you as the chairman?
11              MR. WHITE:  Objection.
12              THE WITNESS:  Yes.
13      BY MR. BOWE:
14          Q    Okay.  Were you aware that MindGeek had
15      told them that you were the chairman?
16              MS. MASSEY:  Object to form.
17              MR. WHITE:  Objection.
18              THE WITNESS:  No.
19      BY MR. BOWE:
20          Q    Okay.  Did they refer to you as the
21      chairman when you were there?
22          A    I don't recall that.
23          Q    Okay.  How many people from █████
24      attended?
25          A    I think there were two.

CONFIDENTIAL

Page 240

1      Q      Who were they?

2      A      One is the head of the infrastructure.  His

3   name escapes me now, but he used to be in charge of

4   infrastructure at Oracle beforehand.  And the other

5   one was a, you know, much junior person.

6              THE REPORTER:  Much what?

7              THE WITNESS:  A junior person.

8              MR. BOWE:  Junior.

9      Q      So this person was the head of

10  infrastructure for all of ████?

11     A      That, I don't know.  I think ████ had at

12  one point decided, you know, seeing how Amazon AWS

13  it's called, Amazon Web Services, so I think they

14  saw how much money Amazon Web Services was making

15  for Amazon, and then they decided to also get into

16  that line of business, but that -- you know, I'm

17  not --

18     Q      My question was:  Was that man the head of

19  infrastructure for ████

20     A      And, that, I don't know.

21     Q      Okay.

22     A      I think he was the head for this new

23  division, but I imagine that ████ has a lot of

24  their own or separate infrastructure that they use

25  for their own operations and, you know, whether that

CONFIDENTIAL

Page 241

1     is part or commingled with the infrastructure that

2     they are offering to third parties, I don't know.

3          Q    Okay.  But you don't remember attending

4     with anyone from MindGeek?

5          A    That's right.

6          Q    So I'm confused.  So let me try and clarify

7     it.

8               The people from ███████ thought this was a

9     meeting about using their services, right?

10              MR. WHITE:  Objection.

11              THE WITNESS:  They had invited me as the

12    majority UBO.

13    BY MR. BOWE:

14         Q    How did they know you were the majority

15    UBO?

16         A    I don't know.

17         Q    Did you ask anyone, how did they find out I

18    was the majority UBO?

19         A    Sir?

20         Q    Did you ask anybody like how they found out

21    you were the majority UBO?

22         A    No.

23         Q    It wasn't public information, was it?

24         A    But neither was it a big secret.

25         Q    Okay.  Why would they want to talk to you

CONFIDENTIAL

Page 257

1     A     I remember an acquisition they did, and
2     they gave me information on that.
3     Q     Which acquisition was that?
4     A     It was, I think, about ████████, but I
5     don't remember the name of the asset.
6     Q     Okay.  When was this?
7     A     I don't remember now.  It was -- it was
8     not -- it was not shortly after the MBO.  It was at
9     some later point in time.
10    Q     Okay.  And were they seeking your approval?
11    A     No, they -- they told me how great this
12    asset was, and that's cheap for what it -- what it
13    generates.  In general, he wouldn't call me seeking
14    approval.  He informed me of steps and stuff they
15    were doing.
16          THE REPORTER:  I'm sorry.  Steps?
17          THE WITNESS:  Steps and stuff they were
18    doing.
19    BY MR. BOWE:
20    Q     So there's nothing about that interaction
21    that you recall that would have led him to believe
22    he got approval from you on that?
23          MR. WHITE:  Objection.
24          MS. MASSEY:  Object to form.
25          THE WITNESS:  Yes.