# EXHIBIT 25

# [PORTIONS OF EXHIBIT FILED UNDER SEAL PURSUANT TO APPLICATION TO SEAL]

**THIS SHARE PURCHASE AGREEMENT** made this 30ᵗʰ day of January, 2023.

**BETWEEN:**

        **FDCO HOLDING INC.**, a corporation governed by the laws of the Province of Quebec

        (hereinafter called the "**Vendor**")

OF THE FIRST PART

        **ECP ONE LIMITED**, a business company existing under the laws of the British Virgin Islands

        (hereinafter called the "**Purchaser**")

OF THE SECOND PART

**RECITALS:**

        **WHEREAS** the Vendor owns ███████ shares, each without nominal value, in the capital of MindGeek S.à r.l., a Luxembourg private limited liability company (*société à responsabilité limitée*), having its registered office at 32, boulevard Royal, L-2449 Luxembourg and registered with the Luxembourg trade and companies register under number B181337 (the "**Corporation**"), representing ████ ██████████████ of the shares of the Corporation outstanding as at the date hereof (such shares being the "**Purchased Shares**");

        **AND WHEREAS** the Vendor wishes to sell to the Purchaser, and the Purchaser wishes to acquire from the Vendor, the Purchased Shares;

        **AND WHEREAS** as consideration for the acquisition by the Purchaser of the Purchased Shares, the Purchaser shall pay to the Vendor the Purchase Price all in accordance with the terms of this Agreement (collectively, the "**Sale Transaction**");

        **AND WHEREAS** after giving effect to the Sale Transaction, the Purchaser will own one hundred percent (100%) of the issued and outstanding Purchased Shares;

        **NOW THEREFORE THIS AGREEMENT WITNESSETH** that in consideration of the mutual covenants herein contained, and for other good and valuable consideration, receipt whereof is by them acknowledged, the parties hereto hereby agree as follows:

<u>**ARTICLE 1.00 - INTERPRETATION**</u>

1.01    As used in this Agreement or any amendment or supplement hereof, the following words and phrases have the following meanings, respectively:

"**Acquisition Proposal**" means any inquiry, proposal or offer by any Person relating to a merger, consolidation, share exchange, liquidation, recapitalization or other business combination involving any Target Entity, any proposal or offer to acquire in any manner (whether direct or indirect) an equity interest in, or a portion of the Business, properties or assets of, any Target Entity (other than immaterial assets or inventory in the ordinary course of business), any proposal or offer with respect to any recapitalization or restructuring with respect to any Target Entity, or any proposal or offer with respect to any other transaction

similar to any of the foregoing with respect to any Target Entity; provided, however, for the avoidance of doubt, any liquidation or dissolution proceeding that is not submitted to the Vendor for approval shall not constitute an Acquisition Proposal;

"**Additional Obligation Amount**" has the meaning ascribed thereto in Section 7.10(vii);

"**Affiliate**" has the meaning ascribed to that term in Rule 405 promulgated under the Securities Act;

"**Agreement**" means this Share Purchase Agreement as the same may be amended from time to time in accordance with the terms hereof;

"**Ancillary Agreements**" means, collectively, all agreements, annexed as Exhibits hereto and "**Ancillary Agreement**" means any one of such ancillary agreements;

"**Antitrust Division**" has the meaning ascribed thereto in Section 7.15(ii);

"**Applicable Percentage**" has the meaning ascribed thereto in Section 10.03(ii);

"**Asset Sale**" means the sale, lease, conveyance or other disposition of any assets or rights of any of the Purchaser or the Target Entities provided that (A) any sale of Equity Interests in the Purchaser or a Target Entity shall only be considered an "Asset Sale" in the event that such sale is not in connection with a Permitted Reorg, and is not to another Target Entity or the Purchaser and results in a Change of Control of the Purchaser or Target Entity so sold and (B) notwithstanding the preceding, the following items shall not be considered to be an Asset Sale:

(i)     any single transaction or series of related transactions that involves assets having a Fair Market Value of less than $10,000,000 and less than 5% of the Consolidated EBITDA of the Corporation for the Corporation's most recently ended four full fiscal quarters for which internal financial statements are available (and determined on a consolidated basis);

(ii)    a sale, lease, conveyance or other disposition of assets between or among any Target Entity;

(iii)   any disposition of worn-out, obsolete, retired or otherwise unsuitable or excess assets or equipment or facilities or of assets or equipment no longer used or useful (including intellectual property), in each case, in the ordinary course of business;

(iv)    the sale or lease of equipment, inventory, accounts receivable or other assets in the ordinary course of business;

(v)     the surrender or waiver of contractual rights or the settlement, release or surrender of contract, tort or other claims of any kind;

(vi)    dispositions of receivables owing to any Target Entity in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings of the account debtor and exclusive of factoring or similar arrangements;

(vii)   the licensing or sublicensing of intellectual property or other general intangibles and licences, leases or subleases of other property in the ordinary course of business and which do not materially interfere with the business of the Target Entities taken as a whole;

2

(viii)    any sale of assets received by the Corporation or any Target Entity upon foreclosure of a Lien; and

(ix)    any lease, conveyance or other disposition of any assets or rights comprising a Permitted Reorg;

"**Asset Sale Notice**" has the meaning ascribed thereto in Section 7.10(vii);

"**Asset Sale Objection**" has the meaning ascribed thereto in Section 7.10(vii);

"**Authorization**" means, with respect to any Person, any authorization, order, permit, approval, grant, licence, consent, right, franchise, privilege, certificate, judgement, writ, injunction, award, determination, direction, decree, variance, permission, to or from, or filings, notices, or recordings to or with or by rule or regulation of any Governmental Authority having jurisdiction over such Person that are required in connection with the present transaction;

"**Balance Sheet Date**" means October 30, 2022;

"**Benefit Plans**" means all employee benefit plans relating to the employees of the Target Entities, including profit sharing, deferred compensation, stock option, employee stock purchase, bonus, retirement, disability, health, insurance, fringe benefit, supplemental unemployment benefit, incentive, profit sharing, termination, change of control, pension, savings, stock appreciation, welfare, medical, dental, and similar plans, programmes, arrangements or practices relating to the current or former employees, officers or directors of the Target Entities maintained, sponsored, contributed to or funded by the Target Entities, whether written or oral, funded or unfunded, insured or self-insured, registered or unregistered under which the Corporation may have any liability contingent or otherwise, which are disclosed as benefit plans in Schedule 4.30;

"**Business**" means the business carried on by the Corporation, being a holding corporation, the business of the Subsidiaries thereof being the ownership, licensing and operation of internet websites primarily used for providing adult content;

"**Business Day**" means any day other than a Saturday, Sunday or any other day on which the banking institutions located in New York, New York are authorized or obliged by Law to close;

"**Buyco**" has the meaning ascribed thereto in Section 7.10(viii);

"**Change of Control**" means an event whereby any Person or group:

(i)    shall beneficially own (as determined pursuant to Rule 13d-3 of the Exchange Act), directly or indirectly, Equity Interests in the capital of the Purchaser or a Target Entity, as applicable, which have or represent more than 50% of the votes that may be cast to elect the directors or other persons charged with the management and direction of the Purchaser or such Target Entity; or

(ii)    succeed in having a sufficient number of nominees elected to the board of directors of the Purchaser or a Target Entity, as applicable, that such nominees, when added to any existing director remaining on the board of directors of the Purchaser or such Target Entity after such election who is also a nominee of such Person or group of Persons, will constitute a majority of the board of directors of the Purchaser or such Target Entity.

HIGHLY CONFIDENTIAL                                    Tassillo_Fleites_00000853

For greater certainty, a Permitted Reorg shall not be considered a Change of Control;

"**Claim**" means, in respect of any Person, any claim of any nature whatsoever against such Person, including any claim, demand, liability, obligation, debt, cause of action, suit, proceeding, judgement, award, assessment or reassessment;

"**Clips4Sale Business**" means the business of Tropical Sun Ltd and Tropical Sun Corp. of operating and providing adult entertainment over the Internet through the websites www.Clips4sale.com, www.Images4Sale.com, www.Videos4Sale.com, www.Customs4u.com, and www.C4SLive.com and related operations using the Clips4Sale name and related marks;

"**Closing**" has the meaning ascribed thereto in Section 12.01;

"**Closing Date**" has the meaning ascribed thereto in Section 12.01;

"**Closing Date Cash Payment**" has the meaning ascribed thereto in Section 3.02(i);

"**Competition Law**" means any Law that is designed or intended to prohibit, restrict or regulate foreign investment or mergers or acquisitions, antitrust, monopolization, restraint of trade or competition, including the HSR Act;

"**Consents**" means the consents of contracting parties to any Contract or Lease to the transactions contemplated in this Agreement and the Ancillary Agreements (as required pursuant to the terms of such Contract or Lease), and "**Consent**" means any one of such Consents;

"**Consolidated EBITDA**" has the meaning ascribed thereto in the Financing Agreement, as in effect on the date hereof;

"**Contracts**" means all written or oral outstanding contracts and agreements, work in progress, leases (including Leases), third-party licences, insurance policies, deeds, indentures, instruments, entitlements, commitments, undertakings and orders made by or to which an entity is a party or by which an entity is bound or under which an entity has, or will have, any rights or obligations, in each case, other than an Authorization, and "**Contract**" means any one of such Contracts;

"**Corporation**" has the meaning set forth in the recitals;

"**Corporation Financial Statements**" means the Quarterly Corporation Financial Statements and the Monthly Corporation Financial Statements;

"**Damages**" means any losses, fines, penalties, liabilities, damages, Taxes or expenses (including reasonable legal fees and expenses), whether resulting from an action, suit, proceeding, arbitration, claim or demand that is instituted or asserted by a third party, including a Governmental Authority, or a cause, matter, thing, act, omission or state of facts not involving a third party, provided, however, that Damages shall not, except in the case of a third party Claim where such Damages are actually awarded to such third party, include lost profits or revenues, opportunity costs, diminution in value, damages based upon a multiple of earnings or similar financial measure or consequential, incidental, special, indirect, aggravated, exemplary or punitive damages;

"**Deductible**" has the meaning ascribed thereto in Section 10.03(i)(a);

"**Direct Claim**" has the meaning ascribed thereto in Section 10.04(vi);

4

HIGHLY CONFIDENTIAL                                    Tassillo_Fleites_00000854

"**Distribution**" means, with respect to any Person, (a) any declaration or payment, directly or indirectly, by such Person of any dividends on any Equity Interest of such Person, other than dividends payable in shares; and (b) any payment, directly or indirectly, by such Person of any other distribution or payments in respect of its Equity Interests, other than distributions of additional Equity Interests;

"**Earnout**" has the meaning ascribed thereto in Section 3.02(iii);

"**ECP Shares**" has the meaning ascribed thereto in Section 3.04;

"**Employees**" means, collectively, all persons employed by the applicable Target Entities that employ the Employees as of Closing, and each individually, an "**Employee**";

"**Environment**" means the ambient air, all layers of the atmosphere, surface water, underground water, all land, and the interacting natural systems that include components of air, land and water, and includes indoor spaces;

"**Environmental Laws**" means all applicable Laws relating to the Environment including those related to the storage, generation, use, handling, manufacturing, processing, transportation, release or disposal of Hazardous Substances, or occupational health and safety;

"**Equity Interests**" means any and all shares, interests, participations or other equivalents (however designated) of shares in a corporation, any and all equivalent ownership (or profit) interests in a Person (including partnership, membership or trust interests therein), securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person, and any and all warrants, rights or options to purchase any of the foregoing, whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are authorized or otherwise existing on any date of determination;

"**Exchange Act**" means the United States Securities Exchange Act of 1934;

"**Exclusivity Period**" has the meaning ascribed thereto in Section 7.09(i);

"**Fair Market Value**" means the value that would be paid by a willing buyer to a willing seller that is not an Affiliate of the willing buyer;

"**Financing Agreement**" means that certain Financing Agreement, date as of April 9, 2018, by and among the Corporation, Licensing IP International S.à r.l., a private limited liability company (*société à responsabilité limitée*) incorporated under the laws of Luxembourg, having its registered office at 32, boulevard Royal, L-2449 Luxembourg and registered with the RCS under number B158298, MG Licensing Europe S.à r.l., a private limited liability company (*société à responsabilité limitée*) incorporated under the laws of Luxembourg, having its registered office at 32, boulevard Royal, L-2449 Luxembourg and registered with the RCS under number B158299, MG Ex-US S.à r.l., a private limited liability company (*société à responsabilité limitée*) incorporated under the laws of Luxembourg, having its registered office at 32, boulevard Royal, L-2449 Luxembourg and registered with the RCS under number B181672, MG IP S.àr.l., a private limited liability company (*société à responsabilité limitée*) incorporated under the laws of Luxembourg, having its registered office at 32, boulevard Royal, L-2449 Luxembourg and registered with the RCS under number B169286, each Subsidiary of the Corporation listed as a "Guarantor" on the signature pages thereto, the lenders from time to time party thereto (the "**Lenders**"), Lucid Trustee Services Limited, as collateral agent for the Lenders, and Lucid Agency Services Limited, as administrative agent for the Lenders;

5

"**Governmental Authorities**" or "**Governmental Authority**" means any government, regulatory authority, governmental department, agency, commission, board, tribunal, crown corporation, or court or other law, rule or regulation-making entity having jurisdiction on behalf of any nation, or province or state or other subdivision thereof or any municipality, district or subdivision thereof with the authority to bind a Person at Law;

"**Hazardous Substances**" means any substance or material which is flammable, toxic, hazardous, or corrosive, or which might be detrimental to human, animal or plant life or to the Environment and which is regulated by Environmental Laws, including any pollutant, contaminant, toxic or hazardous waste, or any other substance the manufacture, use, storage, removal, transfer, handling or ownership of which is regulated by Environmental Laws;

"**HSR Act**" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976;

"**IFRS**" means the International Financial Reporting Standards established by the International Accounting Standards Board;

"**indemnified party**" has the meaning ascribed thereto in Section 10.04(i);

"**indemnifying party**" has the meaning ascribed thereto in Section 10.04(i);

"**Intellectual Property**" means all patents, patent applications, copyrights, registered and unregistered trade-marks, trade-mark applications, trade-names, logos, commercial symbols, inventions, licences, trade secrets, patterns, drawings, computer software, formulae, technical information, research data, concepts, methods, procedures, designs, know-how, websites, internet domain name registrations and all other intellectual property owned by, licensed to or used by the Target Entities;

"**Interim Period Materials**" has the meaning ascribed thereto in Section 7.03(xiii);

"**Inventory**" means all inventory of the Business of any kind, character, nature or description, including without limitation all finished goods, work in process, raw materials, manufactured and purchased parts, scrap and containers, but specifically excluding obsolete, expired, unmerchantable, damaged or defective inventory;

"**Knowledge**", "**Known to**", "**to the knowledge of**", or any other similar knowledge qualification, means: (i) with respect to the Vendor, the actual knowledge of the Principals, Vendor and/or any of the Vendor's Affiliates and the knowledge that the Principals, Vendor and/or any of the Vendor's Affiliates could be expected to discover or otherwise become aware, in the course of conducting reasonable and appropriate inquiries of the directors, officers, consultants (who are engaged by any of the Target Entities on a full-time basis) and employees of the Target Entities who should reasonably be expected to possess information relevant to the fact or matter in question, up to the date that is ten (10) Business Days prior to Closing; and (ii) with respect to the Purchaser, any material posted in the Vendor Data Room or delivered by the Vendor, any Target Entity, or any Affiliate of Vendor or any Target Entity, in each case, by e-mail to any recipient with the following email domain name: @opge.com or @ethicalcapitalpartners.com, or otherwise in writing up to the date of this Agreement. For the avoidance of doubt, the use of the words or phrases "Knowledge", "Known to", "to the knowledge of", or similar knowledge qualifications in this Agreement are intended only to allocate rights and risks among the parties to this Agreement and are not intended to be admissions against interests, give rise to any inference or proof of accuracy, be admissible against any party to this Agreement by any Person who is not a party to this Agreement, or give rise to any claim or benefit to any Person who is not a party to this Agreement;

6

"**Law(s)**" means with respect to a Person or matter, any and all applicable: (i) laws, constitutions, treaties, statutes, codes, ordinances, principles of common and civil law and equity, orders, decrees, rules, regulations and municipal by-laws whether domestic, foreign or international; and (ii) judicial, arbitral, administrative, ministerial, departmental and regulatory Authorization of any Governmental Authorities, in each case, binding upon or applicable to such Person or matter, in each case in effect as of the Closing Date;

"**Leased Real Properties**" means the immovable real property, lands, buildings and premises used in connection with the Business which are leased, subleased, licensed or with respect to which a right to use or occupy has been granted to the Target Entities, as the context may require;

"**Leases**" means all written or oral leases, subleases, licenses, concessions and other agreements, including all amendments, extensions, and renewals with respect thereto, pursuant to which the Target Entities holds or has the right to use any real property (including the Leased Real Properties) or personal property;

"**Liens**" means liens, charges, mortgages, hypothecs, pledges, security interests, Claims, defects of title, restrictions and any other rights of third parties relating to any property, including any other encumbrances of any kind, which, in substance, secure payment or performance of an obligation and "**Lien**" means any of the foregoing;

"**Litigation Cost Damage Amount**" means the Damages incurred by the Target Entities and/or the Purchaser relating to a Pending Action including but not limited to all reasonably documented out-of-pocket, fees, expenses and other costs incurred by the Target Entities and/or the Purchaser;

"**Matter**" has the meaning ascribed thereto in Section 7.05;

"**Material Adverse Effect**" means, in respect of the Target Entities or the Business, a change, effect, event, occurrence or circumstance: (i) that is or would be in the aggregate materially adverse and durationally significant to the business, assets, properties, results of operations, management, condition (financial or otherwise) or prospects of the Target Entities or the Business, or (ii) that is or would be in the aggregate materially adverse and durationally significant to the ability of the Vendor to consummate the transactions contemplated by this Agreement and the Ancillary Agreements or perform its obligations under this Agreement, the Ancillary Agreements or the other documents contemplated hereby or thereby, except in each case, to the extent resulting from: (a) any changes in general local, domestic, foreign or international economic or political conditions or any securities, currency, commodity or financial markets in general, (b) any change, condition or effect generally in the industries or in financial banking or securities markets in general (including any disruption thereof and any increase, decline or change in prevailing interest rates) in which the Business or the Target Entities operates, (c) any change, condition or effect resulting from an action required by this Agreement or taken at the written direction or with the written consent of the Purchaser, (d) any change, condition or effect resulting from any changes in Laws or accounting rules, including IFRS, (e) any natural disaster or outbreaks of illness, pandemics, including the Covid-19 pandemic and its variants, acts of war (whether declared or not declared), armed hostilities or terrorism or the escalation or worsening thereof, or other acts of God, (f) any and all pending or threatened actions (which are Known to the Purchaser) prior to the date hereof as amended from time to time, without material change in fact(s) or amount(s) claimed, and all other similar civil legal proceedings, class actions, arbitration proceedings, investigations, enquiries, commissions, claims, damages (including punitive, exemplary and moral damages, actions and demands, cross-claims, defences, warranty claims, filed amended or threatened prior to the Closing Date, in each case, alleging directly or indirectly failures to take adequate action to combat the publication and distribution of child sexual abuse material ("**CSAM**") and all materials as to which consent of any Person was allegedly not provided or not given for generation, creation or publication ("**NCM**"), as well as any and all alleged related failures by any Person to comply with any applicable privacy and data protection laws, regulations and rules, and all actions, initiatives and

7

matters taken, in the process of being taken, and those to be taken in the future to address, enhance or remedy all alleged or actual deficiencies in policies, procedures, practices and products of the Target Entities or the Business (including, but not limited to, those referred to in the *New York Times* article dated December 4, 2020 and the Canadian Parliamentary investigation conducted by the standing Committee on Access to Information, Privacy and Ethics in February 2021) provided, that any change, effect, event, occurrence or circumstance referred to in this clause (f) shall be taken into account in determining whether a Material Adverse Effect has occurred, (g) the failure of the Target Entities or the Business to meet any projections (provided that the underlying causes thereof, to the extent not otherwise excluded by this definition, may be deemed to contribute to a "Material Adverse Effect"; provided, further, that this clause (g) shall not be construed as implying that the Vendor is making any representation or warranty hereunder with respect to any such projections, forecasts or budgets); or (h) any effect resulting from the announcement of this Agreement (including by reason of the identity of Purchaser or any of its Affiliates), compliance with terms of this Agreement or the consummation of the transactions contemplated by this Agreement. Notwithstanding anything stipulated above, in the event that after the date hereof, a written claim for purposes of instituting criminal or regulatory proceedings is submitted by a recognized authority, or the institution of criminal or regulatory proceedings against the Vendor, its shareholders or directors, or against any of the Target Entities, or the summoning of a grand jury for purposes of determining whether criminal proceedings should be commenced against any of the above, or a written claim for purposes of instituting new and additional civil proceedings, class action(s), arbitration proceedings for any claims, damages (including punitive, exemplary and moral damages) for an amount in excess of $1,000,000, or the institution of any such criminal or regulatory proceedings in respect of alleged CSAM or NCM, shall be and constitute a Material Adverse Effect;

"**Material Contract**" means in respect of any Target Entity:

    (i)     each of the Leases and any lease relating to the lease of personal property having a value in excess of $500,000;

    (ii)    any Contract for the purchase or sale of materials, supplies, goods, services, equipment or other assets providing for annual payments by or to the Corporation in excess of $500,000;

    (iii)   any Contract with respect to any capital expenditures in excess of $500,000 in the aggregate;

    (iv)   any employment or consulting Contract with any executive officer, key employee or key consultant of any Target Entity;

    (v)    any agreement for the borrowing of money, any currency exchange, interest rate, commodities or other hedging arrangement or leasing transaction of the type required to be capitalized in accordance with IFRS;

    (vi)   any partnership, joint venture or other similar Contract, arrangement or agreement involving at least $500,000 in the assets or properties of the Target Entities;

    (vii)  any Contract relating to indebtedness or the deferred purchase price of property (whether incurred, assumed, guaranteed or secured by any asset in excess of $500,000) which is not terminable by the Target Entity within 12 months;

    (viii) any license agreement, franchise agreement or agreement in respect of similar rights granted to or held by a Target Entity providing for payments of amounts in excess of $500,000 per year;

8

(ix)    any agency, dealer, sales representative or other similar agreement providing for payment of amounts in excess of $500,000 per year;

(x)     any Contract or other document that limits the freedom of the Target Entities to compete in any line of business or with any Person or in any area or which would so limit the freedom of a Target Entity after the Closing Date;

(xi)    any Contract for the sale of any assets, other than sales of inventory to customers in the ordinary course of business;

(xii)   any Contract that could prevent a Target Entity from disposing of any of its assets;

(xiii)  any Contract that could restrict the Business as currently conducted by a Target Entity on the date hereof and on the Closing Date;

(xiv)   any confidentiality, secrecy or non-disclosure Contract (whether a Target Entity is a beneficiary or obligor thereunder) relating to any proprietary or confidential information which is material to the Business;

(xv)    any binding oral agreements and expressions of interest, binding letters of understanding, binding memoranda of understanding and like binding agreements or understandings between a Target Entity and any third party which gives or may give rise to any payment obligation of such Target Entity, including without limitation any obligation to pay royalties of any kind;

(xvi)   any agreement the termination of which prior to the end of its applicable term would result in a Material Adverse Effect;

(xvii)  any agreement which involves any commitment to or by a Target Entity which expiration date falls on a date that is after the first anniversary of this Agreement, providing for annual payments in excess of $250,000.00;

(xviii) any agreement which involves any obligation or potential obligation of a Target Entity to indemnify any Person including any guarantee provided by such Target Entity for the obligations or liabilities of any other Person;

(xix)   any Contract with any Person with whom a Target Entity does not deal at arm's length within the meaning of the Tax Act;

(xx)    any Contract that includes an exclusivity provision or similar such provision with any Person that a Target Entity has provided, is or will be providing, or is required to provide, any products or services to;

(xxi)   any Contract that includes a "most favoured nations" or similar such favourable pricing or commercial terms with any Person that a Target Entity has provided, is or will be providing, or is required to provide, any products or services to; and

(xxii)  any other Contract or commitment not made in the ordinary course of business that is material to a Target Entity;

9

Tassillo_Fleites_00000859

"**Monthly Corporation Financial Statements**" means the unaudited, management internally prepared consolidated financial statements of the Corporation for the fiscal period ended November 30, 2022, prepared in accordance with IFRS (other than absence of (x) notes to the financial statements, (y) appropriate revenue cut-offs, and (z) accounting for content capitalization and IFRS-16 Leases and inter company eliminations and certain reclassifications), consisting of statement of financial position and the accompanying income statement, but excluding statement of cash flows and statement of changes in equity for the period then ended, as attached as Schedule 1.01(a) hereto, in each case, prepared consistent with the financial statements prepared by the Corporation in calculating Consolidated EBITDA pursuant to the terms of the Financing Agreement;

"**Monthly Payment**" has the meaning ascribed thereto in Section 3.02(ii);

"**Outside Date**" has the meaning ascribed thereto in Section 11.01(f);

"**Outstanding Claims**" has the meaning ascribed thereto in Section 10.03(iii);

"**Outstanding Claims Withholding Amount**" has the meaning ascribed thereto in Section 10.03(iii);

"**Outstanding Tax Matter**" has the meaning ascribed thereto in Section 10.03(iii);

"**Outstanding Tax Matter Amount**" has the meaning ascribed thereto in Section 10.03(iii);

"**Pending Actions**" means any Proceeding filed, amended or threatened, before the Closing Date or prior to payment of the last Monthly Payment and Earnout, that relate to the Business carried on by the Target Entities prior to the Closing Date and that involve the alleged failure to take action by a Target Entity to combat the publication and distribution of child sexual abuse materials or material as to which consent allegedly was not given by all depicted individuals for generation or publication, as well as alleged related failures to comply with applicable privacy and data protection laws and action taken, being taken and to be taken to address or enhance any alleged deficiencies in policies, procedures and products except those taken in the ordinary course of business and not connected to the Pending Actions;

"**Pending Investigations**" has the meaning ascribed thereto in Section 4.19(i);

"**Permitted Liens**" means (i) Liens for Taxes, assessments or similar charges not yet due and payable; (ii) statutory Liens in favour of mechanics, material men, warehousemen, carriers, or other like Liens securing obligations incurred in the ordinary course of business that are not yet due and payable; (iii) Liens, including easements, servitudes, rights of way, objections, reservations, consents, tenancies, licenses, and the like affecting any real property, in each case either registered on title to the real property or visible upon a physical inspection of the real property; (iv) Liens that are not material in amount and that do not adversely affect the use of the property subject thereto; (v) Liens that secure the payment of the purchase price of or repayment of indebtedness for property acquired in the ordinary course of business; (vi) Liens affecting a landlord's interest in any Leased Real Property; and (v) those Liens securing the Senior and Subordinated Debt Agreement;

"**Permitted Reorg**" means a reorganization of the corporate structure of the Purchaser and/or the Corporation that may, without limitation, include the transfer of assets from the Purchaser and/or a Target Entity to the Purchaser and/or another Target Entity, or the merger or amalgamation of certain Target Entities, or the creation of new subsidiaries of the Purchaser or a Target Entity (to which assets may be transferred), or the transfer of ownership of a subsidiary to the Purchaser or a Target Entity, where all or substantially all of the assets of the subsidiaries prior to such transaction or series of transactions as the case may be remain assets of the associated corporate group after such transaction or series of transactions,

HIGHLY CONFIDENTIAL                                        Tassillo_Fleites_00000860

provided that following any such reorganization the security interests granted to the Vendor under this Agreement remain in the same form and attach directly or indirectly to the same assets;

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, corporation, unincorporated association, unincorporated syndicate, unincorporated organization, trust, body corporate, Governmental Authority, and a natural person in such Person's capacity as trustee, executor, administrator or other legal representative;

"**Post-Closing Actions**" means any Proceeding filed, amended or threatened after the Closing Date that relate to the Business carried on by the Target Entities prior to the Closing Date and that involve the alleged failure to take action by a Target Entity to combat the publication and distribution of child sexual abuse materials or material as to which consent allegedly was not given by all depicted individuals for generation or publication, as well as alleged related failures to comply with applicable privacy and data protection laws and action taken, being taken and to be taken to address or enhance any alleged deficiencies in policies, procedures and products;

"**Pre-Closing Period**" shall mean the period from the date of this Agreement up to but excluding the Closing;

"**Pre-Closing Tax Period**" means a taxation year or other fiscal period that begins before the Closing Date and ends before the Closing Date;

"**Pre-Closing Tax Returns**" has the meaning ascribed thereto in Section 7.14(i);

"**Principals**" means, collectively, Feras Antoon and David Tassillo;

"**Proceeding**" has the meaning ascribed thereto in Section 4.19(i);

"**Purchase Price**" has the meaning ascribed thereto in Section 3.01;

"**Purchased Shares**" has the meaning set forth in the recitals;

"**Purchaser**" has the meaning set forth in the preamble;

"**Purchaser Indemnified Parties**" has the meaning ascribed thereto in Section 10.01(i);

"**Purchaser MAE**" means any such matter, event or circumstance that, individually or in the aggregate could reasonably be expected to have a material adverse effect on: (a) the business, assets, properties, liabilities (actual or contingent), of the Purchaser and the Target Entities taken as a whole; (b) the perfection or priority of any lien granted by the Purchaser to the Vendor pursuant to the Share Pledge Agreement; (c) the enforceability of the Share Pledge Agreement; or (d) the ability of the Purchaser to perform any of its obligations under this Agreement and the Share Pledge Agreement;

"**Purchaser's Fundamental Representations**" means Section 6.01 (Organization and Authority), Section 6.02 (No Conflict), and Section 6.03 (Funding);

"**Quarterly Corporation Financial Statements**" means the unaudited, management internally prepared consolidated financial statements of the Corporation for the fiscal period ended September 30, 2022 prepared in accordance with IFRS (other than (x) inclusion of notes to the financial statements, consisting of statement of financial position and the accompanying income statement but excluding statement of cash flows and statement of changes in equity for the period then ended, as attached as Schedule 1.01(b) hereto,

11

in each case, prepared consistent with the financial statements prepared by the Corporation in calculating Consolidated EBITDA pursuant to the terms of the Financing Agreement;

"**Reduction Amount**" has the meaning ascribed thereto in Section 7.10(vii);

"**Related Party**" means, for the purposes of this Agreement, (i) the Vendor, (ii) any current or former officer, director, associate or Affiliate of the Corporation; (iii) any Person not dealing with the Corporation at arm's length; and (iv) any immediate family member or any entity that is an Affiliate of either of the foregoing;

"**Related Party Debt**" means all indebtedness and payment obligations of any kind (whether for money borrowed, guarantees, intercompany indebtedness, extension of credit or otherwise) of the Corporation owing to or for the benefit of any Related Party together with any related obligations including, without limitation, any Liens;

"**Required Liquidity**" has the meaning ascribed thereto in Section 7.09(iv)(c);

"**Required Regulatory Approvals**" has the meaning ascribed thereto in Section 7.15(i);

"**Required Third Party Consents**" has the meaning ascribed thereto in Section 7.15(i);

"**Requisite Pledgees**" means Vendor, as pledgee under the Share Pledge Agreement, and each other pledgee of shares of the Corporation's capital stock pledged pursuant to any similar share pledge agreement, covering, in the aggregate, at least fifty percent (50%) of the shares of the Corporation's capital stock that have been pledged pursuant to the Share Pledge Agreement and any similar share pledge agreement;

"**Response Period**" has the meaning ascribed thereto in Section 7.10(vii);

"**Sale Price**" has the meaning ascribed thereto in Section 7.10(vii);

"**Sale Transaction**" has the meaning set forth in the recitals;

"**Securities Act**" means the United States Securities Act of 1933;

"**Senior and Subordinated Debt Agreement**" means those certain Financing Agreements and security agreements referred to in Schedule 4.05;

"**Severance Agreements**" means those certain agreements dated June 6, 2022, by and between 9219-1568 Quebec Inc. and each of David Tassillo and Feras Antoon;

"**Share Pledge Agreement**" has the meaning ascribed thereto in Section 7.02(ii);

"**Shareholders' Agreement**" means that certain shareholders' agreement dated October 18, 2013, as amended to date, among Vendor, Share Investments S.A., Coginvest S.A., Acaju Investments S.A., RK Holdings, LLC, and the Corporation;

"**Spam Laws**" has the meaning ascribed thereto in Section 4.33;

"**Subsidiaries**" means Licensing IP International S.a r.l., MG Media S.a r.l., MG Global Entertainment (Europe) Limited, STV International B.V., MG Holdings USA Corp., MG Billing US Corp., MG Global Entertainment Inc., Toqon, LLC, MindGeek USA Incorporated, Clixir US Ltd, MG CY Holdings Ltd, FTSA. LLC, Donormass Ltd, Nutaku Entertainment Ltd. MG Freesites Ltd, MG Technologies Ltd, MG

HIGHLY CONFIDENTIAL                    Tassillo_Fleites_00000862

Premium Ltd, Toqon EU Ltd, Clixir EU Ltd, Mirmay Limited, Liquidum Limited, Appatomic Limited, MG Billing Limited, Nutaku Publishing Limited, Super Hippo Studios RO S.R.L., MG Social Ltd, 9279-2738 Quebec Inc., 9219-1568 Quebec Inc., Seabreeze Marine Ventures Limited, and MG Germany GmbH, and "**Subsidiary**" means any one of them;

"**Target Entities**" means, collectively, the Corporation and the Subsidiaries;

"**Tax**" and "**Taxes**" means (i) any and all taxes, duties, fees, excises, premiums, assessments, imposts, levies and other charges or assessments of any kind whatsoever imposed by any Governmental Authority, whether computed on a separate, consolidated, unitary, combined or other basis, including those levied on, or measured by, or described with respect to, income, gross receipts, profits, gains, windfalls, capital, capital stock, production, recapture, transfer, land transfer, license, gift, occupation, wealth, environment, net worth, indebtedness, surplus, sales, goods and services, harmonized sales, use, value-added, excise, special assessment, add-on minimum, alternative, ad velorem, stamp, withholding, business, franchising, real or personal property, health, employee health, payroll, workers' compensation, employment or unemployment, severance, social services, social security, education, utility, surtaxes, customs, import or export, and including all license and registration fees and all employment insurance, health insurance and government pension plan premiums or contributions; (ii) all interest, penalties, fines, additions to tax or other additional amounts imposed by any Governmental Authority on or in respect of amounts of the type described in clause (i) above or this clause (ii); (iii) any liability for the payment of any amounts of the type described in clauses (i) or (ii) as a result of being a member of an affiliated, consolidated, combined or unitary group for any period; and (iv) any liability for the payment of any amounts of the type described in clauses (i) or (ii) as a result of any express or implied obligation to indemnify any other Person or as a result of being a transferee or successor in interest to any party;

"**Tax Act**" means the applicable Laws relating to Taxes in the applicable jurisdiction in which the Vendor or the Target Entities are domiciled and file Tax Returns;

"**Tax Returns**" means all reports, elections, notices, forms, designations, declarations, filings, returns and other documents filed or required to be filed in respect of Taxes including any amendment thereof;

"**Termination Fee**" has the meaning ascribed thereto in Section 7.12;

"**Third Party Consultations**" has the meaning ascribed thereto in Section 7.07;

"**Total Remaining Monthly Payment Amount**" has the meaning ascribed thereto in Section 7.10(vii);

"**Update**" has the meaning ascribed thereto in Section 7.05;

"**Vendor**" has the meaning set forth in the preamble;

"**Vendor Data Room**" means the electronic data room hosted by 9219-1568 Quebec Inc. as it stood at the end of the day (New York time) on the date of this Agreement;

"**Vendor Indemnified Parties**" has the meaning ascribed thereto in Section 10.02;

"**Vendor's Fundamental Representations**" means Section 4.01 (No Conflict), Section 4.03 (Incorporation and Registration), Section 4.04 (Authorized and Issued Capital), Section 4.07 (Regulatory Approvals), Section 4.19 (Legal Matters), Section 4.20 (Authorizations), Section 4.36 (Indebtedness), Section 4.37 (No Brokers), Section 5.01 (Authority), Section 5.02 (No Conflict), Section 5.03 (Title to

13

Securities), Section 5.04 (Regulatory Approvals), Section 5.04 (Litigation) and Section 5.08 (No Benefits); and

"**Visa & Mastercard Events**" means those events described in Schedule 1.01(c).

1.02    The division of this Agreement into articles and sections and the insertion of headings and the table of contents is for convenience of reference only and shall not affect the interpretation or construction of this Agreement.

1.03    Time shall be of the essence of this Agreement and of every part hereof and no extension or variation of this Agreement shall operate as a waiver of this provision.

1.04    Unless the context requires otherwise, any reference to gender shall include all genders and words importing the singular number shall include the plural and vice-versa.

1.05    Any reference to "hereof", "hereto" or "hereunder" and similar expressions mean and refer to this Agreement and not to any particular Article, Section or other subdivision of this Agreement.

1.06    When a reference is made to a "party" or "parties", such reference shall be to a party or parties to this Agreement unless otherwise indicated.

1.07    Whenever the words "include", "includes" or "including" are used, they shall be deemed to be followed by the words "without limitation".

1.08    The phrase "the aggregate of", "the total of", "the sum of", or a phrase of similar meaning means "the aggregate (or total or sum), without duplication, of".

1.09    All references in this Agreement to "dollars" or to "$" are expressed in United States currency unless otherwise specifically indicated.

1.10    Unless otherwise specifically provided, any reference to any Law shall be construed as a reference to such Law as amended or re-enacted from time to time or as a reference to any successor thereto.

1.11    All accounting terms not specifically defined herein, on a consolidated basis, shall be construed in accordance with IFRS and all determinations of an accounting nature in respect of the Business, on a consolidated basis, required to be made herein shall be made in a manner consistent with IFRS and on a basis consistent with the Corporation Financial Statements and past practice; provided, however, that any accounting terms herein applicable to any of the Target Entities shall be construed in accordance with either IFRS (if so chosen by respective Target Entity) or accounting principles generally accepted in the reportable jurisdiction.

1.12    Where a period is expressed to begin or end at, on or with a specified day, or to continue to, through or until a specified day, the period includes that day. Where a period is expressed to begin after or to be from a specified day, the period does not include that day. Where anything is to be done within a period expressed after, from or before a specified day, the period does not include that day.

1.13    Whenever any action to be taken or payment to be made pursuant to this Agreement would otherwise be required to be taken or made on a day that is not a Business Day, such action shall be taken, or such payment shall be made on the first Business Day following such day.

HIGHLY CONFIDENTIAL                    Tassillo_Fleites_00000864

1.14    This Agreement was prepared jointly by the parties and no rule that it be construed against the drafter shall have any application in its construction or interpretation.

1.15    No representation, warranty or statement made herein shall constitute an admission of liability towards a third person or is made as a stipulation for, or for the benefit of third persons on the part of the Vendor, Purchaser and Target Entities.

1.16    As used in this Agreement, unless the context would require otherwise, the terms "**material**" or "**material to the Corporation/Target Entities**" and the concept of the "**material**" nature of an effect on the Corporation and/or the Target Entities shall be determined solely by reference to the Business, taken as a whole, as the Business is currently being conducted. There have been included in the Vendor's schedules annexed hereto (the "**Schedules**"), and may be included elsewhere in this Agreement, items that are not "material" within the meaning of the immediately preceding sentence; that inclusion shall not be deemed to be an acknowledgement by the Vendor that those items are "material" and shall not be used to further define the meaning of "material" for purposes of this Agreement.

1.17    The following are the Schedules to this Agreement:

| Schedule 1.01(a) | - | Monthly Corporation Financial Statements |
| Schedule 1.01(b) | - | Quarterly Corporation Financial Statements |
| Schedule 1.01(c) | - | Visa & Mastercard Events |
| Schedule 4.02 | - | Restrictive Documents |
| Schedule 4.03 | - | Registrations |
| Schedule 4.04 | - | Authorized Capital & Issued Capital |
| Schedule 4.05 | - | Title to the Assets |
| Schedule 4.06 | - | Subsidiaries |
| Schedule 4.07 | - | Authorizations |
| Schedule 4.08 | - | Consents |
| Schedule 4.10 | - | Undisclosed Liabilities |
| Schedule 4.11 | - | Absence of Changes |
| Schedule 4.12 | - | Absence of Unusual Transactions |
| Schedule 4.13 | - | Non-Arm's Length Transactions |
| Schedule 4.15 | - | Tax Matters |
| Schedule 4.16 | - | No Joint Venture Interest, etc. |
| Schedule 4.17 | - | Absence of Guarantees |
| Schedule 4.19 | - | Legal Matters |
| Schedule 4.22 | - | Intellectual Property |
| Schedule 4.24 | - | Violation or Breach of Real Property Leases |
| Schedule 4.26 | - | Material Contracts |
| Schedule 4.28 | - | Employee and Independent Contractor Matters |
| Schedule 4.30 | - | Benefit Plans |
| Schedule 4.36 | - | Indebtedness |
| Schedule 7.15(i) | - | Required Regulatory Approvals |
| Schedule 7.15(i)-2 | - | Required Third Party Consents |
| Schedule 9.01(v)(f) | - | Competition Act Matters |
| Schedule 13.13 | - | Confidentiality Disclosure Parties |

1.18    The following are Exhibits to this Agreement:

| Exhibit A | - | Issued Share Capital of the Corporation |

HIGHLY CONFIDENTIAL                                    Tassillo_Fleites_00000865

Exhibit B        – Form of Share Pledge Agreement
Exhibit C        – Form of Non-Competition Agreement


## ARTICLE 2.00 - PURCHASE AND SALE

2.01   Subject to the terms and conditions hereof, the Vendor hereby agrees to sell, assign and transfer to the Purchaser and the Purchaser hereby agrees to purchase from the Vendor all of the Purchased Shares.

## ARTICLE 3.00 - PURCHASE PRICE

3.01   The purchase price for the Purchased Shares shall be an amount ▮▮▮▮▮▮ plus any amount payable pursuant to the Earnout herein after provided (the "**Purchase Price**").

3.02   The Purchase Price shall be payable by the Purchaser as follows:

   (i)    by delivery to an account designated by the Vendor of a wire transfer of immediately available funds, in the aggregate amount of ▮▮▮▮▮▮ on the Closing Date (the "**Closing Date Cash Payment**"), which payment shall be nonrefundable;

   (ii)   by delivery to an account designated by the Vendor, ▮▮▮▮▮▮ cash payments of ▮▮▮▮▮▮ each in the form of a wire transfer of immediately available funds no later than on the first Business Day of each calendar month following the Closing (each such payment, a "**Monthly Payment**"), which payments shall be nonrefundable, provided, that any Monthly Payment shall be applied first to satisfy any unpaid default interest, penalties or fees that may become due pursuant to this Agreement; and

   (iii)  subject to any adjustments as set out in this Agreement, by delivery to the Vendor, as per Vendor's instructions, in the form of a wire transfer of immediately available funds no later than the date that is the four-year anniversary of the Closing Date, an Earnout amount of up to a maximum of ▮▮▮▮▮▮, with such amount determined as follows ("**Earnout**"):

      (a)   If the Litigation Cost Damage Amount is less than or equal to Redacted - Privilege the Earnout amount shall be determined as follows: ▮▮▮▮▮▮, plus the amount obtained by multiplying the Litigation Cost Damage Amount by Redacted - Privilege and subtracting the resulting amount from Redacted - Privilege For example, if the Litigation Cost Damage Amount is Redacted - Privilege the Earnout amount payable will be Redacted - Privilege.

      (b)   If the Litigation Cost Damage Amount is greater than Redacted - Privilege, but less than or equal to Redacted - Privilege, the Earnout amount payable shall ▮▮▮▮▮▮.

3.03   If the Purchaser fails to deliver any payment described in Section 3.02 on or prior to the due date set forth above, any outstanding balance(s) shall bear interest at a rate of ten percent (10%) per annum from the date of default until full repayment and shall be calculated and compounded daily.

3.04   On the Closing Date, against delivery by the Vendor of certificates evidencing the Purchased Shares duly endorsed for transfer and accompanied by instruments of transfer in the manner contemplated

16

by or in order to give effect to the transactions contemplated under this Agreement and the Share Pledge Agreement (or in the event of non-certificated shares, in the manner in which the Purchased Shares are duly registered for transfer), and upon satisfaction of all other terms and conditions to be satisfied by the Vendor hereunder, the Purchaser shall make the payment set out in Section 3.02 in accordance with the instructions delivered by the Vendor to the Purchaser prior to the Closing, and the Purchaser and ECP Alpha Holdings Ltd. pledge the Purchased Shares and all shares of the Purchaser (the "**ECP Shares**") to the Vendor in accordance with the terms of the Share Pledge Agreement as security for Purchaser's obligations to the Vendor in respect of the Monthly Payments and the Earnout as set forth in this Agreement.

## ARTICLE 4.00 – REPRESENTATIONS AND WARRANTIES IN RESPECT OF THE TARGET ENTITIES

The Vendor represents and warrants to the Purchaser that all the statements set out in this Article (except as provided for in the Schedules annexed hereto) are accurate as of the date hereof and acknowledges that the Purchaser is relying on such representations and warranties in entering into this Agreement and the Ancillary Agreements to which it is a party and completing the transactions contemplated herein and therein.

4.01  **No Conflict.** Subject to obtaining the Consents referred to in Schedule 4.08 of this Agreement, the Consents required pursuant to the Shareholders' Agreement, and the Authorizations and/or filings referred to in Schedule 4.07 of this Agreement, the execution and delivery by the Vendor of this Agreement and each Ancillary Agreement to which it is a party and the performance by the Vendor of its obligations hereunder and thereunder and the completion of the transactions contemplated by this Agreement and the Ancillary Agreements do not and will not (or would not with the giving of notice, the lapse of time, or the happening of any other event or condition):

   (i)     constitute or result in a violation of, default under or breach of, require any consent to be obtained under or give rise to any termination rights by a third party, payment obligation by a Target Entity, or rights of a third party the exercise of which would result in breach or default under any provision of: (A) each Target Entity's certificate of incorporation, constating documents, by-laws or other charter documents, including any shareholders' agreement or any other agreement or understanding with any Person; (B) any Laws by which a Target Entity is bound; or (C) any Contract or other instruments to which a Target Entity is a party or pursuant to which any of its assets or property may be affected;

   (ii)    cause any available credit to cease to be available;

   (iii)   result in the imposition of any Liens upon any of the assets of a Target Entity; or

   (iv)    restrict the ability of a Target Entity to carry on the Business as it is now being carried on.

4.02  **Restrictive Documents.**  Other than as set out in Schedule 4.02, there are no shareholders agreements, voting trust agreements, share pledge agreements or any similar agreements in effect in respect of any of the Target Entities.

4.03  **Incorporation/Formation and Registration.**  With the exception of any Subsidiary that is in the process of being liquidated as set out in Schedule 4.03, each Target Entity is either a corporation duly incorporated and validly existing under the Laws of its jurisdiction of incorporation or a partnership duly organized under the laws of its jurisdiction of organization, and has all necessary power, authority, and capacity to own its property and assets and to carry on its business as

HIGHLY CONFIDENTIAL

Tassillo_Fleites_00000867

presently conducted.  Other than as set out in Schedule 4.03, each Target Entity is qualified, licensed or registered in all material respects to carry on business in all the jurisdictions in which the conduct of the Business makes such qualification, licensing or registration necessary.

4.04    **Authorized and Issued Capital.**  Schedule 4.04 sets out the authorized capital of each Target Entity. The issued and outstanding capital of each Target Entity consists solely of those shares issued to the holders thereof as set forth in Schedule 4.04. All the Purchased Shares have been duly issued and are outstanding as fully paid and non-assessable shares in the capital of the Corporation and the holders thereof will be on the Closing Date the sole registered and beneficial holders of the Purchased Shares in the share ownership as set forth in Schedule 4.04.  Other than as set out in the Shareholders' Agreement, no Person has any right to require any Target Entity to issue any shares in such Target Entity's share capital or any security convertible into or exercisable or exchangeable for shares in such Target Entity's capital.  Other than as set out in the Shareholders' Agreement, no Person has any option, warrant, right, call, commitment, conversion right, right of exchange or other agreement or any right, privilege or entitlement (whether by law, pre-emptive or contractual) capable of becoming an option, warrant, right, call, commitment, conversion right, right of exchange or other agreement for (i) the purchase, directly or indirectly, from the Vendor of any Purchased Shares other than the Purchaser under this Agreement, or for the purchase, subscription, allotment or issuance of any unissued securities in the capital of the Corporation or (ii) the purchase or other acquisition from any Target Entity of any of its undertaking, property or assets.

4.05    **Title to the Assets.**  To the Knowledge of the Vendor, other than as set out in Schedule 4.05, each Target Entity is the sole beneficial and (where its interests are registrable) the sole registered owner of all its assets and interests in assets, real and personal, in each case which it purports to own, with good title thereto, free and clear of all Liens, other than the Permitted Liens. Since the Balance Sheet Date, there has been no assignment, subletting or granting of any licence (of occupation or otherwise) of or in respect of any Target Entity's assets or any granting of any agreement or right capable of becoming an agreement or option for the purchase of any of such assets other than pursuant to the provisions of, or as disclosed in, this Agreement or pursuant to purchase orders in the ordinary course of business.  Each Target Entity owns, leases, or has the legal right to use all of its properties and assets which are used or currently intended to be used by such Target Entity in the conduct of the Business, and such properties, assets and rights constitute all the properties, assets and rights as are necessary to conduct the Business as of the Closing Date.

4.06    **Subsidiaries.**  Other than the Subsidiaries, the Corporation does not own, or have any interest in, any securities of any other Person nor is the Corporation a party to any agreements of any nature to acquire any securities of any other Person or to acquire or lease any other business operations not forming part of the Business. All the issued and outstanding shares of capital stock of each Target Entity are owned with good, and marketable title thereto, free and clear of all Liens (other than Permitted Liens, Liens created pursuant to the terms of this Agreement, and as set out in Schedule 4.06).

4.07    **Regulatory Approvals.**  To the Knowledge of the Vendor, except as set forth in Schedule 4.07, no Authorization is required on the part of any Target Entity in connection with the execution, delivery and performance of this Agreement or any Ancillary Agreement to which it is a party or the performance of any of the Target Entities' obligations under any Ancillary Agreement to which it is a party and there is no requirement for any Target Entity to make any filing with or give any notice to any Governmental Authority as a condition to the lawful completion of the transactions contemplated by this Agreement and the Ancillary Agreements.

HIGHLY CONFIDENTIAL                    Tassillo_Fleites_00000868

4.08    **Consents.**  To the Knowledge of the Vendor, except as set forth in Schedule 4.08, there is no requirement to obtain any Consent, approval, or waiver of any party under any Material Contract to complete any of the transactions contemplated by this Agreement and the Ancillary Agreements.

4.09    **Financial Statements.**  To the Knowledge of the Vendor, the Corporation Financial Statements, copies of which have been delivered to the Purchaser:

(i)     have been prepared on a basis consistent with those of previous fiscal years subject to deviations as outlined in the definition of Corporation Financial Statements, Quarterly Corporation Financial Statements, and Monthly Corporation Financial Statements;

(ii)    except for liabilities related to the Pending Actions and the Pending Investigations, present fully, fairly and correctly in all material respects the assets, liabilities (whether accrued, absolute, contingent or otherwise) and financial condition of the Target Entities, in each case, in compliance with IFRS;

(iii)   are in accordance with the books and records of the Target Entities in all material respects;

(iv)    except for liabilities related to the Pending Actions and the Pending Investigations, contain and reflect all necessary adjustments of a material nature for a fair presentation of the results of operations and the financial condition for the periods covered thereby; and

(v)     in regards to the Material Contracts, contain and reflect adequate provision or allowance for all reasonably anticipated liabilities, expenses and losses, in each case, except for liabilities related to the Pending Actions and the Pending Investigations.

4.10    **Absence of Undisclosed Liabilities.**  To the Knowledge of the Vendor, none of the Target Entities have any liabilities, obligations or commitments of any nature whatsoever, absolute or contingent (excluding the Pending Actions and the Pending Investigations), accrued or unaccrued, matured or unmatured or otherwise, except (a) those which are adequately reflected or reserved against in the balance sheet of the Corporation Financial Statements; (b) those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date and which are not, individually or in the aggregate, material in amount; (c) as set forth in Schedule 4.10; or (d) which are Known to the Purchaser and its Affiliates. The Purchaser is aware of claims made and which can be made in the future in respect of the Pending Actions, and confirms that the contents of same have been fully disclosed to the Purchaser.  For the avoidance of doubt, none of such Pending Actions shall be deemed to result in a breach of this Section 4.10.

4.11    **Absence of Changes.**  To the Knowledge of the Vendor, except as set forth in Schedule 4.11 and other than in connection with any Pending Action, since the Balance Sheet Date there has not been:

(i)     any change in the financial condition or operations of any Target Entity other than changes in the ordinary course of business, none of which individually or in the aggregate have had a Material Adverse Effect on the Business or the results of operations, assets, financial condition, or manner of conducting the Business; or

(ii)    any damage, destruction, loss, labour trouble or other event, development, or condition of any character (whether or not covered by insurance) which have individually or in the aggregate had a Material Adverse Effect on the Business, or the results of operations, assets, financial condition or manner of conducting the business.

HIGHLY CONFIDENTIAL                    Tassillo_Fleites_00000869

4.12    **Absence of Unusual Transactions.** Except as set forth in Schedule 4.12 (except for those matters which are Known by the Purchaser and its Affiliates), since the Balance Sheet Date, no Target Entity has:

(i)     transferred, assigned, sold or otherwise disposed of any of the assets shown or reflected in the Corporation Financial Statements or cancelled any material debts or entitlements except, in each case, in the ordinary course of business;

(ii)    made any capital expenditure or any commitment to do so individually or in the aggregate in excess of $1,000,000;

(iii)   incurred or assumed any obligation or liability (whether accrued, absolute, contingent or otherwise) or incurred any indebtedness for borrowed money, except in the ordinary course of business consistent with past practice, none of which have individually or in the aggregate had a Material Adverse Effect;

(iv)    made any loan or advance, or assumed, guaranteed or otherwise become liable with respect to the liabilities or obligations of any Person;

(v)     discharged any secured or unsecured liability or obligation of any Person owed to such Target Entity (whether accrued, absolute, contingent or otherwise);

(vi)    paid any obligation or liability (whether accrued, absolute, contingent or otherwise) other than liabilities included in the Corporation Financial Statements, reimbursement of legal fees incurred by the Vendor and its Affiliates up to a maximum of $100,000, and liabilities incurred since the date of the Corporation Financial Statements in the ordinary course of business other than with respect to the Severance Agreements;

(vii)   suffered an operating loss or any extraordinary loss, waived or omitted to take any action in respect of any rights of substantial value, or entered into any commitment or transaction not in the ordinary course of business where such loss, rights, commitment or transaction is or would be material in relation to such Target Entity other than with respect to the Visa & Mastercard Events;

(viii)  granted any bonuses whether monetary or otherwise, or made any general wage or salary increases in respect of any Employee other than in the ordinary course of business or materially changed the terms of employment for any Employee;

(ix)    made any bonus or profit sharing distribution or similar payment of any kind or directly or indirectly, declared or paid any dividends or declared or made any other payments or distributions on or in respect of any of their respective shares and has not directly or indirectly, purchased or otherwise acquired any of their respective shares;

(x)     increased the benefits to which Employees are entitled under any Benefit Plan or created any new Benefit Plan of such Target Entity for any Employee;

(xi)    suffered any material shortage or any cessation or interruption of inventory shipments, supplies or ordinary services;

(xii)   cancelled or waived any Claims or rights of a material nature other than in the ordinary course of business;

20

(xiii)    compromised or settled any litigation, proceeding or other governmental action relating to the Corporation, its assets or the Business, save in the ordinary course of business;

(xiv)    cancelled or reduced any insurance coverage;

(xv)     made any material change in any method of accounting practice;

(xvi)    written off any accounts receivable individually or in the aggregate which exceeds $250,000;

(xvii)   mortgaged, pledged, hypothecated, subjected to lien, granted a security interest in or otherwise encumbered any of their respective assets or property, whether tangible or intangible; or

(xviii)  authorized, agreed, or otherwise become committed to do any of the foregoing.

4.13    **Non-Arm's Length Transactions.**    To the Knowledge of the Vendor, Schedule 4.13 sets forth a complete and accurate list (including the name of the parties) of all Contracts between each Target Entity, on the one hand, and the Vendor or any of its Affiliates on the other. Other than amounts payable to Vendor or its Affiliates under the Contracts listed in Schedule 4.13, no Target Entity has any Related Party Debt or any liability, obligation, or commitment, actual or contingent, in respect of any Related Party Debt to be repaid, forgiven or otherwise extinguished as of the Closing Date.

4.14    **Intentionally Omitted.**

4.15    **Tax Matters.** Except as set forth in Schedule 4.15:

(i)      The Target Entities have duly and timely filed all its tax returns with all appropriate taxing authorities. Each such tax return was true, correct and complete in all material respects. All taxes due and payable by the Target Entities for periods (or portions thereof) ending on or before the Closing Date (whether or not shown due on any tax returns and whether or not assessed or reassessed by the appropriate taxing authority) have been paid, except as contested in good faith, and, where payment is not yet due and payable.

(ii)     The Target Entities have duly and timely withheld or collected the proper amount of Taxes that are required by law to be withheld or collected (including Taxes and other amounts required to be withheld by it in respect of any Person, including any employee, officer or director and any person not resident in the applicable jurisdiction for purposes of the applicable Laws in such jurisdiction and have duly and timely remitted to the appropriate taxing authority such taxes and other amounts required to be remitted by the Target Entities, except as contested in good faith and where payment is not yet due and payable.

(iii)    No taxing authority of a jurisdiction in which any Target Entity has not filed a tax return has made any claim that a Target Entity is or may be subject to tax or required to file tax returns by such a taxing authority in such jurisdiction. There is no basis for a claim that any Target Entity is subject to Tax in a jurisdiction in which a Target Entity does not file tax returns.

(iv)     No Target Entity has waived any statute of limitation in respect of Taxes or agreed to any extension of time within which: (i) to file any tax return covering any taxes for which a Target Entity is or may be liable; (ii) a Target Entity is required to pay or remit amounts

21

on account of Taxes; or (iii) any taxing authority may assess or collect taxes for which a Target Entity may be liable.

(v)     Adequate provision has been made in accordance with IFRS in the books and records of the Target Entities for all taxes payable in respect of a Target Entities' business or its assets.

(vi)    No Target Entity has received any notice from any taxing authority that it is taking steps to assess any additional taxes against a Target Entity for any period for which tax returns have been filed and, to Vendor's Knowledge, save as set out in Schedule 4.15, there are no actual or pending audit investigations or other Actions of or against a Target Entity by any taxing authority relating to taxes. No taxing authority has given notice of any intention to assert any deficiency or claim for additional taxes against any Target Entity.

(vii)   No Target Entity is a party to, or bound by, any tax indemnity, tax sharing or tax allocation agreement.

4.16    **No Joint Venture Interests, etc.**  To the Knowledge of the Vendor, and except as set forth in Schedule 4.16, no Target Entity is a partner, beneficiary, trustee, co-tenant, joint venturer or otherwise a participant in any partnership, trust, joint venture, co-tenancy or other similar jointly owned business undertaking and no Target Entity has any other investment interest in any business owned or controlled by any third party.

4.17    **Absence of Guarantees.**  To the Knowledge of the Vendor, except as set out in Schedule 4.17, none of the Target Entities has given or agreed to give, or is party to or bound by any guarantee or indemnity in respect of indebtedness for borrowed money or other obligations of any Person.

4.18    **Location of the Assets.**  All of the tangible assets of the Target Entities are located at the Leased Real Properties.

4.19    **Legal Matters.**  To the Knowledge of the Vendor:

(i)     other than the Pending Action(s) and investigations referred to in Schedule 4.19(i), and investigations referred to in the Vendor Data Room (the "**Pending Investigations**"), and other than any related matters or any other matters Known to the Purchaser and its Affiliates, there is no court, administrative, regulatory or similar proceeding, arbitration or other dispute settlement procedure; investigation or inquiry by any Governmental Authority, or any similar matter or proceeding (collectively, the "**Proceedings**") against or involving the Target Entities (whether in progress or threatened).  To the Knowledge of the Vendor, save as with respect to issues of CSAM and NCM and the Visa and Mastercard Events, no event has occurred which is reasonably expected to give rise to any Proceedings and there is no judgment, decree, injunction, rule, award or order of any court, government department, board, commission, agency, arbitrator or similar body outstanding against the Target Entities. Other than the Pending Actions, Pending Investigations, any matters related to the Pending Actions and Pending Investigations, and any matters Known to the Purchaser and its Affiliates, no complaint, grievance, Claim or investigation has been filed, made, commenced or threatened against the Target Entities which remains outstanding. None of the Target Entities is plaintiff or complainant in any Proceedings. There is no settlement agreement, judgment, injunction, order, or decree binding upon any of the Target Entities which has or would have the effect of prohibiting or materially impairing any current business practice of a Target Entities, any acquisition of property by a Target Entity or the overall conduct of the Business as currently conducted by a Target Entity.

HIGHLY CONFIDENTIAL                                                      Tassillo_Fleites_00000872

None of the Target Entities has entered into any agreement under which a Target Entity is restricted from selling, licensing or otherwise distributing any of its products or services to any class of customers, in any geographic area, during any period or in any market or market segment. Schedule 4.19(i) sets out an accurate list of all Pending Actions and Pending Investigations, including, with respect to the Pending Actions, a list of all pleadings and motions associated therewith and the current status of each such Pending Action provided, however, that Schedule 4.19(i) need not include a list of any pleadings or motions that have been publicly filed or are otherwise publicly available;

(ii)     there are no outstanding or threatened order, writ, injunction, or decree of any court, Governmental Authority, or arbitration tribunal against any of the Target Entities affecting, involving, or relating to the Business or the properties and assets of a Target Entity. The Target Entities are, in all material respects, in compliance with applicable Law affecting, involving, or relating to the Business or its properties and assets and the Target Entities has not received any notices of any allegation of any violation of applicable Law, save as (x) stipulated in the Pending Actions and the Pending Investigations, or (y) for alleged violations of the General Data Protection Regulation which are Known to the Purchaser;

(iii)    Schedule 4.19(iii) set out a complete summary of the Vendor's Knowledge with respect to the actions taken by the Corporation to monitor content on its website in respect of certain allegations of the publication and distribution of child sexual abuse materials or material as to which consent was allegedly not given by all depicted individuals for generation or publication, as well as alleged related failures to comply with applicable privacy and data protection laws; and

(iv)     the Vendor Data Room contains all materials, including opinions and memorandums, from counsel to any of the Target Entities and/or the Vendor with respect to the Pending Actions and there has been no change to such information uploaded to the Vendor Data Room since the date posted to the Vendor Data Room website.

4.20    **Authorizations.**  To the Knowledge of the Vendor, the Target Entities own, hold, possess or lawfully use in the operation of the Business all Authorizations that are required for the conduct of the Business. The Target Entities are in compliance, in all material respects, with all terms and conditions of any such required Authorizations. All of the Authorizations are valid, subsisting and in good standing and in full force and effect, and, to the Knowledge of the Vendor, no suspension or cancellation of any of them has occurred.

4.21    **Restrictive Covenants.**  To the Knowledge of the Vendor, none of the Target Entities is a party to, or bound or affected by any commitment, agreement or document containing any covenant expressly limiting the freedom of a Target Entity to compete in any line of business, transfer or move any of its assets or operations or which materially or adversely affects the business practices, operations or conditions of a Target Entity or the continued operation of the Business after the Closing Date on substantially the same basis as its business is presently carried on.

4.22    **Intellectual Property.**  To the Knowledge of the Vendor, Schedule 4.22 sets forth an accurate and complete list of all patents and patent applications, rights in designs, unregistered or common law trademarks, registered trademarks and trademark applications, unregistered or common law copyrights, registered copyrights and copyright applications owned by or licensed to the Target Entities. The Intellectual Property set forth in Schedule 4.22 comprises all material intellectual property used for the proper carrying on of the Business. The Intellectual Property which is not owned by the Target Entities is being used by the Target Entities only with the consent of or license

23

from the rightful owner thereof and all such licenses are in full force and effect. The Intellectual Property owned by the Target Entities is valid and subsisting and has not been used or enforced or failed to be used or enforced by the Target Entities in a manner that would result in the abandonment, cancellation, or unenforceability of any such Intellectual Property. Except as set out in Schedule 4.22, the Target Entities are not a party to any Material Contract to pay any royalty, license, or other fee in respect of the use of Intellectual Property. In addition, to the Knowledge of the Vendor: (i) the conduct of the Business does not involve any infringement, misuse, or misappropriation of any Intellectual Property rights of third parties; (ii) no infringement, misuse or misappropriation of the Intellectual Property owned by the Target Entities has occurred; and (iii) there are no known material problems or defects in any software used in connection with the Business.

4.23    **Real Property.**  None of the Target Entities is the owner of any real property nor has it entered into any agreement to purchase any real property.

4.24    **Real Property Lease.**  Each of the Leases for the Leased Real Properties is in good standing, creates a good and valid leasehold estate in the Leased Real Properties thereby demised and is in full force and effect as of the Closing Date.  To the Knowledge of the Vendor, other than as set forth in Schedule 4.24 or as Known to the Purchaser or its Affiliates, the Target Entities are not in violation, contravention or in breach of any Lease for the Leased Real Properties.  There are no written or oral agreements, leases, undertakings, subleases, licenses, concessions, occupancy agreements or other Contracts granting to any other Person the right of use or occupancy of any of the Leased Real Properties (or any portion thereof), and there is no other Person in possession of all or any portion of the Leased Real Properties. Complete and accurate copies of the Leases for the Leased Real Properties, including all amendments, modifications, notices or memoranda of lease, all estoppel certificates or subordinations, non-disturbance and attornment agreements and other documents related thereto, as of the date hereof, have been delivered to the Purchaser. There are no Contracts (other than as contained in the Leases for the Leased Real Properties) pertaining to the rights and obligations of the parties to the Leased Real Properties or relating to the use and occupation of the properties under the Leased Real Properties. All rental and other payments required to be paid or made by the Target Entities pursuant to the Leases for the Leased Real Properties have been duly paid or made to date, and the Target Entities are not in default in meeting its obligations under any of the Leases for the Leased Real Properties. There exists no event of default or event, occurrence, condition or act on the part of the Target Entities (including the transactions contemplated by this Agreement) which would constitute a default under any Lease for the Leased Real Properties.

4.25    **Environmental Matters.**  To the Knowledge of the Vendor, all operations of the Target Entities are conducted on the Leased Real Properties and each Leased Real Property itself while occupied by the Target Entities have been and are now, to the Knowledge of the Vendor, in material compliance with all Environmental Laws.  Except as may be necessary for the operation of the Business, there are no Hazardous Substances in or on the Leased Real Properties.  The Target Entities have not been required by any Governmental Authority to: (i) alter any of the Leased Real Properties to be in material compliance with Environmental Laws; or (ii) perform any environmental closure, decommissioning, rehabilitation, restoration or post-remedial investigations, on, about or in connection with any Leased Real Property.

4.26    **Material Contracts.**  To the Knowledge of the Vendor, Schedule 4.26 sets forth a list of the Material Contracts to which any Target Entity is a party and:

(i)    the transactions contemplated by this Agreement will not result in any change to any

24

material terms of the Material Contracts other than the Shareholders' Agreement and the Senior and Subordinated Debt Agreements;

(ii)    each Material Contract is a valid and binding obligation of the applicable Target Entity that it is a party thereto and enforceable by or against such Target Entity in accordance with its terms, and is in full force and effect and will be in full force and effect on identical terms immediately following the Closing Date, subject, however, to such limitations with respect to enforcement as are generally imposed by Law on creditors, in particular without limitation, in connection with bankruptcy or similar proceedings, and to the extent that equitable remedies such as specific performance and injunction are in the discretion of the competent court; and

(iii)    except for the Senior and Subordinated Debt Agreement, none of the Target Entities or, to the Knowledge of the Vendor, any other party thereto is in material breach of or default under (or is alleged to be in breach of or default under) in any material respect or has provided or received any notice of any intention to terminate, any Material Contract. Other than as set forth in Schedule 4.26(iii), no event or circumstance has occurred with respect to a Target Entities that, with notice or lapse of time or both, would constitute an event of default by such Target Entity under any Material Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder. No Target Entity has repudiated any such Material Contract.

4.27    **Other Contracts.**  To the Knowledge of the Vendor, with respect to any Contracts to which a Target Entity is a party that are not Material Contracts, such Target Entity has not violated or breached any of the terms or conditions of any such Contract and all of the covenants to be performed by any other party to such Contracts have been fully performed in all respects, except where such violation or breach or failure to fully perform any such covenant would not reasonably be expected to have a Material Adverse Effect on the Corporation, or the continued operation of the Corporation on or after the Closing Date as currently conducted.

4.28    **Employee and Independent Contractor Matters.**  To the Knowledge of the Vendor, except as set forth on Schedule 4.28:

(i)    no Employee is on long-term disability leave, maternity leave, extended absence or receiving worker's compensation;

(ii)    each Target Entity is in material compliance with all Laws respecting employment and employment practices, terms and conditions of employment, pay equity and wages and hours and has not and is not engaged in any unfair labour practice;

(iii)    no unfair labour practice, complaint or grievance against a Target Entity is pending or, to the Knowledge of the Vendor, threatened before any labour relations board or similar Governmental Authority with respect to the Business;

(iv)    all vacation pay, bonuses, commissions and other benefit payments due to current and former employees of the Target Entities have been accrued in the ordinary course of business consistent with past practice;

(v)    all required employer and employee contributions and premiums under the Benefit Plans of each Target Entity have been made or accrued, the respective fund or funds established under the Benefit Plans of such Target Entity are funded in accordance with applicable

HIGHLY CONFIDENTIAL

Tassillo_Fleites_00000875

Laws, and no past service funding liabilities exist thereunder, except as disclosed in Schedule 4.28(v);

(vi)    there are no charges, investigations, administrative proceedings, or formal complaints of discrimination (including discrimination based upon sex, age, marital status, race, national origin, sexual preference, handicap, or veteran status) pending or threatened before any Governmental Authority pertaining to any Target Entity or the Employees, save and except as disclosed in Schedule 4.28(vi);

(vii)    no Employee has any agreement as to length of notice or severance payment required to terminate his or her employment (including any notice or severance payment that would arise as a result of the completion of the transactions contemplated by this Agreement), other than such results by Law from the employment of an Employee as to notice or severance or as otherwise set out in any written contract of employment;

(viii)    any Person now or heretofore engaged by a Target Entity as a consultant or independent contractor, rather than an employee, has been properly classified as such (to the Knowledge of the Vendor), and is not entitled to any compensation or benefits to which employees are or were at the relevant time entitled, were and have been engaged in accordance with all applicable Laws, and has been treated accordingly and appropriately for all Tax purposes. No consultant or independent contractor is in material violation of any agreement between such consultant or independent contractor and a Target Entity, or of any policy or procedure applicable of a Target Entity to consultants or independent contractors; and

(ix)    none of the Target Entities has an obligation or liability (whether accrued, absolute, contingent or otherwise), including under any Benefit Plan, arising out of the classification or treatment of any service provider as a consultant or independent contractor and not as an employee.

4.29    **Collective Agreements.** None of the Target Entities is subject to any agreement with any labour union or employee association and has not made any commitment to or conducted negotiations with any labour union or employee association with respect to any future agreement and during the period of three years preceding the date of this Agreement there has been no attempt to organize, certify or establish any labour union or employee association in relation to any of the employees of a Target Entity. There is not now pending nor, to the Knowledge of the Vendor, threatened any labour dispute, strike or work stoppage which affects, or which may affect the Business. There is not now, pending nor, to the Knowledge of the Vendor, threatened any material Claim, charge, grievance or complaint against a Target Entity in connection with the Business by any Employee or former employee, and no Target Entity is a party to any material claims or proceedings under applicable labour legislation in connection with the Business.

4.30    **Benefit Plans.** All required contributions and/or premiums to be made under the Benefit Plans of the Target Entities have been fully paid to the date hereof in a timely fashion in accordance with the terms of the Benefit Plans of the Target Entities and applicable Laws, and no Taxes, penalties or fees are owing or exigible under any Benefit Plan of a Target Entity, and there are no liabilities or contingent liabilities in respect of any pension, benefit or compensation plan that has been discontinued. No Benefit Plan of a Target Entity is subject to any pending investigation, examination or other proceeding, action or Claim initiated by any Governmental Authority, or by any other party (other than routine Claims for benefits). None of the Target Entities has ever maintained, sponsored, or contributed to a defined benefit pension plan for the benefit of the Employees or former employees. No Benefit Plan of a Target Entity exists that will result in (i)

26

the payment to any Employee of any money, benefits or other property; (ii) accelerated or increased funding requirements for any Benefit Plan of such Target Entity; or (iii) the acceleration or provision of any other increase rights or benefits to any Employee, in each case, as a result of the transactions contemplated by this Agreement.

4.31    **Insurance.** The Target Entities maintain such policies of insurance, issued by responsible insurers, as have been able to be obtained for its operations, property and assets, in such amounts and against such risks as have been made available by its insurers. All such policies of insurance are in full force and effect and none of the Target Entities is in default, as to the payment of premiums or otherwise, under the terms of any such policy and no Target Entity has failed to give any notice or to present any claim under any insurance policy in a due and timely fashion. Complete and accurate copies of all insurance coverage policies have been delivered or made available to the Purchaser and of which the Purchaser acknowledges receipt. The Purchaser is aware that the Target Entities have not been able to obtain insurance coverage for errors & omissions, directors and officers liability and cyber attacks and various other matters and, for the avoidance of doubt, the failure to procure or maintain such insurance shall not be deemed to be a breach or violation of the terms of this Agreement.

4.32    **Minute Books.** To the Knowledge of the Vendor, the corporate records and minute books of the Target Entities (including any amalgamated predecessor corporations) contain, in all material respects, complete and accurate minutes of all material meetings of the directors and shareholders of the Target Entities held since the incorporation of each such Target Entity, all material decisions of the directors and shareholders of the Target Entities made since the last directors' and shareholders' meeting, respectively, have been ratified by the directors and shareholders, and the share certificate book, register of shareholders, register of transfers and register of directors of the Target Entities are complete and accurate. Such corporate records and minute books are complete and accurate in all material respects and all corporate proceedings and actions reflected therein have been conducted or taken in compliance with all applicable Laws in all material respects and with the constating documents of the Target Entities. Such corporate records and minute books have been made available to the Purchaser and of which the Purchaser acknowledges receipt.

4.33    **Anti-Spam Compliance.** To the Knowledge of the Vendor, each Target Entity carries on and has carried on the Business in compliance, in all material respects, with all applicable Laws relating to the sending of spam or unsolicited electronic messages, including Canada's Anti-Spam Legislation (CASL) ("**Spam Laws**"), and has not been, and is not in breach, default or violation of any applicable Spam Laws, in each case, to the extent such breach, default or violation would reasonably be expected to have a Material Adverse Effect. The Target Entities have developed and materially comply with a policy or policies regarding anti-spam consistent with applicable Spam Laws. No Target Entity is subject of a complaint, audit, review or inquiry or similar Proceeding, made under any Spam Law.

4.34    **Books and Records.** To the Knowledge of the Vendor, the books of account and financial records of the Target Entities reflect, in all material respects, all transactions of the Target Entities and have been kept on a basis consistent with those of preceding accounting periods, other than (x) the inclusion of notes to financial statements as required under IFRS (except as outlined in the definition of Corporation Financial Statements, Quarterly Corporation Financial Statements and Monthly Financial Statements) and (y) liabilities arising in connection with the Pending Actions and the Pending Investigations, and have been fully, properly and accurately kept and completed in all material respects and such books and records have been maintained for such duration as required by Law.

HIGHLY CONFIDENTIAL                    Tassillo_Fleites_00000877

4.35    **Bankruptcy.** No bankruptcy, insolvency or receivership proceedings have been instituted or are pending against any of the Target Entities, nor has a Target Entity made a voluntary assignment in bankruptcy.

4.36    **Indebtedness.** To the Knowledge of the Vendor, except as set out in the Corporation Financial Statements and in Schedule 4.36 and except to the extent Known by the Purchaser and its Affiliates, none of the Target Entities have any liabilities or obligations of any nature other than those incurred in the ordinary course of business, or as may be proven by judgment in the Pending Actions, Pending Investigations, or any other similar actions or proceedings.

4.37    **No Brokers.** There is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of the Target Entities who might be entitled to any fee or commission from the Purchaser or a Target Entity upon consummation of the transactions contemplated by this Agreement.

4.38    **Full Disclosure.** To the Knowledge of the Vendor, none of the foregoing representations, warranties and statements of fact contains any untrue statement of material fact or omits to state a material fact necessary to make any such statement, warranty or representation not misleading. As a condition of closing, all of the representations, warranties, and agreements of the Vendor contained in this Article 4.00 shall be true and correct and in full force and effect on and as of the Closing Date.

## ARTICLE 5.00 – REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE VENDOR

The Vendor hereby represents and warrants to the Purchaser that all the statements set out in this Article are correct and complete as of the date hereof and acknowledges that the Purchaser is relying on such representations and warranties in entering into this Agreement and the Ancillary Agreements to which it is a party and completing the transactions contemplated herein and therein.

5.01    **Authority.** The Vendor is duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation and has all necessary corporate power and authority to execute and deliver this Agreement and each Ancillary Agreement to which it is a party and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and each Ancillary Agreement by the Vendor, the performance by the Vendor of its obligations hereunder and thereunder and the consummation by the Vendor of the transactions contemplated herein and therein have been duly and validly authorized by all necessary corporate or other action on the part of the Vendor, and no other corporate or other proceeding on the part of the Vendor is necessary to authorize this Agreement or any Ancillary Agreement to which it is a party or the performance by the Vendor of its obligations hereunder or thereunder or to consummate the transactions contemplated herein and therein. The Vendor has duly and validly executed and delivered this Agreement and has (or will prior to Closing) duly execute and deliver each Ancillary Agreement to which it is a party. Assuming the due authorization, execution and delivery by the Purchaser of this Agreement and the Ancillary Agreements (as applicable), this Agreement and such Ancillary Agreements constitute a legal, valid and binding obligation of the Vendor, enforceable against the Vendor in accordance with their respective terms (subject to any limitation on enforcement under applicable Laws relating to (i) bankruptcy, winding-up, insolvency, arrangement and other Laws of general application affecting the enforcement of creditors' rights, and (ii) the discretion that a court may exercise in the granting of extraordinary remedies such as specific performance and injunction).

28

5.02    **Restrictive Documents.**    Other than restrictions on transferring securities as set out in the constating documents of the Corporation and applicable corporate and securities Laws and subject to the Authorizations that are required to conduct the Business and consents required pursuant to the Shareholders' Agreement the Vendor is not subject to, or a party to, any charter or by-law restriction, Law, Claim, shareholders agreement, voting trust, contract, instrument, indenture, mortgage, lease, agreement, obligation, statute, regulation, order, judgment, decree, licence, or permit which would be violated, contravened, breached by, or under which default would occur, in each case by the Vendor, or any Lien or any other restriction of any kind or character which would prevent the consummation of the transactions contemplated by this Agreement or compliance with the terms, conditions and provisions of this Agreement, or which would restrict the ability of the Vendor to sell any of the Purchased Shares to the Purchaser.

5.03    **Title to Securities.**    The Vendor is the sole registered holder and beneficial owner of all the Purchased Shares set forth in the attached Exhibit "A". Such Purchased Shares are owned by the Vendor with good, valid and marketable title thereto, free and clear of all Liens other than the rights of the Purchaser under this Agreement, Liens and restrictions on transferring such shares in the Shareholders' Agreement and applicable corporate and securities Laws. Prior to the Closing, all Purchased Shares will be owned by the Vendor, with good, valid and marketable title thereto, free and clear of all Liens other than the rights of the Purchaser under this Agreement, Liens and restrictions on transferring such shares in the Shareholders' Agreement and applicable corporate and securities Laws. Except for Consents required pursuant to the Shareholders' Agreement, the Vendor has the exclusive right to dispose of the Purchased Shares to be sold by the Vendor to the Purchaser pursuant to this Agreement and no Person (other than the Vendor) has any written or oral agreement, option, warrant, or any right or privilege (whether by law, pre-emptive or contractual) capable of becoming such for the purchase or acquisition of such Purchased Shares. All rights and powers to vote the Purchased Shares set forth in Exhibit "A" are held exclusively by the Vendor. The delivery of the share certificates representing the Purchased Shares to be sold by the Vendor to the Purchaser pursuant to the provisions hereof on the Closing Date will transfer to the Purchaser valid title to such Purchased Shares, free and clear of all Liens other than restrictions on transferring such shares as set out in the Shareholders' Agreement and applicable corporate and securities Laws. The Purchased Shares to be sold by the Vendor pursuant to this Agreement are, other than as provided for above, not subject to the terms of any other shareholders agreement, voting trust agreement, share pledge agreement or similar agreement.

5.04    **Regulatory Approvals.**    No Authorization is required on the part of the Vendor in connection with the execution, delivery and performance of this Agreement or any Ancillary Agreement to which each Vendor is a party or the performance of the Vendor's obligations under this Agreement or any Ancillary Agreement to which the Vendor is a party and, there is no requirement for the Vendor to make any filing with or give any notice to any Governmental Authority as a condition to the lawful completion of the transactions contemplated by this Agreement and the Ancillary Agreements.

5.05    **Litigation.**    Other than the Pending Actions, the Pending Investigations and any similar matters and other than as Known to the Purchaser and its Affiliates, there is no suit, action, litigation, investigation, Claim, complaint, grievance or proceeding, including, without limitation, any appeal or application for review, in progress, pending or, to the Knowledge of the Vendor, threatened against or relating to the Vendor or which may prohibit, restrict or delay the completion by the Vendor of the transactions contemplated by this Agreement, at law or in equity, before any court, governmental department, commission, board, bureau, agency or arbitrator or instrumentality, domestic or foreign.

HIGHLY CONFIDENTIAL                Tassillo_Fleites_00000879

5.06    **Consents.**  Except as set out in Schedule 4.07, no Consent, waiver, approval, authorization, exemption, registration, license or declaration of or by or filing with or notification to any Person is required to be made or obtained by the Vendor in connection with (i) the execution and delivery by the Vendor of this Agreement or any Ancillary Agreement to which it is a party; or (ii) the consummation of any transactions provided for herein involving the Vendor.

5.07    **No Benefits.**  Other than the rights described in Section 7.10, there is no agreement, commitment or understanding pursuant to which the Vendor (or an Affiliate of the Vendor) received or is entitled to receive, directly or indirectly, any consideration in connection with any Contract entered into by a Target Entity.

5.08    **No Brokers.**  There is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of the Vendor who might be entitled to any fee or commission from the Purchaser, the Corporation or any Target Entity upon consummation of the transactions contemplated by this Agreement.

5.09    **Bankruptcy.**  No bankruptcy, insolvency or receivership proceedings have been instituted or are pending against the Vendor, nor has the Vendor made a voluntary assignment in bankruptcy or a proposal to creditors.

5.10    **Full Disclosure.**  None of the foregoing representations or statements of fact contains any untrue statement of material fact or omits to state any material fact necessary to make any such statement or representation not misleading to a prospective purchaser of the Purchased Shares seeking full disclosure of all material information as to the business and affairs of the Vendor.  As a condition of Closing, all of the representations, warranties, and agreements of the Vendor contained in this Article 5.00 shall be true and correct and in full force and effect on and as of the Closing Date.

## ARTICLE 6.00 - REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE PURCHASER

The Purchaser represents and warrants to the Vendor that all of the statements set out in this Article are true, correct and complete as of the date hereof and acknowledges that the Vendor is relying on such representations and warranties in entering into this Agreement and the Ancillary Agreements to which it is party and completing the transactions contemplated herein and therein.

6.01    **Organization and Authority.**  The Purchaser is duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation and has all necessary corporate power and authority to execute and deliver this Agreement and each Ancillary Agreement to which it is a party and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and each Ancillary Agreement by the Purchaser, the performance by the Purchaser of its obligations hereunder and thereunder and the consummation by the Purchaser of the transactions contemplated herein and therein have been duly and validly authorized by all necessary corporate or other action on the part of the Purchaser, and no other corporate or other proceeding on the part of the Purchaser is necessary to authorize this Agreement or any Ancillary Agreement to which it is a party or the performance by the Purchaser of its obligations hereunder or thereunder or to consummate the transactions contemplated herein and therein.  This Agreement and each Ancillary Agreement to which the Purchaser is a party has been duly and validly executed and delivered by the Purchaser, and (assuming due authorization, execution and delivery by the other parties hereto and thereto) this Agreement and each Ancillary Agreement to which the Purchaser is party constitutes a legal, valid and binding obligation of the Purchaser enforceable against the Purchaser in accordance with

30

its terms, subject only to any limitation under applicable Laws relating to: (i) bankruptcy, winding-up, insolvency, arrangement, fraudulent preference and conveyance, assignment and preference and other similar laws of general application affecting creditors' rights, and (ii) the discretion that a court may exercise in the granting of equitable remedies such as specific performance and injunction. No bankruptcy, insolvency or receivership proceedings have been instituted or are pending against the Purchaser and, as of the date hereof, the Purchaser represents and warrants to the Vendor that the Purchaser expects to be able to satisfy its payment obligations as they become due pursuant to this Agreement and the Ancillary Agreements.

6.02    <u>No Conflict.</u>  The execution and delivery by the Purchaser of this Agreement and each Ancillary Agreement to which it is a party and the performance by the Purchaser of its obligations hereunder and the completion of the purchase of the Purchased Shares do not and will not result in a violation of, default under or breach of: (A) the Purchaser's memorandum and articles of association, including any shareholders' agreement or any other agreement or understanding with any Person; (B) any Contract or other instruments to which the Purchaser is a party or pursuant to which its respective assets or property may be affected; or (C) any applicable Laws.

6.03    <u>Intentionally Omitted.</u>

6.04    <u>Regulatory Approvals.</u>  No Authorization is required on the part of the Purchaser in connection with the execution, delivery and performance of this Agreement or any Ancillary Agreement to which they are a party or the performance of the Purchaser's obligations under this Agreement or any Ancillary Agreement to which the Purchaser is a party and there is no requirement for the Purchaser to make any filing with or give any notice to any Governmental Authority as a condition to the lawful completion of the transactions contemplated by this Agreement and the Ancillary Agreements.

6.05    <u>Consents.</u>  No Consent, waiver, approval, authorization, exemption, registration, license or declaration of or by or filing with or notification to any Person is required to be made or obtained by the Purchaser in connection with (i) the execution and delivery by the Purchaser or enforcement against the Purchaser of this Agreement or any Ancillary Agreement to which the Purchaser is a party; or (ii) the consummation of any transactions provided for herein.

6.06    <u>Full Disclosure.</u> None of the foregoing representations, warranties and statements of fact contains any untrue statement of material fact or omits or omits to state any material fact necessary to make any such statement, warranty or representation not misleading to the Vendor. As a condition of Closing, all of the representations, warranties, and agreements of the Purchaser contained in this Article 6.00 shall be true and correct in all material respects and in full force and effect on and as of the Closing Date.

### ARTICLE 7.00 - COVENANTS OF THE VENDOR, THE PURCHASER AND THE CORPORATION AND DELEGATION OF AUTHORITY

7.01    The Vendor hereby covenants and agrees with the Purchaser that, at the Closing Date, it will take all necessary steps and proceedings to permit all the applicable Purchased Shares to be duly transferred to the Purchaser.

7.02    The Purchaser hereby covenants and agrees with the Vendor that, on the Closing Date, it will do or cause to be done the following:

HIGHLY CONFIDENTIAL                    Tassillo_Fleites_00000881

(i)    deliver to the Purchaser's counsel, in trust (or as the Vendor may otherwise direct), by wire transfer of immediately available funds in the aggregate amount of the Closing Date Cash Payment as contemplated by Section 3.02(i); and

(ii)    deliver to the Vendor, a pledge agreement(s) of Purchased Shares and ECP Shares as security for the payments due from time to time under this Agreement including, without limitation, Monthly Payments and Earnout and any unpaid default interest and penalties due thereon, in the form attached hereto as Exhibit "B", together with all consents and waivers of shareholders of the Corporation and the Corporation that are required under Section 5.5 of the Shareholders Agreement (the "**Share Pledge Agreement**").

7.03    **Pre-Closing Conduct of Vendor.**  During the Pre-Closing Period, the Vendor covenants and agrees to use its best efforts to (as applicable) (a) do the following, or (b) cause the Corporation to:

(i)    carry on the Business in substantially the same manner as heretofore carried on;

(ii)    take all actions to ensure that the representations and warranties of the Vendor in this Agreement remain true and correct at Closing, with the same force and effect as if such representations and warranties were made at and as of Closing;

(iii)    not acquire, sell, transfer, lease, mortgage, pledge, encumber or otherwise dispose of any of the assets of the Business other than in the ordinary course of business or with the express written consent of Purchaser;

(iv)    not enter into any transaction without the prior written consent of the Purchaser, which, if entered into before the Closing Date, would reasonably be expected to cause any representation or warranty of the Vendor contained herein to be incorrect or constitute a breach of any covenant or agreement of the Vendor contained herein;

(v)    not enter into any new agreements, instruments, leases, arrangements, or commitments relating to the Business which are not terminable on thirty (30) days' notice without penalty and which would have been a Material Contract if entered into prior to the date of this Agreement, or any material amendments to any existing Material Contract;

(vi)    not grant any salary or wage increase to any executive officer, or enter into any new employment, agency, or consulting agreement with any executive officer or amend or alter any existing employment, agency, or consulting agreement with any executive officer to the detriment of the Target Entities or establish, enter into or amend or materially alter any benefit plan(s) or similar arrangements with respect to any executive officer without the prior written consent of the Purchaser;

(vii)    maintain in full and good standing all policies of insurance maintained by the Corporation and to present all claims under such policies in a due and timely manner, in each case, except where the failure to take any such action would not reasonably be expected to result in a Material Adverse Effect;

(viii)    maintain in full and good standing all relevant licenses except where the failure to take any such action would not reasonably be expected to result in a Material Adverse Effect;

(ix)    comply with all applicable Laws affecting the operation of the Business in all material respects;

(x)    not suffer or permit any new Lien (other than Permitted Liens) to attach to or affect any of the Purchased Shares;

HIGHLY CONFIDENTIAL

Tassillo_Fleites_00000882

(xi)    promptly advise the Purchaser in writing of the following to the extent the Vendor has Knowledge thereof:

(a)    any Material Adverse Effect during the Pre-Closing Period or the occurrence of any development in the business or affairs of the Target Entities which is likely, in the reasonable judgment of the Vendor, to result in a Material Adverse Effect, or materially affects the value of the Purchased Shares;

(b)    any material developments in the business or operations of the Target Entities during the Pre-Closing Period;

(c)    the discovery by the Vendor or the Corporation of any event, condition, fact or circumstance that occurred or existed on or prior to the date of this Agreement and that caused or constitutes a breach of any representation or warranty made by the Vendor in this Agreement;

(d)    any event, condition, fact or circumstance that occurs, arises or exists after the date of this Agreement and that would cause or constitute a breach of any representation or warranty made by the Vendor in this Agreement if (A) such representation or warranty had been made as of the time of the occurrence, existence or discovery of such event, condition, fact or circumstance, or (B) such event, condition, fact or circumstance had occurred, arisen or existed on or prior to the date of this Agreement; and

(e)    any event, condition, fact or circumstance that is reasonably expected to make the timely satisfaction of any of the conditions set forth in Section 9.01 impossible or unlikely.

(xii)    approve any material changes in the strategy of the Business which would result in the segregation of any content on any of the Corporation's platforms which are or may potentially be non-compliant with any Laws, regulations, rules or orders;

(xiii)    deliver to the Purchaser monthly unaudited financial statements of the Corporation and, upon request by the Purchaser, provide the Purchaser with any reasonable additional information with respect to the Corporation and the Target Entities that the Purchaser may require (such financial statements, documents and other information so delivered to the Purchaser, the "**Interim Period Materials**"); and

(xiv)    authorize, agree, or otherwise become committed to do any of the foregoing.

7.04    **Conduct of the Purchaser.** From the Closing Date until the full repayment of all of the Purchaser's payment obligations to the Vendor herein, the Purchaser covenants and agrees to use its commercially reasonable efforts to comply in all material respects with all applicable Laws affecting the operation of its business in all material respects.

7.05    **Updates to Schedules**. If any event, condition, fact or circumstance occurring or discovered after the date of this Agreement (each, a "**Matter**") would require a change to the Schedules assuming the Schedules were dated or the applicable representation or warranty was made on and as of the date of the occurrence, existence or discovery of such event, condition, fact or circumstance, then the Vendor shall promptly deliver to the Purchaser an update to the Schedules specifying such change (the "**Update**"). Upon its receipt of any Update that includes any Matter that would have prevented the Vendor from satisfying the condition set forth in Section 9.01(ii) had such Matter not

33

been in the Schedules, the Purchaser may terminate this Agreement by providing written notice to the Vendor within ten (10) Business Days following the Purchaser's receipt of such Update. If the Purchaser proceeds to the Closing after delivery of such Update, then such Update shall supplement and amend the Schedules for all purposes under this Agreement.

7.06    **Prohibition on Communications**. During the Pre-Closing Period, none of the Vendor or its Affiliates shall, nor shall any of them cause any other Person to, directly or indirectly, solicit or contact:

(i)    any customer or supplier of a Target Entity, as it relates to any Target Entity, the Business or the Sale Transaction; or

(ii)    any party, including the news media, as it relates to any Target Entity, the Business or the Sale Transaction.

Notwithstanding the foregoing, (a) Vendor or its Affiliates may contact such Person's representatives, and (b) in the event that Vendor, its Affiliates, or their respective representatives are requested pursuant to, or required by, applicable Law, regulation or legal process to have contact with a party (including, without limitation, a regulatory or supervisory authority) in connection with any Target Entity, the Business, or the Sale Transaction, Vendor, such Affiliate, or such representative may have contact with such requesting party, in each case, without any violation whatsoever of this Section 7.06.

7.07    **Third Party Consultations.** During the Pre-Closing Period, the Purchaser shall be permitted to engage in discussions with                                    **Redacted - Privilege**

the Canadian Office of the Privacy Commissioner and any criminal and civil litigation counsel of the Target Entities with respect to certain matters that pertain to the Target Entities (the "**Third Party Consultations**"), provided such discussions would not reasonably be expected to impair any attorney or solicitor-client privilege (including the reliance of the common-interest doctrine), or any other privilege or confidentiality agreements upon which the Target Entities and/or the Vendor may rely. The Purchaser shall forthwith after consultation(s), provide the Vendor with the results of its consultation(s). Any information received by the Purchaser or its representatives in connection with the Third Party Consultation contemplated by this Section 7.07 shall be deemed to be confidential information.

7.08    **Clips4Sale.** If the Corporation receives any proceeds from the sale of the Clips4Sale Business, the Purchaser shall provide the Corporation with an irrevocable direction to direct such proceeds which would otherwise have been payable to the Vendor as shareholder of the Corporation prior to the Closing Date, less any applicable costs and Taxes, to the Vendor (or such Person as it may designate, as directed by the Vendor at such time).

7.09    Non-Solicitation.

(i)    During the Pre-Closing Period (the "**Exclusivity Period**"), the Vendor, to the extent legally capable, shall not, nor shall it authorize any of its Affiliates or representatives, and shall direct its Affiliates or representatives not, to directly or indirectly: (a) solicit, initiate or encourage, facilitate or take any action to facilitate an Acquisition Proposal, or which is reasonably likely to lead to any Acquisition Proposal; (b) participate in any discussions or negotiations with, or furnish any information, to any Person, other than the Purchaser, its Affiliates, or their respective representatives, relating to any Acquisition Proposal; or (c) enter into any agreement (whether or not binding) with respect to any Acquisition Proposal.

34

Following the Exclusivity Period, the Vendor shall be released from the exclusivity provisions contained herein without any liability to the Purchaser whatsoever.

(ii)   The Vendor shall immediately cease and cause to be terminated, and shall, to the extent legally capable, cause the Corporation and all of its representatives to immediately cease and cause to be terminated, all existing discussions or negotiations with any Persons conducted heretofore with respect to, or that could lead to, an Acquisition Proposal. The Vendor shall refrain from, and shall, to the extent legally capable, cause the Corporation and all of their respective representatives to immediately refrain from, any other discussions or negotiations with any Persons with respect to, or that could lead to, an Acquisition Proposal. The Vendor shall and shall cause, to the extent legally capable, the Corporation to promptly notify the Purchaser in writing if any proposals are received by, any information is requested from, or any negotiations or discussions are sought to be initiated and continued with the Vendor, any of the Vendor's Affiliates, the Corporation, or any of their representatives, in each case, in connection with an Acquisition Proposal.

(iii)   The Vendor agrees that the rights and remedies for noncompliance with this Section 7.09 shall include having such provision specifically enforced by any court having jurisdiction, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to the Purchaser and that money damages may not provide an adequate remedy to the Purchaser.

(iv)   Notwithstanding anything herein to the contrary, Section 7.06 and this Section 7.09 shall not restrict or otherwise prevent the Vendor and/or its Affiliates or their respective representatives from taking any and all actions in respect of or in connection with:

(a)   defending or otherwise dealing with any Pending Action or Pending Investigations;

(b)   communicating with the Target Entities and their respective legal counsel in connection with any Pending Action or Pending Investigations; and

(c)   obtaining equity or debt financing, or other liquidity which the Corporation reasonably determine is required for the continuation of the Business ("**Required Liquidity**"), to the extent the: (i) the Vendor have provided the Purchaser with at least five (5) Business Days' notice in writing of the Required Liquidity, such notice to specify in reasonable detail all material terms of such liquidity requirement including the quantum, all of which shall be on commercially reasonable terms; and (ii) the Purchaser and/or its Affiliates fail or decline to provide such Required Liquidity within five (5) Business Days after receipt of such notice.

In the case of Section 7.09(iv)(b), where the Purchaser and/or its Affiliates have failed or declined to provide the Required Liquidity, (x) the Vendor shall continue to keep the Purchaser informed of all developments in respect the Vendor and/or the Target Entities' search for equity or debt financing, or other liquidity including informing the Purchaser of the identity of the parties that the Vendor or any Target Entity have approached and the material terms of such discussions, and deliver to the Purchaser all written communications with such parties, and (y) provided the Vendor has complied with its obligations under Section 7.09(iv)(b)(i) and the Purchaser and/or its Affiliates fail or decline to provide the Required Liquidity within the timeline specified in Section 7.09(iv)(b)(ii), no breach of this Section 7.09, Section 7.06 or Section 13.13 shall be deemed to result from the discussions, negotiations, execution, consummation, or other actions taken by the Vendor and its representatives in connection with such Required Liquidity.

35

7.10    **Additional Purchaser Post-Closing Affirmative Covenants**. From the Closing Date until the date on which the Purchaser and Affiliates have satisfied all obligations to Vendor, the Purchaser shall and shall cause the Corporation and the Target Entities to:

(i)     preserve, renew and keep in full force and effect its existence, organization and status in its jurisdiction of incorporation and in each other jurisdiction in which it carries on business or owns assets and make all corporate, partnership and other registrations and filings necessary to do so, except where failure to do so would not reasonably be expected to result in a Purchaser MAE or an inability of Purchaser to fully satisfy all of its obligations under the Share Pledge Agreement;

(ii)    take all reasonable action to obtain and maintain in full force and effect all material permits, rights, privileges and licences necessary or desirable in the normal conduct of its business and the ownership of its assets, in each jurisdiction where it carries on business or owns material assets;

(iii)   comply in all material respects with all applicable law and the terms of its constating documents except to the extent that the failure to comply therewith would not, in the aggregate, reasonably be expected to have a Purchaser MAE or result in an inability of Purchaser to fully satisfy all of its obligations under the Share Pledge Agreement;

(iv)    maintain insurance with respect to its property and business, with financially sound and reputable insurance companies, in such amounts and covering such risks as are usually insured against by similar companies engaged in the same or a similar business;

(v)     keep proper books of records and accounts, in which full, true and correct entries in all material respects and in any event in conformity with IFRS, its constating documents and all applicable laws, of all dealings and transactions and assets in relation to its business and activities;

(vi)    duly file on a timely basis all tax returns required to be filed by it, and duly and punctually pay all Taxes as they become due and payable under applicable law unless they are being contested in good faith by appropriate proceedings and an adequate reserve has been set aside for payment of the contested amount;

(vii)   give written notice (in sufficient detail in Vendor's discretion acting reasonably) to the Vendor (the "**Asset Sale Notice**") prior to the occurrence of an Asset Sale comprising the assets of the Target Entities which notice shall set out the nature of the assets being sold, the purchase price therefor and the principle payment terms in respect thereof.   If the Purchaser has not received written notice of any objection from the Requisite Pledgees to such Asset Sale (an "**Asset Sale Objection**") within fifteen (15) Business Days from the date of the Vendor's actual receipt of the Asset Sale Notice (the "**Response Period**"), the Asset Sale may be consummated on the terms set forth in the Asset Sale Notice. For greater certainty, an Asset Sale Objection shall only be provided if the Vendor believes in good faith that the assets being sold are being sold for consideration below Fair Market Value. If the Purchaser receives an Asset Sale Objection within the Response Period, the Purchaser and the Vendor shall negotiate in good faith to resolve the Vendor's objection. If the Vendor's objection cannot be resolved within a fifteen (15) Business Day period from receipt by the Purchaser of the Asset Sale Objection, the Purchaser may, at its sole discretion, to the extent it is able (A) terminate the Asset Sale, (B) continue negotiations with the Vendor concerning asset purchase terms satisfactory to the Vendor (in which case the Purchaser may elect to proceed with option (A) or (C) at any time thereafter) or (C) consummate the Asset Sale and appoint three (3) Experienced Advisors to determine the

HIGHLY CONFIDENTIAL                    Tassillo_Fleites_00000886

Fair Market Value of the assets being sold, with the average of those three determinations being referred to as the "**Average Advisor Price**". "**Experienced Advisor**" means a Person (that being a corporate finance advisory firm, and/or business valuation firm) that has as least $20,000,000 in fee billings in TMT (technology, media and telecom) advisory over the 24 months prior to the date of determination. In the event that the Average Advisor Price is higher than the sale price in the Asset Sale Notice (the "**Sale Price**"), the Purchaser shall make a payment, on the date the next Monthly Payment is due, in the amount obtained by multiplying (x) the Applicable Percentage by (y) such positive difference between the Average Advisor Price and the Sale Price (the "**Additional Obligation Amount**") and the documented, out-of-pocket costs of the Experienced Advisors shall be borne by the Purchaser. In the event that the Sale Price is higher than the Average Advisor Price, the aggregate Monthly Payments that remain unpaid at such time (the "**Total Remaining Monthly Payment Amount**") shall be reduced by an amount equal to the reasonable, documented, out-of-pocket costs incurred by the Purchaser for the Experienced Advisors (the "**Reduction Amount**"). Upon the payment of the Additional Obligation Amount or the application of the Reduction Amount, the Monthly Payments due thereafter shall be calculated as follows: the Total Remaining Monthly Payment Amount less the Additional Obligation Amount or less the Reduction Amount, as applicable, divided by the number of Monthly Payments remaining after such payment or reduction;

(viii)   if the Purchaser or any of its Affiliates (the "**Buyco**") acquires any assets of the Corporation or any of its Affiliates in connection with a Permitted Reorg, the Purchaser shall cause 100% of the capital stock of Buyco to be pledged to the Vendor pursuant to an amendment to the Share Pledge Agreement to be mutually executed by the Purchaser, Buyco, and the Vendor;

(ix)    if the Purchaser provides debt or other funding to any Target Entity or any Affiliate of a Target Entity, such funding shall be provided at fair market interest rates and other terms as mutually agreed to between the Purchaser and the Requisite Pledgees, and if such parties are unable to agree on such interest rate or other terms, such rate and/or terms as determined by an independent third party; and

(x)     if any tag-along or similar rights under the Shareholders Agreement is available to any other shareholder of the Corporation other than the Vendor, the Purchaser shall (x) be responsible for and assume the cost of acquiring any shares of the Corporation that such shareholders would be eligible to sell and transfer to the Purchaser and (y) indemnify and hold harmless the Vendor and its Affiliates from any costs or expenses incurred by them in connection therewith;

(xi)    the Purchaser shall or shall cause the Corporation to deliver to the Vendor monthly unaudited financial statements of the Corporation and, upon request by the Vendor, the Purchaser shall provide the Vendor with any reasonable additional information with respect to the Corporation and the Target Entities that the Vendor may require; and

(xii)   Intentionally Omitted.

7.11   **Additional Purchaser Post-Closing Restrictive Covenants**. From the Closing Date until the date on which the Purchaser has fully satisfied all obligations hereunder, the Purchaser shall not, without the prior written consent of the Vendor, make any Distribution (including directly to or involving any Person that is an Affiliate of the Purchaser other than any Target Entity) other than to satisfy the payment obligations hereunder and any fees and expenses paid to Ethical Capital Partners Canada Ltd. for advisory services rendered up to a monthly amount that is equal to $500,000 multiplied by the Applicable Percentage.

37

7.12    **Termination Fee**. If the Purchaser elects to terminate this Agreement pursuant to Section 11.01(c) as a result of a breach by the Vendor of Section 7.06, 7.09 or 13.13, which occurred after the date hereof, in lieu of all other claims and remedies that might otherwise be available with respect thereto, including elsewhere under this Agreement and notwithstanding any other provision of this Agreement, the Vendor shall pay to the Purchaser a fee of ▆▆▆▆▆▆ (the "**Termination Fee**"). The Termination Fee shall be payable in immediately available funds by wire transfer no later than ten (10) Business Days after such termination.

7.13    **Delegation of authority of the Vendor and Purchaser**. The Vendor and the Purchaser hereby delegate authority to any legal representatives of the Vendor, the Purchaser as well as any manager of the Corporation, with full power of substitution, to, in their name and on their behalf, amend and make and sign the necessary entries in the shareholders' register of the Corporation to reflect: (i) the assignment and transfer of the Purchased Shares from the Vendor to the Purchaser on the Closing Date; and (ii) the pledge of the Purchased Shares pursuant to the terms of the Share Pledge Agreement on the Closing Date.

7.14    **Post-Closing Tax Covenants.**

(i)     The Purchaser shall prepare or cause to be prepared and file or cause to be filed all Tax Returns for each Target Entity for all Pre-Closing Tax Periods that are filed after the Closing Date (such Tax Returns referred to herein as the "**Pre-Closing Tax Returns**"). All Pre-Closing Tax Returns shall be prepared consistently with the past practice of the applicable Target Entity, unless otherwise required by applicable Law. The Purchaser shall submit any such Pre-Closing Tax Return to the Vendor for the Vendor's review and comment at least thirty (30) days prior to the due date (with applicable extensions) for such Pre-Closing Tax Return. The Vendor shall provide any written comments to the Purchaser not later than twenty (20) days after receiving any such Pre-Closing Tax Return and the Purchaser shall accept all comments that are reasonable.

(ii)    Without obtaining the prior written consent of the Vendor, the Purchaser shall not, and shall not cause or permit any Target Entity to, (a) take any action on the Closing Date following the Closing other than in the ordinary course of business, (b) make or change any material Tax election, amend any Tax Return, take any Tax position on any Tax Return, or compromise or settle any Tax liability, or (c) make a voluntary disclosure to any Governmental Authority with respect to any Tax Return of any Target Entity, in each case if such action could have the effect of increasing the Tax liability of an Target Entity with respect to any Pre-Closing Tax Period.

7.15    **Efforts to Consummate; Certain Governmental Matters.**

(i)     Each of the Vendor and the Purchaser shall use their respective reasonable commercial efforts to take, or cause to be taken, all actions and to do, or cause to be done, and to assist and cooperate with the other party in doing, all things necessary, proper or advisable (a) to consummate and make effective as promptly as possible the transactions contemplated hereby, (b) obtain and to cooperate in obtaining the regulatory approvals identified on Schedule 7.15(i) (the "**Required Regulatory Approvals**") and (c) obtain and to cooperate in obtaining the third-party consents, including pursuant to any Contracts that a Target Entity is a party, required to complete the transactions contemplated under this Agreement and identified on Schedule 7.15(i)-2 (the "**Required Third Party Consents**").

(ii)    If deemed required, upon the advice of the Purchaser and the Vendor's respective legal

38

advisors, each party hereto agrees to make an appropriate filing pursuant to the HSR Act with respect to the transactions contemplated hereby as soon as reasonably practicable. The Purchaser and Vendor shall, at their own expense, respond as promptly as practicable to any inquiries received from the Antitrust Division of the U.S. Department of Justice (the "**Antitrust Division**"), the Federal Trade Commission or any other Governmental Authority for additional information or documentation and to all inquiries and requests received from any Governmental Authority in connection with the transactions contemplated hereby.

(iii)    In using their "reasonable commercial efforts" the Purchaser shall, and the Vendor, at the reasonable request of Purchaser, shall cooperate with the Purchaser to take any and all steps necessary, proper, or advisable to avoid or eliminate each and every impediment and any proceeding instituted or threatened by a Governmental Authority or private party under the HSR Act or any other Competition Law that is asserted with respect to the transactions contemplated hereby so as to enable the consummation of such transactions to occur as expeditiously as possible, including (a) opposing vigorously and fully any such challenge, promptly appealing any adverse decision or order by a Governmental Authority, and litigating any such challenge to a final non-appealable order and (b) proposing, negotiating, committing to and effecting, by consent decree, hold separate order or otherwise, the sale, divestiture or disposition of any assets or business (or otherwise taking or committing to take any action that limits the freedom of action with respect to, or its ability to retain, any businesses, product lines, assets, relationships or contractual rights) as may be required or advisable in order to obtain any clearance under the HSR Act or any other Competition Law or to avoid the entry of, or to effect the dissolution of, any injunction, temporary restraining order, or other order in any legal proceeding, which would otherwise have the effect of preventing or delaying the consummation of the transactions contemplated hereby; provided, that the Purchaser shall not be obligated to take any action set forth in this Section 7.15(iii) unless the taking of such action is expressly conditioned upon the consummation of the transactions contemplated in this Agreement and any agreement or document contemplated hereby.

(iv)    The Vendor and the Purchaser shall use their respective reasonable commercial efforts to take or cause to be taken all actions, and do or cause to be done all things, necessary, or reasonably advisable on its part under this Agreement and applicable Law to satisfy the conditions to Closing, and to consummate and make effective the transactions contemplated hereby as soon as practicable.

(v)    Subject to applicable Law or except as prohibited by any Governmental Authority, the Vendor and the Purchaser each shall keep the other apprised of the status of matters relating to consummation of the transactions contemplated hereby, including (a) promptly notifying the other of any facts, circumstances or other reason that would prevent the receipt of any Required Regulatory Approvals or the Required Third Party Consents for the timely consummation of transactions contemplated hereby and the other agreements and documents contemplated hereby and (ii) promptly furnishing the other with copies of material notices or other communications received by it from any third party or any Governmental Authority with respect to the transactions contemplated hereby; provided, that any such notices furnished by the parties to one another may be redacted to the extent necessary to comply with applicable Law or to protect information protected by the attorney-client privilege or other privilege or the attorney work product doctrine; provided, further, that competitively sensitive information may be provided on an "outside attorneys only" basis. Neither the Vendor nor the Purchaser shall permit any of its officers or any

HIGHLY CONFIDENTIAL                Tassillo_Fleites_00000889

other representatives or agents to participate in any meeting with any Governmental Authority with respect to any filings, investigation or other inquiry relating to the transactions contemplated hereby unless it consults with the other party in advance and, to the extent permitted by such Governmental Authority, gives the other party the opportunity to attend and participate thereat.

(vi)     Subject to applicable Law and except as required by any Governmental Authority, neither the Vendor nor the Purchaser shall (a) agree to extend any waiting period under the HSR Act without the prior written consent of the other party (such consent not to be unreasonably withheld, conditioned or delayed), (b) enter into any agreement with any Governmental Authority not to consummate the transactions contemplated hereby without the prior written consent of the other party (such consent not to be unreasonably withheld, conditioned of delayed) or (c) take any other take any action that would be reasonably likely to prevent or materially delay the receipt of any Required Regulatory Approvals or Required Third Party Consents.

7.16    **Compliance with Shareholders' Agreement**.  On or prior to the Closing Date, the Vendor shall have fulfilled all of its obligations under the Shareholders Agreement triggered as a result of the Sale Transaction including the right of first refusal obligations as set out in Section 6.3 of the Shareholders Agreement or, in the event the Parties have support of holders of the requisite number shares of the Corporation as required under the Shareholders' Agreement, exercised the drag-along rights under Section 6.5 of the Shareholders' Agreement.

7.17    **Intentionally Omitted.**

## ARTICLE 8.00 - SURVIVAL OF COVENANTS, REPRESENTATIONS AND WARRANTIES

8.01    The covenants, representations and warranties provided herein shall survive the Closing and, notwithstanding any such Closing, shall continue in full force and effect, subject to the following:

(i)      the Vendor's Fundamental Representations and the Purchaser's Fundamental Representations shall survive the Closing and shall continue in full force and effect until the expiration of the applicable statute of limitations;

(ii)     the representations and warranties set out in Section 4.15 (Tax Matters) shall survive the Closing and shall continue in full force and effect until a date being ninety (90) days after the expiration of the last of the limitation periods contained in the Tax Act and/or any other Law imposing Tax on the Target Entities, upon which the Governmental Authorities shall no longer be entitled to assess, reassess or issue other any other form of recognized written demand assessing liability for Tax against the Target Entities for any Pre-Closing Tax Period having regard to any waiver, consent, agreement, action or document that extends such period; and

(iii)    all other representations and warranties of the Vendor and the Purchaser provided herein (other than referred to in Sections 8.01(i) and 8.01(ii) above) shall survive the Closing and shall continue in full force and effect for a period ending on the twenty-four (24) month anniversary of the Closing Date.

Notwithstanding the limitations set out in this Section ARTICLE 8.00, any Claim which is based on fraud or fraudulent misrepresentation, or criminal conduct, in each case, by the Purchaser or the

HIGHLY CONFIDENTIAL                                    Tassillo_Fleites_00000890

Vendor with respect to the representations and warranties in Article 4.00, Article 5.00 and Article 6.00 may be brought at any time.

## ARTICLE 9.00 - CONDITIONS

9.01    **Conditions to the Obligations of the Purchaser**.  The Purchaser shall not be obligated to complete the purchase of the Purchased Shares herein provided for unless on the Closing Date each of the following conditions shall have been satisfied:

(i)     there shall have been performed or complied with, in all material respects, all of the obligations, covenants and agreements of the Vendor under this Agreement and any Ancillary Agreement to which any Vendor is a party and for which must be satisfied or complied with as of Closing, each and every one of which is hereby declared to be a separate condition to the Closing;

(ii)    each of the representations and warranties of the Vendor made pursuant to this Agreement shall be true and correct as of the Closing Date, in each case, except for any failure to be true and correct which is not reasonably expected to result in a Material Adverse Effect;

(iii)   there shall have been no change, effect, event, occurrence or circumstance, since the Balance Sheet Date, that has had, or would reasonably be likely to have, a Material Adverse Effect;

(iv)    the Purchaser shall have had the opportunity to complete the Third Party Consultations to its entire and sole satisfaction; and

(v)     there shall have been delivered to the Purchaser, in scope, form and terms satisfactory to it and the Purchaser's counsel, acting reasonably, the following:

    (a)     certified copies of: (i) the constating documents and by-laws or articles of association, as applicable, of the Corporation and the Vendor; and (ii) all resolutions of the board of directors or of the managers (as applicable) and, if applicable, shareholder(s) of the Corporation, in accordance with art. 710-12 of the Luxembourg law of 10 August 1915 on commercial companies as amended, and the Vendor, in each case approving the transactions contemplated hereby;

    (b)     a certificate of status (or equivalent) of the Corporation and the Vendor;

    (c)     a copy of the shareholders' register of the Corporation up-to-date of the entries reflecting the assignment and transfer of the Purchased Shares from the Vendor to the Purchaser, such copy to be held in escrow by the Purchaser with automatic release once Closing has occurred;

    (d)     a duly executed non-competition agreement between the Corporation, the Purchaser, the Principals and the Vendor in the form attached hereto as Exhibit "C" which agreement shall restrict the Principals and Vendor, any Affiliate of the Vendor from competing against the Corporation or the Business, subject to certain exceptions as set out therein, which shall cover a territory comprising of the world, for a term beginning on the Closing Date and ending on the earlier to occur of (x) final Monthly Payment and (y) any breach or default under this Agreement or the Share Pledge Agreement;

41

(e)     evidence reasonably satisfactory to the Purchaser that all shareholder and other Related Party Debt has been repaid, satisfied, or otherwise discharged, including, without limitation, the release of any Liens in respect thereof;

(f)     if required, evidence reasonably satisfactory to the Purchaser that all applicable waiting periods (including any extensions thereof) under the HSR Act and under the Competition Laws set forth in Schedule 9.01(v)(f) expired or have been terminated;

(g)     evidence reasonably satisfactory to the Purchaser that all Required Regulatory Approvals shall have been obtained;

(h)     evidence reasonably satisfactory to the Purchaser that all Required Third Party Consents shall have been obtained;

(i)     Intentionally Omitted; and

(j)     an agreement from the Corporation to indemnify the Purchaser, its Affiliates or any entity controlled by the Purchaser and their respective shareholders, directors, officers, employees, agents and representatives, as applicable, from any Damages (other than any economic Damages suffered as a shareholder of the Corporation as a result of the diminution in value of the Purchased Shares) relating to the Pending Actions or any Post-Closing Actions.

Any of the foregoing conditions may be waived in whole or in part by the Purchaser and shall thereafter not form part hereof, without prejudice to its rights upon the non-performance of any other condition or conditions, as provided for in this Section 9.01, any such waiver to be binding upon the Purchaser only if the same is in writing.

9.02    **Conditions to the Obligations of the Vendor.**  The Vendor shall not be obligated to complete the sale of the Purchased Shares herein provided for unless on the Closing Date each of the following conditions shall have been satisfied:

(i)     there shall have been performed or complied with, in all respects, all of the Purchaser's obligations, covenants and agreements under this Agreement and any Ancillary Agreement to which it is a party, each and every one of which is hereby declared to be a separate condition to the Closing;

(ii)    all of the representations and warranties of the Purchaser made or pursuant to this Agreement and the Ancillary Agreements shall be true and correct as of the Closing Date, the truth and correctness of each such representation and warranty is hereby declared to be a separate condition to the Closing;

(iii)   there shall have been delivered to the Vendor, in scope, form and terms satisfactory to them and their counsel, acting reasonably, the following:

(a)     certified copies of: (i) the certificate of incorporation and memorandum and articles of association of the Purchaser; and (ii) all resolutions of the board of directors of the Purchaser approving the transactions contemplated hereby;

(b)     a certificate of good standing in respect of the Purchaser and Ethical Capital Partners

42

Ltd. obtained from the registrar of corporate affairs in the British Virgin Islands, dated no earlier than ten (10) calendar days prior to the Closing Date;

(c)     a certificate from the registered agent of the Purchaser dated no earlier than ten (10) calendar days prior to the Closing Date, in a form and substance satisfactory to the Vendor, together with certified true copies of the Purchaser's registers of members, directors and charges (if any);

(d)     the Share Pledge Agreement(s) executed by the Purchaser;

(e)     a Consent and waiver of the shareholders of the Corporation and the Corporation permitting the execution of the Share Pledge Agreement under Section 5.5 of the Shareholders Agreement and any Consent required pursuant to the Senior and Subordinated Debt Agreement;

(f)     if required, evidence reasonably satisfactory to the Vendor that all applicable waiting periods (including any extensions thereof) under the HSR Act and under the Competition Laws set forth in Schedule 9.01(v)(f) expired or have been terminated;

(g)     evidence reasonably satisfactory to the Vendor that all Required Regulatory Approvals shall have been obtained;

(h)     a copy of the shareholders' register of the Corporation up-to-date of the entries reflecting the pledge of the Purchased Shares pursuant to the Share Pledge Agreement, such copy to be held in escrow by the Vendor with automatic release upon Closing;

(i)     a copy of the shareholders' resolutions of the Corporation, approving, *inter alia*, the Share Pledge Agreement in accordance with article 12 of the Luxembourg law of 5 August 2005 on financial collateral arrangements;

(j)     an undertaking of shareholders of the Corporation that in the event of enforcement of the Share Pledge Agreement(s) by the Vendor, there will be no restrictions on the Purchased Shares being transferred to Vendor, other than the Vendor agreeing to the terms of any shareholders agreement with respect to the Corporation in place at such time; and

(k)     a copy of the shareholders' register of the Purchaser up-to-date of the entries reflecting the pledge of the ECP Shares to the Vendor pursuant to the Share Pledge Agreement, such copy to be held in escrow by the Purchaser with automatic release upon Closing;

(iv)     at Closing, the Purchaser shall have duly made and delivered payment of the Closing Date Cash Payment in accordance with Article 3.00, and duly executed all ancillary agreements, documents and other instruments required pursuant to this Agreement.

Any of the foregoing conditions may be waived in whole or in part by the Vendor and shall thereafter not form part hereof, without prejudice to their rights upon the non-performance of any other condition or conditions, as provided for in this Section 9.02 any such waiver to be binding upon the Vendor only if the same is in writing.

HIGHLY CONFIDENTIAL
Tassillo_Fleites_00000893

## ARTICLE 10.00 – INDEMNIFICATION

10.01  **Indemnification by the Vendor in Favour of the Purchaser.**

(i)  The Vendor shall indemnify, defend and save the Purchaser and its shareholders, directors, officers, employees, agents, representatives and, following Closing, the Corporation (collectively, the **"Purchaser Indemnified Parties"**) harmless of and from any Damages suffered by, imposed upon or asserted against them (whether direct or indirect) as a result of, in respect of, connected with or arising out of, under or pursuant to:

    (a)  any misrepresentation, breach or inaccuracy of any representation or warranty given by the Vendor in Article 4.00 of this Agreement which includes, for greater certainty, any Exhibits attached hereto;

    (b)  any Taxes which are required to be paid by any Target Entity in respect of any Pre-Closing Tax Period to the extent not reflected in the Corporation Financial Statements;

    (c)  all debts or liabilities of the Corporation whatsoever not disclosed on and included in the Corporation Financial Statements and which are not debts or liabilities incurred in the ordinary course of business and not otherwise expressly assumed by the Purchaser under this Agreement; and

    (d)  all costs and expenses including reasonable legal fees on a solicitor and client basis, incidental to or in respect of the foregoing.

(ii)  The Vendor shall indemnify, defend and save the Purchaser Indemnified Parties harmless of and from any Damages suffered by, imposed upon or asserted against them (whether direct or indirect) as a result of, in respect of, connected with or arising out of, under or pursuant to:

    (a)  any misrepresentation, breach or inaccuracy of any representation or warranty given by the Vendor in Article 5.00 of this Agreement or in any Ancillary Agreement to which a Vendor is a party which includes, for greater certainty, any Exhibits attached hereto;

    (b)  any failure by a Vendor to perform and fulfil any covenant to be performed by such Vendor with respect to the Vendor under this Agreement or in any Ancillary Agreement to which the Vendor is a party; and

    (c)  all costs and expenses including reasonable legal fees on a solicitor and client basis, incidental to or in respect of the foregoing.

10.02  **Indemnification by the Purchaser in Favour of the Vendor.** The Purchaser shall indemnify, defend and save the Vendor and its respective shareholders, directors, officers, employees, agents, and representatives (the **"Vendor Indemnified Parties"**) harmless of and from any Damages or loss suffered by, imposed upon or asserted against the Vendor Indemnified Parties as a result of, in respect of, connected with or arising out of, under or pursuant to:

44

HIGHLY CONFIDENTIAL
Tassillo_Fleites_00000894

(i)    any misrepresentation, breach or inaccuracy of any representation or warranty given by
Purchaser in Article 6.00 or any Ancillary Agreement to which the Purchaser is a party
which includes, for greater certainty, any Exhibits attached hereto;

(ii)   any failure by the Purchaser to perform and fulfill any covenant of the Purchaser to be
performed by it under this Agreement or any Ancillary Agreement to which it is party; and

(iii)  all costs and expenses including reasonable legal fees incidental to or in respect of the
foregoing.

10.03   <u>Scope and Limitation on Indemnification.</u>

(i)    Subject to Section 10.03(iii):

(a)    no Claim may be made against the Vendor pursuant to (A) Section 10.01(i)(a) or
Section 10.01(ii)(a) until the aggregate of Damages for all Claims asserted
pursuant to Section 10.01(i)(a) or Section 10.01(ii)(a) equals or exceeds
$1,000,000 (the "**Deductible**"), in which event the Vendor shall be required to pay
or be liable for all such Damages from the first dollar.  No individual Claim under
$50,000 shall form part of the calculation of the Deductible for indemnification.
Accordingly, all Claims to reach the Deductible must be in amounts of $50,000 or
more;

(b)    no Claim may be made against the Purchaser pursuant to Section 10.02(i) until the
aggregate of Damages for all Claims asserted to that date against the Purchaser
including the claim(s) then being asserted, as the case may be, equals or exceeds
the Deductible in which event the Purchaser shall be required to pay or be liable
for all such Damages from the first dollar.  No individual Claim under $50,000
shall form part of the calculation of the Deductible for indemnification.
Accordingly, all Claims to reach the Deductible must be in amounts of $50,000 or
more; and

(c)    the maximum liability of:

(A) the Purchaser under Sections 10.02 shall be limited to the Monthly Payments
that have not yet been delivered to the Vendor pursuant to this Agreement;

(B) the Vendor under Section 10.01 shall be limited to the amount of the Monthly
Payments and any Earnout amount that is payable by the Purchaser that have
not yet actually been delivered to the Vendor pursuant to this Agreement, by
offset first against such Monthly Payments as they become due and second
against any Earnout amount that is payable by the Purchaser; provided,
however, that, notwithstanding the foregoing, any liability related to Pending
Actions shall be governed by Section 10.03(i)(c)(C) below; provided, further,
that, notwithstanding the foregoing, liability of the Vendor under Section
10.01(i)(c) shall be limited to the amount of the Monthly Payments and any
Earnout amount that is payable by the Purchaser that have not yet been actually
delivered to the Vendor pursuant to this Agreement by offset first against such
Monthly Payments as they become due and second any Earnout amount

45

HIGHLY CONFIDENTIAL                                    Tassillo_Fleites_00000895

payable by the Purchaser; and

(C) the Vendor for the Pending Actions is limited to the Vendor not receiving all or a portion of the Earnout amount in accordance with Section 3.02(iii), other than in the case of fraud or fraudulent misrepresentation, intentional misrepresentation, wilful misconduct, or wilful breach by Vendor, in each case, solely in connection with the negotiation, execution, and delivery of this Agreement.

(ii)    Notwithstanding anything herein to the contrary, but subject to the other limitations set forth herein, the Vendor's liability with respect to any Claim pursuant to Section 10.01(i) shall the amount of such Damages multiplied by the percentage obtained by dividing the number of Purchased Shares by the total number of shares of the Corporation outstanding as at the date hereof (such percentage, the "**Applicable Percentage**").

(iii)   In the event the Vendor is liable for any amounts pursuant to Section 10.01, the Purchaser's sole and exclusive remedy shall be a reduction, on a dollar-for-dollar basis, first against the Monthly Payments and second against any Earnout amount that is payable by the Purchaser that have not been delivered by the Purchaser to the Vendor. If there are any unresolved or pending claims for Damages under Section 10.01 on the date when the final Monthly Payment is due or when the Earnout payment, if any, is due ("**Outstanding Claims**") or if there is any pending Tax audit or investigation with respect to the Target Entities which relate to or include the Pre-Closing Tax Period on the date when the final Monthly Payment is due or when the Earnout payment, if any, is due (the "**Outstanding Tax Matter**"), the Purchaser shall, in the event of Outstanding Claims, be entitled to withhold the aggregate amount of such Outstanding Claims (or, to the extent the Outstanding Claim relates to a Claim pursuant to Section 10.01(i), the amount of such potential Damages multiplied by the Applicable Percentage) (the "**Outstanding Claims Withholding Amount**") from the final Monthly Payment or the Earnout payment (as applicable) or, in in the event of an Outstanding Tax Matter, be entitled to withhold from the final Monthly Payment and/or the Earnout payment (as applicable) the amount of potential Damages relating to such Tax Matter multiplied by the Applicable Percentage (the "**Outstanding Tax Matter Amount**"), in each case until such time as when such unresolved or pending claims for Damages in the case of an Outstanding Claim or potential claims for Damages in the case of an Outstanding Tax Matter are finally resolved at which time the Purchaser shall pay an amount, if any, equal to the Withholding Amount and/or the Outstanding Tax Matter Amount less the finally determined amount of Damages in respect of the Outstanding Claims and/or Outstanding Tax Matter, respectively.

In the event any amounts are withheld by the Purchaser with respect to an Outstanding Claim or Outstanding Tax Matter and such claim or matter is resolved or a final, non-appealable judgment is rendered in respect of such claim or matter resulting in no Damages, then the Purchaser shall pay an interest payment equal to fifteen percent (15%) per annum, calculated and compounded daily, from the date such amount was withheld until full repayment of repayable portion of the withheld amount.

(iv)    The threshold or liability caps set out in Section 10.03(i) will not apply to limit any liability in respect of fraud, willful misconduct, willful breach or criminal conduct with respect to any representation or warranty in this Agreement.

(v)     The Purchaser shall not be entitled to recover Damages from the Vendor pursuant to

HIGHLY CONFIDENTIAL                    Tassillo_Fleites_00000896

Section 10.01(i)(a) or Section 10.01(ii)(a) unless a written notice of Claim is delivered by Purchaser to the Vendor prior to the expiration of the applicable survival period set out in Section 8.01(i), Section 8.01(ii) or Section 8.01(iii), as applicable.

(vi)     The Vendor shall not be entitled to recover Damages from the Purchaser pursuant to Section 10.02(i) unless a written notice of Claim is delivered by the Vendor to the Purchaser prior to the expiration of the applicable survival period set out in Section 8.01(iii).

(vii)    With respect to any Damages suffered by any indemnified party, no liability shall attach to the indemnifying party to the extent that the same Damages have been recovered by any other indemnified party under any other representation, warranty or indemnity contained in this Agreement or any Ancillary Agreement and, accordingly, the indemnified party may only recover once in respect of the same Damages. In addition, the Vendor shall not have any liability in respect of a Claim to the extent the Purchaser has already recovered the amount of the Damages which is the subject-matter of such Claim whether by a previous indemnity claim or otherwise under this Agreement, another agreement to which the Vendor is not a party, or otherwise.

(viii)   To the extent that any breach of representation or warranty contained in this Agreement is capable of remedy, the indemnified party shall afford the indemnifying party a reasonable opportunity to remedy the matter complained of, provided that the indemnified party shall not be obligated to offer the indemnifying party such opportunity where the breach is continuing and the Corporation suffers continuing material harm or prejudice as a result of such breach.

(ix)     Notwithstanding anything contrary herein, the Vendor shall not have any liability in respect of any matter or thing done or omitted to be done at the direction or with the consent of the Purchaser, or if the Purchaser had Knowledge of any of the foregoing.

(x)      Nothing in this Agreement will in any way restrict or limit the general obligation at law of an indemnified party to mitigate any Damages which it may suffer or incur.

(xi)     If the amount of any Damages incurred by an indemnified party at any time subsequent to the making of an indemnity payment is reduced by any recovery, settlement or otherwise under or pursuant to any insurance coverage or pursuant to any claim, recovery, settlement or payment by or against any other Person or otherwise, the amount of such reduction shall promptly be paid by the indemnified party to the indemnifying party.

(xii)    No party shall be liable to any other party under Article 10.00 hereof for any Claims, actions, damages or losses resulting from or relating to any inaccuracy in or breach of any representation or warranty in this Agreement, if the party seeking indemnification for such Claim, action, damage or loss had Knowledge of such inaccuracy or breach on or before Closing.

(xiii)   In the event that on or before Closing, either party notifies the other of a breach of any matter for which a representation or a warranty is herein provided, and then proceeds to close the present transaction, same shall constitute a waiver, release and renunciation to any and all claims for indemnification, Damages and losses in respect of such breach.

(xiv)    The amount of any Damages recoverable under Section 10.01 by any Purchaser

47

Indemnified Party shall be reduced by (i) the amount of any insurance proceeds actually received or receivable by the Purchaser Indemnified Persons with respect to such Damages, and (ii) the amount of any Tax benefits actually realized by the applicable Purchaser Indemnified Party or any Affiliate thereof.

(xv)    Notwithstanding anything in this Agreement to the contrary, for purposes of determining the amount of any Damages arising from any breach of any representation or warranty set forth herein, each representation and warranty in this Agreement and the schedules and exhibits hereto shall be read without regard and without giving effect to the terms "material", "in all material respects", "Material Adverse Effect", except where the failure to so comply would not reasonably be expected to have a "Material Adverse Effect" or similar words or phrases contained in such representation or warranty (as if such words or phrases were deleted from such representation and warranty).

10.04    **Indemnification Proceedings.**

(i)    Any party seeking indemnification under this Article 10.00 (the "**indemnified party**") shall forthwith notify the party against whom a Claim for indemnification is sought hereunder (the "**indemnifying party**") in writing, which notice, to be delivered in strict accordance with Section 13.01 hereof, shall specify, in reasonable detail, the nature and estimated amount of the Damages in respect of the Claim provided that, in so doing, it may restrict or condition any disclosure in the interest of preserving privileges of importance in any foreseeable litigation.

(ii)    If a Claim by a third party is made against an indemnified party, and if the indemnified party intends to seek indemnity with respect thereto under this Article 10.00, the indemnified party shall promptly (and in any case, the later of fifteen (15) days of such Claim being made or such Claim coming to the attention of the indemnified party) notify the indemnifying party of such with reasonable particulars. The failure to give such prompt written notice shall not, however, relieve the indemnifying party of its indemnification obligations, except and only to the extent that the indemnifying party forfeits rights or defenses by reason of such failure. The indemnifying party shall have fifteen (15) days after receipt of such notice to undertake, conduct and control, through counsel of its own choosing and at its expense, the settlement or defence thereof, and the indemnified party shall co-operate with it in connection therewith. The indemnifying party may not settle, compromise or resolve a claim without the consent of the indemnified party, if such settlement, compromise or resolution causes or requires an admission or finding of guilt against the indemnified party, imposes any monetary damages against the indemnified party, imposes any restrictions on the business operations of the indemnified party, or does not fully release the indemnified party from liability with respect to the Claim. If the indemnifying party undertakes, conducts and controls the settlement or defence of such Claim: (i) the indemnifying party shall permit the indemnified party to participate in (subject to the indemnifying party's right to conduct and control) such settlement or defence through counsel chosen by the indemnified party, provided that the fees and expenses of such counsel shall be borne by the indemnified party; and (ii) the indemnifying party shall promptly reimburse the indemnified party for the full amount of any Damages resulting from any Claim and all related expenses (other than the fees and expenses of counsel as aforesaid) incurred by the indemnified party upon the final settlement or adjudication of such claims. The indemnified party shall not pay or settle any Claim so long as the indemnifying party is reasonably contesting any such Claim in good faith on a timely basis, save and except that the indemnified party shall have the right to settle any

48

such Claim, provided that in such event it shall waive any right to indemnity therefor by the indemnifying party. Notwithstanding the foregoing, in the event the indemnified party is ordered to make payment in respect of a Claim by a court of competent jurisdiction, such event shall not constitute a waiver of any further rights to indemnity provided in this Article 10.00.

(iii)    With respect to third party Claims, if the indemnifying party does not notify the indemnified party within fifteen (15) days after the receipt of the indemnified party's notice of a Claim of indemnity hereunder that it elects to undertake the defence thereof or the indemnifying party fails to diligently prosecute the defense of such third party Claim, the indemnified party shall have the right, but not the obligation, to contest, settle or compromise the Claim in the exercise of its reasonable judgement at the expense of the indemnifying party.

(iv)    In the event of any Claim by a third party against an indemnified party, the defense of which is being undertaken and controlled by the indemnifying party, the indemnified party will use all reasonable efforts to make available to the indemnifying party those employees whose assistance, testimony or presence is necessary to assist the indemnifying party in evaluating and in defending any such Claims; provided that the indemnified party shall be responsible for the expense associated with any employees made available by the indemnified party to the indemnifying party hereunder, which expense shall be equal to a reasonable amount to be mutually agreed upon per person per hour or per day for each day or portion thereof that such employees are assisting the indemnifying party and which expenses shall not exceed the actual cost to the indemnified party associated with such employees.

(v)    With respect to third party Claims, the indemnified party shall make available to the indemnifying party or its representatives on a timely basis all documents, records and other materials in the possession of the indemnified party, at the expense of the indemnified party, reasonably required by the indemnifying party for its use in defending any Claim and shall otherwise co-operate on a timely basis with the indemnifying party in the defence of such Claim.

(vi)    With respect to a Claim by an indemnified party on account of Damages which do not result from a third party Claim (a "**Direct Claim**"), the indemnified party shall promptly (and in any case, fifteen (15) days of such Claim coming to the attention of the indemnified party) notify the indemnifying party of such with reasonable particulars. The failure to give such prompt written notice shall not, however, relieve the indemnifying party of its indemnification obligations, except and only to the extent that the indemnifying party forfeits rights or defenses by reason of such failure. The indemnifying party shall have thirty (30) days after its receipt of such notice to respond in writing to such Direct Claim. The indemnified party shall allow the indemnifying party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim and the indemnified party shall assist the indemnifying party's investigation by giving such information and assistance (including access to the Corporation's premises and personnel and the right to examine and copy any accounts, documents or records) as the indemnifying party or any of its professional advisors may reasonably request. If the indemnifying party does not so respond within such thirty (30) day period referred to above, the indemnifying party shall be deemed to have rejected such Claim, in which case the indemnified party shall be free to pursue such remedies as may be available to the indemnified party on the terms and

49

subject to the provisions of this Agreement to recover the full amount of its claim. Further, if the indemnified party and the indemnifying party do not agree within such thirty (30) day period referred to above (or any mutually agreed upon extension thereof), the indemnified party shall be free to pursue such remedies as may be available to the indemnified party on the terms and subject to the provisions of this Agreement to recover the full amount of its Claim.

10.05    **Characterization of Indemnification Payments.**  To the extent permitted pursuant to applicable Laws, all payments made by or on behalf of an indemnifying party to an indemnified party in respect of any claim to this Article 10.00 shall be treated as adjustments to any outstanding Monthly Payment and/or the Earnout amount and a corresponding adjustment to the amount outstanding of the Monthly Payments as they become due and/or any Earnout amount payable by the Purchaser.

10.06    **Set-off.**  Notwithstanding anything in this Agreement to the contrary and subject to the limitations set forth in Section 10.03 hereof, to the extent the Vendor is an indemnifying party or has been named as an indemnifying party in an indemnity claim made pursuant to Article 10.00 hereof,  the Purchaser shall, in any case, satisfy any amount that is finally due and owing to them by the Vendor by set-off against amounts owing under the Monthly Payments and/or the Earnout amount in accordance to the terms set out therein. In such an instance where the Vendor is an indemnifying party or has been named an indemnifying party in an indemnity claim pursuant to Article 10.00 hereof, the Purchaser shall take reasonable steps to ensure a timely resolution of such claim to the extent the Purchaser has control over timing.

10.07    **Sole Remedy.**  From and after the Closing Date, the rights of indemnity set out in this Article 10.00 are the sole and exclusive remedy of each of the parties in respect of Claims which may be brought against it or Claims that it may suffer or incur as a result of any and all matters under this Agreement, including as a result of, in respect of, or arising out of any incorrectness in or breach of any representation, warranty, covenant, agreement or obligation contained herein, any Ancillary Agreement or in any certificate furnished pursuant hereto or thereto, other than claims in respect of fraud or fraudulent misrepresentation, intentional misrepresentation, wilful misconduct, wilful breach or criminal conduct by Vendor in respect of any covenants, representations or warranty provided for herein. This Article 10.00 shall remain in full force and effect in all circumstances and shall not be terminated by any breach (fundamental, negligent or otherwise) by any party of its covenants, representations or warranties hereunder or under any certificate furnished pursuant hereto or by any termination or rescission of this Agreement. The foregoing shall not prohibit a party from making any Claim for fraud, criminal activity, wilful misconduct, wilful blindness, specific performance or injunctive relief which may be pursued against the applicable Person alleged to have engaged in such fraud, criminal activity, wilful misconduct, wilful blindness or other prohibited activity without regard to the provisions of this Section 10.07.

10.08    **Effect of Purchaser's Knowledge.**  Notwithstanding anything contained herein to the contrary, the Vendor shall not have (a) any liability for any breach of or inaccuracy in any representation or warranty made by the Vendor to the extent that the Purchaser, any of its Affiliates or any of its or their respective officers, employees, counsel, advisors or other representatives had Knowledge at or before the Closing of the facts as a result of which such representation or warranty was breached or inaccurate or (b) any liability after the Closing for any breach of or failure to perform before the Closing any covenant or obligation of the Vendor to the extent that the Purchaser, or its Affiliates or any of its or their respective officers, employees, counsel or other representatives had Knowledge at or before the Closing of such breach or failure.

50

## ARTICLE 11.00 - TERMINATION

11.01    This Agreement may be terminated at any time prior to the Closing by:

(a)    the consent of each of the Purchaser and the Vendor;

(b)    either the Purchaser or the Vendor, if the Closing has not been consummated by the Closing Date, without liability to the terminating Party on account of such termination; provided that the right to terminate this Agreement pursuant to this Section 11.01(b) shall not be available to such Party whose material breach or violation of any representation, warranty, covenant, obligation or agreement under this Agreement has been the cause of or has resulted in the failure of the Closing to occur on or before such date;

(c)    the Purchaser, if there has been a material breach by the Vendor of any representation, warranty, covenant or agreement set forth in this Agreement or any of the documents contemplated hereby, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 9.01 which the Vendor fails to cure within ten (10) Business Days after written notice thereof is given by the Purchaser, or if there has been a material breach by the Vendor of its obligations under Section 7.06, 7.09 or 13.13, or within ten (10) Business Days upon receipt of any update to the Schedules as permitted under Section 7.05;

(d)    the Vendor, if there has been a material breach by the Purchaser of any representation, warranty, covenant or agreement set forth in this Agreement or any of the documents contemplated hereby, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 9.02 which the Purchaser fails to cure within ten (10) Business Days after written notice thereof is given by the Vendor;

(e)    either the Purchaser or the Vendor, if any permanent injunction or other order of a court or other competent authority **Redacted - Privilege** preventing the Closing has become final and non-appealable; provided, however, that neither the Purchaser nor the Vendor shall be entitled to terminate this Agreement if such Party's material breach of this Agreement or any of the documents contemplated hereby has resulted in such permanent injunction or order; or

(f)    either the Purchaser or the Vendor, by giving written notice of such termination to the other party, on or after the date that is sixty (60) days from the date hereof (the "**Outside Date**"), if the Closing shall not have occurred, prior to the Outside Date; provided, however, that either the Purchaser or the Vendor, by written notice to the other party prior to such date, may extend the Outside Date for up to an additional ninety (90) days, if the conditions set forth in Section 9.01(v)(f), Section 9.01(v)(g), Section 9.02(iii)(f) and Section 9.02(iii)(g) are not satisfied; provided, further, that neither the Purchaser nor the Vendor may terminate this Agreement pursuant to this Section 11.01(f) at any time during which, in the case of the Purchaser, the Purchaser is in material breach of its covenants in this Agreement or, in the case of the Vendor, any Vendor is in material breach of its covenants in this Agreement; provided, further, that, subject to the foregoing proviso, if, at any time prior to five (5) Business Days prior to the Outside Date, any Required Regulatory Approvals and/or Required Third Party Consent have not been obtained and all other conditions in Article 9.00 have theretofore been satisfied or are reasonably capable of being satisfied, then either the Purchaser or the Vendor may, by written notice to the other party, extend the Outside Date for additional thirty (30) days in order to obtain such outstanding Required Regulatory

51

Approvals and/or Required Third Party Consents; provided, further, that the extension of the Outside Date pursuant to the preceding proviso (regardless of which party initiated such extension) may occur only once.

Any termination of this Agreement pursuant to this Section 11.01 shall be effected by a written instrument signed by the Party or Parties so terminating to the other parties hereto (if any), which notice shall specify the Section hereof pursuant to which this Agreement is being terminated.

11.02    **Obligations Following Termination**.  In the event of the termination of this Agreement as provided in Section 11.01, this Agreement shall be of no further force or effect without any liability to any Person in respect hereof or of the transactions contemplated hereby on the part of any party hereto, except for Sections 1.02 to 1.16 (inclusive), Section 7.12, this Section 11.02 and Article 13.00, each of which shall survive the termination of this Agreement; provided, however, that if this Agreement is terminated because of a material breach by the Purchaser or the Vendor of the representations, warranties, covenants, obligations or agreements of such Party set forth in this Agreement, the terminating Party's right to pursue all legal remedies will survive such termination unimpaired.

## ARTICLE 12.00 - CLOSING ARRANGEMENTS

12.01    Subject to the satisfaction of the terms and conditions herein, the transactions contemplated by this Agreement shall be completed at the offices of the Purchaser's counsel in Toronto, Ontario, or at such other place or places or in such other manner as the parties agree (the "**Closing**"), on such date as promptly as practicable following the satisfaction or waiver of all of the conditions to Closing set forth in Article 9.00, with the precise closing date subject to mutual agreement between the Parties but such date to be no earlier than 45 days from the date of this Agreement (the date on which the Closing occurs, the "**Closing Date**").

12.02    At Closing, the Vendor shall deliver to the Purchaser certificates representing the Purchased Shares duly endorsed in blank for transfer (or other sufficient evidence of transfer that is in compliance with applicable Laws), together with reasonable evidence of the due compliance with all of the conditions contained in Section 9.01, the Purchaser shall pay the Purchase Price as contemplated in this Agreement and shall deliver reasonable evidence of the due compliance with all of the conditions contained in Section 9.02.

## ARTICLE 13.00 - GENERAL CONTRACT PROVISIONS

13.01    **Notices.**  All notices, requests, demands or other communications by the terms hereof required or permitted to be given by one party to another shall be given in writing by registered mail, postage prepaid, or email and addressed to such other party or delivered to such other party as follows:

(a)  to the Vendor:

Feras Antoon
**Redacted - PII**

and

David Tassillo

HIGHLY CONFIDENTIAL                    Tassillo_Fleites_00000902

**Redacted - PII**

Stein & Stein Inc.
4101 Sherbrooke Street West
Montreal, Quebec
H3Z 1A7

Attention : Neil H. Stein
Email :        **Redacted - PII**

(b)    to the Purchaser:

ECP One Limited
        **Redacted - PII**

Attention:        Fady Mansour
Email:                **Redacted - PII**

and such notices, requests, demands, acceptances and other communications shall be deemed to be given and received: (a) if sent by personal delivery or courier, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time at the location of the recipient), and otherwise on the next Business Day; or (b) on the date sent by email of a PDF document (with confirmation of transmission) if sent prior to 4:00 p.m. (local time at the location of the recipient), and on the next Business Day if sent after 4:00 p.m. (local time at the location of the recipient) or if sent on a day that is not a Business Day. A party may change its address for service from time to time by providing a notice in accordance with this Section 13.01. Any subsequent notice must be sent to the party at its changed address. Any element of a party's address that is not specifically changed in a notice delivered pursuant to this Section ARTICLE 13.00 will be assumed not to be changed.

13.02    **Expenses.** Except as otherwise expressly set forth herein, each party shall be responsible for and bear all of its own costs and expenses in respect of the transactions contemplated by this Agreement.

13.03    **Governing Law.** This Agreement and any action, claim, controversy or dispute arising under, in connection with or related to this Agreement, including claims of fraud, the relationship of the parties and/or the interpretation and enforcement of the rights and duties of the parties, in all respects, including matters of construction, validity and performance, shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York applicable to Contracts made and performed in that state (without regard to the choice of law or conflicts of law provisions thereof that would require the application of the law of any other jurisdiction and including, for the avoidance of doubt, Section 5-1401 of the General Obligations Law of the State of New York).

13.04    **Entire Agreement.** This Agreement (including the Schedules and Exhibits hereto and the agreements, documents and instruments referred to herein that are to be delivered at Closing) constitutes the entire agreement among the parties and supersedes any prior understandings, agreements, or representations by or among the parties, or any of them, written or oral, with respect to the subject matter of this Agreement.

53

13.05  **Amendments.** This Agreement shall not be amended, altered, or qualified except by a document in writing signed by all of the parties hereto and any amendments, alterations or qualifications hereof shall be null and void and shall not be binding upon any party which has not given its consent.

13.06  **Waiver and Remedies.** The parties may: (a) extend the time for performance of any of the obligations or other acts of any other party; (b) waive any inaccuracies in the representations and warranties of any other party contained in this Agreement, any Ancillary Agreement or in any agreement, certificate, instrument, or document delivered pursuant to this Agreement; or (c) waive compliance with any of the covenants, agreements or conditions for the benefit of such party contained in this Agreement. Any such extension or waiver by any party will be valid only if set forth in a written document signed on behalf of the party or parties against whom the waiver or extension is to be effective. No extension or waiver will apply to any time for performance, inaccuracy in any representation or warranty, or non-compliance with any covenant, agreement, or condition, as the case may be, other than that which is specified in the written extension or waiver. No failure or delay by any party in exercising any right or remedy under this Agreement or any of the documents delivered pursuant to this Agreement, and no course of dealing between the parties, operates as a waiver of such right or remedy, and no single or partial exercise of any such right or remedy precludes any other or further exercise of such right or remedy or the exercise of any other right or remedy. Any enumeration of a party's rights and remedies in this Agreement is not intended to be exclusive, and a party's rights and remedies are intended to be cumulative to the extent permitted by Law and include any rights and remedies authorized in Law or in equity.

13.07  **Severability.** If any provision of this Agreement shall be determined by an arbitrator or any court of competent jurisdiction to be illegal, invalid or unenforceable, that provision shall be severed from this Agreement and the remaining provisions shall continue in full force and effect; provided that the severed provision is not so material to impair the intent and purpose of this Agreement.

13.08  **Exhibits and Schedules.** The Exhibits and Schedules to this Agreement are incorporated herein by reference and made a part of this Agreement. In the event of any conflict between the provisions in this Agreement and any of the Exhibits and Schedules, this Agreement shall prevail unless expressly provided otherwise.

13.09  **Successors and Assigns.** This Agreement shall enure to the benefit of and be binding upon the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns; provided that no party may assign, delegate or otherwise, transfer any of its rights or obligations under this Agreement without the consent of each other party hereto. Notwithstanding the foregoing, the Purchaser may assign, in its sole discretion, any of or all its rights, interests and obligations under this Agreement to any Affiliate of the Purchaser provided that (a) such Affiliate agrees to assume all obligations of the Purchaser under this Agreement and (b) the Purchaser shall remain liable, on a joint and several basis, for all of its obligations under this Agreement.

13.10  **Tender.** Any tender of documents or any money hereunder shall be made upon the Vendor, the Purchaser or any solicitor acting for them and the money shall be tendered by wire transfer of immediately available funds.

13.11  **Dispute Resolution; Waiver of Jury Trial.**

     (i)     ALL DISPUTES ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY ANCILLARY AGREEMENT, OR ANY OBLIGATIONS HEREUNDER OR THEREUNDER, SHALL BE BROUGHT IN ANY STATE OR FEDERAL COURT OF

HIGHLY CONFIDENTIAL                    Tassillo_Fleites_00000904

COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK. BY EXECUTING AND DELIVERING THIS AGREEMENT, THE PURCHASER, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, AND THE VENDOR, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (I) ACCEPTS GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (II) WAIVES ANY DEFENSE OF *FORUM NON CONVENIENS*; (III) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE PURCHASER OR THE VENDOR AT THEIR ADDRESS PROVIDED IN SECTION 13.01; (IV) AGREES THAT, SERVICE AS PROVIDED IN CLAUSE (III) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE PURCHASER OR THE VENDOR, AS THE CASE MAY BE, IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; (V) AGREES THAT THE HOLDER RETAINS THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST THE BORROWER IN THE COURTS OF ANY OTHER JURISDICTION; AND (VI) AGREES THAT THE PROVISIONS OF THIS PARAGRAPH RELATING TO JURISDICTION AND VENUE SHALL BE BINDING AND ENFORCEABLE TO THE FULLEST EXTENT PERMISSIBLE UNDER NEW YORK GENERAL OBLIGATIONS LAW SECTION 5-1402 OR OTHERWISE.

(ii)     EACH OF THE PARTIES TO THIS AGREEMENT AND THE ANCILLARY AGREEMENTS HEREBY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED PURSUANT TO THE MONTHLY PAYMENTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT AND THE ANCILLARY AGREEMENTS, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS PARAGRAPH AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING

HIGHLY CONFIDENTIAL

Tassillo_Fleites_00000905

TO THE TRANSACTIONS CONTEMPLATED HEREBY. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

13.12   **No Third Party Beneficiaries.**  This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and, except (a) for the Purchasers' Indemnified Parties and the Vendor Indemnified Parties in connection with Article 10.00, and (b) in connection with this Section 13.12, nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

13.13   **Confidentiality and Public Notices.** The Vendor shall not disclose to any Person, issue any press release or make any other public announcement concerning the transactions contemplated by this Agreement, including the identity of the parties to this Agreement, without the prior written consent of the Purchaser. Notwithstanding the foregoing, the Vendor may; (i) without the consent of the Purchaser, make such disclosure if the same is required by applicable Law, any Governmental Authority or any other regulatory authority having jurisdiction over the Corporation, the Vendor or any of their Affiliates; and (ii) make such disclosure to the parties set out in Schedule 13.13. Unless required by applicable Law, any Governmental Authority or any other regulatory authority, the Purchaser shall not disclose the Purchase Price to any Person, or issue any press release or make any other public announcement which discloses the Purchase Price, without the prior written consent of the Vendor. Additionally, all shareholders, directors, officers, employees, agents, representatives or affiliates of the Purchaser who may be bound by the terms of any non-disclosure agreements signed among the Vendor and any other third party as a result of such individual being a shareholder, director, officer, employee, agent, representative or affiliate of such third party, shall be released from any confidentiality and other restrictions under such other agreements.

Notwithstanding the foregoing, (a) Vendor or its Affiliates may contact such Person's representatives, and (b) in the event that Vendor, its Affiliates, or their respective representatives are requested pursuant to, or required by, applicable Law, regulation or legal process to make any disclosure to any party (including, without limitation, a regulatory or supervisory authority) in connection with any Target Entity, the Business, or the Sale Transaction, Vendor, such Affiliate, or such representative may make such disclosure to such requesting party, in each case, without any violation whatsoever of this Section 13.13.

13.14   **Further Assurances.** Each party shall from time to time promptly execute and deliver all further documents and take all further action reasonably necessary or appropriate to give effect to the provisions of this Agreement and to complete the Sale Transaction.

13.15   **Independent Advice.** Each of the parties to this Agreement acknowledges that it: (i) has received a copy of, and has had sufficient time to review and consider, this Agreement and each Ancillary Agreement to which it is a party; (ii) has read and understand the terms of this Agreement and each Ancillary Agreement to which it is a party and its obligations hereunder and thereunder; (iii) has entered into this Agreement and each Ancillary Agreement to which it is a party voluntarily; (iv) has been given an opportunity to obtain independent legal, accounting and tax advice, or other advice as it may desire, concerning the interpretation and effect of this Agreement and each Ancillary Agreement to which it is a party; and (v) by signing this Agreement, confirms it has either obtained independent legal, accounting and/or tax advice or voluntarily waived the opportunity to receive that advice.

56

HIGHLY CONFIDENTIAL                    Tassillo_Fleites_00000906

13.16    <u>Counterparts.</u>  This Agreement and any of the documents to be delivered or furnished pursuant to this Agreement may be executed and delivered in any number of counterparts, each of which when executed and delivered is an original but all of which taken together constitute one and the same instrument.  Any party may deliver an executed copy of this Agreement or any of the documents to be delivered or furnished pursuant to this Agreement by facsimile transmission or electronic PDF but that party shall immediately deliver to the other party an originally executed copy of such document.

13.17    <u>Post-Closing Cooperation of Purchaser & Target Entities.</u>  Purchaser, to the extent legally capable, shall:

(a)    furnish or cause to be furnished to the Vendor and its Affiliates, promptly upon request, all documents, data, information and other material in the possession, custody or control of the Target Entities, and make available all employees for assistance or testimony, deemed necessary to defend against any of the CSAM/NCM proceedings, without charge;

(b)    ensure that Employees shall prioritize responding to requests made pursuant to this provision over all other work and that employees requested for depositions or testimony shall be made available for same and preparation for same without unreasonable delay or time limits; and

(c)    execute agreements with counsel, document management and review vendors, experts, and others deemed necessary to ensure that the attorney-client privilege, solicitor-client privilege, work product doctrine, confidentiality and other similar protections available to the Vendor and its Affiliates in connection with his defense of the CSAM/NCM proceedings are not be impaired.

For the avoidance of doubt, to the extent that any information shared or disclosed pursuant to this Section 13.17 includes materials subject to the attorney-client privilege, solicitor-client privilege, work product doctrine, or similar privileges, the disclosing party shall not be deemed to have waived or diminished its attorney work-product protections, attorney-client privileges, solicitor-client privilege or similar protections and privileges as a result of disclosing such information (including information related to pending or threatened litigation) to the receiving party.

13.18    <u>Post-Closing Cooperation of Purchaser & Target Entities.</u>  Vendor, to the extent legally capable, shall:

(a)    furnish or cause to be furnished to the Target Entities, promptly upon request, all documents, data, information and other material in the possession, custody or control of the Vendor, and make available all employees for assistance or testimony, deemed necessary to defend against any of the CSAM/NCM proceedings, without charge;

(b)    ensure that Employees shall prioritize responding to requests made pursuant to this provision over all other work and that employees requested for depositions or testimony shall be made available for same and preparation for same without unreasonable delay or time limits; and

(c)    execute agreements with counsel, document management and review vendors, experts, and others deemed necessary to ensure that the attorney-client privilege, solicitor-client privilege, work product doctrine, confidentiality and other similar protections available to the Target Entity and its Affiliates in connection with their defense of the CSAM/NCM proceedings are not be impaired.

57

For the avoidance of doubt, to the extent that any information shared or disclosed pursuant to this Section 13.18 includes materials subject to the attorney-client privilege, solicitor-client privilege, work product doctrine, or similar privileges, the disclosing party shall not be deemed to have waived or diminished its attorney work-product protections, attorney-client privileges, solicitor-client privilege or similar protections and privileges as a result of disclosing such information (including information related to pending or threatened litigation) to the receiving party.

13.19    **Agent for Service of Process.** At all times while any portion of the Monthly Payments and/or Earnout remains outstanding, the Purchaser shall continually maintain an agent for service of process who shall (a) be reasonably acceptable to the Vendor, (b) accept legal notices sent to the Purchaser in the State of New York, United States and (c) perform other services customarily performed by an agent for service of process in the United States.

13.20    **Waiver of Immunity.** To the extent that the Purchaser has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution or execution, on the ground of sovereignty or otherwise) with respect to itself or its property, it hereby irrevocably waives, to the fullest extent permitted by applicable law, such immunity in respect of its obligations under this Agreement and/or the Ancillary Agreements.

13.21    **Specific Performance.**

(i)    The Purchaser and the Vendor agree that (a) irreparable damage would occur in the event that the provisions of this Agreement or obligations, undertakings, covenants or agreements of the parties hereto were not performed in accordance with their specific terms or were otherwise breached and (b) monetary damages, even if available, would not be an adequate remedy for any such failure to perform or any breach of this Agreement. Accordingly, it is agreed that prior to the valid termination of this Agreement pursuant to Article 11.00, the parties hereto shall be entitled to an injunction or injunctions to enforce specifically the terms and provisions of this Agreement in any court specified in Section 13.11 without proof of actual damages, this being in addition to any other remedy to which they are entitled at law or in equity.

(ii)    Each party hereto agrees that it will not oppose (and hereby waives any defense in any action for) the granting of an injunction, specific performance and other equitable relief as provided herein on the basis that (a) the other party has an adequate remedy at law or (b) an award of specific performance or other equitable remedy is not an appropriate remedy for any reason at law, equity or otherwise. Any party hereto seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement when available pursuant to the terms of this Agreement shall not be required to provide any bond or other security in connection with any such order or injunction.

(iii)    To the extent either party brings an action to enforce specifically the performance of the terms and provisions of this Agreement (other than an action to enforce specifically any provision that expressly survives termination of this Agreement), the Outside Date shall automatically be extended to (a) the tenth Business Day following the final resolution of such action and (b) such other time period established by the court presiding over such action.

13.22    **English Language.** All of the parties hereto declare that they have specifically requested and do hereby confirm their request that the present Agreement and all agreements, amendments, exhibits and schedules referred to herein be drafted and executed in the English language. *Toutes les parties*

58

*aux présentes déclarent qu'elles ont spécifiquement demandé et par les présentes confirment leur demande que la présente convention, et tous les autres contrats, pièces et annexes dont référence est fait soit rédigée et signée en anglais.*

[The remainder of this page is intentionally left blank]

HIGHLY CONFIDENTIAL                                    Tassillo_Fleites_00000909

**IN WITNESS WHEREOF** the parties have hereunto duly executed these presents as of the date first hereinabove written.

FDCO HOLDING INC.

Per: _____

Authorized Signing Officer

I have authority to bind the company

ECP ONE LIMITED

Per: _____

Authorized Signing Officer

I have authority to bind the company

60

## EXHIBIT "A"
### Issued Share Capital of the Corporation

The issued capital of the Corporation is set at USD ██████████████
██████████████████████████ US dollars) divided into ██████████
█████████████████████████████████████████████████████████████
█████████████████████, each without nominal value.

*Purchased Shares:*

| Entity | Number and Type of Shares Owned on the Date Hereof |
|---|---|
| FDCO Holding Inc. | ████████ Shares |

61

EXHIBIT "B"

Form of Share Pledge Agreement

See attached.

EXHIBIT "C"

Form of Non-Competition Agreement

See attached.

Tassillo_Fleites_00000913