# EXHIBIT 66

# [PORTIONS OF EXHIBIT FILED UNDER SEAL PURSUANT TO APPLICATION TO SEAL]

CONFIDENTIAL

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2            CENTRAL DISTRICT OF CALIFORNIA
 3                 SOUTHERN DIVISION
 4
 5    SERENA FLEITES and JANE DOE   )
      NOS. 1 through 33,            )
 6                                  ) Case No.
                  Plaintiffs,       ) 2:21-CV-04920-CJC-ADS
 7                                  )
          VS.                       )
 8                                  )
      MINDGEEK S.A.R.L.; MG         )
 9    FREESITES, LTD.; MINDGEEK     )
      USA INCORPORATED; MG PREMIUM  )
10    LTD.; RK HOLDINGS USA INC.;   )
      MG GLOBAL ENTERTAINMENT,      ) Pages 1-358
11    INC.; TRAFFICJUNKY INC.;      )
      BERND BERGMAIR; FERAS ANTOON; )
12    DAVID TASSILLO; COREY URMAN;  )
      VISA INC.; COLBECK CAPITAL    )
13    DOES 1-10; BERGMAIR DOES      )
      1-10,                         )
14                                  )
                  Defendants.       )
15    _____)
16
                C O N F I D E N T I A L
17
18    VIDEOTAPED DEPOSITION OF:
19            BERND BERGMAIR
20            THURSDAY, JUNE 15, 2023
21            9:24 A.M.
22
23
24    Reported by:  LINDA NICKERSON
25                  CSR No. 8746
```

CONFIDENTIAL

Page 218

```
 1          A     That was imposed by the lender.
 2          Q     My question was:  Did you ever talk to
 3      Mr. Antoon about it?
 4          A     I think I was on a call with the lender and
 5      Antoon and Tassillo where this was conveyed, yes.
 6          Q     Okay.  Why were you on that call?
 7          A     Because I was a ████████ UBO and the
 8      lender had -- those were -- so there were
 9      █████████████████████.  And then the
10      lender -- as a result of the New York Times article
11      and the fallout, the lender I think ████████
██      ████████████████████████████████
██      ████████████████████████████████
██      ████████████████
15          Q     When you say they moved it, how did they do
16      all that?  Did they just do it themselves?
17              MS. MASSEY:  Object to form.
18              THE WITNESS:  There is -- you could only --
19      you would have needed a -- another lender to stand
20      by readily to refinance all of this in the absence
21      of which you -- they basically tell you what the --
22      what the conditions are.  There's no negotiating.
23      BY MR. BOWE:
24          Q     I'm confused.  There's a lending agreement
25      that sets out the terms of the loan and all that.
```

CONFIDENTIAL

Page 219

1          Do they get to change it at any time they

2      want or are you in default?

3          A     So this agreement has, as far as I

4      remember, one of the conditions says that the --

5      pardon -- company has ███████████████

  ████████████████████████████████████████████

  ████████████████████████████████████████████

  ████████████████████████████            .

9              MS. HARGROVE:  Objection.

10             MR. BOWE:  Keep going.  I don't think you

11     get to object to his answer.

12             Go ahead.  Keep going.

13             THE WITNESS:  There was a technical

14     violation of the section that talked about the --

15     this type of requirement, which gave the lenders the

16     optional opportunity to, you know, renegotiate.

17     BY MR. BOWE:

18         Q     So you were -- they claimed you were in

19     default?

20             MS. MASSEY:  Object to form.

21             MR. WHITE:  Objection.

22             THE WITNESS:  I don't remember the

23     technicality, but what I do remember is the

24     lender was on the -- you know, MindGeek was in a not

25     good position.  The lender was in a much stronger

CONFIDENTIAL

Page 277

```
1                MR. WHITE:  Can I get one?

2                MR. GOTTLIEB:  We're short on copies.

3                MR. WHITE:  You've got one, a grand total

4       of one?

5                MR. GOTTLIEB:  Three.

6                MR. BOWE:  I mean he doesn't need one, but

7       whatever.  The witness has one.  You can share the

8       witness's.  You can share Kathleen's.  You guys can

9       share together.  We usually have copies for

10      everyone, but on this one, we don't.

11           Q    What is this document, sir?  Do you know

12      what it is?

13                Sir, I'm going to let you go through the

14      whole thing, but I have a question before you do

15      that.  When you look at the first page of this, do

16      you know what it is?

17           A    I can read what it says here.

18           Q    All right.  Does that -- do you recognize

19      this document?

20           A    No.

21           Q    All right.  So do you know what it is?

22           A    Well, I can read what it says here.

23           Q    Yes, I know.  It says, "Intellectual

24      Property License Agreement."

25                Have you ever seen it before?
```

CONFIDENTIAL

Page 278

1      A    I don't recall.

2      Q    Okay.  It says it's between RT Holding

3   S.a.r.L., right?

4      A    Yes.

5      Q    That's the company you own a ██████ stake

6   in, right?

7      A    Yes.

8      Q    Okay.  And it's -- one of the

9   counterparties is MG IP I S.a.r.L., right?

10     A    Yes.

11     Q    There's a MindGeek S.a.r.L. subsidiary,

12  right?

13     A    I would need that chart.

14     Q    The chart is there.

15     A    Oh.

16          MR. WHITE:  That's not a MindGeek chart.

17          MR. BOWE:  What's that?

18          MR. WHITE:  It's not a MindGeek chart.

19          MR. BOWE:  Okay.

20          MR. WHITE:  That's prior to the MBO.  If

21  you want to ask him about a MindGeek entity, show

22  him a MindGeek organizational chart.

23          THE WITNESS:  This says, "Manwin."

24  BY MR. BOWE:

25     Q    Does that refresh your recollection on

CONFIDENTIAL

Page 279

1      which one is which?

2          A    Sorry?

3          Q    Does that refresh your recollection about

4      what entity MG IP I S.a.r.L. is?

5          A    I can't -- the small boxes, I can't --

6          Q    Sorry.  Why don't you go to the back end

7      that talks about the proposed structure that was

8      created five days before this document.

9          A    So we're looking for --

10         Q    We don't have to play hide and seek.  Let

11     me ask you this, sir.

12              Do you have any idea what this document is?

13         A    I don't recall ever seeing or reading

14     through this before.

15         Q    All right.  Okay.  So let me ask you

16     something.  If you go to the back --

17              MR. WHITE:  Hold on.  Objection.  I thought

18     you said you were going to give him a chance to read

19     before you asked him questions.

20              MR. BOWE:  Not when he says he has no idea

21     what it is.

22              MR. WHITE:  You started asking him

23     questions before he looked at it.

24              MR. BOWE:  I asked him if you look at the

25     front, other than -- other than he can read it, he

CONFIDENTIAL

Page 280

1    knows -- do you need to take another break, sir?

2            THE WITNESS:  Yes, sorry.

3            MR. BOWE:  Okay.  No problem.  Go off the

4    record.

5            THE VIDEOGRAPHER:  Okay then.  This is the

6    end of Media Unit Seven.  We're going off the record

7    at 4:06 p.m.

8                 (Recess taken.)

9            THE VIDEOGRAPHER:  We are going back on the

10   record at 4:11 p.m., and this is the beginning of

11   Media Unit Eight.

12   BY MR. BOWE:

13       Q    So your counsel wanted you to have an

14   opportunity to look through this document.  So why

15   don't you flip through the document up to the

16   signature pages which is the actual contract.  Just

17   flip through it.  I don't want you to read line by

18   line unless you think that's going to help you.

19       A    I don't know what's expected --

20       Q    All right.  We can do it any way you like.

21            Mr. Bergmair, if you're going to read it

22   line by line, that's fine.  I'm going to go get

23   coffee and go to the bathroom.

24            Is that what you -- is that what you want

25   to do?

CONFIDENTIAL

Page 281

```
 1          A    I'll do whatever you want me to do.
 2          Q    I don't want to deprive -- I asked you to
 3     look at it and see if you could identify.  Your
 4     counsel said I didn't give you an opportunity to
 5     look at it sufficiently.
 6               I wanted to give you whatever opportunity
 7     you think you need.  If you think reading it line by
 8     line will help you remember what it is or recognize
 9     it, that's fine.  I don't want you to think you have
10     to.
11          A    Okay.  I don't recall ever looking at this
12     before.
13          Q    Do you know if RT Holding had licensing
14     agreements?
15          A    Oh, I don't know.
16          Q    Okay.
17          A    But what I find strange here is it says
18     between RT Holding S.a.r.L. and RT Holding.  So it
19     sounds like the company made a contract with itself.
20          Q    Right.  And then it says and MG I S.a.r.L.,
21     right?
22          A    Yeah, at the bottom.  But normally I would
23     expect to see something that says between RT Holding
24     and MG, but not between RT Holding and RT Holding
25     and MG.
```

CONFIDENTIAL

                                                    Page 282

1          Q    Right.  You wouldn't think it was odd if
2     the middle was missing; you think it would be -- you
3     would understand if it said RT Holding S.a.r.L. and
4     MG IP I, right?
5          A    Yes, but as always, I'm sure a lot of money
6     was spent on legal advisors to make this document.
7     So there must be a reason.
8          Q    Right, okay.  Let's see if this is -- you
9     find this out, too.  Go to the signature pages on
10    page 9 of that document.
11              Okay.  Now, who signs on behalf of RT
12    Holding?
13         A    I don't know.  It says here RT Holding,
14    Philippe Poire Cote.
15         Q    You know that person, right?
16         A    Yes, and ███████████████.
17         Q    You know that person ███████?
18         A    Nope.
19         Q    Okay.  But who is the first person,
20    Philippe?
21         A    Manager of currently RT Holding at the
22    time.
23         Q    But how do you know him?
24         A    I've met him in Montreal.
25         Q    Isn't he somebody you request your dividend

CONFIDENTIAL

Page 283

1          information and everything from?

2          A     Yeah.

3          Q     Doesn't he run all the MindGeek Luxembourg

4     entities?

5               MR. WHITE:  Objection.

6               THE WITNESS:  I'm not sure.

7     BY MR. BOWE:

8          Q     Okay.  Did you know he was a manager of RT

9     Holding, the company that you were a ███████ owner

10    of?

11              MS. MASSEY:  Object to form.

12              THE WITNESS:  No.

13    BY MR. BOWE:

14         Q     Okay.  Who signs on behalf of counterparty

15    MG IP I?

16         A     Sorry.

17         Q     Who signs on behalf of MG IP I, the

18    counterparty in this contract, one of them?

19         A     So here it is Philippe.

20         Q     Same guy?

21         A     It looks like.

22         Q     Okay.  So he signed on behalf of one

23    side -- one side of the table and then he went

24    around to the other side of the table and signed the

25    other side, right?

CONFIDENTIAL

Page 284

1              MR. WHITE:  Objection.

2              MS. MASSEY:  Object to form.

3              THE WITNESS:  It's customary if there is,

4       you know, numerous entities.

5       BY MR. BOWE:

6          Q    Okay.  Like you said before, it seems like

7       the company is contracting with itself, correct?

8              MS. MASSEY:  Object to form.

9              THE WITNESS:  Oh, I see.  It's -- it seems

10      that this is a contract between RT Holding and

11      Cartwright and MG IP I because in the second block,

12      now that I read it, it says, "RT Holding acting for

13      and on behalf of Cartwright."

14              So I'm not a lawyer, but I now understand

15      that this -- then it makes sense -- unless I'm

16      wrong, it seems it's RT Holding and Cartwright and

17      MG who are parties to this agreement.

18      BY MR. BOWE:

19         Q    And who are the counterparties?  Do you

20      understand the term "counterparties" in a contract?

21              MR. WHITE:  Objection.

22              THE WITNESS:  No, it's a three-way

23      contract.

24      BY MR. BOWE:

25         Q    Yeah, okay.  What person signed on behalf

Page 293

1    were made from 2010" -- "2018 to 2020.  From the

2    Groups accounts (note that the EUR payments made in

3    2019 and 2020 were made by LIPI on behalf of RT

4    Holding)."

5           Do you see that?

6       A    Yes.

7       Q    What did that mean?

8           MS. MASSEY:  Object to form.

9           THE WITNESS:  "Groups accounts (note that

10   EUR payments were made in 20-" -- "made by LIPI on

11   behalf of RT Holding)."

12          So, to me, this says that I -- one entity

13   initiated a wire transfer, and that payment was made

14   on behalf of RT Holding.

15   BY MR. BOWE:

16      Q    Okay.  But aren't those -- LIPI is not a

17   subsidiary of RT Holding?

18          MS. MASSEY:  Object to form.

19          THE WITNESS:  So if this is what the --

20   what was actually done, then according to this

21   proposed chart, it wouldn't be.

22   BY MR. BOWE:

23      Q    Okay.  So an entity underneath MindGeek

24   S.a.r.L. is paying dividends that RT Holding should

25   have been paying, right?

CONFIDENTIAL

                                        Page 294

1              MS. MASSEY:  Object to form.

2              MR. WHITE:  Objection.

3              MS. MASSEY:  That's not what the document

4    says.

5              THE WITNESS:  No.

6    BY MR. BOWE:

7         Q    Well, it says it was paid on behalf of,

8    right?

9         A    But that doesn't make it a dividend from

10   LIPI.

11        Q    Okay.  So it paid the money.  What was it?

12        A    An advance, I would describe it as.

13        Q    Okay.  When was it paid back?

14        A    I don't know.

15        Q    Do you know if it was paid back?

16        A    I don't know.

17        Q    Okay.

18        A    But I can -- you know, I'm -- no entity

19   makes gifts to other entities, and if there was an

20   advance, then at the same time, you know, it's a

21   basic principle of double entry accounting.  If

22   there is a cash advance to one side, you have to

23   book it against another account, and that would then

24   establish for the same amount of money an account

25   receivable in Licensing IP's accounts and an account

CONFIDENTIAL

Page 295

1    payable on the RT Holding side.

2         Q    Whose accounts are you accounting for?

3    They're two separate entities, two separate

4    accounts.

5         A    Of course, because that's -- that's the

6    nature of double entry accounting.  You know, RT

7    Holding receives cash.  So they have to book cash

8    received and make the other entry in accounts

9    payable as a liability.

10         Q    But RT Holding didn't get any cash;

11    █████████ got the cash which isn't in that group?

12              MS. MASSEY:  Object to form, if that's a

13    question.

14              MR. BOWE:  That's what the document says.

15              THE WITNESS:  So then -- hold on.

16    BY MR. BOWE:

17         Q    You understand RT Holding was supposed to

18    pay --

19              MR. WHITE:  Please let him finish his

20    answer.  He was in the middle of an answer.

21              THE WITNESS:  So let me -- let me start

22    with the Licensing IP side.  So the Licensing IP

23    sends money on behalf of RT, it says here, right.

24    BY MR. BOWE:

25         Q    Right, because it's outside of the group to

CONFIDENTIAL

Page 297

1      receivable would be booked, right.

2          Q    Yeah, I understand.

3          A    So that, you know, no -- nothing

4      disappeared from LIPI's balance sheet.  It just --

5      it's swapped the category --

6               THE REPORTER:  I'm sorry.  It's blocked?

7               THE WITNESS:  Swapped.  Sorry.  It swapped

8      the asset type cash for the asset type account

9      receivable.

10     BY MR. BOWE:

11         Q    No, I understand, right.  It's out money?

12     It's out cash?

13              MS. MASSEY:  Object to form.

14              THE WITNESS:  Cash is out, but receivable

15     is established.  So it's accounted for.

16     BY MR. BOWE:

17         Q    Sure.  Okay.

18         A    So nothing -- like nobody was robbed of any

19     money, in other words.

20         Q    I didn't say anyone was robbed.

21         A    No, I'm just explaining --

22         Q    I understand.

23         A    -- my understanding of --

24         Q    Right.

25         A    -- what this -- how this works.

CONFIDENTIAL

Page 298

1       Q    But now RT Holding has to take its money

2    and pay that account receivable, that's your

3    testimony, right?

4       A    Yeah, yes.  This transaction would then on

5    the RT Holding side, they would book dividend paid

6    against accounts payable.

7       Q    Okay.  So basically IP's money was used,

8    and then RT's going to pay it back later with its

9    money?

10            MS. MASSEY:  Object to form.

11            MR. WHITE:  Objection.

12   BY MR. BOWE:

13      Q    Right?

14      A    That's how I think accounting works.

15            MR. BOWE:  Okay.  Did you get the

16   attachments?  Do you have a stapler?  Is it just one

17   attachment.

18            MR. GOTTLIEB:  Yeah, there's three copies.

19   Do you need a stapler?

20            MR. BOWE:  All right.  That's the right

21   ones?

22            MR. GOTTLIEB:  Yes.

23            MR. BOWE:  Okay.  There's no four?

24            MR. GOTTLIEB:  Four is just the logo.

25            MR. BOWE:  This is 5, right?  What exhibit

CONFIDENTIAL

Page 312

1     A     I don't know.  I don't think so.

2     Q     Was that something they were allowed to do?

3     A     I don't think so.

4     Q     Okay.  Why do you say you don't think so?

5     A     Because the -- I hope it's something that

6     the shareholders agreement prevents.

7     Q     Did you know if it did?

8     A     I don't know.

9     Q     Okay.

10    A     Oh, by the way, can I -- how do you say --

11    augment my previous testimony?

12    Q     Sure.

13    A     You asked about real estate, and I

14    remembered I also have -- I am an indirect UBO of

15    some real estate in China.  You asked about

16    countries where I had real estate.

17    Q     All right.  Nothing related to MindGeek,

18    right?

19    A     No.

20    Q     Okay.

21    A     And the other thing I was wondering, you

22    asked about Mr. Antoon and Tassillo taking loans.

23    Q     Uh-huh.

24    A     Where do you find this because I'm not

25    aware of any of this?

CONFIDENTIAL

Page 313

```
 1          Q    I'm asking you.  Do you know if they took
 2    any loans?
 3          A    No.  I thought you had some evidence or --
 4          Q    Did you know -- did you know that they --
 5    that they were ██████████████████████?
 6          A    I'm aware of that.
 7          Q    Okay.  When did you become aware of that?
 8          A    Earlier this year.
 9          Q    Earlier this year?
10          A    Yes.
11          Q    You didn't know about it before they left?
12          A    No.
13          Q    You didn't know Mr. Tassillo -- I mean
14    Mr. Antoon or Tassillo ████████████████████████
   ██ ████████████████████████?
16          A    I now know that.
17          Q    They never told you that?
18          A    No.
19          Q    Okay.  Well, that would have been a
20    related-party transaction, right?
21               MS. MASSEY:  Object to form.
22               THE WITNESS:  Presumably.
23    BY MR. BOWE:
24          Q    Okay.  When I asked you if you knew of any,
25    did you remember that one after I asked you?
```

CONFIDENTIAL

Page 322

```
 1        friend or cousin, something along those lines.
 2        BY MR. BOWE:
 3             Q    Well, a cousin would be family, right?
 4             A    Okay.  Yeah.  I was thinking in terms of
 5        immediate family.
 6             Q    Okay.  So is it your testimony that the
 7        departure of Mr. Antoon and Tassillo together in
 8        2022 had nothing to do with you?
 9             A    Antoon had -- I'm trying to remember -- I
10        think in early '21, so after the -- the -- this
11        December 2020 when he had started saying that he was
12        thinking about resigning and leaving, and then, you
13        know, he expressed that repeatedly.
14                  Then at one point, his house that he was
15        building, I was told was set on fire and then in the
16        end, he decided to -- to resign.
17             Q    Okay.  A year later?
18                  MS. MASSEY:  Object to form.
19                  THE WITNESS:  Whenever it was.
20        BY MR. BOWE:
21             Q    Well, he said the discussion started in
22        January of '22.
23                  Does that ring a bell?
24             A    No.
25                  MS. MASSEY:  Object to form.
```

CONFIDENTIAL

Page 323

1              THE WITNESS:  I did not say discussion

2        started.

3        BY MR. BOWE:

4            Q     No, he did.  He testified that the

5        discussions began around January 2022 and went

6        through about June 2022?

7              MS. MASSEY:  Object to form.

8              THE WITNESS:  Uh-huh.

9              MR. WHITE:  Mischaracterizes testimony.

10             THE WITNESS:  I thought he had started

11        talking about resigning in '21.

12        BY MR. BOWE:

13            Q     Maybe he said, but I'm saying -- what he

14        said yesterday was that he had discussions with you

15        about the terms of his departure from about January,

16        February of '22 through the time he left in

17        June '22.

18             MS. MASSEY:  Object to form and calls for

19        testimony about issues irrelevant to jurisdictional

20        discovery, way beyond the time period.

21             MR. WHITE:  Objection to timeframe as well.

22        BY MR. BOWE:

23            Q     Did you negotiate his departure,

24        Mr. Antoon, between January, February '22 and

25        June '22?

CONFIDENTIAL

Page 324

1          A     I don't recall negotiating his departure.

2          Q     Were you in discussions with him during

3     that period about his departure?

4          A     He may have provided or expressed his

5     thoughts about quitting.  I can't dispute that, but

6     I don't remember any particular conversation or

7     details.

8          Q     Didn't you negotiate with him the terms of

9     his departure?

10               MS. MASSEY:  Object to form and object

11     beyond the scope of jurisdictional discovery.

12               THE WITNESS:  I couldn't do that.

13     BY MR. BOWE:

14          Q     You couldn't, right, because you don't have

15     standing to do that, right?

16               MR. WHITE:  Objection.

17               THE WITNESS:  Yes.

18     BY MR. BOWE:

19          Q     But you did that?

20               MS. MASSEY:  Object to form.

21               THE WITNESS:  I don't recall.

22     BY MR. BOWE:

23          Q     I know you don't recall, but you're not

24     saying no because you did have those discussions?

25               MR. WHITE:  Objection.

CONFIDENTIAL

Page 325

```
 1                THE WITNESS:  Well, being provided
 2     information or discussing an aspect doesn't make it
 3     negotiating or deciding.
 4     BY MR. BOWE:
 5          Q    What were you actually doing then?  Tell me
 6     exactly what you were discussing about.
 7          A    I don't remember the details.
 8          Q    So maybe you were negotiating?
 9                MS. MASSEY:  Object to form.
10                THE WITNESS:  He quit of his own volition
11     so --
12     BY MR. BOWE:
13          Q    He quit of his own volition?  Well, then
14     why would you be talking to him at all?
15                MS. MASSEY:  Object to form.
16                THE WITNESS:  If he brings up a topic, you
17     know, I'm generally polite, and I listen.
18     BY MR. BOWE:
19          Q    So did he bring up a topic in January or
20     February about I'm going to quit and then you spent
21     five months talking to him about it?  Is that what
22     happened?  Is that your testimony under oath?
23          A    No.
24                MS. MASSEY:  Object to form.
25                MR. WHITE:  Objection.
```

CONFIDENTIAL

Page 334

1    shared with them?

2         MR. WHITE:  Objection.  It misstates his

3    testimony.

4         THE WITNESS:  Sorry?

5         MR. WHITE:  I said objection; misstates

6    your testimony.

7    BY MR. BOWE:

8       Q    During these discussions when they're

9    telling you they're thinking of leaving, do you

10    have --

11       A    I need to have a word with my lawyer.

12       Q    No.  Do you have a privilege issue?  I'm

13    not asking you anything that could remotely deal

14    with privilege.  I'm asking you about discussions

15    you had a year ago in 2022.

16         And is it your testimony under oath that

17    when Tassillo and Antoon are talking to you about

18    the fact they're going to leave, you had no thoughts

19    that you shared with them one way or the other that

20    you remember?

21         MR. WHITE:  Objection.

22         THE WITNESS:  I don't remember anything in

23    particular.

24    BY MR. BOWE:

25       Q    Anything generally?

Page 335

1          A     Yeah.   Whenever somebody is leaving, with

2      every question, there's pros and cons.  So on the

3      one hand, knowledge and experience that they've

4      accumulated leaves.  On the other hand -- sorry --

5      it was my understanding that ████████████████████

6      ████████████████████████  so -- but, you know,

7      impossible to tell what the unbalance.

8          Q     What ████████████████████████████████?

9              MS. MASSEY:   Objection.

10             MR. WHITE:   Objection.

11             THE WITNESS:   I don't think I said ████████

12     ██████████████████████████.   I think ████████████

13     ████████████████████████████████████████████████

14     ████████████████████████████

15     BY MR. BOWE:

16         Q     You said, "It was" -- "it was my

17     understanding that ██████████████████████████████

18     ██████████████████"?

19         A     Correct.

20         Q     Okay.   ████████████████████████████

21     ████████████████████████████████████████?

22         A     My understanding was that, in particular,

23     with -- so ██████████████████████████████████

24     ████████████████████████████████████████████████

25     ████████████████████████████████████████████

CONFIDENTIAL

Page 336

1

2

3      Q   Who told you that?  Where did you get that

4 understanding from?

5      A   I don't remember.  It was something that I

6 gathered, but I can't recall the particular person.

7      Q   Did Mr. Di Santo tell you that?

8      MS. MASSEY:  Object to form.

9      THE WITNESS:  I don't think so.

10 BY MR. BOWE:

11      Q   Did Mr. Penhale tell you that?

12      A   I don't think so.

13      MS. MASSEY:  Object to form and object as

14 far as --

15 BY MR. BOWE:

16      Q   You gathered it?

17      THE REPORTER:  I'm sorry.  What was your

18 objection?

19      MS. MASSEY:  Object to form and objecting

20 so far as it calls for privileged information.

21 BY MR. BOWE:

22      Q   You gathered it -- you're a passive

23 investor.

24      How did that information come to you?

25      A   As I said, I don't remember.

CONFIDENTIAL

Page 357

1    STATE OF CALIFORNIA    )

2                           )  ss

3    COUNTY OF ORANGE       )

4          I, LINDA NICKERSON, CSR #8746, in and for

5    the State of California do hereby certify:

6          That, prior to being examined, the witness

7    named in the foregoing deposition was by me duly

8    sworn to testify the truth, the whole truth, and

9    nothing but the truth;

10         That said deposition was taken down by me in

11   shorthand at the time and place therein named, and

12   thereafter reduced to typewritten form at my

13   direction, and the same is a true, correct, and

14   complete transcript of the testimony at said

15   proceedings.

16         Before completion of the deposition, review

17   of transcript [ ] was [X] was not requested.  If

18   requested, any changes made by the deponent (and

19   provided to the reporter) during the period allowed

20   are appended hereto.

21         I further certify that I am not interested

22   in the event of the action.

23   WITNESS MY HAND this 21st day of June, 2023.

24         *[signature]*

25              LINDA NICKERSON, CSR No. 8746