# EXHIBIT 67

# [PORTIONS OF EXHIBIT FILED UNDER SEAL PURSUANT TO APPLICATION TO SEAL]

Page 1

1                    C O N F I D E N T I A L

2    UNITED STATES DISTRICT COURT

3    CENTRAL DISTRICT OF CALIFORNIA

4    CASE No. 2:21-CV-04920-CJC-ADS

5    --------------------------------*

6    SERENA FLEITES,

7                         Plaintiff,

8              vs.

9    MINDGEEK S.A.R.L.; MG FREESITES,

10   LTD.; MINDGEEK USA INCORPORATED;

11   MG PREMIUM LTD.; MG GLOBAL

12   ENTERTAINMENT INC.; 9219-1568

13   QUEBEC, INC.; BERND BERGMAIR;

14   FERAS ANTOON; DAVID TASSILLO;

15   COREY URMAN; VISA INC.;

16   COLBECK CAPITAL DOES 1-5;

17   BERGMAIR DOES 1-5,

18                    Defendants.

19   --------------------------------*

20           STENOGRAPHIC AND VIDEO-RECORDED

21                DEPOSITION OF

22                DAVID TOSSILLO

23           Friday, June 16, 2023

24                  9:17 a.m.

25

```
 1              CONFIDENTIAL - TOSSILLO
 2   BY MR. BOWE:
 3       Q.   Mr. Tossillo, explain the circumstance
 4   under which you left MindGeek employment.
 5            MR. SACK:  Objection, both scope and
 6       relevance, but I'll allow a limited set of
 7       questions.
 8       A.   Can you qualify that, please?
 9       Q.   When did you leave?  When did you --
10   when were you no longer employed by MindGeek?
11       A.   It was in -- I can't remember if it was
12   June 1st or July 1st of 2022.
13       Q.   You need to keep your voice up, if you
14   could.
15       A.   I can't remember if it was June or
16   July 1st of '22.
17       Q.   And did you resign or were you fired?
18       A.   It was a mutual decision to part ways.
19       Q.   Okay.  Who was involved in that
20   decision?
21       A.   Well, myself obviously.  The other
22   shareholders.  Myself and the other shareholders.
23   That's it.
24       Q.   That was it?
25       A.   I'm sure other people had, potentially
```

```
 1                 CONFIDENTIAL - TOSSILLO

 2    had some input, but nothing that I'm aware of.

 3         Q.   So I'm having trouble catching what

 4    you're saying.  I'm going to move a little closer

 5    because I don't want to make you speak in an

 6    unnatural way.

 7         A.   Yeah, I talk lower.  Sorry.

 8         Q.   That's okay.

 9              So let me just read you what I think I

10    heard and what was typed.

11              (Whereupon, brief conversation.)

12              (Whereupon, resumed.)

13         Q.   All right.  So you said the other

14    shareholders, who did you mean?

15         A.   It was me and Feras both leaving at the

16    same time, so it was us discussing with Bernard.

17    The RK Group really didn't, to the best of my

18    knowledge, really didn't partake in any of it.

19    The vast majority of the conversation was done

20    through counsel at MindGeek.

21         Q.   When you say "counsel at MindGeek," who

22    do you mean?

23         A.   Primarily ███████████.

24         Q.   You're talking about Mr. ████████ who's

25    here?
```

```
 1                CONFIDENTIAL - TOSSILLO
 2        Q.    Okay.  And did he say why he thought it
 3   would be a good idea?  Why he thought -- well, let
 4   me withdraw that.
 5              Did you understand he thought it was a
 6   good idea, he wanted you to resign?
 7        A.    I think he believed that the concept of
 8   a fresh face could be beneficial.
 9        Q.    Did he say, "I want you to resign"?
10        A.    No, he never said that to me.
11        Q.    He left it up to you?
12              MR. SACK:  Objection to the form.
13        A.    I don't think anyone was forced.
14        Q.    You thought he left it up to you to
15   decide?
16              MR. SACK:  Objection to the form.
17        A.    I was never forced to leave.
18        Q.    That wasn't my question.  Did you think
19   he was giving you the option of staying?
20              MR. SACK:  Objection to the form.
21        A.    By me saying I don't think I was forced
22   that leads some level of optionality.
23        Q.    Well, not being forced would be giving
24   you the option to resign.  Isn't it true he gave
25   you the option to resign?
```

```
 1              CONFIDENTIAL - TOSSILLO
 2              MR. SACK:  Objection to the form.
 3         Q.   And to negotiate a severance and not be
 4    forced out?
 5         A.   During the negotiation process, he would
 6    have preferred, obviously, if there was no
 7    severance.  It would leave money in the company,
 8    if that's what you're asking.
 9         Q.   Well, not quite, but I was going to get
10    there.
11              Why -- did he express the view that he
12    didn't want you to get a severance?
13         A.   The terms of the severance there was a
14    negotiation around the terms.
15         Q.   Okay.  Why didn't the company think you
16    were entitled to a severance?
17              MR. SACK:  Objection to the form.
18         A.   The company never said that.
19         Q.   Well, you had an agreement that entitled
20    you to a severance under certain circumstances,
21    right?
22         A.   That's correct.
23         Q.   Okay.  And the company didn't want to
24    pay that to you, right?
25         A.   The company never said that to me.
```

```
 1              CONFIDENTIAL - TOSSILLO
 2      Q.   Well, you said he would have preferred
 3   not to pay you a severance, and then you had to
 4   negotiate a severance, right?
 5              MR. SACK:  Objection.
 6      A.   That's Bernard, that's not the company.
 7      Q.   Okay.  Bernard didn't want to give you a
 8   severance?
 9      A.   I don't think anyone particularly enjoys
10   parting with money.
11      Q.   So is the answer no, Bernard did not
12   want to give you a severance?
13      A.   Bernard would have preferred if there
14   was no additional financial burdens placed on the
15   company.
16      Q.   Okay.  Well, you've saying what Bernard
17   would have preferred.  What did you understand his
18   position to have been either articulated to you,
19   Mr. Antoon or the company?
20              MR. SACK:  In regard to what?
21      Q.   Your severance.
22      A.   He, like I just said, he preferred that
23   I wouldn't.
24      Q.   And who did he express that to?
25      A.   I believe it went to ████████ .
```

1          CONFIDENTIAL - TOSSILLO

2     Q.    He communicated that to your lawyers?

3     A.    There was a negotiation around the

4  amounts and the time frame.

5     Q.    Okay.  And were you negotiating with the

6  company or with your lawyers?

7     A.    I was sending my request to my lawyer

8  and they would send it over to MindGeek.

9     Q.    Okay.  Did you have an understanding

10 about why you might not get a severance; why did

11 you have to negotiate a severance?

12          MR. SACK:  Objection to the form.

13    A.    I believe, to the best of my

14 understanding, it was purely financially driven.

15    Q.    Okay.  It was purely that "we don't want

16 to pay you the money that we owe you"?

17    A.    I wouldn't state it exactly like that.

18 I think the logic was more around, the more that's

19 in the company is better for the company.

20    Q.    Okay.  Was there any allegation that you

21 weren't entitled to the severance?

22    A.    Not to my knowledge.

23    Q.    Okay.  That you had engaged in any

24 misconduct?

25    A.    Not to my knowledge.

1              CONFIDENTIAL - TOSSILLO

2       Q.    Okay.  Did Mr. Bergmair ever confront

3   you about using MindGeek employees for your

4   personal business?

5       A.    Never.

6       Q.    Did you use MindGeek employees for your

7   personal business?

8       A.    What do you mean by my personal

9   business?

10      Q.    Not MindGeek business.

11            MR. SACK:  Objection to the form.

12      A.    Like having my assistant book a dental

13   appointment?

14      Q.    That would be a nominal example, yeah.

15      A.    There was some of that, yes.

16      Q.    Okay.  Well, tell me everything there

17   was.

18            MR. SACK:  Objection to the form.

19      Q.    Where you had MindGeek personnel working

20   on your personal business and not MindGeek

21   business.

22      A.    So it's hard for me to, to quantify or

23   to even create a list.  Because the vast majority

24   of the people I interacted with were my friends,

25   so a lot of it might have just fallen on I'm doing

```
 1              CONFIDENTIAL - TOSSILLO
 2   a favor the same way I would do something for
 3   them.  The only one that I can probably say is,
 4   like, an example, they wouldn't book me a dentist
 5   appointment, as an example, but I did have people
 6   that would help me out with a couple small things
 7   here and there.
 8        Q.   Like what?
 9        A.   Once again, I don't know if this
10   qualifies as they did me a favor or if they were
11   doing something for the business.
12             I had someone once help me out with a
13   meeting over a simple real estate template to sell
14   a small property in Montreal, as an example.
15        Q.   Who was that?
16        A.   I honestly don't know if I'm comfortable
17   giving the names.
18        Q.   No, I'm asking you who worked on your
19   personal business at MindGeek.
20        A.   There's actually like a reason why I
21   don't want to give personal --
22        Q.   This is not privileged.
23        A.   It's not privileged.  There's been a lot
24   of harassment done to ex-employees.
25        Q.   I need an answer to my question, sir.
```

Case 2:21-cv-04920-WLH-ADS Document 560-63 Filed 03/26/25 Page 11 of 85 Page ID #:19472

```
 1              CONFIDENTIAL - TOSSILLO
 2       A.   I just don't know if I'm comfortable
 3  giving these names.
 4       Q.   Are you refusing to answer the question?
 5            THE WITNESS:  Do I have to answer
 6       this?
 7            MR. SACK:  Why don't we confer.
 8            MR. BOWE:  Well, it's not a privilege
 9       issue.  He's refusing to answer the
10       question.
11            MR. SACK:  He wants to talk --
12            MR. BOWE:  Are you going to instruct
13       him not to answer?
14            THE WITNESS:  I want to understand
15       this.  By giving someone's name they will
16       continue to -- well, they would fall under
17       the harassment that's happened in the past
18       to ex-employees of ours.
19            MR. BOWE:  That's what you want to
20       talk to your lawyer about?  That's not
21       privileged.  You're refusing to answer the
22       question?
23            THE WITNESS:  I don't want to subject
24       someone to harassment.
25
```

Case 2:21-cv-04920-WLH-ADS Document 486-65 (Ex Parte) Filed 03/26/25 Page 12 of 85 Page ID #:19473

1             CONFIDENTIAL - TOSSILLO

2    BY MR. BOWE:

3         Q.   Are there any other examples where

4    people worked on your personal business?

5         A.   Without naming names?

6         Q.   You won't give me any names?

7         A.   I'm waiting for my lawyers to tell me if

8    it's okay or not because I don't want to be

9    responsible for what happens to the employees

10   after.

11        Q.   ████████████, did she work on your

12   personal business?

13        A.   That's ████████

14        Q.   Did she work on your personal business

15   while she was working at MindGeek?

16        A.   She had worked on -- no, I believe that

17   was for her own interest.

18        Q.   What?

19        A.   She had helped with some condos, but

20   she's a beneficiary of those condos as well.

21        Q.   Okay.  Was she working on Mr. Antoon's

22   condos too?

23        A.   Not to my knowledge.

24        Q.   Okay.  When you say she's a beneficiary

25   of those condos, what do you mean?

```
 1              CONFIDENTIAL - TOSSILLO

 2        A.    Those condos are held by a corporation

 3   that's held by a trust that she's a beneficiary

 4   of.

 5        Q.    Okay.  And when did she do that work?

 6        A.    I have no idea.

 7        Q.    During the days?

 8        A.    I don't really know what time she did

 9   it.  To the best of my knowledge, she was never

10   reprimanded for not doing her job or not getting

11   her work done.

12        Q.    She was, she was -- you were the COO.

13   She's ████████.  She didn't get reprimanded.

14   Who's going to reprimand her?

15              MR. SACK:  Objection to the form.

16        A.    I was very clear at all times that

17   anyone could be subject to anything to do with

18   work.  If they're not doing their job, then I have

19   nothing, I stay out of it.

20        Q.    Okay.  What's your testimony under oath

21   about what her involvement was at your condos?

22        A.    On a small percentage of the condos I

23   owned she was doing some tasks to keep them

24   running.

25        Q.    Tell me what the tasks were.
```

```
                                                      Page 92
  1                CONFIDENTIAL - TOSSILLO
  2        A.    She would help me find renters.   She
  3   would field some of the calls.
  4        Q.    From tenants?
  5        A.    From tenants.
  6        Q.    Okay.
  7        A.    She would take care of the mortgages.
  8   Let's see what else.
  9              She would field the calls.   Some of the
 10   stuff I would get involved with as well.
 11        Q.    I don't know whether it was meant to be
 12   audible or not, but you said something about
 13   mortgages?
 14        A.    No, mortgages was, I handled the
 15   mortgages.
 16        Q.    Did anybody else at MindGeek work with
 17   you on the mortgages?
 18        A.    I don't believe so.
 19        Q.    ███████████████?
 20              MR. SACK:   What's the question?
 21        Q.    Did he work with you on your properties?
 22        A.    He didn't work with me on the
 23   properties.   He helped us administer some of the
 24   banking stuff, so it's possible he set up a wire
 25   or something along the way.
```

1               CONFIDENTIAL - TOSSILLO

2        Q.    When you say he helped you administer

3    some of the banking stuff, you mean he was the

4    bookkeeper for your real estate?

5        A.    No, we had accounting firms for that.

6        Q.    You had accounting firms as bookkeepers

7    tracking the in and out and making payments when

8    they needed to be made?

9        A.    No, payments were automatic, the vast

10   majority of them I think was.

11       Q.    What did he do for you guys?  Did he

12   keep, for example, did he keep a spreadsheet of

13   who your tenants were and what they had paid and

14   what they hadn't paid?

15       A.    No, I don't think so.

16       Q.    No?  You never saw that?

17       A.    I saw a spreadsheet with tenants but it

18   wasn't from ▓▓▓▓▓▓.

19       Q.    Who was it from?

20       A.    My ▓▓▓▓▓ had it.

21       Q.    Okay.  And what was on that spreadsheet?

22       A.    Tenants.

23       Q.    Okay.  Tenants and what?  Rents?  Rent

24   rolls?  Payments?  Expenses?  What?

25       A.    They were the costs associated with the

Page 94

CONFIDENTIAL - TOSSILLO

```
 1         CONFIDENTIAL - TOSSILLO
 2   condo for the year.
 3        Q.   For the whole year?
 4        A.   There was like taxes and condo fees and
 5   stuff like that, but most of that was just set up
 6   automatically just to be withdrawn from the
 7   account.
 8        Q.   Okay.  But who was -- she kept the Excel
 9   spreadsheet?
10        A.   She had the Excel spreadsheet, yes.
11        Q.   Where did she have it, at MindGeek?
12        A.   I don't know if it was at MindGeek, it
13   was on the computer.
14        Q.   Okay.  Was it on -- did she work on that
15   at MindGeek?
16        A.   I don't know when she sent the emails.
17        Q.   Did she send emails from MindGeek's
18   email account?
19        A.   I'm pretty sure she did.
20        Q.   All right.  Tenants were getting emails
21   from ██████████ from MindGeek about your property
22   business, right?
23        A.   I'm not sure what correlation you're
24   trying to draw between --
25        Q.   I'm just asking --
```

```
 1              CONFIDENTIAL - TOSSILLO
 2   cabins that you owned?
 3        A.   The -- I can't really call them
 4   partners, but the group that was doing the
 5   short-term rentals they were taking a fee and I
 6   was getting like a portion of it.  They were like
 7   a mini Airbnb you can call it.
 8        Q.   Okay.  So you paid them to do that.  How
 9   many units were there?
10        A.   Four.
11        Q.   You owned four?
12        A.   Four or five.  Well, I didn't own four.
13   I think I owned one or one and a half, then my
14   wife owned the rest.  I don't remember.
15        Q.   Now, did ███████████ have anything to
16   do with any of your properties?
17        A.   ███████ was the individual that helped me
18   go through that sales contract.
19        Q.   Okay.  Was she a lawyer?
20        A.   No, she had her real estate license.
21        Q.   She had a real estate license?
22        A.   Uh-hum.
23        Q.   Okay.  And so what did she do?
24        A.   She just reviewed the contract.  I just
25   wanted to make sure I wasn't slipping up on
```

Case 2:21-cv-04920-WLH-ADS Document 366-63 Filed 03/26/25 Page 18 of 85 Page ID #:12479

```
 1              CONFIDENTIAL - TOSSILLO
 2    anything.
 3         Q.   And did you have anyone from legal ever
 4    review the contracts?
 5              MR. SACK:  Excuse me.  Did you say,
 6         did she have anyone from legal?
 7         Q.   Did you.
 8         A.   For the condominiums, I never had them
 9    look at anything, no.
10         Q.   I'm sorry?
11         A.   For the condominiums, I never had them
12    look at anything.
13         Q.   Okay.  What about, did you ever have
14    to -- did you ever have tenants who didn't pay
15    their rent?
16         A.   I'm sure it's happened.  I'm sure it's
17    happened, I'm just not aware of it.
18         Q.   And who takes care of that?
19         A.   It would depend on which one of the
20    condos it happened at.
21         Q.   For the ones downtown.
22         A.   Either I would have taken care of it or
23    ████████████ but I can't remember it happening.  I
24    remember -- I don't -- there was never -- I
25    don't -- honestly, no, I think maybe -- I don't
```

```
                                                        Page 109

  1               CONFIDENTIAL - TOSSILLO
  2     think we had a nonpayment issue.
  3          Q.   Okay.  Did ████████████  work on your
  4     properties?  Handyman.
  5          A.   He might have been -- someone might have
  6     asked him to do something at some point, I'm not
  7     sure.
  8          Q.   Who was your handyman other than him?
  9          A.   I don't know, I wasn't dealing with
 10     these things.
 11          Q.   Who was dealing with them?
 12          A.   Once again, it depends on which
 13     property.
 14          Q.   Well, would people -- would ████████
 15     ████████  had been talking to him about your -- about
 16     doing stuff?
 17          A.   No, I don't believe they know each
 18     other.
 19          Q.   Okay.  So it would have been ████████
 20     ████████?
 21          A.   If we're talking about the condos that
 22     she was looking after, that's possible.
 23          Q.   Okay.  Did she have a different handyman
 24     that she used?
 25          A.   I don't know.
```

Case 2:21-cv-04920-WLH-ADS Document 486-65 (Ex Parte) Filed 03/26/25 Page 20 of 85 Page ID #:19255

                    CONFIDENTIAL - TOSSILLO

1
2        Q.    Okay.  And was he aware that there were
3    people who worked on your personal business --
4              MR. SACK:  Objection.
5        Q.    -- who were employed by MindGeek?
6              MR. SACK:  Objection to the form.
7    Calls for speculation.
8        A.    I'm not sure.
9        Q.    Okay.  In your Request to Admit, it
10   says:  Mr. Tossillo admits that some 92191568
11   Quebec Inc. personnel occasionally performed
12   personal services for non-MindGeek-related
13   business in which Mr. Tossillo had an interest.
14              Please tell me under oath all the
15   MindGeek personnel.  You say, "some MindGeek
16   personnel," which ones are you talking about in
17   your Request to Admit?
18        A.    So I'm referencing ███████.  I'm
19   referencing ██████ had helped me with that.
20              Once again, if we want to get into
21   booking appointments and stuff, then any one of
22   the shared executive assistants might do that.
23              I might have asked legal along the way
24   to take a look at something.  But, once again, I
25   would say that's more a favor than anything else,

Case 2:21-cv-04920-WLH-ADS Document 486-65 (Ex. Part) Filed 03/26/25 Page 21 of 85 Page ID #:19482

```
 1            CONFIDENTIAL - TOSSILLO
 2   but in the abundance of caution I'm disclosing it.
 3       Q.    Anyone else?
 4       A.    Not to the best of my recollection, no.
 5       Q.    Okay.  And you're excluding ██████████
 6   from that even though she worked at MindGeek?
 7       A.    I'm excluding --
 8            MR. SACK:  Objection to the form.
 9       He's talked about her for 10 minutes.
10            MR. BOWE:  I'm asking, I'm asking in
11       response to this question.
12       A.    I'm excluding ████████ from that
13   because I believe she was working on it because
14   she is one of the beneficial owners.
15       Q.    Okay.
16       A.    So based on that I'm just classifying
17   that she was doing her own stuff.
18       Q.    Okay.  So like if an administrative
19   assistant wanted to take a few hours off every
20   week during the workweek to go manage their own
21   real estate properties, would that be okay?
22       A.    We've always operated with flex hours.
23   We have goals and targets.  We don't, we don't --
24   we don't run a factory.  We don't have punch
25   clocks.
```

```
                                            Page 123

 1              CONFIDENTIAL - TOSSILLO

 2      A.    More than once probably, but not a

 3  regular basis.

 4      Q.    Okay.  And so did he just keep coming up

 5  and asking you if he could help you on your real

 6  estate business?  Or when you needed to make a

 7  payment did you go to him and say, "Could you

 8  please do this?"

 9      A.    I should probably clarify when I said

10  "make a payment."

11      Q.    Yeah.

12      A.    I mean make a payment like once in a

13  blue moon.  He was not making payments to like, to

14  the best of my knowledge, if he had to do it, like

15  pay for a hydro bill or something like that, that

16  wasn't, he wasn't doing that stuff.

17      Q.    Okay.  What stuff was he doing?

18      A.    Once again, I'm erring on the side of

19  caution and saying that he might have made

20  payments, but I don't actually know if he did make

21  a payment or not.

22      Q.    Okay.

23      A.    I'm just trying to be safe and not be

24  offside.

25      Q.    Okay.  So anyone else that you were
```

```
                                              Page 124

 1              CONFIDENTIAL - TOSSILLO
 2    referring to in your Request to Admit when you
 3    said some 92191568 Quebec personnel occasionally
 4    performed personal services for
 5    non-MindGeek-related business?
 6         A.   You'd have to refresh my memory which
 7    ones I spoke about.
 8         Q.   You spoke about Mr. ████████.  You spoke
 9    about ████████████.  You excluded ████████████.
10    Those are the ones that I have.
11         A.   I said that ████████ might have given me
12    a hand at one point looking over a contract.
13         Q.   Okay.  ████████████████?
14         A.   Anthony Penhale.
15         Q.   Okay.  What about his subordinates in
16    legal?
17         A.   One individual was my partner in an
18    endeavor, so I believe that was all done on their
19    free time.
20         Q.   Who's that?
21         A.   ████████.
22         Q.   Who?
23         A.   ████████.
24         Q.   ████████ who?
25         A.   I never spell her name right.  ████████████.
```

```
 1            CONFIDENTIAL - TOSSILLO
 2       A.    I did not.
 3       Q.    Okay.  Did you own two properties in
 4   which MindGeek was tenants?
 5       A.    Partial ownership.
 6       Q.    Okay.  Which were those properties,
 7   what's the name of them?
 8       A.    There's one located at quadruple 7
 9   Decarie and 8000 Decarie.
10       Q.    Okay.  Now quadruple 7 Decarie is an
11   address that some of your tenants got emails from.
12   What is that address with respect to MindGeek?  Is
13   that the main office?
14       A.    My tenants got what?
15       Q.    Nevermind.
16            The 7777, what MindGeek entity is there?
17       A.    9219-1568.
18       Q.    Okay.  And is that where your office
19   was?
20       A.    My office?  Which office?
21       Q.    When you were there as COO was that
22   where your office was?
23       A.    Where my employee office was?  Like
24   where I worked as an employee?
25       Q.    Sure.
```

```
                                              Page 139

 1              CONFIDENTIAL - TOSSILLO
 2       A.    Yes.
 3       Q.    Did you have a different office there
 4   where you worked as not an employee?
 5       A.    No, you asked me where my office was, I
 6   didn't know what you were referring.
 7       Q.    I asked you where was your 9219 office.
 8             MR. SACK:  That's actually not what
 9        you asked, but I think you can answer where
10        your work office was.
11       A.    Yeah, you want to know where which
12   office is?  The 9219 office?  Or you want to know
13   where my office was.  Because you said as an
14   employee, you said as a COO, and then you said as
15   9219, so I'm not sure what you're asking.
16       Q.    Okay.  How many roles did you have at
17   MindGeek during this period?
18       A.    One.
19       Q.    Okay.  So whether it's COO or employee,
20   where was your office?
21       A.    David Tossillo had an office at 7777
22   Decarie.
23       Q.    Okay.
24       A.    As an employee.  Which you also asked me
25   what 9219 is, so there were offices there, that's
```

```
                                            Page 140
 1              CONFIDENTIAL - TOSSILLO
 2    why I didn't know what you were asking.
 3         Q.   Okay.  So David Tossillo as COO of what
 4    entity?
 5         A.   9219-1568.
 6         Q.   Okay.  And where was that human being's
 7    office.
 8         A.   I just told you.
 9         Q.   Tell me again.
10         A.   David Tossillo worked at 7777.
11         Q.   In what capacity, as a COO?
12         A.   As the COO.
13         Q.   Okay.  And is the COO office the same
14    office that you were referring to when you said
15    David Tossillo had an employee office?
16         A.   I meant the physical office like a room.
17         Q.   Okay.  It's the same office, right, not
18    two offices there?
19         A.   You're honestly, you're honestly losing
20    me, I'm sorry.
21         Q.   Okay.  How many offices did you have at
22    7777?
23         A.   One.
24         Q.   Okay.  Did you have one that you used in
25    your personal capacity?
```

Case 2:21-cv-04920-WLH-ADS Document 486-63 (Ex Parte) Filed 03/26/25 Page 27 of 85 Page ID #19255

CONFIDENTIAL - TOSSILLO

1

2          MR. SACK:  You mean like did he have a

3     home office?

4          MR. BOWE:  No.

5     Q.   Did you have an office at 7777 that you

6  had that you used in your own personal capacity,

7  not as COO, a separate office?

8     A.   I don't understand the question.

9          MR. SACK:  Did you have more than one

10     office at 7777?

11          THE WITNESS:  No, I just had an office

12     I worked out of.

13     Q.   And what ownership interest did you have

14  at 7777?

15     A.   I owned a minority stake in the real

16  estate.

17     Q.   Can you speak up?

18     A.   I owned a minority stake in the real

19  estate.

20     Q.   Okay.  And when did you acquire that?

21     A.   '16 or '17, I can't remember.

22     Q.   Okay.  And did you acquire that with

23  Mr. Antoon?

24     A.   I acquired my ownership at the same time

25  that he did.

```
                                              Page 142

 1              CONFIDENTIAL - TOSSILLO
 2       Q.    Okay.  And how did that come about?
 3       A.    We negotiated a deal to buy part of the
 4  building.
 5       Q.    Okay.  Did you tell Mr. Bergmair that
 6  you were going to buy part of the building that
 7  the company was renting?
 8       A.    Feras communicated that to him.
 9       Q.    How do you know that?
10       A.    Feras had told me.
11       Q.    Okay.  When did he communicate that to
12  him?
13       A.    Prior to the purchase.
14       Q.    Okay.  And why did he communicate that
15  to him?
16       A.    Because --
17             MR. SACK:  Objection to the form.
18       Calls for speculation.
19             But if you have a view, you can give
20       it.  He asked you why Mr. Antoon
21       communicated something.
22             THE WITNESS:  Oh, sorry.
23             MR. SACK:  So I just want you to feel
24       comfortable that you can answer that
25       question.
```

Page 143

1            CONFIDENTIAL - TOSSILLO

2            THE WITNESS:  That's fine.  That's

3        fine.

4        A.   Both myself and Feras agreed that

5    because MindGeek was a tenant that it was the

6    right thing to make sure that the partners knew.

7        Q.   Okay.  He didn't have to approve it?

8        A.   He -- if he would have display -- if he

9    would have said he was unhappy with it, I even

10   believe -- I believe Feras even offered him if he

11   wanted to come in as an investor and he chose not

12   to.

13       Q.   Okay.  Was that disclosed to Grant

14   Thornton?

15       A.   Yes, I believe so.

16       Q.   And did they do an analysis of the

17   pricing?

18       A.   An analysis of the pricing was done, but

19   it wasn't done by Grant Thornton.  We hired a

20   third party firm because we wanted to stay -- what

21   is it?  It's at arm's length, you say, I don't

22   want to say it the wrong way.  We realized,

23   obviously, we were at the same time owners, so we

24   didn't want to influence it, so we had a third

25   party do some analysis of what appropriate pricing

```
1                   CONFIDENTIAL - TOSSILLO
2      individuals who are sending us traffic.  So I want
3      to use your meaning.  I asked you about affiliate
4      partners, you said those are individuals who send
5      traffic to our website.
6                   MR. SACK:  No, no, to the subscription
7           site.  He said subscription site.
8           Q.   Okay.  To the subscription site.  That's
9      a website, right?
10          A.   It would be a website, yes.
11          Q.   Okay.  All right.  So to the
12     subscription website.  Who are those people?
13          A.   I don't know.  I don't know.
14          Q.   Do you or a member, any member of your
15     immediate family own or have any interest in any
16     such affiliate partner?
17          A.   No.
18          Q.   Are you aware of any other person at
19     MindGeek who does?
20          A.   To the best of my knowledge, no.
21          Q.   Okay.  Mr. Antoon?
22          A.   To the best of my knowledge, no.
23          Q.   Any member of his family?
24          A.   To the best of my knowledge, no.
25          Q.   Any member of your family?
```

```
 1              CONFIDENTIAL - TOSSILLO
 2      A.    To the best of my knowledge, no.
 3      Q.    Mr. Bergmair?
 4      A.    To the best of my knowledge, no.
 5      Q.    Okay.  Now, you said that's different
 6  than people you buy ads from?
 7      A.    That's correct.
 8      Q.    Okay.  So what would you call those, the
 9  entities or individuals you buy ads from, what
10  should we call those?
11      A.    We used to call it part of ad
12  purchasing.
13      Q.    But you didn't -- the entities you're
14  buying the ads from, do they have any particular
15  name?
16      A.    There's hundreds, maybe thousands.
17      Q.    Okay.  And are those all websites?
18      A.    No.
19      Q.    What else could they be?
20      A.    Email campaign.  They, in theory, could
21  be a brick-and-mortar campaign.  It's any type of
22  marketing, I guess.
23      Q.    Okay.  Same questions.  Any members of
24  your family from whom MindGeek purchased
25  advertising?
```

```
 1              CONFIDENTIAL - TOSSILLO
 2      A.    No.
 3      Q.    Mr. Antoon's?
 4      A.    To the best of my knowledge, no.
 5      Q.    Okay.  Mr. Bergmair?
 6      A.    Same thing.
 7      Q.    Okay.  Any other person at MindGeek that
 8  you're aware of who purchased -- who owned an
 9  entity from which MindGeek purchased advertising?
10      A.    To the best of my knowledge, no, but I
11  don't know what 1,800 people are doing.
12      Q.    Okay.  Was there any requirement to
13  disclose if you worked at MindGeek and you were
14  going to do business with MindGeek?
15      A.    What's the question?
16      Q.    Was there -- was there a policy that you
17  needed to make some disclosure if you were going
18  to do business with MindGeek?  If you owned an
19  entity that was trying to do business with
20  MindGeek.
21      A.    Are you referring to a third-party
22  entity now?
23      Q.    Yes.
24      A.    There might have been in the terms of
25  service.
```

```
 1              CONFIDENTIAL - TOSSILLO
 2       Q.   Well, I'm talking about in terms of an
 3   employee at MindGeek.
 4       A.   Well, I thought you said third party,
 5   that's why.
 6       Q.   Well, an employee who works at MindGeek
 7   but is also selling MindGeek advertising.
 8       A.   I believe that was part of the
 9   employment agreements.
10       Q.   Okay.  Did you have an obligation to
11   disclose such stuff?
12       A.   I believe it was part of my employment
13   agreement.
14       Q.   Okay.  In 2018 your employment agreement
15   was amended, right?
16       A.   I believe so.
17       Q.   Who signed off on that?
18       A.   Feras, I believe.
19       Q.   Okay.  And did he sign your employment
20   agreement?
21       A.   Yes, he was the other director of the
22   9219-1568.
23       Q.   Okay.  So he signed off on yours?
24       A.   I believe so.
25       Q.   Anyone else?
```

```
                                                    Page 161
 1              CONFIDENTIAL - TOSSILLO
 2              MR. SACK:  You mean physically sign or
 3        approve?
 4              MR. BOWE:  Physically sign.
 5        A.    Physically sign it, I believe he was the
 6   only one that signed it.  I believe he was the
 7   only other director at the time.
 8        Q.    Okay.  So he was the only other person
 9   who approved it?
10        A.    That's not correct.
11        Q.    Who else approved it?
12        A.    Bernard.
13        Q.    Why was he approving it?
14        A.    Because it would be inappropriate to be
15   the sole director to be able to sign off on
16   something that would be your own compensation.
17        Q.    Okay.  But why would you go to Bernard?
18        A.    Because he's the ████████████████████████
     ██      █████████████.
20        Q.    Is he?
21        A.    I don't know the correct wording of it,
22   but ███ he was ██ percent owner.
23        Q.    Of what?
24        A.    Pardon me?
25        Q.    Of what?
```

                    CONFIDENTIAL - TOSSILLO

1

2      A.   Of -- I guess there's a difference

3   between economical interest and then share

4   interest.

5      Q.   Right.  You're talking about it was a

6   share -- you talked to him as the shareholder.

7   What did own?  He didn't own ██ percent.  He

8   wasn't a ██ percent shareholder of MindGeek.

9      A.   In 2018?

10     Q.   Ever.

11     A.   Define "ever."

12     Q.   From the MBO until you left.

13     A.   I'm not a hundred percent sure.

14     Q.   Was he ever during that time a ██

15  percent shareholder of MindGeek?

16     A.   I'm not sure.

17     Q.   Okay.  You said he was a ██ percent

18  what?

19     A.   I'm trying to make sure I don't

20  miscategorize.  He had ██ percent, I guess

21  economical interest would be the most appropriate

22  way to define it.

23     Q.   Okay.  You can, you can -- you've called

24  it something, you haven't defined it.  What does

25  that mean?  When you say -- first you said he

1             CONFIDENTIAL - TOSSILLO

2    approved it as the ███████████████.  I

3    understand that concept.  When you distinguished

4    that by saying he was a ██ percent, somewhat ██

5    percent economic -- excuse me.  Let me try that

6    again without the gaffes.

7             You started out by saying he was a ██

8    percent shareholder.  Now you've distinguished

9    that by saying he had a ██ percent economic

10   interest.  How were those different?

11       A.   So I don't have all the knowledge on how

12   the corporate structure backs out into what I'm

13   trying to describe, which is essentially that he

14   is the ██ percent owner.  And once again, owner is

15   probably using the wrong terminology.

16           So as partners we interchange the words,

17   and I'm probably mixing up the proper terminology

18   from a finance or accounting perspective, but in

19   the end of the day he was ██ percent.  He was

20   entitled to ██ percent of whatever the profits of

21   the organization were.  And at anytime he was able

22   to reorganize the company in a way that he would

23   actually -- that could be transformed into ██

24   percent of, I guess shareholding would be the

25   proper way to describe it.

Case 2:21-cv-04920-WLH-ADS Document 486-66 (Ex Parte) Filed 03/26/25 Page 37 of 85 Page ID #:19498

1                CONFIDENTIAL - TOSSILLO
2        Q.   All right.  So you knew he wasn't a █
3   percent shareholder.  There was some circumstances
4   where he could make that happen?
5        A.   It depends on what time.
6        Q.   Well, he never made it happen.
7            MR. SACK:  Well, I think you asked him
8        about his understanding, so --
9            MR. BOWE:  Right.
10           MR. SACK:  -- so not about what could
11       happen.
12       Q.   Your understanding was that he never
13  actually was a █ percent shareholder in MindGeek?
14       A.   He was not a █ -- I don't know if he
15  was a █ percent shareholder at MindGeek during
16  between the MBO and the time that I departed.
17       Q.   Okay.  He might have been in your view?
18       A.   He might have been.
19       Q.   Okay.  Why did he approve of your
20  contract in 2018?
21           MR. SACK:  Objection to the form.
22       Calls for speculation.
23       A.   Because he was -- and once again I'm
24  using the word -- and I know it's not the correct
25  word to use -- he was the ███████████████.

```
 1              CONFIDENTIAL - TOSSILLO
 2   Even though shareholder I know is being misused in
 3   this context.
 4        Q.   Because you know it's being misused
 5   because he actually owned ███████████████
      ████████ of MindGeek S.a.r.l. and all its
 7   subsidiaries, right, including 9219?  You knew
 8   that, right?
 9        A.   For -- there was a time, and I don't
10   know from the -- at the time of the MBO, that's
11   correct.
12        Q.   Okay.  And did you -- the fact that you
13   don't know, you're uncomfortable saying that was
14   always the case is, is it because something
15   happened or because you just never learned
16   anything differently but you don't know what
17   happened?
18              MR. SACK:  Objection to form.
19        A.   I don't know when certain things
20   happened, that's right.
21        Q.   Okay.  Did something happen that you're
22   aware of that caused him to become a ██ percent
23   shareholder?
24        A.   I don't know when, but at a certain
25   point his option was executed to become a
```

```
 1              CONFIDENTIAL - TOSSILLO
 2    ██ percent shareholder.
 3          Q.   When was that?
 4          A.   I've been telling you the whole time I
 5    don't know.
 6          Q.   Was it years before you left?
 7               MR. SACK:  Years before what?  Sorry.
 8          A.   I'm not sure what time frame you're
 9    referencing.  I don't know, I really don't know
10    when it was switched.
11          Q.   Okay.  You have no idea?
12          A.   It wasn't in 2013, I could tell you
13    that.
14          Q.   Was it in 2014?
15          A.   It's probably closer to the tail end of
16    my time there.
17          Q.   Okay.  How much closer?
18          A.   Could be within the last year or two,
19    I'm not sure.
20          Q.   Okay.  In 2018?
21          A.   Closer to the last year or two is what I
22    think.
23          Q.   At the time --
24          A.   But I'm not sure.
25          Q.   At the time you had him approve your
```

1

2    contract, he was not a ███ percent shareholder?

3        A.   I don't believe so, but he was treated

4    as such.

5        Q.   Okay.  And as a result he was treated as

6    such in terms of he had the right to approve the

7    contract?

8        A.   In our eyes, or my eyes -- I shouldn't

9    speak on anyone else's behalf -- he had the right

10   to approve it or not allow it.

11       Q.   Okay.  But even, let's say there was a

12   part where he converted into an indirect or UBO

13   holder of ███ percent of the shares in MindGeek

14   S.a.r.l., he actually wasn't a shareholder, right?

15       A.   I don't know that.

16       Q.   Well, you went to him for approval, was

17   he the actual shareholder of MindGeek, of any

18   MindGeek consolidated entity or did he hold it

19   through other entities?

20            MR. COLEMAN:  I'm sorry, can we add a

21       time frame here?

22       Q.   When you sought his approval for your

23   contract.

24       A.   You're going to have to be a little more

25   specific and then I'll attempt my best to answer.

```
                                          Page 168

 1              CONFIDENTIAL - TOSSILLO

 2       Q.    When you got his approval to amend your

 3  employment contract in 2018, you understood that

 4  Mr. Bergmair ████████████████████████████████

 5  ██████████████████████████████████████████████?

 6       A.    ███████████████████████████████████?

 7       Q.    Correct.  He had entities that held

 8  shares, right?

 9       A.    I believe that's the way it was set up,

10  yes.

11       Q.    ██████████  ██████████████████████████

12  ████████████████████████████████████████████████

13  ████████████, right?

14       A.    I believe that could be a correct

15  categorization from a finance perspective, I'm not

16  sure.

17       Q.    Okay.

18       A.    I just don't want to mischaracterize

19  something.

20       Q.    And you understood that those entities

21  had directors other than Mr. Bergmair, right?

22       A.    They might have.

23       Q.    Okay.  But yet you went to, for

24  shareholder approval, you went to him not those

25  directors, right?
```

```
                                        Page 169

 1              CONFIDENTIAL - TOSSILLO

 2        A.    The discussion was with him.

 3        Q.    And he didn't tell you, "I don't know

 4   why you're talking to me, I'm not a shareholder,

 5   go talk to my director"?

 6              MR. SACK:  The question is, did he say

 7        that?  That's the question.

 8        A.    Did Bernard say what?

 9        Q.    Did he say, "I don't know why you're

10   talking to me, I'm not a shareholder, talk to the

11   directors"?

12        A.    I don't believe he said that.

13        Q.    He actually engaged in the conversation

14   with you and gave you his approval, right?

15        A.    Primarily he spoke with Feras about it,

16   but I think I was on one or two of the

17   conversations.

18        Q.    Okay.  And did he also approve Feras's

19   contract amendment?

20        A.    It was taken care of at the same time, I

21   believe.

22        Q.    Okay.  And did you sign as the

23   counterparty to Feras's agreement and he signed as

24   the counterparty to yours?

25        A.    We were the only the two directors of
```

```
                                        Page 170

 1              CONFIDENTIAL - TOSSILLO
 2     9219, we really didn't have a choice.
 3          Q.   Okay.  What other approvals did you seek
 4     from Mr. Bergmair in your time there?
 5              MR. SACK:  In the entire time from
 6          20 --
 7              MR. BOWE:  Uh-hum.  Yes.
 8              MR. SACK:  -- 13?
 9              MR. BOWE:  Yes.
10              MR. SACK:  2013 to the --
11              MR. BOWE:  Yes.
12              MR. SACK:  -- present?
13              And you meant you personally or
14          Mr. Tossillo personally?
15          Q.   You or Mr. Antoon.
16          A.   So I had limited interaction with
17     Bernard over the years to be, to be frank.
18          Q.   Okay.  But can you answer my question?
19          A.   I can't recall specifics.  I know there
20     was multiple conversations that went on and I
21     honestly -- I just don't have any specifics right
22     now of things that I said is this okay or not
23     okay.
24          Q.   Okay.  When you say multiple
25     conversations, just give me what recollection you
```

```
 1              CONFIDENTIAL - TOSSILLO
 2    have.
 3              You have a recollection of multiple
 4    conversations with him about some form of consent.
 5         A.   I know --
 6         Q.   Tell me what you remember.
 7         A.   I know he was in communication with
 8    Feras far more often than with me.
 9         Q.   I understand.  And I'll ask you about
10    that in a minute, but I want to stand on my
11    question.
12              You have a general recollection of some
13    amount of consents that were sought from him.
14    What do you remember?
15         A.   I remember having conversations about
16    topics.  Is it possible during one of those
17    conversations we asked is this okay or is that
18    okay, but the decision-making process for a lot of
19    the company really didn't follow that route.
20         Q.   Okay.  When did it follow that route?
21         A.   I want to say almost never.  I can't, I
22    can't recall like -- I can't recall it happening
23    that way.
24         Q.   Okay.
25         A.   We had a very systematic approach of
```

Case 2:21-cv-04920-WLH-ADS Document 486-63 (Ex Parte) Filed 03/26/25 Page 45 of 85 Page ID #:19275506

```
 1              CONFIDENTIAL - TOSSILLO
 2   English language, do you have something you think
 3   of when you hear those words "answer to"?
 4        A.   Yes, I had a direct report.
 5        Q.   Okay.  Let's use your definition.  Who
 6   did he answer to?
 7        A.   So if your question is, does Feras have
 8   a direct report as another employee at 9219-1568,
 9   there is not another employee that sits above him
10   that he answers to on a day-to-day basis.
11        Q.   But that's who a CEO -- I didn't limit
12   it to employee, I said who's his direct report.
13        A.   Hence why I'm asking you to clarify.
14        Q.   Okay.  Well, who's his direct report?  I
15   didn't limit it to employee so you shouldn't.
16        A.   Well, you asked me what my definition
17   was for myself and I explained, and then I
18   extrapolated it upon the other question.
19        Q.   So without limiting it to employee, who
20   was his direct report?
21        A.   As the CEO he was responsible to fulfill
22   the contracts that we had to service to the best
23   of his ability.
24        Q.   So who did he report to?
25        A.   Once again, I believe you're
```

```
                                                    Page 195

 1                CONFIDENTIAL - TOSSILLO
 2    interchanging terms.
 3         Q.    Did he report to a director?
 4         A.    The director of 9219-1568 was myself and
 5    him.
 6         Q.    So he reported to you and himself?
 7         A.    Once again, I didn't say that.
 8         Q.    Okay.  So you don't believe that the CEO
 9    reports to the director?
10         A.    I didn't say that.
11         Q.    I know, I'm asking you.  I'm asking you,
12    who did he report to, and you're sort of stuck at
13    his level, so I'm asking you:  Doesn't he report
14    to the directors?  And just give me whatever your
15    answer is.
16         A.    Report to the directors in what
17    capacity?
18         Q.    As the CEO reporting to the directors.
19         A.    I'm really sorry, you're not being
20    clear.
21         Q.    I think I'm being clear, but that's
22    okay, you've given me the best answer you can give
23    me.  That's how you -- that's how -- however you
24    understood -- that's not a meaningful question as
25    you understand MindGeek?
```

```
                                                    Page 196

 1              CONFIDENTIAL - TOSSILLO
 2              MR. SACK:  Objection to the form.  I
 3      just don't know what question we're
 4      referring to now.
 5      A.   I'm mean, I'm not --
 6      Q.   Does the CEO of -- do the CEO of
 7  MindGeek entities report to the directors?
 8      A.   I'm -- I'm trying to basically answer it
 9  to the best of my ability.
10              I guess for some topics and under some
11  areas, yes, and at the same time there's a service
12  agreement that he's fulfilling the requirements of
13  that service agreement, so that's why my
14  hesitation.
15      Q.   Okay.  In what context does he report to
16  the board?
17      A.   The board of who?
18      Q.   MindGeek Canada.
19      A.   Aren't the directors and the board the
20  same?
21      Q.   I'm asking the question.  Can you answer
22  that question?
23      A.   I don't remember if the board and
24  directors are the same individuals.
25      Q.   Why does that matter to you?
```

1              CONFIDENTIAL - TOSSILLO

2         A.   Because you're asking me how someone

3    interacts with something and I don't know who that

4    other individual is.  You're asking me who he

5    interacts with.

6         Q.   No, I'm asking you whether he

7    interacts -- whether he reports to that position

8    or not.  What difference does it make whether it's

9    the same person?

10        A.   Because I think I might be using the

11   words interchangeably unintentionally and I don't

12   want to be saying the wrong thing.

13        Q.   What words do you think you're using

14   interchangeably?

15        A.   I might be using board and directors

16   because I don't know if they were separate

17   individuals.

18             MR. COLEMAN:  I'm going to object.

19        Q.   Well, they're not different individuals,

20   right?

21        A.   Pardon me?

22        Q.   They're not different individuals.

23             Let's use, what's the word that you used

24   in the ordinary course?  Don't use my words.

25             MR. SACK:  Objection.

```
 1              CONFIDENTIAL - TOSSILLO
 2      Q.   I wasn't there.
 3           MR. SACK:  Objection.
 4      Q.   I'm just asking questions.  What words
 5   did you use?
 6      A.   I didn't use those words ever.
 7      Q.   Did you ever have an understanding as a
 8   practical matter about the CEO of MindGeek Canada
 9   reporting to somebody in the corporate sense?
10      A.   We're now talking -- we're not talking
11   about operational stuff anymore?
12      Q.   Well, he's not the contractual party,
13   right?  I mean, he doesn't technology answer.
14           But no, we're talking about in terms of
15   corporate formalities who did he report to?
16           MR. SACK:  Objection to the form.
17           MR. COLEMAN:  Objection.  Objection.
18      Calls for a legal conclusion.
19      A.   So Feras answered to the directors of
20   9219, but I'm not, I'm not -- and even that I
21   might be saying that out of place.
22      Q.   Okay.  I'm going to mark for you as
23   Exhibit 1 a demonstrative exhibit that we prepared
24   from two documents that are listed there.
25           MR. SACK:  Mr. Bowe, is this a
```

Page 202

1

2    only gets ▮▮▮▮▮▮▮?

3          MR. SACK:  Objection to form.

4      A.   No, I do not.

5      Q.   Do you know where -- ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮

10          MR. SACK:  Objection to form.

11    Assumes --

12      Q.   -- but you only got ▮▮▮▮▮?

13          MR. SACK:  Objection to form.  Assumes

14    facts not in evidence, but that'll be a

15    continuing set of objections to all

16    questions based on this document.

17      A.   No, I don't know why the finance team

18    didn't declare a dividend or -- no, I don't.

19      Q.   ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

24          MR. SACK:  Can I hear that question

25    back?

Page 252

CONFIDENTIAL - TOSSILLO

1
2        A.    Right now I believe it's only -- I
3    believe ██████ is employed, but I don't believe
4    anyone else.
5        Q.    Okay.  Request to Admit No. 9 to you:
6    Please admit that members of Feras Antoon's family
7    received monies for services provided to MindGeek
8    entities.
9              Mr. Tossillo admits that certain members
10   of Mr. Feras Antoon's family were employed by
11   9219-1568 Quebec Inc. and received compensation.
12             Which members of his family were you
13   admitting were employed and received compensation?
14       A.    Is there a certain year or certain time
15   frame?
16       Q.    No.  The request was for you to admit
17   it, and you admitted it with the statement that
18   certain members of Feras Antoon's family were
19   employed by 9219-1568 Quebec Inc. and received
20   compensation, which ones?
21       A.    What's the time period for the
22   interrogatory again, please?
23       Q.    There isn't one.
24       A.    Yes, there is.
25             MR. SACK:  There is a time period

```
 1              CONFIDENTIAL - TOSSILLO
 2     the Cyprus customer is the one giving direction
 3     under this service agreement or they just sign the
 4     service agreement and not do interviews?
 5              MR. COLEMAN:  Objection.
 6              MR. SACK:  Objection to form.
 7         A.   No.  It followed these same -- it
 8     followed the same logic as I described earlier
 9     today of quarterly initiatives and approvals.
10         Q.   Okay.
11         A.   And then execution.
12         Q.   Okay.  Request for Admit No. 12 asks you
13     to admit that the MindGeek Defendants did not
14     maintain records of all its corporate entities and
15     ownership interests in nonconsolidated entities.
16     Okay?
17         A.   Okay.
18         Q.   Do you want me to say that again?  It's
19     a little confusing.
20         A.   Very confusing.
21         Q.   Please admit that the MindGeek
22     Defendants did not maintain records of all its
23     corporate entities and ownership interests in
24     nonconsolidated entities.  That was the question
25     that you were asked to admit.
```

Page 260

CONFIDENTIAL - TOSSILLO

1                   CONFIDENTIAL - TOSSILLO

2           The response was, in further -- you have

3  objections.

4           You say, in further response to Request

5  for Admission No. 12, pursuant to Federal Rules of

6  Civil Procedure 36(a)4, Mr. Tossillo states that

7  after making a reasonable inquiry he lacks

8  sufficient knowledge to respond to Request for

9  Admission No. 12 based on the information he knows

10  or could readily obtain.

11          Why couldn't you admit or deny whether

12  MindGeek maintained records for all its corporate

13  entities and ownership interest in nonconsolidated

14  entities?

15     A.   I have zero documentation about anything

16  that happened at MindGeek.

17     Q.   Well, sure, you have zero documentation,

18  but you were an owner there, one of three owners

19  publicly identified for over nine years.

20     A.   And during my whole tenure there I never

21  worked with legal or financing or setting up

22  corporate structures or any of that stuff.

23     Q.   Okay.  Well, you might not have had any

24  documentation and you might not have worked with

25  anyone in those areas, but it doesn't mean that

```
 1              CONFIDENTIAL - TOSSILLO
 2    you wouldn't have information that you couldn't
 3    have admitted or denied.
 4              MR. SACK:  So what's your question?
 5         Q.   My question is:  Why couldn't you admit
 6    or deny?  You don't know one way or the other the
 7    answer to that question?
 8              MR. SACK:  Objection.  Asked and
 9         answered.  Try again.
10         A.   I'm under the -- I'm under the
11    assumption that everything that needed to be filed
12    or submitted was done so by the finance,
13    accounting or legal team or any of the handful of
14    professionals that were servicing Cyprus or
15    Luxembourg or any of the other entities in the
16    group.
17         Q.   Well, that's not an answer to my --
18    that's an answer to a question but not to my
19    question.  My question is not whether it needed to
20    be disclosed somewhere or written down somewhere,
21    I want to know -- I'll break it down this way:
22              Did the entities on that org chart that
23    we just looked at, the last exhibit.
24         A.   Number 3?
25         Q.   Number 3.  Did they have any ownership
```

```
 1                CONFIDENTIAL - TOSSILLO
 2    them.
 3         Q.   Okay.  Well, you were, part of what you
 4    said you were in charge of was customer service
 5    group, right?
 6         A.   Yes.
 7         Q.   And the engineering team, right?
 8         A.   Large portions of it.
 9         Q.   Okay.  And I thought you said that he
10    did payment processing with acquiring banks?
11         A.   Payment processing, yes.
12         Q.   And SEO?
13         A.   Yes.
14         Q.   Okay.  So prior to The New York Times
15    story, is it your testimony you were never aware
16    of complaints coming through the customer service
17    that there was non-consensual content on the
18    website?
19              MR. SACK:   Objection.
20         A.   I didn't say that.
21         Q.   Okay.  Were you aware of complaints
22    coming through customer service about
23    non-consensual content on the website?
24         A.   I don't know if complaints came in
25    through the customer service arm.  It is possible.
```

Page 284

1           CONFIDENTIAL - TOSSILLO
2   There was a process by which it would be passed
3   along to the appropriate individuals to handle it.
4        Q.   Tell me the process and the individuals.
5        A.   I'm not a hundred percent sure what the
6   process was.  I know it was handed off so it could
7   be dealt with as if it had come in through any
8   other conduit would be treated the same way.  And
9   what that process was of how it was removed or
10  handled it after, I'm not sure.  I just know they
11  had a -- they had a special -- they had a way of
12  moving it over if it did make its way.
13       Q.   What do you mean "they had a way of
14  moving it over if it did make its way," what are
15  you talking about?
16       A.   They had a way if the request made it --
17  if a request came in, they had a conduit to
18  basically handle it to the team that normally
19  would handle such requests.
20       Q.   Okay.  I want to put some specifics on
21  it.  Who's "they," customer service?
22       A.   Customer service team.
23       Q.   Okay.
24       A.   Had a process, which I couldn't give you
25  the details on, that if there was a complaint that

```
 1              CONFIDENTIAL - TOSSILLO

 2              I asked you if you thought your process

 3     and mechanisms were so good you must have been

 4     gobsmacked when that story came out and is your

 5     answer yes or no?

 6              MR. SACK:  Objection to form.  You

 7         mean the process of customer service

 8         referring matters to another area or

 9         something else?

10         A.   So I believe the process that was under

11     customer service was working.  The other process,

12     the other conduits to -- for an end user to

13     basically try and contact the site.  My

14     understanding was even though they were under me,

15     the systems were working as they should to

16     basically put every deterrent in place and to try

17     and get ways to avoid having this stuff make it on

18     the site were working.  So I wasn't -- yeah.

19         Q.   So you thought customer service was

20     working, it was other groups that were responsible

21     for keeping things off the site that weren't

22     working?

23         A.   I didn't say that.

24         Q.   Okay.

25         A.   I said I can speak to stuff that somehow
```

```
 1              CONFIDENTIAL - TOSSILLO
 2    made its way up to me.  I was under the
 3    impression -- impression is the wrong word.
 4              To the best of my knowledge, the rest of
 5    the systems were working as well.
 6         Q.   Okay.  Let's break those down.
 7              What were the rest of the systems you're
 8    referring to?
 9         A.   I can't speak to how the majority of
10    those systems worked, or even what they all were,
11    prior to the article.
12         Q.   Okay.  So you testified in front of the
13    committee in Parliament that keeping CSAM off the
14    site was one of your biggest priorities since you
15    became an owner of the firm.  Do you remember
16    that?
17         A.   Yes.  I believe I said something, I
18    might have said something along those lines.
19         Q.   Okay.  And yet by the time The New York
20    Times story comes out in 2020, about seven years
21    later, it doesn't sound like you did anything to
22    figure out whether your system to keep stuff off
23    the site worked?
24              MR. COLEMAN:  Objection.
25              MR. SACK:  Objection to form.
```

```
 1              CONFIDENTIAL - TOSSILLO

 2      A.   I don't agree with that statement at

 3  all.

 4      Q.   Okay.  So I want to give you a chance to

 5  reconcile it.

 6           So you said you thought customer service

 7  is working, it was the other groups responsible

 8  for keeping things off the site that weren't

 9  working?

10      A.   I didn't say that at all.

11      Q.   That was my question.  I asked you.

12           So you thought customer service was

13  working, it was the other groups responsible for

14  keeping things off the site that weren't working.

15  You said, "I didn't say that.  I said I can speak

16  to stuff that somehow made its way up to me.  I

17  was under the impression -- impression is the

18  wrong word.  To the best of my knowledge, the rest

19  of the systems are working as well."

20           So what you meant when you said, "I can

21  speak to the stuff that somehow made its way to

22  me," you're talking about customer service and

23  you're distinguishing that from the other

24  processes that were designed to keep the stuff off

25  the website.  And now that, that didn't make its
```

```
                    CONFIDENTIAL - TOSSILLO
 1
 2    way up to you.  Is that your testimony?
 3         A.   The day-to-day operations of that stuff.
 4    The rest of the responsibilities around the --
 5    around the Freesites was either being managed by
 6    the product in Montreal or it was being managed by
 7    different employees that the site left under the
 8    control that they didn't, they didn't give to us
 9    as a service agreement.
10         Q.   They didn't give it to you, they made
11    that decision not to give it to you, not Montreal?
12         A.   They were the contracting entity.
13         Q.   I understand.  And you're saying they
14    made that decision?
15         A.   It depends at what stage of the decision
16    making.
17         Q.   Okay.
18         A.   It could have made its way up to the
19    board and the board made the final call and then
20    it came back down.  There was, there was a
21    hierarchy of decision making that happened.
22         Q.   All right.  So, again, I want to give
23    you an opportunity to reconcile.
24              You told the Canadian Parliament from
25    the time you became an owner keeping child
```

Case 2:21-cv-04920-WLH-ADS Document 486-66 (Ex Parte) Filed 03/26/25 Page 61 of 85 Page ID #:19522

```
 1              CONFIDENTIAL - TOSSILLO
 2    pornography off the site was a personal priority
 3    of yours.  What did you do as someone in charge of
 4    both customer service and the engineering team to
 5    ensure that this priority of yours was working?
 6              MR. SACK:  Objection to the form.
 7         Q.   Before The New York Times story.
 8         A.   Every time there was a project that
 9    could move that initiative forward, we made sure
10    to basically allocate whatever resources that I
11    had control of.  It wouldn't play out exactly
12    that.  We basically would use our engineering
13    resources to make sure we would code the systems
14    or integrate or whatever the proper terminology
15    would be, depending on what the solution is, to
16    basically make sure they work as they should.
17         Q.   Okay.  But this was your, as an owner,
18    this was your priority.  What did you do to ensure
19    that it was being -- it was treated as a priority
20    at MindGeek?
21              MR. SACK:  Objection.  Asked and
22         answered.
23         A.   The only thing I can add is make sure we
24    had competent people running those divisions that
25    we trusted to get the job done.
```

```
 1              CONFIDENTIAL - TOSSILLO
 2    the website since this was your biggest priority?
 3              MR. SACK:  Objection to form.
 4        A.    I didn't say it was my biggest priority,
 5    I said it was one of the things that was very
 6    important to me.
 7        Q.    You said it was one of your priorities.
 8        A.    As an individual it's one of my
 9    priorities that this stuff doesn't end up on the
10    site.
11        Q.    Was it one of your priorities as an
12    owner?
13        A.    As an owner as well, we can say that,
14    that's the same person.
15        Q.    I'm sorry?
16        A.    That is the same person, I'm still
17    David.
18        Q.    Right.  Well, you made a distinction.
19    So you're not making a distinction.
20        A.    My apologies.
21        Q.    Okay.  So tell me in all these
22    initiative meetings, since that was your priority
23    as an individual owner and CEO or COO, how often
24    did you present an initiative you wanted to have
25    presented, you wanted to have pursued to keep CSAM
```

```
 1              CONFIDENTIAL - TOSSILLO
 2         MR. SACK:  He says he doesn't
 3    remember.
 4         A.    These were years that -- this was, I
 5    wasn't dealing with product and stuff like that.
 6    I don't remember.
 7         Q.    I know, but you said when you bought the
 8    company in 2020, it was in 2013, along with three
 9    other groups, it was your priority to keep this
10    stuff off.
11         A.    Right.
12         Q.    So was it --
13         A.    So if somebody --
14         Q.    Do you have any recollection of when
15    Vobile was put in place?
16         A.    No.  And if someone, whenever they came
17    to me -- and at some point I must have heard about
18    it -- I'm fairly confident, or being modest about
19    it, but I know myself, I would have voted a
20    hundred percent to have anything like that up and
21    live on the site.
22         Q.    Okay.  But you never went out and said,
23    "Hey, how do we keep this stuff off the site?"
24         MR. SACK:  Objection to form.
25         A.    I never said that.
```

1              CONFIDENTIAL - TOSSILLO

2        Q.    You never commissioned anyone and said,

3   "Look, my number one priority is, I want to make

4   sure that we don't have child pornography on the

5   site, go figure out what we can do about it"?

6              MR. SACK:  Objection to form.

7        A.    Everyone that I ever spoke to knew that

8   was important to me as an individual.  And even

9   selfishly, even if you didn't care as a human

10  being, or a business perspective, it would be the

11  worst thing you could do.

12       Q.    All right.  I'll try my question a

13  different way.

14             Did you -- do you recall ever going in

15  2013 when you became an owner to anybody and say,

16  "My priority is keeping child pornography off the

17  site, find out what it is we're doing to do that

18  and whether it works."  Do you remember saying

19  that in 2013?

20             MR. SACK:  Objection to form.

21       A.    I don't remember saying that in 2013

22  because I wouldn't have had to say it in 2013.  I

23  was in the role of operations of 9219-1568 since

24  maybe 2010/2011, and everyone knew where I stood.

25       Q.    So you didn't do that in 2013?

```
 1              CONFIDENTIAL - TOSSILLO
 2       A.   Everyone knew, everyone knew where the
 3   whole organization stood.
 4       Q.   Okay.  But you don't remember whether
 5   Vobile was being used in 2013?
 6       A.   When they were -- when the -- when we
 7   were aware -- I shouldn't say that.
 8            When it was brought to our attention
 9   that we could do this, to the best of my
10   knowledge, we integrated stuff as quickly as we
11   could.
12       Q.   And were you involved in implementing
13   Vobile since this was a priority of yours?
14            MR. SACK:  Objection to form.
15       A.   I wasn't involved with integrating
16   anything.  I didn't do any engineering tasks.
17       Q.   Okay.  So when Vobile was implemented,
18   whenever it was implemented, how did you populate
19   the database that it was comparing images to?
20            MR. SACK:  Objection to form.
21       A.   I don't remember how it was initially
22   populated.  I don't know what actions were taken.
23   How to populate it.  We -- to the best of my
24   knowledge, ███████████████████████████████
     ███████████████████████████████████████████
```

Page 312

CONFIDENTIAL - TOSSILLO



21     Q.    Okay.  Did you contact NCMEC in 2013 to

22  do that?

23     A.    I don't believe, I don't believe anyone

24  contacted NCMEC in 2013.

25     Q.    You didn't contact NCMEC until after The

```
                                                    Page 313

 1                   CONFIDENTIAL - TOSSILLO
 2    New York Times story, right?
 3          A.    No.  I believe we started working with
 4    NCMEC prior to The New York Times story.
 5          Q.    Prior to 2020?
 6          A.    My -- I want to say 2019, but I'm not a
 7    hundred percent sure.
 8          Q.    Okay.  Isn't it true you started working
 9    with NCMEC in response to the Traffickinghub
10    campaign?
11          A.    No, I wouldn't say that's true at all.
12          Q.    Did you -- what about the Canadian
13    Center for Child Exploitation?
14          A.    ████████████████████████████████████████
      ██████████████████████████████████████████████████
      ██████████████████████████████████████████████████
      ████████████████████████████████████████████
      ████████████████████████████████████████████████████
      ██████████████████████████████████████████
      ████████████████████████████████████
21          Q.    You tried to do the integration in 2020
22    with them, right?
23          A.    We were trying to do integrations, to
24    the best of my knowledge, as soon as we were made
25    aware there's another database here and now
```

```
 1              CONFIDENTIAL - TOSSILLO
 2    there's most likely a huge overlap between one and
 3    the another.  But we were just like, okay, it
 4    doesn't matter how many catches, we'll put as many
 5    as we can in.
 6         Q.   Yeah, but you could have done that in
 7    2013, it was always available?
 8         A.   I don't know if that database was
 9    available.
10         Q.   Okay.  So you didn't when you got there
11    find out.  Did you know that entity existed in
12    Canada in 2013?
13              MR. SACK:  Objection to form.
14         A.   I don't, I don't think I was aware of C3
15    at the time, no.
16         Q.   Okay.  In 2014 were you aware of them?
17         A.   I don't know when I became aware of it.
18    I became aware of the issue that they wouldn't let
19    us integrate but I don't know when I was -- I
20    don't, I don't have a specific time of when I was
21    made aware that they existed.
22         Q.   Isn't it true that you had been
23    operating without any relationship with them for
24    seven years and didn't approach them until after
25    you had been publicly accused of not taking
```

Case 2:21-cv-04920-WLH-ADS Document 486-65 (Ex Parte) Filed 03/26/25 Page 69 Page570 of 85 Page ID #:9295530

```
 1            CONFIDENTIAL - TOSSILLO
 2    adequate steps and they didn't want to work with
 3    you then?
 4            MR. COLEMAN:  Objection.
 5            MR. SACK:  Objection to the form.
 6        Q.   Isn't that what happened?
 7        A.   I don't know that was the case or not.
 8        Q.   Okay.  Do you have any different
 9    recollection from that?  Do you have a specific
10    recollection that contradicts that?
11        A.   No, because I wasn't part of the team
12    that was basically working on the upload process.
13        Q.   Okay.  Is training staff to review
14    comments made on flagged videos?
15        A.   Pardon me?
16        Q.   Some sort of novel idea in terms of
17    trying to keep child pornography off your site.
18            MR. SACK:  Could I hear that question
19        back, please.
20            MR. BOWE:  Sure.
21        Q.   Is having your staff review and consider
22    comments on videos that had been flagged as an
23    additional step for identifying child pornography,
24    is that like a real novel idea?
25            MR. SACK:  Objection to form.
```

Page 316

CONFIDENTIAL - TOSSILLO

1    CONFIDENTIAL - TOSSILLO

2         MR. COLEMAN:  Objection.

3     A.    I'm not aware if -- I'm not aware prior

4   to -- I wouldn't say it's a novel idea.  It's a

5   mischaracterization.  ████████████████████████████



```
                                              Page 317

 1            CONFIDENTIAL - TOSSILLO

 2  ███████████████████████████████████████████

    ████████████████████████████████████████

    ████████████████████████████████████████████

    ███████████████████████████████████████████

    ████████████████████████████████████████████

    ███████████████████████████████████████████

    ████████████████████████████████████████████

    ████████████████████████████████████

10       Q.   Yeah, but why after all those years

11  MindGeek, which advertises itself as one of the

12  best technology firms in doing exactly what you

13  just described -- running a website, figuring out

14  what's on the website, optimizing the website --

15  why after all those years when the Traffickinghub

16  campaign started, why did you have to go --

17       A.   It's not, it's not --

18       Q.   Let me ask you.

19       A.   Because it's not what I said.

20       Q.   Why did you have to go outside to

21  someone else to do those algorithms --

22            MR. SACK:  Objection to form.

23       Q.   -- after all those years when this was a

24  top priority?

25       A.   First of all, I didn't say that at all.
```

```
 1              CONFIDENTIAL - TOSSILLO
 2        Q.    Had you done it in-house?
 3        A.    No.
 4              MR. SACK:  Objection to form.
 5        Q.    Okay.
 6        A.    I said -- I didn't say it.  I'm guessing
 7   you're making reference to what's written on
 8   mindgeek.com that we have a bunch of engineers and
 9   we work with cutting edge technology.
10              We were not a company that specialized
11   in sentiment-based and AI textual recognition.
12   That's not what we're experts in.
13        Q.    Okay.
14        A.    Which is why we went to a firm that was.
15        Q.    So how then were you so expert in if
16   somebody wrote in a search for "young teen,"
17   producing a video with a young teen, and then
18   suggesting pages and pages and pages of other
19   videos of similar type of content, how were you so
20   good at that, but yet in 2020 you were scrambling
21   to figure out a way to keep people from viewing
22   banned words like "tiny teen, young teen, underage
23   teen"?
24              MR. SACK:  Objection to form.
25              THE WITNESS:  It's fine.
```

```
 1              CONFIDENTIAL - TOSSILLO

 2       A.    I think you mixed a bunch of ideas in

 3  that unfortunately.

 4       Q.    Okay.  Well, explain to me why you

 5  couldn't have done -- why you couldn't have been

 6  in a better position in 2020 if this was such a

 7  priority.

 8       A.    It's for the --

 9             MR. SACK:  Objection to form.

10       A.    It's the -- I'll give you the best

11  engineering explanation I could, or can.

12             What you're making reference to -- first

13  of all, there's a couple things that you said

14  wrong.

15             Just because you search for something on

16  the site doesn't actually mean it's there.

17             So you could go to McDonald's and ask

18  for pizza, it doesn't mean you'll get pizza.  But

19  you could go ask for it or type it into their

20  search thing on the site, but that's a topic in

21  and all of itself.

22             The way the search algorithm works is

23  it's a textual-based search algorithm.  So you

24  could do a search for -- to use a simple example.

25             If you put 13 in the field with
```

Page 320

CONFIDENTIAL - TOSSILLO

1
2 something before or something after it, either
3 appended or not appended to it, the system will go
4 and try and find the most relevant content to it
5 based on the title.  What it could yield is Dave's
6 Favorite Videos Volume 13 as an example.  It
7 doesn't mean that Dave's Favorite Videos Volume 13
8 has actually what was being searched for in the
9 text.

Page 321



1            CONFIDENTIAL - TOSSILLO

2     Q.   How about "just 13"?

3     A.

Page 322



1          CONFIDENTIAL - TOSSILLO

CONFIDENTIAL - TOSSILLO

```
 1
 2  ███████████████████████████████████████
    ███████████████████████████████████████████
    ██████████████████████████████████████
    █████████████████████████████████████████████
    ████████████████████████████████████████████
    ███████████████████████████████████████████
    █████████████████████████████████████████████
    ██████████████████████████████████████████████
    ████████████████████████████████
```

11    Q.    Okay.  Have you accurately described --

12    A.    Have I accurately --

13    Q.    -- essentially the approach you took

14  from at least the time you got there to 2020?

15         MR. SACK:  Objection to form.  You

16     mean the company?

17         MR. BOWE:  Yeah.

18    A.    So what I'm describing to you is what

19  the -- what things -- how things operated 2020ish.

20  How the timing of the evolution of each one of

21  those components or each one of those subsystems,

22  I couldn't give you an accurate timeline of when

23  each one of them started or stop -- none of them

24  stopped.  If something stopped, it was because it

25  was replaced by something better.  But I couldn't

```
                                                    Page 324
  1              CONFIDENTIAL - TOSSILLO
  2    give you a time of exactly when each one of those.
  3    Each one of those is dependent on technology that
  4    was available at the time, stuff that it
  5    developed, third parties where you're bringing
  6    other softwares into the fold to try and help.  So
  7    I couldn't tell you when and where.  But I know
  8    that basically when we were able to make
  9    improvements, I know that was the team's focus and
 10    I know on my end when I was more closely involved
 11    with the topics, which was kind of early '21 --
 12    well, really, really late '20, early '21 -- it was
 13    all stuff I was looking at and we made sure we can
 14    incorporate as much as we could.
 15         Q.    Okay.  So that was a standard, you just
 16    described the standard in 2020?
 17         A.    I've described how I know stuff was.
 18    When each one of those components came into play,
 19    I couldn't tell you.
 20         Q.    Okay.  Okay.  Is there some component
 21    where you would guarantee -- be guaranteed to
 22    know -- hold on.
 23              Is there some version of the word "rape"
 24    that you would think has an appropriate
 25    connotation?
```

Page 325

CONFIDENTIAL - TOSSILLO

2    A.    No. ████████████████████████

███████████████████████████████████

██████████████████████████████████

███████████████████████████████████

████████████████████████████████████

███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████████████████████

██████████████████████████████████

13    Q.    Okay.  So you were looking for a

14    technological solution to intent?

15    A.    I think technological is one of the

16    conduits that can be used for sure.  We're talking

17    about technology, that's why I referenced it that

18    way.

19    Q.    Another way would be having people

20    watching the videos, right?

21    A.    Of course, which has always been done at

22    MindGeek, well, as far as I can remember.

23    Q.    Okay.  Well, you were just talking about

24    using technology to ████████████████████

█████████████████████████████████

Page 326

1                CONFIDENTIAL - TOSSILLO

2    ████████████████████████████████████

3         A.   I was discussing --

4              MR. COLEMAN:  Objection to the term

5         fingerprint.  It has a very specific

6         meaning within the CSAM community.  If you

7         want to question him on fingerprinting

8         specifically, go ahead.

9         A.   I used the term fingerprinting just for

10   lack of a better word.  ████████████████

```
                                                    Page 327

 1              CONFIDENTIAL - TOSSILLO

 2    ████████████████████████████████████

      ████████████████████████████████████████

      ███████████████████████████████████████

      ██████████████████████████████████████████

      ████████████████████████

 7         Q.   Right.  Because it was becoming a bigger

 8    and bigger priority at MindGeek, right?  You were

 9    involved, Mr. Antoon was involved, Mr. Bergmair

10    was involved, right?

11              MR. SACK:  Objection to the form.

12         Q.   Because MasterCard and Visa had been

13    contacted by activists and you were concerned they

14    were going to cut off your accounts, right?

15              MS. CAZES:  Objection to scope.

16              MR. SACK:  Objection to form.

17         Q.   Right?

18              MR. SACK:  What's the question?  Could

19         we have the specific question?  There was

20         sort of a fluidity there.

21              I'm sorry, could we have the pending

22         question, please?

23              MR. BOWE:  She's going to read the

24         question back.

25              MR. SACK:  Thank you.
```

```
1              CONFIDENTIAL - TOSSILLO
2        delete it --
3              MR. BOWE:  No.
4              MR. SACK:  -- for the entire six years
5        or seven years before he testified?  What
6        are you talking about?
7              MR. BOWE:  I'm asking questions, I
8        don't know what you guys are talking about.
9        None of those are questions.
10             MR. SACK:  Well, they're not
11       understandable, but if you can answer the
12       question.
13             MR. BOWE:  So sorry, I see now you're
14       going to say they're not understandable.
15  BY MR. BOWE:
16       Q.   You don't think it would be misleading
17  to go to Parliament and say you looked but
18  couldn't find evidence without telling them, but
19  the fact is that --
20       A.   I'm going to rely --
21             MR. SACK:  Objection to form.
22             THE WITNESS:  That's fine.
23       A.   I want to rewind for clarity because it
24  seems you're not understanding what I'm saying.
25             I basically said we had multiple systems
```

```
                                              Page 346

 1                CONFIDENTIAL - TOSSILLO

 2     that were tracking this stuff.

 3     ███████████████████████████████████████

       ███████████████████████████████████████

       ███████████████████████████████████████

       ████████████████████████████████████████████

       █████████████████████████████████████████

       ██████████████████████████████████████

       ███████████████████████████████████████

       ██████████████████████████████████████

11          Q.   Okay.  All right.

12          A.   -- of anything.

13          Q.   So you didn't have a two-year retention

14     policy?

15          A.   ███████████████████████████████████████

       █████████████████████████████████████

       ██████████████████████████████████████████

       ██████████████████████████████████████████████

       ████████

20          Q.   I was asking about emails.

21          A.   Those would be individual emails.

22          Q.   What do you mean individual emails?

23          A.   If there was no preservation notices in

24     place, I believe -- and don't quote me on this --

25     I believe the company had a two-year retention
```

```
                                          Page 347

  1              CONFIDENTIAL - TOSSILLO
  2    policy.  But if a request was made to take down a
  3    piece of content, it would have or it should have,
  4    I should say, make its way into one of those
  5    systems which would have allowed it to be
  6    preserved.
  7         Q.   Okay.  Why do you -- how would it have
  8    made it into that system, into one of those
  9    systems, meaning --
 10         A.   Someone needs to go in and either
 11    trigger it manually to be removed or some piece of
 12    software, so you can't just wish it to happen.
 13         Q.   All right.  So an email comes in.
 14              MR. SACK:  He didn't say an email.
 15         A.   I said, I said I don't know.
 16              MR. SACK:  He said takedown request.
 17              MR. BOWE:  I want to talk about
 18         emails.
 19              MR. SACK:  No, no, he went to talk
 20         about takedown.
 21              MR. BOWE:  I want to talk about
 22         emails.
 23              MR. COLEMAN:  He's not talking about
 24         emails.
 25
```

Page 390

1                    CONFIDENTIAL

2              CERTIFICATION OF WITNESS

3

4       I, DAVID TOSSILLO, hereby certify that I have

5   read the transcript of my testimony taken under oath

6   in my stenographically recorded deposition of June

7   16, 2023, and that the transcript is a true,

8   complete and accurate record of my testimony, and

9   that the answers on the record as given by me are

10  true and correct, subject to the changes and/or

11  corrections, if any, shown on the attached page.

12

13

            _____

14                    DAVID TOSSILLO

15

16  Subscribed and sworn to before me this_____ day

17  of_____, 2023.

18

19          _____

            Notary Public State of

20

21

22

23

24

25