# EXHIBIT 74

# [PORTIONS OF EXHIBIT FILED UNDER SEAL PURSUANT TO APPLICATION TO SEAL]

**THIS SHARE PLEDGE AGREEMENT** (the "**Agreement**") is made on MARCH 16, 2023

**AMONG**

(1) ███████████████, a business company incorporated under the laws of the British Virgin Islands, having its registered office at 2nd Floor, Water's Edge Building, PO Box 2429, Wickhams Cay II, Road Town, Tortola, British Virgin Islands and registered with the BVI registry of corporate affairs under number ██████ as pledgor (the "**MG Share Pledgor**")

**AND**

(2) ████████████████, a business company incorporated under the laws of the British Virgin Islands, having its registered office at 2nd Floor, Water's Edge Building, PO Box 2429, Wickhams Cay II, Road Town, Tortola, British Virgin Islands and registered with the BVI registry of corporate affairs under number ██████, as pledgor (the "**ECP Share Pledgor**" and, together with the MG Share Pledgor, each a "**Pledgor**" and, together, the "**Pledgors**");

**AND**

(3) ███████████████, a corporation incorporated under the laws of the Province of Quebec, as pledgee (the "**Pledgee**");

**AND**

(4) **MindGeek S.à r.l.**, a private limited liability company (*société à responsabilité limitée*) organised and established under the laws of the Grand Duchy of Luxembourg, having its registered office at 32, boulevard Royal, L-2449 Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Register of Commerce and Companies (*Registre de Commerce et des Sociétés de Luxembourg*) under number B181337, as company (the "**Company**").

**WHEREAS**

(A) Under a New York (USA) law governed share purchase agreement dated as of January 30, 2023 made between, *inter alios*, the MG Share Pledgor, as purchaser, and the Pledgee, as vendor (the "**Share Purchase Agreement**"), the Pledgee has agreed to sell all the MG Shares owned by it to the MG Share Pledgor upon the closing of the transactions contemplated by the Share Purchase Agreement.

(B) The Pledgors have agreed to enter into this Agreement, as security for the payment and discharge of all Secured Obligations.

(C) The share capital of the Company amounts to ████████████████████████. On the date of this Agreement, immediately following consummation of the transactions contemplated by the Share Purchase Agreement, the MG Share Pledgor is the holder of █████████████████████ Class X Shares without nominal value, representing █████████████████ of the entire issued, fully paid-up and subscribed share capital of the Company (the "**MG Shares**"), including all right, title, interest and benefit in, to and under all the Distributions.

(D) The MG Share Pledgor has ████████████ ordinary shares of ██████ par value each in issue. On the date of this Agreement, the ECP Share Pledgor is the holder of ██████████ ordinary shares of MG Share Pledgor, representing █████████

2

 Tassillo_Fleites_00000914

of the entire issued, fully paid-up and subscribed shares of the MG Share Pledgor (the "**ECP Shares**" and, together with the MG Shares, the "**Shares**"), including all right, title, interest and benefit in, to and under all the Distributions.

**NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:**

1.    DEFINITIONS AND INTERPRETATION

1.1    **Incorporated definitions**

Unless expressly defined in this Agreement or if the context requires otherwise, terms defined in the Share Purchase Agreement shall bear the same meaning in this Agreement. In the event of any inconsistency or contradiction between the provisions of this Agreement and the provisions of the Share Purchase Agreement or the Seller Note the provisions of the Share Purchase Agreement or the Seller Note shall prevail (to the extent permitted by applicable Law and to the extent the validity and enforceability of the Pledge is not affected).

1.2    **Additional definitions**

In this Agreement, the following terms shall have the following meaning:

"**BCA**" means the BVI Business Companies Act, 2004, as amended from time to time.

"**BVI**" means the British Virgin Islands.

"**Business Day**" means a day (other than a Saturday or a Sunday) on which banks are open for general business in New York, New York (USA) and Luxembourg.

"**Collateral Law**" means the Luxembourg Law of 5 August 2005 on financial collateral arrangements, as amended.

"**Companies Law**" means the Luxembourg Law of 10 August 1915 on commercial companies, as amended.

"**Default**" means any event or circumstance that, with the passing of time or the giving of notice or both, would (if not cured or otherwise remedied during such time) become an Event of Default.

"**Distributions**" means all dividends, interest and other monies payable in respect of the Shares and all other rights, benefits and proceeds in respect of or derived from the Shares (whether by way of redemption, bonus, preference, option rights, substitution, conversion capital decrease, withdrawal of a shareholder, or otherwise, including the proceeds from any sale of the Pledged Assets following an enforcement of the Pledge and, in particular, any proceeds that may not immediately be used to discharge the Secured Obligations).

"**ECP Register**" means the register of members of the MG Share Pledgor.

"**Event of Default**" has the meaning ascribed thereto in the Seller Note.

"**Insolvency Act**" means the BVI Insolvency Act, 2003, as amended from time to time.

"**Insolvency Regulation**" means the Council Regulation (EC) N° 2015/848 of the European Parliament and of the Council of 20 May 2015 on insolvency proceedings.

"**Luxembourg**" means the Grand Duchy of Luxembourg.

"**Pledge**" means the first priority pledge (*gage de premier rang*) created under Clause 2 (*The Pledge*) of this Agreement.

3

"**Pledged Assets**" means the Shares and the Distributions.

"**Register**" means the register of shareholders (*registre des associés*) of the Company.

"**Secured Obligations**" means any and all obligations and liabilities of and due by the MG Share Pledgor to the Pledgee under or in connection with the Share Purchase Agreement and the Seller Note, including without limitation, the Monthly Cash Payments and/or the Final Cash Payment, and any and all interest, penalties and other amounts due thereon (including, without limitation, all liabilities arising out of any extension, amendment or any variation, modification, restatement, novation of or supplement to the Share Purchase Agreement or the Seller Note whatsoever), provided that no obligation or liability shall be included in this definition of "**Secured Obligation**" to the extent the security (or any part thereof) or any provision of this Agreement would be unlawful or prohibited under any applicable Law by reason of such inclusion.

"**Seller Note**" means that certain secured promissory note, dated on or about the date hereof, issued by MG Share Pledgor to the Pledgee in connection with certain financial obligations of the MG Share Pledgor under the Share Purchase Agreement.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the District of Columbia (USA) or such other jurisdiction as may be applicable.

1.3     **Interpretation and construction**

(a)     In this Agreement, unless the contrary intention appears, any reference to:

(i)     any document, agreement or other instrument is a reference to that document, agreement or other instrument as from time to time amended, modified, restated, novated, varied or supplemented;

(ii)     a provision of Law is a reference to that provision as amended or re-enacted;

(iii)     a Person includes its successors, transferees and assignees;

(iv)     a reference herein to the "parties" shall mean the parties to this Agreement; and

(v)     words denoting the plural shall include the singular and vice versa and words denoting one gender shall include another gender.

(b)     No provision of this Agreement shall be interpreted adversely against a party solely because that party was responsible for drafting that particular provision, or because that party is relying on that particular provision.

(c)     This Agreement, as well as all other documents relating thereto, including notices, are, and will be, drawn up in English. In the event of any discrepancy between the English text of this Agreement or any agreement resulting from it or relating to it and any translation of it, the English language version shall prevail.

(d)     The titles and headings in this Agreement are inserted for ease of reference only and shall not affect the interpretation of the terms of this Agreement.

2.     **THE PLEDGE**

2.1     **Creation of the Pledge**

On the date of this Agreement, each Pledgor grants in favour of the Pledgee a first priority pledge (*gage de premier rang*) over the Pledged Assets as continuing security for the due,

4

unconditional, irrevocable and full payment and discharge of the Secured Obligations, and the Pledgee accepts this Pledge.

Each Pledgor specifically agrees and acknowledges that the Secured Obligations will be deemed to include any and all Secured Obligations as may be so amended, modified, restated, novated, varied or supplemented from time to time and any combination of any of the foregoing in accordance with the terms thereof or, as the case may be, with the agreement of the relevant parties.

## 2.2 Preservation of the Pledge

If, and to the extent that at any time, and from time to time, in the reasonable opinion of the Pledgee, it shall be necessary or appropriate that further instruments be executed and/or further action be taken in order to create, preserve or perfect a valid first priority right over the Pledged Assets as created in this Agreement, each Pledgor shall as soon as possible execute such further instruments or take such further action, at its expenses and in such manner and form as the Pledgee may reasonably require.

## 2.3 Registration

(a) The MG Share Pledgor and the Pledgee request the Company, simultaneously with the execution of this Agreement to record the Pledge of the MG Shares and the associated Distributions in the Register (*inscription*). The Company acknowledges and accepts the existence of this Pledge as a security interest created over the applicable Pledged Assets, takes notice of its terms, and undertakes to promptly and duly record this Pledge in its Register.

(b) The MG Share Pledgor shall, on the date of execution of this Agreement provide to the Pledgee a certified copy of the Register as evidence of registration.

The following text shall be used for the registration in the folio of the MG Share Pledgor:

"*Pursuant to a share pledge agreement dated March 16, 2023,* ███████████
████████████████████ *class X shares of MindGeek S.à r.l. (the "***Company***")*
*owned by* ████████████ *(the "***MG Share Pledgor***") on the date of the present*
*registration have been pledged by a first priority pledge (gage de premier rang) (the*
*"***Pledge***") granted in favour of* ████████████ *(the "***Pledgee***").*

*[date]*

*[signature]*".

(c) The MG Share Pledgor and the Company hereby instruct and appoint as their special attorneys each manager of the Company, as well as any present or future employee of Hogan Lovells (Luxembourg) LLP, each acting individually and with full power of substitution, for the purposes of registering the Pledge in the Register and delivering a certified copy thereof to the Pledgee.

(d) The ECP Share Pledgor and the Pledgee request the MG Share Pledgor, simultaneously with the execution of this Agreement to record the Pledge of the ECP Shares and the associated Distributions in the ECP Register. The MG Share Pledgor acknowledges and accepts the existence of this Pledge as a security interest created over the applicable Pledged Assets, takes notice of its terms, and undertakes to promptly and duly record this Pledge in the ECP Register.

5

(e)     The ECP Share Pledgor shall, on the date of execution of this Agreement provide to the Pledgee a certified copy of the ECP Register as evidence of registration.

The following text shall be used for the registration in the folio of the ECP Share Pledgor:

"*Pursuant to a share pledge agreement dated March 16, 2023,* ███████████ ███████████████ *owned by* ███████████████ *(the "**ECP Share Pledgor**") on the date of the present registration have been pledged by a first priority pledge (gage de premier rang) (the "**Pledge**") granted in favour of* ███████████ *(the "**Pledgee**")*".

(f)     The ECP Share Pledgor and the MG Share Pledgor hereby instruct and appoint as their special attorneys each manager of MG Share Pledgor, each acting individually and with full power of substitution, for the purposes of registering the Pledge in the ECP Register and delivering a certified copy thereof to the Pledgee.

(g)     The ECP Share Pledgor shall:

(i)     within 3 Business Days after the date of this Agreement, enter the particulars of this Agreement on the ECP Share Pledgor's register of relevant charges pursuant to Section 162 of the BCA;

(ii)    within 1 Business Day after the date of this Agreement, file this Agreement with the Registrar of Corporate Affairs pursuant to Section 163 of the BCA and within 2 Business Days of receipt of the same, provide to the Pledgee or its advisers the original certificate of registration of charge issued by the Registrar of Corporate Affairs; and

(iii)   maintain the filings made pursuant to (i) and (ii) above until such time as the security created pursuant to this Agreement has been irrevocably and unconditionally released in full by the Pledgee.

## 2.4    **Delivery of Pledged Assets**.

Each Pledgor shall or shall cause the Company or MG Share Pledgor, as the case may be, to promptly deliver each instrument or certificate representing the Pledged Assets, duly endorsed or subscribed by the applicable Pledgor or accompanied by appropriate instruments of transfer or assignment duly executed in blank by the applicable Pledgor, to Pledgee.  Until properly delivered to the Pledgee, any such instruments or certificates shall be held by the Pledgors in trust, as agent for the Pledgee.

## 2.5    **Other BVI Deliverables**

The MG Share Pledgor shall and the ECP Share Pledgor shall procure that the MG Share Pledgor shall:

(a)     on the date of this Agreement, or within 3 Business Days after the date on which a new director of the MG Share Pledgor is appointed, deposit with the Pledgee, or as the Pledgee may direct:

(i)     a signed but undated letter of resignation from each director of the MG Share Pledgor; and

(ii)    a signed and dated letter of authority from each director of the MG Share Pledgor;

6

(b)      on the date of this Agreement, deposit at the office of its registered agent a signed and dated letter in the form set out in Schedule 1, with a copy of such letter to be deposited with the Pledgee, or as the Pledgee may direct; and

(c)      within 5 Business Days after the date of this Agreement, amend the memorandum and articles of association of the MG Share Pledgor, in a form approved by the Pledgee, in order to, without limitation, remove any lien over the ECP Shares and any restrictions or impediment on the transfer of the ECP Shares to the Pledgee (or its nominee).

2.6    **UCC Financing Statement**.

Each Pledgor authorizes the Pledgee to (a) file such UCC financing statements describing the Pledged Assets as Pledgee reasonably determines necessary or desirable to perfect and protect the Pledgee's liens and security interests in the Pledged Assets, (b) perform any and all other acts which the Pledgee deems reasonable and/or reasonably necessary for the protection and preservation of the Pledged Assets or the Pledgee's security interest therein, and (c) pay any charges or expenses which the Pledgee reasonably deems necessary for the foregoing purpose, but without any obligation to do so (and any amounts so paid shall constitute Secured Obligations).

3.    EFFECTIVENESS OF THE PLEDGE

3.1    **Continuing security**

This Pledge shall be a continuing security for the due performance of the Secured Obligations, shall remain in full force and effect until expressly released in accordance with Clause 12 (*Discharge of the Pledge*) and shall in particular not be discharged by reason of the circumstance that there is at any time no Secured Obligation currently owing from the Pledgors to the Pledgee, nor shall the Pledge be discharged by any intermediate payment or satisfaction of any part of the Secured Obligations or by any settlement of accounts.

3.2    **No discharge**

(a)      Neither the obligations of the Pledgors contained in this Agreement nor the rights, powers and remedies conferred upon the Pledgee by this Agreement or by Law, nor the Pledge created hereby shall be discharged, impaired or otherwise affected by:

(i)      any amendment to, or any variation, waiver, release, discharge, exchange or substitution of, any Secured Obligation;

(ii)     any failure to take any security agreed to be taken in respect of the Secured Obligations;

(iii)    any failure to realise the value of, or any waiver, release, discharge, exchange or substitution of, any security taken in respect of the Secured Obligations;

(iv)     any other act, event or omission which, but for this Clause 3.2, might operate to discharge, impair or otherwise affect any obligations of the Company or the Pledgor under the Share Purchase Agreement or the Seller Note and the rights, powers and remedies conferred upon the Pledgee by the Share Purchase Agreement, the Seller Note, this Agreement or by Law;

(v)      any waiver or consent granted to, or composition with, either Pledgor or any other Person, or any release of either Pledgor or any other Person under

7

the terms of any composition or arrangement with any creditor of any member of either Pledgor's group;

(vi)    the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce any rights against, or security over assets of, either Pledgor or any other Person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(vii)    the application of any payment received from the Pledgors or any other Person for its account towards obligations of the Pledgors other than the Secured Obligations;

(viii)    any unenforceability, illegality or invalidity of any obligation of any Person under the Share Purchase Agreement, this Agreement, or the Seller Note; or

(ix)    any insolvency or similar proceedings.

(b)    Each Pledgor expressly acknowledges and recognizes the right of the Pledgee to enter into any agreements, arrangements and amicable settlements, with or without remission of the Secured Obligations, as may be proposed by the Pledgor, without the Pledgee's rights under this Pledge being in any manner altered or prejudiced.

4.    **VOTING RIGHTS AND DISTRIBUTIONS**

4.1    **Voting rights**

(a)    Until a Default or Event of Default occurs, each Pledgor shall be entitled to exercise all voting rights attached to the Shares in a manner which does not adversely affect this Pledge, cause a Default or Event of Default to occur or vary the rights attaching to or conferred by all or any part of the Pledged Assets.

(b)    When a Default or Event of Default occurs or when the Secured Obligations are due and payable but unpaid, the Pledgors shall not, without the prior written consent of the Pledgee, exercise any voting rights in relation to the Pledged Assets and the Pledgee shall be entitled to exercise the voting rights attached to the Shares in accordance with the provisions of Article 9 of the Luxembourg Collateral Law in any manner the Pledgee deems fit. Therefore, as soon as practicable thereafter, each Pledgor shall seek instructions from the Pledgee on the exercise of the voting rights attached to the Pledged Assets and act upon such instructions. Hence the Pledgee may either give voting instructions to the applicable Pledgor and such Pledgor shall act upon such instructions, or the Pledgee may, after having given notice to the Pledgors and the Company, declare that it will, with effect from such notice, exercise the voting rights in the Pledged Assets and preclude the Pledgors from doing so, all in accordance with Article 9 of the Collateral Law. The Pledgors and the Company shall do whatever is necessary in order to ensure that the exercise of the voting rights in these circumstances is facilitated and becomes possible for the Pledgee, including the issuing of a written proxy in any form or any other document that the Pledgee may require for purpose of exercising the voting rights.

4.2    **Distributions**

(a)    Until a Default or Event of Default occurs, each Pledgor shall be entitled to directly receive and apply all Distributions, whether or not they have been declared or have accrued prior to enforcement in accordance with Clause 9 (*Enforcement of the*

8

    Tassillo_Fleites_00000920

*Pledge*), except to the extent such Distributions are restricted and/or prohibited under the Share Purchase Agreement, Seller Note, or applicable Law.

(b)    Following the occurrence and during the continuance of an Event of Default, any Distribution shall be paid exclusively to the Pledgee, which shall apply the same towards the Secured Obligations in accordance with the terms of the Share Purchase Agreement and the Seller Note.

## 4.3    Power of Attorney

Each Pledgor agrees to do whatever is necessary in order to ensure that the exercise of the voting rights under this Clause 4 (*Voting Rights and Distributions*) is facilitated for the Pledgee or any other Person designated by the Pledgee and each Pledgor shall promptly execute and deliver to the Pledgee, at such Pledgor's cost such forms of proxy as the Pledgee or such other Person may require for the purpose of protecting, exercising and/or enforcing its rights hereunder.

## 5.    COVENANTS AND WARRANTIES

The representations and covenants set out in the Share Purchase Agreement and the Seller Note apply in relation to this Agreement as if they were set out herein. In addition, the following applies:

## 5.1    Representations and Warranties

Each Pledgor represents and warrants to the Pledgee as at the date hereof that:

(a)    it is, and will be, duly incorporated, validly existing and in good standing under the laws of its jurisdiction;

(b)    it has the power, authority and capacity to enter into this Agreement and to exercise its rights and perform its obligations hereunder and all corporate and other actions required to authorise the execution and performance of this Agreement have been duly taken;

(c)    the Company is a private limited liability company (*société à responsabilité limitée*) which has been duly incorporated and validly exists under the laws of Luxembourg and a copy of the articles of association of the Company delivered to the Pledgee is complete, correct and up-to-date;

(d)    all necessary authorisations, consents, acts, corporate actions and generally all things to enable it to enter into and carry out its obligations under this Agreement have been obtained, taken or done and are, and will remain, in full force and effect;

(e)    the granting of the Pledge falls within the corporate purpose and is in the best corporate interest and corporate benefit of the Pledgor;

(f)    this Agreement has been duly executed and delivered by each Pledgor and the Company and creates a valid, perfected and enforceable first priority right of pledge over the Pledged Assets and constitutes the legal, valid and binding obligations of the Pledgor, enforceable in accordance with its terms;

(g)    except in the case where this Agreement would be filed for registration in Luxembourg or the BVI on a voluntary basis, no order, consent, approval, license, authorisation or validation of, or filing, recording or registration with (except such as have been obtained or made prior to the date hereof), or exemption by, any Governmental Authority, governmental or public body or authority, or any subdivision thereof, is required to authorise, or is required in connection with, (i) the

9

execution, delivery and performance of this Agreement, or (ii) the legality, validity, binding effect or enforceability of this Agreement;

(h) the execution and performance of this Agreement does not constitute a breach of any contractual or other obligation of such Pledgor or the Company, nor any law or court order, decree, regulation or other order or judgment of any competent authority applicable to any of its assets;

(i) the execution and performance of this Agreement has been approved by a general meeting of shareholders of the Company under Articles 12(2) of the Collateral Law and 710-12 of the Companies Law;

(j) the Pledged Assets represent and shall at all times represent a minimum of ███ of the entire issued and fully paid up share capital of the Company, other than any reduction to such percentage as a result of an issuance by the Company of shares to the MG Pledgor or its Affiliate in connection with one or more equity financings for up to ████████████████████████, and a minimum of ███ of the issued and fully paid up shares of the MG Pledgor; there are no income-sharing certificates or other shares which represent the capital or shares of the Company or the MG Pledgor in existence, nor any warrant, convertible bond, exchange right or other right of any kind to acquire shares in the Company or the MG Pledgor and that would require the Company or the MG Pledgor, as the case may be, to issue, sell or otherwise cause to become outstanding any of its shares; no contract or other agreement exists with respect to the share capital of the Company or the shares of the MG Pledgor or any right or claim to it other than otherwise disclosed to the Pledgee;

(k) it is, and will be, the owner of, and has, and will have, good marketable title to, the Pledged Assets (it being understood that the Pledgors are the sole owners of the Pledged Assets), free from any Liens, encumbrances or any other third party rights (other than the Pledge or existing by virtue of mandatory Luxembourg law or BVI law);

(l) it has taken no action to or steps to prejudice its right, title and interest in and to the Pledged Assets;

(m) neither the Company nor the MG Pledgor has declared any dividends in respect of the Pledged Assets that are still unpaid at the date hereof;

(n) the Pledge creates a valid first priority security over the Pledged Assets in favour of the Pledgee;

(o) the Company's "centre of main interests" (within the meaning of the Insolvency Regulation) is in Luxembourg and it does not maintain an "establishment" (within the meaning of the Insolvency Regulation) in any jurisdiction other than Luxembourg;

(p) to its best knowledge, no petition has been presented for its insolvency nor of the Company, it or the Company are not subject to any formal insolvency proceedings, are not insolvent and have had no receiver appointed in respect of all (or substantially all) of their assets;

(q) each of the Company and it has not taken any winding-up resolution, has not been declared bankrupt or insolvent (as such term is defined under section 8(1) of the Insolvency Act) and has not applied for, or is subject to, general settlement, voluntary arrangement, administration, receivership or composition or arrangement with creditors, controlled management or moratorium, reprieve from payment,

10

assignment for the benefit of creditors, liquidation or any similar proceedings affecting the rights of creditors generally;

(r) immediately prior to the execution of this Agreement it was, and it has, and will have, full right and title to the Shares and none of the Shares secured under this Agreement is subject to any prohibition in respect of the taking of security in respect thereof; and

(s) there is no tax, levy, impost, deduction, charge or withholding imposed by Luxembourg, the BVI, or any political subdivision thereof on or by virtue of the execution, delivery or enforcement of this Agreement.

5.2 **Covenants**

Each Pledgor (other than as noted below) covenants with the Pledgee as follows:

(a) subject to the terms of the Share Purchase Agreement and the Seller Note, and as long as this Agreement remains in force, not to agree to transfer, lease, lend, or dispose of any of the Shares, create or permit to subsist any encumbrance over any of the Pledged Assets or any part thereof (irrespective of whether ranking before or behind the Pledge), other than this Pledge, without the Pledgee's prior written approval;

(b) that no executory attachment (*saisie exécutoire*) is made on any of the Shares and that any conservatory attachment (*saisie conservatoire*) over any of the Shares is lifted immediately within ten (10) calendar days of its first being made;

(c) to give or procure to be given to the Pledgee such certificates, information and evidence (and in such form) as the Pledgee may reasonably request for the purpose of the discharge or exercise of the duties, powers, authorities and discretions vested in it under or under this Agreement, the Share Purchase Agreement, the Seller Note, or any other security/secured document to which the Pledgee is a party or by operation of law;

(d) at all times to observe and perform its obligations and rights in respect of the Pledged Assets, not do, or permit to be done, anything which could prejudice the Pledge and not, without the prior written consent of the Pledgee, perform any act which may result in a reduction of the value of the Pledged Assets;

(e) in the event of a seizure or attachment by a third party of any of the Pledged Assets which such Pledgor is aware of, at its own expense, to

  (i) promptly notify the Pledgee and send it or its attorneys a copy of the relevant attachment or seizure documentation as well as all other documents required under applicable Law, signed to the extent required by the Pledgee, for challenging the attachment or seizure (if possible);

  (ii) notify the third party or the attorneys acting on behalf of such third party in writing of the Pledgee's interest in the Pledged Assets; and

  (iii) take such measures (including necessary legal action) as may reasonably be required or requested by the Pledgee to protect the Pledgee's interest in the Pledged Assets;

(f) to notify the Pledgee as soon as possible of any event or circumstance which would reasonably be expected to have a material adverse effect on the validity or enforceability of this Agreement;

11

(g)     not to undertake any of the following actions without the prior written consent of the Pledgee (which consent may be withheld, delayed, or conditioned in the sole and absolute discretion of the Pledgee):

    (i)     amend its memorandum or articles of association;

    (ii)     merge or consolidate with any other company

    (iii)     make a disposition of more than fifty per cent. "in value" of its assets;

    (iv)     continue into another jurisdiction;

    (v)     change its registered agent (in respect of the MG Share Pledgor); or

    (vi)     register the transfer of any Share to any person other than the Pledgee (or as the Pledgee shall direct).

The MG Share Pledgor further covenants to the Pledgee that it shall maintain its original register of members at the office of its registered agent at all times from the date of the Agreement until the date on which the Pledge is released.

Each Pledgor represents and warrants to the Pledgee that the covenants, representations and warranties in this Clause 5 (*Covenants and Warranties*) that apply to such Pledgor shall at all times remain true and correct.

6.     **IMMEDIATE RECOURSE, WAIVER**

(a)     Each Pledgor waives, to the fullest extent permitted by applicable Law, any right or benefit, present or future, it may have of first requiring the Pledgee to proceed against or claim payment from any Person or enforce any guarantee or security granted by any other Person before enforcing this Agreement and/or any rights hereunder (including for purposes of article 1285 of the Luxembourg Civil Code), and any right or benefit, present or future, it may have under articles 2036 and 2037 of the Luxembourg Civil Code.

(b)     To the fullest extent allowed by applicable Law, each Pledgor waives any right, action or claim it may have under the Pledge against any Person securing or guaranteeing the Secured Obligations, including, in particular, such Pledgor's rights of recourse under articles 2028 *et seq.* of the Luxembourg Civil Code, any right to subrogation or any other similar right, action or claim under any applicable law (including ancillary relief or provisional measures such as *saisie-arrêt conservatoire*) or by way of set-off. This waiver shall, to the extent required, continue in full force and effect notwithstanding any discharge under Clause 12 (*Discharge of the Pledge*).

(c)     For the avoidance of doubt, each Pledgor hereby waives any rights to the benefit of discussion (*bénéfice de discussion*) under article 2021 of the Luxembourg Civil Code or to the benefit of division (*bénéfice de division*) under article 2026 of the Luxembourg Civil Code.

(d)     Each Pledgor shall not by virtue of any payment made, security realised or security interest enforced or moneys received hereunder:

    (i)     be subrogated in any rights, security, security interest or moneys held, received or receivable by the Pledgee or be entitled to any right of contribution or indemnity, or

HIGHLY CONFIDENTIAL                                                            Tassillo_Fleites_00000924

(ii)     claim, rank, prove or vote as a creditor of the Company or MG Pledgor or their respective estates in competition with the Pledgee.

Notwithstanding any of the above or anything to the contrary in this Agreement, in the event that the Pledgee enforces on its rights in respect of this Agreement, it shall only be entitled to such value from the Pledged Assets so as to make the Pledgee whole in an amount equal to (A) the amount of the Secured Obligations existing at the time of enforcement; plus (B) reasonable costs incurred by the Pledgee in enforcing this Agreement (the "**Enforcement Value**").  Any value gained or considered to be gained by the Pledgee (together with its nominees, if any) above the Enforcement Value shall be promptly paid to the applicable Pledgor.  If all or part of the Pledged Assets are sold by the Pledgee or it nominee to a bona fide third party purchaser (that is not an Affiliate of the Pledgee) on arms-length commercial terms within six months of the date of Pledgee commencing actions to enforce on the Pledged Assets, the fair market value of such Pledged Assets shall be deemed to be the cash purchase price paid by such bona fide third party purchaser for such Pledged Assets; provided, however, if the Pledged Assets are not sold for cash the consideration received by the Pledgor shall be valued at their fair value as determined by (x) an independent auditor (*réviseur d'entreprises*) registered with the Luxembourg Order of Independent Auditors (*Institut des Réviseurs d'Entreprises*) (*réviseur d'entreprises agréé*) or (y) an investment bank of good repute, acting reasonably and designated by Pledgee in its sole commercially reasonable discretion at the cost of the Pledgors.  This paragraph is intended to prohibit the Pledgee from earning a windfall by enforcing on any Shares.

7.     **FURTHER ASSURANCES**

Each Pledgor shall at its own expense execute such agreements, deeds, confirmations and notices and give, perform and do all such assurances, acts and things (including, without however being limited to, any filings and registrations) as the Pledgee reasonably may require or which may be necessary to:

(a)     give full effect to this Agreement;

(b)     create, perfect, protect and maintain the Pledgee's security rights over the Pledged Assets or any part thereof;

(c)     facilitate the enforcement and/or realisation of the Pledge or any part thereof;

(d)     facilitate the exercise of all rights, powers, authorities, discretions and remedies of the Pledgee under this Agreement in respect of the Pledge or any part thereof; and/or

(e)     defend its rights, title and interest in and to the Pledged Assets against the claims and demands of any person, when necessary in cooperation with the Pledgee.

8.     **ADDITIONAL SECURITY**

This Agreement shall be in addition to and shall not in any way be prejudiced by, or dependent on, any collateral or other security now or hereafter held by the Pledgee as security for the Secured Obligations or any Lien to which they may be entitled. The rights of the Pledgee are in addition to and not exclusive of those provided by Law.

9.     **ENFORCEMENT OF THE PLEDGE**

9.1     Upon the occurrence of an Event of Default, the Pledgee shall be entitled (but not be obliged) to realise and enforce the Pledged Assets in the most favourable manner provided for by Luxembourg Law. In particular, without limitation, the Pledgee shall (in its absolute discretion) and at the Pledgor's expense be entitled to:

13

(a)     record, or procure to record, the ownership of the Shares in the applicable share register;

(b)     appropriate the Pledged Assets, in which case the Pledged Assets will be valued for the purpose of discharging the Secured Obligations:

    (i)     at their list price, in case the applicable Pledged Assets are admitted to the official list of stock exchange located in Luxembourg or abroad, or traded on a regulated market functioning regularly, recognized and open to the public or otherwise

    (ii)    at their fair value as determined by (a) an independent auditor (*réviseur d'entreprises*) registered with the Luxembourg Order of Independent Auditors (*Institut des Réviseurs d'Entreprises*) (*réviseur d'entreprises agréé*) or (b) an investment bank of good repute, acting reasonably and designated by Pledgee in its sole commercially reasonable discretion at the cost of the Pledgors. The Pledgee can further determine, at its sole discretion, that the right to appropriate all or part of the Pledged Assets be transferred or allocated to a Person other than the Pledgee (including a special purpose vehicle);

(c)     apply for a court order transferring title to the Pledged Assets to the Pledgee or any other Person designated by the Pledgee, in satisfaction of the Secured Obligations to the amount of a valuation of the Pledged Assets undertaken by a court appointed expert (*attribution judiciaire*), taking control of any Distributions to which the Pledgee is entitled and applying any money paid to, the Pledgee to the satisfaction and set-off against all or any part of the Secured Obligations;

(d)     sell the Pledged Assets or have the Pledged Assets sold in realisation upon agreement in a private transaction at normal commercial conditions (*conditions commerciales normales*), taking control of any proceeds to which the Pledgee is entitled and applying the purchase price paid to the Pledgee to the satisfaction and set-off against all or any part of the Secured Obligations;

(e)     sell the Pledged Assets on a stock exchange determined by the Pledgee or by public auction held by an official designated by the Pledgee, taking control of any proceeds to which the Pledgee is entitled and applying the purchase price paid to the Pledgee to the satisfaction and set-off against all or any part of the Secured Obligations;

(f)     request a judicial decision that the Pledged Assets shall be attributed to the Pledgee in discharge of the Secured Obligations following a valuation of the Pledged Assets made by a court appointed expert; and

(g)     where possible, proceed to a set-off between the Secured Obligations and the Pledged Assets.

For the avoidance of doubt, with respect to any Luxembourg Matter, in the event of any conflict between the terms of this Clause 9.1 and the terms of any other Clause of this Agreement (including Clause 9.5), the terms of this Clause 9.1 shall govern and control.

9.2     Each Pledgor expressly and irrevocably waives any right, claim or objection deriving from any restriction applicable to the transfer of the Pledged Assets at the time an enforcement action is taken, including any restriction provided for in the articles of association of the Company or the MG Pledgor and/or in any shareholders' agreement relating to the Company or the MG Pledgor.

14

Tassillo_Fleites_00000926

9.3     Subject to Clause 9.1, the Pledgee shall have the right to request enforcement of the Pledge over all or part of the Pledged Assets in its most absolute discretion. No action, choice or absence of action in this respect, or partial enforcement, shall in any manner affect the Pledge created hereunder over the Pledged Assets, as it then shall be. The Pledge shall continue to remain in full and valid existence until enforcement, discharge or termination hereof, as the case may be.

9.4     Each Pledgor procures to hold, at any time prior to the termination of enforcement proceedings affecting only part of the Pledged Assets, and in any event no later than eight (8) Business Days after such change of shareholdings, a general meeting of the shareholders of the Company or the MG Pledgor, in each case, approving the transferee or purchaser (whether known or unknown) of the Shares as new shareholder of the Company or MG Pledgor, as the case may be, all in accordance with articles 12(2) of the Collateral Law and 710-12 of the Companies Law.

9.5     Upon the occurrence of an Event of Default (and in addition to all of its other rights, powers and remedies under this Agreement), the Pledgee may, at its option, without notice to the Pledgors or any other Person, do any one or more of the following:

(a)     declare any unpaid balance of the Secured Obligations to be immediately due and payable (the occurrence or nonoccurrence of an Event of Default shall in no manner impair the ability of the Pledgee to demand payment of any portion of the Secured Obligations that is payable upon demand);

(b)     proceed to perform or discharge any and all of the Pledgors' obligations, duties, responsibilities, or liabilities and exercise any and all of its rights in connection with the Pledged Assets for such period of time as the Pledgee may deem appropriate, with or without the bringing of any legal action in or the appointment of any receiver by any court;

(c)     do all other acts which the Pledgee may deem necessary or proper to protect the Pledgee's security interest in the Pledged Assets and carry out the terms of this Agreement;

(d)     exercise all voting and management rights of the Pledgors as to the Company or the MG Pledgor, as the case may be, or otherwise pertaining to the Pledged Assets, and each Pledgor, forthwith upon the request of the Pledgee, shall use its best efforts to secure, and cooperate with the efforts of the Pledgee to secure (if not already secured by the Pledgee), all the benefits of such voting and management rights;

(e)     sell the Pledged Assets in any manner permitted by the UCC; and upon any such sale of the Pledged Assets, the Pledgee may (i) bid for and purchase the Pledged Assets and apply the expenses of such sale (including, without limitation, attorneys' fees) as a credit against the purchase price, or (ii) apply the proceeds of any sale or sales to other Persons, in whatever order the Pledgee in its sole discretion may decide, to the expenses of such sale (including, without limitation, attorneys' fees), to the Secured Obligations, and the remainder, if any, shall be paid to the applicable Pledgor or to such other Person legally entitled to payment of such remainder;

(f)     proceed by suit or suits in Law or in equity or by any other appropriate proceeding or remedy to enforce the performance of any term, covenant, condition, or agreement contained in this Agreement, and institution of such a suit or suits shall not abrogate the rights of the Pledgee to pursue any other remedies granted in this Agreement or to pursue any other remedy available to the Pledgee either at Law or in equity;

HIGHLY CONFIDENTIAL                                                          Tassillo_Fleites_00000927

(g)    The Pledgee shall have all of the rights and remedies of a secured party under the UCC and other applicable Laws.  All costs and expenses, including reasonable attorneys' fees and expenses, incurred or paid by the Pledgee in exercising or protecting any interest, right, power or remedy conferred by this Agreement, shall bear interest at a per annum rate of interest equal to the then highest rate of interest charged on any of the obligations under the Seller Note from the date of payment until repaid in full and shall, along with the interest thereon, constitute and become a part of the Secured Obligations;

(h)    Each Pledgor hereby constitutes the Pledgee as the attorney-in-fact of such Pledgor after an Event of Default (including but not limited to this Agreement) to take such actions and execute such documents as the Pledgee may deem appropriate in the exercise of the rights and powers granted to the Pledgee in this Agreement.  The power of attorney granted hereby shall be irrevocable and coupled with an interest and shall terminate only upon the payment in full of the Secured Obligations.  Each Pledgor shall indemnify and hold the Pledgee harmless for all losses, costs, damages, fees, and expenses suffered or incurred in connection with the exercise of this power of attorney and shall release Pledgee from any and all liability arising in connection with the exercise of this power of attorney; and

(i)    Each Pledgor recognizes that the Pledgee may be unable to effect a public sale of the Pledged Assets by reason of certain provisions contained in the United States Securities Act of 1933 and applicable state or other applicable securities Laws and, under the circumstances then existing, may reasonably resort to a private sale to a restricted group of purchasers who will be obliged to agree, among other things, to acquire the Pledged Assets for their own account for investment and not with a view to the distribution or resale of the Pledged Assets.  Each Pledgor agrees that a private sale so made may be at a price and on other terms less favorable to the seller than if the Pledged Assets were sold at public sale and that the Pledgee has no obligation to delay sale of the Pledged Assets for the period of time necessary to permit each Pledgor, even if such Pledgor would agree to register or qualify the Pledged Assets for public sale under the United Securities Act of 1933 and applicable state or other securities Laws.  Each Pledgor agrees that a private sale made under the foregoing circumstances and otherwise in a commercially reasonable manner shall be deemed to have been made in a commercially reasonable manner under the UCC.

For the avoidance of doubt, with respect to any Other Matter, in the event of any conflict between the terms of this Clause 9.5 and the terms of any other Clause of this Agreement (including Clause 9.1), the terms of this Clause 9.5 shall govern and control.

10.    **APPLICATION OF PROCEEDS**

Any monies received by the Pledgee in respect of the Shares before or following the enforcement of the Pledges (or any of them) in accordance with Clause 9 (*Enforcement of the Pledge*) above and/or under the rights and powers hereby conferred shall be applied by the Pledgee in or towards payment and discharge of the Secured Obligations in accordance with the terms of the Share Purchase Agreement or the Seller Note, or, at the discretion of the Pledgee, be held as a continuing security for the Secured Obligations.

The Pledgor shall remain liable for any shortfall between the amount of the proceeds and the Secured Obligations and expressly waives the benefit of Articles 1253 and 1256 of the Luxembourg Civil Code and the applicable provisions of Section 9-608 of the UCC.

16

11. **LIABILITY AND INDEMNITY**

The Pledgee or any of its agents shall not be liable to the Pledgors for any costs, losses, liabilities, expenses (including legal fees, taxes and duties) loss, wrong delivery of, or change to, the Pledged Assets or relating to the enforcement of the Pledge or for any act, default, omission or misconduct of the Pledgee, or its officers, employees or agents in connection with this Agreement, the Seller Note, and the Share Purchase Agreement and relating to the enforcement of the Pledge and to the Pledged Assets save where the same arises as a result of gross negligence (*faute grave*) or wilful misconduct *(dol, faute lourde*).

The Pledgee shall be indemnified in accordance with the provisions of the Share Purchase Agreement and the Seller Note.

12. **DISCHARGE OF THE PLEDGE**

12.1 Subject to Clause 3.2 (*No Discharge*), upon expiry of the period beginning on the date of this Agreement and ending on the date upon which the Pledgee (acting reasonably) is satisfied that (i) all Secured Obligations (other than contingent indemnity obligations for which a demand for payment has not been made) shall have been unconditionally and irrevocably paid and discharged in full and (ii) there is no possibility of any further Secured Obligations coming into existence, the Pledgee shall promptly at the request of the Pledgors release the Pledged Assets from the Pledge.

12.2 This Pledge shall be discharged by, and only by, the express release thereof granted by the Pledgee in writing. The Pledgee shall inform the Company and the MG Pledgor of such a release and authorise the Company and the MG Pledgor, as the case may be, to share such dispositions as the Pledgors may request and instruct (a) the Company to record the release of the Pledge in the Register, and (b) the MG Pledgor to record the release of the Pledge in the ECP Register.

12.3 Any release of this Pledge shall be null and void *ab initio* and without effect if any payment received by the Pledgee and applied towards satisfaction of all or part of the Secured Obligations (i) is avoided or declared invalid as against the creditors of the maker of such payment, or (ii) becomes repayable by the Pledgee, or (iii) proves not to have been effectively received by the Pledgee.

13. **POWER OF ATTORNEY**

13.1 Each Pledgor irrevocably and unconditionally appoints the Pledgee to be its attorney and to execute, deliver and perfect, in its name and on its behalf, all documents (including any share transfer forms and other transfer instruments) and do all things that the Pledgee requires by this Agreement or by Law, including for the enforcement of the Pledge.

13.2 Each Pledgor shall ratify and confirm all things done and all documents executed by the Pledgee in pursuance of the power of attorney conferred to it hereunder.

13.3 The Parties expressly agree in accordance with article 2003 of the Luxembourg civil code that the powers of attorney granted pursuant to this Clause 13 (and any other Clause in this regard in this Agreement) do not terminate upon the occurrence of an event of bankruptcy (*faillite*) or similar or foreign proceedings affecting the rights of creditors generally in respect of the Pledgors or the Company.

14. **NOTICES**

All notices and communications in connection with this Agreement must be made in accordance with the provisions of Clause 13.1 of the Share Purchase Agreement, which is incorporated herein *mutatis mutandis*.

HIGHLY CONFIDENTIAL                                                                    Tassillo_Fleites_00000929

15.     **FURTHER PROVISIONS**

15.1    **Currency conversion**

For the purpose of, or pending, the release of this Pledge in accordance with Clause 12 (*Discharge of the Pledge*),or discharge of the Secured Obligation and in particular for the purpose of the satisfaction of, and set-off against all or any part of the Secured Obligations under Clause 9 (*Enforcement of the Pledge*), the Pledgee may convert any monies collected recovered or realised or applied by it under this Agreement from one currency to another, as the Pledgee in its absolute discretion may think fit, and any such conversion shall be undertaken at the prevailing spot rate of exchange for the time being, obtaining such other currency with the first currency as determined by the Pledgee in its discretion, acting reasonably, except where such conversion is required to be made in accordance with the provisions of the Share Purchase Agreement or the Seller Note in such case such provisions shall prevail.

15.2    **Illegality, severability**

(a)     The illegality, invalidity or unenforceability of any provisions hereof shall not affect the legality, validity or enforceability of this Agreement or of any other provision hereof.

(b)     Any provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting, impairing or invalidating the remaining provisions hereof, and any such invalidity, illegality or unenforceability in any jurisdiction shall not render invalid, illegal or unenforceable such provision in any other jurisdiction. To the extent permitted by applicable Law, each Pledgor waives any provision of law which renders any provisions hereof invalid, illegal or unenforceable in any respect.

(c)     In the event of any such invalidity, illegality or unenforceability in any jurisdiction, the parties hereto shall negotiate in good faith with a view to agreeing on the substitution and replacement of any such provision by a provision that is legal, valid, binding and enforceable in such jurisdiction, and that, to the extent practicable, most nearly approximates its economic effects and effects the parties original intentions and purpose upon entering into this Agreement.

15.3    **Costs and expenses**

All the Pledgee's reasonable costs and expenses (including legal fees, taxes and duties) incurred in connection with the preparation, negotiation, signing, execution, perfection or enforcement of this Agreement or Pledge or the exercise of its rights under the Pledge shall be borne by the Pledgors, on a joint and several basis. The obligation to reimburse such reasonable costs and expenses shall be part of the Secured Obligations.

15.4    **Transferability**

(a)     This Agreement shall be binding upon and shall inure to the benefit of the Pledgors, the Company and the Pledgee and their respective successors and permitted assigns and references in this Agreement to any of them shall be construed accordingly.

(b)     The Pledgors shall not be entitled to assign, novate, encumber or transfer any of its rights or benefits and obligations under this Agreement without the prior written consent of the Pledgee in accordance with the Share Purchase Agreement and Seller Note.

HIGHLY CONFIDENTIAL                                            Tassillo_Fleites_00000930

(c)     The rights and obligations of the Pledgee hereunder shall automatically and without any further action being necessary be transferred to any new pledgee appointed in relation to the Secured Obligations. In case more than one pledgee is appointed in relation to all or part of the Secured Obligations each pledgee shall automatically and without any further action being necessary be entitled to exercise the rights granted hereby in relation to the part of the Secured Obligations in respect of which it has been appointed, always subject, however, to the provisions of the Share Purchase Agreement and the Seller Note. For the avoidance of doubt, the right granted under this Clause 15.4(c) shall exclusively benefit the Pledgee.

(d)     For the purpose of Articles 1278 *et seq.* of the Luxembourg Civil Code and any other relevant legal provisions, to the extent required under applicable Law and without prejudice to any other terms hereof and in particular Clause 3 (*Effectiveness of the Pledge*) hereof, the Pledgee hereby expressly reserves and each Pledgor agrees to the preservation of this Pledge and the security interest created hereunder in case of assignment, novation, amendment or any other transfer of the Secured Obligations.

## 15.5    Amendments, Waiver

(a)     The respective rights and remedies of the parties provided in this Agreement are cumulative and may be exercised as often as considered appropriate and are in addition to any respective rights or remedies provided by general Law.

(b)     Any amendments to this Agreement and any waivers and discharges of rights under this Agreement shall require written form and due execution on behalf of the parties to this Agreement.

(c)     A failure to exercise or a delay in exercising any right, power, privilege or remedy by either party to this Agreement shall not operate as a waiver thereof, nor shall any partial exercise of any right, power, privilege or remedy. The rights, powers, privileges and remedies herein provided are cumulative and not exclusive of any rights, powers, privileges or remedies provided by Luxembourg Law. The rights of the Pledgee under this Agreement may be waived only expressly and in writing.

## 15.6    Counterparts

This Agreement may be executed in any number of counterparts (whether by delivery of an original of such executed counterparts or by facsimile or electronic transmission of such executed counterparts), all of which will be deemed to be an original and such counterparts taken together will constitute one agreement and any of the parties hereto may execute this Agreement by signing any such counterpart

## 15.7    Additional Rights of Pledgee

(a)     The Pledgee may from time to time and at its option (a) require each Pledgor to, and such Pledgor shall, periodically deliver to the Pledgee records and schedules, which show the status of the Pledged Assets and such other matters which affect the Pledged Assets; (b) verify the Pledged Assets and inspect the books and records of the Pledgors and the Company and make copies of or extracts from the books and records; and (c) notify any prospective buyers or transferees of the Pledged Assets of the Pledgee's interest in the Pledged Assets. Each Pledgor agrees that the Pledgee may at any time take such steps as the Pledgee deems reasonably necessary to protect the Pledgee's interest in and to preserve the Pledged Assets. Each Pledgor agrees that the Pledgee may at any time take such steps as the Pledgee deems reasonably necessary to protect the Pledgee's interest in and to preserve the Pledged Assets.

19

(b)     This Agreement shall remain in full force and effect and shall not be limited, impaired or otherwise affected in any way by reason of (i) any delay in making demand on either Pledgor for or delay in enforcing or failure to enforce, performance or payment of any Secured Obligations, (ii) any failure, neglect or omission on the Pledgee's part to perfect any Lien upon, protect, exercise rights against, or realize on, any property of the Pledgors or any other party securing the Secured Obligations, (iii) any failure to obtain, retain or preserve, or the lack of prior enforcement of, any rights against any Person or Persons or in any property, (iv) the invalidity or unenforceability of any obligations or rights in any collateral securing the Secured Obligations, (v) the existence or nonexistence of any defenses which may be available to the Pledgors with respect to the Secured Obligations, or (vi) the commencement of any bankruptcy, reorganization; liquidation, dissolution or receivership proceeding or case filed by or against the Pledgors or the Company.

(c)     The Pledgee shall not be required to marshal any present or future collateral security (including but not limited to this Agreement and the Pledged Assets) for, or other assurances of payment of, the Secured Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising.

15.8    **Agent for Service of Process; Election of Domicile**.

At all times while any portion of the Secured Obligations remains unpaid and outstanding, the Pledgors shall continually maintain an agent for service of process who shall (a) be reasonably acceptable to the Pledgee, (b) accept legal notices sent to the Pledgors in the State of New York, United States and (c) perform other services customarily performed by an agent for service of process in the United States.

For the specific purpose of any legal proceedings to be initiated before the courts of the district of Luxembourg City in accordance with Clause 16(a), each of the Pledgors hereby elects domicile in the sense of an *élection de domicile* as provided for by Article 111 of the Luxembourg Civil Code, in the registered offices of the Company, currently 32, boulevard Royal, L-2449 Luxembourg, Grand Duchy of Luxembourg (and in case of change at the new registered seat's address as filed and registered with the Luxembourg trade and companies register) and the Pledgors hereby acknowledge and accept each for itself that the service of any convening notice (*assignation* or any other *acte de procédure*) to appear before such Luxembourg City courts will be validly performed and notified to it if made at this elected domicile (*domicile élu*).

15.9    **Waiver of Immunity**.

To the extent that either Pledgor has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution or execution, on the ground of sovereignty or otherwise) with respect to itself or its property, it hereby irrevocably waives, to the fullest extent permitted by applicable law, such immunity in respect of its obligations under this Agreement.

15.10   **Specific Performance**.

(a)     The Pledgors and the Pledgee agree that (i) irreparable damage would occur in the event that the provisions of this Agreement or obligations, undertakings, covenants or agreements of the parties hereto were not performed in accordance with their specific terms or were otherwise breached and (ii) monetary damages, even if

20

available, would not be an adequate remedy for any such failure to perform or any breach of this Agreement. Accordingly, it is agreed that the parties hereto shall be entitled to an injunction or injunctions to enforce specifically the terms and provisions of this Agreement in any court specified in Clause 16 without proof of actual damages, this being in addition to any other remedy to which they are entitled at Law or in equity.

(b)     Each party hereto agrees that it will not oppose (and hereby waives any defense in any action for) the granting of an injunction, specific performance and other equitable relief as provided herein on the basis that (i) the other party has an adequate remedy at law or (ii) an award of specific performance or other equitable remedy is not an appropriate remedy for any reason at Law, equity or otherwise. Any party hereto seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement when available pursuant to the terms of this Agreement shall not be required to provide any bond or other security in connection with any such order or injunction.

16.     **GOVERNING LAW AND JURISDICTION**

(a)     All provisions related to (i) the lawful transfer and/or voting of the Pledged Assets, (ii) internal governance matters involving the Company and (iii) any non-contractual obligations arising out of or in connection therewith pursuant to the terms of this Agreement (collectively, the "**Luxembourg Matters**") shall be governed by and construed in accordance with the laws of Luxembourg. Any dispute arising in connection with the Luxembourg Matters shall be submitted to the courts of the district of Luxembourg City.

(b)     WITH THE EXCEPTION OF THE LUXEMBOURG MATTERS, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER (COLLECTIVELY, THE "**OTHER MATTERS**") SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, EACH PLEDGOR HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO § 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(c)     THE PLEDGORS AND THE PLEDGEE HEREBY EXPRESSLY WAIVE ANY RIGHT TO TRIAL BY JURY OR ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (i) ARISING UNDER THIS AGREEMENT OR ANY OTHER DOCUMENT OR INSTRUMENT ATTACHED HERETO, REFERRED TO HEREIN OR DELIVERED IN CONNECTION HEREWITH, OR (ii) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PLEDGORS WITH RESPECT TO THIS AGREEMENT OR ANY INSTRUMENT ATTACHED HERETO, REFERRED TO HEREIN OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND THE PLEDGORS AND THE PLEDGEE HEREBY AGREE AND CONSENT THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PLEDGORS AND THE PLEDGEE HERETO TO THE WAIVER OF ITS

HIGHLY CONFIDENTIAL                                                              Tassillo_Fleites_00000933

RIGHT TO TRIAL BY JURY.

(d)     The Pledgors and the Pledgee consents to the commencement and maintenance of any action or proceeding against it with respect to any Other Matter in any state or federal court within the City of New York, New York (USA).

17.     **English Language**.  All of the parties hereto declare that they have specifically requested and do hereby confirm their request that the present Agreement and all agreements, amendments, exhibits and schedules referred to herein be drafted and executed in the English language.  *Toutes les parties aux présentes déclarent qu'elles ont spécifiquement demandé et par les présentes confirment leur demande que la présente convention, et tous les autres contrats, pièces et annexes dont référence est fait soit rédigée et signée en anglais.*

22

HIGHLY CONFIDENTIAL                    Tassillo_Fleites_00000934

## SIGNATORIES

**THE PLEDGORS**



By: ███████
Title: Director

By: ███████
Title: Director

**THE PLEDGEE**

By:
Title:

**THE COMPANY**

**MindGeek S.à r.l.**
By:
Title: Manager and authorised signatory

**SIGNATORIES**

**THE PLEDGORS**

_____
██████████████
By:
Title:

_____
███████████████████
By:
Title:

**THE PLEDGEE**



_____
████████ ████████
By:    Feras Antoon
Title:  President

**THE COMPANY**

_____
**MindGeek S.à r.l.**
By:
Title: Manager and authorised signatory

Tassillo_Fleites_00000936

**SIGNATORIES**

**THE PLEDGORS**

By:
Title:

By:
Title:

**THE PLEDGEE**

By:
Title:

**THE COMPANY**

**MindGeek S.á r.l.**
By:
Title: Manager and authorised signatory

Tassillo_Fleites_00000937

# SCHEDULE 1

Form of Letter to Registered Agent

Date:  March 16, 2023

████████████████

2nd Floor Water's Edge
Building
Wickams Cay II
Road Town
British Virgin Islands

Copy to:

████████████████

Dear Sirs

**Irrevocable letter of instruction - pledge over all of the shares issued by ████████████ (the Company) to ██████████████████ (the Pledgor)**

1      You are the Registered Agent of the Company.

2      We enclose at Schedule 1 a copy of a share pledge dated March 16, 2023 (the **Pledge**) executed by the Pledgor and the Company in favour of ██████████████ (the **Pledgee**) pursuant to which the Pledgor pledged, among other things, all of the shares held by it in the Company from time to time (the **Shares**) in favour of the Pledgee. Capitalised terms defined in the Pledge have the same meaning in this letter.

3      Pursuant to Clause 2.3(e) of the Pledge, the Company is required to make an annotation of the Pledge on its register of members.

4      Pursuant to Clause 5.2 of the Pledge, the Company is prohibited from doing any of the following without the prior written consent of the Pledgee:

      (a)      amend its memorandum or articles of association;

      (b)      merging or consolidating with any other company;

      (c)      making a disposition of more than fifty per cent. "in value" of its assets;

      (d)      continuing into another jurisdiction;

      (e)      changing its registered agent;

      (f)      registering the transfer of any Share to any person other than the Pledgee (or as the Pledgee shall direct).

2

Tassillo_Fleites_00000938

5          Pursuant to Clause 5.2 of the Pledge, the Company must, maintain its original register of members at the office of its registered agent at all times from the date of the Pledge until the date on which the security created by the Pledge is released.

6          We hereby irrevocably and unconditionally, authorise, instruct and direct you that:

      (a)      you must annotate the register of members of the Company;

      (b)      you may not permit the Company to, or assist the Company with, carrying out any of the actions listed at paragraph 4 above;

      (c)      you must maintain the original register of members of the Company at your office;

      (d)      any transfer of the Shares pursuant to, or in connection with, an enforcement of the security created by the Pledge be and is hereby approved;

      (e)      you must, on request by the Pledgee or its legal advisors (which request by only be made during the continuance of an Event of Default that has not been cured during the applicable cure periods), register any transfer of any Share to the Pledgee, its nominee or to any third party as it or its legal advisors may direct;

      (f)      you must accept, during the continuance of an Event of Default, instructions (if any) concerning the transfer of the Shares from the Pledgee or its legal advisors without the requirement for any further approval or instruction from us;

      (g)      in the event of any conflicting instructions being given by us which conflict with any instructions that are given by the Pledgee or its legal advisors concerning transfer of the Shares to the Pledgee or its nominee during the continuance of an Event of Default, the instructions of the Pledgee or its legal advisors are to prevail during the continuance of such Event of Default and you must during the continuance of an Event of Default comply with the instructions of the Pledgee or its legal advisors in respect of such instructions; and

      (h)      you must accept any payment of fees from the Pledgee in relation to any steps required to be taken by you in relation to enforcement of the Charge or otherwise, including, without limitation, any payment of fees owed by the Company in order to restore the Company to good standing.

7          This letter of instruction:

      (a)      was approved by a resolution of directors of the Company dated _____ and, as such, is an instruction of the directors for the purposes of Section 91B of the BVI Business Companies Act, 2004;

      (b)      shall remain in force until the Pledgee notifies you in writing that the security created pursuant to the Pledge has been released; and

HIGHLY CONFIDENTIAL                                  Tassillo_Fleites_00000939

(c)     is governed by British Virgin Islands law.


Yours faithfully


……………………………………………
Name:
for and on behalf of
<span style="background:black"> </span>



……………………………………………
Name:
for and on behalf of
<span style="background:black"> </span>

Tassillo_Fleites_00000940

## NON-COMPETITION AGREEMENT

This Non-Competition Agreement (this "**Agreement**") is dated as of March 16, 2023 (the "**Effective Date**"), by and between ▮▮▮▮▮▮▮▮▮▮ a corporation incorporated under the laws of the Province of Quebec (the "**Vendor**"), Feras Antoon, an individual resident in the Province of Quebec ("**Feras**"), David Tassillo, an individual resident in the Province of Quebec ("**David**" and, together with Feras, the "**Principals**") and MindGeek S.à r.l., a Luxembourg private limited liability company (*société à responsabilité limitée*), having its registered office at 32, boulevard Royal, L-2449 Luxembourg and registered with the Luxembourg trade and companies register under number B181337 (the "**Corporation**").

All capitalized terms used but not defined herein shall have the respective meanings ascribed thereto in the Share Purchase Agreement (as defined below).

## RECITALS

A.        The Vendor and ▮▮▮▮▮▮▮▮▮, a business company existing under the laws of the British Virgin Islands, having its registered office at 2nd Floor, Water's Edge Building, PO Box 2429, Wickhams Cay II, Road Town, Tortola, British Virgin Islands and registered with the BVI registry of corporate affairs under number ▮▮▮▮▮ (the "**Purchaser**"), entered into a Share Purchase Agreement, dated as of January 30, 2023 (the "**Share Purchase Agreement**"), pursuant to which, among other things, the Vendor agreed to sell the Purchased Shares to the Purchaser.

B.        The Principals, as direct or indirect shareholders of the Vendor, will also derive substantial benefit from the completion of the transactions contemplated under the Share Purchase Agreement.

C.        Pursuant to Section 9.01(v)(d) of the Share Purchase Agreement, the Vendor is required to deliver a duly executed copy of this Agreement to the Purchaser as a condition to the Closing.

D.        The Closing has occurred as of the Effective Date.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises made herein, the Vendor, the Principals and the Purchaser hereby agree as follows:

1.        *Definitions*.  For purposes of this Agreement, the parties hereto agree to the following definitions of the following terms used in this Agreement:

"**Restricted Territory**" shall mean the entire world.

"**Restricted Period**" shall mean the period of time commencing on the Effective Date and ending on the earlier to occur of (a) the four-year anniversary of the Closing Date and (b) any material breach or default by the Purchaser under the Share Purchase Agreement, the Share Pledge Agreement, or any other document or agreement entered into in connection therewith.

2.        **Non-Competition**.  During the Restricted Period and anywhere in the Restricted Territory, the Vendor and its Principals agree that, without the prior written consent of the Corporation, it and its Affiliates shall not:

(a)  directly or through any agent, be or become an officer, director, consultant or advisor to any firm, partnership, corporation, Person, entity or business which offers to its customers any product, technology or

-1-

HIGHLY CONFIDENTIAL

service which competes with the Business; or

    (b)  become employed by, or provide services to, any firm, partnership, corporation, Person, entity or business, where the responsibilities of the Vendor or its Affiliates involve or in any way relate to any service, product or technology which competes with the Business.

    *Provided*, *however*, that, for the avoidance of doubt, nothing in this Agreement shall prevent the Vendor or its Affiliates from acquiring, disposing of, entering into derivative transactions regarding, owning (beneficially or of record), or otherwise entering into any transaction with respect to any shares of capital stock or other debt or equity securities of any Person or business that competes with the Business.

    3.  *Severability of Covenants*.  The covenants contained in Section 2 shall be construed as a series of separate covenants, one for each country, province and state in the Restricted Territory.  If, in any judicial proceeding, a court determines that any of such separate covenants (or any part thereof) is unenforceable because it is deemed to exceed the time, geographic or scope limitations permitted by applicable law, then such unenforceable covenant (or such part) shall be eliminated from this Agreement and the remaining separate covenants (or portions thereof) shall remain in full force and effect.  Moreover, if any one or more of the provisions contained in this Agreement shall be held to be excessively broad as to duration, activity or subject, it  is the intention of the parties hereto that any court of competent jurisdiction will construe such provisions by blue- penciling the provisions and limiting and reducing them so as to be enforceable to the maximum extent allowed by applicable law.

    4.  *Confidentiality.*  The Vendor and the Principals acknowledge that they have had and may continue to have access to information (including trade secrets, financial data, know how, customer lists, employee lists, marketing plans, production and business plans, special techniques, methods, procedures, equipment and programs) of the Corporation, the Purchaser and its respective Affiliates (collectively, the "**Confidential Information**").  It is acknowledged and agreed that the Confidential Information constitutes proprietary rights of the Corporation and the Purchaser which the Corporation and the Purchaser are entitled to protect and that the use of any Confidential Information or disclosure of any Confidential Information to competitors of the Corporation, the Purchaser and its Affiliates or the Business, or the general public, would be detrimental to the interests of the Corporation, the Purchaser and its Affiliates.  Each of the Vendor and the Principals therefore covenant and agree with the Corporation that it or he will not divulge or disclose, at any time until such information is disseminated to the public by the Corporation or the Purchaser or becomes public knowledge other than as a result of a breach of this Agreement, any Confidential Information to any person, and it or he shall not use or exploit, directly or indirectly, Confidential Information for any purpose.  Notwithstanding the foregoing, the Vendor or the Principal shall be entitled to disclose Confidential Information if required by law or pursuant to a subpoena or order issued by a governmental authority, provided that in the case of disclosure required by law or pursuant to a subpoena or order issued by a governmental authority, the Vendor or a Principal must: (a)promptly notify the Corporation and the Purchaser thereof (if permitted by law or such governmental authority to do so); (b)if requested by the Corporation or the Purchaser, at such party's expense, take reasonable steps to resist or narrow such requirement; and (c) cooperate with the Corporation or the Purchaser, at such party's expense, in any attempt to obtain an order or other assurance that such information will be accorded confidential treatment.

    5.  *Communications.*  Unless required by applicable law or otherwise as consented to by the Purchaser, and which consent shall not be unreasonably withheld, during the Restricted Period, the Vendor and the Principals shall not, directly or indirectly, make any public statement, written or oral, or cause or encourage others to make any public statement, written or oral, in respect of the Corporation, the Purchaser or any of their respective Affiliates, including with respect to a Principal's former engagement as an employee, director or officer of the Corporation or its Affiliates or with respect to the Vendor's capacity as a former shareholder of the Corporation. Notwithstanding the foregoing, in the context of new employment of the Principals or engagement of the Vendor and or  Principals in any new project(s), nothing herein shall prevent the Vendor, the Principals, new employer or  new project entity from referring to the Vendor and Principals' past engagements and achievements as employee, director or officer

-2-

of the Corporation.

6. ***Independence of Obligations***.  The covenants and obligations of Vendor and the Principals set forth in this Agreement shall be construed as independent of any other agreement or arrangement between Vendor and the Principals, on the one hand, and the Corporation or any of its Affiliates, on the other.  Vendor and the Principals nevertheless understand and agree to their obligations and the restraints they may impose and in particular:

(a) ***Vendor and Principals Acknowledgement of Receipt of Value***.  The Vendor and the Principals acknowledge that (i) the Vendor was a significant holder of the equity securities of the Corporation prior to the Effective Date, (ii) Vendor's and the Principals' agreement  as set forth herein is necessary to preserve the value and goodwill of the Corporation for the Purchaser following the Purchaser's investment in the Corporation, (iii) the consideration to be delivered by the Purchaser to the Vendor pursuant to the Share Purchase Agreement in respect of the Purchased Shares (the "**Specified Consideration**") is sufficient and adequate to compensate the Vendor and the Principals (as direct or indirect shareholders of the Vendor) for agreeing to the restrictions contained in this Agreement, and (iv) such restrictions will not cause the Vendor or the Principals undue hardship.

(b) ***Vendor and Principals Acknowledgement of Restraints***.  The Vendor and Principals acknowledge that the limitations of time, geography and scope of activity agreed to in this Agreement are reasonable because, among other things:(i) the Corporation and its Affiliates are engaged in a highly competitive industry, (ii) the Vendor and the Principals had unique access to the trade secrets and know-how of the Corporation and its Affiliates, including, without limitation, the plans and strategy (and, in particular, the competitive strategy) of the Corporation and its Affiliates, and (iii) this Agreement provides no more protection than is necessary to protect the Purchaser's and the Corporation's  interests in the Corporation's trade secrets and confidential information.

(c) ***Vendor and Principals Acknowledgement of Duration***.  The Vendor and the Principals acknowledge, understand and agree that the Specified Consideration is paid in consideration, in part, for the non-compete obligations hereunder and that in light of the nature of the transactions contemplated by the Share Purchase Agreement, the significance of the non-compete covenant to the Business, and to the Purchaser's willingness to enter into the Share Purchase Agreement and make a significant investment in the Corporation, the duration of the non-compete covenant set forth herein is reasonable and fair in the circumstances.

7. ***General Provisions***.

(a) ***Notices***.  All notices and other communications hereunder shall be in writing and shall be given or made by delivery in person (and shall be deemed to have been duly given upon such delivery), or by commercial messenger or courier service (and shall be deemed to have been duly given one business day after delivery to the commercial messenger or courier service), or mailed by registered or certified mail (return receipt requested) (and shall be deemed to have been duly given five days after delivery to the mail service) or sent via email (and shall be deemed to have been duly given after transmission in full with electronic confirmation of delivery if delivered prior to 5:00p.m. local time on a business day, or at 9:00 a.m. the next business day if delivered after 5:00p.m. local time on a business day or delivered any time on a day which is not a business day) to the parties hereto at the following addresses (or at such other address for a party as shall be specified by like notice).

(i)        if to the Vendor, to:

Feras Antoon

**Redacted - PII**

-3-

HIGHLY CONFIDENTIAL                                                                              Tassillo_Fleites_00000943

and

David Tassillo

**Redacted - PII**

with a copy (which shall not constitute notice pursuant to this Section 5(a)(i)) to:

Stein & Stein Inc.
4101 Sherbrooke Street West
Montreal, Quebec H3Z 1Ay

Attention: Neil H. Stein
Email: nstein@steinandstein.com

(ii)     if to the Corporation, to:

c/o ██████████ 365
 Bay Street, Suite 800
Toronto, Ontario M5H 2V1.
Attention: Fady Mansour
**Redacted - PII**

(b) ***Counterparts***.  This Agreement and any of the documents to be delivered or furnished pursuant to this Agreement may be executed and delivered in any number of counterparts, each of which when executed and delivered is an original but all of which taken together constitute one and the same instrument.  Any party may deliver an executed copy of this Agreement or any of the documents to be delivered or furnished pursuant to this Agreement by facsimile transmission or electronic PDF but that party shall immediately deliver to the other party an originally executed copy of such document.

(c) ***Entire Agreement***.  This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings both written and oral, among the parties hereto with respect to the subject matter hereof.

(d) ***No Third Party Beneficiaries***.  This Agreement is not intended to, and shall not, confer upon any other person any rights or remedies hereunder.

(e) ***Assignment***.  This Agreement shall not be assigned by operation of law or otherwise without the express prior written consent of the Vendor, the Principals and the Corporation.

(f) ***Severability***.  In the event that any provision of this Agreement or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto.  The parties hereto further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

-4-

(g) **Other Remedies**.  Any and all remedies herein expressly conferred upon a party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such party, and the exercise by a party of any one remedy will not preclude the exercise of any other remedy.

(h) **Governing Law, Venue, and Consent to Jurisdiction.** This Agreement and any action, claim, controversy or dispute arising under, in connection with or related to this Agreement, including claims of fraud, the relationship of the parties hereto and/or the interpretation and enforcement of the rights and duties of the parties hereto, in all respects, including matters of construction, validity and performance, shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York applicable to Contracts made and performed in that state (without regard to the choice of law or conflicts of law provisions thereof that would require the application of the law of any other jurisdiction and including, for the avoidance of doubt, Section 5-1401 of the General Obligations Law of the State of New York.  ALL DISPUTES ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OBLIGATIONS HEREUNDER SHALL BE BROUGHT  IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK. BY EXECUTING AND DELIVERING THIS AGREEMENT, THE CORPORATION, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, AND THE VENDOR AND THE PRINCIPALS, FOR ITSELF AND HIMSELF, AS APPLICABLE, AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY: (I) ACCEPTS GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (II) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (III) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE PURCHASER OR THE VENDOR AT  THEIR ADDRESS PROVIDED IN SECTION 5(A); (IV) AGREES THAT, SERVICE AS PROVIDED IN CLAUSE (III) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE PURCHASER OR THE VENDOR, AS THE CASE MAY BE, IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; (V) AGREES THAT THE HOLDER RETAINS THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST THE BORROWER IN THE COURTS OF ANY OTHER JURISDICTION; AND (VI) AGREES THAT THE PROVISIONS OF THIS PARAGRAPH RELATING TO JURISDICTION AND VENUE SHALL BE BINDING AND ENFORCEABLE TO THE FULLEST EXTENT PERMISSIBLE UNDER NEW YORK GENERAL OBLIGATIONS LAW SECTION 5-1402 OR OTHERWISE.  EACH OF THE PARTIES TO THIS AGREEMENT HEREBY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL- ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS PARAGRAPH AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN

-5-

CONSENT TO A TRIAL BY THE COURT.

        (i) ***Representation by Counsel.*** The Vendor, the Principals and the Corporation each hereby acknowledge and agree that each of them was in fact individually represented by legal counsel in negotiating the terms of this Agreement, including a designation of the venue and forum in which a controversy arising from this Agreement will be adjudicated and the choice of law to be applied.

        THE PRINCIPALS AND THE PERSON SIGNING ON BEHALF OF THE CORPORATION AND THE VENDOR EACH HEREBY CERTIFY AS FOLLOWS: I CERTIFY THAT I HAVE READ THE ENTIRE CONTENTS OF THIS AGREEMENT BEFORE SIGNING MY NAME HERETO; THAT I FULLY UNDERSTAND ALL THE TERMS, CONDITIONS AND PROVISIONS SET FORTH IN THIS AGREEMENT, THAT I HAVE RECEIVED A COPY OF THIS AGREEMENT AND THAT I HAD THIS AGREEMENT REVIEWED BY MY ATTORNEY. FURTHERMORE, I UNDERSTAND AND AGREE THAT I AM UNDER NO DISABILITY OR IMPAIRMENT THAT AFFECTS MY DECISION TO SIGN THIS AGREEMENT AND I KNOWINGLY AND VOLUNTARILY INTEND TO CAUSE THE CORPORATION, THE VENDOR OR THE PRINCIPALS, AS THE CASE MAY BE, TO BE LEGALLY BOUND BY THIS AGREEMENT.

*[Signature Page Follows]*

HIGHLY CONFIDENTIAL        Tassilo_Fleites_00000946

IN WITNESS WHEREOF, the parties hereto have caused this Non-Competition Agreement to be duly executed on the date first above written.

By: _____
Name: Feras Antoon
Title:  President

_____
Name: Feras Antoon

_____
Name: David Tassillo

**MINDGEEK S.À R.L.**

By: _____
Name:
Title:

Tassillo_Fleites_00000947

IN WITNESS WHEREOF, the parties hereto have caused this Non-Competition Agreement to be duly executed on the date first above written.

█████████████

By: _____
Name:
Title:

By: _____
Name: Feras Antoon

By: _____
Name: David Tassillo

**MINDGEEK S.À R.L.**

By: _Andreas Alkiviades Andreou_____
Name: Andreas Alkiviades Andreou
Title: Manager Class A

By: _Anis Baba_____
Name: Anis Baba
Title: Manager Class A