# EXHIBIT 159

# [PORTIONS OF EXHIBIT FILED UNDER SEAL PURSUANT TO APPLICATION TO SEAL]

# FURTHER AMENDED AND RESTATED
# EXECUTIVE EMPLOYMENT AGREEMENT
# 2018 - 2024

**ENTERED INTO** as of this 22nd day of March, 2018 and effective as of the Effective Date,

| | |
|---|---|
| **BETWEEN:** | **9219-1568 QUÉBEC INC.**, a corporation duly incorporated under the laws of the Province of Quebec, having its head office at 7777, Décarie Boulevard, Suite 300, Montreal, Quebec H4P 2H2, herein represented by **David Tassillo**, duly authorized for this purpose as he so declares (the "**Company**") |
| **AND:** | **FERAS ANTOON**, domiciled and residing at [Redacted - PII] (the "**Executive**"). |

**WHEREAS** an employment agreement was entered into on the first day of May 2010 by and between 9219-1568 Québec Inc., Froytal Services Ltd., D.C.I. Daily Capital Investment Limited, WebExpansion Cyprus Limited and Reimsberg Inc., and the Executive, which agreement was later amended and restated on February 1, 2012 amended and restated on October 18, 2013 and amended on January 1, 2015 (collectively, as amended and restated the "**2013 Employment Agreement**");

**WHEREAS** the Company and the Executive wish to further amend and restate the 2013 Employment Agreement governing the relationship between the Company (and its Affiliates, as defined below) and the Executive by this Agreement (as defined below);

**WHEREAS** the Executive represents having the skills, experience, competence, training and education required for the purposes of this Agreement and to fulfill his duties hereunder;

**WHEREAS** the Executive is not restricted in any way from executing the duties provided for hereunder;

**WHEREAS** the Company wishes to employ the Executive and the Executive agrees to be employed by the Company, subject to and in accordance with the terms and conditions set out in this Agreement as of the Effective Date; and

**WHEREAS** the Parties wish to amend certain provisions of the 2013 Employment Agreement, as amended, and enter into this Further Amended and Restated Executive Employment Agreement ("2018 Agreement") in order to reflect such amendments and which 2018 Agreement shall replace the 2013 Employment Agreement on the Effective Date;

**NOW, THEREFORE,** in consideration of the foregoing and the mutual covenants and agreements herein contained, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **DEFINITIONS AND INTERPRETATION**

    1.1 **Definitions.** For the purposes of this Agreement, unless the context otherwise requires, the following terms shall have the respective meanings set out below and grammatical variations of such terms shall have corresponding means:

CONFIDENTIAL   MindGeek_Fleites_00000020

"**Affiliate**" means with respect to any Person, another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person;

"**Agreement**" means this further amended and restated executive employment agreement and all schedules to it, as it may be further re-amended, restated or supplemented from time to time;

"**Base Salary**" has the meaning set out in Section 4.1;

"**Board**" means the board of directors of the Company (or the equivalent governing body) and includes, where the context requires, any compensation committee or similar committee of such board to which such board may delegate matters relating to the terms of the employment of senior employees of the Company, including the Executive;

"**Bonus**" has the meaning set out in Section 4.2;

"**Business**" has the meaning set out in Section 9.1;

"**Car Allowance**" has the meaning set out in Section 5.3;

"**Cause**" means any of the following:

(i) the Executive's fraud, dishonesty, misappropriation of funds or theft with respect to his employment hereunder;

(ii) the Executive's conviction or entering a plea of guilty or no contest to any criminal offence (except for minor traffic offences) which reasonably may be considered likely to adversely affect the Company or any of its Affiliates or the suitability of the Executive to perform his duties hereunder, including, without restriction, any offence involving fraud, theft, embezzlement, forgery, willful misappropriation of funds or property, or other fraudulent or dishonest acts;

(iii) Executive's willful and continued (A) misconduct or failure to properly carry-out his material duties hereunder or, (B) failure to comply with (i) the material rules and policies of the Company or of any Affiliate by which Executive is employed, or (ii) any reasonable and lawful directives or instructions of the Board;

(iv) the Executive's violation of any of the provisions of Sections 7, 8 or 9; or

(v) any other misconduct on the part of the Executive which would be likely to materially injure the business or reputation of the Company or any of its Affiliates.

"**Confidential Information**" has the meaning set out in Section 7.1;

"**Company**" means 9219-1568 Québec Inc.;

"**Effective Date**" means the Closing Date (as defined in the Financing Agreement);

"**Employment Period**" has the meaning set out in Section 3.1;

"**Executive**" means Feras Antoon;

"**Financing Agreement**" ███████████████████████████████████

8564395.3

CONFIDENTIAL

MindGeek_Fleites_00000021

███████████████████████████████████████
███████

"**Good Reason**" means any of the following actions taken by the Company unilaterally without the express consent of the Executive:

    (i)    a material reduction of the Executive's Base Salary, Bonus, Dividend Payments, benefits or perquisites, as in effect from time to time, except, in any such cases, as part of a general reduction applicable to all or substantially all of the senior executives of the Company;

    (ii)    a material adverse change to the Executive's duties, responsibilities, authority, title(s), reporting relationship or position(s) held immediately prior to the change, or the assignment to the Executive of duties and responsibilities materially inconsistent with the title(s) or position(s) held by the Executive immediately prior to the change;

    (iii)    notice by the Company to the Executive that his primary place of employment is to be relocated to a geographic area more than 50 kilometers from Montréal, Québec, without the Executive's consent; or

    (iv)    any other action which constitutes a "constructive dismissal" under applicable law;

"**Intellectual Property**" has the meaning set out in Section 8.1;

"**Parties**" means collectively the Company and the Executive, and "**Party**" means either of them;

"**Person**" means a natural person, partnership, limited partnership, limited liability partnership, corporation, limited liability company, unlimited liability company, joint stock company, trust, unincorporated association, joint venture or other entity or a governmental or other regulatory entity, and pronouns have a similarly extended meaning; and

"**Release**" has the meaning set out in Section 11.2.

1.2    **Headings and Titles.** The headings and titles in this Agreement have been inserted for convenience of reference only and shall not be deemed to be part of this Agreement, nor shall they affect the interpretation or construction of this Agreement.

1.3    **Article References.** Unless reference is specifically made to some other document or instrument, all references herein to articles, sections and exhibits are to articles, sections and exhibits of this Agreement.

1.4    **Extended Meanings.** Unless the context otherwise requires, words importing the singular number shall include the plural and *vice versa;* words importing any gender shall include all genders; words importing Persons shall include individuals, partnerships, associations, bodies corporate, trusts, unincorporated organizations, governments, regulatory authorities, and other entities; and words such as "including", "includes" and "include" mean "including (or includes or include) without limitation".

2.    **EMPLOYMENT AND DUTIES**

2.1    Subject to the terms and conditions set forth in this Agreement, the Executive shall be employed by the Company as Chief Executive Officer, reporting to the Board, or to any committee or person designated thereby.

8564395.3

2.2  In this capacity, the Executive shall perform such duties and exercise such powers as are normally associated with or incidental or ancillary to the position of Chief Executive Officer, and such other powers, duties and responsibilities which, from time to time, may be assigned to him by the Board, or any committee or persons designated thereby.

2.3  The Company may require that the Executive perform his services for or hold offices with any of the Company's Affiliates.

2.4  The Executive agrees to devote his full business time, attention and skills and to use his best efforts to develop and enhance the business of the Company and its Affiliates and to the performance of his duties as they may from time to time be determined pursuant to the terms of this Agreement. The Executive further covenants that he will faithfully and diligently perform those duties which are assigned to him to the best of his abilities and in the best interests of the Company and its Affiliates. The Executive further covenants and agrees that, during the term of this Agreement, he will not, without the written authorization of the Board, engage in any other employment, business, occupation or commercial endeavour, nor hold any corporate directorships with any other Person, it being understood, however, that the Executive may engage in civic or charitable activities, provided that, in each case, such activities, in the Board's opinion, are not incompatible with the Executive's responsibilities with the Company and do not interfere with the Executive's proper and timely performance of same.

2.5  The Executive agrees to be bound by and strictly and faithfully adhere to and comply with all of the Company's policies, practices, rules, codes of conduct, directives, standards and regulations (or those of any Affiliate by which he is employed) as same may be in force from time to time.

2.6  The Executive's principal place of work will be where the Company's head office is or may be located, which is currently in the City of Montréal. The Parties acknowledge and agree that the nature of the Executive's position and services hereunder may require frequent travel by the Executive, including travel to other offices of the Company or its Affiliates.

3.  **TERM**

3.1  Subject to the provisions of this Agreement, the Company shall employ the Executive and the Executive shall be employed by the Company in accordance with this Agreement for a fixed term beginning on the Effective Date and ending on December 31, 2024 (the "**Employment Period**"). Unless agreed to otherwise by the Parties in writing, this Agreement and the Executive's employment will terminate automatically at the end of this fixed term, whereupon the Company shall have no further obligations to the Executive hereunder except as provided for under Section 11.7.

3.2  The Parties acknowledge that the employment of the Executive with the Company commenced on May 1, 2010.

4.  **COMPENSATION**

    For all services rendered by the Executive pursuant to this Agreement, the Company will provide the Executive with the following compensation:

4.1  **Base Salary.** The Company will pay to the Executive an annual base salary (the "**Base Salary**") in the gross amount of ███████████████████████. Base Salary shall be subject to applicable deductions and withholdings and paid in accordance with the Company's usual payroll practices.

CONFIDENTIAL
MindGeek_Fleites_00000023

Case 2:21-cv-04920-WLH-ADS Document 563-152 Filed 07/25/25 Page 6 Page ID #:19847682

- 5 -

4.2 **Bonus**. Executive shall be eligible to receive during a given year of employment, or part thereof, a bonus (the "**Bonus**") equal to, for a given year or part thereof, ███████████████████████████████

4.3 **Discretionary Dividend.** ███████████████████████████████ Notwithstanding anything to the contrary herein, the amount of any Bonus owing to Executive pursuant to Section 4.2 shall be reduced by the amount of any Dividend Payment paid to Executive in such year.

4.4 **Compensation Exhaustive.** For greater certainty, the Executive shall not be entitled to any salary, bonus, dividends, participation in profits or other remuneration, or payment or compensation in lieu thereof from or by the Company, except as expressly set forth in this Agreement or otherwise determined in by the Company (or unless otherwise specifically agreed in writing between the Executive and the Company).

5. **BENEFITS**

5.1 **Vacation.** The Executive shall be entitled to six (6) weeks' paid vacation per calendar year, which shall accrue *pro rata* during the applicable year. Such vacation shall be taken at times convenient to the Executive and the Company and subject to the need for the timely performance of the Executive's responsibilities hereunder. Any unused vacation time shall not be carried over from one year to the next and Executive shall be entitled to payment in lieu thereof. Executive shall be entitled to medical, disability, family and other leave in accordance with applicable policies of the Company as in effect from time to time to its senior executives. The Company reserves the right to require the Executive to use all of his vacation time, and to pay out all vacation pay, during any particular year, or as the Company may otherwise determine in its discretion.

5.2 **Benefit Plans.** Subject to the provisions and eligibility rules of the applicable policies and plans and applicable laws and regulations in effect from time to time, the Executive and, to the extent eligible, his dependents, shall be entitled to participate in all benefit plans as may from time to time be made available by the Company to its senior executives or other employees generally, including all deferred compensation plans, retirement, medical, dental, disability, accidental death and dismemberment protection and group insurance plans. The Executive acknowledges that the Company may amend or terminate any such benefits from time to time, at its discretion.

5.3 **Automobile.** The Executive will be entitled to a monthly car allowance in the gross amount of ███████████████████████████ (the "**Car Allowance**"). The Executive undertakes and agrees to maintain, at all times throughout the term of this Agreement, at his own expense, a valid driver's license and adequate automobile insurance coverage, including third-party liability coverage. The Executive acknowledges that the Car Allowance may constitute, in whole or in part, a taxable benefit to the Executive. The Executive shall be responsible for all costs associated with the use of any vehicle, except and to the extent as may be otherwise provided for in the Company's expense-reimbursement policies, as same may be in effect from time to time.

6. **EXPENSES**

6.1 **Business Expenses.** The Company shall reimburse the Executive for all reasonable and necessary travel, business, entertainment and other out-of-pocket expenses incurred by him in performing his

8564395.3

CONFIDENTIAL

MindGeek_Fleites_00000024

employment duties hereunder, provided that such expenses are incurred and accounted for in accordance with the policies and procedures established by the Company from time to time, and upon presentation of appropriate invoices and supporting documents. The Company shall reimburse the Executive such expenses within 30 days of the Executive submitting proper expense reports (including all justifying statements, bills or receipts evidencing such expense) to the accounting department of the Company. The expenses that are subject to reimbursement pursuant to this Section 6.1 shall not be limited as a result of when the expenses are incurred. The amount of expenses eligible for reimbursement pursuant to this Section 6.1 during any given year of employment of the Executive shall not affect the amount of expenses eligible for reimbursement in any other year of employment of the Executive. The right to reimbursement pursuant to this Section 6.1 is not subject to liquidation, set off or exchange for another benefit.

7. **CONFIDENTIAL INFORMATION AND OWNERSHIP RIGHTS**

7.1 The Executive acknowledges that, in the course of his employment with the Company or its Affiliates, he has had and will continue to have access to, be entrusted with and acquire knowledge of confidential and proprietary information and trade secrets belonging to the Company and its Affiliates relating to their activities, which the Company and its Affiliates have a right and legitimate interest to protect. Such information and trade secrets means all information relating to the business or affairs of the Company and its Affiliates and all information supplied by a third party to the Company and its Affiliates in confidence, which, at the time is confidential in nature (whether or not specifically identified as confidential), is known or should be known by the Executive as being confidential and has been or is from time to time used by, developed by, made known to or otherwise learned by, the Executive, through the use of any of the facilities or resources of the Company and its Affiliates, in connection with the business or affairs of the Company and its Affiliates or in the course of his employment with the Company and its affiliates including any employment prior to the Effective Date, and include, but are not limited to the following:

(i) The identity of the Company's and its Affiliates' clients, including advertisers; any list of such clients; the prices charged to, the buying habits and preferences of, and volume of sales made to such clients, the particular needs of such clients, and the methods or arrangements implemented by the Company and its Affiliates to service or do business with such clients;

(ii) The identity of the Company's and its Affiliates' suppliers; any list of such suppliers; the products and/or services purchased from such suppliers, the prices paid to such suppliers, and the financial or other particular arrangements made between such suppliers and the Company or any of its Affiliates;

(iii) The identity of the Company's and its Affiliates' employees; any list of such employees; the salary, remuneration, other employment benefits provided to such employees;

(iv) Any information concerning the actual or planned creation, production, development, manufacture, engineering, marketing, sale, distribution or licensing of any products, services or technology of the Company or any of its Affiliates, including sales, marketing, product development or business plans, strategies or projections;

(v) Any technique, process, method of doing business, survey, design, technology, computer program, software or hardware, inventions or other intellectual property or trade secrets of the Company or any of its Affiliates, including all antecedent derivative works;

(vi) Any information concerning the financial affairs of the Company or any of its Affiliates, and information concerning negotiations, licensing or other business agreements between the Company or any of its Affiliates and third parties;

CONFIDENTIAL

MindGeek_Fleites_00000025

(vii)      Any information relating to potential mergers, acquisitions, divestitures or other business opportunities of the Company or its Affiliates;

(viii)    all information treated as proprietary by the Company or any of its Affiliates;

(ix)       all confidential facts relating to the Company or any of its Affiliates; and

(x)        Any information relating to a third party that is disclosed to the Executive, the Company or any of the Company's Affiliates and which the Company or its Affiliates have a duty to keep confidential,

(all such information referred to collectively as "**Confidential Information**"). The Executive acknowledges and agrees that the foregoing are only examples of the types of trade secrets, confidential and proprietary information that have been or will be made known to him by reason of his employment with the Company or its Affiliates, and are not to be construed as an exhaustive list of such information. It is also understood that the term "Confidential Information" does not include information which is or becomes generally known to or readily available for use by the public without any breach by the Employee of his obligations hereunder or any fault on the part of the Employee or any other Person.

7.2     The Executive acknowledges and agrees that the Confidential Information shall include all copies and embodiments thereof in whatever form (including, without restriction, hard copies, computer-stored copies, computer hard-drives, discs, DVDs, memory sticks, diskettes and any other storage medium or device), and wherever stored, shall remain the exclusive property of the Company or its Affiliates.

7.3     The Executive acknowledges that the Confidential Information constitutes a unique, special and highly-valuable asset of the Company or its Affiliates, the unauthorized use or disclosure of which would be highly detrimental to the Company or its Affiliates, and would give to a competitor an unfair advantage. Accordingly, the Executive covenants and agrees that, during his employment with the Company, and for a period of five (5) years immediately following the cessation of his employment, for whatever reason, whether voluntary or involuntary, he shall not, directly or indirectly, in any manner or for any purpose whatsoever, except for the business purposes of the Company and as may be reasonably required to properly and loyally perform his duties hereunder or unless and to the extent he is specifically required to do so by Court order or other valid legal process (as specifically contemplated under Section 7.4, and subject thereto) or authorized in writing by the Board, use, copy or reproduce or allow to be used, copied or reproduced any Confidential Information or in any manner disclose, transmit or transfer or allow to be disclosed, transmitted or transferred any Confidential Information to any other Person. The Parties acknowledge and agree that, notwithstanding the foregoing or any other provision of this Agreement, the undertakings and restrictions set out in the present Section 7.3 shall continue indefinitely and at all times following the Executive's cessation of employment in the case of the Company's and its Affiliates' trade secrets.

7.4     If the Executive is required by law or governmental regulation or by subpoena, Court order or other valid legal process to disclose any Confidential Information to any Person, the Executive will immediately provide the Company with written notice of the applicable law, regulation, Court order, subpoena or other valid legal process so that the Company may seek a protective order or other appropriate remedy. The Executive will cooperate fully with the Company and the Company's representatives in any attempt by the Company to obtain any such protective order or other remedy. If the Company elects not to seek, or is unsuccessful in obtaining, any such protective order or other remedy in connection with any requirement that the Executive disclose Confidential Information, then the Executive may disclose such Confidential Information only to the extent legally required;

CONFIDENTIAL                                                                                     MindGeek_Fleites_00000026

provided, however, that the Executive will use his reasonable best efforts to ensure that such Confidential Information is treated confidentially by each Person to whom it is disclosed.

7.5 The Executive will abide by any enforceable obligations contained in any agreements that the Executive has entered into with any prior employers or other parties to whom Executive has an obligation of confidentiality.

7.6 All materials, documents, records, data, software programs, working papers, notes, memoranda, files and other records of or containers of Confidential Information made or compiled by the Executive at any time or made available to the Executive at any time during his employment with the Company or its Affiliates, including all copies thereof, which are in his possession, or under his custody or control, shall be the property of the Company or its Affiliates and belong solely to the Company or its Affiliates, and shall be held by the Executive solely for the benefit of the Company or its Affiliates and shall be delivered to the Executive by the Company or its Affiliates on termination of the Employment Period or at any other time on request by the Company or its Affiliates.

## 8. INTELLECTUAL PROPERTY

8.1 The Executive hereby acknowledges that all ideas, concepts, research, information, discoveries, inventions, improvements, methods, formulae, designs, processes, programs, software, trade-marks, trade-names, copyrights, patents, products, computer objects and source codes, plans, writings and other intellectual property originated, conceived, discovered, made or first produced by him during the course of his employment with the Company or its Affiliates, whether or not he did so using the property of the Company or its Affiliates, on their premises, solely or with others, either in whole or in part, during the Executive's working hours or otherwise and which relate to the business activities of the Company or its Affiliates (the "**Intellectual Property**") is and shall be the sole and exclusive property of the Company or its Affiliates or their respective assignees, and the Executive shall promptly disclose same to the Company or one or more of its Affiliates, as the Board may direct. The Executive hereby assigns to the Company, without any limitation whatsoever, any and all right, title and interest in and to the Intellectual Property that he may have. Further, the Executive hereby waives, without any limitation whatsoever, to the benefit of the Company or its Affiliates and their respective successors, assigns and licensees any moral rights which he may have with respect to the Intellectual Property for the term of such rights.

8.2 In addition, and without any further compensation, the Executive will execute, at the request and expense of the Company or its Affiliates, all applications, assignments and/or other instruments and will perform all acts which are deemed useful or necessary by the Company or its Affiliates, including giving testimony, in order to apply for and obtain, renew, extend, or reissue patent, copyright or any other Intellectual Property protection, trade-marks or trade-names in Canada or foreign countries or in order to assign and convey to the Company or its Affiliates all right, title and interest in and to the Intellectual Property. The Executive will also co-operate, as deemed necessary by the Company or its Affiliates in connection with any judicial or administrative procedure or any type of litigation, actual or contemplated, with respect to the defence or the protection of the Intellectual Property.

## 9. RESTRICTIVE COVENANTS

9.1 **Executive's Acknowledgements.** The Executive acknowledges and agrees that the Company and its Affiliates are engaged in the licensing and distribution by the Company of adult entertainment through various media, forums and platforms, including the World-Wide Web (i.e. the Internet) and specialty television channels and also includes the development and distribution of software applications for mobile devices and games for mobile devices which use the iOS (Apple) or Android

operating system/platform, which are marketed, sold and accessible to viewers and subscribers in all parts of the world (the "**Business**"). As such, the Business carried on by the Company, and the location of its customers and suppliers transcend all territorial boundaries and are world-wide. As an integral part of their Business, the Company and its Affiliates also sell advertising space, products and services on the various distribution media used, including their various web-sites and platforms. The Executive further acknowledges that, given his functions hereunder and his knowledge of Confidential Information, he would have an unfair advantage and be in a position to cause serious and irreparable harm to the Business and goodwill of the Company and its Affiliates in the event he were to compete with them or, for competitive purposes, seek to do business with their clients or suppliers, or otherwise interfere with their relationships with such Persons or with their employees.

9.2 **Non-Competition**. The Executive covenants and agrees that, for so long as he is an employee of the Company or any of its Affiliates and for a period of twelve (12) months immediately following the date on which he ceases to be so employed, for whatever reason, whether voluntary or involuntary, he will not, anywhere in the world, either individually, on his own account, or in partnership or jointly or in conjunction with or on behalf of any other Person, whether as an employee, principal, agent, officer, director, partner, consultant, distributor, trustee, shareholder (except for ownership of not more than five percent (5%) of the outstanding shares of any corporation or entity the securities of which are traded on a regular basis on a recognized securities exchange or on an over-the-counter market, and in which the Executive's involvement is purely passive), or in any manner or capacity whatsoever, directly or indirectly, be employed by, render services to, carry on or be engaged in, or be financially interested in or financially assist, or advise, or participate in the management, operation or control of any business or enterprise (in whatever form) or any activity which competes or is planning to compete with the Business, or any business or line of business, which, at the date of the Executive's cessation of employment, was actively being developed by the Company or any of its Affiliates with the Executive's involvement. For further clarity this Non-Competition undertaking will not preclude the Executive after the cessation of his employment from being employed, rendering services to or being engaged in any capacity by a Person in a non-competitive line of business carried on by that Person who may otherwise be in competition with the Business.

9.3 **Products and Services**. For purposes of Sections 9.4 and 9.5, the terms "Service" or "Product" shall mean any service or product directly related to the distribution of adult or non-adult entertainment through various distribution media and shall include selling advertising space, products and services on the various distribution media used by the Company or its Affiliates, including the various web-sites and platforms.

9.4 **Clients**. The Executive covenants and agrees that, for so long as he is an employee of the Company or any of its Affiliates and for a period of twelve (12) months immediately following the date on which he ceases to be so employed, for whatever reason, whether voluntary or involuntary, he will not, directly or indirectly, in any manner or capacity whatsoever, on his own behalf or on behalf of or in conjunction with any Person other than the Company or its Affiliates:

(i) solicit or contact any Person, wherever situated, who purchased or subscribed to any Service or Product offered by the Company or any of its Affiliates in the twelve-month period preceding the date of cessation of the Executive's employment for the purpose of selling to such Person any Product or Service that is the same or similar to any Product or Service offered by the Company or any of its Affiliates;

(ii) solicit, encourage or induce any Person contemplated by Subsection 9.4(i) to cease purchasing or subscribing to any Product or Service offered by the Company or any of its Affiliates;

CONFIDENTIAL

MindGeek_Fleites_00000028

(iii)  solicit or contact any Person, wherever situated, who purchased any advertising Product or Service from the Company or its Affiliates within the twelve (12)-month period preceding the date of cessation of the Executive's employment, for the purpose of selling to such Person an advertising Product or Service that is the same or similar to any advertising Product or Service offered by the Company or any of its Affiliates; or

(iv)  accept any order for advertising Product or Service that is the same or similar to any advertising Product or Service offered by the Company or any of its Affiliates from any Person contemplated by Subsection 9.4(iii).

9.5  **Suppliers.** The Executive covenants and agrees that, for so long he is an employee of the Company or any of its Affiliates and for a period of twelve (12) months immediately following the date on which he ceases to be so employed, for whatever reason, whether voluntary or involuntary, he will not, directly or indirectly, in any manner whatsoever, on his own account, or on behalf of or in conjunction with any other Person, for any purpose or activity which is competitive with the Business carried on by the Company or any of its Affiliates:

(i)  place any orders with or purchase any Product or Service from any supplier with which the Company or its Affiliates have done business within a period of twelve (12) months preceding the date of cessation of the Executive's employment; or

(ii)  solicit, encourage or induce any such supplier to cease doing business with the Company or any of its Affiliates or to reduce the volume of business in connection with the Business conducted with the Company or any of its Affiliates, or otherwise interfere or attempt to interfere with the Company's or its Affiliates' relationships with any such suppliers.

9.6  **Employees.** The Executive covenants and agrees that, for as long as he is an employee of the Company and for a period of twenty-four (24) months immediately following the date on which he ceases to be an employee of the Company, for whatever reason, whether voluntary or involuntary, he will not, directly or indirectly, in any manner whatsoever, on his own account, or on behalf of or in conjunction with any other Person:

(i)  solicit, induce or encourage any employee of, service provider or consultant to the Company or any of its Affiliates, wherever situated in North America or Europe, to terminate his/her employment, service agreement or consulting agreement or relationship with, or to cease providing services to, the Company or any of its Affiliates; or

(ii)  hire or otherwise engage or use the services of any such Person who was so employed or engaged within the six (6)-month period immediately preceding such date of employment, engagement or use of services.

9.7  **Legal Counsel and Consideration.** The Executive acknowledges that he has had the benefit of legal counsel and has carefully considered the duration, territorial scope and activities covered by the restrictions set out in this Section 9, and he declares that he is satisfied with same.

9.8  **Enforcement.** The obligations undertaken by the Executive pursuant to this Section 9 may be enforced directly against the Executive by any Affiliate of the Company or any purchaser from the Company of all or any part of its business, to the extent applicable by their terms to such Affiliate or such purchased business, and shall, with respect to each Affiliate of the Company or such purchased business, constitute a separate and distinct covenant and the invalidity or unenforceability of any such covenant shall not affect the validity or enforceability of the covenant in favour of the Company or any other Affiliate of the Company or any such purchaser. If for any reason any of the obligations of the Executive pursuant to this Section 9 cannot be directly enforced by an Affiliate or purchaser as contemplated hereby, the Executive acknowledges that such

8564395.3

obligations may be enforced by the Company on behalf of such Affiliate or purchaser, as the case may be.

9.9 If the Executive is in breach of any of the terms of any of Sections 7 or 9, the running of the relevant period of prohibition, as applicable, shall be stayed and shall recommence upon the date the Executive ceases to be in breach thereof, whether voluntarily or by injunction.

9.10 In the event that in any legal proceedings before a competent Court or tribunal in any jurisdiction, it is determined that any of Sections 7, 8 or 9, or any part thereof, is invalid, that section or part thereof, shall be deemed to be severed from this Agreement, and the remaining provisions of said sections shall, in every other respect, continue in full force and effect.

## 10. REASONABLENESS OF CONFIDENTIALITY OBLIGATIONS AND RESTRICTIVE COVENANTS

10.1 The Executive acknowledges and confirms that the obligations and covenants set out in Sections 7, 8 and 9, including the geographic scope, duration and nature of the restricted activities set out therein, are reasonable and necessary to protect the legitimate interests of the Company and its Affiliates, and are drawn up in sufficiently-express terms.

10.2 The Executive acknowledges and agrees that the obligations and covenants set out in Sections 7, 8 and 9 will not preclude him from earning a reasonable livelihood following the cessation of his employment with the Company or its Affiliates.

10.3 The Executive acknowledges and agrees that he has received and that, in virtue of this Agreement, he will receive, valuable and sufficient consideration for agreeing to the undertakings and covenants set out in Sections 7, 8 and 9. Without limiting the generality of the foregoing, the Executive acknowledges and agrees that the benefits and payments provided for at Section 11.2 include additional and valuable consideration for the Executive's agreement to be bound by the undertakings and covenants set out in Section 9, and his compliance with same.

## 11. TERMINATION

11.1 **Termination by the Company for Cause.** The Company may terminate the employment of the Executive at any time for Cause, effective immediately, upon written notice to such effect, the whole without further notice or any compensation in lieu of notice, or any other compensation whatsoever, except as specifically provided in Section 11.7.

11.2 **Termination by the Company without Cause.** The Company may terminate the employment of the Executive at any time without Cause upon written notice. In such event, and subject to the Executive's compliance with the provisions of this Agreement which are intended to survive its termination, including Sections 7, 8 and 9, and further subject to the execution by the Executive of a release and transaction document substantially in a form acceptable to the Company, (the "**Release**"), in addition to any accrued amounts as set out in section 11.7 below, the Company shall pay the Executive an amount equal to the Executive's Base Salary and Car Allowance that the Executive would have earned during the then-remaining Employment Period (the "**Payment**"). The Payment will be payable by way of monthly or bi-weekly payments. The Company shall also continue, until the end of the Employment Period, the Executive's group insurance benefits to the extent permissible under the relevant policies and plans or, in the alternative and at its option, the Company will pay the Executive an amount equal to the premiums and contributions that would have been payable by the Company for these benefits during such period. In the event that the Executive's insurance benefits are continued or replaced by way of payment pursuant to this section,

CONFIDENTIAL                                                                                                          MindGeek_Fleites_00000030

such benefits and the Company's obligations in respect of same shall cease upon the Executive becoming eligible to receive replacement coverage with a new employer.

11.3   **Death.** The Executive's employment shall terminate automatically upon the Executive's death, whereupon the Company shall have no further obligations toward the Executive hereunder except as specifically provided for in Section 11.7.

11.4   **Termination by the Company in the Event of Physical or Mental Disability.** The Company may terminate this Agreement upon written notice in the event that the Executive becomes physically or mentally ill or disabled to such an extent as to make him unable to perform his essential duties hereunder for a period of ninety (90) consecutive days or an aggregate of one hundred and eighty (180) days in any twelve (12)-month period, and it has been determined by a doctor selected by mutual consent between the Parties or by the Company alone in the event that the Executive is unable to give his consent, that such inability is likely to continue. The Executive undertakes and agrees to cooperate fully with the Company and the designated doctor, any other medical professional such designated doctor may designate, and to give them access to all relevant information, in order that they may evaluate the Executive's situation and likelihood of returning. Upon termination of the Executive's employment pursuant to this Section 11.4, the Company shall have no further obligations toward the Executive hereunder, except as specifically provided under Section 11.7, and except for payment of an accrued Bonus, if any. The Executive acknowledges and agrees that, given the nature and importance of his position, the Company will be justified in terminating his employment pursuant to this Section 11.4, if the relevant conditions have been met, and it and will have satisfied any duty of reasonable accommodation which may apply in the circumstances.

11.5   **Voluntary Termination by Executive.** The Executive may resign from his employment with the Company by providing the Company with a reasonable prior notice of at least one hundred and eighty (180) days. In such event, the Company may, in its sole and absolute discretion, waive the Executive's notice, in whole or in part, and advance the Executive's resignation date, without any obligation to pay the Executive for the waived-notice period, and whereupon the Company shall have no further obligations toward the Executive hereunder, except as specifically provided for under Section 11.7.

11.6   **Termination by Executive for Good Reason.** The Executive may terminate this Agreement and his employment hereunder at any time, upon written notice, for Good Reason, as contemplated below. In such event, and subject to the Executive's compliance with the provisions of this Agreement which are intended to survive its termination, including Sections 7, 8 and 9, and further subject to the execution by the Executive of a Release, the Executive will be entitled to receive the Payment and benefits described in Section 11.2 in respect of the balance of the Employment Period. Notwithstanding any provision of this Agreement to the contrary, this Agreement and the Executive's employment shall not be terminated for Good Reason unless the Executive provides written notice to the Company within ninety (90) days of the alleged Good Reason stating the basis for such termination and the Company is given thirty (30) days to remedy the action that is the basis of such claim and the Company fails to remedy such action within such thirty (30)-day period.

11.7   **Payment of Accruals.** Upon the termination of the Executive's employment hereunder for any reason, in addition to any other rights the Executive may have under this Agreement, the Company shall be required to pay the Executive or his estate, as the case may be: (i) his then-current Base Salary and Car Allowance accrued through to the date of termination of employment, less any payment received pursuant to any disability insurance policy, as the case may be; (ii) any unpaid Bonus or Dividend Payment already earned by the Executive and granted by the Company prior to the date of termination of employment; (iii) any accrued but unpaid vacation entitlements through to the date of termination of employment in accordance with the Company's policies; and (iv)

8564395.3

CONFIDENTIAL

MindGeek_Fleites_00000031

reimbursement for all eligible expenses incurred in accordance with the provisions of this Agreement prior to the date of termination of employment.

11.8 **Deemed Notice of Resignation.** Notwithstanding anything to the contrary contained herein, upon the termination of the Executive's employment hereunder, for any reason, whether voluntary or involuntary, the Executive shall be deemed to have given the Company notice of his resignation from any and all positions as officer and director of the Company and its Affiliates to the extent applicable, and he shall execute and deliver to the Company any documents that may reasonably be required to give effect to such resignation.

11.9 **Effect Following Termination.** Notwithstanding any termination of this Agreement or of the Executive's employment with the Company, for whatever reason, whether voluntary or involuntary, the provisions of Sections 7, 8 and 9 and any provision of this Agreement necessary to give effect thereto shall continue in full force and effect following such termination. The Executive specifically acknowledges and agrees that this Agreement provides for significant payments and benefits, including those provided for under Section 11.2, and that these payments and benefits include valuable and additional consideration, in particular, for the Executive's agreeing to the undertakings and covenants set out in Sections 7, 8 and 9 and for his compliance with same.

11.10 **Acknowledgement of Executive.** The Executive acknowledges that the amounts and benefits contemplated in Sections 11.2, 11.4, 11.6 and 11.7 are fair and reasonable and that such amounts cover any and all amounts which may be owing or payable by the Company or any of its Affiliates in respect of the Executive's employment or the termination thereof, whether as prior notice, compensation, indemnity or pay in lieu of notice of termination, severance pay, vacation, bonus, incentive, allowance, expenses, benefits or contractual or extra-contractual damages, pursuant to any provision of law, contract, policy, plan, regulation, decree or practice whatever or otherwise. The Executive specifically acknowledges and agrees that neither he nor his estate shall be entitled to receive any other amounts from the Company upon ceasing to be an employee.

11.11 **Further Acknowledgement of Executive.** The Executive further acknowledges and agrees that his entitlement to receive the Payment and benefits provided for under Sections 11.2 or 11.4 is conditional on the Executive's signature of a Release acceptable to the Company and pursuant to which the Executive shall undertake to respect the provisions of Sections 7, 8 and 9.

11.12 **Post-Termination Cooperation.** The Executive agrees and covenants that, following termination of his employment hereunder, he shall, to the extent reasonably requested by the Company, cooperate in good faith with and assist the Company and its Affiliates in the pursuit or defense of any claim, administrative charge or cause of action by or against the Company or any of its Affiliates as to which Executive, by virtue of his employment with the Company or any of its Affiliates, has relevant knowledge or information, including by acting as a representative of the Company or any of its Affiliates in any such proceeding and, without the necessity of a subpoena, providing truthful testimony in any jurisdiction or forum. Similarly, following the termination of his employment hereunder, the Executive shall be required to respect the provisions of Section 9.2, notwithstanding the termination of his employment. It is further understood and agreed that, notwithstanding any other provision of this Agreement, should the Executive be required to meet with representatives of the Company, including attorneys, accountants or other professionals, and/or attend at Court or at any other type of legal or administrative proceeding at the request of the Company for any of the foregoing purposes, following the cessation of the Executive's employment with the Company, the Executive will be entitled to be compensated by the Company for any lost salary. The Company shall also reimburse the Executive for his reasonable out-of-pocket expenses in complying with this Section 11.12 or Section 8.1.

12. **VIOLATIONS**

8564395.3

CONFIDENTIAL

MindGeek_Fleites_00000032

12.1  The Executive acknowledges that, in connection with his employment by the Company or any of its Affiliates, he will receive or will become eligible to receive substantial benefits and compensation. The Executive acknowledges that his employment by the Company or any of its Affiliates, and all compensation and benefits and potential compensation and benefits to the Executive from such employment will be conferred upon him by the Company or its Affiliates, only because and on condition of his willingness to commit his best efforts and loyalty to the Company and its Affiliates, including protecting the Company's right to have its Confidential Information protected from non-disclosure by him and abiding by the confidentiality, non-competition and other provisions herein. The Executive understands his obligations as set forth in Sections 7, 8 and 9 and further agrees that such obligations would not unduly restrict or curtail his legitimate efforts to earn a livelihood following the termination of his employment with the Company. The Executive agrees that the restrictions contained in Sections 7, 8 and 9 are reasonable and valid. The Executive further acknowledges that irreparable damage would result to the Company or its Affiliates if the provisions of Sections 7, 8 and 9 are not specifically complied with by the Executive, and agrees that the Company and its Affiliates shall be entitled to any appropriate legal, equitable, or other remedy, including injunctive relief, in respect of any failure or continuing failure to comply with the provisions of Sections 7, 8 and 9.

12.2  The Company and the Executive acknowledge that if the extent of any restriction contained in the present Agreement is judged excessively wide to permit its full application, such restriction will then be applicable up to the maximum permitted by the laws of the Province of Quebec and the Parties consent and agree, by the present Agreement, that the extent of this restriction may then be altered accordingly by a court of competent jurisdiction in case of any action or procedure brought for the purpose of ensuring the respect of, and to give effect to, such restriction.

## 13. RETURN OF COMPANY PROPERTY

13.1 The Executive covenants and agrees that, upon the request of the Company and, in any event, upon the termination of his employment with the Company or its Affiliates, for whatever reason, whether voluntary or involuntary, he will return or remit to the Company immediately, without making or keeping any copies or reproductions thereof, in whatever form, all Confidential Information, as well as all materials, documents, records, data, software programs, working papers, notes, memoranda, files and other records of or containers of Confidential Information made or compiled by the Executive at any time or made available to the Executive at any time during his employment with the Company or its Affiliates, including all copies thereof, and other property of the Company which are in his possession, or under his custody or control, which pertain or relate, in any manner whatsoever, to his employment with the Company or one of its Affiliates, to the Confidential Information or to the affairs of the Company. It is understood and agreed that the Executive's compliance with the foregoing undertaking shall be a condition to any payment obligations that the Company may then have to the Executive.

## 14. GENERAL

14.1 **Preamble.** The preamble of this Agreement shall constitute an integral part.

14.2 **Benefit of Agreement.** This Agreement shall enure to the benefit of and be binding upon the heirs, liquidators, administrators and legal or personal representatives of the Executive and the successors and permitted assigns of the Company, respectively.

14.3 **Entire Agreement.** This Agreement constitutes the entire agreement between the Parties with respect to the subject matter and cancels and supersedes any prior understandings and agreements between

CONFIDENTIAL                                                                                                                             MindGeek_Fleites_00000033

the Parties with respect thereto, including, without restriction, any prior Executive Employment Agreement. There are no representations, warranties, conditions, undertakings or collateral agreements, expressed, implied or statutory between the Parties other than as expressly set forth in this Agreement.

14.4 **Amendments and Waivers.** No amendment to this Agreement shall be valid or binding unless set forth in writing and duly executed by both of the Parties. No waiver of any breach of any provision of this Agreement shall be effective or binding unless made in writing and signed by the party purporting to give the same and, unless otherwise provided in the written waiver, shall be limited to the specific breach waived.

14.5 **Severability.** Should any provision or term be held by a Court of competent jurisdiction to be invalid, illegal or unenforceable, in whole or in part, such invalidity, illegality or unenforceability shall not affect or in any way impair the legality, validity or enforceability of any other provision, which shall, in every other respect, continue in full force and effect.

14.6 **Notices.** Any notice, consent, waiver, direction or other communication required or permitted to be given under this Agreement by a Party shall be in writing and may be given by delivering same or sending same by facsimile or e-mail transmission or by delivery addressed to the Party to which the notice is to be given at its address for service herein. Any notice, consent, waiver, direction or other communication aforesaid shall, if delivered, be deemed to have been given and received on the date on which it was delivered to the address provided herein (if a Business Day and, if not, the next succeeding Business Day) and if sent by facsimile or e-mail transmission be deemed to have been given and received at the time of receipt (if a Business Day and, if not, the next succeeding Business Day) unless actually received after 5:00 p.m. (local time) at the point of delivery in which case it shall be deemed to have been given and received on the next Business Day. The address for service for each of the Parties shall be as follows:

**To the Executive:**

Feras Antoon

Redacted - PII

Fax: (514) 359-3556
E-mail: feras.antoon@mindgeek.com

**To the Company:**

9219-1568 Quebec Inc.
7777 Décarie Boulevard
Suite 300
Montreal, Quebec
H4P 2H2

Attention: David Tassillo, Chief Operating Officer

Fax: 514 359-3556

Email: david.tassillo@mindgeek.com

CONFIDENTIAL                                                                                         MindGeek_Fleites_00000034

Case 2:21-cv-04920-WLH-ADS   Document 563-169   Filed 07/25/25   Page 17 of 18   Page ID #:19870693
- 16 -

or to such other address or individual as may be designated by one party to the other in accordance herewith.

14.7 **Currency.** Unless otherwise indicated, all amounts referred to herein are in Canadian dollars.

14.8 **Deductions and Withholdings.** The Company shall be entitled to make such deductions and withholdings from the Executive's remuneration as may be required by law and as may be required by the Executive's participation in or receipt of any benefit, stock option or other program contemplated hereby, and the Corporation's obligations in respect thereof shall thereby be satisfied to the extent of such deductions and withholdings.

14.9 **Assignment.** The Executive may not assign any of his rights or any obligation under this Agreement without the express written consent of the Company. The Company may assign any and all of its rights or duties under this Agreement to any affiliate or subsidiary of the Company or to any purchaser of the Company's business at any time and from time to time without the consent of the Executive.

14.10 **Executive's Representations.** The Executive warrants and represents that he has the capacity to enter into this Agreement and to fulfill his duties and obligations hereunder, that this capacity is not limited or restrained by any other agreement or undertaking between the Executive and any other Person or by any order, judgment, decree or instrument of any kind.

14.11 **Governing Law.** This Agreement shall be governed and construed in accordance with the laws of the province of Quebec and the laws of Canada applicable therein. The Executive irrevocably submits to the non-exclusive jurisdiction of the Courts of the province of Quebec, in the judicial district of Montreal, with respect to all matters and disputes relating to this Agreement.

14.12 **Copy of the Agreement.** The Executive hereby acknowledges having received a copy of this Agreement duly signed by the Company.

14.13 **Acknowledgement.** The Executive acknowledges that he has read and understood the terms of this Agreement, and that he has had sufficient time and opportunity to seek independent legal and/or professional advice prior to the signature of this Agreement.

14.14 **Counterparts.** This Agreement may be executed in any number of counterparts, and each such counterpart (including facsimiles and PDF copies), when separate counterparts have been executed by the Parties hereto, shall be deemed an original, and all of which together shall be deemed to be one and the same Agreement with the same effect as if the Parties had executed the same document.

14.15 **Language.** The Parties hereto have expressly required that this Agreement and any notice or document relating thereto be drafted in the English language only. *Les parties aux présentes ont expressément exige que la présente Convention ainsi que tout avis ou document s'y rattachant soient rédigés en langue anglaise seulement.*

[SIGNATURE PAGE TO FOLLOW]

CONFIDENTIAL

MindGeek_Fleites_00000035

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date first above written.

9219-1568 QUÉBEC INC.

_____        _____
**FERAS ANTOON**                                By **DAVID TASSILLO**

SIGNED AND WITNESSED
In the presence of:

██████████████████████████████

[Signature and print name of witness]

8564395.3

CONFIDENTIAL                                                                 MindGeek_Fleites_00000036