# EXHIBIT 165

# [PORTIONS OF EXHIBIT FILED UNDER SEAL PURSUANT TO APPLICATION TO SEAL]

DAN MARMALEFSKY
(CA SBN 95477)
DMarmalefsky@mofo.com
Morrison & Foerster LLP
707 Wilshire Boulevard
Los Angeles, California 90017-3543
Telephone: 213-892-5200
Facsimile: 213-892-5454

RONALD G. WHITE
(admitted pro hac vice)
RWhite@wmhwlaw.com
Walden Macht Haran & Williams LLP
250 Vesey Street
New York, NY 10281
Telephone: 212-335-2387
Facsimile: 212-335-2040

Attorneys for Defendant Bernd Bergmair

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERENA FLEITES,<br><br>          Plaintiff,<br><br>vs.<br><br>MINDGEEK S.A.R.L., et al.,<br><br>          Defendants. | Case No.: 2:21-cv-4920-WLH-ADS<br><br>**DEFENDANT BERND BERGMAIR'S REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION [FRCP 12(B)(2)] AND FOR FAILURE TO STATE A CLAIM [FRCP 12(B)(6)]; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date: January 31, 2025<br>Time: 1:30 p.m.<br>Courtroom: 9B<br>Judge: Hon. Wesley L. Hsu<br>Complaint Filed: June 17, 2021<br>Trial Date: None Set |

# **TABLE OF CONTENTS**

**Pages**

INTRODUCTION ...................................................................................... 1

ARGUMENT............................................................................................. 2

I.    Plaintiff has not established personal jurisdiction over Bergmair. ................. 2

    A.    Plaintiff cannot establish the "injustice" element of the alter ego test. ............................................................................................ 2

    B.    Plaintiff cannot establish the "unity of interest" element of the alter ego test. ............................................................................ 6

        1.    Plaintiff's unity of interest allegations do not establish that Bergmair exercised day-to-day control of MindGeek........ 6

        2.    Plaintiff's unity of interest allegations are legally and factually unsupported................................................................ 12

II.   Plaintiff has failed to state a claim against Bergmair.................................... 16

    A.    Section 230 bars all of Plaintiff's claims against Bergmair. .............. 16

    B.    The federal trafficking claims (Counts I and IV) fail to state a claim.............................................................................................. 17

    C.    The federal child pornography claims (Counts V and VI) fail to state a claim.................................................................................. 19

    D.    The California law claims (Counts VII through XVI) fail to state a claim. ......................................................................................... 19

CONCLUSION........................................................................................ 20

BERGMAIR REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Pages</u>

3

4

<u>Cases</u>

5

*Acevedo v. EXP Realty, LLC*,

6
713 F. Supp. 3d 740 (C.D. Cal. 2024)................................................................18

7

*Activision Publishing, Inc. v. EngineOwning UG*,

8
2023 WL 3272399 (C.D. Cal. Apr. 4, 2023).......................................................4

9

*American Tel. & Tel. Co. v. Compagnie Bruxelles Lambert*,

10
94 F.3d 586 (9th Cir. 1996)............................................................................4, 11

11

*Calvert v. Huckins*,

12
875 F. Supp. 674 (E.D. Cal. January 13, 1995) .................................................12

13

*Campanelli v. Image First Uniform Rental Service, Inc.*,

14
2016 WL 4729173 (N.D. Cal. Sept. 12, 2016) ...................................................2

15

*Cox v. CoinMarketCap OPCO, LLC*,

16
112 F.4th 822 (9th Cir. 2024).............................................................................3

17

*Doe v. Grindr, Inc.*,

18
2023 WL 9066310 (C.D. Cal. Dec. 28, 2023) ...................................................18

19

*Doe v. Twitter*,

20
2023 WL 3220912 (9th Cir. 2023).....................................................................17

21

*Doe v. Twitter, Inc.*,

22
2023 WL 8568911 (N.D. Cal. Sept. 11, 2023) ..................................................18

23

*Doe v. Unocal Corp.*,

24
248 F.3d 915 (9th Cir. 2001)...........................................................4, 8, 11, 12

25

*Does v. Reddit, Inc.*,

26
51 F. 4th 1137 (9th Cir. 2022)...........................................................................18

27

*Fair Housing Council of San Fernando Valley v. Roomates.com*,

28
521 F.3d 1157 (9th Cir. 2008)............................................................................17

*Fru-Con Constr. Corp. v. Sacramento Municipal Utility District*,
2007 WL 2384841 (E.D. Cal. Aug. 17, 2007) ............................................5, 11

ii

*Harris Rutsky & Co. Insurance Services, Inc. v. Bell & Clements Ltd.*,
    328 F.3d 1122 (9th Cir. 2002) ..................................................................... 4

*Iconlab, Inc. v. Bausch Health Companies, Inc.*,
    828 F. App'x 363 (9th Cir. 2020) ................................... 2, 4, 11, 12

*Iconlab, Inc. v. Valeant Pharma. Intl., Inc.*,
    2017 WL 7240856 (C.D. Cal. Apr. 25, 2017) ........................... 2, 12

*Kramer Motors, Inc. v. British Leyland, Ltd.*,
    628 F.2d 1175 (9th Cir. 1980) ................................................ 11

*Krantz v. Bloomberg, L.P.*,
    2022 WL 2102111 (C.D. Cal. Jan. 19, 2022) ................................... 2

*Mireskandari v. Daily Mail and General Trust PLC*,
    2013 WL 12114760 (C.D. Cal. July 31, 2013) ........................... 11

*Pacific Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*,
    992 F.3d 893 (9th Cir. 2021) ................................................ 7

*Ranza v. Nike, Inc.*,
    793 F.3d 1059 (9th Cir. 2015) ........................... 1, 4, 9, 11

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) ................................................ 7

*Sun Group U.S.A. Harmony City, Inc. v. CCRC Corp. Ltd.*,
    2024 WL 2193311 (N.D. Cal. May 14, 2024) ........................... 11

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023) ................................................ 18

*United States v. Bestfoods*,
    524 U.S. 51 (1998) ................................................ 8, 11

**Statutes**

18 U.S.C. § 1591(a) ................................................ 17, 18, 19

18 U.S.C. § 1595 ................................................ 18

18 U.S.C. § 2258a(f)(3) ................................................ 18

47 U.S.C. § 230(c) ................................................ 16, 17

Cal. Civ. Code § 1708.85 ................................................ 20

BERGMAIR REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

Cal. Civ. Code § 3344 ........................................................................................ 19

Cal. Penal Code § 236.1 .................................................................................... 20

BERGMAIR REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

## **INTRODUCTION**

Plaintiff's Opposition exposes the fatal flaws in her claims against defendant Bernd Bergmair. Her response to the arguments in Bergmair's motion to dismiss is to simply ignore them – because she has no answer for them – or instead to exaggerate the evidence she elicited in jurisdictional discovery in a futile attempt to meet the legal requirements of her claims. Both approaches make plain the insufficiency of her claims. To begin with, Plaintiff abandons any argument that Bergmair, who lives in China, has any contacts with the United States sufficient to confer personal jurisdiction over him. Instead, Plaintiff's sole remaining argument for personal jurisdiction over Bergmair relies upon imputing to him the contacts of the MindGeek entities on an alter ego basis. But as evidence Plaintiff elicited in jurisdictional discovery makes plain, she cannot establish either of the two elements of an alter ego claim. **First** and most obviously, she cannot establish the injustice element of the alter ego test. The SAC nowhere alleges that the MindGeek corporate defendants are insolvent or unable to pay a judgment in this single-plaintiff case, and discovery revealed that the MindGeek group of companies ("MindGeek") was sold just last year to third-party buyers for over ███████. As a result, there is no basis to require Bergmair – a foreign resident who was merely the beneficial owner of one of the shareholders of MindGeek – to remain in the case. This flaw alone requires dismissal of the case against Bergmair, without the need for the Court to address Plaintiff's allegations regarding the unity of interest element. **Second**, Plaintiff also cannot satisfy the unity of interest prong of the alter ego test since she cannot show that Bergmair exercised "pervasive control" and "dictate[d] every facet" of MindGeek's business, including "routine matters of day-to-day operation."[1] The SAC concedes that the company's full-time, highly paid CEO and COO handled its daily operations, and none of the evidence Plaintiff gathered in jurisdictional discovery establishes that Bergmair was in day-to-day control of the

---

[1] *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015).

BERGMAIR NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT

company's operations.  In fact, the evidence affirmatively shows the opposite: while Bergmair was kept informed of the business's progress, as is common for a substantial shareholder, he did not exercise decision-making authority over MindGeek's daily operations.  Because Plaintiff cannot establish either element of the alter ego test – her only claimed basis for personal jurisdiction over Bergmair – the Court should grant Bergmair's motion to dismiss for lack of personal jurisdiction.

Similarly, Plaintiff's Opposition barely mentions Bergmair in attempting to argue that her claims are adequately pled.  In addition to its numerous other flaws, the SAC does not allege that Bergmair even knew of Plaintiff or her videos, and as a result, fails to state any basis to deny Bergmair Section 230 immunity and is insufficient to state any claims against Bergmair and should be dismissed.

## **ARGUMENT**[2]

**I.    Plaintiff has not established personal jurisdiction over Bergmair.**

    **A.    Plaintiff cannot establish the "injustice" element of the alter ego test.**

Plaintiff's Opposition makes clear that she is unable to establish the injustice element of the alter ego test.[3]  The SAC nowhere alleges that the MindGeek corporate defendants are insolvent or unable to pay a judgment in this case.

---

[2] In addition to the arguments set forth here, Bergmair joins in the motions and arguments submitted by all other defendants, as applicable.

[3] Plaintiff stakes her alter ego claim on the theory that the Individual Defendants and MindGeek corporate defendants comprise a "single enterprise" (Plaintiff's Opposition ("Opp.") 62, 76-78) but this is <u>not</u> a basis for establishing personal jurisdiction. *See Krantz v. Bloomberg, L.P.*, 2022 WL 2102111 at *5 (C.D. Cal. Jan. 19, 2022) ("courts within this circuit routinely reject the use of a 'single enterprise' theory as a basis to establish personal jurisdiction"); *Iconlab, Inc. v. Valeant Pharma. Intl., Inc.*, 2017 WL 7240856 at *6 (C.D. Cal. Apr. 25, 2017) (same), *aff'd on other grounds*, *Iconlab, Inc. v. Bausch Health Companies, Inc.*, 828 F. App'x 363, 364 (9th Cir. 2020); *Campanelli v. Image First Uniform Rental Service, Inc.*, 2016 WL 4729173 at *7 (N.D. Cal. Sept. 12, 2016) (same).

Moreover, the jurisdictional discovery Plaintiff obtained affirmatively shows the opposite: MindGeek can pay a judgment in this case, and indeed, its current owner agreed to pay over ███████ to purchase it just last year.  Bergmair Motion to Dismiss (ECF No. 433) ("Bergmair Br.") at 18; White Decl. Ex. E at 16-17 and Ex. F at 16-17.  Moreover, that substantial valuation reflects MindGeek's consistent profitability as reflected in audited financial statements produced in discovery, which confirm that its annual revenues have regularly exceeded its expenses by hundreds of millions of dollars.[4]  In addition, last year's financial statements for the specific corporate defendants that own and operate Pornhub, MG Freesites Ltd. (Freesites") and 9219-1568 Quebec, Inc. ("9219") – which do not challenge personal jurisdiction – indicate that they were each worth "tens of millions of dollars." Andreou Decl. ¶ 20.  Recognizing that, in the face of this evidence, she cannot satisfy the injustice element of the alter ego test, Plaintiff retreats to a series of meritless arguments to paper over this fatal flaw.[5]

First, Plaintiff claims – contrary to decades of Ninth Circuit precedent – that the injustice element of the alter ego test does not apply in the jurisdictional context. Opp. 82-83.  This is simply wrong.  In applying the alter ego test in the personal jurisdiction context, the Ninth Circuit has repeatedly (including just months ago) defined the test as requiring *both* unity of interest *and* injustice.  *See, e.g., Cox v. CoinMarketCap OPCO, LLC,* 112 F.4th 822, 835 (9th Cir. 2024) (to establish personal jurisdiction under an alter ego theory, a plaintiff must show both unity of

---

[4] *See* Andreou Decl. (ECF No. 440-2) ("Andreou Decl.") ¶ 30 (MindGeek, S.a.r.l.'s ("MG S.a.r.l.") ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████

[5] The Opposition does not even address the multiple cases holding that failure to establish that a corporate defendant is unable to pay a judgment is grounds for dismissal of its supposed alter ego owner.  Bergmair Br. 19-20.

1  interest and that "failure to disregard [their separate identities] would result in fraud

2  or injustice") (internal quotation marks and citation omitted); *Iconlab, Inc. v. Bausch*

3  *Health Companies, Inc.*, 828 F. App'x 363, 364 (9th Cir. 2020) (same); *Ranza*, 793

4  F.3d at 1073 and 1075 n.9 (same); *Harris Rutsky & Co. Insurance Services, Inc. v.*

5  *Bell & Clements Ltd.*, 328 F.3d 1122, 1134-35 (9th Cir. 2002) (same); *Doe v. Unocal*

6  *Corp.*, 248 F.3d 915, 926 (9th Cir. 2001) (same); *American Tel. & Tel. Co. v.*

7  *Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 (9th Cir. 1996) (same).  Plaintiff's

8  desperate – and demonstrably incorrect – argument that she need not establish

9  injustice indicates her awareness that she cannot satisfy this element.[6]

10      The cases Plaintiff cites in support of her argument (Opp. 82-83) contradict

11  her claim or are irrelevant.  The only California case she cites, *Activision Publishing,*

12  *Inc. v. EngineOwning UG*, 2023 WL 3272399 (C.D. Cal. Apr. 4, 2023), directly

13  undercuts her argument.  On the same page Plaintiff cites, the Court stated the *exact*

14  *opposite* of the argument she now advances, ruling that to establish personal

15  jurisdiction under an alter ego theory a plaintiff must plead facts supporting "two

16  elements," including that "failure to disregard the corporation would result in fraud

17  or injustice."  *Id*. at *6 (internal quotation marks omitted).  Plaintiff's remaining

18  cases also do not support her argument and, in any event, have no application here

19  because they are interpreting Texas, New York and Mississippi state law.

20      Indeed, Plaintiff previously recognized that the injustice prong of the alter ego

21  test applies to jurisdiction.  In filings, Plaintiff argued that the terms of the 2023 buy-

22  out agreements entered into by the Individual Defendants were "highly relevant to

23  the Court's jurisdictional and alter ego analyses," since they were "critical" to the

24  issue of "enforcing a judgment against insolvent or undercapitalized entities."

25  Proposed Notice of Motion and Motion to Compel Defendants' Buy-Out

26

27

28

---

[6] The Court in this case also ruled more than once that Plaintiff must demonstrate injustice to employ an alter ego theory to establish personal jurisdiction.  *See* July 29, 2022 Order (ECF No. 167) at 4; Feb. 3, 2023 Order (ECF No. 260) at 3.

Agreements (ECF No. 356-2) at 3-4, 6.[7] It was only after the buy-out agreements were produced and Plaintiff realized that they undercut her alter ego claim that she began furiously backpedaling and now argues that they are legally irrelevant.

Plaintiff offers several other equally meritless arguments. First, she asserts that "allowing the defendants to hide behind an illusory corporate shield … which bore no relationship to how they … operated the business" would result in injustice. Opp. 83. This is nothing more than a repetition of her incorrect argument that the alter ego test has no injustice element; she claims that failure to pierce the corporate veil where she has shown unity of interest would be an injustice, collapsing the two alter ego elements into one. *See Fru-Con Constr. Corp. v. Sacramento Municipal Utility District*, 2007 WL 2384841 at *3 (E.D. Cal. Aug. 17, 2007) (rejecting argument that failure to maintain corporate separateness would result in injustice, ruling that "if this were sufficient, … the injustice prong of the test would collapse into the unity prong and become superfluous").

Second, Plaintiff argues that she has alleged MindGeek's insolvency because, except for its "tax scheme," it cannot operate profitably. Opp. 83. But the SAC nowhere links this supposed "scheme" to MindGeek's current financial condition. Plaintiff cannot cite to any such linkage because the corporate structure that she labels a "scheme" (SAC ¶¶ 357-361) ceased to exist in 2021 when RT Holding ("RT") and MG S.a.r.l. merged. Bergmair Decl. (ECF No. 433-18) ¶ 5. Yet even without benefit of Plaintiff's imagined "scheme," defendants Freesites and 9219 were each worth "tens of millions of dollars" as of year-end 2023 (Andreou Decl. ¶ 20) and the overall MindGeek group was sufficiently profitable that an arms-length

---

[7] *See also* Plaintiff's Opposed Ex Parte Application to Shorten Time on Motion to Compel (ECF No. 356) at 1 (same). While the parties were meeting and conferring regarding redactions to protect attorney-client privileged and other confidential information in the buy-out agreements, Plaintiff filed an *ex parte* application to shorten the time for a potential motion to compel. Once the parties reached agreement on the appropriate redactions, Defendants produced the agreements.

buyer purchased it in March 2023 for over ████████. Plaintiff's argument that MindGeek cannot be profitable also flies in the face of her own allegations that MindGeek is the "dominant" monopoly in an industry that generates $97 billion in revenues per year (SAC ¶¶ 2, 34), its tubesites are "some of the most trafficked on the internet," with as many visitors as Amazon and Netflix (SAC ¶ 34), and it earns "enormous amounts of money" (SAC ¶¶ 9, 34).

Third, Plaintiff mischaracterizes the buy-out agreements, suggesting without evidence that they reflect a "pretextual sale" and asserting that "no one paid anything for the business." Opp. 83-84. Notably, Plaintiff's Opposition cites no evidence supporting this claim. Discovery Plaintiff herself elicited shows that her claim is simply incorrect. ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

## B. Plaintiff cannot establish the "unity of interest" element of the alter ego test.

### 1. Plaintiff's unity of interest allegations do not establish that Bergmair exercised day-to-day control of MindGeek.

Plaintiff has no answer for the extensive evidence summarized in Bergmair's motion and his Declaration (¶¶ 7-8) establishing that he did not exercise day-to-day control of MindGeek's operations, which is a prerequisite for a finding of alter ego.

---

[8] Plaintiff also makes the desperate argument that the Court should not consider the buy-out agreements in assessing MindGeek's financial condition because Defendants objected to certain of Plaintiff's other discovery requests for financial information beyond 2021. Opp. 84. But if Plaintiff thought she was entitled to further discovery, she could have filed a motion to compel.

Bergmair Br. 21-25.  Plaintiff does not even try to square her argument with her concession that Antoon and Tassillo "handl[ed]   the   direct   day-to-day implementation" of MindGeek's operations.  SAC ¶ 109.  *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (plaintiff can "plead himself out of a claim" by alleging facts inconsistent with his claim).  In addition, Plaintiff offers no explanation:

- why Bergmair would agree to MindGeek paying Antoon and Tassillo over ████████████████████████████████████████████████ if he (Bergmair) was really dictating day-to-day operations of the company.  Bergmair Br. 6.

- why Bergmair would agree to Antoon and Tassillo acquiring an increased equity stake in MindGeek worth over ████████████ without investing any capital unless their role was to continue to manage the company on a daily basis as CEO and COO.  *Id*. at 5-6.

- how Bergmair could direct daily operations of the company from Hong Kong when the company's senior management and most of its employees were in Montreal,[10] whose business day is nighttime in Hong Kong.  *Id*. at 6, 21-22.

- why Antoon would testify before a Canadian parliamentary committee that Bergmair was "a passive investor" who was "not involved in daily activities" of the company, if that were not true.[11]  *Id*. at 6.

- for the MindGeek documents (including Plaintiff's own Exhibits 22 and 34) that advised potential investors and lenders that Antoon and Tassillo –

---

[9] █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ White Decl. Ex. A at 72-73, 76.

[10] Antoon testified that "we in Montreal" handled "the daily operation running, managing Pornhub."  White Decl. Ex. B at 134-35.

[11] The Ninth Circuit observed in the alter ego context that "investors often do not care about the details of business – they just invest their money with purported experts and expect a good return."  *Pacific Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 900 (9th Cir. 2021).

not Bergmair – oversaw all the company's business divisions and their operations on a daily basis. *Id*.

- for the fact that both Antoon and Tasillo, when asked to admit that Bergmair "was involved in operational decisions concerning" MindGeek, *denied* this in discovery responses. *Id*. at 7.

Where Plaintiff's Opposition addresses the evidence regarding the management of MindGeek, she frequently mischaracterizes it, in a futile attempt to satisfy the legal standard requiring day-to-day control. As a substantial shareholder, Bergmair was kept informed regarding the business, as both he and Antoon testified, but Bergmair did not direct its operations or manage the company on a daily basis. Bergmair Br. 5-7. Plaintiff repeatedly tries to blur the distinction between a shareholder being kept informed of the business's progress – which is typical and not indicative of an alter ego relationship – versus exercising decision-making authority and directing its operations on a daily basis. *Unocal Corp.*, 248 F.3d at 926 (majority shareholder monitoring company's performance is "consistent with [its] investor status" and does not indicate an alter ego relationship) (quoting *United States v. Bestfoods*, 524 U.S. 51, 59 (1998)).

For example, Plaintiff claims that Antoon testified that "'I run the company' *along with Tassillo and Bergmair*." Opp. 68 (emphasis added). In fact, Antoon testified that he ran the company without mentioning Bergmair (White Decl. Ex. B at 148, 260); the cited Antoon testimony says only that he regularly spoke to Bergmair. Pl. Ex. 3 at 205. Plaintiff claims that Antoon testified that he, Tassillo and Bergmair collectively "ran" MindGeek's quarterly meetings, at which they "decided" its business plans, "set policy and directed [its] operations." Opp. 68-69. But the cited testimony says only that Bergmair attended these sessions, not that he "ran" the meetings or "set policy" or "decided" anything at them. Pl. Ex. 3 at 205. While Bergmair at times attended these quarterly meetings, Plaintiff conspicuously never asked of any of the four witnesses she deposed who attended these meetings whether Bergmair made any decisions at them. Bergmair Br. 22, n.19. Plaintiff also

claims that Bergmair accompanied Antoon on "as many as ten trips a year" to industry meetings (Opp. 70) but Antoon testified that Bergmair attended only "a couple" or "several" meetings over a 9-year period.  Bergmair Br. 23, n. 21.[12]

Plaintiff similarly mischaracterizes Bergmair's (non-existent) involvement in formulating MindGeek's content moderation policies.  Bergmair Decl. ¶¶ 7-8.  She claims he was involved in formulating such policies (Opp. 70, 71) but cites emails that only show Bergmair being sent information, <u>not</u> making decisions, formulating policy, or directing action.  Pl. Exs. 20, 21, 31, 35, 37-39.[13]  In the cited emails (all forwarded to Bergmair by Antoon), Antoon often explicitly noted that he was sending the information to Bergmair "FYI" or as an "update."  Pl. Exs. 20 (emails dated June 11, 2020; June 15, 2020; June 17, 2020; June 22, 2020); 31, 35, 37-39. The emails confirm that senior management, not Bergmair, set content moderation policies and communicated with credit card networks regarding those policies. None of the cited emails even contain a reply from Bergmair; he never wrote "I approve" or "I disagree" or decided anything – or even commented at all.  None of the emails asked for Bergmair's approval, as would be expected if he had exercised "pervasive control" over the company and "dictated every facet" of its business, right down to "routine matters of day-to-day operation."  *Ranza*, 793 F.3d at 1073.

---

[12] The Opposition repeats other mischaracterizations of the record already debunked in Bergmair's motion, including how often Antoon spoke to Bergmair (Opp. 69) and her incorrect claim that Bergmair appointed the directors of all MindGeek entities (Opp. 71).  Bergmair Br. 6, n.6; 22, n.18.

[13] Plaintiff cites emails almost exclusively from February through June 2020, implicitly and inaccurately suggesting that the volume of emails received by Bergmair during this period was typical of the ten-year period when he was a shareholder. In fact, as the emails reflect (*e.g.*, Pl. Exs. 20 (May 28, 2020, 12:39 pm email); 35, 37), during this period, MindGeek undertook content moderation improvements that entailed substantial additional expense and received inquiries from credit card networks prompted by anti-porn activists' complaints, both of which were the type of significant corporate developments of which a major shareholder would be kept apprised.

9

Instead, the emails largely show Bergmair received information *after* company management had already decided a course of action.  Many relate to MindGeek's responses to inquiries from Visa or MasterCard, with Antoon sending Bergmair the company's response letters *after* they were finalized or sent.  Pl. Ex. 20 (February 20, 2020 email; May 8, 2020 email; May 28, 2020 email; June 15, 2020 email; June 30, 2020 email).  Even in the few instances where Bergmair received such letters before they were final, he offered no edits or comments.  Pl. Ex. 20 (February 19, 2020 email; May 7, 2020 email; May 28, 2020, 1:44 pm email; May 28, 2020, 12:39 pm email).  Similarly, other emails advise Bergmair of content moderation policy decisions already made by others at the company. For example, Antoon's June 9, 2020 email (Pl. Ex. 20) notified Bergmair that "*we just approved* the attached" policies (emphasis added).  *See* Pl. Exs. 35 ("updat[ing]" Bergmair regarding hiring of content reviewers); 20 (June 17, 2020 email) (forwarding to Bergmair a plan of content moderation improvements "that Corey's team put together").  Thus, the emails Plaintiff cites as proof of Bergmair's supposed involvement in content moderation policies reflect no decision-making by him.  Her inability to cite even one instance of Bergmair setting such policies confirms Antoon's description of his role: Antoon *denied* that Bergmair was even "aware of" – much less formulated – MindGeek's content moderation policies and more generally, *denied* that Bergmair "was involved in [its] operational decisions."  White Decl. Ex. M (RFA Nos. 16, 17).[14]

The handful of remaining actions by Bergmair that Plaintiff alleges do

---

[14] The other emails involving Bergmair cited by the Opposition also incorrectly equate information being provided to Bergmair with him exercising day-to-day decision-making control.  *See* Pl. Exs. 22, 33, 34, 36 (Bergmair was sent copies of a monthly budget and presentations prepared for potential MindGeek lenders); 23, 24 (Bergmair was sent presentation slides for a MindGeek strategy session); 25, 26, 29 (Bergmair updated on meetings of MindGeek executives with third parties regarding a potential new business line and a potential acquisition).  None reflect any decision-making by Bergmair or request his approval.

not establish that he had the requisite day-to-day control of MindGeek. Instead, they are "consistent with [his] investor status," and do not give rise to alter ego status. *Unocal Corp.*, 248 F.3d at 926 (quoting *Bestfoods*, 524 U.S. at 59); Bergmair Br. 23-25. The Opposition does not address this argument, instead simply repeating a list of exaggerated allegations. Opp. 70. But the alleged actions by Bergmair – approving significant corporate acquisitions, expenses or policies,[15] involvement in executive personnel and salary decisions[16] and staying informed of the company's performance[17] – are prototypical examples of what the Ninth Circuit has found to be

---

[15] *See Iconlab, Inc.*, 828 F. App'x 363, 364–65 (owner "approved [companies'] large purchases"); *Ranza*, 793 F.3d at 1074-75 (owner approved "large purchases" and set general policies); *Unocal*, 248 F.3d at 927 (owner involved in company's "acquisitions, divestments and capital expenditures" and formulated "general business policies and strategies"); *Kramer Motors, Inc. v. British Leyland, Ltd.*, 628 F.2d 1175, 1177 (9th Cir. 1980) (parent had "general executive responsibility for the operation" of its subsidiary and "reviewed and approved its major policy decisions"); *Sun Group U.S.A. Harmony City, Inc. v. CCRC Corp. Ltd.*, 2024 WL 2193311, at *11-13 (N.D. Cal. May 14, 2024) (owner directed acquisitions and major financial actions); *Fru-Con Constr.*, 2007 WL 2384841 at *5-6 (owner approved major contracts).

[16] *See American Tel. & Tel.*, 94 F.3d at 589, n. 4 (owner's employee on company's board caused termination of senior executives); *Mireskandari v. Daily Mail and General Trust PLC*, 2013 WL 12114760 at *3 and *6 (C.D. Cal. July 31, 2013) (owner set company's policies with respect to compensation); *Fru-Con Constr.*, 2007 WL 2384841 at *5-6 (owner approved personnel decisions). As noted in Bergmair's motion, ██████████████████ input on the salaries of the CEO and COO of a company indicates that the CEO and COO are managing the company on a daily basis, <u>not</u> the shareholder. Bergmair Br. 23, n.20.

[17] *See Ranza,* 793 F.3d at 1074 (parent company operated "information tracking systems" that all its subsidiaries used); *Unocal*, 248 F.3d at 926 (parent company involved in "monitoring of the subsidiary's performance"); *American Tel & Tel. Co.*, 94 F.3d at 589, n. 4 (9th Cir. 1996) (parent company "received reports" concerning subsidiary and monitored details of its business through its representative who attended board meetings); *Fru-Con Constr.*, 2007 WL 2384841 at *5-7 (parent company's employee spent extensive time at worksite of company discussing project, interviewing executives and "keeping abreast" of developments; subsidiary

"macromanagement," which, even along with other corporate involvement, does not give rise to an alter ego relationship. Bergmair Br. 22-24.[18]

Even after extensive discovery, Plaintiff's throw-everything-against-the-wall-and-see-what-sticks approach fails to show that Bergmair exercised day-to-day control of MindGeek. Despite her fusillade of allegations, they simply do not satisfy the legal standard to find an alter ego relationship. *See Unocal*, 248 F.3d at 928 (affirming district court's rejection of alter ego claim where plaintiffs "present[ed] a wealth of evidence" obtained in jurisdictional discovery but failed to satisfy alter ego standard); *Iconlab*, 2017 WL 7240856 at *6 ("even after months of jurisdictional discovery, Plaintiffs have been unable to establish a prima facie case" of alter ego), *aff'd., Iconlab*, 828 F. App'x at 364-65.

### 2. Plaintiff's unity of interest allegations are legally and factually unsupported.

In addition to the deficiencies described above, Plaintiff's overall alter ego theory is based on an incorrect legal premise and factual allegations that are contradicted by the evidence developed in jurisdictional discovery. The gist of her alter ego theory is that (1) MindGeek had a "sham" corporate structure ███████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

had "duty" to report significant issues to parent); *Calvert v. Huckins*, 875 F. Supp. 674, 679 (E.D. Cal. January 13, 1995) ("broad oversight" typical of majority owner).

[18] Plaintiff's other allegations similarly do not amount to day-to-day control of the company: attending one meeting with a potential vendor and "a couple" of trade shows over a nine-year period (Bergmair Br. 22, n. 19) and consenting to the appointment of directors for two MindGeek entities (*id*. at 23, n. 21).

█████████████████████████████████████

█████  The first element of Plaintiff's theory rests on a basic misunderstanding of corporate law.  Shareholder agreements distributing economic or voting rights in different proportion than shareholding interests are common and perfectly proper.[19] Bergmair Br. 26-27.  Moreover, Bergmair was represented in the negotiation of this corporate structure by a sophisticated corporate law firm, Sheppard Mullin, which would hardly have recommended an arrangement that was as obviously improper as Plaintiff suggests.[20]  *Id.* at 8, 26-27; Bergmair Decl. ¶ 6.  Plaintiff does not even attempt to rebut this argument in her Opposition.

The second element of Plaintiff's alter ego theory is directly contradicted by the Andreou Declaration, as well as Bergmair's deposition testimony, which establish that RT had sufficient revenues to pay Bergmair's dividends,[21] that his dividends were paid from RT, and on the few occasions when another MindGeek entity advanced a dividend on RT's behalf, RT re-paid it.  Andreou Decl. at ¶¶ 60-61; White Decl. Ex. A at 135-41, 147-48, 150-52, 158-59.  In her Opposition, Plaintiff doubles down on this unsupported claim.  In the face of Andreou's

---

[19] ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████

[20] Plaintiff concedes that the 2013 transaction by which Bergmair invested in MindGeek was "meticulously structured and heavily lawyered" by law and accounting firms.  SAC ¶ 323.

[21] Other evidence corroborates the Andreou Declaration on this point.  ████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████

declaration, Plaintiff does not cite a single piece of evidence to support her claim that RT did not have sufficient revenues to pay Bergmair's dividends. Opp. 73. If RT consistently had insufficient revenues to pay required dividends over a nine-year period, one would have thought that Plaintiff would have found some evidence of that in the 100,000 pages of internal documents she obtained in jurisdictional discovery.[22]

The evidence is also clear with respect to which entity paid Bergmair's dividends. Plaintiff concedes that MindGeek's contemporaneous financial documents reflect that RT paid these dividends (Opp. 74)[23] but rests her whole argument on a single email that she claims contradicts this. In Plaintiff's telling, her Exhibit 91 ████████████████████████████████████████████████ ████████████████████████████████████████████ Opp. 73. But it says nothing of the kind. The email from MindGeek's CFO to Bergmair attached a chart showing ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████ The CFO's email explained that ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████ Consistent with Bergmair and Andreou's testimony,

---

[22] Again, Plaintiff's theory requires accepting the proposition that prominent accounting and law firms *knowingly* devised a structure that lacked sufficient sources of revenue to pay the necessary dividends, instead leaving their clients to engage in "manipulat[ions]" … to engineer economic distributions consistent with the agreed-upon ownership interests, irrespective of the delineated corporate form." SAC ¶ 324.

[23] *See, e.g.*, White Reply Decl. Ex. T ████████████████████████ ████████████████████████████████████████████████

the email confirms that RT paid Bergmair's dividends.[24]  Plaintiff's assertion that the email "explicitly state[s] that MindGeek was paying RT Holdings dividends directly" (Opp. 73) is simply wrong – it does not mention any entity other than RT as paying Bergmair's dividends.   The attached spreadsheet – which was conspicuously <u>not</u> included in Plaintiff's Exhibit 91 – shows why she failed to disclose it.  *See* White Reply Decl. Ex. U (cover email and attachment).  Just as the CFO's email noted, the spreadsheet reflects that RT – not MG S.a.r.l. – paid Bergmair's dividends.[25]  Thus, despite receipt of thousands of pages of MindGeek financial records, Plaintiff can cite just one document to support the central factual claim of her alter ego theory – and that document literally shows the opposite of what she claims.[26]

Plaintiff tacks onto her alter ego theory an allegation that MindGeek's

---

[24] As noted above, the Andreou Declaration (¶ 60, n.4) indicates that, on certain occasions, ██████████████████████████████████████████████████████ ███████████████████████████

[25] ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████

[26] The Opposition also recycles factual claims that were debunked in Bergmair's motion.  It repeats her argument that ████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████  Despite this, the Opposition cites no evidence to support her made-up characterization.  Plaintiff also cites Bergmair's supposed "related party transactions" (Opp. 75) but ignores the evidentiary record that shows that ███████████████████████████████████████████████████████████████ ███████████████████████████

BERGMAIR REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

corporate structure did not comply with the U.S.-Luxembourg tax treaty (SAC ¶¶ 357-58) but as described in Bergmair's motion, this is beside the point. Whether the structure met the treaty's technical requirements is irrelevant to the alter ego analysis. In addition, the supposed "scheme" would have *benefitted* MindGeek. Bergmair Br. 27. In any event, this claim again relies upon Plaintiff's mistaken understanding that shareholder agreements governing their economic interests are improper. Even though she concedes Bergmair had less than a 1% shareholding interest in MG S.a.r.l., she simplistically alleges – contrary to the expert tax and legal counsel who developed the structure[27] – that the Shareholder Agreement made him the ███████████ MG S.a.r.l., rendering the corporate structure a "sham" and meaning the company did not qualify under the tax treaty. SAC ¶ 358. But as noted above, such shareholder agreements are common and proper.[28]

## II.     Plaintiff has failed to state a claim against Bergmair.

In addition to those set forth in the motions and replies of the other Defendants, Plaintiff's claims are insufficient with respect to Bergmair for additional reasons.

### A.     Section 230 bars all of Plaintiff's claims against Bergmair.

Plaintiff asserts without explanation that Section 230 does not apply to Bergmair (Opp. 53, n.34) and ignores the cases cited by Bergmair confirming that, given the SAC's allegations, he is a "provider ... of an interactive computer service." 47 U.S.C. § 230(c); Bergmair Br. 35. Plaintiff argues that certain alleged actions by

_____

[27] Plaintiff incorrectly claims that Bergmair testified that the "sole purpose" of MindGeek's corporate structure was to "conceal" his ownership interest and "avoid U.S. taxes." Opp. 64. In Bergmair's declaration and deposition testimony, he stated that he relied upon Sheppard Mullin and Grant Thornton to devise the structure and believed it was "lawful and proper" and "fully compliant" with tax laws. Bergmair Decl. at ¶ 6; White Decl. Ex. A at 105, 107-09, 117, 163.

[28] Plaintiff's attempt to bolster her argument with a declaration from a supposed "expert" witness falls flat because his opinion admittedly depends on the assumption that the SAC's alter ego allegations are accepted as true (Pl. Ex. 9 at ¶ 11) and ignores the substantial jurisdictional discovery evidence contradicting her allegations.

1  MindGeek, such as allowing users to create titles and tags for videos, make it a

2  "content creator" and thus ineligible for Section 230 immunity.  Opp. 53-55.  But

3  the SAC nowhere alleges that Bergmair was involved in the specific practices that

4  Plaintiff says take MindGeek out of Section 230's protections.  The only specific

5  allegation the SAC makes regarding Bergmair's involvement in MindGeek is that

6  he did not change its pre-existing "unrestricted content" model (SAC ¶¶ 17, 109,

7  149-51, 157), which is exactly what the Ninth Circuit has ruled Section 230

8  immunizes: "any activity that can be boiled down to deciding whether to exclude

9  material that third parties seek to post online."  *Fair Housing Council of San*

10  *Fernando Valley v.  Roomates.com,* 521 F.3d 1157, 1170-71 (9th Cir. 2008).

11       **B.**     **The federal trafficking claims (Counts I and IV) fail to state a**

12                 **claim.**

13       Plaintiff has no serious argument that her claim for direct trafficking liability

14  under §1591(a)(1) is sufficient.  Opp. 19, n.12.  Because Bergmair did not know

15  Plaintiff, he could not have taken one of the actions specified in subsection (a)(1)

16  with respect to her person.  Bergmair Br. 39.  *Doe v. Twitter*, 2023 WL 3220912 at

17  *2 (9th Cir. 2023) (§1591(a)(1) requires that defendant took one of the specified

18  actions with respect to "*a person*") (emphasis added).

19       The absence of any allegation that Bergmair had dealings with Plaintiff or her

20  traffickers is also fatal to her beneficiary liability claim under §1591(a)(2).

21  Bergmair Br. 39.  Earlier in this case, Judge Carney ruled that Plaintiff had not

22  adequately pled a §1591(a)(2) claim against Visa because, without such interaction,

23  it could not have formed an agreement with the primary traffickers or known that

24  plaintiff was a victim of trafficking.  July 29, 2022 Order (ECF No. 166) at 21-22.

25  This analysis applies equally to Bergmair, who had no interaction with or knowledge

26  of Plaintiff, her traffickers or her videos.[29]  The Ninth Circuit's decision in *Does v.*

27   

28  [29] Even if Section 230 did not apply and the standard for a §1595 civil claim
governed, a plaintiff must show a "direct association or a business relationship" with

1  *Reddit, Inc.*, 51 F. 4th 1137 (9th Cir. 2022) and the cases following it bolster this

2  conclusion.  In those cases, courts found factual allegations essentially identical to

3  those against MindGeek here were insufficient to demonstrate a violation of

4  §1591(a)(2).  They make clear that, even though MindGeek dealt directly with

5  Plaintiff and handled her videos, the SAC's allegations against it are nonetheless

6  insufficient to establish beneficiary liability under §1591(a)(2).  *See, e.g.*, *Reddit*, 51

7  F. 4th at 1145; *Doe v. Grindr, Inc.*, 2023 WL 9066310 at *7 (C.D. Cal. Dec. 28,

8  2023); *Doe v. Twitter, Inc.*, 2023 WL 8568911 at *7-8 (N.D. Cal. Sept. 11, 2023).

9  If the conduct in these cases by websites themselves does not amount to trafficking

10  under §1591(a)(2), a corporate shareholder who had no dealings with Plaintiff, her

11  traffickers or her videos cannot be liable under this provision.  Indeed, none of the

12  alleged conduct Plaintiff cites as the basis of MindGeek's participation in the

13  venture, such as suggesting titles and tags for content (Opp. 11-14), is alleged to

14  have involved Bergmair.  The only allegation against Bergmair is that he failed to

15  change MindGeek's supposed pre-existing "unrestricted content" model – even

16  though federal law explicitly provided that a website had no duty to affirmatively

17  screen for underage content.  18 U.S.C. § 2258a (f)(3).  Failing to do something the

18  law does not require in the first place cannot possibly satisfy the elements of §1591.

19  *See also Twitter, Inc. v. Taamneh*, 598 U.S. 471, 489 (2023) (failure to police a

20  website's user-generated content was insufficient for aiding and abetting liability

21  since "our legal system generally does not impose liability for mere omissions,

22  inactions or nonfeasance").

23    Finally, recognizing that §1595 does not apply extraterritorially, Plaintiff

24  contends that her claim involves a "domestic application" of the statute since the

25  "focus" of §1591 is trafficking.  Opp. 84.  Even if that were true of §1591(a)(1),

26  plaintiff has no viable claim under that subsection.  The plain language of

27

28  _____

traffickers to establish a defendant's participation in the venture.  *Acevedo v. EXP Realty, LLC*, 713 F. Supp. 3d 740, 783-84 (C.D. Cal. 2024).  The SAC does not allege that Bergmair knew Plaintiff's alleged traffickers (her boyfriends).

1  §1591(a)(2) indicates that its "focus" is the receipt of a "benefit" from trafficking.
2  But the dividends paid to Bergmair by MindGeek were received outside the United
3  States and were derived from its non-U.S. operations (Andreou Decl. ¶ 61) so
4  Plaintiff's claim is an impermissible extraterritorial application of the statute.

5  **C.    The federal child pornography claims (Counts V and VI) fail to**
6  **        state a claim.**

7  Plaintiff has no real answer to Bergmair's argument that the SAC lacks any
8  allegation that he was aware of her videos and that she was underage (Bergmair Br.
9  39), instead asserting that knowledge may be inferred from "general allegations."
10  Opp. 47, n.26.   But the SAC does not allege Bergmair had any contact with
11  Plaintiff's videos or suggest any reason why, of the millions of videos posted by
12  users annually on MindGeek websites, Bergmair would have become aware of those
13  featuring Plaintiff.  As a result, there are simply no allegations in the SAC to support
14  an inference that Bergmair knew Plaintiff's age or the content of her videos.

15  **D.    The California law claims (Counts VII through XVI) fail to state a**
16  **        claim.**

17  Plaintiff's state law claims suffer from the same flaw as her federal claims:
18  since the SAC does not allege that Bergmair had any contact with Plaintiff or her
19  videos, it necessarily fails to allege that he took the specific actions necessary to
20  satisfy the elements of her claims.   Each state common law claim cites the same
21  factual allegation as its basis: MindGeek "maintain[ed], stream[ed], distribut[ed],
22  reupload[ed] and monetiz[ed] videos" of Plaintiff on its websites.  SAC ¶¶ 530, 538,
23  543, 550, 570.  *See* SAC ¶ 591.  But the SAC does not allege that Bergmair even
24  knew of Plaintiff or her videos, much less that he personally took any of the alleged
25  actions with respect to her videos.  Her state statutory claims suffer from the same
26  flaw.  Count XI asserts a claim under California Civil Code § 3344, which requires
27  that a defendant "knowingly use another's name ... or likeness, in any manner ...
28  without such person's consent ...."  Count XII asserts a claim under California Civil

Code § 1708.85, which provides a right of action against anyone who "intentionally distributes by any means a photograph [or] videotape ... of another, without the other's consent ...." The SAC does not allege that Bergmair knew of Plaintiff or her videos, much less that he used her likeness or took any action regarding her videos. Count XV asserts a claim under California's trafficking statute, which applies to one who "induces or persuades ... a person who is a minor ... to engage in a commercial sex act." Cal. Penal Code § 236.1(c). Just as under the federal trafficking statute, since there is no claim that Bergmair even knew Plaintiff, he could not have taken one of the actions specified in § 236.1 with respect to her "person."

## <u>CONCLUSION</u>

For these reasons, the Court should dismiss the SAC with prejudice for both lack of personal jurisdiction and failure to state a claim for relief.

Dated: December 6, 2024

By: */s/ Ronald G. White*

RONALD G. WHITE
(admitted *pro hac vice*)
rwhite@wmhwlaw.com
Walden Macht Haran & Williams LLP
250 Vesey Street
New York, NY 10281
Tel: (212) 335-2387
Fax: (212) 335-2040

DAN MARMALEFSKY (CA SBN 95477)
DMarmalefsky@mofo.com
Morrison & Foerster LLP
707 Wilshire Boulevard
Los Angeles, California 90017-3543
Telephone: 213-892-5200
Facsimile: 213-892-5454

Attorneys for Defendant Bernd Bergmair

1

# <u>CERTIFICATE OF COMPLIANCE</u>

2       The undersigned, counsel of record for Bernd Bergmair, certifies that the

3   Memorandum of Points and Authorities consists of 20 pages, which complies with

4   the 20-page limit set forth in the Court's October 11, 2024 Order Granting Joint

5   Stipulation to Request Extension of Remaining Briefing Schedule for Defendants'

6   Responses to Plaintiff's Second Amended Complaint (ECF No. 473).

7   Dated: December 6, 2024          Respectfully submitted,

8

9                                   */s/ Ronald G. White*
                                    RONALD G. WHITE
10                                  (admitted *pro hac vice*)
                                    rwhite@wmhwlaw.com
11                                  Walden Macht Haran & Williams LLP
                                    250 Vesey Street
12                                  New York, NY  10281
                                    Tel: (212) 335-2387
13                                  Fax: (212) 335-2040
14

15                                  DAN MARMALEFSKY (CA SBN 95477)
                                    DMarmalefsky@mofo.com
16                                  Morrison & Foerster LLP
                                    707 Wilshire Boulevard
17                                  Los Angeles, California 90017-3543
                                    Telephone: 213-892-5200
18                                  Facsimile: 213-892-5454
19

20                                  Attorneys for Defendant Bernd Bergmair

21

22

23

24

25

26

27

28

1    **<u>CERTIFICATE OF SERVICE</u>**

2        The undersigned, the counsel of record for Bernd Bergmair, certifies that the

3    foregoing instrument was served pursuant to the Federal Rules of Civil Procedure

4    on December 6, 2024 upon all counsel of record via ECF.

5    Dated: December 6, 2024          Respectfully submitted,

6

7                                     */s/ Ronald G. White*_____
                                      RONALD G. WHITE
8                                     (admitted *pro hac vice*)
                                      rwhite@wmhwlaw.com
9                                     Walden Macht Haran & Williams LLP
10                                    250 Vesey Street
                                      New York, NY 10281
11                                    Tel: (212) 335-2387
                                      Fax: (212) 335-2040
12
13                                    DAN MARMALEFSKY (CA SBN 95477)
14                                    DMarmalefsky@mofo.com
                                      Morrison & Foerster LLP
15                                    707 Wilshire Boulevard
16                                    Los Angeles, California 90017-3543
                                      Telephone: 213-892-5200
17                                    Facsimile: 213-892-5454
18
19                                    Attorneys for Defendant Bernd Bergmair

20

21

22

23

24

25

26

27

28