Michael J. Bowe
(*pro hac vice*)
mbowe@brownrudnick.com
Lauren Tabaksblat
(*pro hac vice*)
ltabaksblat@brownrudnick.com
**BROWN RUDNICK LLP**
7 Times Square
New York, NY 10036
Telephone:    (212) 209-4800
Facsimile:    (212) 209-4801

David M. Stein (State Bar # 198256)
dstein@olsonstein.com
**OLSON STEIN LLP**
240 Nice Lane # 301
Newport Beach, CA 92663
Phone: 949.887.4600

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERENA FLEITES, | CASE NO. 2:21-cv-4920-WLH-ADS |
| Plaintiff, | HON. WESLEY L. HSU |
| v. | **PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEFS** |
| MINDGEEK S.A.R.L., et al., | |
| Defendants. | SAC FILED:   MAY 23, 2024 |

# **TABLE OF CONTENTS**

**Page**

ARGUMENT ...................................................................................................1

I.  PLAINTIFFS HAVE ADEQUATELY PLED JURISDICTION ..................1

   A.  Alter Ego..............................................................................................1

   B.  "Single Enterprise" and Attribution Piercing......................................4

   C.  The Lesser Jurisdictional Standard.......................................................6

   D.  Defendants Ignore the Applicable Law and Alleged Facts..................6

II.  THE TENTATIVE DECISION ON THE TVPRA CONSPIRACY
     CLAIMS IS CORRECT AND SHOULD BE ADOPTED. .........................11

   A.  ATRA Was a Clarifying Amendment With Retroactive Effect..........11

   B.  The Complaints Plead a Conspiracy To Profit From the
       Distribution Of CSAM. ......................................................................13

      1.  The Complaints Plead Each Defendants' Knowledge..............13

      2.  The Complaints Plead Each Defendants' Agreement and
         Intent...........................................................................................16

   C.  Defendants' Claimed Far-Reaching Consequences Are
       Unfounded ...........................................................................................19

III.  THE COMPLAINTS PLEAD BENEFICIARY LIABILITY AS TO
      VISA, REDWOOD, AND COLBECK. ...............................................20

IV.  THE TENTATIVE RULING ON MINDGEEK'S MOTION TO
      DISMISS IS CORRECT AND SHOULD BE ADOPTED.........................22

   A.  This Court Has Carefully Considered And Rejected Each
       of MindGeek's Challenges to Plaintiffs' Beneficiary
       Liability Claim....................................................................................22

   B.  The Court Correctly Concluded That CDA 230 Does Not
       Immunize MindGeek's Conduct. .......................................................26

CONCLUSION ...........................................................................................29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ABKCO Music, Inc. v. LaVere*,
    217 F.3d 684 (9th Cir. 2000) ...................................................... 11, 12

*Acevedo v. eXp Realty, LLC*,
    713 F. Supp. 3d 740 (C.D. Cal. 2024) .......................................25

*Benson v. JPMorgan Chase Bank, N.A.*,
    2010 WL 1526394 (N.D. Cal. Apr. 15, 2010) ..........................17

*Bernhardt v. Islamic Republic of Iran*,
    47 F.4th 856 (D.C. Cir. 2022) ...................................................17

*Beverly Community Hosp. Ass'n v. Belshe*,
    132 F.3d 1259 (9th Cir. 1997) ..................................................12

*Brown v. Kinross Gold U.S.A., Inc.*,
    531 F. Supp. 2d 1234 ...................................................................3

*Burri Law PA v. Skurla*,
    35 F.4th 1207 (9th Cir. 2022)....................................................10

*Carafano v. Metrosplash.com, Inc.*,
    339 F.3d 1119 (9th Cir. 2003) ..................................................26

*Compound Prop. Mgmt., LLC v. Build Realty, Inc.*,
    462 F.Supp.3d 839 (S.D. Ohio 2020) .......................................17

*Craigslist Inc. v. 3Taps Inc.*,
    942 F.Supp.2d 962 (N.D. Cal. 2013).........................................17

*Doe #1 v. Red Roof Inns*, *Inc.*,
    21 F.4th (11th Cir. 2021) ..........................................................25

*Doe 1 v. Deutsche Bank Aktiengesellschaft*,
    671 F.Supp.3d 387 (S.D.N.Y. 2023) .........................................17

*Doe (L.M.) v. 42 Hotel Raleigh, LLC*,
    2024 WL 4204906 (E.D.N.C. Sept. 16, 2024) .......................... 24, 25

*Doe v. Grindr Inc.*,
    128 F.4th 1148 (9th Cir. 2025) ................................................................. 22, 26

*Doe v. Grindr Inc., et al.*,
    709 F.Supp.3d 1047 (C.D. Cal. 2023) ...................................................26

*Doe v. MG Freesites, LTD*,
    2024 WL 5339485 (N.D. Ala. Dec. 19, 2024) .......................................3

*Doe v. Reddit, Inc.*,
    2021 WL 5860904 (C.D. Cal. Oct. 7, 2021).........................................22

*Doe v. WebGroup Czech Republic, a.s.*,
    2025 WL 879562 (C.D. Cal. Feb. 21, 2025) .............................. 22, 26

*Doe v. Wyndham Hotels & Resorts*,
    2025 WL 824369 (S.D. Cal. Mar. 14, 2025) ............................... 21, 25

*Does 1-6 v. Reddit*,
    51 F. 4th 1137 (9th Cir. 2022) .................................................... 22, 23

*Douglas v. Hirson*,
    63 F.4th 49 (1st Cir. 2023) .....................................................................17

*Fadlalla v. DynCorp Int'l LLC*,
    402 F.Supp.3d 162 (D. Md. 2019)...........................................................3

*Forrest v. Meta Platforms, Inc.*,
    737 F.Supp.3d 808 (N.D. Cal. 2024) ....................................................28

*Fyk v. Facebook, Inc.*,
    80 Fed. Appx. 597 (9th Cir. 2020).........................................................26

*G.G. v. Salesforce*,
    76 F.4th 544 (7th Cir. 2023)........................................................ 21, 23, 24

*In re GGW Brands, LLC*,
    504 B.R. 577 (Bankr. C.D. Cal. 2013).....................................................5

*Hoffman v. Constr. Protective Servs., Inc.*,
    541 F.3d 1175 (9th Cir. 2008) ...............................................................8

*Hunter v. Citibank, N.A.*,
    2011 WL 7462143 (N.D. Cal. May 5, 2011).........................................19

*Kayne v. Ho*,
  2012 WL 12878753 (C.D. Cal. Sept. 6, 2012) ....................................................5

*Laborers Clean-up Contract Admin. Trust. Fund v. Uriarte Clean-up
  Service, Inc.*,
  736 F.2d 516 (9th Cir. 1984) ...........................................................2, 4

*Landsgraf v. USI Film Products*,
  511 U.S. 244 (1994)...........................................................................11

*Las Palma Assoc. v. Las Palmas Associates*,
  235 Cal.App.3d 1220 (1991) ........................................................ 1, 4, 5

*Lesnik v. Eisenmann SE*,
  2023 WL 3740318 (N.D. Cal. 2023) .................................................3

*M.L. v. Craiglist Inc.*,
  2020 WL 6434845 (W.D. Wash. Apr. 17, 2020) ...............................28

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
  243 F.Supp.2d 1073 (C.D. Cal. 2003) ........................................ 4, 5, 6

*Mossimo Holdings LLC v. Haralambus, et al*,
  2015 WL 476298 (C.D. Cal. Feb. 3. 2015) .........................................4

*Pacific Maritime Freight, Inc. v. Foster*,
  2010 WL 3339432 (S.D. Cal. 2010)....................................................2

*Prompt Staffing, Inc. v. United States*,
  321 F. Supp. 3d. 1157 (C.D. Cal. 2018) ..........................................1, 3

*Ratha v. Rubicon Resources, LLC (Ratha II)*,
  111 F.4th 946 (9th Cir. 2024) ..................................................... 11, 12

*Resilient Floor Covering Pension Fund v. M&M Instal.*,
  Inc., 630 F.3d 848 (9th Cir. 2011) .....................................................2

*In re Schaefers, et al*,
  623 B.R. 777 (B.A.P. 9th Cir. 2020) ..................................................2

*In re Schwarzkopf*,
  626 F.3d 1032 (9th Cir 2010) .........................................................1, 2

*Seymour v. Hull & Moreland*,
  605 F.2d 1105 (9th Cir. 1979)............................................................2

*T.E. v. Wyndham Hotels & Resorts, Inc.*,
   2024 WL 474400 (S.D. Ohio Feb. 7, 2024) ......................................................24

*Tatung Co., Ltd., v. Shu Tze Hsu*,
   217 F.Supp.3d 1138 (C.D. Cal. 2016) ...............................................16

*Telectronics Pacing Systems, Inc.*,
   953 F.Supp. 909 (S.D. Ohio 1997) ...........................................6

*Toho-Towa v. Morgan Creek Prods., Inc.*,
   217 Cal.App.4th 1096 (2013) ...........................................4, 5

*Towe Antique Ford Found. v. IRS*,
   999 F.2d 1387 (9th Cir. 1993) ........................................ 1, 2, 3

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
   768 F.2d 1001 (9th Cir. 1985) ...........................................16

*Twitter, Inc. v. Taamneh*,
   598 U.S. 471 (2023) ...........................................19

*U.S. v. Boyce*,
   38 F. Supp. 3d 1135 (C.D. Cal. 2014) ........................................ 1, 2, 3

*UA Local 343 v. Nor-Cal Plumbing*,
   48 F.3d 1465 (9th Cir 1994) ........................................ 1, 2, 4

*United Steelworkers of America v. Phelps Dodge Corp.*,
   865 F.2d 1539 (9th Cir 1989) ...........................................15

*Wolfe v. United States*,
   798 F.2d 1241 (9th Cir. 1986) ...........................................2, 3

*Xpel Tech. Corp v. Maryland Performance Works LTD., et al.*,
   2006 WL 1851703 (W.D. Tex May 19, 2006) ...................................6

*Young v. City of Menifee*,
   2019 WL 3037926 (C.D. Cal. Apr. 5, 2019) ....................................17

**Statutes**

18 U.S.C. §1591 ................................................. 13, 20, 23, 25

18 U.S.C. § 1594 ...........................................12

18 U.S.C. § 1595 ........................................................................................ *passim*

18 U.S.C. § 1596 ...................................................................................................12

CASE NO. 21-CV-04920-WLH-ADS

PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEFING

Pursuant to the Court's March 7, 2025 order (Dkt. 540), plaintiffs[1] submit this omnibus memorandum of law responding to the five supplemental briefs filed by defendants.[2]

## ARGUMENT

## I. PLAINTIFFS HAVE ADEQUATELY PLED JURISDICTION

### A. Alter Ego

In the Ninth Circuit, "[i]n determining whether alter ego liability applies, we apply the law of the forum state." *In re Schwarzkopf*, 626 F.3d 1032, 1037 (9th Cir 2010); *Towe Antique Ford Found. v. IRS*, 999 F.2d 1387, 1391 (9th Cir. 1993); *Prompt Staffing, Inc. v. United States*, 321 F. Supp. 3d. 1157, 1171 n.8 (C.D. Cal. 2018); *U.S. v. Boyce*, 38 F. Supp. 3d 1135, 1155 (C.D. Cal. 2014).

California alter ego requires: (a) "such unity of interest and ownership that the individuality, or separateness, of the said person and corporations has ceased"; and (b) "adhering to the fiction of separate existence . . . would sanction fraud or promote injustice." *In re Schwarzkopf,* 626 F.3d at 1038; *Boyce,* 38 F. Supp. 3d at 1155. The test has "no concrete formula," is "highly fact specific," rarely appropriate for summary disposition, and should "curb injustices resulting from improper use of a corporate entity." *Towe*, 999 F.2d at 1391; *UA Local 343 v. Nor-Cal Plumbing,* 48 F.3d 1465, 1471 (9th Cir 1994); *Las Palma Assoc. v. Las Palmas Associates,* 235 Cal.App.3d 1220, 1249-50 (1991)*.*

---

[1] References to "plaintiffs" throughout refer to plaintiff Serena Fleites and the plaintiffs in the 14 Related Actions identified in n.1 to the Omnibus Opposition filed in *K.A. v. MindGeek S.a.r.l., et al.*, No. 2:24-cv-04786-WLH-ADS ("K.A. Action") (Dkt. 96-1).

[2] References to "Fleites Opp." refer to the Opposition to Defendants' Motions to Dismiss filed in this action (Dkt. 480-1). References to "K.A. Omnibus Opp." are to Dkt. 96-1 in the K.A. Action. References to "SAC" are to the Second Amended Complaint filed in this action on May 23, 2024 (Dkt. 387-1).

1    Both prongs apply "non-exhaustive factors" none of which are determinative,

2  any of which can be sufficient.  There can be unity of interest if there is, for

3  example, common ownership, domination, or control; non-arm's length relations; or

4  absent corporate formalities.  *See UA Local 343,* 48 F.3d at 1471-72 (unity of

5  interest via ownership domination and control and commingling of finances and

6  personal and corporate affairs); *In re Schwarzkopf* at 1039-40 (same).

7    Under the second "injustice" prong, the Ninth Circuit has explained,

8  "decisions in this circuit have emphasized the injustice created by . . . the intent of

9  the incorporators to evade civil or criminal liability.  Decisions in other circuits are

10  substantially in accord."  *Seymour v. Hull & Moreland*, 605 F.2d 1105, 1111 (9th

11  Cir. 1979) (citations omitted); *In re Schaefers, et al*, 623 B.R. 777, 78 (B.A.P. 9th

12  Cir. 2020) (alter ego prohibits using an otherwise ignored corporate form "to escape

13  personal liability") (quoting *Hennessey's Tavern*, *Inc. v. Am. Air Filter Co.*, 204

14  Cal.App.3d 1351, 1359 (1988)); *Boyce*, 38 F. Supp. 3d at 1155 (unjust to permit

15  "shareholder [who] has abused the corporate form to evade individual liability,

16  circumvent a statute, or accomplish a wrongful purpose" based on the corporate

17  form) (*quoting Postal Instant Press, Inc. v. Kaswa Corp.,* 162 Cal. App 4th 1510,

18  1521-23 (2008)).

19    Thus, in the Ninth Circuit, "[c]ourts have not hesitated to ignore the fiction of

20  separateness and approved a piercing of the corporate veil when the corporate device

21  frustrates clear intendment of the law," such as where it is used as "subterfuge to

22  defeat public convenience, justify wrong, or perpetuate fraud" or "evade a public

23  duty."  *Towe*, 999 F.2d at 1391.

24    Alter ego has been deployed in this Circuit to protect virtually every possible

25  "public duty," including tax obligations, labor law obligations, ERISA obligations,

26  contract obligations, and tort obligations.  *Wolfe v. United States*, 798 F.2d 1241 (9th

27  Cir. 1986) (tax obligations); *Towe*, 999 F.2d at 1393 (same); *Laborers Clean-up*

28  *Contract Admin. Trust. Fund v. Uriarte Clean-up Service, Inc.*, 736 F.2d 516 (9th

Cir. 1984) (collective bargaining); *Resilient Floor Covering Pension Fund v. M&M Instal., Inc.*, 630 F.3d 848 (9th Cir. 2011) (ERISA); *Pacific Maritime Freight, Inc. v. Foster,* 2010 WL 3339432 (S.D. Cal. 2010) (applied to avoid "avoidance of personal liability" for breach of fiduciary duty and contract, fraud, tortious interference, and misappropriation); *Brown v. Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234) (D. Nev. 2008) (preventing effort to "circumvent and defeat" contract).

Of course, this doctrine extends equally to attempts to use a fictional corporate form to evade federal trafficking laws. *See Lesnik v. Eisenmann SE*, 2023 WL 3740318 (N.D. Cal. 2023) (allegations of unity of interest, no separate personalities, and commingling of assets and personnel); *Fadlalla v. DynCorp Int'l LLC*, 402 F.Supp.3d 162 (D. Md. 2019) (same).  These cases include a recent federal district court case sustaining alter ego claims on summary judgment against MindGeek S.A.R.L. and other MindGeek entities based on the identical facts presented to this Court on this motion, holding "there are obviously material facts in dispute as to whether these entities are distinct or alter egos."  *Doe v. MG Freesites, LTD*, 2024 WL 5339485, at *16 (N.D. Ala. Dec. 19, 2024).

In none of these trafficking cases was undercapitalization required as a basis for sustaining either prong of the alter ego test.  As the case law makes clear, it is sufficient injustice to permit a party to ignore the corporate form in operating a trafficking venture and then attempt to use the form to avoid responsibility under the trafficking laws.  Insolvency or actual fraud can establish "injustice," but injustice is not limited to either.  *See, e.g.*, *Wolfe*, 798 F.2d at 1244 (applied without "a positive showing of fraud" against a bona fide and adequately capitalized business); *Towe*, 999 F.2d at 1393 (same); *Boyce*, 38 F. Supp. 3d at 1155 (same); *Prompt Staffing*, 321 F.Supp.3d at 1178.  Indeed, defendants have cited no case holding that undercapitalization or insolvency is an essential element of the injustice prong of California's alter ego test.

### B.    "Single Enterprise" and Attribution Piercing

Alternatively, under California law, the veil can be pierced through the "single Enterprise" theory, which is a "conceptually related, but distinct theor[y]" from traditional alter ego.  *UA Local 343*, 48 F.3d at 1470; *Las Palmas*, 235 Cal.App.3d at 1249-50.

This theory holds that "it would be unjust to permit those who control companies to treat them as a single or unitary enterprise and then assert their corporate separateness" to avoid liability "with impunity."  Consequently, where "there are two or more personalities, [] but one enterprise," all "should respond, as a whole, for the debts of certain component elements of it."  *Las Palmas,* 235 Cal.App.3d at 1249-50 (corporate parent responsible for subsidiary liabilities).[3]  This is also an inherently factual determination inappropriate for summary dismissal.  *Id.* at 1248.

This "equitable doctrine applie[s] [] partnership-type liability principles when corporations integrate their resources and operations to achieve a common business purpose" such that they have no separate "mind, will, or existence."  *Toho-Towa v. Morgan Creek Prods., Inc.,* 217 Cal.App.4th 1096, 1108-09 (2013) (corporation liable on affiliate contract).  This Court repeatedly has recognized this distinct variation of "partnership-type liability" under California law where "there is really only one corporation."  *Mossimo Holdings LLC v. Haralambus, et al*, 2015 WL 476298, at *2-3 (C.D. Cal. Feb. 3. 2015) (corporation liable under indirect affiliate's

---

[3] Defendants' supplemental brief misrepresents that plaintiffs' counsel argued at the March 7th hearing that no injustice was required under this theory.  Omitted from the section defendants cite are the following five pages in which, among other things, counsel reads the very words set forth in *Las Palmas* about the injustice requirement. H'rg Tr. at 47:20-48:3. As the full transcript reflects, counsel's point was that under California law the injustice is the defendants' attempt to use the corporate form as a shield to liability after ignoring it in operation as opposed to a particular requirement that the plaintiff suffer some direct injustice from the corporate from prejudicing the merits of the claim.

contract); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 243 F.Supp.2d 1073 (C.D. Cal. 2003) ("single-enterprise" or "merger" is distinct, broader basis for piecing veil); *see also Laborers Clean-Up Cont. Admin. Tr. Fund v. Uriarte Clean-Up Serv., Inc.*, 736 F.2d 516 (9th Cir. 1984) (uncontested "single enterprise" claim rendered all affiliates liable for the other).

Similarly, the bankruptcy court in this district has held that "California law recognizes the 'single business enterprise' doctrine" and, under virtually identical facts involving an online pornography business, applied it where the individual owner of a "'tangle' of putatively distinct legal entities" also "exercised complete control and decision making authority over all" such that there was "only one real business enterprise" because "[i]t would be unjust to permit those who control companies to treat them as a single or unitary enterprise and then assert their corporate separateness in order to commit frauds and other misdeeds." *In re GGW Brands, LLC*, 504 B.R. 577, 600, 621-23 (Bankr. C.D. Cal. 2013).

Contrary to defendants' arguments, this theory is equally applicable to individual owners as well as corporate owners and affiliates. *See. e.g.*, *Kayne v. Ho*, 2012 WL 12878753 (C.D. Cal. Sept. 6, 2012) (individual shareholder and corporate parent he owned directedly were both responsible for indirect subsidiary's liability). Likewise, it applies irrespective of whether any one or all of the entities comprising the single enterprise are adequately capitalized. *See Las Palmas*, 233 Cal.App.3d. at 149-52; *Toho-Towa Co.*, 217 Cal.App.4th at 1108-09; *Kayne*, 2012 WL 12878753.

With respect to the attribution theory, responsibility for the corporation attaches to any individual or corporate shareholder who directs or acts on behalf of the corporation. *MGM Studios*, 243 F.Supp.2d at 1099.  This also is a distinct theory from alter ego and merger, although their applications overlap significantly. *Id*. Thus, where, as here, individual owners are directing and running the relevant activities, the responsibility is attributed directly to them. *Id*.

## C.    The Lesser Jurisdictional Standard

All three of these standards are frequently used to establish jurisdiction over an individual or corporate owner or affiliate.  However,

> [t]he formalistic approach . . . is irrelevant to the question whether the exercise of jurisdiction . . . would violate the Due Process Clause" [because] a corporation's relationship with an affiliated corporation in the forum is relevant to the due process question in a manner different from that in which it pertains to the corporate law question . . . For jurisdictional purposes, [] the existence of the relationship . . . is a minimum 'contact, tie or relation' . . . that may render possible the constitutional exercise of jurisdiction . . . The nature of the relationship, the degree of control or identity bears upon the weight to be given . . . . the formal separation of corporate entities does not alone raise a bar to the court exercising jurisdiction [because] substance, not form, of the inter-corporate nexus will be dispositive.

*Telectronics Pacing Systems, Inc.,* 953 F.Supp. 909, 915, 918-19 (S.D. Ohio 1997) ("single enterprise" made it "reasonable for the parent to anticipate being 'haled' into court."); *see also Xpel Tech. Corp v. Maryland Performance Works LTD., et al.*, 2006 WL 1851703 (W.D. Tex May 19, 2006) (corporation subject to affiliate's contractual jurisdictional clause). This Court has held the same.  *See MGM Studios,* 243 F.Supp.2d at 1099-1100 (citing and quoting *Telectronics).*

Contrary to defendants' supplemental arguments, none of these theories or cases depend on agency; they depend on violating the corporate form, a *de facto* identity, or direct attribution, all of which are the opposite of a principal/agent relationship.  Defendants have never cited an apposite case abrogating alter ego or its variants as viable jurisdictional theories.

## D.    Defendants Ignore the Applicable Law and Alleged Facts

Defendants' motions to dismiss made no serious effort to challenge the reams of allegations concerning their unity of interest but argued instead (and incorrectly) that plaintiffs had not alleged requisite "insolvency" or undercapitalization. Recognizing that neither of these factors is essential,  defendants' supplemental briefs attempt to disguise the same deficient argument by asserting plaintiffs do not

1  allege "injustice" because they do not and cannot allege defendants are insufficiently
2  capitalized or unable to satisfy a judgment.  Of course, however semantically
3  creative it is phrased, this is the same incorrect argument.

4       As set forth above, the law is clear that alter ego injustice can be satisfied by
5  insolvency but can also be, and usually is, established without it. Moreover, no case
6  holds that where the elements of alter ego are present, a plaintiff is precluded from
7  holding those alter ego actors accountable for their primary responsibility in the
8  harm because the pierced entity could satisfy a judgment.  Indeed, as defendants
9  have pointed out, the ability of the pierced entity to satisfy a judgment is not alone a
10  relevant factor for piercing.  Rather, these doctrines are directed at the injustice of
11  ignoring corporate separateness and then attempting to use it to "evade a public
12  duty."

13       Here, the SAC provides more allegations of requisite unity of interest than any
14  of the reported cases finding alter ego and single enterprise culpability. Dkt. 387-1
15  at ¶¶ 313-445; Dkt. 480-1 at 63-82.  Having done so, that same precedent makes
16  clear that it would be inequitable to permit the individual defendants and MindGeek
17  S.A.R.L. to evade U.S. trafficking laws by hiding behind a corporate form they
18  completely ignored for a decade while directly and personally operating a trafficking
19  venture prohibited by that statute.

20       Moreover, although not necessary, the SAC and Omnibus Opposition also
21  contain detailed allegations and evidence that the MindGeek entities were
22  undercapitalized and insolvent from inception.  Dkt. 387-1 at ¶¶ 314-23, 353-61;
23  Dkt. 480-1 at 66-67, 83-84 & Ex. 9 (Expert Report of Joao P. Santos, CPA).
24  Notably, defendants' motions did not present any substantive factual challenge to
25  these detailed allegations, including to the allegations based on discovery that
26  MindGeek's corporate structure was a sham designed to evade U.S. tax,
27  pornography, and trafficking laws; ████████████████████████████
28  ████████████████████████████████████████████████

PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEFING

1 ████████████████████████████████████

2 ████████████████████████████████████████

3 ████████████████████████████████████████

4 ████████████████████████████████████████

5 ████████████████████████████████████.

6    Dkt. 387-1 at ¶¶ 314-23, 353-61.

7       Instead, in a classic bait and switch, after objecting to discovery into

8 MindGeek's finances after June 2021 as irrelevant, defendants now seek to make an

9 evidentiary challenge to the SAC based on those post-2021 "irrelevant" finances.[4]

10 This unfair sandbag is not permitted. Defendants' right to mount an evidentiary

11 challenge at this early stage of the proceeding requires that the plaintiffs also have an

12 opportunity for discovery into the relevant facts being presented.

13       Having taken the position that these facts were "irrelevant," and never

14 supplementing that position or production when they changed its position,

15 defendants are precluded from making an evidentiary challenge based on them.

16 *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1177 (9th Cir. 2008)

17 (explaining that under F.R.C.P. 26 and 37 there is a "self-executing" preclusion on a

18 party that withheld evidence and then did not supplement its position and production

19 before proffering that evidence on that subject). Contrary to defendants' shameless

20 argument, it was not plaintiffs' duty to move to compel evidence the defendants

21 objected to as irrelevant and thus could not present; it was defendants' duty to

22 supplement their discovery if they wished to change their position that this

23 information was not the crux of their defense.

24

25 ───────────────

26 [4] Contrary to defendants' assertions, defendants pressed their objection to plaintiff's proposed time period early arguing that the relevant period for jurisdictional

27 discovery was the period covered by the complaint, prevailed on the Magistrate to adopt that standard and maintained that position through the end of discovery. *See,*

28 *e.g.*, Dkt. 312 at 32.

Moreover, the *de minimis* "evidence" they do present of solvency is woefully deficient.  The purported 2023 "purchase" of the individual defendants' MindGeek interests by a third party reveals nothing about the present solvency of the underlying entities, which very likely were leveraged as part of this transaction just as defendants did when they purchased MindGeek in 2013.  Indeed, this is precisely the inference dictated by the several-year delay in delivery of the purchase price. Nor does it provide any basis for finding as a matter of law that the present MindGeek defendants will be able to satisfy judgments to all these plaintiffs, the almost two hundred more with unfiled claims, and all the victims covered by the two pending class actions.

Obviously, defendants could have, but elected not to, produce in discovery or on this motion the fundamental evidence they possess most relevant to this issue: for example, a current balance sheet reflecting assets and liabilities and income and expenditure statements.  Indeed, discovery easily could have met the Court's original three-month expedited schedule even if it had had not been limited to June 2021. It would have been neither time-consuming, expensive, nor burdensome for MindGeek to simply produce the financial information it can access in a moment's notice from its centralized electronic financial and accounting reporting systems. The parties then would have been in position to present the type of comprehensive evidentiary presentation on solvency courts regularly consider.  Instead, defendants made a telling tactical decision that they were better served by withholding such information at all costs rather than subjecting it to discovery and an evidentiary hearing.

As a result, defendants are asking this Court to do what no professional valuation expert would do:  determine solvency without the most basic information necessary to do so.

More important, defendants are asking the Court to do what it is simply not permitted to do at this procedural stage.  That is, find as a matter of law that the

assertions of MindGeek's lawyers that it is solvent are true based on speculation and inference about a sales agreement that contains no information about the business' actual solvency.  This turns the governing standard on its head.

The law is clear, even after jurisdictional discovery, absent an evidentiary hearing, the Court must accept the plaintiff's allegations, evidence, and reasonable inferences as true and resolve all factual dispute in plaintiff's favor, unless they are "directly contradicted" by specific, nonconclusory affidavits or evidence.  *See* Dkt. 480-1 at 79-80.  MindGeek elected not to provide any such showing obviously because it did not want to permit the discovery it would require.  It also objects to an evidentiary hearing or further jurisdiction-specific discovery.

Accordingly, plaintiffs' allegations and evidence of insolvency and the 2023 buyout must be accepted as true and all inferences and factual disputes resolved in their favor.  This is particularly so for all plaintiffs other than Fleites who have never had the opportunity to take jurisdictional discovery. *Id; Burri Law PA v. Skurla,* 35 F.4th 1207, 1212 (9th Cir. 2022).  As a result, even if allegations of undercapitalization and insolvency were necessary (which they are not), they have been alleged.

This outcome is not only the law, it is also entirely fair.  This Court provided defendants with the opportunity for a summary disposition of the jurisdictional issue provided they produced the evidence necessary to do so and proceeded with an evidentiary hearing.  They elected not to produce that evidence and do not wish to proceed with an evidentiary hearing.  They must live with the consequences of those tactical decisions.

Nevertheless, defendants retain their jurisdictional defense and can renew it at summary judgment and at trial after complete discovery into all the allegations they have now put in issue.  At that point, the Court will have the benefit of the complete record necessary to make a determination consistent with the governing legal standards.

PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEFING

## II.    THE TENTATIVE DECISION ON THE TVPRA CONSPIRACY CLAIMS IS CORRECT AND SHOULD BE ADOPTED.

At the March 7, 2025 hearing, the Court indicated its tentative decision to "deny both Visa and the Redwood/Colbeck motion on this conspiracy count." Mar. 7, 2025 Hr'g Tr. 7:19-21. Defendants' supplemental briefs offer no reason to depart from that ruling.

### A.    ATRA Was a Clarifying Amendment With Retroactive Effect.

As the Court recognized at the hearing, ATRA provided a clarifying amendment and may be applied retroactively. Mar. 7, 2025 H'rg Tr. 7:10-19 (Court: "I believe that [ATRA's] a clarifying amendment and not a new right. . . ."); *ABKCO Music, Inc. v. LaVere*, 217 F.3d 684, 689 (9th Cir. 2000) (holding that "clarifying legislation" is not subject to a presumption against retroactivity).

Citing *Landsgraf v. USI Film Products*, 511 U.S. 244 (1994), Visa argues that the Ninth Circuit's vacated decision in *Ratha v. Rubicon Resources, LLC (Ratha II)*, 111 F.4th 946, 969 (9th Cir. 2024) was correct because a clarifying amendment is not an exception to the presumption against retroactive application of an amendment that alters substantive rights. Dkt. 549 at 1-2.[5]  But Judge Graber correctly reasoned that ATRA's 2023 "Technical and Clarifying Update to Civil Remedy" did not alter the pre-existing scope of liability; it merely clarified existing rights under the statute and thus should be applied retroactively. *See Ratha II*, 111 F.4th at 969 (Graber, J., dissenting).

As this Court concluded, Judge Graber's opinion is corroborated by the timing, title, and commentary surrounding ATRA's enactment. *See* Mar. 7, 2025 H'rg Tr. 7:8-21; 90:16-24.  Among other things, the ATRA amendment to Section

---

[5] *Landsgraf* does not prescribe the universe of exceptions; it merely presented examples to illustrate the well-settled principle that "in many situations, a court should apply the law in effect at the time it renders its decision, even though that law was enacted after the events that gave rise to the suit." *Landsgraf*, 511 U.S. at 273 (internal quotations and citations omitted).

1595(a) was proposed just two weeks after the Supreme Court denied certiorari in *Ratha I*, which held that attempt liability under the TVPRA did not extend to civil suits. The amendment passed unanimously just one month later: "Congress acted immediately – to resolve the ambiguity and correct [the *Ratha I* panel's] error." *Ratha II*, 111 F.4th at 970 (Graber, J., dissenting). Moreover, ATRA's title "Technical and Clarifying Update to Civil Remedy," its limited legislative history, and quick and unanimous passage evince Congress's intent that the amendment was a mere clarification rather than a substantive change in the law. *See id.* at 973; *see also Beverly Community Hosp. Ass'n v. Belshe*, 132 F.3d 1259, 1265-1266 (9th Cir. 1997) (including "clarification" afforded great weight in construing the statute as a clarifying amendment with retroactive effect); *Ratha II*, 111 F.4th at 974-975 (Graber, J., dissenting) (similar phrasing in titles "suffices to demonstrate that an amendment is clarifying."). Finally, Congress's intent that the statute be retroactively applied was corroborated by a September 2024 amicus brief submitted by several members of Congress in support of petitioners' request for en banc rehearing of *Ratha II*, confirming that ATRA was passed with the well-established principles of legislative clarification in mind.  *See* Ex. 1, Brief of Members of Congress Representative Nadler, et al., as *Amici Curiae* in support of Plaintiffs-Appellants ("Congressional Amicus"), Dkt. 57, Case No. 23-55299 at 4-6; *see also ABKCO*, 217 F.3d at 690-91 (considering congressional advocacy in assessing retroactive intent).[6]

---

[6] Despite this clear expression of congressional intent, Visa argues that any finding that Congress intended the civil and criminal provisions to apply coextensively is inconsistent with the different standards for criminal and civil liability under the statute. Visa Br. at 2. But the fact that the statute applies different standards does not undermine its coextensive reach. Visa's related claim that the "clear textual differences" between the criminal and civil liability provisions preclude a finding of coextensive liability ignores the plain terms of section 1595, which since 2008 provides a claim for civil liability to individuals who are "victim of a violation of this chapter" which includes sections 1594 and 1596.

**B.    The Complaints Plead a Conspiracy To Profit From the Distribution Of CSAM**

It is undisputed that plaintiffs plead each defendant's years-long business relationship with MindGeek. Fleites Opp., 21-24, 33. It is also undisputed that MindGeek's business model included monetizing child porn. Fleites Opp. at 11-14. At the March 7 hearing, the Court aptly observed that each defendant's ▮▮▮▮▮▮▮ participation in MindGeek's business, with the requisite knowledge that a substantial portion of that business involves CSAM, is sufficient at this stage of the proceeding to infer their agreement and intent to conspire with MindGeek to profit from that CSAM:

> I would say that the limiting principle in this specific case would be Visa knew that a substantial portion of MindGeek's income was from CSAM.  That's taking their allegations as true.  And so when they agreed to provide the same service that they provided to other entities, this was different because they knew at the time that they provided the services or at least at some point when they were providing services that a substantial portion of MindGeek's business involves CSAM.

Hr'g Tr. at 98:26-99:8. Judge Carney reached the same conclusion in holding that Fleites had adequately pled a conspiracy between Visa and MindGeek to violate Section 1591(a)(2). Dkt. 166 at 22-25 (Visa's agreement and intent to conspire may be inferred from "the very fact that Visa continued to provide MindGeek the means to [profit from sex trafficking] and knew MindGeek was indeed doing so.")

**1.    The Complaints Plead Each Defendants' Knowledge**

As this Court correctly recognized, defendants' knowledge of MindGeek's illegal activities is derived from, among other sources, their ongoing due diligence of MindGeek's business operations:

> [T]hat's the allegation. They conducted their own due diligence and learned from their due diligence that a substantial portion of MindGeek's business was derived from CSAM.

March 7, 2025 Hr'g Tr. at 100:18-21; *see also* Fleites Opp., 35 (alleging Visa performed ongoing due diligence); 23, 28-29 (addressing Redwood and Colbeck's

13

1 ████████████████████████████). Plaintiffs allege that Redwood and Colbeck

2 were further aware of MindGeek's systemic commercialization of child porn and

3 other nonconsensual content from their ████████████████████████████████

4 ████████████████████████████████████ (Fleites Opp.,

5 22-23); their regular communications with the individual defendants (Fleites Opp.,

6 28); ████████████████████████████████████

7 ████████ (Fleites Opp., 21-24).[7]

8       Incredibly, Visa entirely ignores the allegations of its contemporaneous and

9 ongoing due diligence observed by the Court. This is fatal to Visa's motion. Instead,

10 Visa spends pages arguing that the April 2020 correspondence from NGOs alerting

11 Visa to MindGeek's sex trafficking activities were insufficient to put Visa on notice

12 because they were sent "long after" the events alleged in the complaints. Hr'g Tr. at

13 100:24-101:1; Visa Br. at 5. But plaintiffs allege that MindGeek continued to

14 disseminate and profit from CSAM videos until December 2020 when MindGeek

15 finally removed 10 million unverified videos in response to the New York Times

16 expose and the credit card companies resulting investigation.  SAC ¶ 458; Fleites

17 Opp. at 19.

18       Visa fails to address its actual knowledge of MindGeek's sex trafficking

19 activities during the intervening period from April to December. Its failure to ask

20 MindGeek a single question, suspend its services, commence an investigation, or run

21 a simple Google search to corroborate the information provided by the NGOs during

22 this period demonstrates it knew about MindGeek's illegal activities throughout and

23 sanctioned them. Fleites Opp., 33-35. Finally, as Redwood notes, the 2019 public

24 reports about Visa's competitor's decision to terminate its relationship with

25 _____

26 [7] Colbeck's extensive argument that it had no notice of MindGeek's illegal activities

27 because the material public reporting was not issued until after Colbeck exited the
loan (Colbeck Br. at 4) are a non-sequitur because plaintiffs plead Colbeck's

28 knowledge from its ████████████████████████████.

1  MindGeek upon discovering MindGeek's child trafficking venture is sufficient to
2  establish Visa's actual or constructive knowledge at this stage of the proceedings.
3  Redwood Br. at 9.[8]

4      Redwood also ignores the allegations of its extensive due diligence.  It argues
5  that plaintiffs' claims fail as a matter of law because there are no "allegations that
6  Redwood knew that MindGeek altered videos or tags or ignored requests to remove
7  videos." Redwood Br. at 5.  But this argument conflates the applicability of CDA
8  230 with liability under the TVPRA. Moreover, to plead knowledge of a conspiracy
9  to violate the TVPRA, a plaintiff need only allege constructive knowledge of the
10 venture's criminal activities, not the exact means through which those activities are
11 carried out. *See United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d
12 1539, 1541 (9th Cir 1989) ("To be liable, each participant in the conspiracy need not
13 know the exact details of the plan, but each participant must at least share the
14 common objective of the conspiracy.").

15     In any event, the complaints plead Redwood's knowledge of the means
16 MindGeek employed from their ongoing involvement in the business, regular
17 discussions with the Individual Defendants, and ██████████████████
18 ████████████. Fleites Opp., 24; Pearl Decl. Ex. C ████████. These
19 allegations raise material questions of fact concerning the extent of Redwood's
20 knowledge, which cannot be resolved without discovery.[9]

21

22 [8] Visa again claims that the TVPRA requires plaintiffs establish Visa's knowledge of
23 plaintiffs' trafficking or their direct trafficker. Visa Br. at 3-5. This argument has
   been rejected by Judge Carney (Dkt. 166 at 23), this Court (Hr'g Tr. at 95), and the
24 long line of cases holding that under the TVPRA and common law conspiracy
25 principles, neither knowledge of a specific victim or knowledge of all co-
   conspirators is required.  Fleites Opp. at 41.
26 [9] Redwood goes to great lengths to argue that it was only one of many lenders to
27 MindGeek (Redwood Br. at 7). This fails to address its ███████████████
   ████████████████. Fleites Opp. at 24.  In any event, the fact that ████████
28

1   Finally, Colbeck's reliance on (i) ███████████████████████████

2   ████████████████████████████ and (ii) ███████████████████████

3   ███████████████████████████████████████████████

4   ███████████████████████. Colbeck Br. at 4.  At best, it raises factual

5   questions about what Colbeck knew ████████████████████████████

6   ███████████████████████████████████████. *See* Fleites

7   Opp. at19.

        2.    <u>The Complaints Plead Each Defendants' Agreement and Intent.</u>

9   An agreement and intent to conspire may be inferred where a defendant

10  "entered into a joint enterprise with consciousness of its general nature and extent."

11  Dkt. 166 at 23; *see also Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d

12  1001, 1020 (9th Cir. 1985) (agreement to conspire may be inferred from "unity of

13  purpose or a common design and understanding, or the meeting of the minds in an

14  unlawful arrangement.").  Moreover, as Visa notes (Visa Br. 4), ████████████

15  such as the ones Redwood and Colbeck had with MindGeek may be used to infer

16  agreement and intent. Visa Br. at 4 (*citing G.G. v. Salesforce*, 76 F.4th 544, 556 (7th

17  Cir. 2023)). Ultimately, each of these elements is highly factual and thus can rarely

18  be resolved at the pleadings stage. *Tatung Co., Ltd., v. Shu Tze Hsu*, 217 F.Supp.3d

19  1138, 1183 (C.D. Cal. 2016).

20  No defendant disputes that, for ███████████, they provided funding and

21  payment services critical to MindGeek's business. *See* Fleites Opp., 21-25, 32-33.[10]

22  Rather, each regurgitates the previously rebutted arguments that they cannot be

23  _____

24  ████████████████████████ from MindGeek's trafficking venture does not

25  absolve Redwood of liability.
    [10] Colbeck asserts it left the conspiracy by ████████████████████. Colbeck

26  Br. at n.8. ████████████

27  ████████████████. Fleites Opp. at 22. Additionally, plaintiffs' trafficking
    occurred prior to the termination of Colbeck's financing agreement. *See e.g.*, SAC ¶

28  448-450.

liable for routine commercial and banking transactions. *See* Fleites Opp., 27, n.15. But their attempts to analogize this case to the dozens of cases that have declined to impose lender liability in arms-length relationships fails to address the extensive allegations that Visa, Redwood, and Colbeck each knew of MindGeek's illegal activities during the course of their business relationships and shared the objective to profit from them. This alone distinguishes this case from the cases on which defendants rely.  *See, e.g., Douglas v. Hirson,* 63 F.4th 49 (1st Cir. 2023) (plaintiffs failed to allege lenders knew of fraud or benefited from or participated in transactions); *Benson v. JPMorgan Chase Bank, N.A.,* 2010 WL 1526394 (N.D. Cal. Apr. 15, 2010) (bank had normal depository relationship with defendants and no incentive to further scheme to defraud plaintiffs); *Compound Prop. Mgmt., LLC v. Build Realty, Inc.,* 462 F.Supp.3d 839 (S.D. Ohio 2020) (plaintiff failed to allege any benefit to lenders); *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 873 (D.C. Cir. 2022) (plaintiff failed to allege common objective where bank was trying to profit through the evasion of sanctions whereas al-Qaeda's goal was to terrorize the United States and incite anti-American sentiment); *Craigslist Inc. v. 3Taps Inc.,* 942 F.Supp.2d 962, 982 (N.D. Cal. 2013) (defendant allegedly purchased inappropriately obtained information after the fact and did not facilitate or assist in the completion of the illicit act).[11]

For this reason, Visa's and Redwood's reliance on *Deutsche Bank* is unavailing. As Judge Rakoff reasoned in dismissing plaintiffs' conspiracy claim, although plaintiff adequately pleaded the banks' knowledge of the venture's illegal activities, there were no allegations that defendants shared the objective to participate in the alleged conspiracy to sex traffic minors. *Doe 1 v. Deutsche Bank*

---

[11] *Young v. City of Menifee*, also cited by Colbeck (Colbeck Br. at 7), does not involve a financing agreement or lender. Rather, plaintiff alleged assault and false arrest, among other violations, by city officials. 2019 WL 3037926 (C.D. Cal. Apr. 5, 2019). Plaintiff's conspiracy claims were inadequate because he failed to allege the aims of the purported conspiracy or the participants in the conspiracy. *Id.* at *4.

1  *Aktiengesellschaft*, 671 F.Supp.3d 387, 412 (S.D.N.Y. 2023). By contrast, as Judge

2  Carney and this Court both previously recognized, "the predicate criminal agreement

3  or meeting of minds . . . is not to participate in sex trafficking; it is an agreement to

4  knowingly benefit financially from sex trafficking." Dkt. 166 at 24; Hr'g Tr. at 95:7-

5  10. The complaints plead defendants' knowledge and incentives to profit from

6  MindGeek's monetization of CSAM in spades. Fleites Opp., 27-30, 35-36.

7       Finally, Redwood goes to great lengths to argue the allegations of its intent to

8  profit from illegal content are "implausible" because they would be paid the same

9  interest rates under the loan agreements irrespective of whether MindGeek was

10  deriving its revenue from legal or illegal activities and thus they had no economic

11  interest in MindGeek deriving greater profits. Redwood Br. at 9-10.  But the

12  complaints plead that Redwood was only able to secure these exorbitant and

13  unprecedented interest rates because MindGeek was not able to secure funding from

14  traditional sources due to its illegal activities. Fleites Opp. at 59. The complaints

15  further allege that after years of involvement with MindGeek and becoming

16  increasingly intimately familiar with the business, Redwood ███████████████

17  ████████████████████████████████████████████████████

18  (Fleites Opp. 23-24), ████████████████████████████████

19  ████████████████████████████████████████████████████

20       ████ (Fleites Opp., 24-25), ██████████████████████████

21  ████████████████████████████████████████████████

22  ██████████████████████████████, because it wanted to continue

23  to reap the enormous profits that would otherwise be unavailable from any

24  legitimate business. *Id*. [12] Each of these allegations are sufficient to plead

25  Redwood's intent on this Motion.

26  _____

27  [12]Although Colbeck claims that plaintiffs have somehow conceded that the Colbeck
    defendants must have committed an overt act in furtherance of the conspiracy

28

## C.    Defendants' Claimed Far-Reaching Consequences Are Unfounded

Citing *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), Visa and Redwood argue that imposing conspiracy liability here would create endless liability for anyone that has ever provided any service to the MindGeek Defendants. Visa Br. at 8-9; Redwood Br. at 10. But *Twitter* is distinguishable because it involved an arm's length, passive, and largely indifferent relationship between Twitter and one of the millions of entities that post on its platform. *Id. at* 500-501. In declining to find that Twitter substantially participated in ISIS's illegal activities, the Supreme Court reasoned that there were no allegations that Twitter contributed anything material to ISIS's content. *Id*. 498-499. To the contrary, the Twitter complaint was devoid of any allegation that Twitter even reviewed ISIS's content before it was posted to its platform. *See id.*  By contrast here, the complaints allege that Visa, Redwood, and Colbeck provided MindGeek with hundreds of millions of dollars in aid and support that was direct and material. Fleites Opp. at 21-24, 32-33. And they each did so with knowledge of MindGeek's illegal activities at that time they provided that substantial support.

As this Court correctly reasoned, each defendants' knowledge of MindGeek's illegal activities at the time they provided those services to MindGeek is the "limiting principle" that distinguishes defendants from the theoretical power company who doesn't know what is stored on MindGeek's servers and lacks the means, compliance function, or contractual rights to conduct due diligence or investigate. Hr'g Tr. at 99:20-100:21.

---

(Colbeck Br. at 8), plaintiffs' brief and black letter conspiracy law are clear that while an overt act is required, it is not necessary that either Colbeck or Redwood commit that act. Fleites Opp., 44; K.A. Omnibus Opp., 52 ("Only one defendant must take an overt act in furtherance of the conspiracy – an act which need not itself be illegal . . .."). In any event, each wire of funds is an overt act. *Hunter v. Citibank, N.A.*, 2011 WL 7462143, at *6 (N.D. Cal. May 5, 2011) (loans constituted overt acts). The complaint pleads ██████████████ acts by Colbeck and Redwood.

### III. THE COMPLAINTS PLEAD BENEFICIARY LIABILITY AS TO VISA, REDWOOD, AND COLBECK.

The detailed allegations of Visa's, Redwood's and Colbeck's decade-long participation in MindGeek's business with knowledge of MindGeek's illegal activities also state claims for beneficiary liability against each of these defendants.

To state a claim under section 1591(a)(2), a plaintiff need only allege that defendant (1) knowingly participated in a venture; (2) received a benefit from its participation; and (3) knew or should have known that the venture was engaged in sex trafficking. Fleites Opp. at 6.

Although, Judge Carney previously held that a plaintiff could not sustain a claim for beneficiary liability absent a direct relationship between the beneficiary and direct trafficker (Dkt. 166 at 21), there is nothing in the statute or caselaw that imposes this limiting requirement. Fleites Opp. at 7-10. Congress could have written this restriction straight into the statute; it chose not to. Its decision is consistent with its express mandate that the statute is intended to be "broad," "expansive," and "punish a wide range of conduct" to effectuate its remedial purpose. Fleites Opp. at 5.

The broad language Congress carefully chose provides that where a company, like MindGeek, is involved in a business venture, some part of which is engaged in sex trafficking, participation in any part of that venture results in liability where defendant: (1) is aware that part of the business is engaged in sex trafficking; (2) participates in the venture (even just in the business aspects); and (3) receives a benefit from its participation. Fleites Opp. at 5-6. (collecting cases imposing beneficiary liability for knowing participation in a commercial venture with knowledge of the venture's sex trafficking activities).

Knowledge requires actual or constructive knowledge of a specific venture. Fleites Opp. at 7-10. While knowledge of a general industry problem is not sufficient, (*see* Fleites Opp at 8-9 (distinguishing cases dismissing beneficiary liability claims against hotel franchisees where the complaint only alleges

knowledge of sex trafficking at hotels generally, but is devoid of allegations of a venture at its franchisee hotel)), knowledge that the specific company you are doing business with is generally engaged in sex trafficking is enough. K.A. Opp. 8-9 (citing cases imposing beneficiary liability against hotel franchisors arising from their ongoing business relationships with franchisees where the franchisors were on notice of the sex trafficking even though they had no direct interaction with the street level traffickers); *see also Doe v. Wyndham Hotels & Resorts,* 2025 WL 824369 (S.D. Cal. Mar. 14, 2025). A plaintiff need not plead the beneficiary's knowledge of each particular plaintiff or each direct trafficker. Fleites Opp 8-9, 17-18 (rejecting specific plaintiff requirement).

Finally, while the statute and caselaw define "participation" broadly (K.A. Opp. at 13), the conduct supporting the venture must be more than "arm's length, passive, and largely indifferent." *Salesforce.com,* 76 F.4th at 563. Participation may be inferred from a continuous business relationship. *Id.* at 559-560.

Plaintiffs plainly plead Visa's, Redwood's, and Colbeck's knowledge and participation in the MindGeek venture under these standards. Redwood and Colbeck each provided ████████████████████ ████████████ MindGeek's business over a decade. (Fleites Opp. at 21-24.) During that same period, Visa earned millions of dollars by processing ad and subscription payments. SAC ¶ 8. The complaints allege each did so with full knowledge of MindGeek's illegal activities. Fleites Opp. at 27-30, 35-36.

It is the continuous participation in the face of that knowledge that distinguishes this case from the ones that involve one-off or occasional interaction with the venture. *See Salesforce,* 76 F.4th at 556-558 (surveying cases finding that participation in a commercial venture with require knowledge is sufficient to state a claim for beneficiary liability and distinguishing cases that hold otherwise for failure to plead knowledge or participation). Under the plain terms of the statute and

controlling law, nothing more is required to sustain a claim for beneficiary liability in violation of section 1591(a)(2).

## IV.    THE TENTATIVE RULING ON MINDGEEK'S MOTION TO DISMISS IS CORRECT AND SHOULD BE ADOPTED.

In its 42-page Tentative Decision, this Court thoroughly analyzed and rejected each of MindGeek's challenges to plaintiffs' beneficiary liability, federal child sexual exploitation, and California state law claims. The Court's well-reasoned Tentative Decision is consistent with Judge Carney's prior finding that plaintiffs had "comfortably stated a claim [for beneficiary liability] against MindGeek," (Dkt. 166 at 18), and should be adopted without change.

### A.    This Court Has Carefully Considered And Rejected Each of MindGeek's Challenges to Plaintiffs' Beneficiary Liability Claim

MindGeek lodges four challenges to plaintiffs' beneficiary liability claim, each of which is easily disposed of.

First, citing *Does 1-6 v. Reddit*, 51 F. 4th 1137, 1145 (9th Cir. 2022),[13] MindGeek renews its rejected argument that plaintiffs have failed to allege the requisite direct connection between the venture's illegal activities and the benefit MindGeek received. MindGeek Br. at 5.  But as this Court properly concluded, this argument improperly seeks to extend the criminal liability standards applicable to the FOSTA exception to CDA 230 to the civil liability standards under 1595 governing here. Tentative Op. at 17 (concluding that the Ninth Circuit in *Reddit* "repeatedly narrowed its holding to the FOSTA's immunity exception).  The knowing benefit element of a civil beneficiary liability claim under section 1595

---

[13] Each of the additional cases MindGeek relies on in footnote five of its supplemental brief likewise address the criminal standard applicable to the FOSTA exception to CDA 230. *See Doe v. Grindr Inc.*, 128 F.4th 1148, 1154-1156 (9th Cir. 2025) (analyzing Grindr's conduct under FOSTA exception); *Doe v. Reddit, Inc.*, 2021 WL 5860904, at *7-8 (C.D. Cal. Oct. 7, 2021) (finding section 230 applied to Reddit's conduct and analyzing TVPRA claim under FOSTA); *Doe v. WebGroup Czech Republic, a.s.*, 2025 WL 879562, at *7-8 (C.D. Cal. Feb. 21, 2025) (same).

merely requires that defendant knowingly received a financial benefit, which need not derive directly from the trafficking activity. *See id.*; *see also* Fleites Opp. at 9. In any event, as the Court acknowledged, plaintiffs allege that MindGeek received advertising revenue, fee-based subscription service revenue, and other benefits from the CSAM on its sites, including each plaintiff's videos. Tentative Op. at 20.

Second, MindGeek again seeks to invoke the criminal standards addressed in *Reddit* to argue that it cannot be held to have participated in a trafficking venture absent allegations that MindGeek had "engaged in any act that violated § 1591." MindGeek Br. at 6. This Court has also considered and rejected this argument, concluding that "[w]hen read in context, the Court does not see how this *dicta* [in *Reddit* that MindGeek relies on] can be construed as the Ninth Circuit imposing the criminal standard for the "participation in a venture" element to both criminal and civil beneficiary liability cases." Tentative Op. at 17. Accordingly, the Court "refuse[d] to depart from the long line of cases that states that, for a defendant to be held civilly liable under section 1595 of the TVPRA, plaintiff need not demonstrate an overt act that furthered the sex trafficking aspect of the venture in order to satisfy the participation requirement under section 1595(a)." Tentative Op. at 18 (internal quotations and citations omitted); *see also* Hr'g Tr. at 25:25-26:1; 26:7-14.[14]

_____

[14] To the extent MindGeek argues that knowledge under the TVPRA requires knowledge of each specific victim (MindGeek Br. at 6, n.6), this Court and the "majority" of other courts to consider this issue have uniformly rejected this stringent standard. *See* Hr'g Tr. at 95:4-6 ("I don't necessarily agree with you that even for the beneficiary liability that they would have to know about [the specific plaintiff's] video."); *see also Salesforce.com, Inc.,* 76 F.4th at 559 (noting "majority" of courts have held that under section 1595, a plaintiff need only allege that defendant had constructive knowledge of the venture; knowledge of the specific victim, let alone knowledge of her identity, is not required."); Fleites Opp. at 8. But even if such specificity was required, plaintiffs allege that defendants had specific knowledge of each plaintiff from its human moderation of plaintiffs' videos prior to upload (Fleites Opp. at 12, 17-18, 47-48), the tags, titles and comments indicating

1  Applying the correct standard, this Court observed that the complaints plead a

2  "business model" and "pattern of conduct" that "encouraged the posting of CSAM

3  and other nonconsensual materials by traffickers by accepting and allowing their

4  videos to be uploaded, optimizing and editing the videos in a way to making it easy

5  for users to find CSAM, and shielding the videos from law enforcement and

6  removal." Tentative Opp. at 18.  Ultimately, the Court correctly concluded that this

7  "pattern of conduct" "indicates that [MindGeek] had a tacit agreement with

8  traffickers and a desire to promote the 'wrongful venture's success'" sufficient to

9  satisfy the participation element under section 1595. Tentative Opp. at 18-19; *see*

10 *also* Dkt. 166 at 19-20 (finding allegations that MindGeek posted, formatted and

11 propagated CSAM videos over the course of several years sufficiently alleged a

12 continuous business relationship between MindGeek and plaintiffs' traffickers

13 sufficient to establish participation).

14      Third, MindGeek argues that plaintiffs fail to plead a "specific venture"

15 because the complaints fail to plead a "continuous business relationship" or "tacit

16 agreement" with plaintiffs' direct traffickers. MindGeek Br. at 7. As an initial

17 matter, plaintiffs' complaints allege that MindGeek had a direct relationship with

18 every poster, each of whom entered into a contractual relationship with MindGeek at

19 the time of posting. SAC ¶ 46. The complaints also allege a commercial venture to

20 profit from the monetization of child porn and nonconsensual content (Tentative Op.

21 at 18-19), which numerous courts have held is sufficient to satisfy the venture

22 requirement under the TVPRA. *See Salesforce*, 76 F.4th at 561-562 (finding

23 beneficiary liability was adequately pled where the complaint alleged Salesforce's

24 participation in a commercial venture with Backpage to grow and operate the

25 business and its knowledge that Backpage violated the TVPRA); *see also Doe*

26 ──────────────

27 that plaintiffs were minors and the content was nonconsensual (Fleites Opp. at 47); and plaintiffs' repeated takedown requests (Fleites Opp. 19, 48, n.28, 50).

28

*(L.M.) v. 42 Hotel Raleigh, LLC*, 2024 WL 4204906, *4-6 (E.D.N.C. Sept. 16, 2024) (sustaining beneficiary liability claim against franchisor absent direct interaction between franchisor and plaintiff's direct trafficker); *T.E. v. Wyndham Hotels & Resorts, Inc.*, 2024 WL 474400, at *3, 6 (S.D. Ohio Feb. 7, 2024) (rejecting defendant's argument that it could not be liable as a beneficiary in the absence of direct interaction with plaintiff's street level trafficker); *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 725-727 (11th Cir. 2021) (observing that beneficiary liability may be properly pled where "plaintiff had alleged that [defendants] participated in commercial ventures to operate hotels and those hotel ventures violated section 1591."). MindGeek does not cite a single case to support its myopic interpretation of the statutory requirement, and it is inconsistent with the TVPRA's broad definition of venture (*see* § 1591(e)(6) (defining venture to mean "any group of two or more individuals associated in fact, whether or not a legal entity)), Congress's mandate that the TVPRA be broadly construed to effectuate its remedial purpose (*Acevedo v. eXp Realty, LLC*, 713 F. Supp. 3d 740, 766 (C.D. Cal. 2024) (observing that the TVPRA is a remedial statute that is intended to be construed broadly and applied to cases that may not be the "archetypal" sex trafficking action)), and the long line of cases that have consistently interpreted that definition and the statute's remedial purpose to extend to commercial ventures engaged in sex trafficking, such as the one alleged here. *See, e.g., Doe v. Wyndham Hotels & Resorts*, 2025 WL 824369, at *13-15 (finding TVPRA beneficiary liability as to hotel-operating venture between franchisee and franchisor with commercial objective of maximizing hotel revenue); *42 Hotel Raleigh,* 2024 WL 4204906, at *4-6.

Finally, MindGeek argues that plaintiffs fail to allege that MindGeek provided "tailored," "ongoing" or "personalized" support to plaintiffs' direct traffickers sufficient to establish its participation. MindGeek Br. at 7-8. As alleged, *supra* at 23, beneficiary liability under section 1595 does not require an overt act in furtherance of the sex trafficking itself.  Rather, the court properly concluded that MindGeek's

1   participation in the sex trafficking venture is properly inferred from its tacit
2   agreement with traffickers to promote the 'wrongful venture's success'" Tentative
3   Op. at 18.  In any event, the Court has correctly stated that MindGeek's human
4   formatters actively contributed to the illegality of each video prior to posting. Hr'g
5   Tr. at 11:22-12:3, 12:12-16, 15:11-21. The specifics and extent of that contribution
6   is a factual question.

7       For all these reasons, the Court should adopt its Tentative Decision denying
8   MindGeek's motion to dismiss plaintiffs' beneficiary liability claim.

9       **B.    The Court Correctly Concluded That CDA 230 Does Not Immunize
10          MindGeek's Conduct**

11      Finally, the Court correctly rejected MindGeek's CDA 230 immunity
12  defenses, finding that the complaints plead that MindGeek materially contributed to
13  the illegality of each posted CSAM video when its human formatters actively
14  modified and optimized each video prior to posting on its tube sites. Hr'g Tr. at
15  11:22-12:3, 12:12-16, 15:11-21.[15]

16      In its supplemental brief, MindGeek goes to great lengths to argue that the
17  Court's decision on CDA 230 is inconsistent with Judge Garnett's recent decision in
18  *Doe v. WebGroup Czech Republic, a.s.*, 2025 WL 879562 (C.D. Cal. Feb. 21, 2025),
19  which found that similar allegations against xVideos were barred by CDA 230

---

20
21  [15] MindGeek cites to many of the same cases it relied upon in prior briefing. But
22  none of these cases grapple with allegations that the defendant website took an
    active role in reviewing and modifying content. Nor do any of the cases, with the
23  exception of *Grindr*, deal with illegal conduct. *Doe v. Grindr Inc., et al.*, 709
    F.Supp.3d 1047 (C.D. Cal. 2023) (plaintiff sought to hold Grindr liable for
24  publishing user profiles using its match feature notification based on third-party
25  provided information without allegations that Grindr edited or modified user-
    provided information in any way); *Fyk v. Facebook, Inc*., 80 Fed. Appx. 597 (9th
26  Cir. 2020) (no allegations that underlying pages were in any way illegal content and
    Facebook was alleged to have re-published them in the exact same format);
27  *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003) (selection of the
28  content was "left exclusively" to the user and was transmitted "unaltered" to users).

immunity. MindGeek Br. at 2-4. As this Court correctly observed during oral argument, there are key differences between the two cases which necessitate a different outcome. *See e.g.*, Hr'g Tr. at 10:24-11:11; 11:22-12:3; 15:11-21. While MindGeek attempts to analogize the two cases by focusing on the parallel human moderation function alleged in both cases (MindGeek Br. at 2-3), a close review of *Webgroup* reveals that xVideo's contributions were limited to moderation and content neutral support/formatting which the Ninth Circuit held were insufficient to establish a material contribution to illegality.   *See, e.g.,* (WG SAC ¶ 123 "WGCZ reviewed, monitored, and approved incoming videos to determine whether the videos may be posted to channel accounts. Further, WGCZ reviewed videos to confirm whether the video was of adequate quality and length required for a channel account. WGCZ reviewed videos and cautioned that "if you are stealing content, please don't bother. We will verify." However, there is no age or consent verification involved in being granted channel status on the site."); *id*., ¶ 216(h) (The WGCZ Defendants reviewed, monitored, and approved the monetized content, so WGCZ Defendants reviewed, monitored, and approved the CSAM uploaded for monetization purposes"); *id*., ¶ 7 ("The Defendants used words indicative of CSAM to create and develop content on their websites that infers CSAM is present and available for viewing."). Read in context, the *WebGroup* complaint pleads that the *WebGroup* defendants only reviewed those videos that were part of its content-partner program and only to the extent necessary to determine whether the content met the requirements for partner channel accounts. WG SAC ¶¶ 116-119, 123.

In contrast, as this Court acknowledged, plaintiffs plead that MindGeek employees collaborated with the individual posters on each video prior to posting. Specifically, the complaints alleges that MindGeek employees, as a matter of company policy, reviewed each and every video prior to posting, and "themselves optimized and edited the videos to garner more views, including by highlighting content and adding tags known to attract CSAM viewers. . ." Tentative Op. at 12;

SAC ¶¶ 73, 74, 449. MindGeek's formatters also reviewed the videos to scrub information that unequivocally indicated criminality and worked directly with those uploading the content to edit the material. SAC ¶¶ 75, 77; Hr'g Tr. at 10:24-11:11; Tentative Op. at 12.

Accepting these allegations as true as required on this Motion, this Court correctly concluded:

> [T]his isn't just a case of a platform employing content neutral features used by bad actors. Rather, here, Plaintiff claims that MindGeek Defendants intentionally adopted a business model that exacerbated the proliferation of CSAM and other nonconsensual content by, among other means, employing moderators who were purportedly tasked with screening out CSAM and other non consensual content, but instead reviewed, accepted, uploaded, optimized, and monetized videos of Plaintiffs despite knowing or at least in reckless disregarding the fact that Plaintiff was a minor.

Tentative Op. at 35-36.

MindGeek's material contributions to how the content was presented, described, and who it was shown to precludes CDA 230 immunity. *See, e.g., Forrest v. Meta Platforms, Inc.*, 737 F.Supp.3d 808, 818 (N.D. Cal. 2024) (section 230 did not apply where Meta was alleged to have contributed to the production of scam ads through tools that adjusted the appearance and content of ads and optimized those ads to specific audiences); *see also M.L. v. Craigslist Inc.*, 2020 WL 6434845, at *11-12 (W.D. Wash. Apr. 17, 2020) (section 230 did not bar plaintiff's claims where plaintiff alleged traffickers used craigslist rules and guidelines to create content and illicit advertisement, paid craigslist a fee to host the content, and craigslist purposefully made its website easier for traffickers to use) *R. & R. adopted,* 2020 WL 5494903 (W.D. Wash. Sept. 11, 2020).

Additionally, although MindGeek is correct that the content "was illegal the moment it was created" (MindGeek Br. at 1), MindGeek's actions materially contributed to its dissemination, which, as the court pointed out, is itself a separate crime. Hr'g Tr. at 11:6-7. At the very least, Plaintiffs' allegations create a question

of fact concerning the functions and practices of MindGeek's employees prior to upload which requires discovery. *See Forrest*, 737 F.Supp.3d at 815 (on the pleadings, "plaintiffs simply need to plead facts demonstrating a potential factual dispute that could affect whether the defense applies.") (internal citations omitted).

Finally, MindGeek's appeal to the public policy behind Section 230 is unavailing. The "good samaritan" protections of CDA 230 are intended for those ICS who use neutral tools to police content. As described above, MindGeek did not use content neutral tools, and contrary to the purposes of CDA 230, actively encouraged and disseminated illegal content as part of its business model. *See e.g.*, Fleites SAC ¶¶ 56-58, 78-80, 106; K.A. Compl. ¶¶ 59-61, 81-83

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully requests that the Court deny defendants' motions to dismiss.

DATED: April 4, 2025                 Respectfully submitted,

                                     BROWN RUDNICK LLP


                                     By:  */s/ Michael J. Bowe*
                                          Michael J. Bowe (*pro hac vice*)
                                          Lauren Tabaksblat (*pro hac vice*)
                                          Attorneys for Plaintiff
                                          SERENA FLEITES

# CERTIFICATE OF COMPLIANCE

The undersigned counsel of record for plaintiff Serena Fleites certifies that this brief contains less than 40 pages, in accordance with this Court's order (Dkt. 540), permitting 10 pages per issue raised by defendants.

DATED: April 4, 2025                                    By: /s/ *Michael J. Bowe*

PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEFING