# EXHIBIT A

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
RICHARD MUELLER, II, et al.,            :
                                        :
                    Plaintiffs,         :     24cv6225 (DLC)
                                        :
         -v-                            :     OPINION AND
                                        :     ORDER
DEUTSCHE BANK AKTIENGESELLSCHAFT, et    :
al.,                                    :
                                        :
                    Defendants.         :
                                        :
--------------------------------------- X
```

APPEARANCES:

For plaintiffs:
Matthew Jason Fisher
Ryan Robert Sparacino
Eli Johnson Kay-Oliphant
Adam Joshua Goldstein
Sparacino PLLC
1920 L Street, NW
Suite 835
Washington, DC 20036

Matthew Jason Fisher
Sparacino PLLC
150 South Wacker Drive
Suite 2400
Chicago, IL 60606

Scott Hessell
Daniel Shmikler
Sperling Kenny Nachwalter, LLC
321 N. Clark Street, 25th Floor
Chicago, IL 60654

For defendants:
David George Januszewski
Sheila Chithran Ramesh
Sesi V. Garimella

Cahill Gordon & Reindel LLP
32 Old Slip
New York, NY 10005

DENISE COTE, District Judge:

The plaintiffs, family members and estates of people abducted and killed by the terrorist group Islamic State of Iraq and Syria ("ISIS"), have sued Deutsche Bank Aktiengesellschaft ("DBA") and its American affiliate Deutsche Bank Trust Company Americas ("DBTCA"; collectively, "Deutsche Bank") under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a).  The plaintiffs allege that, by providing financial services to customers affiliated with ISIS, the defendants knowingly benefitted from participating in ISIS's human trafficking in violation of the TVPRA.  The defendants have moved to dismiss this claim for lack of personal jurisdiction as to DBA pursuant to Rule 12(b)(2), Fed. R. Civ. P.  They have also moved to dismiss the complaint, as to both defendants, for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6), Fed. R. Civ. P.  For the following reasons, the defendants' motion to dismiss for lack of personal jurisdiction is denied, and their motion to dismiss for failure to state a claim is granted.

## **Background**

The following facts are taken from the complaint.  Only the facts necessary to decide this motion are included.  They are assumed to be true for the purposes of this motion.

A.   ISIS Background

Al-Qaeda-in-Iraq ("AQI") was a terrorist group that from 2003 to 2014 was supported and funded by the Afghanistan- and Pakistan-based leadership of al-Qaeda, an international terrorist organization founded in the 1980s.  In 2013, as AQI expanded into Syria, its leader Abu Bakr al-Baghdadi changed its name to ISIS.  Until February 2014, AQI and ISIS were financially supported by al-Qaeda leadership.  ISIS, like AQI before it, engaged in the widespread and brutal killing of innocent people and other horrific crimes, including abduction, rape, torture, human trafficking, sex trafficking, and forced labor.  Members of both AQI and ISIS abducted hostages, made and distributed videos of them, and tortured, raped, enslaved, and killed them.

B.   Defendants and Their Alleged Involvement

Defendant DBA is a financial institution based in Frankfurt, Germany.  Defendant DBTCA is a New York-based wholly owned subsidiary of DBA that conducts correspondent banking and dollar-clearing operations for clients of DBA and its

affiliates.[1]  DBA relies on DBTCA and DBA's New York branch to provide dollar-clearing services to DBA's customers.

The complaint alleges that the defendants earned commissions, fees, and interest from providing financial services to people and organizations that were assisting or controlled by ISIS.  The provision of these services allowed ISIS to access the legitimate, international financial system and obtain substantial funding (including in U.S. dollars) that it otherwise could not.  This funding supported AQI and ISIS's violent, terroristic activity, including their hostage-taking operations.  Specifically, using its access to the international financial system, ISIS sought and obtained funding to pay for the salaries of fighters holding hostages, bribes and intelligence to prevent the hostages' rescue, transportation of hostages, sustenance for hostages, and equipment for creating propaganda videos involving hostages.  The defendants facilitated funding and access to financial services for AQI and ISIS (either directly, or indirectly through al-Qaeda leadership) in two ways: (a) by allowing the transfer and

---

[1] The complaint defines correspondent banking as "an arrangement under which one bank (correspondent) holds deposits owned by other banks (respondents) and provides payment and other services to those respondent banks."  Those services can include U.S. dollar clearing, or the settling of dollar-denominated transactions on behalf of the respondent bank.

laundering of proceeds from tax fraud schemes and (b) by providing dollar-clearing and other services to banks in areas of Iraq seized and controlled by ISIS ("seized banks").

      1.   VAT Fraud Schemes

     First, the defendants serviced al-Qaeda cells that committed tax fraud to raise funds for al-Qaeda leadership and its clients like AQI and ISIS. Generally, al-Qaeda and its progeny raised money by defrauding European governments that impose value-added taxes ("VAT"). VATs are levied at each point in a supply chain where value is added to a good. Each time a supplier sells a good, it calculates the tax it owes in part by deducting any VAT previously paid by a different supplier for the same product. In one type of VAT fraud scheme, falsified documentation reflecting a series of fake transactions, which purportedly include VAT payments, is used to claim an unwarranted deduction from the government. The complaint describes two cells fundraising for al-Qaeda by committing VAT fraud in Europe.

       i.   Azizi Cell

     One cell was run from the 2000s to 2015 by Samir Azizi, who sent tens of millions of dollars to al-Qaeda. Azizi was a Deutsche Bank customer, holding accounts at its New York, Frankfurt, and London branches that contained proceeds of VAT

fraud. Deutsche Bank's services were valuable to the cell because they legitimized its fraudulent activities, allowed it to transfer money quickly, and minimized signs of money laundering. In the early 2010s, German law enforcement investigated Deutsche Bank for aiding and abetting VAT fraud, and, in 2015, several Deutsche Bank employees were charged and later convicted.

According to the complaint, Deutsche Bank knew or should have known that Azizi was an al-Qaeda agent for four reasons: (a) he was a young Afghan national without a business background; (b) his activities exhibited several indicia of VAT fraud, which was common among terrorist financing schemes; (c) he was operating in Germany and the United Arab Emirates, where al-Qaeda fundraising often took place; and (d) his VAT fraud involved the export of cell phones to Afghanistan, which was doubly helpful for al-Qaeda given its demand for the cell phones themselves. Despite these signs, Deutsche Bank facilitated Azizi's operations from 2007 to 2014 by performing trades, preparing "key documentation," converting funds to U.S. dollars, transferring funds to different accounts, and, through these forms of involvement, making the cell's activities look legitimate. Also, DBA and its affiliates outside the United States used DBTCA and Deutsche Bank's New York branch to process

dollar-denominated transactions, which the Azizi cell used to remit its proceeds to al-Qaeda leadership in laundered U.S. dollars.

ii.  Ahmed Cell

Another al-Qaeda fundraising cell using VAT fraud was run by Imran Yakub Ahmed ("Ahmed cell").  Ahmed exhibited several signs that he was raising funds for al-Qaeda and AQI: (a) he was a Pakistani national without a business background; (b) his transactions exhibited signs of VAT fraud;[2] (c) the Ahmed cell operated in Italy, which was common among al-Qaeda fundraisers; and (d) the Ahmed cell's transactions involved exporting cell phones.  Deutsche Bank facilitated the Ahmed cell's transactions, like the Azizi cell's, by performing trades, preparing key documentation, facilitating the conversion of funds to U.S. dollars, and, through its involvement, making its operations appear legitimate.

2.  Seized Banks

Apart from the VAT fraud cells, Deutsche Bank provided financial services to banks in Iraq located in areas that had

---

[2] For both the Azizi and Ahmed cells, these signs included "the virtually nonexistent public record of the [cells'] companies, the backgrounds of key members of the [cells], the types of transactions, the suspicious nature of the business records and papers furnished by members of the [cells] to Deutsche Bank, and Deutsche Bank's direct communications with the [cells]."

been seized by ISIS.  DBTCA in particular provided U.S. dollar-clearing services for banks under ISIS's control.

As ISIS took over substantial portions of Iraq in and around 2014, it seized control of the banks in those areas, including branches of the Central Bank of Iraq.  ISIS obtained enormous wealth from these seizures.  Because this wealth was denominated in Iraqi currency, the dinar, ISIS needed access to the international finance system to exchange these funds for U.S. dollars in order to spend them more flexibly.  Because the banks it seized had existing correspondent banking relationships with banks in the United States, ISIS was able to engage in dollar-denominated transactions by taking control of those banks, as long as they maintained their correspondent banking relationships.

Attempting to limit ISIS's access to the international financial system, the United States Department of the Treasury, the Central Bank of Iraq, and global financial institutions took steps to limit or suspend correspondent banking relationships with banks seized by ISIS.  From 2013 to 2015, the U.S. Departments of State and Treasury warned financial institutions about the money-laundering and terrorism-financing risks of processing transactions from Iraq and reminded them of their regulatory obligations to detect and report suspicious activity.

8

International bodies such as the Financial Action Task Force and
the United Nations sent similar messages.  The U.S. government,
United Nations, and the news media also issued numerous reports
indicating that ISIS was seeking funding and access to the
banking system to support its hostage-taking activities.

     Deutsche Bank acknowledged these warnings in its
securities filings and incorporated them into its internal
procedures.  Under U.S. law, the defendants were required to
establish a "due diligence program" including controls that were
"reasonably designed" to "detect and report" known or suspected
money laundering activity.  Between 2013 and 2015, Deutsche Bank
publicly stated it had such procedures, that it had trained its
staff on them, that they involved recording detailed information
about each correspondent banking transaction, and that they were
capable of stopping suspicious payments.

     In 2014 and 2015, Deutsche Bank, including DBTCA,
nevertheless processed thousands of transactions, worth around
$3 billion, on behalf of banks in ISIS-controlled areas.[3]  These
transactions were reflected in suspicious activity reports that
Deutsche Bank filed with the U.S. government and that were later
leaked to journalists.  They were routed through DBTCA and other

---

[3] DBTCA may have processed even more transactions for seized
banks, including before 2014.

9

DBA affiliates.  ISIS itself may have used and benefitted from
the seized banks' correspondent banking relationships, as
evidenced by the seized banks' operating in areas that ISIS
controlled and by the volume of dollar-denominated transactions
in which they engaged.  Such a large amount of economic activity
in that region could have been attributable only to ISIS.

Because of Deutsche Bank's anti-money laundering procedures
and internal research operations, its employees may have been
aware of certain suspicious characteristics of transactions
involving seized banks.  Those characteristics included the
conversion of Iraqi dinars into U.S. dollars and the transfer of
large amounts of U.S. dollars into areas of Iraq controlled by
ISIS.  In addition, Deutsche Bank's internal research office was
aware of ISIS's expansion in Iraq and its seizure of banks
there.  To the extent that Deutsche Bank was not aware that
correspondent banking with seized banks would give ISIS access
to the international financial system, its ignorance arose from
a failure to conduct due diligence, weaknesses of its anti-money
laundering procedures, and its failure to act appropriately on
warning signs of suspicious transactions.

C.   The Plaintiffs and this Lawsuit

The plaintiffs in this case are the estates and family
members of three people who were abducted, tortured, and killed

by ISIS.  Kayla Mueller, a humanitarian aid worker, was kidnapped near Aleppo, Syria on August 4, 2013, confined and tortured for nearly two years, and murdered around February 2015.  James Foley, a journalist, was kidnapped on November 22, 2012 near Raqqa, Syria.  ISIS held and tortured him for two years, before murdering him around August 2014.  Steven Sotloff, a journalist, was kidnapped near Aleppo on August 4, 2013.  ISIS tortured and then murdered him around September 2014.

The plaintiffs filed this lawsuit on August 16, 2024, seeking relief under 18 U.S.C. § 1595(a).  The defendants moved to dismiss the complaint on November 1, arguing that DBA is not subject to this Court's personal jurisdiction and that the plaintiffs failed to state a claim as to both defendants.  That motion was fully briefed on February 3, 2025.

## **Discussion**

I.  Personal Jurisdiction

"To defeat a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists."  <u>Okla. Firefighters Pension & Ret. Sys. v. Banco Santander (México) S.A. Institución de Banca Múltiple</u>, 92 F.4th 450, 455-56 (2d Cir. 2024) (citation omitted).  And at this stage, the pleadings must be construed "in the light most favorable to plaintiffs, resolving all doubts in their favor."

11

Id. at 456 (citation omitted).  Courts in New York have jurisdiction "over a foreign defendant for causes of action that arise out of transacting any business within the state, whether in person or through an agent." Spetner v. Palestine Inv. Bank, 70 F.4th 632, 639 (2d Cir. 2023) (citing C.P.L.R. § 302(a)(1)). The defendant's contacts with the state must be purposeful and have a "substantial relationship" with the plaintiff's claim against it, but this "relatively permissive inquiry requires only that at least one element of the claim arises from defendant's New York contacts." Id. at 643 (citation omitted).

In the context of international banking relationships, the Second Circuit has ruled that personal jurisdiction exists both where a foreign bank was alleged to have used its New York correspondent account to transfer dollar-denominated funds to a terrorist organization, Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 169 (2d Cir. 2013), and where a defendant foreign bank held an account with another foreign bank, which itself had correspondent accounts in New York, and where the defendant was alleged to have used those nested correspondent accounts to fund a terrorist group. Spetner, 70 F.4th at 637-38, 643-44.  In sum, "the existence of a correspondence account in New York, without more" does not establish personal jurisdiction, but the "repeated use of a correspondent account in New York on behalf

of a client -- in effect, a course of dealing -- can constitute transacting business for purposes of § 302(a)(1), even if the defendant has no other contacts with the forum." Id. at 639-40 (citation omitted).

Here, the plaintiff's allegation that DBA relies on its agents, DBTCA and its New York branch, to conduct dollar-clearing operations for its customers, is sufficient for personal jurisdiction at this stage. The plaintiff's claim is that DBA participated in ISIS's human trafficking by providing a set of financial services to certain clients. One of those services is dollar-clearing, which DBA offers and, through DBTCA and other affiliates, provides in New York. Like the defendant in Spetner, DBA is alleged to have used correspondent bank accounts in New York for the conduct from which the plaintiff's claim arises. Id. at 637. That DBA used the New York accounts in the sense of directing its clients to them, rather than placing its own money in them, is not material to whether it transacted business here or whether that business activity is connected to the claim. Accepting the complaint's factual allegations as true, DBA's business activity in this district is not "completely unmoored" from the plaintiffs' claim, as it would have to be to dismiss it for lack of personal jurisdiction at this stage. Id. at 644 (citation omitted).

13

DBA's argument to the contrary misstates the standard for finding personal jurisdiction at this juncture and conflates the question whether it is amenable to suit with the question whether the plaintiffs have stated a claim. DBA does not argue that it does not transact business in New York, or that its contacts are "extraneous or coincidental," id. at 640, but rather that the plaintiffs have not alleged a sufficient connection between their TVPRA claim and DBA's conduct here. That argument fails. It relies almost entirely on decisions that preceded Licci and Spetner. And it contradicts the Second Circuit's clarification that New York's long-arm statute "does not require a causal link between the defendant's New York business activity and the plaintiff's injury" but only that "the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim." Licci, 732 F.3d at 168-69 (citation omitted). DBA also argues that the plaintiffs premise jurisdiction entirely on DBA's parent relationship with DBTCA. But construed in the light most favorable to the plaintiffs, the complaint alleges more than that -- that is, that DBA itself worked on behalf of its clients to establish and maintain correspondent banking relationships in New York. Because at this early stage the plaintiffs have alleged the requisite connection between their claim and DBA's contacts with New York,

14

the motion to dismiss the plaintiffs' claims against DBA for lack of personal jurisdiction is denied.

## II. Failure to State a Claim

The defendants also move to dismiss the complaint for failure to state a claim, arguing that the complaint does not sufficiently allege illegal conduct under the TVPRA. That motion is granted.

To survive a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Doe v. Franklin Square Union Free Sch. Dist., 100 F.4th 86, 94 (2d Cir. 2024) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Vengalattore v. Cornell Univ., 36 F.4th 87, 102 (2d Cir. 2022) (quoting Iqbal, 556 U.S. at 678). In determining if a claim is sufficiently plausible, a court must "accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party." Doe, 100 F.4th at 94 (citation omitted). But "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do

15

not suffice." Dane v. UnitedHealthcare Ins. Co., 974 F.3d 183, 189 (2d Cir. 2020) (quoting Iqbal, 556 U.S. at 678).

The TVPRA establishes criminal penalties for involuntary servitude, forced labor, human trafficking, and sex trafficking. 18 U.S.C. §§ 1584, 1589-91.  The TVPRA also provides for a civil remedy:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) . . . .

18 U.S.C. § 1595(a) (emphasis supplied).

Section 1595 does not define participation or "venture," so courts interpreting the provision have looked to the plain meaning of these terms, as identified by dictionary definitions. E.g. Doe 1 v. Apple Inc., 96 F.4th 403, 414-15 (D.C. Cir. 2024). "Venture" means "an undertaking that is dangerous, daring, or of uncertain outcome" or a "business enterprise involving some risk in expectation of gain." Id. at 414 (citation omitted). "Participation" is "taking part or sharing in something." Id. at 415 (citation omitted).  "Participation in a venture" thus means "taking part or sharing in an enterprise or undertaking that involves danger, uncertainty, or risk, and potential gain." Id.

16

To be held liable, the defendant must also have actual or constructive knowledge that the venture in which they participated violated the TVPRA.  Doe #1 v. Red Roof Inns, Inc., 21 F.4th 714, 725 (11th Cir. 2021).  Actual knowledge is "an awareness or understanding of a fact or circumstance," while constructive knowledge is knowledge that "one using reasonable care or diligence should have."  Id. (citation omitted).  In other contexts, the question whether a party "knew or should have known" something has been likened to the issues of foreseeability in tort law and "conscious avoidance" in criminal law.  Gordon v. Softech Int'l, Inc., 726 F.3d 42, 54 & nn. 11-13 (2d Cir. 2013).  "Conscious avoidance" is also known as "willful blindness" and arises where a defendant "consciously avoided learning a fact while aware of a high probability of its existence."  United States v. Graham, 51 F.4th 67, 83-84 (2d Cir. 2022) (citation omitted).

The Court of Appeals for the Second Circuit has not construed the language regarding beneficiary liability,[4] but

---

[4] In cases involving facts similar to this one, the Second Circuit has affirmed the dismissal of claims that banks were secondarily liable for the actions of terrorist groups under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(d)(2).  Freeman v. HSBC Holdings PLC, 57 F.4th 66, 80 (2d Cir. 2023); Honickman v. BLOM Bank SAL, 6 F.4th 487, 501 (2d Cir. 2021); Siegel v. HSBC N. Am. Holdings, Inc., 933 F.3d 217, 225-26 (2d Cir. 2019).  The Circuit reversed such a dismissal where the defendant was alleged to have provided nonroutine services and granted

other Courts of Appeals have described the necessary features of such a claim.  Applying the plain meaning of "venture" and "participation" in Red Roof Inns, Inc., the Eleventh Circuit held that "participation in a venture requires that the [plaintiffs] allege that the [defendants] took part in a common undertaking or enterprise involving risk and potential profit." 21 F.4th at 725.  In G.G. v. Salesforce.com, Inc., 76 F.4th 544 (7th Cir. 2023), the Seventh Circuit reasoned that the defendant's constructive knowledge of its customers' involvement in trafficking could be reasonably inferred from the defendant's repeated consultations with its customer to assess its needs, its development of "targeted solutions" to address them, and its "active, tailored, and ongoing support" of its customers' business.  Id. at 556.  It also found "participation" to have arisen from "a continuous business relationship" and the defendant's "desire to promote the wrongful venture's success." Id. at 559; see also id. at 563-64 (requiring "more than . . . mere passive nonfeasance or an arm's length, passive, and largely indifferent relationship with the criminal" (quoting

---

terrorism-affiliated customers special treatment that violated banking regulations and its own internal policies.  Kaplan v. Lebanese Canadian Bank, SAL, 999 F.3d 842, 858 (2d Cir. 2021). In any event, the ATA's language is different than the TVPRA's, so while this Opinion is consistent with those decisions, it does not rely on them.

18

Twitter, Inc. v. Taamneh, 598 U.S. 471, 500 (2023))).  Last year, in Doe 1 v. Apple Inc., 96 F.4th 403 (D.C. Cir. 2024), the D.C. Circuit held that "taking part or sharing in an enterprise or undertaking that involves danger, uncertainty, or risk, and potential gain" includes "something more than engaging in an ordinary buyer-seller transaction."  Id. at 415.

In their briefing on the defendants' motion, the parties do not dispute that the complaint adequately pleads underlying TVPRA violations committed against the plaintiffs, but they disagree about whether the defendants may be held civilly liable as knowing beneficiaries of participation in a venture that committed those underlying violations.  The defendants posit that the complaint does not sufficiently allege they participated in a venture that they knew or should have known was engaged in human trafficking.  That argument is correct, so the claim is dismissed.

A.   Participation

The complaint does not plausibly allege facts that fit within the contours of the beneficiary claim set forth by the TVPRA.  First, it fails to allege "participation" as required by the TVPRA.  As to both the VAT fraud and seized bank allegations, nothing in the complaint suggests that the defendants provided anything other than routine financial

services to allegedly AQI- or ISIS-connected customers, that the
defendants shared in any common enterprise (and associate risk
or profit) with them, or that they provided services or support
that was tailored to those customers in any way.  Without having
interacted with their allegedly ISIS-connected accountholders
any more or differently than they would with their many other
customers, the defendants cannot be said to have "tak[en] part
or shar[ed] in an enterprise or undertaking" with them.  Apple
Inc., 96 F.4th at 415.

To support their allegations of participation, the
plaintiffs point to a line in the complaint that alleges "[o]n
information and belief" that Deutsche Bank charged higher fees
to ISIS-connected customers because they were suspicious and
high-risk.  Even assuming that is true, it does not mean that
the defendants were engaged in a shared enterprise, or anything
other than a "ordinary buyer-seller transaction" that they also
have with many other parties.  Id.  These factual allegations
are distinguishable from the defendant's alleged conduct in
Salesforce.com, Inc., which included working with its client
over time to assess its needs, develop customized products, and
provide individualized support.  The plaintiffs also argue that
whether financial services are routine is a question of fact,

but the plaintiff still must plead facts about the defendants' conduct that, if proven true, could establish their liability.

B.    Knowledge

Second, the complaint does not plausibly allege that the defendants had actual or constructive knowledge of their customers' involvement in a trafficking venture.  With respect to the VAT fraud schemes, the plaintiffs assert that Azizi and Ahmed had some characteristics that were consistent with VAT fraud and operated in countries where other al-Qaeda fundraisers had done so in the past.  But the TVPRA requires the beneficiary to know its client is engaged in trafficking, not just in any illegal activity.  And even if other regulations require financial institutions to maintain certain controls to detect or prevent money laundering or terrorism financing, the TVPRA itself does not require a company providing generally available services to investigate its customers to ensure they are not indirectly connected to trafficking.[5]  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility

_____

[5] To put a finer point on it, the plaintiffs insist that they "allege that Defendants knew or should have known about <u>specific</u> terrorism and trafficking risks related to particular business practices."  By its terms, the TVPRA requires more than knowledge of risks.

of entitlement to relief." Elias v. Rolling Stone LLC, 872 F.3d
97, 104 (2d Cir. 2017) (quoting Iqbal, 556 U.S. at 678). These
facts do not create a reasonable inference that the defendants
had the knowledge necessary to state a claim of beneficiary
liability.

As for the seized banks, the complaint suggests that the
defendants should have known that servicing any bank in a region
overtaken by ISIS would involve participation in a trafficking
venture. Again, the pleaded facts do not establish more than a
possibility that the defendants should have known they were
participating in a trafficking venture (or indeed that they
actually were).[6] See Iqbal, 556 at 678 (requiring more than a
"sheer possibility that a defendant has acted unlawfully").

The plaintiffs provide no compelling argument to the
contrary. Their brief points to a wide array of facts
suggesting that Deutsche Bank's customers were suspicious, high-
risk, or engaged in illegal activity in general or that was not

_____

[6] The parties disagree about whether beneficiary liability under
the TVPRA requires knowledge of trafficking as to the specific
plaintiffs bringing suit. Compare Red Roof Inns, Inc., 21 F.4th
at 726 (requiring participation in a venture that "violated the
TVPRA as to the plaintiff"), with Salesforce.com, Inc., 76 F.4th
at 558 (holding that TVPRA liability does not require knowledge
of the specific victim). Because the complaint fails to allege
participation in and knowledge of a venture engaged in TVPRA-
prohibited conduct in general, this motion does not require
resolving that question.

22

covered by the TVPRA, such as VAT fraud.  The plaintiffs also emphasize that the defendants were aware or should have been aware of media reports about ISIS's trafficking and other crimes.  But those allegations are inadequate under § 1595(a), which requires the defendant's knowledge or constructive knowledge that its benefactor is involved in certain forms of criminal conduct.  For one illustrative example, the complaint repeatedly refers to the defendants' filing of suspicious activity reports reflecting thousands of transactions involving seized banks.  But the complaint also says that those documents merely reflect "known or suspected violations of law or suspicious activity observed by financial institutions."  That the defendants filed those reports is not sufficient to create a reasonable inference that they knew their clients were involved with human trafficking.

### Conclusion

The defendants' November 1, 2024 motion to dismiss for lack of personal jurisdiction is denied.  Their November 1 motion to dismiss for failure to state a claim is granted.  The Clerk of Court shall enter judgment for the defendants.

Dated:    New York, New York
          April 4, 2025

_____
DENISE COTE
United States District Judge