UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SERENA FLEITES,

          Plaintiff,

v.

MINDGEEK S.A.R.L.; MG FREESITES, LTD; MINDGEEK USA INCORPORATED; MG PREMIUM LTD.; MG GLOBAL ENTERTAINMENT INC.; 9219-1568 Quebec, Inc. (d/b/a MindGeek); BERND BERGMAIR; FERAS ANTOON; DAVID TASSILLO; COREY URMAN; VISA, INC.; COLBECK CAPITAL DOES 1-5; BERGMAIR DOES 1-5,

          Defendants.

Case No. 2:21-CV-04920-WLH-ADS

**ORDER RE BERND BERGMAIR'S MOTION TO DISMISS [433] AND FERAS ANTOON AND DAVID TASSILLO'S MOTION TO DISMISS [436] PLAINTIFF'S SECOND AMENDED COMPLAINT**

      Before the Court is Defendants Bernd Bergmair ("Bergmair"), Feras Antoon ("Antoon"), and David Tassillo's ("Tassillo") (collectively "Moving Individual Defendants") Motions to Dismiss Plaintiff Serena Fleites's ("Plaintiff") Second Amended Complaint ("SAC") ("Motion"). (Bergmair Mot., Docket No. 433; AT Mot., Docket No. 436). The Court heard oral argument on March 7, 2025, and April 24, 2025.

For the reasons set forth below, the Court **GRANTS** Moving Individual Defendants'
Motion to Dismiss with prejudice.

## I.    BACKGROUND

### A. <u>Factual Background</u>

#### 1. <u>Plaintiff Serena Fleites</u>

Plaintiff, who is now at the age of majority, brings this action against the
MindGeek S.A.R.L., MG Freesites, Ltd., MindGeek USA, Inc., MG Premium, Ltd.,
MG Global Entertainment, Inc., 9219-1568 Quebec Inc.'s (the "MindGeek Defendants"
or "MindGeek"); Individual Defendants; Visa, Inc.; Colbeck Capital Management, LLC,
CB Media Ventures DD, LLC, CB Agency Services, LLC, CB Participations SPV, LLC
(the "Colbeck Defendants" or "Colbeck"); and the Redwood Capital Management, LLC,
Redwood Master Fund Ltd., Redwood Opportunity Master Fund, Ltd., Manuel 2018,
LLC, Ginogerum, LLC, White-Hathaway Opportunity Fund, LLC's (the "Redwood
Defendants" or "Redwood") for allegations related to her sex trafficking when she was
a minor.  (SAC, Docket No. 385 ¶ 10).

In 2014, a thirteen-year-old Plaintiff was induced to make a sexually explicit
video by her then high school boyfriend, which he uploaded to Pornhub.com, a
pornography website owned and operated by the MindGeek Defendants, without
Plaintiff's knowledge or consent.  (*Id.* ¶¶ 11, 448).  Plaintiff alleges that a MindGeek
employee reviewed the video of Plaintiff prior to making the video publicly available
on Pornhub, as MindGeek Defendants have repeatedly claimed they do for every video
uploaded to Pornhub, and therefore knew that the video of Plaintiff constituted child
sex abuse material ("CSAM") as her age was apparent, not only from the image itself,
but also from the title "13-Year Old Brunette Shows Off For the Camera."  (*Id.* ¶¶ 448,
449).  Despite having knowledge that the video contained illicit material, Plaintiff
claims that MindGeek posted the video to its Pornhub site consistent with its overall
business model and practice.  (*Id.* ¶ 449).  In addition, MindGeek "categorized, tagged,
optimized for user preferences, and disseminated the images, tags, and video" of

Plaintiff on Pornhub. (*Id.*). Plaintiff alleges that MindGeek also uploaded the optimized video to its other tubesites[1] and incorporated the video into its algorithmic playlists and suggested videos. (*Id.*). MindGeek also placed advertisements alongside the video, through which it earned revenue with every page visit, impression, engagement, and conversion. (*Id.* ¶ 450). By the time Plaintiff discovered the video, the video had already garnered 400,000 views. (*Id.*).

Impersonating her mother, Plaintiff contacted MindGeek to inform that the video of Plaintiff qualified as CSAM. (*Id.* ¶ 451). After two weeks, MindGeek finally responded, acknowledging that the content was CSAM, but took another two weeks to remove the video after continued demands from Plaintiff. (*Id.*). During this time, the video continued to generate views, and MindGeek continued to earn advertising revenue. (*Id.*). In addition, the video was downloaded and reuploaded several times by different users and with different titles, including by MindGeek Defendants.[2] (*Id.* ¶ 452; Opp'n at 47). One of the reuploads had 2.7 million views. (SAC ¶ 452.). Others had hundreds of comments noting that Plaintiff could not be more than a teenager. (*Id.*). Each reuploaded video was reviewed, accepted, tagged, categorized, and optimized by MindGeek. (*Id.*). MindGeek itself even uploaded the video to its other pornographic tubesites. (*Id.*). Every time Plaintiff discovered a reposted video, she would request MindGeek to remove the videos. (*Id.* ¶ 453). Each time, however, MindGeek would ask Plaintiff "to provide photographic proof that she was the child depicted in the video before removing [the videos]" and would take weeks to do so. (*Id.*).

As a result of the viral dissemination of the video, Plaintiff's life spiraled out of control. She was harassed and bullied in school to such a degree that she started skipping school and finally unenrolled to attend courses online. (*Id.* ¶ 455). Plaintiff

---

[1] A tubesite is a website that contains "free user-populated content." (*Id.* ¶ 38).
[2] The claim that MindGeek Defendants reuploaded *Plaintiff*'s videos after they were initially taken down was not expressly alleged in the SAC. Plaintiff, however, clarifies this point in her Opposition. (Opp'n at 14, 47, 51).

1   did not tell her mother about the video, and so her relationship with her mother became

2   strained, as her mother did not know why her daughter had suddenly begun to skip

3   classes. (*Id.*). This led to Plaintiff leaving her mother's home to move in with her sister.

4   (*Id.*). A year later, she moved back in with her mother, whereafter she attempted to

5   hang herself, only to be stopped by her younger sister and her mother's boyfriend "who

6   removed the power cord from her neck." (*Id.* ¶ 456.) Plaintiff was admitted to a mental

7   health facility in Bakersfield. (*Id.*) She would attempt suicide several times in the

8   ensuing years. (*Id.* ¶ 260).

9       Not wanting to face her family after the first suicide attempt, Plaintiff moved in

10  with a friend. (*Id.* ¶ 457). At her friend's house, an older man introduced Plaintiff to

11  heroin, to which Plaintiff became addicted. (*Id.*) To fund her heroin addiction,

12  Plaintiff—still a minor at this point—created sexually explicit videos at the older man's

13  behest, who in turn sold the videos on Craigslist and Kik app. (*Id.*) Some of the videos

14  were then uploaded to Pornhub and were still available on the website as recently as

15  June 2020. (*Id.* ¶ 458). One of the videos was titled "Teen F*cks Guy In Car," and had

16  a user tag that she was underage. (*Id.*) Some videos even had comments about

17  Plaintiff's young age, such as "she looks like she's f*cking 12," "And she is 13?!," "she

18  dadass looks no older than 16," "sh look s like she's 16." (*Id.*). Plaintiff alleges that

19  MindGeek nevertheless reviewed, accepted, optimized, categorized, tagged the videos;

20  incorporated the videos into its algorithmic playlists and suggestions; uploaded the

21  videos to its other tubesites; and placed ads alongside the videos through which

22  MindGeek earned revenue. (*Id.*). While MindGeek profited from the CSAM featuring

23  Plaintiff, Plaintiff was intermittently homeless or living in her car, addicted to heroin,

24  depressed and suicidal, and without the support of her family. (*Id.* ¶ 460.)

25              2. MindGeek's Business Practices and Business Model

26      From 2013 to 2023, MindGeek was the dominant online pornography company

27  in the world. (*Id.* ¶ 2). MindGeek operates several pornographic websites which

28  generally fall into two general categories: (1) free "tubesites" that contain free,

4

purportedly user populated content and (2) premium "paysites" where it sells content, services, and merchandises. (*Id.* ¶ 38).

MindGeek's business model is predicated on maximizing views and driving traffic to its sites. (*Id.* ¶ 44). Traffic and content are crucial in MindGeek's business model because greater traffic and content directly correlate to greater profit through: (1) garnering and driving more traffic to MindGeek and third-party "premium" paysites or services; (2) selling ad space on free sites for the services or products of third parties, which generates revenue with every visit, impression, engagement, and conversion; (3) selling the data of persons who use the free sites; and (4) harvesting data to optimize their website content and become the top result for queries on search engine like Google, which further drive traffic and content. (*Id.* ¶¶ 44–45, 450). In other words, MindGeek is incentivized to have more content and drive traffic to maximize its profit.

The "gold standard" for generating traffic and obtaining content is to be the top result for queries on search engines like Google, which can be accomplished through Search Engine Optimization ("SEO"). (*Id.* ¶ 45). SEO "is the science of optimizing a website's ability to garner top search rankings and depends on many factors, but most prominently, content volume, how well that content is described in detail, the website's ability to capture and analyze user interactions and preferences, and traffic." (*Id.*). In service of its SEO, MindGeek proactively helps users with messaging and content development to enhance the video or image's ability to grab attention. (*Id.* ¶ 40). For example, MindGeek provides instructions on "how to succeed" and maximize attention with suggested titles, descriptions and categories that MindGeek's SEO analysis has determined most effectively draw attention to particular types of content and better reach their intended audience. (*Id.*). MindGeek's goes even further by having its own formatters review and modify the presentation of the videos and images as they deem appropriate, including the titles, tags and categories, as well as the videos themselves. (*Id.*). MindGeek combines posted content with other, similarly described content and recommends it to users in the form of proposed searches or playlists to further drive

attention and traffic. (*Id.*). Finally, MindGeek itself uploads content to its other websites, at times as a matter of course.  (*Id.* ¶ 43).

Disturbingly, CSAM drives web traffic.  In 2020, the National Center for Missing and Exploited Children ("NCMEC") produced a report describing the "insatiable demand" for CSAM between 1998 to 2019, with 8.4 million such videos posted online in 2018. (*Id.* ¶ 54).  The same is true for other forms of nonconsensual content including adult sex trafficking, rape and revenge porn.  (*Id.*).  Plaintiff alleges victims, employees, advocacy groups, law enforcement, press reports, and government agencies have all made MindGeek Defendants aware that CSAM and other nonconsensual materials appear on their platforms.  (*See, e.g.*, ¶¶ 99–101, 154–155, 197).  For example, a 2020 *New York Times* article exposed how "modest investigatory efforts easily revealed" that PornHub was "infested" with videos depicting "child abuse and nonconsensual violence."  (*Id.* ¶ 307).

Despite being aware the ubiquitousness of CSAM and other nonconsensual content on its sites, MindGeek maintained what Plaintiff describes as an "unrestricted content" business model to feed MindGeek's "singular priority of using SEO to be the top search engine website result in any porn related search." (*Id.* ¶¶ 56, 57, 110).  Under this model, MindGeek allegedly "knowingly and intentionally solicited, optimized, and commercialized content of any kind, including child pornography and other nonconsensual content, and avoided any policy, process, or technology that would exclude illegal content or limit or even slow the upload of content generally to its websites." (*Id.* ¶ 57).  Specifically, Plaintiff claims that MindGeek achieved this through three knowing and intentional practices.  (*Id.* ¶ 58).

First, MindGeek systematically ignored the laws in the jurisdictions in which it did business by setting up "shifting, opaque, and Byzantine international corporate structure" which "obscured MindGeek's ownership and operation" in jurisdictions that are known to be "havens" for tax evasion, money laundering, and with weak laws and enforcement related to pornography.  (*Id.* ¶ 58–66).

Second, MindGeek knowingly and intentionally created a faux "moderation" process that was "hopelessly under-staffed [and] under-resourced," which consisted of an exclusively human moderation team of no more than 30 untrained, minimum wage contractors in Cypress to review 700-1200 videos a day. (*Id.* ¶¶ 58, 67, 73). Even worse, this team was not only understaffed, but also perversely incentivized: they were offered bonuses that depended on the number of videos they *approved* for upload. (*Id.* ¶ 79 (emphasis in the original)). Thus, despite touting that every video was reviewed and screened by a moderator prior to it being available on MindGeek's website, (*Id.* ¶¶ 67-80, 103, 471), these so-called moderators were not actually tasked with excluding CSAM and other nonconsensual content but rather proactively attracting, optimizing, and monetizing it, while also masking it from authorities by "'scrubb[ing]' words in the titles and tags that unequivocally indicated criminality." (*Id.* ¶¶ 58, 74–77). In other words, while providing a "public veneer of legality," the real goal for these moderators was to let as much content as possible go through, including CSAM and nonconsensual materials, to maximize revenue. (*Id.* ¶ 79, 101).

Consequently, Plaintiff alleges that MindGeek never verified the age, identity, and the consensual nature of the videos uploaded onto their sites. (*Id.* ¶¶ 205, 295, 297). They also clearly underreported CSAM to NCMEC. (*Id.* ¶ 99–100). Until 2020, MindGeek purportedly never voluntarily made a single legally required disclosure to authorities in the United States or Canada. (*Id.* ¶ 99).

With little policing done by MindGeek, it was largely up to the victims to flag, report, and request takedown of illicit content to MindGeek. These victims, however, were often met with delay tactics and/or stonewalling, especially if the content sought to be removed was "performing well." (*Id.* ¶ 88). The delay would permit MindGeek to preserve the use of content as long as possible so that it could continue analyzing a well performing, albeit illegal, video so that MindGeek could refine its algorithms to push similar content. (*Id.*). If and when the illegal videos were successfully removed, MindGeek only disabled the video but kept the webpage with its title, description, tags,

7

and comments to that video so that it would still continue to increase its SEO and users
searching for such content could be directed to similar content that were not disabled.
(*Id.* ¶¶ 90, 96). Moreover, because MindGeek's website allowed users to download
videos, removed videos were often reuploaded, requiring victims to constantly monitor
for a reposting of their videos. (*Id.* ¶ 137). Perhaps, most disturbingly, Plaintiff alleges
that MindGeek systematically and surreptitiously reuploaded removed content that it
had been forced to disable. (*Id.* ¶ 97).

Third, MindGeek proactively used its extensive SEO technology to curate CSAM
and other nonconsensual content by further "optimizing" its descriptions, tags, titles and
video formats and arranging recommended searches to find, and curate playlists of, such
content, even though it had the capability and the technology to exclude nonconsensual
or other banned content. (*Id.* ¶¶ 58–59, 67–68, 106–107). For example, MindGeek
directed users to use up to 16 tags that describe the video and performers; select up to 8
relevant categories, and where applicable, use niche specific categories to ensure the
content would reach the "right" fans; and write creative titles that described the scene.
(*Id.* ¶ 114). Amongst the "preexisting" categories that a user could select for a video
were categories such as "teen," "school," "babysitter," and "old/young"—all categories
that purportedly targeted views who are interested in CSAM. (*Id.* ¶¶ 113–114). And
on the page explaining the video categories, MindGeek represented that "Teen" is one
of the most popular categories. (*Id.*).

In addition to providing guidance to the users, MindGeek's own formatters added
and edited content, including the tags and categories. (*Id.* ¶ 115). They would also
create a graph or timeline underneath the videos to help viewers identify and quickly
advance to various levels of sexual activity within the video. (*Id.* ¶ 116). They also
created thumbnails for the videos on MindGeek's tubesites, some of which were created
from CSAM videos. (*Id.* ¶ 118). To reach their intended audience, MindGeek would
edit advertisements on its websites to frequently highlight terms such as "girls," "boys,"
"broken teens," and "twink," which are terms that promote the creation, use and viewing

8

of CSAM and "encouraged for use by MindGeek." (*Id.* ¶ 120). MindGeek's platforms even allowed advertisers to build campaigns around keywords like "13yearoldteen" and "not18"; indeed, they were even allowed to target ads to people searching the term "child rape" in languages other than English. (*Id.* ¶ 121). The result meant that MindGeek would retain its position as the top search result for all porn searches, including CSAM and nonconsensual content. (*Id.* ¶ 123). Accordingly, Plaintiff alleges that MindGeek's sites contain a trove of obvious and easily accessible CSAM. Plaintiff alleges that "in just few minutes of basic searches, users" could seemingly find countless videos clearly depicting child sexual assault or exploitation, where titles, descriptions, and tags bluntly describe the illicit nature of the videos. (*Id.* ¶ 125.)

### 3. Moving Individual Defendants

#### a. Bernd Bergmair

Defendant Bergmair is a resident of Hong Kong, China, and was the majority owner of MindGeek until 2023 when he sold his interest in MindGeek to a private equity firm, Ethical Capital Partners. (SAC at 1 n.1, ¶ 17). Prior to investing in MindGeek, Bergmair owned a porn website called Redtube, which was a competitor of Pornhub. (*Id.* ¶ 150). According to Plaintiff, Bergmair had adopted the same "unrestricted content" model when running Redtube's business. (*Id.*). In 2013, Bergmair was approached by Colbeck, Antoon and Tassillo to invest in MindGeek. (*Id.* ¶ 257). Bergmair agreed to invest in MindGeek through a series of Special Purpose Vehicles ("SPVs"), and as part of the MindGeek acquisition, Bergmair "contributed all of Redtube's business and assets as well as cash, with a collective value of $300 million, in exchange for a 59% ownership interest in the combined business of MindGeek." (*Id.* ¶¶ 150, 256–259, 374–375).

Plaintiff states that Bergmair was aware that the "unrestricted content" model necessarily resulted in a proliferation of CSAM and nonconsensual content on MindGeek platforms. (*Id.* ¶ 152). He was kept abreast of complaints, questions and concerns from employees as well as the hundreds of reports from law enforcement,

9

1   advocacy groups, victims, government agencies, the press and website users that Illegal
2   content was "ubiquitous" on MindGeek's websites. (*Id.* ¶¶ 154–55). Yet, Plaintiff
3   claims that Bergmair, while never holding a formal executive or employee position at
4   any of MindGeek entities, "actually exercised ultimate control over all such entities and
5   their collective business," including MindGeek's continued use of the "unrestricted
6   content" model. (*Id.* ¶¶ 17, 150, 375). In other words, according to Plaintiff, Bergmair
7   was MindGeek's "alter ego." (*Id.* ¶ 17).

8          Specifically, Plaintiff alleges that Bergmair spoke "virtually everyday" with
9   Antoon, the CEO of 9219-1568 Quebec, Inc. ("MindGeek Canada"), about the business,
10  and in turn, Antoon "took direction from [Bergmair] as the majority owner and ultimate
11  decision maker on all material matters, including their practices with respect to [CSAM]
12  and other nonconsensual content." (*Id.* ¶ 157). For example, Bergmair spoke
13  "'regularly' with Antoon regarding "strategic, governance, and operational decisions,
14  including decisions about acquisitions, executive hiring, firing, [] salaries, and business
15  strategies and policies" (*id.* ¶¶ 382, 393); approved significant corporate acquisitions
16  and contracts (*id.* ¶ 382); attended MindGeek's board calls and quarterly and annual
17  meetings (*id.* ¶¶ 157, 386–388); and attended several "critical annual industry events"
18  and "one-on-one" business meetings where Bergmair represented himself as
19  MindGeek's chairman. (*Id.* ¶¶ 391–92). In addition, Plaintiff claims that Bergmair was
20  involved in the decision to actively conceal MindGeek's business model and how it was
21  contributing to the flood of CSAM and nonconsensual content on MindGeek's platform
22  through an "aggressive and sustained disinformation campaign" that misrepresented
23  MindGeek's moderation capabilities—or the lack thereof—rather than address the
24  underlying issues. (*Id.* ¶¶ 198–244).

25                          *b.  Feras Antoon and David Tassillo*

26         Feras Antoon and David Tassillo are residents of Canada and were the minority
27  owners of MindGeek until 2023 when they sold their interest in MindGeek to a private
28  equity firm, Ethical Capital Partners. (*Id.* at 1 n.1, ¶¶ 18–19). Both Antoon and Tassillo

both previously worked at a predecessor corporation, Manwin, which became MindGeek in 2013. (*Id.* ¶ 151).    In 2013, Antoon and Tassillo increased their investment in MindGeek and together owned 31% of MindGeek's shares through a series of SPVs. (*Id.* ¶¶ 258, 375, 377). At this time, they also became CEO and COO of MindGeek Canada as well as the alleged *de facto* CEO and COO of all of the MindGeek entities, respectively. (*Id.* ¶¶ 18–19). Accordingly, Antoon and Tassillo held themselves out to be CEO and COO of the entire MindGeek organization in every public facing document. (Opp'n at 69 (citing Ex. 17 at § 4.8)). As *de facto* CEO and COO of the MindGeek entities, Plaintiff alleges that Antoon and Tassillo were "alter egos" to MindGeek and "exercised control over all [MindGeek] entities and their collective businesses, including being aware of, endorsing, and implementing illegal activities" at issue in this suit. (*Id.* ¶¶ 18–19).

Plaintiff claims that while Antoon and Tassillo were running MindGeek predecessor Manwin, they employed the same "unrestricted content model" which necessarily embraced CSAM and other nonconsensual content. (*Id.* ¶ 151). As with Bergmair, Antoon and Tassillo were aware that MindGeek platforms were rife with illicit content through complaints, questions and concerns from employees as well as the hundreds of reports from law enforcement, advocacy groups, victims, government agencies, the press, and website users. (*Id.* ¶¶ 154–55). Moreover, both Antoon and Tassillo closely monitored such reports. (*Id.* ¶¶ 158, 197). Nevertheless, despite knowing that the business model that they adopted proactively monetized CSAM and other nonconsensual content, not only did Antoon and Tassillo agree to continue the model when Manwin became MindGeek in 2013, but they also took steps to conceal MindGeek's illicit business model by repeatedly lying to the public that MindGeek had adequate moderation processes and that it was unequivocally committed to combating CSAM and illegal materials. (*Id.* ¶¶ 151, 198–244). Furthermore, Antoon and Tassillo, as CEO and COO, "handl[ed] the direct day-to-day implementation" of the operation of MindGeek and its "unrestricted content" business model. (*Id.* ¶¶ 109, 324). They,

along with Bergmair, made the "business' strategic, operational, and policy decisions, including on things as fundamental as salaries and business plans." (*Id.* ¶ 387). They attended quarterly and annual meetings "at which the strategic, operational, and policy decisions for the entire integrated enterprise were made." (*Id.* ¶ 388; Opp'n at 68). In addition, they personally appointed all directors and managers of the MindGeek entities and attended critical annual industry events. (*Id.* ¶¶ 380, 391).

### B. **Procedural Background**

On June 17, 2021, named Plaintiff Serena Fleites ("Plaintiff" or "Plaintiff Fleites") and Plaintiffs Jane Does No. 1 through 33 filed this action bringing numerous causes of actions against Defendants MindGeek S.A.R.L., MG Freesites, Ltd., MindGeek USA, Inc., MG Premium, Ltd., RK Holdings USA, Inc., MG Global Entertainment, Inc., TrafficJunky, Inc., Bernd Bergmair, Feras Antoon, David Tassillo, Corey Urman, Visa, Inc., Colbeck Capital unnamed does 1 through 10, and Bergmair unnamed does 1 through 10. (Compl., Docket No. 1). On February 10, 2022, the Court granted Defendants' motion to sever Plaintiffs and ordered Plaintiff Fleites to file a First Amended Complaint ("FAC") with her continuing as the only named plaintiff in this action and dismissed Plaintiffs Jane Does No. 1 through 33 without prejudice. (Docket No. 119). On March 21, 2022, Plaintiff filed a FAC consistent with the Court's February 10, 2022, order. (FAC, Docket No. 124, Ex. 124-3). On May 23, 2022, Defendants filed motions to dismiss Plaintiff's FAC. (Docket Nos. 135–140). On July 29, 2022, Judge Carney granted in part and denied in part Visa's motion to dismiss Plaintiff's First Amended Complaint. (FAC Visa Order, Docket No. 166). Judge Carney also ordered the MindGeek Defendants and the Moving Individual Defendants to submit to jurisdictional discovery and granted Plaintiff leave to amend her complaint after jurisdictional discovery was complete. (FAC MindGeek Order, Docket No. 167). Specifically, Judge Carney noted that that Plaintiff's FAC suffered from a "group-pleading problem" as Plaintiff listed "*each* MindGeek Moving Individual Defendants as responsible for a policy or practice each time she identifies the pernicious policy or

practice" and her allegations supporting her alter ego theory were "conclusory, vague, and indeed, quite difficult to follow at times." (*Id.* at 5–6 (emphasis in the original)). Given that the Moving Individual Defendants, however, failed to rebut these allegations through any declarations, Judge Carney denied the MindGeek Defendants and the Moving Individual Defendants' motions to dismiss in light of the "near certainty that Plaintiff will file a Second Amended Complaint at the close of jurisdictional discovery." (*Id.* at 8).

On May 23, 2024, Plaintiff filed her Second Amended Complaint. (SAC, Docket. No. 385). On August 30, 2024, the Moving Individual Defendants filed a Motion to Dismiss Plaintiff's SAC. (Docket Nos. 433, 436). On October 31, 2024, Plaintiff filed an Omnibus Opposition to Defendants' Motions to Dismiss, including MindGeek's Motions to Dismiss (Opp'n, Docket No. 477), to which the Moving Individual Defendants filed a reply on December 6, 2024. (Bergmair Reply, Docket No. 499; AT Reply, Docket No. 491).

On March 7, 2025, the Court heard oral arguments from all parties. At the hearing, Plaintiff raised for the first time certain arguments and case law with respect to the personal jurisdiction issue over MindGeek S.a.r.l. and the Moving Individual Defendants. The Court allowed for supplemental briefing on the issue. On March 21, 2025, the Moving Individual Defendants filed a Supplemental Brief to their Motions to Dismiss, (Suppl. Br., Docket No. 550), to which Plaintiff filed a reply on April 4, 2025. (Docket No. 573). The Court heard oral argument on March 7, 2025, and April 24, 2025. The matter is considered fully briefed.

## II.   DISCUSSION

Plaintiff, in her SAC, alleges three causes of action against the Moving Individual Defendants: (1) conspiracy to violate the TVPRA pursuant to 18 U.S.C. §§ 1594(c), 1595 (Count IV); (2) violation of the UCL and FAL under the Cal. Bus. & Prof. Code §§ 17200 and 17500 (Count XIV); and (3) violation of civil conspiracy (Count XVI). (SAC at 155–56, 166–71). The Moving Individual Defendants advance multiple

grounds for dismissal under Rule 12(b)(2) for lack of personal jurisdiction and Rule 12(b)(6) for failure to state a claim.  Because the Court finds that it does not have a personal jurisdiction over any of the Individual Defendants, the Court need only address the first challenge.

### A. <u>Legal Standard</u>

Under Rule 12(b)(2), "[w]hen a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction." *In re W. States Wholesale Nat. Gas Antitrust Litig. (Western States)*, 715 F.3d 716, 741 (9th Cir. 2013).  To overcome a motion to dismiss for lack of personal jurisdiction based on written materials rather than an evidentiary hearing, the plaintiff need only make a *prima facie* showing of jurisdictional facts.  *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1207 (9th Cir. 2020); *see Bauman v. Daimler Chrysler Corp.*, 644 F.3d 909, 913-14 n.7 (9th Cir. 2011) (applying *prima facie* standard for personal-jurisdiction allegations even after jurisdictional discovery).  This standard, however, "is not toothless," and a plaintiff "cannot simply rest on the bare allegations of its complaint."  *In re Boon Global Ltd.*, 923 F.3d 643, 650 (9th Cir. 2019).  Although "uncontroverted allegations in the complaint must be taken as true" and "[c]onflicts between parties over statements contained in affidavits must be resolved in [Plaintiff's] favor," *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004), disputed allegations in the complaint that are not supported with evidence or affidavits cannot establish jurisdiction, *see In re Boon Glob. Ltd.*, 923 F.3d at 650; *see also Chem Lab Products, Inc. v. Stepanek*, 554 F.2d 371, 372 (9th Cir. 1977) ) ("Mere allegations of a complaint, when contradicted by affidavits, are not enough to confer personal jurisdiction over a non-resident defendant.").

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons."  *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014).  "Because 'California's long-arm statute allows the exercise of personal jurisdiction to the full extent permissible under the U.S. Constitution,' our inquiry centers on whether

exercising jurisdiction comports with [constitutional] due process." *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015); *see* Cal. Code Civ. Proc. § 410.10 ("A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States.").

"Federal due process permits a court to exercise personal jurisdiction over a nonresident defendant if that defendant has at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1106 (9th Cir. 2020) (quoting *Schwarzenegger*, 374 F.3d at 801) (quotation marks omitted). The Supreme Court has recognized two types of personal jurisdiction: "'general' (sometimes called 'all-purpose') jurisdiction and 'specific' (sometimes called 'case-linked') jurisdiction." *Bristol-Myers Squibb Co. v. Super. Ct.*, 582 U.S. 255, 262 (2017). To be subject to general personal jurisdiction, the defendant's contacts with the forum must be so continuous and systematic as to render it "essentially at home" in the forum state and amenable to any suit there. *Glob. Commodities Trading Grp.*, 972 F.3d at 1106. The "paradigmatic locations" where a corporation is at home is in the state where it is incorporated and where it has its principal place of business. *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1069 (9th Cir. 2015). Given that Plaintiff acknowledges that the Moving Individual Defendants are residents of Hong Kong and Canada (SAC ¶¶ 17–19), the question before this Court is whether there is specific jurisdiction over the Moving Individual Defendants.

A court may exercise specific jurisdiction over "issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). The Ninth Circuit has established a three-part test for determining specific jurisdiction: (1) the defendant must purposefully avail himself of the privilege of conducting activities in the forum and invoking the benefits and protections of its laws; (2) the claim must arise out of or result from the defendant's forum-related activities; and (3) exercise of jurisdiction must be

1   reasonable. *Rano v. Sipa Press, Inc.*, 987 F.2d 580, 588 (9th Cir. 1993); *see also Burger*

2   *King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985). The party asserting jurisdiction

3   bears the burden of satisfying the first two prongs of this test. *Schwarzenegger*, 374

4   F.3d at 802. If it does so, then the burden shifts to the party contesting jurisdiction to

5   "present a compelling case" that the third prong of reasonableness has not been satisfied.

6   *Id.*

7       The Moving Individual Defendants each argue that Plaintiff has failed to

8   establish the first prong—purposeful availment—of the test. (Berg. Mot. at 11–13; AT

9   Mot. at 15–16). When assessing the first prong, courts generally apply either a

10  "purposeful availment" or "purposeful direction" test. *Glob. Commodities Trading*

11  *Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir. 2020).

12  "Purposeful availment generally provides a more useful frame of analysis for claims

13  sounding in contract, while purposeful direction is often the better approach for

14  analyzing claims in tort." *Id.* at 1107. The "purposeful direction" test "inquire[s]

15  whether a defendant 'purposefully direct[s] his activities' at the forum state, applying

16  an 'effects' test that focuses on the forum in which the defendant's actions were felt,

17  whether or not the actions themselves occurred within the forum." *Yahoo! Inc. v. La*

18  *Ligue Contre Le Racisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (en banc).

19      The Ninth Circuit applies a three-part "effects" test derived from *Calder v. Jones*,

20  465 U.S. 783 (1984) to determine in tort claims whether the first prong of the specific

21  jurisdiction analysis is met. "Under this test, a defendant purposefully directed his

22  activities at the forum if he: (1) committed an intentional act, (2) expressly aimed at the

23  forum state, (3) causing harm that the defendant knows is likely to be suffered in the

24  forum state." *Picot*, 780 F.3d at 1214 (internal quotation marks and citations omitted).

25  "In applying this test, we must look to the defendant's contacts with the forum State

26  itself, not the defendant's contacts with persons who reside there." *Id.* (internal

27  quotation marks and citation omitted).

28

1    As the Moving Individual Defendants note, Plaintiff's SAC does not provide any

2 specific factual allegations as to actions that the Moving Individual Defendants

3 specifically took that were expressly aimed at the forum state.  And Plaintiff's general

4 claim that all defendants "directed their activities at United States citizens and

5 California residents"[3] (SAC ¶ 30) are too conclusory and therefore insufficient to

6 invoke personal jurisdiction.  *SEC v. Jammin Java Corp.*, No. 2:15-CV-08921 (SVW)

7 (MRW), 2016 WL 6595133, at *11 (C.D. Cal. July 18, 2016).   Moreover, Plaintiff's

8 SAC suffers from the same group pleading problem that Judge Carney noted in his FAC

9 MindGeek Order.  While Plaintiff does vaguely assert that the Moving Individual

10 Defendants adopted an "unrestricted content" model business that was the driving force

11 behind the alleged criminal policies and practices, Plaintiff again "lists *each* MindGeek

12 Individual Defendant as responsible for a policy or practice."  (FAC MindGeek Order

13 at 5 (emphasis in the original)).   Thus, it remains unclear as to which Individual

14 Defendant, if any, bears the responsibility for the specific policies and practices—such

15 as the practice of MindGeek moderator reviewing, editing, optimizing, scrubbing,

16 uploading, and reuploading illicit videos—that are at the center of Plaintiff's causes of

17 actions.  Rather, it appears from Plaintiff's SAC that Plaintiff seeks to reach the Moving

18 Individual Defendants by imputing the contacts of the defendants that do not contest

19 personal jurisdiction ("Non-contesting Defendants") on an alter ego theory.  (*See, e.g.*,

20 SAC ¶¶ 17–19).

21    "Under the fiduciary shield doctrine, a person's mere association with a

22 corporation that causes injury in the forum state is not sufficient in itself to permit that

23 forum to assert jurisdiction over the person."  *Davis v. Metro Prods., Inc.*, 885 F.2d 515,

---

[3] The Court is aware that on April 21, 2025, the Ninth Circuit filed its *en banc* opinion
in *Briskin v. Shopify Inc.*, 135 F.4th 739 (9th Cir. 2025) (*en banc*).  The Ninth Circuit
held in *Briskin* that Shopify could escape the exercise of personal jurisdiction in
federal court in California where it directs its conduct at all fora, including California,
equally.  The Court finds this holding inapposite here because the SAC provides no
specific factual allegations as to conduct directed by the Moving Individual
Defendants toward the United States, much less to California specifically.

520 (9th Cir. 1989). As the Ninth Circuit recently reiterated, "[a] basic tenet of American corporate law is that the corporation and its shareholders are distinct entities." *Ranza v. Nike, Inc*., 793 F.3d 1059, 1070 (9th Cir. 2015) (quoting *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003)). In "rare" circumstances, however, the Court may pierce the corporate veil to impute liability from one entity to another. *Dole Food Co.*, 538 U.S. at 475 (2003); *Ranza,* 793 F.3d at 1071. To do so, however, the party "accusing another of an alter ego relationship carries a high burden." *Incipio, LLC v. Argento Sc By Sicura Inc*., No. SACV1701974AGKESX, 2018 WL 4945002, at *2 (C.D. Cal. July 18, 2018) (citing *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd*., 328 F.3d 1122, 1134 (9th Cir. 2003)).

To make a *prima facie* showing of an alter ego relationship, a plaintiff must plausibly allege "(1) that there is such unity of interest and ownership that the separate personalities of [the entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice." *Unocal*, 248 F.3d at 926 (alterations in original) (quoting *AT & T Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 (9th Cir.1996)). The "unity of interest and ownership" prong of the alter ego doctrine requires Plaintiff to show that the relevant individual controls the company "to such a degree as to render the latter the mere instrumentality of the former." *See Boon Glob.*, 923 F.3d at 653 & n.4 (quoting *Ranza*, 793 F.3d at 1073) (internal quotation marks omitted). This test envisions pervasive control over the subsidiary, such as when an individual "dictates every facet of the subsidiary's business—from broad policy decisions to routine matters of day-to-day operation." *Id.* (internal quotation marks omitted). Total ownership and shared management personnel are alone insufficient to establish the requisite level of control. *See Harris Rutsky,* 328 F.3d at 1135. As to the second prong, Plaintiff must show that an individual used the corporate form "unjustly and in derogation of the plaintiff's interest." *Butler v. Adoption Media, LLC*, 486 F. Supp. 2d 1022 (N.D. Cal. 2007) (quoting *Mesler v. Bragg Mgmt. Co*., 39 Cal.3d 290, 300 (1985)).

1    **B. <u>Analysis</u>**

2        The Moving Individual Defendants argue that Plaintiff cannot carry her "high

3    burden" to pierce the corporate veil because she fails to establish that there is a

4    cognizable fraud or injustice.  The Court agrees.

5        "In almost every instance where a plaintiff has attempted to invoke the [alter ego]

6    doctrine [s]he is an unsatisfied creditor*." Perfect 10, Inc. v. Giganews, Inc*., No. 2:11-

7    CV-07098 (AB) (JPR), 2015 WL 12710753, at *3 (C.D. Cal. June 3, 2015), aff'd, 847

8    F.3d 357 (9th Cir. 2017) (citations omitted).  "[M]ere '[d]ifficulty in enforcing a

9    judgment or collecting a debt, [however], does not satisfy' the injustice standard for

10   alter ego liability." *Perfect 10, Inc. v. Giganews, Inc*., 847 F.3d 657, 677 (9th Cir. 2017).

11   For "insolvency or inadequate capitalization [to] satisfy this standard," a plaintiff must

12   show that the corporation is "so undercapitalized that it is unable to meet debts that may

13   reasonably be expected to arise in the normal course of business."  *Id.*  Plaintiff here,

14   however, does not allege, that the Non-contesting Defendants are undercapitalized such

15   that she cannot seek redress from them.  *See Boeing Co. v. KB Yuzhnoye*, No. 2:13-CV-

16   00730 (AB) (AJW), 2016 WL 2851297, at *25 (C.D. Cal. May 13, 2016)

17   ("Undercapitalization and insolvency are the most relevant factors in determining

18   whether the corporation was established to defraud its creditors or [some] other

19   improper purpose such as avoiding the risks known to be attendant to a type of business."

20   (citation omitted)).

21       Rather, the SAC's allegations support the opposite inference: that the Non-

22   contesting Defendants were (and are) well-capitalized.  (*See, e.g*., SAC ¶¶ 1 n.1, 406,

23   352 (alleging an investor paid $300 million for an equity interest in the company in

24   2013 and that the company was sold in 2023 to a third party for $402 million); *Id.* ¶¶ 495,

25   270 (alleging that the company had fully secured financing for over a decade); *Id.* ¶¶ 2,

26   6, 34 (alleging MindGeek is "the dominant, monopolistic" company in an almost $100

27   billion market)).  In her Opposition, Plaintiff attempts to address this issue by claiming,

28   without any cite to affidavit or evidence, that the $400 million purchase is nothing but

a "pretextual 'sale' to avoid personal responsibility while siphoning off the economics still in the business for themselves," and Defendants failed to produce any evidence of their solvency. (Opp'n at 83–84). These statements, however, amount to nothing more than conclusory allegations that are directly contradicted by evidence and affidavits Defendants produced as part of jurisdictional discovery.

For example, Defendants submitted a share purchase agreement memorializing the terms of the sale of MindGeek. (*See* White Decl. Ex. E, Docket No. 435-5). Both Defendants Antoon and Tassillo testified that they had received the initial $10.5 million payment for their MindGeek shares. (White Reply Decl. Ex. Q at 286, 395, 505, Docket No. 507-2; White Reply Decl. Ex. R at 21; Docket No. 507-3). According to the schedule of payments set forth in the agreements, more than $50 million has been paid to date. (White Decl. Ex. E at 16-17, Docket No. 435-5; Ex. F at 16-17, Docket No. 435-5). Antoon's testimony confirmed that these funds are being paid to the Moving Individual Defendants by the third-party buyer, Ethical Capital Partners, not MindGeek. (White Reply Decl. Ex. Q at 506).

While Plaintiff need only establish a *prima facie* case for personal jurisdiction at this point in the litigation, she "cannot simply rest on the bare allegations of its complaint," especially if contradicted by affidavits. *In re Boon Global Ltd.*, 923 F.3d at 650; *see also Chem Lab Products, Inc.*, 554 F.2d at 372 (9th Cir. 1977) ("Mere allegations of a complaint, when contradicted by affidavits, are not enough to confer personal jurisdiction over a non-resident defendant."); *Scott v. Breeland*, 792 F.2d 925 (9th Cir. 1986) ("When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff is 'obligated to come forward with facts, by affidavit or otherwise, supporting personal jurisdiction.'") (quoting *Amba Marketing Systems, Inc. v. Jobar International, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977)). Moreover, even accepting Plaintiff's contention that the 2023 sale was "pretextual" and that no entity paid anything for the business as true, Plaintiff does not provide any argument, let alone evidence, to undermine Andreou's declaration that the remaining MindGeek entities are

and have always been adequately capitalized during the relevant period and that the total assets for both 9219-1568 Quebec Inc. and MG Freesites Ltd. exceed total liabilities by tens of millions of dollars. (Andreou Decl. ¶¶ 20, 35–51; Docket No. 448-2). In other words, even without the 2023 sale, the Non-contesting Defendants are capable of satisfying potential judgment. This evidence squarely forecloses any suggestion that the corporate form has been abused to shield the MindGeek entities from liability. Plaintiff's theory of injustice hinges on speculation about a pretextual sale and asset-stripping, but the jurisdictional record tells a different story: the relevant MindGeek entities remain solvent, capitalized, and able to meet their obligations. That does not amount to the type of injustice required to pierce the corporate veil. *Giganews*, 847 F.3d at 677.

Plaintiff's other arguments to support her injustice and fraud prong are equally unavailing. In her SAC, Plaintiff asserts, without much elaboration, that the "corporate structure was created and is not maintained for any legitimate business purpose or need of the organizations and has no economic substance but instead to . . . circumvent tax, money transfer, and pornography laws in the United States and other countries in which MindGeek actually does business." (SAC ¶ 21). As the Ninth Circuit made clear, however, such "[c]onclusory allegations that [a defendant] structures companies to escape liability are insufficient to confer personal jurisdiction." *In re Boon Global*, 923 F.3d at 654. "Indeed, almost every business enterprise in the United States ultimately forms some sort of corporate entity for the purpose of avoiding personal liability." *NuCal Foods, Inc. v. Quality Egg LLC*, 887 F. Supp. 2d 977, 994 n.9 (E.D. Cal. 2012). Moreover, "[t]he underlying cause of action cannot supply the necessary fraud or injustice prong. To hold otherwise would render the fraud or injustice element meaningless . . . ." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 183 (2d Cir. 2008) (quoting *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989); *see also TradeWinds Airlines, Inc. v. Soros*, No. 1:08-CV-05901 (JFK), 2012 WL 983575, at *6 (S.D.N.Y. Mar. 22, 2012) ("This 'injustice' must consist of

more than merely the tort or breach of contract that is the basis of the plaintiff's lawsuit."). Rather, "[s]omething more is needed." *Boon Global*, 923 F.3d at 654 (citing *In re Schwarzkopf*, 626 F.3d 1032, 1039–40 (9th Cir. 2010) (alter ego theory recognized where individual used corporation to acquire asset at time when he was insolvent)); *Riddle v. Leuschner*, 51 Cal. 2d 574, 581–82 (1959) (finding injustice would result where jurisdictional facts showed that insolvent company's assets were transferred to another company as a means of avoiding creditors)).

Plaintiff's contention that the "intent of the incorporators to evade civil or criminal liability" alone satisfies the injustice prong is unpersuasive. (Fleites Reply at 2). The cases that Plaintiff cites do not support such a sweeping rule. Each involves either a distinct legal context (labor, bankruptcy or tax enforcement), a disfavored form of reverse veil piercing or requires a separate showing of bad faith. *Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 1109–11 (9th Cir. 1979) (announcing a three-prong federal alter ego test in the labor and ERISA context, not general corporate veil-piercing); *Hennessey's Tavern, Inc. v. Am. Air Filter Co.*, 204 Cal. App. 3d 1351, 1358 (1988) (stating under California law, courts require a showing of "bad faith in one form or another" to disregard corporate separateness); *United States v. Boyce*, 38 F. Supp. 3d 1135, 1155–56 (C.D. Cal. 2014), *aff'd*, 683 F. App'x 654 (9th Cir. 2017) (federal tax enforcement case rejecting outside reverse veil piercing and reaffirming that traditional alter ego liability requires unity of interest and an inequitable result); *In re Schaefers*, 623 B.R. 777, 785 (B.A.P. 9th Cir. 2020) (bankruptcy case rejecting insider reverse veil piercing where debtor failed to show that recognizing the LLC's separateness would result in injustice).

And while tax evasion may provide a basis to satisfy the "fraud or injustice" prong, *see, e.g., Prompt Staffing, Inc. v. United States*, 321 F. Supp. 3d 1157, 1177 (C.D. Cal. 2018), that has only been the case when the United States or a creditor from whom a defendant is hiding assets is the party seeking to pierce the corporate veil. *See, e.g., Towe Antique Ford Found. v. I.R.S.*, 999 F.2d 1387 (9th Cir. 1993); *Politte v. United*

*States*, No. 07CV1950 AJB WVG, 2012 WL 965996 (S.D. Cal. Mar. 21, 2012), aff'd, 587 F. App'x 406 (9th Cir. 2014).  This makes sense given that—as Plaintiff conceded at oral argument—there must be some causal connection between the alleged misconduct and Plaintiff's injury.  *See Mesler*, 39 Cal.3d at 300 ("The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests.") (citing 6 Witkin, Summary of Cal. Law (8th ed. 1974) Corporations, § 5, p. 4318); *Gerritsen v. Warner Bros. Ent. Inc*., 116 F. Supp. 3d 1104, 1136 (C.D. Cal. 2015) (same); *see also Hambleton Bros. Lumber Co. v. Balkin Enterprises, Inc*., 397 F.3d 1217, 1228 (9th Cir. 2005) ("Even if improper conduct of a shareholder is shown, a 'causal connection' must be shown: The plaintiff must 'demonstrate a relationship between the misconduct and the plaintiff's injury.'") (quoting *Amfac Foods, Inc. v. Int'l Systems & Controls Corp*., 294 Or. 94, 654 P.2d 1092, 1103 (1982)).

Plaintiff's allegations of the alleged improper dividends and self-dealing do not fare better.  Plaintiff states that the dividends paid to the Moving Individual Defendants were improper because they received dividends in a way that deviated from corporate form.  (SAC ¶¶ 362–373).  Plaintiff also claims that each Moving Individual Defendants engaged in self-dealing with Antoon and Tassillo misusing MindGeek Canada's personnel and offices to manage and store their own personal and investment affairs and those of their family members and Bergmair receiving millions of dollars from related party transactions where he was providing bandwidth for MindGeek's use.  (*Id.* ¶¶ 427–447).  Notwithstanding the declarations and evidence that suggest that the dividend payments to the Moving Individual Defendants were in accordance with corporate form and governing agreements, (*see* Andreou Decl. at ¶¶ 60–61; White Decl. Ex. A at 135-41, 147-48, 150-52, 158-59; Antoon Decl. ¶ 33, Docket No. 436-2; Tassillo Decl. ¶ 29, Docket No. 426-6), the Court finds that these allegations are irrelevant for the purpose of assessing the "fraud and injustice" prong.  As discussed

above, Plaintiff must show that there is a causal connection between the alleged misconduct and Plaintiff's injury to satisfy the second prong.

Here, Plaintiff does not demonstrate how these actions by the Moving Individual Defendants were "in derogation of the plaintiff's interest." *Mesler*, 39 Cal.3d at 300. Plaintiff fails to allege that the Moving Individual Defendants took excessive dividends or diverted significant funds to a degree that would affect the capitalization of the Non-contesting Defendants. *See Art Attacks Ink, LLC v. MGA Ent., Inc*., No. 3:04-CV-01035 (JAH) (BLM), 2009 WL 10672486, at *4 (S.D. Cal. Aug. 10, 2009) (denying addition of defendants under alter ego theory and finding that the "instances of co-mingled assets are *de minimus non curat lex*" because the personal credit card charges were small "in relation to the total volume of charges" on the credit card), *aff'd*, 581 F.3d 1138 (9th Cir. 2009).   Plaintiff does not even contest Defendant's declaration that Bergmair's related-party transactions were on terms that were beneficial to the MindGeek entities. (*See* Bergmair Mot. at 18; Bergmair Opp'n at 15 n.26).

Acknowledging at oral argument that Plaintiff cannot meet the second prong of the alter ego theory, Plaintiff sought to clarify her legal theory by stating that she may pierce the corporate veil under a "merger/single enterprise" theory or "attribution theory," which Plaintiff claims are versions of alter ego liability recognized under California law that is distinct from the traditional doctrine involving direct shareholder-company privity.  Under the "merger/single enterprise" theory, Plaintiff would need to only show that there is "such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal" *Toho-Towa Co. v. Morgan Creek Prods., Inc*., 217 Cal. App. 4th 1096, 1107 (2013).  Under the attribution test, Plaintiff need to demonstrate that an "absent parent instigated the subsidiary's local activity." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd*., 243 F. Supp. 2d 1073, 1099 (C.D. Cal. 2003) (quoting *In re Telectronics Pacing Sys., Inc*., 953 F. Supp. 909, 918) (S.D. Ohio 1997).  In other words, Plaintiff argues she need not meet the second "injustice or fraud"

24

1    prong.  In support, Plaintiff pointed the Court to several cases including two California

2    state law cases— *Las Palmas Assocs. v. Las Palmas Ctr. Assocs*., 235 Cal. App. 3d

3    1220 (Ct. App. 1991) and *Toho-Towa Co.*, 217 Cal. App. 4th 1096—three cases in this

4    district—*Kayne v. Ho*, No. LACV0906816JAKCWX, 2012 WL 12878753 (C.D. Cal.

5    Sept. 6, 2012), *Mossimo Holdings LLC v. Haralambus*, No. CV 14-05912 DDP JEMX,

6    2015 WL 476298 (C.D. Cal. Feb. 3, 2015), and *Metro-Goldwyn-Mayer Studios*, 243 F.

7    Supp. 2d at 1099—as well as several out-of-circuit case law.  The Court, however, finds

8    Plaintiff's argument unpersuasive and the case law cited inapposite.

9        The Moving Individual Defendants correctly point out that courts within this

10   circuit routinely reject the use of "single enterprise" theory as a basis to establish

11   personal jurisdiction. *Krantz v. Bloomberg L.P*., 2022 WL 2102111, at *5 (C.D. Cal.

12   Jan. 19, 2022); *see also Iconlab Inc. v. Valeant Pharms. Int'l, Inc.*, No.

13   816CV01321JLSKES, 2017 WL 7240856 (C.D. Cal. Apr. 25, 2017), *aff'd sub nom.*

14   *Iconlab, Inc. v. Bausch Health Companies, Inc*., 828 F. App'x 363 (9th Cir. 2020)

15   ("Plaintiffs' other, exotic theories of imputing contacts—"single enterprise," "aiding

16   and abetting," and "ratification"—are not valid theories of establishing personal

17   jurisdiction in the Ninth Circuit to the extent that they stray from the well-established

18   alter ego and agency theories") (internal citations omitted); *Campanelli v. Image First*

19   *Unif. Rental Serv., Inc*., No. 15-CV-04456-PJH, 2016 WL 4729173, at *7 (N.D. Cal.

20   Sept. 12, 2016) (observing that "'single enterprise' and 'joint employer' theories are

21   bases for liability, not tests for personal jurisdiction.")).

22       Notably, the two California state law cases and one of the cases within this district

23   on which Plaintiff relies do not once mention "personal jurisdiction." *See Las Palmas*

24   *Assocs.*, 235 Cal. App. 3d 1220; *Toho-Towa Co.*, 217 Cal. App. 4th 1096; *Mossimo*

25   *Holdings*, 2015 WL 476298.  Instead, those cases apply the "single enterprise" doctrine

26   as a basis of imposing liability, not personal jurisdiction.  As for the two Central District

27   of California cases that do mention personal jurisdiction, neither are persuasive.  In

28   *Kayne*, for example, the court there discusses the "single enterprise" theory in the

context of a personal jurisdiction analysis, not as a theory apart from the traditional alter ego theory, but rather as a theory to support the first of the two prongs of the traditional alter ego theory.  2012 WL 12878753, at *8.  Thus, on the very same page that the court mentions the "single enterprise theory," the court in *Kayne* also conducts an analysis on the second "fraud or injustice" prong.  And while the court in *Metro-Goldwyn-Mayer Studios Inc*. does seem to suggest that a merger or attribution theory can provide be a separate and independent doctrine to support personal jurisdiction apart from the traditional alter ego theory, in doing so, the court applies out-of-circuit case law.  *See* 243 F. Supp. 2d at 1099–100 (citing to a cases from the Sixth Circuit and S.D. Ohio as well as a Ninth Circuit case applying Nevada law) (citing *Third National Bank v. WEDGE Group*, 882 F.2d 1087, 1092, 1094 (6th Cir.1989) (Keith, J., concurring); *In re Telectronics Pacing Systems, Inc*., 953 F.Supp. at 919; *Wells Fargo & Co. v. Wells Fargo Exp. Co*., 556 F.2d 406, 419 (9th Cir. 1977)).  It is notable that no court from this district has adopted the approach implied in *Metro-Goldwyn-Mayer Studios* in the 22 years since it was decided.  The remaining out-of-circuit cases that Plaintiff cites have no application here and contradict the law that governs here.

Even if Plaintiff were correct that the "single enterprise" theory somehow relaxes the traditional alter ego test, which as discussed above she is not, the theory would not apply here because it concerns liability between sister corporations, not liability imposed on individual shareholders.  (Suppl. Br. at 7–8).  The court in *Las Palmas* explicitly contrasted the "usual[]" alter ego case—where liability is sought to be imposed on an individual shareholder—with the "single enterprise" variation, which applies only to "sister companies."  *See Las Palmas Assocs.*, 235 Cal. App. 3d at 1249. *Toho-Towa* is distinguishable on similar grounds because its discussion of the "single-business-enterprise" theory concerned related corporations that "integrate their resources and operations," not individual investors.  217 Cal. App. 4th at 1107-08.  Thus, even assuming Plaintiff could rely on this variant of alter ego, it would have no bearing on the Moving Individual Defendants.

1    Both the Ninth Circuit and California courts have made clear that for a plaintiff
2    to avail herself to the alter ego doctrine for jurisdiction purposes, she must meet both
3    prongs of the test. *See Boon Glob.*, 923 F.3d at 653 ("California recognizes alter ego
4    liability where two conditions are met") (citations omitted); *id*. at 654 (finding that the
5    lower court's alter ego analysis was flawed for failing to "determine[e] that both prongs
6    of alter ego jurisdiction were met); *see also Gerritsen v. Warner Bros. Ent. Inc*., 116 F.
7    Supp. 3d 1104, 1136 (C.D. Cal. 2015) ("Before the doctrine can be invoked, two
8    elements must be alleged"); *Mesler v. Bragg Mgmt. Co*., 39 Cal.3d 290, 300 (1985)
9    ("There is no litmus test to determine when the corporate veil will be pierced; rather the
10    result will depend on the circumstances of each particular case. There are, nevertheless,
11    two general requirements.").  Given that Plaintiff has conceded at oral argument that
12    she cannot meet the second prong, the Court finds that the admission is dispositive and
13    therefore need not reach the first "unity of interest" prong.  The Court thus **GRANTS**
14    the Moving Individual Defendants' Motions to Dismiss.

15    **III.    CONCLUSION**

16    For the foregoing reasons, the Moving Individual Defendants' Motions to
17    Dismiss Plaintiff's Second Amended Complaint are **GRANTED**.  Dismissal with
18    prejudice is warranted because this is Plaintiff's Second Amended Complaint and the
19    deficiencies identified here mirror those raised in Defendants' earlier motions.
20    Plaintiff has now had multiple opportunities to amend plus jurisdictional discovery but
21    has failed to cure the defects.  *See Nat'l Funding, Inc. v. Com. Credit Counseling*
22    *Servs., Inc.*, 817 F. App'x 380, 385 (9th Cir. 2020) (affirming dismissal where the
23    amended complaint "failed to cure the deficiencies explicitly identified by the district
24    court in its prior order"); *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995)
25    ///
26    ///
27
28

1  (emphasizing that futility of amendment can, by itself, justify denial of leave to

2  amend).

3        **IT IS SO ORDERED.**

4  Dated:  September 15, 2025

5                                          _____
                                           HON. WESLEY L. HSU
6                                          UNITED STATES DISTRICT JUDGE

28