1

2

3

4

5

6

7

8                   UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11   SERENA FLEITES,                    Case No. 2:21-CV-04920-WLH-ADS

                    Plaintiff,          **AMENDED[1] ORDER RE COLBECK**
12                                      **AND REDWOOD DEFENDANTS'**
                                        **MOTION TO DISMISS**
13   v.                                 **PLAINTIFF'S SECOND AMENDED**
                                        **COMPLAINT [442, 447]**
14   MINDGEEK S.A.R.L.; MG
     FREESITES, LTD; MINDGEEK USA
15   INCORPORATED; MG PREMIUM
     LTD.; MG GLOBAL
16   ENTERTAINMENT INC.; 9219-1568
     Quebec, Inc. (d/b/a MindGeek);
17   BERND BERGMAIR; FERAS
     ANTOON; DAVID TASSILLO;
18   COREY URMAN; VISA, INC.;
     COLBECK CAPITAL DOES 1-5;
19   BERGMAIR DOES 1-5,

20                   Defendants.

21

22

23          Before the Court is Defendants Colbeck Capital Management, LLC, CB Media

24   Ventures DD, LLC, CB Agency Services, LLC, CB Participations SPV, LLC (the

25   "Colbeck Defendants" or "Colbeck") and Redwood Capital Management, LLC,

26   Redwood Master Fund Ltd., Redwood Opportunity Master Fund, Ltd., Manuel 2018,

27   _____

28   [1] This Order supersedes the order filed by this Court on September 10, 2025, as to this motion (Dkt. No. 603).

LLC, Ginogerum, LLC, White-Hathaway Opportunity Fund, LLC's (the "Redwood Defendants" or "Redwood") (collectively the "Defendants") Motion to Dismiss ("Motion") Plaintiff Serena Fleites's ("Plaintiff" of "Fleites") Second Amended Complaint ("SAC"). (Mot., Docket Nos. 442, 447). On March 7, 2025, and April 24, 2025, the Court held hearings and heard oral arguments from all parties. For the reasons set forth below, the Court **GRANTS** Defendants' Motions to Dismiss.

## I.    BACKGROUND

### A. <u>Factual Background</u>

#### 1. *Plaintiff Serena Fleites*

Plaintiff, who is now at the age of majority, brings this action against MindGeek S.A.R.L., MG Freesites, Ltd., MindGeek USA, Inc., MG Premium, Ltd., MG Global Entertainment, Inc., 9219-1568 Quebec Inc. (the "MindGeek Defendants" or "MindGeek"); Bernd Bergmair, Feras Antoon, David Tassillo (the "Individual Defendants"); Visa, Inc.; Colbeck Capital Management, LLC, CB Media Ventures DD, LLC, CB Agency Services, LLC, CB Participations SPV, LLC (the "Colbeck Defendants" or "Colbeck"); and the Redwood Capital Management, LLC, Redwood Master Fund Ltd., Redwood Opportunity Master Fund, Ltd., Manuel 2018, LLC, Ginogerum, LLC, White-Hathaway Opportunity Fund, LLC's (the "Redwood Defendants" or "Redwood") for allegations related to her sex trafficking when she was a minor. (SAC, Docket No. 385 ¶ 10).

In 2014, a thirteen-year-old Plaintiff was induced to make a sexually explicit video by her then high school boyfriend, which he uploaded to Pornhub.com, a pornography website owned and operated by the MindGeek Defendants, without Plaintiff's knowledge or consent. (*Id.* ¶¶ 11, 448). Plaintiff alleges that a MindGeek personnel reviewed the video of Plaintiff prior to making the video publicly available on Pornhub as MindGeek Defendants have repeatedly claimed they do for every video uploaded to Pornhub, and therefore knew that the video of Plaintiff constituted child sex abuse material ("CSAM") as her age was apparent, not only from the image itself, but

1   also from the title "13-Year Old Brunette Shows Off For the Camera." (*Id.* ¶¶ 448,

2   449). Despite having knowledge that the video contained illicit material, Plaintiff

3   claims that MindGeek posted the video to its Pornhub site consistent with its overall

4   business model and practice. (*Id.* ¶ 449). In addition, MindGeek "categorized, tagged,

5   optimized for user preferences, and disseminated the images, tags, and video" of

6   Plaintiff on Pornhub. (*Id.*). Plaintiff alleges that MindGeek also uploaded the

7   optimized video to its other tubesites and incorporated the video into its algorithmic

8   playlists and suggested videos. (*Id.*). MindGeek also placed advertisements alongside

9   the video, through which it earned revenue with every page visit, impression,

10  engagement, and conversion. (*Id.* ¶ 450). By the time Plaintiff discovered the video,

11  the video had already garnered 400,000 views. (*Id.*).

12          Impersonating her mother, Plaintiff contacted MindGeek to inform that the

13  video of Plaintiff qualified as child pornography. (*Id.* ¶ 451). After two weeks,

14  MindGeek finally responded, acknowledging that the content was CSAM, but took

15  another two weeks to remove the video after continued demands from Plaintiff. (*Id.*).

16  During this time, the video continued to generate views and MindGeek continued to

17  earn advertising revenue. (*Id.*). In addition, the video was downloaded and reuploaded

18  several times by different users and with different titles, including by MindGeek

19  Defendants.[2] (*Id.* ¶ 452; Opp'n at 47). One of the reuploads had 2.7 million views.

20  (SAC ¶ 452.). Others had hundreds of comments noting that Plaintiff could not be

21  more than a teenager. (*Id.*). Each reuploaded videos was reviewed, accepted, tagged,

22  categorized, and optimized by MindGeek. (*Id.*). MindGeek itself even uploaded the

23  video to its other pornographic tubesites. (*Id.*). Every time Plaintiff discovered a

24  reposted video, she would request MindGeek to remove the videos. (*Id.* ¶ 453). Each

25  time, however, MindGeek would ask Plaintiff "to provide photographic proof that she

26

27  [2] The claim that MindGeek Defendants reuploaded *Plaintiff*'s videos after they were initially taken down was not expressly alleged in the SAC. Plaintiff, however,

28  clarifies this point in her Opposition. (Opp'n at 14, 47, 51).

1  was the child depicted in the video before removing [the videos]" and would take
2  weeks to do so.  (*Id.*).

3      As a result of the viral dissemination of the video, Plaintiff's life spiraled out of
4  control.  She was harassed and bullied in school to such a degree that she started
5  skipping school and finally unenrolled to attend courses online.  (*Id.* ¶ 455).  Plaintiff
6  did not tell her mother about the video, and so her relationship with her mother
7  became strained, as her mother did not know why her daughter had suddenly begun to
8  skip classes.  (*Id.*).  This led to Plaintiff leaving her mother's home to move in with
9  her sister.  (*Id.*).  A year later, she moved back in with her mother, whereafter she
10  attempted to hang herself, only to be stopped by her younger sister and her mother's
11  boyfriend "who removed the power cord from her neck."  (*Id.* ¶ 456.)  Plaintiff was
12  admitted to a mental health facility in Bakersfield.  (*Id.*)  She would attempt suicide
13  several times in the ensuing years.  (*Id.* ¶ 260).

14      Not wanting to face her family after the first suicide attempt, Plaintiff moved in
15  with a friend.  (*Id.* ¶ 457).  At her friend's house, an older man introduced Plaintiff to
16  heroin, to which Plaintiff became addicted.  (*Id.*)  To fund her heroin addiction,
17  Plaintiff—still a minor at this point—created sexually explicit videos at the older
18  man's behest, who in turn sold the videos on Craigslist and Kik app.  (*Id.*)  Some of
19  the videos were then uploaded to Pornhub and were still available on the website as
20  recently as June 2020.  (*Id.* ¶ 458).  One of the videos was titled "Teen F*cks Guy In
21  Car," and had a user tag that she was underage.  (*Id.*)  Some videos even had
22  comments about Plaintiff's young age, such as "she looks like she's f*cking 12,"
23  "And she is 13?!," "she dadass looks no older than 16," "sh look s like she's 16."
24  (*Id.*).  Nevertheless, Plaintiff alleges that MindGeek reviewed, accepted, optimized,
25  categorized, tagged the videos; incorporated the videos into its algorithmic playlists
26  and suggestions; uploaded the videos to its other tubesites; and placed ads alongside
27  the videos through which MindGeek earned revenue.  (*Id.*).  While MindGeek profited
28  from the child porn featuring Plaintiff, Plaintiff was intermittently homeless or living

4

1  in her car, addicted to heroin, depressed and suicidal, and without the support of her

2  family.  (*Id.* ¶ 460.).

3       *2.  MindGeek's Business Practices and Business Model*

4       From 2013 to 2023, MindGeek was the dominant online pornography company

5  in the world.  (*Id.* ¶ 2).  MindGeek operates several pornographic websites which

6  generally fall into two general categories: (1) free "tubesites" that contain free,

7  purportedly user populated content and (2) premium "paysites" where it sells content,

8  services, and merchandises.  (*Id.* ¶ 38).

9       MindGeek's business model is predicated on maximizing view and driving

10  traffic to its sites.  (*Id.* ¶ 44).  Traffic and content are crucial in MindGeek's business

11  model because greater traffic and content directly correlate to greater profit through:

12  (1) garnering and driving more traffic to MindGeek and third-party "premium"

13  paysites or services; (2) selling ad space on free sites for the services or products of

14  third parties, which generates revenue with every visit, impression, engagement, and

15  conversion; (3) selling the data of persons who use the free sites; and (4) harvesting

16  data to optimize their website content and become the top result for queries on search

17  engine like Google, which further drive traffic and content.  (*Id.* ¶¶ 44–45, 450).  In

18  other words, MindGeek is incentivized to have more content and drive traffic to

19  maximize its profit.

20       The "gold standard" for generating traffic and obtaining content is to be the top

21  result for queries on search engines like Google, which can be accomplished through

22  Search Engine Optimization ("SEO").  (*Id.*¶ 45).  SEO "is the science of optimizing a

23  website's ability to garner top search rankings and depends on many factors, but most

24  prominently, content volume, how well that content is described in detail, the

25  website's ability to capture and analyze user interactions and preferences, and traffic."

26  (*Id.*).  In service of its SEO, MindGeek proactively helps users with messaging and

27  content development to enhance the video or image's ability to grab attention.  (*Id.*

28  ¶ 40).  For example, MindGeek provides instructions on "how to succeed" and

5

1    maximize attention with suggested titles, descriptions and categories that MindGeek's

2    SEO analysis has determined most effectively draw attention to particular types of

3    content and better reach their intended audience.  (*Id.*).  MindGeek's goes even further

4    by having its own formatters review and modify the presentation of the videos and

5    images as they deem appropriate, including the titles, tags and categories, as well as

6    the videos themselves.  (*Id.*).  MindGeek combines posted content with other,

7    similarly described content and recommends it to users in the form of proposed

8    searches or playlists to further drive attention and traffic. (*Id.*).  Finally, MindGeek

9    itself uploads content to its other websites, at times as a matter of course.  (*Id.* ¶ 43).

10         Disturbingly, child porn and drives web traffic.  In 2020, the National Center

11    for Missing and Exploited Children ("NCMEC") produced a report describing the

12    "insatiable demand" for child porn between 1998 to 2019, with 8.4 million such

13    videos posted online in 2018.  (*Id.* ¶ 54).  The same is true for other forms of

14    nonconsensual content including adult sex trafficking, rape, and revenge porn. (*Id.*).

15    Plaintiff alleges victims, employees, advocacy groups, law enforcement, press reports,

16    and government agencies have all made MindGeek Defendants aware that CSAM and

17    other nonconsensual materials appear on their platforms.  (*See, e.g.*, ¶¶ 99–101, 154–

18    155, 197).  For example, a 2020 *New York Times* article exposed how "modest

19    investigatory efforts easily revealed" that PornHub was "infested" with videos

20    depicting "child abuse and nonconsensual violence."  (*Id.* ¶ 307).

21         Despite being aware the ubiquitousness of child porn and other nonconsensual

22    content on its sites, MindGeek maintained what Plaintiff describes as an "unrestricted

23    content" business model to feed MindGeek's "singular priority of using SEO to be the

24    top search engine website result in any porn related search."  (*Id.* ¶¶ 56, 57, 110).

25    Under this model, MindGeek allegedly "knowingly and intentionally solicited,

26    optimized, and commercialized content of any kind, including child pornography and

27    other nonconsensual content, and avoided any policy, process, or technology that

28    would exclude illegal content or limit or even slow the upload of content generally to

its websites." (*Id.* ¶ 57).  Specifically, Plaintiff claims that MindGeek achieved this through three knowing and intentional practices.  (*Id.* ¶ 58).

First, MindGeek systematically ignored the laws in the jurisdictions in which it did business by setting up "shifting, opaque, and Byzantine international corporate structure" which "obscured MindGeek's ownership and operation" in jurisdictions that are known to be "havens" for tax evasion, money laundering, and with weak laws and enforcement related to pornography.  (*Id.* ¶ 58–66).

Second, MindGeek knowingly and intentionally created a faux "moderation" process that was "hopelessly under-staffed [and] under-resourced," which consisted of an exclusively human moderation team of no more than 30 untrained, minimum wage contractors in Cypress to review 700-1200 videos a day.  (*Id.* ¶¶ 58, 67, 73).  Even worse, this team was not only understaffed, but also perversely incentivized: they were offered bonuses that depended on the number of videos they *approved* for upload.  (*Id.* ¶ 79 (emphasis in the original)).  Thus, despite touting that every video was reviewed and screened by a moderator prior to it being available on MindGeek's website, (*Id.* ¶¶ 67-80, 103, 471), these so-called moderators were not actually tasked with excluding child pornography and other nonconsensual content but rather proactively attracting, optimizing, and monetizing it, while also masking it from authorities by "'scrubb[ing]' words in the titles and tags that unequivocally indicated criminality."  (*Id.* ¶¶ 58, 74–77).  In other words, while providing a "public veneer of legality," the real goal for these moderators was to let as much content as possible go through, including CSAM and nonconsensual materials, to maximize revenue.  (*Id.* ¶ 79, 101).  Consequently, Plaintiff alleges that MindGeek never verified the age, identity, and the consensual nature of the videos uploaded onto their sites.  (*Id.* ¶¶ 205, 295, 297).  They also clearly underreported CSAM to NMEC.  (*Id.* ¶ 99–100).  Until 2020, MindGeek purportedly never voluntarily made a single legally required disclosure to authorities in the United States or Canada.  (*Id.* ¶ 99).  With little policing done by MindGeek, it was largely up to the victims to flag, report, and

7

request takedown of illicit content to MindGeek.  These victims, however, were often met with delay tactics and/or stonewalling, especially if the content sought to be removed was "performing well." (*Id.* ¶ 88).  The delay would permit MindGeek to preserve the use of content as long as possible so that it could continue analyzing a well performing, albeit illegal, video so that MindGeek could refine its algorithms to push similar content.  (*Id.*).  If and when the illegal videos were successfully removed, MindGeek only disabled the video but kept the webpage with its title, description, tags, and comments to that video so that it would still continue to increase its SEO and users searching for such content could be directed to similar content that were not disabled.  (*Id.* ¶¶ 90, 96).  Moreover, because MindGeek's website allowed users to download videos, removed videos were often reuploaded, requiring victims to constantly monitor for a reposting of their videos.  (*Id.* ¶ 137).  Perhaps, most disturbingly, Plaintiff alleges that MindGeek systematically and surreptitiously reuploaded removed content that it had been forced to disable.  (*Id.* ¶ 97).

Third, MindGeek proactively used its extensive SEO technology to curate child pornography and other nonconsensual content by further "optimizing" its descriptions, tags, titles, and video formats and arranging recommended searches to find, and curate playlists of, such content, even though it had the capability and the technology to exclude nonconsensual or other banned content (*Id.* ¶¶ 58–59, 67–68, 106–107).  For example, MindGeek directed users to use up to 16 tags that describe the video and performers; select up to 8 relevant categories, and where applicable, use niche specific categories to ensure the content would reach the "right" fans; and write creative titles that described the scene.  (*Id.* ¶ 114).  Amongst the "preexisting" categories that a user could select for a video were categories such as "teen," "school," "babysitter," and "old/young"—all categories that purportedly targeted views who are interested in CSAM.  (*Id.* ¶¶ 113–114).   And on the page explaining the video categories, MindGeek informed that "Teen" is one of the most popular categories.  (*Id.*).  In addition to providing guidance to the users, MindGeeks' own formatters added and

8

1  edited content, including the tags and categories. (*Id.* ¶ 115). They would also create

2  a graph or timeline underneath the videos to help viewers identify and quickly

3  advance to various levels of sexual activity within the video. (*Id.* ¶ 116). They also

4  created thumbnails for the videos on MindGeek's tubesites, some of which were

5  created from CSAM videos. (*Id.* ¶ 118). To reach their intended audience, MindGeek

6  would edit advertisements on its websites to frequently highlight terms such as "girls,"

7  "boys," "broken teens," and "twink," which are terms that promote the creation, use

8  and viewing of CSAM and "encouraged for use by MindGeek." (*Id.* ¶ 120).

9  MindGeek's platforms even allowed advertisers to build campaigns around keywords

10 like "13yearoldteen" and "not18"; indeed, they were even allowed to target ads to

11 people searching the term "child rape" in languages other than English. (*Id.* ¶ 121).

12 The result meant that MindGeek would retain its position as the top search result for

13 all porn searches, including CSAM and nonconsensual content. (*Id.* ¶ 123).

14 Accordingly, Plaintiff alleges that MindGeek's sites contain a trove of obvious and

15 easily accessible child porn. Plaintiff alleges that "in just few minutes of basic

16 searches, users" could seemingly find countless videos clearly depicting child sexual

17 assault or exploitation, where titles, descriptions, and tags bluntly describe the illicit

18 nature of the videos. (*Id.* ¶ 125).

19          *3.  Colbeck and Redwood's Involvement*

20          Colbeck and Redwood are hedge funds specializing in financing distressed and

21 "special situations" business that have no other sources of capital. (*Id.* ¶ 245). In

22 2011 and 2013, Colbeck was the lead lender that advised and assembled a syndicate of

23 similar hedge funds to finance MindGeek's growth and operations ("Colbeck

24 Syndicate"). (*Id.*). Redwood was one of the larger participants in both syndicates.

25 (*Id.*). In 2018, Redwood pushed out Colbeck and became MindGeek's largest

26 financier ("Redwood Syndicate"). (*Id.*). The Colbeck and Redwood Syndicates

27 ("Syndicates") provided MindGeek hundreds of millions of dollars in loans. (*Id.*

28 ¶¶ 250, 258, 260, 276).

Plaintiff alleges that Colbeck and Redwood knew from their own extensive due diligence they conducted prior to financing MindGeek that child pornography and nonconsensual content was rampant on MindGeek's platform. (*Id.* ¶¶ 246, 261). They also knew that MindGeek lacked meaningful moderation compared to other websites and social media companies in the industry in order to be in compliance with the applicable laws, and the choice was intentional for profit generating purposes. (*Id.* ¶¶ 265, 267). Moreover, because of the alleged financial control the Syndicates had over MindGeek, they had "complete access to information about MindGeek's operations." (*Id.* ¶ 272). They received regularly detailed reports on MindGeek's business and financial performance, business plans, and legal issues and risks. (*Id.* ¶ 271). They monitored MindGeek's websites and news and other public information about the business and industry—including public reports about CSAM and other nonconsensual content on MindGeek's website—as part of the ongoing management of their high-risk investment. (*Id.* ¶ 273). In other words, the Syndicates were allegedly "intimately familiar" with MindGeek's "unrestricted content" business model and its plan to capitalize and monetize child pornography and other nonconsensual material to pay back the debt owed to the Syndicates. (*Id.* ¶¶ 267– 268). Yet, Colbeck and Redwood knowingly and intentionally entered into agreements—twice by Colbeck and three times by Redwood—to finance MindGeek and chose to directly profit from MindGeek's monetization of child pornography and other nonconsensual content. (*Id.* ¶ 246). They even exacted a high interest rate of more than 20% despite the loan being fully secured because they knew MindGeek's access to other capital was limited or otherwise unavailable due to the "well-known illicit nature of the business." (*Id.* ¶ 251). And in 2018, Plaintiff alleges that Redwood fought for even more investment into MindGeek upon realizing that the "unrestricted content" model was succeeding, eventually cutting Colbeck out of the syndicate and becoming the lead lender. (*Id.* ¶ 274–276).

1    Furthermore, because of exorbitant loan, Plaintiff claims that as a practical

2    matter, the Syndicates owned MindGeek's business.  (*Id.* ¶ 251).  They imposed

3    draconian control rights over the company's management, operations, and economics

4    such that during the term of the financing, had the ability to control virtually all aspects

5    of the business and receive the vast majority of the earnings.  (*Id.* ¶¶ 251, 259).   And in

6    their roles, Colbeck and Redwood allegedly worked closely with MindGeek and

7    assisted in the execution of MindGeek's "unrestricted content" business model by

8    advising MindGeek on various matters, including the potential acquisition of other

9    businesses and content as part of their growth strategy.  (*Id.* ¶¶ 245, 271).  And in 2020,

10   when the *New York Times*' bombshell article was dropped exposing MindGeek's

11   trafficking venture, rather than pulling out their financing, Redwood purportedly

12   exploited the crisis to secure an even greater economic deal.  (*Id.* ¶¶ 281–283).

13   Specifically, Redwood demanded that MindGeek agree to even higher interest rates, a

14   quicker repayment of the loan, and that the Individual Defendants cease receiving

15   dividends and receive less executive salary.  (*Id.* ¶ 283).  Redwood, however, chose to

16   leave the Individual Defendants in charge because it wanted to minimize impact on the

17   business model that maximized their profit.  (*Id.*  ¶ 284).

## B. **Procedural Background**

19   On June 17, 2021, named Plaintiff Serena Fleites and Plaintiffs Jane Does No. 1

20   through 33 filed this action bringing numerous causes of actions against Defendants

21   MindGeek S.A.R.L., MG Freesites, Ltd., MindGeek USA, Inc., MG Premium, Ltd.,

22   RK Holdings USA, Inc., MG Global Entertainment, Inc., TrafficJunky, Inc., Bernd

23   Bergmair, Feras Antoon, David Tassillo, Corey Urman, Visa, Inc., Colbeck Capital

24   unnamed does 1 through 10, and Bergmair unnamed does 1 through 10.  (Compl.,

25   Docket No. 1).  On February 10, 2022, the Court granted Defendants' motion to sever

26   Plaintiffs and ordered Plaintiff Fleites to file a First Amended Complaint ("FAC")

27   with her continuing as the only named plaintiff in this action and dismissed Plaintiffs

28   Jane Does No. 1 through 33 without prejudice.  (Docket No. 119).  On March 21,

2022, Plaintiff filed a FAC consistent with the Court's February 10, 2022, order. (FAC, Docket No. 124, Ex. 124-3).  On May 23, 2022, Defendants filed motions to dismiss Plaintiff's FAC.  (Docket Nos. 135–140).  On July 29, 2022, Judge Carney granted in part and denied in part Visa's motion to dismiss Plaintiff's First Amended Complaint.  (FAC Visa Order, Docket No. 166).  Judge Carney also ordered the MindGeek Defendants and the Individual Defendants to submit to jurisdictional discovery and granted Plaintiff leave to amend her complaint after jurisdictional discovery was complete.  (FAC MindGeek Order, Docket No. 167).  Accordingly, Judge Carney denied the MindGeek Defendants and the Individual Defendants' motions to dismiss in light of the "near certainty that Plaintiff will file a Second Amended Complaint at the close of jurisdictional discovery."  (*Id*. at 8).

On May 23, 2024, Plaintiff filed her Second Amended Complaint, this time adding the Colbeck and Redwood Defendants. (SAC, Docket. No. 385; *see also* Docket No. 384). On August 30, 2024, Colbeck and Redwood filed separate Motions to Dismiss Plaintiff's SAC.  (Colbeck Mot., Docket No. 442; Redwood Mot., Docket No. 447).  On October 31, 2024, Plaintiff filed an Omnibus Opposition to Defendants' Motions to Dismiss, including Colbeck and Redwood's Motions to Dismiss (Opp'n, Docket No. 477), to which Colbeck and Redwood filed replies on December 6, 2024. (Colbeck Reply, Docket No. 500; Redwood Reply, Docket No. 492).

On March 7, 2025, and April 24, 2025, the Court heard oral argument from all parties.  At the hearing, the Court granted some parties supplemental briefing in light of the recent Ninth Circuit's decision vacating *Ratha v. Rubicon Res., LLC*, 111 F.4th 946 (9th Cir. 2024) (*Ratha II*).  On March 21, 2025, the Colbeck Defendants filed their supplemental brief (Colbeck Supp., Dkt. No. 545), and Redwood Defendants filed their supplemental brief (Redwood Supp., Dkt. No. 542).  On April 4, 2025, Plaintiff filed an omnibus reply.  (Fleites Reply, Dkt. No. 573).  The matter is considered fully briefed.

1    **II.    DISCUSSION**

2        Plaintiff, in her SAC, brought the following causes of action against the

3    Colbeck and Redwood Defendants: (1) violation of TVPRA based on a theory of

4    beneficiary liability pursuant to 18 U.S.C. §§ 1591, 1595 (Count III); (2) conspiracy to

5    violate the TVPRA pursuant to 18 U.S.C. §§ 1594(c), 1595 (Count IV); (3) violation

6    of the UCL and FAL under the Cal. Bus. & Prof. Code §§ 17200 and 17500 (Count

7    XIV); and (4) violation of civil conspiracy (Count XVI).  (SAC at 150–53, 155–56,

8    166–71).  Colbeck and Redwood filed this instant motion to dismiss each cause of

9    action on the grounds that Plaintiff lacks standing and also has failed to state a claim

10   under Federal Rules of Civil Procedure Rule 12(b)(6).  The Court will address each

11   argument in turn.

12   **A. <u>Plaintiff's Standing</u>**

13       Colbeck and Redwood Defendants argue that Plaintiff lacks Article III standing.

14   (Colbeck Mot. at 10; Redwood Mot. at 14–18).  Plaintiff has the burden of

15   establishing that she has Article III standing with respect to the Colbeck and Redwood

16   Defendants.  *See WildEarth Guardians v. U.S. Dep't of Agriculture*, 795 F.3d 1148,

17   1154 (9th Cir. 2015).  To establish standing, Plaintiff must show that she "(1) suffered

18   an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant,

19   and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v.

20   Robins*, 136 S. Ct. 1540, 1547 (2016).

21       Colbeck and Redwood Defendants' challenge to Plaintiff's standing centers on

22   the second element—traceability.  (Colbeck Mot. at 11, Redwood Mot. at 15).  To

23   meet that requirement, plaintiffs must allege that their injuries are "fairly traceable" to

24   the defendants' conduct and "not the result of the independent action of some third

25   party not before the court." *Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088, 1094 (9th

26   Cir. 2020) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

27   Although this does not require a showing of proximate cause, it does require plaintiffs

28   to "establish a 'line of causation' between defendants' action and their alleged harm

that is more than 'attenuated.'" *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (quoting *Allen v. Wright*, 468 U.S. 737, 757 (1984)). The fact that "the harm to [Plaintiff, however] may have resulted indirectly does not itself preclude standing." *Warth v. Seldin*, 422 U.S. 490, 504 (1975). "Causation may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury, and there's no requirement that the defendant's conduct comprise the last link in the chain." *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014). "[W]hat matters is not the length of the chain of causation, but rather the plausibility of the links that comprise the chain." *Id.* (quoting *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002)). "To plausibly allege that the injury was 'not the result of the independent action of some third party,' the plaintiff must offer facts showing that the [defendant's] unlawful conduct 'is at least a substantial factor motivating the third parties' actions.'" *Mendia*, 768 F.3d at 1013 (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997); *Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001)). In other words, "[s]o long as the plaintiff can make that showing without relying on 'speculation' or 'guesswork' about the third parties' motivations, she has adequately alleged Article III causation." *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413–14 (2013)).

Applying the principles here, the Court finds that Plaintiff's allegations are adequate to establish standing with respect to both Colbeck and Redwood Defendants. Plaintiff claims that the Colbeck and Redwood knew prior to financing MindGeek that MindGeek was violating the applicable laws related to child pornography and nonconsensual content and had no meaningful moderation process in place to address the issue. (SAC ¶¶ 245–284).[3] Despite this knowledge, Plaintiff asserts that Colbeck

---

[3] The Colbeck Defendants seek to distance themselves to Plaintiff's injury by claiming that even according to the Plaintiff, the issue of CSAM on MindGeek's website "exploded in 2019-2023" (SAC ¶ 110), which was after Colbeck Defendants' exit in 2018. This argument, however, is unpersuasive. The Court agrees with Defendants that Plaintiff does not particularly allege facts pertaining to MindGeek and CSAM

1   and Redwood Defendants facilitated and enabled the proliferation of child

2   pornography and nonconsensual content on MindGeek's platforms by lending

3   millions of dollars in capital that would have been otherwise unavailable to MindGeek

4   due to the risky nature of MindGeek's business.  (SAC ¶¶ 249, 251).  By funding

5   MindGeek and its "unrestricted content" business model, the Colbeck and Redwood

6   Defendants helped create and sustain a platform that ultimately allowed the

7   victimization and exploitation of Plaintiff in 2014 and the continued harm she faced

8   since.  The Court finds that such allegations sufficiently establish a "line of causation"

9   that is beyond mere "speculation" and "guesswork."

10      Defendants raises several arguments in defense, none of which the Court finds

11  persuasive.  First, Defendants contest the merits of Plaintiff's allegations by pointing

12  to the terms of the loan agreement, which specifically required MindGeek to comply

13  with applicable laws, including those related to child pornography and nonconsensual

14  content, and a breach would have constituted default and given Colbeck and Redwood

15  the rights to pull out from the loan agreements.  (*See, e.g.*, Colbeck Mot. at 7–8).  Not

16  only is such argument inappropriate at this stage of the litigation,[4] but the Court also

---

18  prior to 2011, when Colbeck and Redwood Defendants first entered into loan
    agreements with MindGeek.  Plaintiff claims, however, that by 2013, both Colbeck
19  and Redwood Defendants knew of the issue because the each of the Individual
    Defendants "were already" "proactively embrac[ing] and monetiz[ing] child
20  pornography and other nonconsensual content" "at their respective online porn
    websites that they were running prior to their 2013 acquisitions."  (*Id.* ¶ 109).
21  Moreover, Plaintiff also claims that prior to Antoon and Tassillo becoming MindGeek
    owners in 2013, they had been running MindGeek predecessor Manwin for years with
22  the "same unrestricted content and intentional monetization of child pornography and
    other nonconsensual content," and they both agreed to continue this model in the new
23  company of MindGeek.  (*Id.* ¶ 151).  Thus, at least by the time Colbeck and Redwood
    Defendants entered into second loan agreement with MindGeek in 2013, they
24  allegedly knew of MindGeek's "unrestricted content" business model that embraced
25  CSAM and other nonconsensual content to generate profit.
26  [4]  Defendants request that the Court take judicial notice of several documents,
    including the loan agreement, as well as argue that such documents are incorporated
27  by reference.  "As a general rule, a district court may not consider any material
    beyond the pleadings in ruling on a Rule 12(b)(6) motion*." Lee v. City of Los Angeles*,
28  250 F.3d 668, 688 (9th Cir. 2001) (citation omitted).  Under limited circumstances, a

disagrees with Defendants' position that Plaintiff's allegations are in contravention of the financing terms.  Plaintiff's claims, which must be taken as true at this stage of litigation, *see U.S. v. LSL Biotechnologies*, 379 F.3d 672, 698 (9th Cir. 2004) (citation omitted), suggest that Colbeck and Redwood Defendants *disregarded* the terms of the loan agreement because the "unrestricted content" model was too lucrative for the Defendants to stop.  (*See, e.g.*, SAC ¶ 264).  Colbeck and Redwood Defendants allegedly charged incredibly high interest rates (*Id.* ¶¶ 251, 283) and saw how the MindGeek's search engine dominance through MindGeek's business model was "essential to MindGeek's ability to successfully . . . pay back the exorbitant debt." (*Id.* ¶¶ 264, 268).  In other words, despite having both the ability and the choice to enforce the terms of the loan agreement or pull out of the syndicates because MindGeek was in blatant violation of laws related to CSAM and nonconsensual content, Colbeck and Redwood Defendants instead continued to fund MindGeek's illicit venture with the full knowledge that MindGeek was executing a business model that relied in part on the optimization and promotion of CSAM and nonconsensual content.  Moreover, with respect to Redwood Defendants, Plaintiff specifically claims that in 2018, after seven years of monitoring the MindGeek and becoming intimately familiar with its illegal business model, Redwood "moved aggressively to seize control of the syndicate and dramatically increase its share of the financing," ultimately settling with and ousting the Colbeck Defendants.  (SAC ¶¶ 274–276).

---

court may however consider materials if the matter is subject to judicial notice or if the document is incorporated into the complaint by reference.  Fed. R. Evid 201(b); *U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  Even if the document outside the pleadings is judicially noticeable or incorporated by reference, the Court may not weigh competing factual narratives at a motion to dismiss.  *See In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1062 n. 143 (C.D. Cal. 2012); *see also* Lacayo v. Donahoe, No. 14-CV-04077-JSC, 2015 WL 993448, at *10 (N.D. Cal. Mar. 4, 2015) (taking judicial notice of documents in ruling on a motion to dismiss "only. . .[as to] the existence of the administrative proceedings and the agency's findings," and not "credit[ing] the truth of any fact recounted or matter asserted in the documents").

1    Second, Colbeck and Redwood Defendants also attempt to separate themselves

2    from Plaintiff's injuries by interposing Plaintiff's traffickers—Plaintiff's ex-boyfriend

3    and the unnamed older man—between themselves and the harm Plaintiffs suffered.

4    (Colbeck Mot. at 11–12; Redwood Mot. at 17–18).  They highlight the lack of

5    allegations directly linking Defendants to Plaintiff or her traffickers and claim that

6    Plaintiff's alleged injuries depended entirely on independent actions of several layers

7    of parties that were neither Colbeck nor Redwood Defendants.  (*Id.*).  This same

8    argument was raised by Visa in its first motion to dismiss and was expressly rejected

9    by Judge Carney.  (FAC Visa Order at 10).  The Court sees no reason why the

10   principles and logic motivating Judge Carney's ruling should not be equally

11   applicable here.   In denying Visa's argument, Judge Carney noted that Visa's position

12   may have had more weight if Plaintiff was directly suing her traffickers and

13   proceeding on a theory of enticement and solicitation of Plaintiff to engage in sexual

14   commercial acts under TVPRA § 1591(a)(1).  (*Id.*).  The heart of Plaintiff's case,

15   however, focuses MindGeek and the "monetization of child porn after it was made

16   and posted to MindGeek's sites."  (*Id.*).  In other words, Plaintiff's harm is that which

17   flows from MindGeek's financial benefitting from Plaintiff's exploitation.  When

18   defined in such a way, Redwood and Colbeck's connection becomes much less

19   attenuated and their role comes into sharper focus, "unobscured by the third parties

20   that [they] attempt[] to place between [themselves] and Plaintiff."  (*Id.*).  In other

21   words, like Visa, Redwood and Colbeck played a crucial role in the venture by

22   "len[ding] to MindGeek a much-needed tool" to sustain its business—capital.  (*Id.*).

23   Moreover, unlike the case with Visa, MindGeek was at least in part substantially

24   motivated to engage in the illegal venture to pay back the enormous debt owed to the

25   Colbeck and Redwood Defendants—*i.e.*, MindGeek continued to execute its

26   "unrestricted content" business model for the purpose of financially benefitting

27   Colbeck and Redwood Defendants.  (*Id.* ¶ 268).  *See Mendia*, 768 F.3d at 1013.

28

17

None of the cases on which Redwood and Colbeck Defendants rely compel a different conclusion.  For example, in *Williams v. Sisolak*, No. 22-16859, 2024 WL 194180 (9th Cir. Jan. 18, 2024), *cert. denied sub nom. Williams v. Lombardo*, 144 S. Ct. 2659, 219 L. Ed. 2d 1285 (2024), the Ninth Circuit affirmed a lower court's ruling that plaintiffs lacked standing to assert claims against the Nevada state and local officials for the abuse plaintiffs allegedly in Nevada's commercial sex industry on the grounds that while the government defendants had "various roles in regulating that industry," plaintiffs failed to sufficiently allege that government defendants' actions or inactions "exert[ed] a determinative or coercive effect on the third-party conduct that directly caused their injury."  *Id.* at 1–2 (cleaned up).  And in *Kaing v. Pulte Homes, Inc.*, 2010 WL 625365 (N.D. Cal. Feb. 18, 2010), *aff'd sub nom. Kaing v. Pultegroup, Inc.*, 464 F. App'x 630 (9th Cir. 2011)—a case that Visa also relied on which Judge Carney found "inapposite" (FAC Visa Order at 14)—the plaintiff attempted to hold a certain lender responsible for the decrease in her home's value on the theory that the lender's practices caused foreclosures in her neighborhood.  *Id.* at *5–6.  The court there denied plaintiff's argument and explained that the plaintiff's standing "theoy . . . depends upon a chain of causation that is dependent upon many factors, such as unemployment, health problems, a general weakening economy, or other financial conditions, the decisions of various homeowners to foreclose rather than refinance, as well as other economic factors that can have unpredictable effects on the housing market."  *Id.* at *6.  In both cases, various plaintiffs sought to pin "intractable and complicated social, economic, or political problems on one or a few actors despite the existence of multiple, independent actors who could also be blamed for the plaintiffs' harms."  (FAC Visa Order at 13).  As Judge Carney concluded, however, "[t]his is not a case in which the "independent decisions" of "numerous third parties" separate Defendants from Plaintiff.  (*Id.* at 13).  As with Visa, "there are sufficient facts pled here to suggest that" MindGeek's "decision to continue monetizing child porn" depended on Colbeck and Redwood's

18

1  decision to finance MindGeek and ensure that the loan was paid back, regardless of
2  whether MindGeek's business strategy adhered to the applicable laws.  (*Id.*)

3      Finally, while Colbeck and Redwood Defendants seek to downplay the control
4  they had over the MindGeek Defendants (*see* Colbeck Mot. at 8–9; Redwood Mot. at
5  17–18), such argument directly contradicts Plaintiffs' allegations, which the Court
6  must accept as true at this juncture.  According to Plaintiff, both Colbeck and
7  Redwood were at one point lead lenders in their syndicates that funded the
8  MindGeek's operation and growth.  (SAC ¶ 245).  During the duration of the funding,
9  Plaintiff alleges that Colbeck and Redwood effectively owned MindGeek as the debt
10  owed to them was fully secured by the entire business.  (*See, e.g. id*. ¶¶ 251, 259, 270,
11  272).  They also had control rights over the MindGeek business through various
12  draconian loan covenants.  (*Id.* ¶ 259, 270, 272).  Through these covenants, they had
13  the right to enforce MindGeek's compliance with the CSAM laws, but instead, they
14  allowed MindGeek to continue its illicit venture and even advised MindGeek on its
15  growth strategy.  The argument that Colbeck and Redwood were just two of many
16  lenders to MindGeek in 2011, 2013, and 2018, and Plaintiff failed to plead that absent
17  Defendants' participation, "MindGeek would have stopped operating or operated any
18  differently" or the argument that Defendants were not involved in the day-to-day
19  operation of MindGeek misses the point.  (Colbeck Mot. at 13; Redwood Mot. at 18).
20  As noted above, the standard to establish the traceability element is whether there is a
21  "line of causation" between defendants' action and their alleged harm that is more
22  than "attenuated."  *Maya*, 658 F.3d at 1070.  There is no need to establish direct or
23  proximate causation.  *Id.*; *Warth*, 422 U.S. at 504.  The Court finds that Plaintiff has
24  sufficiently met the standard here, and therefore has Article III standing to pursue her
25  case against Colbeck and Redwood.

26    **B.  Rule 12(b)(6)**

27      Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a
28  claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  A complaint may

be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557). The court must construe the complaint in the light most favorable to the plaintiff, accept all allegations of material fact as true, and draw all reasonable inferences from well-pleaded factual allegations. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002). The court, however, is not required to accept as true legal conclusions couched as factual allegations. *See Iqbal*, 556 U.S. at 678. A claim is considered to have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In deciding a Rule 12(b)(6) motion, a court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007).

**C. <u>Analysis</u>**

*1. Violation of TVRA pursuant to 18 U.S.C. §§ 1591, 1595 (Count III)*

Plaintiff brings a beneficiary liability claim under section 1595(a)(2) of the TVPRA against both Colbeck and Redwood Defendants.[5] Section 1595(a) permits civil victims to bring a claim under the beneficiary liability theory against anyone who "knowingly benefits . . . from participation in a venture which that person knew or should have known" was engaged in sex trafficking. 18 U.S.C. § 1595(a). Relying on

---

[5] Although Plaintiff cites to Section 1591 generally, which includes direct liability under Section 1591(a)(1), Plaintiff has failed to allege that either Colbeck or Redwood Defendants are direct perpetrators of Plaintiff's trafficking in her SAC. (SAC ¶¶ 489–98). The Court therefore addresses only the beneficiary liability theory under Section 1595(a)(2) of the TVPRA.

20

Judge Carney's prior order dismissing Plaintiff's beneficiary liability claim against the Visa Defendants for failing to meet the "participation in a venture" and "knowledge" factor, the Colbeck and Redwood Defendants claim that the same deficiencies exist here and therefore dismissal is warranted. (Colbeck Mot. at 16–20; Redwood Mot. at 19–20, 24–26).  The Court agrees.

An element of a Section 1595 claim is whether Defendants participated in a sex trafficking venture.  Under the TVPRA, a "venture" is "any group of two or more individuals associated in fact." 18 U.S.C. § 1591(e)(6).  While Plaintiff need not establish some "overt act" that furthers the sex trafficking aspect of the venture under a civil beneficiary liability theory, *see Acevedo v. eXp Realty*, LLC, 713 F. Supp. 3d 740, 755 (C.D. Cal. 2024); *Doe v. Twitter*, Inc., 555 F. Supp. 3d 889, 918 (N.D. Cal. 2021), *abrogated on other grounds by Does 1-6 v. Reddit, Inc*., 51 F.4th 1137 (9th Cir. 2022);  "in the absence of direct association with traffickers, Plaintiff must 'allege at least a showing of a continuous business relationship between the trafficker and [Defendants] such that it would appear that the trafficker and [Defendants] have established a pattern of conduct or could be said to have a tacit agreement.' *Doe v. MindGeek USA Inc*., 558 F. Supp. 3d 828, 837 (C.D. Cal. 2021), *adhered to on denial of reconsideration*, 574 F. Supp. 3d 760 (C.D. Cal. 2021) (quoting *M.A. v. Wyndham Hotels Resorts, Inc*., 425 F. Supp. 3d 959, 970 (S.D. Ohio 2019), *A.B. v. Marriott Int'l, Inc*., 455 F. Supp. 3d 171, 186 (E.D. Pa. Apr. 22, 2020)).  The Court does not find that here.

Similar to Visa, Plaintiff has failed to allege that the Colbeck and Redwood Defendants had any relationship, let alone a continuous business one, with Plaintiff's *traffickers*.  *MindGeek*, 558 F. Supp. 3d at 837 ("Plaintiff must 'allege at least a showing of a continuous business relationship between the *trafficker* and [Defendants]") (emphasis added).  Unlike MindGeek Defendants, which had direct interaction with the videos of Plaintiff that her traffickers uploaded, there is no such connection here with respect to Colbeck and Redwood Defendants and Plaintiff's

traffickers.  Therefore, as in the case with Visa, Colbeck and Redwood Defendants "therefore cannot bear beneficiary liability for knowingly participating in the sex trafficking venture that harmed Plaintiff."  (FAC Visa Order at 21).

The cases on which Plaintiff relies are unavailing or unpersuasive.  For example, in *Salesforce*, the entity with which the Seventh Circuit found Salesforce had a "continuous business relationship"—Backpage—itself was liable as a direct sex trafficker under 1951(a)(1).  76 F.4th at 548, 563 (emphasis added).   Here, however, the only relationship Defendants had was with MindGeek, and Judge Carney rejected Plaintiff's theory that the MindGeek Defendants were direct sex traffickers of Plaintiff under the meaning of section 1591(a)(1).  (FAC Visa Order at 17–18).  In other words, unlike the Salesforce defendant, Colbeck and Redwood Defendants were "one step removed from the sex traffickers."  76 F.4th at 562 (Distinguishing *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir. 2021), where the Eleventh Circuit found that plaintiffs failed to allege that franchisors had participated within the meaning of the TVPRA, from *Salesforce*).  The fact that the *Salesforce* court did not require a showing that Salesforce have a direct connection to plaintiff's specific *trafficking* or even her *primary* street level trafficker is irrelevant.  (Opp'n at 31 (citing *Salesforce*, 76 F.4th at 561–62)).  The fact that defendant there had a direct connection and a continuous relationship with one of the traffickers, and not just with a party that is liable for beneficiary liability, sufficiently differentiates the *Salesforce* case from the case here.

The other three cases to which Plaintiff cites—*Doe (L.M.) v. 42 Hotel Raleigh, LLC*, No. 5:23-CV-235-FL, 2024 WL 4204906 (E.D.N.C. Sept. 16, 2024); *T.E. v. Wyndham Hotels & Resorts, Inc.*, No. 2:22-CV-3185, 2024 WL 474400 (S.D. Ohio Feb. 7, 2024); *Doe (L.M.) v.*; *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir. 2021)—for the proposition that beneficiary liability may be sustained based on a relationship with another beneficiary all deal with *franchisee* hotels and their *franchisors*, a relationship that is markedly different than a company and its financiers.

22

In all three cases, the franchisors exercised a level of control over the day-to-day operations of the underlying business venture in a way that is not alleged here.  For example, in *42 Hotel Raleigh*, plaintiff claimed that Hilton "exercised systemic control over 42 Hotel, including by issuing policies and procedures governing security, payment, training, and other circumstances."  2024 WL 4204906, at *2 (cleaned up).  In *Wyndham Hotels*, plaintiff stated that Wyndham "control[led] every aspect of the day-to-day operations of its branded hotels including how reservations are made, room rates, what form of payment is taken, how employees are hired and trained, what employees wear, how complaints and customer feedback are handled, the temperature of the coffee served, and the number of pillows on each bed."  2024 WL 474400, at *4.  And in *Red Roof Inns*, plaintiff there asserted that the franchisors "controlled the policies and standards applicable to and enforced (or not enforced) at the [franchisee hotel], as well as the training of its managers and employees" as well as "sent inspectors to examine this hotel, at times anonymously, and the ongoing sex trafficking activity would have been apparent to those inspectors."  21 F.4th at 720–21.

By contrast, although Plaintiff in this case allege generally that the large debt MindGeek Defendants owed to the Colbeck and Redwood Defendants meant that the Defendants "owned MindGeek" as a practical matter and the loan agreement imposed "draconian covenants" that provided full transparency into the business and control rights over virtually all aspects of MindGeek's managements, operations, and economics, (SAC ¶¶ 251, 259; Opp'n at 21–24), that is not the same as actually exercising control over the policies and operational decisions as the franchisors did in the three cases.  Plaintiffs do assert that the Colbeck and Redwood Defendants "worked closely with MindGeek and advised and assisted them in implementing the plan to dominate online porn via unrestricted content mode," but such conclusory allegation is not sufficient for the Court to infer a level of control akin the to three cases on which Plaintiff relies.  (SAC ¶ 245).  Moreover, to do so would contradict Plaintiff's own pleadings elsewhere in her SAC that impute that kind of control to the Individual

1    Defendants.  (*See, e.g.*, *id.* ¶ 149 ("Individual Defendants were the alter ego of

2    MindGeek, personally controlled, set, and implemented policies and practices in their

3    capacity as the three owners, and were fully aware of and directed its unrestricted use

4    of CSAM and other nonconsensual content").

5         Because the Court finds that Plaintiff has failed to plausibly allege the

6    "participation in a venture" element under Section 1595(a), the Court does not address

7    the other elements.[6]  The Court **GRANTS** Colbeck and Redwood's motions to

8    dismiss Plaintiff's beneficiary liability TVPRA claim pursuant to Section 1595(a).

9              *2.  TVPRA Civil Conspiracy Claim (Count IV)*

10        Colbeck and Redwood Defendants challenge both of Plaintiff's conspiracy

11   claims—one arising under TVPRA §§ 1594(c) and 1595(a) and the other under

12   common state law—on multiple grounds.  The Court addresses (1) whether the 2023

13   amendment to 18 U.S.C. § 1595 applies retroactively to pre-2023 conduct, and

14   (2) whether Plaintiff has stated a viable civil conspiracy claim under the TVPRA..

15              i.  *Retroactivity of the 2023 TVPRA Amendment*

16        Whether the 2023 amendment to 18 U.S.C. § 1595 applies retroactively is the

17   threshold issue for Plaintiff's conspiracy claim.  The Trafficking Victims Protection

18   Act ("TVPA"), later reauthorized as the TVPRA, was enacted in 2000 to "combat

19   trafficking in persons" by imposing enhanced criminal penalties for offenses related to

20   sexual exploitation.  18 U.S.C. §§ 1589–1594; 22 U.S.C. § 7101(a), (b)(2).  Section

21   1591 set forth the elements for a criminal trafficking offense.  18 U.S.C. § 1591(a).

22   Conspiracy to violate these provisions were also criminalized, with section 1594

23   providing that "[w]hoever conspires with another to violate section 1591 shall be fined

24

25

26   ──────────────────────
    [6] In any event, the Court finds that similar to Visa, given the lack of any connection to
27   Plaintiff's video or Plaintiff's trafficker, Plaintiff's claim that the Colbeck and
    Redwood Defendants had knowledge or constructive knowledge of Plaintiff's
28   trafficking venture also fails. (*See* FAC Visa Order at 21–22).

24

under this title, imprisoned for any term of years or for life, or both." TVPRA § 1594(c).

In 2003, Congress amended the TVPA by enacting the TVPRA, which among other things added a civil remedy provision, codified at 18 U.S.C. § 1595. The provision read in pertinent part:

> An individual who is a victim of a violation of section 1589, 1590, or 1591 of this chapter may bring a civil action against the perpetrator in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

TVPRA § 4(a)(4)(A). In 2008, Congress amended section 1595 to expand the TVPRA's civil remedies. *See* William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 221, 122 Stat. 5044, 5067. As amended, section 1595(a) provided a civil remedy if the following was met:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever *knowingly benefits*, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a) (2008) (emphasis added). Finally, most recently in January 2023, Congress again amended section 1595 through the Abolish Trafficking Reauthorization Act of 2022, Pub. L. No. 117-347, 136 Stat. 6199 (2023) ("ATRA") to the following:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, *or attempts or conspires to benefit*, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a) (2023) (emphasis added).

1    Colbeck and Redwood Defendants argue the statute along with a pair of Ninth

2    Circuit cases— *Ratha v. Phatthana Seafood Co*., 35 F.4th 1159 (9th Cir. 2022) (*Ratha*

3    *I*) and *Ratha v. Rubicon Res., LLC*, 111 F.4th 946 (9th Cir. 2024) (*Ratha II*)—make

4    clear that TVPRA did not allow for civil liability for conspiracy to violate the TVPRA

5    until the most recent 2023 amendment by Congress, and such amendment does not

6    have a retroactive effect.  (*Id*.).  The Court disagrees and finds that the 2023 ATRA

7    amendment to Section 1595 applies retroactively.  In reaching this conclusion,

8    however, the Court does not adopt Plaintiff's argument that *Ratha I* is irrelevant to the

9    issue of conspiracy liability under the pre-2023 TVPRA.  As explained below, the

10    Court finds *Ratha I*'s reasoning instructive on whether Congress intended civil

11    conspiracy liability prior to the 2023 amendment.

12    In *Ratha I*, which was decided *before* ATRA, the Ninth Circuit addressed

13    whether the pre-2023 version of Section 1595(a) imposed civil liability for another

14    inchoate violation—attempted violation—of Section 1591.  35 F.4th at 1176.  The

15    analysis hinged on whether an "attempt to benefit" satisfied the "knowingly benefit"

16    requirement under the 2008 version of Section 1595(a), which allowed victims to

17    bring an action not only against perpetrators of a violation of the TVPRA, but also

18    against anyone who "knowingly benefits, financially or by receiving anything of value

19    from participation in a venture which that person knew or should have known has

20    engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a) (2008).  The Court

21    held that it did not.  Specifically, it ruled that "[t]he text of § 1595 does not extend

22    liability to those who attempt to benefit from a perpetrator's TVPRA violation," and

23    that to rule otherwise would "violat[e] a fundamental principle of statutory

24    interpretation that absent provisions cannot be supplied by the courts."  *Id*. (alteration

25    and quotation marks omitted).  The Ninth Circuit further observed that "Congress's

26    decision to impose civil liability on those who 'benefit' but not those who 'attempt to

27    benefit' is significant because attempt liability is plainly authorized elsewhere in the

28    TVPRA," pointing to Section 1594(a)'s provision for criminal attempt liability.  *Id*.

The Ninth Circuit reasoned that because "it is generally presumed that Congress acts intentionally" when "Congress uses certain language in one part of a statute and different language in another," it was reasonable to conclude that "[h]ad Congress intended to create civil liability under § 1595 for attempts to benefit, . . . it would have done so in express terms." *Id*.

Contrary to Plaintiff's assertion that *Ratha I* has no application to conspiracy liability, (Opp'n at 38–40), the Court finds that the case is directly controlling. Both the criminal portion of attempt and conspiracy are found in Section 1594. 18 U.S.C. §§ 1594(a), (c). Similarly, when Congress made the most recent amendment to the TVPRA in 2023, it added language that included both attempt and conspiracy. *See generally* ATRA, Pub. L. No. 117-347, 136 Stat. 6199 (2023) (expanding civil liability to "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value" from an unlawful trafficking venture (emphasis added)). In other words, Congress's treatment of attempt and conspiracy liability are similar, if not the same, and thus the Ninth Circuit's holdings in *Ratha I* should apply with equal force to conspiracy claims.

Plaintiff seeks to distinguish the two liabilities by rehashing the same argument that the *Ratha I* plaintiffs raised—none of which are helpful or persuasive. (Opp'n at 38–39). The "knowingly benefit" requirement under the 2008 amendment does not somehow contemplate conspiracy while "violating a fundamental principle of statutory interpretation" for attempt. 35 F.4th at 1176. As the Ninth Circuit noted, the fact that that the specific language—"conspire to benefit" here, whereas it was "attempt to benefit" there—is found elsewhere under the TVPRA indicates that the exclusion was intentional by Congress.

In *Ratha II*, which was decided after the 2023 amendment, the Ninth Circuit considered whether the 2023 amendment of the TVPRA—which now expressly imposed a private right of action for attempt and conspiracy violations of the TVPRA—had retroactive effect. The Court again ruled against plaintiffs and held that

the 2023 amendment "*does not* apply to pre-enactment conduct." *Ratha II*, 111 F.4th at 969 (emphasis added).  This decision, however, has since been vacated by the Ninth Circuit, which granted rehearing *en banc*.  *Ratha v. Rubicon Res*., LLC,  2025 WL 689487 (9th Cir. Mar. 4, 2025).  The Court thus is no longer bound by *Ratha II* and reviews the parties' argument under applicable law.

In determining whether legislation applies retroactively, courts generally apply a two step-framework.  *Fernandez–Vargas v. Gonzales*, 548 U.S. 30, 37, 126 S. Ct. 2422, 165 L.Ed.2d 323 (2006).  First, the court looks to "whether Congress has expressly prescribed the statute's proper reach."  Id. at 37, 126 S. Ct. 2422 (quoting *Landgraf v. USI Film Prods*., 511 U.S. 244, 280 (1994)).  If the answer to the first question is "yes," the statute applies retroactively unless it runs afoul of the constitution.  *Landgraf*, 511 U.S. at 280.   If the statute contains no "express command" as to its applicability to pre-enactment conduct, a court's second task is to determine whether its application would "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280.  If the statute has such effects, courts apply a presumption against retroactive application "absent clear congressional intent favoring such a result." *Id*., *see also Fernandez-Vargas*, 548 U.S. at 37–38.

The Ninth Circuit has held, however, that such framework is inapplicable in cases where an amendment is enacted to clarify existing law rather than effect change in a legislation.  *ABKCO Music, Inc. v. LaVere*, 217 F.3d 684, 689 (9th Cir. 2000).  This is because in this context, Congress is exercising the "power to clarify the law" for the purpose of "confirm[ing] what the law has always meant."  *Beverly Cmty. Hosp. Ass'n v. Belshe*, 132 F.3d 1259, 1265 (9th Cir. 1997).  In other words, because such an enactment "merely clarifies what [the law] was originally intended to mean" and "state[s] more clearly what the law already was," it "has no retroactive effect that might be called into constitutional question."  *Id*.  Thus, "[w]hen an amendment is deemed

1  clarifying rather than substantive, it is applied retroactively." *ABKCO Music, Inc*., 217

2  F.3d at 689 (citation omitted).

3      "Several factors are relevant when determining if an amendment clarifies, rather

4  than effects a substantive change to prior law." *Dept. of Toxic Substances Control v.*

5  *Interstate Non–Ferrous Corp*., 99 F. Supp. 2d 1123, 1129–30 (E.D. Cal.2000); *see*

6  *also Callejas v. McMahon*, 750 F.2d 729, 731 (9th Cir. 1984) ("It is the duty of a court

7  in construing a statute to consider time and circumstances surrounding the enactment as

8  well as the object to be accomplished by it.").  "A significant factor is whether a

9  conflict or ambiguity existed with respect to the interpretation of the relevant provision

10  when the amendment was enacted.  If such an ambiguity existed, courts view this as an

11  indication that a subsequent amendment is intended to clarify, rather than change, the

12  existing law." *Dept. of Toxic Substances Control*, 99 F.Supp.2d at

13  1129 (quoting *Piamba Cortes v. American Airlines, Inc*., 177 F.3d 1272, 1283–84

14  (11th Cir.1999)); *see also Callejas*, 750 F.2d at 731 ("a dispute or ambiguity, such as a

15  split in the circuits, is an indication that a subsequent amendment is intended to clarify,

16  rather than change, the existing law") (cleaned up) (internal citations omitted).  Courts

17  may also "rely on upon a declaration by the enacting body that its intent is to clarify the

18  prior enactment." *Dept. of Toxic Substances Control*, 99 F.Supp.2d at 1284.

19      Thus, for example, in *ABKCO Music, Inc.,* the Ninth Circuit held that a 1997

20  amendment to the Copyright Act providing that distribution of phonorecords before

21  January 1, 1978, did not constitute publication of the musical work was a clarification

22  of prior law rather than a change in legislation and therefore applied retroactively.

23  *ABKCO Music, Inc*., 217 F.3d at 691–92.  In its analysis, the court first looked to see

24  if there was an ambiguity of the prior statute and noted that the lack of a definition for

25  the term "publication" in the Copyright Act created a circuit split as to how courts

26  have interpreted the term.  *Id*. at 690–91.  Specifically, the court in *ABKCO*

27  highlighted that prior to the 1997 amendment, a 1995 Ninth Circuit decision departed

28  from a long-standing 1976 Second Circuit decision stating that a sale of a phonorecord

in the 1950s did not constitute a publication.  *Id.*  The 1976 Second Circuit decision was the leading case regarding phonorecords until the Ninth Circuit decision in 1995. *Compare Rosette v. Rainbo Record Mfg. Corp.*, 546 F.2d 461 (2d Cir.1976) with *La Cienega Music Co. v. ZZ Top*, 53 F.3d 950 (9th Cir. 1995).  The Court then reviewed the congressional record, which further supported the position that the amendment was a clarifying amendment.  For example, the record stated that the amendment "intended to restore the law to what it was before the decision of the Ninth Circuit Court of Appeals in *La Cienega Music Co. v. Z.Z. Top.*"  *Id.* at 690.  Moreover, sponsors and nonsponsors of the bill used words such as "clarify" and made comments like "restore national uniformity on this important issue" and the "*La Cienega* decision took settled law and cast it on its head, threatening to thrust into the public domain hundreds of thousands of musical works which presently enjoy copyright protection," which further supported the conclusion that the amendment was a clarification.  *Id*. at 690.

     In addition to the statute's text as well as congressional records, courts have considered the timing of the enactment including both how swiftly the amendment was enacted after a controversy arose and the amendment's effective date.  In *Walls v. Dep't of Correction*, for example, the court there found that an amendment to a Delaware's Workers' Compensation Act that expressly excluded inmates from the definition of "employee" was a clarifying amendment, in large part, because the General Assembly acted within a few months of a court's decision upholding an inmate's right to seek workers' compensation benefit.  663 A.2d 488 (Del. 1995).  The court explained that the "sequence of events" and the fact that the "legislature passe[d] an amendment shortly after a controversy [arose]" "strongly suggest[ed] that the recent amendment [] was intended to remove any ambiguity as to the original scope of the statute."  *Id.*  And in *Fitzgerald v. Century Park, Inc*., in holding that an amendment that the permitted a more liberal measure of damages under the Interstate Land Sale Act was not a clarifying amendment and therefore did not have retroactive effect, the Ninth Circuit considered, among other factors, the timing of the effective date of the enactment.

1    642 F.2d 356, 358–59 (9th Cir. 1981).  In enacting the amendment, Congress expressly

2    stated that amendment should become effective "on the effective date of regulations

3    implementing such amendments, but in no case later than six months following the date

4    of enactment . . . ." *Id.* at 359 (citing P.L. 96-153).  The court in *Fitzgerald* interpreted

5    the six-months delay as Congress's intent that the amendment be applied proactively

6    because "[i]t [was] unlikely that Congress would delay the effective date of

7    amendments which are to be applied retroactively." *Id.*

8         Applying the principles here, the Court finds that all the factors indicate that

9    Congress enacted ATRA to clarify the ambiguity identified in *Ratha I*, not create new

10   legislation.  First, the Court finds that the prior enactment of the TVPRA had sufficient

11   ambiguity that it generated inconsistent judicial decisions.  In 2000, Congress enacted

12   the TVPA to "combat trafficking in persons, a contemporary manifestation of slavery

13   whose victims are predominantly women and children, to ensure just and effective

14   punishment of traffickers, and to protect their victims."  Pub. L. No. 106-386, § 102,

15   114 Stat. 1464 (2000) (codified as amended at 18 U.S.C. §§ 1589–92)).  In 2008,

16   Congress enacted a reauthorized and amended TVPRA, including the civil remedy

17   provision codified at 18 U.S.C. § 1595 and the provision regarding the extra-territorial

18   reach of the statute codified under 18 U.S.C. § 1596.  1 Pub. L. No. 110-457, 122 Stat.

19   5044 (2008).  Notably, section 1595 civil remedy provision did not include the word

20   "attempt or conspiracy" while the section 1596 extraterritorial provision did, thereby

21   creating an ambiguity as to whether civil liability attached to attempted and conspiracy

22   violations.

23        Similar to the circumstances in the *ABKCO Music* case, the Court finds that this

24   ambiguity resulted in a circuit split.  As Plaintiff points out, prior to the Ninth Circuit

25   *Ratha I* decision that ruled that civil liability for "attempt to benefit" did not exist pre-

26   ATRA, several courts across circuits and districts concluded that section 1595's civil

27   liability provision extends to attempt and conspiracy claims rising under section 1594.

28   For example, in *Ricchio v. McLean*, the First Circuit reversed a district court's dismissal

31

of plaintiff's conspiracy and attempt claim under the TVPRA. 853 F.3d 553, 556 (1st Cir. 2017). Two years later, in *Roe v. Howard*, the Fourth Circuit affirmed a jury award under section 1595's for conspiracy to engage in commercial sex trafficking pursuant to sections 1591 and 1594. 917 F.3d 229, 243 (4th Cir. 2019). Since, numerous other courts, including in this district, allowed civil conspiracy claims arising under the TVPRA. *See Tanedo v. E Baton Rouge Parish School Board*, 790 F. Supp. 2d 1134, 1147 (C.D. Cal. May 11, 2011) (holding that plaintiff alleged a conspiracy claim under section 1594(b)); *Akhtar v. Vitamin Herbal Homeopathic Ctr. Inc.*, 2021 WL 7186030, at *11 (E.D.N.Y. Apr. 30, 2021) (denying motion for summary judgment as to TVPRA civil conspiracy claim); *Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445, 455 (E.D. Va. 2015) ("[P]laintiff sufficiently states a conspiracy claim pursuant to 18 U.S.C. § 1594(b)."). In 2021, the Ninth Circuit's *Ratha I* decision came out the other way from the cases listed here, thereby creating a circuit split. In other words, *Ratha I* highlighted the ambiguity in the TVPRA statute and signaled an indicia of judicial confusion.

Colbeck and Redwood Defendants argue that these decisions are distinguishable because they dealt with defendants who "attempted or conspired to violate" whereas the case here concerns defendants who are "attempting or conspiring to benefit" under the TVPRA. (CB Reply at 13; Redwood Reply at 16). The Court finds the distinction that Colbeck and Redwood identify is a distinction without a difference. Knowingly benefiting from a TVPRA violation is in and of itself a violation of the TVPRA. See § 1589(b) ("Whoever knowingly benefits, financially or by receiving anything of value . . . shall be punished as provided in subsection (d)."); *see also Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 716 (D.C. Cir. 2022) ("The 'financial benefit' that violates § 1589(b) is itself 'wrongful conduct.' "); *Bistline v. Parker*, 918 F.3d 849, 871 (10th Cir. 2019) ("One can violate [§ 1589] either as a primary offender or simply by benefiting financially from participation in a 'venture' with the primary offender."). In any event, the Fourth Circuit in *Howard*, when finding civil liability for attempt and

conspiracy, did not seem at all motivated by this distinction when it expressly stated that the criminal and civil provisions are coextensive.  917 F.3d at 243.

A review of the congressional record further supports the view that the ATRA is a clarifying amendment.  Specifically, Congress titled the amendment as a "Technical and *Clarifying* Update."  Pub. L. No. 117-347, § 102, 136 Stat. at 6200 (emphasis added).  While a label or title alone is not dispositive, such phrasing may be used to "resolve ambiguity in a statute, so long as [it does] not contradict the actual text" or is not outweighed by other factors that indicate otherwise.  *Beverly Cmty. Hosp.*, 132 F.3d at 1266 n.6; *Beaver*, 816 F.3d at 1187 (finding that heavy reliance on an amendment's title is "misplaced" given other factors including the lapse between the enactment of the bill and the bill's effective date).  The Court does not find any text in the amendment or the TVPRA statute that would contradict this Court taking the amendment's title at face value.

Moreover, the other factors, including the timing of the enactment, only provides additional support that the amendment is clarifying.  First, ATRA took immediate effect when the President signed it in January 2023.  Second, Congress acted swiftly.  Congress introduced ATRA about five weeks after *Ratha I* was published on February 25, 2022.  *See* All Actions: S.3946 — 117th Congress (2021–2022), available at https://www.congress.gov/bill/117th-congress/senate-bill/3946/all-actions (noting that the ATRA was first introduced, "[r]ead twice[,] and referred to the Committee on the Judiciary" on March 29, 2022).  On December 5, 2022, the Supreme Court denied certiorari with respect to *Ratha I.  Ratha v. Phatthana Seafood Co.*, 143 S. Ct. 491 (2022).  Two weeks later, on December 20, 2022, the amendment to § 1595(a) was proposed and was passed by the Senate and House on December 20, 2022, and December 22, 2022, respectively. S. Amend. 6581, 117th Cong., 168 Cong. Rec. S9658, S9658–59 (Dec. 20, 2022), available at https://www.congress.gov/117/crec/2022/12/20/168/198/CREC-2022-12-20-pt3-PgS9658.pdf; All Actions: S.3946 — 117th Congress (2021–2022).  The "sequence of

1  events" and the speed in which Congress acted after *Ratha I* suggest Congress was

2  "merely clarify[ing] what [the law] was originally intended to mean" and "stat[ing]

3  more clearly what the law already was." *Beverly Cmty. Hosp.*, 132 F.3d at 1265; *see*

4  *also Callejas*, 750 F.2d at 731 ("A dispute or ambiguity, such as a split in the circuits, is

5  an indication that a subsequent amendment is intended to clarify, rather than change, the

6  existing law.") (cleaned up) (internal citation omitted)).

7       Based on the analysis of the above factors, the Court finds that ATRA is a

8  clarifying amendment and therefore has retroactive effect.

9                  ii.  *Sufficiency of the TVPRA Civil Conspiracy Allegations*

10       Given that the Court finds that Colbeck and Redwood Defendants may be held

11  liable for civil conspiracy under the TVPRA for pre-2023 conduct, the Court now turns

12  to the parties' substantive conspiracy arguments.  The civil remedy provision of the

13  TVPRA permits suit against any person who "conspires to benefit" from participation

14  in a sex trafficking venture.  18 U.S.C. § 1595(a).  The statute does not define

15  "conspires," but where Congress uses a legal term with a well-established common law

16  meaning, courts presume that Congress intends to incorporate that meaning.  *See*

17  *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 484–85 (2023) (quoting *Sekhar v. United*

18  *States*, 570 U.S. 729, 733 (2013)).[7]

19       At common law, civil conspiracy liability requires: (1) an agreement to do an

20  unlawful act or a lawful act in an unlawful manner; (2) an overt act in furtherance of the

21  agreement by someone participating in it; and (3) injury caused by the act.  *Halberstam*

22  *v. Welch*, 705 F.2d 472, 487 (D.C. Cir. 1983)[8]; *Kashi v. Gratsos*, 790 F.2d 1050, 1055

23  (2d Cir. 1986); *U.S. v. Matta-Ballesteros*, 71 F.3d 754, 765 (9th Cir. 1995).  Courts

24

25    [7] Where a statute imposes both civil and criminal liability, courts interpret the relevant

26  terms consistently across both contexts.  *See Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) ("[W]e must interpret the statute consistently, whether [we] encounter its

27  application in a criminal or noncriminal context.").

28  [8] *Twitter* refers to *Halberstam* as "a leading case on civil aiding-and-abetting and conspiracy liability."  *Twitter,* 598 U.S. at 444.

have further broken down the agreement element into three sub-elements:

(i) knowledge of the wrongful activity, (ii) agreement to join in the wrongful activity, and (iii) intent to aid in the wrongful activity. *See Ajzenman v. Office of Comm'r of Baseball*, 487 F. Supp. 3d 861, 867 (C.D. Cal. 2020) (citing *Craigslist Inc. v. 3Taps Inc.*, 942 F. Supp. 2d 962, 981 (N.D. Cal. 2013)).  This case turns primarily on the sufficiency of Plaintiff's allegations as to these three elements.  The Court analyzes each in turn.

### 1. Knowledge of the Wrongful Activity

The knowledge required to establish liability for civil conspiracy under the TVPRA is higher than the constructive knowledge standard applicable to beneficiary liability.  While § 1595 permits a beneficiary claim against a defendant who "knew or should have known" that a venture was engaged in trafficking, conspiracy requires actual knowledge of the venture's unlawful purpose.

As the D.C. Circuit explained in *Halberstam*, "a person must know the object of the conspiracy and intend to participate in it."  705 F.2d at 481.  This framework guided the court's analysis in *Doe v. Deutsche Bank Aktiengesellschaft,* 671 F. Supp. 3d 387 (S.D.N.Y. 2023).  In applying conspiracy principles to a TVPRA claim, the court emphasized that conspiracy requires that each defendant must have "entered into a joint enterprise with consciousness of its general nature and extent." *Id.* at 411 (quoting *United States v. Alessi*, 638 F.2d 466, 473 (2d Cir. 1980)); *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir. 1989) (holding that "each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy.").

Here, the SAC alleges that Colbeck and Redwood knew through ongoing access to MindGeek that it lacked meaningful moderation and monetized CSAM.  (SAC ¶¶ 89-101, 246, 261, 265, 267, 271–73).  More broadly, the SAC describes Colbeck as a "special situations" financier that provided usurious loans to MindGeek despite

1    "innumerable red flags of illegality," including prior investigations into money

2    laundering, tax evasion, and child pornography.  (SAC ¶¶ 87–90).

3        Defendants counter that these allegations are conclusory and insufficient to plead

4    actual knowledge of a trafficking venture.  Colbeck emphasizes that its loans were

5    issued in 2011 and 2013 and terminated in 2018, years before the 2019–2020 events,

6    such as PayPal's withdrawal and the *New York Times* exposé, that Plaintiff cites as

7    evidence of widespread notice.  (Colbeck Mot. at 21–22; Colbeck Supp. at 2–3).  It

8    argues there are no factual allegations showing that, during the period of its financing,

9    Colbeck was aware that MindGeek's business contained CSAM.  (*Id.*).  At oral

10   argument on April 24, 2025, Colbeck stressed that the loan agreements contained

11   express representations and covenants prohibiting illegal conduct to ensure compliance,

12   including sex trafficking, and that Plaintiff points to no specific facts suggesting

13   Colbeck knew those representations were false when made.  (Apr. 24, 2025 Hr'g Tr. at

14   9:35:19–9:37:58).  Redwood similarly argues that the SAC pleads only generalized

15   awareness, lumping all lenders together without alleging that Redwood itself was

16   presented with reports or information showing that MindGeek's business model

17   depended on sex trafficking.  (Redwood Mot. at 28–33; Redwood Supp. at 6–7).

18   Redwood also points to independent audit reports it obtained before lending, which

19   concluded that MindGeek had "best-in-class" compliance procedures and reviewed

20   "every single user uploaded video" for unlawful content.  (Redwood Supp. at 2).

21       The Court agrees.  The SAC does not allege facts showing that Colbeck or

22   Redwood knew MindGeek's business was rampant with CSAM content.  Nor does the

23   SAC plead facts indicating that Defendants were presented with reports or information

24   during their lending relationship demonstrating that MindGeek's venture itself fostered

25   a sex trafficking enterprise.  Instead, the allegations amount to generalized assertions

26   that sophisticated lenders "should have known" of red flags.  That showing falls short

27   of the actual awareness of the unlawful objective required for the knowledge prong of

28   conspiracy liability.  *Halberstam*, 705 F.2d at 481.

1        *2.  Agreement to Join in the Wrongful Activity*

2        Courts have emphasized that the agreement is the essential feature of conspiracy.

3   *Deutsche Bank*, 671 F. Supp. 3d at 412 (quoting *United States v. Beech–Nut Nutrition*

4   *Corp.*, 871 F.2d 1181, 1191 (2d Cir. 1989)) ("The gist of conspiracy is, of course,

5   agreement."); *Halberstam*, 705 F.2d at 477 ("The element of agreement is a key

6   distinguishing factor for a civil conspiracy action.").  As the Ninth Circuit has

7   explained, agreement in this context means that the parties reached a "meeting of the

8   minds in an unlawful arrangement."  *Transgo, Inc. v. Ajac Transmission Parts Corp.*,

9   768 F.2d 1001, 1020 (9th Cir. 1985).

10       Because direct evidence of an explicit agreement is rare, conspiracy may be

11  proven through circumstantial evidence.  *Halberstam* explained that "[p]roof of a tacit,

12  as opposed to explicit, understanding is sufficient to show agreement," and that "absent

13  a confession, an agreement between conspirators must generally be inferred from

14  circumstantial evidence revealing a common intent."  705 F.2d at 480;  *see also Green*

15  *v. Benden*, 281 F.3d 661, 665–66 (7th Cir. 2002) ("Agreement may be inferred from

16  circumstantial evidence, but only if it is sufficient to permit a reasonable jury to

17  conclude that a meeting of the minds had occurred and that the parties had an

18  understanding to achieve the conspiracy's objectives.").

19       A finding of conspiracy may be justified where the defendants "pursued the same

20  object, although by different means, one performing one part and another another part."

21  *Id.* at 480 (quoting *Davidson v. Simmons*, 203 Neb. 804, 280 N.W.2d 645, 648–49

22  (1979)).  Relevant considerations include "the relationships between the actors and

23  between the actions (e.g., the proximity in time and place of the acts, and the duration

24  of the actors' joint activity)."  *Id.*  These factors help determine whether the defendants'

25  coordinated conduct reflects a shared unlawful objective.

26       The agreement required cannot solely be a business relationship or overlapping

27  commercial interests.  *Craigslist*, 942 F. Supp. 2d at 982 (holding that a buyer-seller

28  relationship does not, without more, establish a conspiratorial agreement or intent to aid

1   in wrongdoing); *Direct Sales Co. v. United States*, 319 U.S. 703, 709 (1943) (holding

2   that "the inference of [conspiracy] cannot be drawn merely from knowledge that the

3   buyer will use the goods illegally").  However, a prolonged and actively pursued course

4   of dealing—when coupled with the seller's knowledge of and shared stake in the

5   buyer's unlawful venture, the standardization of transactions, the duration of the

6   relationship and mutual trust—may support an inference of conspiratorial agreement.

7   *United States v. Menting*, 166 F.3d 923, 928 (7th Cir. 1999).  Without allegations

8   showing that level of conscious participation, a civil conspiracy claim cannot proceed.

9   Plaintiff therefore must allege not merely that Colbeck and Redwood loaned money to

10  MindGeek, but that they agreed to join in MindGeek's trafficking venture.

11      Here, The SAC alleges that Colbeck and Redwood imposed onerous loan terms,

12  secured extensive control rights, advised MindGeek on acquisitions and strategy (SAC

13  ¶¶ 89-101, 245–46, 251, 259, 267–73), and "understood that MindGeek was

14  intentionally operating without any [] meaningful moderation and compliance," which

15  was "essential to MindGeek's ability to . . . pay back" to the loan (*Id.* ¶¶ 246, 266-268,

16  491).

17      These allegations do not plausibly establish an agreement to participate in sex

18  trafficking.  As Colbeck emphasized, the loan agreements expressly prohibited unlawful

19  conduct, making it implausible to infer a tacit understanding to conspire.  (Apr. 24,

20  2025 Hr'g Tr. at 9:38:08–9:39:06; Colbeck Supp. at 2–3).  Redwood further points to

21  independent audit reports describing "best-in-class" compliance procedures.  (Redwood

22  Supp. at 6).  Those contractual protections and diligence efforts are fundamentally

23  inconsistent with an alleged conspiratorial "meeting of the minds" to traffic in CSAM.

24      The Court agrees.  Agreement requires more than parallel commercial interests or

25  awareness of risk; it requires facts supporting a shared unlawful objective.  *Halberstam*,

26  705 F.2d at 477.  The SAC does not allege that Colbeck or Redwood coordinated with

27  MindGeek on the use of CSAM, tailored their financing to promote unlawful content or

28  otherwise aligned themselves with a trafficking purpose.  To the contrary, it is not

38

1    plausible that lenders with fixed-interest returns that was unaffected by MindGeek's

2    traffic volume, would agree to jeopardize repayment by encouraging unlawful conduct.

3    (Redwood Supp. at 2; Colbeck Supp. at 2).  As Colbeck stresses, Plaintiffs' theory

4    would require the Court to conclude that dozens of sophisticated financial institutions

5    conspired to encourage CSAM despite having every incentive to avoid legal risk that

6    could imperil their loans.  (Colbeck Supp. at 2).  That commercial reality weighs

7    against any inference of a shared unlawful objective, because the lenders received

8    interest on their loans rather than an equity stake in any MindGeek entity.

9        At most, the SAC alleges an ordinary creditor-debtor relationship.  But

10   commercial dealings, without more, do not establish conspiracy.  *Craigslist*, 942 F.

11   Supp. 2d at 982.  Without factual allegations of coordination or assent to an unlawful

12   objective, the SAC does not plausibly plead agreement.

13       *3.  Intent to Aid in the Wrongful Activity*

14       Conspiracy also requires that the defendant intended to further the conspiracy's

15   unlawful objective.  *Menting*, 166 F.3d at 927.  In practice, this element often overlaps

16   with the requirement of an agreement.  As the Ninth Circuit has explained, "[s]imple

17   knowledge, approval of, or acquiescence in the object or purpose of a conspiracy,

18   without an intention and agreement to accomplish a specific illegal objective, is not

19   sufficient." *United States v. Melchor–Lopez*, 627 F.2d 886, 891 (9th Cir. 1980).

20       Courts have repeatedly declined to infer intent from knowledge alone.  In *United*

21   *States v. Collins*, the Seventh Circuit emphasized that "[a] person who is indifferent to

22   the goals of an ongoing conspiracy does not become a party to this conspiracy merely

23   because that person knows that his or her actions might somehow be furthering that

24   conspiracy."  966 F.2d 1214, 1219–20 (7th Cir. 1992); *see also Bernhardt v. Islamic*

25   *Republic of Iran,* 47 F.4th 856, 873 (D.C. Cir. 2022) (holding that a plaintiff must plead

26   facts showing a "common intent," not just knowledge).  In *Kemper v. Deutsche Bank*

27   *AG*, the Seventh Circuit rejected conspiracy liability for a bank that processed

28   transactions for entities linked to terrorism, explaining that the SAC failed to allege the

1  bank "cared how its customers obtained or spent the funds."  911 F.3d 383, 395 (7th

2  Cir. 2018).  The Supreme Court reaffirmed this principle in *Twitter*, 598 U.S. at 500,

3  holding that extensive provision of services to a bad actor is not enough where the

4  relationship is "arm's length, passive, and largely indifferent."  These cases establish

5  that civil conspiracy liability requires more than awareness or facilitation—it requires a

6  conscious decision to help achieve the venture's illicit purpose. *Halberstam*, 705 F.2d

7  at 481.

8      Here, Plaintiffs argue that Colbeck and Redwood's loans constituted "direct and

9  material" support for MindGeek and that the Court may infer intent from their

10  knowledge of MindGeek's misconduct.  (Fleites Resp. at 21–24, 32–33).  But the

11  SAC alleges nothing beyond a standard lender-borrower relationship. Neither Colbeck

12  nor Redwood is alleged to have taken steps affirmatively designed to further

13  trafficking.  Instead, they are alleged to have extended loans and then collected fixed-

14  interest repayments.

15      As noted above, Redwood specifically argues that its return was "fixed at the

16  contractual interest" and that it had "nothing to gain from MindGeek's participation in

17  a sex trafficking venture."  (Redwood Mot. at 31; Redwood Supp. at 1).  To the

18  contrary, Redwood points out that lenders had every incentive for MindGeek to

19  operate legally so it could continue to service its debt.  (Redwood Supp. at 2–3).

20  Similarly, Colbeck notes that its loans concluded in 2018, before the 2019–2020

21  scrutiny of CSAM on Pornhub, and that Plaintiffs cite no facts showing Colbeck

22  intended to encourage or profit from trafficking rather than lawful content.  (Colbeck

23  Mot. at 21–22; Colbeck Supp. at 2–3).

24      This distinction underscores why Colbeck and Redwood are even further

25  removed from the alleged trafficking venture than Visa. In *Fleites v. MindGeek*, Judge

26  Carney permitted conspiracy claims against Visa to proceed at the pleading stage

27  because Visa was alleged to have "knowingly provided the tool used to complete a

28  crime"—payment processing that directly monetized CSAM. 617 F. Supp. 3d 1146,

1163–64 (C.D. Cal. 2022).  But as this Court has explained, conspiracy liability under the civil remedy statute requires more than knowingly providing a service that plays some role in unlawful conduct; it requires a conscious decision to join the unlawful purpose.[9]  Even Visa's alleged conduct, more direct and intertwined with MindGeek's monetization of CSAM than the loans at issue here, does not satisfy that intent-to-aid requirement.  Colbeck and Redwood, which were passive lenders among dozens in large, syndicated transactions, with no role in operations and no profit incentive tied to unlawful content, cannot be said to have shared MindGeek's unlawful purpose.  (Redwood Supp. at 2–4; Colbeck Supp. at 2–3).

Taken together, these allegations describe a commercial lending relationship, not a conspiratorial alignment.  As multiple courts have held, "[t]he financial incentive to accept interest on debt provided to a borrower does not establish an intent to aid in sex trafficking." (Redwood Mot. at 31) (citing *Craigslist*, 942 F. Supp. 2d at 982).  The SAC does not allege facts plausibly showing that either Colbeck or Redwood consciously decided to further MindGeek's alleged trafficking venture.  Accordingly, the intent element of conspiracy is not satisfied.

---

[9] Plaintiff points out that Judge Carney previously held that similar allegations were sufficient to state a conspiracy claim under § 1594(c), reasoning that "Visa allegedly 'knowingly provided the tool used to complete a crime,'" and that this was enough to infer intent at the pleading stage. (Opp'n at 40 (quoting Dkt. 166 at 22–23); Fleites Resp. at 13).  This Court respectfully reaches a different conclusion under the civil remedy statute.  Judge Carney reasoned that MindGeek's trafficking violations were a "natural consequence" of the alleged conspiracy and that, at the pleading stage, it was sufficient that Visa allegedly "knowingly provided the tool used to complete a crime." (*Id.*).  But as has already been discussed above, conspiracy requires that the defendant agree and intend to further the unlawful objective, which requires more than mere continued service in the face of known wrongdoing.  *Halberstam*, 705 F.2d at 481.  If merely "knowingly" providing a service that plays a role in the commission of a crime were sufficient to plead agreement, the agreement and intent elements would risk collapsing into the knowledge prong—undermining *Halberstam*'s distinction between actors who passively facilitate unlawful conduct and those who consciously align themselves with it.  Civil conspiracy liability demands more: a shared unlawful purpose, not just awareness of the conduct or failure to prevent it.

1    Plaintiffs' theory also risks eliminating any limiting principle.  As Redwood

2    notes, finding conspiracy liability here would effectively expose to suit many other

3    parties including MindGeek's other 124 lenders, its banks, landlord, payroll providers,

4    server hosts, auditors, lawyers, or consultants.  (Redwood Supp. at 10).  The same

5    reasoning would extend to any number of neutral actors with tangential roles in

6    MindGeek's business, despite having no control over its content or operations.  That is

7    not the law.  Civil conspiracy liability under the TVPRA cannot be triggered by

8    passive nonfeasance or generalized awareness; it requires affirmative alignment with

9    the venture's unlawful purpose.  *Green*, 281 F.3d at 665–66.

10    Accordingly, the Court finds that Plaintiff has not plausibly alleged that Colbeck

11    or Redwood possessed the requisite knowledge, entered into an agreement with

12    MindGeek, or acted with intent to further a sex trafficking venture.  The SAC alleges, at

13    most, that Defendants could have accessed information regarding the public

14    controversy surrounding MindGeek's platforms and structured loans to maximize

15    profit.  Those allegations may support an inference of indifference, but they do not

16    establish a "meeting of the minds" or purposeful participation in unlawful conduct.

17    *Halberstam*, 705 F.2d at 481; *Deutsche Bank*, 671 F. Supp. 3d at 412.  The Court

18    therefore **GRANTS** the Colbeck and Redwood Defendants' motions to dismiss

19    Plaintiff's civil conspiracy claim under § 1595(a).

20    *3.  Common Law Civil Conspiracy Claim (Count XVI)*

21    Under California law, civil "[c]onspiracy is not a cause of action, but a legal

22    doctrine that imposes liability on persons who, although not actually committing a tort

23    themselves, share with the immediate tortfeasors a common plan or design in its

24    perpetration." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd*., 7 Cal. 4th 503, 510–

25    11, (1994). "In such an action the major significance of the conspiracy lies in the fact

26    that it renders each participant in the wrongful act responsible as a joint tortfeasor for

27

28

1  all damages ensuing from the wrong, irrespective of whether or not he was a direct

2  actor and regardless of the degree of his activity." *Id.* at 511 (citations omitted).

3      Under a conspiracy theory of recovery, liability depends on the actual

4  commission of a tort. *Id.*  Once an underlying tort is established, there must be a

5  showing that the conspiring defendants had actual knowledge that a tort is planned

6  and concur in the scheme with knowledge of its unlawful purpose. *Kidron v. Movie*

7  *Acquisition Corp.*, 40 Cal. App. 4th 1571, 1582 (1995).  In other words, "knowledge

8  of the planned tort must be combined with intent to aid in its commission." *Id.*; *see*

9  *also Michael R. v. Jeffrey B.*, 158 Cal.App.3d 1059, 1069 (1984) ("mere knowledge,

10  acquiescence, or approval of an act, without cooperation or agreement to cooperate is

11  insufficient to establish liability").  An agreement may be tacit as well as express.

12  *Navarrete v. Meyer*, 237 Cal. App. 4th 1276, 1292 (2015).  While "knowledge and

13  intent 'may be inferred from the nature of the acts done, the relation of the parties, the

14  interest of the alleged conspirators, and other circumstances,'" *Kidron*, 40 Cal. App.

15  4th at 1582 (quoting *Wyatt v. Union Mortg. Co.*, 24 Cal. 3d 773, 785 (1979)),

16  "'[c]onspiracies cannot be established by suspicions . . . . There must be evidence of

17  some participation or interest in the commission of the offense.'" *Id.* (quoting *Davis v.*

18  *Superior Court* 175 Cal.App.2d 8, 23 (1959)).

19      Plaintiff in her SAC has identified three tort violations on which her common

20  law conspiracy theory is predicated: (1) distribution of private sexually explicit

21  materials in violation of Cal. Civ. Code § 1708.85 (Count XII), (2) violation of the

22  UCL and FAL Cal. Bus. & Prof. Code §§ 17200 and 17500 (Count XIV); and

23  (3) violation of California's Trafficking Victims Protection Act under Cal. Civ. Code

24  § 52.5 (Count XV).  (SAC at 168).  The Court will first address Plaintiff's civil

25  conspiracy theory based on violations of Distribution of Private Sexually Explicit

26  Materials and CTVPA and then turn to claims predicated on the alleged UCL and

27  FAL violations.

28

43

i.    Distribution of Private Sexually Explicit Materials (Cal. Civ. Code § 1708.85)

A civil conspiracy cause of action under California law "must be activated by a commission of an actual tort." *Applied Equipment*, 7 Cal.4th at 511. The Court thus first assesses the viability of the underlying tort claims against the MindGeek Defendants on which Plaintiff's conspiracy claim is predicated. California Civil Code § 1708.85 provides a private cause of action against a

> person who intentionally distributes by any means a photograph, film, videotape, recording, or any other reproduction of another, without the other's consent, if (1) the person knew that the other person had a reasonable expectation that the material would remain private, (2) the distributed material exposes an intimate body part of the other person, or shows the other person engaging in an act of intercourse, oral copulation, sodomy, or other act of sexual penetration, and (3) the other person suffers general or special damages . . . .

Cal. Civ. Code. § 1708.85. Section 1708.85 exempts from liability, however, a "person distributing material under subdivision (a)" where "[t]he distributed material was previously distributed by another person." Cal. Civ. Code section 1708.85(c)(6). Based on the plain language of these provisions, the Court concludes Plaintiff has failed to state a claim.

Plaintiff's SAC makes clear that MindGeek Defendants were not the first party to intentionally distribute the videos—Plaintiff's traffickers were, including Plaintiff's then-boyfriend and an unnamed older man. (SAC ¶¶ 448–462). The fact that the videos of Plaintiff may have first appeared on MindGeek Defendants' platform does not save Plaintiff's claim.[10] The first intentional distributors were those who uploaded

---

[10] The Court notes that Judge Carney had previous ruled in a related class action case that plaintiffs had stated a viable claim under California Civil Code § 1708.85 on the grounds that Plaintiff had plausibly alleged that videos of Plaintiff were first distributed on Defendants' platforms. *Doe v. Mindgeek USA Inc.*, 558 F.Supp.3d 828, 844 (C.D. Cal., 2021). Such holding, however, is not the "law of the case." *City of Los Angeles, Harbor Division*, 254 F.3d at 888 (9th Cir. 2001); *see also United States v. Smith*, 389 F.3d 944, 949 (9th Cir. 2004) ("The law of the case doctrine is 'wholly inapposite' to circumstances where a district court seeks to reconsider an order over

the videos on MindGeeks' platform. *See Doe v. Twitter*, Inc., 555 F. Supp. 3d 889, 931 (N.D. Cal. 2021), *aff'd in part, rev'd in part on other grounds and remanded sub nom. Doe #1 v. Twitter, Inc.*, No. 22-15103, 2023 WL 3220912 (9th Cir. May 3, 2023). Because Plaintiff has failed to adequately plead the underlying tort violation against the MindGeek Defendants under this statute, Plaintiff's civil conspiracy claim against Colbeck and Redwood Defendants predicated on this violation also fails.

    ii. California's Trafficking Victims Protection Act (Cal. Civ. Code § 52.5)

  California Trafficking Victims Protection Act ("CTVPA") provides "[a] victim of human trafficking, as defined in Section 236.1 of the Penal Code, may bring a civil action" for damages or injunctive relief. Cal. Civ. Code § 52.5. In turn, Section 236.1 of the California Penal Code provides three definitions of a human trafficker: (1) "[a] person who deprives or violates the personal liberty of another with the intent to obtain forced labor or services," Cal. Penal Code § 236.1(a); (2) "[a] person who deprives or violates the personal liberty of another with the intent to effect or maintain a violation of" one of the enumerated statutes, including California Penal Code sections 311.1 and 311.5, *id.* §236.1(b), §§ 311.1, 311.5 (criminalizing the distribution, possession, and promotion of obscene material including matters depicting sexual conduct by a person under 18); and (3) "[a] person who causes, induces, or persuades, or attempts to cause, induce, or persuade, a person who is a minor at the time of commission of the offense to engage in a commercial sex act with the intent to effect or maintain a violation of" one of the enumerated statutes, including California Penal Code sections 311.1 and 311.5, *id.* § 236.1(c)

---

which it has not been divested of jurisdiction"). Rather, this discretionary doctrine is applied "where an issue has been decided by a higher court or where the court has entered a final decree or judgment." *Alfasigma USA, Inc. v. First Databank, Inc.*, 525 F.Supp.3d 1088, 1095 (N.D. Cal. 2021) (citing *Askins v. United States Dep't of Homeland Security*, 899 F.3d 1035, 1042-43 (9th Cir. 2018)). Because neither of those situations is presented here, the Court may freely revisit its prior order.

1    Plaintiff alleges that the MindGeek Defendants have violated CTVPA by

2    "knowingly solicit[ing], maintain[ing], and profit[ing] from CSAM, trafficked, rape,

3    and sex abuse material on its websites" and "intend[ing] to, and [] distribut[ing] CSA

4    and other trafficked, rape, and sex abuse materials through their websites." (SAC at

5    167–68).   These allegations, however, are insufficient to meet the required elements

6    of the CTVPA.  First, Plaintiff has failed to allege that the MindGeek Defendants

7    "deprive[d] or violate[d] the personal liberty" of Plaintiff within the meaning

8    California Penal Code § 236.1 (h)(3), which defines "[d]eprivation or violation of the

9    personal liberty of another" as the following:

> "Deprivation or violation of the personal liberty of another"
> includes substantial and sustained restriction of another's
> liberty accomplished through force, fear, fraud, deceit,
> coercion, violence, duress, menace, or threat of unlawful
> injury to the victim or to another person, under
> circumstances where the person receiving or apprehending
> the threat reasonably believes that it is likely that the person
> making the threat would carry it out.

14   Cal. Penal Code § 236.1 (h)(3).

15    Nor has Plaintiff adequately pled that the MindGeek Defendants "intend[ed] to

16   obtain forced labor or services." *Id.* § 236.1(a); *see S. S. v. Ali*, No. 3:23-CV-05074-

17   JSC, 2024 WL 150728, at *7 (N.D. Cal. Jan. 11, 2024) ("Plaintiff's CTVPA claim

18   differs slightly from her TVPRA claim—while not a requirement under the TVPRA,

19   Plaintiff must allege Defendants 'intend[ed] to obtain forced labor or services' to

20   plead a CTVPA violation."); *Lofthus v. Long Beach Veterans Hosp*., 214 F. Supp. 3d

21   908, 916 (C.D. Cal. 2016) (dismissing Plaintiff's CTVPA claim for failing to allege

22   any intent to obtain forced labor or services); *Talib v. Guerrero*, 2016 WL 1470082, at

23   *11 (C.D. Cal. Mar. 14, 2016) (recommending dismissal for failure to allege facts

24   indicating defendants acted with intent to obtain forced labor or services within

25   meaning of § 36.1), R & R adopted, 2016 WL 1452315 (C.D. Cal. Apr. 12, 2016); *cf.*

26   *Maslic v. ISM Vuzem d.o.o*., No. 21-CV-02556-BLF, 2024 WL 3408217,  (N.D. Cal.

27   July 11, 2024) (finding that Defendant is entitled to summary judgment because

28

46

CTVPA does not impose liability on a beneficiary of a trafficking scheme, but only the perpetrator). Finally, Plaintiff has made no allegations that MindGeek Defendants at any time "cause[d], induce[d], persuade[d], or attempt[ed] to cause, induce, or persuade [Plaintiff] *at the time of the commission* of the offense to engage in a commercial sex act. Cal. Penal Code § 236.1(c) (emphasis added). The Court therefore finds that Plaintiff has failed to state a viable claim under the CTVPA against the MindGeek Defendants.[11] Accordingly, Plaintiff's conspiracy claim against the Colbeck and Redwood Defendants to the extent it is based on MindGeek Defendants' violation of the CTVPA must also fail.

               iii.    UCL and FAL (Cal. Bus. & Prof. Code §§ 17200 and 17500)

The UCL forbids "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. Prof. Code § 17200. A practice is considered "unlawful" if it violates a law other than the UCL. *Farmers Ins. Exch. v. Super. Ct*., 2 Cal. 4th 377, 383 (1992). The UCL "'borrows' violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under [the UCL]." *Id*.; *see also Clerkin v. MyLife.com, Inc*., No. C 11–00527 CW, 2011 WL 3607496, at *6 (N.D. Cal. Aug. 16, 2011) ("Violation of almost any federal, state or local law may serve as the basis for a UCL claim."). Based on this sweeping definition, any viable claim against the MindGeek Defendants can become a predicate for an independent violation of the UCL. This presents to the Court a number of issues, including a circular theory of liability against all Defendants.

First and foremost, the UCL would subsume all other alleged tort violations by the MindGeek Defendants that goes beyond the torts specifically identified by Plaintiffs—such as misappropriation of name and likeness in violation of the California Civil Code § 3344—on which now Plaintiff's civil conspiracy claim may

---

[11] The Court again notes that this ruling deviates from Judge Carney's related class action order finding that plaintiffs there had a viable claim under the CTVPA. *Doe v. Mindgeek USA Inc.*, 558 F.Supp.3d at 844. As noted in the previous footnote, however, this Court is not bound by a prior order in a related case.

be based on. (See SAC ¶¶ 555–560). This not only contradicts Plaintiff's own pleadings, but it would present the same issues that Judge Carney identified in his FAC Visa Order regarding Plaintiff's lack of clarity on her civil conspiracy claim. (FAC Visa Order at 30–31). Second, should the Court find that Plaintiff has stated a viable claim against MindGeek for violation of the TVPRA, Plaintiff purportedly may bring a state law civil conspiracy claim for MindGeek's alleged violation of the TVPRA through the UCL (assuming that Plaintiff has sufficiently alleged facts to meet the elements required under a civil conspiracy claim), circumventing the Court's ruling above that *Ratha I* and *Ratha II* precludes a civil conspiracy claim under the TVPRA for actions that took place prior to 2023. Finally, Plaintiff's direct claims against the Colbeck and Redwood Defendants under the UCL can seemingly be predicated on the Colbeck and Redwood's alleged conspiracy to violate MindGeek's UCL claim, which itself is predicated on violations of other laws.

For these reasons, the Court **GRANTS** Colbeck and Redwood's motions to dismiss Plaintiff's civil conspiracy claim based on MindGeek's alleged violation of the UCL. As to Plaintiff's conspiracy claim based on MindGeek's alleged violation of the FAL, the Court finds that Plaintiff has failed to identify any "unfair, deceptive, untrue, or misleading advertising" required under the statute, Cal. Bus. and Prof. Code § 17500, and accordingly **GRANTS** Colbeck and Redwood's motion to dismiss Plaintiff's civil conspiracy claim based on MindGeek's alleged violation of the FAL.

### 4. *Violation of the UCL and FAL under the Cal. Bus. & Prof. Code §§ 17200 and 17500 (Count XIV)*

Plaintiff alleges that Colbeck and Redwood violated the UCL and FAL. The UCL prohibits unlawful, unfair, or fraudulent business acts or practices. Cal. Bus. & Prof. Code § 17200. An "unlawful business activity" includes anything that can properly be called a business practice and that at the same time is forbidden by law. *Walker v. Countrywide Home Loans, Inc*., 98 Cal.App.4th 1158, 1169 (2002). "Under the UCL's unlawful prong, violations of other laws are borrowed and made

48

independently actionable under the UCL." *Herron v. Best Buy Co. Inc.*, 924 F. Supp. 2d 1161, 1177 (E.D. Cal. 2013) (internal quotations omitted); *Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 180 (1999). The FAL prohibits "unfair, deceptive, untrue, or misleading advertising." Cal. Bus. and Prof. Code § 17500. Plaintiff's allegations under the UCL and FAL primarily focus on conduct attributable to MindGeek, not Colbeck or Redwood. (*See* SAC ¶¶ 573–583; *see also* FAC Visa Order at 29 (Judge Carney noting the same issue as to Plaintiff's UCL and FAL allegations against Visa)). Thus, the only applicable prong under the UCL that the Court can glean is relevant to Colbeck and Redwood is the unlawful prong. Given, however, that the Court finds that Plaintiff has failed to allege a predicate viable claim against Colbeck and Redwood Defendants, the Court finds that Plaintiff's UCL claim as to these two defendants must also fail. With respect to Plaintiff's FAL, the Court finds that Plaintiff has failed to identify any "unfair, deceptive, untrue, or misleading advertising" required under the statute. Accordingly, the Court **GRANTS** Defendants' motion with respect to Plaintiff's UCL and FAL claim.

### III.   CONCLUSION

For the foregoing reasons, Colbeck and Redwood's Motions to Dismiss Plaintiff's Second Amended Complaint is **GRANTED**. If Plaintiff chooses to file an amended complaint as to Colbeck and Redwood, Plaintiff may do so 21 days after the Court resolves the two outstanding motions to dismiss in this matter (by the MindGeek Defendants and Visa Inc.).

**IT IS SO ORDERED.**

Dated:  September 17, 2025

_____
HON. WESLEY L. HSU
UNITED STATES DISTRICT JUDGE