1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                       CENTRAL DISTRICT OF CALIFORNIA

10

11    SERENA FLEITES,                      Case No. 2:21-cv-04920-WLH-ADS

                    Plaintiff,             **ORDER RE MINDGEEK'S**
12                                         **MOTION TO DISMISS [440]**

13    v.

14    MINDGEEK S.A.R.L.; MG
      FREESITES, LTD; MINDGEEK USA
15    INCORPORATED; MG PREMIUM
      LTD.; MG GLOBAL
16    ENTERTAINMENT INC.; 9219-1568
      Quebec, Inc. (d/b/a MindGeek);
17    BERND BERGMAIR; FERAS
      ANTOON; DAVID TASSILLO;
18    COREY URMAN; VISA, INC.;
      COLBECK CAPITAL DOES 1-5;
19    BERGMAIR DOES 1-5,

20
                    Defendant(s).
21

22          Before the Court is Defendants MindGeek S.A.R.L., MG Freesites, Ltd.,

23    MindGeek USA, Inc., MG Premium, Ltd., MG Global Entertainment, Inc., 9219-1568

24    Quebec Inc.'s (the "MindGeek Defendants" or "MindGeek") Motion to Dismiss

25    Plaintiff Serena Fleites's ("Plaintiff") Second Amended Complaint ("SAC")

26    ("Motion").  (MG Mot., Docket Nos. 440).  The Court heard oral argument on March

27    7, 2025, and April 24, 2025.  For the reasons set forth below, the Court **GRANTS** in

28    part and **DENIES** in part MindGeek Defendants' Motion to Dismiss.

1    **I.    BACKGROUND**

2        **A.    <u>Factual Background</u>**

3            *1.  Plaintiff Serena Fleites*

4        Plaintiff, who is now at the age of majority, brings this action against the

5    MindGeek Defendants; Bernd Bergmair, Feras Antoon, David Tassillo (the "Individual

6    Defendants"); Visa, Inc.; Colbeck Capital Management, LLC, CB Media Ventures DD,

7    LLC, CB Agency Services, LLC, CB Participations SPV, LLC (the "Colbeck

8    Defendants" or "Colbeck"); and the Redwood Capital Management, LLC, Redwood

9    Master Fund Ltd., Redwood Opportunity Master Fund, Ltd., Manuel 2018, LLC,

10   Ginogerum, LLC, White-Hathaway Opportunity Fund, LLC's (the "Redwood

11   Defendants" or "Redwood") for allegations related to her sex trafficking when she was

12   a minor.  (SAC, Docket No. 385 ¶ 10).

13       In 2014, a thirteen-year-old Plaintiff was induced to make a sexually explicit

14   video by her then high school boyfriend, which he uploaded to Pornhub.com, a

15   pornography website owned and operated by the MindGeek Defendants, without

16   Plaintiff's knowledge or consent.  (*Id*. ¶¶ 11, 448).  Plaintiff alleges that a MindGeek

17   employee reviewed the video of Plaintiff prior to making the video publicly available

18   on Pornhub, as MindGeek Defendants have repeatedly claimed they do for every video

19   uploaded to Pornhub, and therefore knew that the video of Plaintiff constituted child sex

20   abuse material ("CSAM") as her age was apparent, not only from the image itself, but

21   also from the title "13-Year Old Brunette Shows Off For the Camera."  (*Id*. ¶¶ 448,

22   449).  Despite having knowledge that the video contained illicit material, Plaintiff

23   claims that MindGeek posted the video to its Pornhub site consistent with its overall

24   business model and practice.  (*Id*. ¶ 449).  In addition, MindGeek "categorized, tagged,

25   optimized for user preferences, and disseminated the images, tags, and video" of

26   Plaintiff on Pornhub.  (*Id*.).  Plaintiff alleges that MindGeek also uploaded the

27

28

optimized video to its other tubesites[1] and incorporated the video into its algorithmic playlists and suggested videos. (*Id*.). MindGeek also placed advertisements alongside the video, through which it earned revenue with every page visit, impression, engagement, and conversion. (*Id*. ¶ 450). By the time Plaintiff discovered the video, the video had already garnered 400,000 views. (*Id*.).

Impersonating her mother, Plaintiff contacted MindGeek to inform that the video of Plaintiff qualified as CSAM. (*Id*. ¶ 451). After two weeks, MindGeek finally responded, acknowledging that the content was CSAM, but took another two weeks to remove the video after continued demands from Plaintiff. (*Id*.). During this time, the video continued to generate views, and MindGeek continued to earn advertising revenue. (*Id*.). In addition, the video was downloaded and reuploaded several times by different users and with different titles, including by MindGeek Defendants.[2] (*Id*. ¶ 452; Opp'n at 47). One of the reuploads had 2.7 million views. (SAC ¶ 452.). Others had hundreds of comments noting that Plaintiff could not be more than a teenager. (*Id*.). Each reuploaded video was reviewed, accepted, tagged, categorized, and optimized by MindGeek. (*Id*.). MindGeek itself even uploaded the video to its other pornographic tubesites. (*Id*.). Every time Plaintiff discovered a reposted video, she would request MindGeek to remove the videos. (*Id*. ¶ 453). Each time, however, MindGeek would ask Plaintiff "to provide photographic proof that she was the child depicted in the video before removing [the videos]" and would take weeks to do so. (*Id*.).

As a result of the viral dissemination of the video, Plaintiff's life spiraled out of control. She was harassed and bullied in school to such a degree that she started skipping school and finally unenrolled to attend courses online. (*Id*. ¶ 455). Plaintiff

---

[1] A tubesite is a website that contains "free user-populated content." (*Id*. ¶ 38).
[2] The claim that MindGeek Defendants reuploaded *Plaintiff*'s videos after they were initially taken down was not expressly alleged in the SAC. Plaintiff, however, clarifies this point in her Opposition. (Opp'n at 14, 47, 51).

did not tell her mother about the video, and so her relationship with her mother became strained, as her mother did not know why her daughter had suddenly begun to skip classes. (*Id*.). This led to Plaintiff leaving her mother's home to move in with her sister. (*Id*.). A year later, she moved back in with her mother, whereafter she attempted to hang herself, only to be stopped by her younger sister and her mother's boyfriend "who removed the power cord from her neck." (*Id*. ¶ 456.) Plaintiff was admitted to a mental health facility in Bakersfield. (*Id*.) She would attempt suicide several times in the ensuing years. (*Id*. ¶ 260).

Not wanting to face her family after the first suicide attempt, Plaintiff moved in with a friend. (*Id*. ¶ 457). At her friend's house, an older man introduced Plaintiff to heroin, to which Plaintiff became addicted. (*Id*.) To fund her heroin addiction, Plaintiff—still a minor at this point—created sexually explicit videos at the older man's behest, who in turn sold the videos on Craigslist and Kik app. (*Id*.) Some of the videos were then uploaded to Pornhub and were still available on the website as recently as June 2020. (*Id*. ¶ 458). One of the videos was titled "Teen F*cks Guy In Car," and had a user tag that she was underage. (*Id*.) Some videos even had comments about Plaintiff's young age, such as "she looks like she's f*cking 12," "And she is 13?!," "she dadass looks no older than 16," "sh look s like she's 16." (*Id*.). Plaintiff alleges that MindGeek nevertheless reviewed, accepted, optimized, categorized, tagged the videos; incorporated the videos into its algorithmic playlists and suggestions; uploaded the videos to its other tubesites; and placed ads alongside the videos through which MindGeek earned revenue. (*Id*.). While MindGeek profited from the CSAM featuring Plaintiff, Plaintiff was intermittently homeless or living in her car, addicted to heroin, depressed and suicidal, and without the support of her family. (*Id*. ¶ 460.)

### 2. *MindGeek's Business Practices and Business Model*

From 2013 to 2023, MindGeek was the dominant online pornography company in the world. (*Id*. ¶ 2). MindGeek operates several pornographic websites which

4

generally fall into two general categories: (1) free "tubesites" that contain free, purportedly user populated content and (2) premium "paysites" where it sells content, services, and merchandises.  (*Id*. ¶ 38).

MindGeek's business model is predicated on maximizing views and driving traffic to its sites.  (*Id*. ¶ 44).  Traffic and content are crucial in MindGeek's business model because greater traffic and content directly correlate to greater profit through: (1) garnering and driving more traffic to MindGeek and third-party "premium" paysites or services; (2) selling ad space on free sites for the services or products of third parties, which generates revenue with every visit, impression, engagement, and conversion; (3) selling the data of persons who use the free sites; and (4) harvesting data to optimize their website content and become the top result for queries on search engine like Google, which further drive traffic and content.  (*Id*. ¶¶ 44–45, 450).  In other words, MindGeek is incentivized to have more content and drive traffic to maximize its profit.

The "gold standard" for generating traffic and obtaining content is to be the top result for queries on search engines like Google, which can be accomplished through Search Engine Optimization ("SEO").  (*Id*.¶ 45).  SEO "is the science of optimizing a website's ability to garner top search rankings and depends on many factors, but most prominently, content volume, how well that content is described in detail, the website's ability to capture and analyze user interactions and preferences, and traffic." (*Id*.).  In service of its SEO, MindGeek proactively helps users with messaging and content development to enhance the video or image's ability to grab attention.  (*Id*. ¶ 40).  For example, MindGeek provides instructions on "how to succeed" and maximize attention with suggested titles, descriptions and categories that MindGeek's SEO analysis has determined most effectively draw attention to particular types of content and better reach their intended audience.  (*Id*.).  MindGeek's goes even further by having its own formatters review and modify the presentation of the videos and images as they deem appropriate, including the titles, tags and categories, as well as

the videos themselves.  (*Id*.).  MindGeek combines posted content with other, similarly described content and recommends it to users in the form of proposed searches or playlists to further drive attention and traffic. (*Id*.).  Finally, MindGeek itself uploads content to its other websites, at times as a matter of course.  (*Id*. ¶ 43).

Disturbingly, CSAM drives web traffic.  In 2020, the National Center for Missing and Exploited Children ("NCMEC") produced a report describing the "insatiable demand" for CSAM between 1998 to 2019, with 8.4 million such videos posted online in 2018.  (*Id*. ¶ 54).  The same is true for other forms of nonconsensual content including adult sex trafficking, rape, and revenge porn. (*Id*.).  Plaintiff alleges victims, employees, advocacy groups, law enforcement, press reports, and government agencies have all made MindGeek Defendants aware that CSAM and other nonconsensual materials appear on their platforms.  (*See, e.g.*, ¶¶ 99–101, 154–155, 197).  For example, a 2020 *New York Times* article exposed how "modest investigatory efforts easily revealed" that PornHub was "infested" with videos depicting "child abuse and nonconsensual violence."  (*Id*. ¶ 307).

Despite being aware the ubiquitousness of CSAM and other nonconsensual content on its sites, MindGeek maintained what Plaintiff describes as an "unrestricted content" business model to feed MindGeek's "singular priority of using SEO to be the top search engine website result in any porn related search."  (*Id*. ¶¶ 56, 57, 110).  Under this model, MindGeek allegedly "knowingly and intentionally solicited, optimized, and commercialized content of any kind, including child pornography and other nonconsensual content, and avoided any policy, process, or technology that would exclude illegal content or limit or even slow the upload of content generally to its websites." (*Id*. ¶ 57).  Specifically, Plaintiff claims that MindGeek achieved this through three knowing and intentional practices.  (*Id*. ¶ 58).

First, MindGeek systematically ignored the laws in the jurisdictions in which it did business by setting up "shifting, opaque, and Byzantine international corporate structure" which "obscured MindGeek's ownership and operation" in jurisdictions

that are known to be "havens" for tax evasion, money laundering, and with weak laws and enforcement related to pornography.  (*Id*. ¶ 58–66).

Second, MindGeek knowingly and intentionally created a faux "moderation" process that was "hopelessly under-staffed [and] under-resourced," which consisted of an exclusively human moderation team of no more than 30 untrained, minimum wage contractors in Cypress to review 700-1200 videos a day.  (*Id*. ¶¶ 58, 67, 73).  Even worse, this team was not only understaffed, but also perversely incentivized: they were offered bonuses that depended on the number of videos they *approved* for upload.  (*Id*. ¶ 79 (emphasis in the original)).  Thus, despite touting that every video was reviewed and screened by a moderator prior to it being available on MindGeek's website, (*Id*. ¶¶ 67-80, 103, 471), these so-called moderators were not actually tasked with excluding CSAM and other nonconsensual content but rather proactively attracting, optimizing, and monetizing it, while also masking it from authorities by "'scrubb[ing]' words in the titles and tags that unequivocally indicated criminality." (*Id*. ¶¶ 58, 74–77).  In other words, while providing a "public veneer of legality," the real goal for these moderators was to let as much content as possible go through, including CSAM and nonconsensual materials, to maximize revenue.  (*Id*. ¶ 79, 101).  Consequently, Plaintiff alleges that MindGeek never verified the age, identity, and the consensual nature of the videos uploaded onto their sites.  (*Id*. ¶¶ 205, 295, 297).  They also clearly underreported CSAM to NCMEC.  (*Id*. ¶ 99–100).  Until 2020, MindGeek purportedly never voluntarily made a single legally required disclosure to authorities in the United States or Canada.  (*Id*. ¶ 99).  With little policing done by MindGeek, it was largely up to the victims to flag, report, and request takedown of illicit content to MindGeek.  These victims, however, were often met with delay tactics and/or stonewalling, especially if the content sought to be removed was "performing well."  (*Id*. ¶ 88).  The delay would permit MindGeek to preserve the use of content as long as possible so that it could continue analyzing a well performing, albeit illegal, video so that MindGeek could refine its algorithms to push similar

content.  (*Id.*).  If and when the illegal videos were successfully removed, MindGeek only disabled the video but kept the webpage with its title, description, tags, and comments to that video so that it would still continue to increase its SEO and users searching for such content could be directed to similar content that were not disabled.  (*Id.* ¶¶ 90, 96).  Moreover, because MindGeek's website allowed users to download videos, removed videos were often reuploaded, requiring victims to constantly monitor for a reposting of their videos.  (*Id.* ¶ 137).  Perhaps, most disturbingly, Plaintiff alleges that MindGeek systematically and surreptitiously reuploaded removed content that it had been forced to disable.  (*Id.* ¶ 97).

Third, MindGeek proactively used its extensive SEO technology to curate CSAM and other nonconsensual content by further "optimizing" its descriptions, tags, titles, and video formats and arranging recommended searches to find, and curate playlists of, such content, even though it had the capability and the technology to exclude nonconsensual or other banned content (*Id.* ¶¶ 58–59, 67–68, 106–107).  For example, MindGeek directed users to use up to 16 tags that describe the video and performers; select up to 8 relevant categories, and where applicable, use niche specific categories to ensure the content would reach the "right" fans; and write creative titles that described the scene.  (*Id.* ¶ 114).  Amongst the "preexisting" categories that a user could select for a video were categories such as "teen," "school," "babysitter," and "old/young"—all categories that purportedly targeted views who are interested in CSAM.  (*Id.* ¶¶ 113–114).   And on the page explaining the video categories, MindGeek represented that "Teen" is one of the most popular categories.  (*Id.*).  In addition to providing guidance to the users, MindGeek's own formatters added and edited content, including the tags and categories.  (*Id.* ¶ 115).  They would also create a graph or timeline underneath the videos to help viewers identify and quickly advance to various levels of sexual activity within the video.  (*Id.* ¶ 116).  They also created thumbnails for the videos on MindGeek's tubesites, some of which were created from CSAM videos.  (*Id.* ¶ 118).  To reach their intended audience, MindGeek

1    would edit advertisements on its websites to frequently highlight terms such as "girls,"

2    "boys," "broken teens," and "twink," which are terms that promote the creation, use

3    and viewing of CSAM and "encouraged for use by MindGeek." (*Id*. ¶ 120).

4    MindGeek's platforms even allowed advertisers to build campaigns around keywords

5    like "13yearoldteen" and "not18"; indeed, they were even allowed to target ads to

6    people searching the term "child rape" in languages other than English. (*Id*. ¶ 121).

7    The result meant that MindGeek would retain its position as the top search result for

8    all porn searches, including CSAM and nonconsensual content. (*Id*. ¶ 123).

9    Accordingly, Plaintiff alleges that MindGeek's sites contain a trove of obvious and

10   easily accessible CSAM. Plaintiff alleges that "in just few minutes of basic searches,

11   users" could seemingly find countless videos clearly depicting child sexual assault or

12   exploitation, where titles, descriptions, and tags bluntly describe the illicit nature of

13   the videos. (*Id*. ¶ 125.)

14        **B.    Procedural Background**

15        On June 17, 2021, named Plaintiff Serena Fleites and Plaintiffs Jane Does No. 1

16   through 33 filed this action bringing numerous causes of actions against Defendants

17   MindGeek S.A.R.L., MG Freesites, Ltd., MindGeek USA, Inc., MG Premium, Ltd.,

18   RK Holdings USA, Inc., MG Global Entertainment, Inc., TrafficJunky, Inc., Bernd

19   Bergmair, Feras Antoon, David Tassillo, Corey Urman, Visa, Inc., Colbeck Capital

20   unnamed does 1 through 10, and Bergmair unnamed does 1 through 10. (Compl.,

21   Docket No. 1). On February 10, 2022, the Court granted Defendants' motion to sever

22   Plaintiffs and ordered Plaintiff Fleites to file a First Amended Complaint ("FAC")

23   with her continuing as the only named plaintiff in this action and dismissed Plaintiffs

24   Jane Does No. 1 through 33 without prejudice. (Docket No. 119). On March 21,

25   2022, Plaintiff filed a FAC consistent with the Court's February 10, 2022, order.

26   (FAC, Docket No. 124, Ex. 124-3). On May 23, 2022, Defendants filed motions to

27   dismiss Plaintiff's FAC. (Docket Nos. 135–140). On July 29, 2022, Judge Carney

28   granted in part and denied in part Visa's motion to dismiss Plaintiff's First Amended

Complaint.  (FAC Visa Order, Docket No. 166).  Judge Carney also ordered the MindGeek Defendants and the Individual Defendants to submit to jurisdictional discovery and granted Plaintiff leave to amend her complaint after jurisdictional discovery was complete.  (FAC MindGeek Order, Docket No. 167).  Accordingly, Judge Carney denied the MindGeek Defendants and the Individual Defendants' motions to dismiss in light of the "near certainty that Plaintiff will file a Second Amended Complaint at the close of jurisdictional discovery."  (*Id*. at 8).

On May 23, 2024, Plaintiff filed her Second Amended Complaint. (SAC, Docket. No. 385). On August 30, 2024, MindGeek Defendants filed a Motion to Dismiss Plaintiff's SAC.  (Docket No. 440).   On October 31, 2024, Plaintiff filed an Omnibus Opposition to Defendants' Motions to Dismiss, including MindGeek's Motions to Dismiss (Opp'n, Docket No. 477), to which the MindGeek Defendants filed a reply on December 6, 2024.  (Reply, Docket No. 501).

On March 7, 2025, the Court heard oral arguments from all parties.  At the hearing, Plaintiff raised for the first time certain arguments and case law with respect to the personal jurisdiction issue over MindGeek S.a.r.l.  The Court allowed for supplemental briefing on the issue.  On March 21, 2025, MindGeek Defendants filed their Supplemental Brief Regarding Personal Jurisdiction (MG Suppl. Br., Docket No. 553), to which Plaintiff filed a Reply to MindGeek Defendants' Supplemental Brief on April 4, 2025 (Fleites Reply, Docket No. 573).  The matter is considered fully briefed.

## II.    DISCUSSION

Plaintiff, in her SAC, alleges 14 causes of action against the MindGeek Defendants: (1) violation of Trafficking Victims Protection Reauthorization Act ("TVPRA") based on a theory of direct and beneficiary liability pursuant to 18 U.S.C. §§ 1591(a)(1), 1591(a)(2), 1595 (Count I); (2) conspiracy to violate the TVPRA pursuant to 18 U.S.C. §§ 1594(c), 1595 (Count IV); (3) Receipt, distribution, or transport of materials involving the sexual exploitation of minors in violation of 18

U.S.C. §§ 2252, 2255 (Count V); (4) Receipt, distribution, or transport of CSAM in violation of 18 U.S.C. §§ 2252A, 2255 for the transport of CSAM (Count VI); (5) Public Disclosure of Private Facts (Count VII); (6) Intrusion into Private Affairs (Count VIII); (7) Placing Plaintiff in False Light (Count IX); (8) Common Law Misappropriation of Name and Likeness (Count X); (9) Misappropriation of Name and Likeness in Violation of Cal. Civ. Code § 3344 (Count XI); (10) Distribution of Private Sexually Explicit Materials in Violation of Cal. Civ. Code § 1708.85 (Count XII); (11) Negligence (Count XIII); (12) violation of the UCL and FAL under the Cal. Bus. & Prof. Code §§ 17200 and 17500 (Count XIV); (13) violation of California's Trafficking Victims Protection Act under Cal. Civ. Code § 52.5 (Count XV); and (14) violation of civil conspiracy (Count XVI).  (SAC at 150–53, 155–56, 166–71). MindGeek Defendants advance multiple grounds for dismissal under 12(b)(6), lack of standing; and lack of personal jurisdiction over MindGeek S.à.r.l.  The Court will address each argument in turn.

## A.  <u>Legal Standard</u>

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  A complaint may be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

The court must construe the complaint in the light most favorable to the plaintiff, accept all allegations of material fact as true, and draw all reasonable inferences from well-pleaded factual allegations.  *Gompper v. VISX, Inc*., 298 F.3d 893, 896 (9th Cir. 2002).  The court, however, is not required to accept as true legal

11

conclusions couched as factual allegations. *See Iqbal*, 556 U.S. at 678. A claim is considered to have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. In deciding a Rule 12(b)(6) motion, a court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007).

### B. Analysis

#### 1. Section 230 of the Communication Decency Act

MindGeek Defendants first argue that they are immune under Section 230 of the Communications Decency Act ("CDA"). (MG Mot. at 2–8). Section 230 of the CDA affords Interactive Computer Service Providers ("ICSs") broad immunity from liability for content posted to their websites by third parties. *Carafano v. Metrosplash.com, Inc*., 339 F.3d 1119, 1123 (9th Cir. 2003). The statute immunizes ICSs when plaintiffs seek to treat them "as the publisher or speaker of any information provided by another information content provider." U.S.C. § 230(c)(1). That is, Section 230 applies when a plaintiff alleges that the defendant is (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat as a publisher or speaker (3) of information provided by another information content provider. *Barnes v. Yahoo!, Inc*., 570 F.3d 1096, 1100–01 (9th Cir. 2009). "When a plaintiff cannot allege enough facts to overcome Section 230 immunity, a plaintiff's claims should be dismissed." *Dyroff v. Ultimate Software Grp., Inc*., 934 F.3d 1093, 1097 (9th Cir. 2019). "Courts consistently have held that § 230 provides a 'robust' immunity," *Goddard v. Google, Inc*., 2008 WL 5245490, at * 2 (N.D. Cal. Dec. 17, 2008) (quoting *Carafano v. Metrosplash.com, Inc*., 339 F.3d 1119, 1123 (9th Cir. 2003)), and "that all doubts 'must be resolved in favor of immunity.'" *Id*. (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1174 (9th Cir. 2008)).

1    While § 230 immunity is broad, however, it is not absolute.  *See Barnes*, 570

2    F.3d at 1100.  There are several exceptions to § 230 immunity, two of which Plaintiff

3    advances here: the content provider exception and the Fight Online Sex Trafficking

4    Act ("FOSTA") exception.  (Opp'n at 53–57).  Because the Court finds that Plaintiff

5    has sufficiently alleged the former exception—which would abrogate MindGeek's §

6    230 immunity as to all of Plaintiff's federal and state law claims, and not just

7    Plaintiff's TVPRA claims—the Court does not address the FOSTA exception here.

8    *See Doe #1 v. MG Freesites, LTD*, 676 F. Supp. 3d 1136, 1159 (N.D. Ala. 2022)

9    (stating that the Court need not address or rule on parties' FOSTA argument because

10   the court can separately find that defendants are not subject to Section 230 immunity

11   based upon on another exception).

12    It is undisputed that MindGeek is an ICS.  Instead, Plaintiff argues that

13   Defendants are also acting as content providers, and, as such, cannot claim § 230

14   immunity. "[I]mmunity [under § 230] applies only if the [ICS] is not also an

15   'information content provider,' which is defined as someone who is 'responsible, in

16   whole or in part, for the creation or development of' the offending content."

17   *Roommates.com*, 521 F.3d at 1162 (citing 47 U.S.C. § 230(f)(3) (defining "information

18   content provider")).  In other words, content providers cannot use Section 230

19   immunity to escape liability for the unlawfulness of the content they create.

20    In *Roommates*, the Ninth Circuit held that an ICS steps into the role of an

21   information content provider "if it contributes materially to the alleged illegality of the

22   conduct." *Id*. at 1168 (emphasis added).  "A 'material contribution,' [however,] does

23   not refer to 'merely . . . augmenting the content generally, but to materially

24   contributing to its alleged unlawfulness.'" *Gonzalez v. Google*, 2 F.4th 871, 892 (9th

25   Cir. 2021) (quoting *Roommates*, 521 F.3d at 1167–68) (emphasis in original).  Thus, a

26   "website does not create or develop content when it merely provides a neutral means

27   by which third parties can post information of their own independent choosing

28   online." *Kimzey v. Yelp! Inc*., 836 F.3d 1263, 1270 (9th Cir. 2016) (citation omitted).

13

1  Nor can providing "passive conduits" or "neutral tools for navigating websites"

2  constitute as content creation or development "absent substantial affirmative conduct

3  on the part of the website creator promoting the use of such tools for unlawful

4  purposes." 521 F.3d at 1167 & 1174 n.37. Rather, "making a material contribution . .

5  . is 'being responsible for what makes the displayed content allegedly unlawful.'"

6  *Gonzalez*, 2 F.4th at 892 (quoting *Jones v. Dirty World Ent. Recordings LLC*, 755

7  F.3d 398, 410 (6th Cir. 2014)).

8        Thus, in *Roommates.com*, the Ninth Circuit found a website provider,

9  Roommates.com, was both a service provider and a content creator when it required

10  users to elect discriminatory housing preferences. Specifically, the court there found

11  that "[b]y requiring subscribers to provide the information as a condition of accessing

12  its service, and by providing a limited set of pre-populated answers, Roommate

13  becomes much more than a passive transmitter, of information provided by others; it

14  becomes the developer, at least in part, of that information." 521 F.3d. at 1166. By

15  contrast, in *Doe v. Grindr Inc*., the Ninth Circuit held that a dating app, Grindr, was

16  not a content provider because the features and functions that allowed a minor to be

17  matched with a predator based on geographic data it extracted from them, and

18  communicate with a predator, were neutral features that were meant to facilitate the

19  communication and content of all users, not just minors and predators. No. 24-475,

20  2025 WL 517817, at *3 (9th Cir. Feb. 18, 2025).

21        Applying the above standard, two cases against the same MindGeek Defendants

22  here with very similar factual allegations—one in this very district, *Doe v. Mindgeek*

23  *USA Inc*., 558 F. Supp. 3d 828 (C.D. Cal. 2021), *adhered to on denial of*

24  *reconsideration*, 574 F.Supp.3d 760 (C.D. Cal. 2021), and one in a sister district, *Doe*

25  *#1 v. MG Freesites, LTD*, 676 F. Supp. 3d 1136 (N.D. Ala. 2022)—found that

26  MindGeek was a content provider within the meaning of the § 230 exception. In *Doe*

27  *v. MindGeek*, Judge Carney there found that the MindGeek Defendants "materially

28  contributed to" the development of illegal CSAM because plaintiff's sufficiently

alleged that defendants "do far more than employ neutral tools that treat videos depicting child pornography the same as any other video on the platforms." 574 F.Supp.3d at 770. Instead, plaintiff claimed that the same defendants at issue here "solicit, review, approve and feature [illicit] videos on their platforms," and target unlawful content by "directing users to complete preference surveys, categorizing its videos using coded language for child pornography to ensure that content is visible to the 'right fans,' and instructing users how to title their videos to target individuals interested in child pornography." *Id*. (cleaned up). In addition, the defendants purportedly took it upon themselves to "assist traffickers in anonymizing web traffic, making it difficult for law enforcement to locate child pornography producers." *Id*. (cleaned up). In other words, the tools and functions that the defendants provided "call[ed] directly for child pornography" by "specify[ing] and prompt[ing] the type of content" at issue. *Id*. (cleaned up).

In *Doe #1 v. MG Freesites*, the Northern District of Alabama, finding *Doe v. MindGeek* persuasive, also found that MindGeek defendants were content providers based on allegations that defendants "encourage and materially contribute to the development, optimization, and advertising of CSAM on Pornhub." 676 F.Supp.3d at 1162. Specifically, the Alabama court found that allegations that defendants "*themselves* generate[d] tags, categories, and keywords that users wishing to post CSAM videos can use, and in fact are encouraged to use, to maximize views, such "teen," "abused teen," and "middle school girls"; created thumbnails of CSAM videos and "timelines for viewers to jump around to certain labeled scenes in videos depicting CSAM"; "employ[ed] coded language for CSAM content to ensure that such content is visible to users who search for it;" and "control[ed] the content in each video through extensive instructions to uploaders including the type of content viewers wish to see and the sex acts to take place" amounted to "tools [that they] themselves function in a way to direct users to CSAM in particular." *Id*. 1162–63.

The Court finds the two cases persuasive. Here, Plaintiff claims that the MindGeek Defendants, for the purpose of optimizing content for the SEO, themselves generated and suggested preexisting categories and tags to uploaders that specifically targeted viewers who are interested in CSAM. (SAC ¶¶ 113–114). In their "How to Succeed" guideline, MindGeek explained how "Teen" was one of the most popular categories that a user could select to attract viewers. Moreover, "for maximum effect," MindGeek employees added and edited the content themselves such as highlighting terms that are known to promote the creation, use, and viewing of CSAM such as "girls," "boys," "broken teens," and "twink." (*Id*. ¶¶ 115, 117, 120). Further, Plaintiff alleges that MindGeek formatters "scrubbed" words in titles and tags that unequivocally indicated criminality to shield illicit videos from law enforcement and prevent their removal. (*Id*. ¶¶ 76–77). Taking Plaintiff's allegations as true, the Court found that Defendants' tools and guidelines themselves prompted and encouraged CSAM and other nonconsensual content, thereby contributing materially to the illegal content. *MG Freesites*, 676 F.Supp.3d at 1163.

MindGeek Defendants point the Court to *Doe v. WebGroup Czech Republic, a.s., et al.*, No. 2:21-cv-02428-SPG-SK, ECF 205 (C.D. Cal. Feb. 21, 2025), a recent case from this district, as persuasive authority to compel a different outcome. (MG Suppl. Br. At 2-4). There, the court assessed whether § 230 barred plaintiff's sex-trafficking claims against defendants whose business model included "promoting and encouraging CSAM, hosting voluminous CSAM on their websites, failing to moderate and cull out illegal content, profiting from CSAM, and revenue-sharing with uploaders of CSAM." *WebGroup,* ECF 205 at 6 (C.D. Cal. Feb. 21, 2025). In support of her material contribution argument, the plaintiff offered as examples several factual allegations including: "[d]efendants' creation of advertisement based on data indicating CSAM; sharing of profits with sex trafficking users; use of VPNs to anonymize web traffic and evade law enforcement; [] creation of thumbnails, titles, tags, keywords, search terms, and categories indicative of CSAM;" and the "create[ion

16

of] guidelines which permit, promote, and encourage sex trafficking." *Id*. at 9; *Doe v. WebGroup Czech Republic, a.s*., 2024 WL 3533426, at *7 (C.D. Cal. July 24, 2024). Based on these facts, the court ultimately concluded that defendants' online tools that plaintiff challenged did not rise to the level of promotion and encouragement of CSAM. *Id*.

Notwithstanding the fact that *WebGroup* is not controlling precedent, the Court agrees that the facts in *WebGroup* present facts similar to those presented in this instant action. As the court acknowledged in *WebGroup*, however, the "scope of § 230(c)(1) immunity doctrine has 'yielded mixed results'" as it presents "'a difficult and complex issue that requires case-specific, and indeed claim-specific, analysis . . . .'" *Id*. at 6 (quoting *Calise v. Meta Platforms, Inc*. 103 F.4th 732, 736, 739 (9th Cir. 2024)). The Court finds that there are sufficiently distinguishable facts that limit *WebGroup*'s persuasiveness in this matter. First, with respect to the alleged guidelines that promoted and encouraged sex trafficking, the court in *WebGroup* found that the plaintiff there failed to present allegations to show exactly "how any such guideline specifically promotes illegal conduct." *WebGroup*, 2024 WL 3533426, at *8. Plaintiff here specifically states that MindGeek's page explaining video categories expressly informs uploaders that "Teen" is one of its most popular categories, despite knowing that the term attracts and encourages CSAM. (SAC ¶ 114).

Second, the court in *WebGroup*, in finding that the "existence of titles, tags, key words, search terms, and categories indicative of CSAM" still constituted "standard publishing function or neutral tool made available to all third parties seeking to upload material onto Defendants' website," noted that plaintiff did not deny that most tags and keywords in use on defendants' websites were user-generated. *WebGroup*, 2024 WL 3533426, at *8. In stark contrast, Plaintiff here alleges that MindGeek employees *themselves* add and edit tags and categories to the videos that specifically target viewers who are interested in CSAM. (SAC ¶¶ 113–115).

17

Finally, unlike *WebGroup* where the only allegation relating to tools to evade law enforcement was defendants' use of VPNs to anonymize web traffic, which seemingly applied to the general user population, 2024 WL 3533426, at *8, here, Plaintiff has alleged that MindGeek formatters specifically targeted CSAM and "scrubbed" words in titles and tags that were blatant red flags of criminality to shield the illicit videos from law enforcement and prevent their removal.  (SAC ¶¶ 75–76). Such "affirmative conduct" and guidelines go beyond being a "passive transmitter of information provided by others." *Roommates*, 521 F.3d at 1166, 1174 n.37.  Even accepting MindGeek Defendants' argument that all of MindGeek's platform features and functions are mere "neutral search tools or algorithms" that may be "misused by bad actors," Plaintiff here has sufficiently alleged that MindGeek Defendants are the "bad actors" themselves, misusing their own tools to aid in the production and proliferation of CSAM.  *MG Freesites*, 676 F.Supp.3d at 1163.  The Court thus finds that this is a case different in kind than *Webgroup*.

At oral argument, MindGeek urged the Court to read the SAC in ways to make it more like *Webgroup*.  Specifically, MindGeek argued that, because Plaintiff's videos were CSAM when they were created and uploaded, the things MindGeek is alleged to have done post-upload cannot constitute "material contribution" to the CSAM.  MindGeek further argued that the Compaint insufficiently alleged that viewing of Plaintiff's videos by a MindGeek employee would create knowledge on the employee's part that Plaintiff was underaged, for example if the video only included "Plaintiff's calf."  MindGeek also argued that the SAC was not specific enough as to what MindGeek actually did, using ambiguous terms such as "curate." As to the first argument, the Court finds that the Complaint sufficiently alleges that MindGeek itself, not its users, engaged in acts which was specifically designed to drive traffic to Plaintiff's videos, thereby "materially contributing" to the value of the CSAM.  (*See* SAC ¶¶ 58–59, 67–68, 106–107, 114-125).  As to the second argument, the Court finds this argument to make a factual challenge inappropriate for this Court

to visit at the Motion to dismiss stage.  As to the third argument, the Court finds the descriptions in the SAC of MindGeek's conduct are sufficient to satisfy notice pleading standards.

MindGeek Defendants argue that even if the Court were to find that Plaintiff's general allegations are enough to overcome the § 230 immunity, § 230 still bars Plaintiff's claims as it specifically relates to her because she fails to show that MindGeek "created or developed the particular [content] at issue."  (MG Mot. at 4 (citing *Carafano v. Metrosplash.com*, Inc., 339 F.3d 1119, 1125 (9th Cir. 2003); *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1118 (N.D. Cal. 2020)).  In other words, Plaintiff has not sufficiently alleged how MindGeek materially contributed to the creation and development of the two videos of Plaintiff that were uploaded by her ex-boyfriend and the unnamed older man.  (*Id.*).

The Court disagrees.  In the SAC, Plaintiff claims that MindGeek reviewed, uploaded, categorized, tagged, optimized for user preference and disseminated the videos of Plaintiff.  (SAC ¶ 449).  MindGeek also purportedly uploaded the optimized, tagged, and categorized video to its other tubesites.  (*Id.*).  While the Court agrees that Plaintiff's pleadings as to MindGeek's involvement in the videos as specific to her leave more to be desired, the Court finds that these allegations paired with the general allegations found in the rest of the SAC detailing MindGeek's tools that are not neutral in nature but rather encourage criminality are sufficient at this stage of the litigation when all reasonable inferences are drawn in favor of Plaintiff. *Gompper*, 298 F.3d at 896; *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097 (9th Cir. 2008) (noting that plaintiff need not plead with particularity but need to only meet the standard of notice pleading); *Gregory Vill. Partners, L.P. v. Chevron U.S.A., Inc.*, 805 F. Supp. 2d 888, 895 (N.D. Cal. 2011) (explaining that notice pleading only requires a short and plain statement of the claim showing that the pleader is entitled to relief and need not provide specific facts as long as it provides defendant fair notice of the claim and the grounds upon which it rests).  The Court

1    thus finds that MindGeek Defendants are not entitled to immunity under § 230 of the

2    CDA given the allegations in the SAC.

3            *2.  Violation of TVPRA pursuant to 18 U.S.C. §§ 1591, 1595 (Count I)*

4            Title 18, United States Code, Section 1595 provides a private right of action to

5    victims of violations of 18 U.S.C. § 1591.  18 U.S.C. § 1595(a).  Section 1591

6    criminalizes two categories of actors involved in a sex trafficking venture:

7    perpetrators of trafficking ("direct liability"), or those who knowingly benefit

8    financially from trafficking ("beneficiary liability").  Plaintiff brings claims based on

9    both theories against MindGeek.

10                   a.  Direct Liability under § 1591(a)(1)

11           Section 1591(a)(1) ("direct liability") imposes criminal liability on anyone who

12   "knowingly . . . recruits, entices, harbors, transports, provides, obtains, advertises,

13   maintains, patronizes, or solicits by any means a person . . . knowing . . . that the

14   person has not attained the age of 18 years and will be caused to engage in a

15   commercial sex act."  18 U.S.C. § 1591(a)(1).  A "commercial sex act" is "any sex

16   act, on account of which anything of value is given to or received by any person."  *Id*.

17   § 1591(e)(3).

18           MindGeek argues that this claim must be dismissed on the grounds that the

19   "SAC offers not a single fact suggesting that MindGeek" committed any such acts in

20   violation of Section 1591(a)(1) with respect to Plaintiff.  (MG Mot. at 9, 16).  Rather,

21   Plaintiff specifically attributes these actions to her ex-boyfriend and the unidentified

22   party who uploaded the CSAM video onto Pornhub.  (*Id*.).

23           The Court agrees.  There are no facts in the SAC that suggest MindGeek acted

24   as a primary violator with respect to Plaintiff, and Plaintiff's repeat of the statutory

25   language without further support is the definition of conclusory that cannot pass

26   muster on a motion to dismiss.  (*See* SAC ¶ 467).  *Lee v. City of Los Angeles*, 250

27   F.3d 668, 679 (9th Cir. 2001).  Notably, Plaintiff fails to address Defendants'

28   challenges to direct liability or even mention direct liability in her opposition.  (*See*

                                                20

*generally* Opp'n at 5–19).  The only theory that can potentially be gleaned from Plaintiff's SAC is that MindGeek "advertised" Plaintiff.  (*See* SAC ¶ 522).  Judge Carney, however, already expressly rejected this theory *in dicta* on the grounds that Plaintiff failed to allege that "her videos were posted in the form of an advertisement to users that she might be available for future sex acts."  (FAC Visa Order at 18). Because Plaintiff has failed to offer any new theories or allegations that would require a departure from Judge Carney's conclusion, the Court **GRANTS** MindGeek Defendants' motion to dismiss with respect to the claim arising from Section 1591(a)(1) with prejudice.  *See Nat'l Funding, Inc. v. Com. Credit Counseling Servs., Inc.*, 817 F. App'x 380, 385 (9th Cir. 2020) (affirming dismissal where the amended complaint "failed to cure the deficiencies explicitly identified by the district court in its prior order"); *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995) (emphasizing that futility of amendment can, by itself, justify denial of leave to amend).

### b.  Beneficiary Liability under § 1591(a)(2)

Section 1595(a) permits civil victims to bring a claim under the beneficiary liability theory against anyone who "knowingly benefits . . . from participation in a venture which that person knew or should have known" was engaged in sex trafficking.  18 U.S.C. § 1595(a).  In contrast to Plaintiff's Section 1591(a)(1) argument, Judge Carney has previously concluded, *in dicta*, that Plaintiff had "comfortably stated a claim under section 1591(a)(2) against MindGeek."  (FAC Visa Order at 18).  This Court agrees.

Here, Plaintiff claims that MindGeek knew that there were troves of CSAM and nonconsensual content on their platforms but nevertheless, adopted and executed an "unrestricted content" business model that embraced such illicit content for the purpose of maximizing profit.  (*See, e.g.*, SAC ¶¶ 2, 56-58, 71, 148–152).  Plaintiff argues that despite having the technology to monitor and screen out illegal content, MindGeek deployed their employees, tools and guidelines in such a way to prompt and encourage the proliferation of CSAM and other nonconsensual content.  (*Id.*

21

¶¶ 58–59, 67–68, 106–107).  Specifically, MindGeek had a woefully understaffed
moderating team who were incentivized by MindGeek to upload rather than screen out
content, including illicit content.  (*Id*. ¶¶ 74, 162).  These moderators purportedly
reviewed every video prior to upload and despite the videos and images clearly
depicting and indicating CSAM, they posted them to their platforms.  (*Id*. ¶¶ 67–80,
471).  Moreover, MindGeek employees themselves optimized and edited the videos to
garner more views, including by highlighting content and adding tags known to attract
CSAM viewers and scrubbing blatant red flags of criminality to shield the videos from
law enforcement.  (*Id*. ¶¶ 40, 74–78, 115–118).  MindGeek also allegedly stonewalled
and delayed the removal of illicit content on their platform when presented with
takedown request from victims.  (*Id*. ¶¶ 88–94, 100, 156).  Even worse, MindGeek
would also reupload content that it had been forced to disable.  (*Id*. ¶ 97; Opp'n at 14).
All the while, MindGeek placed alongside every video, including CSAM and
nonconsensual content, advertisements that brought in revenue with every page view,
impression, conversion and engagement.  (*Id*. ¶ 450).

With respect to Plaintiff specifically, Plaintiff alleges that her underage was
apparent in the videos featuring Plaintiff not only from the image itself but also from
the titles—"13-Year-Old Brunette Shows Off For The Camera" and "Teen F*cks Guy
In Car"—and user tags.  (SAC ¶¶ 448, 458).  Yet, consistent with MindGeek's overall
business model and practice, a MindGeek employee reviewed the videos—as they
purportedly do with every video prior to making it publicly available on their
websites—and allowed the videos to be posted on Pornhub.  (*Id*. ¶ 449).  In addition,
after making a seemingly apparent CSAM video on its websites publicly available, a
MindGeek formatter also "categorized, tagged, optimized for user preferences, and
disseminated the images, tags and video depicting" an underaged Plaintiff; "uploaded
the optimized, tagged, and categorized video to its other tubesites;" and "incorporated
it into its algorithmic playlists and suggested videos."  (*Id*. ¶¶ 449, 458).  MindGeek
Defendants then made revenue off her videos through the advertisements appearing

next to the videos.  (*Id*. ¶¶ 450, 458).  When Plaintiff eventually discovered the first video of her when she was 13-years old and contacted MindGeek to inform them that the video constituted CSAM, MindGeek took two weeks to respond and then another two weeks to remove the video from the website.  (*Id*. ¶ 451).  During that period, the video not only continued to gain views from which MindGeek continued to profit through advertisements, but it was also downloaded and uploaded countless times.  (*Id*. ¶¶ 451–452).  Each reupload was allegedly reviewed, accepted, optimized, categorized, tagged, and uploaded to other tubesites by MindGeek.  (*Id*. ¶ 452).  And each time Plaintiff requested a takedown of the video, MindGeek stalled the removal of the video by requiring Plaintiff to provide photographic proof that she was the child depicted in the video before removing it from its site.  (*Id*. ¶ 453).  Moreover, Plaintiff alleges that MindGeek Defendants reuploaded her videos.  These allegations are sufficient to show that MindGeek Defendants "knowingly benefit[ed] . . . from participation in a venture which that person knew or should have known" was engaged in sex trafficking.  18 U.S.C. § 1595(a).

    MindGeek Defendants advance several challenges, none of which the Court finds compelling.  First, MindGeek Defendants heavily rely on *Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137 (9th Cir. 2022), to argue that Plaintiff has failed to meet the required elements to allege a plausible beneficiary liability theory under the TVPRA.  (MG Mot. at 10–16; Reply at 1–4).  As Defendants acknowledge, however, *Reddit* is a case in the context of the FOSTA exception under Section 230 of the CDA, where the Ninth Circuit found that the relevant standard for a plaintiff to meet to avail herself to the FOSTA exception is the *criminal* standard of liability under Section 1591(a)(2) and not the civil under Section 1595(a)(2).  (Reply at 2).  *Reddit*, 51 F.4th at 1141–43.  That is not applicable here.  Given that Plaintiff need not rely on the FOSTA exception to § 230 immunity, *supra* at 12, the relevant issue is whether Plaintiff has

met the required elements for a *civil* beneficiary liability claim, and the Court finds that she has.

MindGeek Defendants nevertheless claim that the *Reddit* case "continues to be instructive" and argue, based on the Ninth Circuit's *dicta* that cited to Section 1595(a) of the TVPRA and stated "[i] n a sex trafficking beneficiary suit *against a defendant-website*, the most important component is the *defendant-website's* own conduct—its 'participation in the venture,'" 51 F.4th at 1142 (emphasis in the original), that the Ninth Circuit essentially imposed a requirement that, in both civil and criminal beneficiary liability cases, a plaintiff must meet the criminal standard for the "participation in a venture" element.  (Reply at 2 (citing *Reddit*, 51 F.4th at 1142)).  In other words, a plaintiff bringing a private right of action under Section 1595 of the TVPRA must show that the website's "own conduct [itself] violate[d] 18 U.S.C. § 1591"—*i.e.*, the defendant must have actually "engaged in some aspect of the sex trafficking" by "assisting, supporting, or facilitating" trafficking with actual knowledge.  *Reddit*, 51 F.4th at 1142, 1145.  The Court finds that such a broad interpretation of *Reddit* is unsupported and therefore rejects MindGeek Defendants' argument.

FOSTA states "[n]othing in [§ 230] shall be construed to impair or limit [] any claim in a civil action brought under section 1595 of Title 18, *if the conduct underlying the claim* constitutes a violation of section 1591 of that title. . . ."  47 U.S.C. § 230(e)(5)(A) (emphasis added).  The *dicta* to which MindGeek Defendants point was regarding the Ninth Circuit's analysis as to which element of Section 1595(a)(2) constituted "the conduct underlying the claim" element of FOSTA, which in turn, must meet the criminal standard under section 1591 for the FOSTA exception to apply.  *Reddit*, 51 F.4th at 1142.  Finding that the "participation in a venture" element was the "gravamen" to a civil beneficiary claim under section 1595, and thus constituted the "conduct underlying the claim" element of FOSTA, the Ninth Circuit concluded that a plaintiff must show that a defendant's own participation violated the criminal standard of the TVPRA to successfully invoke the FOSTA exception.  *Id*. at

1142–43.  When read in context, the Court does not how see this *dicta* can be

construed as the Ninth Circuit imposing the criminal standard for the "participation in

a venture" element to both criminal and civil beneficiary liability cases.  Rather, in its

opinion, the Ninth Circuit repeatedly narrowed its holding to the FOSTA's immunity

exception.  *See, e.g.*, *id*. at 1141 ("We hold that *for a plaintiff to invoke FOSTA's*

*immunity exception*, she must plausibly allege that the website's own conduct violated

section 1591.") (emphasis added); *id*. at 1143 ("As such, a website's own conduct

must violate 18 U.S.C. § 1591 *for the immunity exception to apply*.") (emphasis

added); *id*. at 1145 ("On this record, it is clear that *FOSTA requires* that a defendant-

website violate the criminal statute by directly sex trafficking or, with actual

knowledge, 'assisting, supporting, or facilitating' trafficking, *for the immunity*

*exception to apply*.") (emphasis added).

The Court therefore refuses to depart from the long line of cases that states that,

for a defendant to be held civilly liable under section 1595 of the TVPRA, plaintiff

need not "demonstrate an overt act that furthered the sex trafficking aspect of the

venture" in order to satisfy the participation requirement under Section 1595(a).  *Doe*

*v. Twitter, Inc.*, 555 F. Supp. 3d 889, 918 (N.D. Cal. 2021), *abrogated on other*

*grounds by Does 1-6 v. Reddit, Inc*., 51 F.4th 1137 (9th Cir. 2022); *Acevedo*, 714

F.Supp.3d at 775; *see also M.A. v. Wyndham Hotels Resorts, Inc*., 425 F. Supp. 3d

959, 969–70 (S.D. Ohio 2019); *S.Y. v. Naples Hotel Co*., 476 F. Supp. 3d 1251 (M.D.

Fla. 2020) (conducting thorough review of cases where courts have held "actual

participation in the sex trafficking act itself" is not required for a civil beneficiary

liability claim as it would "void the 'known or should have known' language of

§ 1595").  This conclusion follows from the *M.A.* court's statutory construction

analysis, which reasoned that applying the "participation in a venture" definition from

§ 1591, the criminal provision under the TVPRA which requires "knowingly assisting,

supporting, or facilitating a [TVPRA] violation," 18 U.S.C. § 1591(e)(4), "would void

the 'should have known' language in the civil remedy" and, thus, "violate[ ] the

1    'cardinal principle of statutory construction that a statute ought, upon the whole, to be

2    construed so that, if it can be prevented, no clause, sentence, or word should be

3    superfluous, void or insignificant." *M.A*., 425 F. Supp. 3d at 969.  Rather,

4    participation in the civil context requires only a showing of a "desire to promote the

5    wrongful venture's success." *Salesforce.com*, 76 F.4th at 559.  Thus, for example,

6    courts have said that in the absence of direct association with traffickers, participation

7    may be inferred by a "showing of a continuous business relationship between the

8    trafficker and [Defendants] such that it would appear that the trafficker and

9    [Defendants] have established a pattern of conduct or could be said to have a tacit

10   agreement." *MindGeek*, 558 F.Supp.3d at 837 (quoting *M.A.*, 425 F. Supp. 3d at 970).

11        MindGeek Defendants claim that Plaintiff could not meet even the civil

12   standard for "participation in a venture" on the ground that she failed to allege

13   sufficient facts to show a "continuous business relationship" between MindGeek

14   Defendants and her specific trafficker—*i.e.*, her ex-boyfriend and the unidentified

15   older man.  (MG Suppl. Br. at 7; Tr. Oral Arg. 2:13-2:16).  Pointing to a Seventh

16   Circuit case, *G.G. v. Salesforce.com, Inc*., MindGeek Defendants contend that facts

17   akin to the *Salesforce* case must be shown to establish a "continuous business

18   relationship." 76 F.4th at 565  In *Salesforce*, the court there found that plaintiff there

19   established a "continuous business relationship" between defendant Salesforce and

20   trafficker Backpage where Salesforce entered into several lucrative contracts with

21   Backpage, Salesforce provided Backpage with "targeted solutions addressed to the

22   needs of Backpage's business," and provided "active, ongoing support" that was

23   tailored to those needs.  *Id.* at 560.

24        The Court, however, does not accept MindGeek Defendants' framing that

25   *Salesforce*—an out of circuit case—somehow sets the standard of what constitutes a

26   "continuous business relationship."  Moreover, nowhere in the *Salesforce* decision did

27   the Seventh Circuit proclaim that it was setting such a bar.  Rather, the Court finds

28   that courts in this district and others have repeatedly held that facts much closer to the

ones presented in the instant case were sufficient to establish a "continuous business relationship" for the purpose of the "participation in a venture" element under section 1595. For example, in *M.A.*, the court found the plaintiff had adequately alleged participation in a venture under "§ 1595 by alleging that Defendants rented rooms to people [they] knew or should have known were [sic] engaged in sex trafficking." *M.A.*, 425 F. Supp. 3d at 971. There, the plaintiff alleged that the "[d]efendants were on notice about the prevalence of sex trafficking generally at their hotels and failed to take adequate steps to train staff in order to prevent its occurrence[.]" *Id*. at 968. Additionally, the plaintiff alleged a "number of signs . . . [that] should have alerted staff to her situation." *Id*. The court explained that "[t]hese [alleged] acts and omissions by Defendants . . . facilitated the sex trafficking venture." *Id*. Similarly, in *Doe v. Twitter*, the court found that "general allegations that Twitter enables sex trafficking on its platform"—Twitter makes it hard for users to report child sexual abuse material; permits large amounts of human trafficking on its platform, despite having the ability to monitor it and at least constructive knowledge of its posting on the platform; provides hashtags to help users find child sexual abuse material; rarely removes hashtags that are associated with such material; and has a search suggestion feature that makes it easier for users to find the illicit content—combined with specific allegations about how Twitter failed to remove child pornography videos depicting the plaintiffs, made it plausible that Twitter and the sex traffickers had a "tacit agreement." *Twitter*, 2021 WL 3675207, at *25.

Here, Plaintiff claims that MindGeek Defendants adopted a business model that essentially encouraged the posting of CSAM and other nonconsensual materials by traffickers by accepting and allowing their videos to be uploaded, optimizing and editing the videos in a way to make it easy for users to find CSAM and shielding the videos from law enforcement and removal. With respect to the specific allegations concerning videos of Plaintiff, the SAC states that a MindGeek employee reviewed, approved and uploaded videos of Plaintiff despite clear indications that they contained

1   CSAM.  (*SAC* ¶¶ 58-80).  Moreover, despite Plaintiff specifically reporting the video as

2   CSAM, MindGeek Defendants allegedly delayed the takedown of the videos and even

3   reuploaded the videos anonymously after their removal.  The Court thus finds that

4   Plaintiff's general allegations regarding MindGeek's overall business model along with

5   Plaintiff's specific allegations as they pertain to her indicate a "tacit agreement"

6   between MindGeek and traffickers—including Plaintiff's traffickers—and a desire to

7   promote the "wrongful venture's success."  *M.A*., 425 F. Supp. 3d at 970.

8       MindGeek Defendants argue that even if the Court were to find that there are

9   sufficient allegations to support the participation in a venture element, Plaintiff's

10  beneficiary liability claim must still fail because Plaintiff fails to allege that MindGeek

11  "knowingly benefited" from participating in the trafficking venture.  (Reply at 3).

12  While conceding that Section 1595 of the TVPRA requires Plaintiff to meet the

13  "constructive" knowledge standard, MindGeek Defendants assert that even the lower

14  mental state standard is not met here because there was not an "overwhelming

15  presence of trafficking."  (*Id*. at 4).  This argument seems to conflate two elements of

16  Section 1595(a)(2) and rather seems to be challenging the "knew or should have

17  known" element, not the "knowingly benefit" element of the claim.  The Court,

18  nevertheless, will address both elements for the purpose of completeness.

19      The "knowingly benefit" element of a civil beneficiary liability claim under

20  Section 1595 "merely requires that Defendant knowingly receive a financial benefit."

21  *B.M. v. Wyndham Hotels & Resorts, Inc*., No. 20-CV-00656-BLF, 2020 WL 4368214,

22  at *4 (N.D. Cal. July 30, 2020); *Salesforce.com*, 76 F.4th at 564 ("as the statutory text

23  clearly dictates, where the defendant is simply aware that it is benefiting, that is

24  enough"); *Acevedo*, 713 F. Supp. 3d at 776 ("Knowingly benefit" only requires that

25  defendants knowingly received a financial benefit from the relationship, not that the

26  trafficker provided any benefit because defendants facilitated in the sexual

27  misconduct).  The "benefit received" need not derive directly from the trafficking.

28  *B.M.*, 2020 WL 4368214, at *4.  As the court explained in *B.M.*, such an interpretation

"improperly reads a requirement for actual knowledge of criminal sex trafficking into the civil statute and reads out the should have known language." *Id*.; *see also Salesforce.com*, 76 F.4th at 565 n.20 (noting that *quid pro quo* requirement "has been rejected by virtually every other court). Plaintiff alleges that MindGeek Defendants monetized the postings of videos of CSAM and other nonconsensual content, including videos of her, through advertisement revenue, fee-based subscription services, and selling user data. (*See e.g*., SAC ¶¶ 44, 452, 458). The Court therefore finds that Plaintiff plausibly alleged that MindGeek Defendants knowingly received benefits from the trafficking venture.

The "known or should have known" language requires Plaintiff to demonstrate Defendants' constructive knowledge as to the venture's general violation of Section 1591. *MindGeek*, 558 F.Supp.3d at 836; *see also Reddit*, 51 F.4th at 1141 (distinguishing sections 1595 and 1591 and explaining that unlike civil liability under 1595, to be held criminally liable as a beneficiary, a defendant must have actual knowledge of the trafficking). Pointing to *G.G. v. Salesforce.com, Inc.*, and *Doe v. Deutsche Bank*, MindGeek Defendants argue that because there was a lack of a venture that was "publicly and notoriously engaged in sex trafficking activity to a significant degree," the Court cannot impute constructive knowledge to MindGeek "on the basis of a comparatively small amount of allegedly illegal user-generated content." (Reply at 3–4).[3] MindGeek Defendants' attempt to again cherry pick high profile cases and set it as the standard is unpersuasive and not rooted in the applicable law. The mental state that MindGeek Defendants seek to impose here is much closer to "willful blindness" or at least "reckless disregard." *See Glob.-Tech Appliances, Inc.*

---

[3] *G.G. v. Salesforce.com, Inc.*, was a case where the plaintiffs brought a beneficiary liability claim against Salesforce for allegedly facilitating Backpage—a platform which had been "publicly identified" as "the biggest and most notorious sex trafficking and pimping website" as early as five years before it first contracted with Salesforce. 76 F.4th at 549, 554. *Doe v. Deutsche Bank* involved bank funding of Jeffrey Epstein trafficking venture. 671 F. Supp. 3d at 407.

*v. SEB S.A.*, 563 U.S. 754, 769–70 (2011) (explaining that a "willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts" while a " reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing"). But that is not the standard. The "should have known" language invokes a *negligence* standard, not a willful blindness or a reckless disregard standard. *Acevedo*, 714 F.Supp.3d at 780; *M.A.*, 425 F. Supp. 3d at 965; *see also Glob.-Tech Appliances,* 563 U.S. at 770 (2011).

Thus, courts across districts have consistently found that the constructive knowledge standard was met based on sex trafficking ventures that were much less notorious than the ones presented in either the *Salesforce* case or the *Deutsche Bank* case. *See, e.g.*, *M.A.*, 425 F. Supp. 3d at 965–69; *Acevedo*, 714 F.Supp.3d at 781; *Doe (L.M.) v. 42 Hotel Raleigh, LLC*, No. 5:23-CV-235-FL, 2024 WL 4204906, at *6 (E.D.N.C. Sept. 16, 2024); *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 192–94 (E.D. Pa. 2020); *M.L. v. craigslist Inc.*, No. C19-6153 BHS-TLF, 2020 WL 5494903, at *6 (W.D. Wash. Sept. 11, 2020). For example, in *M.A.*, plaintiff there was a victim of sex trafficking that occurred at hotels owned by the defendant, and she sued under Sections 1595(a) and 1591(a)(2) of the TVPRA based on the theory that the hotel chain benefited from the rental of the rooms where she was trafficked and knew or should have known that trafficking was occurring there based on various signs of sex trafficking that should have been obvious to hotel staff. 425 F.Supp.3d at 962. Specifically, plaintiff alleged that her traffickers frequently paid in cash, requested rooms near exit doors, refused housekeeping services, and left "an extraordinary number" of used condoms in the trash cans; the same staff worked at hotels where plaintiff was trafficked for multiple days or weeks in succession; plaintiff's trafficker routinely escorted her in view of the front desk; staff ignored plaintiff's pleas and screams for help; and defendant's hotel locations were in areas "known for sex trafficking." *Id*. at 967. The Court found that these allegations, while not sufficient to

30

demonstrate actual knowledge, were sufficient to demonstrate negligence where "[d]efendants were on notice about the prevalence of sex trafficking generally at their hotels and failed to take adequate steps to train staff in order to prevent its occurrence." *Id*.

Here, Plaintiff alleges that there is a proliferation of CSAM and nonconsensual content on Defendants' platform such that a simple search produced flood of results of illicit videos and images. (*See, e.g.*, SAC ¶¶ 123–124, 290, 307). MindGeek was purportedly made aware of the issue by victims, employees, advocacy groups, law enforcement, press reports and government agencies during the relevant time period. (*See, e.g.*, *id*. ¶¶ 99–101, 154–155, 197). Despite having "actual knowledge of the pervasiveness of CSAM on their platforms," *MindGeek*, 558 F.Supp.3d at 837–38, MindGeek not only failed to implement basic protections against posting CSAM, such as age verification technology, but instead continued to employ an "unrestricted content" business model that proactively embraced and monetized CSAM and nonconsensual content. (SAC ¶ 109). Against this background, Plaintiff asserts that the video of Plaintiff uploaded by her ex-boyfriend clearly indicated that it contained CSAM based on the image itself as well the title "13-Year Old Brunette Shows Off For The Camera." (*Id*. ¶ 448). A MindGeek employee purportedly reviewed the video prior to posting it on Pornhub. (*Id*. ¶ 449). The videos of Plaintiff had hundreds of comments noting that Plaintiff was clearly a minor. (*Id*. ¶ 452). Moreover, each time Plaintiff discovered an uploaded or reuploaded video of her, Plaintiff contacted MindGeek Defendants directly to notify them that the video was CSAM and should be taken down. (*Id*. ¶¶ 450–51). Yet, MindGeek Defendants delayed the removal of the video and required verification from Plaintiff that she was, in fact, the victim. (*Id*. ¶ 453). The Court finds that these allegations, which the Court must take true at this

1  junction of litigation, indicate not just negligence but actual knowledge that the video
2  constituted CSAM.

3      MindGeek Defendants also raised at oral argument that Plaintiff must show
4  constructive knowledge as to the trafficking of Plaintiff specifically.  (*See also* MG
5  Suppl. Br. At 6).  This interpretation is inconsistent with the statutory language of
6  Section 1595, which only demands constructive knowledge as to the *venture*, not the
7  specific *victim*.  18 U.S.C. §§ 1591(a)(2); 1595(a); *see also Deutsche Bank*, 671
8  F.Supp.3d at 407 ("By the express terms of the statute, then, liability is imposed for
9  knowingly benefiting from participation in a sex-trafficking *venture*, not for
10  knowingly benefiting from the sex-trafficking of a particular *person*.") (emphasis in
11  the original).  Such a requirement would also lead to a perverse outcome where a
12  beneficiary would be more likely to escape liability with larger sex-trafficking
13  ventures with more victims.  *See Salesforce*, 76 F.4th at 557.  In any event, as
14  discussed above, the Court does find that Plaintiff has alleged sufficient facts to
15  demonstrate that MindGeek had constructive knowledge as to Plaintiff specifically.

16      Based on the foregoing, the Court finds that Plaintiff has alleged a plausible
17  civil beneficiary liability claim and therefore **DENIES** MindGeek Defendants' motion
18  to dismiss Plaintiff's claim arising under section 1595(a)(2) of the TVPRA.

19          *3.  Conspiracy to violate the TVPRA pursuant to 18 U.S.C. §§ 1594(c),*
20              *1595 (Count IV)*

21      Plaintiff has asserted a claim of civil conspiracy under the TVPRA pursuant to
22  section 1594(c) against all Defendants.  (SAC ¶¶ 155–56).  Given that (1) the Court
23  has already found that Plaintiff has stated a viable beneficiary liability claim under
24  section 1595(a)(2) against the MindGeek Defendants and (2) the Court has found that
25  Plaintiff's conspiracy claims fail as to all other Defendants, leaving only the
26  MindGeek Defendants remaining, the Court concludes that there is no other party with
27  whom MindGeek could have conspired as a matter of law.  Because a civil conspiracy
28  claim requires at least two participants, and Plaintiff does not allege a conspiracy

among MindGeek entities alone, Plaintiff cannot plausibly state a conspiracy claim against MindGeek.  The court **GRANTS** MindGeek Defendant's motion to dismiss as to Count IV without prejudice, with leave to amend.

> 4.  *Violation of Receipt, Transport, and Distribution of CSAM pursuant to 18 U.S.C. §§ 2252, 2252A, 2255 (Count V & VI)*

Counts V & VI allege that MindGeek Defendants knowingly received, possessed, and distributed CSAM depicting Plaintiff, in violation of 18 U.S.C. §§ 2252 and 2252A.  Plaintiff further alleges that MindGeek Defendants duplicated and distributed *new* CSAM by creating and posting new "thumbnail" images from existing videos of Plaintiff.

Section 2252A(f) provides a civil remedy to persons aggrieved by the conduct prohibited in section 2252A(a) or (b).  18 U.S.C. § 2252A(f).  Section 2252A recognizes that the elements of the offense can be met through actions "by any means, including by computer" and liability for knowing distribution applies to "any CSAM"—regardless of the material's publication status or whether it was originally created by a third party.  *Id.* § 2252(A)(a)(2).  To be held liable under Section 2252 and 2252A, a plaintiff must prove defendant's "knowledge that the video contained sexually explicit conduct with a minor."  *United States v. Ruiz-Castelo*, 835 F. App'x 187, 189 (9th Cir. 2020); *see also United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994) (concluding that "the term 'knowingly' in § 2252 extends both to the sexually explicit nature of the material and to the age of the performers").  Actual knowledge can be established based on willful blindness, which in turns requires a showing of "deliberate actions to avoid confirming a high probability of wrongdoing."  *Glob.-Tech Appliances*, 563 U.S. at 769.

Relying on a Ninth Circuit decision regarding trademark infringement that held that "willful blindness requires the defendant to be aware of *specific instance* of infringement or specific infringers," *Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1002 (9th Cir. 2023) (emphasis added), MindGeek Defendants argue that Plaintiff has

1    not pled sufficient facts to meet the knowledge requirement under sections 2252 and

2    2252A because Plaintiff has failed to establish that "MindGeek had actual knowledge

3    of or was willfully blind to—*i.e.*, took deliberate action to avoid confirming—the fact

4    that Plaintiff was underage in the videos." (MG Mot. at 17–18).

5         The Court disagrees. As discussed above with respect to the knowledge

6    requirement under civil beneficiary liability under Section 1595 of the TVPRA, *supra*

7    at 24–27, the Court finds that Plaintiff has alleged sufficient facts to establish actual

8    knowledge that the video of Plaintiff contained CSAM. According to Plaintiff, not

9    only was Plaintiff's minor status apparent from the videos themselves, but the title

10   expressly called out the fact that the video was of a 13-year old. (SAC ¶ 448). Again,

11   according to the SAC, a MindGeek employee allegedly reviewed the videos depicting

12   Plaintiff as a minor prior to posting on Pornhub, as Defendants claim to do for every

13   video uploaded to their sites. (*Id.* ¶ 449). Moreover, Plaintiff further alleges that

14   Plaintiff contacted MindGeek Defendants directly to notify them that the videos of

15   Plaintiff constituted CSAM and nonconsensual content, but nevertheless, MindGeek

16   Defendants declined to remove the videos for weeks, reuploaded them to its other

17   tubesites, and kept a copy in their libraries and servers. (*Id.* ¶¶ 451–454, 461, 98;

18   Opp'n at 47). Taking these allegations as true, Plaintiff has stated a claim for relief

19   pursuant to 18 U.S.C. §§ 2252 and 2252A. This is enough to plausibly allege that

20   Defendants knowingly received, possessed and distributed CSAM. *See Mindgeek*,

21   558 F.Supp.3d at 843–44 (reaching same conclusion in a case against the same

22   defendants); *MG Freesites, LTD*, 676 F. Supp. 3d at 1167–69 (same). Therefore,

23   MindGeek's motion is **DENIED** as to Counts V and VI.

24              *5.   Public Disclosure of Private Facts (Count VII)*

25        To prove a claim for public disclosure of private facts, a plaintiff must show:

26   "'(1) public disclosure (2) of a private fact (3) which would be offensive and

27   objectionable to the reasonable person and (4) which is not of legitimate public

28   concern.'" *See Doe v. Gangland Productions., Inc.*, 730 F.3d 946, 958 (9th Cir. 2013)

34

quoting *Shulman v. Grp. W Prods., Inc*., 18 Cal.4th 200, 214 (1998)).  The Court finds that Plaintiff has made *a prima facie* showing of all four elements with respect to the first video that her ex-boyfriend uploaded but not the videos that the unnamed older man posted.  *See, e.g., Michaels v. Internet Entertainment Group, Inc*., 5 F. Supp. 2d 823, 842 (C.D. Cal. 1998) (holding privately made adult sex tapes "constitute[] a set of private facts whose disclosure would be objectionable to a reasonable person").

As the MindGeek Defendants note, "[a] matter that is already public or that has previously become part of the public domain is not private."  *Moreno v. Hanford Sentinel, Inc*., 172 Cal. App. 4th 1125, 1130 (Apr. 30, 2009); *see also Dinkins v. Schinzel*, 362 F.Supp.3d 916 (D. Nev. 2019) ("[Defendant] cannot be held liable for public disclosure of private facts when the fact that he disclosed was already readily available to the public on the internet—no matter how distasteful it was to do so.").  With respect to the videos that the unidentified older man coerced Plaintiff to make, Plaintiff claims that he first sold the videos on Craigslist and the Kik app.  (SAC ¶ 458).  Because by the time the videos made their way onto Pornhub, the videos were already public, MindGeek Defendants cannot be held liable for public disclosure of private facts as to Plaintiff's latter videos.

As to Plaintiff's first video, the Court finds that Plaintiff does have a viable claim.  MindGeek Defendants seek to avoid liability on the grounds that MindGeek was not the publisher of the videos depicting plaintiff.  (MG Mot. at 19).  The Court finds this argument unavailing.  Here, Plaintiff claims that prior to any video becoming publicly available on MindGeek's platform, a MindGeek employee reviewed and approved the upload of the video, including the video of Plaintiff. (SAC ¶¶ 67, 103, 449, 452, 471).  Based on these allegations, the initial sharing of the video depicting Plaintiff by Plaintiff's trafficker was limited to MindGeek Defendants alone. *Cf. In re Facebook, Inc., Consumer Priv. User Profile Litig*., 402 F. Supp. 3d 767, 796 (N.D. Cal. 2019) (finding that sensitive information does not lose the label "private" simply because it is shared with others on a limited basis, such as with your friends).

1   In other words, "it was not third-party conduct that rendered Plaintiff's videos

2   publicly available." (Opp'n at 51).  It was the MindGeek Defendants, after reviewing

3   the illicit content, that allowed the videos to be posted on their website, thereby

4   making it publicly available. *See, e.g.*, *Shulman*, 18 Cal.4th at 214 (liability attaches

5   to the "one who gives publicity to a matter concerning the private life of another"

6   (quoting Rest.2d Torts, § 625D)).

7          MindGeek Defendants' reliance on *Caraccioli v. Facebook, Inc.*, 167 F. Supp.

8   3d 1056, 1064 (N.D. Cal. 2016), *aff'd*, 700 F. App'x 588 (9th Cir. 2017), is

9   unavailing.  Unlike the case here, there were no allegations that Facebook reviewed

10  and accepted the content at issue prior to it being posted on Facebook's platform.

11  Rather, Facebook's Terms of Service expressly disclaimed any control or

12  responsibility over user's actions of Facebook or the content or information users

13  transmit or share on Facebook.  *Id*. at 1062.  The Court therefore **DENIES** MindGeek

14  Defendants' motion with respect to Public Disclosure of Private Facts.

15                  *6.    Intrusion into Private Affairs (Count VIII)*

16          To prevail on a claim for intrusion into private affairs, plaintiff must

17  demonstrate two elements: "(1) intrusion into a private place, conversation or matter,

18  (2) in a manner highly offensive to a reasonable person." *Taus v. Loftus*, 40 Cal. 4th

19  683, 725 (2007) (quoting *Shulman*, 18 Cal. 4th at 231 (1998)).  As to the first element,

20  "the plaintiff must show the defendant penetrated some zone of physical or sensory

21  privacy surrounding, or obtained unwanted access to data about, the plaintiff." *Id*. at

22  232.  "The tort is proven only if the plaintiff had an objectively reasonable expectation

23  of seclusion or solitude in the place, conversation or data source."  As to the second

24  element, "determining offensiveness requires consideration of all the circumstances of

25  the intrusion, including its degree and setting and the intruder's motives and

26  objectives." *Id*. at 236 (citation and internal quotation marks omitted).

27          While Plaintiff does not clearly spell out the factual theories underlying this

28  claim and how they meet the two required elements, the Court nevertheless finds that

Plaintiff has pled a viable claim of intrusion into private affairs.  In *People v. Bollaert*, the defendant at issue designed a website for the specific purpose of eliciting nude photographs and private information of other persons and "freely accepted" all of the victim's personal information, intended to continue to possess it, and used it for his own purpose.  48 Cal. App. 4th 699, 711 (2016).  The Court found that a defendant who has willfully received intimate photographs from others without the victim's consent has "obtained unwanted access to data about Plaintiff" within the meaning this tort.  *Id*. at 712.  Willful receipt, in turn, need not require solicitation on the part of the defendant as long as the defendant freely accepted the information and used it for his own purpose.  *Id*. at 711 (citing *In re Rolando S.* 197 Cal.App.4th 936, 941 (2011)).

Here, Plaintiff claims that MindGeek Defendants adopted a business model that embraced and monetized CSAM and other nonconsensual content.  (*See, e.g.*, SAC ¶ 109).  Plaintiff also alleges that upon receiving and reviewing the videos of Plaintiff uploaded by her ex-boyfriend and reuploaded by numerous other users, MindGeek Defendants accepted the video and allowed them to be posted on MindGeek's platforms for the purpose of generating revenue off of the videos (*id*. ¶¶ 449, 452–454, 458).  Moreover, MindGeek then optimized the videos and reposted them to its other tubesites.  (*Id*. ¶¶ 449, 451–454).  These facts indicate that MindGeek willfully received the illicit videos of Plaintiff and therefore may be held liable under an intrusion into private affairs cause of action.  The Court therefore **DENIES** MindGeek's motion as to Count VII.

### 7.   *Placing Plaintiffs in "False Light" (Count IX)*

To state a cause of action for false light, Plaintiffs must each plead and prove (1) that the defendant disclosed (2) to one or more persons (3) information about or concerning Plaintiffs that was presented as factual but that is actually false or created a false impression about Plaintiffs, and (4) that the information was understood by one or more of the persons to whom it was disclosed as stating or implying something that

would have a tendency to injure Plaintiffs. *Fellows v. National Enquirer, Inc.*, 42 Cal.3d 234, 238–39 (1986).

Plaintiff claims that she was placed before the public in false light because "viewers and at least some users of the websites, including but not limited to Pornhub, may have, and likely did, believe that Plaintiff voluntarily appeared in the videos and images, willingly engaged in pornography, and made money as 'actors' off of the posting of the videos and images." (SAC ¶ 544). Tension exists between these allegations and Plaintiff's other factual claims that are central to her case. It is not for this Court to resolve those tensions at this stage of the litigation. Because Plaintiff's allegations are plausible, MindGeek's motion to dismiss Count IX is therefore **DENIED**.

### 8.    *Misappropriation of Likeness Claims (Count X & Count XI)*

"California recognizes, in its common law and its statutes, 'the right of a person whose identity has commercial value-most often a celebrity-to control the commercial use of that identity.'" *Hoffman v. Capital Cities/ABC, Inc.,* 255 F.3d 1180, 1184 (9th Cir.2001) (quoting *Waits v. Frito–Lay, Inc.,* 978 F.2d 1093, 1098 (9th Cir.1992)). The aim is "to prevent others from misappropriating the economic value generated . . . through merchandising of the 'name, voice, signature, photograph, or likeness of the [publicity holder].'" *Youngevity Int'l v. Smith*, 350 F. Supp. 3d 919 (S.D. Cal. 2018) (quoting *Timed Out, LLC v. Youabian, Inc.*, 229 Cal. App. 4th 1001, 1006, 177 Cal.Rptr.3d 773 (2014)). To sustain a misappropriation of likeness under California's common law, plaintiff must prove "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1138 (9th Cir. 2006) (citing *Eastwood v. Superior Court*, 149 Cal.App.3d 409, 198 Cal.Rptr. 342, 347 (1983), *superseded by statute on other grounds as stated in KNB Enters. v. Matthews*, 78 Cal.App.4th 362, 92 Cal.Rptr.2d 713 (2000)). In addition to the common law cause of action,

California has provided a statutory remedy for commercial misappropriation under California Civil Code § 3344.  The remedies provided for under California Civil Code § 3344 complement the common law cause of action; they do not replace or codify the common law.  *See Newcombe v. Adolf Coors Co*., 157 F.3d 686, 691–92 (9th Cir.1998).  Section 3344 provides in relevant part:

> Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent . . . shall be liable for any damages sustained by the person or persons injured as a result thereof.

Cal. Civ. Code § 3344(a).  Under Section 3344, a plaintiff must prove all the elements of the common law cause of action.  In addition, the plaintiff must allege a knowing use by the defendant as well as a direct connection between the alleged use and the commercial purpose.  *See Eastwood*, 149 Cal.App.3d at 417.

"'However, the general rule is that incidental use of a plaintiff's name or likeness does not give rise to liability' under a common law claim of commercial misappropriation or an action under Section 3344."  *Yeager v. Cingular Wireless LLC*, 673 F. Supp. 2d 1089, 1100 (E.D. Cal. 2009) (quoting *Aligo v. Time–Life Books, Inc*., 1994 WL 715605, at *2 (N.D. Cal. Dec. 19, 1994)).  "The rationale underlying this doctrine is that an incidental use has no commercial value, and allowing recovery to anyone briefly depicted or referred to would unduly burden expressive activity."  *Id*.  "Whether the use of a plaintiff's name or likeness falls within the incidental use exception to liability is determined by the role that the use of the plaintiff's name or likeness plays in the main purpose and subject of the work at issue."  *Id*. (internal quotations and citation omitted).  Courts have taken into consideration four factors: "(1) whether the use has a unique quality or value that would result in commercial

1   profit to the defendant, (2) whether the use contributes something of significance,

2   (3) relationship between the reference to the plaintiff and the purpose and subject of

3   the work, and (4) the duration, prominence or reputation of the likeness relative to the

4   rest of the publication." *Id*. Thus, for example, "if the mention of a plaintiff's name

5   or likeness is brief, [but] the use stands out prominently within the commercial speech

6   or enhances the marketability of the defendant's product or service," the doctrine of

7   incidental use is inapplicable. *Id*. "A claim is [] not actionable when a plaintiff's

8   likeness is appropriated because 'it is published for purposes other than taking

9   advantage of his reputation, prestige, or other value associated with him.'" *Id*.

10  (quoting Restatement (Second) of Torts § 652C).

11      Here, Plaintiff argues that MindGeek misappropriated Plaintiff's likeness in two

12  distinct ways by: (i) profiting from the unauthorized dissemination of Plaintiff's

13  videos to attract users and drive traffic; and (ii) profiting from the unauthorized use by

14  placing advertisements alongside the videos of Plaintiff. (Opp'n at 52). While these

15  allegations show that MindGeek used the videos of Plaintiff to generate revenue, there

16  are no facts to support that Plaintiff's identity, name, or likeness was particularly

17  unique or that MindGeek took advantage of the economic value specifically

18  associated with Plaintiff's identity, name or likeness. In other words, these allegations

19  do not demonstrate MindGeek seeking to take advantage of Plaintiff's "reputation,

20  prestige, or other value associated with [her]." *Yeager*, 673 F. Supp. 2d at 1100.

21      *Cross v. Facebook* is instructive here. There, the Court found that Plaintiff's

22  common law and statutory misappropriation of likeness claims failed because "placing

23  unrelated ads from Facebook advertisers adjacent to the content that allegedly used

24  [plaintiff's] name and likeness—content, [plaintiff] concedes, created by third party

25  users"—was not evidence that "Facebook used his name or likeness in any way." *Id.*

26  The Court therefore finds that Plaintiff has failed to state a claim as to her

27  misappropriation of likeness under both California common law and under Section

28

3344 of the California Civil Code and **GRANTS** MindGeek's motion to dismiss as to this cause of action.

> 9.    *Distribution of Private Sexually Explicit Materials pursuant to Cal.*
> *Civ. Code § 1708.85 (Count XII)*

California Civil Code § 1708.85 provides a private cause of action against a

> person who intentionally distributes by any means a
> photograph, film, videotape, recording, or any other
> reproduction of another, without the other's consent, if
> (1) the person knew that the other person had a reasonable
> expectation that the material would remain private, (2) the
> distributed material exposes an intimate body part of the
> other person, or shows the other person engaging in an act of
> intercourse, oral copulation, sodomy, or other act of sexual
> penetration, and (3) the other person suffers general or
> special damages . . . .

Cal. Civ. Code. § 1708.85. Section 1708.85 exempts from liability, however, a "person distributing material under subdivision (a)" where "[t]he distributed material was previously distributed by another person." Cal. Civ. Code section 1708.85(c)(6). Based on the plain language of these provisions, the Court concludes Plaintiff has failed to state a claim.

Plaintiff's SAC makes clear that MindGeek Defendants were not the first party to intentionally distribute the videos—Plaintiff's traffickers were, including Plaintiff's then-boyfriend and an unnamed older man. (SAC ¶¶ 448–462). The fact that the videos of Plaintiff may have first appeared on MindGeek Defendants' platform does not save Plaintiff's claim.[4] *See Doe v. Twitter*, Inc., 555 F. Supp. 3d 889, 931 (N.D.

---

[4] The Court notes that Judge Carney had ruled in a related class action against the same MindGeek Defendants that Plaintiff had stated a viable claim under California Civil Code § 1708.85 on the grounds that Plaintiff had plausibly alleged that videos of

Cal. 2021), *aff'd in part, rev'd in part on other grounds and remanded sub nom. Doe #1 v. Twitter, Inc.*, No. 22-15103, 2023 WL 3220912 (9th Cir. May 3, 2023) (finding that Defendant was not liable under California Civil Code § 1708.85(a) on the grounds that the users of Twitter that allegedly posted the video were the first distributors).  Nor does the fact that MindGeek employee allegedly reviewed the video prior to the posting on MindGeek's website.  (*Id.* ¶¶ 448, 449).  The language of the statute under § 1708.85 embraces a broad interpretation of the word "distribution" by stating that a person may be held liable under the statute if she "intentionally distributes by *any means.* . . ."  Cal. Civ. Code § 1708.85(a).  This does not require a mass distribution through the internet—*i.e.*, Plaintiff's trafficker uploading the illicit video of Plaintiff onto MindGeek's platform is sufficient to constitute the first act of distribution.  MindGeek's subsequent posting of the video onto its websites is a separate second act.  The Court therefore **GRANTS** MindGeek's motion to dismiss Count XII.

### 10.  Negligence (Count XIII)

The elements of a negligence tort cause of action are duty, breach, causation and damages.  *Artiglio v. Corning Inc.*, 18 Cal.4th 604, 614 (1998).  MindGeek Defendants argue that Plaintiff's negligence claim fails because she has not alleged that MindGeek owed her any legal duty.  The Court disagrees.  As Plaintiff points out, California created a statutory baseline duty under California Civil Code § 1714 which

Plaintiff were first distributed on Defendants' platforms.  *Doe v. Mindgeek USA Inc.*, 558 F.Supp.3d 828, 844 (C.D. Cal., 2021).  Such holding, however, is not the "law of the case."  *City of Los Angeles, Harbor Division*, 254 F.3d at 888 (9th Cir. 2001); *see also United States v. Smith*, 389 F.3d 944, 949 (9th Cir. 2004) ("The law of the case doctrine is 'wholly inapposite' to circumstances where a district court seeks to reconsider an order over which it has not been divested of jurisdiction").  Rather, this discretionary doctrine is applied "where an issue has been decided by a higher court or where the court has entered a final decree or judgment."  *Alfasigma USA, Inc. v. First Databank, Inc.*, 525 F.Supp.3d 1088, 1095 (N.D. Cal. 2021) (citing *Askins v. United States Dep't of Homeland Security*, 899 F.3d 1035, 1042-43 (9th Cir. 2018)).  Because neither of those situations is presented here, the Court may freely reconsider a prior order in a related case.

provides that "[e]veryone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself." Cal. Civ. Code § 1714(a); *see also Social Media Cases*, JCCP No. 5255, 2023 WL 6847378, at *23–24 (Cal. Super. Ct. Oct. 13, 2023); *see also Hughes v. Apple, Inc.*, No. 22-cv-07668-VC, 723 F.Supp.3d 693, 699-707 (N.D. Cal. Mar. 15, 2024). "This statute establishes the default rule that each person has a duty 'to exercise, in his or her activities, reasonable care for the safety of others." *Brown v. USA Taekwondo* 11 Cal.5th 204, 214 (2021). Courts, however, can carve out exceptions to the baseline duty that applies to everyone using what the Supreme Court has established as the *Rowland* factors. *Kesner v. Superior Court*, 1 Cal.5th 1132, 1143 (2016); *Rowland v. Christian*, 69 Cal.2d 108, 112–13, (1968). These factors can be generally broken down into "foreseeability" factors and "public policy" considerations. *Hugh*, 723 F.Supp.3d at 701. The foreseeability factors are "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, [and] the closeness of the connection between the defendant's conduct and the injury suffered." *Social Media Cases*, 2023 WL 6847378, at *24. The policy factors are "the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." *Id*. Courts should create such an exception only when it is "clearly supported by public policy" and when it is possible to "promulgate relatively clear, categorical, bright-line rules of law applicable to general classes of cases." *Id*. at 1143–44.

Neither Plaintiff nor MindGeek Defendants discuss the *Rowland* factors. The Court notes however that California courts have been reluctant to create broad, categorical, exception to technology or social media platforms. For example, in

*Social Media Cases*, plaintiffs brought a case against various social media platforms—including Facebook, Instagram, Snapchat, TikTok, and Youtube—for designing and operating their business in a way that induces more use by minors, thereby creating an unreasonable risk of harm of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries.  2023 WL 6847378, at *2–3, 21.  The court there ultimately found that the *Rowland* factors did not weigh in favor of Defendants and therefore the baseline duty applied.

Here, Plaintiff alleges that MindGeek Defendants run one of the largest porn websites where there is substantial risk that CSAM and nonconsensual content will be posted on their platforms.  Despite this, MindGeek employed a "unrestricted content" business model that proactively embraced and monetized such illicit content.  The Court thus finds that the foreseeability factors weigh in favor of Plaintiff.

As to the public policy factors, the analysis is more complicated.  As discussed above, there is a broad immunity under section 230 of the CDA for ICSs such as MindGeek. *Carafano*, 339 F.3d at 1123 (9th Cir. 2003).  As MindGeek Defendants also note, there is a general rule that ISCs do not "have a legal duty to inspect every single user-generated message before it is communicated to a single person or displayed to the public." *Reddit*, 2021 WL 586094, at *8; *Dyroff v. Ultimate Software Grp., Inc*., 934 F.3d 1093, 1101 (9th Cir. 2019) ("No website could function if a duty of care was created when a website facilitates communication, in a content-neutral fashion, of its users' content."); *see also Doe v. MySpace*, 474 F. Supp. 2d 843, 846, 852 (W.D. Tex. 2007) (dismissing negligence claims because Myspace did not owe a legal duty to parents of a teenager who was raped to protect their daughter from criminal acts "nor to institute reasonable safety measures on its website").  The Court, however, already found that MindGeek Defendants here cannot avail themselves of § 230 immunity under the content provider exception. *Supra* at 18.  Moreover, unlike *Dryoff*, this isn't just a case of a platform employing content-neutral features used by bad actors.  Rather, here, Plaintiff claims that MindGeek Defendants intentionally

44

1   adopted a business model that exacerbated the proliferation of CSAM and other

2   nonconsensual content by, among other means, employing moderators who were

3   purportedly tasked with screening out CSAM and other nonconsensual content, but

4   instead reviewed, accepted, uploaded, optimized, and modified videos of Plaintiff

5   despite knowing or at least recklessly disregarding the fact that Plaintiff was a minor.

6   (SAC ¶¶ 449-54, 457-58, 460-62).  The Court therefore finds that policy

7   considerations are insufficient to overcome the baseline duty imposed under

8   California law.  Accordingly, the Court finds that Plaintiff has stated a viable claim of

9   negligence against MindGeek Defendants and therefore **DENIES** MindGeek's motion

10  as to Count XIII.

11              *11.  Unfair Competition pursuant to Cal. Bus. & Prof. Code §§ 17200,*

12                   *17500 (Count XIV)*

13          Plaintiff alleges that MindGeek violated the Unfair Competition Law ("UCL")

14  and False Advertising Law ("FAL").  First and foremost, MindGeek Defendants claim

15  that Plaintiff's claim under the UCL and FAL must be dismissed on grounds that

16  Plaintiff lacks statutory standing.  (MG Mot. at 22).  In 2004, the voters of California

17  passed Proposition 64, which restricts standing for individuals alleging UCL and FAL

18  claims to persons who "ha[ve] suffered injury in fact and ha[ve] lost money or

19  property as a result of the unfair competition."  *Hinojos v. Kohl's Corp*., 718 F.3d

20  1098, 1103 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8,

21  2013) (citing Cal. Bus. & Prof. Code §§ 17204 (UCL), 17535 (materially identical

22  standard under the FAL)).  The core inquiry is whether the plaintiff has suffered

23  "economic injury . . . caused by . . .the unfair . . . practice . . . that is the gravamen of

24  the claim."  *Kwiskel v. Superior Court*, 51 Cal.4th 310, 322 (2011).  Accordingly,

25  standing under the UCL and FAL is far narrower than traditional federal standing

26  requirements.  *Ehret v. Uber Techs., Inc*., 68 F. Supp. 3d 1121, 1132 (N.D. Cal. 2014);

27  *see also Troyk v. Farmers Group, Inc*., 171 Cal.App.4th 1305, 1348 n.31 (2009).

28

MindGeek Defendants argue that Plaintiff's conclusory allegations that she "lost money" and suffered "financial harm in the form of costs for therapy," "time away from her work," and "hiring a company to assist her with her efforts investigate [sic] the continued dissemination of her videos on Pornhub" are insufficient to show that she suffered any actionable injury caused by any unfair business practices alleged in the SAC.  (MG Mot. at 22).  The Court disagrees.  While the UCL's focus on "loss of money or property" restricts the broad range of harms that could otherwise give rising to standing, the California Supreme Court in *Kwisket v. Superior Court*, explained that there "are innumerable ways in which economic injury from unfair competition may be shown" such as:

> A plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) *be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary.*

51 Cal.4th at 323 (emphasis added).  Further, the court there found that "[n]either the text of Proposition 64 nor the ballot arguments in support of it purport to define or limit the concept of 'lost money or property'" and that it did not "supply an exhaustive list of the ways in which unfair competition may cause economic harm."  *Id*.

Here, Plaintiff alleges that due to MindGeek Defendants' practice of optimizing and promoting CSAM videos, including Plaintiff's videos, and the lack of MindGeek's own moderating processes, she was "forced to retain an investigatory firm to investigate whether any of her videos were still accessible on Pornhub or other pornographic sites and to facilitate takedown requests."  (SAC ¶ 461).  Based on the definition by the Supreme Court in *Kwikset*, the Court finds that Plaintiff has shown

an economic injury that was caused by MindGeek Defendant's alleged unlawful business practice—specifically, Plaintiff was "required to enter into a transaction, costing money or property, that would otherwise have been unnecessary." *Kwikset*, 51 Cal.4th at 323.

*California Med. Assn. v. Aetna Health of California Inc*., 14 Cal. 5th 1075 (2023), here is instructive. There, the California Supreme Court addressed whether resources that an organization has spent to counter an unfair or unlawful practice constitute "money or property" that has been "lost . . . as a result of the unfair competition." *Id*. at 1082. The Court ultimately concluded that the UCL's standing requirements when "an organization, in furtherance of a bona fide, preexisting mission, incurs costs to respond to perceived unfair competition that threatens that mission, so long as those expenditures are independent of costs incurred in UCL litigation or preparation for such litigation." *Id*. While Plaintiff here is not an organization with a preexisting mission, Plaintiff here expended resources—money—to hire an investigatory firm to continually address the "hopeless whack-a-mole situation" MindGeek created through their unrestricted content business model of allowing Plaintiff's videos to be downloaded and reuploaded, and at times, uploading Plaintiff's videos themselves. (FAC Visa Order at 5). The Court therefore finds that Plaintiff has standing to bring a claim under the UCL and FAL.

The UCL prohibits unlawful, unfair, or fraudulent business acts or practices. Cal. Bus. & Prof. Code § 17200. An "unlawful business activity" includes anything that can properly be called a business practice and that at the same time is forbidden by law. *Walker v. Countrywide Home Loans, Inc*., 98 Cal.App.4th 1158, 1169 (2002). "Under the UCL's unlawful prong, violations of other laws are borrowed and made independently actionable under the UCL." *Herron v. Best Buy Co. Inc*., 924 F. Supp. 2d 1161, 1177 (E.D. Cal. 2013) (internal quotations omitted); *Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Telephone Co*., 20 Cal.4th 163, 180 (1999). As discussed above, Plaintiff has stated a viable claim under beneficiary liability under the TVPRA

1    section 1595(a)(2); receipt, transport and distribution of CSAM pursuant to 18 U.S.C.

2    §§ 2252, 2252A, 2255; public disclosure of private facts; and intrusion into private

3    affairs.  The Court therefore finds that Plaintiff has sufficiently alleged a UCL claim

4    under the unlawful prong.

5         As to Plaintiff's FAL claim, however, the Court finds that Plaintiff has failed to

6    plead a viable FAL claim.  FAL makes unlawful "untrue or misleading" advertising.

7    Cal. Bus. & Prof. Code § 17500.  Plaintiff has not advanced any coherent theory of

8    liability as to how MindGeek engaged in "untrue or misleading" advertising.

9         The Court therefore **DENIES** MindGeek's motion as to Plaintiff's UCL claim

10   but **GRANTS** MindGeek's motion with prejudice as to her FAL claim.

11            *12.   Violation of California's Trafficking Victims Protection Act*

12               *pursuant to Cal. Civ. Code § 52.5 (Count XV)*

13        California's Trafficking Victims Protection Act ("CTVPA") provides "[a]

14   victim of human trafficking, as defined in Section 236.1 of the Penal Code, may bring

15   a civil action" for damages or injunctive relief.  Cal. Civ. Code § 52.5.  In

16   turn, Section 236.1 of the California Penal Code provides three definitions of a human

17   trafficker: (1) "[a] person who deprives or violates the personal liberty of another with

18   the intent to obtain forced labor or services," Cal. Penal Code § 236.1(a);  (2) "[a]

19   person who deprives or violates the personal liberty of another with the intent to effect

20   or maintain a violation of" one of the enumerated statutes, including California Penal

21   Code sections 311.1 and 311.5, *id*. §236.1(b), §§ 311.1, 311.5 (criminalizing the

22   distribution, possession, and promotion of obscene material including matters

23   depicting sexual conduct by a person under 18); and (3) "[a] person who causes,

24   induces, or persuades, or attempts to cause, induce, or persuade, a person who is a

25   minor at the time of commission of the offense to engage in a commercial sex act with

26   the intent to effect or maintain a violation of" one of the enumerated statutes,

27   including California Penal Code sections 311.1 and 311.5.  *Id*. § 236.1(c)

28

Plaintiff alleges that the MindGeek Defendants have violated CTVPA by "knowingly solicit[ing], maintain[ing], and profit[ing] from CSAM, trafficked, rape, and sex abuse material on its websites" and "intend[ing] to, and [] distribut[ing] CSA and other trafficked, rape, and sex abuse materials through their websites." (SAC at 167–68). These allegations, however, are insufficient to meet the required elements of the CTVPA. First, Plaintiff has failed to allege that the MindGeek Defendants "deprive[d] or violate[d] the personal liberty" of Plaintiff within the meaning California Penal Code § 236.1 (h)(3), which defines "[d]eprivation or violation of the personal liberty of another" as the following:

> "Deprivation or violation of the personal liberty of another" includes substantial and sustained restriction of another's liberty accomplished through force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person, under circumstances where the person receiving or apprehending the threat reasonably believes that it is likely that the person making the threat would carry it out.

Cal. Penal Code § 236.1 (h)(3). Nor has Plaintiff adequately pled that the MindGeek Defendants "intend[ed] to obtain forced labor or services." *Id*. § 236.1(a); *see S. S. v. Ali*, No. 3:23-CV-05074-JSC, 2024 WL 150728, at *7 (N.D. Cal. Jan. 11, 2024) ("Plaintiff's CTVPA claim differs slightly from her TVPRA claim—while not a requirement under the TVPRA, Plaintiff must allege Defendants 'intend[ed] to obtain forced labor or services' to plead a CTVPA violation."); *Lofthus v. Long Beach Veterans Hosp.*, 214 F. Supp. 3d 908, 916 (C.D. Cal. 2016) (dismissing Plaintiff's CTVPA claim for failing to allege any intent to obtain forced labor or services); *Talib v. Guerrero*, 2016 WL 1470082, at *11 (C.D. Cal. Mar. 14, 2016) (recommending dismissal for failure to allege facts indicating defendants acted with intent to obtain

1    forced labor or services within meaning of § 36.1), R & R adopted, 2016 WL 1452315

2    (C.D. Cal. Apr. 12, 2016); *cf. Maslic v. ISM Vuzem d.o.o.*, No. 21-CV-02556-BLF,

3    2024 WL 3408217,  (N.D. Cal. July 11, 2024) (finding that Defendant is entitled to

4    summary judgment because CTVPA does not impose liability on a beneficiary of a

5    trafficking scheme, but only the perpetrator).  Finally, Plaintiff has made no

6    allegations that MindGeek Defendants at any time "cause[d], induce[d], persuade[d],

7    or attempt[ed] to cause, induce, or persuade [Plaintiff] *at the time of the commission* of

8    the offense to engage in a commercial sex act.  Cal. Penal Code § 236.1(c) (emphasis

9    added).  The Court therefore finds that Plaintiff has failed to state a viable claim under

10   the CTVPA against the MindGeek Defendants and therefore **GRANTS** MindGeek's

11   motion as to this claim.[5]

12              *13.  Civil Conspiracy (Count XVI)*

13        Under California law, civil "[c]onspiracy is not a cause of action, but a legal

14   doctrine that imposes liability on persons who, although not actually committing a tort

15   themselves, share with the immediate tortfeasors a common plan or design in its

16   perpetration." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510–

17   11, (1994). "In such an action the major significance of the conspiracy lies in the fact

18   that it renders each participant in the wrongful act responsible as a joint tortfeasor for

19   all damages ensuing from the wrong, irrespective of whether or not he was a direct

20   actor and regardless of the degree of his activity." *Id.* at 511 (citations omitted).

21        Under a conspiracy theory of recovery, liability depends on the actual

22   commission of a tort. *Id.*  Here, Plaintiff does not identify any predicate tort

23   violations by parties other than MindGeek Defendants on which MindGeek

24   Defendant's common law conspiracy violation can be predicated.  Rather, the tort

25

26   _____

27   [5] The Court again notes that this ruling deviates from Judge Carney's finding that
     Plaintiff has a viable claim under the CTVPA in a related class action lawsuit. *Doe v.
     Mindgeek USA Inc.*, 558 F.Supp.3d at 844. As noted in footnote 2, however, this
28   Court is not bound by this related opinion.

violations that Plaintiff specifically alleges as underlying Plaintiff's civil conspiracy claims are MindGeek's own tort violations.  (*SAC* ¶ 591).  And Plaintiff has failed to attribute a specific tort violation by specific a MindGeek entity on which the other MindGeek entities can be held liable on a conspiracy theory.[6]   The Court therefore finds that Plaintiff has failed to state a claim as to civil conspiracy with respect to MindGeek Defendants and **GRANTS** MindGeek Defendants' motion to dismiss this cause of action.

### C.    <u>Personal Jurisdiction</u>

On July 29, 2022, Judge Carney ordered the parties to engage in jurisdictional discovery to understand MindGeek's corporate structure and assess as to (1) which entity owns Pornhub and other MindGeek websites that hosts Plaintiff's video; and (2) whether Plaintiff may be able to impute contacts of the non-objecting MindGeek Entity Defendants to MindGeek S.a.r.l. and MG Premium LTD through the alter ego doctrine.  (FAC MindGeek Order at 3–4).  Judge Carney noted the concern of prematurely dismissing any of the MindGeek entities and how the "possibility that judgment will be entered against remaining insolvent or undercapitalized entities" may lead to possible unfairness.  (*Id*. at 4).  Accordingly, Judge Carney denied MindGeek Defendants' motion to dismiss Plaintiff's FAC "in light of the near certainty that Plaintiff will file a Second Amended Complaint at the close of jurisdictional discovery."  (*Id*. at 8).

MindGeek Defendants, in their motion to dismiss Plaintiff's SAC, challenge the Court's personal jurisdiction over MindGeek S.a.r.l.  (*See* MG Mot. 23–40).  Notably, it seems that the MindGeek Defendants decided to drop the personal jurisdiction challenges related to MG Premium LTD.

Under Rule 12(b)(2), "[w]hen a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has

---

[6] Instead, Plaintiff consistently and repeatedly refers to all of the MindGeek entities as a "single business enterprise" that are all "alter ego of each other."  (SAC ¶¶ 16, 20).

jurisdiction." *In re W. States Wholesale Nat. Gas Antitrust Litig. (Western States)*, 715 F.3d 716, 741 (9th Cir. 2013).  To overcome a motion to dismiss for lack of personal jurisdiction based on written materials rather than an evidentiary hearing, the plaintiff need only make a *prima facie* showing of jurisdictional facts.  *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1207 (9th Cir. 2020); *see Bauman v. Daimler Chrysler Corp*., 644 F.3d 909, 913-14 n.7 (9th Cir. 2011) (applying *prima facie* standard for personal-jurisdiction allegations even after jurisdictional discovery). This standard, however, "is not toothless," and a plaintiff "cannot simply rest on the bare allegations of its complaint."  *In re Boon Global Ltd*., 923 F.3d 643, 650 (9th Cir. 2019).  Although "uncontroverted allegations in the complaint must be taken as true" and "[c]onflicts between parties over statements contained in affidavits must be resolved in [Plaintiff's] favor," *Schwarzenegger v. Fred Martin Motor Co*., 374 F.3d 797, 800 (9th Cir. 2004), disputed allegations in the complaint that are not supported with evidence or affidavits cannot establish jurisdiction, *see In re Boon Glob. Ltd*., 923 F.3d at 650; *see also Chem Lab Products, Inc. v. Stepanek*, 554 F.2d 371, 372 (9th Cir. 1977) ) ("Mere allegations of a complaint, when contradicted by affidavits, are not enough to confer personal jurisdiction over a non-resident defendant.").

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons."  *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). "Because 'California's long-arm statute allows the exercise of personal jurisdiction to the full extent permissible under the U.S. Constitution,' our inquiry centers on whether exercising jurisdiction comports with [constitutional] due process."  *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015); *see* Cal. Code Civ. Proc. § 410.10 ("A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States.").

"Federal due process permits a court to exercise personal jurisdiction over a nonresident defendant if that defendant has at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional

notions of fair play and substantial justice.'" *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1106 (9th Cir. 2020) (quoting *Schwarzenegger*, 374 F.3d at 801) (quotation marks omitted). The Supreme Court has recognized two types of personal jurisdiction: "'general' (sometimes called 'all-purpose') jurisdiction and 'specific' (sometimes called 'case-linked') jurisdiction." *Bristol-Myers Squibb Co. v. Super. Ct.*, 582 U.S. 255, 262 (2017). To be subject to general personal jurisdiction, the defendant's contacts with the forum must be so continuous and systematic as to render it "essentially at home" in the forum state and amenable to any suit there. *Glob. Commodities Trading Grp.*, 972 F.3d at 1106. The "paradigmatic locations" where a corporation is at home is in the state where it is incorporated and where it has its principal place of business. *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1069 (9th Cir. 2015). Given that Plaintiff acknowledges that "MindGeek S.a.r.l. is a foreign entity organized and existing under the laws of Luxembourg" and "operates out of Montreal, Canada" (SAC ¶ 11), the question before this Court is whether there is specific jurisdiction over MindGeek S.a.r.l.

A court may exercise specific jurisdiction over "issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). The Ninth Circuit has established a three-part test for determining specific jurisdiction: (1) the defendant must purposefully avail himself of the privilege of conducting activities in the forum and invoking the benefits and protections of its laws; (2) the claim must arise out of or result from the defendant's forum-related activities; and (3) exercise of jurisdiction must be reasonable. *Rano v. Sipa Press, Inc.*, 987 F.2d 580, 588 (9th Cir. 1993); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985). The party asserting jurisdiction bears the burden of satisfying the first two prongs of this test. *Schwarzenegger*, 374 F.3d at 802. If it does so, then the burden shifts to the party contesting jurisdiction to "present a compelling case" that the third prong of reasonableness has not been satisfied. *Id.*

According to Plaintiff, MindGeek S.a.r.l is a Luexembourg company that operates out of Montreal, Canada.  (SAC ¶ 11).  While mentioning that MindGeek S.a.r.l. has satellite offices in Los Angeles, San Diego, and San Francisco, California, Plaintiff does not allege that this establishes necessary minimum contacts with California to give rise to a valid exercise of personal jurisdiction.[7]  Rather, the bulk of Plaintiff's argument centers around the contention that MindGeek S.a.r.l's direct and indirect subsidiaries have specific contacts with California, and those contacts can be properly imputed to MindGeek S.a.r.l on an alter ego theory for jurisdictional purposes.  (*See, e.g.*, SAC ¶¶ 16, 20, 21, 313–462).

"The existence of a parent-subsidiary relationship is insufficient, on its own, to justify imputing one entity's contacts with a forum state to another for the purpose of establishing personal jurisdiction."  *Ranza v. Nike, Inc*., 793 F.3d 1059, 1070 (9th Cir. 2015) (citing *Doe v. Unocal Corp*., 248 F.3d 915, 925–26 (9th Cir. 2001)).  Thus, as a general principle, "corporate separateness insulates a parent corporation from liability created by its subsidiary, notwithstanding the parent's ownership of the subsidiary." *Id*. (citing *United States v. Bestfoods*, 524 U.S. 51, 61, 118 S. Ct. 1876, 141 L.Ed.2d 43 (1998)).  In "rare" circumstances, however, the Court may pierce the corporate veil to impute liability from one entity to another.  *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003); *Ranza,* 793 F.3d at 1071.  Such "[d]isregarding [of] the corporate entity is recognized as an extreme remedy."  *Langley v. Guiding Hands Sch., Inc*., No. 2:20-CV-00635-TLN-KJN, 2021 WL 978950, at *4 (E.D. Cal. Mar. 16, 2021) (citing

---

[7] Plaintiff's conclusory assertion that MindGeek S.a.r.l. "directly and indirectly owns and operates" Pornhub does not meet her burden of demonstrating specific jurisdiction over MindGeek S.a.r.l.  Notably, Plaintiff reiterated the exact same allegations in her FAC, which Judge Carney already found as insufficient to establish personal jurisdiction on the ground that the "distinction between direct and indirect ownership of the offending websites is crucially important to the Court's jurisdictional analysis." (FAC MindGeek Order at 3).  Given that Plaintiff fails to provide any additional clarity on this point, the Court finds that Plaintiff has failed to show that MindGeek S.a.r.l. has sufficient contacts with this forum on its own to support a finding of specific jurisdiction.

1    *Calvert v. Huckins*, 875 F. Supp. 674, 678 (E.D. Cal. 1995)).  One such circumstance

2    is when a parent and subsidiary are "not really separate entities," or are "alter egos" of

3    one another.  *Unocal*, 248 F.3d at 926; *Ranza,* 793 F.3d at 1071; *see also ADO Fin.,*

4    *AG v. McDonnell Douglas Corp.,* 931 F. Supp. 711 (C.D. Cal. 1996).  The "alter ego

5    . . . relationship is typified by parental control of the subsidiary's internal affairs or

6    daily operations."  *Unocal*, 248 F.3d at 926.

7        To make a *prima facie* showing of an alter ego relationship, a plaintiff must

8    plausibly allege "(1) that there is such unity of interest and ownership that the separate

9    personalities of [the entities] no longer exist and (2) that failure to disregard [their

10    separate identities] would result in fraud or injustice."  *Unocal*, 248 F.3d at 926

11    (alterations in original) (quoting *AT & T Co. v. Compagnie Bruxelles Lambert*, 94

12    F.3d 586, 591 (9th Cir.1996)).  Both elements must be met for a plaintiff to avail

13    herself to this doctrine.  *See In re Boon Glob. Ltd*., 923 F.3d 643, 653 (9th Cir. 2019)

14    ("California recognizes alter ego liability where two conditions are met") (citations

15    omitted); *id*. at 654 (finding that the lower court's alter ego analysis was flawed for

16    failing to "determine[e] that both prongs of alter ego jurisdiction were met); *see also*

17    *Gerritsen v. Warner Bros. Ent. Inc*., 116 F. Supp. 3d 1104, 1136 (C.D. Cal. 2015)

18    ("Before the doctrine can be invoked, two elements must be alleged"); *Mesler v.*

19    *Bragg Mgmt. Co*., 39 Cal.3d 290, 300 (1985) ("There is no litmus test to determine

20    when the corporate veil will be pierced; rather the result will depend on the

21    circumstances of each particular case. There are, nevertheless, two general

22    requirements").  The "unity of interest and ownership" prong of this test requires "a

23    showing that the parent controls the subsidiary to such a degree as to render the latter

24    the mere instrumentality of the former." *See In re Boon Glob. Ltd*., 923 F.3d at 653 &

25    n.4 (quoting *Ranza*, 793 F.3d at 1073) (internal quotation marks omitted).  This test

26    envisions pervasive control over the subsidiary, such as when a parent corporation

27    "dictates every facet of the subsidiary's business—from broad policy decisions to

28    routine matters of day-to-day operation." *Id.* (internal quotation marks omitted).

1    Total ownership and shared management personnel are alone insufficient to establish

2    the requisite level of control. *See Harris Rutsky & Co. Ins. Servs. v. Bell & Clements*

3    *Ltd.*, 328 F.3d 1122, 1135 (9th Cir.2003).   As to the second prong, Plaintiff must

4    show that a parent used the corporate form "unjustly and in derogation of the

5    plaintiff's interest." *Butler v. Adoption Media, LLC*, 486 F. Supp. 2d 1022 (N.D. Cal.

6    2007) (quoting *Mesler*, 39 Cal.3d at 300).  Plaintiff spends a significant amount of

7    focus on attempting to establish the first prong, but fatally does not sufficiently show

8    how she meets the second prong.

9        "In almost every instance where a plaintiff has attempted to invoke the [alter

10   ego] doctrine [s]he is an unsatisfied creditor.*" Perfect 10, Inc. v. Giganews, Inc*., No.

11   2:11-CV-07098 (AB) (JPR), 2015 WL 12710753, at *3 (C.D. Cal. June 3, 2015),

12   aff'd, 847 F.3d 357 (9th Cir. 2017) (citations omitted). "[M]ere '[d]ifficulty in

13   enforcing a judgment or collecting a debt, [however], does not satisfy' the injustice

14   standard for alter ego liability." *Perfect 10, Inc. v. Giganews, Inc*., 847 F.3d 657, 677

15   (9th Cir. 2017).  For "insolvency or inadequate capitalization [to] satisfy this

16   standard," a plaintiff must show that the corporation is "so undercapitalized that it is

17   unable to meet debts that may reasonably be expected to arise in the normal course of

18   business." *Id*.  Plaintiff here, however, does not allege that the MindGeek Defendants

19   that do not contest personal jurisdictions ("Non-contesting Defendants") are

20   undercapitalized such that she cannot seek redress from these Defendants. *See Boeing*

21   *Co. v. KB Yuzhnoye*, No. 2:13-CV-00730 (AB) (AJW), 2016 WL 2851297, at *25

22   (C.D. Cal. May 13, 2016) ("Undercapitalization and insolvency are the most relevant

23   factors in determining whether the corporation was established to defraud its creditors

24   or [some] other improper purpose such as avoiding the risks known to be attendant to

25   a type of business." (citation omitted)).

26       Rather, the SAC's allegations support the opposite inference: that the Non-

27   contesting Defendants were (and are) well-capitalized. (*See, e.g*., SAC ¶¶ 1 n.1, 406,

28   352 (alleging an investor paid $300 million for an equity interest in the company in

2013 and that the company was sold in 2023 to a third party for $402 million); *Id.* ¶¶ 495, 270 (alleging that the company had fully secured financing for over a decade); *Id.* ¶¶ 2, 6, 34 (alleging MindGeek is "the dominant, monopolistic" company in an almost $100 billion market)).  In her Opposition, Plaintiff attempts to address this issue by claiming, without any cite to affidavit or evidence, that the $400 million purchase is nothing but a "pretextual 'sale' to avoid personal responsibility while siphoning off the economics still in the business for themselves," and Defendants failed to produce any evidence of their solvency.  (Opp'n at 83–84).  These statements, however, amount to nothing more than conclusory allegations that are directly contradicted by evidence and affidavits Defendants produced as part of jurisdictional discovery.  For example, Defendants submitted a share purchase agreement memorializing the terms of the sale of MindGeek.  (See White Decl. Ex. E, Docket No. 435-5).  Both Defendants Antoon and Tassillo testified that they had received the initial $10.5 million payment for their MindGeek shares.  (White Reply Decl. Ex. Q at 286, 395, 505, Docket No. 507-2; White Reply Decl. Ex. R at 21; Docket No. 507-3).  According to the schedule of payments set forth in the agreements, more than $50 million has been paid to date.  (White Decl. Ex. E at 16-17, Docket No. 435-5; Ex. F at 16-17, Docket No. 435-5).  Antoon's testimony confirmed that these funds are being paid to the Individual Defendants by the third-party buyer, Ethical Capital Partners, not MindGeek.  (White Reply Decl. Ex. Q at 506).  While Plaintiff need only establish a *prima facie* case for personal jurisdiction at this point in the litigation, she "cannot simply rest on the bare allegations of its complaint," especially if contradicted by affidavits.  *In re Boon Global Ltd.*, 923 F.3d at 650; *see also Chem Lab Products, Inc.*, 554 F.2d at 372 (9th Cir. 1977) ("Mere allegations of a complaint, when contradicted by affidavits, are not enough to confer personal jurisdiction over a non-resident defendant."); *Scott v. Breeland*, 792 F.2d 925 (9th Cir. 1986) ("When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff is 'obligated to come forward with facts, by affidavit or otherwise, supporting personal

1  jurisdiction.'") (quoting *Amba Marketing Systems, Inc. v. Jobar International, Inc.*,

2  551 F.2d 784, 787 (9th Cir. 1977)).  Moreover, even accepting Plaintiff's contention

3  that the 2023 sale was "pretextual" and "[i]n fact, no on paid anything for the

4  business" as true, Plaintiff does not provide any argument, let alone evidence, to

5  undermine Andreou's declaration that the remaining MindGeek entities are and have

6  always been adequately capitalized during the relevant period and that the total assets

7  for both 9219-1568 Quebec Inc. and MG Freesites Ltd. exceed total liabilities by tens

8  of millions of dollars.  (Andreou Decl. ¶¶ 20, 35–51; Docket No. 448-2).  In other

9  words, even without the 2023 sale, the Non-contesting Defendants are capable of

10  satisfying potential judgment.

11      Plaintiff's other arguments to support her injustice and fraud prong are equally

12  unavailing.  In her SAC, Plaintiff asserts, without much elaboration, that the

13  "corporate structure was created and is not maintained for any legitimate business

14  purpose or need of the organizations and has no economic substance but instead to . . .

15  circumvent tax, money transfer, and pornography laws in the United States and other

16  countries in which MindGeek actually does business."  (SAC ¶ 21).  As the Ninth

17  Circuit made clear, however, such "[c]onclusory allegations that [a defendant]

18  structures companies to escape liability are insufficient to confer personal

19  jurisdiction."  *In re Boon Global*, 923 F.3d at 654.  "Indeed, almost every business

20  enterprise in the United States ultimately forms some sort of corporate entity for the

21  purpose of avoiding personal liability."  *NuCal Foods, Inc. v. Quality Egg LLC*, 887

22  F. Supp. 2d 977, 994 n.9 (E.D. Cal. 2012).  Moreover, "[t]he underlying cause of

23  action cannot supply the necessary fraud or injustice prong.  To hold otherwise would

24  render the fraud or injustice element meaningless . . . ."  *NetJets Aviation, Inc. v. LHC

25  Commc'ns, LLC*, 537 F.3d 168, 183 (2d Cir. 2008) (quoting Mobil Oil Corp. v. Linear

26  Films, Inc., 718 F. Supp. 260, 268 (D. Del. 1989); *see also TradeWinds Airlines, Inc.

27  v. Soros*, No. 1:08-CV-05901 (JFK), 2012 WL 983575, at *6 (S.D.N.Y. Mar. 22,

28  2012) ("This 'injustice' must consist of more than merely the tort or breach of contract

that is the basis of the plaintiff's lawsuit."). Rather, "[s]omething more is needed." *In re Boon Global*, 923 F.3d at 654 (citing *In re Schwarzkopf*, 626 F.3d 1032, 1039–40 (9th Cir. 2010) (alter ego theory recognized where individual used corporation to acquire asset at time when he was insolvent); *Riddle v. Leuschner*, 51 Cal. 2d 574, 581–82 (1959) (finding injustice would result where jurisdictional facts showed that insolvent company's assets were transferred to another company as a means of avoiding creditors)). And while tax evasion may provide a basis to satisfy the "fraud or injustice" prong, *see, e.g., Prompt Staffing, Inc. v. United States*, 321 F. Supp. 3d 1157, 1177 (C.D. Cal. 2018), that has only been the case when the United States or a creditor from whom a defendant is hiding assets is the party seeking to pierce the corporate veil. *See, e.g.*, *Towe Antique Ford Found. v. I.R.S.*, 999 F.2d 1387 (9th Cir. 1993); *Politte v. United States*, No. 07CV1950 AJB WVG, 2012 WL 965996 (S.D. Cal. Mar. 21, 2012), aff'd, 587 F. App'x 406 (9th Cir. 2014). This makes sense given that—as Plaintiff conceded at oral argument—there must be some causal connection between the alleged misconduct and Plaintiff's injury. See *Mesler*, 39 Cal.3d at 300 ("The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests.") (citing 6 Witkin, Summary of Cal. Law (8th ed. 1974) Corporations, § 5, p. 4318); *Gerritsen v. Warner Bros. Ent. Inc.*, 116 F. Supp. 3d 1104, 1136 (C.D. Cal. 2015) (same); *see also Hambleton Bros. Lumber Co. v. Balkin Enterprises, Inc.*, 397 F.3d 1217, 1228 (9th Cir. 2005) ("Even if improper conduct of a shareholder is shown, a 'causal connection' must be shown: The plaintiff must 'demonstrate a relationship between the misconduct and the plaintiff's injury.'") (quoting *Amfac Foods, Inc. v. Int'l Systems & Controls Corp.*, 294 Or. 94, 654 P.2d 1092, 1103 (1982)).

Acknowledging at oral argument that Plaintiff cannot meet the second prong of the alter ego theory, Plaintiff sought to clarify her legal theory by stating that she may pierce the corporate veil under a "merger/single enterprise" theory or "attribution

theory," which Plaintiff claims are versions of alter ego liability recognized under California law that is distinct from the traditional doctrine involving direct shareholder-company privity. Under the "merger/single enterprise" theory, Plaintiff would need to only show that there is "such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal" *Toho-Towa Co. v. Morgan Creek Prods., Inc*., 217 Cal. App. 4th 1096, 1107 (2013). Under the attribution test, Plaintiff need to demonstrate that an "absent parent instigated the subsidiary's local activity." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd*., 243 F. Supp. 2d 1073, 1099 (C.D. Cal. 2003) (quoting *In re Telectronics Pacing Sys., Inc*., 953 F. Supp. 909, 918) (S.D. Ohio 1997). In other words, Plaintiff need not meet the second "injustice or fraud" prong. In support, Plaintiff pointed the Court to several cases including two California state law cases— *Las Palmas Assocs. v. Las Palmas Ctr. Assocs*., 235 Cal. App. 3d 1220 (Ct. App. 1991) and *Toho-Towa Co.*, 217 Cal. App. 4th 1096—three cases in this district—*Kayne v. Ho*, No. LACV0906816JAKCWX, 2012 WL 12878753 (C.D. Cal. Sept. 6, 2012), *Mossimo Holdings LLC v. Haralambus*, No. CV 14-05912 DDP JEMX, 2015 WL 476298 (C.D. Cal. Feb. 3, 2015), and *Metro-Goldwyn-Mayer Studios Inc.*, 243 F. Supp. 2d at 1099—as well as several out-of-circuit case law. The Court, however, finds Plaintiff's argument unpersuasive and the case law inapposite.

    As MindGeek Defendants correctly point out, courts within this circuit routinely reject the use of "single enterprise" theory as a basis to establish personal jurisdiction. *Krantz v. Bloomberg L.P.*, 2022 WL 2102111, at *5 (C.D. Cal. Jan. 19, 2022); *see also Iconlab Inc. v. Valeant Pharms. Int'l, Inc.*, No. 816CV01321JLSKES, 2017 WL 7240856 (C.D. Cal. Apr. 25, 2017), *aff'd sub nom. Iconlab, Inc. v. Bausch Health Companies, Inc.*, 828 F. App'x 363 (9th Cir. 2020) ("Plaintiffs' other, exotic theories of imputing contacts—"single enterprise," "aiding and abetting," and "ratification"—are not valid theories of establishing personal jurisdiction in the Ninth

1  Circuit to the extent that they stray from the well-established alter ego and agency

2  theories") (internal citations omitted); *Campanelli v. Image First Unif. Rental Serv.,*

3  *Inc.*, No. 15-CV-04456-PJH, 2016 WL 4729173, at *7 (N.D. Cal. Sept. 12, 2016)

4  (observing that "'single enterprise' and 'joint employer' theories are bases for

5  liability, not tests for personal jurisdiction.")).

6      Notably, the two California state law cases and one of the cases within this

7  district on which Plaintiff relies do not once mention "personal jurisdiction."  *See Las*

8  *Palmas Assocs.*, 235 Cal. App. 3d 1220; *Toho-Towa Co.*, 217 Cal. App. 4th 1096;

9  *Mossimo Holdings*, 2015 WL 476298.  Instead, those cases apply the "single

10  enterprise" doctrine as a basis of imposing liability, not personal jurisdiction.  As for

11  the two Central District of California cases that do mention personal jurisdiction,

12  neither are persuasive.  In *Kayne*, for example, the court there discusses "single

13  enterprise" theory in the context of a personal jurisdiction analysis, not as a theory

14  apart from the traditional alter ego theory, but rather as a theory to support the first of

15  the two prongs of the traditional alter ego theory.  2012 WL 12878753, at *8.  Thus,

16  on the very same page that the court mentions the "single enterprise theory," the court

17  in *Kayne* also conducts an analysis on the second "fraud or injustice" prong.  And

18  while the court in *Metro-Goldwyn-Mayer Studios Inc*. does seem to suggest that a

19  merger or attribution theory can provide be a separate and independent doctrine to

20  support personal jurisdiction apart from the traditional alter ego theory, in doing so,

21  the court applies out-of-circuit case law. *See* 243 F. Supp. 2d at 1099–100 (citing to a

22  cases from the Sixth Circuit and S.D. Ohio as well as a Ninth Circuit case applying

23  Nevada law) (citing *Third National Bank v. WEDGE Group*, 882 F.2d 1087, 1092,

24  1094 (6th Cir.1989) (Keith, J., concurring); *In re Telectronics Pacing Systems, Inc*.,

25  953 F.Supp. at 919; *Wells Fargo & Co. v. Wells Fargo Exp. Co*., 556 F.2d 406, 419

26  (9th Cir. 1977)).  The remaining out-of-circuit cases that Plaintiff cites have no

27  application here and contradict the law that governs here.

28

1    Even if Plaintiff were correct that the "single enterprise" theory somehow

2   relaxes the traditional alter ego test, which as discussed above she is not, the theory

3   would not apply here because it concerns liability between sister corporations, not

4   liability imposed on individual shareholders.  (Supp. Brief at 7–8).  The court in *Las*

5   *Palmas* explicitly contrasted the "usual[]" alter ego case—where liability is sought to

6   be imposed on an individual shareholder—with the "single enterprise" variation,

7   which applies only to "sister companies."  *See Las Palmas Assocs.*, 235 Cal. App. 3d

8   at 1249.  *Toho-Towa* is distinguishable on similar grounds because its discussion of

9   the "single-business-enterprise" theory concerned related corporations that "integrate

10   their resources and operations," not individual investors.  (Supp. Brief at 8).  Thus,

11   even assuming Plaintiff could rely on this variant of alter ego, it would have no

12   bearing on the Individual Defendants.

13    Both the Ninth Circuit and California courts have made clear that for a plaintiff

14   to avail herself to the alter ego doctrine for jurisdiction purposes, she must meet both

15   prongs of the test.  *See In re Boon Glob. Ltd.*, 923 F.3d at 653 ("California recognizes

16   alter ego liability where two conditions are met") (citations omitted); *id*. at 654

17   (finding that the lower court's alter ego analysis was flawed for failing to

18   "determine[e] that both prongs of alter ego jurisdiction were met); *see also Gerritsen*

19   *v. Warner Bros. Ent. Inc*., 116 F. Supp. 3d 1104, 1136 (C.D. Cal. 2015) ("Before the

20   doctrine can be invoked, two elements must be alleged"); *Mesler v. Bragg Mgmt. Co*.,

21   39 Cal.3d 290, 300 (1985) ("There is no litmus test to determine when the corporate

22   veil will be pierced; rather the result will depend on the circumstances of each

23   particular case. There are, nevertheless, two general requirements").  Given that

24   Plaintiff conceded at oral argument that she cannot meet the second prong and the

25   admission is dispositive as to this issue, the Court not reach the first prong.  The Court

26   therefore holds that it does not have personal jurisdiction over MindGeek S.a.r.l and

27   **GRANTS** MindGeek Defendants' Motion to Dismiss as to MindGeek S.a.r.l.  As

28

1  Plaintiff has already had jurisdictional discovery on precisely this issue and the
2  opportunity to amend, this dismissal is with prejudice.

3  **III.    CONCLUSION**

4        For the foregoing reasons, MindGeek Defendants' Motion to Dismiss Plaintiff's
5  Second Amended Complaint is **GRANTED in part and DENIED in part** as follows:
6  (Count I) Violation of Trafficking Victims Protection Reauthorization Act
7  ("TVPRA") based on a theory of direct liability under 18 U.S.C. § 1591(a)(1) is
8  dismissed with prejudice; (Count I) Violation of the TVPRA based on beneficiary
9  liability under 18 U.S.C. § 1591(a)(2), 1595 is not dismissed; (Count IV) Conspiracy
10 to Violate the TVPRA pursuant to 18 U.S.C. §§ 1594(c), 1595 is dismissed without
11 prejudice; (Count V) Receipt, Distribution, or Transport of Materials Involving the
12 Sexual Exploitation of Minors in Violation of 18 U.S.C. §§ 2252, 2255 is not
13 dismissed; (Count VI) Receipt, Distribution, or Transport of CSAM in Violation of 18
14 U.S.C. §§ 2252A, 2255 is not dismissed; (Count VII) Public Disclosure of Private
15 Facts is not dismissed; (Count VIII) Intrusion into Private Affairs is not dismissed;
16 (Count IX) Placing Plaintiff in False Light is not dismissed; (Count X) Common Law
17 Misappropriation of Name and Likeness is dismissed without prejudice; (Count XI)
18 Misappropriation of Name and Likeness in Violation of Cal. Civ. Code § 3344 is
19 dismissed without prejudice; (Count XII) Distribution of Private Sexually Explicit
20 Materials in Violation of Cal. Civ. Code § 1708.85 is dismissed without prejudice;
21 (Count XIII) Negligence is not dismissed; (Count XIV) Violation of the UCL under
22 Cal. Bus. & Prof. Code § 17200 is not dismissed; (Count XIV) Violation of the FAL
23 under Cal. Bus. & Prof. Code § 17500 is dismissed with prejudice; (Count XV)
24 Violation of California's Trafficking Victims Protection Act under Cal. Civ. Code §
25 52.5 is dismissed without prejudice; and (Count XVI) Violation of Civil Conspiracy is
26 dismissed without prejudice.  Defendant MindGeek S.a.r.l. is dismissed with
27 prejudice.
28 ///

Should Plaintiff wish to file a Third Amended Complaint in conformity with this Order, Plaintiff must do so within 21 days of this Order.

**IT IS SO ORDERED.**

Dated: September 26, 2025

HON. WESLEY L. HSU
UNITED STATES DISTRICT JUDGE