1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT
9              CENTRAL DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| SERENA FLEITES, | Case No. 2:21-CV-04920-WLH-ADS |
| Plaintiff, | **AMENDED ORDER RE VISA INC.'S MOTION TO DISMISS [432] PLAINTIFF'S SECOND AMENDED COMPLAINT** |
| v. | |
| MINDGEEK S.A.R.L.; MG FREESITES, LTD; MINDGEEK USA INCORPORATED; MG PREMIUM LTD.; MG GLOBAL ENTERTAINMENT INC.; 9219-1568 Quebec, Inc. (d/b/a MindGeek); BERND BERGMAIR; FERAS ANTOON; DAVID TASSILLO; COREY URMAN; VISA, INC.; COLBECK CAPITAL DOES 1-5; BERGMAIR DOES 1-5, | |
| Defendants. | |

Before the Court is Defendant Visa, Inc's ("Defendant" or "Visa") Motion to Dismiss ("Motion") Plaintiff Serena Fleites's ("Plaintiff" of "Fleites") Second Amended Complaint ("SAC"). (Mot., Dkt. No. 432). The Court heard oral argument on March 7, 2025, and April 24, 2025. For the reasons set forth below, the Court **GRANTS** Visa's Motion to Dismiss.

# I.    BACKGROUND

## A. <u>Factual Background</u>

### 1.  *Plaintiff Serena Fleites*

Plaintiff, who is now at the age of majority, brings this action against MindGeek S.A.R.L., MG Freesites, Ltd., MindGeek USA, Inc., MG Premium, Ltd., MG Global Entertainment, Inc., 9219-1568 Quebec Inc. (the "MindGeek Defendants" or "MindGeek"); Bernd Bergmair, Feras Antoon, David Tassillo (the "Individual Defendants"); Visa, Inc.; Colbeck Capital Management, LLC, CB Media Ventures DD, LLC, CB Agency Services, LLC, CB Participations SPV, LLC (the "Colbeck Defendants" or "Colbeck"); and the Redwood Capital Management, LLC, Redwood Master Fund Ltd., Redwood Opportunity Master Fund, Ltd., Manuel 2018, LLC, Ginogerum, LLC, White-Hathaway Opportunity Fund, LLC's (the "Redwood Defendants" or "Redwood") for allegations related to her sex trafficking when she was a minor.  (SAC, Docket No. 385 ¶ 10).

In 2014, a thirteen-year-old Plaintiff was induced to make a sexually explicit video by her then high school boyfriend, which he uploaded to Pornhub.com, a pornography website owned and operated by the MindGeek Defendants, without Plaintiff's knowledge or consent.  (*Id*. ¶¶ 11, 448).  Plaintiff alleges that a MindGeek personnel reviewed the video of Plaintiff prior to making the video publicly available on Pornhub as MindGeek Defendants have repeatedly claimed they do for every video uploaded to Pornhub, and therefore knew that the video of Plaintiff constituted child sex abuse material ("CSAM") as her age was apparent, not only from the image itself, but also from the title "13-Year Old Brunette Shows Off For the Camera."  (*Id*. ¶¶ 448, 449).  Despite having knowledge that the video contained illicit material, Plaintiff claims that MindGeek posted the video to its Pornhub site consistent with its overall business model and practice.  (*Id*. ¶ 449).  In addition, MindGeek "categorized, tagged, optimized for user preferences, and disseminated the images, tags, and video" of Plaintiff on Pornhub.  (*Id*.).  Plaintiff alleges that MindGeek also uploaded the

optimized video to its other tubesites and incorporated the video into its algorithmic playlists and suggested videos. (*Id*.). MindGeek also placed advertisements alongside the video, through which it earned revenue with every page visit, impression, engagement, and conversion. (*Id*. ¶ 450). By the time Plaintiff discovered the video, the video had already garnered 400,000 views. (*Id*.).

Impersonating her mother, Plaintiff contacted MindGeek to inform that the video of Plaintiff qualified as child pornography. (*Id*. ¶ 451). After two weeks, MindGeek finally responded, acknowledging that the content was CSAM, but took another two weeks to remove the video after continued demands from Plaintiff. (*Id*.). During this time, the video continued to generate views and MindGeek continued to earn advertising revenue. (*Id*.). In addition, the video was downloaded and reuploaded several times by different users and with different titles, including by MindGeek Defendants.[1] (*Id*. ¶ 452; Opp'n at 47). One of the reuploads had 2.7 million views. (SAC ¶ 452.). Others had hundreds of comments noting that Plaintiff could not be more than a teenager. (*Id*.). Each reuploaded videos was reviewed, accepted, tagged, categorized, and optimized by MindGeek. (*Id*.). MindGeek itself even uploaded the video to its other pornographic tubesites. (*Id*.). Every time Plaintiff discovered a reposted video, she would request MindGeek to remove the videos. (*Id*. ¶ 453). Each time, however, MindGeek would ask Plaintiff "to provide photographic proof that she was the child depicted in the video before removing [the videos]" and would take weeks to do so. (*Id*.).

As a result of the viral dissemination of the video, Plaintiff's life spiraled out of control. She was harassed and bullied in school to such a degree that she started skipping school and finally unenrolled to attend courses online. (*Id*. ¶ 455). Plaintiff did not tell her mother about the video, and so her relationship with her mother

---

[1] The claim that MindGeek Defendants reuploaded *Plaintiff*'s videos after they were initially taken down was not expressly alleged in the SAC. Plaintiff, however, clarifies this point in her Opposition. (Opp'n at 14, 47, 51).

became strained, as her mother did not know why her daughter had suddenly begun to skip classes. (*Id*.). This led to Plaintiff leaving her mother's home to move in with her sister. (*Id*.). A year later, she moved back in with her mother, whereafter she attempted to hang herself, only to be stopped by her younger sister and her mother's boyfriend "who removed the power cord from her neck." (*Id*. ¶ 456.) Plaintiff was admitted to a mental health facility in Bakersfield. (*Id*.) She would attempt suicide several times in the ensuing years. (*Id*. ¶ 260).

Not wanting to face her family after the first suicide attempt, Plaintiff moved in with a friend. (*Id*. ¶ 457.) At her friend's house, an older man introduced Plaintiff to heroin, to which Plaintiff became addicted. (*Id*.) To fund her heroin addiction, Plaintiff—still a minor at this point—created sexually explicit videos at the older man's behest, who in turn sold the videos on Craigslist and Kik app. (*Id*.) Some of the videos were then uploaded to Pornhub and were still available on the website as recently as June 2020. (*Id*. ¶ 458). One of the videos was titled "Teen F*cks Guy In Car," and had a user tag that she was underage. (*Id*.) Some videos even had comments about Plaintiff's young age, such as "she looks like she's f*cking 12," "And she is 13?!," "she dadass looks no older than 16," "sh look s like she's 16." (*Id*.). Nevertheless, Plaintiff alleges that MindGeek reviewed, accepted, optimized, categorized, tagged the videos; incorporated the videos into its algorithmic playlists and suggestions; uploaded the videos to its other tubesites; and placed ads alongside the videos through which MindGeek earned revenue. (*Id*.). While MindGeek profited from the child porn featuring Plaintiff, Plaintiff was intermittently homeless or living in her car, addicted to heroin, depressed and suicidal, and without the support of her family. (*Id*. ¶ 460.).

### 2. *MindGeek's Business Practices and Business Model*

From 2013 to 2023, MindGeek was the dominant online pornography company in the world. (*Id*. ¶ 2). MindGeek operates several pornographic websites which generally fall into two general categories: (1) free "tubesites" that contain free,

4

purportedly user populated content and (2) premium "paysites" where it sells content, services, and merchandises.  (*Id*. ¶ 38).

MindGeek's business model is predicated on maximizing view and driving traffic to its sites.  (*Id*. ¶ 44).  Traffic and content are crucial in MindGeek's business model because greater traffic and content directly correlate to greater profit through: (1) garnering and driving more traffic to MindGeek and third-party "premium" paysites or services; (2) selling ad space on free sites for the services or products of third parties, which generates revenue with every visit, impression, engagement, and conversion; (3) selling the data of persons who use the free sites; and (4) harvesting data to optimize their website content and become the top result for queries on search engine like Google, which further drive traffic and content.  (*Id*. ¶¶ 44–45, 450).  In other words, MindGeek is incentivized to have more content and drive traffic to maximize its profit.

The "gold standard" for generating traffic and obtaining content is to be the top result for queries on search engines like Google, which can be accomplished through Search Engine Optimization ("SEO").  (*Id*.¶ 45).  SEO "is the science of optimizing a website's ability to garner top search rankings and depends on many factors, but most prominently, content volume, how well that content is described in detail, the website's ability to capture and analyze user interactions and preferences, and traffic." (*Id*.).  In service of its SEO, MindGeek proactively helps users with messaging and content development to enhance the video or image's ability to grab attention.  (*Id*. ¶ 40).  For example, MindGeek provides instructions on "how to succeed" and maximize attention with suggested titles, descriptions and categories that MindGeek's SEO analysis has determined most effectively draw attention to particular types of content and better reach their intended audience.  (*Id*.).  MindGeek's goes even further by having its own formatters review and modify the presentation of the videos and images as they deem appropriate, including the titles, tags and categories, as well as the videos themselves.  (*Id*.).  MindGeek combines posted content with other,

similarly described content and recommends it to users in the form of proposed searches or playlists to further drive attention and traffic. (*Id*.).  Finally, MindGeek itself uploads content to its other websites, at times as a matter of course.  (*Id*. ¶ 43).

Disturbingly, child porn and drives web traffic.  In 2020, the National Center for Missing and Exploited Children ("NCMEC") produced a report describing the "insatiable demand" for child porn between 1998 to 2019, with 8.4 million such videos posted online in 2018.  (*Id*. ¶ 54).  The same is true for other forms of nonconsensual content including adult sex trafficking, rape, and revenge porn. (*Id*.). Plaintiff alleges victims, employees, advocacy groups, law enforcement, press reports, and government agencies have all made MindGeek Defendants aware that CSAM and other nonconsensual materials appear on their platforms.  (*See, e.g*., ¶¶ 99–101, 154–155, 197).  For example, a 2020 *New York Times* article exposed how "modest investigatory efforts easily revealed" that PornHub was "infested" with videos depicting "child abuse and nonconsensual violence."  (*Id*. ¶ 307).

Despite being aware the ubiquitousness of child porn and other nonconsensual content on its sites, MindGeek maintained what Plaintiff describes as an "unrestricted content" business model to feed MindGeek's "singular priority of using SEO to be the top search engine website result in any porn related search."  (*Id*. ¶¶ 56, 57, 110). Under this model, MindGeek allegedly "knowingly and intentionally solicited, optimized, and commercialized content of any kind, including child pornography and other nonconsensual content, and avoided any policy, process, or technology that would exclude illegal content or limit or even slow the upload of content generally to its websites." (*Id*. ¶ 57).  Specifically, Plaintiff claims that MindGeek achieved this through three knowing and intentional practices.  (*Id*. ¶ 58).

First, MindGeek systematically ignored the laws in the jurisdictions in which it did business by setting up "shifting, opaque, and Byzantine international corporate structure" which "obscured MindGeek's ownership and operation" in jurisdictions

that are known to be "havens" for tax evasion, money laundering, and with weak laws and enforcement related to pornography. (*Id*. ¶ 58–66).

Second, MindGeek knowingly and intentionally created a faux "moderation" process that was "hopelessly under-staffed [and] under-resourced," which consisted of an exclusively human moderation team of no more than 30 untrained, minimum wage contractors in Cypress to review 700-1200 videos a day. (*Id*. ¶¶ 58, 67, 73). Even worse, this team was not only understaffed, but also perversely incentivized: they were offered bonuses that depended on the number of videos they *approved* for upload. (*Id*. ¶ 79 (emphasis in the original)). Thus, despite touting that every video was reviewed and screened by a moderator prior to it being available on MindGeek's website, (*Id*. ¶¶ 67-80, 103, 471), these so-called moderators were not actually tasked with excluding child pornography and other nonconsensual content but rather proactively attracting, optimizing, and monetizing it, while also masking it from authorities by "'scrubb[ing]' words in the titles and tags that unequivocally indicated criminality." (*Id*. ¶¶ 58, 74–77). In other words, while providing a "public veneer of legality," the real goal for these moderators was to let as much content as possible go through, including CSAM and nonconsensual materials, to maximize revenue. (*Id*. ¶ 79, 101). Consequently, Plaintiff alleges that MindGeek never verified the age, identity, and the consensual nature of the videos uploaded onto their sites. (*Id*. ¶¶ 205, 295, 297). They also clearly underreported CSAM to NMEC. (*Id*. ¶ 99–100). Until 2020, MindGeek purportedly never voluntarily made a single legally required disclosure to authorities in the United States or Canada. (*Id*. ¶ 99). With little policing done by MindGeek, it was largely up to the victims to flag, report, and request takedown of illicit content to MindGeek. These victims, however, were often met with delay tactics and/or stonewalling, especially if the content sought to be removed was "performing well." (*Id*. ¶ 88). The delay would permit MindGeek to preserve the use of content as long as possible so that it could continue analyzing a well performing, albeit illegal, video so that MindGeek could refine its algorithms to

push similar content. (*Id*.). If and when the illegal videos were successfully removed, MindGeek only disabled the video but kept the webpage with its title, description, tags, and comments to that video so that it would still continue to increase its SEO and users searching for such content could be directed to similar content that were not disabled. (*Id*. ¶¶ 90, 96). Moreover, because MindGeek's website allowed users to download videos, removed videos were often reuploaded, requiring victims to constantly monitor for a reposting of their videos. (*Id*. ¶ 137). Perhaps, most disturbingly, Plaintiff alleges that MindGeek systematically and surreptitiously reuploaded removed content that it had been forced to disable. (*Id*. ¶ 97).

Third, MindGeek proactively used its extensive SEO technology to curate child pornography and other nonconsensual content by further "optimizing" its descriptions, tags, titles, and video formats and arranging recommended searches to find, and curate playlists of, such content, even though it had the capability and the technology to exclude nonconsensual or other banned content. (*Id*. ¶¶ 58–59, 67–68, 106–107). For example, MindGeek directed users to use up to 16 tags that describe the video and performers; select up to 8 relevant categories, and where applicable, use niche specific categories to ensure the content would reach the "right" fans; and write creative titles that described the scene. (*Id*. ¶ 114). Amongst the "preexisting" categories that a user could select for a video were categories such as "teen," "school," "babysitter," and "old/young"—all categories that purportedly targeted views who are interested in CSAM. (*Id*. ¶¶ 113–114). And on the page explaining the video categories, MindGeek informed that "Teen" is one of the most popular categories. (*Id*.). In addition to providing guidance to the users, MindGeeks' own formatters added and edited content, including the tags and categories. (*Id*. ¶ 115). They would also create a graph or timeline underneath the videos to help viewers identify and quickly advance to various levels of sexual activity within the video. (*Id*. ¶ 116). They also created thumbnails for the videos on MindGeek's tubesites, some of which were created from CSAM videos. (*Id*. ¶ 118). To reach their intended audience, MindGeek

1    would edit advertisements on its websites to frequently highlight terms such as "girls,"

2    "boys," "broken teens," and "twink," which are terms that promote the creation, use

3    and viewing of CSAM and "encouraged for use by MindGeek." (*Id*. ¶ 120).

4    MindGeek's platforms even allowed advertisers to build campaigns around keywords

5    like "13yearoldteen" and "not18"; indeed, they were even allowed to target ads to

6    people searching the term "child rape" in languages other than English. (*Id*. ¶ 121).

7    The result meant that MindGeek would retain its position as the top search result for

8    all porn searches, including CSAM and nonconsensual content. (*Id*. ¶ 123).

9    Accordingly, Plaintiff alleges that MindGeek's sites contain a trove of obvious and

10    easily accessible child porn. Plaintiff alleges that "in just few minutes of basic

11    searches, users" could seemingly find countless videos clearly depicting child sexual

12    assault or exploitation, where titles, descriptions, and tags bluntly describe the illicit

13    nature of the videos. (*Id*. ¶ 125.)

14         *3. Visa's Involvement*

15         Plaintiff alleges that "Visa provided the means of monetizing the trafficked

16    content that was an integral part of MindGeek's march to market dominance" by

17    "recogniz[ing] MindGeek as an authorized merchant and process[ing] payments to its

18    websites including but not limited to Pornhub[.]" (*Id*. ¶¶ 8, 27). Plaintiff alleges that

19    Visa knew not only that MindGeek's sites contained a substantial amount of child

20    porn and other nonconsensual materials, but its business model consisted of using

21    illegal content to further drive revenue and profit. (*Id*. ¶¶ 8, 299.) Plaintiff alleges

22    that nonetheless, "Visa processed and continued to process financial payments for

23    MindGeek because of the millions of dollars it was earning doing so." (*Id*.)

24         Plaintiff alleges that Visa obtained knowledge of MindGeek's child porn

25    problem from various sources. First, Plaintiff alleges that Visa performed reviews of

26    MindGeek's sites pursuant to its own "due diligence and compliance functions." (*See,*

27    *e.g., id*. ¶ 289). A quick search returned tens of thousands of videos depicting CSAM

28    and nonconsensual materials on MindGeek's websites. (*Id*.). A simple investigation

would have alerted Visa that MindGeek was not only taking no steps to police the presence of such illicit materials, but MindGeek was encouraging its upload and viewing through its optimization function. (*Id*. at 290). Further, in November 2019, Visa's competitor PayPal terminated its relationship with MindGeek, issuing a public statement that "[PayPal] explicitly prohibits the use of [its] services for the sale of materials that depict criminal behavior[.]" (*Id*. ¶ 296). In 2020, Visa also landed on an annual "Dirty Dozen List" maintained by anti-trafficking advocates to highlight mainstream business that facilitate, participate in, and profit from sexual abuse and exploitation. (*Id*. ¶ 298). Visa responded with a statement that it only permits transactions for the purchase or sale of lawful products or services. (*Id*.) Anti-sex trafficking advocates also sent various letters and emails to Visa detailing MindGeek's child trafficking venture. (*Id*. ¶¶ 300–305). Visa responded: "Maintaining a neutral stance under the law is vital for the free flow of commerce." (*Id*. ¶ 306).

It was not until December 2020 when the *New York Times* published a report titled "The Children of Pornhub"—wherein the author explained MindGeek's child porn problem—that Visa along with its biggest competitor, Mastercard, took action, by suspending business with MindGeek pending 'investigations' into the allegations in the *New York Times* article. (*Id*. ¶ 307–310). In response to the suspension, MindGeek took down over 10 million unverified videos from its tubesites. (*Id*. ¶ 285.) Ultimately, however, Visa restored services for MindGeek's paid premium sites. (*Id*. ¶ 312)

**B. Procedural Background**

On June 17, 2021, named Plaintiff Serena Fleites and Plaintiffs Jane Does No. 1 through 33 filed this action bringing numerous causes of actions against Defendants MindGeek S.A.R.L., MG Freesites, Ltd., MindGeek USA, Inc., MG Premium, Ltd., RK Holdings USA, Inc., MG Global Entertainment, Inc., TrafficJunky, Inc., Bernd Bergmair, Feras Antoon, David Tassillo, Corey Urman, Visa, Inc., Colbeck Capital unnamed does 1 through 10, and Bergmair unnamed does 1 through 10. (Compl.,

Docket No. 1). On February 10, 2022, the Court granted Defendants' motion to sever Plaintiffs and ordered Plaintiff Fleites to file a First Amended Complaint ("FAC") with her continuing as the only named plaintiff in this action and dismissed Plaintiffs Jane Does No. 1 through 33 without prejudice. (Docket No. 119). On March 21, 2022, Plaintiff filed a FAC consistent with the Court's February 10, 2022, order. (FAC, Docket No. 124, Ex. 124-3).

On May 23, 2022, Visa filed a motion to dismiss Plaintiff's FAC. (Docket No. 138). On July 29, 2022, Judge Carney granted in part and denied in part Visa's motion to dismiss Plaintiff's First Amended Complaint. (FAC Visa Order, Docket No. 166). In his order, Judge Carney held in pertinent part the following.

Plaintiff failed to state a claim against Visa for direct beneficiary liability pursuant to Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1591(a)(2). (*Id.* at 21). Specifically, Judge Carney found that because Visa was "not alleged to have any direct interaction with Plaintiff, her direct traffickers, or her videos," Visa therefore "cannot bear beneficiary liability for knowingly *participating* in the sex trafficking venture that harmed Plaintiff." (*Id.* (emphasis in the original)). Judge Carney also concluded that because Visa lacked "any knowledge—constructive or otherwise—of Plaintiff, her videos, or her age in the videos," Visa "did not form any sort of continuous relationship with or tacit agreement with Plaintiff's primary traffickers." (*Id.*) In dismissing this claim, the Court did not grant Plaintiff leave to amend her section 1591(a)(2) claim against Visa on the grounds that any amendment would be futile because "Plaintiff simply has no basis for claiming Visa directly participated in the sex trafficking ventures that harmed her." (*Id.* at 33).

Judge Carney, however, found that Plaintiff had adequately alleged that Visa conspired with MindGeek Defendants' alleged violation of section 1591(a)(2) pursuant to section 1594(c) of the TVPRA. (*Id.* at 22). The Court found that Plaintiff sufficiently alleged facts supporting a conclusion that MindGeek Defendants and Visa

11

had a "unity of purpose" or a "meeting of the minds" to engage in the unlawful arrangement.  Specifically, the Court found that Plaintiff adequately alleged that "Visa knew that MindGeek's websites were teeming with monetized child porn from its own due diligence and discussions and negotiations with Mind Geek, PayPal's decision to cease doing business with MindGeek, communications from advocates with which Visa interacted, and from the *New York Times* article,"—i.e., "MindGeek was regularly committing violations of section 1591(a)(2)"—yet "Visa continued to grant MindGeek the means to financially benefit from its participation in sex trafficking venture: the Visa payment network."  (*Id*. at 23–24).  The fact that Visa did not know who the eventual victims would be was irrelevant for conspiracy liability purposes, as long as the resulting harm was a "natural consequences of Visa's alleged knowing decision to provide the means through which MindGeek could monetize child porn videos."  (*Id*. at 24).  Central to the Court's ruling was the fact that Visa provided the "tool" through which MindGeek completed its criminal act.  (*Id*. at 25).

Judge Carney further found that Plaintiff had pled sufficient facts under the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, pursuant to the unlawful prong, which borrows violations of other laws.  (*Id*. at 29).  Plaintiff, however, failed to state a viable claim under the False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17200, as the Court could not "neatly glean a theory of liability of liability for Plaintiff's FAL claim from the FAC" and Plaintiff did not even "attempt to spell out her theory of FAL liability."  (*Id*.).

Plaintiff was ordered to plead a more definite statement of her civil conspiracy claim.  The Court noted that while Plaintiff has alleged several tort causes of action against MindGeek, she did not make clear "what torts Visa allegedly conspired to commit." (*Id*. at 30–31).

On May 23, 2024, Plaintiff filed her Second Amended Complaint. (SAC, Docket. No. 385).  On August 30, 2024, Visa filed a Motion to Dismiss Plaintiff's SAC.  (Mot., Docket No. 432).  On October 31, 2024, Plaintiff filed an Omnibus

Opposition to Defendants' Motions to Dismiss, including Visa's Motion to Dismiss (Opp'n, Docket No. 477), to which Visa filed a reply on December 6, 2024.  (Reply, Docket No. 498).

On March 7, 2025, the Court heard oral arguments from all parties.  At the hearing, the Court granted Visa supplemental briefing in light of the recent Ninth Circuit's decision vacating *Ratha v. Rubicon Res., LLC*, 111 F.4th 946 (9th Cir. 2024) (*Ratha II*).  On March 21, 2025, Visa filed its Supplement to Notice of Motion and Motion to Dismiss Second Amended Complaint (Visa Suppl. Br., Docket No. 549), to which Plaintiff filed its Omnibus Response to Defendants' Supplemental Briefs on April 4, 2025.  (Fleites Resp., Docket No. 573).  The matter is considered fully briefed.

## II.   DISCUSSION

Plaintiff, in her SAC, brought the following causes of action against Visa: (1) violation of TVPRA based on a theory of beneficiary liability pursuant to 18 U.S.C. §§ 1591, 1595 (Count II); (2) conspiracy to violate the TVPRA pursuant to 18 U.S.C. §§ 1594(c), 1595 (Count IV); (3) violation of the UCL and FAL under the Cal. Bus. & Prof. Code §§ 17200 and 17500 (Count XIV); and (4) violation of civil conspiracy (Count XVI).  (SAC at 150–53, 155–56, 166–71).  Visa filed this instant motion to dismiss each cause of action on the grounds that Plaintiff has failed to state a claim under Federal Rules of Civil Procedure Rule 12(b)(6).  The Court will address each argument in turn.

### A.   <u>Legal Standard</u>

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  A complaint may be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  "To survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557). The court must construe the complaint in the light most favorable to the plaintiff, accept all allegations of material fact as true, and draw all reasonable inferences from well-pleaded factual allegations. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002). The court, however, is not required to accept as true legal conclusions couched as factual allegations. *See Iqbal*, 556 U.S. at 678. A claim is considered to have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In deciding a Rule 12(b)(6) motion, a court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007).

**B.    Analysis**

1.    *Violation of TVRA pursuant to 18 U.S.C. §§ 1591, 1595 (Count II)*

Visa argues that Plaintiff's claim for direct TVPRA liability is barred by Judge Carney's July 29, 2022, order dismissing this exact claim with *prejudice*. (FAC Visa Order at 21). Plaintiff asserts, however, that intervening decisions since the order warrants this Court to reconsider Judge Carney's ruling. (Opp'n at 31–32). The Court agrees with Visa.

Pursuant to Rule 54(b), a court order that does not terminate the action "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b); *see also City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) ("As long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient.") (internal quotation marks and citation omitted). A motion for reconsideration under Federal Rule of Civil Procedure 59(e), however, "should not

1    be granted[] absent highly unusual circumstances." *Orange St. Partners v. Arnold*,

2    179 F.3d 656, 665 (9th Cir.1999) (citing *School Dist. No. 1J v. ACandS, Inc*., 5 F.3d

3    1255, 1263 (9th Cir.1993)).  Generally, a motion for reconsideration is appropriate

4    "(1) if such motion is necessary to correct manifest errors of law or fact upon which

5    the judgment rests; (2) if such motion is necessary to present newly discovered or

6    previously unavailable evidence; (3) if such motion is necessary to prevent manifest

7    injustice; or (4) if the amendment is justified by an intervening change in controlling

8    law." *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011).

9        Plaintiff cites to two cases in support of her motion for consideration:  (1) *G.G.*

10    *v. Salesforce.com, Inc*., 76 F.4th 544 (7th Cir. 2023) and (2) *Doe 1 v. Deutsche Bank*

11    *Aktiengesellschaft*, 671 F. Supp. 3d 387 (S.D.N.Y. 2023).  (*See* Opp'n at 31).  As

12    Plaintiff concedes, however, these two cases are "out of circuit decisions"—*i.e.*, they

13    are not "controlling law."  (*Id*. at 31 n.16).  Plaintiff therefore has failed to

14    demonstrate any of the factors that would justify this Court to revisit Judge Carney's

15    prior ruling.

16        The Court finds that the two cases to which Plaintiff cites are unpersuasive.

17    The Court agrees that both *Salesforce* and *Deutsche Bank* held that "knowledge of the

18    specific victim, let alone knowledge of her identity, is not required."  The Court also

19    agrees such a requirement is inconsistent with the language in the statute which only

20    demands knowledge or constructive knowledge as to the *venture,* not victim.  18

21    U.S.C. §§ 1591(a)(2); 1595(a); see also *Deutsche Bank*, 671 F.Supp.3d at 407.  The

22    Court also agrees with the Seventh Circuit's explanation in *Salesforce* that requiring

23    such specificity would result in an unworkable outcome where beneficiaries are

24    allowed to more easily escape liability in the most egregious cases involving large

25    numbers of victims.  *Salesforce*, 76 F.4th at 557.  The Court finds, however, that these

26    holdings are not inconsistent with Judge Carney's holding in his FAC Visa Order.

27    The Court does not construe Judge Carney's statement that "knowledge—constructive

28    or otherwise—of Plaintiff" could not be found due to Visa's lack of "interaction with

Plaintiff and her videos" to mean that Plaintiff was required to show that Visa had to have knowledge that a particular victim—*i.e.*, Plaintiff—herself was sex trafficked.

In any event, even if the Court were to interpret Judge Carney's decision as requiring specificity with respect to Plaintiff, the Court finds that to be irrelevant to the issue at hand because Judge Carney's decision to dismiss the direct TVPRA claim against Visa with prejudice did not turn on the knowledge element. Although Judge Carney did find Visa's lack of "knowledge—constructive or otherwise—of Plaintiff, her videos, or her age in the videos" to be persuasive factor in his holding, Judge Carney's decision ultimately hinged on Visa's lack of participation. (FAC Visa Order at 21). Reviewing *Salesforce* and *Deutsche Bank* under the participation factor, the Court finds that the two cases are sufficiently distinguishable from the case here.

In *Salesforce*, the court found that the plaintiff there stated a viable claim of direct beneficiary liability under section 1951(a)(2) in large part because "Salesforce had such a close business relationship with Backpage—providing advice and custom-tailored software for years to help grow its business," such that Salesforce demonstrated "active participation of a contractual partner." 76 F.4th at 548, 563 (emphasis added). And more importantly, the contractual partner Backpage—with which the Court found Salesforce to have a "continuous business relationship"—itself was liable as a *direct sex trafficker* under section 1951(a)(1). *Id.* By contrast, here, Judge Carney specifically found that Visa "did not form any sort of continuous relationship with or tacit agreement with Plaintiff's primary traffickers." (FAC Visa Order at 21 (emphasis added)). The only relationship Visa had was with MindGeek, and Judge Carney rejected Plaintiff's theory that the MindGeek Defendants were perpetrators of sex trafficking of Plaintiff under the meaning of section 1591(a)(1). (*Id.* at 17–18). In other words, unlike the Salesforce defendant, Visa here "was one step removed from the sex traffickers." 76 F.4th at 562 (distinguishing *Doe #1 v. Red Roof Inns, Inc*., 21 F.4th 714 (11th Cir. 2021), where the Eleventh Circuit found that plaintiffs failed to allege that franchisors had participated within the meaning of the

TVPRA, from *Salesforce*).  The fact that the *Salesforce* court did not require a showing that Salesforce have a direct connection to plaintiff's *trafficking* or even her *primary* trafficker is irrelevant.  (Opp'n at 31 (citing *Salesforce*, 76 F.4th at 561–62)).  The defendant there had a direct connection and a continuous relationship with one of the sex trafficking perpetrators, not with a party that is only liable for beneficiary liability, sufficiently differentiating the *Salesforce* case from the case here.  Moreover, there is no allegation here that Visa provided "personalized support" that was "targeted to [MindGeek's] specific needs."  *Id*. at 563.  Rather, the relationship that Plaintiff illustrates of Visa and MindGeek is more akin to a "remote intermediary" that provided "off-the-shelf product" to MindGeek.  *Id*. at 562–63; *see also id*. at 563 ("But plaintiffs have described a relationship between Salesforce and Backpage much closer than that between a web-hosting service or *a credit-card payment processor* and a website" (emphasis added)).

 Similar to *Salesforce*, plaintiffs in *Deutsche Bank* not only adequately alleged that defendant banks had a direct relationship with their *trafficker*, Jeffrey Epstein, but also that defendant banks had "active engagement" that went beyond just "passive facilitation."  671 F. Supp. 3d at 405–06.  More specifically, plaintiffs there asserted that defendant banks "concealed" the trafficker's suspicious activities by delaying filing suspicious activity reports and "structuring" cash withdrawals to avoid alerting authorities.  *Id*.  Plaintiffs even went as far to allege that one of the defendant banks "actually trafficked women and girls for Jeffrey Epstein through its subsidiary."  *Id*. at 406.  These allegations show a level of participation on the part of the defendants that is not shown here.  The Court therefore affirms Judge Carney's prior order and **DISMISSES** Plaintiff's beneficiary liability TVPRA claim pursuant to section 1591(a)(2) against Visa with prejudice this time, as Plaintiff has already had an opportunity to amend.  *See Nat'l Funding, Inc. v. Com. Credit Counseling Servs., Inc.*, 817 F. App'x 380, 385 (9th Cir. 2020) (affirming dismissal where the amended complaint "failed to cure the deficiencies explicitly identified by the district court in

1    its prior order"); *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995) (emphasizing

2    that futility of amendment can, by itself, justify denial of leave to amend).

3                    2.      *TVPRA Civil Conspiracy Claim (Count IV)*

4          Visa moves to dismiss Plaintiff's TVPRA conspiracy claim, arguing that all of

5    Visa's alleged conduct with respect to Plaintiff predates the 2023 amendment to 18

6    U.S.C. § 1595(a), and that no private right of action for civil conspiracy existed under

7    the TVPRA prior to that amendment.  (Mot. at 11–17).  The Court addresses

8    (1) whether the 2023 amendment to 18 U.S.C. § 1595 applies retroactively to pre-

9    2023 conduct, and (2) whether Plaintiff has stated a viable civil conspiracy claim

10   under the TVPRA.

11                   a.      *Retroactivity of the 2023 TVPRA Amendment*

12         Whether the 2023 amendment to 18 U.S.C. § 1595 applies retroactively is the

13   threshold issue for Plaintiff's conspiracy claim.  The Trafficking Victims Protection

14   Act ("TVPA"), later reauthorized as the TVPRA, was enacted in 2000 to "combat

15   trafficking in persons" by imposing enhanced criminal penalties for offenses related to

16   sexual exploitation.  18 U.S.C. §§ 1589–1594; 22 U.S.C. § 7101(a), (b)(2).  Section

17   1591 set forth the elements for a criminal trafficking offense.  18 U.S.C. § 1591(a).

18   Conspiracy to violate these provisions were also criminalized, with section 1594

19   providing that "[w]hoever conspires with another to violate section 1591 shall be fined

20   under this title, imprisoned for any term of years or for life, or both."  TVPRA §

21   1594(c).

22         In 2003, Congress amended the TVPA by enacting the TVPRA, which among

23   other things added a civil remedy provision, codified at 18 U.S.C. § 1595.  The

24   provision read in pertinent part:

25         An individual who is a victim of a violation of section 1589, 1590,
           or 1591 of this chapter may bring a civil action against the
26         perpetrator in an appropriate district court of the United States and
           may recover damages and reasonable attorneys fees.
27

28

TVPRA § 4(a)(4)(A).  In 2008, Congress amended section 1595 to expand the TVPRA's civil raemedies.  *See* William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 221, 122 Stat. 5044, 5067.  As amended, section 1595(a) provided a civil remedy if the following was met:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever *knowingly benefits*, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

18 U.S.C. § 1595(a) (2008) (emphasis added).  Finally, most recently in January 2023, Congress again amended section 1595 through the Abolish Trafficking Reauthorization Act of 2022, Pub. L. No. 117-347, 136 Stat. 6199 (2023) ("ATRA") to the following:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, *or attempts or conspires to benefit*, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a) (2023) (emphasis added).

Visa argues the "text and history" of the statute along with a pair of Ninth Circuit cases— *Ratha v. Phatthana Seafood Co*., 35 F.4th 1159 (9th Cir. 2022) (*Ratha I*) and *Ratha v. Rubicon Res., LLC*, 111 F.4th 946 (9th Cir. 2024) (*Ratha II*)—make clear that TVPRA did not allow for civil liability for conspiracy to violate the TVPRA until the most recent 2023 ATRA amendment by Congress, and such amendment does not have a retroactive effect.  (*Id.*).  The Court disagrees with Visa and finds that the 2023 ATRA amendment to Section 1595 applies retroactively.  In reaching this conclusion, however, the Court does not adopt Plaintiff's argument that *Ratha I* is irrelevant to the issue of conspiracy liability under the pre-2023 TVPRA.  As explained below, the Court finds *Ratha I*'s reasoning instructive on whether Congress intended civil conspiracy liability prior to the 2023 amendment.

In *Ratha I*, which was ruled *before* ATRA, the Ninth Circuit addressed whether the pre-2023 version of Section 1595(a) imposed civil liability for another inchoate violation—attempted violation—of Section 1591.  35 F.4th at 1176.  The analysis hinged on whether an "attempt to benefit" satisfied the "knowingly benefit" requirement under the 2008 version of Section 1595(a), which allowed victims to bring an action not only against perpetrators of a violation of the TVPRA, but also against anyone who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a) (2008).  The Court held that it did not.  Specifically, it ruled that "[t]he text of § 1595 does not extend liability to those who attempt to benefit from a perpetrator's TVPRA violation," and that to rule otherwise would "violat[e] a fundamental principle of statutory interpretation that absent provisions cannot be supplied by the courts." *Id*. (alteration and quotation marks omitted).  The Ninth Circuit further observed that "Congress's decision to impose civil liability on those who 'benefit' but not those who 'attempt to benefit' is significant because attempt liability is plainly authorized elsewhere in the TVPRA," pointing to Section 1594(a)'s provision for criminal attempt liability.  *Id*. The Ninth Circuit reasoned that because "it is generally presumed that Congress acts intentionally" when "Congress uses certain language in one part of a statute and different language in another," it was reasonable to conclude that "[h]ad Congress intended to create civil liability under § 1595 for attempts to benefit, . . . it would have done so in express terms."  *Id*.

Contrary to Plaintiff's assertion that *Ratha I* has no application to conspiracy liability, (Opp'n at 38–40), the Court finds that the case is directly controlling.  Both the criminal portion of attempt and conspiracy are found in Section 1594.  18 U.S.C. §§ 1594(a), (c).  Similarly, when Congress made the most recent amendment to the TVPRA in 2023, it added language that included both attempt and conspiracy.  *See generally* ATRA, Pub. L. No. 117-347, 136 Stat. 6199 (2023) (expanding civil

liability to "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value" from an unlawful trafficking venture (emphasis added)).  In other words, Congress's treatment of attempt and conspiracy liability are similar if not the same, and thus the Ninth Circuit's holdings in *Ratha I* should apply with equal force to conspiracy claims.

Plaintiff seeks to distinguish the two liabilities by rehashing the same argument that the *Ratha I* plaintiffs raised—none of which are helpful or persuasive.  (Opp'n at 38–39).  The "knowingly benefit" requirement under the 2008 amendment does not somehow contemplate conspiracy while "violating a fundamental principle of statutory interpretation" for attempt.  35 F.4th at 1176.  As the Ninth Circuit noted, the fact that that the specific language—"conspire to benefit" here, whereas it was "attempt to benefit" there—is found elsewhere under the TVPRA indicates that the exclusion was intentional by Congress.

In *Ratha II*, which was decided after the 2023 amendment, the Ninth Circuit considered whether the 2023 amendment of the TVPRA—which now expressly imposed a private right of action for attempt and conspiracy violations of the TVPRA—had retroactive effect.  The Court again ruled against plaintiffs and held that the 2023 amendment "*does not* apply to pre-enactment conduct."  *Ratha II*, 111 F.4th at 969 (emphasis added).  This decision, however, has since been vacated by the Ninth Circuit, which granted rehearing *en banc*.  *Ratha v. Rubicon Res*., LLC,  2025 WL 689487 (9th Cir. Mar. 4, 2025).  The Court thus is no longer bound by *Ratha II* and reviews the parties' argument under applicable law.

In determining whether legislation applies retroactively, courts generally apply a two step-framework.  *Fernandez–Vargas v. Gonzales*, 548 U.S. 30, 37, 126 S. Ct. 2422, 165 L.Ed.2d 323 (2006).  First, the court looks to "whether Congress has expressly prescribed the statute's proper reach."  Id. at 37, 126 S. Ct. 2422 (quoting *Landgraf v. USI Film Prods*., 511 U.S. 244, 280 (1994)).  If the answer to the first question is "yes," the statute applies retroactively unless it runs afoul of the

21

constitution.  *Landgraf*, 511 U.S. at 280.   If the statute contains no "express command" as to its applicability to pre-enactment conduct, a court's second task is to determine whether its application would "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280.  If the statute has such effects, courts apply a presumption against retroactive application "absent clear congressional intent favoring such a result." *Id.*, *see also Fernandez-Vargas*, 548 U.S. at 37–38.

The Ninth Circuit has held, however, that such framework is inapplicable in cases where an amendment is enacted to clarify existing law rather than effect change in a legislation.  *ABKCO Music, Inc. v. LaVere*, 217 F.3d 684, 689 (9th Cir. 2000).  This is because in this context, Congress is exercising the "power to clarify the law" for the purpose of "confirm[ing] what the law has always meant." *Beverly Cmty. Hosp. Ass'n v. Belshe*, 132 F.3d 1259, 1265 (9th Cir. 1997).  In other words, because such an enactment "merely clarifies what [the law] was originally intended to mean" and "state[s] more clearly what the law already was," it "has no retroactive effect that might be called into constitutional question." *Id*.  Thus, "[w]hen an amendment is deemed clarifying rather than substantive, it is applied retroactively." *ABKCO Music, Inc.*, 217 F.3d at 689 (citation omitted).[2]

"Several factors are relevant when determining if an amendment clarifies, rather than effects a substantive change to prior law." *Dept. of Toxic Substances Control v. Interstate Non–Ferrous Corp.*, 99 F. Supp. 2d 1123, 1129–30 (E.D. Cal.2000); *see also Callejas v. McMahon*, 750 F.2d 729, 731 (9th Cir. 1984) ("It is the duty of a court

---

[2] In its supplemental brief, Visa, without citing to any case law, argues that such exception to the *Landgraf* framework does not exist.  (Visa Suppl. Br., Docket No. 549 at 1–2).  The Ninth Circuit is clear, however, that such exception does exist. *See, e.g.*, *ABKCO Music, Inc.*, 217 F.3d at 689 ("We have long recognized that clarifying legislation is not subject to any presumption against retroactivity . . . ."); *Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1186 (9th Cir. 2016) ("However, no *Landgraf* analysis is required if an amendment merely serves to clarify rather than change the substance of existing law.").

in construing a statute to consider time and circumstances surrounding the enactment as well as the object to be accomplished by it."). "A significant factor is whether a conflict or ambiguity existed with respect to the interpretation of the relevant provision when the amendment was enacted. If such an ambiguity existed, courts view this as an indication that a subsequent amendment is intended to clarify, rather than change, the existing law." *Dept. of Toxic Substances Control*, 99 F.Supp.2d at 1129 (quoting *Piamba Cortes v. American Airlines, Inc*., 177 F.3d 1272, 1283–84 (11th Cir.1999)); *see also Callejas*, 750 F.2d at 731 ("a dispute or ambiguity, such as a split in the circuits, is an indication that a subsequent amendment is intended to clarify, rather than change, the existing law") (cleaned up) (internal citations omitted). Courts may also "rely on upon a declaration by the enacting body that its intent is to clarify the prior enactment." *Dept. of Toxic Substances Control*, 99 F.Supp.2d at 1284.

Thus, for example, in *ABKCO Music, Inc.,* the Ninth Circuit held that a 1997 amendment to the Copyright Act providing that distribution of phonorecords before January 1, 1978, did not constitute publication of the musical work was a clarification of prior law rather than a change in legislation and therefore applied retroactively. *ABKCO Music, Inc*., 217 F.3d at 691–92. In its analysis, the court first looked to see if there was an ambiguity of the prior statute and noted that the lack of a definition for the term "publication" in the Copyright Act created a circuit split as to how courts have interpreted the term. *Id*. at 690–91. Specifically, the court in *ABKCO* highlighted that prior to the 1997 amendment, a 1995 Ninth Circuit decision departed from a long-standing 1976 Second Circuit decision stating that a sale of a phonorecord in the 1950s did not constitute a publication. *Id*. The 1976 Second Circuit decision was the leading case regarding phonorecords until the Ninth Circuit decision in 1995. *Compare Rosette v. Rainbo Record Mfg. Corp*., 546 F.2d 461 (2d Cir.1976) with *La Cienega Music Co. v. ZZ Top*, 53 F.3d 950 (9th Cir. 1995). The Court then reviewed the congressional record, which further supported the position that the amendment was a clarifying amendment. For example, the record stated that the amendment "intended

to restore the law to what it was before the decision of the Ninth Circuit Court of Appeals in *La Cienega Music Co. v. Z.Z. Top.*"  *Id.* at 690.  Moreover, sponsors and nonsponsors of the bill used words such as "clarify" and made comments like "restore national uniformity on this important issue" and the "*La Cienega* decision took settled law and cast it on its head, threatening to thrust into the public domain hundreds of thousands of musical works which presently enjoy copyright protection," which further supported the conclusion that the amendment was a clarification.  *Id.* at 690.

In addition to the statute's text as well as congressional records, courts have considered the timing of the enactment including both how swiftly the amendment was enacted after a controversy arose and the amendment's effective date.  In *Walls v. Dep't of Correction*, for example, the court there found that an amendment to a Delaware's Workers' Compensation Act that expressly excluded inmates from the definition of "employee" was a clarifying amendment, in large part, because the General Assembly acted within a few months of a court's decision upholding an inmate's right to seek workers' compensation benefit.  663 A.2d 488 (Del. 1995).  The court explained that the "sequence of events" and the fact that the "legislature passe[d] an amendment shortly after a controversy [arose]" "strongly suggest[ed] that the recent amendment [] was intended to remove any ambiguity as to the original scope of the statute." *Id*.  And in *Fitzgerald v. Century Park, Inc*., in holding that an amendment that the permitted a more liberal measure of damages under the Interstate Land Sale Act was not a clarifying amendment and therefore did not have retroactive effect, the Ninth Circuit considered, among other factors, the timing of the effective date of the enactment. 642 F.2d 356, 358–59 (9th Cir. 1981).  In enacting the amendment, Congress expressly stated that amendment should become effective "on the effective date of regulations implementing such amendments, but in no case later than six months following the date of enactment . . . ." *Id*. at 359 (citing P.L. 96-153).  The court in *Fitzgerald* interpreted the six-months delay as Congress's intent that the amendment be applied proactively

1  because "[i]t [was] unlikely that Congress would delay the effective date of
2  amendments which are to be applied retroactively." *Id.*

3      Applying the principles here, the Court finds that all the factors indicate that
4  Congress enacted ATRA to clarify the ambiguity identified in *Ratha I*, not create new
5  legislation.  First, the Court finds that the prior enactment of the TVPRA had sufficient
6  ambiguity that it generated inconsistent judicial decisions.  In 2000, Congress enacted
7  the TVPA to "combat trafficking in persons, a contemporary manifestation of slavery
8  whose victims are predominantly women and children, to ensure just and effective
9  punishment of traffickers, and to protect their victims."  Pub. L. No. 106-386, § 102,
10  114 Stat. 1464 (2000) (codified as amended at 18 U.S.C. §§ 1589–92)).  In 2008,
11  Congress enacted a reauthorized and amended TVPRA, including the civil remedy
12  provision codified at 18 U.S.C. § 1595 and the provision regarding the extra-territorial
13  reach of the statute codified under 18 U.S.C. § 1596.  1 Pub. L. No. 110-457, 122 Stat.
14  5044 (2008).  Notably, section 1595 civil remedy provision did not include the word
15  "attempt or conspiracy" while the section 1596 extraterritorial provision did, thereby
16  creating an ambiguity as to whether civil liability attached to attempted and conspiracy
17  violations.

18      Similar to the circumstances in the *ABKCO Music* case, the Court finds that this
19  ambiguity resulted in a circuit split.  As Plaintiff points out, prior to the Ninth Circuit
20  *Ratha I* decision that ruled that civil liability for "attempt to benefit" did not exist pre-
21  ATRA, several courts across circuits and districts concluded that section 1595's civil
22  liability provision extends to attempt and conspiracy claims rising under section 1594.
23  For example, in *Ricchio v. McLean*, the First Circuit reversed a district court's dismissal
24  of plaintiff's conspiracy and attempt claim under the TVPRA.  853 F.3d 553, 556 (1st
25  Cir. 2017).  Two years later, in *Roe v. Howard*, the Fourth Circuit affirmed a jury award
26  under section 1595's for conspiracy to engage in commercial sex trafficking pursuant to
27  sections 1591 and 1594.  917 F.3d 229, 243 (4th Cir. 2019).  Since, numerous other
28  courts, including in this district, allowed civil conspiracy claims arising under the

TVPRA.  *See Tanedo v. E Baton Rouge Parish School Board*, 790 F. Supp. 2d 1134, 1147 (C.D. Cal. May 11, 2011) (holding that plaintiff alleged a conspiracy claim under section 1594(b)); *Akhtar v. Vitamin Herbal Homeopathic Ctr. Inc*., 2021 WL 7186030, at *11 (E.D.N.Y. Apr. 30, 2021) (denying motion for summary judgment as to TVPRA civil conspiracy claim); *Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445, 455 (E.D. Va. 2015) ("[P]laintiff sufficiently states a conspiracy claim pursuant to 18 U.S.C. § 1594(b)."). In 2021, the Ninth Circuit's *Ratha I* decision came out the other way from the cases listed here, thereby creating a circuit split.  In other words, *Ratha I* highlighted the ambiguity in the TVPRA statute and signaled an indicia of judicial confusion.

Visa argues that these decisions do not evince any such disagreement on the grounds that (1) these cases are distinguishable because they dealt with defendants who "attempted or conspired to violate" whereas the case here concerns defendants who are "attempting or conspiring to benefit" under the TVPRA; and (2) none of the cases engaged in any exercise of statutory interpretation to discern whether civil liability under Section 1595(a) can be premised on a theory of conspiracy as *Ratha I* did.  The Court finds Visa's arguments unpersuasive.  First, the distinction that Visa identifies is a distinction without a difference.  Knowingly benefiting from a TVPRA violation is in and of itself a violation of the TVPRA.  *See* § 1589(b) ("Whoever knowingly benefits, financially or by receiving anything of value . . . shall be punished as provided in subsection (d)."); *see also Rodriguez v. Pan Am. Health Org*., 29 F.4th 706, 716 (D.C. Cir. 2022) ("The 'financial benefit' that violates § 1589(b) is itself 'wrongful conduct.'"); *Bistline v. Parker*, 918 F.3d 849, 871 (10th Cir. 2019) ("One can violate [§ 1589] either as a primary offender or simply by benefiting financially from participation in a 'venture' with the primary offender.").  In any event, the Fourth Circuit in *Howard*, when finding civil liability for attempt and conspiracy, did not seem at all motivated by this distinction when it expressly stated that the criminal and civil provisions are coextensive.  917 F.3d at 243.

Second, Visa's argument that the cases on which Plaintiff relies did not engage in any statutory interpretation as *Ratha I* did is not helpful to Visa. The fact that these decisions all implicitly assumed that there was a civil conspiracy or attempt claim under the TVPRA reflect the courts' belief in "what the law already was." *Beverly Cmty. Hosp.*, 132 F.3d at 1265. Thus, the Court finds that *Ratha I* did create a circuit split, which is "an indication that a subsequent amendment is intended to clarify, rather than change, the existing law." *Callejas*, 750 F.2d at 731.

A review of the congressional record further supports the view that the ATRA is a clarifying amendment. Specifically, Congress titled the amendment as a "Technical and *Clarifying* Update." Pub. L. No. 117-347, § 102, 136 Stat. at 6200 (emphasis added). While a label or title alone is not dispositive, such phrasing may be used to "resolve ambiguity in a statute, so long as [it does] not contradict the actual text" or is not outweighed by other factors that indicate otherwise. *Beverly Cmty. Hosp.*, 132 F.3d at 1266 n.6; *Beaver*, 816 F.3d at 1187 (finding that heavy reliance on an amendment's title is "misplaced" given other factors including the lapse between the enactment of the bill and the bill's effective date). The Court does not find any text in the amendment or the TVPRA statute that would contradict this Court taking the amendment's title at face value.

Moreover, the other factors, including the timing of the enactment, only provides additional support that the amendment is clarifying. First, ATRA took immediate effect when the President signed it in January 2023. Second, Congress acted swiftly. Congress introduced ATRA about five weeks after *Ratha I* was published on February 25, 2022. *See* All Actions: S.3946 — 117th Congress (2021–2022), available at https://www.congress.gov/bill/117th-congress/senate-bill/3946/all-actions (noting that the ATRA was first introduced, "[r]ead twice[,] and referred to the Committee on the Judiciary" on March 29, 2022). On December 5, 2022, the Supreme Court denied certiorari with respect to *Ratha I*. *Ratha v. Phatthana Seafood Co.*, 143 S. Ct. 491 (2022). Two weeks later, on December 20, 2022, the amendment to § 1595(a) was

proposed and was passed by the Senate and House on December 20, 2022, and December 22, 2022, respectively. S. Amend. 6581, 117th Cong., 168 Cong. Rec. S9658, S9658–59 (Dec. 20, 2022), available at https://www.congress.gov/117/crec/2022/12/20/168/198/CREC-2022-12-20-pt3-PgS9658.pdf; All Actions: S.3946 — 117th Congress (2021–2022).   The "sequence of events" and the speed in which Congress acted after *Ratha I* suggest Congress was "merely clarify[ing] what [the law] was originally intended to mean" and "stat[ing] more clearly what the law already was." *Beverly Cmty. Hosp.*, 132 F.3d at 1265; *see also Callejas*, 750 F.2d at 731 ("A dispute or ambiguity, such as a split in the circuits, is an indication that a subsequent amendment is intended to clarify, rather than change, the existing law.") (cleaned up) (internal citation omitted)).

Based on the analysis of the above factors, the Court finds that ATRA is a clarifying amendment and therefore has retroactive effect.

### b.    Sufficiency of the TVPRA Civil Conspiracy Allegations

Given that the Court finds that Visa may be held liable for civil conspiracy under the TVPRA for pre-2023 conduct, the Court now turns to the parties' substantive conspiracy arguments.  The civil remedy provision of the TVPRA permits suit against any person who "conspires to benefit" from participation in a sex trafficking venture. 18 U.S.C. § 1595(a).  The statute does not define "conspires," but where Congress uses a legal term with a well-established common law meaning, courts presume that Congress intends to incorporate that meaning.  *See Twitter, Inc. v. Taamneh*, 598 U.S. 471, 484–85 (2023) (quoting *Sekhar v. United States*, 570 U.S. 729, 733 (2013)).[3]

At common law, civil conspiracy liability requires: (1) an agreement to do an unlawful act or a lawful act in an unlawful manner; (2) an overt act in furtherance of the

---

[3] Where a statute imposes both civil and criminal liability, courts interpret the relevant terms consistently across both contexts. *See Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) ("[W]e must interpret the statute consistently, whether [we] encounter its application in a criminal or noncriminal context.").

agreement by someone participating in it; and (3) injury caused by the act. *Halberstam v. Welch*, 705 F.2d 472, 487 (D.C. Cir. 1983)[4]; *Kashi v. Gratsos*, 790 F.2d 1050, 1055 (2d Cir. 1986); *U.S. v. Matta-Ballesteros*, 71 F.3d 754, 765 (9th Cir. 1995). Courts have further broken down the agreement element into three sub-elements: (i) knowledge of the wrongful activity, (ii) agreement to join in the wrongful activity, and (iii) intent to aid in the wrongful activity. *See Ajzenman v. Office of Comm'r of Baseball*, 487 F. Supp. 3d 861, 867 (C.D. Cal. 2020) (citing *Craigslist Inc. v. 3Taps Inc.*, 942 F. Supp. 2d 962, 981 (N.D. Cal. 2013)). This case turns primarily on the sufficiency of Plaintiff's allegations as to these three elements. The Court analyzes each in turn.

### i.    *Knowledge of the Wrongful Activity*

The knowledge required to establish liability for civil conspiracy under the TVPRA is higher than the constructive knowledge standard applicable to beneficiary liability. While § 1595 permits a beneficiary claim against a defendant who "knew or should have known" that a venture was engaged in trafficking, conspiracy requires actual knowledge of the venture's unlawful purpose.

As the D.C. Circuit explained in *Halberstam*, "a person must know the object of the conspiracy and intend to participate in it." 705 F.2d at 481. This framework guided the court's analysis in *Doe v. Deutsche Bank Aktiengesellschaft,* 671 F. Supp. 3d 387 (S.D.N.Y. 2023). In applying conspiracy principles to a TVPRA claim, the court emphasized that conspiracy requires that each defendant must have "entered into a joint enterprise with consciousness of its general nature and extent." *Id.* at 411 (quoting *United States v. Alessi*, 638 F.2d 466, 473 (2d Cir. 1980))[5]; *United Steelworkers of Am.*

---

[4] *Twitter* refers to *Halberstam* as "a leading case on civil aiding-and-abetting and conspiracy liability." *Twitter*, 598 U.S. at 444.

[5] Visa relies on *Doe*, 671 F. Supp. 3d at 387, to argue that knowledge must be tethered to the "particular" sex trafficking venture. (Supp. Brief at 4). But that quote is taken from the court's discussion of beneficiary liability under § 1591(a)(2), not conspiracy. Even in that context, the court rejected the idea that liability requires knowledge of trafficking involving a specific victim. *Id.* at 407.

*v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir. 1989) (holding that "each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy.").

Visa argues that it cannot be held liable for conspiracy unless it had knowledge of the specific acts perpetrated against Plaintiff herself. According to Visa, beneficiary liability under § 1591(a)(2) requires knowledge of the acts committed against Plaintiff, the same level of knowledge must be required for conspiracy liability.[6] (Mot. at 20). Visa cites *Collazo* and *Bekowies* for the general rule that when knowledge of a fact is required for a substantive offense, that same level of knowledge is also required for conspiracy to commit that offense. *See United States v. Collazo*, 984 F.3d 1308, 1333 (9th Cir. 2021); *United States v. Bekowies*, 432 F.2d 8, 14 (9th Cir. 1970). Visa's position, in effect, would require Plaintiff to plead and prove that Visa had actual knowledge of the particular sex trafficking venture that harmed Plaintiff, not just knowledge of MindGeek's role as a beneficiary or of generalized wrongdoing. But the Supreme Court has clarified that conspiracy "cannot exist without at least the degree of criminal intent necessary for the substantive offense itself." *Ingram v. United States*, 360 U.S. 672, 678 (1959). That does not mean the constructive knowledge standard for beneficiary liability under § 1591(a)(2) automatically applies to conspiracy. Rather, what is required here is actual knowledge of the unlawful objective—namely, MindGeek's participation as a beneficiary in a sex trafficking venture. In other words, Visa is attempting to conflate the standards for beneficiary and conspiracy liability, but the law requires that Visa have actual awareness of the broader venture with MindGeek, not specific knowledge of acts perpetrated against the Plaintiff herself.

---

[6] To the extent Visa suggests that beneficiary liability itself demands knowledge of the particular acts against the plaintiff, the Court finds, as already stated, that such a requirement is inconsistent with the statutory language, which only demands knowledge or constructive knowledge as to the venture—not the victim. 18 U.S.C. §§ 1591(a)(2); 1595(a); see also *Deutsche Bank*, 671 F. Supp. 3d at 407.

1    Plaintiff contends that Visa acquired actual knowledge of the venture's unlawful

2    objectives through a series of escalating warnings and public disclosures, along with

3    Visa's own due diligence of MindGeek's business operations.  (Fleites Resp. at 13-14).

4    According to the SAC, Visa conducted internal due diligence reviews of MindGeek's

5    platforms, which would have revealed an abundance of nonconsensual content and

6    child sexual abuse material (CSAM).  (SAC ¶ 289).  Plaintiff also alleges that Visa's

7    competitor, PayPal, terminated its relationship with MindGeek in 2019, citing policies

8    prohibiting transactions involving criminal content.  (*Id*. ¶ 296).  In 2020, Visa was

9    placed on an anti-trafficking "Dirty Dozen List," and received a series of advocacy

10    letters and emails detailing the trafficking and CSAM issues endemic to MindGeek's

11    platforms.  (Id. ¶¶ 298, 300–305).  Although Visa publicly stated that it only processed

12    payments for lawful goods and services, it did not suspend processing for MindGeek

13    until after a December 2020 *New York Times* exposé, "The Children of Pornhub,"

14    brought widespread scrutiny.  (*Id*. ¶¶ 306–310).  Even then, Visa later reinstated

15    services for MindGeek's premium sites. (*Id*. ¶ 312).[7]

---

16    [7] Plaintiff points out that Judge Carney previously held that similar allegations were

17    sufficient to state a conspiracy claim under § 1594(c), reasoning that "Visa allegedly 'knowingly provided the tool used to complete a crime,'" and that this was enough to

18    infer intent at the pleading stage.  (Opp'n at 40 (quoting Dkt. 166 at 22–23); Fleites Resp. at 13).  This Court respectfully reaches a different conclusion under the civil

19    remedy statute.  Judge Carney reasoned that MindGeek's trafficking violations were a "natural consequence" of the alleged conspiracy and that, at the pleading stage, it was

20    sufficient that Visa allegedly "knowingly provided the tool used to complete a crime." (*Id*.).  But as has already been discussed above, conspiracy requires that the defendant

21    agree and intend to further the unlawful objective, which requires more than mere

22    continued service in the face of known wrongdoing.  *Halberstam*, 705 F.2d at 481.  If merely "knowingly" providing a service that plays a role in the commission of a crime

23    were sufficient to plead agreement, the agreement and intent elements would risk collapsing into the knowledge prong—undermining *Halberstam*'s distinction between

24    actors who passively facilitate unlawful conduct and those who consciously align

25    themselves with it.  Civil conspiracy liability demands more: a shared unlawful

26    purpose, not just awareness of the conduct or failure to prevent it.

27    In reaching a different conclusion from Judge Carney, this Court is cognizant of the Ninth Circuit's decision in *Zeyen v. Bonneville Joint District #39*, 114 F.4th 1129 (9th

28    Cir. 2024) (quoting *Delta Sav. Bank v. United States*, 265 F.3d 1017, 1027 (9th Cir.

While the SAC alleges that Visa received escalating public warnings, through PayPal's withdrawal, advocacy letters and the New York Times exposé, it does not plead facts showing that Visa internally understood or endorsed MindGeek's participation in a sex trafficking venture or agreed to facilitate that purpose.  There are no allegations of internal Visa communications, decision-making or admissions reflecting an understanding of MindGeek's unlawful objectives.  Instead, the allegations suggest that Visa continued a pre-existing business relationship in the face of controversy. Still, Plaintiff alleges that Visa conducted internal due diligence, received concrete complaints from advocacy groups, was placed on the "Dirty Dozen" list and was aware that PayPal terminated its relationship with MindGeek over similar concerns. (SAC ¶¶ 289, 296, 298–305).  Taken together, these allegations plausibly support an inference, though a close one, that Visa became aware that MindGeek's business model relied, at least in part, on the monetization of trafficking-related content.  *Doe v. Deutsche Bank*, 671 F. Supp. 3d at 412.[8]At oral argument, Plaintiffs emphasized that

_____

2001)), which holds that, when a district court judge reviews the interlocutory order by a prior judge in the same case, the second district court judge "should not reconsider the ruling of a predecessor unless:  '(1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial.'"  The Court believes the circumstances of this case are either sufficiently dissimilar to *Zeyen* and/or satisfy the standard set forth in *Zeyen* to warrant reconsideration of Judge Carney's order on Visa's prior motion to dismiss. First, the circumstances are dissimilar from *Zeyen* because this Court is not revisiting Judge Carney's decision as to Visa *sua sponte*; it has been raised by Visa with substantially greater briefing from both sides on the conspiracy issue.  Second, Judge Carney's decision at the motion to dismiss stage wase extremely early in the case, unlike the motion for summary judgement at issue in *Zeyen*.  Third, this Court believes that Judge Carney's interlocutory decision was clearly erroneous and manifest injustice would occur in keeping Visa in the matter until summary judgment when Judge Carney's order on the motion to dismiss would no longer control.  Fourth, *Ratha II* constitutes intervening authority worthy of consideration on the issue of conspiracy liability.

[8] Visa also contends that Plaintiff's primary video was uploaded in 2013, well before any alleged notice, and therefore it could not have known about that particular act of trafficking.  Courts have consistently held that conspiracy liability attaches if the defendant joins the conspiracy with knowledge of its aims—even if some overt acts

1   Visa's services were indispensable to MindGeek's ability to profit from CSAM and

2   argued that continuing to process payments in the face of specific warnings and NGO

3   reports supports a finding of actual knowledge.  Apr. 24, 2025 Hr'g Tr. at 15:12–15:14.

4   They sought to distinguish *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), by pointing

5   out that Visa's conduct was not merely passive hosting, but active financial enablement.

6   While *Taamneh* reaffirmed that awareness and neutrality are not enough, the Court

7   finds that, at the pleading stage, Plaintiff has alleged sufficient facts to support Visa's

8   actual knowledge of the venture's unlawful aims for purposes of the first element of

9   civil conspiracy under § 1595(a).

10                    *ii.*    *Agreement to Join in the Wrongful Activity*

11          Courts have emphasized that the agreement is the essential feature of conspiracy.

12  *Deutsche Bank*, 671 F. Supp. 3d at 412 (quoting *United States v. Beech–Nut Nutrition*

13  *Corp.*, 871 F.2d 1181, 1191 (2d Cir. 1989)) ("The gist of conspiracy is, of course,

14  agreement."); *Halberstam*, 705 F.2d at 477 ("The element of agreement is a key

15  distinguishing factor for a civil conspiracy action.").  As the Ninth Circuit has

16  explained, agreement in this context means that the parties reached a "meeting of the

17  minds in an unlawful arrangement." *Transgo, Inc. v. Ajac Transmission Parts Corp.*,

18  768 F.2d 1001, 1020 (9th Cir. 1985).

19          Because direct evidence of an explicit agreement is rare, conspiracy may be

20  proven through circumstantial evidence.  *Halberstam* explained that "[p]roof of a tacit,

21  as opposed to explicit, understanding is sufficient to show agreement," and that "absent

22  _____

23  predate the defendant's entry.  *See United States v. Feola*, 420 U.S. 671, 694 (1975)
    (holding that liability for conspiracy does not turn on whether the substantive offense
24  occurred before the defendant joined, so long as the defendant knowingly entered the
    agreement); *Pinkerton v. United States*, 328 U.S. 640, 647 (1946) (co-conspirators can
25  be held liable for reasonably foreseeable acts of the conspiracy, even if committed
    before their entry, so long as the conspiracy was ongoing); *United States v. Bridgeman*,
26  523 F.2d 1099, 1108 (D.C. Cir. 1975) (citing *United States v. McGann*, 431 F.2d 1104
    (5th Cir. 1970)) ("An individual who joins an already formed conspiracy *knowing* of its
27  unlawful purpose may be held responsible for acts done in furtherance of the conspiracy
    both prior to and subsequent to his joinder.") (emphasis added).

28

                                          33

a confession, an agreement between conspirators must generally be inferred from circumstantial evidence revealing a common intent." 705 F.2d at 480. *But see Green v. Benden*, 281 F.3d 661, 665–66 (7th Cir. 2002) ("Agreement may be inferred from circumstantial evidence, but only if it is sufficient to permit a reasonable jury to conclude that a meeting of the minds had occurred and that the parties had an understanding to achieve the conspiracy's objectives.").

A finding of conspiracy may be justified where the defendants "pursued the same object, although by different means, one performing one part and another another part." *Id.* at 480 (quoting *Davidson v. Simmons*, 203 Neb. 804, 280 N.W.2d 645, 648–49 (1979)). Relevant considerations include "the relationships between the actors and between the actions (e.g., the proximity in time and place of the acts, and the duration of the actors' joint activity)." *Id.* These factors help determine whether the defendants' coordinated conduct reflects a shared unlawful objective.

The agreement required cannot solely be a business relationship or overlapping commercial interests. *Craigslist*, 942 F. Supp. 2d at 982 (holding that a buyer-seller relationship does not, without more, establish a conspiratorial agreement or intent to aid in wrongdoing); *Direct Sales Co. v. United States*, 319 U.S. 703, 709 (1943) (holding that "the inference of [conspiracy] cannot be drawn merely from knowledge that the buyer will use the goods illegally"). However, a prolonged and actively pursued course of dealing—when coupled with the seller's knowledge of and shared stake in the buyer's unlawful venture, the standardization of transactions, the duration of the relationship and mutual trust—may support an inference of conspiratorial agreement. *United States v. Menting*, 166 F.3d 923, 928 (7th Cir. 1999). Without allegations showing that level of conscious participation, a civil conspiracy claim cannot proceed.

Here, Visa argues that there is no factual allegation suggesting it entered into an agreement—explicit or tacit—with MindGeek to further sex trafficking. (Visa Suppl. Br. at 5-8). It emphasizes that Plaintiff's conspiracy theory impermissibly rests on passive nonfeasance, the notion that a service provider can be deemed a conspirator

solely for continuing to offer standard services while aware of red flags. According to Visa, the SAC alleges nothing more than that Visa provided generic payment processing services. There are no allegations that Visa customized services or entered into multiple agreements with MindGeek. (Mot. at 24–25; Visa Reply at 10–11; Oral Arg. Tr. at 4:29–4:31).

At oral argument, Visa distinguished its role from the kind of sustained, tailored engagement seen in *Salesforce*, where the platform offered marketing support, client-specific onboarding, and tools designed to enhance the trafficker's operations. *See Salesforce.com*, 76 F.4th at 556; (Oral Arg. Tr. at 4:28). The Court agrees. In the absence of interaction, coordination, or shared purpose, continued service—even in the face of awareness—is not enough to demonstrate a meeting of the minds and plead agreement. *Halberstam*, 705 F.2d at 481; *Transgo,* 768 F.2d at 1020. Plaintiff does not allege that Visa provided any trafficking-specific support, had internal discussions about facilitating MindGeek's conduct or affirmatively aligned itself with MindGeek's unlawful objectives. The SAC instead asserts that Visa continued to process payments while being aware—through its own due diligence, NGO letters, media reporting, and PayPal's withdrawal—of MindGeek's CSAM problem. (SAC ¶¶ 307–10). But as Visa correctly points out, even the SAC concedes that Visa allegedly pressured MindGeek to clean up references to trafficking content, and was criticized only for failing to do more.[9] (*Id*.). These allegations reflect—at most—a failure to act, not affirmative participation. *Twitter*, 598 U.S. at 507 (holding that a defendant's mere passive nonfeasance, even in the face of known wrongdoing by customers, is not enough to impose liability). Unlike *Salesforce* or *Red Roof*, the SAC alleges no active engagement—no customization, no implementation support and no joint strategy. It

---

[9] Plaintiffs contend that MindGeek only removed CSAM after Visa suspended processing, suggesting Visa was essential to the monetization of unlawful content. (Oral Arg. Tr. at 15:14:44). But operational leverage is not enough to show agreement.

asserts only that Visa continued a pre-existing business relationship in the face of controversy.  That is not enough.

Visa also illustrated the danger of adopting Plaintiff's approach: if passive nonfeasance and general awareness are enough, then virtually any vendor with commercial ties to MindGeek could face liability—including utility providers.  As Visa explained, a power company knowingly supplying electricity to MindGeek's servers for profit could, under this theory, be swept in as a conspirator.  (Oral Arg. Tr. at 4:35-4:36).[10]  The Court finds that concern persuasive.  Civil TVPRA conspiracy cannot be triggered solely by knowledge and inertia; it requires affirmative alignment with the venture's unlawful purpose.  *Green*, 281 F.3d at 665–66. That showing is absent here.

*iii.*     *Intent to Aid in the Wrongful Activity*

Conspiracy also requires that the defendant intended to further the conspiracy's unlawful objective. *Menting*, 166 F.3d at 927.  In practice, this element often overlaps with the requirement of an agreement.  As the Ninth Circuit has explained, "[s]imple knowledge, approval of, or acquiescence in the object or purpose of a conspiracy, without an intention and agreement to accomplish a specific illegal objective, is not sufficient." *United States v. Melchor–Lopez*, 627 F.2d 886, 891 (9th Cir. 1980).

---

[10] At oral argument, Visa contended that if MindGeek is a beneficiary of the venture, and Visa is a beneficiary of MindGeek—then conspiracy liability would have "truly boundless reach," sweeping in anyone who knowingly does business with a beneficiary, such as payment processors or even utility companies.  (Oral Arg. Tr. at 4:34–4:37).  The Court acknowledges this concern, but the TVPRA does not require conspirators to be traffickers, nor does it require direct contact among them. *Martin v. United States*, 100 F.2d 490, 496 (10th Cir. 1938) ("And it is not necessary that all of the parties be personally acquainted with each other.  Neither is it requisite that one have direct contact with all others.  It suffices if with knowledge that others have combined to violate the law, one knowingly co-operates in some affirmative manner to further the purpose of the conspiracy.").  To hold otherwise would risk collapsing conspiracy liability into beneficiary liability, contrary to both the statutory text and remedial purpose of the TVPRA.

Courts have repeatedly declined to infer intent from knowledge alone.  In *United States v. Collins*, the Seventh Circuit emphasized that "[a] person who is indifferent to the goals of an ongoing conspiracy does not become a party to this conspiracy merely because that person knows that his or her actions might somehow be furthering that conspiracy."  966 F.2d 1214, 1219–20 (7th Cir. 1992); *see also Bernhardt v. Islamic Republic of Iran,* 47 F.4th 856, 873 (D.C. Cir. 2022) (holding that a plaintiff must plead facts showing a "common intent," not just knowledge).  In *Kemper v. Deutsche Bank AG*, the Seventh Circuit rejected conspiracy liability for a bank that processed transactions for entities linked to terrorism, explaining that the SAC failed to allege the bank "cared how its customers obtained or spent the funds."  911 F.3d 383, 395 (7th Cir. 2018).  The Supreme Court reaffirmed this principle in *Twitter*, 598 U.S. at 500, holding that extensive provision of services to a bad actor is not enough where the relationship is "arm's length, passive, and largely indifferent."  These cases establish that civil conspiracy liability requires more than awareness or facilitation—it requires a conscious decision to help achieve the venture's illicit purpose.  *Halberstam*, 705 F.2d at 481.

Visa argues that Plaintiffs have not plausibly alleged that it acted with the intent to further a sex trafficking venture.  (Mot. at 25–26).  Visa contends that, even assuming it knew its services might be facilitating trafficking, such knowledge is not sufficient to show the requisite intent.  (Mot. at 25).  Visa further notes that the SAC does not allege any individualized conduct suggesting that Visa affirmatively sought to support MindGeek's unlawful operations.  (*Id*.).  The Court agrees that the SAC, while detailed in describing public controversy surrounding MindGeek, does not plead facts showing that Visa intended to further a trafficking venture.

Plaintiffs point to various public "red flags" and escalating media scrutiny, including letters from advocacy organizations, PayPal's decision to sever ties with MindGeek and the December 2020 *New York Times* article exposing CSAM on Pornhub.  (SAC ¶¶ 300-310).  Plaintiffs argue that Visa's continued support in the face

of this information permits an inference of intent.  (Opp. at 35–36).  But continued provision of services, even after being put on notice of potential misconduct, does not itself establish intent to participate in that misconduct.  As *Kemper* and *Taamneh* make clear, the fact that a company continues to do business with an entity accused of wrongdoing—without more—is not enough to show that it shares the entity's unlawful objective.  That conclusion is particularly warranted here, where the SAC does not allege that Visa went beyond standard business practice.  (*See* SAC ¶¶ 285–312; Oral Arg. Tr. at 4:29–4:31).  As the Supreme Court warned in *Taamneh*, courts must be cautious before imposing civil liability on neutral actors who operate at "arm's length."  598 U.S. at 500.

In addition, the SAC concedes that Visa allegedly applied pressure on MindGeek to clean up references to trafficking content and was criticized for not doing more. (SAC ¶¶ 307-310).  As Visa argued at oral argument, the very allegations that suggest Visa was alerted to the trafficking problem also reflect that it attempted to mitigate it— albeit unsuccessfully.  (Oral Arg. Tr. at 4:29-4:30).  These facts, standing alone, do not establish a "meeting of the minds" to further unlawful conduct.  While Plaintiffs allege that Visa was aware of troubling conduct by MindGeek, they do not allege facts showing that Visa affirmatively sought to further that conduct or shared MindGeek's unlawful goals.[11]  The SAC alleges passive inaction, not purposeful participation.  That is not enough to establish the specific intent required.

Plaintiffs also rely on *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), to argue that Visa's continued relationship with MindGeek constitutes affirmative and culpable support for the trafficking venture.  Apr. 24, 2025 Hr'g Tr. at 15:12–15:14.  They

---

[11] At oral argument, Plaintiffs attempted to distinguish *Deutsche Bank* by arguing that the venture here is not the trafficking itself, but rather a joint effort to profit from trafficking.  (Oral Arg. Tr. at 15:15:52–15:16:23).  But regardless of how the venture is framed, conspiracy liability still requires that each defendant intend to further an unlawful objective.  *Halberstam*, 705 F.2d at 481; *Taamneh*, 598 U.S. at 500. Recasting the venture as profit-driven does not eliminate the need to allege purposeful alignment with its illegal aims.

1  contend that Visa's payment processing services were not only central to the

2  monetization of CSAM, but that the decision to continue providing those services, after

3  receiving detailed reports of trafficking, reflects a conscious choice to participate in the

4  venture.  The Court agrees that Visa's alleged conduct is more directly connected to the

5  underlying harms than the social media platforms in *Taamneh*.  However, *Taamneh*

6  makes clear that awareness of misconduct, even when paired with ongoing commercial

7  support, does not establish liability unless the defendant affirmatively aligned itself with

8  the venture's unlawful aims.  *Id*. at 500, 507.  Here, the SAC does not allege facts

9  suggesting that Visa customized its services, acted in coordination with MindGeek or

10  took steps to further trafficking.  At most, it describes a decision to continue a profitable

11  business relationship despite controversy—conduct that is insufficient to establish intent

12  under *Halberstam* and *Taamneh*.

13  　　　The Court finds that the SAC lacks sufficient allegations of an agreement and

14  **GRANTS** Visa's motion as to Plaintiff's civil conspiracy claim to impose liability

15  under § 1595(a).

16  　　　　　　　3.　*Common Law Civil Conspiracy Claim (Count XVI)*

17  　　　Under California law, civil "[c]onspiracy is not a cause of action, but a legal

18  doctrine that imposes liability on persons who, although not actually committing a tort

19  themselves, share with the immediate tortfeasors a common plan or design in its

20  perpetration." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd*., 7 Cal. 4th 503, 510–

21  11, (1994). "In such an action the major significance of the conspiracy lies in the fact

22  that it renders each participant in the wrongful act responsible as a joint tortfeasor for

23  all damages ensuing from the wrong, irrespective of whether or not he was a direct

24  actor and regardless of the degree of his activity." *Id*. at 511 (citations omitted).

25  　　　Under a conspiracy theory of recovery, liability depends on the actual

26  commission of a tort.  *Id*.  Once an underlying tort is established, there must be a

27  showing that the conspiring defendants had actual knowledge that a tort is planned

28  and concur in the scheme with knowledge of its unlawful purpose.  *Kidron v. Movie*

*Acquisition Corp*., 40 Cal. App. 4th 1571, 1582 (1995).  In other words, "knowledge of the planned tort must be combined with intent to aid in its commission."  *Id*.; *see also Michael R. v. Jeffrey B*., 158 Cal.App.3d 1059, 1069 (1984) ("mere knowledge, acquiescence, or approval of an act, without cooperation or agreement to cooperate is insufficient to establish liability").  An agreement may be tacit as well as express.  *Navarrete v. Meyer*, 237 Cal. App. 4th 1276, 1292 (2015).  While "knowledge and intent 'may be inferred from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators, and other circumstances,'" *Kidron*, 40 Cal. App. 4th at 1582 (quoting *Wyatt v. Union Mortg. Co*., 24 Cal. 3d 773, 785 (1979)), "'[c]onspiracies cannot be established by suspicions . . . . There must be evidence of some participation or interest in the commission of the offense.'" *Id*. (quoting *Davis v. Superior Court* 175 Cal.App.2d 8, 23 (1959)).

In the Court's prior July 29, 2022, order, Judge Carney noted that while Plaintiff raised several tort causes of action as to the MindGeek Defendants, she did "not make clear what torts Visa allegedly conspired to commit."  (FAC Visa Order at 30).  Because the Court could not "simply guess what tort or torts that list is supposed to represent," Judge Carney stated that he could not "perform an analysis of whether civil conspiracy is adequately pled" and ordered Plaintiff to a plead a more definite statement of her civil conspiracy claim under Fed. R. Civ. P. 12(e).  (*Id*. at 31).

Plaintiff has now clarified in her SAC which tort she seeks to hold Visa liable under a civil conspiracy theory: (1) Distribution of Private Sexually Explicit Materials in violation of Cal. Civ. Code § 1708.85 (Count XII), (2) violation of the UCL and FAL, Cal. Bus. & Prof. Code §§ 17200 and 17500 (Count XIV); and (3) violation of California's Trafficking Victims Protection Act ("CTVPA") under Cal. Civ. Code § 52.5 (Count XV).  (SAC at 168).  The Court will first address Plaintiff's civil conspiracy theory based on violations of Distribution of Private Sexually Explicit Materials and CTVPA and then turn to claims predicated on the alleged UCL and FAL violations.

1                     *a.     Distribution of Private Sexually Explicit Materials (Cal. Civ.*

2                                  *Code § 1708.85)*

3       A civil conspiracy cause of action under California law "must be activated by a

4 commission of an actual tort." *Applied Equipment*, 7 Cal.4th at 511. The Court thus

5 first assesses the viability of the underlying tort claims against the MindGeek

6 Defendants on which Plaintiff's conspiracy claim is predicated.

7       California Civil Code § 1708.85 provides a private cause of action against a

8       person who intentionally distributes by any means a photograph, film,
videotape, recording, or any other reproduction of another, without the

9       other's consent, if (1) the person knew that the other person had a
reasonable expectation that the material would remain private, (2) the

10       distributed material exposes an intimate body part of the other person, or
shows the other person engaging in an act of intercourse, oral copulation,

11       sodomy, or other act of sexual penetration, and (3) the other person
suffers general or special damages . . . .

12

13 Cal. Civ. Code. § 1708.85. Section 1708.85 exempts from liability, however, a "person

14 distributing material under subdivision (a)" where "[t]he distributed material was

15 previously distributed by another person." Cal. Civ. Code § 1708.85(c)(6). Based on

16 the plain language of these provisions, the Court concludes Plaintiff has failed to state a

17 claim.

18       Plaintiff's SAC makes clear that MindGeek Defendants were not the first party

19 to intentionally distribute the videos—Plaintiff's traffickers were, including Plaintiff's

20 then-boyfriend and an unnamed older man. (SAC ¶¶ 448–462). The fact that the

21 videos of Plaintiff may have first appeared on MindGeek Defendants' platform does

22 not save Plaintiff's claim.[12] *See Doe v. Twitter*, Inc., 555 F. Supp. 3d 889, 931 (N.D.

23

24    [12] The Court notes that Judge Carney had previously ruled in a related class action
case that plaintiffs had stated a viable claim under California Civil Code § 1708.85 on

25 the grounds that Plaintiff had plausibly alleged that videos of Plaintiff were first
distributed on Defendants' platforms. *Doe v. Mindgeek USA Inc.*, 558 F.Supp.3d 828,

26 844 (C.D. Cal., 2021). Such holding, however, is not the "law of the case." *City of
Los Angeles, Harbor Division*, 254 F.3d at 888 (9th Cir. 2001); *see also United States*

27 *v. Smith*, 389 F.3d 944, 949 (9th Cir. 2004) ("The law of the case doctrine is 'wholly
inapposite' to circumstances where a district court seeks to reconsider an order over

28 which it has not been divested of jurisdiction"). Rather, this discretionary doctrine is

Cal. 2021), *aff'd in part, rev'd in part on other grounds and remanded sub nom. Doe #1 v. Twitter, Inc.*, No. 22-15103, 2023 WL 3220912 (9th Cir. May 3, 2023) (finding that Defendant was not liable under California Civil Code § 1708.85(a) on the grounds that the user of Twitter that allegedly posted the video were the first distributors).  Nor does the fact that MindGeek employee allegedly reviewed the video prior to the posting on MindGeek's website.  (*Id*. ¶¶ 448, 449).  The language of the statute under § 1708.85 embraces a broad interpretation of the word "distribution" by stating that a person may be held liable under the statute if she "intentionally distributes by *any means*. . . ."  Cal. Civ. Code § 1708.85(a) (emphasis added).  This does not require a mass distribution through the Internet, as the broad language of the statutory text does not impose a quantitative threshold for the distribution. MindGeek's subsequent posting of the video onto its websites is a separate second act. Because Plaintiff has failed to adequately plead the underlying tort violation against the MindGeek Defendants under this statute, Plaintiff's civil conspiracy claim against Visa predicated on this violation also fails.

>    *b.*    *California's Trafficking Victims Protection Act (Cal. Civ. Code § 52.5)*

CTVPA provides "[a] victim of human trafficking, as defined in Section 236.1 of the Penal Code, may bring a civil action" for damages or injunctive relief.  Cal. Civ. Code § 52.5.  In turn, Section 236.1 of the California Penal Code provides three definitions of a human trafficker: (1) "[a] person who deprives or violates the personal liberty of another with the intent to obtain forced labor or services," Cal. Penal Code § 236.1(a);  (2) "[a] person who deprives or violates the personal liberty of another

---

applied "where an issue has been decided by a higher court or where the court has entered a final decree or judgment."  *Alfasigma USA, Inc. v. First Databank, Inc.*, 525 F.Supp.3d 1088, 1095 (N.D. Cal. 2021) (citing *Askins v. United States Dep't of Homeland Security*, 899 F.3d 1035, 1042-43 (9th Cir. 2018)).  Because neither of those situations is presented here, the Court may freely reconsider a prior order in a related case.

1   with the intent to effect or maintain a violation of" one of the enumerated statutes,

2   including California Penal Code sections 311.1 and 311.5, *id*. §§ 236.1(b), 311.1,

3   311.5 (criminalizing the distribution, possession, and promotion of obscene material

4   including matters depicting sexual conduct by a person under 18); and (3) "[a] person

5   who causes, induces, or persuades, or attempts to cause, induce, or persuade, a person

6   who is a minor at the time of commission of the offense to engage in a commercial

7   sex act with the intent to effect or maintain a violation of" one of the enumerated

8   statutes, including California Penal Code sections 311.1 and 311.5.  *Id*. § 236.1(c)

9       Plaintiff alleges that the MindGeek Defendants have violated CTVPA by

10  "knowingly solicit[ing], maintain[ing], and profit[ing] from CSAM, trafficked, rape,

11  and sex abuse material on its websites" and "intend[ing] to, and [] distribut[ing] CSA

12  and other trafficked, rape, and sex abuse materials through their websites."  (SAC at

13  167–68).   These allegations, however, are insufficient to meet the required elements

14  of the CTVPA.  First, Plaintiff has failed to allege that the MindGeek Defendants

15  "deprive[d] or violate[d] the personal liberty" of Plaintiff within the meaning

16  California Penal Code § 236.1 (h)(3), which defines "[d]eprivation or violation of the

17  personal liberty of another" as the following:

> 18  "Deprivation or violation of the personal liberty of another" includes
> 19  substantial and sustained restriction of another's liberty accomplished
>     through force, fear, fraud, deceit, coercion, violence, duress, menace, or
>     threat of unlawful injury to the victim or to another person, under
> 20  circumstances where the person receiving or apprehending the threat
>     reasonably believes that it is likely that the person making the threat
> 21  would carry it out.

22  Cal. Penal Code § 236.1 (h)(3).

23      Nor has Plaintiff adequately pled that the MindGeek Defendants "intend[ed] to

24  obtain forced labor or services."  *Id*. § 236.1(a); *see S. S. v. Ali*, No. 3:23-CV-05074-

25  JSC, 2024 WL 150728, at *7 (N.D. Cal. Jan. 11, 2024) ("Plaintiff's CTVPA claim

26  differs slightly from her TVPRA claim—while not a requirement under the TVPRA,

27  Plaintiff must allege Defendants 'intend[ed] to obtain forced labor or services' to

28  plead a CTVPA violation."); *Lofthus v. Long Beach Veterans Hosp*., 214 F. Supp. 3d

908, 916 (C.D. Cal. 2016) (dismissing Plaintiff's CTVPA claim for failing to allege any intent to obtain forced labor or services); *Talib v. Guerrero*, 2016 WL 1470082, at *11 (C.D. Cal. Mar. 14, 2016) (recommending dismissal for failure to allege facts indicating defendants acted with intent to obtain forced labor or services within meaning of § 36.1), R & R adopted, 2016 WL 1452315 (C.D. Cal. Apr. 12, 2016); *cf. Maslic v. ISM Vuzem d.o.o.*, No. 21-CV-02556-BLF, 2024 WL 3408217,  (N.D. Cal. July 11, 2024) (finding that Defendant is entitled to summary judgment because CTVPA does not impose liability on a beneficiary of a trafficking scheme, but only the perpetrator).  Finally, Plaintiff has made no allegations that MindGeek Defendants at any time "cause[d], induce[d], persuade[d], or attempt[ed] to cause, induce, or persuade [Plaintiff] *at the time of the commission* of the offense to engage in a commercial sex act.  Cal. Penal Code § 236.1(c) (emphasis added).  The Court therefore finds that Plaintiff has failed to state a viable claim under the CTVPA against the MindGeek Defendants.[13]  Accordingly, Plaintiff's conspiracy claim against Visa, to the extent it is based on MindGeek Defendants' violation of the CTVPA, must also fail.

c.      *UCL and FAL (Cal. Bus. & Prof. Code §§ 17200 and 17500)*

The UCL forbids "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. Prof. Code § 17200.  A practice is considered "unlawful" if it violates a law other than the UCL.  *Farmers Ins. Exch. v. Super. Ct*., 2 Cal. 4th 377, 383 (1992).  The UCL "'borrows' violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under [the UCL]."  *Id*.; *see also Clerkin v. MyLife.com, Inc*., No. C 11–

---

[13] The Court again notes that this ruling deviates from Judge Carney's previous order finding that Plaintiff has a viable claim under the CTVPA.  *Doe v. Mindgeek USA Inc*., 558 F.Supp.3d at 844.  As noted in footnote 2, however, this Court is not bound by a prior order in a related case.

00527 CW, 2011 WL 3607496, at *6 (N.D. Cal. Aug. 16, 2011) ("Violation of almost any federal, state or local law may serve as the basis for a UCL claim.").  Based on this sweeping definition, any viable claim against the MindGeek Defendants can become a predicate for an independent violation of the UCL.  This presents to the Court a number of issues, including a circular theory of liability against all Defendants.

First and foremost, the UCL would subsume all other alleged tort violations by the MindGeek Defendants that goes beyond the torts specifically identified by Plaintiffs—such as misappropriation of name and likeness in violation of the California Civil Code § 3344—on which now Plaintiff's civil conspiracy claim may be based on.  (*See* SAC ¶¶ 555–560).  This not only contradicts Plaintiff's own pleadings, but it would present the same issues that Judge Carney identified in his FAC Visa Order regarding Plaintiff's lack of clarity on her civil conspiracy claim.  (FAC Visa Order at 30–31).  Second, should the Court find that Plaintiff has stated a viable claim against MindGeek for violation of the TVPRA, Plaintiff purportedly may bring a state law civil conspiracy claim for MindGeek's alleged violation of the TVPRA through the UCL (assuming that Plaintiff has sufficiently alleged facts to meet the elements required under a civil conspiracy claim), circumventing the Court's ruling above that *Ratha I* and *Ratha II* precludes a civil conspiracy claim under the TVPRA for actions that took place prior to 2023.  Finally, Plaintiff's direct claims against Visa under the UCL can seemingly be predicated on Visa's alleged conspiracy to violate MindGeek's UCL claim, which itself is predicated on violations of other laws.

Given these issues and for the same reasons provided in Judge Carney's Order, the Court **GRANTS** without prejudice Visa's motion to dismiss Plaintiff's civil conspiracy claim based on MindGeek's alleged violation of the UCL.  The Court notes, however, that should Plaintiff amend its pleading to include a civil conspiracy

1    claim based on MindGeek's violation of the UCL, the Court expects that Plaintiff will

2    address all the issues identified above.

3         As to Plaintiff's conspiracy claim based on MindGeek's alleged violation of the

4    FAL, the Court finds that Plaintiff has once again failed to identify any "unfair,

5    deceptive, untrue, or misleading advertising" required under the statute, Cal. Bus. and

6    Prof. Code § 17500, and accordingly **GRANTS** Visa's motion to dismiss Plaintiff's

7    civil conspiracy claim based on MindGeek's alleged violation of the FAL, this time

8    with prejudice as Plaintiff has already had the opportunity to amend this claim as to

9    Visa.  *See Nat'l Funding*, 817 F. App'x at 385 (affirming dismissal where the

10   amended complaint "failed to cure the deficiencies explicitly identified by the district

11   court in its prior order"); *Bonin*, 59 F.3d at 845 (emphasizing that futility of

12   amendment can, by itself, justify denial of leave to amend).

13            4.    *Violation of the UCL and FAL under the Cal. Bus. & Prof. Code*

14                  *§§ 17200 and 17500 (Count XIV)*

15        Plaintiff alleges that Visa violated the UCL and FAL.  Judge Carney, in his

16   prior order, expressly found that Plaintiff has failed to plead an FAL claim against

17   Visa. (FAC Visa Order at 29).  Plaintiff has made no amendment in her SAC as to her

18   FAL claim so the Court **GRANTS** Visa's motion as to Plaintiff's FAL claim.

19   (Compare FAC at 164–65 and SAC at 166–67).  As to Plaintiff's UCL claim, because

20   Judge Carney's denial of Defendant's motion turned on Plaintiff's underlying TVPRA

21   conspiracy claim—which the Court now dismisses—and Plaintiff has provided no

22   new theory that would serve as a predicate violation that would satisfy the unlawful

23   prong under the UCL, the Court accordingly dismisses Plaintiff's UCL claim.  (*Id*.)

24   **III.    CONCLUSION**

25        For the foregoing reasons, Visa's Motion to Dismiss Plaintiff's Second

26   Amended Complaint is **GRANTED** as follows: (Count II) violation of TVPRA based

27   on a theory of beneficiary liability pursuant to 18 U.S.C. §§ 1591, 1595  is dismissed

28   with prejudice; (Count IV) conspiracy to violate the TVPRA pursuant to 18 U.S.C.

§§ 1594(c), 1595  is dismissed without prejudice; (Count XII) violation of Distribution of Private Sexually Explicit Materials under Cal. Civ. Code § 1708.85 is dismissed without prejudice; (Count XV) violation of the California Trafficking Victims Protection Act, Cal. Civ. Code § 52.5 is dismissed without prejudice; (Count XIV) violation of the UCL under the Cal. Bus. & Prof. Code §§ 17200 and 17500 is dismissed without prejudice but with prejudice as to the FAL allegations; and (Count XVI) violation of civil conspiracy is dismissed without prejudice.  Should Plaintiff wish to file a Third Amended Complaint in conformity with this Order, Plaintiff must do so within 21 days of this Order.

**IT IS SO ORDERED.**

Dated:  October 17, 2025

HON. WESLEY L. HSU
UNITED STATES DISTRICT JUDGE