Michael J. Bowe
(admitted *pro hac vice*)
mbowe@brithem.com
Lauren Tabaksblat
(admitted *pro hac vice*)
ltabaksblat@brithem.com
BRITHEM LLP
565 Fifth Avenue
New York, NY 10017
Telephone:   (646) 653-9378

David M. Stein (#198256)
dstein@olsonstein.com
Olson Stein LLP
240 Nice Lane, #301
Newport Beach, California 92663
Mobile:  (949) 887-4600

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

SERENA FLEITES,

           Plaintiff,

v.

MINDGEEK S.A.R.L. a foreign entity;
MG FREESITES, LTD., a foreign
entity; MINDGEEK USA
INCORPORATED, a Delaware
corporation; MG PREMIUM LTD, a
foreign entity; MG GLOBAL
ENTERTAINMENT INC., a Delaware
corporation; 9219-1568 QUEBEC,
INC., a foreign entity; BERND
BERGMAIR, a foreign individual;
FERAS ANTOON, a foreign
individual; DAVID TASSILLO, a
foreign individual; VISA INC., a
Delaware corporation; REDWOOD
CAPITAL MANAGEMENT, LLC, a
Delaware corporation; REDWOOD
MASTER FUND, LTD, a foreign
entity; REDWOOD OPPORTUNITY
MASTER FUND, LTD, a foreign
entity; MANUEL 2018, LLC, a
Delaware corporation;
GINGOGERUM, LLC, a Delaware
corporation; WHITE-HATHAWAY
OPPORTUNITY FUND, LLC, a
Delaware corporation; COLBECK
CAPITAL MANAGEMENT, LLC, a
Delaware corporation, CB MEDIA
VENTURES LLC, a Delaware
corporation; CB AGENCY SERVICES,
LLC, a Delaware corporation; and CB
PARTICIPATIONS SPV, LLC, a
Delaware corporation,

CASE NO. 2:21-cv-4920

**THIRD AMENDED COMPLAINT**

1. VIOLATIONS OF FEDERAL
   SEX TRAFFICKING LAWS
   [18 U.S.C. §§ 1591, 1594,
   1595]
2. RECEIPT, TRANSPORT,
   AND DISTRIBUTION OF
   CHILD PORNOGRAPHY
   [18 U.S.C. §§ 2252, 2252A,
   2255]
3. PUBLIC DISCLOSURE OF
   PRIVATE FACTS
4. INTRUSION INTO PRIVATE
   AFFAIRS
5. PLACING PLAINTIFFS IN
   "FALSE LIGHT"
6. NEGLIGENCE
7. UNFAIR COMPETITION
   [California Business &
   Professions Code § 17200,]
8. CALIFORNIA PRODUCTS
   LIABILITY DESIGN
   DEFECT
9. CIVIL CONSPIRACY

**DEMAND FOR JURY TRIAL**

Defendants.

Plaintiff Serena Fleites ("Plaintiff"), through undersigned counsel, for her complaint against MG Freesites, Ltd. d/b/a Pornhub ("Pornhub"), MindGeek USA Incorporated ("MindGeek USA"), MG Premium Ltd., MG Global Entertainment, Inc., and 9219-1568 Quebec, Inc. (collectively "MindGeek");[1] Visa Inc. ("Visa"); Redwood Capital Management, LLC, Redwood Master Fund, LTD, Redwood Opportunity Master Fund, Ltd., Manuel 2018, LLC, Gingogerum, LLC, and White-Hathaway Opportunity Fund, LLC (collectively, "Redwood"); Colbeck Capital Management, LLC, CB Media Ventures LLC, CB Agency Services, LLC, and CB Participations SPV, LLC (collectively "Colbeck") (together with MindGeek, Visa, and Redwood, "Defendants") for sex trafficking and conspiracy to benefit from a trafficking venture in violation of 18 U.S.C. §§ 1591, 1594, and 1595, for receipt, transport, and possession of child pornography in violation of 18 U.S.C. §§ 2252, 2252A, and 2255, and state statutory and common law violations, allege as follows:

## INTRODUCTION

1.      This is a case about rape and trafficking, not pornography.   And it is a case about each of these defendants knowingly and intentionally electing to capitalize and profit from the horrendous exploitation and abuse of tens of thousands of other human beings so they could make more than the enormous sums of money

_____

[1] In 2023, MindGeek was purportedly sold to the "pop-up" Montreal private equity firm Ethical Capital Partners.   Ethical Capital Partners is not an actual private equity fund and had no private equity with which to purchase MindGeek from its four owners.   Rather, as MindGeek has done every time it has been caught in a scandal, the owners purported to "sell" their interests to a new, now "Ethical," owner in exchange for hundreds of millions of dollars in debt obligations that MindGeek would pay over time from the ongoing revenues.   Thus, like Stephane Manos and Fabian Thylmann before them—the owners of MindGeek's predecessor entities—the owners retained their financial interests in the business albeit in different form. Since the "sale," MindGeek has rebranded several of corporate entities, including Defendants MG Freesites, Ltd. (now Aylo Freesites Ltd.); MindGeek USA Incorporated (now Aylo USA Incorporated); MG Premium Ltd. (now Aylo Premium Ltd.); and MG Global Entertainment, Inc. (now Aylo Global Entertainment, Inc.).

they would have otherwise made anyway.

2.    From 2013 to 2023, MindGeek became the dominant, monopolistic online pornography company in the world.    MindGeek built this empire by knowingly and intentionally adopting an unrestricted content business model under which they would solicit and monetize all pornographic content without restriction, including child pornography and other nonconsensual content.

3.    In doing so, MindGeek did not merely provide a platform for others to post child pornography.    It embraced the practice and proactively assisted such users in maximizing the attention their content received.    It did this by rigorously analyzing and testing the performance of child porn and other nonconsensual content with users and search engines, determining how to maximize the attention such content received, and then working with users uploading the content to do so.    In essence, MindGeek used what it learned from analyzing content performance to turn images into marketing and advertising that would most effectively attract more users to its websites.

4.    MindGeek did this by creating a format in which the user uploaded an image into a template that called for added descriptive content; MindGeek instructed the user on how to use the descriptive template to generate more attention; and MindGeek shared and suggested with the user specific descriptions it had determined were most effective, including suggested titles, tags, and categories that MindGeek's search engine optimization analysis had determined drew the most attention to that particular type of content.    It was not until the user – with MindGeek's assistance, suggestions and sometimes direct instruction or intervention – had added the descriptive content to the image content that the product was added to MindGeek's website.    MindGeek then proactively drew attention to the content by combining it in playlists, suggested searches, and category libraries with other like described content offered to users with similar interests.    MindGeek would also separately upload the content to other websites it controlled.

5.     This plainly went far beyond the neutral provision of a platform to post content.    It was collaborative content development in which MindGeek identified descriptive content and messaging to add to the user's particular type of image content and, thereby, enhance its viewership (for both the user and MindGeek's benefit).

6.     MindGeek knowingly and intentionally included child pornography and other nonconsensual content in this business model because it had a singular priority of dominating online pornography, it materially helped them to do so, and it expected to make hundreds of millions of dollars in the process.

7.     This entire business plan was designed, directed, controlled, and implemented by defendant Colbeck Capital which just months after launching developed an investment thesis for the emerging adult entertainment market and decided to make it a centerpiece of its new fund.    Colbeck's thesis was that size and scale that maximized site traffic and exploited well-funded SEO capabilities would quickly permit a well-financed online platform to dominate this emerging market. And Colbeck understood that generating that size and scale required an unrestricted content model which solicited and utilized all content, not just legal content.

8.     In 2011, it assembled a syndicate to buy the Company and provide the hundreds of millions of dollars MindGeek needed to acquire and build its empire. Throughout the next six years, Colbeck devised, directed, and funded the plan to transform MindGeek into the dominant online porn company through the adoption of the unrestricted content business model that maximized traffic and returns, not compliance.    In 2018, Redwood pushed out Colbeck as the lead lender and assumed full control over the business.    As set forth herein, in owning, operating, and funding MindGeek throughout this period, Colbeck and Redwood were not only aware of, but knowingly and intentionally developed, invested in, and raised money to advance MindGeek's illegal unrestricted content model for their own benefit; lied about it to fraudulently induce others to fund MindGeek's illegal operations and their

investment in the same; and deviated from standard lending practices by not only funding each of the necessary loans despite knowing MindGeek was in breach of the loan covenants but also permitting the financing to remain in place despite ongoing breaches that would have dictated a default notice and foreclosure in any standard funding situation.   They did so because they too had a singular focus on profits they would earn from the exorbitant interest rates and other fees they could demand because others were unwilling to partner with and finance this illicit business.

9.    Visa knowingly and intentionally agreed to proactively facilitate MindGeek's commercialization of trafficked content that was an integral part of MindGeek's march to market dominance.   As set forth herein, Visa's agreement is reflected in the over seven years in which Visa and its network banks knowingly and intentionally suspended Visa's compliance and enforcement standards and procedures for MindGeek and thereby permitted it to operate in a manner that would have resulted in termination of other merchants, including smaller merchants in the online porn industry.   As a *quid pro quo* for this agreement, Visa and its network banks became the dominant payment processor for MindGeek, processing the majority of its payment transactions and earning hundreds of millions of dollars for doing so.

10.   Plaintiff was 14 years old when her life was destroyed by the trafficking enterprise these defendants knowingly and intentionally joined to make more than the already enormous amounts of money they were already earning and would continue to earn even if they had not decided to earn more from child pornography.

## PARTIES

### Plaintiff

11.   Plaintiff Serena Fleites is an individual who is now at the age of majority.   As alleged herein, Ms. Fleites is a victim of child sex trafficking.   At all relevant times, Ms. Fleites was a resident of California.

**Defendants**

12.     Defendant MG Freesites, Ltd. ("MG Freesites") (d/b/a Pornhub) is a foreign company incorporated in the Republic of Cyprus with a principal place of business at 195-197 Old Nicosia-Limassol Road, Block 1 Dali Industrial Zone, Cyprus, 2540.   MG Freesites conducts business in the United States, including in this District.   MG Freesites owns, operates, and/or manages one or several of the pornographic websites owned by MindGeek, including Pornhub, and is controlled and operated by directors, officers, and employees working in MindGeek's offices in the United States and Canada.   MG Freesites' servers containing its redundant library of pornographic content, including the vast amount of child pornography uploaded to its sites since inception, are located in Waltham, Massachusetts as well as elsewhere in the United States and the world.

13.     Defendant MindGeek USA Incorporated ("MindGeek USA") is a corporation incorporated in the state of Delaware, with its principal place of business of 21800 Oxnard Street, Suite 150, Woodland Hills, California.   MindGeek USA is used to support the operations of Pornhub and MindGeek's other tubesites through support services, industry outreach and influencing, lobbying, and media relations in the State of California.

14.     Defendant MG Premium Ltd. ("MG Premium") is a foreign company incorporated in the Republic of Cyprus with a principal place of business at 195-197 Old Nicosia-Limassol Road, Block 1 Dali Industrial Zone, Cyprus, 2540.   MG Premium conducts business throughout the United States, including within this District.   MG Premium owns and operates certain MindGeek premium and pay sites that are supported by MindGeek's network of free tubesites which are used as a means of creating traffic to, and revenues for, these premium services.   Those premium sites are one of the more frequent subjects of advertisements placed on Pornhub and other MindGeek tubesites, including its CSAM and others trafficked content used to attract and more deeply engage users on those sites.

15.    Defendant MG Global Entertainment, Inc. ("MG Global Entertainment") is a corporation incorporated in the state of Delaware, with its principal place of business at 21800 Oxnard Street, Suite 150, Woodland Hills, California.   MG Global Entertainment is used to support the operations of Pornhub and other MindGeek tubesites and paysites through support services such as moderation, formatting, review, and approval of content, industry outreach and influencing, lobbying, and media relations in the State of California and throughout the United States.

16.    Defendant 9219-1568 Quebec, Inc. (d/b/a MindGeek) ("MindGeek Canada") is a company organized and existing under the laws of Canada with a principal place of business located in Montreal, though it conducts business throughout the United States, including within this District.   During the period relevant to this complaint, MindGeek Canada directly employed MindGeek's senior executives, including MindGeek's then-CEO, Feras Antoon, and then-COO, David Tassillo, as well as the other employees who actually direct and manage all of the operations of MindGeek's tubesites and paysites.

17.    Defendants Colbeck Capital Management LLC, CB Media Ventures LLC, CB Agency Services, LLC, CB Participations SPV, LLC (collectively, "Colbeck") are Delaware limited liability companies with their principal places of business at 888 7th Avenue New York, New York.   Colbeck Capital Management is the hedge fund manager for the other three Colbeck hedge funds through which Colbeck Capital financed the trafficking enterprise alleged below.

18.    Redwood Capital Management, LLC is a Delaware limited liability company with its principal place of business at 250 W. 55th Street, New York, New York.   Redwood Master Fund, LTD and Redwood Opportunity Master Fund, Ltd. are Cayman Islands limited companies with their principal place of business at 250 W. 55th Street, New York, New York.   Manuel 2018, LLC, Gingogerum, LLC, and White-Hathaway Opportunity Fund, LLC are Delaware limited liability companies

with their principal places of business at 250 W. 55th Street, New York, New York. These entities are collectively referred to herein as "Redwood."  Redwood Capital Management is the hedge fund manager for the other Redwood hedge funds through which Redwood Capital financed the trafficking venture alleged below.

19.    Defendant Visa Inc. ("Visa") is a corporation incorporated in the state of Delaware with a principal place of business at P.O. Box 8999, San Francisco, California.  Visa recognized MindGeek as an authorized merchant and processed payment to its websites including but not limited to Pornhub, and continued processing payments for its business throughout the period covered by this third amended complaint.

## JURISDICTION AND VENUE

20.    This action arises under the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589-1595, federal child pornography and sexual exploitation laws, 18 U.S.C. §§ 2252A, 2255, and state statutes and common laws.

21.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and has supplemental jurisdiction over pendent state-law claims under 28 U.S.C. § 1367.

22.    This Court has personal jurisdiction over Defendants pursuant to, inter alia, 18 U.S.C. § 2255 because each defendant transacts business on a systematic and continuous basis in the United States and this District and/or has engaged in tortious misconduct here in violation of U.S. law, Rule 4(k)(2) of the Federal Rules of Civil Procedure which provides a federal forum for claims over the foreign Defendants, and under the California long-arm statute, Cal. Civ. Proc. § 410.10, because each defendant, directly and through agents, transacts business within the state; committed tortious acts and omissions within the state; committed tortious injury in the state caused by an act or omission outside the state; regularly does business, engages in persistent course of conduct, and derives substantial revenue from services rendered in the state; owns, uses, and possesses real property within the state; or is registered

to do business in and has consented to personal jurisdiction in this state.

23.    Among other things, Defendants (i) directed their activities at United States citizens and California residents, (ii) derived benefit from United States citizens' and California residents' activities, (iii) created a substantial connection with the United States and the state of California, (iv) engaged in significant activities in the United States, including within California, (v) created continuing contractual obligations between MindGeek and United States entities and citizens, including California citizens, and (vi) caused foreseeable harm to plaintiffs in this country, state, and district.

24.    Defendants have offices throughout the United States, including in this State and in this District and conduct business directly related to the tubesites at issue in this case both in this District and throughout the United States.    Specifically, MindGeek USA and MindGeek Global Entertainment maintain their principal place of business at 21800 Oxnard Street, Suite 150, Woodland Hills, California 91367. Defendant Visa's principal place of business is located at P.O. Box 8999, San Francisco, California.

25.    Moreover, MindGeek conducts business in this country and state through a network of shell entities which are registered to do business in the United States and California, conduct business in this country and state, committed tortious acts in this country and state, and committed tortious acts outside the country and state that caused harm in the United States, California and this District.    These putative shell entities, agents, and alter egos, include, but are not limited to, California-based entities MG Billing U.S. Corp, MG DP Corp., MindGeek LLC, MG Holdings Ltd.; U.S.-based entities MG Processing Corp., RK Holdings LLC, MG Global Entertainment Inc., and MG Billings U.S.; and Defendants MG Freesites, Ltd., MindGeek USA.

26.    The illegal materials that MindGeek and its agents and alter egos solicit, fund, produce, modify, disseminate, advertise, and monetize are created in the United

States, including in among other locations this state, uploaded in this country and State, and stored on servers in the United States.   Indeed, MindGeek transmits millions upon millions of videos and images to and from this State and processes millions of dollars through the State on an annual basis.

27.     Furthermore, MindGeek derives substantial profits from U.S-based operations, including from California-based users.   MindGeek's tubesites are some of the most trafficked websites on the internet, generating an enormous amount of revenue—over $460 million in 2018.   More recent estimates suggest that figure is low, as the online porn industry as a whole—which is dominated by MindGeek— may generate as much as $97 billion per year.   By comparison, Netflix generates approximately $11.7 billion in annual revenue.   In 2020, MindGeek's tubesites received an average of 3.17 trillion monthly web impressions, more than internet giants Amazon (2.58 trillion), Netflix (2.47 trillion), and Reddit (1.55 trillion), a significant percentage of which is comprised of U.S.-based users and generated from U.S.-based user uploads, including in California.   As of 2019, Los Angeles is the city with the fourth highest volume of Pornhub.com usage in the world.

28.     MindGeek profits from United States users, including California residents by, inter alia, (i) selling targeted advertising directed at United States-based citizens and California residents on free pornographic videos hosted on MindGeek's tubesites, (ii) selling MindGeek's Pornhub Premium service to United States residents and California residents for $9.99 per month, (iii) directly selling United States citizens and California residents a license to view MindGeek's ModelHub content, and (iv) selling customer data to United States and California residents.

29.     Additionally, MindGeek partnered and shared advertising revenue with numerous sex traffickers who reside in the United States and California, uploaded and distributed sexually explicit videos of the U.S.- and California-based plaintiff without her knowledge or consent, and generated advertising revenue and other financial benefits from those uploads.

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this District.   Further, MindGeek maintains an office in this judicial district and conducts substantial business within the district.

## FACTUAL BACKGROUND

## I.     MindGeek's Basic Business Model.

31.     MindGeek owns dozens of websites commercializing pornography that fall into two general categories.   It operates free "tubesites" that contain free, purportedly user populated content, and premium "paysites" where it sells content, services, and merchandise.   MindGeek attracts users to its tubesites by providing valuable services, including the ability to access, download, upload, and exchange free content; assistance in finding content they wish to view and uploading content in a manner that will maximize its exposure; and messaging, file-share, crypto, VPN, and Tor services to allow them to communicate and exchange free content with other users privately and anonymously.   Users can also become so-called "verified" users or members of MindGeek's "ModelHub" program and earn a share of MindGeek revenues earned from their content.

32.     These offerings have value to users for many reasons beyond the mere access to free pornography and revenue sharing.   For many, the ability to share and widely disseminate content that they prefer on the largest online pornographic platform, develop an online presence and network with others with similar preferences, and receive, exchange, and view the content from others with similar tastes has great value, including being able to do so privately and anonymously in a manner that would be difficult for authorities to trace.   This is particularly so for predators who traffic in child pornography and other nonconsensual content because the wide dissemination of that content is part of the perverse gratification they experience from their exploitation, and it allows them to connect and share with others who possess similar preferences and content.

33.    In addition to being the largest internet pornography platform, users who value being able to widely disseminate videos receive value from the robust content development support MindGeek provides.   Specifically, MindGeek does not simply provide a neutral platform or means to post content online; it proactively helps the user associate substantive messaging to the image to enhance its ability to garner attention.   This includes instructions on "how to" maximize attention with suggested titles, descriptions, and categories that MindGeek's SEO analysis has determined most effectively draw attention to that particular type of content, including child pornography.   In addition, MindGeek's own formatters review and modify this presentation as they deem appropriate for the same purpose, including the actual titles, tags and categories, as well as the videos themselves.   And MindGeek then proactively draws attention to the content by combining it with other, similarly described content and suggesting it to others who MindGeek identifies as likely to be interested in the form of proposed searches or playlists.

34.    This was a collaborative development of content that was materially more than the image itself and which was also tailored to the nature of the image, including in the case of child pornography and other nonconsensual content.   While merely providing a platform to post an image that others could view might be neutral, preparing specific messaging and associated descriptions that are tailored to the image's content is not.

35.    For predators seeking to further their exploitation by widely publicizing abusive content, this assistance is of enormous value.   Moreover, providing a platform is a *de minimis* part of this value compared to MindGeek's substantive addition to, and amplification of, the image's distinct characteristics of interest.

36.    MindGeek provides additional value by itself uploading the content to websites other than the particular website the user chose to upload to – thus itself becoming the content provider for that website.   It does this as a matter of course with respect to some websites, and asks the user about others as part of their explicit

online agreement permitting MindGeek to use the content in exchange for the user's ability to upload it.

37.     MindGeek offers these valuable services because it too receives great value.   That is, the users provide the most valuable "coins of the realm" to MindGeek's business model: traffic and content.   MindGeek uses this traffic and content to (a) advertise and drive traffic to MindGeek and third-party "premium" pornographic sites or services; (b) sell advertising for non-pornographic third-party products and services; and (c) harvest data to identify user interests and optimize their website content to attract even more traffic and content.   It also sells the data to third-parties.

38.     The Gold Standard for generating traffic and obtaining content is to be the top result for queries on search engines like Google.    To do this, MindGeek's almost singular focus is Search Engine Optimization or SEO.    Indeed, publicly, MindGeek did not even mention on its corporate website that it is involved in pornography.    Rather, it described itself exclusively as a technology company skilled in SEO and related services.    SEO is the science of optimizing a website's ability to garner top search rankings and depends on many factors, but most prominently, content volume, how well that content is described in detail, the website's ability to capture and analyze user interactions and preferences, and traffic.

39.     In establishing the valuable mutual relationship between MindGeek and its users, they enter into an explicit online agreement whereby the users agree, among other things, that MindGeek can use the content in exchange for the services MindGeek will provide.    Moreover, although the users also putatively agree to follow the website's "Terms of Service" ("TOS"), there is a tacit understanding between MindGeek and those trafficking in nonconsensual content that the TOS are not enforced or real, which MindGeek communicates with the ubiquitous presence and proactive promotion of such content on the websites themselves.

40.     For example, according to those TOS, content depicting racism, hate,

incest, and children (even by adults) were all banned but nevertheless omnipresent on the platform.   Indeed, numerous versions of "underage," "teen," and "incest" were consistently among the most searched search terms and popular results in MindGeek's algorithmic video and search term suggestions.   Likewise, numerous versions of "drunk," "drugged," "passed out," and others indicating incapacitation were also among search terms sought most often by users and suggested by MindGeek.   Irrespective of the TOS, the very loud messaging of MindGeek's website was such content and users who sought to upload or view were welcome.

## II.    MindGeek's Trafficking Venture

### A.    The Pre-Online Porn Industry

41.    Prior to the explosion of online pornography, there was a relatively effective federal and state statutory framework policing child pornography, other non-consensual content, and copyright piracy in the porn industry.

42.    First, federal law mandates that "producers" of pornographic material verify the age and consent of all performers via government-issued identification; maintain specified signed records of such verification for inspection; and mark all pornographic materials with disclosures certifying this verification had been completed and where the records can be inspected.   It is a federal felony to violate these requirements.   The statute also makes it a federal crime "for any person" to "sell or transfer or offer for sale or transfer" any pornographic material that did not contain the required age verification disclosures.   This imposed a compliance obligation on those through whom porn producers sell or transfer content or offer to do so.

43.    Second, federal and state laws throughout the United States criminalize child pornography and impose near strict criminal liability for possessing or distributing such content.   Federal law also required those who came into possession of child pornography to report it to the National Center for Missing and Exploited Children ("NCMEC").

44.     Third, federal and state laws also criminalized, among other things, sex trafficking as well as benefiting from a sex trafficking venture, such as the commercialization of pornography produced with trafficked individuals.   These anti-trafficking laws provided substantial criminal and civil sanctions for producing or monetizing non-consensual pornography, including child pornography.

45.     Fourth, copyright laws likewise imposed substantial criminal and civil sanctions for willful copyright piracy.

46.     Collectively, these various legal regimes effectively policed child pornography, nonconsensual content, and copyright infringement in the pre-online industry.

**B.     MindGeek's "Unrestricted Content" Business Model.**

47.     The explosion of online porn overwhelmed the established porn industry and existing legal regime governing it.   NCMEC published a study in 2020 reporting that from 1998 to 2019 there was an "insatiable demand" for internet CSAM/child pornography, with millions of reported instances of such videos posted online, including 8.4 million in 2018, with a "trend toward more egregious sexual content in later years."   The same was true for other forms of nonconsensual content including adult sex trafficking, rape, and revenge porn.

48.     MindGeek was a primary driver of this metastasizing criminality.   To secure the most traffic and content and, thereby, dominate search engine results, it knowingly exploited the lag in awareness, capabilities, and enforcement concerning online pornography to aggressively solicit, pay for, and curate and optimize child pornography and other nonconsensual content on its websites.

49.     MindGeek's motivation for its unrestricted use of nonconsensual content was its singular priority of using SEO to be the top search engine website result in any porn related search.   As one insider explained, MindGeek's sophisticated SEO went beyond merely acquiring content and traffic, and extended to optimizing how that content was described:

1    what happen[ed] with Pornhub . . . is the fight they have on

2    Google results.   And that's where Pornhub lives or dies. . .

3    the fight they've had with sites like Xvideos, or XHamster,

4    or XXX and XVideos . . . the fight they've had with

5    rankings is just crazy.   And that's the thing, . . . it[']s about

6    the long searches, it[']s about the long tail that are the few

7    searches but enough to matter.   And that's where instead

8    of you looking for one keyword, you're looking for longer

9    strings of words.   And whoever is having more content

10    and more diverse content, wins.

11    50.   MindGeek's plan to "win" was an "unrestricted content" SEO model

12  that knowingly and intentionally solicited, optimized, and commercialized content of

13  any kind, including child pornography and other nonconsensual content, and avoided

14  any policy, process, or technology that would exclude illegal content or limit or even

15  slow the upload of content generally to its websites.   Like a soft-drink company

16  selling different beverage types and flavors to capture all existing consumer tastes,

17  MindGeek proactively sought to service demand for all pornographic tastes,

18  including tastes for child pornography, rape, extreme violence, racism and hate, and

19  other illegal acts like bestiality.   As one whistleblower explained, "there is a lot of

20  f***ed up sh*t that is going on" (asterisks added) on MindGeek's tubesites, and "it is

21  not an accident . . . ownership and management are clearly complicit . . . 100%"

22  because "[i]t's just money" they care about.

23    51.   MindGeek's unrestricted content model relied on three knowing and

24  intentional practices.   First, it systematically ignored the laws in the jurisdictions in

25  which it did business.   Second, it knowingly and intentionally created a faux

26  "moderation" process that was designed not to exclude child pornography and other

27  nonconsensual content but to proactively attract, optimize, and monetize it, while

28  also masking it from authorities.   Third, it proactively used its extensive SEO

1  technology to curate child pornography and other nonconsensual content by further
2  "optimizing" its descriptions, tags, titles, and video formats and arranging
3  recommended searches to find, and curate playlists of, such content.

4  ### 1.    MindGeek Systemically Ignores Pornography Laws.

5    52.    From MindGeek's inception, it used a shifting, opaque, and Byzantine
6  international corporate structure to, among other things, avoid rigorous laws
7  governing pornography, particularly child pornography.   This structure obscured
8  MindGeek's ownership and operation from authorities and manufactured the fiction
9  that it was a Luxembourg company operating out of Cyprus.   It selected these
10  jurisdictions because they were havens for tax evasion, money laundering, and had
11  weak laws and enforcement related to pornography.   As a whistleblower explained,
12  "spreading the corporate structure out in hundreds of shells located in dozens of
13  jurisdictions allowed spreading of transactions out such that they did not raise
14  suspicion in any one country, and even if they did it was very difficult for that
15  jurisdiction to investigate the suspicion when much of the information was in other
16  jurisdictions."

17    53.    MindGeek used this corporate fiction to ignore pornography laws in the
18  United States in particular, where it generated most of its revenues, even though its
19  operations were clearly covered under those laws.   The United States was
20  MindGeek's largest market, and it maintained servers, subsidiaries, and numerous
21  payment processing agents in the United States to service that market.   Those U.S.
22  servers contained virtually all of its content.   When users uploaded content onto
23  MindGeek's tubesites, it was uploaded onto its U.S. servers, automatically
24  transferred to certain of its other tubesites, transferred to still other tubesites if the
25  uploader chose to do so, and transferred to other users via downloads or viewing, all
26  of which went through U.S. servers for any users in the United States (which was the
27  majority).   In addition, the vast majority of MindGeek's revenues were earned in,
28  and the payments processed, through United States financial and banking

institutions.

54.     MindGeek also took all of the content from libraries it acquired like Redtube, YouPorn, Fake Taxi, etc., and transferred that in bulk to its servers, including its U.S. servers, without any initial review at all let alone verifying the content complied with 18 U.S.C. § 2257.

55.     All of these functions involved transferring pornographic content in and around the United States through U.S. servers and made MindGeek the largest pornography company selling, transferring, or offering to sell or transfer pornographic content in the United States under 18 U.S.C. § 2257.

56.     Indeed, in 2023, MindGeek S.a.r.l., on behalf of Defendants MindGeek USA and MG Freesites (which operates its tubesites), entered into a deferred prosecution agreement ("DPA") with the United States Attorney's Office of the Eastern District of New York for unlawful monetary transactions involving proceeds from sex trafficking based on content uploaded to Pornhub, YouPorn, and Redtube. In doing so, these Defendants "admit[ted], accept[ted] and acknowledge[d] that it [was] responsible under United States law for the acts of its officers, directors, employees and agents with respect to" their tubesites involved in these transactions.

57.     Nevertheless, MindGeek used the fiction that it was not operating in the United States to systematically ignore 18 U.S.C. § 2257.   It did this because complying with those laws would have utterly frustrated its unrestricted content model and made it impossible for it to acquire the enormous library of user-uploaded content that its business plan depended on.   Among other things, complying with § 2257 would have prevented virtually all of MindGeek's so-called uploaded "amateur" content for which written consents were almost never acquired and, in any event, were universally unavailable.   It would also have excluded the ubiquitous pirated professional content for which users also did not possess the required documentation.   And even if these hurdles could be overcome, complying with the law would have limited the amount of content that could be uploaded by excluding

1    illegal content that MindGeek knowingly and intentionally intended to use to "win"

2    the SEO race and dominate the online porn industry.   MindGeek ignored § 2257

3    even though it acknowledged internally that it was subject to the statute.

4        58.    Similarly, MindGeek ignored the federal law requiring it to report to

5    NCMEC all child pornography it received and possessed on its servers (which

6    included all its uploads of such content because they were all co-located on its

7    United States servers).   Complying with this law would have also devastated its

8    unrestricted content model by discouraging the upload of such content and flagging

9    for U.S. authorities the scope of the problem and MindGeek's continued possession

10   of such illegal content in the U.S.

11       59.    Similarly, MindGeek ignored Canada's federal laws related to

12   pornography by likewise having no way to verify the consent of those appearing in

13   its content.   In February 2024, Canadian authorities published findings of their

14   investigation into MindGeek and found that it had, and continued to, violate

15   Canadian law by failing to meet these requirements.   In doing so, they rejected

16   MindGeek's claim that it was not subject to Canadian jurisdiction because it was

17   headquartered in Luxembourg and operating out of Cyprus.   Rather, they found that

18   MindGeek was headquartered and operating, in fact, in Canada.

19

20

21

22

23

24

25

26

27

28

1

## 2. **MindGeek's Faux Moderation Process.**

2   60.    In addition to ignoring the applicable laws concerning pornography,

3   MindGeek maintained an exclusively human, and completely performative,

4   "moderation" function that was hopelessly under-staffed, under-resourced, and not

5   actually tasked with excluding illegal or otherwise purportedly banned content.

6   What it was actually tasked with was formatting the descriptive part of the content,

7   based on MindGeek's SEO analysis, to maximize its SEO value and mask blatant

8   descriptions of criminality.   Although MindGeek has publicly admitted every upload

9   was reviewed, it was only reviewed long enough to format the descriptive part of the

10  content, not moderate its legality.

11  61.    Likewise, although MindGeek publicly claimed it used technology to

12  screen child pornography and other illegal content, it actually was not doing so to

13  ensure such content was not uploaded.   MindGeek instead applied that technology to

14  actively curate and optimize child pornography and other nonconsensual content to

15  maximize its revenues just as it did with licit content.   MindGeek's knowing and

16  intentional policy of not excluding any, and instead proactively optimizing all,

17  content even extended to content that violated its equally performative TOS.

18  62.    MindGeek's motive in doing so was explicitly explained by its own

19  Social Media Manager who publicly stated that it would be a "disaster" to try to

20  restrict users and uploaders to adults—despite the TOS adult-only requirement—

21  because "then no one would upload anything," it would "cost[] us money to verify,"

22  "devastate[] traffic," and "MindGeek loses money."

23  63.    This MindGeek spokesperson further warned that even pretextual

24  restrictions that could be evaded easily would be unacceptable because most minors

25  would not be able to figure out how to circumvent them: "you would get around

26  them, a lot of people here would too but the large majority won't know how."   Thus,

27  even though MindGeek's TOS technically required users to be 18, it plainly did not

28  intend to actually prevent minors from accessing its websites because that would

1  limit traffic and content from adult and minor children alike.   This failure was not

2  mere indifference or negligence, it was proactive and intentional – the intent was to

3  capture and monetize such content.

4      64.   The same was true for child pornography and other nonconsensual

5  content.   As one insider explained, "they knew they were doing illegal stuff," but

6  they refused to take any steps to restrict content or traffic because it would restrict

7  SEO and revenue:

8          No doubt.   I'm sure . . . Were we planning any efforts to

9          stop that?   Absolutely not.   Because of views.   Every

10          time you put an extra layer of control on who watches, you

11          lose content.   And it[']s the same thing, in this case, if you

12          put an extra layer of control on what content goes up, you

13          lose content.   And content in this case is more pages, and

14          more pages is more results, more results is more paid

15          views.

16      65.   MindGeek's knowledge and intentional use of nonconsensual content

17  was widely understood within the company.   An insider explained one such

18  notorious example that was common knowledge internally:

19          I remember there was one girl, it was huge, from when I

20          was there.   But she always seemed, in the videos she never

21          looked okay.   Like I remember she was always high.   I

22          mean something that, according to the minimum rules of

23          decency, you would at least have a bit of the type of

24          thinking you know, 'is it okay to have this type of content?

25          Is she really, you know in a state where she should be

26          doing these videos?

27      66.   Thus, while non-pornographic tubesites with far less content uploaded

28  on a daily basis (and far fewer users seeking illegal conduct) employed tens of

thousands of trained and well-paid "moderators" and sophisticated technology to ensure content was legal and complied with the terms of service, MindGeek's exclusively human moderation team consisted over time of a handful to never more than about 30 untrained, minimum wage contractors in Cyprus because of the availability of cheap labor.   It was impossible for this group to genuinely moderate the content, which would have required the careful review of 700-1200 videos a day per moderator according to insiders, advocates, media sources, and others, including the Canadian Privacy Commission in its 2024 report finding MindGeek's moderation and other business practices violated Canadian law.

67.    In reality, the real function of these "moderators" was SEO formatting, and they internally were called "content formatters," not "content moderators."   As formatters, their task was not to moderate legality but to format the videos to optimize SEO and to conceal explicit mentions of criminality.   To do this formatting, they would add or edit the content title, tags, categories, and descriptions to conform with MindGeek's algorithmic code words so that those algorithms could most effectively categorize them, add them to playlists, and retrieve them in response to searches.   They would also sometimes edit the video for the same purposes.

68.    Further, they "scrubbed" words in the titles and tags that unequivocally indicated criminality.   While the red flags of criminality were removed, the video would nevertheless be uploaded with optimized titles, tags, and descriptions that would still permit internet and MindGeek search engines to suggest the video to users searching for that illegal content.

69.    As an insider familiar with the process explained:

> They basically went really fast with the content.   It's not like they are watching every Pornhub video.   *They kind of like would scroll through it, make sure that the titles didn't have anything awful, and that's it.   And it's mostly about*

1    *the titles you know?*   Because *in the end if you can't find it*
2    *through a search, then no one who works against human*
3    *trafficking will.   Right?*
4    (Emphasis added.)

5    70.    When MindGeek moderators identified titles or tags that too explicitly
6    flagged illegal content, they would notify the user to change the title or change it
7    themselves.   But MindGeek would not disable the illegal video or suspend the user.
8    For example, a member of the Pornhub model program, whose revenues were shared
9    with MindGeek, had multiple videos of underage women with titles indicating they
10   were underage.   One video of an underage and incapacitated woman carried the
11   viewer comments, "I thought she was dead until five minutes in" and "I don't think
12   that girl is old enough to buy lottery tickets.   If you catch my drift."   The uploader
13   originally titled the video, "delete your history after watching this," which obviously
14   flagged the video as child pornography.   But then he changed the title and when
15   asked why he did so by other users, he explained, "Pornhub support told me to
16   change all titles."

17   71.    Moreover, formatting supervisors clearly communicated that actually
18   screening questionable or even obviously illegal content was not the formatters' task.
19   The goal was uploading content and formatting it for use, including nonconsensual
20   content, according to the code words and instructions from the SEO analysis.   Thus,
21   one insider explained that the woman with overall responsibility for formatting and
22   ostensible "moderation" was a "sociopath" who would regularly "tell her team to just
23   look the other way."   According to another insider, there was a motto drilled into
24   formatters: "Don't f**k with the f**ker."   (Asterisks added).   As one whistleblower
25   explained, a typical response to a formatter questioning legality of content would be:
26   "Imagine the trouble I will get in if we report this and take time and we don't meet
27   quota and you will lose your job."
28

72.    Put simply, as a former MindGeek employee told the *New York Times* in 2020, "[t]he goal for a content moderator is to let as much content as possible go through" to maximize revenues.   Indeed, MindGeek's yearly bonus system for its faux moderators was based on the number of videos they *approved* for upload.

73.    MindGeek also did nothing to remove or even investigate patently underage and nonconsensual content that was flagged by users.   To the contrary, it would take extraordinary steps to ignore, frustrate, or minimize the impact of those trying to flag illegal content.   For example, for seven years Pornhub contained a video of a completely unconscious girl with underdeveloped breasts clearly being physically assaulted and raped.   The title of the video was "dead pig half-opened eyes after being drugged."   That this title was literally true was painfully obvious from the video.   The rapist repeatedly displayed the victim's dilated, red eyes and even touched her eyeball to prove she was truly unconscious.   No moderator could have missed the obvious rape depicted in this video.

74.    Another example involved one of MindGeek's most popular partner channels (and a constant focus of its SEO optimization), "Exploited Teens Asia."   A representative video on this channel involved a young girl in a child's room surrounded by toys and stuffed animals.   She was being aggressively penetrated by an old man and she was crying out for him to stop.   Viewer comments demonstrated the obviously non-consensual nature of the video:

> Do we really know sex trafficking when we see it!!
> EXPLOITED TEENS ASIA she can't be older than 15 or
> 16.   This is a real victim.   In some moment she looks like
> she wants to cry.   You can see that she doesn't want this,
> you can see that she wishes he'd leave her alon[e]!   I can't
> believe 9k liked the image of an old perv humping a
> helpless GIRL!   Flag the f*** out of this and hopefully

1    pornhub will remove it.   My heart breaks for her.

2    (Asterisks added).

3    Others comments likewise identified this as rape: "She is crying 'kurushi' meaning

4    painful and begging him to stop!" and "She looks underage af."

5        75.    The video had been up for 3 years and received over 4 million views,

6    certainly performance that MindGeek SEO would have closely analyzed and tried to

7    recreate, and the comments had been up as much as 7 months before advocates called

8    out the video on twitter.   In response, MindGeek kept the title, description, and tags,

9    and swapped out the video.   This was done because the SEO indicated that the

10    explicit titles were very effective in capturing internet traffic searching for child

11    pornography and other rape.

12        76.    Similarly, at the end of 2019, a video of an undeniably intoxicated and

13    incapacitated women being sexually assaulted was uploaded to Pornhub.   The video

14    was categorized as "homemade," titled as "Misadventures of a Drunk Girl," and

15    tagged in the category of "teen," "teenager, young drunk, funny."   The woman was

16    stripped naked, unable to walk or stand, crawled when she did move, and ultimately

17    was completely unconscious with her eyes rolled into the back of her head.



77.    Viewer comments such as, "so hot.   Love how drunk she is!",

confirmed her obvious incapacity as did, "I would take advantage of her all nite.

dude's smart for trying get her to drink more.   Bet he dumped loads in her stupid

c*nt.   I know I would."   (Asterisks added).



78.    Users who MindGeek directed to this video were then directed by

MindGeek's suggested search and video algorithms to equally clear cases of rape.

In one video, the drug needle used to render the victim unconscious was then inserted

into the vagina of the victim and zoomed in on.   These videos were on the site for

years and accompanied by numerous comments flagging them as obvious rape.

79.    Another video on Pornhub for over four years captured the rape of an

Indian woman.   The video was not professionally produced.   There was no indicia

of consent or performance.   Neither the uploader nor woman were identified.   The

woman was clearly in distress and desperately trying to hide her face.   Two years of

user comments plainly flagged the video as rape: "this is f***ing rape!!!!!!!

bastards!!!!!!!!" (Asterisks added).   MindGeek was aware of the video, its obvious

nonconsensual content, and the users' comments.   Rather than remove the video and

page, Pornhub instead censored the word "rape" from the comments and left the

video and its other tags and descriptions because they were effective in capturing

internet traffic searching for rape.

80.    For this video, MindGeek's suggested search algorithms directed viewers to similar rape videos, including a young teen woman in obvious distress, crying, and trying to cover her face while her rape was recorded.   The video is titled and tagged "amateur teen" and "hot Indian teen."

81.    Even worse, MindGeek also had no functioning process for victims of nonconsensual content to have that content removed, and instead actively worked to retain such content for SEO optimization.   Consequently, victims who tried to get nonconsensual content removed were typically ignored, stonewalled, and stalled as much as possible to preserve the use of the content for as long as possible.   This was especially a priority when the content was performing well, and MindGeek's SEO analysts were trying to use that data to refine their algorithms to effectively solicit similar content and traffic seeking such content.   Standard MindGeek practices to thwart takedowns included demanding information victims reasonably could not possess in many instances, like the URL, even though they had provided sufficient other information for MindGeek to locate it; or telling victims only the uploader could request a video be taken down, that the videos did not exist or could not be found when they did exist and could be found or had not even been searched for, and that the video had been taken down when it had not been.

82.    For example, one victim had the video of her rape uploaded to Pornhub with her personal information where it remained for months despite her desperate pleas until she hired a lawyer:

> It was terrifying, there were people on Twitter-sharing
> screenshots of them buying a train ticket saying they were
> going to come and rape me.   I thought about killing myself
> it got so bad. Hundreds of thousands of people saw that
> -video, which I didn't even know I still had.   It was
> devastating.   What a horrible, humiliating thing to do to
> someone.   I moved in with a friend and put my flat on the

1    market because I thought I was going to get raped.   I had

2    to change my whole life – leave my job, withdraw from

3    almost everybody I used to work with.   I used to stay in

4    my room all weekend crying because I couldn't deal with

5    it.   He ruined my life.   I came off social media completely

6    and the only version of me that existed online was this

7    persona that he created.

8

9    83.   Remarkably, MindGeek's indifference was so callous it extended to

10   even public outreach from victims, such as this victim who made her report to

11   MindGeek's Social Media Director on social media:

12   I was away on an international business trip when I met a

13   man at a hotel bar and went back to his room to have

14   sex . . . .   Recently my friend sent me a Pornhub video and

15   said it looked like me.   I looked at it and it was me having

16   sex in the hotel room with thousands of views.   My face

17   was clearly visible in parts.   The video had an insulting

18   title calling me a slut.   The channel it was on featured a

19   dozen other videos of the same guy having sex with

20   different women in hotel rooms with the same amateur

21   quality . . . .   I tried flagging the video with no results. I

22   want the video taken down and the guy punished, but I'm

23   really not sure what to do.

24   84.   Pornhub's only response to this report was to send the victim a link to

25   their site's takedown page.

26

27

28



85. Not only did MindGeek not remove CSAM/child pornography it became aware of on its tubesites, or report it to authorities, it actively discouraged victims and others from reporting it to authorities and lied to do so. For example, MindGeek tried to convince a victim of CSAM/child pornography not to report its presence on MindGeek's tubesites and lied about MindGeek's practice of not removing such content unless forced to do so: "You don't need to report the urls to an agency, just flag them it['s very likely if it['s not removed it not illegal content. . . . We do have access to our entire upload library, including deleted videos and can confirm this."



86.    Even for content that MindGeek was forced to take down, it did so in the most limited fashion possible so as to minimize the impact on its SEO.   For example, even where MindGeek verified that content was child pornography or other illegal content, they would not terminate the account that uploaded it, disable the user's ability to upload more content, search the account for other versions of the content or other illegal content, track whether the content had been downloaded or notify the downloaders that it was illegal.

87.    Moreover, MindGeek took no steps to disable the website or internet registry links to the content to prevent it from triggering search engine results. Indeed, one can still run internet searches for known CSAM/child pornography or other non-consensual content that was ordered taken down by NCMEC or otherwise and the search will bring you to Pornhub even though that video is not enabled.

MindGeek's algorithm will then direct you to similar non-disabled content.    This was an intentional product of MindGeek preserving the SEO links to the video and its descriptors so they will be included in internet search engine results. As one insider explained:

> If you do [a takedown request] through Pornhub, then Pornhub eliminates the video but keeps the page.    So that page still has the titles and can still run from Google. . .    Because what they want is ad impressions, because that's what they charge for, for their clients.    It's ad impressions, ad impressions, ad impressions.

88.    Much worse, according to multiple insiders, MindGeek systematically and surreptitiously would reupload content that it had been forced to disable and do so in a manner in which it appeared to have been reuploaded by independent users and which circumvented MindGeek's purported moderation.    One eyewitness to this process explained that caches of disabled content "would be provided to employees on disks and they would be instructed to reupload those videos from non-MindGeek computers using specific email addresses that would allow the uploads to bypass MindGeek's purported 'fingerprinting' of removed videos. . . .    They say they kept the stuff on the servers to cooperate with authorities but it was really so they could reupload."

89.    MindGeek has stated publicly and repeatedly that it retains on its servers all videos ever uploaded onto its tubesites.    This no doubt is necessary for its reuploading practice and to maximize optimization.    MindGeek, therefore, has throughout its existence illegally possessed CSAM/child pornography, and reuploaded that CSAM/child pornography innumerable times.    Indeed, MindGeek, with duplicative servers in the United States and Canada (among other locations) is likely the largest non-regulatory repository of CSAM/child pornography in North America.

90.     Despite admitted possession of massive amounts of child pornography, until 2020, MindGeek never voluntarily made a single legally required disclosure to authorities in the United States or Canada about that material under either countries' CSAM/child pornography laws.   MindGeek failed to do so even when its possession had been publicly reported.   For example, in 2019, 58 videos of a 15-year who was beaten and raped were posted on Pornhub.   These videos were ultimately removed, but as per the testimony of NCMEC during Canada's parliamentary investigation, MindGeek had never reported any instances of child sexual abuse to NCMEC as required by federal law or reported to NCMEC's counterpart under Canadian law until late 2020 when its business practices were revealed in the *New York Times* and it was forced to do so.

91.     Likewise, in early 2020, two videos of child pornography – one involving a toddler in diapers being abused and another of a pre-pubescent girl being anally raped – were located on Pornhub.   After multiple reports, MindGeek notified those flagging it that the video had been disabled, fingerprinted, and reported to NCMEC.   But according to NCMEC's own testimony, it was not reported to NCMEC.   Two months later, the same two videos were discovered back up on the site, uploaded by two separate user accounts.   Investigators submitted takedown requests to Pornhub that were ignored.   It was not taken down until it was reported to the FBI, the FBI notified NCMEC, and NCMEC issued a takedown order to Pornhub.   One reupload remained up for almost two weeks after the initial takedown requests and had over 20,000 views and an unknown number of downloads.   Even after it was removed, MindGeek left the title, tags, views and url live to continue driving traffic to the site using the child rape video.

92.     In addition to actually facilitating its monetization of nonconsensual content, MindGeek's faux moderation process also provided a public veneer of legality and plausible deniability to MindGeek.   Since its inception, MindGeek frequently trumpeted its robust moderation processes that it falsely claimed

1  employed well-trained moderators and advanced technology and prevented child

2  pornography, other nonconsensual content, and violations of its TOS.   It maintained

3  such false statements on its websites and in response to the many public reports to

4  the contrary.

5       93.   This phony public portrayal of MindGeek's actual business model was

6  essential to its agreement with payment processors like Visa and Visa's agent banks

7  to continue processing payments for advertising and paysite subscriptions.

8  Although, as set forth below, Visa and its agent banks were fully aware of

9  MindGeek's actual business model and the falsity of its public portrayals,

10 maintaining these public pretexts and window dressings provided these payment

11 processors plausible deniability.

12      94.   And when such reports became so widespread that the Canadian

13 Parliament held hearings, Antoon and Tassillo repeated this false narrative in sworn

14 testimony.   For example, Tassillo testified that he could "guarantee you that every

15 piece of content, before it's actually made available on the website, goes through

16 several different filters," including several "different pieces of software" followed by

17 review by moderators.   Tassillo claimed that "the human moderators will watch each

18 one of the videos" and that "we always instruct all of our agents to err on the

19 cautious side.   Basically, if you have any doubt at all, just don't let it up" to the

20 tubesites.   He also testified that MindGeek reported "all cases to NCMEC."   None

21 of this was true.

22      95.   When one whistleblower familiar with the moderation process heard

23 their testimony, he said, "it is a lie."   This accusation was corroborated by the

24 findings of the Canadian Privacy Commissioner in its 2024 report concluding even

25 as of that date that MindGeek (now called Aylo) never employed "reasonable

26 efforts" to ensure all its content was consensual, employed "completely inadequate

27 control measures" that were "wholly ineffective," and "could only result in

28 devastating consequences."   The Privacy Commissioner also found that as of 2024,

1  MindGeek still "did not accept responsibility," had not "take[en] necessary

2  corrective measures," acted "wholly inconsistent with an organization taking

3  responsibility for giving meaningful effect" to consent requirements, and "had not

4  taken the necessary and responsible corrective measures to redress the significant

5  privacy harm that was uncovered . . . It has not committed to follow our

6  recommendations, nor has MindGeek proposed any meaningful alternative measures

7  to address the contraventions identified" other than suing the agency to prevent it

8  from issuing its finding and recommendations.   Among other examples, it noted that

9  MindGeek continued to allow all content to be uploaded without any moderation for

10 significant periods of time and that 70% of this content failed to meet its purported

11 uploading criteria.

12        **3.    MindGeek's SEO Technology Actively**

13            **Commercialized Nonconsensual Content.**

14        96.    MindGeek intentionally did not deploy any technology to exclude non-

15 consensual or other banned content even though it described itself as the leading

16 SEO technology firm in the world and instead spent tens of millions of dollars on

17 SEO technology and effort to optimize all its content, including child pornography

18 and other nonconsensual content, in order to maximize revenues.

19        97.    Utilizing its bread and butter SEO technology to not just optimize and

20 monetize legal content, but also enhance meaningful moderation would have been

21 easily feasible, but MindGeek's unrestricted content model knowingly and

22 intentionally wanted to utilize all content and traffic, even illegal content.   As one

23 insider explained: "I've seen it, you can search any word, any video, you can look for

24 the user, anything like any other database. . . . and the titles are there . . . so, why are

25 they not searching for this and cleaning? . . . Because they want the content on their

26 sites."

27        98.    Indeed, when certain content adversely affected SEO performance, it

28 was removed using the same SEO capabilities.   For example, through its constant

analysis, MindGeek determined that male homosexual content on its more popular tubesites was interfering with its impressions and conversions because when the suggested video and search algorithms suggests a gay video, a material percentage of users exited the website.   Accordingly, MindGeek affirmatively worked to reduce such content on the site by deleting it, transferring it to other sites, segregating, and suppressing it.   No similar steps were taken when it became aware of illegal, nonconsensual content in its SEO work.

99.    Thus, MindGeek incorporated all illegal content into its SEO process just like it did all other legal content.   Nonconsensual content that was performing well was analyzed, refined, and tested to amplify that performance, and the lessons learned were used to optimize similar content and proactively provide uploaders and users preferred titles, tags, and category descriptions as well as suggested searches and playlists to watch.   Thus, when a user sought to upload content, they would be directed and assisted in adding to the content detailed titles, descriptions, tags, and categories, and MindGeek would provide suggestions and preexisting terms to use based on its SEO analysis.

100.   For example, in its explanation of "How to Succeed" on Pornhub's website, MindGeek directed users to use up to 16 tags that describe the video and performers; select up to 8 relevant categories; when applicable, use niche specific categories to ensure content is visible to the "right" fans; write a creative title that described the scene; and add a stage name to the title of the video.   MindGeek's categories demonstrate how they are specifically targeting viewers who are interested in child pornography, with categories like "teen," "school," "babysitter" and "old/young."   On the page explaining video categories, MindGeek informed that "Teen" is one of its most popular categories.

101.   But MindGeek did not leave the development of uploaded content exclusively to user decisions based on its assistance and input.   Its formatters would also add and edit the content for maximum effect when they reviewed it, including

1  not just the descriptive part of the content, but also scenes and length.    Indeed, in

2  public remarks, the owner of MindGeek's predecessor, Fabian Thylmann, explained

3  that MindGeek was a creator of content and that customizing content for identified

4  user preferences was the only way to make "really good money" in the online porn

5  industry.

6      102.    Thus, for example, MindGeek formatters create a graph or timeline

7  underneath videos to demonstrate the level of intensity of activity within a particular

8  section of the video.    This helps the viewer identify and quickly advance to various

9  levels of sexual activity within the video.    MindGeek harvests this data to optimize

10 its advertising services by determining which words generate traffic and refines its

11 suggestions to users for content to watch and descriptions to use on uploads.

12     103.    Along similar lines, MindGeek formatters create buttons for some

13 videos that describe certain types of sexual activity occurring within the video,

14 thereby allowing viewers to jump ahead to desired sections of the video depicting the

15 activity identified in the button.    These efforts are yet another way to optimize profit

16 sharing, ad placement, and otherwise capitalize on the data of user preferences.

17     104.    Similarly, MindGeek formatters create thumbnails for the videos on

18 MindGeek's tubesites and store these thumbnails on a separate server.    The server

19 includes thumbnails created from CSAM videos.    As MindGeek explains to its users

20 and content partners, thumbnails are a key component to attracting viewers to a

21 video: "A well-chosen thumbnail will greatly impact the number of views by making

22 videos more appealing for users to click on."

23     105.    All of this content creation is directed at maximizing revenues.    With

24 respect to advertising placement and content, MindGeek, through its advertising

25 business, sells banner and sidebar advertisements, as well as advertisements that

26 appear before and after videos.    MindGeek placed these advertisements on all pages

27 viewed by users, including those featuring CSAM.

28     106.    MindGeek edits advertisements placed on its websites to frequently

highlight terms such as "girls," "boys," "broken teens," and "twink," which are terms that are known and encouraged for use by MindGeek.    These terms promote the creation, use, and viewing of CSAM.

107.    Indeed, MindGeek's advertising platforms allow advertisers to build campaigns around keywords that clearly reflect illegal activity, including "13yearoldteen"; "not18"; "14yrold"; and "15yrold."    For example, if an advertiser selects the keyword "teens," the advertising platform shows that term alongside related terms including "teenager"; "pigtail"; "clubseventeen"; "coed"; "braces"; "teenplayground" and "teenylovers."    MindGeek tracks the amount of traffic generated by each word, showing advertisers the volume of traffic being driven by such keywords and the expected traffic to be generated by each potential word choice.    In doing so, it allows people to target ads to people searching for words such as "rape" and "child rape" in languages other than English.    All this traffic data is then used to direct uploaders to upload the categories of content most watched and use the best descriptions to capture that interest.    Throughout the period in the complaint, child pornography and nonconsensual content was one of the most in demand categories.

108.    What was not a focus at all of any of this effort was excluding child pornography or other nonconsensual content because the business model intended to do the opposite.

109.    The result of this was just what MindGeek intended.    Simple Google searches even suggesting nonconsensual content would invariably return Pornhub as the top search result.    Pornhub's suggested video and search algorithms would then direct users to similar content.    With each click the search was refined further and further.    In just a few clicks, and in just a few minutes, users (and investigators and journalists) could find seemingly unlimited pages and videos depicting violent rapes, date and drugged rapes, child sexual assault or exploitation, coerced or trafficked subjects, secret and stolen recordings, or any other form of nonconsensual conduct.

110.   For example, when a user searched for "teen sex," MindGeek would present the most popular video results associated with that term, suggest playlists, and suggest searches with a host of other more detailed terms used by others for similar content, like "barely legal teen sex," "young teen sex," "middle school teen sex," etc.   Titles, descriptions, tags and comments with these videos and suggested by MindGeek were blunt, including: "CP" (i.e., child porn), "teen," "young teen," "barely legal," "super-young teen," "old/young," "young," "exploited teen," "crying teen," "little," "xxxtra small," "drunk girl," "drugged girl," and "passed out." MindGeek knew from its SEO that many of these were among the most popular searches and included substantial content that was patently nonconsensual with little of the rest discernibly consensual.

111.   By way of example only, in just minutes of basic searches, users, and certainly those working fulltime optimizing MindGeek's SEO, would easily be directed to troves of:

   a.   homemade videos of adult males having sex with apparently or obviously underage girls with titles such as, "Young Teen Gets Pounded," "Old Man with young teen," "Young girl tricked," "Petite Thai Teen," "A Club Where You Can Play With Little Girls And It's So Fun," "Bratty Little Girl," "Giant guys f***ing with no mercy this little whore while she's crying" (asterisks added);

   b.   homemade movies of young boys being raped with titles and tags such as "Barely legal step-son well used after school in uniform," "Young hairless twink gets slapped," "Daddy f***s young teen boy virgin first time" (asterisks added), "Daddy came home frustrated and abused boy to crying";

   c.   drunk, drugged or otherwise incapacitated women, often clearly underage, being assaulted with titles and tags such as "Drunk,"

"Passed out teen," "Passed out sex," "Drunk and Passed Out Porn," "Passed out teen f***ed" (asterisks added), "Teen Totally Drunk Passed Out Sex Video Free," "Passed Out Naked Teens," "Tinder Girl Passed out at my House so I stuck it in her ass," "Mexican Teen She's to Drunk After Party Real Home Made!," "Drunk girl let's me dominate her," "Cute Amateur Teen Drunk And Stoned In Ecstasy With Her First BBC On Drugs," "F***ed sister hard in the ass while she was drunk and sleeping" (asterisks added), "Drunk girl gets handcuffed and abused," "Teen gets drunk and gangbanged";

    d.    non-professional secret recordings, often of obviously underage women, such as Asian high school students in a bathroom with a hidden camera with the title, "Stolen Teen's secret peeing scenes";

    e.    stolen underage pornographic videos with titles and tags such as, "Amateur sextape stolen from teen girl[']s computer";

    f.    videos with extreme hate and racist themes such as "Black slave girl brutalized" with comments including "yes f*** that n*****" (asterisks added) and "love seeing this little petite black whore tied up like she belongs taking it in her black ass," "Busty African Slave Gets Pounded," "African Busty sluts get tortured by white master," "You should get your own black slave," " Black slave girl pleasures white master and call herself 'N***** whore" (asterisks added) and "Black slave Girls Made to Eat White Girl Asshole" or anti-Semitic Nazi themed content.

112.    Likewise, searches for "Pnp," "meth," "homeless," "crack whores," "meth whores," and other similar terms turned up countless videos of women who were plainly incapacitated or having a debilitating drug addiction being exploited by

1  pimps and johns.

2      113.   Further, MindGeek's algorithmic suggestions and playlists would direct

3  users searching "Asian" to a cache of sadistic abuse videos.   Among these caches

4  were a category in which apparently underage Asian women were being suffocated

5  in plastic bags attached to a vacuum packing machine.   The women were thrashing

6  and screaming.   They were not performing.   The videos were amateur, poor quality,

7  and had zero indicia of consent.

8      114.   In one such video, an apparently underage Asian women was dragged

9  onto a dirty balcony and submerged in a plastic tub of ice water.   Her assailants were

10  violently grabbing her hair and used their boots to force her head under the water.

11  They restrained her and sprayed her face from a hose when she tried to breathe.

12  There was no indication of consent, only assault: the young woman shook, shivered,

13  wept, gasped, and pleaded.   She was not performing.   When the men finally

14  removed her from the tub, they continued to dose the collapsed, shivering woman

15  with the hose before all urinating on her shaking body.

16      115.   Abuse videos were also common in MindGeek's partner channels in

17  which it shared revenues with the uploader.   For example, one of MindGeek's

18  official ModelHub partner accounts called PornForce, from which MindGeek

19  received a cut of all revenue, had videos of obvious victims being exploited.   One of

20  those videos, titled "Thai street teen" with the description "f***ed and facialized for

21  $5" (asterisks added), showed a homeless and disabled Thai teen being penetrated

22  and filmed "for $5."   In the comments a viewer asked, "is she deaf," and PornForce

23  responded, "yes."

24      116.   Another ModelHub account was comprised of a man exploiting

25  homeless teens in New Jersey in commercial sex acts.   The victims of this

26  exploitation were anally assaulted while crying and pleading for the abuse to stop.

27  MindGeek's suggested video and search algorithm would direct viewers of these

28  videos to similar videos and suggested search terms such as "abused teen," "crying

teen," "exploited black teens," "homeless teen," and the like.

117.   The same abuse occurred on Pornhub Gay.   A simple search for "daddy and son" produced oceans of unprofessionally produced videos of patently underage or young looking boys with the titles saying "REAL Father Son" and other videos of distressed young hairless boys being penetrated by older men.   Other cases of child pornography involved underage boys videotaping themselves in sex acts, with video titles like "13 yr old boy" and "14yr old."

118.   Like many videos on Pornhub, these abuse videos all were typically introduced with Pornhub or other advertisements before playing and always were surrounded by other ads for which Pornhub was paid for its own products and websites.   Some of these videos had millions of views alone.   The "categories" collectively had many millions more, evidencing the significant contribution unrestricted access to nonconsensual content was to MindGeek's business model.

119.   MindGeek's SEO was so sophisticated, that it could tell advertisers what kind of content categories were most likely to engage with its ads.

120.   In addition, in order to further amplify its SEO, MindGeek allowed users to download such content so they could reupload curated playlists of such nonconsensual content on MindGeek's websites and other third-party websites with links MindGeek provided back to its sites.   In this way, MindGeek effectively deputized users as optimizers and advertisers, and each such transfer violated 18 U.S.C. § 2257.

121.   All this optimization involved more than merely allowing content to be uploaded.   Rather, it involved the curating, editing, and formulating of how the content was substantively described, presented and optimized for searching and viewing.   The fact that MindGeek proactively avoided using its technology to exclude such content and instead used it to optimize it demonstrates its knowing intent.

### 4.    MindGeek Produced Nonconsensual Content.

122.   In its earlier years when MindGeek was attempting to rapidly reach content scale, it manufactured fictional purported "user" content for its tubesites that was actually produced by human traffickers that MindGeek itself commissioned or from whom it otherwise agreed to purchase.   It did this to increase its content and SEO exponentially faster than it could have through genuine user uploaded content alone.   It also allowed it to secure tailored content that its SEO analysis identified as high performers.   MindGeek used different variations to secure such content.   As set forth below, these efforts were directed and implemented by the founders of Colbeck Capital Jason Beckman and Jason Colodne.

123.   First, monies necessary to pay for the production, middlemen, and uploading of the content were transferred from different foreign subsidiaries to agents/middlemen without any paper trail as to what the payments were for.   Those agents/middlemen would handle all interactions with producers in Eastern Europe and Asia who offered the best quality for the cheapest prices.   This was dramatically cheaper than what such productions would cost in the United States, and MindGeek understood it was because the content was the product of trafficking.   The finished content would then be transferred to the agent, who then transferred it to shell companies or MindGeek partner channels who would do the formatting in exchange for favorable terms or monies disguised as partner channel payouts.   MindGeek was fastidious about avoiding any contact in the process with certain jurisdictions like the United States, Germany, or the United Kingdom, which were viewed as the most rigorous in enforcing laws against trafficking.

124.   Insiders familiar with this elaborate scheme left no doubt that MindGeek understood this was trafficked content: "100% they knowingly paid real pimps. They would discuss how this cheap content was coming from old school pimps. They found it exciting.   They would explain, 'we don't need to pay studios in the US, low paid pimps come to us.'"

125.   Once formatted, the content would be uploaded by these entities and/or

1  a network of agents who were paid to create user identities and upload content.

2  Sometimes such content would be uploaded by MindGeek directly, either in Canada

3  or Cyprus.   Once uploaded, the content would be analyzed for its SEO effectiveness,

4  ad impressions, and conversions, and the content as well as the formatting refined to

5  maximize SEO.   Then additional orders would be placed using the conclusions from

6  that analysis.

7         126.   One insider described the process this way:

8              MindGeek owns studios and works with studios.   These

9              studios produce high quality porn at high cost.   MindGeek

10             determined that high quality porn doesn't convert well on

11             tubesites.   Most people want to see the girl next door and

12             videos that seem more realistic.   To get this content they

13             run networks of advisors who run agencies that acquire

14             porn and cam videos from high trafficking areas like Czech

15             Republic and sell in bulk to MindGeek entities all over the

16             world or license companies that all actively feed the videos

17             into the tube sites as user uploads.   Actively feeding

18             content on the sites to make sure it does not touch North

19             America, Germany, or the United Kingdom.   It is clear to

20             anyone in this industry that stuff out of eastern Europe is

21             from trafficking.   People within the company knew there

22             were real pimps running these agencies and MindGeek

23             knew it.   It was actively communicated among

24             management especially in Cyprus who were the ones

25             working to get stuff through it.   'We don't care,' was their

26             attitude. . . .   MG affiliates will contract with a local agent.

27             Local agent interfaces with the production companies.

28             Agent gets it and sell it to MindGeek in bulk to their

1    affiliates.   No employee can talk of these studios.   Then

2    they create identities and upload it through Cyprus and

3    Canada.   They avoided UK and Germany.   The content

4    couldn't touch the UK or Germany offices because

5    enforcement and investigation risk was too much.   There

6    were other means of bulk uploading.   If huge partners have

7    big studio that is part of MindGeek group.   You could give

8    it to them and they upload it and they get better treatment

9    and terms and share the revenue.   MindGeek pays for it

10   but steer business through agents and pay huge amounts to

11   launder the money and uploading.   So you can't see it

12   went to MindGeek or that it uploaded it.

13   127.   In addition to the general awareness that content from these regions was

14   the product of extensive trafficking operations, MindGeek was aware the content was

15   trafficked because it met with the producers and visited some of their production

16   sites.   In one such visit, MindGeek executives witnessed a football-field size

17   warehouse in which women were crammed into adjoining studio stalls "like

18   livestock" to perform on camera.   Many of the women appeared young and were

19   engaged in scenes depicting underage girls.

20   128.   When asked by the producer where the women came from and lived, the

21   producer unapologetically explained that his company had agents that scoured

22   Eastern Europe for women who they recruited with promises of lucrative modelling

23   jobs that would allow them to go to college and otherwise have a better life.   When

24   those women agreed, they were transported to dormitory style housing or apartments

25   and matched with a "boyfriend" who would groom them for porn.

26   129.   Women who were victimized by this trafficking network reported that

27   when they tried to leave, they were informed that their cam sessions had been

28   recorded and if they did not continue performing, the trafficker would send copies to

their families and otherwise release them publicly and destroy their reputation and future.

130. Similarly, MindGeek allowed its platform to be used for prostitution. Like now defunct online marketplace BackPage (which was indicted along with its founders and seized by federal authorities), and Craigslist's now defunct "personal" pages, MindGeek knowingly permitted its platform to be used to facilitate trafficked prostitution. The website is awash in third-party advertisements for "Craigslist," "Backpage," and other previously known sites where prostitution could be solicited from trafficked women.

131. MindGeek repeatedly deflected concerns raised internally by finance people who were alerted when they realized MindGeek was paying numerous ostensibly independent cam models through a single account. This was a trafficking red flag, but MindGeek executives informed finance to ignore the red flags and continue payments because "they knew the people behind the account and it was ok."

132. In addition, MindGeek allowed its private premium accounts on Pornhub to be used as a secret marketplace to distribute illicit content, particularly CSAM/child pornography, for a fee, sometimes directly on the platform, sometimes through links to an external CSAM cache exchanged privately through the accounts. This trafficking included minors posting child pornography of themselves at the direction of predators and pimps. The content, while private to other unsubscribed users, was visible to MindGeek, part of its SEO analysis, and included in Google and other search engine search result calculations and thus embraced and allowed to remain.

133. This pervasive incorporation of multiple streams of illegal content and revenue was not accidental, but a knowing and intentional business decision. MindGeek embraced illegal content precisely because that content would significantly enhance its SEO, traffic, ad impressions, and customer conversions. Its legality or consequences were irrelevant, as an insider explained:

1    They focus on how much money I can make today.   Right?

2    So they take risk because today it's going to give you a

3    dollar.   If you have to change your practices next month,

4    well we'll get there.   But right now this is making more

5    money.   Right, that's the type of mentality that makes you

6    take those decisions.   What's going to help me make more

7    money. . . .   100% they are all about the money, not safety

8    . . . .   they just see numbers, let's be honest.

9   **C.    MindGeek's Failure to Address or Mitigate the Existence of Illegal**

10   **Content on its Sites.**

11   134.   MindGeek's intent to pursue an unrestricted business model is further

12 evidenced by its failure to take a single step to address or mitigate the tsunami of

13 illegal content on its sites in response to the decade of public reporting revealing that

14 its sites were awash with child sexual abuse material and nonconsensual content.

15 MindGeek closely monitored such reports as part of their robust marketing and brand

16 awareness activities, their relationship management with lenders and payment

17 processors, and their concern that their false claims about a robust moderating

18 function and their actual unrestricted content model would be revealed.

19   135.   For example, in the mid-2010s, multiple UK news outlets repeatedly

20 reported on the problem of children accessing and uploading videos of themselves to

21 Pornhub, often at the direction of an abuser.    In March 2015, the *Daily Mail*

22 claimed that according to research from the National Society for the Prevention of

23 Cruelty to Children (NSPCC), ten percent of children had "made or been part of

24 sexually explicit videos."

25   136.   In 2012, it was widely reported that Taiwanese playboy Justin Lee was

26 arrested for date raping dozens of women, some minors, and posting videos of those

27 rapes to Pornhub.    Although Lee's arrest, conviction, and criminal conduct,

28 including his uploading of the rape videos to Pornhub, were highly publicized

worldwide, MindGeek kept those rape videos on its site and optimized them for years thereafter.    While the videos were subsequently disabled, MindGeek continued to use them to ensure search engines would still direct searches concerning Lee to Pornhub, including search engines directing the users to similar content categories like "celebrity sex tapes."

137.   In 2013, it was widely reported that a German model was raped, and the video of her assault was uploaded to Pornhub.    The video remained on Pornhub and was optimized until June 10, 2016, at which point it had been viewed over 1 million times.

138.   In October 2014, a Slate essay quoted a MindGeek employee who explained, that "[i]f you're interested in the 'Content Formatter' job, just be aware you're basically a glorified child porn screener, and you will be watching disgusting videos all day."

139.   On October 16, 2014, Detroit Free Press reported that a Florida man began cyberstalking a 13-year-old girl in Michigan, coerced her into sending him naked photographs, and posted those on Pornhub where the photos remained and were optimized for over 5 years with thousands of user comments, many users noting that the subject was obviously underage.

140.   In 2014, a Reddit user posted that she had been raped and a video of the rape had been uploaded to Pornhub.

141.   On August 20, 2015, the Columbus Dispatch reported that a local man had been arrested after creating child pornography of several minors and uploading it to Pornhub.

142.   In October 2015, multiple news outlets reported that rapper Eric D. Chavis was arrested and charged with rape and creating child pornography for regularly raping and videotaping minor girls and posting the videos to Pornhub and that MindGeek paid him $10,000 and 60% of the revenue earned on his child rape collection as part of its revenue-sharing content partner program.

143.   In October 2015, Pornhub publicized a purported process to make it easier to take down revenge porn, but multiple news outlets noted that the process did not work, which MindGeek knew because the process was merely part of its ongoing effort to conceal its unrestricted content model.   Publication the Verge called this out, quoting law professor Mary Ann Franks, who said that "[i]f Pornhub or any other site or platform featuring adult content really wants to launch a 'preemptive strike' ... against nonconsensual pornography, they should be focusing on truly preemptive measures, not after-the-fact procedures."

144.   Likewise, in October 2015, Splinter News reported on the ineffectiveness of Pornhub's recent purported crackdown on revenge porn, "if you search terms like "ex-girlfriend porn" or "revenge porn" on Pornhub, plenty of results still come up" and that it was impossible to determine whether they were consensual or not.

145.   On December 26, 2015, The Sunday Guardian reported that the government of India had filed a lawsuit against Pornhub seeking to ban it in India because of its use of child pornography.

146.   On January 26, 2016, a UK advocate published an essay reporting that there were "endless videos" tagged "domestic violence" and "sexual abuse" on Pornhub that appeared to be, in fact, nonconsensual.   Media reports that month and the next, further reported on the popularity of the Pornhub categories "teen," "humiliation," "abuse," and "rape."

147.   Also in January 2016, the International Business Times published an article titled "Pornhub: If you have ever watched teen porn you could be breaking the law" noting according to Pornhub's own 2015 published statistics, "teen" was their most popular search term and that it was impossible to discern if the individuals appearing in many of these videos were adults.

148.   On March 15, 2016, California media outlets reported on the arrest of a California man for recording sexual acts he had with a minor girl and posting them to

Pornhub.

149.    Througouth 2016, there were numerous media reports concerning arrests, civil judgments, and victim accounts concerning revenge porn or nonsonsensul content being posted to Pornhub.

150.    In 2016 and 2017, there was widespread reporting on multiple nations banning Pornhub because of the widespread presence of child pornography.

151.    In 2016, Pornhub's most popular Content Partners, GirlsDoPorn and its founders were sued by twenty-two women and minors for trafficking since 2009, and the founders were indicted on federal trafficking charges in 2019.    GirlsDoPorn and its website were shut down in 2020 shortly after the indictment and the flight of one of its founders to New Zealand.    Ruben Andre Garcia, one of the traffickers involved in the GirlsDoPorn trafficking operation, was sentenced to twenty years in prison on June 15, 2021.    This human trafficking ring was one of Pornhub's most popular partner channels, with nearly 800,000 subscribers and over six hundred million views, and was heavily promoted by MindGeek.

152.    The channel was so lucrative, and MindGeek so indifferent to monetizing nonconsensual content, that MindGeek kept the channel on its site and collected revenue from it even after learning of the initial civil lawsuit and did nothing to investigate the allegations.    Pornhub continued to host and monetize this trafficked content until the company and its founders were indicted and the website shutdown.    Nevertheless, even after the formal channel was disabled, trafficked GirlsDoPorn content was ubiquitous on MindGeek's tubesites and its internal search engine would regularly direct users to those videos.    As of October 2020, a simple search of "GDP" would result in over 300 videos and images of those victims.

153.    In December 2016, multiple news sources reported that porn actress Nikki Benz had gone on Twitter to publicly accuse Tony T, a director for MindGeek's Brazzers premium brand, of forcing her to participate in a rape scene. Other women porn performers affirmed that they had experienced similarly coercive

and abusive behavior from Brazzers directors.    Buzzfeed's reporting specifically noted that Brazzers is a MindGeek subsidiary.

154.    In February 2017, the Jamaican press reported on the presence of child pornography in the thousands of videos on Pornhub's "Jamaican School Girls" channel and the plans of Jamaican prosecutors to bring prosecutions under its child pornography laws.

155.    In March 2017, Mashable.com reported that nude photographs of female marines and other women were uploaded to Pornhub without the women's consent and the women were doxed as well, and the Louisiana media also reported on the arrest of a man for posting revenge porn on Pornhub.

156.    In April 2017, Pennsylvania media outlets reported on the arrest of an individual on child pornography charges who created a Pornhub account for the purpose of acquiring and distributing such content.

157.    In May 2017, Florida media reported that a Pensacola man raped a female minor and posted photographs to Pornhub.

158.    In October 2017, Wisconsin media reported on the nonconsensual video recording of women in changing room that were posted to Pornhub.

159.    In late 2017, there was public reporting documenting "[t]he hatred of women" and misogynistic violence on Pornhub.    One video was described as follows: "This is a homemade video taken on a mobile.    The female does not appear to be enjoying this and is protesting verbally and with her body language.    The male pulls the string from the stool that supports her weight and then dives and holds her body up to prevent anything life threatening.    He does this a few times.    This is real footage of a woman being hanged for the male's sexual arousal and uploaded onto Pornhub for other men's misogynistic and sexual gratification."

160.    In December 2017, the Coalition Against Trafficking in Women, the National Organization for Women, and Gloria Steinem held a press conference concerning Pornhub and its active promotion of "racism, incest, sexual violence, and

rape," the fact "Pornhub sells the idea of sexual abuse of children," "sexual violence against woman," and the "degradation" of women, and included statements from victims reporting on pimps and traffickers recording rapes and posting them to the website.

161.    Follow-up publications from the Coalition Against Trafficking in Women (CATW) further accused Pornhub of "normalizing violence against women and sexual abuse of children" with, among other things, categories of "barely legal" content allowing "Pornhub visitors [to] watch middle-aged men penetrating 'actresses' resembling barely pubescent girls in pigtails and school uniforms," content described as "'Picking up a Schoolgirl for a Quick Drive Home,' . . . 'Hot Innocent Teen Gives Grandpa a Blowjob,'" and sex trafficking.

162.    In 2018, MindGeek porn performer Asa Akira its exclusive "Brand Ambassador" promoted sex with 13 year-olds and disdain for the laws protecting minors and for "snitches" who dare object to such abuse:

>This 13-year-old? . . . if I were single and we were sitting in the jacuzzi and he was like, "Hey, you know, like, I've never f***ed a girl. (Asterisks added) Do you want to?" I think I'd say yes.   No, that definitely... no one, no one would consider that rape . . . except maybe his mom. . . . And that's only if she's, like, a total bitch. . . . Yeah . . . and the law. Whatever. . . . Who's gonna tell? No snitching. Snitches get stitches.... . . . I think there are 13- year-old girls out there that might be ready to be f***ing, but not that many. (Asterisks added). Like, 15, yeah. There's- . . . quite a few that are ready. . . .I would not finger this 13-year-old's asshole

163.    These were not the only such comments Akira publicly made before MindGeek made her its exclusive brand ambassador.   By way of example only,

before she was hired as MindGeek's Brand Ambassador Akira had made the
following widely publicized comments celebrating rape, pedophilia, incest, and anti-
Semitism: (a) "Is GHB the rape drug.    Asking for a friend" (9/8/2011); (b) "it's not
really rape unless its anal rape, right? . . . "what the f*** is marital rape you can't
rape the willing . . . Shoutout to my pedophiles" (9/27/2011) (asterisks added); (c) "If
loving Japanese rape porn is wrong, then I don't want to be right" (1/29/2011);
(d) "Also, I'm pretty proud of myself for making it this far in life without having to
register as a sex offender" (2/29/12); (e) "It only hurts if you resist" (1/23/13);
(f) "Gay incest should be legal" (12/9/14); (g) "adulthood is knowing the difference
between good rape and bad rape" (10/31/13); (h) "Why not f*** a jew for Hitler's
birthday" (4/20/15) (asterisks added); and (i) "not one but TWO sightings of Hassidis
Jews today" (11/28/09).

164.    In February 2018, a Pornhub user repeatedly flagged child pornography
being uploaded repeatedly to Pornhub's gay content categories.    One of those users
told MindGeek, "[p]lease remove all pictures in the gay category starting with
[XXXX] in the title.    They contain underage children.    Some of whom look 7 or 8
years old.    Its disgusting that this has slipped through, two nights in a row.    Does
this material get screened.    I'll be checking to see if the content has been removed."
Again, MindGeek permitted this illegal content to be repeatedly uploaded and
transferred to its other tubesites despite its obviously illegal nature and despite being
explicitly being flagged by users.

165.    In March 2018, news outlets reported on an American in Taiwan who
"has been secretly filming one-night-stands with Taiwanese women and posting
them on a porn website for profit…On the adult video website Pornhub, Schulte has
an account titled TravelPorn with over 3,000 subscribers and 800,000 views, which
contains videos of at least 36 Asian women performing sexual acts with him."

166.    In October 2018, the media reported on the arrest of a Palo Alto woman
who posted videos on Pornhub showing her having sex with an underage 14-year old

1   female relative.

2   167.   In the fall of 2019, the Internet Watch Foundation, the United

3   Kingdom's private internet watchdog for child pornography, reported to the Sunday

4   Times that it had been notified of 118 instances of child pornography on Pornhub by

5   the public over the prior 2.5 years, increasing each year.   Half of that child

6   pornography was Category A, the worst kind of abuse involving penetration and/or

7   sadism.   MindGeek permitted the upload of this child pornography and transferred

8   it to its other tubesites and never reported it the authorities as it was required to do in

9   the United States and other jurisdictions where its servers are located.   That child

10   pornography remains on MindGeek's servers to this day.

11   168.   The Sunday Times published an investigation in 2019 confirming that

12   Pornhub was "flooded" with illegal content that it failed to remove even after the

13   paper had notified it of that illegal content:

14          the world's most popular porn website [Pornhub] is flooded

15          with illegal content . . . . Pornhub is awash with secretly

16          filmed "creepshots" of schoolgirls and clips of men

17          performing sex acts in front of teenagers on buses.   It has

18          also hosted indecent images of children as young as three. .

19          . . The website says it bans content showing under-18s and

20          removes it swiftly. But some of the videos identified by this

21          newspaper's investigation had 350,000 views and had been

22          on the platform for more than three years. Three of the

23          worst clips that were flagged to Pornhub still remained on

24          the site 24 hours later. . . . The Sunday Times found dozens

25          of examples of illegal material on the website within

26          minutes. It followed research by the campaign group

27          #NotYourPorn, which identified revenge porn videos and

28          clips filmed by secret cameras. . . . One account, called

52                          CASE NO. 2:21-cv-4920

"Candid teen asses," is devoted to posting covertly filmed
"creepshots" showing UK girls in school uniform. Another
features clips of a man performing sex acts among young
concertgoers, rubbing up against them in a crowded music
venue. . . . While Pornhub has blocked users from
searching terms such as "underage" and "child porn,"
synonyms including "jailbait," "very young girl" and
"lolita" can still be used to find content. . . .

169.    Also, in 2019, PayPal terminated its relationship with MindGeek
because of the presence of illegal content on MindGeek's websites.

170.    These individual examples of the frequent public reporting of individual
nonconsensual content on MindGeek's websites were merely indications of the
knowing and intended consequences of it its unrestricted content model.    Among
those consequences included hundreds of videos of child pornography uploaded and
present on its websites from 2013-20, including from video chat service Stickam,
which was a notorious child pornography exchange that was shut down in 2014 as
part of one of the largest internet child pornography prosecutions in history,
involving the sextortion of over 350 minors via the video chat service.    Despite the
highly publicized investigation and conviction, for years, those child pornographic
videos and compilations of those videos were ubiquitously uploaded by MindGeek
users and optimized and transferred by MindGeek to its other tubesites and to users
downloading the videos.

171.    Similarly, from 2013-2017, New York resident Nicole Addimando's
husband physically abused and raped her, and subjected her to sodomy with objects,
vaginal torture with heated spoons, and being left for extended periods of time and in
degrading and painful positions.    These assaults were videotaped and posted to
Pornhub.    Pornhub not only permitted those uploads, it optimized and transferred
those videos to its other tubesites.    Even after Addimando's abuse and Pornhub

uploads became highly publicized, videos of the assaults remained on MindGeek's tubesites and were uploaded, downloaded, optimized, and transferred by MindGeek numerous times.   Those videos remained on MindGeek's tubesites as late as 2019 and remain on its servers even after having been disabled for optimization purposes. To this day, a search engine inquiry of "Nicole Addimando Sex Tape" will result in the top two search results being to Pornhub with the result stating: "Nicole Addimando" and "Watch Nicole Addimando porn videos for free, here on Pornhub.com.   No other sex tube is more popular and features more Nicole Addimando scenes than Pornhub!"

172.   Likewise, from 2014-2015, 49-year-old Dawn Giannini sexually abused a 14-year-old relative, recorded the abuse, and posted those recordings on Pornhub. MindGeek not only permitted the obviously underage assault and child pornography to be uploaded to Pornhub, it transferred those videos to its other tubesites.   The videos were viewed by the victim's friends at school, one of whom ultimately alerted the authorities leading to Giannini's arrest in 2018.   Those videos were still present on MindGeek sites as late as 2019 and remain on its servers for optimization purposes.   To this date, a search of "Giannini sex tape" on Yahoo produces a Pornhub search result listed third, for "Dawn Giannini Porn Videos" and the message "Watch Dawn Giannini porn videos for free, here on Pornhub.com. . . . No other sex tube is more popular and features more Dawn Giannini scenes than Pornhub!.

173.   MindGeek was aware in real time of these reports, many of which were accompanied by inquiries from the media, law enforcement, advocacy groups, victims, government agencies, the press, and website users.   Nevertheless, MindGeek knowingly and intentionally decided to continue capturing illegal content, optimizing it, and using it as part of its product offering.

## D.   MindGeek's Active Concealment

174.   MindGeek's knowledge and intent is also demonstrated by the aggressive and sustained disinformation campaign they directed and sustained in

1 response to the public reports that revealed MindGeek's lack of any genuine

2 moderation and active monetization of child pornography and other nonconsensual

3 content.

4      175. For example, in response to The Sunday Times' 2019 reporting that

5 Pornhub was "flooded" with illegal content that it failed to remove even after the

6 paper had notified it of that illegal content, MindGeek disseminated blatantly false

7 denials from a fictious spokesman who does not exist, but who was, in fact,

8 MindGeek VP Corey Urman.   As the Sunday Times reported,

9           Pornhub said it had a 'robust internal policy' for removing

10           offending material, including 'expertly-trained human

11           reviewers' and 'scanning content to determine whether it is

12           consensual.'   Blake White, its vice president, said child

13           sexual abuse made up a tiny proportion of content and the

14           aim was to eradicate it.   'It is important to note that

15           oftentimes videos described as 'hidden camera footage' or

16           'young teen' are in fact legal, consensual videos that are

17           produced to cater to various user fantasies,' he said.

18           'They are in fact protected by various freedom of speech

19           laws.   Certain words are banned from being used in titles

20           and tags, and we will be doing a thorough audit of our

21           websites to update and expand this list.

22      176. Urman's statement was a lie.   MindGeek had no real moderation

23 function and did not scan videos before they were uploaded.   Instead, despite being

24 fully aware of all these and many more other reports of CSAM and other

25 nonconsensual content on its websites, MindGeek did nothing to alter its unrestricted

26 content model but instead continued to intentionally monetize such content while

27 publicly misrepresenting its practices in response to reports otherwise.

28      177. Indeed, even months after this reporting, on or about March 10, 2020,

1  four videos of child pornography were uploaded to Pornhub depicting men abusing a

2  toddler in diapers and a pre-pubescent child bound and being raped anally while

3  crying for the abuser to stop.　At the time, Pornhub publicly admitted that these

4  videos had been uploaded on its site, but misrepresented that they had been removed,

5  "fingerprinted" so they could not be reuploaded, and reported to NCMEC.

6      178.　Because MindGeek's response was not true, two months later two of the

7  videos were reuploaded to Pornhub by two separate Pornhub accounts, received

8  thousands of views, and were the subject of takedown requests to Pornhub.

9  Pornhub, however, refused to remove the videos for over ten days, during which time

10  they were viewed tens of thousands of times, and only did so when the FBI became

11  involved, reported it to NCMEC, and NCMEC instructed Pornhub to disable the

12  video.　Although Pornhub disabled the video, it left the video page, title, tags, and

13  user on its site, did not cancel and remove the uploading accounts or review those

14  accounts for the offending videos or other offending videos.　Indeed, to this day, if

15  one googles the title or user, Pornhub remains the number one search result.

16  Although the video is not available, Pornhub directs you to similar content identified

17  by its algorithm.　As with all important undertakings, MindGeek's response to this

18  incident was directed by its CEO and COO Antoon and Tassillo in consultation with

19  its ▓▓▓▓▓▓▓ Bergmair.

20      179.　Similarly, in late 2019, it was widely reported that a "verified" member

21  of Pornhub's model program was actually a trafficked 15-year-old girl who had been

22  missing for approximately a year.　MindGeek allowed the uploading of fifty-eight

23  videos of this child being raped to its "verified" model channel and transferred those

24  videos to its other tubesites.　MindGeek never reported this child pornography to

25  NCMEC or Canada's CP3 as it was legally required to do.

26      180.　Once again, MindGeek's response to these reports was to disavow any

27  responsibility or knowledge, here claiming that the child had been "verified" as an

28  adult with "valid ID": " @luxliv3s Hey Lux, she is a verified model with valid ID."

181.   This, however, also was a lie.   MindGeek knew that it had never verified the age of the 15-year old missing girl (which was impossible), but elected to permit the upload anyway to use the videos as advertising for traffic and to profit from advertising impressions from these videos and other videos viewed by those who it drew to the website.

182.   MindGeek's entrenched commitment to using illegal content to fuel its business is perhaps best captured by its response to the viral internet campaign in 2019-20 exposing its practices and the late 2020 bombshell *New York Times* expose confirming those claims.   MindGeek's response to the viral campaign was not to change its practices, but to continue lying about those practices while attacking victims and advocates in an aggressive PR campaign to defame and discredit them.

183.   This major undertaking of existential strategic importance was discussed and directed by Bergmair, Antoon, and Tassillo and led by MindGeek vice-president Corey Urman and New York public relations and social media firm 5wPR.   Urman and 5wPR regularly speak on behalf of MindGeek using false identities misrepresented as MindGeek spokespeople because they know their statements are lies.   These identities include Ian Andrews, Mike Williams, Chris Jackson, Brett Hall, Dusty Gitalto, and Corey Price.

184.   On February 9, 2020, advocate Laila Mickelwait published an op-ed in the Washington Times about Pornhub to make the public aware that the site was infested with easily located child pornography and other nonconsensual content because it had no meaningful moderation process and was intentionally monetizing

such illegal content.    Thereafter, Mickelwait launched a Change.org campaign to shut down what the campaign branded as "Trafficking Hub" and titled "Shut Down Pornhub and Hold Its Executives Accountable for Aiding Trafficking." Mickelwait's "Traffickinghub" Campaign went viral.

185.    After years of acting with impunity, Pornhub's initial response was muted.    Indeed, it did not even deny the Op-Ed's claims, instead only stressing that MindGeek was a technology company registered in Luxembourg for tax purposes. The Washington Times Op-Ed editor noted the response "speaks volumes" about the accuracy of the petition's claims.

186.    However, as the Traffickinghub Campaign continued its viral momentum, MindGeek unleashed an aggressive gaslighting campaign to preserve its unrestricted content model by smearing, discrediting, and intimidating advocates and victims who dared to speak out.

187.    This campaign began with MindGeek's CEO and COO misrepresenting to employees that the public claims were "lies" spread by people seeking to destroy the porn industry for "religious reasons."

188.    MindGeek and 5wPR also engaged an extensive network of social media agents, influencers, and amplifiers to spread the same disinformation.    On or about February 25, 2020, Corey Urman, falsely posing under the alias Blake White, misrepresented that MindGeek had "a steadfast commitment to eradicating and fighting any and all illegal content on the internet, including non-consensual content and child sexual abuse material," was and continued to be committed to ensuring nonconsensual content, that nonconsensual content was not part of its product and that claims otherwise were "factually wrong" and "intentionally misleading" lies:

> Pornhub has a steadfast commitment to eradicating and
> fighting any and all illegal content on the internet,
> including non-consensual content and child sexual abuse
> material.    Any suggestion otherwise is categorically and

1    factually inaccurate. . . . Pornhub is actively working to put

2    in place state-of-the-art, comprehensive safeguards on its

3    platform to combat this material.    These actions include a

4    robust system for flagging, reviewing and removing all

5    illegal material, employing an extensive team of human

6    moderators dedicated to manually reviewing all uploads to

7    the site, and using a variety of digital fingerprinting

8    solutions.    We use automated detection technologies such

9    as YouTube's CSAI Match and Microsoft's PhotoDNA as

10   added layers of protection to keep unauthorized content off

11   the site.    We also use Vobile, a state-of-the-art

12   fingerprinting software that scans any new uploads for

13   potential matches to unauthorized materials to protect

14   against banned video being re-uploading.    We are actively

15   working on expanding our safety measures and adding new

16   features and products to the platform to this end, as they

17   become available.    Furthermore, Pornhub will continue to

18   work with law enforcement efforts and child protection

19   non-profits in the goal of eliminating any and all illegal

20   content across the internet.    The petition is not only

21   factually wrong and intentionally misleading, it was created

22   and is promoted by a radical rightwing fundamentalist

23   group in the United States – a group who's founders have

24   long vilified and attacked LGBTQ communities and

25   women's rights groups, aligned themselves with hate

26   groups, and espoused extremist and despicable language.

27   https://www.dailydot.com/irl/petition-pornhub-shut-down-sex-trafficking/

28        189.   These claims were gross misrepresentations.    There was no such

commitment to avoiding non-consensual content; it was embraced.    MindGeek had no effective way to moderate content either by technology or human moderation.    It had never made any real effort to develop such capabilities, and its CEO admitted internally to another employee by email that MindGeek's policies "do not appear to match our practices."    It did not work with law enforcement or report suspected CSAM as required under federal law, and Antoon knew it had repeatedly ignored takedown requests from authorities.    And Laila Mickelwait was not a bigot, anti-LGBTQ or women's rights, or misleading, let alone, intentionally misleading.

190.    Over the course of the next year, MindGeek's press relations and social media organization would continue to aggressively disseminate this gross disinformation. This effort included surreptitiously "vandaliz[ing]" the Wikipedia page for advocates by loading them with this disinformation.    Their efforts were so blatant and extensive, Wikipedia put a disclaimer on the target's page.

191.    A centerpiece of this disinformation campaign included "ghost bloggers" and other undisclosed operatives publishing scripts provided by MindGeek and 5wPR as "independent" work.    That placed content by MindGeek would then be amplified by its social media network, captive reporters, and 5wPR.

192.    One such operative using the social media moniker "EyeDeco" began attacking and doxing advocates and victims.    EyeDeco's real identity is a female living in Montreal known to Plaintiff with the initials GS.

193.    On March 1, 2020, she began disseminating MindGeek's gaslighting narrative misrepresenting that it only operated legally and with consensual content and that those publicly claiming otherwise were lying to enrich themselves.    She indicated that her audience would discover this if they "#FollowtheMoney," which was a message and meme she would continue promoting for months.

194.    She also began publicly doxing and releasing personal information about those who dared speak up against MindGeek and their extended families. This personal information was researched and provided to GS by Urman and 5wPR.

As part of this intimidation campaign, in June 2020, GS doxed Mickelwait and her extended family by releasing information on the properties that they owned, one of which GS falsely indicated was a brothel.

195.   Shortly thereafter, Mickelwait's extended family members discovered that their bank accounts, messaging apps, and iClouds had been hacked.   Those who committed this illegal intrusion then sent an intimate stolen picture of the spouse of one family member to threaten and intimidate Mickelwait.   Other critics of MindGeek received similar treatment.   For example, senior executives at vocal critic National Center for Sexual Exploitation as well as their siblings had computers, cloud storage, emails, and social media accounts hacked.

196.   GS also directly targeted CSAM victims.   One victim, going by Sofia, shared on a blog her story of being trafficked from the age of 9-15 and having videos of her abuse posted on Pornhub.[2]   In response, GS called her part of a group of "#grifters" who "have hijacked a legitimate issue in order to further their own agenda" of enriching themselves.   GS also used very particular information only MindGeek would have known to falsely claim that the video had been uploaded by "sofia herself" showing she was a "scammer" working for #LailaMickelwait."   More particularly, she published, "I see you created your twitter account rather quickly – as in today.   Your 'friend' #LailaMickelwait must have coached you on how to open a new account.   What timely timing.   As to why you would #lie about this – no doubt Laila knows she does a lot of it re: #Pornhub."

197.   When the sixteen-year-old Sofia defended herself, GS again accused her of lying, actually being "Laila aka Sofia," and accused her again of uploading the video herself as part of a scam:   "Before uploading stories, suggest vetting sources first see above regarding #edit button ONLY being available to #Uploaders Which in this case as per screenshot in your #Article #Story is Sofia herself. #LailaMickelwait

1  #scammers."

2    198.   GS only stopped her assault after a distraught Sofia explained she had

3  the uploaded image "because my assaulter sent me the screenshot himself.   He used

4  it to make me know he could profit of my body I am just a 16 year old why would I

5  lie about this," and then shared the actual text message that accompanied the image,

6  which said, in Spanish, "See told you I could do whatever I wanted with you" "cheap

7  whore" "they don't even have to wear a condom I am gonna tell Desire I found more

8  clients for you."

9

10

11



12

13

14

15

16

17

18

19    199.   Urman and 5wPR made the same knowing misrepresentation about

20  Sophia to the *New York Times* in an effort to persuade it not to publish in 2020.

21    200.   Urman and 5wPR also had GS attack plaintiff Serena Fleites, who was

22  featured in the 2020 *New York Times* expose.   MindGeek fed GS opposition

23  research on Fleites derived from a "scrap" of the young woman's social media

24  accounts to likewise attack Serena as a "#grifter": "Serena seems like she knows and

25  has known for quite some time exactly what she is doing aka #grifting."

26    201.   When the *New York Times* asked MindGeek about GS's targeting of

27  Serena and Sofia, and the coincidence of both MindGeek and GS accusing Sofia of

28  uploading the video herself, MindGeek lied that it had nothing to do with it and GS

began taking down her social media and locked her account.

202.   After GS was compromised, Urman and 5wPR shifted the responsibility of online attacks to Sarah Valmont, a porn writer who had attended graduate school in Montreal, and who freelanced for MindGeek under the false identity, Justine Halley.   Valmont would subsequently get a job with MindGeek.

203.   Valmont began publishing MindGeek messaging to discredit the viral campaign claiming it was "really an effort to exploit[] the pain of real victims in [support of the advocate's] million dollar trafficking hub campaign . . . . Churning out increasingly sensationalist messages and outright falsehood to make it appear as though Pornhub is intentionally acting in bad faith, and is encouraging people to abuse their own platform terms of service by uploading illegal content. . . . Pornhub dos not allow illegal content period.   Pornhub has a robust system in place to moderate content using both cutting edge technology and human moderators."

204.   Valmont went on to claim falsely that Mickelwait was "doctoring screenshots" that she was presenting publicly to prove her claims: "I have evidence that Laila Mickelwait is doctoring screenshots she shares of Pornhub content and is deliberately lying and misrepresenting the platform.   In some legal circles that kind of things is called, 'libel'.   More to come" ((8/29/20), and "I hope Laila gives whoever doctors her screenshots of PH a nice raise, along with plenty of Kleenex." (9/1/20).

205.   MindGeek's more overt network operatives also aggressively prosecuted its gaslighting disinformation campaign with the same false narrative. One of the most aggressive was its exclusive Brand Ambassador Asa Akira.   For example, on July 2, 2020, Akira publicly misrepresented that claims by victims and advocates were false:   "Their claim that Pornhub is profiting off of child porn is FALSE.   Illegal content is (and always has been) strictly prohibited on Pornhub; that included any porn involving anyone underage and any porn involving anyone who is there without consent."   On October 17, 2020, she called such claims

1   "straight-up lies and misinformation."

2        206.   Likewise, throughout 2020, Pornhub's social media director "Pornhub

3   Aria" also misrepresented that MindGeek strictly prohibited illegal content, screened

4   for it, had technology to detect it, `and removed it immediately.   For example, on

5   April 10, 2020, Pornhub's Aria wrote on social media about "misinformation

6   circulating" on social media by advocates and victims who "misrepresent

7   [MindGeek's] policies and procedures":

> First and foremost, illegal content is strictly prohibited on
> Pornhub.   This has always been the case and will always
> be the case and the safety of our users and models is our
> number one priority.   Upon upload, every video and photo
> uploaded to Pornhub is reviewed manually by a large and
> extensive team of moderators looking for illegal content.
> This sets us apart from other platforms like Twitter or You
> Tube as well as other adult sites and allows us to act swiftly
> and promptly for users who violate the terms of service.
> In addition we use automatic detection technologies on
> uploads such as YouTube's CSAI Match and Microsoft
> Photo DNA as added layers of protection.   Finally, we
> also review flags or content removal reports for illegal
> content.   We have a dedicated community that works
> actively to ensure that content adheres to our TOS and
> rapidly flags any they find questionable for
> review/removal.   Any content removal request we receive
> on our content are priorities and expedited faster than any
> other type of support request and acted upon within hours,
> not days.   If we come across CSAM, the videos are
> fingerprinted so they cannot be reuploaded, and the user is

1  banned.   We report the user and the uploads to the

2  National Center for Missing and Exploited Children

3  (NCMEC) who will work with global authorities. . . . All

4  illegal content, in addition to content that breaches our

5  terms of service, is immediately removed as it is detected.

6      207.   Every sentence of this MindGeek statement was a lie.

7      208.   Proof of the lie appeared in the December 2020 *New York Times* expose

8  reporting that the search "Young Asian" tuned up 26,000 videos in addition to

9  thousands more from related suggested searches like "young tiny teen," extra petite

10  teen," "extra small petite teen," "tiny Asian teen," "young girl," and "exploited teen

11  Asia"; there were "many videos on Pornhub that were recordings of assault on

12  unconscious women and girls"; "its business model profits from sex videos starring

13  young people"; users with names like "13yoboyteen" were posting videos; searches

14  such as "Girl with braces" turned up almost 2000 videos while "13yo" generated

15  155,000 videos; videos titles such as "Junior High School Girl After Class" depicting

16  an underage teenager"; and videos of prepubescent girls and other minor girls were

17  easily found that the *New York Times* reported it could not "see how good-faith

18  moderators could approve of these videos."

19      209.   MindGeek's response to this reporting was to refuse to provide an

20  executive for an interview and instead to issue its standard blatantly false mantra:

21  "Pornhub is unequivocally committed to combating child sexual abuse material, and

22  has instituted a comprehensive, industry-leading trust and safety policy to identify

23  and eradicate illegal material from our community" and that claiming otherwise "is

24  irresponsible and flagrantly untrue."

25      210.   However, this time, MindGeek's gaslighting was not sufficient.

26  When Visa and Mastercard responded by quickly confirming the accuracy of the

27  *New York Times* reporting based on their own investigation and suspending their

28  relationship with MindGeek, MindGeek scrambled to save the business by promising

better moderation.    They made numerous public statements about adding substantial

technology, better human moderation, and partnerships with authorities and anti-

trafficking NGOs.    But instead of actually delivering on those promises, they

continued to proactively work to frustrate the effect of such steps so they could

continue to monetize as much unrestricted content as possible.

211.    Among other things, as reflected in one text exchange between

employees, in the scramble to address the fallout while continuing to cover up the

extent of the problem, senior MindGeek executives instructed subordinates not to

forward to them reports on the amount of CSAM present on the websites because

they did not "wnat [sic] to know how much cp we have ignored for the past 5 years?"

212.    MindGeek's continued effort to frustrate its own moderation practices

included limiting the deployment of such technology to its paysites so that it could

tell Visa and Mastercard it had deployed such technology on the sites where they

processed payments, while secretly not using that technology on the tubesites that it

used to attract traffic to its paysites and where there was the greatest risk of

nonconsensual content.    This effort was directed by Antoon in consultation with

Bergmair.

213.    Likewise, although MindGeek claimed it was



214.    In addition, although MindGeek touted its new policy of reviewing

flagged content, it concealed that it was only reviewing content that had been flagged

over 15 times.    Its chief product officer instructed in an email with Antoon and other

senior executives, "I wouldn't mention the threshold of when we manually review a flagged videos being 15+," while another executive responded that the chief product officer's alternative just made 'it[] obvious we are just trying to hide that it's a minimum number of flags" before content was reviewed.   Antoon himself responded that using a percentage indicated that "we want to on purpose profit from popular high viewed video[s]" that were flagged, which, of course, they did and always had.

215.   When employees purportedly tasked with implementing MindGeek's publicly announced policies confronted its chief product officer and chief legal officer to tell them the actual policies were grossly inadequate, and then pressed the issue, the chief legal officer told him to "F*ck off.   It's all good.   Stop" (asterisk added).

216.   MindGeek's disingenuous public claims of a new business model are further belied by the scathing February 2024 report from the Canadian Privacy Committee, which reported that MindGeek had refused to cooperate with its investigation, refused to provide requested information or even an affidavit attesting to the accuracy of the information it had provided, contradicted its own interviewed employees, ignored the agency's recommendations, and instead sued the agency unsuccessfully to prevent it from publicly issuing its findings and recommendations.

217.   Although that lawsuit managed to delay the findings for over a year, when they were issued in February 2024, the findings included that (a) MindGeek's much touted increased human and technological moderation practices remained "inadequate" and had "many deficiencies" that "are wholly inconsistent with an organization taking responsibility" for ensuring all content is consensual; (b) MindGeek still "in the majority of cases [] had no knowledge of evidence as to whether all individuals depicted in the content in question consented" and knew a large portion did not; and (c) MindGeek refused to "take[] the necessary and responsible corrective measures," "commit[] to follow our recommendations," or

1  []propose any meaningful alternative measures to address the contraventions we

2  identified."

3       218.   Instead, it reported that MindGeek "continues to rely on the uploaders

4  for [] consent," allows content to go live without the uploaders satisfying the new,

5  purportedly more robust documentation requirements, and refuses to apply its

6  increased moderation standards and processes to previously uploaded content.   And

7  it found that MindGeek continued to do so despite "overwhelming evidence that this

8  results in the posting of vast amounts of intimate content without consent."

9       219.   It was only after MindGeek lost its lawsuit to prevent these findings

10  from becoming public that it announced in August 2024 it would finally require

11  proof of consent from all persons appearing in uploads although it has still refused to

12  reveal whether this is actually an enforced requirement and whether it applies to its

13  paysites and tubesites.   MindGeek continues to refuse to apply the same moderation

14  standards to previously uploaded content.

15       220.   All of this evidence demonstrates that MindGeek's commercialization

16  of child pornography and other nonconsensual content was not an innocent

17  deficiency but the product of deliberate and knowing choice that it is trying to

18  maintain to this day.

19  **III.    The Financiers And Visa Knowingly And Intentionally Participated In
        The Trafficking Venture**



28



THIRD AMENDED COMPLAINT





CASE NO. 2:21-cv-4920
THIRD AMENDED COMPLAINT





CASE NO. 2:21-cv-4920

THIRD AMENDED COMPLAINT

















CASE NO. 2:21-cv-4920

THIRD AMENDED COMPLAINT







CASE NO. 2:21-cv-4920

THIRD AMENDED COMPLAINT



CASE NO. 2:21-cv-4920

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







CASE NO. 2:21-cv-4920

THIRD AMENDED COMPLAINT



## C.    Visa

286.    As set forth more fully below, since no later than 2014, Visa was aware that MindGeek had neither the means nor the intent to comply with MindGeek's own terms of service or compliance and enforcement standards related to CSAM and other nonconsensual content and that it was operating an unrestricted content model that intentionally incorporated CSAM and other illegal nonconsensual material.   As such, Visa also knew that MindGeek had neither the means nor the intent to comply with Visa's standards and enforcement regime.

287.    As set forth more fully below, despite this knowledge Visa knowingly and intentionally agreed to proactively facilitate MindGeek's commercialization of CSAM and other illegal content through Visa's network and its network banks. Among other examples, this agreement is reflected in the over seven years in which Visa and these network banks knowingly and intentionally suspended Visa's compliance and enforcement standards and procedures for MindGeek and thereby permitted it to operate in a manner and under circumstances that would have resulted in termination of other merchants, including smaller merchants in the online porn industry.

288.    It is further reflected, as set forth below, in Visa's permitting MindGeek to process payments through MindGeek-owned payment processors that could more

easily mask illegal conduct and traffickers, and Visa delegating to these MindGeek owned entities the compliance obligation of monitoring MindGeek (*i.e.,* allowing MindGeek to monitor itself).

289.   It is further reflected, as set forth below, in collaboration between Visa and MindGeek in masking MindGeek's illegal conduct as opposed to enforcing Visa's prohibition on such conduct, which Visa regularly did as a matter of course with other merchants.

290.   And the agreement is reflected, as set forth below, in Visa's repeated public and private misrepresentations that it was ensuring MindGeek complies with the law and Visa's "rigorous" enforcement regime even though it knew this was not true.

291.   Visa permitted MindGeek to operate outside its enforcement regime because it wanted (a) to become the primary payment processor in the booming online porn industry and capture that market's substantial and rapidly increasing flow of payment transactions, especially those of its emerging dominant monopolist, MindGeek; (b) to receive the higher fees Visa and its network banks could charge MindGeek on these transactions that many other competing legacy payment processors refused to process; (c) to ensure MindGeek directed payment transaction volume through Visa's payment network as opposed to alternatives; and (d) to prevent emerging payment processing alternatives like crypto, direct transfers, and digital wallets from using MindGeek and this industry to grow more competitive.

292.   This *quid pro quo* arrangement allowed Visa and its network banks to become the dominant payment processor for MindGeek, processing the majority of its payment transactions.   This was of critical importance to Visa, which ran a non-premium volume business and had placed grabbing market share in transaction volume as one of its highest priorities, particularly in the emerging online marketplace overall and booming adult online industry in particular.   It also facilitated Visa's objective of excluding alternative non-credit card payment methods

in the online market such as electronic transfers and crypto.

293.   The arrangement also allowed Visa and its member banks to charge fees exponentially higher by orders of magnitude than those charged to other merchants. Collectively, these fees were as much as 1000% higher than for most merchants. MindGeek agreed to pay these high fees to have access to the most recognized and accessible payment brand while being able to pursue its unrestricted content model.

**1. Visa's Knowledge**

294.   Visa acquired from several sources intimate knowledge that MindGeek's websites hosted substantial CSAM and other illegal content and that this was intentional and part of its business model and plan to dominate the industry.

295.   First, Visa conducted extensive due diligence into each industry and merchant utilizing or seeking to use its network in order to understand the risk of processing that merchant's payments. From this work, Visa identified the online adult industry as posing the highest risk of illegality, primarily in the form of illegal content and trafficking, and it designated this industry and any merchants in the industry as the highest of risks in its enforcement regime as a result.

296.   Second, Visa's knowledge and awareness grew as its experience in the industry increased.   This knowledge came from (a) public reports about the industry which Visa and its network banks monitored and shared; (b) its network banks' due diligence, direct and third-party monitoring, and reporting to Visa related to active merchants, including MindGeek; (c) merchant mandatory self-reporting; and (d) numerous public and private reports from victims, law enforcement, NGO's and advocates, and other third parties.

297.   Visa's understanding was particularly developed with respect to MindGeek.   As an early and prominent merchant in this industry, MindGeek was among the first merchants initially subjected to Visa's application due diligence and ongoing reporting and monitoring functions.   From these sources, by no later than 2014, Visa was aware before the public or others of MindGeek's unrestricted content

model, untrue claims about its terms of service and compliance, and the widespread presence of CSAM and illegal content on MindGeek's sites.    Specifically, Visa was aware by this time of the following:

298.    MindGeek was operating an unrestricted content model with *no bona fide* moderation or compliance functions and that its stated technology, terms of service, policies, and compliance programs were fake and publicly misrepresented;

299.    CSAM and illegal content was widespread on MindGeek's sites and fully incorporated into its SEO, advertising, and sales business model with CSAM and illegal content being commercialized like any other content and optimized by algorithms which utilized titles, descriptions, tags, and recommendations to service those seeking illegal content in the same manner as other customers;

300.    MindGeek made no effort to comply with the requirements of 18 U.S.C. § 2257, which was enacted decades earlier because it was a known fact that absent basic age verification CSAM/child pornography would infest the pornography business; and

301.    MindGeek's failure to effectively police its sites for, and to instead commercialize, CSAM and other illegal content was intentional and a business decision made with the objective of becoming the dominant monopoly in the booming online adult content industry.

302.    Thus, from no later than the mid-2010's, Visa and its network banks understood that MindGeek neither qualified as a merchant for the Visa network nor would it be able to operate consistent with Visa's merchant agreements and enforcement regime.    In short, if Visa enforced its agreements and compliance regime, it could not do business with MindGeek.

**2. Visa's Intentional Participation**

303.    Despite this knowledge, Visa nevertheless agreed with MindGeek and Visa's network banks to process payments irrespective of MindGeek's known non-compliance.    This agreement was manifested in several bespoke practices unique to

1   MindGeek that deviated entirely from Visa's written compliance and enforcement
2   regime and its application of that regime to other merchants, including smaller online
3   porn merchants.

4       304.   First, Visa intentionally permitted its network banks to onboard
5   MindGeek and its various entities despite its illegal behavior and content and,
6   thereafter, to ignore the applicable compliance and enforcement obligations,
7   especially the standards for regular monitoring of the sites.   Visa permitted these
8   network banks to avoid *bona fide* website monitoring and to instead provide
9   pretextual periodic reports that were not consistent with Visa's standards and rules or
10  its practices for other merchants.

11      305.   Second, Visa ignored its own internal standards and practices in
12  response to reported violations by MindGeek, including in response to public and
13  private reports it received as part of its own ongoing monitoring, reporting from its
14  network banks, and direct communications from regulators, NGOs, activists, and law
15  enforcement.   Although individually and certainly collectively these reports would
16  have caused Visa to sanction and eventually terminate any other merchant, Visa
17  applied a different standard to the leading player in this booming online market to
18  which it wanted access.

19      306.   Thus, despite being aware throughout 2017-2020 of more and more
20  public reports of widespread CSAM and other illegal content on MindGeek's
21  websites, and of MindGeek's lack of moderation or compliance, Visa would only
22  take action when forced to by direct communications from, and demands by, third-
23  parties, like law enforcement, activists and NGOs, victims, and the media.   In
24  contrast, when it became aware of such information on its own or through its
25  network banks, it took no action even though it regularly did so for far less serious
26  circumstances with less prominent merchants.   Even when forced by third-parties to
27  respond to such facts, Visa did not suspend, fine, or suspend MindGeek as it would
28  have done and regularly did with other merchants.   Instead, many such incidences

generated nothing more than untrue public assurances that MindGeek was operating under Visa's robust compliance and enforcement regime, and none generated more than merely pretextual, non-material "enforcement" steps with no material consequences to MindGeek.

307.    This treatment stood in stark contrast to the serious consequences other merchants, including smaller ones in the online porn industry, faced for far less serious violations as a matter of course.   Unlike those merchants, neither MindGeek nor the network banks processing its payments were forced to undertake serious compliance and enforcement steps such as audits, substantial fines, or suspension or termination.   Instead, Visa, at most, would ask the network banks to secure from MindGeek a "self-certification" that it was operating legally and which would not address the specific instances and evidence presented by third-parties or otherwise be subjected to good faith scrutiny as would have been the case with other merchants.

308.    Third, Visa worked with MindGeek to develop payment structures to help them both continue to process illegal payments without public exposure.   For example, Visa and its network banks encouraged and permitted MindGeek to process substantial amounts of its online payments through "Third-Party Payment Processors" that MindGeek actually owned, and Visa delegated to those payment processors the purported obligations of monitoring the merchant – i.e., permitting MindGeek to monitor itself.   Visa knew that in doing so it would be permitting the merchant to also be responsible for its own monitoring and to process payments in a manner that concealed illegality.   Under similar circumstances, Visa would not have permitted other merchants to operate in this manner.   But MindGeek was permitted to do so because Visa had agreed to facilitate MindGeek's illegal business and this structure masked and insulated Visa's agreement and involvement.

309.    As a result, payment transactions would occur over Visa's network and through its network banks related to known traffickers, such as MindGeek's partner

channel "Girls Do Porn," because MindGeek's own captive payment companies would conceal those identities.   Similarly, when instances of CSAM or illegal conduct were directly presented to Visa, it accepted pro forma reports from MindGeek that did nothing other than contain boilerplate descriptions of MindGeek's purported compliance processes that Visa and its networks banks knew were untrue.

310.   Fourth, Visa and MindGeek also collaborated on minimizing the visibility of illegal conduct.   For example, Visa and its network banks sometimes suggested changes to words and descriptions connected to illegal content but not the removal of the content or any consequences for the presence of such content under Visa's compliance and enforcement regime.   Visa and its member banks also removed restrictions on payments that had clear indicia of trafficking and which would have resulted in a suspension or blocks on other merchant accounts.   This included, by way of example, regular payments from large numbers of purportedly independent cam models being deposited into single accounts of obvious traffickers. Likewise, Visa permitted MindGeek to use on its tubesites words that were banned from its premium sites even though for compliance purposes the violation would have been the same.

311.   Fifth, Visa and MindGeek repeatedly coordinated their public comments to misrepresent that MindGeek's operations were legal and in compliance with Visa's standards.   Specifically, in Visa's public and in private communications with advocates, journalists, law enforcement, and others Visa consistently insisted that it would not tolerate a merchant that had CSAM or other illegal content on their website despite the fact this was precisely what it was doing.   In so misrepresenting, it corroborated what it knew was MindGeek's repeated false assurance that it maintained robust technological and other compliance methods, which Visa knew to be untrue.   Visa would also claim that it was seriously investigating allegations of CSAM or illegal conduct when in fact it was permitting MindGeek to investigate and

knew that the responses it was providing were untrue.   And Visa misrepresented the steps it would take in response to violations of its policies that were substantiated.

312.   Visa's commitment to MindGeek's business became very public in 2019-2020 when MindGeek's reliance on CSAM and other illegal content became widely known among the public.   For example, in 2019, dozens of victims of sex trafficking sued MindGeek's most popular partner channels, GirlsDoPorn, and several months later GDP and its founders were indicted on sex trafficking charges. These developments constituted dramatic violations of MindGeek's terms of service and merchant agreement with Visa and Visa's incorporated rules and virtually any other merchant would have been terminated or at a minimum suspended and subjected to an extensive compliance audit and mandatory remedial steps before being reinstated.   Visa, however, subjected MindGeek to none of these standard responses because it had agreed to allow MindGeek to operate outside such limitations.

313.   On the heels of the GDP developments, activists separately began publicly exposing MindGeek's widespread commercialization of CSAM and other illegal conduct and this campaign went viral online and in the news.   These activists also targeted Visa by confronting it directly with evidence of the illegal conduct of which it was already well aware.   In response to such evidence demonstrating clear disqualifying conduct by MindGeek, Visa, consistent with its longstanding arrangement with MindGeek, did not terminate the relationship, suspend, audit, and impose remedial steps, or take other standard enforcement steps that it would have for other merchants.   Instead, it collaborated with MindGeek on ways to scrub its sites of words and descriptions that would make illegal content much easier for activists to find; permitted MindGeek entities to investigate MindGeek; and accepted purported investigatory findings it knew were false and nonresponsive.

314.   Moreover, consistent with their agreement, Visa covered up for MindGeek by misrepresenting to advocates and journalists that Visa had stringent

1  prohibitions on illegal content and that MindGeek was not engaged in such activities.
2  It then also made those same statements publicly:

3         Visa only permits transactions on the Visa network for the
4         purchase or sale of lawful products and services.   We
5         categorically prohibit transactions involving child pornography
6         and human trafficking. As a founding member of the Financial
7         Coalition Against Child Sexual Exploitation, Visa works
8         together with our coalition partners to identify potentially
9         illegal merchants or illegal activities and bar them from the
10         Visa network.

11  315.   With respect to MindGeek, this was a lie.   While Visa did bar many
12  merchants for even minor violations of its terms, including smaller, less significant
13  adult online merchants, it applied an entirely different standard to MindGeek because
14  of its size and dominance in this booming industry.   Visa's misrepresentation was
15  designed to both conceal its illegal conduct and also facilitate and corroborate what it
16  knew were MindGeek's repeated public and private statements that it had robust
17  compliance capabilities and technology that was stringently enforced.

18  316.   Visa would continue to make these misrepresentations in support of
19  MindGeek going forward.   For example, in April 2020 Elizabeth Scofield, the
20  Director of Global Brand Protection for Visa, repeated these claims in phone calls
21  with anti-sex trafficking advocates.   Scofield also feigned ignorance about illegal
22  content on MindGeek's sites and asked for a letter presenting the information for
23  Visa to consider.   That letter was provided at the end of April, additional letters and
24  presentations were provided in May, including a detailed letter to Visa's CEO, and
25  that same month Visa received thousands of emails and letters from victims and
26  regular citizens likewise complaining about its processing of payments on websites
27  with CSAM and trafficked conduct.

28  317.   Although Visa's rules and standard operating procedures would have

1   required and regularly resulted in termination or, at a minimum, suspension, audit,

2   and remedial conditions, Visa did not take any such steps with respect to MindGeek

3   in response to all this evidence and related complaints presented in 2020.   Instead, it

4   merely initiated a minimal inquiry that permitted MindGeek to investigate itself and

5   accepted a short two-page boilerplate response that merely repeated MindGeek's

6   standard claims of compliance capabilities and practices that Visa and its network

7   banks knew were not true.   This treatment of such serious and substantiated

8   allegations was completely inconsistent with Visa's standard operating procedures

9   for regular merchants.

10      318.   The April 2020 letters from advocates enclosed screenshots and URLs

11  of plaintiff Serena Fleites's child sexual abuse materials live on MindGeek's sites.

12  Nevertheless, Visa did not demand the obviously illegal images be immediately

13  removed, take the most basic steps to determine how the images were uploaded in

14  the first place, or conduct a simple google search to determine whether there were

15  others like it on MindGeek's sites.   This is because Visa knew for years how these

16  illegal images were uploaded and of the hundreds of thousands of other videos like it,

17  including from the thousands of emails and links it received from advocates that

18  month.   Instead, it simply forwarded the images and URLs to MindGeek and

19  allowed MindGeek to investigate itself, as it had done hundreds of times before.

20  Ultimately, MindGeek elected not to remove Fleites's CSAM images and to do

21  nothing because it understood from its agreement and years of dealings with Visa

22  that Visa too would do nothing.   Consistent with this long-standing agreement, Visa

23  never made a single follow up inquiry about Fleites's images or took the most basic

24  steps to confirm the illegal images had been removed.   Fleites's videos remained on

25  MindGeek's website until December 2020 when MindGeek learned that the New

26  York Times was working on a story that would discuss her victimization by

27  MindGeek.   In the intervening six months since Visa and MindGeek were directly

28  informed of Plaintiff's child abuse images, MindGeek and Visa pocketed millions of

dollars in advertising and traffic from their continued dissemination.

319.   The decision during this period to continue Visa's long-standing arrangement with MindGeek under which it was permitted to operate outside Visa's standards and rules was the subject of extensive discussions at the highest levels of Visa and at the participating members of its network banks.   Executives and professionals at both Visa and network banks expressed their objections to continuing the relationship with MindGeek, and some would ultimately leave their positions over the decision to do so.

320.   Visa, however, decided to stay the course and, on July 15, 2020 issued a carefully deliberated and drafted letter that effectively admitted Visa was providing MindGeek with a unique arrangement not available to its other merchants.   Gone were statements about Visa's stringent standards, rules and robust enforcement, and in their place was a statement that Visa was remaining "neutral" with respect to MindGeek's operations:

> "We believe that any truly effective solution must come
>
> from thoughtful changes to laws and regulations by
>
> those elected to establish the laws of our country . . .
>
> Maintaining a neutral stance under the law is vital for
>
> the free flow of commerce."

321.   This statement of Visa's relationship with MindGeek is plain evidence of the bespoke custom privileges it granted MindGeek in exchange for higher fees and becoming the predominant payment processor of the dominant online pornographer.   Every other merchant in Visa's network was still required to comply with its rules and regulations prohibiting CSAM and illegal conduct on websites but with respect to MindGeek Visa would remain "neutral" for enforcement purposes.

322.   Visa maintained this position and facilitated MindGeek's trafficking enterprise for the remainder of 2020 until a seismic December 4, 2020 *New York Times* bombshell report by Pulitzer Prize winner Nicholas Kristoff, "The Children of

Porn Hub."   Acknowledging that MindGeek's business involves much legitimate, legal pornography, Kristoff also reported how his relatively modest investigative efforts easily revealed that its business also was flooded with non-consensual content and seems designed so be so:

> Yet there's another side of the company:   Its site is infested with rape videos. It monetizes child rapes, revenge pornography, spy cam videos of women showering, racist and misogynist content, and footage of women being asphyxiated in plastic bags. A search for "girls under18" (no space) or "14yo" leads in each case to more than 100,000 videos. Most aren't of children being assaulted, but too many are.

> **************************************

> A great majority of the 6.8 million new videos posted on the site each year probably involve consenting adults, but many depict child abuse and nonconsensual violence. Because it's impossible to be sure whether a youth in a video is 14 or 18, neither Pornhub nor anyone else has a clear idea of how much content is illegal.

> **************************************

> I came across many videos on Pornhub that were recordings of assaults on unconscious women and girls. The rapists would open the eyelids of the victims and touch their eyeballs to show that they were nonresponsive.

1  Pornhub profited this fall from a video of a naked woman

2  being tortured by a gang of men in China. It is monetizing

3  video compilations with titles like "Screaming Teen,"

4  "Degraded Teen" and "Extreme Choking." Look at a

5  choking video and it may suggest also searching for "She

6  Can't Breathe."

7  ****************************************

8  Facebook removed 12.4 million images related to child

9  exploitation in a three-month period this year. Twitter

10  closed 264,000 accounts in six months last year for

11  engaging in sexual exploitation of children. By contrast,

12  Pornhub notes that the Internet Watch Foundation, an

13  England-based nonprofit that combats child sexual abuse

14  imagery, reported only 118 instances of child sexual abuse

15  imagery on its site over almost three years, seemingly a

16  negligible figure.

17

18  The Internet Watch Foundation couldn't explain why its

19  figure for Pornhub is so low. Perhaps it's because people

20  on Pornhub are inured to the material and unlikely to report

21  it. But if you know what to look for, it's possible to find

22  hundreds of apparent child sexual abuse videos on Pornhub

23  in 30 minutes. Pornhub has recently offered playlists with

24  names including "less than 18," "the best collection of

25  young boys" and "under- - age."

26

27  ****************************************

28

So while it is now no longer possible to search on Pornhub in English using terms like "underage" or "rape," the company hasn't tried hard to eliminate such videos. A member called "13yoboyteen" is allowed to post videos. A search for "r*pe," turns up 1,901 videos. "Girl with braces" turns up 1,913 videos and suggests also trying "exxxtra small teens." A search for "13yo" generates 155,000 videos. To be clear, most aren't of 13-year-olds, but the fact that they're promoted with that language seems to reflect an effort to attract pedophiles.

Moreover, some videos seem at odds with the list of banned content. "Runaway Girl Gets Ultimatum, Anal or the Streets" is the title of one Pornhub video. Another user posts videos documenting sex with teenage girls as they weep, protest and cry out in pain.

While Pornhub is becoming more careful about videos of potentially litigious Americans, it remains cavalier about overseas victims. One Indonesian video is titled "Junior High School Girl After Class" and shows what appears to be a young teenager having sex. A Chinese sex video, just taken down, was labeled: "Beautiful High School Girl Is Tricked by Classmates and Taken to the Top of a Building Where She Is Insulted and Raped."

In the last few days as I was completing this article, two new videos of prepubescent girls being assaulted were posted, along with a sex video of a 15-year-old girl who

1    was suicidal after it went online. I don't see how good-faith

2    moderators could approve any of these videos.

3    323.    The fallout from this devastating article by the New York Times

4 prominent Pulitzer Prize winning Kristof was immediate, seismic, and impossible for

5 Visa to ignore as it had previously done.

6    324.    On December 10, 2020, Visa posted on Twitter: "[g]iven the allegations

7 of illegal activity, Visa is suspending Pornhub's acceptance privileges pending the

8 completion of our ongoing investigation. We are instructing the financial institutions

9 who serve MindGeek to suspend processing of payments through the Visa network."

10 In making this statement, Visa misled by messaging that it had only then become

11 aware of such allegations when in fact it had been aware of the actual underlying

12 misconduct for years.   And it misled by messaging that it was suspending MindGeek

13 because it had just learned of such claims when in fact it was only doing so because

14 of the highly public and powerful nature of the reporting.

15    325.    Indeed, Visa would continue insisting that it had a robust stringently

16 enforced compliance and enforcement program that did not permit such materials on

17 a merchant site and would later reauthorize payments on MindGeek's premium sites

18 and for the purchase of its advertising on all MindGeek's sites even the tubesite that

19 contained the bulk of the CSAM and illegal content.   In contrast, Mastercard –

20 which only processed a small percentage of MindGeek payments – publicly

21 acknowledged that its investigation revealed MindGeek "crossed the legal standard"

22 and it was "pull[ing] out" of the relationship because "child porn is [illegal], and

23 that's what we saw."[3]

24 **IV.    Plaintiff Was Exploited by MindGeek's Trafficking Venture**

25    326.    In 2014, eighth grader Serena Fleites learned that a nude, sexually

26

27 _____

[3] https://endsexualexploitation.org/wp-content/uploads/2021-Dirty-Dozen-

28 List_Notification-Letter_Visa_Final.pdf.

explicit video her high school boyfriend had coerced her to make months earlier had been uploaded to Pornhub without her knowledge or consent.   She was just 13 years old in the video and was induced to make it by a boyfriend who intended to post it to Pornhub and disseminate it thereby to the school community.   Her age was apparent from the image itself and from the title "13-Year Old Brunette Shows Off For The Camera."

327.   MindGeek personnel reviewed the video of Serena, as they repeatedly have claimed to do for every video uploaded to Pornhub, and the title, and were aware that this video constituted CSAM.   Nevertheless, consistent with its overall business model and practices, MindGeek posted the video to its Pornhub site.   It also categorized, tagged, optimized for user preferences, and disseminated the images, tags and video depicting 13-year old Serena.   And it uploaded the optimized, tagged, and categorized video to its other tubesites itself and incorporated it into its algorithmic playlists and suggested videos.

328.   The video immediately went viral on Pornhub.   By the time Serena discovered the video, it had more than 400,000 views, and had been widely disseminated throughout her school and neighborhood and it continued to generate views exponentially.   The video appeared alongside advertisements that MindGeek had placed and on which it earned revenues with every page visit, impression, engagement, and conversion.

329.   Too embarrassed to disclose the video to her mother, teacher, or principal, Serena reached out to Pornhub directly impersonating her mother, informing Pornhub that the video was child pornography, and demanding the video be removed: "this is child pornography, my daughter is a minor and only 13 years old."   Approximately two weeks passed before Pornhub responded to Serena, during which time the video continued to generate views and MindGeek continued to earn advertising revenues.   When Pornhub did respond, it acknowledged the video contained CSAM and agreed to take it down.   Yet another one to two weeks went by

1  before the video was removed from its site and then only after continued demands

2  from the minor victim.

3      330.   During the months before the video was removed, it was downloaded

4  countless times and reuploaded by different users and with different titles.   One of

5  the uploads had 2.7 million views.   Others had hundreds of comments noting that

6  Serena could not be more than a teenager.   Each of the reuploaded videos was

7  reviewed and accepted by MindGeek, optimized, categorized, and tagged by

8  MindGeek, uploaded to other tubesites by MindGeek, downloaded to users by

9  MindGeek, and matched with advertising from which MindGeek earned revenues.

10     331.   Each time Serena learned the video had been reuploaded, she

11  recommenced the process to have the video removed.   Yet, Pornhub still took weeks

12  to take each video down, each time requiring Serena to provide photographic proof

13  that she was the child depicted in the video before removing it from its site.

14     332.   MindGeek was also provided with direct notice of Plaintiff's CSAM in

15  May 2020 when it was forwarded correspondence from credit card companies

16  attaching screenshots and URLs to Plaintiff's CSAM image.   Plaintiff's age was

17  plainly evident from the images of her face visible in the video and from the dozens

18  of user comments describing her as a child and no older than 12 or 13. Although one

19  MindGeek employee recommended removing the plainly nonconsensual video, the

20  decision was made not to remove it. MindGeek continued to monetize the video until

21  December 2020 when it learned that the New York Times was preparing to publish

22  an article exposing MindGeek's years-long victimization of plaintiff.

23     333.   The dissemination was not limited to Pornhub.   The original Pornhub

24  video depicting 13-year-old Serena was downloaded and then reuploaded countless

25  additional times to other pornography sites, including tubesites owned by MindGeek,

26  and widely disseminated through email and other forms of electronic

27  communication.

28     334.   MindGeek systematically reuploaded all content that it had been forced

to disable back to the system and did so in a manner which circumvented MindGeek's purported systems for identifying previously disabled videos and made it appear that it had been reuploaded by independent users.   This is the reason why so many victims, including Plaintiff, reported that even when they successfully had videos disabled, the same videos would be reuploaded again and again.   Indeed, MindGeek reuploaded the videos to other tubesites and kept a copy of this known CSAM in their libraries and on their servers.

335.   In response to the viral dissemination of the video, Serena was bullied and harassed.   Classmates demanded that Serena send them sexually explicit videos of herself and threatened to disclose the sexually explicit video to Serena's mother or to her school if she did not comply.   The ongoing harassment sent Serena into a downward spiral.   She began to regularly skip school, which resulted in Serena receiving a truancy notice.   Serena's mother, still unaware of Serena's sexually explicit video on Pornhub, and frustrated with Serena's failure to regularly attend school, suggested Serena move in with her sister.   Serena agreed.   Serena, no longer able to face her classmates who incessantly harassed and bullied her, unenrolled from high school, and commenced an online high school program.

336.   Approximately one year later, Serena moved back in with her mother. She was depressed, hated her life, and in a failed suicide attempt, hung herself in the bathroom.   She was found by her younger sister and her mother's boyfriend who removed the power cord from her neck.   Serena received treatment by paramedics and was admitted to a mental health facility in Bakersfield.

337.   The downward spiral precipitated by the viral dissemination of her nude video continued for years.   Following her failed suicide attempt and hospitalization, Serena avoided going back home and facing judgment from her family and community.   In need of a place to stay, she reached out to a female friend who had experienced similar mental health challenges.   Serena went to visit her friend, who she discovered was using methamphetamine.   While staying at her friend's house,

Serena was introduced to heroin by an older male who she subsequently began to date, became addicted, and struggled with addiction for the next three years. To fund their joint heroin habits, the older man manipulated Serena, who was still a minor at the time, into creating sexually explicit videos of herself, which were then sold on Craigslist and the Kik app.

338. Serena subsequently learned that once sold, some of the videos were uploaded to Pornhub without her knowledge or consent. These videos were still on Pornhub as recently as June 2020. MindGeek personnel reviewed these videos of Serena; were aware from that review, the video title "Teen F*cks Guy In Car," and user tags that she was underage; and tagged, categorized, and optimized the video. Indeed, numerous users immediately commented on Serena's young age, including, among other comments, "she looks like she's f*cking 12," "And she is 13?!," "she dadass looks no older than 16," "sh look s like she's 16." Nevertheless, MindGeek incorporated the CSAM video into its algorithmic playlists and suggestions; uploaded the video to its other tubesites; and associated the video with advertisements from which it earned revenues from impressions, engagements, and conversions. As a result, CSAM depicting Serena was distributed broadly throughout the world on MindGeek's tubesites.

339. The older man who manipulated Serena to make these sexually explicit videos intended to monetize these videos at the time that they were made, and he and those to whom he sold the videos regularly uploaded such videos to MindGeek's tubesites.

340. The long-term effects of Pornhub's wrongdoing continue to this day. The CSAM videos continue to be accessible on Pornhub as recently as December 2020. Serena remains estranged from certain family members. Throughout various stages of the past five years she was homeless and lived in her car. She continues to suffer from depression and anxiety and has attempted suicide on multiple occasions over the years.

341.   The proliferation of Serena's CSAM has interfered with her employment.   Moreover, to mitigate these challenges, Serena was forced to retain an investigatory firm to investigate whether any of her videos were still accessible on Pornhub or other pornographic sites and to facilitate takedown requests.

342.   Serena was victimized on multiple occasions.   First, when she was first abused and exploited.   Second, when the videos of her abuse were uploaded to MindGeek's platform.   Third, when MindGeek, as a matter of course, transferred those videos to its other tubesites, to users downloading them, and to its platform again when it periodically reuploaded disabled content or non-disabled content that it had further optimized.   Fourth, when Defendants did nothing to police and report such content to the authorities.

## CAUSES OF ACTION

## COUNT I

## (VIOLATION OF 18 U.S.C. §§ 1591 (A)(2), 1595)

## (AGAINST MINDGEEK )

343.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

344.   As set forth herein, MindGeek, together with its users, through its Byzantine network of sham shell entities, owners, alter egos, agents, executives, and investors, is a sex trafficking venture within the meaning of 18 U.S.C. §§ 1591 and 1595.

345.   MindGeek knowingly used the instrumentalities and channels of foreign commerce to facilitate violations of 18 U.S.C. §§ 1591 and 1595.

346.    MindGeek's conduct was in, or affected, interstate and/or foreign commerce.

347.    MindGeek participated in a venture engaged in sex trafficking that targeted Plaintiff by *inter alia*:

(a)    recruiting, commissioning, producing, buying, and aggressively soliciting illegal content, including content depicting CSAM, rape, assault, and other nonconsensual activities;

(b)    systemically uploading paid for trafficked, CSAM, and other illegal content through a network of agents and MindGeek employees in Canada or Cyprus;

(c)    partnering with content channels to produce CSAM and other illegal content for its tubesites;

(d)    entering into explicit online agreements with traffickers at the time of upload to use the illegal content and commercialize it on other MindGeek owned tubesites;

(e)    curating, formatting and modifying uploaded content to optimize search engine optimization and visualization and mask blatant descriptions of criminality, including editing scenes, video length, and content to appear as if it was user-made;

(f)    creating thumbnails to attract viewers to videos, including CSAM videos;

(g)    directing viewers interested in child pornography and other illegal content to CSAM on its site through playlists, titles, tags, buttons that direct viewers to various types of content and levels of intensity;

(h)    featuring categories on their websites that target users interested in child pornography and other sexual abuse, trafficking, and nonconsensual materials;

(i)    directing and assisting users to describe their videos through content titles and tags using categories like "teen" to drive traffic to CSAM materials and suggesting preexisting terms based on its SEO analysis;

(j)     maintaining the webpage and thumbnails for disabled videos so that the MindGeek Defendants can continue to generate traffic and revenue from that illegal content and direct users to similar content;

(k)     maintaining a search and tagging system that directs users to find and view videos of child and adult sex abuse, sex trafficking, and other nonconsensual content;

(l)     providing guidance to its global network of sex traffickers on how to upload videos of sex trafficking and evade criminal liability while complying with MindGeek's purposefully loose restrictions, including by maintaining public list of "banned words"—i.e., words to avoid in the title of videos;

(m)    providing its global network of sex traffickers VPN services to allow them to cover up their unlawful conduct by obscuring the sex traffickers' locations and identities;

(n)     enabling videos to be uploaded to its tubesites without proper verification and moderation that the video complies with 18 USC 2252 or other applicable laws;

(o)     enabling the downloading of videos which facilitated the reupload by different users with different titles, including numerous instances where the CSAM videos of Plaintiff were reuploaded to Pornhub and other MindGeek owned tubesites;

(p)     pushing and reuploading all effective content on any of its tubesites, including CSAM videos of Plaintiff, regardless of its initial sourcing, to its other tubesites which it falsely portrayed as posted by a user other than MindGeek;

(q)     monetizing CSAM and other illegal content through subscriptions and advertising, including through MindGeek affiliate

TrafficJunky, and by placing advertisements alongside CSAM videos, including CSAM videos of Plaintiff;

(r)   enabling advertisers to build campaigns around keywords that clearly reflect illegal activity, including "13yearoldteen"; "not18"; "14yrold"; and "15yrold";

(s)   editing advertisement placed on its tubesites to highlight terms that promote the creation, use, and viewing of CSAM.

(t)   systematically and surreptitiously reuploading content that it had been forced to disable, and doing so in a manner in which it appeared to have been reuploaded by independent users;

(u)   maintaining a database of all CSAM, illegal, abuse, and other nonconsensual content ever uploaded to any of its tubesites, including deleted videos, for future commercialization and monetization.

348.   As set forth herein, Defendants entered into explicit online agreements with sex traffickers to use and broadly disseminate uploaded content, maintained affiliations with those sex traffickers by enabling the posting of child pornography on their websites, and strengthened those affiliations by connecting traffickers with those who want to view child pornography by, among other things, creating playlists that target those interested in child pornography, featuring categories on their website that target those interested in child pornography, instructing users to describe their videos with terms like "teen"; and declining to take down CSAM images, and when they do leaving the disabled link up so that it can direct viewers to similar content.

349.   MindGeek knowingly benefitted from a sex trafficking venture by benefitting financially from the dissemination and monetization of child sexual abuse materials, including hundreds of millions of dollars in annual profits from subscriptions and almost three billion ad impressions each day, much of which is attributable to CSAM and other illegal content.

350.    MindGeek knew or should have known that their tubesites were rife with CSAM, abuse, rape, trafficked and other nonconsensual content.    Among other things, between 2011 and the present, MindGeek was been repeatedly informed of child pornography and other trafficked, nonconsensual, and illegal content on their websites by victim complaints, user comments, third party reporting, advocacy groups, and governmental investigations.    Moreover, by way of further example, as set forth herein:

  (a) MindGeek had a reasonable opportunity to observe the victims featured on its website;

  (b) MindGeek purported to have moderators review every video prior to uploading it to its website, and the CSAM nature of the video of Serena that was uploaded to Pornhub was obvious from the video title: "13-Year Old Brunette Shows Off For The Camera" and "Teen F*cks Guy In Car";

  (c) MindGeek regularly reuploaded materials that had been removed from its site in response to a directive from authorities or a victim's lawyer to remove child pornography or other illegal materials;

  (d) comments on posts, titles, and tags, including the title and public comments associated with the videos of Plaintiff that was uploaded to Pornhub, informed MindGeek that the content depicted underage victims and victims of assault and sex trafficking, including the following comments: "she looks like she's f*cking 12," "And she is 13?!," "she dadass looks no older than 16," "sh look s like she's 16"; and

  (e) MindGeek intentionally and aggressively pursued an unrestricted content business model, and in furtherance of this objective failed to adopt verification and modification techniques, including for

the videos depicting Plaintiff that were uploaded and reuploaded to its tubesites.

351.   Plaintiff's CSAM videos that were disseminated on MindGeek's tubesites constitute commercial sex acts because all of the videos and images generate revenue for Defendants and/or traffickers.

352.   As a direct and proximate result of MindGeek's violations of 18 U.S.C. §§ 1591 and 1595, Plaintiff has suffered substantial damages, including but not limited to, physical, psychological, financial, and reputational harm as well as adverse employment impacts, investigation expenses, and other costs associated with the prolific dissemination of her CSAM.

353.   Further, by profiting from these videos and images, MindGeek has become unjustly enriched at the expense of Plaintiff in an amount to be determined at trial.

354.   Moreover, by reason of MindGeek's violation of 18 U.S.C. §§ 1591 and 1595, Plaintiff is entitled to recover attorney's fees, costs, and punitive damages.

## COUNT II

### (VIOLATION OF 18 U.S.C. §§ 1591, 1595)

### (AGAINST REDWOOD AND COLBECK)



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CASE NO. 2:21-cv-4920





**COUNT III**

**(VIOLATION OF 18 U.S.C. §§ 1594(c), 1595)**

**(AGAINST ALL DEFENDANTS)**



CASE NO. 2:21-cv-4920
THIRD AMENDED COMPLAINT



# COUNT IV

## (VIOLATION OF 18 U.S.C. §§ 2252, 2255)

### (AGAINST THE MINDGEEK DEFENDANTS)

375.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

376.    Serena Fleites is a victim of violations of 18 U.S.C. §§ 2252 and suffered personal injuries as a result of these violations.    Accordingly, Serena Fleites is entitled to bring a civil action under 18 U.S.C. § 2255.

377.    MindGeek knowingly transported visual depictions of minors engaging in sexually explicit conduct, as defined under 18 U.S.C. § 2256(2)(A), including, but not limited to, photographs and videos of Serena Fleites, who was a minor at the time the photographs and videos were taken, via its websites which affected interstate or foreign commerce in violation of 18 U.S.C. § 2252(a)(1).

378.    MindGeek knowingly received and distributed visual depictions of minors engaging in sexually explicit conduct, as defined under 18 U.S.C. § 2256(2)(A), including, but not limited to, photographs and videos of Serena Fleites, who was a minor at the time the photographs and videos were taken, via their websites which affected interstate or foreign commerce.

379.    MindGeek knowingly sold or possessed with intent to sell visual depictions of minors engaging in sexually explicit conduct, as defined under 18 U.S.C. § 2256(2)(A), including, but not limited to, photographs and videos of Serena Fleites, who was a minor at the time the photographs and videos were taken, via its websites which affected interstate or foreign commerce in violation of 18 U.S.C. § 2252(a)(3).

380.    MindGeek knowingly possessed visual depictions of minors engaging in sexually explicit conduct, as defined under 18 U.S.C. § 2256(2)(A), including, but not limited to, photographs and videos of Serena Fleites, who was a minor at the time the photographs and videos were taken, via its websites which affected interstate or

foreign commerce in violation of 18 U.S.C. § 2252(a)(4).   Moreover, even when
MindGeek was forced to take down illegal content in response to legal requests,
rather than delete the materials it was not legally allowed to possess or redistribute, it
claimed to have stored all the data on its servers and periodically would reupload that
content or push it to affiliate sites so that it could continue to generate traffic and
corresponding revenue.

381.   In addition, the MindGeek Defendants duplicated and distributed new
child pornography depicting Plaintiff by creating and hosting new "thumbnail"
images from existing videos of Plaintiff.

382.   MindGeek's knowledge of the CSAM nature of the videos depicting
Plaintiff can readily be inferred from the title of the video—"13-Year Old Brunette
Shows Off For The Camera"—as well as the hundreds of public comments
associated with that video indicating that Plaintiff was clearly a minor.   Moreover,
even after Plaintiff told Pornhub directly that the video was child pornography, it still
took almost one month before the MindGeek Defendants removed the video, during
which time the video was viewed and downloaded by multiple users, facilitating
future uploads of the video.   Additionally, each time Plaintiff discovered that the
video had been reuploaded to Pornhub, she again informed Pornhub that the video
was child pornography and, each time, Pornhub still waited weeks to remove the
video. Serena Fleites has suffered substantial physical, psychological, financial, and
reputational harm as well as other damages as the result of MindGeek's violation of
18 U.S.C. § 2252.

383.   Defendants' conduct was malicious, oppressive, or in reckless disregard
of Serena Fleites' rights, and Serena Fleites is entitled to injunctive relief,
compensatory, and punitive damages, and the costs of maintaining this action. 18
U.S.C. § 2252A(f).

**COUNT V**

**(VIOLATION OF 18 U.S.C. §§ 2252A, 2255)**

**(AGAINST THE MINDGEEK DEFENDANTS)**

384.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

385.   Serena Fleites is a victim of violations of 18 U.S.C. § 2252A and suffered personal injuries as a result of these violations.   Accordingly, Serena Fleites is entitled to bring a civil action under 18 U.S.C. § 2255.

386.   MindGeek knowingly transported child pornography, as defined under 18 U.S.C. § 2256(8), including, but not limited to, photographs and videos of Serena Fleites, who was a minor at the time the photographs and videos were taken, via their websites which affected interstate or foreign commerce in violation of 18 U.S.C. § 2252A(a)(1).

387.   MindGeek knowingly received or distributed child pornography, as defined under 18 U.S.C. § 2256(8), including, but not limited to, photographs and videos of Serena Fleites, who was a minor at the time the photographs and videos were taken, via their websites which affected interstate or foreign commerce in violation of 18 U.S.C. § 2252A(a)(2).

388.   MindGeek knowingly reproduced child pornography, as defined under 18 U.S.C. § 2256(8), including, but not limited to, photographs and videos of Serena Fleites, who was a minor at the time the photographs and videos were taken, via their websites which affected interstate or foreign commerce in violation of 18 U.S.C. § 2252A(a)(3)(A).

389.   MindGeek knowingly advertised, promoted, presented, distributed, or solicited visual depictions of actual minors engaging in sexually explicit conduct, as defined under 18 U.S.C. § 2256(2)(A), including, but not limited to, photographs and videos of Serena Fleites, who was a minor at the time the photographs and videos were taken, via their websites which affected interstate or foreign commerce in

1  violation of 18 U.S.C. § 2252A(a)(3)(B).

2      390.   MindGeek knowingly sold or possessed with intent to sell child

3  pornography, as defined under 18 U.S.C. § 2256(8), including, but not limited to,

4  photographs and videos of Serena Fleites, who was a minor at the time the

5  photographs and videos were taken, via their websites which affected interstate or

6  foreign commerce in violation of 18 U.S.C. § 2252A(a)(4).

7      391.   MindGeek knowingly possessed child pornography, as defined under 18

8  U.S.C. § 2256(8), including, but not limited to, photographs and videos of Serena

9  Fleites, who was a minor at the time the photographs and videos were taken, via their

10 websites which affected interstate or foreign commerce in violation of 18 U.S.C. §

11 2252A(a)(5).   Moreover, even when MindGeek was forced to take down illegal

12 content in response to legal requests, rather than delete the materials it was not

13 legally allowed to possess or redistribute, it claimed to have stored all the data on its

14 servers and periodically would reupload that content or push it to affiliate sites so

15 that it could continue to generate traffic and corresponding revenue.

16     392.   In addition, the MindGeek Defendants duplicated and distributed new

17 child pornography depicting Plaintiff by creating and hosting new "thumbnail"

18 images from existing videos of Plaintiff.

19     393.   MindGeek's knowledge of the CSAM nature of the videos depicting

20 Plaintiff can readily be inferred from the title of the video—"13-Year Old Brunette

21 Shows Off For The Camera"—as well as the hundreds of public comments

22 associated with that video indicating that Plaintiff was clearly a minor.   Moreover,

23 even after Plaintiff told Pornhub directly that the video was child pornography, it still

24 took almost one month before the MindGeek Defendants removed the video, during

25 which time the video was viewed and downloaded by multiple users, facilitating

26 future uploads of the video.   Additionally, each time Plaintiff discovered that the

27 video had been reuploaded to Pornhub, she again informed Pornhub that the video

28 was child pornography and, each time, Pornhub still waited weeks to remove the

1  video.

2    394.   Serena Fleites has suffered substantial physical, psychological,

3  financial, and reputational harm as well as other damages as a result of MindGeek's

4  violations of 18 U.S.C. §§ 2252A.

5    395.   MindGeek's conduct was malicious, oppressive, or in reckless disregard

6  of Serena Fleites' rights, and Serena Fleites is entitled to injunctive relief,

7  compensatory and punitive damages, and the costs of maintaining this action. 18

8  U.S.C. § 2252A(f).

9                           **COUNT VI**

10            **(PUBLIC DISCLOSURE OF PRIVATE FACTS)**

11            **(AGAINST THE MINDGEEK DEFENDANTS)**

12    396.   Plaintiff incorporates by reference and realleges each and every

13  allegation contained above, as though fully set forth herein.

14    397.   By maintaining, streaming, distributing, reuploading, and monetizing

15  videos and images of sexually explicit conduct, including nonconsensual sexual acts

16  and child pornography, of Plaintiff on its websites, including but not limited to

17  Pornhub, MindGeek publicly disclosed private facts about Plaintiff.

18    398.   Before this disclosure, the videos and images of nonconsensual sexual

19  acts and child pornography of Plaintiff were private and not known to the public.

20    399.   The videos and images of sexually explicit conduct, including

21  nonconsensual sexual acts and child pornography, of Plaintiff made known to the

22  public are highly offensive and objectionable to a reasonable person.

23    400.   MindGeek disclosed the videos and images of sexually explicit conduct,

24  including nonconsensual sexual acts and child pornography, of Plaintiff with

25  knowledge that they are highly offensive or with reckless disregard of whether they

26  are highly offensive.

27    401.   The videos and images of sexually explicit conduct, including

28  nonconsensual sexual acts and child pornography, of Plaintiff are not of legitimate

1  public concern.

2      402.   Plaintiff has suffered substantial physical, psychological, financial, and

3  reputational harm, as well as other damages, as the result of MindGeek's public

4  disclosure of the videos and images of sexually explicit conduct, including

5  nonconsensual sexual acts and child pornography, of Plaintiff.

6      403.   MindGeek's conduct was malicious and/or the MindGeek Defendants

7  acted with the intent to vex, injure, or annoy, or with a conscious disregard of the

8  Plaintiff's rights, and Plaintiff is entitled to injunctive relief, and compensatory and

9  punitive damages.

10                          **COUNT VII**

11              **(INTRUSION INTO PRIVATE AFFAIRS)**

12          **(AGAINST THE MINDGEEK DEFENDANTS)**

13      404.   Plaintiff incorporates by reference and realleges each and every

14  allegation contained above, as though fully set forth herein.

15      405.   By maintaining, streaming, distributing, reuploading, and monetizing

16  videos and images of nonconsensual sexual acts and child pornography of Plaintiff

17  on its websites, including but not limited to Pornhub, MindGeek intentionally

18  intruded upon the solitude or seclusion, private affairs or concerns of Plaintiff.

19      406.   The intrusion was substantial, and of a kind that would be highly

20  offensive to an ordinarily reasonable person.

21      407.   Plaintiff has suffered substantial physical, psychological, financial, and

22  reputational harm, as well as other damages, as the result of MindGeek's intrusion

23  into Plaintiff's private affairs.

24      408.   Because MindGeek has engaged in conduct of an oppressive,

25  fraudulent, and malicious nature, Plaintiff is entitled to punitive damages.

26

27

28

1

2

3

## COUNT VIII

## (PLACING PLAINTIFF IN FALSE LIGHT)

## (AGAINST THE MINDGEEK DEFENDANTS)

4    409.    Plaintiff incorporates by reference and realleges each and every

5    allegation contained above, as though fully set forth herein.

6    410.    By maintaining, streaming, distributing, reuploading, and monetizing

7    videos and images of nonconsensual sexual acts and child pornography of Plaintiff

8    on its websites, including Pornhub, MindGeek made a public disclosure of a fact

9    about Plaintiff.

10    411.    The fact disclosed was false and portrayed Plaintiff in a false light.

11    Namely, Plaintiff was placed before the public in a false light because viewers and at

12    least some users of the websites, including but not limited to Pornhub, may have, and

13    likely did, believe that Plaintiff voluntarily appeared in the videos and images,

14    willingly engaged in pornography, and made money as "actors" off of the posting of

15    the videos and images.

16    412.    The false light in which Plaintiff was placed would be highly offensive

17    to a reasonable person.

18    413.    MindGeek had knowledge of or acted in reckless disregard of the falsity

19    of the publicized fact and the false light in which Plaintiff would be placed.

20    414.    As a result of MindGeek's wrongdoing, Plaintiff has suffered substantial

21    physical, psychological, financial, and reputational harm, as well as other damages.

22    415.    Because MindGeek has engaged in conduct of an oppressive,

23    fraudulent, and malicious nature, Plaintiff is entitled to punitive damages.

24

25

26

## COUNT IX

## (NEGLIGENCE)

## ( AGAINST THE MINDGEEK DEFENDANTS)

27    416.    Plaintiff incorporates by reference and realleges each and every

28    allegation contained above, as though fully set forth herein.

417.   MindGeek had a duty to use ordinary care and to prevent injury to Plaintiff.

418.   By maintaining, streaming, distributing, reuploading, and monetizing videos and images of nonconsensual sexual acts and child pornography of Plaintiff on its websites, failing to take down videos and images upon request but merely disabling the link, and by reuploading illegal content, among other wrongdoing detailed herein, MindGeek breached the duty of care to Plaintiff.

419.   MindGeek's breach of its duty of care caused harm to Plaintiff.

420.   Plaintiff has suffered substantial physical, psychological, financial, and reputational harm, as well as other damages, as the result of MindGeek's breach of the duty of ordinary care.

## COUNT X

## (VIOLATION OF CAL. BUS. & PROF. CODE § 17200)

## (AGAINST ALL DEFENDANTS)

421.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

422.   Defendants have engaged in unlawful, unfair, and fraudulent business acts and practices by participating in a venture engaged in trafficking that intentionally produced, recruited, funded, disseminated, and monetized the dissemination of CSAM materials, sex abuse, trafficking content, and other nonconsensual content on its site.

423.   Defendants fraudulently deceived its users that they were monetizing, distributing, and advertising legitimate, legal content, when in fact defendants' websites were riddled with videos of rape, child pornography, sex trafficking, and other nonconsensual content, including videos of Plaintiff.   Defendants knowingly had inadequate age and consent verification systems in place that enabled users to upload child pornography to Defendants' websites.   This conduct constitutes an unlawful, unfair, and fraudulent business act and practice.

424.   This conduct constitutes an unlawful, unfair, and fraudulent business act and practice.

425.   Plaintiff has a financial interest in the use of her own videos, images, and likeness.

426.   As a result of Defendants' use of Plaintiff's videos, images, and likeness without Plaintiff's consent, Plaintiff has lost money to which she is rightfully entitled.

427.   As a result of Defendants' use of Plaintiff's videos, images, and likenesses without Plaintiff's consent, Plaintiff has suffered financial harm in the form of costs for therapy as well as substantial time away from her work and substantial expense hiring a company to assist her with her efforts investigate the continued dissemination of her videos on Pornhub and facilitate the take downs of her CSAM from MindGeek's tubesites.

428.   Plaintiff seeks restitution of all amounts to which Defendants have been unjustly enriched as a result of their unlawful, unfair, and/or fraudulent acts, and disgorgement of all profits Defendants have made through the unlawful, unfair, and/or fraudulent acts.

429.   Plaintiff is entitled to preliminary and permanent injunctive relief restraining the Defendants from committing further unfair trade practices and mandating the full disclosure of Defendants' personal and financial interests in causing Plaintiff's harm.

**COUNT XI**

**(CALIFORNIA PRODUCTS LIABILITY DESIGN-DEFECT)**

**(AGAINST MINDGEEK)**

430.   Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

431.   MindGeek created the tubesites, and related products, and distributes them and has placed these products into commerce.

432.   MindGeek is not designed to prevent the upload and dissemination of CSAM and other illegal content. Among other examples:

    (a)   it knowingly and intentionally failed to require that each user in the video independently verify age and consent as required under 2257;

    (b)   it failed to employ an adequate number of moderators and failed to implement moderation procedures designed to prevent the upload of illegal content;

    (c)   it failed to employ policies, procedures, technologies and appropriate banned word lists to prevent the upload of illegal and nonconsensual content;

    (d)   failed to review or remove flagged content unless it received more than 15 flags for suspicious activities;

    (e)   failed to provide mechanisms for its enable its users to easily report CSAM, or have it quickly and permanently removed , instead requiring the reporter to have a tubesites account, be logged into his or her tubesites account (e.g., their Pornhub account), then go to the video to be able to then flag the content with a reporting flag on the video to provide a reason for its reporting;

    (f)   required the reporter to provide an email address, fill out a separate content removal request form requiring all the relevant URL links, and then accept a verification email confirming the content removal request; and

    (g)   even when it was forced to take down videos and images containing CSAM, MindGeek only disabled the link, rather than removed it, so the webpage with its title, description, tags, and comments would still continue to increase SEO and when a user

searching for such content landed on the disabled video's webpage, MindGeek's search algorithms would solicit the user with similar videos to the one disabled.

433.    Worse, MindGeek takes affirmative through its human moderators, to optimize illegal content, including helping the user associate substantive meaning to the image to enhance its ability to garner attention, including MindGeek's own formatters modifying actual titles, categories, playlists, and the videos themselves. It also affirmatively reuploaded content it was forced to take down with different titles, tags, and on different platforms.

434.    MindGeek's products are defective because they do not perform as safely as an ordinary consumer would expect them to perform when used in an intended or reasonably foreseeable way.

435.    MindGeek's tubesites are a product about which consumers should be able to have reasonable minimum safety expectations; namely, that a mainstream, general social media platform will not serve as a mass distribution channel for CSAM.

436.    Having insufficient features to easily allow users to report CSAM is a defect in the design of the tubesites.

437.    Further, having insufficient features to easily allow users to make a request to remove CSAM is a defect in the design of the tubesites.

438.    And the tubesites' takedown infrastructure that only disables the videos containing CSAM and keeps the webpage with its tile, description, tags, and comments so that video would continue to increase SEO is a defect in the design of the tubesites.

439.    Plaintiff was harmed by these defects in tubesites products and the products failure to perform safely is a substantial factor in causing the harm to Plaintiff, including MindGeek's failure to remove her CSAM for weeks after she reported it and continuously reuploading it thereafter.

# COUNT XII

## (CIVIL CONSPIRACY)

## (AGAINST ALL DEFENDANTS)

440.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

441.    As set forth herein, Defendants conspired and acted in concert to commit unlawful acts, including but not limited to, count IV, 18 U.S.C. §§ 2252, 2255, count V, 18 U.S.C. §§ 2252a, 2255, count VI, Public Disclosure of Private Facts, count VII, Intrusion Into Private Affairs, count VIII, Placing Plaintiff In False Light, and count X, violation of Cal. Bus. & Prof. Code § 17200.   Each of the Defendants shared the same conspiratorial objective, which was to maintain, receive, stream, distribute, reupload, monetize, and profit from CSAM and other nonconsensual content and/or to benefit financially from such distribution so as to maximize profits and to do so while deceiving the public to believe that all content on MindGeek's tubesites was lawful and consensual.   Colbeck and Redwood designed, directed, advised and implemented the plan to expand and grow MindGeek's business via an unrestricted content business model and acquisitions of companies that also adopted that model.   And Visa provided a de facto exception for MindGeek from the merchant obligations and rules that Visa applied to other merchants throughout the marketplace and permitting its member banks to process payments for MindGeek free from the requirements of ensuring MindGeek's legal operation and compliance.

442.    Defendants' conspiratorial scheme was carried out by the commission of the wrongful and overt acts set forth above, including, but not limited to:

        (a)    recruiting, commissioning, paying for, soliciting content produced through human trafficking and slavery;

        (b)    producing CSAM and nonconsensual sexual content through MindGeek owned production companies;

(c)    partnering with known traffickers;

(d)    advertising MindGeek tubesites prior to playing videos containing CSAM or otherwise illegal and trafficked content, including, upon information and belief, the CSAM videos of Plaintiff;

(e)    generating substantial advertisement revenue based on CSAM and otherwise illegal and trafficked content, including, upon information and belief, the CSAM videos of Plaintiff;

(f)    pushing all content posted on any of its tubesites, including the CSAM videos of Plaintiff, regardless of its initial sourcing to its other tubesites which it falsely portrayed as posted by a user other than MindGeek;

(g)    modifying effective content and duplicating to optimize search engine optimization, including to make content appear as if it was user made;

(h)    creating playlists that target viewers interested in child pornography and other illegal content;

(i)    featuring categories on their websites that target users interested in child pornography and other sexual abuse, trafficking and nonconsensual materials;

(j)    directing users to describe their videos using categories like "teen" to drive traffic;

(k)    maintaining the webpage and thumbnails for disabled videos so that the MindGeek Defendants can continue to generate traffic and revenue from that illegal content;

(l)    maintaining a search and tagging system—which include tags such as "passed out teen," and "sleeping pills"—to make it easier for users to find and view videos of child and adult sex abuse, sex trafficking, and other nonconsensual content;

(m)    providing guidance to its global network of sex traffickers on how to upload videos of sex trafficking and evade criminal liability while complying with MindGeek's purposefully loose restrictions, including by maintaining public list of "banned words"—i.e., words to avoid in the title of videos;

(n)    providing its global network of sex traffickers VPN services to allow them to cover up their unlawful conduct by obscuring the sex traffickers' locations and identities;

(o)    allowing anyone to anonymously upload and download videos on its tubesites, so that it would be extremely difficult for victims to have their videos permanently removed, thus increasing MindGeek's advertising revenue and profits;

(p)    allowing removed videos to reuploaded to its site;

(q)    allowing all videos to be downloaded which facilitated the reupload by different users with different titles; and

(r)    financing the illegal venture through syndicate financing at onerous and exorbitant rates and revenues generated from subscriptions and advertisements on CSAM and other illegal content, including Plaintiff's CSAM images and videos.

443.    At all relevant times, Defendants' conduct was willful and done with legal malice and knowledge that it was wrongful.

444.    As a direct, proximate result of the operation and execution of the conspiracy, Plaintiff has been injured and suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in her favor and against the Defendants, jointly and severally:

A.    Awarding Plaintiff compensatory damages in an amount to be

1  determined at trial;

2      B.    Awarding Plaintiff restitution for all monies Defendants earned

3  marketing, selling, and exploiting Plaintiff's videos, pictures, likeness, and images;

4      C.    Awarding Plaintiff punitive damages;

5      D.    Awarding Plaintiff her attorney fees and costs and expenses for

6  litigating this case;

7      E.    Awarding Plaintiff treble damages;

8      F.    Awarding Plaintiff pre-judgment and post-judgment interest;

9      G.    Awarding Plaintiff injunctive relief;

10      H.    Granting such other and further relief as this Court deems just and

11  equitable.

12                      **<u>DEMAND FOR JURY TRIAL</u>**

13      Plaintiff demands a jury trial for all triable issues of fact.

14  DATED:   December 15, 2025        Respectfully submitted,

15                                   BRITHEM LLP

16

17                          By:   */s/ Michael J. Bowe*
                                  _____

18                                Michael J. Bowe
                                  (admitted *pro hac vice*)

19                                *Attorneys for Plaintiffs*

20

21

22

23

24

25

26

27

28