Michael J. Bowe
(admitted *pro hac vice*)
mbowe@brithem.com
Lauren Tabaksblat
(admitted *pro hac vice*)
ltabaksblat@brithem.com
**BRITHEM LLP**
565 Fifth Avenue
New York, NY 10017
Telephone: (646) 653-9378

David M. Stein (SBN 198256)
dstein@olsonstein.com
Nancy M. Olson (SBN 260303)
nolson@olsonsten.com
**OLSON STEIN LLP**
240 Nice Lane #301
Newport Beach, CA 92663
Phone: 949.887.4600

*Attorney for Plaintiffs*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| SERENA FLEITES,<br><br>Plaintiff,<br><br>v.<br><br>MINDGEEK S.A.R.L., a foreign entity; MG FREESITES LTD, a foreign entity; MINDGEEK USA INCORPORATED, a Delaware corporation; MG PREMIUM LTD, a foreign entity; MG GLOBAL ENTERTAINMENT INC., a Delaware corporation; 9219-1568 QUEBEC, INC., a foreign entity; BERND BERGMAIR, a foreign individual; FERAS ANTOON, a foreign individual; DAVID TASSILLO, a foreign individual; VISA INC., a Delaware corporation; REDWOOD CAPITAL MANAGEMENT, LLC, a Delaware limited liability company; REDWOOD DOE FUNDS 1-7; COLBECK CAPITAL MANAGEMENT, LLC, a Delaware limited liability company; COLBECK DOE FUNDS 1-3, | CASE NO. 2:21-cv-4920-WLH-ADS<br><br>HON. WESLEY L. HSU<br><br>**PLAINTIFFS' OMNIBUS OPPOSITION TO COLBECK, REDWOOD, AND VISA'S MOTIONS TO DISMISS**<br><br>Date:     APRIL 24, 2026<br>Time:     1:30 pm<br>Courtroom:    9B<br><br>TAC FILED:   DECEMBER 15, 2025 |

Defendants.

1

# <u>TABLE OF CONTENTS</u>

2

<u>Page</u>

3

PRELIMINARY STATEMENT.................................................................... 1

4

LEGAL STANDARD ................................................................................. 3

5

NINTH CIRCUIT'S EN BANC DECISION IN *RATHA II* .................................. 4

6

ARGUMENT .............................................................................................. 5

7

I.      THE TAC PLEADS A CONSPIRACY TO VIOLATE THE TVPRA. ..... 5

8

9

    A.    Visa Conspired with the Trafficking Venture. .................................. 7

10

        1.    Knowledge of the Wrongful Activity. .................................... 7

11

        2.    Agreement to Join the Conspiracy. .......................................... 9

12

        3.    Intent To Further the Venture's Unlawful Objective.............. 18

13

        4.    Plaintiff has Article III Standing Against Visa. ...................... 19

14

    B.    Colbeck and Redwood Conspired with the Trafficking Venture...... 22

15

16

        1.    Knowledge of the Wrongful Activity ..................................... 22

17

        2.    Agreement to Join in the Wrongful Activity. ......................... 31

18

        3.    Intent to Further the Wrongful Act. ........................................ 39

19

        4.    Commission of an Overt Act.................................................... 42

20

II.     THE TAC PLEADS BENEFICIARY LIABILITY AS TO COLBECK AND REDWOOD ...................................................................... 43

21

22

    A.    The TAC Pleads Colbeck's and Redwood's Participation In A Trafficking Venture. ........................................................................ 43

23

24

    B.    Colbeck and Redwood Had Knowledge of the Trafficking Venture ........................................................................................... 47

25

26

III.    THE TAC PLEADS UCL CLAIMS AGAINST ALL DEFENDANTS. ........................................................................... 49

27

28

IV.     THE TAC PLEADS CIVIL CONSPIRACY CLAIMS AGAINST
        DEFENDANTS. ........................................................................... 51

V.      COLBECK AND REDWOOD'S STATUTE OF LIMITATIONS
        ARGUMENTS FAIL AS A MATTER OF LAW. ...................................... 52

CONCLUSION ...................................................................................... 54

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.A. v. Omnicom Group, Inc.*,
  2026 WL 504904 (S.D.N.Y. Feb. 24, 2026)........................................... 33, 43, 45

*Acevedo v. eXp Realty, LLC*,
  713 F. Supp. 3d 740 (C.D. Cal. 2024) ..................................................... 2

*Aetna Cas. & Sur. Co. v. Leahey Const. Co.*,
  219 F.3d 519 (6th Cir. 2000)............................................................ 27, 49

*Akhmad v. Bumble Bee Foods, LLC*,
  2025 WL 3158655 *(S.D. Cal. Nov. 12, 2025)* ..................................... 44

*Ammari v. City of Los Angeles*,
  2025 WL 2684015 (C.D. Cal. Aug. 19, 2025)......................................... 36

*In re Anthem, Inc. Data Breach Litig.*,
  162 F. Supp. 3d 953 (N.D. Cal. 2016) .................................................... 47

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
  7 Cal. 4th 503 (1994) ............................................................................ 49

*Aryeh v. Canon Business Solutions, Inc.*,
  55 Cal. 4th 1185 (2013) ......................................................................... 52

*Austin v. University of Oregon*,
  925 F.3d 1133 (9th Cir. 2019) ............................................................... 15

*Autotel v. Nevada Bell Tel. Co.*,
  697 F.3d 846 (9th Cir. 2012)................................................................... 4

*B.T. v. G6 Hosp., LLC*,
  2025 WL 2781131 (S.D. Ohio Sept. 30, 2025) ...................................... 11

*Barrio v. County of San Bernardino*,
  2020 WL 4037169 (C.D. Cal. July 17, 2020)......................................... 51

*BBD Transp. Co. v. S. Pac. Transp. Co.*,
  627 F.2d 170 (9th Cir. 1980)................................................................... 50

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................... 2

*Bernson v. Browning-Ferris Industries*,
  7 Cal. 4th 926 (1994) ....................................................................... 51

*Biggs v. Bank of Am. Corp.*,
  2017 WL 11648863 (C.D. Cal. July 28, 2017) .................................... 28

*Blantz v. Cal. Dep't of Corr. & Rehab.*,
  727 F.3d 917 (9th Cir. 2013) ............................................................ 15

*Ceballos v. Banda Maguey Corp.*,
  2024 WL 5466649 (C.D. Cal. Dec. 19, 2024) ..................................... 36

*Compound Prop. Mgmt., LLC v. Build Realty, Inc.*,
  462 F. Supp. 3d 839 (S.D. Ohio 2020) .............................................. 38

*Coubaly v. Cargill Inc.*,
  144 F.4th 343 (D.D.C. 2025) ............................................................ 18

*Delta Sav. Bank v. United States*,
  265 F.3d 1017 (9th Cir. 2001) ....................................................... 5, 6

*Doe # 1 v. Red Roof Inns, Inc.*,
  21 F.4th 714 (11th Cir. 2021) ................................................. 2, 3, 43

*Doe 1 v. Deutsche Bank*,
  671 F. Supp. 3d 387 (S.D.N.Y. 2023) ................................................ 39

*Doe (A.L.G.) v. Wyndham Hotel & Resorts, Inc.*,
  2024 WL 5371983 (W.D. Tex. Nov. 21, 2024) ............................... 45, 46

*Doe (J.R.L.) v. Hilton Domestic Operating Co. Inc.*,
  2025 WL 3215615 (D. Mass. Nov. 18, 2025) ..................................... 11

*Doe v. Bank of America*,
  2026 WL 380385, at *7 (S.D.N.Y. Feb. 11, 2026) ................ 14, 44, 45, 46

*Doe v. JRD P'ship*,
  2025 WL 2406429 (M.D. Tenn. Aug. 19, 2025) ............................. 11, 14

*Dolzhenko v. City of Los Angeles*,
  2023 WL 3292858 (C.D. Cal. May 5, 2023) ....................................... 36

*Edmondson v. Raniere,*
   751 F. Supp. 3d 136 (E.D.N.Y. 2024) ............................................................. 46

*Eidmann v. Walgreen Co.,*
   522 F. Supp. 3d 634 (N.D. Cal. 2021) ............................................................. 47

*El Ranco, Inc. v. First Nat. Bank of Nev.,*
   406 F.2d 1205 (1968).......................................................... 10, 47, 49, 50

*Emery v. Visa Int'l Serv. Ass'n,*
   95 Cal. App. 4th 952 (2002) ............................................................. 48

*F.C. v. Jacobs Solutions Inc.,*
   790 F. Supp. 3d 1158 (D. Colo. 2025)............................................. 18, 34, 39, 40

*Famm Steel, Inc. v. Sovereign Bank,*
   571 F.3d 93 (1st Cir. 2009) ............................................................. 27

*Ibarra v. Manheim Investments, Inc.,*
   775 F.3d 1193 (9th Cir. 2015) ............................................................. 16

*J.C. v. Choice Hotels Int'l, Inc.,*
   2020 WL 6318707 (N.D. Cal. Oct. 28, 2020) ............................................. 44

*Kendall v. Visa U.S.A., Inc.,*
   518 F.3d 1042 (9th Cir. 2008) ............................................................. 12

*Kidron v. Movie Acquisition Corp.,*
   40 Cal. App. 4th 1571 (1995) ............................................................. 49, 50

*Krivo Indus. Supply v. Nat'l Distillers & Chem.,*
   483 F.2d 1098 (5th Cir. 1973) ............................................................. 27

*L.M.H. v. Red Roof Inns,*
   2025 WL 961720 (S.D. Ohio Mar. 31, 2025)............................................. 11

*Lauter v. Anoufrieva,*
   642 F. Supp. 2d 1060 (C.D. Cal. 2009) ................................................. 51

*Lemus v. Rite Aid Corp.,*
   613 F. Supp. 3d 1269 (C.D. Cal. 2022) ................................................. 29

*McDonald v. Coldwell Banker,*
   543 F.3d 498 (9th Cir. 2008)............................................................. 47, 48

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ........................................................................ 18, 19, 20

*Nat. Res. Def. Council v. Sw. Marine, Inc.*,
    236 F.3d 985 (9th Cir. 2000) .......................................................... 19

*Nat'l Audubon Soc'y, Inc. v. Davis*,
    307 F.3d 835 (9th Cir. 2002) .......................................................... 19

*Navarrete v. Meyer*,
    237 Cal. App. 4th 1276 (2015) ...................................................... 50

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ........................................................ 29

*Odom v. Microsoft Corp.*,
    486 F.3d 541 (9th Cir. 2007) ............................................................ 7

*PAE Gov't Servs., Inc. v. MPRI, Inc.*,
    514 F.3d 856 (9th Cir. 2007) .......................................................... 36

*People v. Zamora*,
    18 Cal. 3d 538 (1976) .................................................................... 51

*Pinkerton v. United States*,
    328 U.S. 640 (1946) .................................................................. 37, 40

*Ratha v. Rubicon Res., LLC*,
    2026 WL 480006 (9th Cir. Feb. 20, 2026) ................................ *passim*

*River Colony Ests. Gen. P'ship v. Bayview Fin. Trading Grp., Inc.*,
    287 F. Supp. 2d 1213 (S.D. Cal. 2003) .......................................... 37

*RTC v. BVS Dev., Inc.*,
    42 F.3d 1206 (9th Cir. 1994) ..................................................... 37, 49

*Ryanair DAC v. Booking Holdings Inc.*,
    636 F. Supp. 3d 490 (D. Del. 2022) ................................................ 33

*G.G. v. Salesforce*,
    76 F.4th at 554 (7th Cir. 2023) ...................................................... 44

*Shirley v. University of Idaho, College of Law*,
    800 F.3d 1193 (9th Cir. 2015) ........................................................ 36

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) ........................................................................ 15

*Supermail Cargo, Inc. v. United States*,
   68 F.3d 1204 (9th Cir. 1995) .......................................................................... 51

*T.E. v. Wyndham Hotels & Resorts, Inc.*,
   2024 WL 474400 (S.D. Ohio Feb. 7, 2024) .................................................... 46

*In re Tobacco II Cases*,
   46 Cal. 4th 298 (2009) .................................................................................... 48

*United States v. Bhimani*,
   2021 WL 5179196 (M.D. Pa. Nov. 8, 2021) .................................................. 12

*United States v. Campbell*,
   507 F.2d 955 (1974) ........................................................................................ 28

*United States v. Cruz-Ramirez*,
   2011 WL 5599630 (N.D. Cal. Nov. 17, 2011) ............................................... 41

*United States v. Curtis*,
   635 F.3d 704 (5th Cir. 2011) .......................................................................... 38

*United States v. Jewell*,
   532 F.2d 697 (9th Cir. 1976) (en banc) ........................................................... 4

*United States v. Lothian*,
   976 F.2d 1257 (9th Cir. 1992) ........................................................................ 41

*United States. v. Matta-Ballesteros*,
   71 F.3d 754 Cir. 1995 ..................................................................................... 40

*United States v. Nicholson*,
   677 F.2d 706 (9th Cir. 1982) .......................................................................... 29

*United States v. Ramos-Atondo*,
   732 F.3d 1113 (9th Cir. 2013) ................................................................... 4, 30

*United States v. Sarno*,
   73 F.3d 1470 (9th Cir. 1995) .......................................................................... 34

*United States v. Upton*,
   559 F.3d 3 (1st Cir. 2009) ............................................................................... 28

*W.K. v. Red Roof Inns, Inc.*,
 692 F. Supp. 3d 1366 (N.D. Ga. 2023) ............................................................ 11

*Walling v. Beverly Enters.*,
 476 F.2d 393 (9th Cir. 1973)................................................................................ 7

*Washington Schs. Risk Mgmt. Pool v. Am. Re-Ins. Co.*,
 2023 WL 5036075 (W.D. Wash. Aug. 8, 2023)................................................. 36

*Woodward v. Metro Bank of Dallas*,
 522 F.2d 84 (5th Cir. 1975)................................................................................ 27

**Statutes**

18 U.S.C. § 1591 ....................................................................................... 19, 44

18 U.S.C. § 1595(a) ............................................................................ 2, 3, 19, 42

18 U.S.C. § 2257 ...................................................................................... 25, 26

Allow States and Victims to Fight Online Sex Trafficking Act of 2018............... 19

California Action Fairness Act of 2005 ............................................................. 16

Cal. Bus. & Prof. Code § 17200............................................................................ 47

Cal. Bus. & Prof. Code § 17208............................................................................ 52

Cal. Penal Code §§ 311.1, 311.2, 311.5, 311.10............................................... 47

California Code of Civil Procedure § 474 ......................................................... 51

**Other Authorities**

Anne Miller Welborn Young, *Willful Blindness: Applying a Drug
 Trafficking Theory of Liability to International Human Trafficking
 Prosecution*, 40 Berkeley J. Int'l L. 143, 159-63 (2022) ................................ 4, 7

Fed. R. Civ. P. 12 ................................................................................. 1, 16, 36

Rule 8 ................................................................................................................. 15

Rule 9(b)............................................................................................................. 28

Serena Fleites and plaintiffs in the Related Actions[1] (collectively, "Plaintiffs") submits this memorandum of points and authorities in opposition to Colbeck, Redwood, and Visa's motions to dismiss.[2]

## PRELIMINARY STATEMENT

On February 20, 2026, the Ninth Circuit's issued its en banc decision in *Ratha v. Rubicon Resources, LLC*, 2026 WL 480006 (9th Cir. Feb. 20, 2026) ("*Ratha II*") that included three holdings highly material to this motion.

First, the court confirmed that Congress's 2023 Abolish Trafficking Reauthorization Act of 2023 ("ATRA") clarifying that liability under the TVPRA extends to those who "attempt or conspire to benefit" applies retroactively to pre-2023 conduct. This holding affirms this Court's prior rulings in this matter.

---

[1] The Related Actions include: *K.A. v. MindGeek, S.à.r.l.*, Case No. 2:24-cv-04786-WLH-ADS (C.D. Cal. Dec. 15, 2025); *L.T. v. MindGeek, S.à.r.l.*, Case No. 2:24-cv-04791-WLH-ADS (C.D. Cal. Dec. 16, 2025); *N.L. v. MindGeek, S.à.r.l.*, Case No. 2:24-cv-04788-WLH-ADS (C.D. Cal. Dec. 16, 2025); *N.Y. v. MindGeek, S.à.r.l.*, Case No. 2:24-cv-04801-WLH-ADS (C.D. Cal. Dec. 15. 2025); *T.C. v. MindGeek, S.à.r.l.*, Case No. 2:24-cv-04795-WLH-ADS (C.D. Cal. Dec. 16. 2025); *X.N. v. MindGeek, S.à.r.l.*, Case No. 2:24-cv-04800-WLH-ADS (C.D. Cal. Dec. 15, 2025); *J.C. v. MindGeek, S.à.r.l.*, Case No. 2:24-cv-04971-WLH-ADS (C.D. Cal. Dec. 16, 2025); *C.S. v. MindGeek, S.à.r.l.*, Case No. 2:24-cv-04992-WLH-ADS (C.D. Cal. Dec. 16, 2025); *S.O. v. MindGeek, S.à.r.l.*, Case No. 2:24-cv-04998-WLH-ADS (C.D. Cal. Dec. 16, 2025); *W.L. v. MindGeek, S.à.r.l.*, Case No. 2:24-cv-04977-WLHADS (C.D. Cal. Dec. 16, 2025); *L.S. v. MindGeek, S.à.r.l.*, Case No. 2:24-cv-05026-WLH-ADS (C.D. Cal. Dec. 16, 2025); *A.K. v. MindGeek, S.à.r.l.*, Case No. 2:24-cv-05190-WLH-ADS (C.D. Cal. Dec. 15, 2025); *W.P. v. MindGeek, S.à.r.l.*, Case No. 2:24-cv-05185-WLH-ADS (C.D. Cal. Dec. 16, 2025); and *J.L. v. MindGeek, S.à.r.l.*, Case No. 2:24-cv-07046-WLH-ADS (C.D. Cal. June 20, 2024).

[2] Motions were filed by Redwood Capital Management, LLC, Redwood Master Fund Ltd., Redwood Opportunity Master Fund, Ltd., Manuel 2018, LLC, Ginogerum, LLC, White-Hathaway Opportunity Fund, LLC (collectively, "Redwood") (ECF No. 640 (Redwood Mot.)), Colbeck Capital Management, LLC, CB Media Ventures DD, LLC, CB Agency Services, LLC, CB Participations SPV, LLC (together, "Colbeck") (ECF No. 635) (Colbeck Mot.)), and Visa Inc. (ECF No. 634 (Visa Mot.)) (together with Redwood and Colbeck, "Defendants").

Second, the Ninth Circuit rejected any judicially imposed "limiting" principle on the plain, ordinary, and broad meaning of "participation" under § 1595 of the statute. Accordingly, it held that "participation" in a trafficking venture requires only that a defendant "take part" in the venture in any manner, and it rejected any attempt to limit that ordinary meaning of participation to operations, management, direct contact with the direct trafficker, or otherwise. This holding is inconsistent with this Court's prior holdings in this case, which now must be conformed to *Ratha II*

Specifically, *Ratha II* is clear that beneficiary liability extends well beyond direct trafficking conduct. All that is required is that a defendant "knew or should have known" of trafficking and nevertheless continued attempting to benefit from participating in any manner in the venture. Moreover, *Ratha II* makes equally clear that because the statute reaches attempts to benefit, liability does not depend on whether the defendant ultimately completed a transaction or successfully profited. A defendant may therefore be liable where, with the requisite knowledge, it continues participating in the venture and attempts to derive financial benefit from its trafficking activity.

Third, *Ratha II* held that the district court in that case had failed to appropriately accept the fact as alleged and apply all reasonable inferences in the plaintiff's favor. That clarification also matters here because defendants' motions explicitly ask this Court to ignore the facts alleged and reject or draw the narrowest possible inferences from those accepted facts. This, *Ratha II* reminds, is not permitted.

Viewed through the *Ratha II* framework, the Third Amended Complaint (the "TAC") easily states TVPRA conspiracy claims against Visa and both conspiracy and beneficiary-liability claims against Colbeck and Redwood. Indeed, even under the more restrictive pre-*Ratha II* framework previously applied by the Court the TAC would still satisfy the properly applied pleading standard.

Further, Visa's effort to reopen standing must be rejected. *Murthy v. Missouri*, 603 U.S. 43 (2024), did not disturb Congress's authority under the TVPRA to impose liability where a defendant's conduct is fairly traceable to the harm, nor does it unsettle this Court's prior determination that Plaintiffs have standing to pursue their claims against Visa.  The TAC's well-pleaded allegations only reinforce that ruling.  The Court should therefore reject Visa's invitation to revisit standing based on its incorrect reading of *Murthy* as imposing a heightened traceability requirement.

Plaintiffs also state claims under California's Unfair Competition Law ("UCL"). The TAC alleges unlawful, unfair, and fraudulent business practices— facilitating, financing, and protecting a business model dependent on sexual exploitation.  That conduct offends established public policy and is pleaded with particularity under Rule 9(b).  The TAC likewise plausibly alleges civil conspiracy under California law, which extends liability to torts that are the natural and probable consequences of the common plan.

Finally, the TAC amplifies and clarifies prior pleadings, it does not contradict them.  And even if it did, settled Ninth Circuit precedent is clear that nothing prevents a plaintiff from revising allegations in subsequent pleadings even if those revisions—unlike the TAC—are inconsistent with prior pleadings.

The Ninth Circuit's recent *Ratha II* decision leaves no question but that the TAC alleges far more than is necessary at this pleading stage to sustain the claims asserted.  The motions to dismiss should be denied.

## LEGAL STANDARD

A motion to dismiss pursuant to Fed. R. Civ. P. 12 should be denied where a complaint "contain[s] sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."  Dkt. 605 at 20 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The court must construe the complaint in the light most favorable to the plaintiff, accept all allegations of material fact as true, and draw all reasonable inferences from well-pleaded factual allegations."  *See id.*  A plaintiff's factual

allegations are sufficient to survive a motion to dismiss "even if it strikes a savvy judge the actual proof of those facts is improbable and that recovery is very remote and unlikely." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556 (2007).

**NINTH CIRCUIT'S EN BANC DECISION IN *RATHA II***

On February 20, 2026, the Ninth Circuit, sitting en banc, confirmed this Court's prior holding that "the ATRA's changes to 18 U.S.C. § 1595(a) apply retroactively." *Ratha v. Rubicon Res., LLC,* 2026 WL 480006, at *12-13 (9th Cir. Feb. 20, 2026) ("*Ratha II*"). The majority concluded that ATRA did not create new liability; it confirmed that Congress had always authorized and intended civil remedies against those who attempt or conspire to benefit from trafficking. *See id.* at 7. The holding is consistent with Congress's clear mandate that TVPRA liability is "broad," "expansive," and intended to punish a wide range of conduct. *See Acevedo v. eXp Realty, LLC,* 713 F. Supp. 3d 740, 766 (C.D. Cal. 2024) (observing that the TVPRA is a remedial statute that is intended to be construed broadly and applies to cases that may not be the "archetypal" sex trafficking action).

After confirming retroactivity, the en banc panel proceeded to clarify the standards governing TVPRA liability and realign them with the statute's broad, remedial purpose and Congress's clear intent. *See id.* at 14. First, it held that the district court "held plaintiff to too high a bar" in imposing an operational or managerial element to the statutory definition of "participation." *Id*. Rather, the Ninth Circuit held that "because the statute contains no special definition" of "participation," the "ordinary meaning" applies and "one can participate in a venture without operating or managing it." *Id.* Specifically, the Ninth Circuit instructed that "participation's" ordinary meaning is "a taking part, association, or sharing (with others) in some action or matter." *Id.* (defining participation as an "act of taking part in something"). In doing so, it adopted the Eleventh Circuit's reasoning in *Doe # 1 v. Red Roof Inns, Inc.,* 21 F.4th 714, 724-25 (11th Cir. 2021)

that participation does not require a direct relationship with the direct trafficker and held instead that a relationship with another beneficiary was sufficient. *See id.* The Ninth Circuit similarly rejected the position that participation required some operational or managerial involvement in the direct trafficking. *Ratha II*, 2026 WL 480006, at *14.

Next, the en banc panel held the district court "doubly erred" in considering the elements of participation and knowledge by "failing to view the evidence in the light most favorable to Plaintiffs" with "all the facts and inferences in favor or plaintiffs." *Id.*

As set forth below, application of these standards to the facts alleged in the TAC mandates the same result.

## ARGUMENT

## I.    THE TAC PLEADS A CONSPIRACY TO VIOLATE THE TVPRA.

Section 1595(a) of the TVPRA authorizes suit against anyone who "conspires to benefit" from participation in a sex-trafficking venture. 18 U.S.C. § 1595(a).

Although the statute does not define the term "conspire," this Court has previously instructed that the common law standards for civil conspiracy governs the analysis. *See* Dkt. 605 at 34 (citing *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 484-85 (2023); *Sekhar v. United States*, 570 U.S. 729, 733 (2013)). Under those standards, the essential elements of a conspiracy are: (i) an agreement to accomplish an unlawful objective (or a lawful objective by unlawful means); (ii) an overt act in furtherance of that agreement by any conspirator; and (iii) resulting injury. *See* Dkt. 605 at 34 (citing cases).[3] An agreement requires: (i) knowledge of the wrongful activity; (ii) agreement to join it; and (iii) intent to further it. *See id.*

---

[3] Neither Visa nor Redwood contest that the TAC alleges overt acts in furtherance of the conspiracy and thus have waived this argument. *See Autotel v. Nevada Bell Tel.*

As to knowledge, this Court has properly held that a plaintiff need only show "actual awareness" of "MindGeek's participation as a beneficiary in a sex trafficking venture," not specific knowledge of acts perpetrated against the plaintiff herself.  *See id.*; Dkt. 614 at 30.  This holding conformed to settled Ninth Circuit precedent holding that awareness of criminality includes both positive knowledge and deliberate indifference.  *See United States v. Jewell*, 532 F.2d 697, 702, 704 (9th Cir. 1976) (en banc) (actual knowledge includes those circumstances where defendant's ignorance was "solely and entirely a result of . . . a conscious purpose to avoid learning the truth"); *see also United States v. Ramos-Atondo*, 732 F.3d 1113, 1120 (9th Cir. 2013) ("The *Jewell* standard eliminates the need to establish such positive knowledge to obtain a conspiracy conviction."); Anne Miller Welborn Young, *Willful Blindness: Applying a Drug Trafficking Theory of Liability to International Human Trafficking Prosecution*, 40 Berkeley J. Int'l L. 143, 159-63 (2022) (explaining willful blindness standard is particularly well suited to trafficking conspiracy and venture-based liability claims where upstream actors deliberately insulate themselves from direct confirmation).

This Court also properly applied the Ninth Circuit's similarly broad definition of agreement and intent, the proof of which "often overlap."  Dkt. 605 at 39.  A "tacit, as opposed to explicit, understanding is sufficient," and "is generally inferred from circumstantial evidence revealing a common intent."  Dkt. 614 at 32-33 (quoting *Halberstam v. Welch*, 705 F.2d 472, 480 (D.C. Cir. 1983)).  Relevant circumstantial evidence includes "the relationships between the actors and between the actions," "the duration of the actors' joint activity" and the existence of "active engagement" "customization," "coordination," and "trafficking specific support."  Dkt. 614 at 34-35.

---

*Co.*, 697 F.3d 846, 852 n.3 (9th Cir. 2012) ("[a]rguments raised for the first time in a reply brief are waived") (citation omitted).

### A.    Visa Conspired with the Trafficking Venture.

The TAC alleges Visa had actual knowledge of MindGeek's participation in a venture to commercialize and monetize child pornography and other illegal content; agreed to join that venture; and took affirmative steps to further it through its own network and its network banks.

### 1.    Knowledge of the Wrongful Activity.

This Court already found that Plaintiffs alleged sufficient facts to support an inference that Visa knew MindGeek's business relied, at least in part, on the monetization of trafficking-related content. Dkt. 614 at 32-33. In so holding, the Court reasoned Visa's knowledge may be inferred from Visa's "internal due diligence" of MindGeek's business and websites, receipt of "concrete complaints from advocacy groups," inclusion on the "'Dirty Dozen' list" and notice that PayPal terminated its relationship with MindGeek over similar concerns. *See id.* at 31; *see also* TAC ¶¶ 286, 294-302. This holding is law of the case and should not be revisited on this motion. *See Delta Sav. Bank v. United States,* 265 F.3d 1017, 1138 (9th Cir. 2001) (absent "exceptional circumstances" or intervening change of law, revisiting earlier order is abuse of discretion).

In addition to the indicia of knowledge that were sufficiently alleged in the SAC, the TAC alleges further facts that Visa acquired direct and intimate knowledge of MindGeek's monetization of CSAM and illegal content from a host of additional sources including:

(i)    Visa's risk assessments and monitoring the online pornography industry generally and MindGeek specifically (*id*. ¶¶ 295-96);

(ii)    Visa's network banks' due diligence (*id*. ¶ 296);

(iii)    Third-party monitoring and reporting concerning MindGeek's violations of Visa's merchant agreements (*id*.),

(iv)    MindGeek's merchant mandatory self-reporting (*id*.);

(v)  Repeated and escalating public and private warnings from victims, the media, regulators, and law enforcement identifying trafficking on MindGeek's platforms (*id.* ¶¶ 296, 311, 314-17);

(vi)  Visa's and its merchant bank's continuous processing of transactions on MindGeek's sites involving known human traffickers, such as MindGeek's partner channel GirlsDoPorn, including after the conviction of GirlsDoPorn's founders on federal sex trafficking charges in 2019 (*id.* ¶¶ 309, 312);

(vii)  Visa's coordination with MindGeek to minimize the visibility of illegal content on MindGeek's sites without removing the content, including by suggesting changes to words and descriptions (*id.* ¶ 310); and

(viii)  Visa's coordination with MindGeek to mitigate the public reporting of illegality and misrepresent that MindGeek's operations were legal and compliant with Visa's standards (*id.* ¶ 311).

Visa's challenge ignores *Ratha II* and the TAC's far more substantial allegations of knowledge. Addressing only the allegations in the earlier SAC and the Court's prior order, Visa contends that the Court should vacate its prior ruling concerning knowledge because the TAC fails to allege Visa "internally understood" MindGeek was engaged in an unlawful trafficking conspiracy. Visa Mot. at 13 (citing *Intel Corp. Sulyma*, 589 U.S. 178 (2020)). Visa argues that allegations it "was in receipt of facts from which it *could* have learned about the alleged unlawful conduct," without allegations that "Visa actually learned about the alleged conspiracy through its due diligence" are insufficient. Visa Mot. at 12 (emphasis in original). This argument is irreconcilable with *Ratha II*.

The Supreme Court and Ninth Circuit have consistently rejected identical arguments in repeatedly holding that a plaintiff need not plead specifically a defendant's internal admissions or self-labeling of illegality but may allege knowledge generally at the pleading stage. *See, e.g.*, *Walling v. Beverly Enters.*, 476 F.2d 393, 397 (9th Cir. 1973); *Odom v. Microsoft Corp.*, 486 F.3d 541, 554 (9th Cir. 2007) ("[T]he state of mind—or scienter—of the defendants may be alleged

CASE NO. 21-CV-04920-WLH-ADS

generally.").  Moreover, as the Supreme Court explained in *Intel*, even at the summary judgment stage, actual knowledge may be established through "circumstantial evidence," including "willful blindness.'"  589 U.S. at 189-90.  The TAC provides several categories of specific, direct and circumstantial allegations from which a reasonable jury could find knowledge.  Visa's challenge to these allegations is nothing less than a request that the Court dismiss the allegations as a trier of fact, which *Ratha II* reminds cannot be done.

Accordingly, the Court's prior holding is correct and should not be revisited.

2.     Agreement to Join the Conspiracy.

The TAC also pleads facts sufficient for a reasonable jury to find Visa agreed to join the conspiracy.  Specifically, it explicitly alleges that in order to accommodate MindGeek's trafficking, Visa created a customized MindGeek set of practices and standards that were inconsistent with the parties' contract and the typical treatment of other merchants.  These customized arrangements and accommodations to facilitate MindGeek's trafficking included, among other things, the following:

(i)     **Visa agreed to exempt MindGeek from ordinary compliance and enforcement.** Visa made a de facto exception for MindGeek and allowed it to operate outside its compliance regime, suspended enforcement mechanisms that applied to and would have resulted in termination of other merchants, declined to terminate or suspend MindGeek in response to third-party reports of illegal activity, and instead allowed MindGeek to provide pretextual public reports and self-certifications that were inconsistent with Visa's standards and rules or its practices for other merchants (TAC ¶¶ 287, 291, 304-07, 312-13, 317);

(ii)     **Visa agreed to permit MindGeek to route payments through MindGeek-controlled third-party processors to conceal illegality**. Visa delegated to those payment processors the putative obligation of monitoring the merchant, *i.e.*, permitting MindGeek to monitor itself which was a deviation from its practice with other high-risk merchants (*id.* ¶¶ 288, 308);

(iii) **Visa coordinated with MindGeek to minimize visibility of illegal content on its tubesites so it could continue processing payments.** In response to public reporting or reports from advocates, law enforcement, regulators and victims, Visa collaborated with MindGeek to scrub the site of illegality and suggested changes to certain words and descriptions connected to illegal content, but not the removal of content or other consequences (*id.* ¶¶ 310, 313);

(iv) **Visa agreed to remove restrictions on payments that had clear indicia of trafficking.** Visa lifted restrictions on high-risk payments with clear indicia of trafficking that would have resulted in suspensions or blocks on other merchant accounts (*id.* ¶¶ 310, 312);

(v) **Visa agreed to ban terminology on certain platforms.** Visa permitted use of banned words on MindGeek's tubesites that it had banned on its premium sites so Visa could continue processing payments for that illegal content without detection (*id.* ¶¶310); and

(vi) **Visa coordinated with MindGeek to mitigate public reporting of illegality**. In response to mounting scrutiny, Visa and MindGeek coordinated to align public messaging, and Visa affirmatively misrepresented MindGeek as compliant and lawful and misled the public about its own enforcement posture (*id.* ¶¶ 311, 314, 316).

These categories are qualitatively different than the passive nonfeasance Visa's claims cannot constitute an agreement. Each category required Visa to agree to do something it would not have otherwise done with any other merchant or agree to refrain from something it would have ordinarily done with any other merchant. And the TAC alleges these were agreements unique to MindGeek as opposed to a universal practice. Indeed, some categories of this customized service arrangement involved mutual collaboration between MindGeek and Visa directly. These allegations are categorically and qualitatively the opposite of mere passive nonfeasance or indifference; they are intentional, directed, and unique.

Thus, the TAC alleges that despite knowledge of MindGeek's persistent wholesale noncompliance with Visa's mandatory contractual terms of service, "Visa nevertheless agreed with MindGeek and Visa's network banks to process payments

irrespective of MindGeek's known non-compliance.  This agreement was manifested in several bespoke practices unique to MindGeek that deviated entirely from Visa's contract with MindGeek, its mandatory compliance and enforcement regime, and its application of those contractual terms and enforcement regime to other merchants." TAC ¶ 303.

For example, the TAC alleges that "Visa worked with MindGeek to develop payment structures to help them both continue to process illegal payments without public exposure."  This included agreeing to "permit MindGeek to process substantial amounts of online payments through 'Third-Party Payment Processors' that MindGeek actually owned"; agreeing to delegate monitoring of MindGeek's compliance to MindGeek itself; and agreeing to both elements even though "[u]nder similar circumstances, Visa would not have permitted other merchants to operate in this manner." *Id.* ¶¶ 308-09.

This unique MindGeek operational arrangement included Visa's agreement that "its network banks [could] onboard MindGeek . . . despite its illegal behavior and content" and "ignore the applicable compliance and enforcement obligations," including "avoid[ig *bona fide website monitoring,*" publishing pretextual periodic reports, and "ignoring its own internal standards and practices in response to reported violations by MindGeek," all of which "would have caused Visa to sanction and eventually terminate any other merchant. . . ." *Id.* ¶¶ 304-07.

Visa's agreement also involved "Visa and MindGeek [] collaborat[ing] on minimizing the visibility of illegal conduct," including "Visa and its network banks sometimes suggest[ing] changes to words and descriptions connected to illegal content" but not the removal of the content or imposition of any sanction or correction as would have occurred with other merchants.  *Id*. ¶ 310.  Likewise, Visa agreed to "remove[] restrictions on payments that had clear indicia of trafficking and which would have resulted in a suspension or blocks on other merchant accounts." *Id.*  Finally, the TAC alleges "Visa and MindGeek repeatedly coordinated their

1    public comments to misrepresent that MindGeek's operations were legal and in

2    compliance with Visa's standards" despite both knowing this was not true. *Id.* ¶¶

3    311-18.

4        And the TAC alleges Visa's agreement to continue its "long-standing

5    arrangement with MindGeek under which it was permitted to operate outside Visa's

6    standards and rules was the subject of extensive discussions at the highest levels of

7    Visa and the participating members of its network banks" with substantial objections

8    to such customized treatment being voiced. *Id.* ¶ 319.

9        Finally, the TAC alleges MindGeek-specific motivations for Visa in creating

10   this customized processing system and a *quid pro quo* between MindGeek and Visa

11   for it doing so.  Visa sought to become the dominant payment processor in the

12   exploding online porn industry, and MindGeek agreed to help it do so by

13   "direct[ing] payment transaction volume through Visa's payment network." *Id.* ¶¶

14   292-93, 321.  "[T]his quid pro quo arrangement allowed Visa and its network banks

15   to become the dominant payment processor for MindGeek" and to charge "fees [] as

16   much as 1000% higher than for most merchants." *Id.* ¶ 293.  And MindGeek

17   "agreed to pay these high fees to have access to the most recognized and accessible

18   payment brand while being able to pursue its unrestricted content model." *Id.*

19       Visa's challenge to these detailed factual allegations demands nothing short of

20   this Court ignoring *Ratha II* and substituting its own factual assessment for what a

21   reasonable jury might conclude accepting all of Plaintiffs' alleged facts and

22   reasonable inferences as true.  Visa Mot. at 14-17; *see Ratha II*, 2026 WL 480006 at

23   *14.

24       *First*, Visa tries to rewrite the TAC as alleging nothing more than Visa's mere

25   passive observation and non-enforcement, which the Court previously found

26   insufficient.  Visa Mot. at 14-15.  But contrary to Visa's assertions, the TAC pleads

27   far more than merely a failure to act in response to clear indica of CSAM.  To the

28   contrary, the TAC alleges Visa actively agreed and collaborated with MindGeek on

a MindGeek-specific payment regime that was (a) inconsistent with the parties' contract, Visa's policies and practices, and the treatment of other Visa merchants, and (b) adopted this bespoke arrangement specifically to accommodate MindGeek's known use of Visa's network to monetize trafficking in exchange for extraordinarily higher fees and major strategic assistance.  TAC ¶¶ 288, 303-10, 315, 317, 321, 367.

In the hospitality context, similar bespoke accommodations and special treatment have consistently been held to be more than mere inaction or normal course activities sufficient to plead participation liability under the statute.  For example, hotel operators are liable as participants under the TVPRA where hotel services are uniquely provided for the specific purpose of accommodating trafficking, such as by permitting special access to entrances, providing isolated rooms, or accepting cash or oral identification instead of otherwise required credit card information and formal identification.  *See, e.g.*, *B.T. v. G6 Hosp., LLC*, 2025 WL 2781131, at *9 (S.D. Ohio Sept. 30, 2025) (hotel allowed "payment in cash, extended stays paid for on a day-to-day basis" and requests for rooms away from other guests); *United States v. Bhimani*, 2021 WL 5179196, at *11 (M.D. Pa. Nov. 8, 2021) (hotel managers instructed employees not to call police as it was "bad for business," rooms in back hallway were reserved for traffickers); *L.M.H. v. Red Roof Inns*, 2025 WL 961720, at *9-11 (S.D. Ohio Mar. 31, 2025) (defendant assisted plaintiff's trafficking "by accepting cash payments, foregoing identification requirements, and providing extra housekeeping services to cover the traffickers' tracks after they left").[4]..

---

[4] *Doe (J.R.L.) v. Hilton Domestic Operating Co. Inc.*, 2025 WL 3215615, at *6 (D. Mass. Nov. 18, 2025) (finding franchisor vicariously liable because defendant assisted trafficking by accepting cash payments, permitting prolonged use of "Do Not Disturb" signs, and accommodating traffickers' requests for particular isolated rooms); *Doe v. JRD P'ship*, 2025 WL 2406429, at *6-8 (M.D. Tenn. Aug. 19, 2025) (traffickers selected hotel because of expectation of minimal interference and certain area of hotel was "informally designated for traffickers, drugs, and prostitution");

Likewise here, Visa proactively accommodated MindGeek's trafficking (a) exempting MindGeek from required monitoring and reporting requirements, (b) instructing MindGeek to utilize its own third-party payment processors and delegating to those captive payment processors compliance responsibilities; (c) collaborating on masking MindGeek's illegality from public discovery; (d) lifting restrictions specifically for MindGeek arising from obviously illegal or suspicious conduct; (e) collaborating on, and approving, the use on MindGeek's tubesites of words used to facilitate trafficking that were banned on the pay sites for which Visa processed payments; and (f) coordinating knowingly false and misleading public messaging to further conceal the illegality.  TAC ¶¶ 303-05, 308, 367.  These facts go far beyond merely ignoring trafficking.

*Second*, Visa attempts to characterizes the TAC's specific allegations of its coordinated efforts to minimize visibility of illegal content as routine "business advice."  Visa Mot. at 17.  This argument is incoherent.[5]  As a threshold matter, providing "business advice" is not a service Visa provides or contracted with MindGeek to provide, and certainly advice on altering descriptions of illegal content to conceal MindGeek's misconduct is neither a subject of their contract nor normal payment processing services.  TAC ¶¶ 310, 313.  Thus, even if the Court improperly accepted Visa's characterization at this pleading stage, this extra-contractual, non-

*W.K. v. Red Roof Inns, Inc.*, 692 F. Supp. 3d 1366, 1371 (N.D. Ga. 2023) (denying defendant's motion for summary judgment where hotel employee would call traffickers to inform them when police were present).

[5] The Ninth Circuit's holding in *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008), cited by Visa, (Visa Mot. at 14), that widespread setting of minimum banking fees were routine banking transactions is inapposite here, where the TAC alleges that Visa departed from its widespread practices with respect to MindGeek and knowingly and actively tailored its services to assist MindGeek's unlawful business objectives, including by lifting payment restrictions on content bearing indicia of trafficking and encouraging  delegation of monitoring obligations to the MindGeek entities it was routing payments through.

payment processing related advice alone admits Visa's agreement to participate in the trafficking.

The same is true of Visa's alleged practice of removing restrictions on MindGeek payments for transactions with clear indicia of trafficking that would have prohibited processing for other merchants.  *See id.* ¶ 310.  Such selective proactive action unique to MindGeek is anathema to normal payment processing and the very rigorous compliance standards Visa touts that it demands of its merchants.

Similarly, Visa's assertion that the use of "third-party payment processors for all kinds of merchants" has been a "long allowed" practice likewise ignores the actual allegations of the TAC.  Visa Mot. at 16.  The TAC does not allege conspiracy merely because Visa permitted MindGeek to use its own payment processors, but because (a) Visa did so knowing MindGeek was using Visa to process trafficking payments; (b) Visa would not have permitted similar high-risk merchants to use captive payment processors; and (c) Visa did so to preserve its ability to continue processing such illegal payments at agreed upon exorbitant fees. TAC ¶¶ 308, 321.  This clearly distinguishes Visa's alleged conduct from merely normal payment processing services or mere indifference:  it is acting contrary to its normal payment processing services for MindGeek specifically, knowing MindGeek is using that service for trafficking, and Visa is doing so for the purpose of permitting that use in exchange for an extraordinary benefit.

Failing to lock a bank safe without more does not itself give rise to a reasonable inference of a conspiratorial agreement to rob a bank.  But such an inference would be supported if that failure was made by someone who was supposed to lock the safe, who otherwise always did lock the safe, and who knew an associate was about to rob the safe.  Likewise, the fact a hotel might have "long allowed" customer requests for a room with a view, does not preclude an inferred conspiratorial agreement when the hotel also accommodates a known trafficker's request for, or the hotel on its own assigns, an isolated room where trafficking

cannot be observed.  *Cf. Bhimani*, 2021 WL 5179196, at *11 (rooms in back hallway were reserved for traffickers).

The same is true in the context of financial institutions involved in the typically unremarkable act of transferring money.  Thus, in *Doe v. Bank of America*, the court held that a bank's transfer of money for known traffickers under suspicious circumstances, and its failure to follow usual procedures in doing so, "go 'beyond merely providing [such] usual services'" and constitute "intentionally facilitating" trafficking.  2026 WL 380385, at *7 (S.D.N.Y. Feb. 11, 2026) (bank participated in trafficking venture through money transfers under suspicious circumstances).[6]

The TAC's allegations that Visa knew MindGeek was using its network to monetize trafficking, processed those payments anyway, and did so in a manner inconsistent with the parties' contract, Visa's own rules and practices, and how Visa treated other merchants (TAC ¶¶ 308-09) is not ordinary third-party processing but "well beyond" usual payment services.  It certainly is evidence from which a reasonable jury could find that Visa explicitly or tacitly agreed to support and facilitate MindGeek's illegal conduct.

Next, Visa contends that the detailed allegations of its customized services are impermissibly vague or conclusory.  Visa Mot. at 14-15.[7]  Not so.  The TAC

---

[6] Although Visa contends it is not plausible it developed a new payment structure for transactions comprising a miniscule percentage of Visa's revenue (Visa Mot. at 16-17), the TAC does not allege captive payment processors were created just for MindGeek.  It alleges MindGeek was permitted to use this structure despite being a high-risk merchant that Visa knew was engaged in trafficking, and which would not have otherwise been permitted to use captive merchant processors or self-monitor.  This required an explicit agreement by Visa to permit something specially for MindGeek for the purpose of facilitating its trafficking.  It is obviously not merely indifference.

[7] Visa's attempt to contrast the specificity of claims asserted against MindGeek (Visa Mot. at 13) is misleading because Plaintiff had the opportunity to take months of jurisdictional discovery from MindGeek before filing the SAC.

identifies the specific monitoring, suspension, and termination standards applicable to other merchants; and it describes the ways in which Visa departed from those standards in its dealings with MindGeek.  TAC ¶¶ 298, 303-05, 310.  These allegations are more than sufficient to put Visa on notice of its alleged wrongdoing at the pleading stage.  *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (Rule 8 does not demand discovery-level proof, and where competing inferences exist, they must be drawn in plaintiffs' favor).[8]

Finally, Visa's attempt to trivialize the allegations of coordinated public messaging ignores the context.  The TAC alleges Visa collaborated closely with MindGeek to mitigate public reporting of illegality in response to mounting scrutiny and affirmatively assisted MindGeek in doing so by publicly misrepresenting that MindGeek was in compliance with Visa's merchant rules, even when Visa knew this was not true.  TAC ¶¶ 311, 314, 316.  This close coordination is consistent with the TAC's allegations of years-long active engagement, customization, and trafficking specific support.  *Id.* ¶¶ 287, 291-92, 303-05, 308-10.

Taken together, the TAC plausibly alleges that Visa affirmatively aligned itself with MindGeek's unlawful objective to monetize CSAM and entered into an agreement to advance it.[9]  These allegations show the type of "interaction,

---

[8]  The cases Visa relies on regarding the specificity required at the pleading stage concern unique statutory or legal circumstances not at issue here.  *See Austin v. University of Oregon*, 925 F.3d 1133, 1138 (9th Cir. 2019) (Title IX discrimination requires showing of motivation by gender bias); *Blantz v. Cal. Dep't of Corr. & Rehab.*, 727 F.3d 917, 926-27 (9th Cir. 2013) (addressing government's vicarious liability for employee's discrimination).

[9]  *Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1193 (9th Cir. 2015), is inapposite.  It addressed the evidentiary showing required to establish the amount in controversy under CAFA when removal is contested—not the sufficiency of allegations under Rule 12(b)(6).  *Id.* at 1197-99.  There, assumptions "pulled from thin air" arose in the context of weighing competing damages evidence on remand.  *Id.* at 1199-1200.

coordination, or shared purpose" and "affirmative participation" required to support an agreement.  Dkt. 614 at 35.

### 3.  Intent To Further the Venture's Unlawful Objective

An intent to further an unlawful objective "often overlaps with the requirement of an agreement" (Dkt. 605 at 39) and thus also may be inferred from allegations that a defendant "went beyond standard business practice," "affirmatively aligned itself with the venture's unlawful aims," or made a "conscious decision to help achieve the venture's illicit purpose."  Dkt. 614 at 37-39; *see also* Dkt. 605 at 39.

Visa claims that, at best, the TAC alleges indifference to the illegal activity, which is insufficient to infer its agreement or intent.  Visa Mot. at 18 (citing *Doe 1 v. Deutsche Bank*, 671 F. Supp. 3d 387, 412 (S.D.N.Y. 2023).  The TAC contains ample allegations that Visa agreed to take affirmative proactive steps to facilitate MindGeek's trafficking activities and intended to profit from this wrongful conduct that went well beyond indifference or normal business practices.  As set forth *supra*, section I.A.2, the TAC pleads Visa's years-long agreement to proactively facilitate MindGeek's commercialization of CSAM and other illegal content through Visa's network and its network banks.  It alleges Visa did so because it wanted to (a) become the primary payment processor in the booming online porn industry and capture that market's substantial and rapidly increasing flow of payment transactions, especially those of its emerging dominant monopolist, MindGeek (TAC ¶¶ 291-92, 321); (b) receive the higher fees Visa and its network banks could charge MindGeek on these transactions that many other competing legacy payment processors refused to process (*id*. ¶¶ 291, 293, 321); (c) ensure MindGeek directed payment transaction volume through Visa's payment network as opposed to alternatives (*id*. ¶¶ 291-92); and (d) prevent emerging payment processing alternatives like crypto, direct transfers, and digital wallets from working with MindGeek and this industry to grow more competitive (*id*. ¶¶ 291-292).

The TAC further alleges this *quid pro quo* arrangement allowed Visa and its network banks to become the dominant payment processor for MindGeek, processing the majority of its payment transactions. *Id*. ¶¶ 291-92, 321.  It alleges this status was of critical importance to Visa, which ran a non-premium volume business and had placed gaining market share in transaction volume as one of its highest priorities, particularly in the emerging online marketplace overall, and the booming adult online industry in particular. *Id*. ¶ 292.  The arrangement also allowed Visa and its member banks to charge fees exponentially higher than those charged to other merchants, by as much as 1000%, which MindGeek agreed to pay to have access to the most recognized and accessible payment brand while being able to pursue its unrestricted content model.[10]  *Id*. ¶¶ 291, 293, 321.

### 4.    Plaintiff has Article III Standing Against Visa.

More than three years ago, the Court rejected Visa's standing arguments, ruling that Plaintiff's injuries are fairly traceable to "Visa's conduct of recognizing MindGeek as a merchant," which was "at least a substantial factor motivating [MindGeek's] actions."  *See* Dkt. 166 at 10-13 & n.7.  In so ruling, the Court reasoned that Visa's conduct enabled MindGeek to monetize trafficking content and provided the financial infrastructure to sustain its operations.  *See id.*  Based on these findings, Visa did not re-raise standing in the last round of motions to dismiss the SAC.  *Compare* Dkt. 614 (Order regarding Visa with no mention of already established standing) *with* Dkt. 605 (Order regarding Redwood and Colbeck with lengthy discussion finding standing).

---

[10] Visa argues the allegations of intent to further trafficking are irreconcilable with other facts, such as Visa attempting to mitigate illegal content when alerted to its existence on MindGeek's sites.  Visa Mot. at 19.  But viewed in the light most favorable to Plaintiffs, the TAC alleges that, when confronted with evidence of trafficking, Visa coordinated with MindGeek to minimize visibility, not remove it.  *See* TAC ¶¶ 308-10.

Although the TAC contains the allegations on which Judge Carney's standing analysis relied, as well as additional allegations that support standing under the standards the Court applied to Redwood and Colbeck (Dkt. 605; *see generally* TAC ¶¶ 286-325), in its latest motion to dismiss, Visa attempts to relitigate standing, invoking *Murthy v. Missouri*, 603 U.S. 43 (2024) as new law. *See* Visa Mot. at 9. But *Murthy* did not heighten the traceability standard as Visa contends. Instead, *Murthy's* standing analysis examined whether plaintiffs could show future social media content moderation decisions would likely be caused by government pressure applied to social media platforms rather than the platforms' independent judgment. *Id.* at 55-64. Because many of the platforms' moderation decisions predated or coincided with the challenged government communications, the Court ruled it was impossible to determine whether moderation of plaintiffs' posts resulted from official pressure or the platforms' preexisting policies. *See id.* Because the causal chain was speculative, standing failed.

No such temporal defect exists here. Courts applying *Murthy* in the TVPRA context have acknowledged "the principle animating *Murthy* is the prevention of "guesswork as to how independent decisionmakers will exercise their judgment," cautioning "abstention from cases in which "the 'direct' relationship between the alleged injury and the claim sought to be adjudicated" can 'be termed only speculative.'" *F.C. v. Jacobs Solutions Inc*., 790 F. Supp. 3d 1158, 1173 (D. Colo. 2025) (although defendants did not directly cause harm, they were "not wholly independent actors," and indirect harm does not defeat traceability under the TVPRA); *accord Coubaly v. Cargill Inc*., 144 F.4th 343, 347-48 (D.D.C. 2025) (citing *Murthy* and noting TVPRA reaches defendants "involved indirectly with

slavery" through their "participation in a venture"). The Court should reject Visa's attempt to recast *Murthy* as requiring a heightened standard.[11]

Further, Visa's effort to reopen standing crumbles under the weight of the TAC's expanded factual allegations, which reinforce the Court's prior traceability determination by detailing how Visa enabled and supported MindGeek's trafficking activities through bespoke, merchant-specific accommodations. *See, e.g.*, TAC ¶¶ 286-87 (knowing facilitation of MindGeek's model), ¶¶ 287, 291, 304-07, 312-13, 317 (exemption from ordinary enforcement), ¶¶ 288-89, 307-08, 310, 313 (concealment through collaboration and payment structuring), ¶¶ 311, 314, 316 (coordinated public misrepresentations). That MindGeek continues to operate without Visa—supposedly proving that Visa was not a "but-for" cause (Visa Mot. at 10)—is beside the point. Visa's conduct need not be the sole cause of Plaintiffs' injuries, the sole motivation for sex traffickers to traffic on MindGeek's websites, or the exclusive financial infrastructure sustaining the venture. *See Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 995 (9th Cir. 2000); *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002) (explaining that the chain of causation may have "more than one link," provided it is not "hypothetical or tenuous"). Article III requires a plausible causal nexus—not exclusivity—and this Court has already found one. Dkt. 166 at 10-13; *id.* at 13 n.7. Against this

---

[11] Through the TVPRA, as amended by the Allow States and Victims to Fight Online Sex Trafficking Act of 2018 ("FOSTA"), Congress expressly authorized trafficking victims to bring civil claims against any person or entity that "knowingly benefits, financially or by receiving anything of value, from participation in a venture" that engaged in sex trafficking. 18 U.S.C. §§ 1591(a)(2), 1595(a). FOSTA clarified and strengthened that civil remedy to ensure that in addition to the hands-on traffickers and abusers, all facilitators and financial beneficiaries could be held liable. In doing so, Congress made a deliberate judgment that victims suffer cognizable injury from the financial and operational facilitation of trafficking ventures.

backdrop, the Court should reject Visa's invitation to reconsider standing based on an incorrect reading of *Murthy*.

**B.  Colbeck and Redwood Conspired with the Trafficking Venture.**

Colbeck and Redwood argue that the TAC fails to allege their (1) knowledge of MindGeek's monetization of CSAM and nonconsensual content, (2) agreement to join in the wrongful activity, and (3) intent to aid in the monetization. *See* Colbeck Mot. at 18; Redwood Mot. at 14. Colbeck also claims that the TAC fails to allege that it committed an overt act in furtherance of the conspiracy. Colbeck Mot. at 18. The TAC amply pleads each of these elements.

### 1.    Knowledge of the Wrongful Activity

In ruling that the SAC alleged sufficient facts from which a reasonable juror could infer Visa's knowledge of MindGeek's illegal activities, the Court relied on allegations of Visa's ongoing due diligence, receipt of concrete complaints from advocacy groups, and review of public reporting about MindGeek's business. Dkt. 614 at 31. The TAC alleges that Colbeck and Redwood were each acutely aware of MindGeek's business model from these same sources and far more.

At the very minimum, Colbeck's and Redwood's knowledge of MindGeek's illegal business model is evident from the exorbitant interest rates and other draconian economic and control rights each were able to charge for fully secured loans because mainstream sources of capital were unwilling to fund the illegal activities that the most basic google search or minimum diligence revealed. TAC ¶¶ 225-36, 241-49, 253-70, 361. Moreover, Colbeck's and Redwood's knowledge is also evident from their utter lack of response to the decade of public reporting and concrete complaints about the rampant existence of child pornography and nonconsensual content on MindGeek's sites because each knew and were neither surprised, nor unhappy about the practices. *Id.* ¶¶ 252, 269-71, 278-84. To the contrary, this had always been the business plan they had designed, developed, controlled, directed, and funded, and from which each knowingly earned hundreds

of millions of dollars of otherwise unavailable profits. *Id.* ¶¶ 223-29, 248-56, 257-69, 276-84.

(a)    **Colbeck**

The TAC alleges Colbeck acquired intimate knowledge of MindGeek's illegal activities through its role in providing almost a billion dollars in financing: (i) developing the investment thesis and business plan (*id.* ¶¶ 223-24, 248, 256); (ii) diligencing it (*id.* ¶¶ 226, 245, 261); (iii) identifying MindGeek's predecessor, Mansef, as an acquisition target to implement the unrestricted business model (*id.* ¶¶ 221, 225-27); (iv) substantially funding Mansef's acquisition, rebranding, and subsequent expansion and growth (*id.* ¶¶ 224-29, 232, 239-40, 249); (v) recruiting other lenders to the syndicate (*id.* ¶¶ 241-42, 246, 250-51); and (vi) through the next seven years during which Colbeck monitored, analyzed, directed, and controlled every aspect of the unrestricted business model it had designed and elected to make a centerpiece of its new fund (*id.* ¶¶ 227-37, 248-56).

Like Visa, immediately after launching its new fund and identifying Mansef, as a potential acquisition target, Colbeck conducted comprehensive analysis of every aspect of the business, including in-depth investigations and financial modeling of the tubesite businesses generally and the online pornography industry in particular, as well as Mansef's specific business model and legal risks, its competitors, and its websites. *Id.* ¶¶ 225-26. Colbeck's due diligence also included interviews with long-time MindGeek executives, Thylmann, ███████████████, other MindGeek personnel, and industry and legal experts. *Id.* ¶ 226. Moreover, the due diligence materials included reports from security and consulting firms that highlighted the risks associated with "minors" and "the distribution of illegal material" and euphemistically explained that the Company tried to "maintain such risks at acceptable levels for all stakeholders while, at the same time, maintaining the attractiveness if its products and services." *Id.* Thus, before making the acquisition and growth of Mansef a centerpiece of its new investment fund, Colbeck fully

1  understood that Mansef's business was engaged in disseminating illegal content and

2  endorsed those risks and the acceptable levels, (*i.e.* as much as possible). *Id.* These

3  business risks were not only known to Colbeck, they were central to its business

4  thesis and plan to drive as much traffic as possible. *Id.*

5      For the next seven years, Colbeck was intimately aware of every aspect of

6  MindGeek's business from its day-to-day management and operational control.

7  Colbeck's founders personally devised and directed the business plan to rebrand

8  Mansef and expand its business via an unrestricted content model that would

9  maximize traffic and revenue, and minimize moderation. *Id.* ¶¶ 223-37, 248-56.

10  They were involved in every strategic, governance, and operational decision,

11  including executive hiring and firing, corporate policies, compliance and

12  technologies, moderation, age verification, and policies for addressing CSAM and

13  other nonconsensual content on MindGeek's sites. *Id.* ¶¶ 232-34. They personally

14  identified acquisition targets that utilized this unrestricted business model, met with

15  them, including numerous meetings in Montreal and London, and negotiated the

16  terms of those acquisitions (*id.* ¶¶ 224-25, 232, 239, 249, 256) ▓▓▓▓▓▓▓

17  ▓▓▓▓▓▓▓▓ which was notorious for being "infested with illegal content."

18  *Id.* ¶¶ 239, 249. And they designed and directed the implementation of the

19  Byzantine, multi-national, Luxembourg-based corporate structure MindGeek used to

20  circumvent the much stricter criminal and civil laws and enforcement regimes

21  concerning pornography and CSAM in the United States, Germany, and Canada

22  where MindGeek actually operated and generated virtually all of its revenues. *Id.* ¶

23  235.

24      In this role, Colbeck also regularly met with MindGeek's senior management

25  team to discuss the Company's policies, procedures, and performance, including in

26  person meeting with Thylmann, and later ▓▓▓▓▓▓▓▓▓, in

27  California, Montreal, London, and Belgium. *Id.* ¶¶ 227, 232, 234, 253. They also

28  received regular reporting about the Company's operational and financial

performance, business plans, and legal issues and risks.  *Id*. ¶¶ 233-34, 248, 253-54.

The reporting Colbeck received included disclosures of complaints concerning child

pornography and other nonconsensual content raised by government regulators, law

enforcement, credit card companies, advocates, victims, and the press.  These

complaints were immediately escalated to Colbeck upon receipt.  *Id*. ¶ 233.  Colbeck

directed and approved the Company's general denials to each report and claim, even

though Colbeck knew the reports were true and the denials false.  *Id*.

(b) **Redwood**

The TAC also pleads Redwood's knowledge that MindGeek's business model

depended on monetizing child porn and illegal content both before it entered into the

2011 loan agreement and during the subsequent decade in which it financed, and

later, seized and exercised control of the business.

As one of the first and most significant members of the 2011 syndicate, prior

to investing, Redwood performed extensive due diligence of the tubesite businesses

generally and the online pornography industry in particular, as well as MindGeek's

specific business model and legal risks, its competitors, and its websites, including

review of Colbeck's investment analyses.  TAC ¶¶ 257, 259, 269, 275.  Redwood

repeated this extensive due diligence process in 2013 prior to materially increasing

its investment in the business, and then again in 2017 from which it decided to oust

Colbeck from the syndicate and replace it as lead lender so that it could seize greater

economics and control rights.  *Id*. ¶¶ 269, 275.  Moreover, throughout the period of

its investment, Redwood received detailed information about the existence of illegal

content on MindGeek's sites via monthly reporting about the business's operations

and performance, including among other things, website traffic, Google analytics

data, operational performance, compliance with 2257 law, and lists of accounts

1   suspended or cancelled as a result of violations. *Id.* ¶¶ 259, 264, 266, 269.[12]  It also

2   received regular and detailed updates from Colbeck in its role as one of the first and

3   most significant participants in the 2011 syndicate. *Id.* ¶ 259.  And Redwood was

4   aware of MindGeek's systemic use of child porn from its close monitoring of the

5   steady drumbeat of public reporting about the Company in which it held a

6   substantial and material investment, including regular and escalating reports of

7   illegal content on MindGeek's sites (*id.* ¶¶ 134-73, 278-80); the 2016 lawsuit filed

8   by victims of MindGeek's partner channel, GirlsDoPorn (*id.* ¶¶ 151-52); and

9   subsequent conviction of GDP's founders on federal sex trafficking charges (*id.*).

10       Redwood's knowledge of MindGeek's illegal activities and the increasing

11   success of the unrestricted content model is also evident from its 2017 decision to

12   oust Colbeck from the business and pay it a substantial settlement fee so that

13   Redwood could seize control of the syndicate and increase its share of the financing

14   and otherwise unavailable profits. *Id.* ¶¶ 271-74.  Evidencing Redwood's awareness



27   At a minimum, whether Redwood enforced its rights under those agreements and

what that required reporting showed cannot be resolved prior to discovery of

28   information in Defendants' exclusive possession.

CASE NO. 21-CV-04920-WLH-ADS

PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS

that it was financing an illicit business, unlike in 2011 and 2013 when it invested through its flagship funds (Redwood Master Fund and Redwood Opportunity Master Fund), when it seized control of the syndicate in 2018, it did so through three nondescriptly named Delaware LLCs with no overt connection to Redwood – Manuel 2018, LLC, Ginogerum, LLC, and White-Hathaway Opportunity LLC – each of which were formed through certificates of formation signed by a Delaware law firm and not any Redwood personnel.  *Id*. ¶ 276.

From 2018 forward, Redwood was intimately aware of MindGeek's illegal activities from its newly assumed unilateral control over every strategic and operational aspect of the business and its regular meetings and communications with MindGeek's executives.  *Id*. ¶¶ 275-77.

The fact that Redwood was aware of these illegal activities for years and nevertheless decided to invest substantially in MindGeek's business, materially increase its investment in 2013, and subsequently fight Colbeck for complete control in 2018 is reflected in Redwood's response to Nick Kristoff's December 2020 *New York Times* bombshell article exposing MindGeek's illegal business and Visa and Mastercard's immediate decision to suspend their relationships with MindGeek in response to the claims set forth therein.  *Id*. ¶¶ 278-80.  Redwood still took no action to materially alter MindGeek's practices.  *Id*. ¶¶ 281-82.  It did not demand that MindGeek immediately begin complying with 18 U.S.C. § 2257 and its loan covenants despite knowing that its actual corporate structure and operations required it to do so and that this was the simplest most effective means of ensuring it was only monetizing legal content.  *Id*. ¶ 281.  It did not demand answers as to whether the *New York Times*' devastating findings were true or how this could be the case if MindGeek truly had systems in place to prevent such things.  *Id*.  It did not demand that long-time MindGeek executives step down and be replaced by a new management team.  *Id*.  And it did not declare a default or seek foreclosure under its loan agreement.  *Id*. ¶¶ 269, 279.  Instead, its focus was exploiting the crisis to

-27-

1    secure even greater economics and a quicker repayment of its investment to preserve

2    it from risk.  It demanded that MindGeek agree to even higher interest rates and

3    other economic costs and to a quicker repayment.  *Id*. ¶¶ 281, 283-84.  To

4    accomplish this, it demanded that █████████████████████████████████████

5    ████████████████████████████████████████████████.  *Id*. ¶ 283.  But

6    it conspicuously left them in charge and approved of MindGeek's false denials of its

7    past business practices and public misrepresentation of its bogus efforts to enhance

8    its moderation process.  *Id*.  This strategy was directly devised and approved by the

9    head of Redwood, Ruben Kliksberg.  *Id*. ¶ 280.  After MindGeek successfully

10   complied with Redwood's direction, Kliksberg sent MindGeek a note commending

11   their actions even though he knew it would do little to address the problem and was

12   designed instead to preserve the existing business practices as much as possible by

13   silencing critics and deflecting scrutiny.  *Id*.  Redwood and Kliksberg did this

14   because they too wanted to minimize the impact on the business of any improved

15   moderation or compliance so as to ensure it could get repaid as quickly as possible

16   now that MindGeek's illegal business had been completely exposed.  *Id*. ¶¶ 280,

17   284.  Indeed, preserving this business model, with as little interference as possible,

18   was essential to their continuing ability to be repaid.  *Id*. ¶¶ 278-84.

19                              *        *        *

20          Like Visa, Colbeck and Redwood ask the Court to ignore these allegations

21   and credit their own characterization of the facts over those alleged in the TAC.

22   They recast themselves as arms-length, disinterested lenders and the concrete

23   examples of their specific knowledge of MindGeek's illegal business model as

24   "generalized assertions that sophisticated lenders 'should have known'" of red flags,

25   which they argue does not gives rise to liability under this Court's prior holding and

26   a long line of cases declining to impose liability on lenders for misconduct of

27   borrowers.  Colbeck Mot. at 14, 19-20; Redwood Mot. at 16-17.  But Plaintiffs do

28   not seek to impose liability on Colbeck and Redwood for MindGeek's misconduct;

-28-

they seek to hold both defendants liable for their own roles in controlling, directing, building, and operating a business predicated on child pornography and nonconsensual content, which is plainly actionable. *See Krivo Indus. Supply v. Nat'l Distillers & Chem.,* 483 F.2d 1098, 1103 (5th Cir. 1973) (when a lender so dominates another such "a subservient corporation may be labeled the instrument, agent, adjunct, branch, dummy, department, or tool of the dominant corporation" then, "the corporate form of the subservient corporation is disregarded so as to affix liability where it justly belongs."); *see also Famm Steel, Inc. v. Sovereign Bank*, 571 F.3d 93, 104 (1st Cir. 2009) ("[A] lender may be held liable under the common-law instrumentality theory when the lender exerts such a degree of control over the borrower that the borrower becomes a mere business conduit for the lender."). Moreover, courts routinely infer a lender's knowledge of illegal business activities from unusual circumstances or terms, such as the otherwise unavailable exorbitant interest rates and draconian control rights alleged here. *See Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 536 (6th Cir. 2000) (denying defendant's motion for judgment as a matter of law and finding that although the lending practice at issue was "commonplace," "the details of [the] particular loan . . . were highly unusual"); *see also Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir. 1975) ("[I]f the method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability.").

Similarly, Colbeck's and Redwood's attempt to analogize their roles and access to information to that of the dozens of other lenders in the syndicates (Colbeck Mot. at 19) is similarly unavailing. The TAC alleges Colbeck's and Redwood's role went far beyond that of a traditional lender in the syndicate (TAC ¶¶ 236-37. 256, 273, 285) and their access to information about the business, its operations, policies, compliance, and performance came from a host of sources beyond the reporting available to all syndicate members. *Id.* ¶¶ 226, 230, 233-34, 236, 245, 253-55, 269, 277.

1    Their putative reliance on the findings in the 2013 pre-financing due diligence

2    report prepared by ██████████████████████████ which opined that

3    MindGeek had "best-in-class" compliance procedures and adequate controls and

4    legal compliance mechanisms (Colbeck Mot. at 19), ignore the TAC's allegations

5    concerning the purpose of the ████ report and Colbeck's and Redwood's material

6    roles in its preparation.  *Id.* ¶¶ 242-245, 247-51, 262-67.  Moreover, they fail to rebut

7    the detailed allegations of their respective knowledge of MindGeek's unrestricted

8    business model before and after the ████ report from their substantial participation

9    in and control over the operation of the business (*id.* ¶¶ 269-70, 273, 275-76, 278-

10   85), the extensive due diligence each conducted before investing in the business in

11   2011, increasing their investments in 2013 (*id.* ¶¶ 226, 261, 275)*,* and in the case of

12   Redwood ousting Colbeck and assuming unilateral control over the business in 2018

13   (*id.* ¶¶ 271, 274-75, 277), their regular meetings and discussions with MindGeek's

14   senior executives (*id.* ¶¶ 232, 234, 253, 277), and their respective role in crafting

15   responses to complaints about CSAM and other nonconsensual content on

16   MindGeek's sites (*id.* ¶¶ 254-55, 278-83).  Given these allegations, there are, at a

17   minimum, numerous material questions of fact concerning whether Colbeck's and

18   Redwood's reliance on ████ findings were reasonable, which cannot be resolved

19   on this motion prior to discovery.  *Biggs v. Bank of Am. Corp.*, 2017 WL 11648863,

20   at *5 (C.D. Cal. July 28, 2017) ("Rule 9(b)'s heightened pleading requirement is

21   relaxed, however, when the allegations of fraud concern 'matters within the

22   opposing party's knowledge.  In such situations, plaintiffs can not be expected to

23   have personal knowledge of the relevant facts."); *United States v. Upton*, 559 F.3d 3,

24   11 (1st Cir. 2009) ("Determining the contours of the conspiracy ordinarily is a

25   factual matter entrusted largely to the jury."); *see also United States v. Campbell*,

26   507 F.2d 955, 57–58 (1974) (explaining that the jury might infer knowledge from

27   defendant's act in driving contraband-laden vehicle" when combined with other

28   factors including "joint nature of the venture").

Finally, Colbeck cannot feign ignorance of MindGeek's business model during the seven-year period it owned, controlled, and directed the Company because it exited the business prior to the 2019 and 2020 media reporting. Colbeck Mot. at 19. As set forth herein, Colbeck had access to all this information through its day-to-day operation of the Company and interaction with MindGeek executives. *Id*. ¶¶ 227, 232-34, 253. In any event, the TAC describes nearly a dozen of high-profile media reports detailing the prevalence of sex trafficking on MindGeek's sites dating back to 2014, (*id*. ¶¶ 134-73); and public disclosures about the 2016 GDP lawsuit and subsequent conviction of GDP executives on federal sex trafficking charge. *Id*. ¶¶ 151-52.

Taken together, these allegations are more than sufficient to infer Colbeck's and Redwood's actual knowledge at the pleading stage prior to discovery, where information about Colbeck's and Redwood's state of mind are uniquely in their possession. *See Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1051-52, 1057 (9th Cir. 2008) (factual disputes concerning defendants' knowledge required discovery); *Lemus v. Rite Aid Corp.*, 613 F. Supp. 3d 1269, 1282 (C.D. Cal. 2022) ("However, at the pleading stage, intent and knowledge 'may be alleged generally'" (citing Fed. R. Civ. P. 9(b); then citing *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993)). At a minimum, the TAC alleges Colbeck's and Redwood's willful blindness, which the Ninth Circuit has held is tantamount to actual awareness. *See supra* Section I (citing *Ramos-Atondo*, 732 F.3d at 1120); *United States v. Nicholson,* 677 F.2d 706, 710 (9th Cir. 1982) ("The circumstances surrounding the investment opportunity presented to Nicholson would have put any reasonable person on notice that there was a 'high probability' that the undisclosed venture was illegal."); *accord Ramos-Atondo*, 732 F.3d at 1120.

### 2.    Agreement to Join in the Wrongful Activity.

The TAC also pleads Colbeck's and Redwood's active engagement in MindGeek's business, and the customized services and trafficking specific support

-31-

each provided MindGeek to acquire, expand, and operate its unrestricted business model.

(a)    **The Allegations Amply Support the Alleged Agreement.**

1.    Colbeck

Contrary to Colbeck's assertions, nothing about Colbeck's interactions with MindGeek is consistent with a typical commercial lender-borrower relationship. The TAC details the years-long continuous, tailored, active, and trafficking-specific support Colbeck provided MindGeek over nearly a decade that it controlled the Company including, but not limited to:

(i)    developing the investment thesis and business model to build a monopolistic online porn conglomerate through an unrestricted content, including trafficked content, and acquisition of smaller porn companies which would further increase traffic and profitability (TAC ¶¶ 223–29, 234-42, 254-56, 357);

(ii)    implementing that strategy through the identification of Mansef as an acquisition target (*id.* ¶¶ 225-27);

(iii)    providing hundreds of millions of dollars in financing for the acquisition of Mansef, and the subsequent growth and expansion of the company through highly atypical loan terms, including twice issuing loans to MindGeek which exceeded the full value of the Company at the time the loans were issued so that Colbeck and MindGeek could execute its business plan and earn outsized profits (*id.* ¶¶ 225-33, 236-41);

(iv)    entering into a separate consulting agreement with MindGeek to provide strategic advice on the operation and growth of MindGeek's business (*id.* ¶ 232), through which Colbeck's founders and senior executives assumed day-to-day strategic and operational control over every aspect of the business, including over technology, moderation, age verification, and compliance (*id.* ¶ 233-38);

(v)    installing Fabian Thylmann as the nominal owner and face of the Company and ███████████████████████

████████████████████████████████ (*id.* ¶¶ 231);

(vi) identifying acquisition targets with the same business model, personally meeting with those targets, and negotiating the terms of their purchase (*id.* ¶ 232), ████████████████████ (*id.* ¶ 239-41);

(vii) devising and directing the implementation of a byzantine corporate structure the purpose of which was to conceal illegality and evade liability for the known commercialization of CSAM and illegal content on MindGeek's sites (*id.* ¶¶ 235, 246);

(viii) conspiring with MindGeek to commission sham audit reports to secure additional required financing in 2013 (*id.* ¶¶ 242-46), and recruiting Redwood to assist with preparation of those knowingly false reports and leveraging its relationship with ████████ (*id.* ¶¶ 257, 62);

(ix) regularly speaking and meeting with MindGeek's executive team, including meetings in Montreal, London, Belgium, and California (*id.* ¶ 234); and

(x) managing MindGeek's relationships with the credit card companies during this period, including preparing MindGeek's general denials to regular inquiries concerning media reports, or complaints from victims, advocates, and law enforcement and directing the Company not to remove content or make any changes in response to these inquiries (*id.* ¶ 255).

### 2.    Redwood

Redwood's role also went far beyond that of a standard, commercial lender. Like Colbeck, Redwood also provided hundreds of millions in funding for a business that it not only knew was engaged in illegal activities at the time it provided the funding, but provided the funding based on the economics of those illegal activities (TAC ¶¶ 257-60), and subsequently increased its investment after two years of observing exactly how that illegal business operated (*id.* ¶¶ 265-72). It too agreed to completely atypical loan terms, including a loan size that exceeded the Company's worth at the time it was made so that it could earn otherwise unavailable returns on a fully secured loan (*id.* ¶¶ 236, 68-69).

Moreover, the TAC also alleges Redwood's knowing and active involvement in securing additional financing for the Company in 2013 through the commission of a materially false and misleading Investor Memorandum, which Redwood was intimately involved in preparing and tailoring for its target audience. *Id.* ¶¶ 262–63. Among other things, after materially contributing to the content of the Investor Memorandum and approving its final version, Redwood used the materially false and misleading report to recruit additional investors, like ▓▓▓▓▓. More importantly, Redwood leveraged its principal's long-standing relationship with ▓▓▓▓ principals to convince ▓▓▓▓ to forego standard due diligence that would have immediately revealed the report's false claims about MindGeek's best in class policies and compliance and precluded ▓▓▓▓ increased investment in 2013. *Id.* ¶ 265.

After ousting Colbeck as lead lender and assuming control of the lending syndicate in 2018, Redwood assumed unilateral control over all aspects of MindGeek's business which Colbeck had wielded during the previous seven years it served as syndicate lead. *Id.* ¶¶ 272-77. This control included unilateral authority over day-to-day strategic, governance, and operational decisions concerning MindGeek's unrestricted business model, including policies about executive hiring and firing, corporate policies, compliance and technologies, traffic, SEO, verification, moderation and compliance. *Id.* ¶¶ 277-84.

Finally, beginning in around 2019 and continuing through 2021 Redwood directed MindGeek's responses and general denials to the drumbeat of escalating public reports, advocate, victim, law enforcement and regulatory complaints, and inquiries from the credit card companies concerning CSAM and nonconsensual content on MindGeek's sites. *Id.* ¶¶ 278-81.

            (b)     **<u>Colbeck and Redwood's Defenses Are Factual Disputes.</u>**

                      1.     <u>The Court Cannot Disregard the TAC's</u>

<u>Allegations</u>

Colbeck and Redwood's primary response to these detailed allegations is to ask this Court to disregard them as "implausible."  Colbeck Mot. at 5-7; Redwood Mot. at 2-3.  *Ratha II*, however, reminds that this the Court cannot do.  This argument rests on a distortion of the law.  While a court may disregard inferences from alleged facts that are not reasonable because they are implausible, it cannot simply disregard the alleged facts themselves.  This is what Colbeck and Redwood ask the Court to do.  They do so because they cannot otherwise credibly argue that if these extensive allegations are true – as *Ratha II* reminds the Court must accept – Plaintiff has plainly pleaded the elements of a TVPRA claim.  Indeed, these defendants cite no remotely similar case to support this argument.

Colbeck's and Redwood's challenges to plausibility fare no better.  They argue that their alleged conspiratorial states of mind are inconsistent with the covenants, representations, and warranties in the loan agreements requiring MindGeek to comply with all applicable laws.  Colbeck Mot. at 13-14; Redwood Mot. at 14, 16.  But "the fact that parties may have signed an agreement stating that they will not violate the law obviously does not immunize them from liability if the allegations assert, and the evidence shows, that they engaged in unlawful conduct." *Ryanair DAC v. Booking Holdings Inc.*, 636 F. Supp. 3d 490, 510 & n.13 (D. Del. 2022) (rejecting similar argument that agreement to refrain from illegal conduct supported motion to dismiss); *A.A. v. Omnicom Group, Inc.*, 2026 WL 504904, at *12 (S.D.N.Y. Feb. 24, 2026) ("Defendants dispute the foregoing allegations [of TVPRA violations], but their efforts to do so are both improper at this stage in the litigation and unavailing.  Based largely on public filings they deem incorporated into the Complaint by reference, they maintain that they provided only 'routine public relations services'. . . . But Defendants may not substitute the generic language of those filings for Plaintiffs' well-pleaded allegations."); *F.C.*, 790 F. Supp. 3d at 1190 (defendants who were engaged to ensure compliance with

1    trafficking laws, could still be liable for violations of the TVPA). At a minimum,

2    what Colbeck and Redwood knew about MindGeek's compliance with its

3    contractual and obligations and what, if any steps, they took to enforce that

4    compliance cannot be resolved on this motion prior to discovery. *F.C.*, 790 F. Supp.

5    3d at 1194 ("To be sure, the Contractors may have tried to keep the defendants in the

6    dark, but whether that is so is a fact issue to be fleshed out through discovery."

7    (citing *Doe (K.E.C.) v. G6 Hosp., LLC*, 750 F. Supp. 3d 719, 738 (E.D. Tex. 2024))).

8         Their related challenge to the plausibility of allegations concerning their roles

9    in commissioning and preparing the ███████████████████ are similarly not

10    appropriate for disposition before discovery, particularly here, where the TAC

11    alleges the Investor Memorandum was prepared based on information provided to

12    ███████████ independent assessment (TAC ¶¶ 241-45, 261-68) and details

13    numerous false statements in the Memorandum that were verifiable from a simple

14    google search or the most basic due diligence (*id.* ¶¶ 244). *See United States v.*

15    *Sarno*, 73 F.3d 1470, 1496 (9th Cir. 1995) (allegations of defendants' control over

16    the business coupled with affirmative acts to conceal illegality including through

17    preparation of a fabricated audit report was sufficient to establish an agreement to

18    conspire). On this record, plaintiffs are entitled to discovery of information uniquely

19    in defendants' possession, including communications concerning Colbeck's and

20    Redwood's role in preparing the Investor Memorandum and its knowledge

21    concerning the truth of the statements set forth therein.

22         (c)    **The TAC Does Not Impermissibly Offer Inconsistent**

23              **Allegations.**

24         Colbeck and Redwood also argue that the TAC's allegations of their unilateral

25    and operational control impermissibly reallocate these roles and functions from the

26    previously dismissed individual defendants – Bernd Bergmair, Feras Antoon, and

27    David Tassillo – to them. Colbeck Mot. at 11; Redwood Mot. at 11. But the TAC's

28    allegations of Colbeck's and later Redwood's *de facto* ownership are entirely

1  consistent with the SAC's allegation that the individuals were owners "on paper."

2  The TAC explicitly explains this structure was designed to "insulate[]" Colbeck and

3  Redwood "from responsibility for the Company's illegal business as putative

4  lender," although Colbeck and Redwood "in practice held all the material economic

5  and control indicia of ownership." TAC ¶¶ 228, 273-76. There is no tension

6  between nominal equity and actual control; the TAC alleges both—and explains

7  why. Indeed, Bergmair himself testified that although he was held out as a putative

8  owner, ███████████████████████████████████████████████████

9  ███████████████████████████████." *Id.* ¶ 228. Thus, although

10  formal equity was allocated ████████████████████████████████████

11  to certain American partners, those percentages did not correspond to actual

12  economic or, more important, operational control. *Id.* ¶¶ 240-48, 53-56.

13    The Colbeck, and later Redwood, syndicates effectively owned the Company

14  because their debt exceeded the company's assets and was fully secured by the entire

15  business; they had the *de facto* power to seize ownership of the Company's assets at

16  any time because the illegal business model placed it in default from inception and

17  throughout its existence; they wielded this *de facto* ownership control throughout the

18  period of their respective investments; and they received the economics earned

19  during the period at issue because of the enormous debt they held and exorbitant

20  interest rates charged. *Id.* ¶¶ 228-40, 259-64, 281-85, 360.

21    Likewise, the TAC's allegations that Colbeck and Redwood approved and

22  directed MindGeek's responses to reports of CSAM and illegal content (*id.* ¶¶ 242-

23  46, 253-55, 278-82) are also consistent with the prior allegations that the individual

24  defendants issued these responses at the direction of and with guidance from

25  Colbeck and Redwood. *See* SAC ¶¶ 271, 279-80.

26    Clarifying allegations which add detail, like those alleged here, are not

27  "contradictory." *See, e.g.*, *Ammari v. City of Los Angeles*, 2025 WL 2684015, at *5

28  (C.D. Cal. Aug. 19, 2025) ("The Court finds that the allegations are not

contradictory but rather merely reflect a change in [the plaintiff's] legal theory as to [the defendant]—[the defendant] is now an alleged co-conspirator in the City's alleged campaign (or ratification of the campaign) to terminate [plaintiff].”); *Ceballos v. Banda Maguey Corp.*, 2024 WL 5466649, at *4 (C.D. Cal. Dec. 19, 2024) (rejecting defendant's arguments amended complaint was contradictory and explaining the “Ninth Circuit's liberal policy favoring amendment”) (collecting cases); *Washington Schs. Risk Mgmt. Pool v. Am. Re-Ins. Co.*, 2023 WL 5036075, at *7 n.8 (W.D. Wash. Aug. 8, 2023) (explaining that additional allegations that provide further information as to defendant's conduct that go beyond the initial allegations are not contradictory).

In any event, the Ninth Circuit has made clear: “there is nothing in the Federal Rules of Civil Procedure to prevent a party from filing successive pleadings that make inconsistent or even contradictory allegations.”  *PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 860 (9th Cir. 2007); *see also Shirley v. University of Idaho, College of Law*, 800 F.3d 1193, 1194 (9th Cir. 2015) (district court erred in denying leave to amend based on perceived inconsistency with prior pleading).  For this reason, on Rule 12(b)(6) review, federal courts generally do not police perceived inconsistencies between an amended complaint and earlier iterations.  *Dolzhenko v. City of Los Angeles*, 2023 WL 3292858, at *5 n.4 (C.D. Cal. May 5, 2023) (citing *PAE Gov't Servs., Inc.*, 514 F.3d at 860).[13]  At a minimum, material questions of fact

---

[13] Colbeck and Redwood's cited cases to argue the loan agreements preclude liability are inapposite. *See* Colbeck Mot. at 13-14; Redwood Mot. at 28.  Here, Colbeck and Redwood “play[ed] an instigating or active role” in controlling MindGeek, including directing the strategy for expanding, promoting, and distributing illicit content.  *RTC v. BVS Dev., Inc.,* 42 F.3d 1206, 1214 (9th Cir. 1994); *River Colony Ests. Gen. P'ship v. Bayview Fin. Trading Grp., Inc.*, 287 F. Supp. 2d 1213, 1224 (S.D. Cal. 2003) (“A special relationship might exist where a bank, through a loan agreement, can control a borrower.”).  And *Warren v. Tinder Inc.*, simply stands for the general proposition that “conclusory allegations which are contradicted by documents referred to in the complaint” but, as explained above,

---

1    exist concerning the respective roles of the individual defendants and Colbeck and

2    Redwood.  Plaintiffs are entitled to discovery to resolve these conflicts.

3                    3.        Intent to Further the Wrongful Act.

4          Finally, at the pleading stage, Redwood's and Colbeck's intent to financially

5    benefit from MindGeek's monetization of illegal content may be inferred from the

6    same circumstantial evidence that establishes their agreement.  Dkt. 605 at 37; *see*

7    *also Pinkerton v. United States*, 328 U.S. 640, 647 (1946) ("The criminal intent to

8    do the act is established by the formation of the conspiracy.").  Here, the TAC

9    alleges that (i) Colbeck and Redwood joined the conspiracy with knowledge of the

10   investment thesis to operate and build the business via an unrestricted content model

11   (TAC ¶¶ 223-24, 226-27, 236, 256-60, 262, 285); (ii) intent to secure exorbitant

12   interest rates and economics on fully secured loans from that business which would

13   otherwise be unavailable to them from investments in legal businesses (*id.* ¶¶ 228-

14   29, 236, 256, 260-61, 285) which is further reflected in the highly atypical lending

15   terms (including a loan amount that exceeded the entire value of the company) (*id.* ¶

16   240); (iii) increased their investments in 2013 after becoming intimately aware of the

17   Company's policies and tolerance for CSAM and other nonconsensual content from

18   their direct involvement in implementing that strategy over the past two years (*id.* ¶¶

19   239-52, 257-69, 285); (iv) continued to finance the business even after it was

20   publicly reported that child porn and other illegal content was ubiquitous on

21   MindGeek's tubesites and that the founders of MindGeek's partner channel, GDP,

22   was convicted on federal sex trafficking charges (*id.* ¶¶ 278-85), and (v) in the case

23   of Redwood, deciding to buy-out Colbeck through a substantial settlement payment

24   in 2018, replace Colbeck as the lead lender in 2018 and increase its interest rates in

25

26   there is no contradiction.  Memorializing on paper a general agreement to not violate
     the law does nothing to address the factual allegations of Colbeck and Redwood's
27   control and furtherance of the proliferation of CSAM and illicit content.

28

2020 after further evidence of illegal activities were revealed. *Id.* ¶¶ 271-84. *See United States v. Curtis*, 635 F.3d 704, 719-20 (5th Cir. 2011) (evidence that defendant "received the lion's share of [the] proceeds" coupled with the overt act to hire recruiters to locate straw buyers "was easily sufficient to allow the jury to find that [the defendant] was a knowing and voluntary participant in the conspiracy.").[14]

Redwood and Colbeck argue that their investments in fixed interest rate loans and thus had no profit incentives to participate or further MindGeek's unlawful activities. Redwood Mot. at 21-23; Colbeck Mot. at 21-22. But the TAC alleges that the exorbitant fixed interest rates on fully secured loans these defendants secured from MindGeek were only available to them because of the illegal nature of the business because traditional sources of capital declined to invest in this business model. In short, the allegation is not that they happened to provide a standard loan to a business engaged in illegality but that they provided an extraordinary loan and received extraordinary economics because it was an illegal business that no one otherwise would finance and they had to lie to investors to get them to finance. TAC ¶¶ 228-29, 236, 256, 260-61, 285.

Indeed, the TAC also alleges that MindGeek's ability to repay the amounts due on these loans was dependent on capturing both legal and illegal content (*id.* ¶¶ 240, 281, 283-84), and preserving that illegal business even in the face of ongoing and escalating public reporting and victim and advocate complaints (*id.* ¶¶ 254-55, 279-84), that Defendants knew this and thus directed efforts to maximize traffic (*id.* ¶¶ 223-24, 226, 232, 240, 248, 260), minimize moderation (*id.* ¶¶ 224, 284), conceal illegality (*id.* ¶¶ 233, 235, 241-45, 250-52, 254-56, 262-67, 269-70, 272-73, 275,)

---

[14] *Compound Prop. Mgmt., LLC v. Build Realty, Inc.*, 462 F. Supp. 3d 839, 864–65 (S.D. Ohio 2020)), cited by Colbeck (Colbeck Mot. at 21), is inapposite because the "the lending entity received what Plaintiffs themselves admit is a commercially reasonable rate of return on those loans," and the only other "allegations that a lending company engaged in due diligence with regard to its lending activities" does not suffice to infer an agreement or intent to conspire. *Id.* at 865.

1  and minimize public scrutiny in response to the public reporting and complaints.  *Id.*

2  ¶¶ 255, 278-85.  It is for these reasons that after the December 2020 *New York Times*

3  article exposed that MindGeek's websites were rife with CSAM, Redwood did not

4  declare a default or foreclose on its loan.  *Id.* ¶¶ 278-84.  Instead, it increased its

5  interest rates, and restricted dividend payments to ███████████████████ so

6  that it could more quickly repay itself back from the illegal proceeds of the business

7  before it risked potential shut-down.  *Id.* ¶¶ 281-84.  And it directed and sanctioned

8  MindGeek's general denials of illegality so that it could preserve the business and its

9  economics, and its principal, ████████ personally commended MindGeek on its

10  efforts to do so.  *Id.* ¶¶ 278-282.  Thus, in contrast to *Deutsche Bank*, (*Doe 1 v.*

11  *Deutsche Bank,* 671 F. Supp. 3d 387, 406-07 (S.D.N.Y. 2023)), which was

12  indifferent to Jeffrey Epstein's sex trafficking activities but nevertheless processed

13  certain payments associated with those activities so that it could continue to generate

14  hundreds of millions of dollars in profits from his legal businesses, here, Colbeck's

15  and Redwood's motive and intent in financing MindGeek's business was the

16  enormous profits it would secure from the illegal business itself.

17        Finally, Colbeck's and Redwood's concerns that imposition of conspiracy

18  liability here would erase any limiting principal and extend liability to any neutral

19  vendor engaged in a commercial relationship with a TVPRA beneficiary (Colbeck

20  Mot. at 1; Redwood Mot. at 26), has been squarely rejected by the recent decision in

21  *F.C. v. Jacobs Sols. Inc.*, 790 F. Supp. 3d at 1190 (cleaned up), which explained that

22  the "required [] personalized services or services delivered with tacit approval of the

23  venture's TVPRA violations," would "exclude run-of-the-mill service providers."

24  Other TVPRA requirements, "such as scienter . . . further circumscribe potential

25  liability." *Id.* Redwood and Colbeck ignore that the limiting principle is not merely

26  knowledge, but their agreement and intent – a combination a neutral vendor would

27  not have.

28

4.    <u>Commission of an Overt Act</u>

The TAC alleges that Colbeck arranged and provided hundreds of millions of dollars in financing to MindGeek, designed, directed, and controlled the acquisition, expansion, and growth of its business, exercised unilateral control rights over the business which it knew was engaged in commercializing child porn and other illegal content, and directed MindGeek's denials of public reports and concrete reports of illegality.[15]  TAC ¶¶ 223-256.  Each of these is a separate overt act in furtherance of a conspiracy.  *See United States. v. Matta-Ballesteros*, 71 F.3d 754, 765 9th Cir. 1995) ("Acts which seem otherwise innocent, when viewed in the context of the surrounding circumstances, may justify an inference of complicity.").

Moreover, where, as here, an agreement to conspire has been inferred, conspirators are "liable for every substantive offense committed in furtherance of the conspiracy." *Id*.  Thus, a defendant need not commit an overt act at all.  *See Pinkerton*, 328 U.S. at 646-47 (citations omitted).  Applying this black-letter law, at a minimum, Colbeck is liable for each of the overt acts committed by MindGeek, Redwood, and Visa in furtherance of the conspiracy to profit from the commercialization and monetization of sex trafficking.  *See* Dkt. 608 at 29 (finding Plaintiffs plausibly alleged MindGeek knowingly benefitting from the trafficking venture).

Colbeck's attempt to distance itself from the conspiracy on the grounds that "videos of most Plaintiffs were discovered on MindGeek's websites, after the CB Defendants exited any loans to the MindGeek Borrowers," (Colbeck Mot. at 23), is likewise unavailing.  This Court has previously rejected this argument and recognized that Colbeck may face liability for the harm caused while it was a

---

[15] Neither Visa nor Redwood contest that the TAC alleges overt acts in furtherance of the conspiracy and thus have waived this argument.  *See Autotel v. Nevada Bell Tel. Co.*, 697 F.3d 846, 852 n.3 (9th Cir. 2012) ("[a]rguments raised for the first time in a reply brief are waived") (citation omitted).

member of the conspiracy (as well as the harm caused after the maturation of its loan) where, as here, Colbeck did not specifically repudiate the conspiracy.  *See* Dkt. 605 at 34 ("TVPRA permits suit against anyone who 'conspires to benefit' from participation in a sex trafficking venture"); s*ee also United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992) ("[O]nce an overt act has taken place . . . the defendant is liable despite his later withdrawal."); *United States v. Cruz-Ramirez*, 2011 WL 5599630, at *5 (N.D. Cal. Nov. 17, 2011) (defendant's participation in a conspiracy is deemed to continue until the defendant affirmatively repudiates the conspiracy).  These holdings extend liability to Colbeck here, where the TAC alleges that Colbeck was forced out—it did not voluntarily withdraw.

## II.    THE TAC PLEADS BENEFICIARY LIABILITY AS TO COLBECK AND REDWOOD

### A.    The TAC Pleads Colbeck's and Redwood's Participation In A Trafficking Venture.

The Ninth Circuit's recent decision in *Ratha II* holds that beneficiary liability under the TVPRA is much broader than that previously applied by this Court in dismissing these claims against Visa,[16] Colbeck, and Redwood in the SAC. Specifically, *Ratha II* explicitly rejects any interpretation of "participation" that limits the ordinary meaning of that word in the context of beneficiary liability.

Rather, the Ninth Circuit made clear all that is required "to take part in or share with others in common or in association."  *Ratha II*, 2026 WL 480006, at *14. Consequently, the Ninth Circuit held the district court erred in requiring "some action to operate or manage the venture" as "too high a bar; one can participate in a venture without operating or managing it."  *Id.* (citing *Chacon v. Wilkinson*, 988 F.3d 1131, 1134 (9th Cir. 2021) (holding that we interpret a term according to its ordinary meaning when Congress does not define it)).  For the same reason, this

---

[16] Based on this new law and standards, Plaintiffs intend to move for reconsideration of the Court's with prejudice dismissal of its beneficiary liability claim against Visa.

Court's prior holding that "participation" requires a direct relationship with the trafficker (Dkt. 605 at 21-22) conflicts *with Ratha II*.  While a direct relationship with the trafficker is certainly one way to participate in a venture, restricting the meaning of participation to this one example would impose a far greater limitation on the ordinary meaning of "participation" than the "manage and operate" limitation *Ratha II* rejected.  *Ratha II*, 2026 WL 480006, at *14.  As defined by the Ninth Circuit, "participation" requires only "[t]he act of taking part in something."  *Id.* Nothing else.  Management, operational control, or a direct relationship with the trafficker may constitute "taking part" but so do the extensive TAC's extensive allegations describing how Visa, Colbeck, and Redwood took part.  And it cautioned when analyzing this element, that the Court must construe all facts and inferences in the light most favorable to the Plaintiff.  *Id.*

In its September 17, 2025 order dismissing the SAC's beneficiary liability claims against Redwood and Colbeck, this Court held that section 1595(a) requires a beneficiary defendant to have a "direct association with traffickers . . . not just with a party that is liable for beneficiary liability."  Dkt. 605 at 21-22.  Because the SAC did not allege a direct association between Colbeck or Redwood and Plaintiff's street-level trafficker, the Court concluded those defendants were "one step removed" from plaintiff's sex trafficking and could not be held liable under a beneficiary theory.  *See id.*  The Order explained that these extra-statutory requirements of direct association and day-to-day operational control served as limiting principles against neutral vendor liability in every commercial transaction.  *Id.* at 22-23.

Relying exclusively on that Order, Redwood and Colbeck each argue that the TAC's beneficiary liability claims asserted against them should again be dismissed because the TAC, like the SAC, fails to allege any direct association between defendants and Plaintiff's street level traffickers. Colbeck Mot. at 15-16; Redwood Mot. at 8.  But as explained *supra* (*Ninth's Circuit's En Banc Decision in Ratha*),

since this Court issued its prior ruling (and after Defendants filed their motions to dismiss in this case), *Ratha II* rejected the imposition of extra-statutory restrictions on participation and significantly expanded its reach.  *Ratha II*, 2026 WL 480006, at *12-13; *see also A.A.*, 2026 WL 504904, at *11-12 (sustaining beneficiary liability claims against defendant public relations firm arising from participation in a venture with another beneficiary of the venture).

In so ruling, the Ninth Circuit cited favorably the Eleventh Circuit's holding in *Doe # 1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 724-25 (11th Cir. 2021), *Ratha II*, 2026 WL 480006, at *14, which Plaintiff previously argued to this Court rejected the extra-statutory requirement of a direct relationship between the beneficiary defendant and plaintiff's street level trafficker.  Dkt. 477 at 10.  In rejecting Plaintiff's argument, the Court held that the holding in *Red Roof* was distinguishable insofar as it involved allegations that the hotel franchisor "exercised control over the day-to-day operations of the underlying business venture in a way that is not alleged" in the SAC.  Dkt. 605 at 22-23.  Thus, the Court concluded that absent a direct relationship, participation requires day-to-day management over the venture and its trafficking activities.  *Id.* at 21-22  It reasoned that imposing beneficiary liability without this direct association or corresponding day-to-day control risked eliminating any limiting principle and would effectively expose suit to a long-line of downstream actors.  *Id.*

*Ratha II* rejected the extra-statutory requirement and the limiting principle it was designed to protect.  *Ratha II*, 2026 WL 480006, at *14 (holding participation does not require some operational or managerial involvement in the direct trafficking).  Instead, the Ninth Circuit gave effect to Congress's intent that TVPRA liability be broad and expansive consistent with the statute's remedial purpose.  *Id.* at *13.  Because Congress did not write such limiting principle into the statute, the Ninth Circuit held it not for Courts to impose.

Under the new standard articulated by the Ninth Circuit, all that is required

is that a defendant participates in a venture with knowledge that some participant is engaged in trafficking. *Ratha II*, 2026 WL 480006, at *14. A "venture" includes any "commercial ventures" including those engaged in purely commercial businesses. *See G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 554 (7th Cir. 2023) ("While a "venture" can certainly run the gamut from an isolated act of sex trafficking to an international sex-trafficking enterprise, it can also be a business whose primary focus is not on sex trafficking."); *see also* 18 U.S.C. § 1591(e)(6) (defining venture as "any group of two or more individuals associated in fact"). The venture does not need to be one created for sex trafficking or have trafficking as its primary purpose. *See J.C. v. Choice Hotels Int'l, Inc.*, 2020 WL 6318707, at *7 (N.D. Cal. Oct. 28, 2020) (rejecting argument that the venture must be a sex trafficking venture). There is no requirement that the beneficiary defendant itself engages in sex trafficking or have knowledge of plaintiffs' specific trafficking, just actual or constructive knowledge of the venture generally. *G.G.*, 76 F.4th at 554-55; *A.A.*, 2026 WL 504904, at *11-12.

Applying this newly expanded paradigm to the facts alleged in this case mandates reversal of the Court's prior dismissal of the beneficiary claims against Redwood and Colbeck. As set forth *supra*, Section I, the TAC plainly alleges each defendants' participation in the venture to grow and expand MindGeek's business, and the continuous, active, , customized services, and trafficking specific support. This is plainly sufficient under *Ratha II*'s standards. *Ratha II*, 2026 WL 480006, at *14*; see also Akhmad v. Bumble Bee Foods, LLC*, 2025 WL 3158655, at *8 (S.D. Cal. Nov. 12, 2025) (finding participation alleged where the defendant fishing vessel operators helped to obtain an MSC certificate by providing "significant ongoing financial investment and business advice."); *Bank of America*, 2026 WL 380385, at *8 (imposing beneficiary liability where defendants provided "premier services" and "facilitat[ed] the transfer of tens of thousands of dollars into and out of [the] account," despite facts raising suspicion that the transactions were not

legitimate).  In any event, the TAC also alleges Redwood's and Colbeck's day-to-day operational control over the venture which this Court previously held was required to impose beneficiary liability based exclusively on relationships with another beneficiary of a sex trafficking venture.  As set forth *supra*, Section I.B, contrary to Redwood's and Colbeck's assertions, their active, customized and tailored support, went well "beyond merely providing their usual services."  *Bank of America*, 2026 WL 380385, at *9.

The TAC alleges that Redwood, like Colbeck before it, directed and controlled every aspect of the business operations, including policies and responses to CSAM, moderation, enforcement, and content removal.  *See supra* Section I.B . And when "numerous high profile media reports began broadly exposing MindGeek's illegal operations to the general public," rather than declaring a default or foreclosing on its loan, Redwood directed and approved MindGeek's responses and its efforts to conceal the illegality that was rampant on its website.  TAC ¶¶ 278-80.  This alone is sufficient to establish participation.  *See A.A.*, 2026 WL 504904, at *11-12.  (sustaining allegations of beneficiary liability against PR firm based on its role collaborating with [a third defendant] to whitewash Qatari labor abuses in support of the [] Venture).  *Id.* at *12.

**B.     Colbeck and Redwood Had Knowledge of the Trafficking Venture**

As detailed above, the TAC alleges Colbeck's and Redwood's actual knowledge of MindGeek's monetization of child pornography and illegal content. *See supra* Section I.B.1.  It also alleges their constructive knowledge of the trafficking venture generally, which is all that is required under section 1591(a)(1). *See* Dkt. 605 at 21; *see also Doe (A.L.G.) v. Wyndham Hotel & Resorts, Inc.*, 2024 WL 5371983, at *4 (W.D. Tex. Nov. 21, 2024), *R. & R. adopted*, 2025 WL 567561 (W.D. Tex. Feb. 19, 2025) (franchisor defendants' knowledge of specific plaintiffs' trafficking was not required to state a claim).

Among other things, the TAC alleges that Redwood and Colbeck had access to significant reporting and information from which it reasonably should have determined that MindGeek was operating an unrestricted business model and monetizing illegal content.  That information included, among other things, comprehensive due diligence before it made its initial investments, increased them, and throughout the course of their respective loans, in-depth investigations and financial modeling, reporting received from third parties that highlighted the risk of "illegal material" distributed on Mansef's tubesites TAC ¶¶ 226-33, 264–69, media reports identifying CSAM on MindGeek's sites, and complaints from victims, advocates, and regulators.  *Id*. ¶¶ 233-34, 278-81.  These allegations are more than sufficient to establish constructive knowledge of a trafficking venture. *Doe (A.L.G. Doe (A.L.G.)*, 2024 WL 5371983, at \*4 n.1.(constructive knowledge of trafficking was available "through their monitoring channels, as well as by way of an agency theory."); *T.E. v. Wyndham Hotels & Resorts, Inc.*, 2024 WL 474400, at \*5 (S.D. Ohio Feb. 7, 2024) (finding constructive knowledge based on access to public policy and internal reports generated by hotel staff); *Edmondson*,'" *Edmondson v. Raniere*, 751 F. Supp. 3d 136, 181 (E.D.N.Y. 2024) (inferring knowledge from false campaigns and denials); *Ratha II*, 2026 WL 480006, at \*14 (emphasis in original); *see also Brown*, 603 F .Supp. 2d at 81 (failure to adopt remediation measures constituted constructive knowledge in 1983 case).

These TAC allegations far exceed those in *Ratha II* that the Ninth Circuit held the district court had "doubly erred" in finding insufficient.  Indeed, *Ratha II* held that the defendant's alleged awareness of a single whistleblower report or, alternatively, that a single customer had refused to do business with the defendant's alleged co-conspirator, were each alone sufficient to establish the element of knowledge.  As set forth herein, the TAC alleges identical facts to these and far more.

### III.    THE TAC PLEADS UCL CLAIMS AGAINST ALL DEFENDANTS.

In granting leave to amend, the Court directed Plaintiffs to provide clarity for the UCL claims. Dkt. 604 at 45-46.  Plaintiffs have done so by pleading UCL claims arising only from acts specified in the pleadings. Plaintiffs provide specific allegations concerning why Defendants' conduct violates the UCL as "[i] unlawful, [ii] unfair [and] [iii] fraudulent.  Cal. Bus. & Prof. Code § 17200.

*First*, Plaintiffs have pleaded violations of the TVPRA which meets the "unlawful" practices prong against Visa, Colbeck, and Redwood.  *See, e.g.*, TAC ¶ 287 (Visa), ¶ 226 (Colbeck), ¶¶ 276-78 (Redwood); *see also Eidmann v. Walgreen Co.*, 522 F. Supp. 3d 634, 647 (N.D. Cal. 2021) (UCL claim fails only where plaintiff "cannot state a claim under the predicate law").  In *Ratha II*, the Ninth Circuit en banc vacated the previous holding that TVPRA did not apply to pre-2023 conduct and found that the TVPRA is retroactive.  2026 WL 480006, at *13. Therefore, *Ratha II* has eliminated the concerns that the UCL would allow a plaintiff to circumvent the Court's ruling regarding pre-2023 TVPRA liability through the UCL.  *See* Dkt. 605 at 45, 48.

*Second*, Plaintiffs have pleaded an "unfair" business practice against Defendants under the UCL.  *See McDonald v. Coldwell Banker*, 543 F.3d 498, 506 (9th Cir. 2008) (an unfair business practice under the UCL is "one that either offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers").  California has criminalized sex trafficking, *see, e.g.*, Cal. Penal Code §§ 311.1, 311.2, 311.5, 311.10, (criminalization of CSAM), *id.* § 647(4)(A)(i) (distribution of intimate images),[17] and has a strong public policy against the practices Plaintiffs allege Visa, Colbeck, and Redwood participated in by enabling both the monetization and expansion of an unfettered SEO model dependent on illicit content.  *See In re Anthem, Inc. Data Breach Litig.*,

---

[17] These laws can also serve as a basis for Plaintiffs' claims under the "unlawful" practices prong.

162 F. Supp. 3d 953, 990 (N.D. Cal. 2016) (whether "[d]efendants' public policy violation is outweighed by the utility of their conduct under the balancing test is a question to be resolved at a later stage in this litigation").  Thus, Defendants' respective actions "offend[] an established public policy."  *McDonald*, 543 F.3d at 506.

*Third*, Plaintiffs have pleaded a UCL claim predicated on Defendants' respective fraudulent business practices, which does not require a standalone fraud claim.  *See In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009) ("The fraudulent business practice prong of the UCL has been understood to be distinct from common law fraud" and "none of the[] elements of [actually false, known to be false by the perpetrator and reasonably relied upon by a victim who incurs damages] are required to state a claim.").  The TAC alleges Visa,[18] Colbeck, and Redwood engaged in "fraudulent" business practices against the public.  *See, e.g.*, TAC ¶ 311 ("**Visa** and MindGeek repeatedly coordinated their public comments to misrepresent that MindGeek's operations were legal and in compliance with Visa's standards."); *id.* ¶ 241 ("Accordingly, to secure the additional financing needed to fuel MindGeek's growth plan, **Colbeck** conspired with MindGeek to misrepresent to potential lenders that MindGeek had appropriate controls, stringent prohibitions against CSAM and other illegal content, and was not engaged in illegal activities"); *id.* ¶ 280 ("Thus, in their role as de facto owners, **Redwood** directed MindGeek to respond to the New York Times expose with bogus declarations about its commitment to meaningful moderation and announced changes to its practices.").

---

[18] Visa's reliance on *Emery v. Visa Int'l Serv. Ass'n*, 95 Cal. App. 4th 952 (2002), is unavailing because the summary judgment record in *Emery* showed Visa exercised no control over preparation, unlike the TAC, which alleges Visa's ongoing relationship with MindGeek, and Visa's own participation in, and control over, the challenged practices, including granting bespoke compliance exemptions, approving payment architectures that delegated monitoring to MindGeek-controlled entities, etc.  *See* TAC ¶¶ 286–311, 422–423.

Thus, the Court should reject Defendants' arguments that Plaintiffs have failed to state a UCL claim.  *See* Visa Mot. at 21; Colbeck Mot. at 26; Redwood Mot. at 29.  Plaintiffs have stated a claim under each of the three UCL prongs.

## IV.    THE TAC PLEADS CIVIL CONSPIRACY CLAIMS AGAINST DEFENDANTS.

Plaintiffs allege Defendants conspired to commit unlawful acts by "shar[ing] the same conspiratorial objective, which was to maintain, receive, stream, distribute, reupload, monetize, and profit from CSAM and other nonconsensual content and/or to benefit financially from such distribution so as to maximize profits and to do so while deceiving the public to believe that all content." TAC ¶ 441.  Plaintiffs provide specificity by incorporating by reference the detailed allegations of the TAC.  *Id.* ¶ 440.

Defendants argue Plaintiffs have failed to plead a predicate UCL claim, lenders are immunized for liability, and Plaintiffs failed to plead agreement, knowledge or intent.  Visa Mot. at 19-21; Colbeck Mot. at 24-26; Redwood Mot. at 27-29.  But each argument fails.

*First*, Plaintiffs have properly stated a claim for violations of the UCL and other alleged California torts.  The guardrail elements of knowledge, agreement, and intent provide the necessary limiting principles for asserting conspiracy liability based on these claims.

*Second*, lenders are not immune where, as here, the "lender plays an instigating or active role in [the development of MindGeek]," thus imposing a duty under California law.  *RTC,* 42 F.3d at 1214; *Aetna Cas., Sur.*, 219 F.3d at 536 ("A bank, however, is not immune from civil aiding and abetting claims").

*Third*, under California law, "the major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tortfeasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of his activity." *Applied Equip. Corp.*

*v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 511 (1994).  "[K]nowledge and intent may be inferred from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators, and other circumstances.'"  *Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1582 (1995) (cleaned up).  And, just like a TVPRA conspiracy, an agreement may be tacit as well as express.  *See Navarrete v. Meyer*, 237 Cal. App. 4th 1276, 1292 (2015). Thus, "all coconspirators are liable for acts done during continuance of a conspiracy and in furtherance of some purpose of the conspiracy even though the acts may have occurred without the knowledge of one of the defendants, and it is not necessary that each defendant have knowledge of each act." *El Ranco, Inc. v. First Nat. Bank of Nev.*, 406 F.2d 1205, 1216 (1968); *accord BBD Transp. Co. v. S. Pac. Transp. Co.*, 627 F.2d 170, 173 (9th Cir. 1980) ("To be liable as a co-conspirator for the anticompetitive acts of the steel companies, the railroads need not have known of or participated in those acts themselves.").

As with the TVPRA conspiracy claim, Plaintiffs have extensively alleged Visa, Colbeck, and Redwood's agreement and intent to further the tortious conduct. *See Kidron*, 40 Cal. App. 4th at 1582 ("[K]nowledge and intent 'may be inferred from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators, and other circumstances.'").  Accordingly, Plaintiffs have pleaded a state civil conspiracy claim against Defendants.

## V.   COLBECK AND REDWOOD'S STATUTE OF LIMITATIONS ARGUMENTS FAIL AS A MATTER OF LAW.

In the latest round of briefing, Colbeck and Redwood seek to rehash their statute of limitations argument, asserting Plaintiffs' state law claims are time-barred because the lending relationships ended in 2018; several Plaintiffs discovered their injuries years ago; and naming "Colbeck Capital Does 1-10" in the initial complaint does not permit relation back.  Colbeck Mot. at 28-31; Redwood Mot. at 29 n.17. None of these arguments supports dismissal at the pleading stage, however. The

1  Court did not dismiss on this basis in its prior order, *see* Dkt. 605, and it should

2  decline to do so now.

3     Under California law, a civil conspiracy claim accrues from "the time of the

4  last overt act committed in furtherance of the conspiracy," not from the date of the

5  original agreement or a defendant's entry into the relationship. *People v. Zamora*,

6  18 Cal. 3d 538, 548 (1976); *see also Lauter v. Anoufrieva*, 642 F. Supp. 2d 1060,

7  1099 (C.D. Cal. 2009).  The relevant question, therefore, is when *any* of the

8  Defendants – not just Colbeck or Redwood – last acted to advance the venture.

9  Further, that Colbeck's loans concluded in 2018 does not show affirmative steps to

10 withdraw from the conspiracy as a matter of law. *See supra* Section II (4).

11    In any event, a statute of limitations defense may be resolved on a motion to

12 dismiss only when the running of the statute is apparent on the face of the complaint.

13 *See Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206-07 (9th Cir. 1995).

14 Where a complaint plausibly alleges tolling, delayed discovery, or continuing

15 conduct, dismissal is improper. *Id.* Plaintiffs allege Defendants concealed their role

16 in financing and preserving the unrestricted-content model well past 2018. Those

17 allegations alone preclude dismissal.  *See Bernson v. Browning-Ferris Industries*, 7

18 Cal. 4th 926, 931 (1994) (fraudulent concealment tolls the statute where a

19 defendant's conduct prevents discovery of its role).[19]

20    Colbeck's attack on relation back under California Code of Civil Procedure §

21 474 likewise fails.  Section 474 permits amendment where a plaintiff is genuinely

22 ignorant of a defendant's identity or the facts rendering that defendant liable at the

23 time of filing. *See Barrio v. County of San Bernardino*, 2020 WL 4037169, at *3

24 (C.D. Cal. July 17, 2020).  California courts apply § 474 liberally in favor of

25 adjudicating cases on the merits.  *Id.*  Here, Plaintiffs did not know, before

26

27 [19] For the same reason, Colbeck's plaintiff-specific challenges fail.  It is Plaintiffs'
   discovery of Colbeck's involvement that governs, not the date each discovered their
28 videos online.

jurisdictional discovery, which specific Colbeck or Redwood entities were the operative lending vehicles or origination agents. Courts permit relation back where, as here, the amendment relies on same core facts and jurisdictional discovery identified the proper defendants. *See, e.g.*, *Barrio*, 2020 WL 4037169, at *3.

Colbeck's reliance on two-year limitations periods for the California tort claims fares no better. Plaintiffs allege continued hosting, monetization, and concealment of illicit material during and after Colbeck's involvement. California recognizes that "separate, recurring invasions of the same right can each trigger their own" limitations periods. *Aryeh v. Canon Business Solutions, Inc.*, 55 Cal. 4th 1185, 1199 (2013). Where, as here, Plaintiffs allege repeated acts of concealment, monetization, and preservation of the unlawful enterprise, each such act independently supports timely accrual. Redwood's separate UCL argument fails for the same reasons. UCL claims are subject to a four-year statute of limitations. Cal. Bus. & Prof. Code § 17208. Accrual is also governed by *Aryeh*, 55 Cal. 4th at 1192-99. Plaintiffs allege post-2018 concealment and continued conduct within the relevant period. At minimum, accrual and tolling present factual questions that cannot be resolved on a motion to dismiss.

Colbeck and Redwood's statute-of-limitations arguments depend on treating the alleged conspiracy as ending the moment the loans were repaid and ignoring allegations of continued overt acts, concealment, lack of repudiation, and delayed discovery. California law does not permit accrual to be manipulated in this manner. Defendants' limitations defenses fail as a matter of law.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Colbeck, Redwood, and Visa's motions to dismiss.

DATED: March 6, 2026          Respectfully submitted,

                              BRITHEM LLP


                         By:  /s/ Michael J. Bowe
                              Michael J. Bowe (*pro hac vice*)
                              Lauren Tabaksblat (*pro hac vice*)
                              David M. Stein (SBN 198256)
                              Nancy M. Olson (SBN 260303)

                              Attorneys for Plaintiff
                              SERENA FLEITES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### CERTIFICATE OF COMPLIANCE

The undersigned counsel of record for Plaintiff Serena Fleites certifies that this brief contains 60 or fewer pages, as stipulated by the parties, ECF No. 653.

DATED:      By: /s/ Michael J. Bowe